IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| TODD TARGGART, individually and on behalf of all others similarly situated, | § § § § | |
| Plaintiff, | § | Case No. 4:24-cv-00767-P |
| v. | § § | CLASS ACTION |
| NEXT BRIDGE HYDROCARBONS, INC., ROBERT L. COOK, CLIFTON DUBOSE, JR., JOSEPH DEWOODY, LUCAS T. HAWKINS, DELVINA OELKERS, MIA PITTS, KRISTIN WHITLEY, GREGORY MCCABE, and JOHN BRDA, | § § § § § § § § | JURY TRIAL DEMANDED |
| Defendants. | § § | |

---

**PLAINTIFFS' AMENDED COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

---

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ............................................................................. 1

II.     JURISDICTION AND VENUE ...................................................................... 3

III.    PARTIES ........................................................................................................ 4

        A.      Plaintiffs ............................................................................................ 4

        B.      Defendants ......................................................................................... 4

IV.     BACKGROUND ............................................................................................ 6

        A.      Corporate History ............................................................................. 6

        B.      Torchlight's O&G Assets ................................................................. 10

                1.      Orogrande Assets .................................................................. 10

                2.      Hazel Assets .......................................................................... 11

                3.      Oklahoma Assets ................................................................... 12

        C.      The Orogrande Assets Were Substantially Worthless at All Relevant Times. ...... 12

                1.      NBH restated the value of the O&G Assets after the Spin-Off. ............... 15

                2.      Meta Materials impaired the O&G Assets after the Spin-Off. ................. 17

                3.      The Orogrande Assets have historically been substantially worthless. .... 20

V.      THE REGISTRATION STATEMENT ......................................................... 24

        A.      O&G Assets ..................................................................................... 24

        B.      Audit Committee Functions and Financial Statements ...................... 25

        C.      Regulation S-K Violations ............................................................... 28

VI.     CLASS ACTION ALLEGATIONS ............................................................. 31

COUNT I ................................................................................................................. 32

COUNT II ................................................................................................................ 33

COUNT III ............................................................................................................... 34

PRAYER FOR RELIEF ........................................................................................... 47

DEMAND FOR JURY TRIAL ................................................................................ 48

APPENDIX A ........................................................................................................... 49

APPENDIX B ........................................................................................................... 50

Lead Plaintiffs Todd Targgart, Mohammed Limon, and Steven Martinez ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of documents filed by Next Bridge Hydrocarbons, Inc. ("NBH" or the "Company") with the United States Securities and Exchange Commission ("SEC"), wire and press releases, analyst reports and news articles, information readily obtainable on the Internet, and other available material and data. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.      This is a federal securities class action on behalf all persons or entities that acquired shares of NBH in connection with the Company's spin-off from Meta Materials, Inc. ("Meta Materials") on December 14, 2022, and were damaged as a result thereof (the "Class"). Plaintiffs, on behalf of the Class, pursue remedies under Sections 11, 12, and 15 of the Securities Act of 1933, 15 U.S.C. §§77k, 77l, 77o (the "Securities Act").

2.      NBH dates back several years to an earlier company named Torchlight Energy Resources, Inc. ("Torchlight"). Torchlight was an oil and gas company that operated primarily in the Orogrande Basin in West Texas under the control of Defendant Gregory McCabe.

3.      In June 2021, Torchlight merged into a Canadian company named Metamaterial Technologies Inc. ("Metamaterial"). In connection with the merger, legacy Torchlight shareholders received shares of non-voting Meta Materials preferred stock (the "Preferred Stock") through a special dividend (the "Preferred Dividend"). The Preferred Stock corresponded to the

1

oil and gas assets that historically belonged to Torchlight but were acquired by Metamaterial during the merger (the "O&G Assets"). Holders of the Preferred Stock would be entitled to receive either proceeds from the sale of the O&G Assets or, if the assets were not sold by a certain date, equity in a spin-off entity that would own the O&G Assets.

4.      Meta Materials did not sell the O&G Assets and, consequently, spun them off into NBH. To effectuate the spin-off, on July 14, 2022, NBH filed a registration statement on Form S-1 with the SEC, followed by several amendments and a final prospectus (collectively, the "Registration Statement"). The Registration Statement became "effective" on November 18, 2022.

5.      On December 14, 2022, Meta Materials completed the spin-off of the O&G Assets to NBH and, as a result, holders of Meta Materials' Preferred Stock received new shares in NBH pursuant to the Registration Statement (the "Spin-Off").

6.      The Registration Statement contained untrue statements of material fact and/or omitted to state material facts to make the statements therein not misleading. In pertinent part, the Registration Statement misstated:

a)      The value of the O&G Assets. According to the Registration Statement, the O&G Assets were worth $47,293,607 as of September 30, 2022. This was not true. Historically, the O&G Assets were never worth anything close to that amount and sure enough, NBH later wrote down the value of the O&G Assets to $0; and

b)      NBH and its Audit Committee's ability to present accurate financial statements. Despite having an Audit Committee and independent auditor tasked with ensuring the accuracy of NBH's financial statements, the Registration Statement's financial statements contained material errors;

2

      c)      Information required under Item 404 of Regulation S-K concerning a related-party transaction involving certain O&G Assets. This related-party transaction allowed Defendant McCabe to intercept oil and gas revenues belonging to NBH. The Registration Statement did not disclose material information concerning this transaction, as required.

7.     Plaintiffs' claims under the Securities Act impose a stringent standard of liability. Liability is virtually absolute whenever false or misleading information is included in a registration statement. NBH's Registration Statement contained false information. Consequently, Defendants violated Sections 11, 12, and 15 of the Securities Act of 1933, 15 U.S.C. §§77k, 77l, 77o. Shareholders who received NBH shares as a result of the Registration Statement and Spin-Off have been damaged as a result of Defendants' violations of the Securities Act.

## II.    <u>JURISDICTION AND VENUE</u>

8.     The claims asserted herein arise under and pursuant to Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, 77o).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v(a)).

10.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 22 of the Securities Act (15 U.S.C. § 77v(a)).

11.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.    PARTIES

####     A.    Plaintiffs

12.    Plaintiff Todd Targgart acquired 16,500 shares of NBH on December 13, 2022 pursuant and traceable to the Registration Statement and suffered damages as a result thereof. Mr. Targgart acquired his NBH shares as a result of owning 16,500 shares of MMTLP at the time of the Spin-Off. Mr. Targgart acquired these MMTLP shares as described in Appendix A attached hereto.

13.    Plaintiff Mohammad Limon acquired 30,000 shares of NBH on December 13, 2022 pursuant and traceable to the Registration Statement and suffered damages as a result thereof. Mr. Limon acquired his NBH shares as a result of owning 30,000 shares of MMTLP at the time of the Spin-Off. Mr. Limon acquired these MMTLP shares on July 7, 2021 pursuant to the Preferred Dividend.

14.    Plaintiff Steven Martinez acquired 19,108 shares of NBH on December 13, 2022 pursuant and traceable to the Registration Statement and suffered damages as a result thereof. Mr. Martinez acquired his NBH shares as a result of owning 19,108 shares of MMTLP at the time of the Spin-Off. Mr. Martinez acquired these MMTLP shares as described in Appendix B attached hereto.

####     B.    Defendants

15.    Defendant NBH describes itself as an energy company engaged in the development of oil and gas properties in the United States. It was incorporated in the State of Nevada on August 31, 2021, and operated as a subsidiary of Meta Materials prior to the Spin-Off. Subsequent to the Spin-Off, NBH operates independently from Meta Materials. NBH currently maintains its principal executive offices at 6300 Ridglea Place, Suite 950, Fort Worth, Texas.

16.    Defendant Robert L. Cook ("Cook") was one of NBH's directors when the

Registration Statement was initially filed. Cook signed the Registration Statement. Cook also served as a director of NBH after the Spin-Off. Cook presently serves as one of NBH's directors.

17.     Defendant Clifton DuBose, Jr. ("DuBose") was NBH's Chief Executive Officer and Chairman of the Board of Directors prior to and/or after the Spin-Off. Prior to the Spin-Off, DuBose was an employee of Hudspeth Operating, LLC, which was one of NBH's subsidiaries. DuBose was 40 years old at the time of the Spin-Off. On January 15, 2024, DuBose resigned from NBH's Board of Directors and as NBH's Chief Executive Officer and President.

18.     Defendant Joseph DeWoody ("DeWoody") was NBH's President and one of its directors after the Spin-Off. Prior to the Spin-Off, DuBose was an employee of Hudspeth Operating, LLC, which was one of NBH's subsidiaries. DeWoody was 40 years old at the time of the Spin-Off. On June 30, 2023, DeWoody resigned from NBH's Board of Directors and as NBH's President.

