**TAB 1**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. JOHN BRDA, GEORGIOS PALIKARAS, Defendants. | Civ. Action No. 1:24-cv-004806 **JURY TRIAL DEMANDED** |

## COMPLAINT

The Securities and Exchange Commission ("**SEC**") files this Complaint against John Brda ("**Brda**") and Georgios Palikaras ("**Palikaras**") (together, "**Defendants**"), and alleges as follows:

### I.   SUMMARY

1.      Defendants engaged in a fraudulent scheme to manipulate the price of Torchlight Energy Resources, Inc. ("**Torchlight**") stock and sell Torchlight stock to investors at inflated prices. Defendants' scheme artificially inflated the price of Torchlight stock in June 2021, causing the price to increase by over 200% in a single week. Defendants capitalized on their scheme by causing Torchlight to conduct an at-the-market offering ("**ATM Offering**") at the peak of their price manipulation, selling 16.2 million shares at inflated prices.

2.      Brda, as CEO of Torchlight, first devised the scheme in early 2020 in response to Torchlight's deteriorating financial condition. Torchlight's stock was trading below $1.00 per share at the time, and Torchlight needed capital to pay its significant debt obligations and to fund

**APP. 001**

ongoing drilling expenses of its oil and gas assets. Brda hatched a plan to artificially inflate the price of Torchlight's stock and raise capital by selling Torchlight shares at inflated prices.

3.     To accomplish his plan, Brda devised a series of transactions intended to create a short squeeze. Those transactions included a merger agreement between Torchlight and another company, along with a dividend—in the form of preferred stock issued to shareholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange ("**Preferred Dividend**").[1] Shareholders who received the Preferred Dividend would purportedly be entitled to receive the net proceeds of the sale of Torchlight's oil and gas assets. Brda believed, and intended to lead investors to believe, that the Preferred Dividend would force short sellers to exit their positions and trigger a short squeeze that would inflate the price of Torchlight's publicly traded stock.

4.     As the first step in his plan, Brda sought a suitable merger partner. He found that partner in Palikaras, the CEO of Metamaterial, Inc. ("**Meta I**"). Brda told Palikaras about the scheme at the outset of negotiations. Palikaras fully embraced and participated in the scheme.

5.     Brda and Palikaras initially believed that merely announcing the Preferred Dividend in a press release accompanying the merger's announcement would cause a short squeeze and a resulting surge in Torchlight's stock price. But when the market did not appear to immediately react following that announcement, Defendants took further action and deceptively promoted the Preferred Dividend in hopes of spreading their short squeeze narrative and, consequently, increasing Torchlight's stock price. They did so through, among other means, private communications with select investors and third-party consultants, who they intended to

---

[1] Unless specified otherwise, the term "Preferred Dividend" used in the Complaint generally refers to the corporate dividend and/or the preferred stock issued pursuant to that dividend.

spread the message for them. Without publicly revealing that they were the source of the short squeeze narrative or fully disclosing their intent or plan, Defendants intended their deceptive promotional efforts to artificially inflate the price of Torchlight stock by: (i) causing short sellers to exit their short positions, and (ii) enticing other investors to acquire or hold Torchlight stock.

6.    As part of their scheme, Defendants also made false and misleading statements and omissions to investors about the Preferred Dividend to further inflate the value of Torchlight stock. In Torchlight's public filings and proxy statements, Brda made false and misleading statements and omissions that were intended to create the false impression that Torchlight's oil and gas assets would be quickly monetized and distributed to Preferred Dividend holders within six months of the merger, when in fact there were no prospects of that happening. Similarly, Palikaras made statements to a group of investors—which were recorded and later circulated and widely cited on social media—that the net proceeds payable to Preferred Dividend holders could range between $1–$20 per share, which had no basis in fact. Palikaras also told that same group of investors that Torchlight was speaking to "the right potential buyers" and that they were "top tier," when in fact Torchlight had not identified *any* potential buyers at the time.

7.    Defendants succeeded in their aim to manipulate the price of Torchlight stock in the days leading up to the merger closing. Before the merger was announced, Torchlight stock was trading below $1.00 per share. As a result of Defendants' scheme, Torchlight's stock price sharply rose during a ten-day period—between June 14–24, 2021—from $3.58 per share to as high as $10.88 per share before dropping back to $4.95 per share by June 25, 2021.

8.    When Torchlight's stock price began to surge, Brda wrote Palikaras: "***We have two days to take advantage of the squeeze***[.]" (emphasis added). Between June 18–24, 2021, Brda caused Torchlight to sell off-the-shelf shares into the public markets in an ATM Offering.

APP. 003

Over the five-day ATM Offering, Torchlight sold 16.2 million shares to investors at an average price of $8.50 per share. In total, the ATM Offering raised $137.5 million from investors. These proceeds primarily benefitted the company that resulted from the Torchlight-Meta I merger— Meta Materials, Inc. ("**Meta II**")—which appointed Palikaras as CEO. And for his part, Brda demanded and received a $1.5 million bonus.

9.      By engaging in the acts and conduct alleged herein, Defendants violated Section 17(a) of the Securities Act of 1933 ("**Securities Act**") and Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 ("**Exchange Act**") and Rules 10b-5 and 14a-9 thereunder. Brda also aided and abetted Meta II's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

10.      For Defendants' violations, the SEC seeks: (i) permanent injunctive relief against both Defendants; (ii) an officer and director bar against both Defendants; (iii) disgorgement of ill-gotten gains and prejudgment interest thereon against Brda; (iv) civil penalties against both Defendants; and (v) such further relief as the Court may deem just and appropriate.

## II.      JURISDICTION AND VENUE

11.      The SEC brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

12.      This Court has jurisdiction over this action pursuant to Sections 20 and 22(a) of the Securities Act [15 U.S.C. §§ 77t and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

13.      Defendants, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce, and/or made use of the mails or means or instruments of transportation or communication, or of facilities of a national securities exchange in interstate

**APP. 004**

commerce, in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

14. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The offer or sale of securities at issue in this case took place in this District, and certain acts, practices, transactions, and courses of business constituting violations of the securities laws alleged herein occurred within this District. At all relevant times in this case, Brda was CEO of Torchlight, which prior to merging with Meta I was traded on the Nasdaq, which is headquartered in this District. As further described in paragraphs 26-28 below, Meta I's primary motivation for entering into the merger at issue with Torchlight was to assume Torchlight's Nasdaq listing. Following the merger, Meta II has traded on the Nasdaq. One or more investors who bought Torchlight stock, and were harmed by the conduct alleged herein, reside in this District. Defendants' false and misleading statements and omissions alleged in paragraphs 38-50 and 67-88 below—which were made in press releases, public filings, and a recording circulated on social media—were published and/or disseminated to investors in this District. Defendants' deceptive marketing efforts, through press releases and social media, alleged in paragraphs 52-54 and 62-66 below were published and/or disseminated to investors in this District.

### III.   DEFENDANTS

15. Defendant John Brda is a resident of St. Louis, Missouri. Brda served as Torchlight's CEO from 2014 through its merger with Meta I on June 28, 2021. After the merger, Brda held a consulting role with Meta II through late 2022. During the lead up to the merger, Brda was one of only four employees of Torchlight. As CEO, he had ultimate authority to approve Torchlight's press releases, public filings, and proxy statements discussed herein.

5

**APP. 005**

16.     Defendant Georgios Palikaras is a Greek citizen and resident of Halifax, Nova

Scotia, Canada. From 2011 until the merger in June 2021, Palikaras was Meta I's President and

CEO. Upon Meta II's creation, Palikaras became President and CEO of Meta II and served on its

board of directors. In October 2023, Meta II terminated Palikaras as President and CEO, and he

resigned from Meta II's Board.

## IV.     RELATED ENTITIES

17.     Torchlight completed a reverse merger with Meta I in June 2021. Prior to the

merger, Torchlight was a publicly traded Texas corporation that was listed on the Nasdaq under

the ticker symbol "TRCH." Its business was oil and gas exploration and production.

18.     Meta I was a Canadian company listed on the Canadian Securities Exchange prior

to its June 2021 merger with Torchlight. Its business focused on research and development of

early-stage, applied materials technology.

19.     Meta II is a Nevada corporation headquartered in Dartmouth, Nova Scotia,

Canada. Meta II was created on June 28, 2021, through the reverse merger between Torchlight

and Meta I. As a result of the merger, Meta II assumed Torchlight's Nasdaq listing and now

trades under the ticker symbol "MMAT." Like Meta I, Meta II's business focuses on research

and development of early-stage, applied materials technology.

## V.     FACTS

### A. With Torchlight Facing Serious Financial Distress, Brda Hatched A Scheme to Manipulate The Price of Torchlight Stock And Capitalize On That Manipulation.

20.     In early 2020, Torchlight was at a crossroads. It had sold all of its revenue-

generating oil and gas assets, leaving Torchlight with oil and gas leases on only a few early-

stage, exploratory properties. Torchlight's primary remaining oil and gas asset, the Orogrande

Project, was undeveloped, had no proven oil and gas reserves, and covered significant areas of

acreage far removed from existing proven geologic formations. Consequently, only a small number of very large and/or specialized oil and gas companies were possible candidates to purchase Torchlight's Orogrande lease interests.

21.     Torchlight required significant capital to maintain its lease interests in the Orogrande project, which were not generating any revenues. The terms of Torchlight's lease obligated it to drill four wells in the Orogrande project before the end of 2021 and an additional five wells in subsequent years.[2] But Torchlight faced an uncertain oil and gas market that made raising capital to pay ongoing drilling expenses challenging.

22.     Torchlight also had significant ongoing debts to pay. In March 2020, Torchlight disclosed, in its 2019 Form 10-K, $25 million in debt and other liabilities. In contrast, Torchlight had less than $1 million in non-oil-and-gas assets and minimal revenue. Torchlight's debt included millions of dollars of convertible promissory notes that Torchlight could avoid paying if its noteholders opted to convert their notes to Torchlight common stock. However, that was unlikely at the low price at which Torchlight common stock was trading in early 2020.

23.     The market for Torchlight stock reflected the company's deteriorating financial condition. The price of Torchlight stock dropped below $1.00 per share in or around October 2019, prompting a delisting notice from Nasdaq that the company announced on November 25, 2019. The stock price continued to fluctuate beneath $1.00 per share during the first quarter of 2020, and the company reiterated its receipt of the delisting notice in its annual financial statement filed March 16, 2020.

24.     In addition, Brda believed that there was a significant volume of short interests in Torchlight stock. In a June 2020 email, Brda wrote that "the short position" in Torchlight stock

---

[2] Torchlight's drilling obligations for 2020 were suspended following outbreak of Covid-19.

"is quite extensive."[3] In that same email, Brda expressed his belief that, through certain steps that he proposed (as discussed below), Torchlight's "short position…will be forced to cover," which could trigger a short squeeze. A "short squeeze" refers to the pressure on short sellers to cover their positions as a result of share price increases or difficulty in borrowing the security that the sellers are short. A rush by short sellers to cover their positions produces additional upward pressure on the price of the stock, which then can cause an even greater squeeze.

25.     As CEO of Torchlight, Brda was aware of the conditions referenced in paragraphs 20-24 above and the predicament that Torchlight faced. But rather than take steps to improve Torchlight's underlying financial health, Brda hatched a plan to manipulate the price of Torchlight stock and capitalize on that manipulation. Specifically, starting by at least June 2020, Brda began developing the following plan:

- Find a merger partner who desired Torchlight's Nasdaq listing but *not* its oil and gas leases;

- As part of the merger structure, issue a dividend—in the form of preferred stock issued to Torchlight stockholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange (i.e., the "Preferred Dividend," defined in paragraph 3 above), ostensibly to allocate proceeds from the sale of Torchlight's oil and gas assets to legacy Torchlight shareholders;

---

[3] A "short seller" sells stock that the short seller does not own (or that the short seller will borrow for delivery) with the goal of repurchasing it or "covering" it later at a lower price. If the price of the stock drops, short sellers buy the stock at the lower price and make a profit. If the price of the stock rises, short sellers incur a loss in buying back the stock at a higher price than the price at which it was sold.

- Market and promote the Preferred Dividend to spread the narrative to select investors that short sellers would not be able to obtain the Preferred Dividend, thus pressuring short sellers to close their positions, leading investors to believe a short squeeze would occur, and artificially inflating the price of Torchlight common stock on a temporary basis;

- Capitalize on Torchlight's inflated common stock price by, among other things, raising capital through an ATM Offering; and

- Use capital raised through the ATM Offering to drill wells required to maintain Torchlight's oil and gas leases.

**B. Brda Found A Merger Partner—Meta I And Its CEO, Palikaras—Willing To Help Him Carry Out The Fraudulent Scheme.**

26.     To carry out his plan, Brda first sought a suitable merger partner. As further discussed below, Brda's plan to manipulate the market required a merger agreement between Torchlight and another company that included a Preferred Dividend, which would purportedly entitle its owners to receive the net proceeds of the sale of Torchlight's remaining oil and gas assets. For such a transaction structure to work, at minimum, Brda needed a merger partner that was *not* interested in Torchlight's oil and gas leases (to provide an excuse to issue the Preferred Dividend), but that nonetheless wanted to merge with Torchlight to acquire its Nasdaq listing— Torchlight's primary asset aside from its oil and gas leases.

27.     Meta I, with Palikaras as its CEO, met Brda's threshold criteria. Meta I was a growing Canadian company listed on the Canadian Stock Exchange looking for an opportunity to gain access to U.S. capital markets. Torchlight's Nasdaq listing offered Meta I that opportunity. At the same time, Meta I was an applied materials technology company; it was not in the business of acquiring, developing, or selling oil and gas leases. Thus, although it wanted

Torchlight's Nasdaq listing, Meta I had no interest in Torchlight's oil and gas leases, which were not generating revenue and did not fit Meta I's existing business or operations.

28.     Beyond that initial threshold, Brda also sought a merger partner who would allow Torchlight to structure and carry out the transactions and supporting sequence of events as Brda planned. In that regard, Meta I's CEO, Palikaras, went above and beyond what Brda needed, as further described below.

### C. Defendants Designed And Planned The Preferred Dividend In Furtherance Of The Fraudulent Scheme.

29.     The Preferred Dividend was the initial piece in Defendants' scheme to manipulate the price of Torchlight stock. Defendants believed, and intended to lead investors to believe, that the Preferred Dividend would trigger a short squeeze in Torchlight stock, thus causing an artificial and temporary increase in Torchlight's stock price.

30.     Brda took a number of steps towards designing and implementing a Preferred Dividend that he intended to cause a short squeeze. Specifically, Brda: (1) conceived, designed, and structured the Preferred Dividend in a manner that he intended to increase Torchlight's stock price by forcing shorts to cover; (2) as a member of Torchlight's Board, voted to authorize the transactions and other corporate matters necessary for Torchlight to issue the Preferred Dividend pursuant to his design; (3) proposed the merger and Preferred Dividend to Meta I and then negotiated and secured Meta I's consent to the same; and (4) approved Torchlight's proxy statements, press releases, and public filings in furtherance of proposing the Preferred Dividend to shareholders, soliciting and obtaining shareholder approval, and ensuring the scheme worked as intended.

31.     The design and structure of the Preferred Dividend that Brda devised, proposed, and negotiated with Meta I included as follows. First, the Preferred Dividend would provide

holders of Torchlight common stock one share of preferred stock, purportedly entitling its owner to receive the net proceeds of the sale of Torchlight's remaining oil and gas assets. Second, only the owners of record of Torchlight stock, as of a designated record date (the "**Record Date**"), would be entitled to receive the Preferred Dividend. Third, after its issuance, the Preferred Dividend would purportedly not be registered or made available for trading on any exchange. More precisely, Torchlight's definitive proxy statement dated May 7, 2021—which Brda approved—stated: "[t]he Series A Preferred Stock will not be listed or traded on any exchange and will not be registered, and will not be freely transferable unless such shares are thereafter registered or are saleable pursuant to an applicable exemption from registration." Similar statements were made in each of Torchlight's preliminary proxy statements, which Brda approved. By this design, Brda intended to cause a short squeeze because of the difficulty he believed short sellers would have in obtaining and delivering the Preferred Dividend (along with the borrowed Torchlight stock) to lenders in the future.

32.     By at least June 2020, Brda had conceived of and begun planning the Preferred Dividend with the intent of causing a short squeeze. In June 2020, for example, he wrote to the Chairman of Torchlight's Board of Directors and its primary investment banker: "[b]y issuing a Pref to [Torchlight] shareholders of record at closing, and announcing it as part of the [merger agreement], the short position which is quite extensive will be forced to cover."

33.     In September 2020, Brda proposed the Preferred Dividend to Meta I and secured Meta I's initial consent via a letter-of-intent that Torchlight and Meta I announced on September 21, 2020. He subsequently negotiated and secured Meta I's consent via a definitive agreement that included the Preferred Dividend, which both companies announced on December 14, 2020.

34.     Brda also caused Torchlight to propose and solicit shareholder approval for his intended structure of the Preferred Dividend. This includes, but is not limited to, the shareholder approval that Brda solicited via Torchlight's definitive proxy statement dated May 7, 2021—which Brda approved—and Torchlight's preliminary proxy statements—which Brda approved—on February 4, 2021, March 23, 2021, and April 21, 2021.

35.     Palikaras, as CEO of Meta I, shared Torchlight's proposed merger structure, including the plan to use the Preferred Dividend to impact short sellers, with Meta I's Board. In Brda's initial presentation to Meta I's Board of Directors in September 2020—which Palikaras knew about and helped convey to Meta I's Board—Brda presented his plan to emphasize the Preferred Dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma." In Palikaras' sworn testimony given during the SEC's investigation that preceded the filing of this lawsuit, Palikaras admitted that Brda explained to him, "way back in the beginning that this deal could potentially create a short squeeze."

36.     Meta I's Board also communicated with Palikaras about Brda's plan. In a September 6, 2020 email, a member of Meta I's board wrote the other members of Meta I's Board—including Palikaras—to summarize the proposed deal based on calls with Torchlight management (including Brda). In that email, the Meta I board member wrote that a goal of the merger structure was to "raise enough money when the shorts get squeezed to eliminate all [Torchlight's] debt." He also wrote that Torchlight "currently has in place and approved an At-The-Market (ATM) Offering," and that "Torchlight's plan is to use either their ATM, or do a deal with a brokerage firm that they have a relationship with, to raise the capital" in the event of a short squeeze and/or inflation in Torchlight's stock price.

37.     Thus, at the outset of discussions between Torchlight and Meta I, Palikaras knew about Brda's plan and intent. As further described below, Palikaras actively worked with Brda to carry out this plan to manipulate the price of Torchlight stock and defraud Torchlight investors.

