IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| TODD TARGGART, individually and on behalf of all others similarly situated, | § § § § | |
| Plaintiff, | § | Case No. 4:24-cv-00767-P |
| v. | § § § | |
| NEXT BRIDGE HYDROCARBONS, INC., ROBERT L. COOK, CLIFTON DUBOSE, JR., JOSEPH DEWOODY, LUCAS T. HAWKINS, DELVINA OELKERS, MIA PITTS, KRISTIN WHITLEY, GREGORY MCCABE, and JOHN BRDA, | § § § § § § § | |
| Defendants. | § § § | |

---

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
FILED BY DEFENDANT JOHN BRDA**

---

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 2

    A.    John Brda. ................................................................................................... 2

    B.    The Special Dividend. ................................................................................ 3

    C.    MMTLP Begins Trading Over-the-Counter. ............................................ 3

    D.    The Spin-Off. ............................................................................................. 5

    E.    The SEC's Enforcement Action. ............................................................... 6

LEGAL STANDARD ............................................................................................................ 8

ARGUMENT .......................................................................................................................... 9

    A.    Rule 8(a) Applies to Plaintiffs' "Statutory Seller" Allegations against Brda. ......... 9

    B.    Plaintiffs "Purchased" Shares in the Spin-Off. ..................................... 10

    C.    Brda Solicited Retail Shareholder Investment Pursuant to a Defective Prospectus and Misleading Registration Statement. ............................... 13

    D.    Brda Is a "Statutory Seller" under Section 12(a)(2). ............................ 14

    E.    Brda's Statute of Limitations Defense Is Meritless. .............................. 17

CONCLUSION ..................................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Cases**

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*,
    38 F.3d 211 (5th Cir. 1994) ................................................................................ 11, 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................ 9

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
    No. H-14-3428, 2016 U.S. Dist. LEXIS 5702 (S.D. Tex. Jan. 19, 2016) .................................. 9

*Combs v. Safemoon LLC*,
    No. 2:22-cv-00642-DBB-JCB, 2024 U.S. Dist. LEXIS 58417 (D. Utah Mar. 29, 2024) ......... 16

*Craftmatic Securities Litigation v. Kraftsow*,
    890 F.2d 628 (3d Cir. 1989) .................................................................................. 16

*Dasho v. Susquehanna Corp.*,
    461 F.2d 11 (7th Cir. 1972) .................................................................................. 11

*DeBenedictis v. Merrill Lynch & Co., Inc.*,
    492 F.3d 209 (3d Cir. 2007) .................................................................................. 18

*In re Enron Corp. Sec.*,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) ...................................................................... 9

*In re Fleming Cos. Sec. & Derivative Litig.*,
    No. 5-03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488 (E.D. Tex. June 10, 2004) ............ 9

*In re Genius Brands Int'l, Inc.*,
    97 F.4th 1171 (9th Cir. 2024) ................................................................................ 15

*Gustafson v. Alloyd Co. Inc.*,
    513 U.S. 561 (1995) .............................................................................................. 13

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019) .................................................................... 14

*Heck v. Triche*,
    775 F.3d 265 (5th Cir. 2014) .................................................................................. 9

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ......................................................................................... 1, 11

*Isquith v. Caremark Int'l*,
    136 F.3d 531 (7th Cir. 1998) ................................................................................ 12

*Junker v. Crory*,

650 F.2d 1349 (5th Cir. 1981) ............................................................................... 10

*Llanos v. U.S.*,
206 F.2d 852 (9th Cir. 1953) ................................................................................ 11

*Lone Star Ladies Inv. Club v. Scholtzsky's Inc.*,
238 F.3d 363 (5th Cir. 2001) ................................................................. 1, 10, 18

*Mader v. Armel*,
402 F.2d 158 (6th Cir. 1968) .......................................................................... 11, 12

*Margolies v. Deason*,
464 F.3d 547 (5th Cir. 2006) ................................................................................ 18

*Mass. Mut. Life Ins. Co. v. DB Structured Prods.*,
No. 11-30039-MGM, 2015 U.S. Dist. LEXIS 87244 (D. Mass. June 19, 2015) ...................... 19

*Merck & Co., Inc. v. Reynolds*,
559 U.S. 633 (2010) ................................................................................... 18, 19

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) ................................................................................... 9

*Pappas v. Qutoutiao Inc.*,
No. 23-1233, 2024 U.S. App. LEXIS 27250 (2d Cir. Oct. 28, 2024) ................................ 9, 10

*Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc.*,
730 F.3d 263 (3d Cir. 2013) ................................................................................. 19

*Pino v. Cardone Capital, LLC*,
55 F.4th 1253 (9th Cir. 2022) ................................................................... 14, 15, 17

*Pinter v. Dahl*,
486 U.S. 622 (1988) ........................................................................... 14, 15, 18

*Rathborne v. Rathborne*,
683 F.2d 914 (5th Cir. 1982) ................................................................................ 12

*Risley v. Universal Navigation Inc.*,
690 F. Supp. 3d 195 (S.D.N.Y. 2023) ....................................................................... 16

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ................................................................................ 16

*S.E.C. v. National Securities, Inc.*,
393 U.S. 453 (1969) ......................................................................................... 11

*Schneider v. Natera, Inc.*,
No. 1:22-CV-398-DAE, 2023 U.S. Dist. LEXIS 160171 (W.D. Tex. Sep. 11, 2023) ............... 9

*SEC v. Datronics Eng'rs, Inc.*,
   490 F.2d 250 (4th Cir. 1973) .................................................................. 12

