UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**TODD TARGGART,**

   Plaintiff,

v.                                      No. 4:24-cv-00767-P

**NEXT BRIDGE HYDROCARBONS,
INC., ET AL.,**

   Defendants.

## MEMORANDUM OPINION & ORDER

Before the Court are two motions to dismiss: one filed by Defendants Robert L. Cook, Joseph DeWoody, Clifton Dubose, Jr., Lucas T. Hawkins, Gregory McCabe, Next Bridge Hydrocarbons, Inc. (Next Bridge), Delvina Oelkers, Mia Pitts, and Kristin Whitley (collectively, the Original Defendants) (ECF No. 49) and the other filed by Defendant John Brda (ECF No. 52). For the sake of economy, the Court takes up both motions together. After reviewing the motions, the briefs, and the applicable law, the Court will **GRANT** both motions and **DISMISS** Plaintiffs' claims with prejudice.

## BACKGROUND

This is a securities fraud action filed pursuant to Sections 11, 12, and 15 of the Securities Act of 1933 (the Act). Plaintiffs allege Defendants made false or misleading statements leading up to the spinoff of Next Bridge from Meta Materials, Inc., its predecessor company.

The history of this case begins with a former company called Torchlight Energy Resources, Inc. (Torchlight), that owned and operated oil and gas interests in West Texas. In 2020, Torchlight began negotiating a reverse merger with Metamaterial Technologies, Inc. (Metamaterial) to gain access to market capital. Under the structure of the merger, Torchlight shareholders were given, through a special

dividend, non-voting preferred shares in the combined company (the Preferred Shares) that would correspond to Torchlight's oil and gas assets (the Assets). The agreement gave the Torchlight-investors-turned-preferred-shareholders the right to receive the proceeds from the sale of the Assets. Alternatively, if the assets did not sell by a certain date, those Preferred Shareholders would receive equity in a spin-off entity called Meta Materials, Inc. (Meta II) that would own the Assets.[1] Plaintiff Mohammed Limon, a Torchlight investor, came to own all his Preferred Shares through the dividend connected with the merger. Plaintiff Todd Targgart acquired most of his Preferred Shares the same way.

Meta II did not sell the Assets by the set date, so its leadership proceeded to arrange the spinoff. In the spinoff, the holders of Preferred Shares would receive a distribution of shares in the spinoff company, Next Bridge. In July 2022, Next Bridge filed a registration statement on Form S-1 with the Securities and Exchange Commission, followed by several amendments and a final prospectus. The Registration Statement valued the Assets at $47,293,607. Leading up to the spinoff, Meta II's Preferred Shares were traded over the counter[2] under the ticker symbol "MMTLP."

In December 2022, Meta II effectuated the spinoff by distributing shares in Next Bridge to all the holders of the Preferred Shares in Meta. Plaintiffs were among the Preferred Shareholders who received shares of Next Bridge in the spinoff. Targgart purchased a portion of his

---

[1]Importantly, the spinoff was structured as a distribution that would not force the Preferred Shareholders to give up their shares in Meta II. "This proposal was attractive to Torchlight because it provided Torchlight with flexibility with respect to eventual divestiture of the [Assets] . . . while also ensuring that the value obtained in the divestiture would benefit investors in Torchlight's legacy oil and gas business, and providing those investors with a substantial ownership percentage of [Meta II]'s business **on an ongoing basis** (which would have a large stockholder base and access to additional capital)." ECF No. 41 ¶ 29 (emphasis added). Thus, Preferred Shareholders would keep their equity in Meta II after the spinoff.

[2]That is, not on centralized exchanges like the New York Stock Exchange.

Preferred Shares, and Plaintiff Steven Martinez purchased all of his, in over-the-counter markets in anticipation of the spinoff.