19.     Defendant Lucas T. Hawkins ("Hawkins") was NBH's Chief Financial Officer after the Spin-Off. Hawkins was 36 years old at the time of the Spin-Off. On January 15, 2024, Hawkins resigned as NBH's Chief Financial Officer.

20.     Defendant Delvina Oelkers a/k/a Delvina Uka a/k/a Delvina Uka Oelkers ("Oelkers") was NBH's Chief Operating Officer after the Spin-Off. Oelkers was 36 years old at the time of the Spin-Off. Prior to the Spin-Off, Oelkers was an employee of Hudspeth Operating, LLC, which was one of NBH's subsidiaries. On March 27, 2024, Oelkers resigned from her position as NBH's Chief Operating Officer.

21.     Defendant Mia Pitts ("Pitts") was a director of NBH after the Spin-Off. Pitts was 38 years old at the time of the Spin-Off. On March 12, 2024, Pitts resigned from NBH's Board of Directors.

22.     Defendant Kristin Whitley ("Whitley") was one of NBH's directors after the Spin-Off. Whitley was 38 years old at the time of the Spin-Off. On March 21, 2024, Whitley resigned from NBH's Board of Directors.

23.     Defendant Gregory McCabe ("McCabe") was Chairman of Torchlight's Board of Directors before its merger with Metamaterial. McCabe owned approximately 13.5% of Meta Materials' common stock following the merger. Historically, McCabe has owned and/or controlled the majority of the oil and gas assets owned initially by Torchlight and now by NBH. McCabe was at all relevant times the largest shareholder of NBH owning approximately 27.4% of NBH's stock. McCabe presently serves as NBH's Chief Executive Officer and Chairman of NBH's Board of Directors.

24.     Defendants Cook, DuBose, DeWoody, Hawkins, Oelkers, Pitts, Whitley, and McCabe are sometimes referred to herein collectively as the "Individual Defendants." The Individual Defendants together with NBH are collectively, in whole or in part, referred to herein as the "Defendants."

25.     Defendant John Brda ("Brda") was Torchlight's CEO from 2014 through its merger with Metamaterial. After the merger, Brda held a consulting role with the combined company, Meta Materials, through late-2022. During the lead up to the merger, Brda was one of only four employees at Torchlight. As CEO, he had ultimate authority to approve Torchlight's press releases, public filings, and proxy statements discussed herein.

IV.     **BACKGROUND**

        A.     **Corporate History**

26.     Torchlight began operations in the oil and gas industry in 2010. It described its business model as one "focus[ed] on drilling and working interest programs within the United States that have a short window of payback, a high internal rate of return and proven and bookable

reserves. We currently have only one interest in an oil and gas project, the Marcelina Creek Field Development . . . . We anticipate being involved in multiple other oil and gas projects moving forward, pending adequate funding."

27.     Between May and August 2020, Torchlight participated in discussions with several entities interested in a reverse-merger. In total, Torchlight engaged in negotiations with five companies. In each instance, the negotiations failed due to issues relating to Torchlight's disposition or sale of its oil and gas assets prior to the consummation of any transaction or disagreements over the valuation of the merging entity.

28.     On September 4, 2020, Defendants McCabe and Brda held a virtual meeting with Metamaterial, after which they signed a confidentiality agreement and proceeded to negotiate the structure for a transaction.

29.     Similar to Torchlight's previous negotiations, issues arose concerning Torchlight's oil and gas assets, specifically "[Metamaterial's] desire that Torchlight divest the O&G Assets [oil and gas assets], the anticipated impact of that divestiture on Torchlight's market capitalization prior to closing the transaction (which the parties were using to determine Torchlight's valuation), the appropriate method for valuing the O&G Assets, and how the value of the O&G Assets should be allocated between each party's legacy stockholder base." According to the definitive proxy statement for the merger, these issues were resolved as follows:

> [Metamaterial] then suggested that the parties structure the transaction so that all of the value of the O&G Assets would be allocated to the legacy Torchlight stockholders, and on that basis agree on the pro forma ownership percentage of the Combined Company that would be allocated to each party's legacy stockholder base. This proposal was attractive to Torchlight because it provided Torchlight with flexibility with respect to eventual divestiture of the O&G Assets (including the ability to structure and consummate the divestiture after the closing of the transaction with [Metamaterial]), while also ensuring that the value obtained in the divestiture would benefit investors in Torchlight's legacy oil and gas business, and providing those investors with a substantial ownership percentage of

[Metamaterial's] business on an ongoing basis (which would have a large stockholder base and access to additional capital). The parties agreed to move forward on this basis, and after substantial negotiation, arrived at the 75%/25% ownership split described elsewhere in this proxy statement, with the ultimate Exchange Ratio generally subject to adjustment for shares issued by either company for its own benefit prior to the closing of the transaction to maintain the agreed ownership split.

30.     On December 14, 2020, Metamaterial and Torchlight executed their agreement (referred to as the "Arrangement Agreement") memorializing the terms of the merger. In substance, the Arrangement Agreement was a reverse takeover of Torchlight by Metamaterial in order to facilitate a listing on the NASDAQ and broad access to the U.S. capital markets. Pursuant to the Arrangement Agreement, once Torchlight indirectly acquired all Metamaterial shares, the combined company would be renamed "Meta Materials Inc." and continue Metamaterial's operations.

31.     Concurrent with the negotiation and execution of the Arrangement Agreement was the Certificate of Designation of Preferences, Rights and Limitations of the Series A Preferred Stock (the "Certificate of Designation"). Pursuant to the Certificate of Designation, upon a sale of Torchlight's oil and gas assets, the proceeds from any such transaction would be distributed to the Preferred Stock stockholders, or Meta Materials would pursue a spin-off.

32.     On June 28, 2021, Metamaterial and Torchlight completed the merger, as described and agreed to in the Arrangement Agreement. In conjunction with the finalization of the merger, the combined company (*i.e.*, Meta Materials) declared a dividend that provided Torchlight's shareholders as of June 24, 2021 (*i.e.*, the record date) with shares of the Preferred Stock on a one-for-one basis.

33.     Meta Materials and/or Torchlight did not ultimately sell the oil and gas assets. Consequently, Meta Materials proceeded with the Spin-Off.

34.     From October 2021 to December 2022, the Preferred Stock traded on over-the-counter markets under the ticker symbol "MMTLP". While the Preferred Stock was trading over-the-counter, it was widely understood that it was one and the same with the NBH stock that would ultimately be received through the Spin-Off. Defendant Brda made this point publicly on Twitter (or X) prior to the Spin-Off. In response to a question from an investor as to which stock he should purchase, Brda responded that the "MMTLP" was "basically the same thing" as NBH's stock, as follows:



35.     On December 14, 2022, Meta Materials completed the Spin-Off and distributed NBH's equity to the Preferred Stock shareholders as of December 12, 2022 (*i.e.*, the record date). In total, Meta Materials distributed 165,472,241 shares of NBH to the Preferred Stock shareholders.

36.     Immediately prior to the completion of the Spin-Off, McCabe owned and/or beneficially controlled 19,605,348 shares of Preferred Stock. Immediately following the Spin-Off, McCabe owned 12,826,492 shares of NBH. Upon information and belief, McCabe liquidated approximately 6.7 million shares of Preferred Stock on the eve of the Spin-Off. The Preferred Stock traded between $2.90 per share and $11.65 per share during the month before the Spin-Off (the average price was $8.15 per share). Consequently, McCabe's sale of Preferred Stock just prior to the Spin-Off resulted in proceeds of between $19.6 million and $78.9 million.

37.     Brda also liquidated shares of Preferred Stock just prior to the Spin-Off. As of May 5, 2021, Brda held 2,318,322 shares of Torchlight, meaning he received an equal amount of Preferred Stock vis-à-vis the Preferred Dividend. Upon completion of the Spin-Off, Brda received 1,930,000 shares of NBH. Consequently, Brda sold approximately 388,000 shares of Preferred Stock while it was trading on over-the-counter markets under the ticker symbol "MMTLP" for proceeds ranging anywhere between $300,000 and $3,000,000 based on historical trading prices.

**B.      Torchlight's O&G Assets**

38.     NBH's primary O&G Assets consisted of oil and natural gas leases for properties in the Orogrande Basin in Hudspeth County, Texas (the "Orogrande Assets"); minor interests in the Eastern edge of the Midland Basin in West Texas (the "Hazel Assets"); and two minor well interests in Oklahoma (the "Oklahoma Assets").

**1.      Orogrande Assets**

39.     The Orogrande Assets initially covered 172,000 acres in Hudspeth County, Texas.

Subsequently, the amount of acreage within the Orogrande Assets was reduced to approximately 134,000 following the release of certain leases, *i.e.*, the Clay Johnson acreage. NBH leased the land from University Lands. University Lands is the entity responsible for managing approximately 2.1 million acres of land in West Texas for the benefit of the Permanent University Fund.