**D. Defendants Made Materially False And Misleading Statements And Omissions Regarding Their Plans And Intent To Manipulate The Price Of Torchlight Stock.**

38.     Brda and Torchlight made several public disclosures about the Preferred Dividend, but those disclosures were misleading—and in some instances, false—because Brda omitted material information about the plan to use the Preferred Dividend to manipulate the price of Torchlight stock and defraud investors.

39.     Brda had ultimate authority to approve Torchlight's May 7, 2021 definitive proxy statement and its preliminary proxy statements dated February 4, 2021, March 23, 2021, and April 21, 2021. Pursuant to that authority, Brda approved Torchlight's definitive and preliminary proxy statements. He also signed the cover letter to Torchlight's definitive proxy statement. In those proxy statements, Brda and Torchlight solicited shareholder approval for the merger and Preferred Dividend. Brda and Torchlight publicly disclosed in those proxy statements, among other things, the terms of, the purported reasons for, and the risks associated with the merger and Preferred Dividend. Certain of these disclosures, however, were false or misleading, because Brda knowingly or severely recklessly failed to disclose material information to investors.

40.     Specifically, Brda failed to disclose, and failed to cause Torchlight to disclose, the following in Torchlight's proxy statements and other public filings and statements: (1) that the Preferred Dividend was intended to cause, and to lead investors to believe, that there would be a short squeeze and an increase in Torchlight's stock price; (2) that Brda believed the Preferred Dividend would cause a short squeeze and/or temporarily inflate Torchlight's stock price; (3) that the potential for a short squeeze and/or temporary inflation of Torchlight's stock price

13

were reasons that Brda and Torchlight considered in approving the merger and Preferred Dividend and recommending that shareholders approve the same; (4) Brda's plan to, and/or the potential that Torchlight would, deploy the ATM Offering; and (5) that, in connection with negotiations over the merger and Preferred Dividend, Torchlight and Meta I discussed the Preferred Dividend's potential to cause a short squeeze, its potential to temporarily inflate Torchlight's stock price, and Brda's plan to use an ATM Offering to raise funds from investors.

41.     To illustrate, Torchlight's definitive proxy statement described the purported "reasons" and "factors" that Torchlight's board (including Brda) considered in both approving the merger and Preferred Dividend and recommending that shareholders approve the same. The proxy statement repeatedly states that the supposed "reason" for approving and proposing the Preferred Dividend is that it "provides the current Torchlight stockholders an opportunity to retain their beneficial interest in [Torchlight's oil and gas assets]." These statements were false, or at least misleading, because Brda and Torchlight failed to disclose in the proxy statement and subsequent public filings that the reason—or at least a reason—that Torchlight and Brda considered was Brda's plan and intention for the Preferred Dividend to cause a short squeeze and/or to temporarily increase Torchlight's stock price.

42.     Similarly, Torchlight's definitive proxy statement also stated that "[t]he *anticipated and intended impact* of the [Preferred Dividend] is to maintain the interest of the Torchlight stockholders as of the [Preferred Dividend] Record Date in [Torchlight's oil and gas assets] after the consummation of the [merger]." (emphasis added). Again, this statement was false, or at least misleading, because Brda and Torchlight failed to disclose in the proxy statement or subsequent filings that an anticipated and intended impact of the Preferred Dividend was that it would cause a short squeeze and/or temporarily increase Torchlight's stock price.

APP. 014

Brda also failed to disclose that he and Torchlight planned to conduct an ATM Offering to take advantage of any squeeze or price inflation that took place. Contrary to Brda's and Torchlight's representations that the Preferred Dividend was intended to protect the interests of Torchlight legacy shareholders, the ATM Offering that they were planning in coordination with the Preferred Dividend—which they failed to publicly disclose—would actually dilute those legacy shareholders' interests by injecting new, off-the-shelf shares into the market.

43.     Torchlight's definitive proxy statement also incorporated by reference certain public filings that were "considered to be part of this proxy statement," including its 2020 Form 10-K filed March 18, 2021, which Brda signed and approved. In that 2020 Form 10-K, Torchlight disclosed generally that "[t]he market price of our common stock *may be* influenced by many factors," including among "many" other factors, "actual or purported 'short-squeeze' trading activity." (emphasis added). However, this generic disclosure made no reference to the Preferred Dividend or the intent or potential for the Preferred Dividend to *cause* a short squeeze. Similarly, Torchlight's definitive proxy statement disclosed several risks that the proposals therein—including the proposed Preferred Dividend—posed to Torchlight and its shareholders. At a minimum, these generic risk disclosures were misleading, because Brda and Torchlight never disclosed in those filings or any subsequent filings the risk that the Preferred Dividend could cause a short squeeze or artificial price increase, much less that the Preferred Dividend *was intended to cause* the same. Nor did Torchlight or Brda disclose their intention to conduct an ATM Offering to take advantage of the squeeze or price inflation.

44.     Torchlight's 2020 Form 10-K further represented to investors that "we have no reason to believe our shares would be the target of a short squeeze." As Brda knew at the time, however, that statement was false, as it was directly contrary to his and other executives'

15

privately stated belief and intention that the Preferred Dividend would cause a short squeeze. In fact, a note-taker at an investor conference on March 17, 2021—the day before Torchlight filed its 2020 Form 10-K—recorded Brda telling an investment firm: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." At a minimum, the representation was misleading, because Brda omitted from the 2020 Form 10-K, proxy statements, and subsequent filings that he and other executives believed the Preferred Dividend could cause a short squeeze or temporary increase in Torchlight's stock, and the plan to use the ATM Offering to take advantage of the squeeze or inflation in Torchlight's stock price.

45.     The definitive proxy statement also purported to detail the discussions and negotiations between Meta I and Torchlight concerning the merger and Preferred Dividend, along with each company's purported motivations and reasons for the transactions. For example, the proxy statement stated that Meta I "suggested that the parties structure the transaction so that all of the value of [Torchlight's oil and gas assets] would be allocated to legacy Torchlight stockholders," which Torchlight purportedly found "attractive" and beneficial to its legacy shareholders. As Brda knew at the time, however, these statements and disclosures of Torchlight and Meta I's negotiations were misleading. In the proxy statements and subsequent public filings, Brda and Torchlight never disclosed that they proposed the idea of a Preferred Dividend that they intended to cause a short squeeze and/or artificial increase in Torchlight's stock price. In fact, Brda and Torchlight never disclosed in the proxy statement or other public filings that the short squeeze was even discussed during those negotiations. In addition, the September 6, 2020 email from Meta I's board member—discussed in paragraph 36 above—reveals that during negotiations the two companies discussed: Brda's short squeeze theory, Torchlight management's belief that Torchlight stock would increase following announcement of the

16

Preferred Dividend, and the ATM Offering that Torchlight had available and planned to use to take advantage of a squeeze or price inflation. Brda and Torchlight, however, never disclosed in the proxy statement or other public filings that these discussions took place.

46.     Brda knowingly or severely recklessly made these false and misleading statements and omissions in furtherance of the scheme to manipulate the price of Torchlight stock. As Brda knew or was severely reckless in not knowing, his false and misleading statements and omissions were deceptive, furthered the fraudulent scheme, and concealed Defendants' scheme, plans, and intentions.

47.     Palikaras was aware of each of the above false and misleading statements and omissions by Brda and Torchlight. He also knew by September 2020—well before the false and misleading statements and omissions in Torchlight's 2020 Form 10-K and proxy statements— about the undisclosed matters referenced in paragraphs 40-45 above. As further described in paragraphs 59-66, 89-93, and 101-105 below, Palikaras also: (a) privately communicated with select groups of investors and/or potential investors about how he believed the Preferred Dividend would cause a short squeeze; (b) knew about a recording of certain of these private communications circulating on social media; (c) indirectly promoted the short squeeze narrative on social media; and (d) coordinated with Brda on these efforts to deceptively promote the short squeeze and on execution of the ATM Offering.

48.     In furtherance of the fraudulent scheme, however, Palikaras never disclosed in any public filings or public statements—and never caused Meta I to publicly disclose—that: (a) he engaged in the aforementioned private communications with select investor groups; (b) he indirectly promoted the short squeeze on social media; (c) he believed the Preferred Dividend would cause a short squeeze or had the potential to do so; (d) that Brda told him and Meta I's

17

board that Brda believed the Preferred Dividend would cause a short squeeze or inflation of Torchlight's stock price; (e) Brda told him and Meta I's board about plans to conduct an ATM Offering to take advantage of a squeeze and/or price inflation; (f) he coordinated with Brda to deceptively promote the short squeeze and on the execution of the ATM Offering; or (g) any of the other undisclosed matters referenced in paragraphs 40-45 above.

49.     As Palikaras knew or was severely reckless in not knowing, his omissions were misleading and/or rendered Brda's statements in Torchlight's public filings discussed above false and misleading. Palikaras also knew, or was severely reckless in not knowing, that his private communications to select investors, indirect promotion of a short squeeze on social media, and private coordination with Brda—while simultaneously failing to publicly disclose to the market his aforementioned omissions—were deceptive, furthered the fraudulent scheme, and concealed Defendants' scheme, plans, and intentions.

50.     Defendants' communications suggest their intentions and motivations in refusing to publicly disclose the planned short squeeze. For example, on June 7, 2021, an anonymous Stocktwits user ("KingOneFolle") posted about Palikaras' statements on the "Italian Investor Call," which is discussed in paragraph 61 below. In that post, KingOneFolle posted a screenshot from a recording of the call and a synopsis of four takeaways from Palikaras' private statements on the call, including the idea that Torchlight's announcement of the Preferred Dividend Record Date would "create a short squeeze as there are many short stocks to cover before the merger!!" Within three minutes of the Stocktwits post, Palikaras emailed a screenshot of the post to Brda and other members of Meta I's management, angrily demanding that investor relations personnel contact KingOneFolle and insist that the post and recording be deleted. Palikaras confided to

**APP. 018**

Meta I's CFO his concern that the deal would "blow up" if his private communications about the short squeeze became public.

**E. Defendants Deceptively Marketed And Promoted The Preferred Dividend In Furtherance Of The Fraudulent Scheme.**

51.     In addition to concealing their scheme from the market through misstatements and omissions, Defendants deceptively marketed and promoted the narrative that the Preferred Dividend would cause a short squeeze in furtherance of their plan to artificially inflate Torchlight's stock price. As further described below, Defendants took steps to market and promote the Preferred Dividend in ways that were intended to: (i) cause short sellers, in the words of Brda, to "understand their dilemma" and trigger a short squeeze; and (ii) increase interest and confidence among legacy and prospective Torchlight shareholders, as well as convertible promissory note holders, in the anticipation of a potential short squeeze, increase in Torchlight's stock price relating to the Preferred Dividend, and/or a purportedly valuable distribution from the Preferred Dividend.

52.     Initially, Defendants believed that they could simply "play up" the Preferred Dividend in press releases to trigger a short squeeze and/or inflate Torchlight's stock price. In a written presentation to Palikaras and Meta I's board in September 2020, Brda proposed his plan to emphasize the Preferred Dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma."

53.     Likewise, in the September 6, 2020 email from a Meta I board member—first discussed in paragraph 36 above—that board member wrote to his fellow board members, based on "two separate calls" that he and Palikaras had with Torchlight management (including Brda): "Torchlight's well thought out strategy…is to finalize an LOI with [Meta I]…and strategically jointly announce it by way of a joint Press Release after the markets close." The board member

wrote that the joint press release "will announce that at closing of the transaction all current shareholders of Torchlight will be issued an equivalent number of Pref Shares." He also explained that, per Brda/Torchlight's strategy, if the two companies agreed on "when the Joint Press Release goes out, the shorts will only have the weekend to come up with their own strategy to cover their short positions." He added that "Torchlight's management [which included Brda] is confident" that Torchlight's stock price would go up following a press release playing up the Preferred Dividend.

54.     Consistent with this plan and proposal, Brda caused Torchlight to issue a press release on September 21, 2020, announcing its merger with Meta I—which Brda participated in drafting and was attached to Torchlight's September 23, 2020 Form 8-K that Brda signed—that emphasized in the release's title: "Special Dividend Intended to be Issued to Torchlight Shareholders at Closing." Similarly, Torchlight's December 14, 2020 press release—which Brda participated in drafting and was attached to Torchlight's December 14, 2020 Form 8-K that Brda signed—announced Meta I and Torchlight's definitive agreement to merge and highlighted in its title: "Preferred Stock Dividend to be Issued to Torchlight Shareholders Prior to Closing." As demonstrated by the communications discussed in paragraphs 52-53 above, Brda deceptively highlighted this one aspect of the merger transaction—the Preferred Dividend to be issued at closing—with the intent of causing the shorts to exit their positions (i.e., "make sure the shorts understand their dilemma") and cause Torchlight's stock price to artificially increase.

55.     Following the September 21, 2020 press release announcing the merger and emphasizing the Preferred Dividend, the market did not appear to immediately react the way the Defendants intended. For example, Torchlight's stock price continued to trade well below $1.00. As a result, Brda turned to some consultants that he knew and previously worked with to spread

the short squeeze narrative for Torchlight. Brda caused Torchlight to pay these consultants to communicate with current or potential Torchlight shareholders. Through these individuals—two of whom Brda introduced to Palikaras as his "guys on stock support"—Brda communicated information about the Preferred Dividend and short squeeze to shareholders.

56.     For example, on September 21, 2020, Brda forwarded to two consultants Torchlight's press release announcing the merger and Preferred Dividend. As reflected in the below exchange, Brda instructed the consultants on how they should message the Preferred Dividend to investors:

> Brda: We need your guys to embrace it. IMO, you get the [Torchlight] value up to $1 and then the 25% of META is free. Lots of room to build a nice position.

> Consultant: Agreed, Everyone I've spoke [sic] to today love it and are buying more and are long term investors! TONS of volume but not moving up?

> Brda: I think people don't understand the dividend properly.

> Consultant: I agree, I'm explaining it and I can hear the light come on while I'm talking to people.

57.     In January 2021, Brda emailed information about the outstanding short position in Torchlight to the stock-support consultants and wrote: "[w]e all knew [the shorts] would come after us one more time. They are creating a massive bubble, IMO, that is going to slingshot in our favor. The dividend is going to be a huge problem for them." Through these and other communications, Brda prompted Torchlight's consultants to explain the Preferred Dividend and its impact on short sellers to investors, without revealing that he and the company were driving that message or disclosing his intention to take advantage of the eventual temporary price inflation by selling Torchlight stock at inflated prices.

58.     To further conceal his deceptive use of stock-support consultants, Brda caused Torchlight to keep inadequate books and records and to maintain inadequate accounting controls

concerning these consultants. Other than generic contracts obligating the consultants to "introduce" the company to potential investors, Brda caused Torchlight to keep no records documenting why Torchlight paid the stock-support consultants $3,000 to $5,000 per month plus stock warrants for their services.

59.     Brda and Palikaras also deceptively had direct communications with select groups of investors where they further played up the short squeeze in furtherance of their scheme.

60.     For example, from March 16-18, 2021, Brda and Palikaras met with a series of institutional investors as part of an investment bank's virtual Annual Investor Conference. During these meetings, Brda and Palikaras pitched the justification for the merger and described to at least one investment firm the potential for the Preferred Dividend to cause a short squeeze. A note-taker at the conference also recorded Brda telling an investment firm on March 17, 2021: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." Through these private communications, Defendants intended to drive interest with these investors in the merger and in buying or retaining Torchlight stock, without publicly disclosing their plan or belief that a short squeeze would occur.

61.     As another example, on May 13, 2021, Palikaras participated in a virtual meeting with a group of Italian shareholders (the "**Italian Investor Call**") that he believed held a significant number of shares of Torchlight common stock. During that meeting, Palikaras described the plan to cause a short squeeze on several occasions, including in one instance:

> And there is one more element to add here, which is the, let's call the x-factor. If you notice the **Torchlight stock is massively shorted** … **This deal is set up not to give a [cash] dividend at closing.** So, in order for the short positions to cover, they have to have the stock on their hand because the dividend will be paid out as a preferred share, not cash. As a result, there is **no physical way for the shorts to cover the stock when the time to close**, and we believe … there will be **a potential jump towards the close**, **it's called a short squeeze**… (emphasis added).

**APP. 022**

62.     In addition, Palikaras and Brda used social media to tout the Preferred Dividend in an indirect manner in furtherance of their market manipulation scheme.

63.     For instance, on June 7, 2021—one week before Torchlight announced the Preferred Dividend Record Date (as defined in paragraph 31 above)—Brda posted on Torchlight's Twitter account a video discussing short squeezes in the context of other stocks. After viewing the tweet, Palikaras texted Brda, advising caution: "I don't think you should be sharing posts on the short squeeze… yet. Just my two cents. Once it happens that's ok as it is fact, but before you are putting yourself at risk for potentially speculative content."

64.     On June 13, 2021—the day before Torchlight announced its Preferred Dividend Record Date—Palikaras tweeted a graphic of shorts-in-flames, kicking off a series of tweets designed to promote the short squeeze theory and encourage investors to purchase Torchlight's common stock. A true and correct copy of this tweet is depicted below:



65.     Palikaras testified during the SEC's investigation that his tweet had nothing to do with the concept of a short squeeze, but the timing, circumstances, and content of his tweet imply that he intended to tout that the Preferred Dividend would set Torchlight's "shorts" on fire by triggering a short squeeze. The reaction of his Twitter followers also belies his testimony. Palikaras' tweet received several comments that made the connection clearly, including:

- "You should set the price of the shorts the price of TRCH at the end of the short squeeze."

- "This is class!!!! burn the shorts"

- "We definitely get the reference "Shorts Are Getting Burner"" [sic]

- "Need a solid PR this Monday … flame those shorties…"

- "This week will be epic! Torch the shorts!"

66.     Palikaras knew or had notice of these comments to his shorts-in-flame tweet. For example, he later posted in response to his tweet, acknowledging that his tweet had over 500 likes in less than an hour. His communications also demonstrate that he was closely monitoring engagement on Twitter around the time of these responses to his tweet. Yet, Palikaras did nothing to disabuse the connection his followers on social media were drawing between his tweet and the short squeeze.

**F. Defendants Made False And Misleading Statements And Omissions Regarding The Value Of The Preferred Dividend In Furtherance Of The Fraudulent Scheme.**

67.     As part of their scheme, Defendants also made false and misleading statements and omissions in public filings and public statements to investors about the Preferred Dividend. These misstatements and omissions created false impressions about the value of the Preferred Dividend and the likelihood that holders of the Preferred Dividend would receive a distribution of the "net proceeds" from the sale of Torchlight's oil and gas assets. As further described below,

24

Defendants made these statements knowingly or with severe recklessness to induce investors to buy or hold Torchlight common stock in furtherance of their fraudulent scheme.