*Sewell v. D'Alessandro & Woodyard, Inc.*,
   725 F. Supp. 2d 1344 (M.D. Fla. 2010) ................................................... 19

*Sheldon v. Vermonty*,
   Nos. 99-3202 & 99-3389, 2000 U.S. App. LEXIS 27292 (10th Cir. Oct. 30, 2000) ............... 12

*Smallwood v. Pearl Brewing Co.*,
   489 F.2d 579 (5th Cir. 1974) .................................................................. 11

*Spitzberg v. Hous. Am. Energy Corp.*,
   758 F.3d 676 (5th Cir. 2014) .................................................................. 18

*Sudo Props. v. Terrebonne Par. Consol. Gov't*,
   503 F.3d 371 (5th Cir. 2007) .................................................................. 18

*Topalian v. Ehrman*,
   954 F.2d 1125 (5th Cir. 1992) ................................................................ 17

*United States v. Wernes*,
   157 F.2d 797 (7th Cir.1946) .................................................................. 11

*Vanguard Specialized Funds v. VEREIT Inc.*,
   No. CV-15-02157-PHX-ROS, 2016 U.S. Dist. LEXIS 137881 (D. Ariz. Oct. 3, 2016) .......... 10

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ................................................................ 10

*In re Vivendi Universal, S.A.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003) ...................................................... 14

*Wildes v. BitConnect Int'l PLC*,
   25 F.4th 1341 (11th Cir. 2022) ......................................................... 15, 17

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003) ...................................................... 14

*Zakinov v. Ripple Labs, Inc.*,
   No. 18-cv-06753-PJH, 2020 U.S. Dist. LEXIS 32982 (N.D. Cal. Feb. 26, 2020) ............ 13

**Statutes**

15 U.S.C. § 77b ........................................................................................ 11

15 U.S.C. § 77l .................................................................................... 9, 13

**Regulations**

17 C.F.R. § 230.145 ............................................................................................................ 11

## <u>INTRODUCTION</u>

Defendant John Brda played an integral role in the registration, promotion, and spin-off of Next Bridge Hydrocarbon, Inc. ("NBH"). By his design, shareholders received preferred stock supposedly tied to the value of oil and gas assets belonging to NBH's predecessor parent company, Torchlight Energy Resources, Inc. ("Torchlight"). Brda then promoted these shares through various channels, including official corporate communications such as press releases and proxy statements as well as informal communications with memes and kitschy Twitter posts. For good measure, Brda also retained and paid undisclosed stock promoters. Brda's efforts worked. He created a feverish market for the preferred shares and immense anticipation among retail investors for NBH's spin-off. In exchange for his efforts, Brda ultimately walked away with a $1.5 million cash bonus and as much as $3 million in proceeds from insider sales.

These facts give rise to liability under Section 12(a)(2) of the Securities Act of 1933. Section 12(a)(2) was intended to supplement the other anti-fraud provisions of the federal securities laws and guarantee recourse to investors harmed by false and/or materially misleading statements made in conjunction with initial offerings. Similar to Section 11 claims, the threshold for establishing liability under Section 12 is relatively low and once met, liability is virtually absolute. *See Lone Star Ladies Inv. Club v. Scholtzsky's Inc.*, 238 F.3d 363, 369 (5th Cir. 2001) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).

Brda raises a handful of arguments in hopes of making a quick exit from the case. None of these arguments has merit. Without question, Plaintiffs' acquisition of NBH shares in the spin-off constituted a "purchase" under black-letter law as well as SEC regulations. Further, although Brda currently presents himself as a former executive far removed from the events in question, he was the driving force behind everything relevant to this lawsuit. Recent case law from the Ninth

and Eleventh Circuits confirms that his use of social media to promote NBH qualifies as "solicitation" for purposes of establishing liability under Section 12(a)(2).  Finally, Brda fails to carry his burden when arguing that Plaintiffs' claims are time-barred.  The SEC's recent enforcement action against Brda unveiled a slew of facts revealing his role and responsibility for NBH's promotion and spin-off.  Those facts were not known prior to the filing of the SEC's complaint, which was within one year of naming Brda as a defendant in this action.

Plaintiffs respectfully request that Brda's motion be denied in its entirety and the case be allowed to proceed to discovery immediately.

## STATEMENT OF FACTS

### A.    John Brda.

Defendant Brda is integral to this case.  He served as CEO of NBH's predecessor parent company, Torchlight, from 2014 through its merger with Metamaterial Technologies Inc. ("Metamaterial").  ¶25.[1]  While at Torchlight, Brda was one of only four employees.  ¶25.

Brda was directly involved in Torchlight's merger negotiations with Metamaterial.  ¶¶27-28.  Alongside Torchlight's founder and controller, Defendant Gregory McCabe, Brda held virtual meetings with Metamaterial's management and, as the SEC's enforcement action later revealed, was responsible for the special dividend, preferred shares, and spin-off underlying this lawsuit.  *See* ¶¶28-29, 122-27, 140.

More so than any other individual defendant in this lawsuit, Brda publicly promoted NBH and the money investors could make if they bought in prior to the spin-off.  *See* ¶34.  Brda repeatedly used social media (mainly through Twitter) to promote NBH and solicit shareholders.  *See*, *e.g.*, ¶¶34, 120-21, 128, 133.

---

[1] Citations to "¶__" refer to Plaintiffs' Amended Complaint for Violations of the Federal Securities Laws (Dkt.  No.  41).