Defendant John Brda played a key role in the plan. Brda, the CEO of Torchlight, spearheaded the search for a company through which Torchlight could gain access to capital markets. It was Brda who "identified and recruited Metamaterial as a merger partner." ECF No. 41 at 36. Leading up to the Torchlight–Metamaterials merger, Brda promoted Torchlight's stock in several venues, including investor meetings, social media posts, and Torchlight press releases. After the merger, Torchlight paid Brda a $1.5 million bonus for his role in conceiving and executing the deal. ECF Nos. 41, 42. When Meta II began preparing for the spinoff and MMTLP was being traded over the counter, Brda continued promoting the stock on his public Twitter account. In those posts, he sometimes described MMTLP and the to-be-created Next Bridge as "basically the same thing." ECF No. 41 at 42. In another post, he referred to Preferred Shareholders as "MMTLP/NBH shareholders." ECF No. 41 at 46. In at least one post, Brda represented that holders of Preferred Shares "hold together 3.2 Billion Barrels of Oil." *Id.*

In March 2023, Next Bridge filed a report for fiscal year 2022, in which it stated the value of the Assets as $79,695,928. Four months later, Next Bridge restated the value of the Assets as zero.

Targgart originally brought this suit in the United States District Court for the Eastern District of New York on behalf of himself and all others who acquired shares of Next Bridge in the spinoff. Plaintiffs bring a claim under Section 11 of the Act against the Original Defendants, alleging the Registration Statement contained false and misleading statements of fact and they acquired shares of Next Bridge traceable to those statements. Plaintiffs next bring a claim under Section 15 of the Act for "controlling person" liability against Defendants Cook, DuBose, DeWoody, Hawkins, Oelkers, Pitts, Whitley, and McCabe. Finally, Plaintiffs allege Brda and Next Bridge offered the Next Bridge shares in a misleading prospectus and related statements in violation of Section 12(a)(2) of the Act. Targgart, Limon, and Martinez became the lead plaintiffs before the district court in New York transferred the case to this Court.

Defendants now move to dismiss all of Plaintiffs' claims. ECF Nos. 49, 52. The Original Defendants argue: (1) Plaintiffs lack standing under Section 11; (2) Defendants McCabe, Hawkins, and Oelkers are not subject to Section 11; and (3) the Registration Statement was not false or misleading. Brda adopts the Original Defendants' arguments and argues, in addition: (4) Plaintiffs lack standing under Section 12(a)(2); (5) Brda is not a statutory seller under Section 12(a)(2); and (6) the 1-year statute of limitations bars Plaintiffs' claims.

## LEGAL STANDARD

Rule 8(a) of the Federal Rules of Civil Procedure requires a claim for relief to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 8 does not require detailed factual allegations, but "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If a plaintiff fails to satisfy Rule 8(a), the defendant may file a motion to dismiss the plaintiff's claims under Rule 12(b)(6) for "failure to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6).

To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The Court is not bound to accept legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.* at 679.

## ANALYSIS

Because Brda's Motion incorporates the Original Defendants' arguments, and both motions concern the same set of allegations, the Court takes both up together. Plaintiffs' claims are evaluated in order.

### A. Section 11

Section 11 of the Act imposes strict liability on any issuer, underwriter, or signer of a false registration statement to those who acquired shares traceable to that registration statement. 15 U.S.C. § 77k(a). A successful plaintiff in a Section 11 suit can recover as damages the difference between the purchase price and its value at the time of suit or the amount for which he sold it at a loss. *Id.* § 77k(e). Plaintiffs allege the Registration Statement was misleading and argue the Defendants are strictly liable because the Plaintiffs acquired shares of Next Bridge traceable to the Registration Statement. ECF No. 41 ¶¶ 103, 107.

The text of Section 11 limits recovery to "any person acquiring such security." 15 U.S.C. § 77k(a). Although the word "such" has no antecedent, the surrounding context narrows down the meaning: "Such security" in Section 11 refers to "a security registered under the particular registration statement alleged to contain a falsehood or misleading omission." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 767 (2023). In other words, the security the plaintiff acquired must be registered under the contested registration statement.

5

Although the Supreme Court settled the meaning of "such security," another term in Section 11(a) remains ambiguous. Neither party has cited—nor has the Court located—any caselaw defining "acquire" with specificity. That is, it is unclear whether the phrase "any person acquiring such security" includes plaintiffs who receive securities as a distribution given to holders of shares in *another* company. To determine whether the statute allows Plaintiffs to sue, therefore, the Court relies on cases involving analogous—but not identical—facts, as well as the language of Section 11(a).