40.     Pursuant to NBH's lease agreement with University Lands, NBH was required to drill five wells per year in years 2021, 2022, and 2023. On November 7, 2022, NBH extended the term applicable to its 2022 drilling obligations in order to stay in compliance with its drilling obligations under the University Lands lease.

41.     The Orogrande Assets were not producing properties. Of all the test wells drilled, only two produced hydrocarbons but only minimal amounts and were subsequently "shut-in." "Shutting-in" a well refers to the process of closing it down when, for example, it is not a viable well either because it does not produce hydrocarbons or the economics of developing it would be cost prohibitive. The remaining Orogrande Asset wells served as fresh water supply wells, wells for salt water disposal, or wells expected to be plugged and abandoned.

### 2.    Hazel Assets

42.     The Hazel Assets consisted of approximately 12,000 acres in the Midland Basin. Through various arrangements, NBH owned approximately 80% of the Hazel Project.

43.     The Hazel Project contained two producing wells referred to as the Flying B Ranch #3H well and the Flying B Ranch #4H well from the Wolfcamp formation. As of December 31, 2021, there were no proved reserves or proved developed nonproducing reserves related to these properties (after accounting for reimbursement obligations relating to drilling costs pursuant to a development agreement with Masterson Hazel Partners, LP).

44.     Initial gross oil production from the Flying B Ranch #3H well reached 8,319 Bbl

per month and 31,613 Bbl per month of water. The initial gross monthly production rate for the Flying B Ranch #4H was estimated to be 4,200 Bbl. Notwithstanding, NBH was not entitled to receive any revenue from these wells until their estimated depletion because all revenue, after deducting expenses to produce the oil, was to be received by Masterson Hazel Partners, LP.

45.     As of December 31, 2022, 2021 and 2020, NBH's proved developed nonproducing reserves related to the Hazel Assets totaled zero barrels of oil equivalent for each year.

### 3.     Oklahoma Assets

46.     The Oklahoma Assets consisted of one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

47.     As of December 31, 2022, NBH was producing from both these wells. However, the wells were marginally producing and were uneconomic for reserve calculation purposes.

### C.     The Orogrande Assets Were Substantially Worthless at All Relevant Times.

48.     The Orogrande Assets comprised the key components of the O&G Assets. According to Torchlight's management (and, later, NBH's management), the value of the O&G Assets depended primarily on the Orogrande Assets.

49.     The importance of the Orogrande Assets first emerged in 2019. On April 11, 2019, Torchlight issued a press release titled, *Torchlight Announces New Field Discovery 3rd Party Reserve Estimate of 3.678 Billion Barrels in Recovery Potential From Unconventional Zones*. In pertinent part, the press release stated:

> PLANO, TX / ACCESSWIRE / April 11, 2019 / Torchlight Energy Resources, Inc. (NASDAQ: TRCH) ("Torchlight" or the "Company"), today announced that the Company has received the final petrophysical report relating to its Orogrande Basin Project. The report will be utilized in the delivery of due diligence materials to industry suitors for potential M&A discussions with Torchlight. The final report, prepared by Stimulation Petrophysics Consulting out of Denver, outlines the potential recoverable reserves from the unconventional zones on Torchlight's 134,000 acres in the Orogrande Basin. The Orogrande is the western most sub-basin of the Greater Permian Basin.

The extensive report outlines a range of recoverable values based on standardized recovery factors. Described in Potential Barrels.

Low Case 2.321 MMBOe Recovery Factor (7%)
Mean Case 3.678 MMBOe Recovery Factor (11%)
Best Case 4.975 MMBOe Recovery Factor (15%)

The following updates were previously disclosed:

- Additional potential of up to 20,000 acres of multiple conventional structures, based upon seismic, gravity, and magnetics

- Potential for up to 10 distinct unconventional and conventional hydrocarbon pay zones throughout the Orogrande Project at varying depths.

"We are pleased to provide this substantive update to shareholders and the broader oil and gas industry," stated John Brda, Torchlight's CEO. "Torchlight's board of directors and management feel that the third-party evaluation and resulting estimate of 3.7 billion barrels of potential recoverable oil at a 11% is a significant revelation. Although the cost to acquire the voluminous amount of science needed for this 3rd party evaluation was quite significant, we are obviously very pleased with the end results. It is unique to find a new basin predominately owned by one exploration company and with agreeable lease terms such as those we have with University Lands. As we enter and continue discussions with suitors, Torchlight will better define the current market value for one of the largest virgin onshore oil and gas basin discoveries in the United States in recent history. We look forward to reporting the impact of such value to our shareholder's ownership."

*[Remainder of page intentionally blank]*

13

50.     Torchlight's management, including Defendant Brda in particular, reiterated this claim on several occasions over the following years prior to and after the merger with Metamaterial. For example, in an investor presentation dated March 3, 2020, Torchlight's management described its "[n]ear term strategy" as prioritizing the Orogrande Assets and provided investors with the following "Project Overview":



51.     Similarly, during an investor conference presentation on September 2, 2020, Brda introduced Torchlight as a "pure Permian player in that our 3 properties are in Midland Basin, the Delaware Basin and Orogrande Basin . . . . We are in control of a world-class project that is Orogrande project. It's 134,000 acres with derisked upside. We have independently verified from simulation petrophysics to have 3.7 billion barrels of recoverable reserves in addition to between 5 and 8 Tcf of gas."

14

52.     On December 11, 2022, just days prior to the Spin-Off, Brda reiterated the importance of the Orogrande Assets on Twitter (or X). In pertinent part, he tweeted as follows:



53.     Despite the supposed importance of the Orogrande Assets to the O&G Assets overall, they were at all relevant times substantially worthless. This conclusion is supported by NBH's impairment of the assets, Meta Materials' impairment of loans secured by the O&G Assets, and historical production and development data concerning the Orogrande Assets.

**1.      NBH restated the value of the O&G Assets after the Spin-Off.**

54.     In the Registration Statement, NBH stated that its O&G Assets were worth $47,293,607 as of September 30, 2022.

55.     On March 31, 2023, several months later, NBH filed its first annual report on Form 10-K for fiscal 2022 (the "2022 Annual Report"), representing that the value of the O&G Assets had increased by nearly 70% to $79,695,928 as of December 31, 2022. An excerpt of the 2022

Annual Report balance sheet is below:

| | | December 31, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| | **ASSETS** | | | |
| Current assets: | | | | |
| Cash | $ | 569,298 | $ | 1,989,419 |
| Accounts receivable | | — | | 74,310 |
| Accounts receivable, related party | | 177,519 | | 163,366 |
| Grants and other receivables | | 150,000 | | |
| Prepaid expenses | | 62,300 | | 2,667 |
| Total current assets | | 959,118 | | 2,229,762 |
| Oil and natural gas properties, net | | 79,695,928 | | 45,663,470 |
| Other assets | | 80,179 | | 25,000 |
| TOTAL ASSETS | $ | 80,735,224 | $ | 47,918,232 |

56.    On July 17, 2024, after a delay of approximately three and a half months, NBH filed its annual report on Form 10-K for fiscal 2023 (the "2023 Annual Report"). The 2023 Annual Report contained a "restatement" of NBH's previously stated financial information; specifically, the value of the O&G Assets. As restated in the 2023 Annual Report, the O&G Assets were worth zero ($0) as of December 31, 2022. An excerpt of the 2023 Annual Report balance sheet is below:

| | As Originally Reported December 31, 2022 | | Adjustment | | As Restated December 31, 2022 |
|---|---|---|---|---|---|
| | **ASSETS** | | | | |
| Current assets: | | | | | |
| Cash | $ | 569,298 | $ | - | $ | 569,298 |
| Accounts receivable | | - | | - | | - |
| Accounts receivable, related party | | 177,519 | | - | | 177,519 |
| Prepayments - development costs | | 150,000 | | - | | 150,000 |
| Prepaid expenses | | 62,300 | | - | | 62,300 |
| Total current assets | | 959,117 | | - | | 959,117 |
| Oil and gas properties | | 79,695,928 | | (79,695,928) | | - |
| Other assets | | 80,179 | | - | | 80,179 |
| TOTAL ASSETS | $ | 80,735,224 | | (79,695,928) | $ | 1,039,296 |

57.    Accounting "restatements" are governed by ASC 250. ASC 250-10-20 defines a restatement as "[t]he process of revising previously issued financial statements to reflect the correction of an error in those financial statements." Further, an error in previously issued financial statements is defined as follows: "An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts

16

that existed at the time the financial statements were prepared."