> ### *i. Brda made false and misleading statements and omissions in Torchlight's proxy filings and Form 8-K filings about ongoing "commercially reasonable efforts" to sell Torchlight's oil and gas assets and plans to distribute "net proceeds" to holders of the Preferred Dividend.*

68.     In Torchlight's public filings leading up to the merger, Brda bolstered the potential value of the Preferred Dividend through false and misleading statements and omissions. Specifically, Brda misrepresented in Torchlight's public filings that Torchlight would make "commercially reasonable efforts" to sell its oil and gas assets and distribute the net proceeds to holders of the Preferred Dividend within six months of the merger closing. Torchlight claimed that if the efforts to sell were unsuccessful six months after the merger date, it would then consider spinning off the assets. In reality, there were no prospects for selling Torchlight's oil and gas assets within six months of the merger closing, and Brda had started planning to spin off the assets as soon the merger agreement was signed. His misrepresentations and omissions created the false impression about the likelihood that Preferred Dividend holders would receive a return on their investments in the form of a distribution of net proceeds from Torchlight's sale of its oil and gas assets shortly after the merger.

69.     Brda, through Torchlight, first made this representation in Torchlight's Form 8-K dated September 23, 2020, announcing the merger, stating that the merged company of Torchlight and Meta I would "use its commercially reasonable efforts to cause the Torchlight oil and gas assets to be sold [within six months of the initial merger date]. Torchlight legacy shareholders will be entitled to a special dividend distribution of any values attributable to the sale of Torchlight's existing oil and gas business assets (net of [certain debt and holdbacks]…)."

70.     Brda repeated a similar version of these false and misleading statements in several of Torchlight's subsequent press releases and Forms 8-K, including most prominently in press releases attached to Torchlight's Forms 8-K filed on April 15, 2021, May 4, 2021, and June 16, 2021. Each of these public filings or press releases stated that Torchlight would distribute "net proceeds" to shareholders who received the Preferred Dividend. A distribution of net proceeds could only happen after Meta II (as successor-in-interest of Torchlight after the merger) made efforts (and succeeded) in selling the oil and gas assets within six months of the merger closing.

71.     As another example, in the press release announcing that Torchlight and Meta I signed a definitive merger agreement, Torchlight's Form 8-K dated December 14, 2020, stated: "[f]ollowing the Reverse Split, and prior to the Effective Time, Torchlight will declare and issue a dividend, on a one-for-one basis, of shares of preferred stock to the holders of its common stock. Following the Effective Time, the holders of preferred stock will be entitled to a dividend based on the net proceeds of the sale of any assets that are used or held for use in Torchlight's oil and gas exploration business…, subject to certain holdbacks."

72.     In Torchlight's proxy statements—which Brda approved—Torchlight repeated the claim that it would make "commercially reasonable efforts" to sell the oil and gas assets. The proxy statements also contained statements about the distribution of proceeds from the sale of Torchlight's oil and gas assets, as well as statements emphasizing that the Preferred Dividend would not be registered or traded on any exchange (consistent with Brda's plan to cause a short squeeze and lead investors to believe a short squeeze would occur).

73.     By way of example, Torchlight's definitive proxy statement dated May 7, 2021, contained the following false and misleading statements about "commercially reasonable efforts"

APP. 026

to sell the company's oil and gas assets and a distribution that "may" be made to holders of the

Preferred Dividend:

> The Arrangement Agreement provides that Torchlight and the Combined Company
> will use commercially reasonable efforts to sell the O&G Assets [*within six months*
> *of the merger closing*]. Torchlight stockholders of record as of the Series A
> Preferred Record Date, will receive a dividend, on a one-for-one basis, of shares of
> Series A Preferred Stock.… Holders of shares of Series A Preferred Stock may
> receive Asset Sale Dividends from any Asset Sale Transactions consummated
> [*within six months of the merger closing*], and may also receive a Spin-Off
> Dividend of any Remaining Assets that have not been sold in an Asset Sale
> Transaction [*within six months of the merger closing*].

74.     These statements were made repeatedly in Torchlight's proxy materials. The

company touted its "commercially reasonable efforts" to sell all of its oil and gas assets a half

dozen times in its May 7, 2021 definitive proxy statement and with similar frequency in its

preliminary proxy statements on February 4, 2021, March 23, 2021, and April 21, 2021.

75.     These statements and representations made by Brda in Torchlight's public filings,

proxy statements, and press releases were false and misleading at the time they were made. As

Brda knew or was reckless in not knowing, Torchlight had no prospects to sell the oil and gas

assets and had taken no actions to lay the groundwork for a sale when the statements were made.

Brda also knew that Torchlight had unsuccessfully tried to sell its largest oil and gas asset for

years. Due to the size and unproven state of Torchlight's oil and gas assets, only a small number

of companies were possible candidates to purchase Torchlight's assets, and Torchlight's records

do not reflect any prospects or discussions with any such candidates in 2020 or 2021. Likewise,

during the SEC's investigation, neither Torchlight nor Brda could identify *any* specific prospects

that the company had discussions with to sell its oil and gas leases in 2020 or 2021.

76.     Without any identified buyers or ongoing negotiations, Brda knew, or was

severely reckless in not knowing, that a sale of Torchlight's oil and gas assets within six months

of the merger closing was not possible. As Brda knew or was severely recklessly in not knowing, it would take at least a year, if not longer, simply to complete the due diligence that a specialized buyer would undertake before completing a sale of Torchlight's assets.

77.    In addition, Brda knowingly or severely recklessly omitted material facts and information that were necessary in order to make his statements in Torchlight's public filings referenced in paragraphs 68-74 not misleading. Among other things, Brda failed to disclose that, at the time of his above-referenced statements, Torchlight had no specific prospects or candidates to buy its largest oil and gas assets, that Torchlight had unsuccessfully tried to sell those asset for years, that Torchlight had no plans in place to use "commercially reasonable efforts" to complete the sale of its assets within six months of the merger closing, or that a sale of those assets within six months of the merger closing was not possible given the lack of prospects or candidates.

78.    Brda also knowingly or severely recklessly failed to disclose that he had laid the foundation for a spin-off of Torchlight's oil and gas assets into a new entity *as early as December 2020*—mere days after the definitive agreement for the merger between Torchlight and Meta I was signed. In particular, beginning in December 2020, Brda circulated to Torchlight's Chairman and other insiders presentations outlining capital formation plans for a spin-off entity (the **"Spin-Off Entity"**). He did not publicly disclose these plans.

79.    Additionally, Brda knowingly or severely recklessly failed to disclose that, starting in January 2021, he caused Torchlight to begin secretly paying $20,000 a month to individuals who would form the initial management team of the Spin-Off Entity. To conceal his plans, Brda caused Torchlight to make these monthly payments through an intermediary who received "consulting fees" for doing no actual work. He further caused Torchlight to keep inadequate books and records, and/or caused it to maintain insufficient controls, to document

why Torchlight was making these monthly payments to this intermediary. Brda did not publicly disclose these payments or his fully-formed spin-off plans before the merger closing.

80.     By August 2021—just six weeks after the merger closed—Brda sent the post-merger Meta II Board a fully-formed plan to abandon all of its so-called "efforts" to sell the assets and, instead, to spin off the assets into the Spin-Off Entity—which had the same name as the Spin-Off Entity that Brda identified in his presentation to Torchlight's board back in December 2020—with a specific management team that Brda and Torchlight had been paying clandestinely through an intermediary since January 2021. Consistent with Brda's recommendation, by August 17, 2021—less than 60 days after the merger closed—Meta II's Board voted to "discontinue" any so-called "effort" to sell the assets and, instead, to drill wells required to maintain the leases, with a goal of spinning off the assets into a separate company as soon as possible.

81.     Thus, Brda knew, or was severely reckless in not knowing, that no "commercially reasonable efforts" would be undertaken to sell Torchlight's assets, that the assets could not be sold within six months of the merger closing, and that no distribution from such a sale would occur. And he knowingly or severely recklessly made false and misleading statements and omissions to the contrary in furtherance of his scheme to manipulate Torchlight's stock price.

### ii.  Palikaras made false statements about the value of the Preferred Dividend.

82.     On May 13, 2021, Palikaras participated in the Italian Investor Call, as described and alleged in paragraph 61 above. Palikaras believed that the investors on the Italian Investor Call held a significant number of shares of Torchlight common stock. The stated purposes of the Italian Investor Call were to: (a) solicit the Italian shareholders' proxy votes in favor of the merger between Torchlight and Meta I, and (b) encourage the investors to hold the common

stock of the post-merger company. During the Italian Investor Call, as discussed in paragraphs 83-88 below, Palikaras made false and misleading statements regarding at least two topics.

83.     First, Palikaras claimed that Torchlight was speaking to "the right potential buyers" and that the buyers were "top tier." However, as Palikaras knew or was severely reckless in not knowing, Torchlight had not identified *any* potential buyers. In fact, Palikaras admitted in sworn testimony during the SEC's investigation that, at the time he made the statement, he had no knowledge of potential buyers or active negotiations.

84.     Second, Palikaras claimed that, based on "the analysis," the value of the Preferred Dividend could be between $1–$20 per share.

85.     As Palikaras knew or was severely reckless in not knowing, the $1–$20 per share range that he identified was wholly unsupported. Likewise, there was no "analysis" supporting his statement. Indeed, by the time he made this statement, he had reviewed the investment bank's third-party asset valuation, which implied an estimated asset value of less than $1.00 per share. Palikaras' reference to an "analysis" also gave investors the misleading impression that his value range was supportable, when it was not.

86.     By at least June 11, 2021, a partial audio recording of the Italian Investor Call had been posted to social media, which included Palikaras' false and misleading statements referenced above. Palikaras' statements quickly became a topic of discussion on social media in the days leading up to the merger closing. A common refrain on social media was that the company's post-merger CEO (Palikaras) estimated that the Preferred Dividend would be worth $20 per share. Palikaras and Brda were aware of the discussions on social media and the existence of the recording, but neither one made any effort to correct or clarify Palikaras'

misstatements that, at that time, they knew, or were severely reckless in not knowing, were materially false or misleading and that investors were relying on.

87.    After the merger, Meta II's VP of Business Development emailed Palikaras and other members of the Meta II management team about an investor complaint citing the $1–$20 dividend range. Meta II's VP of Business Development stated plainly, "[t]he dividend was never going to be worth more than $1… The math was not difficult prior to the merger: value of O&G assets / number of pre-existing TRCH shares." In other words, as Meta II's VP of Business Development confirmed, Palikaras' $1–$20 estimate never had any basis in fact.

88.    Defendants' false and misleading statements gave investors the false impression that Torchlight had made some progress toward selling its oil and gas assets, and that Meta II would be able to quickly monetize Torchlight's oil and gas assets and distribute the net proceeds to shareholders post-merger. This false impression incentivized investors to acquire or hold Torchlight common stock through the Record Date to be eligible to receive the Preferred Dividend. Torchlight legacy shareholders who believed Defendants' misrepresentations about the value of the Preferred Dividend were incentivized not to sell before the Record Date, and thus, missed the opportunity to sell when Torchlight's stock price increased leading up to the merger. In turn, this false impression furthered Defendants' scheme to manipulate the market by artificially inflating the value of Torchlight's stock.

**G. Defendants Succeeded In Manipulating The Price Of Torchlight Stock.**

89.    As a result of their fraudulent scheme and through the use of false and misleading statements and omissions, Defendants artificially inflated the price of Torchlight stock in the days and weeks leading up to the merger closing in June 2021.

90.    On June 14, 2021—just a day after Palikaras made his "shorts-in-flames" tweet mentioned in paragraph 64 above—Torchlight issued a press release announcing the Preferred

Dividend Record Date of June 24, 2021. That same day, Palikaras issued a tweet, linking the press release and stating: "[n]ice release by $TRCH, the dividend [record] date is 06/24 (ten day notice required), there is a T plus 2 rule so last chance to be in @TRCHEnergy is Tuesday 06/22 end of day."[4] Posts and content from other users on social media on or around June 14–22, 2021 show that investors following news about Torchlight and/or Meta I understood Palikaras' tweet to mean that the key to obtaining the benefits of the short squeeze and the Preferred Dividend— which Palikaras had led investors to believe was worth $1–$20 per share—was to buy or hold Torchlight stock through June 22, 2021 (the T+2 Date).

91.     As Defendants intended, users on Twitter, Stocktwits, YouTube, Reddit, and other social media platforms discussed the merger, the Preferred Dividend, and the short squeeze in the days leading up to the merger and Record Date.

92.     On June 14, 2021, Brda sent Palikaras an image of an online campaign promoting the short squeeze theory using the hashtag "#TORCHDAY." An anonymous user created a graphic that conveyed the precise message that Defendants privately hoped to spread: "Post and educate people about our short squeeze … #TORCHDAY" and "Post and educate people about our dividend ranging from $1 - $20 (deadline 06/22)." The graphic went on to explain "[Torchlight] is a heavily shorted stock, and due to the fact a preferred share dividend is being granted to stockholders SHORTS HAVE TO COVER which can lead to a short squeeze of the stock." The Torch Day graphic also explicitly referenced Palikaras' "shorts-in-flames" tweet from the day before.

---

[4] The "T plus 2 rule" mentioned in Palikaras' tweet is the rule, in place at the time, under which the settlement cycle—the time between the transaction date and the settlement date—for most securities transactions was two business days. Thus, per this rule, investors generally had to either hold or place an order to buy Torchlight stock by June 22, 2021 ("**T+2 Date**") to ensure they were Torchlight shareholders of record as of the June 24, 2021 Record Date.

93.     Social media users posted the hashtag and versions of the graphic dozens of times over a few days around June 14-16, 2021. And users on many other social-media platforms picked up on the basic gist of the scheme to promote purchasing Torchlight common stock to benefit from the supposed short squeeze by June 22 (the T+2 Date), using other hashtags, subreddits, and iterations discussing the Preferred Dividend, the Record Date, the expected \$1–\$20 dividend, and the short squeeze.

94.     The trading volume of Torchlight stock dramatically surged as the merger approached. In May 2021, the average trading volume was 5 million shares per day. But, between the announcement of the Record Date on June 14, 2021 and the T+2 Date (June 22, 2021), the average trading volume exceeded 80 million shares per day.

95.     Likewise, following the announcement of the Record Date on June 14, 2021, the price of Torchlight stock surged. The price at closing jumped from \$3.58 per share on June 14 to \$5.07 per share on June 15 to \$5.99 per share on June 16. Torchlight stock price peaked at \$10.88 per share on June 21—an increase of over 200% from its price at closing on June 14.

96.     Torchlight's stock price artificially increased as a result of Defendants' scheme. However, the evidence available at this time is inconclusive as to whether, or to what extent, the trading volume was attributable to short sellers covering their positions versus defrauded investors purchasing Torchlight's stock to "burn the shorts" or obtain the Preferred Dividend that they believed was worth \$1–\$20.

97.     Regardless, at the time that Torchlight's stock price was surging in June 2021, Brda and Palikaras believed that a short squeeze was driving the surge. For example, as further discussed in paragraph 104 below, on June 18, 2021—after Torchlight's stock price began to increase—Brda told Palikaras that they needed "to take advantage of the squeeze," which they

did through an ATM Offering that they had discussed and planned as early as September 2020.

Through their deceptive marketing and promotion discussed in paragraphs 51-66 above,

Defendants also led retail and other investors to believe that a short squeeze would occur and

drive the surge in Torchlight's stock price. Also, the aim of Defendants' scheme was to

manipulate the market by artificially increasing Torchlight's stock price. Defendants achieved

that aim when Torchlight's stock price suddenly and temporarily surged in June 2021 as a result

of Defendants' plans and intent to manipulate the price of Torchlight stock. And as discussed

below, Defendants achieved the other aim of their scheme through an ATM Offering conducted

at the height of their price manipulation.

### H. Brda Deployed An ATM Offering To Capitalize On The Fraudulent Scheme.

98.     Upon successfully manipulating the market for Torchlight common stock, Brda

set in motion the next phase of the scheme: the ATM Offering. His plan— which was not

disclosed in any public filings or statements—sought to capitalize on what he knew or expected

to be a temporary artificial increase in Torchlight's stock price.

99.     Before executing the ATM Offering, Brda sought a formal agreement from Meta I

to use some of the funds raised by the ATM Offering toward drilling oil wells to maintain

Torchlight's oil and gas leases. In an email to Palikaras dated June 16, 2021, Brda wrote:

> "We have the ATM that will be in play by Thursday morning… up to $100 Million…
> *Raising money prior to the dividend record date, IMO, is the best way to get maximum
> money and at the best price*… I believe I can get my board to approve if META would
> agree to lend a decent portion of the raise to [Torchlight]… Say 20% of the amount raised…
> Otherwise, we have no inclination to raise capital now as it only dilutes our oil and gas
> assets further…. The ducks are quacking, time to feed them!" (emphasis added).

100.    Although Palikaras knew from the outset of negotiations about Brda's plan to use

an ATM Offering to capitalize on their scheme to manipulate the price of Torchlight stock—as

discussed, among other places, in paragraph 36 above— Brda waited to make this request to use

34

funds from the ATM Offering to pay Torchlight's drilling expenses until June 16, 2021—less

than ten days before the Torchlight-Meta I merger was set to close. At that point in time, Brda

had leverage over Palikaras and Meta I, who stood to reap the benefit of the ATM Offering for

Meta II's post-merger operations.

101.     Palikaras and Meta I's CFO recommended to Meta I's Board that they take the

deal proposed by Brda, writing on or around June 18, 2021: "all [Meta I's advisers] strongly

recommended we take as much of the money as we can ahead of the closing." And while the

ATM Offering would be "[d]ilutive to Torchlight [common and preferred] shareholders, before

Ex-Dividend date *however it also takes advantage of the potential best pricing due to any short*

*covering effect prior to the Ex-Date*." (emphasis added).

102.     Despite Palikaras' recommendation, Meta I did not formally agree to Brda's

demands. Nonetheless, Torchlight ultimately did vote to proceed with the ATM Offering, and

later Meta II entered into an agreement post-merger to fund the drilling for the oil and gas

assets—consistent with Brda's original plan and scheme.

103.     More importantly, Brda and Torchlight went forward with the ATM Offering as

Defendants had planned while Torchlight's stock price was at its height. Specifically, Brda

caused Torchlight, through an investment bank, to commence the ATM Offering starting on June

18, 2021—just days after the June 14 announcement of the Record Date.

104.     Brda intended the ATM Offering to capitalize on Defendants' price manipulation.

On June 18, 2021—after the ATM Offering had commenced—Brda wrote Palikaras: "[w]e need

to be selling more than we are, the shorts always push down at the end of the day… ***We have two***

***days to take advantage of the squeeze***, today should have been a 5 million share day at 6[.]"

(emphasis added).