B.      **The Special Dividend.**

When Torchlight merged with Metamaterial, Brda and McCabe negotiated an agreement whereby Torchlight's oil and gas assets (referred to as the "O&G Assets") would effectively remain under the ownership and control of Torchlight's shareholders.  The agreement provided that Meta Materials (as the surviving entity post-merger) would attempt to dispose of the O&G Assets and, if successful, Torchlight shareholders would be entitled to receive the proceeds from that disposition.  ¶29.  To facilitate this payment, Torchlight's shareholders received preferred stock upon the completion of the merger that would then entitle them to payment from the proceeds of the O&G Assets sale.  ¶¶3, 31-32.

Meta Materials ultimately did not sell the O&G Assets and instead proceeded with the spin-off (effectively transferring the O&G Assets to Torchlight's preferred stockholders).  ¶¶4, 33.

C.      **MMTLP Begins Trading Over-the-Counter.**

The preferred stock issued in conjunction with the merger began trading over-the-counter under the ticker symbol "MMTLP" shortly after it was issued.  ¶34.  It began trading in October 2021 and continued trading until the spin-off finally occurred in December 2022.  ¶34.  While the MMTLP shares were trading over-the-counter, NBH filed its registration statement for the spin-off.  NBH filed its initial registration statement on July 14, 2022, followed by several amendments and a final prospectus (the "Registration Statement").  ¶4.  The SEC declared the Registration Statement "effective" on November 18, 2022.  ¶4.

Prior to and during MMTLP's time trading over-the-counter, Brda resoundingly promoted the O&G Assets and the preferred stock that would be issued in connection with the merger.  For example:

- On March 3, 2020, Brda told investors during a presentation that the O&G Assets

3

(specifically, the "Orogrande Basin" assets) comprised 3.7 billion barrels of oil.
¶50;

- On September 2, 2020, Brda told investors during another investor presentation that the O&G Assets have "3.7 billion barrels of recoverable reserves in addition to between 5 and 8 Tcf of gas." ¶51;

- On December 14, 2020, Brda issued press releases emphasizing that shareholders who purchased Torchlight stock before the merger would receive the O&G Assets preferred shares prior to closing. ¶129; and

- On February 4, March 23, April 21, and May 7, 2021, Brda disseminated proxy statements soliciting shareholder approval for the issuance of the preferred dividend and the spin-off (*i.e.*, NBH). ¶132.

Brda's promotional efforts grew stronger after the merger, and especially while the preferred stock was trading over-the-counter. For example:

- On June 9, 2022, one month before NBH filed its initial registration statement, Brda tweeted a meme featuring The Monkees singing "I'm a Believer" and told investors they should purchase MMTLP shares to own an interest in the O&G Assets. ¶144;

- On June 17, 2022, Brda again promoted NBH via Twitter by telling investors that shareholders who held "short" positions in MMTLP would be unable to cover once the spin-off occurred. ¶145;

- On October 9, 2022, approximately three months after NBH filed its initial registration statement, Brda told public investors during a "Space" call that he had not "sold a share" of his MMTLP stock because of he was so confident in the O&G Assets. ¶146;

- On December 6, 2022, just days before the spin-off, Brda congratulated retail investors for purchasing MMTLP and holding it through the spin-off.  ¶147;

- On December 7, 2022, Brda again encouraged investors to continue holding MMTLP into the spin-off because it would be "legendary".  ¶148;

- On December 9, 2022, Brda reiterated the claim that the O&G Assets comprised 3.2 billion barrels of oil and urged MMTLP shareholders to maintain "Diamond Hands," which is a trading slang term used to describe investors who hold onto stocks even when the market is volatile.[2] ¶¶149-50; and

- On December 11, 2022, on the eve of the spin-off, Brda tweeted that "WE ALL hold together 3.2 Billion Barrels of Oil," referring to the O&G Assets that would be transferred to MMTLP shareholders vis-à-vis the spin-off.  ¶151.

While Brda was publicly promoting MMTLP and the O&G Assets that would be spun-off to NBH, he was simultaneously selling shares into the over-the-counter markets.  Brda sold approximately 388,000 shares of MMTLP shares before the spin-off.  ¶37.  Based on MMTLP's historical trading prices, Brda sold these shares for between $300,000 and $3,000,000.  ¶37.

Defendant McCabe also sold shares.  In total, McCabe liquidated approximately 6.7 million shares of MMTLP on the eve of the spin-off for proceeds of between $19.6 million and $78.9 million.  ¶36.

**D.    The Spin-Off.**

The spin-off occurred on December 14, 2022.  Shareholders who held preferred stock under

---

[2] "Diamond hands is a slang term for an investor who refrains from selling an investment (such as stock shares) despite downturns or losses. . . .  The term is often used positively to refer to an investor who doesn't panic when their investment decreases or fluctuates in value—one who is resolute and patient enough to hold until they realize big gains."  *Dictionary.com*, https://www.dictionary.com/e/slang/diamond-hands (last visited Nov. 13, 2024).

the MMTLP ticker received new shares in NBH that had been registered under the Registration Statement.  ¶¶5, 35.  In total, Meta Materials exchanged approximately 165 million shares of its preferred stock for new shares in NBH.  ¶35.