Some evidence seems to support an expansive reading. For one thing, a plaintiff does not necessarily have to purchase shares in an initial public offering (IPO) to sue under Section 11. For example, an "aftermarket plaintiff"—one who acquired his shares in a "private, secondary transactions"—has standing under Section 11. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871–72 (5th Cir. 2003). As long as an aftermarket plaintiff "can trace his shares to the challenged registration statement," Section 11 gives him a right of action. *See id.* at 873. Another example is found in stock-for-stock mergers. A plaintiff can qualify as a "person acquiring such security" by exchanging shares of one company for shares of another instead of paying for shares in cash. *7547 Corp. v. Parker & Parsley Dev. Partners, LP*, 38 F.3d 211, 223 (5th Cir. 1994).

But those extended uses of the term "acquire" are supported by a justification that does not support extending the statute to Plaintiffs here. In the cases of both aftermarket sales and stock-for-stock mergers, the plaintiff has given value for a security issued under the contested registration statement. Because "any person acquiring such security" is limited to "purchasers of shares issued and sold pursuant to the challenged registration statement," courts have used the Act's definition of "sale" to find out who may sue under Section 11. *7547 Corp.*, 38 F.3d at 223. The Act, in turn, defines "sale" as "every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b(a)(3). That definition "include[s] exchanges of one security for another." *7547 Corp.*, 38 F.3d at 223. When a shareholder trades his stock in one company for stock in another, he gives value for value and becomes a purchaser with standing to sue under Section 11.

In contrast, the Act's definition of "sale" does not cover the transaction that caused Plaintiffs to own shares of Next Bridge. Although Plaintiffs refer in their response to their "exchange of 'MMTLP' shares for [Next Bridge] stock in the spin-off" (ECF No. 56 at 9), their live pleading says, to the contrary, that Meta II "completed the Spin-Off and distributed [Next Bridge]'s equity to the Preferred Stock shareholders as of December 12, 2022[.]" In other words, Plaintiffs did not give value for their Next Bridge shares. Instead, they paid money for shares of Torchlight or Meta II and later became entitled to a distribution—not a purchase—of Next Bridge shares. In fact, the Registration Statement says so plainly: "We [Next Bridge] are . . . not asking you [Preferred Shareholders] to make any payment or surrender or exchange any of your shares of Meta [II] common stock for shares of our Common Stock." ECF No. 51 at App. 033.[3] In short, the most analogous cases available indicate a Section 11 plaintiff must have given value for the securities issued under the contested registration statement.

An analysis of the text of Section 11 confirms receiving shares in a distribution does not confer standing. Subsection (e) of the statute sets the available damages as:

> such damages as shall represent the difference between **the amount paid for the security** (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.

---

[3] At the pleading stage, the Court may take judicial notice of documents in the public record, including documents filed with the Securities and Exchange Commission, such as the Registration Statement. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 639 n.2 (5th Cir. 2005). The Court may consider such documents for their content, not for their truth. *Id.*

7

15 U.S.C. § 77k(e) (emphasis added). The damages provision assumes a plaintiff has "paid" an "amount" for the security and thereby sheds light on what the word "acquire" must mean in subsection (a). It clarifies that the phrase "person acquiring such security" does not include plaintiffs who receive securities as a distribution without giving any other value in exchange.

Although Defendants couch this line of reasoning as an attack on Plaintiffs' Article III standing, that is not the ground on which the Court bases its decision. While it may be true that Plaintiffs come short of stating a cognizable injury necessary to create an Article III case or controversy (the Court does not decide either way), the problem is more fundamental. It is not that Plaintiffs were wronged under the statute but suffered no damages; it is that the statute simply does not apply to them. This Opinion uses the term "standing" not in the sense intended in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (discussing Article III requirement), but in the sense employed by cases like *7547 Corp.*, 38 F.3d at 225. In that context—and the present one—"standing" refers to whether a plaintiff qualifies as a person authorized by Section 11 to bring suit, not to whether a case satisfies the requirements of Article III. It therefore may be more proper to say, as Plaintiffs themselves quote, that "the terms 'purchase' and 'sale' are relevant only to the question of statutory coverage. Therefore there are no 'standing' problems lurking in the case." *Secs. & Exch. Comm'n v. Nat'l Secs., Inc.*, 393 U.S. 453, 467 n.9 (1969); ECF No. 55 at 11.