58.    Issuers must restate previously issued financial statements when they contain a material error. An error is corrected through a restatement (sometimes referred to as a "Big R restatement") when the error is material to the prior period financial statements. Restatements require the entity to restate and reissue its previously issued financial statements to reflect the correction of the error in those financial statements. NBH's "restatement" in the 2023 Annual Report constituted the correction of a material error pursuant to ASC 250-10-50-7, *i.e.*, a "Big R restatement").

59.    NBH's restatement is strong evidence that the Registration Statement provided investors with a false carrying value for the O&G Assets. While the Registration Statement provided the value for the O&G Assets as of September 30, 2022, the restatement impaired the value of the assets down to $0 just three months later as of December 31, 2022. There were no material changes concerning the O&G Assets between those dates, thereby supporting the conclusion that the value should have also been $0 in the Registration Statement.

### 2.    Meta Materials impaired the O&G Assets after the Spin-Off.

60.    Meta Materials loaned NBH an aggregate of $20 million excluding interest, for use in relation to drilling activity required to maintain compliance with the lease obligations associated with the O&G Assets. At the time of the loan, NBH was still a subsidiary of Meta Materials. Approximately $15 million of the $20 million loan was collateralized by Defendant McCabe's interest in the Orogrande Assets.

61.    Meta Materials continuously tracked the value of the O&G Assets and had full access to all relevant valuation information. Following the Spin-Off, Meta Materials reported in its filings with the SEC that the value of the O&G Assets as of the date of the Spin-Off was "not substantive" and therefore increased its reserves on the NBH loan.

62.     In pertinent part, Meta Materials stated as follows in its annual report for fiscal 2022:

> Notes receivable consists of an amount due from Next Bridge, which was previously a wholly-owned subsidiary of Meta, until the completion of the spin-off transaction on December 14, 2022. One note is partially secured by a combination of Meta's common shares and an interest in the Orogrande Project Property. ***The note receivables have been recognized at their fair value, as of December 14, 2022, subsequent to the deconsolidation of Next Bridge from our consolidated financial results***.
>
> We have assessed the fair value of the notes receivable on the deconsolidation date in accordance with ASC 820, Fair Value Measurement. In particular, we assessed the likelihood of our ability to receive the aggregate amount of the $24.2 million of notes receivable and determined that except for the security interest in our shares held by the Pledgor for the secured loan, ***the other collateral is not substantive and therefore should not serve as the basis for concluding that that loan is well secured and collateralized***; the other loan is unsecured. As a result, we reserved $22 million of the Next Bridge note receivables, resulting in $2.2 million being shown on our balance sheet as of December 31, 2022.

(Emphasis added)

63.     Below is an excerpt from Meta Materials' annual report for fiscal 2022 showing its "Notes receivable" as of December 31, 2022:

| | | As of December 31, | |
| --- | --- | --- | --- |
| | | 2022 | 2021 |
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ | 10,090,858 | $ 46,645,704 |
| Restricted cash | | 1,720,613 | 788,768 |
| Short-term investments | | — | 2,875,638 |
| Grants receivable | | — | 175,780 |
| Accounts and other receivables | | 902,718 | 1,665,700 |
| Notes receivable | | 2,211,900 | — |
| Inventory | | 468,027 | 265,718 |
| Prepaid expenses and other current assets | | 7,202,099 | 3,451,367 |
| Assets held for sale | | — | 75,500,000 |
| Due from related parties | | 8,461 | 10,657 |
| Total current assets | | 22,604,676 | 131,379,332 |
| Intangible assets, net | | 56,313,317 | 28,971,824 |
| Property, plant and equipment, net | | 42,674,699 | 27,018,114 |
| Operating lease right-of-use assets | | 5,576,824 | 6,278,547 |
| Goodwill | | 281,748,466 | 240,376,634 |
| Total assets | $ | 408,917,982 | $ 434,024,451 |

64.     The above "Notes receivable" amount of approximately $2.2 million reflects the

money that Meta Materials believed it reasonably could expect to recover from its loan to NBH. As explained by Meta Materials in its Notes to the financial statements contained in the annual report for fiscal 2022, "We estimated and measured the fair value of the amount receivable from Next Bridge to be $2.2 million as of December 14, 2022. In estimating fair value, the key assumption used was our share price as of the date of deconsolidation, since a portion of amounts owing from Next Bridge are secured by the Stock Pledge Agreement."

65.     Despite being owed approximately $20 million from NBH, Meta Materials immediately impaired the loan to $2.2 million at the time of the Spin-Off to reflect its then-current belief of the value of the collateral underlying the loan, *i.e.*, the Orogrande Assets. This provides further proof and confirmation that the O&G Assets were substantially worthless at the time of the Spin-Off and that the Registration Statement provided a false value for them.

[*Remainder of page intentionally blank*]

3.    The Orogrande Assets have historically been substantially worthless.

66.    The Orogrande Assets are located in Hudspeth County near El Paso, Texas, on the western edge of the Permian Basin far away from the Delaware, Central, and Midland Basins. There is little infrastructure and/or oilfield service providers in the area (*e.g.*, crews, equipment, transportation). In fact, the nearest gas pipeline to the Orogrande Asset wells is the El Paso Natural Gas Pipeline, which is an average of 6.6 miles away. This makes drilling more expensive and, in turn, negatively impacts the value of the Orogrande Assets. The following map depicts the Orogrande Assets relative to the vast majority of drilling in the Permian Basin:



67.    Trail Mountain Inc. first acquired the leasing rights for what would later become the Orogrande Assets in June 1993. Trail Mountain obtained the leasing rights from University Lands.

68.    Trail Mountain drilled several vertical wells. Testing revealed poor production potential and unfavorable economics in terms of development. Consequently, Trail Mountain shut-in the wells and let its leasing rights default in 2003 after the initial 10-year term expired.

69.    After Trail Mountain's leasing rights expired, a company named Arabella

Petroleum Company, LLC, was the next to acquire them. In April 2013, Arabella Petroleum acquired the leasing rights for the Orogrande Assets from University Lands for approximately $1.07 million or $8/acre in Lease Sale #123. The Orogrande Assets comprised part of the "frontier sale" of Lease Sale #123, which denotes a speculative overage area compared to traditional lease sales where oil and gas production and reserves are proven. By comparison, non-frontier sale acreage within Lease Sale #123 leased for $5,167 per acre or nearly 650 times more in value.

70.    As part of its annual lease sale process, University Lands publishes a "Call For Nominations" whereby any eligible oil and gas company can nominate acreage to be placed into the annual auction, after which sealed bids from the industry determine the price and winning bidder. In Hudspeth County, University Lands has 493,405 acres inclusive of the Orogrande Assets, which comprises approximately 134,000 acres. Roughly 359,403 acres adjacent to the Orogrande Assets remain available to lease. In the 11 years since Arabella Petroleum acquired the leasing rights for the Orogrande Assets in Lease Sale #123, no oil and gas industry participant has had the desire or motivation to lease the available acreage because it is widely known to be unproductive or non-commercial.

71.    In fact, companies owning acreage in and/or around the Orogrande Assets have instead released their leasing rights for the acreage. For example, an individual named Clay Johnson held the leasing rights to approximately 38,000 acres adjacent to the Orogrande Assets located to the northwest of Arabella Petroleum's acreage. On March 4, 2014, the same 38,000 acres were assigned to McCabe Petroleum Corporation and then transferred to Hudspeth Oil Corporation, both entities being owned and controlled by Defendant McCabe.

72.    In August and September 2014, Torchlight acquired the Orogrande Assets, including the 38,000 acres previously held by Clay Johnson, from Arabella Petroleum through a

series of transactions involving McCabe Petroleum Corporation and Hudspeth Oil Corporation in exchange for 868,750 shares of common stock and $100,000. The total acreage acquired was 172,000; however, in July 2017, Torchlight released the Clay Johnson acres without ever drilling a well on the land due to the fact that it the area is non-productive and commercially unviable. The following map depicts the Orogrande Assets relative to the Clay Johnson acres and adjacent unleased acreage:



73.    After acquiring the Orogrande Assets, Torchlight recruited a "wildcatting" partner to help finance the exploration and development of the land. Wildcatting refers to drilling exploratory oil wells in unproven or unknown territory, where oil or gas has not been previously discovered. While considered a high risk and high reward endeavor, the balance of knowing when to cut your losses based on the well results is important for purposes of capital preservation. Operators must evaluate whether to continue production, attempt remediation techniques, or

potentially plug and abandon the well contrasting with more conservative approaches that focus on proven reserves or extensions of known fields.

74.    In September 2015, Torchlight found a "wildcatting" partner with Founders Oil & Gas LLC. Torchlight entered into a "Farmout Agreement" whereby Founders Oil & Gas received a 50% interest in the Orogrande Assets in exchange for funding drilling operations.