**APP. 035**

105.     Palikaras knew about and agreed with Brda's plan to use the ATM Offering to capitalize on their market manipulation efforts. On June 16, 2021—as Torchlight's stock price continued to rise following the June 14 announcement of the Record Date—Palikaras wrote Brda to express his agreement with taking advantage of the inflated value of Torchlight's stock: "[t]o the moon! We are happy to take $100-200m at a 20% PREMIUM TO THE MARKET and a minimum of $7 whatever is largest." Then, on June 18, 2021, in response to Brda's above-cited message that "[w]e have two days to take advantage of the squeeze" through the ATM Offering, Palikaras wrote Brda: "Go ahead to $5.75. 5m shares. Fill her up[.]"

106.     Ultimately, Torchlight, through an investment bank, conducted the ATM Offering over a five-day period between Friday, June 18, 2021, and Thursday, June 24, 2021. In the middle of that offering period, on June 21, 2021, Torchlight's stock price reached a record high of $10.88 per share and closed at $9.92 per share. Overall, Torchlight sold 16.2 million shares during the ATM Offering at an average price of $8.50 per share. Over 95% of that volume was sold prior to the T+2 Date. In total, Torchlight raised $137.5 million through the ATM Offering.

107.     Torchlight's stock price fell dramatically after the T+2 Date and Torchlight's completion of the ATM Offering. On June 22, 2021, the T+2 Date, the stock closed at $7.00 per share. By June 25th—after Torchlight had completed its ATM Offering—the stock had dropped to $4.95 per share at closing. The following Monday (June 28, 2021), after Torchlight announced a 2-for-1 reverse stock split and the completion of its merger with Meta I, the company's new ticker (MMAT) closed at $3.98 per share (after accounting for the reverse split, less than half its prior-day closing price). Investors who purchased or held Torchlight common stock during the course of Defendants' fraudulent scheme suffered pecuniary harm.

**I. Brda Profited From The Fraudulent Scheme.**

108.     Brda profited off his fraudulent scheme and false and misleading statements to

investors.

109.     On June 24, 2021, immediately after the ATM Offering and one day before the

merger closed, Brda urged Torchlight's Compensation Committee to award him a $1.5 million

bonus. He presented the Committee with a "Top Ten + 2 Reasons to Pay Bonus to John Brda,"

which touted his achievements in conceiving and executing the Torchlight-Meta I merger. He

specifically pointed out that he "[m]anaged the entire merger process with [Meta I] leading to a

market cap increase from $30 million to nearly $1.44 billion." He also wrote that he

"[c]onceived the timing of the shareholder meeting with windows to raise additional equity and

filing of the shelf S3 for $240 million along with the ATM–raising full amount of $133 million

on ATM." He explained that he "[h]andled all investor calls and fund calls during the process."

For these reasons, Brda requested a "bonus of $1.5 million in cash."

110.     Meta II paid Brda the $1.5 million bonus in two $750,000 increments—half

before closing on June 25, 2021, and the other half after the merger closed.

111.     Brda received his $1.5 million bonus as a result of the funds he raised through his

market manipulation scheme and his false and misleading statements and omissions. Had he not

engaged in this fraudulent scheme, he would not have received the bonus. Indeed, to his request

to the Compensation Committee, Brda attached a spreadsheet reflecting Torchlight's remaining

obligations, which makes clear that the company would not have sufficient funds to pay a $1.5

million bonus *or its existing obligations*, but for the proceeds of the ATM Offering.

## VI.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

***(Against All Defendants)***

112.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

113.    Between at least June 2020 and June 25, 2021, Defendants planned and perpetrated a scheme to manipulate the market by artificially increasing the price of Torchlight's stock on a temporary basis and capitalizing on that artificial increase through the ATM Offering. As further described and alleged in paragraphs 20-107 above, Defendants knowingly and/or severely recklessly engaged in deceptive and/or manipulative acts in furtherance of the fraudulent scheme.

114.    Defendants also knowingly and/or severely recklessly made false and misleading statements or omissions of material fact, as further described and alleged in paragraphs 38-50 and 67-88 above.

115.    By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

- employed a device, scheme, or artifice to defraud; and/or

- obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

- engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

116.    With regard to the violations of Section 17(a)(1), Defendants acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness.  With regard to the violations of Sections 17(a)(2) and 17(a)(3), Defendants acted at least negligently.

117.    By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

#### *(Against All Defendants)*

118.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

119.    Between at least June 2020 and June 25, 2021, Defendants planned and perpetrated a scheme to manipulate the market by artificially increasing the price of Torchlight's stock on a temporary basis and capitalizing on that artificial increase through the ATM Offering. As further described and alleged in paragraphs 20-107 above, Defendants knowingly and/or severely recklessly engaged in deceptive and/or manipulative acts in furtherance of the fraudulent scheme.

120.    Defendants also knowingly and/or severely recklessly made false and misleading statements or omissions of material fact, as further described and alleged in paragraphs 38-50 and 67-88 above.

121.    By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities,

by the use of any means or instrumentality of interstate commerce, or of the mails or of any

facility of any national securities exchange:

- employed a device, scheme, or artifice to defraud; and/or

- made untrue statements of material facts, or omitted to state material facts

  necessary in order to make the statements made, in light of the circumstances

  under which they were made, not misleading; and/or

- engaged in acts, practices, or courses of business which operated, or would

  operate, as a fraud or deceit upon any person.

122.    With regard to the violations of Section 10(b) and Rule 10b-5, Defendants acted

with scienter and engaged in the referenced acts knowingly and/or with severe recklessness.

123.    By reason of the foregoing, Defendants have violated, and unless enjoined will

continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9]

#### *(Against All Defendants)*

124.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if

fully set forth hereunder.

125.    As further described and alleged in paragraphs 39-46 and 67-81 above,

Torchlight's proxy statements contained false or misleading statements and/or omissions of

material fact. Brda solicited and/or permitted the use of his name to solicit shareholder approval

via the proxy statements containing false or misleading statements or omissions of material fact.

APP. 040

126.     As further described and alleged in paragraphs 82-88 above, Palikaras  solicited shareholder approval by means of the oral and/or written communications during the Italian Investor Call that contained statements that, at the time and in the light of the circumstances under which those statements were made, were false or misleading with respect to a material fact, and/or that omitted to state a material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading.

127.     By engaging in the acts and conduct alleged herein, each Defendant, directly or indirectly, singly or in concert with others, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of any national securities exchange or otherwise, solicited and/or permitted the use of his name to solicit a proxy or consent or authorization with respect of securities; and such solicitation was made by means of a proxy statement or other communication, written or oral, that contained false or misleading statements with respect to a material fact and/or omitted to state a material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

128.     With regard to the violations of Section 14(a) and Rule 14a-9, Defendants acted at least negligently.

APP. 041

129.     By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

### FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Meta II's Violations of Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20 and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11]**
*(Against Brda)*

130.     The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

131.     At the time of the conduct alleged herein, including the statements, omissions, and periodic securities filings described above, Torchlight was an issuer of securities registered under Section 12 of the Exchange Act that filed required reports with the SEC under Section 13(a) of the Exchange Act and related rules and regulations. Torchlight subsequently merged with Meta I to become Meta II.

132.     As further described and alleged in paragraphs 67-71 and 75-81 above, Torchlight made untrue statements of material fact without adding such further material information as may be necessary to make the statements not misleading in its periodic securities filings, including but not limited to the false and/or misleading statements and/or omissions in its press releases attached to its Forms 8-K filed with the SEC on December 14, 2020, April 15, 2021, May 4, 2021, and June 16, 2021.

133.     As further described and alleged in paragraphs 15, 67-71, and 75-81 above, Brda knew or was severely reckless in not knowing that Torchlight's periodic securities filings, including but not limited to its press releases attached to its Forms 8-K filed with the SEC on December 14, 2020, April 15, 2021, May 4, 2021, and June 16, 2021, contained untrue statements of material fact without adding such further material information as may be necessary

**APP. 042**

to make statements not misleading in its periodic securities filings. Brda also, among other things, signed, approved, drafted or helped draft, and caused Torchlight to file such press releases and/or periodic securities filings.

134.    By engaging in the acts and conduct alleged herein, Meta II—as the successor-in-interest of Torchlight—violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder. Meta II has consented to the entry of the SEC's Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("**OIP**"), finding that Meta II violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

135.    By engaging in the acts and conduct alleged herein, Brda aided and abetted Meta II's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder by knowingly or recklessly providing substantial assistance to Meta II in violating Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

136.    By reason of the foregoing, Brda, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet—and/or should be restrained from further aiding and abetting—violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11.

### FIFTH CLAIM FOR RELIEF

**Aiding and Abetting Meta II's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]**

***(Against Brda)***

137.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

138.    As further described and alleged in paragraphs 55-58 and 78-80, Meta II (then Torchlight) failed to implement internal accounting controls and maintain adequate books and

43

**APP. 043**

records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses through a series of payments made to stock-support consultants who rendered services to the company without sufficient documentation.

139.    As further described and alleged in paragraphs 55-58 and 78-80, Meta II (then Torchlight) also failed to implement internal accounting controls and maintain adequate books and records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses through a series of payments made to an intermediary who received "consulting fees" without documentation reflecting the services this intermediary purportedly provided (such fees were ultimately paid by the intermediary to individuals who would form the initial management team of the Spin-Off Entity, but Torchlight did not maintain records reflecting the same). During the SEC's investigation, Meta II failed to provide documents or information to SEC staff describing Torchlight's internal accounting controls related to payments to consultants. If Torchlight had such internal accounting controls, they were either insufficiently devised or maintained to account properly for Torchlight's disposition of assets or recognition of expenses.

140.    Torchlight's stock support consultants, and the consultant used to funnel $20,000 per month to the Spin-Off Entity management, provided no evidence to Torchlight of services rendered other than generic consulting contracts. This expense represented a substantial portion of Torchlight's overall expenses in the first half of 2021.

141.    By engaging in the acts and conduct alleged herein, Meta II—as the successor-in-interest of Torchlight—violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act. Meta II has consented to the entry of the SEC's OIP, finding that Meta II violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

**APP. 044**

142.     By engaging in the acts and conduct alleged herein, Brda aided and abetted Meta II's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by knowingly or recklessly providing substantial assistance to Meta II in violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

143.     By reason of the foregoing, Brda, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet—and/or should be restrained from further aiding and abetting—violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

## VII.    PRAYER FOR RELIEF

144.     WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

• Permanently restraining and enjoining Defendant Brda from violating, directly or indirectly, Section 17(a) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder, and from aiding and abetting future violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder;

• Permanently restraining and enjoining Defendant Palikaras from violating, directly or indirectly, Section 17(a) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder;

• Permanently barring each Defendant, pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, from acting or serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act;

• Permanently restraining and enjoining each Defendant from directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account;

• Ordering Defendant Brda to disgorge all ill-gotten gains received as a result of the violations alleged herein, together with pre-judgment interest thereon, pursuant to the Court's equitable powers and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)];

• Ordering each Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

• Granting such other and further relief as this Court may deem appropriate, just, equitable, and/or necessary.

## VIII.   <u>JURY DEMAND</u>

145.   The SEC demands trial by jury in this action on all issues so triable.

Dated:  June 25, 2024                 Respectfully submitted,

/s/ *Patrick Disbennett*
Patrick Disbennett (*pro hac vice* application pending)
Christopher Rogers (*pro hac vice* application pending)

U.S. Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
Tel: 817-978-3821
disbennettpa@sec.gov
rogerschri@sec.gov

APP. 046

JS 44C/SDNY
REV.
05/28/2024

Case 1:24-cv-04806   Document 1-1   Filed 06/25/24   Page 1 of 2
Case 4:24-cv-00767-P   Document 54-1   Filed 10/23/24   Page 47 of 117   PageID 919

**CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

PLAINTIFFS

SECURITIES AND EXCHANGE COMMISSION

DEFENDANTS

JOHN BRDA
GEORGIOS PALIKARAS

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER

Patrick B. Disbennett

801 Cherry St, Suite 1900, Fort Worth, TX 76102 - 817-978-3821

ATTORNEYS (IF KNOWN)

Jason Lewis, 1900 Pearl St., Ste 2200, Dallas, TX 75201, 214-743-4548
Jessica B. Magee, 1722 Routh St., Ste1500, Dallas, TX 75201, 214.969.1375

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Section 17(a) of the Securities Act of 1933, 10(b) & 14(a) of the Securities Exchange Act of 1934 and Rules 10b-5 and 14a-9 thereunder, 13(a), 13(b)(2)(A), & 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.  Violations of Securities.

Has this action, case, or proceeding, or one essentially the same, been previously filed in SDNY at any time? No [✓] Yes [ ] _____
*(If yes, Judge Previously Assigned)*

If yes, was this case Vol. [ ] Invol. [ ] Dismissed. No [ ] Yes [ ]  If yes, give date _____ & Case No. _____

Is this an international arbitration case?   No [X]   Yes [ ]

*(PLACE AN [x] IN ONE BOX ONLY)*   **NATURE OF SUIT**

TORTS

ACTIONS UNDER STATUTES

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY/ | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|

CONTRACT
[ ] 110   INSURANCE
[ ] 120   MARINE
[ ] 130   MILLER ACT
[ ] 140   NEGOTIABLE INSTRUMENT
[ ] 150   RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151   MEDICARE ACT
[ ] 152   RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153   RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160   STOCKHOLDERS SUITS
[ ] 190   OTHER CONTRACT
[ ] 195   CONTRACT PRODUCT LIABILITY
[ ] 196   FRANCHISE

REAL PROPERTY
[ ] 210   LAND CONDEMNATION
[ ] 220   FORECLOSURE
[ ] 230   RENT LEASE & EJECTMENT
[ ] 240   TORTS TO LAND
[ ] 245   TORT PRODUCT LIABILITY
[ ] 290   ALL OTHER REAL PROPERTY

PERSONAL INJURY
[ ] 310   AIRPLANE
[ ] 315   AIRPLANE PRODUCT LIABILITY
[ ] 320   ASSAULT, LIBEL & SLANDER
[ ] 330   FEDERAL EMPLOYERS' LIABILITY
[ ] 340   MARINE
[ ] 345   MARINE PRODUCT LIABILITY
[ ] 350   MOTOR VEHICLE
[ ] 355   MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360   OTHER PERSONAL INJURY
[ ] 362   PERSONAL INJURY - MED MALPRACTICE

ACTIONS UNDER STATUTES

CIVIL RIGHTS
[ ] 440   OTHER CIVIL RIGHTS (Non-Prisoner)
[ ] 441   VOTING
[ ] 442   EMPLOYMENT
[ ] 443   HOUSING/ ACCOMMODATIONS
[ ] 445   AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446   AMERICANS WITH DISABILITIES -OTHER
[ ] 448   EDUCATION

PERSONAL INJURY/ PROPERTY LIABILITY
[ ] 367   HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY
[ ] 365   PERSONAL INJURY PRODUCT LIABILITY
[ ] 368   ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

PERSONAL PROPERTY
[ ] 370   OTHER FRAUD
[ ] 371   TRUTH IN LENDING
[ ] 380   OTHER PERSONAL PROPERTY DAMAGE
[ ] 385   PROPERTY DAMAGE PRODUCT LIABILITY

PRISONER PETITIONS
[ ] 463   ALIEN DETAINEE
[ ] 510   MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530   HABEAS CORPUS
[ ] 535   DEATH PENALTY
[ ] 540   MANDAMUS & OTHER

PRISONER CIVIL RIGHTS
[ ] 550   CIVIL RIGHTS
[ ] 555   PRISON CONDITION
[ ] 560   CIVIL DETAINEE CONDITIONS OF CONFINEMENT

FORFEITURE/PENALTY
[ ] 625   DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 690   OTHER

PROPERTY RIGHTS
[ ] 820   COPYRIGHTS
[ ] 830   PATENT
[ ] 835   PATENT-ABBREVIATED NEW DRUG APPLICATION
[ ] 840   TRADEMARK
[ ] 880   DEFEND TRADE SECRETS ACT

LABOR
[ ] 710   FAIR LABOR STANDARDS ACT
[ ] 720   LABOR/MGMT RELATIONS
[ ] 740   RAILWAY LABOR ACT
[ ] 751   FAMILY MEDICAL LEAVE ACT (FMLA)
[ ] 790   OTHER LABOR LITIGATION
[ ] 791   EMPL RET INC SECURITY ACT (ERISA)

IMMIGRATION
[ ] 462   NATURALIZATION APPLICATION
[ ] 465   OTHER IMMIGRATION ACTIONS

BANKRUPTCY
[ ] 422   APPEAL 28 USC 158
[ ] 423   WITHDRAWAL 28 USC 157

SOCIAL SECURITY
[ ] 861   HIA (1395ff)
[ ] 862   BLACK LUNG (923)
[ ] 863   DIWC/DIWW (405(g))
[ ] 864   SSID TITLE XVI
[ ] 865   RSI (405(g))

FEDERAL TAX SUITS
[ ] 870   TAXES (U.S. Plaintiff or Defendant)
[ ] 871   IRS-THIRD PARTY 26 USC 7609

OTHER STATUTES
[ ] 375   FALSE CLAIMS
[ ] 376   QUI TAM
[ ] 400   STATE REAPPORTIONMENT
[ ] 410   ANTITRUST
[ ] 430   BANKS & BANKING
[ ] 450   COMMERCE
[ ] 460   DEPORTATION
[ ] 470   RACKETEER INFLU-ENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480   CONSUMER CREDIT
[ ] 485   TELEPHONE CONSUMER PROTECTION ACT
[X] 850   SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 490   CABLE/SATELLITE TV
[ ] 890   OTHER STATUTORY ACTIONS
[ ] 891   AGRICULTURAL ACTS
[ ] 893   ENVIRONMENTAL MATTERS
[ ] 895   FREEDOM OF INFORMATION ACT
[ ] 896   ARBITRATION
[ ] 899   ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION
[ ] 950   CONSTITUTIONALITY OF STATE STATUTES

*Check if demanded in complaint:*

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____   OTHER _____

*Check YES only if demanded in complaint*
JURY DEMAND: x YES   NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y. AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

JUDGE _____   DOCKET NUMBER _____

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

**APP. 047**

*(PLACE AN  x  IN ONE BOX ONLY)*                                        **ORIGIN**

[x] 1 Original Proceeding  [ ] 2 Removed from State Court  [ ] 3 Remanded from Appellate Court  [ ] 4 Reinstated or Reopened  [ ] 5 Transferred from (Specify District)  [ ] 6 Multidistrict Litigation (Transferred)  [ ] 7 Appeal to District Judge from Magistrate Judge

[ ] a. **all parties represented**

[ ] b. **At least one party is pro se.**                                   [ ] 8 Multidistrict Litigation (Direct File)

*(PLACE AN  x  IN ONE BOX ONLY)*     **BASIS OF JURISDICTION**     *IF DIVERSITY, INDICATE CITIZENSHIP BELOW.*

[X] 1 U.S. PLAINTIFF  [ ] 2 U.S. DEFENDANT  [ ] 3 FEDERAL QUESTION (U.S. NOT A PARTY)  [ ] 4 DIVERSITY

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [x] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Securities and Exchange Commission
Fort Worth Regional Office
801 Cherry St., Suite 1900
Fort Worth, TX 76102

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

John Brda, Saint Louis, MO 63122
Georgios Palikaras, Nova Scotia, Canada B3M 2Z8

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

**COURTHOUSE ASSIGNMENT**

I have reviewed Rules 18(a) and 20(a) of the Rules for the Division of Business Among District Judges, Southern District of New York, and I hereby certify that this case should be assigned to the courthouse indicated below pursuant thereto.