E.    **The SEC's Enforcement Action.**

On July 20, 2023, approximately seven months after the spin-off, Meta Materials filed a Form 8-k disclosing that the SEC had issued a "Wells Notice" to Meta Materials, Meta Materials' then-current CEO, George Palikaras, and Brda relating to "a previously disclosed SEC investigation." Dkt. No. 54-3, App. 303.  Although the Form 8-k referred to a previous disclosure of the SEC investigation, that disclosure was hardly substantive.  It consisted of one sentence in which Meta Materials disclosed it received a subpoena from the SEC in September 2021 requesting "certain documents and information related to, among other things, the merger involving Torchlight Energy Resources, Inc.  and Metamaterial Inc."  Declaration of Adam M. Apton ("Apton Decl."), Exhibit C (Pl. App. 018).  Meta Materials never provided investors with additional details or information about the scope or purpose of the investigation.

On June 25, 2024, almost three years after first subpoenaing Meta Materials and a year after issuing its "Wells Notices," the SEC filed suit accusing Brda of committing securities fraud under Section 10(b) and Rule 10b-5.  While Brda's public support for the O&G Assets, preferred shares, and the spin-off had been publicly known up to this point, the SEC's complaint placed Brda's actions in context.  It revealed Brda's integral role in a "fraudulent scheme" aimed at creating a "short squeeze" that, importantly, required him to solicit retail shareholder investment to pull it off.  The SEC's enforcement action has a different focus than the case at bar; specifically, it focuses on statements made by Brda about his supposed efforts to sell the O&G Assets (and not the value of the O&G Assets themselves).  However, the factual information contained in the

SEC's complaint establishes with certainty Brda's role as a "statutory seller" for purposes of Section 12(a)(2) liability. ¶120. Specifically, the SEC's complaint revealed that:

- In or around June 2020, Brda concocted a scheme to combat short-sellers of Torchlight's stock, which as he described in internal correspondence would result in forcing "short" investors to "cover" their positions, *i.e.*, a "short squeeze." ¶121;

- Brda's plan entailed segregating Torchlight's O&G Assets, creating a new class of preferred stock tied to the O&G Assets, marketing and promoting the preferred stock using a "short squeeze" narrative, and ultimately enriching himself once the "short squeeze" was executed. ¶¶122-26;

- Brda then followed through with his plan by securing approval from Metamaterial's board of directors to "[p]lay up the [preferred share] dividend," according to a September 2020 presentation. ¶127;

- Brda recruited third-party consultants to help promote Torchlight's merger and the preferred shares that would be issued for the O&G Assets paying them between $3,000 and $5,000 per month. ¶128;

- Brda meanwhile developed the plans for the spin-off and launched NBH by *inter alia* obtaining Defendant McCabe's approval for the spin-off given his then-current role as Chairman and recruiting management to oversee NBH by paying them "consulting fees" in the amount of $20,000 per month. ¶¶129-30; and

- Simultaneously, Brda was continuing to promote Torchlight's O&G Assets and the preferred shares that would ultimately turn into NBH through the spin-off. This included arming stock promoters with information about his "short squeeze" plan they could spread to retail investors, holding meetings with institutional investors

wherein he discussed his plans for the preferred stock and the "short squeeze" it would create, and personally posting promotional claims about Torchlight's O&G Assets on Twitter.  ¶¶130-35.

The SEC's complaint also made clear that Brda profited from his plans for the spin-off and "short squeeze."  As a result of Brda's promotional campaign, Torchlight's trading volume surged just prior to and after the record date for the preferred stock dividend.  ¶¶126-37.  Brda used this period of peak volume (indeed, trading reached over 80 million shares per day hitting prices upwards of $10 per share) to hold an at-the-market offering for Torchlight.  ¶¶137-39.  In total, the offering sold 16.2 million shares and raised $137.5 million.  ¶139.  On June 24, 2021, immediately following the offering and just one day before the merger closed with Metamaterial, Brda successfully obtained a $1.5 million bonus based on the success of the capital raise he had conducted.  ¶¶141-43.

In August 2021, Brda then submitted his fully-formed plan for the spin-off of the O&G Assets to Meta Materials' board of directors, including specifics as to the management team (which had been receiving payment since January 2021).  ¶140.  The plan was adopted and completed the following year with the spin-off occurring in December 2022.  In the interim, Brda promoted the preferred stock and NBH's spin-off repeatedly (while also selling hundreds of thousands of shares for millions of dollars in proceeds).  *See*, *e.g.*, ¶¶37, 144-51.

## LEGAL STANDARD

"'Claims under sections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements' that impose liability for material misstatements and omissions in securities offering documents (for Section 11, the registration statement; for Section 12(a)(2), the prospectus)." *Schneider v. Natera, Inc.*, No.  1:22-CV-398-DAE, 2023 U.S. Dist. LEXIS 160171, at *28 (W.D.

Tex. Sep. 11, 2023) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010)).  To state a *prima facie* claim under Section 12(a)(2), a plaintiff must allege: (1) the defendant is a "statutory seller"; (2) the sale was effectuated "by means of a prospectus or oral communication"; and (3) the prospectus or oral communication "include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359 (quoting 15 U.S.C. §77l(a)(2)).

"Section 12(a) does not require a plaintiff to prove scienter either and the pleadings need only satisfy the liberal pleading requirements of Rule 8 of the Federal Rules of Civil Procedure." *In re Fleming Cos. Sec. & Derivative Litig.*, No. 5-03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488, at *144-45 (E.D. Tex. June 10, 2004) (citing *In re Enron Corp. Sec.*, 235 F. Supp. 2d 549, 596 (S.D. Tex. 2002)).  Consequently, "[t]he complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true."  *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2016 U.S. Dist. LEXIS 5702, *10 (S.D. Tex. Jan. 19, 2016).  So long as the complaint "contain[s] sufficient factual allegations, as opposed to legal conclusions," it will "state a claim for relief that is 'plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pappas v. Qutoutiao Inc.*, No. 23-1233, 2024 U.S. App. LEXIS 27250, *4 (2d Cir. Oct. 28, 2024) (applying notice pleading standard to Securities Act claims).