For that reason, Plaintiffs are wrong in contending that "[a]ccepting Defendants' argument would . . . effectively forc[e] plaintiffs to plead unnecessary elements"—that is, damages. ECF No. 56 at 11. Plaintiffs suing under Section 11 do not have to prove their damages at the pleading stage. But they do have to allege, at the very least, they purchased the relevant securities. They do not claim they purchased shares of Next Bridge; they allege they were distributed the shares as Preferred Shareholders in Meta II. Because of this, they fail to state a claim under Section 11.

8

## B. Section 12(a)(2)

Plaintiffs also bring a claim against Next Bridge and Brda under Section 12(a)(2) of the Act. Section 12(a)(2) creates a right of action for a purchaser of securities against any person who offers or sells the securities to the purchaser through a prospectus containing misleading statements or omissions. 15 U.S.C. § 77*l*(a)(2). Although the statute explicitly makes relief available to "the person purchasing such security *from him*," a person need not necessarily pass title to the securities to be liable under the statute. A person is also liable if he "successfully solicits the purchase [of the securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 647 (1988). Solicitations subject to Section 12(a) liability can include publicly disseminated communications, including those posted on social media. *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022).

Plaintiffs allege Brda orchestrated the Spin-Off to create a "short squeeze," driving up the price of Torchlight stock and allowing Torchlight to raise $137 million through its public offering. He used social media—including Twitter, Reddit, and other channels—to promote Torchlight's stock and combat short-sellers. Plaintiffs argue that in so doing, he was in effect promoting Next Bridge's stock because he was already planning to spin the Assets off into a yet-to-be-created entity. Brda took these actions for his own "financial interests," earning a $1.5 million bonus from Torchlight for his efforts. He then used social media to promote MMTLP in preparation for the Next Bridge spinoff.

Plaintiffs' Section 12 claim suffers from the same fatal flaw as their Section 11 claim. To recover under Section 12, plaintiffs must allege they purchased the securities in question. *Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727, 734 (5th Cir. 2019). Not only that, but they must allege they purchased them in a public, as opposed to an aftermarket, transaction. *Dartley v. ErgoBilt Inc.*, No. 3:98-cv-1442-M, 2001 WL 313964, at *2 (N.D. Tex. Mar. 29, 2001) (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)). "Sale" in the Section 12 context takes the same meaning it does in Section 11 cases—"every contract of sale or

9

disposition of a security or interest in a security, *for value.*" *Lampkin*, 925 F.3d at 734; 15 U.S.C. § 77b(a)(3) (emphasis added). As discussed above, Plaintiffs do not plead they purchased shares of Next Bridge—the shares they allege were issued under a misleading prospectus—although they do try to retroactively reframe their pleadings in their response to Brda's motion to dismiss. ECF No. 55 at 12.