75.    Founders Oil & Gas invested $9.5 million over approximately the next two years helping explore the Orogrande Assets. However, Founders Oil & Gas terminated the "Farmout Agreement" during the fourth quarter of 2017. Founders Oil & Gas's decision to terminate the "Farmout Agreement" is indicative of the fact that testing results for the Orogrande Assets had little-to-no potential for production and/or poor economic value.

76.    Internal correspondence by and/or on behalf of Torchlight confirm further that the wells within the Orogrande Assets were substantively worthless. Indeed, Torchlight had historically relied on three wells in particular to support is valuation of the Orogrande Assets. These three wells were the University Cactus #A35 well, University Founders #A25 and University Hueco #A39 wells. In each instance though, internal documentation show that the wells did not produce hydrocarbons at any profitable rate.

77.    The University Cactus #A35 well was initially drilled by Trail Mountain and subsequently shut-in. According to records with the Texas Railroad Commission, Torchlight reentered the University Cactus #A35 well in October 2019 as a horizontal test well. By March 2020, the well had produced only 15 barrels of oil per day and 110 MCF of gas per day. In an email sent by Scott Kimbrough to University lands and the Texas Railroad Commission on September 23, 2020, Mr. Kimbrough confirmed that the University Cactus #A35 well had been shut-in on March 19, 2020 and had produced only a "Skim of oil (not a barrel & none sold) & very little gas."

Mr. Kimbrough was originally on Torchlight's Board of Directors. However, after Founders Oil & Gas terminated the "Farmout Agreement," Mr. Kimbrough started Maverick Oil & Gas Corporation to operate Torchlight's wells in exchange for Torchlight stock.

78.     On January 23, 2021, Defendant McCabe wrote in an email to NBH's Chief Operating Officer, Defendant Oelkers, that the University Founders #A25 and University Hueco #A39 wells produced only "fresh water" while also being a "nightmare to drill." Producing large amounts of water alongside small quantities of oil and gas makes the wells unviable economically due to the costs of lifting, treating, and disposing of the water which often outweighs the revenue from the small amounts of hydrocarbons produced. While it is common for oil and gas wells to produce a mixture of products that need to be separated at the surface, Torchlight management was well aware that the University Founders #A25 and University Hueco #A39 test wells underlying their valuation of the Orogrande Assets produced almost exclusively a waste byproduct that would be costly to dispose of.

79.     Torchlight has since maintained its drilling obligations for the Orogrande Assets but, to date, has not made any further progress in terms of developing the lease or proving reserves. According to well result data from both University Lands and the Texas Railroad Commission, all attempts at commercial oil and gas production have failed. Completion reports (Form W-2) filed with the State of Texas also show zero oil and zero natural gas production. In other words, neither Torchlight nor NBH discovered any oil or gas within the Orogrande Assets at any point to date since the events described above.

## V.      THE REGISTRATION STATEMENT

### A.      O&G Assets

80.     The Registration Statement was negligently prepared and contained false statements of material fact or omitted to state other facts necessary to make the statements made

not false or misleading.

81.    In the Registration Statement, NBH represented in its financial statements that its oil and gas assets were worth:

- $45,663,480 as of December 31, 2021;

- $46,747,755 as of March 31, 2022; and

- $47,293,607 as of September 30, 2022.

82.    NBH's oil and gas assets were not worth the amounts listed in the immediately preceding paragraph. In truth, NBH's oil and gas assets were at all relevant times substantially worthless. As alleged in detail above (Section IV.C., *supra*), NBH restated the value of the O&G Assets shortly after the Spin-Off, Meta Materials impaired the value of a loan secured by the Orogrande Assets because the collateral was "not substantive," and historical production data confirms that the Orogrande Assets were at all relevant times substantially worthless. The Registration Statement should not have provided investors with the values listed in the previous paragraph but instead indicated that the O&G Assets were substantially worthless, *i.e.*, $0.

### B.    Audit Committee Functions and Financial Statements

83.    The Registration Statement provided investors with a description of NBH's Audit Committee and its role relative to the company. In pertinent part, the Registration Statement stated as follows:

> Upon their appointment to the Board, the members of the Audit Committee will consist of Kristin Whitley, as the chairperson, Mia Pitts and Robert L. Cook, each of whom meet the independence requirements set forth in Rule 10A-3 under the Exchange Act and our Audit Committee Charter. ***Each member of the Audit Committee is financially literate, and Ms. Whitley has accounting and related financial management expertise and satisfies the criteria to be an "audit committee financial expert" under the rules and regulations of the SEC, as those qualifications are interpreted by our Board in its business judgment***.

> [Continued on next page]

The functions of the Audit Committee include:

- ***oversee the quality and integrity of our financial statements, accounting practices and financial information we provide to the SEC or the public***;

- ***review our annual and interim financial statements, the report of our independent registered public accounting firm on our annual financial statements, Management's Report on Internal Control over Financial Reporting and the disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations***;

- select and appoint an independent registered public accounting firm;

- pre-approve all services to be provided to us by our independent registered public accounting firm;

- review related party transactions;

- ***review with our independent registered public accounting firm and our management the accounting firm's significant findings and recommendations upon the completion of the annual financial audit and quarterly reviews***;

- review and evaluate the qualification, performance, fees and independence of our registered public accounting firm;

- ***meet with our independent registered public accounting firm and our management regarding our internal controls, critical accounting policies and practices and other matters***;

- discuss with our independent registered public accounting firm and our management earnings releases prior to their issuance;

- ***oversee our internal audit function***; and

- ***oversee our compliance program, response to regulatory actions involving financial, accounting and internal control matters, internal controls and risk management policies***.

(Emphasis added)

84.    The Registration Statement also included a "REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM" written by BF Borgers CPA PC. The report stated, in pertinent part, that:

We have audited the accompanying consolidated balance sheets of Next Bridge Hydrocarbons, Inc. as of December 31, 2021 and 2020, the related statements of operations, stockholders' equity (deficit), and cash flows for the years then ended, and the related notes (collectively referred to as the "financial statements"). In our opinion, ***the financial statements present fairly, in all material respects, the***

*financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States*.

(Emphasis added)

85.    Following its description of NBH's Audit Committee and the report from its independent auditor, the Registration Statement included the following statement within its "Notes" to NBH's financial statements:

The Company maintains its accounts on the accrual method of accounting in accordance with accounting principles generally accepted in the United States of America. Accounting principles followed and the methods of applying those principles, which materially affect the determination of financial position, results of operations and cash flows are summarized below:

. . .

*Basis of presentation* – The financial statements are presented on a consolidated basis and include all of the accounts of Next Bridge Hydrocarbons, Inc. and its wholly owned subsidiaries, Torchlight Energy, Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC. All significant intercompany balances and transactions have been eliminated.

These interim financial statements are unaudited and have been prepared pursuant to the rules and regulations of the SEC regarding interim financial reporting. Certain disclosures have been condensed or omitted from these financial statements. Accordingly, they do not include all the information and notes required by accounting principles generally accepted in the United States of America ("GAAP") for complete consolidated financial statements, and should be read in conjunction with the audited consolidated financial statements and notes thereto included herein for the year ended December 31, 2021.

***In the opinion of management, the accompanying unaudited financial condensed consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary to fairly present the financial position as of, and the results of operations for, all periods presented***. In preparing the accompanying financial statements, management has made certain estimates and assumptions that affect reported amounts in the condensed financial statements and disclosures of contingencies. Actual results may differ from those estimates. The results for interim periods are not necessarily indicative of annual results.

(Emphasis added)

86.     The statements in the immediately preceding paragraph were false or, at least, materially misleading because the financial statements within the Registration Statement did not "fairly present" the value of the O&G Assets. The description of the Audit Committee's roles and responsibilities combined with the report from BF Borgers lent credence to management's statement above that the financial statements in the Registration Statement were accurate when, in fact, they were not because the O&G Assets were at all relevant times substantially worthless. *See* Section IV.C., *supra*.

### C.    Regulation S-K Violations

87.     Regulation S-K is a set of rules promulgated by the SEC that requires public companies to disclose certain information to shareholders and potential investors. Regulation S-K applies, in particular, to information that must be disclosed in registration statements. As applicable here, Defendants failed to adhere to Item 404 of Regulation S-K, 17 C.F.R. §229.404.

88.     Item 404 of Regulation S-K it titled, *Transactions with related persons, promoters and certain control persons*, and requires issuers to describe related-party transactions by providing specific information, including but not limited to: the name of the related person(s); the related person's interest in the transaction; the dollar value of the amount involved in the transaction; and the approximate dollar value of the amount of the related person's interest in the transaction.

89.     The Registration Statement failed to disclose a related-party transaction involving Defendant McCabe and the Hazel Assets. As described above, the Hazel Assets included the only two wells capable of generating revenue, *i.e.*, the Flying B Ranch #3H well and the Flying B Ranch #4H well. However, pursuant to a development agreement, NBH was not entitled to receive any revenue from these wells until their estimated depletion because all revenue, after deducting expenses to produce the oil, was to be received by Masterson Hazel Partners, LP.