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   [ ] WHITE PLAINS   [X] MANHATTAN

DATE 06/25/2024    s/Patrick B. Disbennett

SIGNATURE OF ATTORNEY OF RECORD

ADMITTED TO PRACTICE IN THIS DISTRICT
[x] NO
[ ] YES (DATE ADMITTED Mo. _____ Yr. _____)
Attorney Bar Code #

RECEIPT #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Daniel Ortiz, Acting Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

**APP. 048**

TAB 2

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN B. MALTAGLIATI, Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>META MATERIALS INC. F/K/A TORCHLIGHT ENERGY RESOURCES, INC., GEORGE PALIKARAS, KENNETH RICE, GREG MCCABE, and JOHN BRDA,<br><br>        Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>JURY TRIAL DEMANDED</u><br><br><u>CLASS ACTION</u> |

Plaintiff John B. Maltagliati ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and

press releases published by and regarding Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc. ("Meta" or the "Company"), analysts' reports and advisories about the Company, and other information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of the Company between September 21, 2020 and December 14, 2021, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

**APP. 050**

5.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

6.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

7.     Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was economically damaged thereby.

8.     Defendant Meta purports to be a developer of high-performance functional materials and nanocomposites. Before the business combination with Metamaterial Inc. ("Metamaterial"), which closed June 28, 2021 (the "Business Combination"), the Company was known as "Torchlight Energy Resources, Inc."

9.     Defendant Meta is incorporated in Nevada with its headquarters in Dartmouth, Nova Scotia, Canada. Meta's common stock is listed on NASDAQ under the ticker symbol "MMAT." Prior to the merger, the Company's shares traded on NASDAQ under the ticker symbol "TRCH."

10.     Defendant George Palikaras ("Palikaras") was at all pertinent times the founder and Chief Executive Officer ("CEO") of Metamaterial. Since the merger, Defendant Palikaras has served as the CEO, President, and as a Director of the Company.

**APP. 051**

11.     Defendant Kenneth Rice ("Rice") was the Chief Financial Officer ("CFO") and Executive Vice President ("EVP") of Metamaterial. Since the merger, Defendant Rice has served as the CFO and EVP of the Company.

12.     Defendant Greg McCabe ("McCabe"), prior to the Business Combination, was the Company's Chairman of the Board of Directors.

13.     Defendant John Brda ("Brda"), prior to the Business Combination, was the Company's President, CEO, and Secretary.

14.     Defendants Palikaras, Rice, McCabe, and Brda are collectively referred to herein as the "Individual Defendants."

15.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

4

16.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

17.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

18.     The Company and the Individual Defendants are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

19.     On September 21, 2020, the Company issued a press release entitled "TORCHLIGHT AND METAMATERIAL ANNOUNCE PLANNED BUSINESS COMBINATION" which announced the Business Combination and stated the following, in pertinent part, regarding Metamaterial's agreements, commercialization, products, and production:

> META has an extensive intellectual property portfolio, a global presence and multiple R&D and product development agreements with government agencies and private enterprises. The combined entity will continue to service a clientele of world-class OEM customers for a range of applications in the automotive, aerospace and defense, energy, consumer electronics and medical markets.
>
> *                    *                    *
>
> "META's management, led by George Palikaras has built an extraordinary award-winning cleantech company ***whose proprietary advanced technologies address multiple markets and improve their customer's capabilities***," said Greg McCabe, Torchlights [sic] Chairman.
>
> *                    *                    *
>
> ***META's products are designed and manufactured*** with environmental sustainability as a high priority. … ***META has also partnered with Lockheed Martin*** and the Canadian Government's Sustainable Development Technology Canada (SDTC) fund to develop metaSOLAR$^{TM}$ a new solar energy product suitable for the transportation industry.

Since 2011, approximately CAD $60MM has been invested in META, yielding a sizable IP portfolio. In 2020 to date, META has been granted 11 new patents. META has a total of 52 granted and 37 pending patent applications, including 26 in the United States and 63 in 18 other countries around the world. META's portfolio comprises 28 patent families, 19 of which are granted.

(Emphasis added.)

20.     On December 14, 2020, the Company issued a press release entitled "METAMATERIAL AND TORCHLIGHT SIGN DEFINITIVE AGREEMENT FOR BUSINESS COMBINATION" which stated the following regarding Metamaterial's commercialization, products, and production:

"We are very excited to sign the definitive agreement with Metamaterial," stated John Brda, Torchlight's CEO. "We believe this Transaction provides our shareholders with the best opportunity moving forward. *Metamaterial offers proven disruptive technology* with strong environmental, social and governance (ESG) priorities. *This Transaction provides our shareholders with access to the multi-billion-dollar markets that Metamaterial serves* …"

"META's management, led by George Palikaras, has built an extraordinary award-winning cleantech company whose proprietary advanced technologies address multiple markets and improve their customers' capabilities," said Greg McCabe, Torchlight's Chairman.

(Emphasis added.)

21.     On June 16, 2021 and June 21, 2021, the Company filed with the SEC prospectus supplements on Forms 424B5 which stated the following, in pertinent part, regarding Metamaterial's commercialization, products, and production: "*Meta's advanced structural design technologies and scalable manufacturing methods provide a path to broad commercial opportunities in aerospace, medical, automotive, energy and other industries.*" (Emphasis added.)

22.     On July 6, 2021, the Company issued a press release entitled "META COMPLETES UK-FUNDED PROJECT TOWARDS DEVELOPING NON-INVASIVE

APP. 054

GLUCOSE SENSING SYSTEM" which stated the following, in pertinent part, regarding the Company's products:

> Meta Materials Inc. (the "Company" or "META®") (NASDAQ:MMAT) a developer of high-performance functional materials and nanocomposites, today announced the conclusion of a 27-month long project to develop a non-invasive glucose sensing prototype, which combined radio wave and optical sensors to improve accuracy in predicting glucose level changes. …



**META's glucoWISE® Point-of-Care "Home Hub" Product Concept**

> … Preliminary results of the project, using an early prototype system, were published in the journal Sensors (https://doi.org/10.3390/s21093275), which may also be found on META's website under Applications / Medical Applications. The novel multiwavelength biosensing technology is protected with two patent applications filed in 2021 and extends the previous research work on this topic resulting in a total of 5 patent families, comprising 11 international patents (4 granted, 7 pending).

23. On August 13, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Palikaras and Rice attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

24. The 2Q21 Report stated the following, in pertinent part, regarding the Company's agreements, commercialization, products, and production:

APP. 055

## BUSINESS AND OPERATIONAL OVERVIEW

The Company has generated a portfolio of intellectual property and is now moving toward commercializing products *at a performance and price point combination that has the potential to be disruptive in multiple market verticals*. The Company's platform technology includes holography, lithography, and medical wireless sensing. … *The Company's advanced structural design technologies and scalable manufacturing methods provide a path to broad commercial opportunities* in aerospace and defense, automotive, energy, healthcare, consumer electronics, and data transmission.

*   *   *

## Holography Technology

Meta's principal products that employ holography technology are its METAAIR® laser glare protection eyewear, METAAIR® laser protection films for law enforcement and metaOPTIX™ notch filters. Meta co-developed its METAAIR® laser protection eyewear product with Airbus S.A.S. that has been engineered to provide laser glare protection for pilots, military and law enforcement using Meta's holography technology. METAAIR® is a holographic optical filter developed using nano-patterned designs that block and deflect specific colors or wavelengths of light. Meta launched METAAIR® with strategic and exclusive distribution partner, Satair, a wholly owned Airbus company and *started producing and selling METAAIR® in April 2019*. *The scale-up and specification for the raw photopolymer material used to produce the eyewear was successfully finalized in late 2019 and commercialized in 2020.* Meta launched its laser protection films for law enforcement use in late 2020. These films are designed to be applied to face shields and helmet visors providing the wearer with the same type of laser eye protection afforded to pilots by METAAIR® glasses while preserving peripheral vision critical to law enforcement duties.

*   *   *

## Lithography Technology

… The Company's current principal prototype product in lithography technology is its transparent conductive film, NANOWEB®. The lithography division operates out of the Company's wholly owned U.S. subsidiary, *which can produce meter-long samples of NANOWEB®*, at a small volumes scale, for industry customers/partners.

There are six NANOWEB®-enabled products and applications that are currently in early stages of development including NANOWEB® for Transparent EMI Shielding, NANOWEB® for Transparent Antennas, NANOWEB® for 5G signal enhancement, NANOWEB® for Touch Screen Sensors, NANOWEB® for Solar cells and NANOWEB® for Transparent Heating to de-ice and de-fog. More details of these products and applications can be found in META's EDGAR filings and on META's website at www.metamaterial.com.

Throughout 2020 and 2021, the Company has been ordering and upgrading its equipment at its California facility to efficiently supply NANOWEB® samples in

8

**APP. 056**

larger volumes. The Company has entered into a collaboration agreement with Crossover Solutions Inc. to commercialize the NANOWEB®- enabled products and applications for the automotive industry and with ADI Technologies to help secure contracts with the US Department of Defense.

**Wireless Sensing Technology**

Wireless Sensing is the ability to cancel reflections (anti-reflection) from the skin to increase the Signal-to-Noise- Ratio ("SNR") transmitted through body tissue to enable better medical diagnostics. This breakthrough wireless sensing technology is made using proprietary patterned designs, printed on metal-dielectric structures on flexible substrates that act as anti-reflection (impedance-matching) coatings when placed over the human skin in combination with medical diagnostic modalities, such as MRI, ultrasound systems, ***non-invasive glucometers*** etc. For example, as a medical imaging application, the Company is developing metaSURFACE™ (also known as RadiWise™) an innovation which allows up to 40 times more energy to be transmitted through the human tissue, instead of being reflected. The benefit is increased diagnostic speed and imaging accuracy leading to patient throughput increases for healthcare providers. The metaSURFACE™ device consists of proprietary non-ferrous metallic and dielectric layers that are exactingly designed to interact (resonate) with radio waves allowing the waves to "see-through the skin".

(Emphasis added.)

25.     The statements referenced in ¶¶ 19-24 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational, and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statement and/or failed to disclose that: (1) the Business Combination would result in an SEC investigation and subpoena in the matter captioned *In the Matter of Torchlight Energy Resources, Inc.*; (2) the Company has materially overstated its business connections and dealings; (3) the Company has materially overstated its ability to produce and commercialize its products; (4) the Company has materially overstated its products' novelty and capabilities; (5) the Company's products did not have the potential to be disruptive because, among other things,

the Company priced its products too high; and (6) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

### The Truth Begins to Emerge

26.     On November 15, 2021, after market hours, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 Report"). The 3Q21 Report announced the SEC subpoena, stating the following in pertinent part:

> ***In September 2021, the Company received a subpoena from the Securities and Exchange Commission, Division of Enforcement, in a matter captioned** **In the Matter of Torchlight Energy Resources, Inc.** **The subpoena requests that the Company produces certain documents and information related to, among other things, the merger involving Torchlight Energy Resources, Inc. and Metamaterial Inc.*** The Company is cooperating and intends to continue to cooperate with the SEC's investigation. The Company can offer no assurances as to the outcome of this investigation or its potential effect, if any, on the Company or its results of operation.

(Emphasis added.)

27.     On this news, Meta's shares fell 3.9% to close at $4.77 per share on November 16, 2021, damaging investors.

28.     The 3Q21 Report also continued misleading investors, stating the following, in pertinent part, regarding the Company's agreements, commercialization, products, and production:

> **BUSINESS AND OPERATIONAL OVERVIEW**
> The Company has generated a portfolio of intellectual property and is now moving toward commercializing products ***at a performance and price point combination that has the potential to be disruptive in multiple market verticals***. The Company's platform technology includes holography, lithography, and medical wireless sensing. … ***The Company's advanced structural design technologies and scalable manufacturing methods provide a path to broad commercial opportunities*** in aerospace and defense, automotive, energy, healthcare, consumer electronics, and data transmission.
> *     *     *
> **Holography Technology**

**APP. 058**

… META's principal products that employ holography technology are its METAAIR® laser glare protection eyewear, METAAIR® laser protection films for law enforcement and METAOPTIX™ notch filters. META co-developed its METAAIR® laser glare protection eyewear product with Airbus S.A.S. that has been engineered to provide laser glare protection for pilots, military and law enforcement using META's holography technology. METAAIR® is a holographic optical filter developed using nano-patterned designs that block and deflect specific colors or wavelengths of light. META launched METAAIR® with strategic and exclusive distribution partner, Satair, a wholly owned Airbus company and started producing and selling METAAIR® in April 2019. *The scale-up and specification for the raw photopolymer material used to produce the eyewear was successfully finalized in late 2019 and commercialized in 2020.* META launched its laser glare protection films for law enforcement use in late 2020. These films are designed to be applied to face shields and helmet visors providing the wearer with the same type of laser eye protection afforded to pilots by METAAIR® glasses while preserving peripheral vision critical to law enforcement duties. METAOPTIX™ notch filters are optical filters that selectively reject a portion of the spectrum, while transmitting all other wavelengths. They are used in applications where it is necessary to block light from a laser, as in machine vision applications and in confocal or multi-photon microscopy, laser-based fluorescence instrumentation, or other life science applications. METAOPTIX™ notch filters were commercially launched by the Company in November 2020.

\*          \*          \*

**Lithography Technology**
… *The Company's current principal prototype product in lithography technology is its transparent conductive film, NANOWEB®.* The lithography division operates out of the Company's wholly owned U.S. subsidiary, *which can produce meter-long samples of NANOWEB®*, at a small volumes scale, for industry customers/partners.

There are six NANOWEB®-enabled products and applications that are currently in early stages of development including NANOWEB® for Transparent EMI Shielding, NANOWEB® for Transparent Antennas, NANOWEB® for 5G signal enhancement, NANOWEB® for Touch Screen Sensors, NANOWEB® for Solar cells and NANOWEB® for Transparent Heating to de-ice and de-fog. More details of these products and applications can be found in META's EDGAR filings and on META's website at www.metamaterial.com.

Throughout 2020 and 2021, the Company has been ordering and upgrading its equipment at its California facility to efficiently supply NANOWEB® samples in larger volumes. The Company has entered into a collaboration agreement with Crossover Solutions Inc. to commercialize the NANOWEB® enabled products and applications for the automotive industry and with ADI Technologies to help secure contracts with the US Department of Defense.

APP. 059

**Wireless Sensing Technology**

Wireless Sensing is the ability to cancel reflections (anti-reflection) from the skin to increase the Signal-to-Noise- Ratio ("SNR") transmitted through body tissue to enable better medical diagnostics. This breakthrough wireless sensing technology is made using proprietary patterned designs, printed on metal-dielectric structures on flexible substrates that act as anti-reflection (impedance-matching) coatings when placed over the human skin in combination with medical diagnostic modalities, such as MRI, ultrasound systems, **non-invasive glucometers** etc. For example, as a medical imaging application, the Company is developing metaSURFACE™ (also known as RadiWise™) an innovation which allows up to 40 times more energy to be transmitted through the human tissue, instead of being reflected. The benefit is increased diagnostic speed and imaging accuracy leading to patient throughput increases for healthcare providers. The metaSURFACE™ device consists of proprietary non-ferrous metallic and dielectric layers that are exactingly designed to interact (resonate) with radio waves allowing the waves to "see-through the skin".

(Emphasis added.)

29.     Attached to the 3Q21 Report were certifications pursuant to SOX signed by Defendants Palikaras and Rice attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

30.     The statements referenced in ¶¶ 28 and 29 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company has materially overstated its business connections and dealings; (2) the Company has materially overstated its ability to produce its products; (3) the Company has materially overstated its products' novelty and capabilities; (4) the Company prices its products too high and not at a price point that has the potential to be disruptive; and (5) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

12

**The Truth Emerges**

31.     On December 14, 2021, during market hours, market researcher Kerrisdale

Capital released a report (the "Report") alleging, among other things, that "Meta has habitually

made outlandish and misleading claims about the feasibility, development, and commercial

potential of various technologies only to repeatedly move the goalposts or retrospectively alter

its claims, often just quietly dropping entire projects they had previously touted as pivotal." The

Report further summarized its findings, in relevant part, as follows:

> Meta's public company filings and website portray an "advanced materials and
> photonics company…seeking to harness the power of light" in three areas:
> holography, lithography, and wireless sensing. But as we discuss at length below,
> ***Meta's three current "businesses" have generated just about zero product
> revenue over the last ten years despite continuously making grandiose product
> development claims.*** We expect this trend to continue given *that **the company
> has never actually commercialized anything***.
>
> \*     \*     \*
>
> ***Before assessing whether there's any commercial substance to these segments
> (in short: no)***, it's instructive to examine the quiet failure of Meta's early
> technological forays and the creative ways Meta was able to finance a façade of
> scientific accomplishment with no legitimate underpinning.
>
> \*     \*     \*
>
> [Meta] deceptively promoted its early endeavors, seemingly in the pursuit of
> funding that almost certainly would not have been forthcoming if the truth were
> known to Meta's counterparties. ***The company's current operations range from
> the dismal failure of LGP glasses to the empty husk of the once-interesting
> NanoWeb to the outright falsehoods being told to promote non-existent medical
> devices.*** If that weren't enough, the questionable circumstances around its reverse
> merger with Torchlight – tainted by a dubious CFO appointment, promotional
> social media buzz, and purposely muddied disclosures around suspiciously
> successful capital raises – make our assessment that much more damning. …
> Holograms and thin films are a fitting metaphor for Meta: a company that looks
> interesting at first glance but turns out to be a hollow illusion behind a flimsy
> veneer of aggressive promotion.
>
> (Emphasis added.)