## ARGUMENT

### A.    Rule 8(a) Applies to Plaintiffs' "Statutory Seller" Allegations against Brda.

Section 12 claims do not require intent or any particular mental state.  *See* 15 U.S.C. §77l; *Heck v. Triche*, 775 F.3d 265, 280 (5th Cir. 2014) (Section 12 "requires only a showing that the defendant was negligent"); *Junker v. Crory*, 650 F.2d 1349, 1359 (5th Cir. 1981) (holding that to

recover under Section 12, "plaintiff need not establish that the defendant acted with scienter or that he relied in any way on the defendant's misrepresentations or omissions.").  Consequently, when pleading a Section 12 claim, plaintiffs only need to satisfy Rule 8's lenient "notice pleading" standard.  *See Pappas*, 2024 U.S. App. LEXIS 27250, at *5 ("A plaintiff may retain the application of the Rule 8 notice pleading standard by expressly pleading negligence, disclaiming fraud, eschewing language in its Section 11 or Section 12(a)(2) claims implying fraud or the elements thereof"); *Lone Star Ladies*, 238 F.3d at 368 ("The proper route is to disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated.").

Brda makes reference to Rule 9(b) but never explains how it applies to Plaintiffs' allegations.  Brda.  Br.  at 4.  This is because Section 12 does not require Plaintiffs to plead that Brda acted with any specific mental intent.  Without any alleged circumstances constituting fraud, Rule 9(b) does not have any relevance.  This is especially true considering that Brda's motion is geared almost exclusively to disputing his role as a "statutory seller."  "[S]ince the acts creating statutory seller liability can be committed negligently, . . . the rationale of *Vess* points to Rule 9(b) being inapplicable to Plaintiffs' statutory seller allegations."  *Vanguard Specialized Funds v. VEREIT Inc.*, No. CV-15-02157-PHX-ROS, 2016 U.S. Dist. LEXIS 137881, at *49-50 (D. Ariz. Oct. 3, 2016) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) (quoting *Lone Star Ladies*, 238 F.3d at 368)).

## B.    Plaintiffs "Purchased" Shares in the Spin-Off.

Without question, Plaintiffs' receipt of shares in the spin-off qualifies as a "purchase" for purposes of establishing liability under Section 12(a)(2).  "Case-law has limited the term 'any person acquiring such security' to purchasers of shares issued and sold pursuant to the challenged registration statement."  *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 223

(5th Cir. 1994); *see also Herman & MacLean*, 459 U.S. at 381-82 ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case."). Thus, the question "turn[s] to the definition of 'sale' under the Securities Act, which provides that '[t]he term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value.'" *7547 Corp.*, 38 F.3d at 223 (quoting 15 U.S.C. §77b(3)). "This section is generally interpreted to include exchanges of one security for another." *Id.* (citing *United States v. Wernes*, 157 F.2d 797, 799 (7th Cir.1946)); *see also Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 591 (5th Cir. 1974); *Dasho v. Susquehanna Corp.*, 461 F.2d 11, 24 (7th Cir. 1972) ("there is no doubt that Susquehanna's acquisition of its own shares in exchange for its block of Vanadium stock was a 'purchase' within the meaning of the Rule"); *Mader v. Armel*, 402 F.2d 158, 160 (6th Cir. 1968); *Llanos v. U.S.*, 206 F.2d 852, 854 (9th Cir. 1953). Indeed, in *S.E.C. v. National Securities, Inc.*, 393 U.S. 453 (1969), the Supreme Court concluded that the shareholders of a merged corporation had "'purchased' shares in the new company by exchanging them for their old stock." *Id.* at 467. Brda is not entitled to a pass simply because Plaintiffs acquired their shares in a spin-off instead of, for instance, a traditional initial public offering. "[T]he terms 'purchase' and 'sale' are relevant only to the question of statutory coverage. Therefore there are no 'standing' problems lurking in the case." *Id.* at 467 n.9.

SEC Rule 145, which abandoned the no-sale rule, further demonstrates that certain exchanges of securities—*e.g.*, in connection with mergers, consolidations, and transfer of assets— are covered within the registration provisions of the Securities Act as constituting "sales." *See* 17 C.F.R. §230.145(a)(3)(ii) (defining an "offer, offer to sell, offer for sale, or sale" as *inter alia*, a "transfer of assets of such corporation or other person, to another person in consideration of the issuance of securities of such other person or any of its affiliates"). "These factors confirm that

the [spin-off] transaction constituted a 'sale' of securities for regulatory purposes of the Securities Act. It would be inconsistent to find that the exchange of [stock] for stock in a newly-formed corporation is a 'sale' for certain purposes of the Securities Act but not a 'sale' for purposes of the private civil remedy to enforce those provisions." *7547 Corp.*, 38 F.3d at 223-24.