Plaintiffs attempt, unsuccessfully, to evade the straightforward application of Section 12 and the subsequent caselaw. For example, they respond to Brda's citation to *Isquith v. Caremark International, Inc.*, which held a spinoff substantially identical to this one was not a sale of securities. 136 F.3d 531, 534 (7th Cir. 1998); ECF No. 53 at 5–6. In response, Plaintiffs argue *Isquith* "involved [a] scenario[ ] in which the plaintiffs received distributions of shares without surrendering anything in exchange." ECF No. 55 at 12. This case is precisely such a scenario. But they attempt to distinguish *Isquith* on the basis that "Brda solicited shareholders to purchase preferred stock in anticipation of the spin-off." *Id.* That allegation does nothing to negate the proposition that Plaintiffs gave no value for their Next Bridge shares. Nothing in the *Isquith* opinion suggested the court's holding turned on whether the plaintiffs had invested before the spinoff. *See generally* 136 F.3d. Nor do Plaintiffs offer any authority for their implied premise that purchasing shares in one company can constitute a "purchase" of a security distributed to holders of those shares. Plaintiffs come the closest to offering an on-point case in citing *Securities & Exchange Commission v. Datronics Engineers, Inc.*, from the United States Court of Appeals for the Fourth Circuit, in which the Commission found spinoffs to constitute a "sale" under the Act. 490 F.2d 250, 253 (4th Cir. 1973). *Datronics*, which is a non-binding out-of-circuit decision, dealt with Section 5, not Section 11 or 12, of the Act. *Id.* And as the Seventh Circuit remarked in *Isquith*, "[*Datronics*] is inapposite because while the SEC indeed obtained an injunction against spinoffs, their only purpose had been to evade the registration requirements of the securities laws." *Isquith*, 136 F.3d at 536.

Plaintiffs' complaint suffers another defect, which is the flip-side of the same coin: Just as the alleged "purchase" was not in fact a purchase, neither did Brda's alleged "sale" of Next Bridge stock actually pertain to Next Bridge stock at all. To the contrary, Brda's promotional activities—to which Plaintiffs devote several pages in their live pleading—were inviting the public to buy shares, not in Next Bridge, but in *Torchlight and Meta II*. Plaintiffs go into detail about Brda's plan to promote Torchlight to create a "short squeeze" and his subsequent promotion of Meta II stock. They refer to those actions as "promoting Next Bridge." But calling it that does not make it so.

Indeed, Plaintiffs' own pleadings totally belie their characterization. According to the Amended Complaint, when the Torchlight–Metamaterial merger occurred, Plan A was to sell the Assets and distribute the proceeds to the Preferred Shareholders. ECF No. 41 ¶ 31. The company pivoted to Plan B, the spinoff, only after the company failed to sell the Assets. *Id.* ¶¶ 33–34. So Brda's pre-merger activities could not have been a sale of shares in Next Bridge—a company that not only did not exist yet, but was in fact nothing more than a contingency at the time.

Plaintiffs' post-merger pleadings are no better. Between the merger and the spinoff, a Twitter user asked Brda, "Which one would you pick?" between stock in Meta II and Next Bridge. ECF No. 41 ¶ 34. Brda replied, "Why must I choose? Oilco [Next Bridge] and MMTLP [Preferred Shares in Meta II] are basically the same thing." *Id.* In another exchange, Brda smugly explained to a Twitter follower that short sellers would be forced to "cover" by purchasing shares in Next Bridge, which would be impossible since Next Bridge would be private. *Id.* ¶ 145. Later, he urged investors to buy more Preferred Shares. *Id.* ¶ 146. None of that amounts to selling or promoting shares of Next Bridge in the sense required for liability under Section 12. True, *Pinter v. Dahl* extended Section 12 liability beyond those actually passing title to securities to cover sellers who solicit the purchase of securities. 486 U.S. at 642–43. But Plaintiffs would have the Court extend Section 12 even further, so as to encompass "sellers" who merely promote a security by soliciting purchases of a *different* security. Plaintiffs do not point the

Court to any case in which a court extended the statute that far. This Court declines to be the first to do so. Plaintiffs have therefore failed to state a claim under Section 12 of the Act.

### C. Section 15

Under Section 15 of the Act, all "controlling persons" of companies liable under Sections 11 or 12 have joint and several liability with the companies they control. 15 U.S.C. § 77*o*(a). Because Plaintiffs have failed to state claims under Sections 11 or 12, they cannot state a claim under Section 15. *See Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 370 n.33 (5th Cir. 2001) (Section 15 liability derivative of Section 11 and 12 liability).

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** both Motions to Dismiss and **DISMISSES** all of Plaintiffs' claims **with prejudice**.

**SO ORDERED** on this **3rd day of July 2025.**

_____
Mark T. Pittman
UNITED STATES DISTRICT JUDGE