90.     NBH referred to the development agreement concerning these wells as the "Option

Agreement with Masterson Hazel Partners, LP" (the "Option Agreement"). In pertinent part, the

Registration Statement described the Option Agreement as follows:

> On August 13, 2020, our subsidiaries Torchlight Energy, Inc. and Torchlight Hazel, LLC (collectively, "Torchlight") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and McCabe Petroleum Corporation. ***Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on our Hazel Project, sufficient to satisfy Torchlight's continuous development obligations on the southern half of the prospect no later than September 30, 2020***. MHP has satisfied this drilling obligation. MHP paid to Torchlight $1,000 as an option fee at the time of execution of the Option Agreement. ***MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the Well attributable to Torchlight's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the well***.
>
> In exchange for MHP satisfying the above drilling obligations, Torchlight granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight's continuous development obligations on the northern half of the prospect. Because MHP exercised this drilling option and satisfied the continuous development obligations on the northern half of the prospect, under the terms of the Option Agreement (as amended in September 2020) MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. Such purchase would be under the terms of a form of Purchase and Sale Agreement included as an exhibit to the Option Agreement, at an aggregate purchase price of $12,690,704 for approximately 9,762 net mineral acres, and not less than 74% net revenue interest (approximately $1,300 per net mineral acre). MHP declined to exercise the Option in 2021.

(Emphasis added)

91.     The Option Agreement was important relative to NBH's overall operations because

it operated to prevent NBH from receiving any revenue from the only two producing wells that

existed, *i.e.*, the Hazel Assets. Despite the importance of the Option Agreement and the

implications it created in terms of generating revenue for NBH's new investors, the Registration

Statement omitted material information concerning it that should have been disclosed pursuant to

Item 404 of Regulation S-K, *i.e.*, Defendant McCabe's interest in the transaction.

92.     The Option Agreement was executed between Torchlight, Masterson Hazel Partners, LP, and McCabe Petroleum Corporation. Brda signed on behalf of Torchlight, DuBose signed on behalf of Masterson Hazel Partners, LP, and McCabe signed on behalf of McCabe Petroleum Corporation. Although McCabe's presence in the transaction was known, it was understood at that time to be limited to his ownership and/or interest in McCabe Petroleum Corporation and not Masterson Hazel Partners, LP. This was significant because the Option Agreement provided Masterson Hazel Partners, LP (and not McCabe Petroleum Corporation) with the right to receive revenue from the Hazel Assets.

93.     In truth, McCabe also held a material interest in Masterson Hazel Partners, LP through an intermediary entity named Masterson Hazel Management LLC. Masterson Hazel Management LLC was jointly owned by McCabe Petroleum Corporation (of which McCabe was the sole owner) and another entity named Korban Resources, LLC (of which DuBose was the sole owner). Thus, while the Option Agreement appeared to provide revenue from the Hazel Assets to Masterson Hazel Partners, LP only, it was in fact also providing McCabe Petroleum Corporation with revenue.

94.     Given McCabe's multiple roles and interests in the Option Agreement, the Registration Statement violated Item 404 of Regulation S-K by failing to disclose the following:

- McCabe's interest in the Option Agreement vis-à-vis Masterson Hazel Partners, LP and Masterson Hazel Management LLC;

- The amount of money McCabe has received pursuant to the Option Agreement in exchange for drilling and exploration in the Hazel Assets;

- The amount of money McCabe would continue to receive pursuant to the Option Agreement;

- The amount of money NBH would continue to **not** receive pursuant to the Option Agreement; and

- McCabe has received and would continue to receive money pursuant to the Option Agreement despite the fact that Masterson Hazel Partners, LP failed to comply with the initial requirement to "drill and complete" one well on the southern half of the Hazel Assets by September 30, 2020.

## VI.   <u>CLASS ACTION ALLEGATIONS</u>

95.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities that acquired shares of NBH in connection with the Company's spin-off from Meta Materials on or around December 14, 2022, and were damaged as a result thereof (previously defined as the "Class"). Excluded from the Class are Defendants, NBH's current and former officers and directors, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Individual Defendants have or had a controlling interest.

96.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NBH or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

97.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein.

98.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

99.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)    whether Defendants violated the Securities Act;

b)    whether statements made by Defendants to the investing public in the Registration Statement misrepresented material facts about the business and operations of NBH; and

c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

100.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 11 of the Securities Act Against All Defendants (Except Brda)

101.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

102.    This count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants (except Brda).

103.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

104.    The Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

105.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

106.    By reason of the conduct herein alleged, each Defendant named herein violated, and/or controlled a person who violated, Section 11 of the Securities Act.

107.    Plaintiff acquired NBH shares pursuant and/or traceable to the Registration Statement.

108.    Plaintiff and the Class have sustained damages.

109.    When they acquired their NBH shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years elapsed between the time that the securities upon which this count is brought were offered to the public and the time Plaintiff commenced this action.

## COUNT II

### Violation of Section 15 of the Securities Act Against the Individual Defendants

110.    Plaintiff repeats and incorporates each and every allegation contained above as if

fully set forth herein.

111.    This count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against the Individual Defendants.

112.    The Individual Defendants each were control persons of NBH by virtue of their positions as directors and/or senior officers of NBH immediately prior to the IPO. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of NBH.

113.    The Individual Defendants were critical to effecting the Spin-Off, based on their signing and/or their authorization of the signing of the Registration Statement, by participating to execute the Spin-Off, and by having otherwise directed through their authority the processes leading to execution of the Spin-Off.

114.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

## COUNT III

### Violation of Section 12(a)(2) of the Securities Act Against NBH and Brda

115.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

116.    This count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against NBH and Brda.

117.    NBH and Brda offered and/or sold securities pursuant to the Registration Statement, which included a prospectus containing untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

118.    NBH was the issuer of the securities being offered and/or sold pursuant to the Registration Statement.

119.    Brda is a "statutory seller" of the securities being offered and/or sold pursuant to the Registration Statement.

120.    Prior to and following the announcement of Torchlight's merger with Metamaterial, Brda promoted NBH through *inter alia* private communications with select investors and third-party consultants, whom he instructed and intended to use to promote NBH to public retail investors. Brda also made promotional claims about NBH and its O&G Assets in Torchlight's public filings and proxy statements. Brda's promotional claims about NBH created demand for NBH's securities among retail investors which, in turn, allowed Torchlight to sell 16.2 million shares of stock to investors and raise approximately $137.5 million. Brda then used these funds to pay himself (through the post-merger company, Meta Materials) a $1.5 million bonus.

121.    Brda's promotional actions began in or around June 2020 as part of a larger plan to combat short-sellers of Torchlight's stock. A "short seller" sells stock that the short seller does not own (or that the short seller will borrow for delivery) with the goal of repurchasing it or "covering" it later at a lower price. In a June 2020 email, Brda wrote that "the short position" in Torchlight stock "is quite extensive." In that same email, Brda expressed his belief that, through certain steps that he proposed (as discussed below), Torchlight's "short position . . . will be forced to cover," which could trigger a short squeeze. A "short squeeze" refers to the pressure on short sellers to cover their positions as a result of share price increases or difficulty in borrowing the security that the sellers are short. A rush by short sellers to cover their positions produces additional upward pressure on the price of the stock, which then can cause an even greater squeeze.

122.    Brda intended to effect the "short squeeze" as follows: (i) find a merger partner

who desired Torchlight's Nasdaq listing but not its oil and gas leases; (ii) As part of the merger structure, issue a dividend—in the form of preferred stock issued to Torchlight stockholders of record at closing—to allocate proceeds from the sale of Torchlight's O&G Assets to legacy Torchlight shareholders; (iii) market and promote the preferred stock to spread the narrative to select investors that short sellers would not be able to obtain the preferred stock, thus pressuring short sellers to close their positions, leading investors to believe a short squeeze would occur, and artificially inflating the price of Torchlight common stock on a temporary basis; (iv) capitalize on Torchlight's inflated common stock price by, among other things, raising capital through an at-the-market offering; and (v) use capital raised through the offering to drill wells required to maintain Torchlight's oil and gas leases.

123.    Brda identified and recruited Metamaterial as a merger partner. Metamaterial's CEO, George Palikaras, also agreed to facilitate and support Brda's promotional actions regarding the spin-off of the preferred stock that would become NBH.