32.     The Report stated the following, in relevant part, regarding the Company's

partnerships, grants, and deals:

Meta's description of the Lambda Solar segment remained unchanged from 2017 to 2020, prominently promoting the Lockheed "partnership" but never actually indicating any progress towards development of a product. Currently, Meta's website description of its solar business is the same one it's presented since 2014, except it's no longer call "Lambda Solar." ***The consistent description of the relationship with Lockheed as a "partnership" is also directly at odds with the contract, in which Lockheed stipulates that the agreement "is not intended to constitute, give effect to, or otherwise create a joint venture, partnership, teaming agreement or other business entity of any kind.*** [emphasis added]" [sic]

\* \* \*

**Meta Materials creatively financed itself through research grants and customer deposits that were never earned, and more recently through reverse mergers**

… In July of 2018, Satair, a subsidiary of Airbus that distributes aircraft parts and equipment, signed a $2 million (USD) purchase order for Meta's LGP glasses. Two months later, Satair signed an agreement to become the exclusive distributor of the LGP frames, paying Meta a C$1.3 million fee for the privilege. Two months after *that*, Satair advanced $500 thousand (C$655 thousand) in cash for the July purchase order. ***To date, of the $2 million order, only C$34 thousand has been filled, with about half a million dollars remaining an operating liability.*** The exclusivity fee, meanwhile, was booked by Meta as deferred revenue, which it continues to recognize at the current time. ***It turns out that Satair essentially funded Meta to the tune of C$2 million in return for 50 pairs of overpriced glasses to which plenty of cheaper and better alternatives exist (more on that below).***

The relationships with Lockheed and Satair provided Meta with two cash infusions totaling C$7.5 million that the company was able to *also* conveniently recognize as "development revenue" spread out over years, ***ironically without ever actually developing anything of value***. Another creative source of funding for Meta over the years has been a variety of Canadian government-affiliated investments and loans:

- Between 2013 and 2019, the Atlantic Canada Opportunities Agency (ACOA), a Canadian government regional development agency, lent C$6.8 million to Meta, almost entirely in the form of interest free loans, and almost all of which is still outstanding. ***The lion's share of these loans – C$6 million – was meant to support the commercialization of the Lamda Guard laser protection shields, a project subsequently dropped by Meta, and the LGP glasses, which Meta has been unsuccessful in commercializing***.
- Sustainable Development Technology Canada (SDTC), a Canadian government-sponsored foundation that funds "clean-tech" startups, agreed to invest C$5.4M in Meta in late 2017 to fund expenses related to a project titled "Enabling solar flight: a testing ground for lightweight and efficient solar panels." As with the Lockheed investment, ***this was over 3 years***

*after Lamda Solar was no longer active, so it's not clear what Meta was going to do with the money.* In the end, SDTC only invested C$1.99M, seemingly because Meta was not meeting its end of the deal, and there's since been no disclosure from Meta as to how, or if, the project is advancing.

(Emphasis added.)

33.     The Report stated the following, in pertinent part, regarding the Company's

products and ability to commercialize them:

**Meta's Current "Operations" are a Collection of Hopeless, Fake, and Obsolete Science Experiments**

*Meta's press releases and recent filings are meant to give (mostly retail) investors the impression of an advanced materials company with proprietary "nano" technology that can be applied to making progress in fields like medtech, automotive, 5G telecom, and "augmented reality."* If those sound like industries that coincidentally are expected to have the most exciting growth opportunities right now, and have therefore garnered the most generous valuations, that's not a coincidence. As Meta's experience with Lamda Solar and Lamda Lux have shown, *the company has a track record of making misleading announcements and proclamations around its capabilities in trendy industries, such as solar and LED lighting ten years ago, only to quietly fail and move on to promoting the next breakthrough*. But as with Solar and Lux, we expect Meta's current businesses – to the extent they really exist – to wallow in irrelevance.

\*       \*       \*

We can't find any record of Satair's blog posts marketing metaAIR glasses, and *it's difficult to explain why, if Meta really had completed the construction of a production facility, they didn't fill Satair's C$2 million purchase order of which Satair had already provided a cash down payment of C$500 thousand!* If the tens of millions of dollars that were raised explicitly for the development and commercialization of this technology over the last seven years were really invested for that purpose, Meta's inability to manufacture the metaAIR glasses at any level of scale reflects the magnitude of its operational ineptitude. It also suggests that, consistent with its longstanding practice, *Meta may have greatly exaggerated its accomplishment of completing a production facility*.

It's notable that the *metaAIR product is not even very good*. The underlying holographic technology, which involves using lasers to alter the optical properties of transparent light-sensitive polymers that comprise a thin film, is difficult and expensive to implement. It's also complete overkill for a niche product with a lot of competition from cheaper and lower-tech alternatives that happen to do a much better job at protecting pilots' eyes from potential laser strikes. Dye-based lenses,

**APP. 063**

such as those manufactured by Gentex and Revision, offer better durability, protection from multiple angles, and protection from a range of dangerous wavelengths, *all for 15% of the price for which the metaAIR frames sell*. Non-holographic thin-film options, such as those from Iridian and PerriQuest effectively offer the same protection as metaAIR lenses, *also for 10-15% of the price*. The *metaAIR glasses are expensive, lack peripheral vision protection, are extremely vulnerable to scratching, and were only developed to protect from green-wavelength lasers* (whereas the competitors mentioned here also offer protection from blue and red wavelengths) *Even if Meta could figure out how to make them, they probably wouldn't sell anyway.*

Meta's latest absurd claim is that it will use its holographic "expertise" to improve augmented reality (AR) eyewear. But holography for AR is a commoditized and widely available technology, already incorporated in AR devices by large (and competent) technology companies like Cisco and Microsoft, while Facebook is already knee-deep into developing the next generation of holographic AR. It's laughable to expect that Meta Materials will be able to develop any AR technology of value when it can't even master basic holography to compete with niche sunglasses manufacturers.

### Meta's med-tech segment is a sham
… Digging into the MediWise story revealed a familiar pattern of smoke and mirrors that Meta exhibited in its other segments, though with the added bonus of a questionable set of related party transactions.

MediWise was founded in 2010 by Meta's CEO, George Palikaras. …

\*     \*     \*

*But glucoWISE didn't exist*. In fact, *though glucoWISE remains the centerpiece of Meta's "Wireless Sensing" technology, it still doesn't exist. And it never will.* John L. Smith, an accomplished research scientist and medtech executive has, for the last 15 years, updated his synopsis of the quest to invent a non-invasive glucose monitor. Smith documents close to a dozen different proposed modalities and dozens of different companies' attempts. While Smith is agnostic as to whether such a feat is possible, his research makes it clear that it's never been done and, as of the present time, there's no sign that anyone is even close to the achievement. glucoWISE is actually just a bit player in the long history of exaggerated claims of having developed a non-invasive glucose monitor. Smith recounts how MediWise originally said they expected to begin taking "pre-orders" for glucoWISE in late 2016, but of course nothing ever came of that. Smith shows how this is a common pattern in the field, as these sorts of announcements by small companies have "perennially…been premature and meant to generate hype."

\*     \*     \*

This past July, Meta announced that it "completed a UK-funded project towards developing non-invasive glucose sensing system." In the first paragraph of the press release, Meta proclaimed that it completed a project to "develop a non-

APP. 064

invasive glucose sensing prototype, which combined radio wave and optical sensors to improve accuracy in predicting glucose level changes." Only later on does it become a bit clearer that the "improved accuracy" is not compared to traditional glucose monitoring but to glucose monitoring using just one of the two sensor methodologies used in the project.

*The press release also depicts computer-generated pictures of the monitoring system – which doesn't actually exist* – for promotional purposes [image omitted]. Most laughably, *the underlying scientific study to which the press release links indicates that the project basically just tested whether some lab-rigged sensors can detect changes in the concentrations of glucose in solutions composed of only glucose and water, and using concentrations that ranged 2-50x normal blood-glucose levels. And even then, the sensors weren't very accurate.* The audacity of using measurements of glucose in *water* to suggest progress in measuring *blood glucose through the skin barrier* is hard to comprehend. *The proclamations are so misleading that they should deem suspect almost any "scientific" claim that Meta makes.*

\*       \*       \*

While "wireless sensing" may not seem like one of the more prominent parts of Meta Materials, we think that Palikaras' track record here is reflective of the same general approach we described with holography: *the products being promoted either don't exist or are grossly overstated, the underlying scientific effort is a sham*, and all of it is enmeshed in a complicated series of financial transactions that seem more related to enriching management than developing any profitable business.

**NanoWeb hasn't progressed since 2014, Meta seems to have no intention of commercializing it having ceased licensing a key patent, and it's obsolete anyway**

Meta's lithography segment is primarily composed of NanoWeb, a conductive TTF technology that it obtained when it acquired Rolith Incorporated in 2016.

\*       \*       \*

… the overall conductive TTF sector has rapidly progressed while NanoWeb has laid dormant. At the current time, there is no NanoWeb spec sheet to be found, and Meta's website says that NanoWeb transparent conductors are "coming soon!" As of March 2020, Meta stated that its "labs in Pleasanton, California can produce a meter long sample of NanoWeb for a variety of applications." *Those meter-long samples were the subject of the Rolith scientists' 2014 paper referenced above, so it's clear that not much has changed in the intervening 6 years.*

Most recently, Meta used $72 million of the $140 million in cash on its balance sheet to buy Nanotech, a Canadian penny-stock company that manufactures anti-counterfeit films that can be used with paper currency or luxury consumer goods. Meta has tried to claim that there are synergies between the lithography capabilities possessed by Nanotech and the lithography technology needed to

**APP. 065**

scale and commercialize Nanoweb. But we spoke with several of NanoWeb's founding scientists, none of whom have remained at Meta since the 2016 acquisition, and they explained that they're extremely familiar with Nanotech's rudimentary technology and that it would make no sense to even try to repurpose any of Nanotech's manufacturing methods for the purpose of commercializing NanoWeb. Meta's pronouncements conflating the two production processes are indicative of Meta's management team either misleading investors or having no idea about what's involved in commercializing NanoWeb and manufacturing it at scale.

Even if Meta wanted to commercialize NanoWeb, and knew how to do it, one notable obstacle laying in its path relates to intellectual property. ***In late 2012, Rolith licensed a critical patterning method patent from the University of Michigan that was meant to be used in its lithography process.*** We discussed this with members of Jay Guo's lab, and they told us that when they inquired with the university's office that arranges IP licenses, ***they were told that Meta stopped paying for the license "years ago."*** The fact pattern – zero development of NanoWeb, acquisition that has nothing to do with NanoWeb, and ***cessation of a critical patent license*** – leads us to believe that ***Meta's management has no intention of ever commercializing NanoWeb at all***, and is using the same promotional playbook it's used in the rest of its business since 2012. It's no wonder Rolith's key founding scientists resigned from Meta in 2018.

(Emphasis added.)

34.     On this news, Meta's shares fell 5.8% to close at $2.91 per share on December 14, 2021, further damaging investors

35.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

36.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of the Company during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant

times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)   whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)   whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)   whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

41.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

42.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by market analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)     Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

43.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

44.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

45.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

21

APP. 069

46.     This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

47.      During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48.     The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

49.     The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

22

50.     Individual Defendants, who are a senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

51.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

52.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

53.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

54.     By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of The Exchange Act
Against The Individual Defendants**

55.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

56.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

57.     As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

58.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were each a "controlling person[]" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

59.     The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and being a director of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause,

**APP. 072**

the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

60.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

**APP. 073**

Dated: January 3, 2022                    Respectfully submitted,

                                          **THE ROSEN LAW FIRM, P.A.**

                                          /s/Phillip Kim
                                          Phillip Kim, Esq. (PK 9384)
                                          Laurence M. Rosen, Esq. (LR 5733)
                                          275 Madison Ave., 40th Floor
                                          New York, NY 10016
                                          Tel: (212) 686-1060
                                          Fax: (212) 202-3827
                                          Email: pkim@rosenlegal.com
                                          Email: lrosen@rosenlegal.com

                                          *Counsel for Plaintiff*

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

| | |
|---|---|
| First name: | John |
| Middle initial: | B |
| Last name: | Maltagliati |
| Address: | Redacted |
| City: | |
| State: | |
| Zip: | |
| Country: | |
| Facsimile: | |
| Phone: | |
| Email: | |

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions*:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 06/17/2021 | 26 | 5.44 |
| Common Stock | 06/17/2021 | 29 | 5.07 |
| Common Stock | 06/30/2021 | 12 | 6.72 |
| Common Stock | 06/30/2021 | 11 | 7.30 |
| Common Stock | 07/14/2021 | 5 | 3.70 |

*1:2 stock split on 6/28/2021.

**Certification for John Maltagliati (cont.)**

7.  I have not served as a representative party on behalf of a class under the federal
    securities laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the
United States, that the information entered is accurate:         **YES**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.       **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform
Electronic Transactions Act as adopted by the various states and territories of the
United States.

Date of signing: 12/30/2021

JS 44 (Rev. 4-29-14)

Case 1:21-cv-07203-CBA-JRC   Document 1-3   Filed 01/03/22   Page 1 of 2 PageID #: 29
Case 4:24-cv-00767-P   Document 54-1   Filed 10/23/24   Page 77 of 117   PageID 949

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
JOHN B. MALTAGLIATI, Individually and on behalf of all others similarly situated,

**DEFENDANTS**
META MATERIALS INC. F/K/A TORCHLIGHT ENERGY RESOURCES, INC., GEORGE PALIKARAS, KENNETH RICE, GREG MCCABE, and JOHN BRDA,

**(b)** County of Residence of First Listed Plaintiff   New Haven Cnty, CT
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
THE ROSEN LAW FIRM, P.A., Phillip Kim, Esq.
275 Madison Ave., 40th Floor, New York, New York 10016
Telephone: (212) 686-1060, Email: pkim@rosenlegal.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

*Does this action include a motion for temporary restraining order or order to show cause?* Yes [ ] No [x]

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[x] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>[ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | **CIVIL RIGHTS**<br>[ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>[ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act<br>**IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | **SOCIAL SECURITY**<br>[ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78i(b) and §78t(a)) and the PSLRA.
Brief description of cause:
Violations of the federal securities laws.

## VII. REQUESTED IN COMPLAINT:
[x] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   1/3/2022
SIGNATURE OF ATTORNEY OF RECORD   /s/Phillip Kim

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.7-1 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000 exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

Case is Eligible for Arbitration [ ]

I, ___Phillip Kim_____, counsel for ___John B. Maltagliati_____, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

[✓]  monetary damages sought are in excess of $150,000, exclusive of interest and costs,

[ ]  the complaint seeks injunctive relief,

[ ]  the matter is otherwise ineligible for the following reason

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

N/A

## RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

## NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.)  Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County?      [ ] Yes   [✓] No

2.)  If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County?      [ ] Yes   [✓] No

b) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District?      [✓] Yes   [ ] No

c) If this is a Fair Debt Collection Practice Act case, specify the County in which the offending communication was received:                                  .

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County?      [ ] Yes   [ ] No
*(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).*

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.

[✓] Yes          [ ] No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?

[ ] Yes   (If yes, please explain      [✓] No

I certify the accuracy of all information provided above.

Signature: ___/s/Phillip Kim_____

**APP. 078**

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | | |
|---|---|---|
| JOHN B. MALTAGLIATI, Individually and on behalf of all others similarly situated, | ) ) ) ) | |
| *Plaintiff(s)* | ) ) | Civil Action No. |
| v. | ) | |
| META MATERIALS INC. F/K/A TORCHLIGHT ENERGY RESOURCES, INC., GEORGE PALIKARAS, KENNETH RICE, GREG MCCABE, and JOHN BRDA, | ) ) ) ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  META MATERIALS INC. F/K/A TORCHLIGHT ENERGY RESOURCES, INC., GEORGE PALIKARAS, KENNETH RICE, GREG MCCABE, and JOHN BRDA
1 Research Drive
Dartmouth, NS B2Y 4M9
Canada

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  THE ROSEN LAW FIRM, P.A.
Phillip Kim, Esq. (PK 9384)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: _____     _____
*Signature of Clerk or Deputy Clerk*

**APP. 079**

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

    ❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

    ❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

    ❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

    ❑ I returned the summons unexecuted because _____ ; or

    ❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**APP. 080**

TAB 3

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN B. MALTAGLIATI, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META MATERIALS INC. F/K/A TORCHLIGHT ENERGY RESOURCES, INC., GEORGE PALIKARAS, KENNETH RICE, GREG MCCABE, and JOHN BRDA,<br><br>Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>JURY TRIAL DEMANDED</u><br><br><u>CLASS ACTION</u> |

Plaintiff John B. Maltagliati ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and

press releases published by and regarding Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc. ("Meta" or the "Company"), analysts' reports and advisories about the Company, and other information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of the Company between September 21, 2020 and December 14, 2021, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

2

5.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

6.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

7.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was economically damaged thereby.

8.      Defendant Meta purports to be a developer of high-performance functional materials and nanocomposites. Before the business combination with Metamaterial Inc. ("Metamaterial"), which closed June 28, 2021 (the "Business Combination"), the Company was known as "Torchlight Energy Resources, Inc."

9.      Defendant Meta is incorporated in Nevada with its headquarters in Dartmouth, Nova Scotia, Canada. Meta's common stock is listed on NASDAQ under the ticker symbol "MMAT." Prior to the merger, the Company's shares traded on NASDAQ under the ticker symbol "TRCH."

10.     Defendant George Palikaras ("Palikaras") was at all pertinent times the founder and Chief Executive Officer ("CEO") of Metamaterial. Since the merger, Defendant Palikaras has served as the CEO, President, and as a Director of the Company.

APP. 083

11.     Defendant Kenneth Rice ("Rice") was the Chief Financial Officer ("CFO") and Executive Vice President ("EVP") of Metamaterial. Since the merger, Defendant Rice has served as the CFO and EVP of the Company.

12.     Defendant Greg McCabe ("McCabe"), prior to the Business Combination, was the Company's Chairman of the Board of Directors.

13.     Defendant John Brda ("Brda"), prior to the Business Combination, was the Company's President, CEO, and Secretary.

14.     Defendants Palikaras, Rice, McCabe, and Brda are collectively referred to herein as the "Individual Defendants."

15.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

**APP. 084**

16.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

17.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

18.     The Company and the Individual Defendants are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

19.     On September 21, 2020, the Company issued a press release entitled "TORCHLIGHT AND METAMATERIAL ANNOUNCE PLANNED BUSINESS COMBINATION" which announced the Business Combination and stated the following, in pertinent part, regarding Metamaterial's agreements, commercialization, products, and production:

> META has an extensive intellectual property portfolio, a global presence and multiple R&D and product development agreements with government agencies and private enterprises. The combined entity will continue to service a clientele of world-class OEM customers for a range of applications in the automotive, aerospace and defense, energy, consumer electronics and medical markets.
>
> \*       \*       \*
>
> "META's management, led by George Palikaras has built an extraordinary award-winning cleantech company *whose proprietary advanced technologies address multiple markets and improve their customer's capabilities*," said Greg McCabe, Torchlights [sic] Chairman.
>
> \*       \*       \*
>
> *META's products are designed and manufactured* with environmental sustainability as a high priority. … *META has also partnered with Lockheed Martin* and the Canadian Government's Sustainable Development Technology Canada (SDTC) fund to develop metaSOLAR$^{TM}$ a new solar energy product suitable for the transportation industry.