Brda incorrectly argues otherwise by trying to fall within the scope of *Isquith v. Caremark Int'l*, 136 F.3d 531, 534 (7th Cir. 1998), and *Rathborne v. Rathborne*, 683 F.2d 914, 920 (5th Cir. 1982). Brda. Br. at 5-6. These cases involved scenarios in which the plaintiffs received distributions of shares without surrendering anything in exchange. Thus, these cases are markedly different than the facts at hand; namely, that Brda solicited shareholders to purchase preferred stock in anticipation of the spin-off. *See* ¶¶34, 120-51. Thus, "the price at which [NBH's shares] w[ere] offered to the public" is equivalent to the price of the preferred stock that Plaintiffs forfeited in exchange. *See Mader*, 402 F.2d at 160 (finding a "sale" occurred "when the merger was approved and the exchange of securities occurred, the owner of stock had in effect purchased a new security and paid for it by turning in his old one. In such a situation the antifraud protections afforded by the Securities Act are needed no less than in a situation where one makes an outright purchase of stock for cash."); *see also Sheldon v. Vermonty*, Nos. 99-3202 & 99-3389, 2000 U.S. App. LEXIS 27292, at *12 (10th Cir. Oct. 30, 2000) ("We conclude that plaintiff's §12(a)(2) allegations concerning the merger between Power Phone (a public company alleged to be a shell having little or no assets) and TMC Agroworld are sufficient to survive defendants' motion to dismiss. Accordingly, the district court's dismissal of the claim was premature."); *SEC v. Datronics Eng'rs, Inc.*, 490 F.2d 250, 253 (4th Cir. 1973) ("As the term 'sale' includes a 'disposition of a security', the dissemination of the new stock among Datronics' stockholders was a sale. However, the appellees urged, and the District Court held, that this disposition was not a

statutory sale because it was not 'for value', as demanded by the definition.  Here, again, we find error.").

C.    **Brda Solicited Retail Shareholder Investment Pursuant to a Defective Prospectus and Misleading Registration Statement.**

Section 12(a)(2) liability attaches whenever a defendant solicits shareholder purchases by means of a "prospectus or oral communication," which includes "documents related to public offerings" and "communications that relate to a prospectus."  *See* 15 U.S.C. §77l(a)(2); *Gustafson v. Alloyd Co. Inc.*, 513 U.S. 561, 569 (1995).  Consequently, Brda's "solicitation" conduct renders him liable under Section 12(a)(2), given the timing and content of his public statements.  Brda devised the spin-off and obtained approval for it from Meta Materials' board of directors in August 2021.  *See* ¶¶126-27, 129-30, 140.  His "solicitations" from that point forward consistently referenced NBH (or "Oilco") and its 3.7 billion barrels of oil (which relates directly to the O&G Assets misrepresentations in the Registration Statement).  ¶¶144-51.  Plaintiffs purchased their shares for the express purpose of receiving stock in NBH, which they ultimately did once the spin-off was completed.  ¶¶5, 34-35.  The shares received by Plaintiffs were indisputably pursuant and traceable to NBH's Registration Statement.  ¶¶12-14.

Brda argues that his role in the creation and promotion of NBH should be overlooked in light of the fact that his solicitations were not allegedly "false or misleading."  Brda Br. at 8.  Brda's argument misinterprets the case law.  Courts have routinely held that promoters can be held liable under Section 12(a)(2) where, as here, they solicit shareholders to purchase stock vis-à-vis statements that "relate" to a misleading prospectus.  *See*, *e.g.*, *Zakinov v. Ripple Labs, Inc.*, No. 18-cv-06753-PJH, 2020 U.S. Dist.  LEXIS 32982, at *35-36 (N.D.  Cal.  Feb.  26, 2020) (finding that defendants qualify as "sellers" where plaintiff alleged that "defendants 'have earned over $1.1

billion through the sale of XRP'" and "that defendants published various tweets, interviews, and articles pushing the adoption of XRP"); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003) (finding adequate allegations that CEO was a statutory seller where he "regularly appeared before investors and financial news agencies to tour the financial vitality of [the company] and thereby encourage investors to purchase [the company's] securities"); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 423 (S.D.N.Y. 2003) (finding sufficient allegations that an underwriter was a statutory seller where the underwriter "participat[ed] in 'road show' meetings").

Accepting Plaintiffs' allegations as true for the purposes of the pleading, Brda's argument fails because his "solicitations" were sufficiently related to NBH's misleading Registration Statement. *See Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 857 (S.D.N.Y. 2019) ("Defendants participated in the preparation of the Registration Statement and participated in marketing 'road shows' to investors. Accordingly, drawing all reasonable inferences in their favor, Plaintiffs have plausibly alleged that these Defendants solicited purchase of stocks through the SPO").

## D.    Brda Is a "Statutory Seller" under Section 12(a)(2).

Brda is liable under Section 12(a)(2) because he qualifies as a "statutory seller" under the case law. In *Pinter v. Dahl*, 486 U.S. 622, 643 (1988), the Supreme Court held that a person may be liable as a "seller" under the predecessor version of Section 12(a) if the person either: (1) passes title to the securities to the plaintiff; or (2) "engages in solicitation," *i.e.*, "solicits the purchase [of the securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pino v. Cardone Capital, LLC*, 55 F.4th 1253, 1257-58 (9th Cir. 2022). What it takes to "engage[] in solicitation" has changed over the years as technology has advanced.

When first enacted, "people understood solicitation to include communications made through diffuse, publicly available means—at the time, newspaper and radio advertisements." *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022). "Under the text, then, a solicitation need not be 'personal' to trigger liability. Broadly disseminated communications also can convey a solicitation—indeed, they are consistent with the longstanding interpretation of the term." *Id*.