124.    Brda: (i) structured the preferred stock in a manner that would increase Torchlight's stock price by forcing shorts to cover; (2) as a member of Torchlight's Board, voted to authorize the transactions and other corporate matters necessary for Torchlight to issue the preferred stock; (3) proposed the merger and preferred stock to Metamaterial and then negotiated and secured Metamaterial's consent to the same; and (4) approved Torchlight's proxy statements, press releases, and public filings in furtherance of proposing the preferred stock to shareholders, and soliciting and obtaining shareholder approval.

125.    Brda designed and structured the preferred stock as follows. First, Brda implemented a dividend that would be issued upon the completion of Torchlight's merger with Metamaterial that would provide holders of Torchlight common stock one share of preferred stock,

thereby entitling its owner to receive the net proceeds of the sale of Torchlight's O&G Assets. Second, only the owners of record of Torchlight stock, as of a designated record date, would be entitled to receive the dividend. Third, after its issuance, the dividend would purportedly not be registered or made available for trading on any exchange. By this design, Brda intended to cause a short squeeze because of the difficulty he believed short sellers would have in obtaining and delivering Torchlight stock when closing their short positions.

126.    By June 2020, Brda had begun planning the dividend to create a short squeeze. In June 2020, for example, he wrote to Defendant McCabe, who was the Chairman of Torchlight's Board of Directors, "[b]y issuing a Pref to [Torchlight] shareholders of record at closing, and announcing it as part of the [merger agreement], the short position which is quite extensive will be forced to cover."

127.    In September 2020, Brda proposed the dividend to Metamaterial and secured Metamaterial's initial consent via a letter-of-intent that Torchlight and Metamaterial announced on September 21, 2020. Brda secured Metamaterial's consent through a presentation to Metamaterial's Board of Directors in September 2020 in which he presented his plan to emphasize the preferred dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma." Brda used the September 21, 2020 announcement to highlight and emphasize the dividend and preferred stock that would be issued in connection with the closing of the merger.

128.    Brda further promoted the preferred stock when, for example, on September 21, 2020, Brda forwarded to two consultants Torchlight's press release announcing the merger and preferred dividend. Brda referred to these consultants in conversations with Palikaras as his "guys on stock support." Brda caused Torchlight to pay the stock-support consultants $3,000 to $5,000

per month plus stock warrants for their services. As reflected in the below exchange, Brda instructed the consultants on how they should message the dividend to investors:

> Brda: We need your guys to embrace it. IMO, you get the [Torchlight] value up to $1 and then the 25% of META is free. Lots of room to build a nice position.
>
> Consultant: Agreed, Everyone I've spoke [sic] to today love it and are buying more and are long term investors! TONS of volume but not moving up?
>
> Brda: I think people don't understand the dividend properly.
>
> Consultant: I agree, I'm explaining it and I can hear the light come on while I'm talking to people.

129.    Beginning in December 2020, Brda circulated to McCabe, who was Torchlight's Chairman at the time, presentations outlining capital formation plans for a spin-off entity, *i.e.*, NBH. At the same time, Brda continued issuing additional press releases emphasizing the dividend and preferred stock, including but not limited to an announcement dated December 14, 2020, highlighting in its title: "Preferred Stock Dividend to be Issued to Torchlight Shareholders Prior to Closing."

130.    Starting in January 2021, Brda caused Torchlight to begin secretly paying $20,000 a month to individuals who would form the initial management team of the spin-off entity, *i.e.*, NBH. Brda caused Torchlight to make these monthly payments through an intermediary who received "consulting fees" for doing no actual work. Brda did not publicly disclose these payments or his plans for the spin-off entity. At the same time, Brda continued promoting the preferred stock by *inter alia* emailing information about the outstanding short position in Torchlight to the stock-support consultants and wrote: "[w]e all knew [the shorts] would come after us one more time. They are creating a massive bubble, IMO, that is going to slingshot in our favor. The dividend is going to be a huge problem for them." Through these and other communications, Brda prompted Torchlight's consultants to explain the preferred dividend and its impact on short sellers to

investors.

131.    Brda also had direct communications with select groups of investors where he further promoted the dividend and preferred stock. For example, from March 16-18, 2021, Brda and Palikaras met with a series of institutional investors as part of an investment bank's virtual Annual Investor Conference. During these meetings, Brda and Palikaras pitched the justification for the merger and described to at least one investment firm the potential for the Preferred Dividend to cause a short squeeze. A note-taker at the conference also recorded Brda telling an investment firm on March 17, 2021: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." Through these private communications, Defendants intended to drive interest with these investors in the merger and in buying or retaining Torchlight stock, without publicly disclosing their plan or belief that a short squeeze would occur.

132.    Brda also solicited shareholder approval for the preferred dividend and, in turn, the spin-off entity through Torchlight's preliminary and definitive proxy statements dated February 4, March 23, April 21, and May 7, 2021.

133.    Brda also used social media to promote the preferred stock. For example, on June 7, 2021, Brda posted on Torchlight's Twitter account a video discussing short squeezes in the context of other stocks. After viewing the tweet, Palikaras texted Brda, advising caution: "I don't think you should be sharing posts on the short squeeze… yet. Just my two cents. Once it happens that's ok as it is fact, but before you are putting yourself at risk for potentially speculative content."

134.    On June 14, 2021, Torchlight issued a press release announcing the record date for the preferred dividend, *i.e.*, June 24, 2021. As Brda intended, users on Twitter, Stocktwits, YouTube, Reddit, and other social media platforms discussed the merger, the dividend, and the short squeeze in the days leading up to the record date. On June 14, 2021, Brda sent Palikaras an

image of an online campaign promoting the short squeeze theory using the hashtag "#TORCHDAY." An anonymous user created a graphic that conveyed the precise message that Brda privately hoped to spread: "Post and educate people about our short squeeze … #TORCHDAY" and "Post and educate people about our dividend ranging from $1 - $20 (deadline 06/22)." The graphic went on to explain "[Torchlight] is a heavily shorted stock, and due to the fact a preferred share dividend is being granted to stockholders SHORTS HAVE TO COVER which can lead to a short squeeze of the stock."

135.    Social media users posted the hashtag and versions of the graphic dozens of times over a few days around June 14-16, 2021. And users on many other social-media platforms picked up on the basic gist of the scheme to promote purchasing Torchlight common stock to benefit from the supposed short squeeze by June 22 (the T+2 Date), using other hashtags, subreddits, and iterations discussing the record date, the expected $1-$20 dividend, and the short squeeze.

136.    The trading volume of Torchlight stock dramatically surged as the merger approached. In May 2021, the average trading volume was 5 million shares per day. But, between the announcement of the record date on June 14, 2021 and the T+2 Date (June 22, 2021), the average trading volume exceeded 80 million shares per day.

137.    Likewise, following the announcement of the record date on June 14, 2021, the price of Torchlight stock surged. The price at closing jumped from $3.58 per share on June 14 to $5.07 per share on June 15 to $5.99 per share on June 16. Torchlight stock price peaked at $10.88 per share on June 21—an increase of over 200% from its price at closing on June 14.

138.    Brda caused Torchlight, through an investment bank, to commence an at-the-market offering starting on June 18, 2021. On June 18, 2021—after the offering had commenced— Brda wrote Palikaras: "[w]e need to be selling more than we are, the shorts always push down at

the end of the day… We have two days to take advantage of the squeeze, today should have been a 5 million share day at 6[.]"

139.    Torchlight, through an investment bank, conducted the offering over a five-day period between Friday, June 18, 2021, and Thursday, June 24, 2021. In the middle of that offering period, on June 21, 2021, Torchlight's stock price reached a record high of $10.88 per share and closed at $9.92 per share. Overall, Torchlight sold 16.2 million shares during the offering at an average price of $8.50 per share. Over 95% of that volume was sold prior to the T+2 Date. In total, Torchlight raised $137.5 million through the offering.

140.    By August 2021, approximately six after Torchlight merged with Metamaterial, Brda sent Meta Materials' Board of Directors a fully-formed plan to spin off the O&G Assets into NBH with a specific management team that Brda and Torchlight had been paying through an intermediary since January 2021.

141.    Brda profited directly from his promotional actions. On June 24, 2021, immediately after the ATM Offering and one day before the merger closed, Brda urged Torchlight's Compensation Committee to award him a $1.5 million bonus. He presented the Committee with a "Top Ten + 2 Reasons to Pay Bonus to John Brda," which touted his achievements in conceiving and executing the Torchlight-Metamaterial merger. He specifically pointed out that he "[m]anaged the entire merger process with [Metamaterial] leading to a market cap increase from $30 million to nearly $1.44 billion." He also wrote that he "[c]onceived the timing of the shareholder meeting with windows to raise additional equity and filing of the shelf S3 for $240 million along with the ATM–raising full amount of $133 million on ATM." He explained that he "[h]andled all investor calls and fund calls during the process." For these reasons, Brda requested a "bonus of $1.5 million in cash."