5

**APP. 085**

> Since 2011, approximately CAD $60MM has been invested in META, yielding a sizable IP portfolio. In 2020 to date, META has been granted 11 new patents. META has a total of 52 granted and 37 pending patent applications, including 26 in the United States and 63 in 18 other countries around the world. META's portfolio comprises 28 patent families, 19 of which are granted.

(Emphasis added.)

20.     On December 14, 2020, the Company issued a press release entitled "METAMATERIAL AND TORCHLIGHT SIGN DEFINITIVE AGREEMENT FOR BUSINESS COMBINATION" which stated the following regarding Metamaterial's commercialization, products, and production:

> "We are very excited to sign the definitive agreement with Metamaterial," stated John Brda, Torchlight's CEO. "We believe this Transaction provides our shareholders with the best opportunity moving forward. *Metamaterial offers proven disruptive technology* with strong environmental, social and governance (ESG) priorities. *This Transaction provides our shareholders with access to the multi-billion-dollar markets that Metamaterial serves* …"

> "META's management, led by George Palikaras, has built an extraordinary award-winning cleantech company whose proprietary advanced technologies address multiple markets and improve their customers' capabilities," said Greg McCabe, Torchlight's Chairman.

(Emphasis added.)

21.     On June 16, 2021 and June 21, 2021, the Company filed with the SEC prospectus supplements on Forms 424B5 which stated the following, in pertinent part, regarding Metamaterial's commercialization, products, and production: "*Meta's advanced structural design technologies and scalable manufacturing methods provide a path to broad commercial opportunities in aerospace, medical, automotive, energy and other industries.*" (Emphasis added.)

22.     On July 6, 2021, the Company issued a press release entitled "META COMPLETES UK-FUNDED PROJECT TOWARDS DEVELOPING NON-INVASIVE

GLUCOSE SENSING SYSTEM" which stated the following, in pertinent part, regarding the Company's products:

> Meta Materials Inc. (the "Company" or "META®") (NASDAQ:MMAT) a developer of high-performance functional materials and nanocomposites, today announced the conclusion of a 27-month long project to develop a non-invasive glucose sensing prototype, which combined radio wave and optical sensors to improve accuracy in predicting glucose level changes. …



**META's glucoWISE® Point-of-Care "Home Hub" Product Concept**

> … Preliminary results of the project, using an early prototype system, were published in the journal Sensors (https://doi.org/10.3390/s21093275), which may also be found on META's website under Applications / Medical Applications. The novel multiwavelength biosensing technology is protected with two patent applications filed in 2021 and extends the previous research work on this topic resulting in a total of 5 patent families, comprising 11 international patents (4 granted, 7 pending).

23. On August 13, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Palikaras and Rice attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

24. The 2Q21 Report stated the following, in pertinent part, regarding the Company's agreements, commercialization, products, and production:

7

**APP. 087**

## BUSINESS AND OPERATIONAL OVERVIEW

The Company has generated a portfolio of intellectual property and is now moving toward commercializing products *at a performance and price point combination that has the potential to be disruptive in multiple market verticals*. The Company's platform technology includes holography, lithography, and medical wireless sensing. … *The Company's advanced structural design technologies and scalable manufacturing methods provide a path to broad commercial opportunities* in aerospace and defense, automotive, energy, healthcare, consumer electronics, and data transmission.

*     *     *

## Holography Technology

Meta's principal products that employ holography technology are its METAAIR® laser glare protection eyewear, METAAIR® laser protection films for law enforcement and metaOPTIX™ notch filters. Meta co-developed its METAAIR® laser protection eyewear product with Airbus S.A.S. that has been engineered to provide laser glare protection for pilots, military and law enforcement using Meta's holography technology. METAAIR® is a holographic optical filter developed using nano-patterned designs that block and deflect specific colors or wavelengths of light. Meta launched METAAIR® with strategic and exclusive distribution partner, Satair, a wholly owned Airbus company and *started producing and selling METAAIR® in April 2019*. *The scale-up and specification for the raw photopolymer material used to produce the eyewear was successfully finalized in late 2019 and commercialized in 2020.* Meta launched its laser protection films for law enforcement use in late 2020. These films are designed to be applied to face shields and helmet visors providing the wearer with the same type of laser eye protection afforded to pilots by METAAIR® glasses while preserving peripheral vision critical to law enforcement duties.

*     *     *

## Lithography Technology

… The Company's current principal prototype product in lithography technology is its transparent conductive film, NANOWEB®. The lithography division operates out of the Company's wholly owned U.S. subsidiary, *which can produce meter-long samples of NANOWEB®*, at a small volumes scale, for industry customers/partners.

There are six NANOWEB®-enabled products and applications that are currently in early stages of development including NANOWEB® for Transparent EMI Shielding, NANOWEB® for Transparent Antennas, NANOWEB® for 5G signal enhancement, NANOWEB® for Touch Screen Sensors, NANOWEB® for Solar cells and NANOWEB® for Transparent Heating to de-ice and de-fog. More details of these products and applications can be found in META's EDGAR filings and on META's website at www.metamaterial.com.

Throughout 2020 and 2021, the Company has been ordering and upgrading its equipment at its California facility to efficiently supply NANOWEB® samples in

8

larger volumes. The Company has entered into a collaboration agreement with Crossover Solutions Inc. to commercialize the NANOWEB®- enabled products and applications for the automotive industry and with ADI Technologies to help secure contracts with the US Department of Defense.

**Wireless Sensing Technology**
Wireless Sensing is the ability to cancel reflections (anti-reflection) from the skin to increase the Signal-to-Noise- Ratio ("SNR") transmitted through body tissue to enable better medical diagnostics. This breakthrough wireless sensing technology is made using proprietary patterned designs, printed on metal-dielectric structures on flexible substrates that act as anti-reflection (impedance-matching) coatings when placed over the human skin in combination with medical diagnostic modalities, such as MRI, ultrasound systems, ***non-invasive glucometers*** etc. For example, as a medical imaging application, the Company is developing metaSURFACE™ (also known as RadiWise™) an innovation which allows up to 40 times more energy to be transmitted through the human tissue, instead of being reflected. The benefit is increased diagnostic speed and imaging accuracy leading to patient throughput increases for healthcare providers. The metaSURFACE™ device consists of proprietary non-ferrous metallic and dielectric layers that are exactingly designed to interact (resonate) with radio waves allowing the waves to "see-through the skin".

(Emphasis added.)

25.     The statements referenced in ¶¶ 19-24 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational, and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statement and/or failed to disclose that: (1) the Business Combination would result in an SEC investigation and subpoena in the matter captioned *In the Matter of Torchlight Energy Resources, Inc.*; (2) the Company has materially overstated its business connections and dealings; (3) the Company has materially overstated its ability to produce and commercialize its products; (4) the Company has materially overstated its products' novelty and capabilities; (5) the Company's products did not have the potential to be disruptive because, among other things,

the Company priced its products too high; and (6) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

### The Truth Begins to Emerge

26.    On November 15, 2021, after market hours, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 Report"). The 3Q21 Report announced the SEC subpoena, stating the following in pertinent part:

> *In September 2021, the Company received a subpoena from the Securities and Exchange Commission, Division of Enforcement, in a matter captioned* **In the Matter of Torchlight Energy Resources, Inc.** *The subpoena requests that the Company produces certain documents and information related to, among other things, the merger involving Torchlight Energy Resources, Inc. and Metamaterial Inc.* The Company is cooperating and intends to continue to cooperate with the SEC's investigation. The Company can offer no assurances as to the outcome of this investigation or its potential effect, if any, on the Company or its results of operation.
>
> (Emphasis added.)

27.    On this news, Meta's shares fell 3.9% to close at $4.77 per share on November 16, 2021, damaging investors.

28.    The 3Q21 Report also continued misleading investors, stating the following, in pertinent part, regarding the Company's agreements, commercialization, products, and production:

> **BUSINESS AND OPERATIONAL OVERVIEW**
> The Company has generated a portfolio of intellectual property and is now moving toward commercializing products *at a performance and price point combination that has the potential to be disruptive in multiple market verticals*. The Company's platform technology includes holography, lithography, and medical wireless sensing. … *The Company's advanced structural design technologies and scalable manufacturing methods provide a path to broad commercial opportunities* in aerospace and defense, automotive, energy, healthcare, consumer electronics, and data transmission.
> *       *       *
> **Holography Technology**

10

**APP. 090**

… META's principal products that employ holography technology are its METAAIR® laser glare protection eyewear, METAAIR® laser protection films for law enforcement and METAOPTIX™ notch filters. META co-developed its METAAIR® laser glare protection eyewear product with Airbus S.A.S. that has been engineered to provide laser glare protection for pilots, military and law enforcement using META's holography technology. METAAIR® is a holographic optical filter developed using nano-patterned designs that block and deflect specific colors or wavelengths of light. META launched METAAIR® with strategic and exclusive distribution partner, Satair, a wholly owned Airbus company and started producing and selling METAAIR® in April 2019. *The scale-up and specification for the raw photopolymer material used to produce the eyewear was successfully finalized in late 2019 and commercialized in 2020.* META launched its laser glare protection films for law enforcement use in late 2020. These films are designed to be applied to face shields and helmet visors providing the wearer with the same type of laser eye protection afforded to pilots by METAAIR® glasses while preserving peripheral vision critical to law enforcement duties. METAOPTIX™ notch filters are optical filters that selectively reject a portion of the spectrum, while transmitting all other wavelengths. They are used in applications where it is necessary to block light from a laser, as in machine vision applications and in confocal or multi-photon microscopy, laser-based fluorescence instrumentation, or other life science applications. METAOPTIX™ notch filters were commercially launched by the Company in November 2020.

\*       \*       \*

**Lithography Technology**

… *The Company's current principal prototype product in lithography technology is its transparent conductive film, NANOWEB®.* The lithography division operates out of the Company's wholly owned U.S. subsidiary, *which can produce meter-long samples of NANOWEB®*, at a small volumes scale, for industry customers/partners.

There are six NANOWEB®-enabled products and applications that are currently in early stages of development including NANOWEB® for Transparent EMI Shielding, NANOWEB® for Transparent Antennas, NANOWEB® for 5G signal enhancement, NANOWEB® for Touch Screen Sensors, NANOWEB® for Solar cells and NANOWEB® for Transparent Heating to de-ice and de-fog. More details of these products and applications can be found in META's EDGAR filings and on META's website at www.metamaterial.com.

Throughout 2020 and 2021, the Company has been ordering and upgrading its equipment at its California facility to efficiently supply NANOWEB® samples in larger volumes. The Company has entered into a collaboration agreement with Crossover Solutions Inc. to commercialize the NANOWEB® enabled products and applications for the automotive industry and with ADI Technologies to help secure contracts with the US Department of Defense.

**APP. 091**

**Wireless Sensing Technology**

Wireless Sensing is the ability to cancel reflections (anti-reflection) from the skin to increase the Signal-to-Noise- Ratio ("SNR") transmitted through body tissue to enable better medical diagnostics. This breakthrough wireless sensing technology is made using proprietary patterned designs, printed on metal-dielectric structures on flexible substrates that act as anti-reflection (impedance-matching) coatings when placed over the human skin in combination with medical diagnostic modalities, such as MRI, ultrasound systems, ***non-invasive glucometers*** etc. For example, as a medical imaging application, the Company is developing metaSURFACE™ (also known as RadiWise™) an innovation which allows up to 40 times more energy to be transmitted through the human tissue, instead of being reflected. The benefit is increased diagnostic speed and imaging accuracy leading to patient throughput increases for healthcare providers. The metaSURFACE™ device consists of proprietary non-ferrous metallic and dielectric layers that are exactingly designed to interact (resonate) with radio waves allowing the waves to "see-through the skin".

(Emphasis added.)

29.     Attached to the 3Q21 Report were certifications pursuant to SOX signed by Defendants Palikaras and Rice attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

30.     The statements referenced in ¶¶ 28 and 29 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company has materially overstated its business connections and dealings; (2) the Company has materially overstated its ability to produce its products; (3) the Company has materially overstated its products' novelty and capabilities; (4) the Company prices its products too high and not at a price point that has the potential to be disruptive; and (5) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

12

### The Truth Emerges

31.     On December 14, 2021, during market hours, market researcher Kerrisdale

Capital released a report (the "Report") alleging, among other things, that "Meta has habitually

made outlandish and misleading claims about the feasibility, development, and commercial

potential of various technologies only to repeatedly move the goalposts or retrospectively alter

its claims, often just quietly dropping entire projects they had previously touted as pivotal." The

Report further summarized its findings, in relevant part, as follows:

> Meta's public company filings and website portray an "advanced materials and
> photonics company…seeking to harness the power of light" in three areas:
> holography, lithography, and wireless sensing. But as we discuss at length below,
> **Meta's three current "businesses" have generated just about zero product
> revenue over the last ten years despite continuously making grandiose product
> development claims.** We expect this trend to continue given *that **the company
> has never actually commercialized anything***.
>
>                           *        *        *
>
> **Before assessing whether there's any commercial substance to these segments
> (in short: no)**, it's instructive to examine the quiet failure of Meta's early
> technological forays and the creative ways Meta was able to finance a façade of
> scientific accomplishment with no legitimate underpinning.
>
>                           *        *        *
>
> [Meta] deceptively promoted its early endeavors, seemingly in the pursuit of
> funding that almost certainly would not have been forthcoming if the truth were
> known to Meta's counterparties. ***The company's current operations range from
> the dismal failure of LGP glasses to the empty husk of the once-interesting
> NanoWeb to the outright falsehoods being told to promote non-existent medical
> devices.*** If that weren't enough, the questionable circumstances around its reverse
> merger with Torchlight – tainted by a dubious CFO appointment, promotional
> social media buzz, and purposely muddied disclosures around suspiciously
> successful capital raises – make our assessment that much more damning. …
> Holograms and thin films are a fitting metaphor for Meta: a company that looks
> interesting at first glance but turns out to be a hollow illusion behind a flimsy
> veneer of aggressive promotion.
>
> (Emphasis added.)

32.     The Report stated the following, in relevant part, regarding the Company's

partnerships, grants, and deals:

Meta's description of the Lambda Solar segment remained unchanged from 2017 to 2020, prominently promoting the Lockheed "partnership" but never actually indicating any progress towards development of a product. Currently, Meta's website description of its solar business is the same one it's presented since 2014, except it's no longer call "Lambda Solar." ***The consistent description of the relationship with Lockheed as a "partnership" is also directly at odds with the contract, in which Lockheed stipulates that the agreement "is not intended to constitute, give effect to, or otherwise create a joint venture, partnership, teaming agreement or other business entity of any kind.*** [emphasis added]" [sic]

\* \* \*

**Meta Materials creatively financed itself through research grants and customer deposits that were never earned, and more recently through reverse mergers**

… In July of 2018, Satair, a subsidiary of Airbus that distributes aircraft parts and equipment, signed a $2 million (USD) purchase order for Meta's LGP glasses. Two months later, Satair signed an agreement to become the exclusive distributor of the LGP frames, paying Meta a C$1.3 million fee for the privilege. Two months after *that*, Satair advanced $500 thousand (C$655 thousand) in cash for the July purchase order. ***To date, of the $2 million order, only C$34 thousand has been filled, with about half a million dollars remaining an operating liability.*** The exclusivity fee, meanwhile, was booked by Meta as deferred revenue, which it continues to recognize at the current time. ***It turns out that Satair essentially funded Meta to the tune of C$2 million in return for 50 pairs of overpriced glasses to which plenty of cheaper and better alternatives exist (more on that below).***

The relationships with Lockheed and Satair provided Meta with two cash infusions totaling C$7.5 million that the company was able to *also* conveniently recognize as "development revenue" spread out over years, ***ironically without ever actually developing anything of value***. Another creative source of funding for Meta over the years has been a variety of Canadian government-affiliated investments and loans:

- Between 2013 and 2019, the Atlantic Canada Opportunities Agency (ACOA), a Canadian government regional development agency, lent C$6.8 million to Meta, almost entirely in the form of interest free loans, and almost all of which is still outstanding. ***The lion's share of these loans – C$6 million – was meant to support the commercialization of the Lamda Guard laser protection shields, a project subsequently dropped by Meta, and the LGP glasses, which Meta has been unsuccessful in commercializing***.
- Sustainable Development Technology Canada (SDTC), a Canadian government-sponsored foundation that funds "clean-tech" startups, agreed to invest C$5.4M in Meta in late 2017 to fund expenses related to a project titled "Enabling solar flight: a testing ground for lightweight and efficient solar panels." As with the Lockheed investment, ***this was over 3 years***

14

**APP. 094**

*after Lamda Solar was no longer active, so it's not clear what Meta was going to do with the money*. In the end, SDTC only invested C$1.99M, seemingly because Meta was not meeting its end of the deal, and there's since been no disclosure from Meta as to how, or if, the project is advancing.

(Emphasis added.)

33.     The Report stated the following, in pertinent part, regarding the Company's

products and ability to commercialize them:

**Meta's Current "Operations" are a Collection of Hopeless, Fake, and Obsolete Science Experiments**

*Meta's press releases and recent filings are meant to give (mostly retail) investors the impression of an advanced materials company with proprietary "nano" technology that can be applied to making progress in fields like medtech, automotive, 5G telecom, and "augmented reality."* If those sound like industries that coincidentally are expected to have the most exciting growth opportunities right now, and have therefore garnered the most generous valuations, that's not a coincidence. As Meta's experience with Lamda Solar and Lamda Lux have shown, *the company has a track record of making misleading announcements and proclamations around its capabilities in trendy industries, such as solar and LED lighting ten years ago, only to quietly fail and move on to promoting the next breakthrough*. But as with Solar and Lux, we expect Meta's current businesses – to the extent they really exist – to wallow in irrelevance.

                    *       *       *

We can't find any record of Satair's blog posts marketing metaAIR glasses, and *it's difficult to explain why, if Meta really had completed the construction of a production facility, they didn't fill Satair's C$2 million purchase order of which Satair had already provided a cash down payment of C$500 thousand!* If the tens of millions of dollars that were raised explicitly for the development and commercialization of this technology over the last seven years were really invested for that purpose, Meta's inability to manufacture the metaAIR glasses at any level of scale reflects the magnitude of its operational ineptitude. It also suggests that, consistent with its longstanding practice, *Meta may have greatly exaggerated its accomplishment of completing a production facility*.