This background on the statute and what constitutes "solicitation" is important in light of how Brda solicited shareholders for NBH. After devising his "short squeeze" plan and laying the groundwork for the spin-off, he predominantly used Twitter to promote NBH and the O&G Assets listed in its Registration Statement. *See* ¶¶133-35, 144-51. These online posts constitute "solicitations" for the purposes of Section 12(a)(2) liability. *See In re Genius Brands Int'l, Inc.*, 97 F.4th 1171, 1182 (9th Cir. 2024) ("PennyStocks solicited the purchase of Genius's securities. According to the complaint, Genius retained PennyStocks 'to publish and disseminate favorable information about Genius's shares.' Those articles solicited the purchase of Genius's securities because they urged or lured readers into purchasing Genius stock."); *Pino*, 55 F.4th at 1260 ("the advertisements at issue in this case—Instagram posts and YouTube videos—are the types of potentially injurious solicitations that are intended to command attention and persuade potential purchasers to invest in the Funds during the 'most critical' first stage of a selling transaction, when the buyer becomes involved. Pino fairly alleges that the nature of social media presents dangers that investors will be persuaded to purchase securities without full and fair information." (citing *Pinter*, 486 U.S. at 646-47)); *Wildes*, 25 F.4th at 1346 ("A new means of solicitation is not any less of a solicitation. So when the promoters urged people to buy BitConnect coins in online videos [posted on YouTube], they still solicited the purchases that followed. The plaintiffs therefore have stated a section 12 claim against Arcaro and the other promoters.").

These cases show that a direct communication between the defendant and the plaintiff is not necessary to establish liability under Section 12, contrary to what Brda claims. *See* Brda Br. at 8-9. Brda's legal support does not hold differently. While he cites *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003), the "the directness requirement urged by [Brda] stems from *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989). The *Craftmatic* court made this statement in the context of holding that 'an issuer [is not] liable solely on the basis of its involvement in preparing the prospectus' (*Craftmatic*, 890 F.2d at 636); it said nothing about diffuse communications published through various forms of media. And, of course, the case itself predates the invention of social media by many years." *Combs v. Safemoon LLC*, No. 2:22-cv-00642-DBB-JCB, 2024 U.S. Dist. LEXIS 58417, at *52-53 (D. Utah Mar. 29, 2024) (inserting citations from footnotes).

Brda also relies upon *Risley v. Universal Navigation Inc.*, 690 F. Supp. 3d 195 (S.D.N.Y. 2023). Brda. Br. at 9. But this case is also distinguishable. As the court explained in *Combs*, "plaintiffs sued the developers of a cryptocurrency exchange (the Uniswap Protocol trading platform) and alleged Section 12(a) liability based on two social media posts from the exchange's CEO stating that the exchange was 'secure.' The *Risely* court reasoned that these posts were 'too attenuated' to support liability under a solicitation theory. But this case too is inapposite. The defendants in *Risely* did not offer or solicit sales for any particular security, but rather made statements related to a platform of exchange. By contrast, [Plaintiffs' complaint] alleges that the defendants in this case were engaged in promotions of a single security." *Combs*, 2024 U.S. Dist. LEXIS 58417, at *53.

Brda's final argument on this point is that the $1.5 million bonus he received was insufficient to qualify as a "financial incentive" for solicitation under Section 12. Brda Br. at 9.

Brda's argument is flawed for at least two reasons. First, he provides no support for the notion that the "financial incentive" must be received or realized after the solicitation and not before. Second, Brda's argument disregards Plaintiffs' allegations concerning the 388,000 shares of preferred stock he was able to liquidate just prior to the spin-off. ¶37. Brda's solicitations helped create a retail market for the preferred shares (through over-the-counter exchanges) that allowed him to monetize between $300,000 and $3,000,000 of his stock. ¶37. These allegations suffice to establish Brda's "financial incentive" at the pleading stage.

"[T]hrough [his] social media engagement, [Brda was a] significant participant[] in the selling transaction because [he] disseminated material information to would-be investors. To conclude that [his] social media communications fall outside the Act's protections would be at odds with Congress's remedial goals." *Pino*, 55 F.4th at 1260; *Wildes*, 25 F.4th at 1346 ("Technology has opened new avenues for both investment and solicitation. Sellers can now reach a global audience through podcasts, social media posts, or, as here, online videos and web links. But under the district court's cramped reading of the Securities Act, a seller who would be liable for recommending a security in a personal letter could not be held accountable for making the exact same pitch in an internet video . . . . That makes little sense.").

**E.      Brda's Statute of Limitations Defense Is Meritless.**

The statutory period for a Section 12(a)(2) claim starts to run "when a purchaser of securities knew—or in the exercise of reasonable diligence, should have known—of the alleged wrongdoing." *Topalian v. Ehrman*, 954 F.2d 1125, 1133 (5th Cir. 1992). "This standard is generally referred to as 'inquiry notice,' and it applies 'when a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.'" *Sudo Props. v. Terrebonne Par. Consol. Gov't*, 503 F.3d 371, 376 (5th Cir. 2007) (quoting *DeBenedictis*

*v. Merrill Lynch & Co., Inc.*, 492 F.3d 209, 216 (3d Cir. 2007)).  "The 'fact-intensive inquiry' of what constitutes inquiry notice 'is typically appropriate for consideration by a jury.'" *Sudo Props.*, 503 F.3d at 376 (quoting *Margolies v. Deason*, 464 F.3d 547, 553 (5th Cir. 2006)).