142.    Meta Materials paid Brda the $1.5 million bonus in two $750,000 increments—half before closing on June 25, 2021, and the other half after the merger closed.

143.    Brda received his $1.5 million bonus as a result of the funds he raised through his promotional actions. Had he not promoted NBH, he would not have received the bonus. Indeed, to his request to the Compensation Committee, Brda attached a spreadsheet reflecting Torchlight's remaining obligations, which makes clear that the company would not have sufficient funds to pay a $1.5 million bonus or its existing obligations, but for the proceeds of the ATM Offering.

144.    Brda continued to promote NBH throughout 2022. For example, on June 9, 2022, Brda sent several tweets encouraging investors to purchase "MMTLP" shares, *i.e.*, the Preferred Stock, in advance of the Spin-Off. These tweets included the following:



145.    On June 17, 2022, Brda also tweeted:



146.    On October 9, 2022, during a "Space" call with public investors, Brda encouraged

investors to continue to hold and/or buy Preferred Stock (which at this point was trading freely on

OTC markets). In pertinent part, Brda stated as follows:

> Brda:  I'm surprised nobody has asked me about MMTLP [the Preferred stock]
> through this whole conversation. . . . I'm waiting for you to bring it up. . . . I do
> enjoy the price movement though.
>
> . . .
>
> [Host]: Can I ask you one brief question then since you brought it up, John?

43

Brda:   Sure.

[Host]: Are you confident?

Brda:   . . . I haven't sold a share.

[Host]: There we go. That's all I need to hear.

147.    On December 6, 2022, just days before the Spin-Off, Brda tweeted:



148.    On December 7, 2022, Brda tweeted:



149.    On December 9, 2022, Brda tweeted the following:



150.    Brda    corrected    the    above    tweet    shortly    after,    tweeting    "CORRECTION

….3.2Billion BO, my bad!" Brda's reference to "Diamond Hands" in the above tweet is a slang term used to describe investors who hold onto their investments despite volatility or potential losses. The term is often used to describe investors who hold high-risk assets, such as cryptocurrency, meme stocks, or emerging company stock.

151.    On December 11, 2022, Brda emphasized his support for NBH and the Spin-Off by tweeting the following:



152.    Less than one year has elapsed since the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based. Specifically, Brda's status as a "statutory seller" did not become known until certain facts were made public in the SEC's enforcement action against Brda on June 25, 2024. *See SEC v. Brda, et ano.*, No. 1:24-cv-04806 (S.D.N.Y.). Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

46

153.    By reason of the foregoing, NBH and Brda are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired NBH securities in and/or traceable to the Registration Statement and who were damaged thereby.

154.    By reason of the foregoing, NBH and Brda are liable to Plaintiffs and the Class for the consideration paid for NBH securities in and/or traceable to the Registration Statement, with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if Plaintiffs or the member of the Class no longer own the security.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding damages to Plaintiff and members of the Class pursuant to Section 11 of the Securities Act;

C.    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

E.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.


DATED: September 9, 2024                    **LEVI & KORSINSKY, LLP**


/s/ Adam M. Apton
Adam M. Apton
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

*Attorneys for Lead Plaintiffs and Lead
Counsel for the Class*

**CONDON TOBIN SLADEK
THORNTON NERENBERG PLLC**
Stuart L. Cochran
8080 Park Ln., Ste. 700
Dallas, TX 75231
Tel.: (214) 265-3804
Fax: (214) 691-6311
scochran@condontobin.com

*Liaison Counsel for Lead Plaintiffs and the
Class*

**APPENDIX A**

Todd Targgart's MMTLP Transactions

1. Acquired 10,000 shares of MMTLP on July 7, 2021 pursuant to the Preferred Dividend

2. Sold 1 share of MMTLP on November 15, 2022 for $9.35/share

3. Purchased 501 shares of MMTLP on November 28, 2022 for $10.16/share

4. Purchased 1,000 shares of MMTLP on November 28, 2022 for $10.26/share

5. Purchased 1,000 shares of MMTLP on December 6, 2022 for $6.98/share

6. Purchased 1,000 shares of MMTLP on December 6, 2022 for $5.20/share

7. Purchased 1,000 shares of MMTLP on December 8, 2022 for $4.39/share

8. Purchased 1,000 shares of MMTLP on December 8, 2022 for $3.18/share

9. Purchased 1,000 shares of MMTLP on December 8, 2022 for $2.95/share

**APPENDIX B**

Steve Martinez's MMTLP Transactions

| Date | Transaction | Amount | Price |
|------|-------------|--------|-------|
| 11/10/2021 | Purchase | 200 | $1.73 |
| 11/11/2021 | Purchase | 233 | $1.70 |
| 11/12/2021 | Purchase | 2 | $1.68 |
| 11/19/2021 | Purchase | 400 | $1.54 |
| 12/06/2021 | Purchase | 983 | $1.21 |
| 12/06/2021 | Purchase | 50 | $1.51 |
| 12/06/2021 | Purchase | 17 | $1.21 |
| 12/06/2021 | Purchase | 10 | $2.14 |
| 12/21/2021 | Purchase | 10 | $2.04 |
| 12/22/2021 | Purchase | 14 | $1.86 |
| 12/31/2021 | Purchase | 500 | $1.54 |
| 01/03/2022 | Purchase | 100 | $1.65 |
| 01/04/2022 | Purchase | 650 | $1.53 |
| 01/13/2022 | Purchase | 700 | $1.40 |
| 01/13/2022 | Purchase | 3 | $3.77 |
| 01/18/2022 | Purchase | 37 | $1.54 |
| 01/31/2022 | Purchase | 230 | $1.29 |
| 01/31/2022 | Purchase | 12 | $1.87 |
| 02/04/2022 | Purchase | 425 | $1.26 |
| 02/04/2022 | Purchase | 59 | $1.26 |
| 02/04/2022 | Purchase | 9 | $1.26 |
| 02/04/2022 | Purchase | 5 | $1.26 |
| 02/04/2022 | Purchase | 2 | $1.26 |
| 02/07/2022 | Purchase | 250 | $1.25 |
| 02/07/2022 | Purchase | 137 | $1.25 |
| 02/07/2022 | Purchase | 10 | $1.25 |
| 02/07/2022 | Purchase | 1 | $1.25 |
| 02/09/2022 | Purchase | 400 | $1.26 |
| 02/14/2022 | Purchase | 505 | $1.31 |
| 02/22/2022 | Purchase | 200 | $1.81 |
| 02/22/2022 | Purchase | 10 | $2.58 |
| 03/08/2022 | Purchase | 1000 | $1.73 |
| 03/08/2022 | Purchase | 13 | $2.26 |
| 03/11/2022 | Purchase | 30 | $1.98 |
| 03/21/2022 | Purchase | 500 | $1.47 |
| 03/21/2022 | Purchase | 153 | $1.46 |

| 03/21/2022 | Purchase | 35   | $1.47  |
| 04/05/2022 | Purchase | 1250 | $1.21  |
| 04/13/2022 | Purchase | 775  | $1.11  |
| 04/13/2022 | Purchase | 500  | $1.14  |
| 04/13/2022 | Purchase | 6    | $2.27  |
| 04/25/2022 | Purchase | 2    | $4.66  |
| 04/25/2022 | Purchase | 2    | $2.92  |
| 04/25/2022 | Purchase | 2    | $2.90  |
| 05/05/2022 | Purchase | 1528 | $1.31  |
| 05/31/2022 | Purchase | 723  | $1.28  |
| 05/31/2022 | Purchase | 437  | $1.30  |
| 05/31/2022 | Purchase | 437  | $1.28  |
| 05/31/2022 | Purchase | 401  | $1.30  |
| 05/31/2022 | Purchase | 240  | $1.28  |
| 05/31/2022 | Purchase | 100  | $1.28  |
| 06/07/2022 | Purchase | 266  | $1.30  |
| 06/16/2022 | Purchase | 1000 | $1.30  |
| 07/15/2022 | Purchase | 507  | $1.92  |
| 10/06/2022 | Purchase | 1250 | $1.96  |
| 10/10/2022 | Purchase | 589  | $3.19  |
| 10/10/2022 | Purchase | 160  | $3.48  |
| 10/10/2022 | Purchase | 100  | $3.19  |
| 10/10/2022 | Purchase | 40   | $3.48  |
| 10/12/2022 | Purchase | 1    | $12.09 |
| 10/14/2022 | Purchase | 200  | $3.78  |
| 10/14/2022 | Purchase | 118  | $4.11  |
| 10/14/2022 | Purchase | 100  | $3.82  |
| 10/14/2022 | Purchase | 100  | $3.78  |
| 11/03/2022 | Purchase | 39   | $7.66  |
| 11/29/2022 | Purchase | 190  | $9.76  |
| 12/07/2022 | Purchase | 150  | $8.55  |