It's notable that the *metaAIR product is not even very good*. The underlying holographic technology, which involves using lasers to alter the optical properties of transparent light-sensitive polymers that comprise a thin film, is difficult and expensive to implement. It's also complete overkill for a niche product with a lot of competition from cheaper and lower-tech alternatives that happen to do a much better job at protecting pilots' eyes from potential laser strikes. Dye-based lenses,

such as those manufactured by Gentex and Revision, offer better durability, protection from multiple angles, and protection from a range of dangerous wavelengths, *all for 15% of the price for which the metaAIR frames sell*. Non-holographic thin-film options, such as those from Iridian and PerriQuest effectively offer the same protection as metaAIR lenses, *also for 10-15% of the price*. The *metaAIR glasses are expensive, lack peripheral vision protection, are extremely vulnerable to scratching, and were only developed to protect from green-wavelength lasers* (whereas the competitors mentioned here also offer protection from blue and red wavelengths) *Even if Meta could figure out how to make them, they probably wouldn't sell anyway.*

Meta's latest absurd claim is that it will use its holographic "expertise" to improve augmented reality (AR) eyewear. But holography for AR is a commoditized and widely available technology, already incorporated in AR devices by large (and competent) technology companies like Cisco and Microsoft, while Facebook is already knee-deep into developing the next generation of holographic AR. It's laughable to expect that Meta Materials will be able to develop any AR technology of value when it can't even master basic holography to compete with niche sunglasses manufacturers.

### Meta's med-tech segment is a sham

… Digging into the MediWise story revealed a familiar pattern of smoke and mirrors that Meta exhibited in its other segments, though with the added bonus of a questionable set of related party transactions.

MediWise was founded in 2010 by Meta's CEO, George Palikaras. …

\*      \*      \*

*But glucoWISE didn't exist*. In fact, *though glucoWISE remains the centerpiece of Meta's "Wireless Sensing" technology, it still doesn't exist. And it never will.* John L. Smith, an accomplished research scientist and medtech executive has, for the last 15 years, updated his synopsis of the quest to invent a non-invasive glucose monitor. Smith documents close to a dozen different proposed modalities and dozens of different companies' attempts. While Smith is agnostic as to whether such a feat is possible, his research makes it clear that it's never been done and, as of the present time, there's no sign that anyone is even close to the achievement. glucoWISE is actually just a bit player in the long history of exaggerated claims of having developed a non-invasive glucose monitor. Smith recounts how MediWise originally said they expected to begin taking "pre-orders" for glucoWISE in late 2016, but of course nothing ever came of that. Smith shows how this is a common pattern in the field, as these sorts of announcements by small companies have "perennially…been premature and meant to generate hype."

\*      \*      \*

This past July, Meta announced that it "completed a UK-funded project towards developing non-invasive glucose sensing system." In the first paragraph of the press release, Meta proclaimed that it completed a project to "develop a non-

APP. 096

invasive glucose sensing prototype, which combined radio wave and optical sensors to improve accuracy in predicting glucose level changes." Only later on does it become a bit clearer that the "improved accuracy" is not compared to traditional glucose monitoring but to glucose monitoring using just one of the two sensor methodologies used in the project.

*The press release also depicts computer-generated pictures of the monitoring system – which doesn't actually exist* – for promotional purposes [image omitted]. Most laughably, *the underlying scientific study to which the press release links indicates that the project basically just tested whether some lab-rigged sensors can detect changes in the concentrations of glucose in solutions composed of only glucose and water, and using concentrations that ranged 2-50x normal blood-glucose levels. And even then, the sensors weren't very accurate.* The audacity of using measurements of glucose in *water* to suggest progress in measuring *blood glucose through the skin barrier* is hard to comprehend. *The proclamations are so misleading that they should deem suspect almost any "scientific" claim that Meta makes.*

*     *     *

While "wireless sensing" may not seem like one of the more prominent parts of Meta Materials, we think that Palikaras' track record here is reflective of the same general approach we described with holography: *the products being promoted either don't exist or are grossly overstated, the underlying scientific effort is a sham*, and all of it is enmeshed in a complicated series of financial transactions that seem more related to enriching management than developing any profitable business.

**NanoWeb hasn't progressed since 2014, Meta seems to have no intention of commercializing it having ceased licensing a key patent, and it's obsolete anyway**

Meta's lithography segment is primarily composed of NanoWeb, a conductive TTF technology that it obtained when it acquired Rolith Incorporated in 2016.

*     *     *

… the overall conductive TTF sector has rapidly progressed while NanoWeb has laid dormant. At the current time, there is no NanoWeb spec sheet to be found, and Meta's website says that NanoWeb transparent conductors are "coming soon!" As of March 2020, Meta stated that its "labs in Pleasanton, California can produce a meter long sample of NanoWeb for a variety of applications." *Those meter-long samples were the subject of the Rolith scientists' 2014 paper referenced above, so it's clear that not much has changed in the intervening 6 years.*

Most recently, Meta used $72 million of the $140 million in cash on its balance sheet to buy Nanotech, a Canadian penny-stock company that manufactures anti-counterfeit films that can be used with paper currency or luxury consumer goods. Meta has tried to claim that there are synergies between the lithography capabilities possessed by Nanotech and the lithography technology needed to

17

**APP. 097**

Case 1:21-cv-07203-CBA-JRC   Document 1   Filed 01/03/22   Page 18 of 26 PageID #: 18
Case 4:24-cv-00767-P   Document 54-1   Filed 10/23/24   Page 98 of 117   PageID 970

scale and commercialize Nanoweb. But we spoke with several of NanoWeb's founding scientists, none of whom have remained at Meta since the 2016 acquisition, and they explained that they're extremely familiar with Nanotech's rudimentary technology and that it would make no sense to even try to repurpose any of Nanotech's manufacturing methods for the purpose of commercializing NanoWeb. Meta's pronouncements conflating the two production processes are indicative of Meta's management team either misleading investors or having no idea about what's involved in commercializing NanoWeb and manufacturing it at scale.

Even if Meta wanted to commercialize NanoWeb, and knew how to do it, one notable obstacle laying in its path relates to intellectual property. ***In late 2012, Rolith licensed a critical patterning method patent from the University of Michigan that was meant to be used in its lithography process.*** We discussed this with members of Jay Guo's lab, and they told us that when they inquired with the university's office that arranges IP licenses, ***they were told that Meta stopped paying for the license "years ago."*** The fact pattern – zero development of NanoWeb, acquisition that has nothing to do with NanoWeb, and ***cessation of a critical patent license*** – leads us to believe that ***Meta's management has no intention of ever commercializing NanoWeb at all***, and is using the same promotional playbook it's used in the rest of its business since 2012. It's no wonder Rolith's key founding scientists resigned from Meta in 2018.

(Emphasis added.)

34.    On this news, Meta's shares fell 5.8% to close at $2.91 per share on December 14, 2021, further damaging investors

35.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

36.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of the Company during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant

APP. 098

times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

40. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

APP. 099

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

42.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by market analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)     Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

43.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

44.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Against All Defendants**

45.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

21

**APP. 101**

46.     This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

47.     During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48.     The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

49.     The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

22

50.     Individual Defendants, who are a senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

51.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

52.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

53.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

54.     By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of The Exchange Act
Against The Individual Defendants**

55.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

56.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

57.     As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

58.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were each a "controlling person[]" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

59.     The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and being a director of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause,

APP. 104

the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

60.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

**APP. 105**

Dated: January 3, 2022     Respectfully submitted,

            **THE ROSEN LAW FIRM, P.A.**

            <u>/s/Phillip Kim</u>
            Phillip Kim, Esq. (PK 9384)
            Laurence M. Rosen, Esq. (LR 5733)
            275 Madison Ave., 40th Floor
            New York, NY 10016
            Tel: (212) 686-1060
            Fax: (212) 202-3827
            Email: pkim@rosenlegal.com
            Email: lrosen@rosenlegal.com

            *Counsel for Plaintiff*

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

| | |
|---|---|
| First name: | John |
| Middle initial: | B |
| Last name: | Maltagliati |
| Address: | Redacted |
| City: | |
| State: | |
| Zip: | |
| Country: | |
| Facsimile: | |
| Phone: | |
| Email: | |

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions*:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 06/17/2021 | 26 | 5.44 |
| Common Stock | 06/17/2021 | 29 | 5.07 |
| Common Stock | 06/30/2021 | 12 | 6.72 |
| Common Stock | 06/30/2021 | 11 | 7.30 |
| Common Stock | 07/14/2021 | 5 | 3.70 |

*1:2 stock split on 6/28/2021.

**Certification for John Maltagliati (cont.)**

---

7.  I have not served as a representative party on behalf of a class under the federal
    securities laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the
United States, that the information entered is accurate:          YES

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.        YES

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform
Electronic Transactions Act as adopted by the various states and territories of the
United States.

Date of signing: 12/30/2021

JS 44 (Rev. 4-29-21)
Case 1:21-cv-07203-CBA-JRC   Document 1-3   Filed 01/03/22   Page 1 of 2 PageID #: 29
Case 4:24-cv-00767-P   Document 54-1   Filed 10/23/24   Page 109 of 117   PageID 981

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JOHN B. MALTAGLIATI, Individually and on behalf of all others similarly situated,

**(b)** County of Residence of First Listed Plaintiff   New Haven Cnty, CT
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
THE ROSEN LAW FIRM, P.A., Phillip Kim, Esq.
275 Madison Ave., 40th Floor, New York, New York 10016
Telephone: (212) 686-1060, Email: pkim@rosenlegal.com

### DEFENDANTS

META MATERIALS INC. F/K/A TORCHLIGHT ENERGY RESOURCES, INC., GEORGE PALIKARAS, KENNETH RICE, GREG MCCABE, and JOHN BRDA,
County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

*Does this action include a motion for temporary restraining order or order to show cause?* Yes ☐ No ☑

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*   *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | | (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78j(b) and §78t(a)) and the PSLRA.

Brief description of cause:
Violations of the federal securities laws.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 1/3/2022 | /s/Phillip Kim |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**CERTIFICATION OF ARBITRATION ELIGIBILITY**

Local Arbitration Rule 83.7 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

Case is Eligible for Arbitration ☐

I, __Phillip Kim__, counsel for __John B. Maltagliati__, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

☑ monetary damages sought are in excess of $150,000, exclusive of interest and costs,

☐ the complaint seeks injunctive relief,

☐ the matter is otherwise ineligible for the following reason

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

N/A

## RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

## NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.) Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County? ☐ Yes ☑ No

2.) If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County? ☐ Yes ☑ No

b) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District? ☑ Yes ☐ No

c) If this is a Fair Debt Collection Practice Act case, specify the County in which the offending communication was received: .

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County? ☐ Yes ☐ No
*(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).*

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.

☑ Yes          ☐ No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?

☐ Yes (If yes, please explain ☑ No

I certify the accuracy of all information provided above.

Signature: ____/s/Phillip Kim____

**APP. 110**

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| JOHN B. MALTAGLIATI, Individually and on behalf of all others similarly situated, | ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| META MATERIALS INC. F/K/A TORCHLIGHT ENERGY RESOURCES, INC., GEORGE PALIKARAS, KENNETH RICE, GREG MCCABE, and JOHN BRDA, | ) ) ) ) ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  META MATERIALS INC. F/K/A TORCHLIGHT ENERGY RESOURCES, INC., GEORGE PALIKARAS, KENNETH RICE, GREG MCCABE, and JOHN BRDA
1 Research Drive
Dartmouth, NS B2Y 4M9
Canada

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:     THE ROSEN LAW FIRM, P.A.
Phillip Kim, Esq. (PK 9384)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: _____         _____
                                            *Signature of Clerk or Deputy Clerk*

**APP. 111**

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**APP. 112**

**TAB 4**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN B. MALTAGLIATI, Individually and on behalf of all others similarly situated, | Case No.  1:21-cv-07203-CBA-JRC |
| Plaintiff, | *AMENDED* STIPULATION AND [~~PROPOSED~~] ORDER RESOLVING PENDING MOTIONS FOR APPOINTMENT OF LEAD PLAINTIFF AND LEAD COUNSEL |
| v. | |
| META MATERIALS INC. F/K/A TORCHLIGHT ENERGY RESOURCES, INC., GEORGE PALIKARAS, KENNETH RICE, GREG MCCABE, and JOHN BRDA, | |
| Defendants. | |
| KENNETH SCOTT MCMILLAN, Individually and on behalf of all others similarly situated, | Case No. 1:22-cv-00463-CBA-JRC |
| Plaintiff, | |
| v. | |
| META MATERIALS INC. F/K/A TORCHLIGHT ENERGY RESOURCES, INC., GEORGE PALIKARAS, KENNETH RICE, GREG MCCABE, and JOHN BRDA, | |
| Defendants. | |

Lead plaintiff movants (i) Kaoutar Kajjame, Philip Granite, Ricardo Joseph (collectively, the "Meta Materials Investor Group") and (ii) Venkateswara Ramireddy, by and through their undersigned counsel, hereby stipulate and agree to the following matters:

WHEREAS, on January 3, 2022, Plaintiff John Maltagliati commenced the above-captioned action (the "Action") by filing the Complaint against the above-captioned Defendants, alleging violations of the federal securities laws on behalf of a putative class consisting of investors

1

in the securities of Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc. ("Meta Materials") (Dkt. No. 1);

WHEREAS, on January 26, 2022, Plaintiff Kenneth Scott McMillan filed a substantially similar lawsuit to the Action by filing a complaint against the same above-captioned Defendants containing the same allegations on behalf of the same class of Meta Materials investors. *See* Complaint, *McMillan* Action, Dkt. No. 1;

WHEREAS, as a putative class action alleging violations of the federal securities laws, the Action is governed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which provides, in relevant part, *that* ~~XXX~~ any putative Class member may move for appointment as Lead Plaintiff in the Action within 60 days of publication of notice of pendency of the Action—here, on or before May 13, 2022 (15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa));

WHEREAS, on March 4, 2022, five members of the putative Class filed motions seeking appointment as Lead Plaintiff pursuant to the PSLRA: (i) Kaoutar Kajjame, Philip Granite, Ricardo Joseph (collectively, the "Meta Materials Investor Group") (Dkt. No. 19); (ii) Steven B. Barbetti and Ernesto S. Escusa III (Dkt. No. 22); (iii) Lewis Wu (Dkt. No. 25); (iv) Venkateswara Ramireddy (Dkt. No. 28); and (v) Steven Raymond (Dkt. No. 30);

WHEREAS, on March 8, 2022, Messrs. Barbetti and Escusa withdrew their motion for lead plaintiff (Dkt. No. 31);

WHEREAS, on March 18, 2022, Mr. Wu withdrew his motion for lead plaintiff (Dkt. No. 34);

WHEREAS, on March 21, 2022, Mr. Raymond withdrew his motion for lead plaintiff (Dkt. No. 36);

**APP. 114**

WHEREAS, on April 11, 2022, the Court held a hearing on the remaining motions for lead plaintiff, which at that time consisted of the motions filed by (i) the Meta Materials Investor Group and (ii) Mr. Ramireddy, and directed the parties to meet and confer in an effort to resolve their pending motions and to submit a status report the following week;

WHEREAS, on April 18, 2022, counsel for the Meta Materials Investor Group and Mr. Ramireddy advised the Court that they had been unable to come to a resolution in connection with their pending motions for lead plaintiff (Dkt. No. 39);

WHEREAS, counsel for the Meta Materials Investor Group and Mr. Ramireddy have since met-and-conferred on several occasions concerning the status of this Action and their respective motions for lead plaintiff and, as a result, reached an agreement whereby the Meta Materials Investor Group and its counsel will serve as Lead Plaintiff and Lead Counsel with support, if necessary, from Mr. Ramireddy and his counsel;

WHEREAS, the PSLRA, 15 U.S.C. § 78u-4(a)(3)(B)(iii), provides, *inter alia*, that the most adequate plaintiff to serve as Lead Plaintiff is, in the determination of the Court, the "person or group of persons" that has the largest financial interest in the relief sought by the class and otherwise satisfies the relevant requirements of Rule 23 of the Federal Rules of Civil Procedure ("Rule 23");

WHEREAS, 15 U.S.C. § 78u-4(a)(3)(B)(iv) provides that, subject to the approval of the Court, the most adequate plaintiff will select and retain counsel to represent the class;

WHEREAS, each member of the Meta Materials Investor Group has provided sworn Certifications pursuant to the PSLRA in support of their application for Lead Plaintiff appointment, setting forth, *inter alia*, their transactions in Meta Materials securities, and each has alleged a significant financial interest in this litigation;

3

WHEREAS, having reviewed the Meta Materials Investor Group's submissions to the Court, Mr. Ramireddy is in agreement that it satisfies the requirements of Rule 23; and

WHEREAS, having reviewed one another's submissions to the Court, the Meta Materials Investor Group and Mr. Ramireddy believe that it is in the best interests of the Class to agree by way of this Stipulation for the Meta Materials Investor Group to serve as Lead Plaintiff and its counsel, Levi & Korsinsky, LLP ("Levi & Korsinsky"), to serve as Co-Lead Counsel;

IT IS HEREBY STIPULATED AND AGREED THAT, subject to the Court's approval, as follows:

1.      The *Maltagliati* and *McMillan* actions are consolidated pursuant to Federal Rule of Civil Procedure 42 for the reasons stated on the record during the hearing on April 11, 2022. All further filings shall bear the caption "In re Meta Materials Inc. Securities Litigation" and be filed under docket number 1:21-cv-07203;

2.      The Meta Materials Investor Group is hereby appointed Lead Plaintiff in this Action and any subsequently filed or transferred actions that are consolidated with this Action, pursuant to 15 U.S.C. §78u-4(a)(3)(B); and

3.      The Meta Materials Investor Group's selection of Levi & Korsinsky as Lead Counsel is hereby approved.

**IT IS SO STIPULATED.**

*[Signature blocks on following page]*

4

Respectfully submitted,

Dated:  June 28, 2022                        LEVI & KORSINSKY, LLP

                                             s/ Adam M. Apton
                                             Adam M. Apton
                                             55 Broadway, 10th Floor
                                             New York, New York 10006
                                             Tel: (212) 363-7500
                                             Fax: (212) 363-7171
                                             Email: aapton@zlk.com

                                             *Attorneys for the Meta Materials Investor
                                             Group and [Proposed] Co-Lead Counsel for
                                             the Class*


Dated June 28, 2022                          THE ROSEN LAW FIRM, P.A.

                                             s/ Phillip Kim
                                             Phillip Kim
                                             Laurence Rosen
                                             275 Madison Ave., 40th Floor
                                             New York, New York 10016
                                             Tel.: (212) 686-1060
                                             Fax: (212) 202-3827
                                             pkim@rosenlegal.com
                                             lrosen@rosenlegal.com

                                             *Attorneys for Venkateswara Ramireddy*


**PURSUANT TO STIPULATION, IT IS SO ORDERED** *AS AMENDED.*


DATED:  ___July 15_____, 2022          s/ James R. Cho
                                             The Honorable James R. Cho
                                             United States Magistrate Judge

5

**APP. 117**