Plaintiffs' claim against Brda is not barred by Section 12's one-year statute of limitations because Brda's role in the spin-off was not known or discoverable before the SEC filed its complaint on June 25, 2024.  ¶152.  Defendants incorrectly argue that because Brda's "purported solicitations" were made in public SEC filings that is not the case.  Brda Br. at 10.  However, the facts that animated Plaintiffs' Section 12 claim were those pertaining to his responsibility for the spin-off plan in the first place, his secret promotional efforts through privately paid consultants, and the financial incentives he secured from successfully pulling it all off.  ¶¶121-43.  As the case law holds, being a "statutory seller" requires more than just the "usual" role of "preparing a prospectus and conducting a road show."  *Lone Star Ladies*, 238 F.3d at 370 (" . . . *Pinter* holds that a plaintiff invoking section 12 may show that an issuer's role was not the usual one; that it went farther and became a vendor's agent.").

Without these additional facts, Plaintiffs' Section 12 claim would not have been viable had they alleged it at the outset.  Brda's public tweets without more would not have been enough to allege his role as a "statutory seller" or otherwise adequately state a claim against Brda.  Consequently, Brda is mistaken when arguing that knowledge of his tweets alone placed Plaintiffs on "inquiry notice."  Brda Br. at 12-13.  As the case law makes clear, without notice of facts supporting the entirety of the claim, the statutory clock did not start ticking.  *See Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010) (implementing "discovery" rule for securities claims); *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 693 (5th Cir. 2014) ("this argument [statute of limitations] could not be evaluated on a motion to dismiss" under *Merck* analysis); *Pension*

*Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc.*, 730 F.3d 263, 273 (3d Cir. 2013) ("We agree with Operating Engineers that the discovery standard announced by the Supreme Court in Merck applies not only the Exchange Act's statute of limitations, but also to the Securities Act's statute of limitations.  Importantly, both statutes incorporate the word 'discovery,' which the *Merck* Court identified as a term of art representing the discovery rule."); *see also Mass. Mut. Life Ins. Co. v. DB Structured Prods.*, No.  11-30039-MGM, 2015 U.S. Dist.  LEXIS 87244, at *25-29 (D. Mass. June 19, 2015) (collecting cases applying "discovery rule" under *Merck*).

Brda's only authority on this issue does not change the outcome.  *See* Brda Br. at 12 (citing *Sewell v. D'Alessandro & Woodyard, Inc.*, 725 F. Supp. 2d 1344 (M.D. Fla. 2010)).  In *Sewell*, there was no dispute over the defendant's role as a statutory seller; thus the dispute was squarely over when the plaintiffs first learned that the statements at issue were false because they waited too long to file suit.  *Id.* at 1346.  Notably, the court in *Sewell* applied the "discovery" rule from *Merck* (discussed above) and also confirmed that "scienter is not an element of a Section 12(a)(2) claim."  *Id.* Unlike the plaintiffs in *Sewell*, Plaintiffs did not discover the facts necessary to establish Brda's role as a "statutory seller" until reading the SEC's complaint.  Those facts included Brda's responsibility for and promotion of the issuance of the preferred stock and the spin-off.  *See* ¶¶120-51.  Those facts elevated Brda's role from just an ordinary commentator on the stock (albeit with a history as Torchlight's former CEO) to the driving force behind the investor interest that allowed him to successfully pocket a $1.5 million bonus, liquidate millions of dollars of stock, and execute NBH's spin-off.

Defendants also try to show "inquiry notice" based on filings from an earlier, unrelated case.  Brda Br. at 11-12.  Although this earlier case, *Maltagliati v. Meta Materials Inc., et al.*, No.

1:21-cv-07203 (E.D.N.Y.), involved some of the same defendants, its focus was entirely removed from the O&G Assets and NBH's spin-off. The *Maltagliati* case instead focused on Metamaterials and its lack of any "commercial ready" products. The plaintiffs in that case did not assert any claims under Section 12 against anyone (let alone Brda); nor could they have because NBH's Registration Statement for the spin-off did not exist (at the time the action was commenced) and was not "effective" (at the time of the amended complaint). Thus, an important prerequisite for a Section 12 claim (a false and/or misleading registration statement) did not exist.

Defendants also misplace reliance on earlier references to the SEC's investigation and subpoena. Brda Br. at 12. These references were insufficient to place Plaintiffs' on "inquiry notice." Meta Materials (not NBH) disclosed its receipt of a "Wells Notice" for Brda but said only that the notice related to "a previously disclosed SEC investigation." Dkt. No. 54-3, App. 303. The "previously disclosed SEC investigation" was described in September 2021 as Meta Materials' receipt of a subpoena from the SEC requesting "certain documents and information related to, among other things, the merger involving Torchlight Energy Resources, Inc. and Metamaterial Inc." Apton Decl., Exhibit C (Pl. App. 018). Being that the spin-off, NBH, and the majority of Brda's promotional claims had not even occurred at this point, Plaintiffs had no basis to believe Brda was a "statutory seller" in violation of Section 12.

## CONCLUSION

Plaintiffs respectfully request that Brda's motion be denied in its entirety for the reasons set forth above.

*[Signature blocks on following page]*

DATED: November 13, 2024

**MOSES, PALMER & HOWELL, L.L.P.**

/s/ Shayne D.  Moses

Shayne D.  Moses
State Bar No.  14578980
smoses@mph-law.com
David A.  Palmer
State Bar No.  00794416
dpalmer@mph-law.com
Fort Worth Club Building
306 West 7th Street, Suite 504
Fort Worth, Texas 76102
Tel.: (817) 255-9101
Fax: (817) 255-9199
Email: smoses@mph-law.com


**LEVI & KORSINSKY, LLP**

Adam M.  Apton (*admitted pro hac vice*)
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Lead Plaintiffs and*
*Lead Counsel for the Class*