# EXHIBIT A

Table of Contents

**The information in this prospectus is not complete and may be changed. We may not issue these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**SUBJECT TO COMPLETION DATED JULY 15, 2022**

**Prospectus**

# Next Bridge Hydrocarbons, Inc.

## Common Stock

**(par value $0.0001)**

---

This prospectus ("Prospectus") is being furnished to you as a Series A Preferred stockholder of Meta Materials, Inc. ("Meta") in connection with the planned distribution (the "Spin-Off" or the "Distribution") by Meta to its Series A Preferred stockholders of all the shares of common stock, par value $0.0001 per share (the "Common Stock"), of Next Bridge Hydrocarbons, Inc. (the "Company," "Next Bridge," "we," "us" or "our") held by Meta immediately prior to the Spin-Off. As of immediately prior to the time of the Distribution, Meta holds 165,523,363 shares of Common Stock, which is 100% of the outstanding shares of capital stock of the Company.

At the time of the Spin-Off, Meta will distribute all the outstanding shares of Common Stock held by it on a pro rata basis to holders of Meta's Series A Non-Voting Preferred Stock. Each one share of Meta's Series A Non-Voting Preferred Stock outstanding as of , New York City time, on , 2022, the record date for the Spin-Off (the "Record Date"), will entitle the holder thereof to receive one share of Common Stock. The Distribution will be made in book-entry form by a distribution agent. Fractional shares of Common Stock will not be distributed in the Spin-Off.

The Spin-Off will be effective as of , New York City time, on , 2022. Immediately after the Spin-Off, the Company will be an independent public reporting company, provided, the Common Stock is not and will not be publicly traded and will not be eligible for electronic transfer through the Depository Trust Company book-entry system or any other established clearing corporation.

Meta's stockholders are not required to vote on or take any other action in connection with the Spin-Off. We are not asking you for a proxy, and we request that you do not send us a proxy. The Series A Preferred stockholders will not be required to pay any consideration for the Common Stock they receive in the Spin-Off; immediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled.

Meta currently owns all the outstanding shares of Common Stock of the Company, and we have not sought to have the shares of Common Stock traded on any exchange. Accordingly, there is currently no public market for the Common Stock, and there is no current expectation for a public market to develop for the Common Stock.

---

**In reviewing this Prospectus, you should carefully consider the matters described in the section titled "Risk Factors" beginning on page 7 of this Prospectus.**

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THESE SECURITIES OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**This Prospectus is not an offer to sell, or a solicitation of an offer to buy, any securities.**

**The date of this Prospectus is , 2022**

**Table of Contents**

Table of Contents


| | |
|---|---|
| CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS | i |
| DEFINITIONS | iii |
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 7 |
| THE SPIN-OFF | 25 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS | 28 |
| USE OF PROCEEDS | 35 |
| DETERMINATION OF OFFERING PRICE | 35 |
| CAPITALIZATION | 35 |
| MANAGEMENT’S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 36 |
| BUSINESS | 37 |
| MANAGEMENT | 55 |
| EXECUTIVE COMPENSATION | 61 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 64 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 65 |
| DESCRIPTION OF OUR CAPITAL STOCK | 68 |
| LEGAL MATTERS | 72 |
| EXPERTS | 72 |
| WHERE YOU CAN FIND MORE INFORMATION | 73 |

Table of Contents

## CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS

This Prospectus contains certain forward-looking statements and information relating to our business that are based on the beliefs of our management as well as assumptions made by and information currently available to our management. When used in this communication, the words "may," "anticipate," "believe," "estimate," "expect," "intend," "plan," "forecasts," "projections," and similar expressions are intended to identify such forward-looking statements. Forward-looking statements include, without limitation, the statements regarding our strategy, future plans for development and production, future expenses and costs and future liquidity and capital resources. Forward looking statements involve a number of risks, assumptions and uncertainties which may cause actual results to differ materially from those contained in this Prospectus. In light of these risks, uncertainties and assumptions, the future events and trends discussed in this Prospectus may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements.

Such statements reflect our current views with respect to future events, the outcome of which is subject to certain risks, including, among others:

- general competitive conditions, including actions our competitors may take to grow their businesses;
- changes to payment terms, the discount or margin on products or other terms with our suppliers;
- risks associated with data privacy, information security and intellectual property;
- work stoppages or increases in labor costs;
- our ability to attract and retain employees;
- finding and development costs;
- timing and success of our drilling activities;
- amount and timing of future production of oil and natural gas;
- our ability to successfully implement our strategic initiatives, including amount, nature and timing of capital expenditures;
- the usual hazards associated with the oil and natural gas industry, including fires, well blowouts, pipe failure, spills, explosions and other unforeseen hazards;
- the numerous uncertainties inherent in estimating quantities of oil and natural gas reserves and actual future production rates and associated costs;
- operating costs including lease operating expenses, administrative costs and other expenses;
- the volatility of prices and supply of, and demand for, oil and natural gas;
- changes in regulatory requirements and legislation governing our business, including sustainability;
- the amount of our indebtedness and ability to comply with covenants applicable to any future debt financing;
- our ability to access the credit and capital markets to satisfy future capital and liquidity requirements on acceptable terms;
- adverse results from litigation, governmental investigations or tax-related proceedings or audits;
- changes in accounting standards;
- impact and cost of energy conservation and other sustainability efforts;
- exploration and development risks, which could lead to environmental damage, injury and loss of life or the destruction of property;

Table of Contents

- proximity and capacity of oil, natural gas and other pipelines, transportation and support infrastructure to production facilities;
- availability of consumables and raw materials and drilling and processing equipment;
- adverse weather conditions, natural disasters or other events;
- the ability to successfully estimate the impact of litigation matters;
- the potential adverse impact on our business resulting from the Spin-Off; and
- the other risks and uncertainties detailed in the section titled “Risk Factors.”

Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results or outcomes may vary materially from those described as anticipated, believed, estimated, expected, intended or planned. Subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements in this paragraph. We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise after the date of this Prospectus except to the extent required by law.

Table of Contents

## DEFINITIONS

The following are abbreviations and definitions of terms commonly used in the oil and gas industry and in this prospectus. Natural gas equivalents and crude oil equivalents are determined using the ration of six Mcf to one barrel. All references to “us”, “our”, “we”, or “Next Bridge” mean Next Bridge Hydrocarbons, Inc. and where applicable, its consolidated subsidiaries.

“**Bbl**” means a barrel of U.S. 42 gallons of oil.

“**BOE**” means one barrel of oil equivalent.

“**Completion**” means the installation of permanent equipment for the production of oil or gas.

“**Condensate**” means the installation of permanent equipment for the production of oil or gas.

“**Exploratory well**” means a well drilled to find a new field or to find a new productive reservoir in a field previously found to be productive of oil or natural gas in another reservoir or to extend a known reservoir.

“**Gross**” when used with respect to acres or wells, production or reserves refers to the total acres or wells in which we or another specified person has a working interest.

“**MBbls**” means one thousand barrels of oil.

“**Mcf**” means one thousand cubic feet of natural gas.

“**Net**” when used with respect to acres or wells, refers to gross acres of wells multiplied, in each case, by the percentage working interest owned by us.

“**NGL**” refers to natural gas liquids, which is composed exclusively of carbon and hydrogen.

“**Oil**” means crude oil or condensate.

“**Operator**” means the individual or company responsible for the exploration, development, and production of an oil or gas well or lease.

“**Proved developed reserves**” means reserves that can be expected to be recovered through existing wells with existing equipment or operating methods.

“**Proved developed non-producing**” means reserves (i) expected to be recovered from zones capable of producing but which are shut-in because no market outlet exists at the present time or whose date of connection to a pipeline is uncertain or (ii) currently behind the pipe in existing wells, which are considered proved by virtue of successful testing or production of offsetting wells.

“**Proved developed producing**” means reserves expected to be recovered from currently producing zones under continuation of present operating methods. This category includes recently completed shut-in gas wells scheduled for connection to a pipeline in the near future.

“**Proved reserves**” means the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided by contractual arrangements.

Table of Contents

"**Proved undeveloped reserves**" means reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Reserves on undrilled acreage are limited to those drilling locations offsetting productive wells that are reasonably certain of production when drilled or where it can be demonstrated with certainty that there is continuity of production from the existing productive formation.

"**Recompletion**" means the completion for production of an existing well bore in another formation from which the well has been previously completed.

"**Royalty**" means an interest in an oil and gas lease that gives the owner of the interest the right to receive a portion of the production from the leased acreage (or of the proceeds of the sale thereof), but generally does not require the owner to pay any portion of the costs of drilling or operating the wells on the leased acreage. Royalties may be either landowner's royalties, which are reserved by the owner of the leased acreage at the time the lease is granted, or overriding royalties, which are usually reserved by an owner of the leasehold in connection with a transfer to a subsequent owner.

**"SEC"** means the United States Securities and Exchange Commission.

"**Working interest**" means an interest in an oil and gas lease that gives the owner of the interest the right to drill for and produce oil and gas on the leased acreage and requires the owner to pay a share of the costs of drilling and production operations. The share of production to which a working interest owner is entitled will always be smaller than the share of costs that the working interest owner is required to bear, with the balance of the production accruing to the owners of royalties. For example, the owner of a 100% working interest in a lease burdened only by a landowner's royalty of 12.5% would be required to pay 100% of the costs of a well but would be entitled to retain 87.5% of the production.

Table of Contents

## PROSPECTUS SUMMARY

*This summary highlights certain information contained elsewhere in this Prospectus and may not contain all of the information that is important to you. To understand fully and for a more complete description of the terms and conditions of the Distribution, you should read this Prospectus in its entirety, including the information presented under the section titled "Risk Factors" and the consolidated financial statements and related notes, and the documents to which you are referred. See "Where You Can Find More Information." Except where the context otherwise requires, or where otherwise indicated, references to the "Company," "Next Bridge," "we," "us," or "our" refer to Next Bridge Hydrocarbons, Inc. and its consolidated subsidiaries, including Torchlight Hazel, LLC, a Texas limited liability company, Hudspeth Oil Corporation, a Texas corporation, Hudspeth Operating, LLC, a Texas limited liability company, and Torchlight Energy, Inc., a Nevada corporation. "Meta" refers to Meta Materials, Inc. and its consolidated subsidiaries.*

### The Company

We were incorporated in Nevada on August 31, 2021, as OilCo Holdings, Inc. and changed our name to Next Bridge Hydrocarbons, Inc. pursuant to our Amended and Restated Articles of Incorporation filed on June 30, 2022.

#### *Background*

On December 14, 2020, Meta (formerly known as Torchlight Energy Resources, Inc., "Torchlight") and its subsidiaries, Metamaterial Exchangeco Inc. (formerly named 2798832 Ontario Inc., "Exchangeco") and 2798831 Ontario Inc. ("Callco"), both Ontario corporations, entered into an Arrangement Agreement (the "Arrangement Agreement") with Metamaterial Inc., an Ontario corporation headquartered in Nova Scotia, Canada, to acquire all of the outstanding common shares of Meta by way of a statutory plan of arrangement (the "Arrangement") under the Business Corporations Act (Ontario), on and subject to the terms and conditions of the Arrangement Agreement, as amended. On June 28, 2021, following the satisfaction of the closing conditions set forth in the Arrangement Agreement, the Arrangement was completed.

In connection with the Arrangement, Meta acquired a group of subsidiary companies that own various oil and natural gas assets, which were transferred to the Company as further described herein. In furtherance of the Arrangement, Meta declared a dividend, on a one-for-one basis, of shares of Series A Non-Voting Preferred Stock of Meta (the "Series A Preferred Stock") to holders of record of Torchlight's common stock as of June 24, 2021. The holders of the Series A Preferred Stock are entitled to receive certain dividends based on the net proceeds of the sale of any assets that are used or held for use in Meta's oil and natural gas exploration business and may also receive a pro rata dividend of equity in a spin-off entity to which Meta will transfer any remaining assets of such business. Meta has not sold to a third party any assets related to the historical oil and natural gas business and has transferred the subsidiary companies, the holders of the oil and natural gas assets to us prior to the Spin-Off.

#### *Business Overview*

We are an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and gas project we hold in the Orogrande Basin in West Texas. Presently, our primary interests include the Orogrande Project in Hudspeth County, Texas. In addition, we have minor interests in the Eastern edge of the Midland Basin and two minor well interests in Oklahoma.

We plan to operate our business through our wholly owned subsidiaries transferred to us from Meta, Torchlight Energy, Inc., a Nevada corporation, Hudspeth Oil Corporation, a Texas corporation, Torchlight Hazel, LLC, a

Table of Contents

Texas limited liability company, and Hudspeth Operating, LLC, a Texas limited liability company. We currently have six full-time employees, and we employ consultants for various roles as needed.

As of December 31, 2021, we had interests in three oil and gas projects: the Orogrande Project in Hudspeth County, Texas, the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, and the Hunton wells in partnership with Kodiak in Central Oklahoma. (the "Oklahoma Properties"). See the description under "Current Projects" below under Note 4, "Oil & Natural Gas Properties," of the financial statements included with this Prospectus for information and disclosure regarding these projects, which description is incorporated herein by reference.

***Emerging Growth Company Status***

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended (the "Securities Act"), as modified by the Jumpstart Our Business Startups Act of 2012 ("JOBS Act"). As an emerging growth company, we may take advantage of specified reduced disclosure and other requirements that are otherwise applicable, in general, to public reporting companies that are not emerging growth companies. These provisions include:

- Exemption from the auditor attestation requirement in the assessment of our internal control over financial reporting; and
- Reduced disclosure of certain financial information requirements related to executive compensation, including the requirements to hold a non-binding advisory vote on executive compensation and to provide information relating to the ratio of total compensation of its Chief Executive Officer to the median of the annual total compensation of all of our employees.

As a smaller reporting company, each of the foregoing exemptions is currently available to us. We may take advantage of these exemptions for up to five years or such earlier time that we are no longer an emerging growth company. We would cease to be an emerging growth company if we have more than $1.0 billion in annual revenues as of the end of a fiscal year, if we are deemed to be a large-accelerated filer under the rules of the SEC, or if we issue more than $1.0 billion of non-convertible debt over a three-year-period.

The JOBS Act permits emerging growth companies to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public reporting companies. Following the consummation of the Spin-Off, we will elect to avail ourselves of the extended transition period. During the extended transition period, it may be difficult to compare our financial results with the financial results of a public reporting company that complies with accounting pronouncements when effective.

***Market Opportunity***

The market for oil and natural gas that we will produce depends on factors beyond our control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, demand for oil and natural gas, the marketing of competitive fuels, and the effects of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial, and individual consumers.

Our oil production is expected to be sold at prices tied to the spot oil markets. Our natural gas production is expected to be sold under short-term contracts and priced based on first of the month index prices or on daily spot market prices. We will rely on our operating partners to market and sell our production.

Table of Contents

***Regulatory Framework***

Our oil and natural gas development operations are subject to stringent and complex federal, state, tribal, regional and local environmental, health and safety laws and regulations governing, among other factors, worker safety and health, the discharge and disposal of substances into the environment, and the protection of the environment and natural resources. Numerous governmental entities, including the Environmental Protection Agency ("EPA") and analogous state and local agencies, (and, under certain laws, private individuals) have the power to enforce compliance with these laws and regulations and any permits issued under them. These laws and regulations may, among other things: (i) require permits to conduct exploration, drilling, water withdrawal, wastewater disposal and other production related activities; (ii) govern the types, quantities and concentrations of substances, including emissions of $CO_2$, methane and certain other greenhouse gases ("GHG"), that may be disposed or released into the environment or injected into formations in connection with drilling or production activities, and the manner of any such disposal, release, or injection; (iii) limit or prohibit construction or drilling activities or require formal mitigation measures in sensitive areas such as wetlands, wilderness areas or areas inhabited by endangered or threatened species; (iv) require investigatory and remedial actions to mitigate pollution conditions arising from the Company's operations or attributable to former operations; (v) impose safety and health restrictions designed to protect employees and others from exposure to hazardous or dangerous substances; and (vi) impose obligations to reclaim and abandon well sites and pits.

Certain existing environmental and occupational safety and health laws and regulations to which our business operations are subject including, the Clean Air Act, as amended (the "CAA"), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the federal Resource Conservation and Recovery Act, Federal Water Pollution Control Act of 1972 as amended by the Oil Pollution Act of 1990, EPA rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of a leak detection and repair ("LDAR") program under the CAA's New Source Performance Standards in 40 C.F.R. Part 60, Subpart OOOOa ("Quad Oa"), the federal Occupational Safety and Health Act and other state equivalent laws and regulations. For further discussion of the risks to our results of operations arising out of our environmental regulatory compliance, see "Risks Related to Our Business", including the following risk factors "—*Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict*," "—*Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays*," and "—*Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce*".

***Corporate Information***

Our executive office is located at 6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116, and our telephone number is (817) 438-1937. We intend to have an internet website. Information contained on or accessible through our website, when available, will not be a part of this prospectus.

Table of Contents

**Summary of the Spin-Off**

| | |
|---|---|
| Distributing Company | Meta Materials, Inc., a Nevada corporation, which holds all of our Common Stock issued and outstanding prior to the Distribution. After the Distribution, the holders of the Series A Preferred Stock will own all of our Common Stock and Meta Materials, Inc. will not own any shares of our Common Stock. |
| Distributed Company | Next Bridge Hydrocarbons, Inc., a Nevada corporation, is a wholly owned subsidiary of Meta immediately prior to the Distribution. At the time of the Distribution, we will hold, directly or through our wholly owned subsidiaries, the assets and liabilities of the oil and natural gas business of Meta. After the Spin-Off, we will be an independent non-trading public reporting company. |
| Distributed Securities | 165,523,363 shares of our Common Stock owned by Meta, which will be 100% of our Common Stock issued and outstanding immediately prior to the Distribution.<br><br>Each holder of Series A Preferred Stock will receive one share of our Common Stock for every one (1) share of Series A Preferred Stock held on the Record Date. The distribution agent will distribute only whole shares of our Common Stock in the Distribution. Shares of Common Stock that remain held by Meta following the Distribution, if any, shall be cancelled immediately after the Spin-Off. |
| Record Date | The Record Date is the close of business on , 2022. |
| Distribution Date | The Distribution Date is , 2022. |
| The Distribution | On the Distribution Date, Meta will release the shares of our Common Stock to the distribution agent to distribute to Series A Preferred stockholders. The distribution agent will distribute our shares in book-entry form, and thus we will not issue any physical stock certificates. We expect that it will take the distribution agent up to two weeks to electronically issue shares of our Common Stock to you or your bank or brokerage firm on your behalf by way of direct registration in book-entry form. You will not be required to make any payment, surrender or exchange your shares of Series A Preferred Stock or take any other action to receive your shares of our Common Stock, although your shares of Series A Preferred Stock will be cancelled as of the Record Date. |
| Conditions to the Spin-Off | The Spin-Off is subject to the satisfaction, or the Meta board of directors' waiver, of the following conditions:<br><br>• the Meta board of directors shall have authorized and approved the Spin-Off and not withdrawn such authorization and approval, and shall have declared the dividend of our Common Stock to Meta stockholders; |

Table of Contents

| | |
|---|---|
| | • the Distribution Agreement and the ancillary agreements contemplated by the Distribution Agreement shall have been executed by each party thereto;<br>• the SEC shall have declared effective our Registration Statement on Form S-1, of which this Prospectus is a part, under the Securities Act, and no stop order suspending the effectiveness of our Registration Statement shall be in effect and no proceedings for that purpose shall be pending before or threatened by the SEC;<br>• no order, injunction or decree issued by any governmental authority of competent jurisdiction or other legal restraint or prohibition preventing consummation of the Spin-Off shall be in effect, and no other event outside the control of Meta shall have occurred or failed to occur that prevents the consummation of the Spin-Off; and<br>• no other events or developments shall have occurred prior to the Distribution Date that, in the judgment of the Meta board of directors, would result in the Spin-Off having a material adverse effect on Meta or its stockholders.<br><br>The fulfillment of the foregoing conditions will not create any obligation on the part of Meta to effect the Spin-Off. We are not aware of any material federal, foreign or state regulatory requirements with which we must comply, other than SEC rules and regulations, or any material approvals that we must obtain, other than the SEC's declaration of the effectiveness of the Registration Statement, in connection with the Spin-Off. Meta has the right not to complete the Spin-Off if, at any time, the Meta board or directors determines, in its sole and absolute discretion, that the Spin-Off is not in the best interests of Meta or its stockholders or is otherwise not advisable. |
| Trading Market | All of our outstanding shares of Common Stock are currently beneficially owned by Meta and our Common Stock is currently not listed for trading on any stock exchange or market and we have not sought to be traded on any exchange or market. The shares of Common Stock will not be eligible for electronic transfer through the Depository Trust Company or any other established clearing corporation. Accordingly, there currently is no public trading market for the Common Stock and there is no current expectation for a public market to develop. |
| U.S. Federal Income Tax Consequences to Series A Preferred Stockholders | U.S. federal income tax treatment of the issuance of our Common Stock to holders of the Series A Preferred Stock will not qualify for non-recognition of gain or loss for U.S. federal income tax purposes, and U.S. holders could be subject to tax as a result of the Spin-Off and the cancellation all shares of the Series A Preferred Stock. Accordingly, holders of Series A Preferred Stock are encouraged to consult their own tax advisors as to the specific U.S. federal, state and local, and non-U.S. tax consequences of the Distribution to such stockholders. |

Table of Contents

| | |
|---|---|
| Transfer Agent | American Stock Transfer & Trust Company LLC. |
| Risk Factors | Our business faces both general and specific risks and uncertainties. Our business also faces risks relating to the Spin-Off. Following the Spin-Off, we will also face risks associated with being an independent company. Accordingly, you should read carefully the information set forth under the heading "Risk Factors." |

Table of Contents

## RISK FACTORS

*You should carefully consider all of the information in this Prospectus and each of the risks described below, which we believe are the principal risks that we face. Some of the risks relate to our business, others to the Spin-Off. Some risks relate principally to the securities markets and ownership of our Common Stock. The risks and uncertainties described below are not the only ones faced by us. Additional risks and uncertainties not presently known or that are currently deemed immaterial also may impair our business operations. If any of the following risks occur, our business, financial condition, operating results and cash flows and the market value of the Common Stock could be materially adversely affected.*

### Risks Relating to Our Business

***We have a limited operating history relative to larger companies in our industry and may not be successful in developing profitable business operations.***

We have a limited operating history relative to larger companies in our industry. Our business operations must be considered in light of the risks, expenses and difficulties frequently encountered in establishing a business in the oil and natural gas industry. As of the date of this Prospectus, we have generated limited revenues and have limited assets. We have an insufficient history at this time on which to base an assumption that our business operations will prove to be successful in the long-term. Our future operating results will depend on many factors, including:

- our ability to raise adequate working capital;
- the success of our development and exploration;
- the demand for oil and natural gas;
- the level of our competition;
- our ability to attract and maintain key management and employees; and
- our ability to efficiently explore, develop, produce or acquire sufficient quantities of marketable oil or natural gas in a highly competitive and speculative environment while maintaining quality and controlling costs.

To achieve profitable operations in the future, we must, alone or with others, successfully manage the factors stated above, as well as continue to develop ways to enhance our production efforts. Despite our best efforts, we may not be successful in our exploration or development efforts or obtain required regulatory approvals. There is a possibility that some, or all, of the wells in which we obtain interests may never produce oil or natural gas.

***We have limited capital and will need to raise additional capital in the future.***

Following the Spin-Off, we will require additional capital to continue to grow our business via acquisitions and to expand our exploration and development programs. We may be unable to obtain additional capital when required or on favorable terms. Future acquisitions, exploration, development, production and marketing activities, as well as our administrative requirements (such as salaries, insurance expenses and general overhead expenses, as well as legal compliance costs and accounting expenses) will require a substantial amount of additional capital and cash flow.

We may pursue sources of additional capital through various financing transactions or arrangements, including joint venturing of projects, debt financing, equity financing, or other means. We may not be successful in identifying suitable financing transactions in the time period required or at all, and we may not obtain the capital we require by other means. If we do not succeed in raising additional capital, our resources may not be sufficient to fund our planned operations.

Table of Contents

Our ability to obtain financing, if and when necessary, may be impaired by such factors as the capital markets (both generally and in the oil and natural gas industry in particular), our limited operating history, the location of our oil and natural gas properties and prices of oil and natural gas on the commodities markets (which will impact the amount of asset-based financing available to us, if any) and the departure of key employees. Further, if oil or natural gas prices on the commodities markets decline, our future revenues, if any, will likely decrease and such decreased revenues may increase our requirements for capital. If the amount of capital we are able to raise from financing activities, together with our revenues from operations, is not sufficient to satisfy our capital needs (even to the extent that we reduce our operations), we may be required to cease our operations, divest our assets at unattractive prices or obtain financing on unattractive terms.

Any additional capital raised through the sale of equity may dilute the ownership percentage of our stockholders. Raising any such capital could also result in a decrease in the fair market value of our equity securities because our assets would be owned by a larger pool of outstanding equity. The terms of securities we issue in future capital transactions may be more favorable to our new investors, and may include preferences, superior voting rights and the issuance of other derivative securities, and issuances of incentive awards under equity employee incentive plans, which may have a further dilutive effect.

We may incur substantial costs in pursuing future capital financing, including investment banking fees, legal fees, accounting fees, securities law compliance fees, printing and distribution expenses and other costs. We may also be required to recognize non-cash expenses in connection with certain securities we may issue, which may adversely impact our financial condition.

***We are mainly concentrated in one geographic area, which increases our exposure to many of the risks enumerated herein.***

Operating in a concentrated area increases the potential impact that many of the risks stated herein may have upon our ability to perform. For example, we have greater exposure to regulatory actions impacting Texas, natural disasters in the geographic area, competition for equipment, services and materials available in the area and access to infrastructure and markets. In addition, the effect of fluctuations on supply and demand may become more pronounced within specific geographic oil and natural gas producing areas such as the Permian Basin, which may cause these conditions to occur with greater frequency or magnify the effect of these conditions. Due to the concentrated nature of our portfolio of properties, a number of our properties could experience any of the same conditions at the same time, resulting in a relatively greater impact on our results of operations than they might have on other companies that have a more diversified portfolio of properties. Such delays or interruptions could have a material adverse effect on our financial condition and results of operations.

***Because of the speculative nature of oil and natural gas exploration, there is risk that we will not find commercially exploitable oil and natural gas and that our business will fail.***

The search for commercial quantities of oil and natural gas as a business is extremely risky. We cannot provide investors with any assurance that any properties in which we obtain a mineral interest will contain commercially exploitable quantities of oil and/or natural gas. The exploration expenditures to be made by us may not result in the discovery of commercial quantities of oil and/or natural gas. Problems such as unusual or unexpected formations or pressures, premature declines of reservoirs, invasion of water into producing formations and other conditions involved in oil and natural gas exploration often result in unsuccessful exploration efforts. If we are unable to find commercially exploitable quantities of oil and natural gas, and/or we are unable to commercially extract such quantities, we may be forced to abandon or curtail our business plan, and as a result, any investment in us may become worthless.

Table of Contents

***Strategic relationships upon which we may rely are subject to change, which may diminish our ability to conduct our operations.***

Following the Spin-Off, our ability to successfully acquire oil and natural gas interests, to build our reserves, to participate in drilling opportunities and to identify and enter into commercial arrangements with customers will depend on developing and maintaining close working relationships with industry participants and our ability to select and evaluate suitable properties and to consummate transactions in a highly competitive environment. These realities are subject to change and our inability to maintain close working relationships with industry participants or continue to acquire suitable property may impair our ability to execute our business plan.

To continue to develop our business should the Distribution not occur, we will endeavor to use the business relationships of our management to enter into strategic relationships, which may take the form of joint ventures with other private parties and contractual arrangements with other oil and natural gas companies, including those that supply equipment and other resources that we will use in our business. We may not be able to establish these strategic relationships, or if established, we may not be able to maintain them. In addition, the dynamics of our relationships with strategic partners may require us to incur expenses or undertake activities we would not otherwise be inclined to in order to fulfill our obligations to these partners or maintain our relationships. If our strategic relationships are not established or maintained, our business prospects may be limited, which could diminish our ability to conduct our operations.

***Our acreage must be drilled before lease expiration in order to hold the acreage by production. In the highly competitive market for acreage, failure to drill sufficient wells in order to hold acreage will result in a substantial lease renewal cost, or if renewal is not feasible, loss of our lease and prospective drilling opportunities.***

Our leases on oil and natural gas properties typically have a primary term of four to five years, after which they expire unless, prior to expiration, drilling obligations are fulfilled or production is established within the spacing units covering the undeveloped acres. As of March 31, 2022, we had leases representing approximately 134,066 net acres in the Orogrande Basin in West Texas expiring in 2022 if we fail to drill five wells as obligated. These leases in the Orogrande Basin are also subject to expiration in 2023 in the event we fail to drill an additional five wells. We will require additional capital to drill these wells, and we may not be able to obtain additional capital when required in order to drill these wells, or on favorable terms. As of March 31, 2022, we have leases representing 645 net acres in the Eastern edge of the Midland Basin in West Texas, which are currently held by production by active wells. In the event that we fail to meet our drilling obligations in the Orogrande Basin, whether because we are unable to obtain additional capital when required or otherwise, or if production ceases in the Midland Basin, our leases will expire. If we have to renew such leases on new terms, we could incur significant cost increases, and we may not be able to renew such leases on commercially reasonable terms or at all. In addition, on certain portions of our acreage, third-party leases may become immediately effective if our leases expire. As such, our actual drilling activities may materially differ from our current expectations, which could adversely affect our business.

***The price of oil and natural gas has historically been volatile. If it were to decrease substantially, our projections, budgets, and revenues would be adversely affected, potentially forcing us to make changes in our operations.***

Following the Spin-Off, our future financial condition, results of operations and the carrying value of any oil and natural gas interests we acquire will depend primarily upon the prices paid for oil and natural gas production. Oil and natural gas prices historically have been volatile and likely will continue to be volatile in the future, especially given current world geopolitical conditions. Our cash flows from operations are highly dependent on the prices that we receive for oil and natural gas. This price volatility also affects the amount of our cash flows available for capital expenditures and our ability to borrow money or raise additional capital. The prices for oil and natural gas are subject to a variety of additional factors that are beyond our control. These factors include:

- the level of consumer demand for oil and natural gas;

Table of Contents

- the domestic and foreign supply of oil and natural gas;
- the ability of the members of the Organization of Petroleum Exporting Countries ("OPEC") to agree to and maintain oil price and production controls;
- the price of foreign oil and natural gas;
- domestic governmental regulations and taxes;
- the price and availability of alternative fuel sources;
- weather conditions;
- market uncertainty due to political conditions in oil and natural gas producing regions, including the Middle East; and
- worldwide economic conditions.

These factors as well as the volatility of the energy markets generally make it extremely difficult to predict future oil and natural gas price movements with any certainty. Declines in oil and natural gas prices affect our revenues and could reduce the amount of oil and natural gas that we can produce economically. Accordingly, such declines could have a material adverse effect on our financial condition, results of operations, oil and natural gas reserves and the carrying values of our oil and natural gas properties. If the oil and natural gas industry experiences significant price declines, we may be unable to make planned expenditures, among other things. If this were to happen, we may be forced to abandon or curtail our business operations, which would cause the value of an investment in us to decline or become worthless.

In early March 2020, the market experienced a precipitous decline in oil prices in response to concerns about oil demand due to the economic impact of COVID-19 and anticipated increases in supply from Russia and OPEC, particularly Saudi Arabia. Generally, demand for oil declined substantially following the initial onset of the COVID-19 pandemic, but has recovered over the past year. These trends materially, adversely affected our results of operations, cash flows and financial condition during the last two years.

If oil or natural gas prices reverse again and go on a downward trend or drilling efforts are unsuccessful, we could be required to record additional write-downs of our oil and natural gas properties. Write-downs may occur when oil and natural gas prices are low, or if we have downward adjustments to our estimated proved reserves, increases in our estimates of operating or development costs, deterioration in drilling results or mechanical problems with wells where the cost to redrill or repair is not supported by the expected economics.

Under the full cost method of accounting, capitalized oil and natural gas property costs less accumulated depletion and net of deferred income taxes may not exceed an amount equal to the present value, discounted at 10%, of estimated future net revenues from proved oil and natural gas reserves plus the cost of unproved properties not subject to amortization (without regard to estimates of fair value), or estimated fair value, if lower, of unproved properties that are subject to amortization. Should capitalized costs exceed this ceiling, an impairment would be recognized.

The Company recognized an impairment charge of $2,108,301 in 2020.

***Because of the inherent dangers involved in oil and natural gas operations, there is a risk that we may incur liability or damages as we conduct our business operations, which could force us to expend a substantial amount of money in connection with litigation and/or a settlement.***

The oil and natural gas business involves a variety of operating hazards and risks such as well blowouts, pipe failures, casing collapse, explosions, uncontrollable flows of oil, natural gas or well fluids, fires, spills, pollution, releases of toxic gas and other environmental hazards and risks. These hazards and risks could result in substantial losses to us from, among other things, injury or loss of life, severe damage to or destruction of property, natural resources and equipment, pollution or other environmental damage, cleanup responsibilities,

Table of Contents

regulatory investigation and penalties and suspension of operations. In addition, we may be liable for environmental damages caused by previous owners of property purchased and leased by us. In recent years, there has also been increased scrutiny on the environmental risk associated with hydraulic fracturing, such as underground migration and surface spillage or mishandling of fracturing fluids including chemical additives. This technology has evolved and continues to evolve and become more aggressive. We believe that new techniques can increase estimated ultimate recovery per well to over 1.0 million barrels of oil equivalent and have increased initial production two- or three-fold. We believe that recent designs have seen improvement in, among other things, proppant per foot, barrels of water per stage, fracturing stages, and clusters per fracturing stage. Nonetheless, substantial liabilities to third parties or governmental entities may be incurred, the payment of which could reduce or eliminate the funds available for exploration, development or acquisitions or result in the loss of our properties and/or force us to expend substantial monies in connection with cleanup, litigation or settlements. In addition, we will need to quickly adapt to the evolving technology, which could take time and divert our attention to other business matters. We currently have no insurance to cover such losses and liabilities, and even if insurance is obtained, it may not be adequate to cover any losses or liabilities. We cannot predict the availability of insurance or the availability of insurance at premium levels that justify our purchase. The occurrence of a significant event not fully insured or indemnified against could materially and adversely affect our financial condition and operations. We may elect to self-insure if management believes that the cost of insurance, although available, is excessive relative to the risks presented. In addition, pollution and environmental risks generally are not fully insurable. The occurrence of an event not fully covered by insurance could have a material adverse effect on our financial condition and results of operations.

***The market for oil and natural gas is intensely competitive, and competition pressures could force us to abandon or curtail our business plan.***

The market for oil and natural gas exploration services is highly competitive, and we only expect competition to intensify in the future. Numerous well-established companies are focusing significant resources on exploration and are currently competing with us for oil and natural gas opportunities. Other oil and natural gas companies may seek to acquire oil and natural gas leases and properties that we have targeted. Additionally, other companies engaged in our line of business may compete with us from time to time in obtaining capital from investors. Competitors include larger companies which, in particular, may have access to greater resources, may be more successful in the recruitment and retention of qualified employees and may conduct their own refining and petroleum marketing operations, which may give them a competitive advantage. Actual or potential competitors may be strengthened through the acquisition of additional assets and interests. Additionally, there are numerous companies focusing their resources on creating fuels and/or materials which serve the same purpose as oil and natural gas but are manufactured from renewable resources.

As a result, we may not be able to compete successfully and competitive pressures may adversely affect our business, results of operations, and financial condition, should the Distribution not occur. If we are not able to successfully compete in the marketplace, we could be forced to curtail or even abandon our current business plan, which could cause any investment in us to become worthless.

***Inflation may adversely affect us by increasing costs beyond what we can recover through price increases and limit our ability to enter into future traditional debt financing.***

Inflation can adversely affect us by increasing costs of critical materials, equipment, labor, and other services. In addition, inflation is often accompanied by higher interest rates. Continued inflationary pressures could impact our profitability. Inflation may also affect our ability to enter into future traditional debt financing, as high inflation may result in an increase in cost.

Table of Contents

***We may not be able to successfully manage growth, which could lead to our inability to implement our business plan.***

Any growth of the Company may place a significant strain on our managerial, operational and financial resources, especially considering that we currently only have a small number of executive officers, employees and advisors. Further, as we enter into additional contracts, we will be required to manage multiple relationships with various consultants, businesses and other third parties. These requirements will be exacerbated in the event of our further growth or in the event that the number of our drilling and/or extraction operations increases. Our systems, procedures and/or controls may not be adequate to support our operations or that our management will be able to achieve the rapid execution necessary to successfully implement our business plan. If we are unable to manage our growth effectively, our business, results of operations and financial condition will be adversely affected, which could lead to us being forced to abandon or curtail our business plan and operations.

***Developing oil and natural gas wells and producing oil and natural gas are costly and high-risk activities with many uncertainties that could adversely affect future production from our oil and natural gas properties. Any delays, reductions or cancellations in development and producing activities could materially, adversely impact the value of your shares of Common Stock.***

Recovery of proved undeveloped reserves and the development of proved developed non-producing reserves requires substantial capital expenditures and successful drilling operations of our oil and natural gas properties. Certain of the development costs related to our Hazel Project (defined below) are shared with Masterson Hazel Partners LP ("MHP"). We granted MHP the option to acquire the Hazel Project in exchange for it conducting, and paying for, development activity sufficient to maintain the Hazel mineral leases in good standing (the "Option Agreement"). The Option Agreement provided that if MHP declined to exercise the option to acquire the property, we would be obligated to reimburse them for their cost of the development activity to the extent that the wells produced revenues beyond the date of the option's lapse until the total amount of development expenses are reimbursed. MHP declined to exercise the option effective September 30, 2021. The 2021 reserve data included in the reserve report of our independent petroleum engineer assumes a certain amount of capital expenditures will be made to develop such reserves, but does not account for our obligation to assign revenue from the Hazel Project to MHP. Additionally, 33.5% of the development expenses for the Orogrande Project (defined below) are borne by the non-operating working interest owners of such properties.

The development of such reserves may in the future take a long period of time and may require higher levels of capital expenditures than anticipated, which, for the Orogrande Project, are borne in part by the non-operating working interest owners of such properties. Delays in the development of the reserves, increases in drilling and development costs (including expenses related to secondary and tertiary recovery techniques) of such reserves or decreases or continued volatility in commodity prices will reduce the future net revenues of the estimated proved undeveloped reserves and may result in some projects becoming uneconomic. In addition, delays in the development of reserves could force us to reclassify certain of the proved reserves as unproved reserves.

In addition, the process of developing oil and natural gas wells and producing oil and natural gas from our properties is subject to numerous risks beyond our control. The ability to carry out operations or to finance planned development expenses could be materially and adversely affected by any factor that may curtail, delay, reduce or cancel development and production, including:

- delays imposed by or resulting from compliance with environmental and other governmental or regulatory requirements, including permitting requirements, limitations on or resulting from wastewater discharge and disposal of exploration and production wastes, including, subsurface injections, as well as additional regulation with respect to GHG emissions;
- pressure or irregularities in geological formations;
- restricted access to land for drilling or to existing pipeline infrastructure;

Table of Contents

- lack of available gathering, transportation and processing facilities, including availability on commercially reasonable terms, or delays in construction of gathering facilities;
- lack of available capacity on interconnecting transmission pipelines;
- equipment failures or accidents;
- failure of secondary recovery operations to perform as expected;
- unexpected operational events and drilling conditions;
- declines in oil or natural gas prices;
- limitations in the market for oil or natural gas;
- pipe or cement failures;
- casing collapses;
- shortages, unavailability or high cost of drilling rigs, tubular materials, equipment, supplies, personnel and services;
- lost or damaged drilling and service tools;
- loss of drilling fluid circulation;
- uncontrollable flows of oil and natural gas, water or drilling fluids;
- blowouts, explosions fires and natural disasters;
- environmental hazards, such as oil and natural gas leaks, pipeline and tank ruptures, encountering naturally occurring radioactive materials, and unauthorized discharges of brine, well stimulation and completion fluids, toxic gases or other pollutants into the surface and subsurface environment;
- adverse weather conditions, such as drought, floods, blizzards, tornados and ice storms; and
- title problems or legal disputes regarding leasehold rights.

***Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict.***

Oil and natural gas activities that we will engage in, including production, processing, handling and disposal of hazardous materials, such as hydrocarbons and naturally occurring radioactive materials (if any), are subject to stringent regulation. We could incur significant costs, including cleanup costs resulting from a release of hazardous material, third-party claims for property damage and personal injuries fines and sanctions, as a result of any violations or liabilities under environmental or other laws. Changes in or more stringent enforcement of environmental laws could force us to expend additional operating costs and capital expenditures to stay in compliance.

Various federal, state and local laws regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment, directly impact oil and natural gas exploration, development and production operations, and consequently may impact our operations and costs. These regulations include, among others, (i) regulations by the Environmental Protection Agency and various state agencies regarding approved methods of disposal for certain hazardous and non-hazardous wastes; (ii) the Comprehensive Environmental Response, Compensation, and Liability Act and analogous state laws which regulate the removal or remediation of previously disposed wastes (including wastes disposed of or released by prior owners or operators), property contamination (including groundwater contamination), and remedial plugging operations to prevent future contamination; (iii) the Clean Air Act and comparable state and local requirements which regulate air emissions; (iv) the Oil Pollution Act of 1990 which contains numerous requirements relating to the prevention of and response to oil spills into waters of the United States; (v) the Resource Conservation and Recovery Act which is the principal federal statute governing the treatment, storage and disposal of hazardous wastes; (vi) the Federal

Table of Contents

Water Pollution Control Act and comparable state and local requirements which regulate discharges to federal and state waters; and (vii) state regulations and statutes governing the handling, treatment, storage and disposal of naturally occurring radioactive material.

We believe that we will be in substantial compliance with applicable environmental laws and regulations in reliance on our contractual relationship with Maverick Operating LLC, who operates our oil and natural gas properties and is primarily responsible for compliance with applicable environmental regulatory with respect to the operating activities of our oil and natural gas properties. We cover all costs associated with the related insurance coverage for such environmental regulatory compliance. To date, other than the cost of insurance, we have not expended any amounts to comply with such regulations, and we do not currently anticipate that future compliance will have a materially adverse effect on our consolidated financial position, results of operations or cash flows. However, if we are deemed to not be in compliance with applicable environmental laws, we could be forced to expend significant funds to be in compliance, which would have a materially adverse effect on our financial condition.

***Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays.***

Several states, including Texas, and local jurisdictions, have adopted, or are considering adopting, regulations that could restrict or prohibit hydraulic fracturing in certain circumstances, impose more stringent operating standards and/or require the disclosure of the composition of hydraulic fracturing fluids. The Texas Legislature adopted legislation, effective September 1, 2011, requiring oil and natural gas operators to publicly disclose the chemicals used in the hydraulic fracturing process. The Texas Railroad Commission adopted rules and regulations implementing this legislation that apply to all wells for which the Texas Railroad Commission issues an initial drilling permit after February 1, 2012. The law requires that the well operator disclose the list of chemical ingredients subject to the requirements of OSHA for disclosure on an internet website and also file the list of chemicals with the Texas Railroad Commission with the well completion report. The total volume of water used to hydraulically fracture a well must also be disclosed to the public and filed with the Texas Railroad Commission. Also, in May 2013, the Texas Railroad Commission adopted rules governing well casing, cementing and other standards for ensuring that hydraulic fracturing operations do not contaminate nearby water resources. The rules took effect in January 2014. Additionally, on October 28, 2014, the Texas Railroad Commission adopted disposal well rule amendments designed, among other things, to require applicants for new disposal wells that will receive non-hazardous produced water and hydraulic fracturing flowback fluid to conduct seismic activity searches utilizing the U.S. Geological Survey. The searches are intended to determine the potential for earthquakes within a circular area of 100 square miles around a proposed new disposal well. The disposal well rule amendments, which became effective on November 17, 2014, also clarify the Texas Railroad Commission's authority to modify, suspend or terminate a disposal well permit if scientific data indicates a disposal well is likely to contribute to seismic activity. The Texas Railroad Commission has used this authority to deny permits and temporarily suspend operations for waste disposal wells and, in September 2021, the Texas Railroad Commission curtailed the amount of water companies were permitted to inject into some wells in the Permian Basin, and has since indefinitely suspended some permits there and expanded the restrictions to other areas. These restrictions on use of produced water and a moratorium on new produced water disposal wells could result in increased operating costs, requiring us or our service providers to truck produced water, recycle it or pump it through the pipeline network or other means, all of which could be costly. We or our service providers may also need to limit disposal well volumes, disposal rates and pressures or locations, or require us or our service providers to shut down or curtail the injection of produced water into disposal wells. These factors may make drilling and completion activity in the affected parts of the Permian Basin less economical and adversely impact our business, results of operations and financial condition.

Table of Contents

***Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce.***

The EPA previously published its findings that emissions of GHGs present a danger to public health and the environment because such gases are, according to the EPA, contributing to warming of the Earth's atmosphere and other climatic changes. Based on these findings, the EPA has adopted various rules to address GHG emissions under existing provisions of the CAA. For example, the EPA has adopted rules requiring the reporting of GHG emissions from various oil and natural gas operations on an annual basis, which includes certain of our operations. In addition, in June 2016, the EPA finalized rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of an LDAR program to minimize methane emissions, under the CAA's New Source Performance Standards Quad Oa. However, the EPA has taken several steps to delay implementation of the Quad Oa standards. The agency proposed a rulemaking in June 2017 to stay the requirements for a period of two years and in October 2018, the EPA proposed revisions to Quad Oa, such as changes to the frequency for monitoring fugitive emissions at well sites and changes to requirements that a professional engineer certify when meeting certain Quad Oa requirements is technically infeasible. In September 2020, the EPA finalized amendments to Quad Oa that rescind requirements for the transmission and storage segment of the oil and natural gas industry and rescind methane-specific limits that apply to the industry's production and processing segments, among other things. On June 30, 2021, Congress issued a joint resolution pursuant to the Congressional Review Act disapproving the September 2020 rule, and on November 15, 2021, EPA issued a proposed rule to revise the Quad Oa regulations that, if finalized, would require methane emissions reductions and implementation of a fugitive emissions monitoring and repair program. EPA has also announced its intention to issue a supplemental proposal in 2022 that may expand on or modify the 2021 proposal in response to public input. It is possible that these rules will continue to require oil and natural gas operators to expend material sums.

In addition, in November 2016, the U.S. Department of the Interior Bureau of Land Management ("BLM") issued final rules to reduce methane emissions from venting, flaring, and leaks during oil and natural gas operations on public lands that are substantially similar to the EPA Quad Oa requirements. However, on December 8, 2017, the BLM published a final rule to temporarily suspend or delay certain requirements contained in the November 2016 final rule until January 17, 2019, including those requirements relating to venting, flaring and leakage from oil and natural gas production activities. Further, in September 2018, the BLM published a final rule to revise or rescind certain provisions of the 2016 rule. On July 21, 2020, a Wyoming federal court vacated almost all of the 2016 rule, including all provisions relating to the loss of gas through venting, flaring, and leaks, and on July 15, 2020, a California federal court vacated the 2018 rule. While, as a result of these developments, future implementation of the EPA and BLM methane rules is uncertain, given the long-term trend towards increasing regulation, future federal GHG regulations of the oil and natural gas industry remain a possibility. We may be required to expend significant costs to obtain the necessary equipment (pollution control equipment and optical gas imaging equipment for LDAR inspections) and personnel trained to assist with inspection and reporting requirements to ensure we are in compliance with these rules.

***We may incur increasing attention to environmental, social and governance ("ESG") matters that may impact our business.***

Businesses across all industries are facing increasing scrutiny from stakeholders related to their ESG practices. If we do not adapt to or comply with investor or stakeholder expectations and standards, which are evolving, or if we are perceived to have not responded appropriately to the growing concern for ESG issues, regardless of whether there is a legal requirement to do so, we may suffer from reputational damage and the business, financial condition and/or the value of our Common Stock could be materially and adversely affected. Increasing attention to climate change, increasing societal expectations on businesses to address climate change, and potential consumer use of substitutes to energy commodities may result in increased costs, reduced demand for our hydrocarbon products, reduced profits, increased investigations and litigation, and negative impacts on our ability to access capital markets.

Table of Contents

In addition, organizations that provided information to investors on corporate governance and related matters have developed rating processes for evaluating business entities on their approach to ESG matters. Currently, there are no universal standards for such scores or ratings, but the importance of sustainability evaluations is becoming more broadly accepted by investors and shareholders. Such ratings are used by some investors to inform their investment and voting decisions. Additionally, certain investors use these scores to benchmark businesses against their peers. If we are perceived as lagging, our investors may engage with such third party organizations to require improved ESG disclosure or performance.

***Our estimates of the volume of reserves could have flaws, or such reserves could turn out not to be commercially extractable. As a result, our future revenues and projections could be incorrect.***

Estimates of reserves and of future net revenues prepared by different petroleum engineers may vary substantially depending, in part, on the assumptions made and may be subject to adjustment either up or down in the future. Our actual amounts of production, revenue, taxes, development expenditures, operating expenses, and quantities of recoverable oil and natural gas reserves may vary substantially from the estimates. Oil and natural gas reserve estimates are necessarily inexact and involve matters of subjective engineering judgment. In addition, any estimates of our future net revenues and the present value thereof are based on assumptions derived in part from historical price and cost information, which may not reflect current and future values, and/or other assumptions made by us that only represent our best estimates. If these estimates of quantities, prices and costs prove inaccurate, we may be unsuccessful in expanding our oil and natural gas reserves base with our acquisitions. Additionally, if declines in and instability of oil and natural gas prices occur, then write downs in the capitalized costs associated with any oil and natural gas assets we obtain may be required. Because of the nature of the estimates of our reserves and estimates in general, reductions to our estimated proved oil and natural gas reserves and estimated future net revenues may not be required in the future, and/or that our estimated reserves may not present and/or commercially extractable. If our reserve estimates are incorrect, we may be forced to write down the capitalized costs of our oil and natural gas properties.

***Decommissioning costs are unknown and may be substantial. Unplanned costs could divert resources from other projects.***

We may become responsible for costs associated with abandoning and reclaiming wells, facilities and pipelines which we use for production of oil and natural gas reserves. Abandonment and reclamation of these facilities and the costs associated therewith is often referred to as “decommissioning.” We accrue a liability for decommissioning costs associated with our wells but have not established any cash reserve account for these potential costs in respect of any of our properties. If decommissioning is required before economic depletion of our properties or if our estimates of the costs of decommissioning exceed the value of the reserves remaining at any particular time to cover such decommissioning costs, we may have to draw on funds from other sources to satisfy such costs. The use of other funds to satisfy such decommissioning costs could impair our ability to focus capital investment in other areas of our business.

***We may have difficulty distributing production, which could harm our financial condition.***

In order to sell the oil and natural gas that we are able to produce, if any, the operators of the wells we obtain interests in may have to make arrangements for storage and distribution to the market. We will rely on local infrastructure and the availability of transportation for storage and shipment of our products, but infrastructure development and storage and transportation facilities may be insufficient for our needs at commercially acceptable terms in the localities in which we operate. This situation could be particularly problematic to the extent that our operations are conducted in remote areas that are difficult to access, such as areas that are distant from shipping and/or pipeline facilities. These factors may affect our and potential partners’ ability to explore and develop properties and to store and transport oil and natural gas production, increasing our expenses.

Table of Contents

Furthermore, weather conditions or natural disasters, actions by companies doing business in one or more of the areas in which we will operate, or labor disputes may impair the distribution of oil and/or natural gas and in turn diminish our financial condition or ability to maintain our operations.

***The marketability of our production is dependent upon transportation and other facilities, certain of which we do not control. When these facilities are unavailable, our operations can be interrupted and our revenues reduced.***

The marketability of our production depends in part upon the availability, proximity and capacity of transportation facilities owned by third parties. Our oil production is transported from the wellhead to our tank batteries by our gathering system. Our purchasers then transport the oil by truck to a pipeline for transportation. Our natural gas production is generally transported by our gathering lines from the wellhead to an interconnection point with the purchaser. We do not control these trucks and other third-party transportation facilities and our access to them may be limited or denied. Insufficient production from our wells to support the construction of pipeline facilities by our purchasers or a significant disruption in the availability of our or third-party transportation facilities or other production facilities could adversely impact our ability to deliver to market or produce our production and thereby cause a significant interruption in our operations.

We may be required to flare a portion of our natural gas production for a number of reasons, including the fact that (i) our well is not yet tied into the third-party gathering system, (ii) the pressures on the third-party gathering system are too high to allow additional production from our well to be transported or (iii) our production is prorated due to high demand on the third-party gathering system. We may flare additional gas from time to time.

Also, the transfer of our oil and natural gas through third-party pipelines may be curtailed or delayed if it does not meet the quality specifications of the pipeline owners. Our access to transportation options, including trucks owned by third parties, can also be affected by U.S. federal and state regulation of oil and natural gas production and transportation, general economic conditions and changes in supply and demand. If, in the future, we are unable, for any sustained period, to implement acceptable delivery or transportation arrangements or encounter production-related difficulties, we may be required to shut in or curtail production. Any such shut in or curtailment, or an inability to obtain favorable terms for delivery of our production, would adversely affect our financial condition and results of operations.

***Our business will suffer if we cannot obtain or maintain necessary licenses.***

Our operations, should the Distribution not occur, will require licenses, permits and in some cases renewals of licenses and permits from various governmental authorities. Our ability to obtain, sustain or renew such licenses and permits on acceptable terms is subject to change in regulations and policies and to the discretion of the applicable governments, among other factors. Our inability to obtain, or our loss of or denial of extension of, any of these licenses or permits could hamper our ability to produce revenues from our operations.

***Challenges to our properties may impact our financial condition.***

Title to oil and natural gas interests is often not capable of conclusive determination without incurring substantial expense. While we have made and intend to make appropriate inquiries into the title of properties and other development rights we have acquired and intend to acquire, title defects may exist. In addition, we may be unable to obtain adequate insurance for title defects, on a commercially reasonable basis or at all. If title defects do exist, it is possible that we may lose all or a portion of our right, title and interests in and to the properties to which the title defects relate. If our property rights are reduced, our ability to conduct our exploration, development and production activities may be impaired. To mitigate title problems, common industry practice is to obtain a title opinion from a qualified oil and natural gas attorney prior to the drilling operations of a well.

Table of Contents

***We rely on technology to conduct our business, and our technology could become ineffective or obsolete.***

We rely on technology, including geographic and seismic analysis techniques and economic models, to develop our reserve estimates and to guide our exploration, development and production activities. We and our operator partners will be required to continually enhance and update our technology to maintain its efficacy and to avoid obsolescence. The costs of doing so may be substantial and may be higher than the costs that we anticipate for technology maintenance and development. If we are unable to maintain the efficacy of our technology, our ability to manage our business and to compete may be impaired. Further, even if we are able to maintain technical effectiveness, our technology may not be the most efficient means of reaching our objectives, in which case we may incur higher operating costs than we would were our technology more efficient.

***The loss of key personnel would directly affect our efficiency and profitability.***

Our future success is dependent, in a large part, on retaining the services of our planned management team. Our executive officers possess a unique and comprehensive knowledge of our industry and related matters that are vital to our success within the industry. The knowledge, leadership and technical expertise of these individuals would be difficult to replace. The loss of one or more of our officers could have a material adverse effect on our operating and financial performance, including our ability to develop and execute our long-term business strategy. We do not maintain key-man life insurance with respect to any employees. We intend to enter into employment agreements with each of our executive officers following the Spin-Off. Currently, three of our executives are party to employment agreements with one of our subsidiaries, which is described in more detail under the heading "Executive Compensation" elsewhere in this Prospectus.

***We have limited management and staff and are dependent upon partnering arrangements and third-party service providers.***

After the Spin-Off we plan to have six full-time employees, including our Chief Executive Officer and Chief Financial Officer. The loss of these individuals would have an adverse effect on our business, as we have very limited personnel. We leverage the services of other independent consultants and contractors to perform various professional services, including engineering, oil and natural gas well planning and supervision, and land, legal, environmental and tax services. We also pursue alliances with partners in the areas of geological and geophysical services and prospect generation, evaluation and prospect leasing. Our dependence on third-party consultants and service providers create a number of risks, including but not limited to:

- the possibility that such third parties may not be available to us as and when needed; and
- the risk that we may not be able to properly control the timing and quality of work conducted with respect to its projects.

If we experience significant delays in obtaining the services of such third parties or they perform poorly, our results of operations and stock price could be materially adversely affected.

***Certain of our directors and officers have significant duties with, and spend significant time serving, entities that may compete with us in seeking acquisitions and business opportunities and, accordingly, may have conflicts of interest in allocating time or pursuing business opportunities.***

Certain of our directors and officers, who are responsible for managing the direction of our operations and acquisition activities, hold positions of responsibility with other entities that are in the business of identifying and acquiring oil and natural gas properties. The existing positions held by these directors and officers may give rise to fiduciary or other duties that are in conflict with the duties they owe to us. These directors and officers may become aware of business opportunities that may be appropriate for presentation to us as well as to the other entities with which they are or may become affiliated. Due to these existing and potential future affiliations, they may present potential business opportunities to other entities prior to presenting them to us, which could cause additional conflicts of interest. They may also decide that certain opportunities are more appropriate for other

Table of Contents

entities with which they are affiliated, and as a result, they may elect not to present those opportunities to us. These conflicts may not be resolved in our favor. For additional discussion of our management's business affiliations and the potential conflicts of interest of which our stockholders should be aware, see "Certain Relationships and Related Party Transactions."

***Our business and operations may be adversely affected by the COVID-19 pandemic and may be adversely affected by other similar outbreaks.***

As a result of the COVID-19 pandemic or other adverse public health developments, including voluntary and mandatory quarantines, travel restrictions, and other restrictions, we have experienced delays, disruptions and temporary suspensions of our operations. In addition, our financial condition and results of operations may be adversely affected by the COVID-19 pandemic in the future.

The timeline and potential magnitude of the COVID-19 outbreak continue to be unknown. The continuation or amplification of the COVID-19 pandemic could continue to more broadly affect the United States and global economy, including our business and operations, and the demand for oil and natural gas. Other contagious diseases in the human population could have similar adverse effects. The potential impact from COVID-19 is difficult to predict, therefore, the extent to which it will negatively affect our operating results, or the duration of any potential business disruption is uncertain. The magnitude and duration of any impact will depend on future developments and new information that may emerge regarding the duration of COVID-19 pandemic, the severity of any variants thereof, rate of vaccinations and other actions taken by authorities to contain its impact or otherwise treat the disease, all of which are beyond our control.

***Terrorist attacks or cyber-incidents could result in information theft, data corruption, operational disruption and/or financial loss.***

Like most companies, we have become increasingly dependent upon digital technologies, including information systems, infrastructure and cloud applications and services, to operate our businesses, to process and record financial and operating data, communicate with our business partners, analyze mine and mining information, estimate quantities of coal reserves, as well as other activities related to our businesses. Strategic targets, such as energy-related assets, may be at greater risk of future terrorist or cyber-attacks than other targets in the United States. Deliberate attacks on, or security breaches in, our systems or infrastructure, or the systems or infrastructure of third parties, or cloud-based applications could lead to corruption or loss of our proprietary data and potentially sensitive data, delays in production or delivery, difficulty in completing and settling transactions, challenges in maintaining our books and records, environmental damage, communication interruptions, other operational disruptions and third-party liability. Our insurance may not protect us against such occurrences. Consequently, it is possible that any of these occurrences, or a combination of them, could have a material adverse effect on our business, financial condition, results of operations and cash flows. Further, as cyber incidents continue to evolve, we may be required to expend additional resources to continue to modify or enhance our protective measures or to investigate and remediate any vulnerability to cyber incidents. We plan to adopt plans and policies to address precautions with respect to data security and appropriate responses in case of a reported breach.

**Risks Relating to the Spin-Off**

***The Spin-Off could result in significant tax liability to Meta and its stockholders.***

The Spin-Off and cancellation of all shares of the Series A Preferred Stock together will not qualify for non-recognition of gain or loss for U.S. federal income tax purposes. Series A Preferred stockholders could be subject to tax as a result of the Spin-Off and such cancellation. The treatment of the Spin-Off and cancellation of all shares of the Series A Preferred Stock together for U.S. federal income tax purposes for a U.S. holder (as defined further below) will depend on whether the Spin-Off and such cancellation qualify as a sale or exchange of the Series A Preferred Stock under Section 302 of the Internal Revenue Code of 1986, as amended (the "Code"). If the Spin-Off and cancellation of all shares of the Series A Preferred Stock together qualify as a sale

Table of Contents

or exchange of the Series A Preferred Stock, the U.S. holder will be treated as recognizing capital gain or loss equal to the difference between the amount realized on the Spin-Off and such cancellation together, and such U.S. holder's adjusted tax basis in the Series A Preferred Stock surrendered in the Spin-Off and such cancellation. The treatment of the Spin-Off and cancellation of all shares of the Series A Preferred Stock for U.S. federal income tax purposes for a non-U.S. holder (as defined further below) likewise will depend on whether the Spin-Off and such cancellation together qualify as a sale or exchange of the Series A Preferred Stock under Section 302 of the Code. If the Spin-Off and such cancellation together qualify as a sale or exchange of the Series A Preferred Stock, gain recognized from the Spin-Off by a non-U.S. holder generally will not be subject to U.S. federal income taxation. If the Spin-Off and such cancellation together do not qualify as a sale or exchange of Series A Preferred Stock, a non-U.S. holder will be treated as receiving a distribution from Meta, which distribution will be treated as a dividend to the extent the distribution is paid out of Meta's current or accumulated earnings and profits (as determined under U.S. federal income tax principles) and will be subject to any applicable withholding. If a Series A Preferred stockholder is subject to withholding tax in connection with the Spin-Off (including nonresident withholding tax or backup withholding tax, each as described further under the heading "Material U.S. Federal Income Tax Considerations" below), Meta has the right to reduce the amount of Common Stock deliverable to such stockholder in the Spin-Off in order to pay such withholding tax.

Meta will generally recognize gain equal to the fair market value of our Common Stock in excess of Meta's adjusted tax basis in such Common Stock at the time of the Spin-Off. To the extent such gain gives rise to unreimbursed federal, state or other tax liabilities, such liabilities could adversely affect Meta's liquidity or capital reserves.

See below under the headings "Notes to Unaudited Pro-Forma Condensed Combined Financial Statements" and "Material U.S. Federal Income Tax Considerations" for more information.

***We may be unable to achieve some or all of the benefits that we expect to achieve from the Spin-Off.***

We believe that, as an independent company, we will be able to, among other things, better focus our financial and operational resources on our specific business, implement and maintain a capital structure designed to meet our specific needs, design and implement corporate strategies and policies that are targeted to our business, more effectively respond to industry dynamics and create effective incentives for our management and employees that are more closely tied to our business performance. However, by separating from Meta, we may be more susceptible to market fluctuations and have less leverage with suppliers, and we may experience other adverse events. In addition, we may be unable to achieve some or all of the benefits that we expect to achieve as an independent company in the time we expect, if at all. The completion of the Spin-Off will also require significant amounts of our management's time and effort, which may divert management's attention from operating and growing our business.

***We may be unable to make, on a timely or cost-effective basis, the changes necessary to operate as an independent company, and we may experience increased costs after the Spin-Off.***

Meta has provided us with various corporate services. Following the Spin-Off, Meta will have no obligation to provide us with assistance other than as described under "Certain Relationships and Related Party Transactions—Agreements with Meta." These arrangements do not account for every service that we have received from Meta in the past. Accordingly, following the Spin-Off, we will need to provide internally or obtain from unaffiliated third parties the services we currently receive from Meta. We may be unable to replace these services in a timely manner or on terms and conditions as favorable as those we receive from Meta. We may be unable to successfully establish the infrastructure or implement the changes necessary to operate independently or may incur additional costs. If we fail to obtain the services necessary to operate effectively or if we incur greater costs in obtaining these services, our business, financial condition and results of operations may be adversely affected.

***We have limited operating history as an independent company, and our historical financial information is not necessarily representative of the results we would have achieved as an independent company and may not be a reliable indicator of our future results.***

We derived the historical financial information included in this Prospectus from Meta's consolidated financial statements, and this information does not necessarily reflect the results of operations and financial position we

Table of Contents

would have achieved as an independent company during the periods presented or those that we will achieve in the future. This is primarily because of the following factors:

- Prior to the Spin-Off, we operated as part of Meta's broader corporate organization, and Meta performed various corporate functions for us. Our historical financial information reflects allocations of corporate expenses from Meta for these and similar functions. These allocations may not reflect the costs we will incur for similar services in the future as an independent company.
- We will enter into transactions with Meta that did not exist prior to the Spin-Off or modify our existing agreements with Meta, such as Meta's provision of transition services, which will cause us to incur new costs.
- Our historical financial information does not reflect changes that we expect to experience in the future as a result of our separation from Meta, including changes in our cost structure, personnel needs, tax structure, financing and business operations. As part of Meta, we enjoyed certain benefits from Meta's operating diversity, size, purchasing power, borrowing leverage and available capital for investments, and we will lose these benefits after the Spin-Off. As an independent entity, we may be unable to purchase goods, services and technologies, such as insurance and health care benefits and computer software licenses or access capital markets on terms as favorable to us as those we obtained as part of Meta prior to the Spin-Off.

Following the Spin-Off, we will also be responsible for the additional costs associated with being an independent company, including costs related to corporate governance, investor and public relations and public reporting. In addition, certain costs incurred by Meta, including executive oversight, accounting, treasury, tax, legal, human resources, occupancy, procurement, information technology and other shared services, have historically been allocated to us by Meta; but these allocations may not reflect the future level of these costs to us as we begin to provide these services ourselves. Therefore, our historical financial statements may not be indicative of our future performance as an independent company. We cannot assure you that our operating results will continue at a similar level when we are an independent company. For additional information about our past financial performance and the basis of presentation of our financial statements, see "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the notes thereto included elsewhere in this Prospectus.

***Our contracts may contain provisions requiring the consent of third parties in connection with the Spin-Off. If these consents are not obtained, we may be unable to enjoy the benefit of these contracts in the future.***

Our contracts may contain provisions that require the consent of third parties to the Spin-Off. Failure to obtain such consents on commercially reasonable and satisfactory terms may impair our entitlement to the benefit of these contracts in the future.

***The 2021 Note with Meta contains restrictive covenants that limit our operations.***

In 2021, we borrowed $15 million pursuant to the terms of the 2021 Note (defined below). If we are not in compliance with the covenants of the 2021 Note, or if we are in default under the 2021 Note, it is unlikely that Meta will offer to extend any additional loans or debt financing under the 2021 Note or otherwise, which may affect our business as a going concern. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2021 Note. This restriction may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for additional information.

Table of Contents

The 2021 Note is secured by a security interest in shares of common stock of Meta and a 25% working interest in the Orogrande Prospect as defined in the Security Agreement (defined below), each held by the Pledgor (defined below) or the Pledgor's affiliate. Any default that is not waived could permit Meta, as lender, to exercise rights and remedies with respect to all of the collateral that is securing the 2021 Note, and/or other rights and remedies under applicable law.

Our ability to meet these restrictive covenants or to avoid defaults can be impacted by events beyond our control. The 2021 Note provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence of an event of default, our lender could elect to declare all amounts outstanding under the 2021 Note to be immediately due and payable. If the outstanding debt under the 2021 Note was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our Common Stock.

***Our Loan Agreement with Meta will contain restrictive covenants that limit our operations.***

We borrowed an additional $1.9 million from Meta, for an aggregate outstanding balance of approximately $2.34 million and, pursuant to the terms of the proposed Loan Agreement (defined below), we may request to borrow up to an additional $2.66 million. It is expected, under the terms of the Loan Agreement, that if we are not in compliance with the draw down conditions or covenants contained in the Loan Agreement, it is unlikely that Meta will offer to extend the remaining $2.66 million available under the Loan Agreement. The Loan Agreement will contain various restrictive covenants and other restrictions, which we expect to include, among other things, restrictions on:

- our ability to transfer all or part of our business or property, except for inventory in the ordinary course of business, surplus or obsolete equipment, permitted liens, and transfers of cash permitted by the agreement;
- our ability to liquidate or dissolve or merge or consolidate with another entity, or acquire another entity;
- our ability to incur additional debt beyond certain limits or encumber our assets; and
- our ability to pay dividends or make investments, other than permitted investments.

These restrictions may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for additional information.

Our ability to meet these restrictive covenants can be impacted by events beyond our control. The Loan Agreement will provide that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence and during the continuance of an event of default, Meta as the lender could elect to (i) declare all outstanding principal and accrued and unpaid interest under the Loan Agreement immediately due and payable, (ii) terminate any remaining commitment to make loans under the Loan Agreement, and/or (iii) exercise certain other rights and remedies anticipated under the Loan Agreement. The events of default under the Loan Agreement is anticipated to include, among other things (subject to grace periods in certain instances), payment defaults, breaches of covenants or representations and warranties, a change in control or certain material adverse effects to be defined in the Loan Agreement, material judgments and attachments, cross defaults with certain of our other material indebtedness, termination of any of our oil and natural gas leases, and bankruptcy and insolvency events with respect to us and our subsidiaries. If the outstanding debt under the Loan Agreement was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our Common Stock. The terms of the Loan Agreement have not yet been finalized.

Table of Contents

***We may have been able to receive better terms from unaffiliated third parties than the terms we receive in our agreements with Meta.***

We will negotiate agreements with Meta related to our separation from Meta, including the Distribution Agreement and Tax Matters Agreement, while we are still part of Meta. Accordingly, these agreements may not reflect terms that would have resulted from arms-length negotiations between unaffiliated parties. The terms of the agreements being negotiated relate to, among other things, allocations of assets, liabilities, rights, indemnifications and other obligations between Meta and us. We may have received better terms from third parties because third parties may have competed with each other to win our business. See "Certain Relationships and Related Party Transactions" for more information.

**Risks Relating to our Common Stock**

***Our Common Stock is not eligible with the Depository Trust Company ("DTC"), which may result in brokerage firms being unwilling to trade the stock.***

A significant number of the holders of the Series A Preferred Stock hold such shares in "street name" brokerage accounts. Our shares of Common Stock will not become eligible with DTC to permit our shares of Common Stock to trade electronically. If an issuer is not "DTC-eligible," then its capital stock cannot be electronically transferred between brokerage accounts, which means that brokerage firms may be unwilling to trade our Common Stock, restricting all trades by holders of our Common Stock following the Spin-Off.

***No active trading market for our Common Stock may develop.***

There is presently no public market for our shares of Common Stock and our shares may not become DTC eligible for electronic trading to third parties. There is no assurance that a trading market will develop or be sustained. Accordingly, you may have to hold the shares of Common Stock indefinitely and may have difficulty selling or otherwise transferring them if an active trading market does not develop.

***We are an emerging growth company, subject to less stringent reporting and regulatory requirements of other publicly held companies and this status may have an adverse effect on our ability to attract interest in our Common Stock.***

We are an emerging growth company as defined in the JOBS Act. As long as we remain an emerging growth company, we may take advantage of certain exemptions from various reporting and regulatory requirements that are applicable to other public reporting companies that are not emerging growth companies. We cannot predict if investors will find our Common Stock less attractive if we choose to rely on these exemptions. If some investors find our Common Stock less attractive as a result of any choices to reduce future disclosure, there may be a less active trading market for our common stock and our stock price may be more volatile.

***We do not intend to pay any cash dividends in the foreseeable future and, therefore, any return on your investment in our Common Stock must come from increases in the fair market value of the Common Stock.***

We do not intend to pay cash dividends on our Common Stock in the foreseeable future. We expect to retain future earnings, if any, for reinvestment in our business. Also, any credit agreements, which we may enter into, may restrict our ability to pay dividends. Whether we pay cash dividends in the future will be at the discretion of our board of directors (the "Board") and will be dependent upon our financial condition, results of operations, cash requirements, future prospects and any other factors our Board deems relevant. Therefore, any return on your investment in our Common Stock must come from increases in the fair market value of the Common Stock.

***Your percentage ownership in the Company may be diluted in the future.***

Your percentage ownership in the Company may be diluted in the future because of equity awards that we expect to grant to our directors, officers and other employees. Prior to the Spin-Off, we expect to approve an incentive

Table of Contents

plan that will provide for the grant of Common Stock-based equity awards to our directors, officers and other employees. In addition, we may issue equity as all or part of the consideration paid for acquisitions and strategic investments that we may make in the future or as necessary to finance our ongoing operations.

***We may issue preferred stock with terms that could adversely affect the voting power or value of our Common Stock.***

Our Board has the authority to cause us to issue, without any further vote or action by the stockholders, shares of preferred stock in one or more series, to designate the number of shares constituting any series, and to fix the rights, preferences, privileges and restrictions thereof, including dividend rights, voting rights and terms of redemption, redemption price or prices and liquidation preferences of such series. The terms of one or more classes or series of preferred stock could adversely impact the voting power or value of our Common Stock. For example, we might afford holders of preferred stock the right to elect some number of our directors in all events or upon the occurrence of specified events or the right to vote on specified transactions. Similarly, the repurchase or redemption rights or liquidation preferences we might assign to holders of preferred stock could affect the residual value of our Common Stock.

***Certain provisions of Nevada law may prevent or delay an acquisition of the Company, which could decrease the market value of the Common Stock.***

Certain provisions of Nevada law, may discourage, delay or prevent a merger or acquisition that our stockholders consider favorable.

These provisions may discourage, delay or prevent certain types of transactions involving an actual or a threatened acquisition or change in control of the Company, including unsolicited takeover attempts, even though the transaction may offer our stockholders the opportunity to sell their Common Stock at a price above the prevailing market price. See "Description of Our Capital Stock—Certain Provisions of Nevada Law" for more information.

Table of Contents

## THE SPIN-OFF

### Background

In June 2020 the board of directors of Torchlight began to pursue strategic alternatives for Torchlight due to the permeating financial climate of the oil and gas industry in 2020. In July 2020 Torchlight engaged Roth Capital Partners, LLC as its financial advisor in connection with a strategic transaction. After discussions with various companies, Torchlight began discussions with Meta in September 2020 concerning a potential strategic transaction.

After several months of negotiations, in December 2020 Torchlight and Meta entered into the Arrangement Agreement. Within the Arrangement Agreement, the oil and gas properties of Torchlight (the O&G Assets) were effectively allocated to the legacy Torchlight stockholders, which became the Series A Preferred stockholders of Meta. Concurrent with the negotiation and execution of the Arrangement Agreement was the Certificate of Designation of Preferences, Rights and Limitations of the Series A Preferred Stock. Pursuant to the Certificate of Designations, upon a sale of the O&G Assets, the proceeds from any such transaction are to be distributed to the Series A Preferred stockholders. In lieu of a sale of the O&G Assets, the board has determined to pursue the Spin-Off.

### Reasons for the Spin-Off

The Meta board of directors considered the Spin-Off to be strategic so that Meta can concentrate on its core business.

### When and How You Will Receive Shares of Common Stock

Meta will distribute to the holders of its Series A Preferred Stock, as a pro rata dividend, one share of our Common Stock for every share of Series A Preferred Stock outstanding as of            , 2022 (the "Record Date").

Prior to the Spin-Off, Meta will deliver all of the issued and outstanding shares of our Common Stock to the distribution agent. American Stock Transfer & Trust Company LLC (the "Transfer Agent") will serve as distribution agent in connection with the Distribution and as transfer agent and registrar for our Common Stock.

If you own Series A Preferred Stock as of the close of business on            , 2022, the shares of our Common Stock that you are entitled to receive in the Distribution will be issued to your account as follows:

- *Registered stockholders*. If you own your shares of Series A Preferred Stock directly through Meta's transfer agent, American Stock and Transfer, you are a registered stockholder. In this case, the distribution agent will credit the whole shares of our Common Stock you receive in the Distribution by way of direct registration in book-entry form to a new account with our transfer agent. Registration in book-entry form refers to a method of recording share ownership where no physical stock certificates are issued to stockholders, as is the case in the Distribution. You will be able to access information regarding your book-entry account holding our shares at American Stock Transfer & Trust Company, LLC.

Commencing on or shortly after the Distribution Date, the distribution agent will mail to you an account statement that indicates the number of whole shares of our Common Stock that have been registered in book-entry form in your name. We expect it will take the distribution agent up to two weeks after the Distribution Date to complete the distribution of the shares of our Common Stock and mail statements of holding to all registered stockholders.

- *"Street name" or beneficial stockholders*. Most Meta stockholders own their shares of Series A Preferred Stock beneficially through a bank, broker or other nominee. In these cases, the bank, broker

Table of Contents

or other nominee holds the shares in "street name" and records your ownership on its books. If you own your shares of the Series A Preferred Stock through a bank, broker or other nominee, your bank, broker or other nominee will credit your account with the whole shares of our Common Stock that you receive in the Distribution on or shortly after the Distribution Date; however, our shares of Common Stock will not be eligible for electronic trading through DTC or any other established clearing corporation. Therefore, we encourage you to contact your bank, broker or other nominee to instruct such bank, broker or other nominee to transfer the shares of Series A Preferred Stock to our transfer agent such that each such holder of Series A Preferred Stock is the registered holder of the distributed shares of Common Stock in book-entry form in a new account with our transfer agent.

If you sell any of your shares of Series A Preferred Stock on or before the Distribution Date, you will not receive any shares of Common Stock.

We are not asking Meta stockholders to take any action in connection with the Spin-Off. No approval of the holders of Meta common stock is required for the Spin-Off. We are not asking you for a proxy and request that you not send us a proxy. We are also not asking you to make any payment or surrender or exchange any of your shares of Meta common stock for shares of our Common Stock. The number of outstanding shares of Meta common stock will not change as a result of the Spin-Off.

### Number of Shares You Will Receive

On the Distribution Date, you will receive one share of our Common Stock for every share of Series A Preferred Stock you hold on the Record Date. No fractional shares of Common Stock will be issued.

### Results of the Spin-Off

After the Spin-Off, we will be an independent company. Immediately following the Spin-Off, we expect to have approximately 64,000 holders of shares of our Common Stock. In computing the number of holders of record, each broker-dealer and clearing corporation holding shares on behalf of its customers, the holders of the Series A Preferred Stock, is counted as a single shareholder. A significant number of shares of our Common Stock are held in either nominee name or street name brokerage accounts, and consequently, we are unable to determine the total number of beneficial owners of our Common Stock.

Before our separation from Meta, we intend to enter into a Distribution Agreement and certain other agreements with Meta related to the Spin-Off. These agreements will govern the relationship between us and Meta up to and after completion of the Spin-Off and allocate between us and Meta various assets, liabilities, rights and obligations, including employee benefits, intellectual property and tax-related assets and liabilities. We describe these arrangements in greater detail under "Certain Relationships and Related Party Transactions—Agreements with Meta."

### Conditions to the Spin-Off

We expect that the separation will be effective on the Distribution Date, provided that the following conditions shall have been satisfied or waived by Meta:

- the Meta board of directors shall have authorized and approved the Distribution and not withdrawn such authorization and approval, and shall have declared the dividend of our Common Stock to Meta stockholders;
- the Distribution Agreement and the ancillary agreements contemplated by the Distribution Agreement shall have been executed by each party to those agreements;
- the SEC shall have declared effective our Registration Statement on Form S-1, of which this Prospectus is a part, under the Securities Act, and no stop order suspending the effectiveness of our

Table of Contents

Registration Statement shall be in effect and no proceedings for that purpose shall be pending before or threatened by the SEC;

- no order, injunction or decree issued by any governmental authority of competent jurisdiction or other legal restraint or prohibition preventing consummation of the Distribution shall be in effect, and no other event outside the control of Meta shall have occurred or failed to occur that prevents the consummation of the Distribution; and
- no other events or developments shall have occurred prior to the Distribution Date that, in the judgment of the board of directors of Meta, would result in the Spin-Off having a material adverse effect on Meta or its stockholders.

**Reasons for Furnishing this Prospectus**

We are furnishing this Prospectus solely to provide information to Series A Preferred Stockholders who will receive shares of our Common Stock in the Distribution. You should not construe this Prospectus as an inducement or encouragement to buy, hold or sell any of our securities or any securities of Meta. We believe that the information contained in this Prospectus is accurate as of the date set forth on the cover. Changes to the information contained in this Prospectus may occur after that date, and neither we nor Meta undertakes any obligation to update the information except in the normal course of our and Meta's public disclosure obligations and practices and except as required by applicable law.

Table of Contents

## MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS

### Certain U.S. Federal Income Tax Consequences of the Spin-Off

The following is a summary of the material U.S. federal income tax consequences of our separation from Meta, and in particular the distribution by Meta of our Common Stock to the holders of the shares of Series A Preferred Stock (the "Series A Preferred Stockholders") and the cancellation of all shares of the Series A Preferred Stock. For purposes of this section under the heading "Certain U.S. Federal Income Tax Consequences of the Spin-Off": (i) any references to the "Spin-Off" shall mean only the distribution of shares of our Common Stock by Meta to Series A Preferred Stockholders and the cancellation of all shares of the Series A Preferred Stock, taken together; (ii) references to "Company," "we," "our" and "us" mean only Next Bridge Hydrocarbons, Inc. and not its subsidiaries or other lower-tier entities, except as otherwise indicated; and (iii) references to Meta refer to Meta Materials, Inc. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Code"), the regulations promulgated by the U.S. Treasury Department ("Treasury Regulations"), rulings and other administrative pronouncements issued by the Internal Revenue Service ("IRS"), and judicial decisions, all as currently in effect, and all of which are subject to differing interpretations or to change, possibly with retroactive effect. No assurance can be given that the IRS would not assert, or that a court would not sustain, a position contrary to any of the tax consequences described below. We have not sought and do not intend to seek an advance ruling from the IRS regarding any matter discussed herein. The summary is also based upon the assumption that Meta, the Company and their respective subsidiaries and affiliated entities will operate in accordance with their applicable organizational documents or partnership agreements and the agreements and other documents applicable to our separation from Meta. This summary is for general information purposes only, does not address all possible tax considerations that may be material to an investor and does not constitute legal or tax advice. Moreover, this summary does not purport to discuss all aspects of U.S. federal income taxation that may be important to a particular investor in light of its investment or tax circumstances, or to investors subject to special tax rules, such as:

- financial institutions;
- insurance companies;
- broker-dealers;
- regulated investment companies and real estate investment trusts;
- partnerships and trusts;
- persons who hold our stock on behalf of another person as a nominee;
- persons who receive our stock through the exercise of employee stock options or otherwise as compensation;
- persons holding our stock as part of a "straddle," "hedge," "conversion transaction," "synthetic security" or other integrated investment;
- tax-exempt organizations;

and, except to the extent discussed below:

- foreign investors.

This summary assumes that investors hold their Series A Preferred Stock as a capital asset and will hold their Common Stock as a capital asset, which generally means as property held for investment.

For purposes of this discussion under the heading "Certain U.S. Federal Income Tax Consequences of the Spin-Off," a U.S. holder is a Series A Preferred Stockholder that is for U.S. federal income tax purposes:

- a citizen or resident of the United States,

Table of Contents

- a corporation (including an entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any of its states, or the District of Columbia,
- an estate, whose income is subject to U.S. federal income taxation regardless of its source, or
- a trust if (1) a U.S. court is able to exercise primary supervision over the administration of such trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) it has a valid election to be treated as a U.S. person.

A "non-U.S. holder" is a Series A Preferred Stockholder that is not a U.S. holder and is not an entity treated as a partnership for U.S. federal income tax purposes. If a partnership, entity or arrangement treated as a partnership for U.S. federal income tax purposes holds Series A Preferred Stock, the U.S. federal income tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. An investor that is a partnership and the partners in such partnership should consult their tax advisors about the U.S. federal income tax consequences of the Spin-Off.

THE U.S. FEDERAL INCOME TAX TREATMENT OF THE SPIN-OFF TO STOCKHOLDERS OF META DEPENDS IN SOME INSTANCES ON DETERMINATIONS OF FACT AND INTERPRETATIONS OF COMPLEX PROVISIONS OF U.S. FEDERAL INCOME TAX LAW FOR WHICH NO CLEAR PRECEDENT OR AUTHORITY MAY BE AVAILABLE. IN ADDITION, THE TAX CONSEQUENCES OF THE SPIN-OFF TO ANY PARTICULAR STOCKHOLDER OF META WILL DEPEND ON THE STOCKHOLDER'S PARTICULAR TAX CIRCUMSTANCES. YOU ARE URGED TO CONSULT YOUR TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES TO YOU OF THE SPIN-OFF IN LIGHT OF YOUR PARTICULAR INVESTMENT OR TAX CIRCUMSTANCES.

***Tax Classification of the Spin-Off in General***

For U.S. federal income tax purposes, the Spin-Off will not be eligible for treatment as a tax-deferred distribution by Meta with respect to its stock. Accordingly, the Spin-Off will generally be treated as a fully taxable transaction. The discussion below describes the U.S. federal income tax consequences to a U.S. holder and a non-U.S. holder upon the receipt of our Common Stock in the Spin-Off.

Although Meta will ascribe a value to the Common Stock distributed in the Spin-Off, this valuation is not binding on the IRS or any other taxing authority. These taxing authorities could ascribe a higher valuation to the distributed Common Stock, particularly if, following the Spin-Off, those shares of Common Stock trade at prices significantly above the value ascribed to those shares by Meta. Such a higher valuation may affect the Spin-Off distribution amount and thus the U.S. federal income tax consequences of the Spin-Off to Meta's Series A Preferred stockholders. Fractional shares of Common Stock will not be distributed.

Meta will be required to recognize any gain, but will not be permitted to recognize any loss, with respect to the Common Stock that it distributes in the Spin-Off equal to the fair market value of the Common Stock in excess of Meta's adjusted tax basis in the Common Stock.

***Tax Basis and Holding Period of Company Shares Received by Holders of Meta Stock***

A Series A Preferred stockholder's tax basis in shares of our Common Stock received in the Spin-Off generally will equal the fair market value of such shares on the date of the Spin-Off, and the holding period for such shares will begin the day after the date of the Spin-Off.

***Tax Treatment of the Spin-Off to U.S. Holders***

The following discussion describes the U.S. federal income tax consequences to a U.S. holder of Meta stock upon the receipt of our Common Stock in the Spin-Off.

Table of Contents

The treatment of the Spin-Off for U.S. federal income tax purposes for a U.S. holder will depend on whether the Spin-Off qualifies as a sale of the Series A Preferred Stock under Section 302 of the Code. If the Spin-Off qualifies as a sale of the Series A Preferred Stock, a U.S. holder will recognize gain or loss as described below under "—Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock" below. If the Spin-Off does not qualify as a sale of the Series A Preferred Stock, a U.S. holder will be treated as receiving a corporate distribution subject to tax as described below under "—Taxation of the Spin-Off Treated as a Distribution." Whether a distribution qualifies for sale treatment will depend largely on the total number of shares of Meta stock treated as held by a U.S. holder (including any shares constructively owned by a U.S. holder) relative to all of the Meta stock outstanding both before and after the Spin-Off. The Spin-Off generally will be treated as a sale of Series A Preferred Stock (rather than as a corporate distribution) if the Spin-Off: (i) results in a "complete termination" of a U.S. holder's interest in Meta, (ii) is "not essentially equivalent to a dividend" with respect to such U.S. holder or (iii) is a "substantially disproportionate redemption" with respect to such U.S. holder. These tests are explained more fully below.

In determining whether any of the foregoing tests are satisfied, a U.S. holder must take into account not only shares of Meta stock actually owned by such U.S. holder, but also shares of Meta stock that are constructively owned by such U.S. holder. A U.S. holder may constructively own, in addition to shares owned directly, shares owned by certain related individuals and entities in which such U.S. holder has an interest or that have an interest in such U.S. holder, as well as any shares such U.S. holder has a right to acquire by exercise of an option. There will be a complete termination of a U.S. holder's interest if either (i) all of the shares of Meta stock actually and constructively owned by such U.S. holder are exchanged or (ii) all of the shares of Meta stock actually owned by such U.S. holder are exchanged and such U.S. holder is eligible to waive, and does waive, the attribution of shares owned by certain family members and such U.S. holder does not constructively own any other shares. The Spin-Off of Series A Preferred Stock will not be essentially equivalent to a dividend if the Spin-Off results in a "meaningful reduction" of a U.S. holder's proportionate interest in Meta. Whether the Spin-Off will result in a meaningful reduction in a U.S. holder's proportionate interest in Meta will depend on the particular facts and circumstances. However, the IRS has indicated in a published ruling that even a small reduction in the proportionate interest of a small minority stockholder in a publicly held corporation who exercises no control over its corporate affairs may constitute such a "meaningful reduction." In order to meet the "substantially disproportionate" test, the percentage of outstanding shares of Meta voting stock actually and constructively owned by a U.S. holder immediately following the Spin-Off must, among other requirements, be less than 80% of the percentage of the outstanding shares of Meta voting stock actually and constructively owned by such U.S. holder immediately before the Spin-Off. Because the Class A Preferred Stock is not voting stock, it is not expected that the "substantially disproportionate" test will be satisfied in respect of the Spin-Off. U.S. holders are urged to consult with their tax advisors as to the tax consequences of the Spin-Off.

If none of the foregoing tests are satisfied, then the Spin-Off will be treated as a corporate distribution and the tax effects will be as described under "—Taxation of the Spin-Off Treated as a Distribution," below.

Meta currently intends to report the Spin-Off as a corporate distribution (including a determination of the portion of the distribution pursuant to the Spin-Off constituting a taxable dividend, assuming that the Spin-Off is treated as a corporate distribution) on IRS Form 1099-DIV after its earnings and profits for the taxable year in which the distribution occurs are calculated. This information may not be available until after U.S. holders file their U.S. federal and state income tax returns for that taxable year, and such U.S. holders may need to file amended tax returns to reflect the amount of the taxable dividend as finally determined. Meta reporting the Spin-Off as a corporate distribution will not preclude a U.S. holder from treating the Spin-Off as a sale of Series A Preferred Stock, if one of the tests described above is satisfied.

*Taxation of the Spin-Off Treated as a Distribution*

If the Spin-Off of a U.S. holder's Series A Preferred Stock does not qualify as a sale of Series A Preferred Stock, such U.S. holder will be treated as receiving a distribution from Meta. A U.S. holder generally will be required to

Table of Contents

include in gross income as dividends the amount received in connection with the Spin-Off to the extent the distribution is paid out of Meta's current or accumulated earnings and profits (as determined under U.S. federal income tax principles). Distributions in excess of such current and accumulated earnings and profits generally will be treated as a return of capital that will be applied against and reduce a U.S. holder's adjusted tax basis in such U.S. holder's shares of Series A Preferred Stock (but not below zero), with any remaining excess treated as gain from the sale or exchange of such shares as described below under "—Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock."

If a U.S. holder is a corporate U.S. holder, dividends paid by Meta to such U.S. holder generally will be eligible for the dividends-received deduction allowed to domestic corporations in respect of dividends received from other domestic corporations so long as such U.S. holder satisfies the holding period requirement for the dividends-received deduction.

If a U.S. holder is a non-corporate U.S. holder, under tax laws currently in effect, dividends generally will be taxed at the preferential applicable long-term capital gains rate so long as such U.S. holder satisfies the holding period requirement (i.e., more than sixty (60) days of ownership, without protection from the risk of loss, during the 121-day period that begins sixty (60) days before the ex-dividend date) and certain other requirements are met (see "—Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock" below).

*Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock*

If the Spin-Off qualifies as a sale of Series A Preferred Stock, such U.S. holder generally will recognize capital gain or loss in an amount equal to the difference between (i) the fair market value of our Common Stock received by such U.S. holder in the Spin-Off and (ii) such U.S. holder's adjusted tax basis in the Series A Preferred Stock surrendered in the Spin-Off.

Any such capital gain or loss generally will be long-term capital gain or loss if a U.S. holder's holding period for the Series A Preferred Stock so disposed of exceeds one (1) year. Long-term capital gains recognized by non-corporate U.S. holders generally will be eligible for taxation at reduced rates. The deductibility of capital losses is subject to limitations.

***Tax Treatment of the Spin-Off to Non-U.S. Holders***

For non-U.S. holders of Series A Preferred Stock, the characterization for U.S. federal income tax purposes of the Spin-Off of such non-U.S. holder's Series A Preferred Stock generally will correspond to the U.S. federal income tax characterization of the Spin-Off of a U.S. holder's Series A Preferred Stock, as described above under "Treatment of the Spin-Off for U.S. Holders" with respect to whether the Spin-Off is a sale or exchange of Series A Preferred Stock or is treated as a distribution.

Non-U.S. holders are urged to consult their own tax advisors as to whether the Spin-Off will be treated as a distribution, or as a sale or exchange, under the Code.

*Taxation of the Spin-Off Treated as a Distribution*

If the Spin-Off of a non-U.S. holder's Series A Preferred Stock does not qualify as a sale or exchange of Series A Preferred Stock, such non-U.S. holder will be treated as receiving a distribution from Meta, which distribution will be treated as a dividend to the extent the distribution is paid out of Meta's current or accumulated earnings and profits (as determined under U.S. federal income tax principles). The gross amount of such dividends will be subject to a withholding tax at a rate of 30% unless a non-U.S. holder is eligible for a reduced rate of withholding under an applicable income tax treaty and provides proper certification of such non-U.S. holder's eligibility for such reduced rate. Dividends that are effectively connected with the conduct by a non-U.S. holder of a trade or

Table of Contents

business in the United States (and are attributable to a U.S. permanent establishment if an applicable treaty so requires) generally will be subject to U.S. federal income tax at the same regular U.S. federal income tax rates applicable to a comparable U.S. holder and, if such non-U.S. holder is a corporation for U.S. federal income tax purposes, may also be subject to an additional branch profits tax at a 30% rate or a lower rate under an applicable tax treaty.

Distributions in excess of current and accumulated earnings and profits generally will be treated as a return of capital that will be applied against and reduce a non-U.S. holder's adjusted tax basis in such non-U.S. holder's shares of Series A Preferred Stock (but not below zero), with any remaining excess treated as gain from the sale or exchange of such shares as described under "—Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock" below.

*Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock*

Subject to the discussions of backup withholding and FATCA withholding below, if the Spin-Off of a non-U.S. holder's shares of Series A Preferred Stock qualifies as a sale or exchange of such shares, such non-U.S. holder generally will not be subject to U.S. federal income tax on any gain recognized on such Spin-Off unless:

- such gain is effectively connected with the conduct by such non-U.S. holder of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment or fixed base that such non-U.S. holder maintains in the United States), in which case such non-U.S. holder generally will be subject to U.S. federal income tax on such gain at the same regular U.S. federal income tax rates applicable to a comparable U.S. holder and, if such non-U.S. holder is a corporation for U.S. federal income tax purposes, also may be subject to an additional branch profits tax at a 30% rate or a lower rate provided by an applicable tax treaty;
- such non-U.S. holder is an individual who is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met, in which case such non-U.S. holder will be subject to a 30% tax on such non-U.S. holder's net capital gain for the year (or lower rate provided by an applicable tax treaty); or
- Meta is or has been a "U.S. real property holding corporation" for U.S. federal income tax purposes at any time during the shorter of the five (5) year period ending on the date of the Spin-Off or the period during which such non-U.S. holder held Series A Preferred Stock, and, in the case where shares of the Series A Preferred Stock are traded on an established securities market, such non-U.S. holder has owned, directly or constructively, more than 5% of the Series A Preferred Stock at any time within the shorter of the five (5) year period or such non-U.S. holder's holding period for the Series A Preferred Stock. Meta does not believe that it is or has been a U.S. real property holding corporation.

Because it may not be certain at the time a non-U.S. holder's Series A Preferred Stock is exchanged whether the Spin-Off will be treated as a sale or exchange or as a distribution, and because such determination will depend in part on such non-U.S. holder's particular circumstances, the applicable withholding agent may not be able to determine whether (or to what extent) such non-U.S. holder is treated as receiving a dividend for U.S. federal income tax purposes. Therefore, the applicable withholding agent may withhold tax at a rate of 30% (or such lower rate as may be specified by an applicable income tax treaty) on the gross amount of any consideration paid to a non-U.S. holder in exchange for such non-U.S. holder's Series A Preferred Stock, unless (i) the applicable withholding agent has established special procedures allowing non-U.S. holders to certify that they are exempt from such withholding tax and (ii) such non-U.S. holder is able to certify that such non-U.S. holder meets the requirements of such exemption (e.g., because such non-U.S. holder is not treated as receiving a dividend under the Section 302 tests described above). However, there can be no assurance that any applicable withholding agent will establish such special certification procedures. Thus, the applicable withholding agent may withhold some portion of our Common Stock otherwise distributable to a non-U.S. holder to satisfy its obligation to withhold tax, except to the extent it estimates that the amount of the proceeds from the Spin-Off will exceed Meta's

current and accumulated earnings and profits. To the extent it is required to withhold tax, the applicable withholding agent may sell the portion of our Common Stock otherwise distributable to non-U.S. holders needed to pay that tax, together with associated expenses. If an applicable withholding agent withholds excess amounts from the amount payable to a non-U.S. holder, such non-U.S. holder generally may obtain a refund of any such excess amounts by timely filing an appropriate claim for refund with the IRS. Non-U.S. holders should consult their own tax advisors regarding the application of the foregoing rules in light of such non-U.S. holder's particular facts and circumstances and any applicable procedures or certification requirements.

### *Tax Considerations to U.S. Holders in Respect of Ownership and Disposition of Our Common Stock*

*Dividends*. Any dividends paid by the Company out of its current or accumulated earnings and profits (as determined for U.S. federal income tax purposes) generally will be taxable to a U.S. holder as ordinary dividend income. Corporate U.S. holders should generally be eligible for the dividends received deduction and non-corporate U.S. holders should generally qualify for reduced rates applicable to qualified dividend income, assuming, in each case, that a minimum holding period and certain other generally applicable requirements are satisfied. Dividends in excess of current and accumulated earnings and profits will be treated as a non-taxable return of capital to the extent of the U.S. holder's basis in our Common Stock and thereafter as capital gain. U.S. holders should consult their own tax advisors with respect to the appropriate U.S. federal income tax treatment of any dividend received from the Company. Dividends received by a non-corporate U.S. holder may be subject to a 3.8% Medicare tax on net investment income.

*Sales or Other Dispositions of Our Common Stock*. A U.S. holder will recognize capital gain or loss on the sale or other disposition of our Common Stock in an amount equal to the difference between the U.S. holder's adjusted tax basis in our Common Stock and the amount realized from the disposition. Any gain or loss on a sale or other disposition of our Common Stock generally will be long-term capital gain or loss if the holder has held our Common Stock for more than one year. Deductions for capital losses are subject to limitations. Any gain recognized by a non-corporate U.S. holder may be subject to a 3.8% Medicare tax on net investment income.

### *Tax Considerations to Non-U.S. Holders in Respect of Ownership and Disposition of Our Common Stock*

*Dividends*. Any dividends paid on our Common Stock that are characterized as dividends paid to a non-U.S. holder generally will be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be provided by an applicable income tax treaty. To receive the benefit of a reduced treaty rate, a non-U.S. holder must furnish to the Company or its paying agent a valid IRS Form W-8 (or applicable successor form) certifying such holder's qualification for the reduced rate. This certification must be provided to the Company or its paying agent prior to the payment of dividends and must be updated periodically. If a non-U.S. holder who qualifies for a reduced treaty rate but does not timely provide the Company or the payment agent with the required certification, such non-U.S. holder may be entitled to a credit against their U.S. federal income tax liability or a refund of the tax withheld, which the non-U.S. holder may claim by filing the appropriate claim for refund with the IRS.

Dividends that are treated as "effectively connected" with a trade or business conducted by a non-U.S. holder within the United States (and, if an applicable income tax treaty so provides, are also attributable to a U.S. permanent establishment of such non-U.S. holder) are not subject to withholding tax, provided the non-U.S. holder satisfies certain certification and disclosure requirements. Instead, such dividends, net of specified deductions and credits, are taxed at the same graduated U.S. federal income tax rates applicable to U.S. persons. To the extent a dividend is effectively connected with a U.S. trade or business, non-corporate non-U.S. holders may be eligible for taxation at reduced U.S. federal income tax rates applicable to qualified dividend income. Any such effectively connected dividends received by a non-U.S. holder that is a corporation may, under certain circumstances, be subject to an additional branch profits tax at a 30% rate or such lower rate as specified by an applicable income tax treaty.

*Sales or Other Dispositions of Our Common Stock*. Subject to the discussions under "Information Reporting and Backup Withholding" and "FATCA," below, a non-U.S. holder will generally not be subject to any U.S. federal income tax or withholding tax on any gain realized upon such holder's sale or other disposition of our Common Stock. Gain on the sale of our Common Stock may be subject to U.S. net income tax (and in respect of corporate non-U.S. holders, branch profits tax) if the gain is effectively connected with a trade or business of the non-U.S. holder in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment or fixed base of the non-U.S. holder within the United States). Additionally, a non-U.S. holder that is an individual who is present in the United States for 183 days or more in the taxable year of the disposition and meets certain other requirements will be subject to a flat 30% tax on the amount of gain derived from the sale that, together with certain other U.S. source capital gains realized during such year exceed certain U.S. source capital losses realized during such year.

*FATCA*. Pursuant to the Foreign Account Tax Compliance Act, or FATCA, foreign financial institutions (which include most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and any other investment vehicles) and certain other foreign entities must comply with registration and information reporting rules with respect to their U.S. account holders and investors or be subject to a withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party). A foreign financial institution or other foreign entity that does not comply with the FATCA registration and reporting requirements will generally be subject to a 30% withholding tax on "withholdable payments." For this purpose, withholdable payments generally include U.S.-source payments (including U.S.-source dividends), and (subject to the proposed Treasury Regulations discussed below) the gross proceeds from a sale of equity or debt instruments of issuers who are considered U.S. issuers under the FATCA rules. The FATCA withholding tax applies even if the payment would otherwise not be subject to U.S. nonresident withholding tax (e.g., because it is capital gain). While withholding under FATCA would also have applied to payments of gross proceeds from the sale or other disposition of stock on or after January 1, 2019, proposed Treasury Regulations which, if finalized in their present form, would eliminate FATCA withholding on payments of gross proceeds of a disposition of Series A Preferred Stock or our Common Stock entirely. Taxpayers may generally rely on these proposed Treasury Regulations until final Treasury Regulations are issued. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. We will not pay additional amounts in respect of amounts withheld. Investors should consult their tax advisors regarding possible implications of FATCA.

*Information Reporting and Backup Withholding*. In general, information reporting requirements may apply to dividends, sales proceeds or other amounts paid to U.S. holders and non-U.S. holders, unless an exemption applies. Backup withholding tax may apply to amounts subject to reporting if the holder fails to provide an accurate taxpayer identification number or fails to report all interest and dividends required to be shown on its U.S. federal income tax returns. A U.S. holder or non-U.S. holder can claim a credit against its U.S. federal income tax liability for the amount of any backup withholding tax and a refund of any overpayment of taxes, provided that all required information is timely provided to the IRS. U.S. holders and non-U.S. holders should consult their tax advisors as to their qualification for exemption from backup withholding and the procedure for establishing an exemption.

**THE DISCUSSION ABOVE IS A GENERAL SUMMARY. IT DOES NOT COVER ALL TAX MATTERS THAT MAY BE OF IMPORTANCE TO A PARTICULAR STOCKHOLDER. EACH STOCKHOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR ABOUT THE TAX CONSEQUENCES TO IT OF THE SPIN-OFF IN LIGHT OF THE STOCKHOLDER'S OWN CIRCUMSTANCES.**

Table of Contents

## USE OF PROCEEDS

We will not receive any proceeds from the Distribution of the Common Stock in the Spin-Off and any expenses incurred in connection with the Distribution shall be borne by us.

## DETERMINATION OF OFFERING PRICE

Currently, there is no public trading market for our Common Stock and no consideration will be paid for the shares of Common Stock distributed in the Spin-Off.

## CAPITALIZATION

The following table sets forth our cash and capitalization as of March 31, 2022 on (i) an actual basis; and (ii) on a pro forma basis to give effect to the Distribution, assuming tender and acceptance of all of the outstanding shares of Series A Preferred Stock. The following table should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical consolidated financial statements and the notes thereto included elsewhere in this Prospectus.

| | March 31, 2022 | |
|---|---|---|
| | Actual As Reported | Pro Forma Adjustments for Distribution |
| Cash and cash equivalents | $ 829,145 | $ 5,829,145 |
| Long-term debt | $ 15,496,000 | $ 20,846,000 |
| Stockholders' Equity | | |
| Common stock, $0.0001 par value; 500,000,000 shares authorized, 1 share issued and outstanding as reported; 165,523,363 shares issued and outstanding, pro forma as adjusted | — | — |
| Preferred stock, $0.0001 par value; 50,000,000 shares authorized, 0 shares issued and outstanding | | |
| Additional paid in capital | 100,864,388 | 100,864,388 |
| Accumulated deficit | (69,310,773) | (70,510,773) |
| Total stockholders' equity | 31,553,615 | 30,353,615 |
| Total capitalization | $ 47,818,465 | $ 52,818,465 |

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our audited and unaudited financial statements and related notes, respectively, beginning on page F-1 below of this Prospectus. Some of the information contained in this discussion and analysis constitutes forward-looking statements that involve risks and uncertainties. Actual results could differ materially from those discussed in these forward-looking statements. Factors that could cause or contribute to these differences include, but are not limited to, those discussed below and elsewhere in this Prospectus, particularly under the section titled "Cautionary Statement Concerning Forward-Looking Statements."*

### Overview

Next Bridge Hydrocarbons, Inc. (formerly known as OilCo Holdings, Inc.) was incorporated in the State of Nevada on August 31, 2021 and established a fiscal year end of December 31st.

In connection with the Arrangement, Meta and Torchlight contemplated a complete legal and structural separation of the Company from Meta. Meta will distribute all of its equity interest in us, consisting of all of the outstanding shares of our Common Stock, to the Series A Preferred Stockholders on a pro rata basis. Following the Spin-Off, Meta will not own any equity interest in us, and we will operate independently from Meta.

The Spin-Off is subject to the satisfaction, or the Meta board of directors' waiver, of a number of conditions. In addition, subject to the terms of the Arrangement Agreement, Meta has the right not to complete the Spin-Off if, at any time, the Meta Board determines, in its sole and absolute discretion, that the Spin-Off is not in the best interests of Meta or its stockholders or is otherwise not advisable.

Our consolidated financial statements have been prepared on a stand-alone basis and are derived from the consolidated financial statements and accounting records of Meta. Our consolidated financial statements reflect our financial position, results of operations and cash flows as we were historically managed, in conformity with GAAP. Our financial statements include certain assets and liabilities that have historically been held at the Meta corporate level but are specifically identifiable or otherwise attributable to us.

All intercompany transactions between us and Meta have been included in our financial statements. The intercompany transactions are reflected in our consolidated statements of cash flow as a financing activity and in our consolidated balance sheets as "Note Payable, Related Party."

The historical costs and expenses reflected in our financial statements include an allocation for certain corporate shared service functions historically provided by Meta including executive oversight, accounting, treasury, tax, legal, human resources, occupancy, procurement, information technology and other shared services. These expenses have been allocated to us on the basis of direct usage when identifiable, with the remainder allocated on a pro rata basis based on sales, headcount, tangible assets or other measures considered to be a reasonable reflection of the historical utilization levels of these services.

Our management believes the assumptions underlying our financial statements, including the assumptions regarding the allocation of general corporate expenses from Meta are reasonable. Nevertheless, our financial statements may not include all of the actual expenses that would have been incurred had we operated as a stand-alone company during the periods presented and may not reflect what our actual results of operations, financial position and cash flows would have been if we had operated as a stand-alone company during the periods presented. Actual costs that would have been incurred if we had operated as a stand-alone company would depend on multiple factors, including organizational structure and strategic decisions made in various areas, including information technology and infrastructure. Following the Spin-Off, we will perform these functions using our own resources or purchased services.

Table of Contents

***Income Taxes***

Judgment is required in determining the provision for income taxes and related accruals, deferred tax assets and liabilities. In the ordinary course of business, tax issues may arise where the ultimate outcome is uncertain. Additionally, our tax returns are subject to audit by various tax authorities. Consequently, changes in our estimates for contingent tax liabilities may materially impact our results of operations or financial position.

## BUSINESS

***General***

We are an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and natural gas project we hold in the Orogrande Basin in West Texas. We operate our business through our wholly owned subsidiaries, Torchlight Energy, Inc., Hudspeth Oil Corporation, Torchlight Hazel, LLC, and Hudspeth Operating, LLC.

Presently, our primary interests include the oil and natural gas leases for properties of the Orogrande basin in Hudspeth County, Texas (the "Orogrande Project"). In addition, we have minor interests in the Eastern edge of the Midland Basin in West Texas (the "Hazel Project") and two minor well interests in Oklahoma (the "Oklahoma Properties").

Rich Masterson, our consulting geologist, originated our Orogrande Project, as discussed below, based on his tenure as a geologist since 1974. He is credited with originating the Wolfbone shale play in the Southern Delaware Basin of West Texas and has prepared prospects totaling over 150,000 acres that have been leased, drilled and are currently being developed by Devon Energy Corp., Occidental Petroleum Corporation, Noble Energy, and Samson Oil & Gas Ltd., among others.

The Company has drilled 14 test wells in the Orogrande Project in the basin in order to stay in compliance with the continuous drilling clause under the University Lands D&D Unit Agreement, as well as, to test for potential shallow pay zones and deeper pay zones that may be present on structural plays. Development of the wells continued through the year ended December 31, 2021 to further capture and document the scientific base in support of demonstrating the production potential of the Orogrande Project properties.

We satisfied the 2021 drilling obligations in the Orogrande play and in satisfying our 2021 drilling obligations, we identified new potential pay zones not yet discovered in the Orogrande play. Development of the play began during the 2022 fiscal year.

In addition to the Orogrande Project, we also have an interest in our Hazel Project in Tom Green County and Sterling County, Texas. In August 2020, our subsidiaries entered into the Option Agreement with MHP, under which, in exchange for satisfying certain drilling obligations, MHP had the option to purchase the entire Hazel Project. The option to purchase the entire acreage block was extended to September 30, 2021 and at such time MHP determined not to exercise the purchase option; however, MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the well attributable to our interest until such time as it has recovered its reasonable costs and expenses for drilling, completing and operating the well. Operations continue under the Option Agreement until such time as the revenue from the project equates to the dollars spent by, and shall be reimbursed to, MHP. At such time, any acreage held by production and all wells will revert back to our subsidiary, Torchlight Hazel, LLC.

Our principal executive offices are located at 6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116. The telephone number of our principal executive offices is (817) 438-1937.

Table of Contents

***Key Business Attributes***

*Experienced People.* Upon completion of the Distribution, we will have six full-time employees and we expect to engage consultants for various roles as needed including high quality exploration and technical partners. We will build on the expertise and experiences of our management team and seek guidance from outside advisors as well as our Board.

*Project Focus.* We are focusing primarily on exploitation projects. We may pursue high risk exploration prospects which may appear less favored than low risk exploration. We will, however, consider these high risk-high reward exploration prospects in connection with exploitation opportunities in a project that would reduce the overall project economic risk. We will consider such high risk-high reward prospects on their individual merits.

*Lower Cost Structure.* We will attempt to maintain the lowest possible cost structure, enabling the greatest margins and providing opportunities for investment that would not be feasible for higher cost competitors.

*Limit Capital Risks.* Limited capital exposure is planned initially to add value to a project and determine its economic viability. Management has experience in successfully managing risks of projects, finance, and value.

***Business Processes***

We believe there are three principal business processes that we must follow to enable our operations to be profitable. Each major business process offers the opportunity for a distinct partner or alliance as we grow. These processes are:

- Investment Evaluation and Review;
- Operations and Field Activities; and
- Administrative and Finance Management.

*Investment Evaluation and Review.* This process is the key ingredient to our success. Recognition of quality investment opportunities is the fuel that drives our engine. Broadly, this process includes the following activities: prospect acquisition, regional and local geological and geophysical evaluations, data processing, economic analysis, lease acquisition and negotiations, permitting, and field supervision. We expect these evaluation processes to be managed by our management team. Expert or specific technical support will be outsourced as needed.

*Operations and Field Activities.* This process begins following management approval of an investment. Well site supervision, construction, drilling, logging, product marketing, and transportation are examples of some activities. We will prefer to be the operator where possible.

*Administrative and Finance Management.* This process coordinates our initial structuring and capitalization, general operations and accounting, reporting, audit, banking and cash management, regulatory agencies reporting and interaction, timely and accurate payment of royalties, taxes, leases rentals, vendor accounts and performance management that includes budgeting and maintenance of financial controls, and interface with legal counsel and tax and other financial and business advisors.

***Current Projects***

As of June 30, 2022, we had interests in three oil and natural gas projects: the Orogrande Project in Hudspeth County, Texas and the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas and the Oklahoma Properties. See the description under "Current Projects" below under Note 4, "Oil & Natural Gas Properties," of the financial statements included with this Prospectus for information and disclosure regarding these projects, which description is incorporated herein by reference.

Table of Contents

***Our Properties***

Our principal executive office is located at 6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116. We currently sublease this office space and believe that the condition and size of our offices are adequate for our current needs.

The Hazel and Orogrande Projects consist only of unevaluated properties in progress of development for future production.

| | Total Acres | | Developed Acres | | Undeveloped Acres | |
|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net |
| **Texas—** | | | | | | |
| Orogrande Project | 134,000 | 89,110 | — | — | 134,000 | 89,110 |
| Hazel Project | 645 | 516 | 645 | 516 | — | — |
| **Oklahoma—** | | | | | | |
| Viking | 640 | 192 | 640 | 192 | — | — |
| Total | 135,285 | 89,818 | 1,285 | 708 | 134,000 | 89,110 |

Investments to support our oil and natural gas properties during the years ended December 31, 2021 and 2020 were $14.7 million and $3.4 million, respectively.

| | Fiscal Year Ended December 31, | |
|---|---|---|
| | 2021 | 2020 |
| Property acquisition costs | $ — | $ — |
| Development costs | 14,664,463 | 3,472,281 |
| Exploratory costs | — | — |
| Totals | $ 14,664,463 | $ 3,472,281 |

Property development costs presented above exclude interest capitalized into the full cost pool of $141,048 in 2021 and $2,353,700 in 2020.

Table of Contents

The development costs for 2020 include work in the Orogrande and Hazel Projects in West Texas and for 2021 the development costs include work solely in the Orogrande Project. We made progress during 2021 to develop proved producing reserves in the Orogrande Project in the Permian Basin in West Texas. We incurred costs of $14.7 million in relation to certain drilling activity carried out to remain in compliance with all aspects of our lease obligations and to satisfy the continuous drilling clause under the agreement with University Lands, whereby we are obligated to satisfy certain minimum yearly requirements that may be exceeded if desired. No development costs were incurred in 2020 or 2021 for the Oklahoma Properties. The following table sets forth the developed acres and drilling activities on our oil and natural gas properties as of December 31, 2021 and 2020, respectively.

| | Cumulative Well Status at 12/31/2021 | | Developed 2021 | | Cumulative Well Status at 12/31/2020 | |
|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net |
| Development Wells: | | | | | | |
| Productive—Texas (Hazel) | 2.00 | 1.60 | 1.00 | 0.80 | 1.00 | 0.80 |
| Productive—Oklahoma | 2.00 | 0.40 | — | — | 2.00 | 0.40 |
| Test Wells—Orogrande | 14.00 | 9.08 | 5.00 | 3.39 | 9.00 | 5.69 |
| Test Wells—Hazel | 4.00 | 3.20 | (1.00) | (0.80) | 5.00 | 4.00 |
| Exploration Wells: | | | | | | |
| Productive | — | — | — | — | — | — |
| Dry | — | — | — | — | — | — |
| **Total Drilled Wells:** | 22.00 | 14.28 | 5.00 | 3.39 | 17.00 | 10.89 |
| Acquired Wells: | | | | | | |
| Productive—Texas | — | — | — | — | — | — |
| Productive—Oklahoma | — | — | — | — | — | — |
| **Total Wells:** | | | | | | |
| Productive—Texas | 2.00 | 1.60 | 1.00 | 0.80 | 1.00 | 0.80 |
| Productive—Oklahoma | 2.00 | 0.40 | — | — | 2.00 | 0.40 |
| Test Wells | 18.00 | 12.28 | 4.00 | 2.59 | 14.00 | 9.69 |
| Total | 22.00 | 14.28 | 5.00 | 3.39 | 17.00 | 10.89 |
| **Well Type:** | | | | | | |
| Oil | — | — | — | — | — | — |
| Gas | — | — | — | — | — | — |
| Combination—Oil and Gas | 4.00 | 2.00 | 1.00 | 0.80 | 3.00 | 1.20 |
| Test Wells | 18.00 | 12.28 | 4.00 | 2.59 | 14.00 | 9.69 |
| Total | 22.00 | 14.28 | 5.00 | 3.39 | 17.00 | 10.89 |

For the three months ended March 31, 2022 compared to the same period in 2021, investments were as follows:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2022 | 2021 |
| Property acquisition costs | $ — | $ — |
| Development costs | 1,084,285 | 487,256 |
| Exploratory costs | — | — |
| Totals | $ 1,084,285 | $ 442,694 |

We did not conduct any drilling activities on any of the properties during the three months ended March 31, 2022.

Table of Contents

*Oil and Natural Gas Reserves*

No reserve report was prepared for 2020. Other than the Producing Hazel Wells (defined below), the only producing properties owned by us were the Oklahoma Properties, which were marginally producing and were uneconomic for reserve calculation purposes. At the end of 2021 and 2020, reserves did not include any value for proved undeveloped properties.

We currently have proved reserves from two producing wells located on the Hazel Project, the Flying B Ranch #3H well and the Flying B Ranch #4H well (the "Producing Hazel Wells"). Production is from the Wolfcamp formation. At December 31, 2021, there were no proved nonproducing reserves related to these properties after giving effect to the obligation to reimburse drilling costs incurred by MHP. The properties of the Hazel Project and Orogrande Project are operated by Maverick Operating LLC.

The operating expenses reflect a substantial reduction from previous years as electric power is available and water is now disposed of on location after we drilled or converted a well to be used for saltwater disposal. Initial gross oil production reached 8,319 Bbl per month and 31,613 Bbl per month of water. It is anticipated that the well has an ultimate oil recovery of 154 MBbl. The Flying B Ranch #4H well had an initial production rate of 4,200 Bbl of oil and has an ultimate oil recovery of 192 MBbl.

As of December 31, 2021 and 2020, our proved nonproducing reserves related to the Producing Hazel Wells totaled 0 and 0 BOE, respectively, and 0 BOE for the three months ended March 31, 2022.

*Production, Price, and Production Cost History*

Oklahoma Properties

During the year ended December 31, 2021, we produced and sold 85 barrels of oil net to our interest at an average sale price of $55.00 per Bbl. We produced and sold 3,586 Mcf of gas net to our interest at an average sales price of $3.17 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $18.54 per BOE. Our depreciation, depletion, and amortization expense was $0 per BOE.

During the year ended December 31, 2020, we produced and sold 278 barrels of oil net to our interest at an average sale price of $16.13 per Bbl. We produced and sold 2,012 Mcf of gas net to our interest at an average sales price of $1.20 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $30.02 per BOE. Our depreciation, depletion, and amortization expense was $130.68 per BOE.

During the three months ended March 31, 2022, we produced and sold 15 Bbls net to our interest at an average sale price of $81.20 per Bbl. We produced and sold 288 Mcf of natural gas net to our interest at an average sales price of $4.66 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $220.58 per BOE. Our depreciation, depletion, and amortization expense was $0 per BOE.

Table of Contents

Hazel Project

During the year ended December 31, 2021, 23,422 barrels of oil net to our interest were sold at an average sale price of approximately $60.00 per Bbl, although we received none of this revenue because all of it, after deducting expenses to produce the oil, was either received by MHP directly during the time that the Option Agreement was in effect or credited towards the recoupment of drilling costs incurred by MHP. We produced and sold Nil Mcf of natural gas net to our interest.

| | December 31, 2021 Reserves | | | December 31, 2021 Future Net Revenue (M$) | |
|---|---|---|---|---|---|
| Category | Oil (Bbls) | Gas (Mcf) | Total (BOE) | Total | Present Value Discounted at 10% |
| Proved Producing | 152,000 | 0 | 152,000 | $4,317 | $ 2,897 |
| Proved Undeveloped | 0 | 0 | 0 | $ — | $ — |
| Total Proved | 152,000 | 0 | 152,000 | $4,317 | $ 2,897 |
| Standardized Measure of Future Net Cash Flows Related to Proved Oil and Gas Properties | | | | | $ — |
| Probable Undeveloped | 0 | 0 | 0 | $ — | $ — |

| | December 31, 2020 Reserves | | | December 31, 2020 Future Net Revenue (M$) | |
|---|---|---|---|---|---|
| Category | Oil (Bbls) | Gas (Mcf) | Total (BOE) | Total | Present Value Discounted at 10% |
| Proved Producing | 0 | 0 | 0 | $— | $ — |
| Proved Nonproducing | 0 | 0 | 0 | $— | $ — |
| Total Proved | 0 | 0 | 0 | $— | $ — |
| Standardized Measure of Future Net Cash Flows Related to Proved Oil and Gas Properties | | | | | $ — |
| Probable Undeveloped | | | | $— | $ — |

The increase in producing reserves from 2020 to 2021 from 0 to 152,000 BOE is related to the Producing Hazel Wells, which included a new well drilled in the Hazel Project as well as bringing a prior well in the Hazel Project back on line after it had been shut down in 2019. All of this activity was performed and paid for by MHP. Reserve values as of December 31, 2021 are related to the two Producing Hazel Wells.

Since we have no remaining reserve value as of December 31, 2021 after consideration of the obligation to pass revenue through to MHP under the terms of the Option Agreement, and there was no reserve value at December 31, 2020, Standardized Measure are not presented.

During the three months ended March 31, 2022, 2,929 barrels of oil net to our interest were sold at an average sale price of approximately $89.80 per Bbl, although we received none of this revenue because all of it, after deducting expenses to produce the oil, was credited towards the recoupment of drilling costs incurred by MHP. We produced and sold Nil Mcf of gas net to our interest.

Due to the inherent uncertainties and the limited nature of reservoir data, both proved and probable reserves are subject to change as additional information becomes available. The estimates of reserves, future cash flows, and present value are based on various assumptions, including those prescribed by the SEC, and are inherently imprecise.

Table of Contents

*Intent to Acquire Additional Interests*

Following the Spin-Off, we intend to make offers and enter into agreements with one or more of the other current working interest owners in the Orogrande Project (each an "Orogrande Owner" and collectively, the "Orogrande Owners"). We anticipate offering the Orogrande Owners shares of Common Stock in exchange for their respective working interest in the Orogrande Project. We intend to offer the number of shares of Common Stock necessary such that each participating Orogrande Owner would own the percentage of Common Stock then outstanding in proportion to the percentage owned in the working interest of the Orogrande Project. For illustration purposes, if an Orogrande Owner owns ten percent (10%) of the working interest of the Orogrande Project, and such Orogrande Owner elects to participate and accept out offer of shares of Common Stock, then such Orogrande Owner will be offered ten percent (10%) of the aggregate amount of outstanding shares of Common Stock. Our decision to enter into these transactions will depend on us and each Orogrande Owner to negotiate and enter into definitive agreements related to such transaction and our Board receiving an industry-standard fairness opinion from an investment banking firm. One of the Orogrande Owners is Wolfbone Investments LLC, an entity controlled by Gregory McCabe, who will own, directly and indirectly through entities he owns or controls, over 11% of the Common Stock following the Spin-Off.

***Industry and Business Environment***

We are experiencing a time of fluctuating, but higher oil prices caused by higher demand, lower U.S. supply, turmoil on the world stage and OPEC's policies on production. Unfortunately, this is the cyclical nature of the oil and natural gas industry. We experience highs and lows that seem to come in cycles. Fortunately, there exists plenty of demand for US onshore oil and natural gas. We believe advances in technology drive the US market and we feel this will drive the development costs down on our exploration and drilling programs while maintaining favorable economics.

***Competition***

The oil and natural gas industry is intensely competitive, and we will compete with numerous other companies engaged in the exploration and production of oil and natural gas. Some of these companies have substantially greater resources than we have. Not only do they explore for and produce oil and natural gas, but also many carry on midstream and refining operations and market petroleum and other products on a regional, national, or worldwide basis. The operations of other companies may be able to pay more for exploratory prospects and productive oil and natural gas properties. They may also have more resources to define, evaluate, bid for, and purchase a greater number of properties and prospects than our financial or human resources permit.

Our larger or integrated competitors may have the resources to be better able to absorb the burden of current and future federal, state, and local laws and regulations more easily than we can, which would adversely affect our competitive position. Our ability to locate reserves and acquire interests in properties in the future will be dependent upon our ability and resources to evaluate and select suitable properties and consummate transactions in this highly competitive environment. In addition, we may be at a disadvantage in producing oil and natural gas properties and bidding for exploratory prospects because we have fewer financial and human resources than other companies in our industry. Should a larger and better financed company decide to directly compete with us, and be successful in its efforts, our business could be adversely affected.

***Marketing and Customers***

The market for oil and natural gas that we will produce depends on factors beyond our control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, demand for oil and natural gas, the marketing of competitive fuels, and the effects of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial, and individual consumers.

Table of Contents

Our oil production is expected to be sold at prices tied to the spot oil markets. Our natural gas production is expected to be sold under short-term contracts and priced based on first of the month index prices or on daily spot market prices. We will rely on our operating partners to market and sell our production.

***Governmental Regulation and Environmental Matters***

Our operations are subject to various rules, regulations, and limitations impacting the oil and natural gas exploration and production industry as a whole.

*Regulation of Oil and Natural Gas Production*

Our oil and natural gas exploration, production, and related operations, when developed, will be subject to extensive rules and regulations promulgated by federal, state, tribal, and local authorities and agencies. Certain states may also have statutes or regulations addressing conservation matters, including provisions for the unitization or pooling of oil and natural gas properties, the establishment of maximum rates of production from wells, and the regulation of spacing, plugging, and abandonment of such wells. We contract with Maverick Operating LLC who operates our oil and natural gas properties and is primarily responsible for compliance with applicable environmental regulatory with respect to the operating activities of our oil and natural gas properties. We cover all costs associated with the related insurance coverage for such environmental regulatory compliance. Failure to comply with any such rules and regulations can result in substantial penalties. The regulatory burden on the oil and natural gas industry will most likely increase our cost of doing business and may affect our profitability. Although we believe we are currently in substantial compliance with all applicable laws and regulations, because such rules and regulations are frequently amended or reinterpreted, we are unable to predict the future cost or impact of complying with such laws. Significant expenditures may be required to comply with governmental laws and regulations and may have a material adverse effect on our financial condition and results of operations.

*Environmental Matters*

Our operations and properties are and will be subject to extensive and changing federal, state, and local laws and regulations relating to environmental protection, including the generation, storage, handling, emission, transportation, and discharge of materials into the environment, and relating to safety and health. In the future, environmental legislation and regulation may trend toward stricter standards. These laws and regulations may, for example:

- require the acquisition of a permit or other authorization before construction or drilling commences and for certain other activities;
- limit or prohibit construction, drilling, and other activities on certain lands lying within wilderness and other protected areas;
- impose substantial liabilities for pollution resulting from operations; or
- restrict certain areas from fracking and other stimulation techniques.

The permits required for our operations may be subject to revocation, modification, and renewal by issuing authorities. Governmental authorities have the power to enforce their regulations, and violations are subject to fines or injunctions, or both. In the opinion of management, we are and will be in substantial compliance with current applicable environmental laws and regulations and have no material commitments for capital expenditures to comply with existing environmental requirements. Nevertheless, changes in existing environmental laws and regulations or in interpretations thereof could have a significant impact on our company, as well as the oil and natural gas industry in general.

The Comprehensive Environmental, Response, Compensation, and Liability Act ("CERCLA") and comparable state statutes impose strict, joint, and several liability on owners and operators of sites and on persons who

Table of Contents

disposed of or arranged for the disposal of "hazardous substances" found at such sites. It is not uncommon for the neighboring landowners and other third parties to file claims for personal injury and property damage allegedly caused by hazardous substances released into the environment. The Federal Resource Conservation and Recovery Act ("RCRA") and comparable state statutes govern the disposal of "solid waste" and "hazardous waste" and authorize the imposition of substantial fines and penalties for noncompliance. Although CERCLA currently excludes petroleum from its definition of "hazardous substance," state laws affecting our operations may impose clean-up liability relating to petroleum and petroleum related products. In addition, although RCRA classifies certain oil field wastes as "non-hazardous," such exploration and production wastes could be reclassified as hazardous wastes thereby making such wastes subject to more stringent handling and disposal requirements.

The Endangered Species Act ("ESA") seeks to ensure that activities do not jeopardize endangered or threatened animal, fish, and plant species, nor destroy or modify the critical habitat of such species. Under the ESA, exploration and production operations, as well as actions by federal agencies, may not significantly impair or jeopardize protected species or habitat. The ESA provides for criminal and civil penalties for violations. Other statutes that provide protection to animal and plant species and that may apply to our operations include, but are not necessarily limited to, the Fish and Wildlife Coordination Act, the Fishery Conservation and Management Act, the Migratory Bird Treaty Act and the National Historic Preservation Act. Although we believe that our operations are and will be in substantial compliance with such statutes, any change in these statutes or any reclassification of a species as endangered could subject us to significant expenses to modify our operations or could force us to discontinue certain operations altogether.

Hydraulic fracturing is regulated by state and federal environmental and oil and gas regulatory authorities, including specifically the requirement to disclose certain information related to hydraulic fracturing operations. Operators must follow applicable legal requirements for groundwater protection and are subject to supervision by state and federal regulators (including the Bureau of Land Management on federal acreage). Furthermore, well construction practices require the installation of multiple layers of protective steel casing surrounded by cement that are specifically designed and installed to protect freshwater aquifers by preventing the migration of fracturing fluids into aquifers. Regulatory proposals in some states and local communities have been initiated to require or make more stringent the permitting and compliance requirements for hydraulic fracturing operations. Federal and state agencies have continued to assess the impacts of hydraulic fracturing, which could spur further action toward federal and/or state legislation and regulation of hydraulic fracturing activities. In addition, in light of concerns about seismic activity being triggered by the injection of produced waters into underground wells and hydraulic fracturing, certain regulators are also considering additional requirements related to seismic safety for hydraulic fracturing activities. Further restrictions on hydraulic fracturing could make it prohibitive to conduct our operations, and also reduce the amount of oil and natural gas that we or our operators are ultimately able to produce from our properties.

*Climate Change*

Significant studies and research have been devoted to climate change and global warming, and climate change has developed into a major political issue in the United States and globally. Certain research suggests that greenhouse gas emissions contribute to climate change and pose a threat to the environment. Recent scientific research and political debate has focused in part on carbon dioxide and methane incidental to oil and natural gas exploration and production. Many states and the federal government have enacted legislation directed at controlling greenhouse gas emissions, and future legislation and regulation could impose additional restrictions or requirements in connection with our drilling and production activities and favor use of alternative energy sources, which could affect operating costs and demand for oil products. As such, our business could be materially adversely affected by domestic and international legislation targeted at controlling climate change.

Table of Contents

## RESULTS OF OPERATIONS

***Historical Results for the Years Ended December 31, 2021 and 2020***

For the year ended December 31, 2021, we had a net loss of $8,238,809 compared to a net loss of $5,749,006 for the year ended December 31, 2020. The difference is primarily due to an increased general and administrative expenses for the year ended December 31, 2021, offset by an impairment loss and a loss on sale of oil and gas property for the year ended December 31, 2020. At December 31, 2021, we had current assets of $2,229,762 and total assets of $47,918,232. As of December 31, 2021, we had current liabilities of $15,537,215. Stockholders' equity was $32,359,080 at December 31, 2021.

***Revenue and Gross Profit***

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2020** | **2021** | **Change** | **%** |
| Product sales | $ 6,906 | $ 15,904 | $ 8,998 | 130.3% |
| Total Revenue | 6,906 | 15,904 | 8,998 | 130.3% |
| Cost of goods sold | 87,486 | 76,331 | (11,155) | (12.7)% |
| Gross Profit (Loss) | (80,580) | (60,427) | (20,153) | 25.0% |
| Gross Profit (Loss) percentage | (1,166.8)% | (379.9)% | 223.97% | |

*Production Revenues and Cost of Revenue*

For the year ended December 31, 2021, we had production revenue of $15,904 compared to $6,906 of production revenue for the year ended December 31, 2020. Refer to the table of production and revenue included below. Our cost of revenue, consisting of lease operating expenses and production taxes, was $76,331 for the year ended December 31, 2021 compared with $87,486 for the year ended December 31, 2020.

Table of Contents

The change in revenue was primarily impacted by the increase in production from the Oklahoma Properties, suspension of production from the Flying B #3 Well in the Hazel Project in May 2019 and the sale of our Warwink Project in November 2020. Production and Revenue are detailed as follows:

| Property | Quarter | Oil Production {BBLS} | Gas Production {MCF} | Oil Revenue | Gas Revenue | Total Revenue |
|---|---|---|---|---|---|---|
| Oklahoma | Q1 - 2021 | 28 | 711 | $ 1,166 | $ 1,305 | $ 2,471 |
| Hazel (TX) | Q1 - 2021 | 0 | 0 | — | — | — |
| **Total Q1-2021** | | 28 | 711 | $ 1,166 | $ 1,305 | $ 2,471 |
| Oklahoma | Q2 - 2021 | 28 | 1,212 | $ 1,692 | $ 1,814 | 3,506 |
| Hazel (TX) | Q2 - 2021 | 0 | 0 | — | — | — |
| **Total Q2-2021** | | 28 | 1,212 | $ 1,692 | $ 1,814 | $ 3,506 |
| **Oklahoma** | Q3 - 2021 | 29 | 441 | $ 1,818 | $ 1,146 | $ 2,964 |
| **Hazel (TX)** | Q3 - 2021 | 0 | 0 | — | — | $ — |
| **Total Q3-2021** | | 29 | 441 | $ 1,818 | $ 1,146 | $ 2,964 |
| **Oklahoma** | Q4 - 2021 | 0 | 1,222 | $ — | $ 6,963 | $ 6,963 |
| **Hazel (TX)** | Q4 - 2021 | 0 | 0 | $ — | $ — | $ — |
| **Total Q4-2021** | | 0 | 1,222 | $ — | $ 6,963 | $ 6,963 |
| **2021 Year To Date** | | 85 | 3,586 | $ 4,676 | $11,228 | $ 15,904 |
| Oklahoma | Q1 - 2020 | 181 | 468 | $ 583 | $ 1,000 | $ 1,583 |
| Hazel (TX) | Q1 - 2020 | 0 | 0 | $ — | $ — | $ — |
| MECO (TX) | Q1 - 2020 | 1,863 | 1,559 | $ 81,530 | $ 1,507 | $ 83,037 |
| **Total Q1-2020** | | 2,044 | 2,027 | $ 82,113 | $ 2,507 | $ 84,620 |
| Oklahoma | Q2 - 2020 | 28 | 448 | $ 774 | $ 156 | $ 930 |
| Hazel (TX) | Q2 - 2020 | 0 | 0 | $ — | $ — | $ — |
| MECO (TX) | Q2 - 2020 | 1,389 | 747 | $ 44,223 | $ 324 | $ 44,547 |
| **Total Q2-2020** | | 1,417 | 1,195 | $ 44,997 | $ 480 | $ 45,477 |
| Oklahoma | Q3 - 2020 | 69 | 1,096 | $ 2,084 | $ 494 | $ 2,578 |
| Hazel (TX) | Q3 - 2020 | 0 | 0 | $ — | $ — | $ — |
| MECO (TX) | Q3 - 2020 | 1,480 | 680 | $ 57,774 | $ 1,370 | $ 59,144 |
| **Total Q3-2020** | | 1,549 | 1,776 | $ 59,858 | $ 1,864 | $ 61,722 |
| Oklahoma | Q4 - 2020 | 0 | 0 | $ 1,042 | $ 773 | $ 1,815 |
| Hazel (TX) | Q4 - 2020 | 0 | 0 | $ — | $ — | $ — |
| MECO (TX) | Q4 - 2020 | 435 | 0 | $ 9,837 | $ 5,519 | $ 15,356 |
| MECO (Sold ) | YTD ADJ | 0 | 0 | $ (10,092) | $ (5,519) | $ (15,611) |
| **Total Q4-2020** | | 435 | 0 | $ 787 | $ 773 | $ 1,560 |
| **Exclude MECO** | Sold 11/20 | -5,167 | -2,986 | $(183,272) | $ (3,201) | $(186,473) |
| Total 2020 | | 278 | 2,012 | $ 4,483 | $ 2,423 | $ 6,906 |

Table of Contents

***Expenses for the Years Ended December 31, 2021 and 2022***

We recorded depreciation, depletion and amortization expense of $4,642 for the year ended December 31, 2021 compared to $820,814 for the year ended December 31, 2020. Impairment expense recognized was $2,108,301 in 2020 with none for the year ended December 31, 2021.

*Operating Expenses*

| | Year Ended December 31, 2021 | 2020 | Change | % |
|---|---|---|---|---|
| Operating Expenses | | | | |
| General & Administrative | $8,050,443 | $2,557,975 | $5,472,468 | 214.7% |
| Total operating expenses | $8,050,443 | $2,557,975 | $2,557,975 | 214.7% |

General and Administrative Expenses

Our general and administrative expense for the year ended December 31, 2021 was $8,050,443 compared with $2,557,975 for the year ended December 31, 2020. Our general and administrative expenses consisted of consulting and compensation expense, substantially all of which were non-cash or deferred, accounting and administrative costs, professional consulting fees, and other general corporate expenses. The change in general and administrative expenses in 2021, compared to 2020, is primarily due to employee bonus compensation and expenses related to the Arrangement Agreement including consulting fees, filing fees, legal fees, director and officer liability insurance, and investor relations expenses.

***Historical Results for the Three Months Ended March 31, 2022 and 2021***

For the three months ended March 31, 2022, we had a net loss of $1,123,257 compared to a net loss of $1,066,547 for the three months ended March 31, 2021. The difference is primarily due to decreased general and administrative expenses for the three months ended March 31, 2022 offset with an increase in interest expense. At March 31, 2022, we had current assets of $1,045,710 and total assets of $47,818,465. As of March 31, 2022, we had current liabilities of $16,242,913. Stockholders' equity was $31,553,615 at March 31, 2022.

| | Three Months Ended March 31, 2022 | 2021 | Change | % |
|---|---|---|---|---|
| Product sales | $ — | $ 2,471 | $ (2,471) | 100% |
| Total Revenue | — | 2,471 | (2,471) | 100% |
| Cost of goods sold | 10,621 | 109,927 | (99,306) | 90.3% |
| Gross Profit | $(10,621) | $(107,456) | $ 96,835 | 90.1% |
| Gross Profit percentage | -0-% | (4,348.7)% | 3,918.9% | |

For the three months ended March 31, 2022, we had production revenue of $-0- compared to $2,471 of production revenue for the three months ended March 31, 2021. Our cost of revenue, consisting of lease operating expenses and production taxes, was $10,621 for the three months ended March 31, 2022 compared with $109,927 for the three months ended March 31, 2021. The change in revenue was impacted by a decrease in production from the Oklahoma Properties.

Table of Contents

***Expenses for the three months ended March 31, 2022 and 2021***

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2022 | 2021 | Change | % |
| Operating Expenses | | | | |
| General & Administrative | $825,737 | $1,034,593 | $(208,856) | 20.1% |
| Total operating expenses | $825,737 | $1,034,593 | $(208,856) | 20.1% |

The change in general & administrative expenses during the three months ended March 31, 2022, compared to the same period in 2021 is related to reductions in directors fees, consulting services and investor relations expenses.

As described in "Our Properties—Intent to Acquired Additional Interests" one of the Orogrande Owners, an entity we intend to make an offer to acquire its working interest in the Orogrande Project, is Wolfshore Investments LLC, which is an affiliate of Gregory McCabe, who is also an affiliate of the Company.

**Changes in Internal Control over Financial Reporting**

There were no changes during the quarter ended March 31, 2022 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**LIQUIDITY AND CAPITAL RESOURCES**

Liquidity risk is the risk that we will not meet its financial obligations as they become due after use of currently available cash. We have a planning and budgeting process to monitor operating cash requirements, including amounts projected for capital expenditures, which are adjusted as input variables change. These variables include, but are not limited to, our ability to generate revenue from operations, general and administrative requirements and the availability of equity or debt capital. As these variables change, we may be required to issue equity or obtain debt financing.

At December 31, 2021, we had cash and cash equivalents of $1,989,419 compared to $130,504 as of December 31, 2020.

Cash from operating activities for the for the year ended December 31, 2021, was $(7,050,541) compared to $(3,300,589) for the year ended December 31, 2020.

Cash used in operating activities for the year ended December 31, 2021 can be attributed principally to net loss from operations of $8,029,919 adjusted for $4,642 in depreciation, depletion and amortization expense, a decrease in accrued liabilities, and an increase in accounts payable.

Cash used in operating activities during 2020 can be attributed principally to net loss from operations of $5,749,006 adjusted for $820,814 in depreciation, depletion and amortization expense, and $2,108,301 in impairment expense.

Cash used in investing activities for the year ended December 31, 2021 and for year ended December 31, 2020 was $14,805,511 compared to $2,271,968. Cash used in investing activities consisted primarily of investments in oil and natural gas properties in 2021 and proceeds from the sale of property in 2020.

Cash from financing activities for the year ended December 31, 2021 and for year ended December 31, 2020 was $23,714,967 compared to $1,128,451 for the year ended December 31, 2020. Cash from financing activities consisted primarily of contributions from, and a note payable to, Meta.

Table of Contents

At March 31, 2022, we had cash and cash equivalents of $829,145 compared to $12,909,306 as of December 31, 2021.

Cash flows from operating activities for the three months ended March 31, 2022 was $(2,893,781) compared to $(2,635,887) for the three months ended March 31, 2021, a decrease of $257,894. Cash flows from operating activities for the three months ended March 31, 2022 can be primarily attributed to net loss from operations equal and a decrease in accounts payable.

Cash flows from operating activities for the three months ended March 31, 2021 can be primarily attributed to net loss from operations of $1,066,547 and a decrease in accounts payable and accrued expenses.

Reference the Consolidated Statements of Cash Flows included in the financial statements for additional detail of the components that comprise the net use of cash in operations. We expect to continue to use cash flow in operating activities until such time as we achieve sufficient commercial oil and gas production to cover all of our operating costs.

Cash flows from investing activities for the three months ended March 31, 2022 was $(1,084,285) compared to $(487,256) for the three months ended March 31, 2021. Cash flows from investing activities principally consists of investment in oil and natural gas properties in Texas.

Cash flows from financing activities for the three months ended March 31, 2022 was $2,817,792 as compared to $15,901,945 for the three months ended March 31, 2021.

Cash flows from financing activities consists of intercompany loans from Meta for the period ended March 31. 2022. For the three months ended March 31, 2021, cash flows from financing activities also consisted of intercompany contributions from Meta. We expect to continue to have cash flow provided by financing activities as we seek new rounds of financing and continue to develop our oil and natural gas investments.

On October 1, 2021, we issued a secured, revolving promissory note in an original principal amount of up to $15 million in favor of Meta (the "2021 Note"). The 2021 Note bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. While the revolving commitment under the 2021 Note expires on 2021 Note Maturity Date, as of the date hereof, the full $15 million available under the 2021 Note has been fully drawn.

The 2021 Note is secured by a security interest in (a) pursuant to a Stock Pledge Agreement dated as of September 30, 2021 between Gregory McCabe (the "Pledgor") and Meta (the "Stock Pledge Agreement"), 1,515,000 shares of common stock of Meta that are owned directly and beneficially by the Pledgor, and (b) pursuant to a Deed of Trust, Mortgage, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production dated as of September 30, 2021 made by Wolfbone Investments, LLC (an affiliate of the Pledgor) for the benefit of Meta (the "Security Agreement"), a 25% working interest beneficially owned by the Pledgor in the Orogrande Prospect as defined in the Security Agreement.

The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2021 Note.

Upon the occurrence and during the continuance of an event of default under the 2021 Note, Meta as the lender may declare all outstanding principal and accrued and unpaid interest under the 2021 Note immediately due and

Table of Contents

payable, may terminate any remaining commitment to make advances under the 2021 Note, and may exercise the other rights and remedies provided for under the 2021 Note and related security documents. The events of default under the 2021 Note include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants, an event of default under the Stock Pledge Agreement or the Security Agreement, bankruptcy and insolvency events with respect us or our subsidiaries, cross defaults with certain of our other material indebtedness, and material judgments against us.

We intend to enter into an unsecured Loan Agreement with Meta as the lender (the "Loan Agreement"). On June 28, 2022, we borrowed $2.34 million as an unsecured term loan, the proceeds of which are available for our working capital and general corporate purposes. Assuming the Loan Agreement is finalized, the $2.34 million loan will be subject to such Loan Agreement and it is anticipated that we may elect to borrow, subject to satisfying the conditions to borrowing under the Loan Agreement, additional term loans up to, but not exceeding, $2.66 million, for an aggregate principal amount of $5.0 million. The commitments under the Loan Agreement would expire on December 31, 2022. The loans would then become due and payable on March 31, 2023 (the "Maturity Date"), unless extended as described below. Loans under the Loan Agreement will bear interest at a fixed rate of 8% per annum if no event of default exists, and at a fixed rate of 12% per annum if an event of default exists. Under the Loan Agreement, if we raise $30 million or more in capital through debt or equity or a combination thereof by the Maturity Date, the Maturity Date will be extended to September 30, 2023 and the 2021 Note plus the loan under the Loan Agreement would be amortized in six equal monthly installments.

We have the right to prepay the loans under the Loan Agreement in whole or in part at any time without penalty. Amounts repaid or prepaid may not be reborrowed. It is anticipated that we will be required to prepay the loans upon an asset disposition (other than permitted asset sales), certain equity issuances (other than permitted equity), debt issuances (other than permitted debt), and certain extraordinary receipts. We also will be required to prepay the loans from our annual excess cash flow, if any.

The Loan Agreement will include customary representations and covenants that, subject to certain exceptions and qualifications, restrict our ability to do certain things, such as: incur additional indebtedness; incur liens; engage in mergers, acquisitions, and asset sales; make loans and investments; declare dividends or redeem or repurchase equity interests; transact with affiliates on a non-arm's length basis; and enter into certain restrictive agreements. In addition, the Loan Agreement will contain customary affirmative covenants, including covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our existence and material properties, customary visitation rights, reporting requirements, and compliance with applicable laws and regulations.

Upon the occurrence and during the continuance of an event of default, Meta as the lender will have the right to declare all outstanding principal and accrued and unpaid interest under the Loan Agreement immediately due and payable and exercise certain other rights and remedies. It is expected that the events of default under the Loan Agreement will include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants or representations and warranties, a change in control or a material adverse change to be defined in the Loan Agreement, material judgments and attachments, cross defaults with certain other material indebtedness, and bankruptcy and insolvency events with respect to the Company and our subsidiaries.

We will require additional debt or equity financing to meet our plans and needs. We may face obstacles in continuing to attract new financing due to industry conditions and our history and current record of net losses. Despite our efforts, we can provide no assurance that we will be able to obtain the financing required to meet our stated objectives or even to continue as a going concern.

We do not expect to pay cash dividends on our Common Stock in the foreseeable future.

**Critical Accounting Estimates**

***Oil and natural gas properties***—The Company uses the full cost method of accounting for exploration and development activities as defined by the SEC. Under this method of accounting, the costs of unsuccessful, as

Table of Contents

well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities. Gain or loss on the sale or other disposition of oil and gas properties is not recognized, unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least annually and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions.

Gains and losses on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

***Depreciation, depletion, and amortization***—The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

***Ceiling test***—Future production volumes from oil and gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and gas properties. If the net capitalized cost of proved oil and gas properties, net of related deferred income taxes, plus the cost of unproved oil and gas properties, exceeds the present value of estimated future net cash flows discounted at 10 percent, net of related tax affects, plus the cost of unproved oil and gas properties, the excess is charged to expense and reflected as additional accumulated DD&A. The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

***Asset retirement obligations***—The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is

Table of Contents

accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

***Recent Accounting Pronouncements***

Our audited financial statements and the accompanying notes thereto found elsewhere in this Prospectus contain a description of recent accounting pronouncements.

**Legal Proceedings**

On January 31, 2020, Meta's predecessor Torchlight Energy Resources, Inc. and its wholly owned subsidiaries Torchlight Energy, Inc. and Torchlight Energy Operating, LLC were served with a lawsuit brought by Goldstone Holding Company, LLC (*Goldstone Holding Company, LLC v. Torchlight Energy, Inc., et al.*, in the 160th Judicial District Court of Dallas County, Texas). On February 24, 2020, Torchlight Energy Resources, Inc., Torchlight Energy, Inc., and Torchlight Energy Operating, LLC timely filed their answer, affirmative defenses, and requests for disclosure. The suit, which sought monetary relief over $1.0 million, made unspecified allegations of misrepresentations involving a November 2015 participation agreement and a 2016 amendment to the participation agreement. Torchlight denied the allegations and asserted several affirmative defenses including but not limited to, that the suit is barred by the applicable statute of limitations, that the claims had been released, and that the claims were barred because of contractual disclaimers between sophisticated parties. Torchlight also asserted counterclaims for attorney fees. On January 14, 2021, Goldstone Holding Company, LLC dismissed its claims without prejudice, leaving Torchlight's counterclaims for attorney fees as the only pending claim in the case. On February 26, 2021, Torchlight filed a non-suit without prejudice on its counterclaims for attorney fees, leaving no claims in the case. The court signed a final order disposing of the entire case on March 5, 2021. However, Goldstone Holding Company, LLC asked the court to re-instate its claims, and a hearing was held on April 13, 2021. On June 16, 2021, the court signed an order denying the motion to reinstate Goldstone Holding Company's, LLC's claims, and the case is closed.

On April 30, 2020, the Company's wholly owned subsidiary, Hudspeth Oil Corporation ("Hudspeth"), filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies ("Cordax"). The suit, Hudspeth and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies, was filed in the 189th Judicial District Court of Harris County, Texas. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Working interest owner Wolfbone Investments, LLC, a company owned by Meta's former Chairman Gregory McCabe, is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. Meta has added the manufacturer of one of the tool components that we contend was one of the causes of the tool failure. It was recently disclosed that Cordax is the subsidiary of a Canadian parent company, Cordax who has also been added to the case. The parties are currently engaged in preliminary discovery and are scheduling mediation.

On March 18, 2021, Cordax filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500.01 and recover related attorney's fees. The foreclosure action, *Datalog LWT Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc.*, was filed in the 205th Judicial District Court of Hudspeth County, Texas. We are contesting the lien in good faith and filed

Table of Contents

a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final disposition of the related case currently pending in Harris County, Texas.

On January 3, 2022, a putative securities class action lawsuit was filed in the U.S. District Court for the Eastern District of New York captioned *Maltagliati v. Meta Materials Inc., et al.*, No. 1:21-cv-07203, against Meta, Meta's former Chief Executive Officer, and Meta's former Chief Financial Officer, Torchlight's former Chairman of the Board of Directors, and Torchlight's former Chief Executive Officer. On January 26, 2022, a similar putative securities class action lawsuit was filed in the U.S. District Court for the Eastern District of New York captioned *McMillan v. Meta Materials Inc., et al.*, No. 1:22-cv-00463. The McMillan complaint names the same defendants and asserts the same claims on behalf of the same purported class as the Maltagliati complaint. The complaints, purportedly brought on behalf of all purchasers of our publicly traded securities from September 21, 2020 through and including December 14, 2021, assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") arising primarily from a short-seller report and statements related to our business combination with Torchlight. The complaints seek unspecified compensatory damages and reasonable costs and expenses, including attorneys' fees. On April 11, 2022, the Court held a hearing on motions to consolidate the two actions and to appoint a lead plaintiff or lead plaintiffs, but has not yet ruled on the motions. In regards to any loss incurred by us in connection with this matter, we will be entitled to seek recovery from Meta pursuant to the indemnification provisions set forth under the Distribution Agreement.

On January 14, 2022, a shareholder derivative action was filed in the U.S. District Court for the Eastern District of New York captioned *Hines v. Palikaras, et al.*, No. 1:22-cv-00248. The complaint names as defendants certain of Meta's current officers and directors, certain former Torchlight officers and directors, and us (as nominal defendant). The complaint, purportedly brought on behalf of Meta, asserts claims under Section 14(a) of the Exchange Act, contribution claims under Sections 10(b) and 21D of the Exchange Act, and various state law claims such as breach of fiduciary duties and unjust enrichment. The complaint seeks, among other things, unspecified compensatory damages in favor of Meta, certain corporate governance related actions, and an award of costs and expenses to the derivative plaintiff, including attorneys' fees. On March 9, 2022, the Court entered a stipulated order staying this action until there is a ruling on a motion to dismiss in the Securities Class Action. In regards to any loss incurred by us in connection with this matter, we will be entitled to seek recovery from Meta pursuant to the indemnification provisions set forth under the Distribution Agreement.

Table of Contents

## MANAGEMENT

### Executive Officers and Non-Employee Directors Following the Spin-Off

The following sets forth information regarding individuals who are currently expected to serve as executive officers and non-employee directors after the Spin-Off, including their positions.

| Name | Age | Position |
|---|---|---|
| ***Executive Officers*** | | |
| Clifton DuBose, Jr. | 40 | Chief Executive Officer, Chairman of the Board of Directors |
| Joseph DeWoody | 40 | President, Director |
| Lucas T. Hawkins | 36 | Chief Financial Officer |
| Delvina Oelkers | 36 | Chief Operating Officer |
| ***Key Employees*** | | |
| Kyle Bradford | 42 | Executive Vice President, Drilling & Construction |
| Daren Rader | 38 | Executive Vice President, Completions & Production |
| ***Non-Employee Directors*** | | |
| Robert Lance Cook | 65 | Director |
| Mia Pitts | 38 | Director |
| Kristin Whitley | 38 | Director |

***Executive Officers***

**Clifton DuBose, Jr.** has successfully acquired, managed, and/or sold thousands of royalty acres and non-operated working interests in the Permian Basin. Since April 2018, Mr. DuBose has served as co-founder and member of Valor Mineral Management LLC ("Valor"). Valor is a mineral and working interest management firm which uses a proprietary software platform it has developed, known as "mineral.tech." Mr. DuBose is also an attorney, licensed to practice law in the State of Texas. He earned his law degree from Georgetown Law, in Washington D.C.in 2009 and a BS in Agribusiness from Abilene Christian University in 2004.

**Joseph DeWoody** has served as the founder and partner of several successful minerals-rights companies, including Clear Fork Royalty, since April 2010, and Valor since May 2018,. Mr. DeWoody implemented strategic initiatives at Valor, managing 80,000 oil and gas interests in over 2,000,000 gross acres across 32 States, with strong revenue growth since inception developing full P&L, strategy, and business operations. He also developed Valor's proprietary mineral and working interest management software, known as "mineral.tech." Mr. DeWoody has also structured and participated in multiple complex transactions in both operated and non-operated assets. He has managed reporting to partners, including quarterly compilations, annual audit, and contractual calculations and payments. Mr. DeWoody was the 2021 D CEO Energy Services and Technology Executive of the Year and is a life member of American Mensa. He received his BBA and MBA from Baylor University, where he played football. He was appointed to the Texas Board of Professional Geoscientists, and he serves as director of the National Association of Royalty Owners—Texas. He was named one of Oil and Gas Investor Magazine's "Top 20 Under 40" and was featured in the Dallas Business Journal's "Who's Who in Energy."

**Lucas T. Hawkins** is the Co-Founder and has served as Chief Financial Officer of Mammoth Exploration LLC, a private equity backed upstream oil and gas company, since June 2016. Since July 2013, Mr. Hawkins has served as VP—Business Development of Hawkins Exploration, Inc. ("HEI"). HEI is an independently owned oil and gas exploration company focused on the Permian Basin. Mr. Hawkins led, managed and executed numerous acquisitions and subsequent development of oil and gas properties across the Permian Basin. From 2010 to 2011, Mr. Hawkins served as an Associate with The Sterling Group, a middle market private equity group focusing on industrial, manufacturing and distribution businesses. From 2011 to 2013 Mr. Hawkins served as an Associate with Natural Gas Partners, an energy private equity firm. Mr. Hawkins has a background in energy investment banking and private equity and earned his BBA in Finance and Business Honors from the University of Texas at Austin.

Table of Contents

**Delvina Oelkers served as Asset Manager from March 2016 to March 2019 at Eclipse Resources and as Completions Manager from March 2019 to November 2020at Montage Resources, in each position where she managed engineering teams, achieving cost and efficiency improvements while implementing innovative technology for substantial reserve recovery. She led her operations team through several successful M&A transactions. Ms. Oelkers designed completions for the Eclipse and Montage Resources Super Lateral Program, including the design and execution of the first world-record-setting "Purple Hayes 1H" Well. As an Asset Manager at Eclipse Resources, Ms. Delvina was responsible for leading the multidisciplinary team to prove-up the asset. By utilizing innovative technologies in design, the first exploratory well produced 35% higher than type curve.**

*Key Employees*

**Kyle Bradford** served in the roles of Director, from February 2019 to November 2020 and VP of Drilling and Completions January 2014 to February 2019 for Eclipse Resources and Montage Resources. He led the drilling and operational teams through the development of the super-lateral program highlighted by the drilling and completion of the world record setting "Purple Hayes 1H". He has a proven track record of implementing technological advancements to reduce costs and increasing operational efficiencies. He previously worked at Chesapeake Energy holding various positions including Senior Operations Engineer Utica Business Unit from April 2012 to January 2014, and Asset Manager of the Appalachian North Business Unit from October 2010 to April 2012. His career started in May 2002 at CNX Gas. He holds a Bachelor of Science in Petroleum Engineering from Marietta College.

**Daren Rader** has 16 years of experience across the MidCon and Appalachian Basins as an engineer and operations leader. From March 2016 to November 2020, Mr. Rader served as a Senior Operations Manager for Montage Resources, and from February 2017 to February 2019, served as an Operations Manager for Blue Ridge Mountain Resources. He was instrumental in creating synergy amongst the field teams through multiple mergers and acquisition transactions. Mr. Rader is highly experienced both in prolific unconventional condensate and natural gas production and completion operations. Mr. Rader has a proven track record as a team leader with a focus on optimizing and streamlining field operations to reduce cost and minimize cycle times.

*Non-Employee Directors*

**Robert Lance Cook** spent 36 years at Shell Oil with final positions of Vice President of Wells Technology and Chief Scientist. Mr. Cook has extensive experience in Deepwater, Arctic, and Unconventional Research & Development and Operations. Mr. Cook is the founder and CEO of Enventure Global Technology, a joint venture between Shell and Halliburton. Mr. Cook has served as the COO of Sirius Well Manufacturing, a joint venture between Shell and CNPC and is a technologist with an extensive patent portfolio

**Mia Pitts** is currently serving as Senior Counsel at Marsh McLennan Companies (February 2018-current) and previously was a litigator and regulatory compliance lawyer at Freshfields Bruckhaus Deringer (March 2010-March 2016), one of the world's largest and oldest law firms. Ms. Pitts has represented corporate and individual clients in internal, regulatory, civil, and criminal investigations before the U.S. Security and Exchange Commission, Department of Justice, and state attorney generals as well as in shareholder securities litigation, class action litigations, and other private civil allegations and suits. She has also represented independent corporate oversight authorities appointed by the federal government, including the DOJ-appointed monitor of a global financial institution and the federal court-appointed receiver of a multi-national firm in an SEC securities fraud matter. Ms. Pitts graduated from Georgetown University Law Center and Barnard College of Columbia University.

**Kristin Whitley, CPA**, began her career in June 2006 as a public accounting with Whitley Penn where she worked for 10 years. While at Whitley Penn she served a variety of clients within the energy and mining industries. Mrs. Whitley joined Vista Minerals, a leading in-basin regional provider of sand to industrial, oil and gas companies, in August 2016 in the role of Chief Accounting Officer and less than a year later was named

Table of Contents

Chief Financial Officer. While at Vista Minerals, Mrs. Whitley has managed the finance and accounting, human resources, and information technology functions, participating in numerous capital raises, strategic initiatives, contract negotiations, and risk management exercises. Mrs. Whitley is a Certified Public Accountant in the State of Texas. She graduated from The University of Texas at Austin with her BBA and from Texas Christian University's Neeley School of Business with her MBA. In 2019, Mrs. Whitley was named one of *Oil and Gas Investor's* Forty Under 40 in Energy.

**Conflicts of Interest**

Nevada law permits corporations to adopt provisions renouncing any interest or expectancy in certain opportunities that are presented to the corporation or its directors, officers or stockholders. Our Amended and Restated Articles of Incorporation, to the maximum extent permitted from time to time by Nevada law, renounce any interest or expectancy that we have in, or right to be offered an opportunity to participate in, specified business opportunities that are from time to time presented to our directors, officers or stockholders or their respective affiliates. Our Amended and Restated Articles of Incorporation provide that, to the fullest extent permitted by law neither any director or officer nor his or her affiliates will have any duty to refrain from (i) engaging in a corporate opportunity in the same or similar lines of business in which we or our affiliates now engage or propose to engage or (ii) otherwise competing with us or our affiliates. In addition, to the fullest extent permitted by law, in the event that any director or officer acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity for such director or officer or such person's affiliates or for us or our affiliates, such person will have no duty to communicate or offer such transaction or business opportunity to us or any of our affiliates and they may take any such opportunity for themselves or offer it to another person or entity. We do not believe, however, that any fiduciary duties or contractual obligations of our directors or officers arising in the future would materially undermine our ability to operate our business. Our Amended and Restated Articles of Incorporation do not renounce our interest in any business opportunity that is expressly offered to a director or officer solely in his or her capacity as a director or officer of the Company. To the fullest extent permitted by law, no business opportunity will be deemed to be a potential corporate opportunity for us unless we would be permitted to undertake the opportunity under our Amended and Restated Articles of Incorporation, we have sufficient financial resources to undertake the opportunity and the opportunity would be in line with our business.

**Director Independence**

It is anticipated that a majority of the members of our Board, other than any of our employees that serve as directors, will meet the criteria for independence as defined by the corporate governance guidelines to be adopted by our Board.

**Corporate Governance Guidelines**

Prior to the completion of the Spin-Off, we will adopt written corporate governance guidelines that serve as a flexible framework within which our Board and its committees operate. These guidelines will cover a number of areas including the size and composition of the board, board membership criteria and director qualifications, director responsibilities, board agenda, roles of the chairman of the board and Chief Executive Officer, meetings of independent directors, committee responsibilities and assignments, board member access to management and independent advisors, director communications with third parties, director compensation, director orientation and continuing education, evaluation of senior management and management succession planning.

**Code of Business Conduct and Ethics**

Prior to the completion of the Spin-Off, we will adopt a written code of ethics that is designed to deter wrongdoing and to promote, among other things:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

Table of Contents

- the protection of the confidentiality of our non-public information;
- the responsible use of and control over our assets and resources;
- full, fair, accurate, timely and understandable disclosure in reports and documents that we file with the SEC and other regulators and in our other public communications;
- compliance with applicable laws, rules and regulations; and
- accountability for adherence to the code and prompt internal reporting of any possible violation of the code.

**Committees of Our Board**

We plan to establish an audit committee, a compensation committee, a nominating and governance committee and an ESG committee, each of which will operate under a written charter. Until such committees are established, matters otherwise addressed by such committees will be acted upon by the whole board. following is a brief description of our contemplated committees.

***Audit Committee***

We plan to establish an audit committee. The functions of the Audit Committee will include:

- oversee the quality and integrity of our financial statements, accounting practices and financial information we provide to the SEC or the public;
- review our annual and interim financial statements, the report of our independent registered public accounting firm on our annual financial statements, Management's Report on Internal Control over Financial Reporting and the disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations;
- select and appoint an independent registered public accounting firm;
- pre-approve all services to be provided to us by our independent registered public accounting firm;
- review related party transactions;
- review with our independent registered public accounting firm and our management the accounting firm's significant findings and recommendations upon the completion of the annual financial audit and quarterly reviews;
- review and evaluate the qualification, performance, fees and independence of our registered public accounting firm;
- meet with our independent registered public accounting firm and our management regarding our internal controls, critical accounting policies and practices and other matters;
- discuss with our independent registered public accounting firm and our management earnings releases prior to their issuance;
- oversee our internal audit function; and
- oversee our compliance program, response to regulatory actions involving financial, accounting and internal control matters, internal controls and risk management policies.

The Audit Committee will consist entirely of independent directors, each of whom will meet the independence requirements set forth in the listing standards of, Rule 10A-3 under the Exchange Act and our Audit Committee Charter. Each member of the Audit Committee will be financially literate, and at least one member of the Audit Committee will have accounting and related financial management expertise and satisfy the criteria to be an

Table of Contents

"audit committee financial expert" under the rules and regulations of the SEC, as those qualifications are interpreted by our Board in its business judgment. The initial members of the Audit Committee will be determined prior to or immediately after the Spin-Off.

***Compensation Committee***

We plan to establish a compensation committee. The functions of our Compensation Committee will include:

- setting and reviewing our general policy regarding executive compensation;
- determining the compensation of our Chief Executive Officer and other executive officers;
- approving employment agreements for our Chief Executive Officer and other executive officers;
- reviewing the benefits provided to our Chief Executive Officer and other executive officers;
- overseeing our overall compensation structure, practices and benefits plans;
- administering our executive bonus and equity-based incentive plans; and
- assessing the independence of compensation consultants, legal counsel and other advisors to the Compensation Committee and hiring, approving the fees and overseeing the work of, and terminating the services of such advisors.

The Compensation Committee will consist entirely of independent directors. The members of the Compensation Committee will be "non-employee directors" (within the meaning of Rule 16b-3 under the Exchange Act). The initial members of the Compensation Committee will be determined prior to or immediately after the Spin-Off.

***Corporate Governance and Nominating Committee***

We plan to establish a corporate governance and nominating committee. The functions of our Corporate Governance and Nominating Committee will include:

- overseeing our corporate governance practices;
- reviewing and recommending to our Board amendments to our committee charters and other corporate governance guidelines;
- reviewing and making recommendations to our Board regarding the structure of our various board committees;
- identifying, reviewing and recommending to our Board individuals for election to the Board;
- adopting and reviewing policies regarding the consideration of board candidates proposed by stockholders and other criteria for Board membership; and
- overseeing our Board's annual self-evaluation.

The Corporate Governance and Nominating Committee will consist entirely of independent directors. The initial members of the Corporate Governance and Nominating Committee will be determined prior to or immediately after the Spin-Off.

***ESG Committee***

We plan to establish an ESG committee. The functions of our ESG Committee will include:

- provide oversight with respect to ESG matters;
- advise and assist the Board with its responsibilities for the oversight of ESG matters; and

Table of Contents

- provide oversight with respect to the our annual sustainability report, which we plan to make available through our website.

**Board Leadership Structure and Role in Risk Oversight**

Our Board is primarily responsible for overseeing our risk management processes on behalf of our Company. The Board will receive and review periodic reports from management, auditors, legal counsel, and others, as considered appropriate regarding our company's assessment of risks. The Board of focuses on the most significant risks facing our company and the Company's general risk management strategy, and also ensures that risks undertaken by the Company are consistent with the Board's appetite for risk. While the Board oversees risk management, management is responsible for day-to-day risk management processes. We believe this division of responsibilities is the most effective approach for addressing the risks facing the Company and that our board leadership structure supports this approach.

**Related Party Transactions**

The Board will adopt a written policy regarding the approval of related party transactions. At regularly scheduled audit committee meetings, management will recommend any related party transactions that are contemplated, and such transactions will require the audit committee's approval. Generally, a "related party" is each of our executive officers, directors, nominees for director, any stockholder owning greater than five percent of our outstanding shares, including any immediate family member of each of the foregoing, and any entity owned or controlled by any of the foregoing. Transactions that are available to all of our employees generally or totaling less than $5,000 when aggregated with all similar transactions are excluded from the policy.

**Legal Proceedings**

None of our current directors and executive officers has been involved in legal proceedings that would be material to an evaluation of our management team.

**Director Compensation**

We are currently in the process of developing the details regarding the compensation packages of the directors who will comprise our Board. This is an ongoing process and we will include the relevant disclosure in subsequent amendments to this Prospectus. We anticipate that only those directors who are considered independent directors will receive compensation from us for their service on our Board.

We did not pay any compensation or grant any equity or other incentive awards to any of our directors who are not employed by us or any of our subsidiaries during the fiscal year ended December 31, 2021, nor did any of our non-employee directors receive any such compensation or awards from Meta or any of our other affiliates for their services during such fiscal year.

Table of Contents

## EXECUTIVE COMPENSATION

We are currently in the process of determining the philosophy and design of our compensation plans and programs to be offered to our senior management team, which we expect will incorporate elements of compensation to attract, retain and motivate highly talented individuals of our management team, align the interests of management with the interests of our stockholders and incentivize behaviors that we believe are necessary to enable us to succeed in our mission while upholding our values in a highly competitive marketplace. All decisions with respect to management compensation are made by the Board (and after this offering, will be made by the Compensation Committee).

### Incentive Compensation Awards

Our executive officers have not historically been paid bonuses or received equity awards, and our Board has not yet established a formal compensation policy for the determination of such awards. If our revenue grows and bonuses become affordable and justifiable, we expect to use the following parameters in justifying and quantifying bonuses for our executive officers: (1) the growth in our revenue, (2) the growth in our earnings before interest, taxes, depreciation and amortization, as adjusted ("EBITDA"), and (3) our stock price. The Board has not adopted specific performance goals and target bonus amounts for any of its fiscal years, but may do so in the future. Subject to approval by the sole stockholder, we also expect that our executive officers will be granted equity awards under our 2022 Plan (described below) in connection with or following this offering. The Board or Compensation Committee will determine the size, type and other terms of such equity awards.

### Employment Agreements

In connection with this offering, we intend to enter into new employment agreements with each of our executive officers. The terms of these agreements have not yet been determined, but each agreement is expected to provide for the executive to receive a base salary, an annual bonus opportunity, severance benefits in connection with an involuntary termination of the executive's employment, and other benefits. Currently, Mr. DuBose, Mr. DeWoody and Ms. Oelkers are party to employment agreements with Hudspeth Operating, LLC, one of our subsidiaries, that provide for the executive to receive a base salary (as reflected in the Summary Compensation Table below) and no other material compensation. The agreements between Hudspeth Operating, LLC and these executives will be superseded by their new employment agreements with us.

### Equity Incentive Plan

Our Board anticipates adopting the 2022 Equity Incentive Plan (the "2022 Plan") to provide an additional means through the grant of awards to attract, motivate, retain and reward selected employees and other eligible persons. We expect that Meta, as the sole stockholder, will approve the 2022 Plan. The summary of the 2022 Plan below is qualified in its entirety by the full text of the plan document, which will be filed with the SEC as an exhibit to the Form S-1 Registration Statement, as amended, of which this prospectus is a part and, upon filing, will be available through the SEC's internet site at http://www.sec.gov.

Employees, officers, directors and consultants that provide services to us or one of our subsidiaries may be selected to receive awards under the 2022 Plan. Our Compensation Committee will administer the 2022 Plan. The Compensation Committee has broad authority to:

- select participants and determine the types of awards that they are to receive;
- determine the number of shares that are to be subject to awards and the terms and conditions of awards, including the price (if any) to be paid for the shares or the award and establish the vesting conditions (if applicable) of such shares or awards;
- cancel, modify or waive our rights with respect to, or modify, discontinue, suspend or terminate any or all outstanding awards, subject to any required consents;

- construe and interpret the terms of the 2022 Plan and any agreements relating to the plan;
- accelerate or extend the vesting or exercisability or extend the term of any or all outstanding awards subject to any required consent;
- subject to the other provisions of the 2022 Plan, make certain adjustments to an outstanding award and authorize the termination, conversion, substitution or succession of an award; and
- allow the purchase price of an award or shares of our Common Stock to be paid in the form of cash, check or electronic funds transfer, by the delivery of previously-owned shares of our Common Stock or by a reduction of the number of shares deliverable pursuant to the award, by services rendered by the recipient of the award, by notice and third party payment or cashless exercise on such terms as the administrator may authorize or any other form permitted by law.

The Board shall determine the number of shares of our Common Stock to be initially reserved for issuance with respect to awards granted under the 2022 Plan. The share limit will automatically increase on the first trading day in January of each year (commencing with January 2023) by an amount to be determined by our Board. Any shares subject to awards that are not paid, delivered or exercised before they expire or are canceled or terminated, fail to vest, as well as shares used to pay the purchase or exercise price of awards or related tax withholding obligations, will become available for other award grants under the 2022 Plan. As of the date of this prospectus, no awards have been granted under the 2022 Plan, and the full number of shares reserved under the 2022 Plan is available for award purposes.

Awards under the 2022 Plan may be in the form of incentive or nonqualified stock options, stock appreciation rights, stock bonuses, restricted stock, stock units and other forms of awards including cash awards. Awards under the plan generally will not be transferable other than by will or the laws of descent and distribution, except that the plan administrator may authorize certain transfers.

Nonqualified and incentive stock options may not be granted at prices below the fair market value of the common stock on the date of grant. Incentive stock options must have an exercise price that is at least equal to the fair market value of our Common Stock on the date of grant (or 110% of the fair market value of our Common Stock for incentive stock option grants to any 10% owner of our Common Stock). The maximum term of options and stock appreciation rights granted under the plan is 10 years (or five years for incentive stock option grants to any 10% owner of our Common Stock). These and other awards may also be issued solely or in part for services. Awards are generally paid in shares of our Common Stock or in cash. The plan administrator may provide for the deferred payment of awards and may determine the terms applicable to deferrals.

As is customary in incentive plans of this nature, the number and type of shares available under the 2022 Plan and any outstanding awards, as well as the exercise or purchase prices of awards, will be subject to adjustment in the event of certain reorganizations, mergers, combinations, recapitalizations, stock splits, stock dividends or other similar events that change the number or kind of shares outstanding, and extraordinary dividends or distributions of property to the stockholders. In no case (except due to an adjustment referred to above or any repricing that may be approved by our stockholders) will any adjustment be made to a stock option or stock appreciation right award under the 2022 Plan (by amendment, cancellation and regrant, exchange or other means) that would constitute a repricing of the per-share exercise or base price of the award.

Generally, and subject to limited exceptions set forth in the 2022 Plan, if we dissolve or undergo certain corporate transactions such as a merger, business combination or other reorganization, or a sale of all or substantially all of its assets, all awards then-outstanding under the 2022 Plan will become fully vested or paid, as applicable, and will terminate or be terminated in such circumstances, unless the plan administrator provides for the assumption, substitution or other continuation of the award. The plan administrator also has the discretion to establish other change in control provisions with respect to awards granted under the 2022 Plan. For example, the administrator could provide for the acceleration of vesting or payment of an award in connection with a corporate event that is not described above and provide that any such acceleration shall be automatic upon the occurrence of any such event.

Table of Contents

Our Board will have the ability to amend or terminate the 2022 Plan at any time, but no such action will affect any outstanding award in any manner materially adverse to a participant without the consent of the participant. Plan amendments will be submitted to stockholders for their approval as required by applicable law or any applicable listing agency. The 2022 Plan will not be exclusive – our Board and Compensation Committee may grant stock and performance incentives or other compensation, in stock or cash, under other plans or authority.

The 2022 Plan will terminate on the tenth anniversary date of the adoption. However, the plan administrator will retain its authority under the 2022 Plan until all outstanding awards are exercised or terminated.

**Benefits**

At this stage of our business, we provide no benefits or prerequisites for our employees other than health insurance and vacation benefits that we believe are generally comparable to those offered by other small private and public companies or as may be required by applicable state employment laws. We do not have a 401(k) retirement plan or any other retirement plan for our employees NEOs. We may adopt these plans and confer other fringe benefits for our executive officers in the future.

**Summary Compensation Table—Fiscal Year 2021**

As an emerging growth company, we have opted to comply with the executive compensation disclosure rules applicable to "smaller reporting companies," as such term is defined under the Securities Act of 1933, as amended, which require compensation disclosure for our principal executive officer and up to two other executive officers who were employed by our wholly owned subsidiary Hudspeth Operating, LLC as of December 31, 2021. The table below sets forth the annual compensation for services rendered during 2021 by our Chief Executive Officer and two other executives employed with us through Hudspeth Operating, LLC (also referred to as our "named executive officers" or "NEOs").

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($)[1] | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Clifton DuBose, Jr.[2]<br>*Chief Executive Officer* | 2021 | 126,667 | — | — | — | — | — | 11,300 | 137,967 |
| Joseph DeWoody[2]<br>*President* | 2021 | 63,333 | — | — | — | — | — | 11,300 | 74,633 |
| Delvina Oelkers[2]<br>*Chief Operating Officer* | 2021 | 121,915 | — | — | — | — | — | 11,300 | 133,215 |

(1) The amount includes insurance reimbursements paid to Mr. DuBose, Mr. DeWoody and Ms. Oelkers.
(2) Mr. DuBose, Mr. DeWoody and Ms. Oelkers each commenced employment with one of our subsidiaries, Hudspeth Operating, LLC, on September 7, 2021 each as a general manager.

**Outstanding Equity Awards as of December 31, 2021**

As of December 31, 2021, our NEOs did not hold any outstanding equity awards with respect to our equity securities or equity securities of Meta or any of its affiliated companies.

Table of Contents

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

All of the Common Stock is currently beneficially owned by Meta. After the Spin-Off, Meta will not own any of the Common Stock. The following table provides information with respect to the expected beneficial ownership of the Common Stock after giving effect to the Spin-Off by (i) each person who we believe will be a beneficial owner of more than 5% of the outstanding Common Stock, (ii) each of our directors and our NEOs, and (iii) all directors and executive officers as a group. We based the share amounts on each person's beneficial ownership of Series A Preferred Stock as of the , 2022, unless we indicate some other basis for the share amounts, and assuming a distribution ratio of one share of our Common Stock for each share of Series A Preferred Stock.

To the extent our directors and officers own Series A Preferred Stock at the time of the Spin-Off, they will participate in the Spin-Off on the same terms as other holders of Series A Preferred Stock.

Except as otherwise noted in the footnotes below, each person or entity identified below has sole voting and investment power with respect to such securities. Following the Spin-Off, we will have outstanding an aggregate of shares of Common Stock based upon shares of Series A Preferred Stock outstanding on , 2022, assuming no exercise of Meta options and applying the distribution ratio of one share of our Common Stock for each share of Series A Preferred Stock held as of the Record Date.

| Name of Beneficial Owner[1] | Number of Series A Preferred Stock Beneficially Owned Before Distribution | Percentage of Series A Preferred Stock Beneficially Owned Before Distribution[2] | Number of Common Stock Beneficially Owned After Distribution | Percentage of Common Stock Beneficially Owned After Distribution[2] |
|---|---|---|---|---|
| ***5% or More Stockholders*** | | | | |
| Gregory McCabe<br>6015 Green Hill Ct.<br>Midland, TX 79707 | 18,758,249 | 11.33% | 18,758,249 | 11.33% |
| ***Directors and Executive Officers*** | | | | |
| Robert L. Cook | 300,000 | 0.18% | 300,000 | 0.18% |
| Clifton DuBose Jr. | — | — | — | — |
| Joseph DeWoody | — | — | — | — |
| Lucas T. Hawkins | — | — | — | — |
| Delvina Oelkers | — | — | — | — |
| Mia Pitts | — | — | — | — |
| Kristin Whitley | — | — | — | — |
| Kyle Bradford | — | — | — | — |
| Daren Rader | — | — | — | — |
| All officers and directors as a group (9 persons) | 300,000 | 0.18% | 300,000 | 0.18% |

1 The address of all of the officers and directors listed above are in the care of Next Bridge Hydrocarbons, Inc., 6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116.

2 Percentages shown assume the exercise by such persons of all options to acquire shares of Series A Preferred Stock that are exercisable within 60 days of , 2022 and no exercise by any other person.

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

With respect to the standards applied by the audit committee when deciding whether to approve a related party transaction, the audit committee shall approve or ratify the transaction if it is on terms believed to be comparable to those that could be obtained in arm's length dealings with an unrelated third party. We believe that the transactions and agreements discussed below (including renewals of any existing agreements) between us and related third parties are at least as favorable to us as could have been obtained from unrelated parties at the time they were entered into.

### Agreements with Meta

Following the Spin-Off, we and Meta will operate independently, and neither will have any ownership interest in the other. In order to govern the ongoing relationships between us and Meta after the Spin-Off and to facilitate an orderly transition, we and Meta intend to enter into agreements providing for various services and rights following the Spin-Off, and under which we and Meta will agree to indemnify each other against certain liabilities arising from our respective businesses. The following summarizes the terms of the material agreements we expect to enter into with Meta.

#### *Assignment of Company Interests*

Pursuant to an Assignment of Company Interests and Stock Power dated as of June 28, 2022 between Meta and us, Meta assigned and conveyed to us one hundred percent (100%) of the equity interest of each of Torchlight Energy, Inc., Torchlight Hazel, LLC and Hudspeth Oil Corporation, such that following such assignment and conveyance, each of such entities became our wholly-owned subsidiaries.

#### *2021 Note*

In 2021, we entered into a note payable with Meta to borrow up to $15 million. On October 1, 2021, the Company issued the 2021 Note, which bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023, and the outstanding principal of the 2021 Note will amortize in six equal monthly installments. If an event of default has occurred and is continuing under the 2021 Note, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts the Company's ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of its assets, unless the Company is the surviving entity or the successor entity assumes all of obligations under the 2021 Note. The note payable is collateralized by certain shares of common stock in Meta held by one of its stockholders and by a lien on a 25% interest in the Orogrande Project.

#### *Loan Agreement*

We intend to enter into the Loan Agreement with Meta as the lender. On June 28, 2022, we borrowed $2.34 million as an unsecured term loan, bearing interest at 8% per annum, which will be subject to the Loan Agreement once finalized. It is expected that, assuming the Loan Agreement is finalized, we may request to borrow additional term loans up to, but not exceeding, $5.0 million in the aggregate.

#### *Distribution Agreement*

We intend to enter into a Distribution Agreement with Meta before the Distribution. The Distribution Agreement will set forth our agreements with Meta regarding the principal actions to be taken in connection with the

Table of Contents

Spin-Off. It will also set forth other agreements that govern aspects of our relationship with Meta following the Spin-Off. We have not yet finalized all the terms of this agreement, and we intend to include additional details on the terms of this agreement in an amendment to this Prospectus.

*Intercompany Arrangements*. All agreements, arrangements, commitments and understandings, including most intercompany accounts payable or accounts receivable, between us, on the one hand, and Meta, on the other hand, will terminate effective as of the Distribution, except specified agreements and arrangements that are intended to survive the Distribution.

*The Distribution*. The Distribution Agreement will govern Meta's and our respective rights and obligations regarding the proposed Distribution. Prior to the Distribution, Meta will deliver all the issued and outstanding shares of our common stock to the distribution agent. Following the Distribution Date, the distribution agent will electronically deliver the shares of our common stock to Meta stockholders based on the distribution ratio. The Meta Board will have the sole and absolute discretion to determine the terms of, and whether to proceed with, the Distribution.

*Conditions*. The Distribution Agreement will also provide that several conditions must be satisfied or waived by Meta in its sole and absolute discretion before the Distribution can occur. For further information about these conditions, see "The Spin-Off—Conditions to the Spin-Off." The Meta Board may, in its sole and absolute discretion, determine the Record Date, the Distribution Date and the terms of the Spin-Off and may at any time prior to the completion of the Spin-Off decide to abandon or modify the Spin-Off.

*Exchange of Information*. We and Meta will agree to provide each other with information reasonably necessary to comply with reporting, disclosure, filing or other requirements of any national securities exchange or governmental authority, for use in judicial, regulatory, administrative and other proceedings and to satisfy audit, accounting, litigation and other similar requests. We and Meta will also agree to use reasonable best efforts to retain such information in accordance with our respective record retention policies as in effect on the date of the Distribution Agreement. Until the end of the first full fiscal year following the Distribution, each party will also agree to use its reasonable best efforts to assist the other with its financial reporting and audit obligations.
*Intellectual Property*. The Distribution Agreement will contain provisions governing our use of the Meta trademark and other related matters following the Spin-Off.

*Termination*. The Meta Board, in its sole and absolute discretion, may terminate the Distribution Agreement at any time prior to the Distribution.

*Release of Claims*. We and Meta will each agree to release the other and its affiliates, successors and assigns, and all persons that prior to the Distribution have been the other's stockholders, directors, officers, members, agents and employees, and their respective heirs, executors, administrators, successors and assigns, from certain claims against any of them that arise out of or relate to events, circumstances or actions occurring or failing to occur or any conditions existing at or prior to the time of the Distribution.

*Indemnification*. We and Meta will each agree to indemnify the other and each of the other's current, former and future directors, officers and employees, and each of the heirs, administrators, executors, successors and assigns of any of them, against certain liabilities incurred in connection with the Spin-Off and our and Meta's respective businesses. The Distribution Agreement will also specify procedures regarding claims subject to indemnification, including our entitlement to indemnification with respect to the matters described under "Legal Proceedings" in this Prospectus.

***Tax Matters Agreement***

We intend to enter into a Tax Matters Agreement with Meta that will govern the respective rights, responsibilities and obligations of Meta and us after the Spin-Off with respect to all tax matters. We have not yet finalized all of the terms of this agreement, and we intend to include additional details on the terms of this agreement in an amendment to this Prospectus.

Table of Contents

**Related Party Transactions**

***Policy and Procedures Governing Related Person Transactions***

Following the Spin-Off, our newly-appointed audit committee of the Board will adopt written procedures in evaluating the terms and provisions of proposed related party transactions or agreements in accordance with the Exchange Act, and the fiduciary duties of directors under Nevada law. Our related party transaction procedures will contemplate audit committee review and approval of all new agreements, transactions or courses of dealing with related parties, including any modifications, waivers or amendments to existing related party transactions. We will ensure that the terms of related party transactions are at least as favorable to us as could have been obtained from unrelated parties at the time of the transaction. The audit committee will consider, at a minimum, the nature of the relationship between us and the related party, the history of the transaction (in the case of modifications, waivers or amendments), the terms of the proposed transaction, our rationale for entering into the transaction and the terms of comparable transactions with unrelated third parties. In addition, management and internal audit will annually analyze all existing related party agreements and transactions and review them with the audit committee.

Table of Contents

## DESCRIPTION OF OUR CAPITAL STOCK

### General

Prior to the Distribution Date, Meta, as our sole stockholder, will approve and adopt our Amended and Restated Articles of Incorporation, and our Board will approve and adopt our Amended and Restated By-laws. The following summarizes information concerning our capital stock, including material provisions of our Amended and Restated Articles of Incorporation, our Amended and Restated By-laws and certain provisions of Nevada law. Additional information regarding our capital stock, including material provisions of our Amended and Restated Articles of Incorporation and our Amended and Restated By-laws, will be included in an amendment to this Prospectus. You are encouraged to read our Amended and Restated Articles of Incorporation and our Amended and Restated By-laws, which will be filed as exhibits to the Registration Statement on Form S-1, of which this Prospectus is a part, for greater detail with respect to these provisions.

The Company was incorporated on August 31, 2021, and 1 share of Common Stock was issued to Meta. Subsequent to the formation of the Company, we have not sold any securities of the Company; provided, that as of July 2022, the Company issued 165,523,362 additional shares of Common Stock to Meta.

### Authorized Capital Stock

Immediately following the Spin-Off, our authorized capital stock will consist of 500,000,000 shares of Common Stock, par value $0.0001 per share, and 50,000,000 shares of preferred stock, par value $0.0001 per share.

### Common Stock

***Shares Outstanding***. Immediately following the Spin-Off, we estimate that approximately 165.5 million shares of our Common Stock will be issued and outstanding, based on approximately shares of Series A Preferred Stock outstanding as of , 2022. The actual number of shares of our Common Stock outstanding immediately following the Spin-Off will depend on the actual number of shares of Series A Preferred Stock outstanding on the Record Date, and will reflect any issuance of new shares or exercise of outstanding options pursuant to Meta's equity plans and any repurchases of Meta shares by Meta pursuant to its common stock repurchase program, in each case on or prior to the Record Date.

***Voting Rights***. The holders of our Common Stock will be entitled to one vote for each share held of record on all matters submitted to a vote of the stockholders. Holders of shares of our Common Stock will not have cumulative voting rights.

***Other Rights***. Subject to the preferential liquidation rights of any preferred stock that may be outstanding, upon our liquidation, dissolution or winding-up, the holders of our Common Stock will be entitled to share ratably in our assets legally available for distribution to our stockholders.

***Fully Paid***. The issued and outstanding shares of our Common Stock are fully paid and non-assessable. Any additional shares of Common Stock that we may issue in the future will also be fully paid and non-assessable.

The holders of our Common Stock will not have preemptive rights or preferential rights to subscribe for shares of our capital stock.

### Preferred Stock

Our Amended and Restated Articles of Incorporation will authorize our Board to designate and issue from time to time one or more series of preferred stock without stockholder approval. If we offer a new series of preferred

Table of Contents

stock, a more specific description will be filed with the SEC, and the designations and rights of such preferred stock will be described in an accompanying prospectus supplement, including the following terms:

- the series, the number of shares offered, and the liquidation value of the preferred stock;
- the price at which the preferred stock will be issued;
- the dividend rate, the dates on which the dividends will be payable, and other terms relating to the payment of dividends on the preferred stock;
- the liquidation preference of the preferred stock;
- the voting rights of the preferred stock;
- whether the preferred stock is redeemable, or subject to a sinking fund, and the terms of any such redemption or sinking fund;
- whether the preferred stock is convertible, or exchangeable for any other securities, and the terms of any such conversion or exchange; and
- any additional rights, preferences, qualifications, limitations, and restrictions of the preferred stock.

The description of the terms of the preferred stock that will be set forth in an applicable prospectus will not be complete and will be subject to and qualified in its entirety by reference to the certificate of designation relating to the applicable series of preferred stock. The registration statement, of which this prospectus forms a part, will include the certificate of designation as an exhibit or incorporate it by reference.

Undesignated preferred stock may enable our Board to render more difficult or to discourage an attempt to obtain control of us by means of a tender offer, proxy contest, merger, or otherwise and to thereby protect the continuity of our management. The issuance of shares of preferred stock may adversely affect the rights of the holders of our Common Stock. For example, any preferred stock issued may:

- rank senior to our common stock as to dividend rights, liquidation preference, or both;
- have full or limited voting rights; and
- be convertible into shares of common stock or another series of preferred stock.

The issuance of additional preferred stock could adversely affect the voting power, conversion or other rights of holders of Common Stock.

### Certain Provisions of Nevada Law

#### *Combination with Interested Stockholders Statute*

Sections 78.411 to 78.444 of the Nevada Revised Statutes (N.R.S.), which apply to any Nevada corporation with more than 200 stockholders, prohibits an "interested stockholder" from entering into a "combination" with the corporation for two years, unless certain conditions are met. A "combination" includes:

- any merger of the corporation or any subsidiary of the corporation with an "interested stockholder," or any other entity, whether or not itself an "interested stockholder," which is, or after and as a result of the merger would be, an affiliate or associate of an "interested stockholder,"
- any sales, lease, exchange, mortgage, pledge, transfer, or other disposition in one transaction, or a series of transactions, to or with an "interested stockholder" or any affiliate or associate of an "interested stockholder," of assets of the corporation or any subsidiary of the corporation:
  - having an aggregate market value equal to more than 5% of the aggregate market value of the corporation's assets, determined on a consolidated basis;

Table of Contents

  - having an aggregate market value equal to more than 5% of the aggregate market value of all of the outstanding shares of the corporation; or
  - representing more than 10% of the earning power or net income, determined on a consolidated basis, of the corporation; or
- the issuance or transfer by the corporation or any subsidiary, of any shares of the corporation or any subsidiary to an "interested stockholder" or any affiliate or associate of an "interested stockholder," having an aggregate market value equal to 5% or more of the aggregate market value of all of the outstanding voting shares of the corporation, except under the exercise of warrants or rights to purchase shares offered, or a dividend or distribution paid or made, pro rata to all stockholders of the resident domestic corporation;
- the adoption of any plan, or proposal for the liquidation or dissolution of the corporation, under any agreement, arrangement or understanding, with the "interested stockholder." or any affiliate or associated of the "interested stockholder;"
- if any of the following actions occurs:
  - a reclassification of the corporation's securities, including, without limitation, any splitting of shares, share dividend, or other distribution of shares with respect to other shares, or any issuance of new shares in exchange for a proportionately greater number of old shares;
  - recapitalization of the corporation;
  - merger of consolidation of the corporation with any subsidiary; or
  - any other transaction, whether or not with or into or otherwise involving the interested stockholder, under any agreement, arrangement or understanding, whether or not in writing, with the interested stockholder or any affiliate or associate of the interested stockholder, which has the immediate and proximate effect of increasing the proportionate share of the outstanding shares of any class or series of voting shares or securities convertible into voting shares of the corporation or any subsidiary of the corporation which is beneficially owned by the interested stockholder or any affiliate or associate of the interested stockholder;
- any receipt by an "interested stockholder" or any affiliate or associate of an "interested stockholder" except proportionately as a stockholder of the corporation, of the benefit of any loan, advance, guarantee, pledge or other financial assistance or any tax credit or other tax advantage provided by or through the corporation

An "interested stockholder" is a person who is:

- directly or indirectly, the beneficial owner of 10% or more of the voting power of the outstanding voting shares of the corporation; or
- an affiliate or associate of the corporation, which at any time within two years immediately before the date in question was the beneficial owner, directly or indirectly, of 10% or more of the voting power of the then outstanding shares of the corporation.

A corporation to which the Combinations with Interested Stockholders Statute applies may not engage in a "combination" within two years after the interested stockholder first became an interested stockholder, unless the combination meets all of the requirements of the corporation's articles of incorporation and (i) the combination or the transaction by which the person first became an interested stockholder is approved by the board of directors before the person first became an interested stockholder, or (ii)(a) the combination is approved by the board of directors and (b) at or after that time, the combination is approved at an annual or special meeting of the stockholders, and not by written consent, by the affirmative vote of the stockholders representing at least sixty

Table of Contents

percent (60%) of the outstanding voting power of the corporation not beneficially owned by the interested stockholder or the affiliates or associates of the interested stockholder. If this approval is not obtained, the combination may be consummated after the two year period expires if either (i)(a) the combination or transaction by which the person first became an interested stockholder is approved by the board of directors before such person first became an interested stockholder, (b) the combination is approved by a majority of the outstanding voting power of the corporation not beneficially owned by the interested stockholder or any affiliate or associate of the interested stockholder, or (c) the combination otherwise meets the requirements of the Combination with Interested Stockholders Statute. Alternatively, a combination with an interested stockholder engaged in more than 2 years after the date the person first became an interested stockholder may be permissible if the aggregate amount of cash and the market value of consideration other than cash to be received by holders of shares of common stock and holders of any other class or series of shares meets the minimum requirements set forth in the statue, and prior to the completion of the combination, except in limited circumstances, the interested stockholder has not become the beneficial owner of additional voting shares of the corporation.

***Acquisition of Controlling Interest Statute***

In addition, Nevada's "Acquisition of Controlling Interest Statute," prohibits an acquiror, under certain circumstances, from voting shares of a target corporation's stock after crossing certain threshold ownership percentages, unless the acquiror obtains the approval of the target corporation's stockholders. Sections 78.378 to 78.3793 of the N.R.S. only apply to Nevada corporations with at least 200 stockholders, including at least 100 record stockholders who are Nevada residents, that do business directly or through an affiliated corporation in Nevada and whose articles of incorporation or bylaws in effect 10 days following the acquisition of a controlling interest by an acquiror do not prohibit its application.

We do not intend to "do business" in Nevada within the meaning of the Acquisition of Controlling Interest Statute. Therefore, we believe it is unlikely that this statute will apply to us. The statute specifies three thresholds:

- at least one-fifth but less than one-third;
- at least one-third but less than a majority; and
- a majority or more, of the outstanding voting power. Once an acquiror crosses one of these thresholds, shares which it acquired in the transaction taking it over the threshold (or within ninety days preceding the date thereof) become "control shares" which could be deprived of the right to vote until a majority of the disinterested stockholders restore that right.

A special stockholders' meeting may be called at the request of the acquiror to consider the voting rights of the acquiror's shares. If the acquiror requests a special meeting and gives an undertaking to pay the expenses of said meeting, then the meeting must take place no earlier than 30 days (unless the acquiror requests that the meeting be held sooner) and no more than 50 days (unless the acquiror agrees to a later date) after the delivery by the acquiror to the corporation of an information statement which sets forth the range of voting power that the acquiror has acquired or proposes to acquire and certain other information concerning the acquiror and the proposed control share acquisition.

If no such request for a stockholders' meeting is made, consideration of the voting rights of the acquiror's shares must be taken at the next special or annual stockholders' meeting. If the stockholders fail to restore voting rights to the acquiror, or if the acquiror fails to timely deliver an information statement to the corporation, then the corporation may, if so provided in its articles of incorporation or bylaws in effect on the tenth day following the acquisition, call certain of the acquiror's shares for redemption at the average price paid for such shares by the acquiror.

Our restated articles of incorporation and amended and restated bylaws do not currently permit us to redeem an acquiror's shares under these circumstances, but could be amended to so provide within ten days following the

acquisition. The Acquisition of Controlling Interest Statute also provides that in the event the stockholders restore full voting rights to a holder of control shares that owns a majority of the voting stock, then, unless the corporation's articles of incorporation or bylaws in effect on the tenth day following the acquisition otherwise provide, all other stockholders who do not vote in favor of restoring voting rights to the control shares may demand payment for the "fair value" of their shares as determined by a court in dissenters rights proceeding pursuant to Chapter 92A of the N.R.S.

***Limitations of Liability and Indemnification Matters***

Our Amended and Restated Articles of Incorporation contain provisions that limit the liability of our current and former directors for monetary damages to the fullest extent permitted by Nevada law. Nevada law provides that directors of a corporation will not be personally liable for monetary damages for any breach of fiduciary duties as directors, unless the presumption that the directors have acted in good faith, on an informed basis, and with a view to the interests of the corporation has been rebutted, in which case directors may be liable for damages resulting from intentional misconduct, fraud or a knowing violation of law. To the extent that indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling our company pursuant to the foregoing provisions, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. If a claim for indemnification against such liabilities (other than the payment by us of expenses incurred or paid by a director, officer or controlling person of our company in the successful defense of any action, suit or proceeding) is asserted by any of our directors, officers or controlling persons in connection with the securities being registered, we will, unless in the opinion of our counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by us is against public policy as expressed in the Securities Act and will be governed by the final adjudication of that issue.

**Transfer Agent and Registrar**

The transfer agent and registrar for the Common Stock is American Stock Transfer & Trust Company LLC.

**No Listing**

Our Common Stock is not listed on any securities exchange and will not be eligible for electronic trading through DTC or any other established clearing corporation.

## LEGAL MATTERS

Certain legal matters in connection with the distribution of our Common Stock in the Spin-Off described in this Prospectus will be passed upon for us by O'Melveny & Myers, LLP, Dallas, Texas, and by Woodburn and Wedge, Reno, Nevada, with respect to matters of Nevada law.

## EXPERTS

The consolidated financial statements of Next Bridge Hydrocarbons, Inc. as of December 31, 2021 and 2020, and for each of the fiscal years then ended, appearing in this Prospectus, have been audited by BF Borgers, CPA, an independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such reports given on the authority of such firm as experts in accounting and auditing.

Estimates of the oil and gas reserves of the Company and related future net cash flows and the present values were based upon reserve reports prepared by PeTech Enterprises, Inc. have been included in this Prospectus. We have included these estimates in reliance on the authority of such firm as an expert in such matters.

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act to register the shares of our Common Stock to be distributed in the Spin-Off. The term registration statement means the original registration statement and any and all amendments thereto, including the exhibits and schedules to the original registration statement and any amendments. This Prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement or the exhibits and schedules filed therewith. For further information with respect to us, reference is made to the registration statement and the exhibits and schedules filed therewith. Statements contained in this Prospectus regarding the contents of any contract or any other document that is filed as an exhibit to the registration statement are not necessarily complete, and each such statement is qualified in all respects by reference to the full text of such contract or other document filed as an exhibit to the registration statement. A copy of the registration statement, along with the exhibits and schedules filed therewith, may be inspected without charge at the SEC's website. The SEC maintains an internet website at www.sec.gov that contains reports, proxy and information statements and other information regarding registrants that file electronically with the SEC.

**The information contained on or accessible through our website or the SEC's website shall not be deemed to be a part of this Prospectus or the registration statement on Form S-1, of which this Prospectus is a part.**

You may request a copy of any of our filings with the SEC at no cost by writing us at the following address:

Investor Relations
Next Bridge Hydrocarbons, Inc.
6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116

We have not authorized anyone to give any information or make any representation about the Spin-Off or of the Company that is different from, or in addition to, that contained in this Prospectus. Therefore, if anyone does give you information of this sort, you should not rely on it. If you are in a jurisdiction where offers to sell, or solicitations of offers to purchase, the securities offered by this Prospectus or the solicitation of proxies is unlawful, or if you are a person to whom it is unlawful to direct these types of activities, then the offer presented in this Prospectus does not extend to you. The information contained in this Prospectus speaks only as of the date of this Prospectus unless the information specifically indicates that another date applies.

Table of Contents

## INDEX TO FINANCIAL STATEMENTS


| | PAGE |
|---|---|
| **Consolidated Financial Statements (audited)** | |
| Report of Independent Registered Public Accounting Firm | F-1 |
| Consolidated Balance Sheets as of December 31, 2021 and 2020 | F-2 |
| Consolidated Statements of Operations for the years ended December 31, 2021 and 2020 | F-3 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2021 and 2020 | F-4 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2021 and 2020 | F-5 |
| **Notes to Consolidated Financial Statements** | F-6 |
| **Condensed Consolidated Financial Statements (unaudited)** | |
| Consolidated Balance Sheets as of March 31, 2022 and December 31, 2021 | F-21 |
| Consolidated Statements of Operations for the three months ended March 31, 2022 and 2021 | F-22 |
| Consolidated Statements of Stockholders' Equity for the three months ended March 31, 2022 and 2021 | F-23 |
| Consolidated Statements of Cash Flows for the three months ended March 31, 2022 and 2021 | F-24 |
| **Notes to Unaudited Condensed Consolidated Financial Statements** | F-25 |
| **Pro Forma Combined Financial Statements (unaudited)** | |
| Combined Statements of Operations for the year ended December 31, 2021 | F-41 |
| Combined Statements of Operations for the three months ended March 31, 2022 | F-42 |
| Combined Balance Sheets for the three months ended March 31, 2022 | F-43 |
| **Notes to Unaudited Pro Forma Combined Financial Statements** | F-44 |

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the shareholders and the board of directors of Next Bridge Hydrocarbons, Inc.

### Opinion on the Financial Statements

We have audited the accompanying consolidated balance sheets of Next Bridge Hydrocarbons, Inc. as of December 31, 2021 and 2020, the related statements of operations, stockholders' equity (deficit), and cash flows for the years then ended, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States.

### Substantial Doubt about the Company's Ability to Continue as a Going Concern

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the financial statements, the Company has suffered recurring losses from operations and has a significant accumulated deficit. In addition, the Company continues to experience negative cash flows from operations. These factors raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

### Basis for Opinion

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

/S/ BF Borgers CPA PC
**BF Borgers CPA PC**
PCAOB ID: 5041
We have served as the Company's auditor since 2022
Lakewood, CO
July 15, 2022

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Consolidated Balance Sheets**

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash | $ 1,989,419 | $ 130,504 |
| Accounts receivable, related party | 163,366 | 69,056 |
| Grants and other receivables | 74,310 | 161,064 |
| Prepaid expenses | 2,667 | 103,672 |
| Total current assets | 2,229,762 | 464,296 |
| Oil and natural gas properties, net | 45,663,470 | 30,857,959 |
| Property and equipment | — | 4,549 |
| Other assets | 25,000 | — |
| TOTAL ASSETS | $ 47,918,232 | $ 31,326,804 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 2,828,326 | $ 708,260 |
| Accrued liabilities | — | 1,213,779 |
| Note payable, related party | 12,708,889 | — |
| Total current liabilities | 15,537,215 | 1,922,039 |
| Asset retirement obligations | 21,937 | 21,844 |
| Total liabilities | 15,559,152 | 1,943,883 |
| Commitments and contingencies | | |
| Stockholder's equity: | | |
| Preferred stock, par value $0.0001; 25,000,000 shares authorized; 0 issued and outstanding | | |
| Common stock, par value $0.0001; 250,000,000 shares authorized; 1 issued and outstanding | — | — |
| Additional paid-in capital | 100,546,596 | 89,331,629 |
| Accumulated deficit | (68,187,516) | (59,948,708) |
| Total stockholder's equity | 32,359,080 | 29,382,921 |
| TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY | $ 47,918,232 | $ 31,326,804 |

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Consolidated Statements of Operations**
**For the Years Ended December 31, 2021 and 2020**

| | 2021 | 2020 |
|---|---|---|
| Oil sales | $ 4,675 | $ 4,484 |
| Natural gas sales | 11,229 | 2,422 |
| **Revenue** | **15,904** | **6,906** |
| **Operating expenses** | | |
| Lease operating expenses | 75,330 | 86,988 |
| Production and ad valorem tax | 1,001 | 498 |
| General and administrative | 8,050,443 | 2,557,975 |
| Depreciation, depletion and amortization | 4,642 | 820,814 |
| Impairment | — | 2,108,301 |
| Total operating expenses | 8,131,416 | 5,574,576 |
| **Other income (expense)** | | |
| Interest expense | (212,201) | (11,121) |
| Gain (loss) on sale of assets | 1,000 | (170,215) |
| Gain on extinguishment of debt | 77,477 | — |
| Interest income | 10,428 | — |
| Total other income (expense)—net | (123,296) | (181,336) |
| **Loss before income taxes** | (8,238,808) | (5,749,006) |
| Provision for income tax | — | — |
| **Net loss** | **$ (8,238,808)** | **$ (5,749,006)** |

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Consolidated Statements of Stockholders' Equity**
**For the Years Ended December 31, 2021 and 2020**

| | Common stock shares | Common stock amount | Additional paid-in capital | Accumulated deficit | Total |
|---|---|---|---|---|---|
| **Balance, December 31, 2019** | 1 | $ — | $ 88,203,178 | $(54,199,702) | $34,003,476 |
| Contributions from parent | — | — | 1,128,451 | — | 1,128,451 |
| Net loss | — | — | — | (5,749,006) | (5,749,006) |
| **Balance, December 31, 2020** | 1 | $ — | $ 89,331,629 | $(59,948,708) | $29,382,921 |
| Contributions from parent | — | — | 11,214,967 | — | 11,214,967 |
| Net loss | — | — | — | (8,238,808) | (8,238,808) |
| **Balance, December 31, 2021** | 1 | $ — | $100,546,596 | $(68,187,516) | $32,359,080 |

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Consolidated Statements of Cash Flows**
**For the Years Ended December 31, 2021 and 2020**

| | 2021 | 2020 |
|---|---|---|
| **Cash Flows From Operating Activities** | | |
| Net loss | $ (8,238,808) | $ (5,749,006) |
| Adjustments to reconcile net loss to net cash from operations: | | |
| Depreciation, depletion and amortization | 4,642 | 820,814 |
| Impairment loss | — | 2,108,301 |
| Paid in kind interest | 208,889 | — |
| Change in: | | |
| Accounts receivable, related party | (94,310) | (27,684) |
| Grants and other receivables | 86,754 | — |
| Prepaid expenses | 101,005 | (7,666) |
| Accounts payable | 2,120,066 | (617,952) |
| Accrued liabilities | (1,213,779) | 172,603 |
| Other assets | (25,000) | — |
| **Net cash from operating activities** | (7,050,541) | (3,300,590) |
| **Cash Flows From Investing Activities** | | |
| Investment in oil and natural gas properties | (14,805,511) | (236,807) |
| Proceeds from sale of oil and natural gas properties | — | 2,508,775 |
| **Net cash from investing activities** | (14,805,511) | 2,271,968 |
| **Cash Flows From Financing Activities** | | |
| Contributions from parent | 11,214,967 | 1,128,451 |
| Proceeds from note payable, related party | 12,500,000 | — |
| **Net cash from financing activities** | 23,714,967 | 1,128,451 |
| **Net increase in cash** | 1,858,915 | 99,829 |
| **Cash—beginning of year** | 130,504 | 30,675 |
| **Cash—end of year** | $ 1,989,419 | $ 130,504 |
| **Supplemental disclosure of cash flow information: (Non Cash Items)** | | |
| Cash paid for interest | $ — | $ — |
| Cash paid for state franchise tax | $ — | $ — |

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1. NATURE OF BUSINESS

Next Bridge Hydrocarbons, Inc., formerly OilCo Holdings, Inc., (the "Company", "we", "our") was incorporated in August 2021 under the laws of the State of Nevada. We are engaged in the acquisition, exploration and development of oil and natural gas properties in the United States. We operate our business through our subsidiaries Torchlight Energy Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC.

Prior to the formation of Next Bridge Hydrocarbons, Inc. (formerly named OilCo Holdings, Inc.), our subsidiaries were consolidated into Meta Materials Inc., an affiliated company. All intercompany transactions have been eliminated in the consolidated financial statements.

On June 29, 2021, our former parent, Torchlight Energy Resources, Inc. ("TERI") was acquired by Meta Materials, Inc.

## 2. GOING CONCERN

At December 31, 2021, the Company had not yet achieved profitable operations. We had a net loss of $8,238,808 for the year ended December 31, 2021. We expect to incur further losses in the development of our business. The Company had a working capital deficit as of December 31, 2021 of $13,307,453. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

The Company's ability to continue as a going concern is dependent on its ability to generate future profitable operations and/or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due. Management's plan to address the Company's ability to continue as a going concern includes: (1) obtaining debt or equity funding from private placement, institutional, or public sources; (2) obtain loans from financial institutions, where possible; or (3) participating in joint venture transactions with third parties. Although management believes that it will be able to obtain the necessary funding to allow the Company to remain a going concern through the methods discussed above, there can be no assurances that such methods will prove successful.

These consolidated financial statements have been prepared assuming that the Company will continue as a going concern and therefore, the financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amount and classifications of liabilities that may result from the outcome of this uncertainty.

## 3. SIGNIFICANT ACCOUNTING POLICIES

The Company maintains its accounts on the accrual method of accounting in accordance with accounting principles generally accepted in the United States of America. Accounting principles followed and the methods of applying those principles, which materially affect the determination of financial position, results of operations and cash flows are summarized below:

***Use of estimates***—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and certain assumptions that affect the amounts reported in these consolidated financial statements and accompanying notes. Actual results could differ from these estimates.

***Basis of presentation***—The financial statements are presented on a consolidated basis and include all of the accounts of the Company and its wholly owned subsidiaries, Torchlight Energy, Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC. All significant intercompany balances and transactions have been eliminated between the Company and its subsidiaries.

Table of Contents

***Risks and uncertainties***—The Company's operations are subject to significant risks and uncertainties, including financial, operational, technological, and other risks associated with operating an emerging business, including the potential risk of business failure.

In January 2020, the World Health Organization ("WHO") announced a global health emergency because of a new strain of coronavirus ("COVID-19") and the significant risks to the international community and economies as the virus spreads globally beyond its point of origin. In March 2020, the WHO classified COVID-19 as a pandemic, based on the rapid increase in exposure globally, and thereafter, COVID-19 continued to spread throughout the U.S. and worldwide. In addition, actions taken by OPEC members and other exporting nations on the supply and demand in global oil and natural gas markets resulted in significant negative pricing pressure in the first half of 2020, followed by a recovery in pricing and an increase in demand in the second half of 2020 and into 2021. However, multiple variants emerged in 2021 and became highly transmissible, which contributed to additional pricing volatility during 2021 and into 2022. The financial results of companies in the oil and natural gas industry have been impacted materially as a result of changing market conditions. Such circumstances generally increase uncertainty in the Company's accounting estimates. Although demand and market prices for oil and natural gas have increased, due to the rising energy use and the improvement in U.S. economic activity, we cannot predict events that may lead to future price volatility and the near term energy outlook remains subject to heightened levels of uncertainty.

We are continuing to closely monitor the overall impact and the evolution of the COVID-19 pandemic, including the ongoing spread of any variants, along with future OPEC actions on all aspects of our business, including how these events may impact our future operations, financial results, liquidity, employees, and operators. Additional actions may be required in response to the COVID-19 pandemic on a national, state, and local level by governmental authorities, and such actions may further adversely affect general and local economic conditions, particularly if the 2021 resurgence and spread of the COVID-19 pandemic continues. We cannot predict the long-term impact of these events on our liquidity, financial position, results of operations or cash flows due to uncertainties including the severity of COVID-19 or any of the ongoing variants, and the effect the virus will have on the demand for oil and natural gas. These situations remain fluid and unpredictable, and we are actively managing our response.

***Concentration of risks***—At times the Company's cash balances are in excess of amounts guaranteed by the Federal Deposit Insurance Corporation. The Company's cash is placed with a highly rated financial institution, and the Company regularly monitors the credit worthiness of the financial institutions with which it does business.

***Fair value of financial instruments***—Financial instruments consist of cash, receivables, convertible note receivable, payables and promissory notes, if any. The estimated fair values of cash, receivables, and payables approximate the carrying amount due to the relatively short maturity of these instruments. The carrying amounts of any promissory notes approximate their fair value giving affect for the term of the note and the effective interest rates.

For assets and liabilities that require re-measurement to fair value the Company categorizes them in a three-level fair value hierarchy as follows:

- Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities.
- Level 2 inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration.
- Level 3 inputs are unobservable inputs based on management's own assumptions used to measure assets and liabilities at fair value.

A financial asset or liability's classification within the hierarchy is determined based on the lowest level input that is significant to the fair value measurement.

Table of Contents

***Cash and cash equivalents***—Cash and cash equivalents include certain investments in highly liquid instruments with original maturities of three months or less.

***Accounts receivable***—Accounts receivable consist of uncollateralized oil and natural gas revenues due under normal trade terms, as well as amounts due from working interest owners of oil and natural gas properties for their share of expenses paid on their behalf by the Company. Management reviews receivables periodically and reduces the carrying amount by a valuation allowance that reflects management's best estimate of the amount that may not be collectible. As of December 31, 2021 and 2020, no valuation allowance was considered necessary. Bad debt expense for the years ended December 31, 2021 and 2020 was $0 and $15,606, respectively.

***Oil and natural gas properties***—The Company uses the full cost method of accounting for exploration and development activities as defined by the Securities and Exchange Commission ("SEC"). Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least quarterly and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions.

Gains and losses on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and natural gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

***Capitalized interest—***The Company capitalizes interest on unevaluated properties during the periods in which they are excluded from costs being depleted or amortized. During the years ended December 31, 2021 and 2020, the Company capitalized $141,048, and $2,353,700 respectively, of interest on unevaluated properties.

***Depreciation, depletion, and amortization***—The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

***Ceiling test***—Future production volumes from oil and natural gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and natural gas properties. If the net capitalized cost of proved oil and natural gas properties, net of related deferred income taxes, plus the cost of unproved oil and natural gas properties, exceeds the present value of estimated future net cash flows discounted at ten percent, net of related realizable tax affects, plus the cost of unproved oil and natural gas properties, the excess is charged to expense and reflected as additional accumulated DD&A. The Company recorded an impairment expense of $-0- and $2,108,301 for the years ended December 31, 2021 and 2020, respectively, to recognize the adjustment required by the ceiling test.

Table of Contents

The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and natural gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and natural gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

***Asset retirement obligations***—The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and natural gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

***Income taxes***—Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is established to reduce deferred tax assets if it is more likely than not that the related tax benefits will not be realized.

Authoritative guidance for uncertainty in income taxes requires that the Company recognize the financial statement benefit of a tax position only after determining that the relevant tax authority would more likely than not sustain the position following an examination. Management has reviewed the Company's tax positions and determined there were no uncertain tax positions requiring recognition in the consolidated financial statements. Company tax returns remain subject to Federal and State tax examinations. Generally, the applicable statutes of limitation are three to four years from their respective filings.

Estimated interest and penalties related to potential underpayment on any unrecognized tax benefits are classified as a component of tax expense in the statements of operation. The Company has not recorded any interest or penalties associated with unrecognized tax benefits for any periods covered by these financial statements.

***Revenue recognition***—The Company's revenue is typically generated from contracts to sell natural gas, crude oil or NGLs produced from interests in oil and natural gas properties owned by the Company. Contracts for the sale of natural gas and crude oil are evidenced by (1) base contracts for the sale and purchase of natural gas or crude oil, which document the general terms and conditions for the sale, and (2) transaction confirmations, which document the terms of each specific sale. The transaction confirmations specify a delivery point which represents

Table of Contents

the point at which control of the product is transferred to the customer. The Company elects to treat contracts to sell oil and natural gas production as normal sales, which are then accounted for as contracts with customers. The Company has determined that these contracts represent multiple performance obligations which are satisfied when control of the commodity transfers to the customer, typically through the delivery of the specified commodity to a designated delivery point.

Revenue is measured based on considerations specified in the contract with the customer, and excludes any amounts collected on behalf of third parties. The Company recognizes revenue in the amount that reflects the consideration it expects to be entitled to in exchange for transferring control of those goods to the customer. Amounts allocated in the Company's price contracts are based on the standalone selling price of those products in the context of long-term contracts. Payment is generally received one or two months after the sale has occurred.

Gain or loss on derivative instruments is outside the scope of ASC 606 and is not considered revenue from contracts with customers subject to ASC 606. The Company may in the future use financial or physical contracts accounted for as derivatives as economic hedges to manage price risk associated with normal sales, or in limited cases may use them for contracts the Company intends to physically settle but do not meet all of the criteria to be treated as normal sales.

*Producer Gas Imbalances.* The Company applies the sales method of accounting for natural gas revenue. Under this method, revenues are recognized based on the actual volume of natural gas sold to purchasers.

***Environmental laws and regulations***—The Company is subject to extensive federal, state, and local environmental laws and regulations. Environmental expenditures are expensed or capitalized depending on their future economic benefit. The Company believes that it is in compliance with existing laws and regulations. The Company accrued no liability as of December 31, 2021 and 2020.

***Recently adopted accounting pronouncements—***

Effective January 1, 2021, we adopted ASU 2019-12 on a prospective basis. The new standard was issued in December 2019 with the intent of simplifying the accounting for income taxes. The accounting update removes certain exceptions to the general principles in ASC 740 Income Taxes as well as provides simplification by clarifying and amending existing guidance. The adoption of this ASU did not have a material impact on our consolidated financial statements.

In October 2020, the FASB issued ASU 2020-09, Debt- Debt (Topic 470): Amendments to SEC Paragraphs Pursuant to SEC Release No. 33-10762 ("ASU 2020-09"). The amendments in ASU 2020-09 amend rules focused on the provision of material, relevant, and decision-useful information regarding guarantees and other credit enhancements, and eliminate prescriptive requirements that have imposed unnecessary burdens and incentivized issuers of securities with guarantees and other credit enhancements to offer and sell those securities on an unregistered basis. The adopted amendments relate to the financial disclosure requirements for guarantors and issuers of guaranteed securities registered or being registered in Rule 3-10 of Regulation S-X, and affiliates whose securities collateralize securities registered or being registered in Rule 3-16 of Regulation S-X. The amendments in ASU 2020-09 are effective for public business entities for annual periods beginning after December 15, 2020. The Company has evaluated the provisions of ASU 2020-09 and noted no material impact to our consolidated financial statements or disclosures from the adoption of this ASU.

In October 2020, the FASB issued ASU 2020-10, Codification Improvements, which updated various codification topics by clarifying or improving disclosure requirements to align with the SEC's regulations. The amendments in ASU 2020-10 are effective for annual periods beginning after December 15, 2020, for public business entities. The Company adopted ASU 2020-10 on January 1, 2021 and its adoption did not have a material effect on the Company's financial statements and related disclosures.

Table of Contents

***Recent accounting pronouncements not yet adopted—***

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which adds a new Topic 326 to the Codification and removes the thresholds that companies apply to measure credit losses on financial instruments measured at amortized cost, such as loans, receivables, and held-to-maturity debt securities. Under current GAAP, companies generally recognize credit losses when it is probable that the loss has been incurred. The revised guidance will remove all recognition thresholds and will require companies to recognize an allowance for credit losses for the difference between the amortized cost basis of a financial instrument and the amount of amortized cost that the company expects to collect over the instrument's contractual life. ASU 2016-13 also amends the credit loss measurement guidance for available-for sale debt securities and beneficial interests in securitized financial assets. The guidance is applicable for fiscal years beginning after December 15, 2019 and interim periods within those years, however, the FASB extended the effective date for smaller reporting companies to fiscal years beginning after December 15, 2022. The Company is currently evaluating the potential impact of the adoption of this standard on its related disclosures.

Other recently issued or adopted accounting pronouncements are not expected to have, or did not have, a material impact on the Company's financial position or results from operations.

## 4. OIL & NATURAL GAS PROPERTIES

The following table presents the capitalized costs for oil & natural gas properties of the Company:

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Evaluated costs subject to amortization | $ — | $ 15,656,182 |
| Unevaluated costs | 45,663,470 | 29,794,015 |
| Total capitalized costs | 45,663,470 | 45,450,197 |
| Less accumulated depreciation, depletion and amortization | — | (15,656,182) |
| Total oil and natural gas properties | $ 45,663,470 | $ 30,857,959 |

Unevaluated costs as of December 31, 2021 and 2020 include cumulative costs on developing projects including the Orogrande and Hazel Projects in West Texas.

The Company periodically adjusts for the separation of evaluated versus unevaluated costs within its full cost pool to recognize the value impairment related to the expiration of, or changes in market value, of unevaluated leases. The impact of reclassifications as they become necessary is to increase the basis for calculation of future period's depletion, depreciation and amortization which effectively recognizes the impairment on the consolidated statement of operations over future periods. Reclassified costs also become evaluated costs for purposes of ceiling tests and which may cause recognition of increased impairment expense in future periods. The remaining cumulative unevaluated costs which have been reclassified within our full cost pool totals $0 as of December 31, 2021. As of December 31, 2021, evaluated costs are $-0- since we have no proved reserve value associated with our properties.

Due to the volatility of commodity prices, should oil and natural gas prices decline in the future, it is possible that a further write-down could occur. Proved reserves are estimated quantities of crude oil, natural gas, and natural gas liquids, which geological and engineering data demonstrate with reasonable certainty to be recoverable from known reservoirs under existing economic and operating conditions. The independent engineering estimates include only those amounts considered to be proved reserves and do not include additional amounts which may result from new discoveries in the future, or from application of secondary and tertiary recovery processes where facilities are not in place or for which transportation and/or marketing contracts are not in place. Estimated reserves to be developed through secondary or tertiary recovery processes are classified as unevaluated properties.

Table of Contents

**Current Projects**

We are an energy company engaged in the acquisition, exploration, exploitation and development of oil and natural gas properties in the United States. We are primarily focused on the acquisition of early stage projects, the development and delineation of these projects, and then the monetization of those assets once these activities are completed.

Since 2010, our primary focus has been the development of interests in oil and natural gas projects we hold in the Permian Basin in West Texas. We also hold minor interests in certain other oil and natural gas projects in Central Oklahoma that we are in the process of divesting.

As of December 31, 2021, we had interests in three oil and gas projects: the Orogrande Project in Hudspeth County, Texas, the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, and two wells in Central Oklahoma.

Orogrande Project, West Texas

On August 7, 2014, our predecessor entered into a Purchase Agreement with Hudspeth Oil Corporation (“Hudspeth”), McCabe Petroleum Corporation (“MPC”), and Gregory McCabe, Met’s former Chairman. Mr. McCabe was the sole owner of both Hudspeth and MPC. Under the terms and conditions of the Purchase Agreement, our predecessor acquired 100% of the capital stock of Hudspeth which held certain oil and natural gas assets, including a 100% working interest in approximately 172,000 predominately contiguous acres in the Orogrande Basin in West Texas. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe. Mr. McCabe also holds a 4.5% overriding royalty interest in the Orogrande acreage, which he obtained prior to, and was not a part of the August 2014 transaction. As of December 31, 2021, leases covering approximately 134,000 acres remain in effect.

Effective March 27, 2017, the property became subject to a DDU Agreement which allows for all 192 existing leases covering approximately 134,000 net acres leased from University Lands to be combined into one drilling and development unit for development purposes. The term of the DDU Agreement expires on December 31, 2023, and the time to drill on the drilling and development unit continues through December 2023. The DDU Agreement also grants the right to extend the DDU Agreement through December 2028 if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid.

Our drilling obligations include five wells per year in years 2021, 2022 and 2023. The drilling obligations are minimum yearly requirements and may be exceeded if acceleration is desired.

We believe all drilling obligations through December 31, 2021 have been met.

On July 25, 2018, we and Hudspeth entered into a Settlement & Purchase Agreement (the “Settlement Agreement”) with University Founders (and Founders Oil & Gas Operating, LLC, former Operator), Wolfbone Investments, LLC (“Wolfbone”) and MPC (entities controlled by a related party), which agreement provided for Founders assigning all of its working interest in the oil and gas leases of the Orogrande Project to Hudspeth and Wolfbone equally. Future well capital spending obligations remained the same 50% contribution from Hudspeth and 50% from Wolfbone until such time as the $40.5 million to be spent on the project. Cumulative capital spending did not exceed $40.5 million until after the closing of the Arrangement.

The Company has drilled fourteen test wells in the Orogrande Project properties in order to stay in compliance with University Lands D&D Unit Agreement, as well as, to test for potential shallow pay zones and deeper pay zones that may be present on structural plays. Development of the wells continued through the year ended December 31, 2021 to further capture and document the scientific base in support of demonstrating the production potential of the property.

Table of Contents

On March 9, 2020, holders of certain notes payable by the Company entered into a Conversion Agreement under which the noteholders elected to convert principal of $6,000,000 and approximately $1,331,000 of accrued interest on the notes, in accordance with their terms, into an aggregate 6% working interest (of all such holders) in the Orogrande Project.

Following the Spin-Off, the Company intends to make offers and enter into agreements with one or more of the other current working interest owners in the Orogrande Project (each an "Orogrande Owner" and collectively, the "Orogrande Owners"). The Company anticipates offering the Orogrande Owners shares of Common Stock in exchange for their respective working interest in the Orogrande Project. The Company intends to offer the number of shares of Common Stock necessary such that each participating Orogrande Owner would own the percentage of Common Stock then outstanding in proportion to the percentage owned in the working interest of the Orogrande Project. For illustration purposes, if an Orogrande Owner owns ten percent (10%) of the working interest of the Orogrande Project, and such Orogrande Owner elects to participate and accept out offer of shares of Common Stock, then such Orogrande Owner will be offered ten percent (10%) of the aggregate amount of outstanding shares of Common Stock. The Company's decision to enter into these transactions will depend on ability of the Company and each Orogrande Owner to negotiate and enter into definitive agreements related to such transaction and the Company's board of directors receiving an industry-standard fairness opinion from an investment banking firm. One of the Orogrande Owners is Wolfbone Investments LLC, an entity controlled by Gregory McCabe, who will own, directly and indirectly through entities he owns or controls, over 11% of the Common Stock following the Spin-Off.

The Orogrande Project ownership as of December 31, 2021 is detailed as follows:

| | Revenue Interest | Working Interest |
|---|---|---|
| University Lands—Mineral Owner | 20.000% | n/a |
| ORRI—Magdalena Royalties, LLC, an entity controlled by Gregory McCabe, Met's former Chairman | 4.500% | n/a |
| ORRI—Unrelated Party | 0.500% | n/a |
| Hudspeth Oil Corporation, a subsidiary of Torchlight Energy Resources Inc. | 49.875% | 66.500% |
| Wolfbone Investments LLC, an entity controlled by Gregory McCabe, Met's former Chairman | 18.750% | 25.000% |
| Conversion by Note Holders in March, 2020 | 4.500% | 6.000% |
| Unrelated Party | 1.875% | 2.500% |
| | 100.000% | 100.000% |

Hazel Project in the Midland Basin in West Texas

Effective April 4, 2016, TEI acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. A back-in after payout of a 25% working interest was retained by MPC and another unrelated working interest owner.

In October 2016, the holders of all of Torchlight Energy Resources, Inc. then-outstanding shares of Series C Preferred Stock (which were issued in July 2016) elected to convert into a total 33.33% working interest in our Hazel Project, reducing our ownership from 66.66% to a 33.33% working interest.

*Acquisition of Additional Interests in Hazel Project*

On January 30, 2017, we entered into and closed an Agreement and Plan of Reorganization and a Plan of Merger with an entity which was wholly-owned by Mr. McCabe, which resulted in the acquisition of approximately 40.66% working interest in the 12,000 gross acres, 9,600 net acres, in the Hazel Project.

Table of Contents

Also, on January 30, 2017, the Company entered into and closed a Purchase and Sale Agreement with Wolfbone. Under the agreement, we acquired certain of Wolfbone's Hazel Project assets, including its interest in the Flying B Ranch #1 well and the 40 acre unit surrounding the well.

Upon the closing of the transactions, our working interest in the Hazel Project increased by 40.66% to a total ownership of 74%.

Effective June 1, 2017, we acquired an additional 6% working interest from unrelated working interest owners increasing our working interest in the Hazel project to 80%, and an overall net revenue interest of 75%.

The Company has drilled seven test wells on the Hazel Project to capture and document the scientific base in support of demonstrating the production potential of the property.

*Option Agreement with Masterson Hazel Partners, LP*

On August 13, 2020, our subsidiaries Torchlight Energy, Inc. and Torchlight Hazel, LLC (collectively, "Torchlight") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and McCabe Petroleum Corporation. Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on our Hazel Project, sufficient to satisfy Torchlight's continuous development obligations on the southern half of the prospect no later thanSeptember 30, 2020. MHP has satisfied this drilling obligation. MHP paid to Torchlight $1,000 as an option fee at the time of execution of the Option Agreement. MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the well attributable to Torchlight's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the well.

In exchange for MHP satisfying the above drilling obligations, Torchlight granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight's continuous development obligations on the northern half of the prospect. Because MHP exercised this drilling option and satisfied the continuous development obligations on the northern half of the prospect, under the terms of the Option Agreement (as amended in September 2020) MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. Such purchase would be under the terms of a form of Purchase and Sale Agreement included as an exhibit to the Option Agreement, at an aggregate purchase price of $12,690,704 for approximately 9,762 net mineral acres, and not less than 74% net revenue interest (approximately $1,300 per net mineral acre). MHP declined to exercise the Option in 2021.

Hunton Play, Central Oklahoma

Presently, we are producing from one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

## 5. RELATED PARTY BALANCES

As of December 31, 2021 and 2020, related party payables were $-0- and $98,805, respectively, due to our executive officers and directors included in accounts payable on the consolidated balance sheets. Accrued payroll was $-0- and $1,213,779, respectively, consisting of accrued and unpaid compensation due to our executive officers.

As of December 31, 2021, and 2020, the Company had a balance of $163,366 and $69,056, respectively, for an account receivable due from McCabe Petroleum Corporation for amounts advanced related to the Orogrande Project development cost sharing agreement.

## 6. COMMITMENTS AND CONTINGENCIES

**Leases**

The Company is subject to a sublease agreement through July 2022 for occupancy of its office premises which requires monthly rent payments of $8,300.

Table of Contents

**Legal Matters**

On January 31, 2020, Torchlight Energy Resources, Inc. and its wholly owned subsidiaries Torchlight Energy, Inc. and Torchlight Energy Operating, LLC were served with a lawsuit brought by Goldstone Holding Company, LLC (Goldstone Holding Company, LLC v. Torchlight Energy, Inc., et al., in the 160th Judicial District Court of Dallas County, Texas). On February 24, 2020, Torchlight Energy Resources, Inc., Torchlight Energy, Inc., and Torchlight Energy Operating, LLC timely filed their answer, affirmative defenses, and requests for disclosure. The suit, which sought monetary relief over $1 million, made unspecified allegations of misrepresentations involving a November 2015 participation agreement and a 2016 amendment to the participation agreement. Torchlight denied the allegations and asserted several affirmative defenses including but not limited to, that the suit is barred by the applicable statute of limitations, that the claims had been released, and that the claims were barred because of contractual disclaimers between sophisticated note parties. Torchlight also asserted counterclaims for attorney fees. On January 14, 2021, Goldstone Holding Company, LLC dismissed its claims without prejudice, leaving Torchlight's counterclaims for attorney fees as the only pending claim in the case. On February 26, 2021, Torchlight filed a non-suit without prejudice on its counterclaims for attorney fees, leaving no claims in the case. The court signed a final order disposing of the entire case on March 5, 2021. However, Goldstone Holding Company, LLC asked the court to re-instate its claims, and a hearing was held on April 13, 2021. On June 16, 2021, the court signed an order denying the motion to reinstate Goldstone Holding Company, LLC's claims, and the case is closed.

On April 30, 2020, the Company's wholly owned subsidiary, Hudspeth Oil Corporation, filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Working interest owner Wolfbone Investments, LLC, a company owned by the Meta's former Chairman Gregory McCabe, is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. The Company has added the manufacturer of one of the tool components that the Company contends was a cause of the tool failure. It was later discovered that Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies forfeited its charter to conduct business in the State of Texas by failing to timely pay its franchise taxes, and the Company added members of the board of directors to the case pursuant to the Texas Tax Code. It was recently disclosed that Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies is the subsidiary of a Canadian parent company, Cordax Evaluation Technologies, Inc., who has also been added to the case. The suit, Hudspeth Oil Corporation and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies, was filed in the 189th Judicial District Court of Harris County, Texas. Gregory McCabe, Meta's former Chairman of the Board filed a special appearance after being served with citation, alleging that he was a Canadian citizen with no meaningful ties to Texas. After discovery was conducted on this issue, the Company filed a nonsuit without prejudice for this Defendant, dismissing him from the case. The remaining parties are currently engaged in preliminary discovery and are scheduling mediation.

On March 18, 2021, Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500.01 and recover related attorney's fees. The foreclosure action, Datalog LWT Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc., was filed in the 205th Judicial District Court of Hudspeth County, Texas. We are contesting the lien in good faith and filed a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final disposition of the related case currently pending in Harris County, Texas.

**Environmental Matters**

The Company is subject to contingencies as a result of environmental laws and regulations. Present and future environmental laws and regulations applicable to the Company's operations could require substantial capital

Table of Contents

expenditures or could adversely affect its operations in other ways that cannot be predicted at this time. As of December 31, 2020 and 2019, no amounts had been recorded because no specific liability has been identified that is reasonably probable of requiring the Company to fund any future material amounts.

## 7. STOCKHOLDERS' EQUITY

Next Bridge Hydrocarbons, Inc. has preferred and common stock both at a par value of $.0001. As of December 31, 2021, the Company has issued 1 share of common stock and 0 shares of preferred stock.

## 8. INCOME TAXES

The Company recorded no income tax provision for 2021 and 2020 because of losses incurred.

There are no uncertain tax positions accounted for in this tax provision.

The following is a reconciliation between the federal income tax benefit computed at statutory federal income tax rates and actual income tax provision for the years ended December 31, 2021 and 2020:

| | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|
| Federal income tax benefit at statutory rate | $ (1,686,283) | $ (1,207,291) |
| Permanent Differences | 390,419 | 308 |
| Annual reconciling adjustment | (451,708) | (19,077) |
| Change in valuation allowance | 1,747,572 | 1,226,060 |
| Provision for income taxes | $ — | $ — |

The tax effects of temporary differences that gave rise to significant portions of deferred tax assets and liabilities at December 31, 2021 and 2020 are as follows:

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Deferred tax assets: | | |
| Net operating loss carryforward | $ 12,491,191 | $ 10,335,223 |
| Disallowed interest expense | — | 2,404 |
| Other | 385 | 9,824 |
| Deferred tax liabilities: | | |
| Investment in oil and gas properties | (2,765,485) | (2,368,932) |
| Net deferred tax assets and liabilities | 9,726,091 | 7,978,519 |
| Less valuation allowance | (9,726,091) | (7,978,519) |
| Total deferred tax assets and liabilities | $ — | $ — |

The Company had a net deferred tax asset related to federal net operating loss carryforwards of $59,481,861 and $49,215,346 at December 31, 2020 and December 31, 2019, respectively. The federal net operating loss carryforward will begin to expire in 2033. Realization of the deferred tax asset is dependent, in part, on generating sufficient taxable income prior to expiration of the loss carryforwards. The Company has placed a 100% valuation allowance against the net deferred tax asset because future realization of these assets is not assured.

Table of Contents

## 9. PROMISSORY NOTES

Certain assets of the Company were used as collateral for promissory notes entered into by TERI.

Promissory Notes Issued in 2017

On April 10, 2017, TERI sold two 12% unsecured promissory notes with a total of $8,000,000 in principal amount to David A. Straz, Jr. Foundation (the "Straz Foundation") and the David A. Straz, Jr. Irrevocable Trust DTD 11/11/1986 (the "Straz Trust") in a private transaction. Interest only was due and payable on the notes each month at the rate of 12% per annum, with a balloon payment of the outstanding principal due and payable at maturity on April 10, 2020. The holders of the notes also received annual payments of common stock in TERI at the rate of 2.5% of principal amount outstanding, based on a volume-weighted average price. Both notes were sold at an original issue discount of 94.25% and accordingly, TERI received total proceeds of $7,540,000 from the investors. TERI used the proceeds for working capital and general corporate purposes, which includes, without limitation, drilling capital, lease acquisition capital and repayment of prior debt.

The effective interest rate was 16.15%.

On February 20, 2020, TERI extended the maturity on $4 million of the 12% unsecured promissory notes previously due in April 2020. The maturity date of the subject promissory note had been extended for one year, from April 10, 2020, to April 10, 2021.

During the quarter ended March 31, 2021, the notes were retired in full by conversion into TERI's common stock.

Promissory Notes Issued in 2018

On February 6, 2018, TERI sold to the Straz Trust in a private transaction a 12% unsecured promissory note with a principal amount of $4,500,000. Interest only was due and payable on the note each month at the rate of 12% per annum, with a balloon payment of the outstanding principal due and payable at maturity on April 10, 2020. The holder of the note also received annual payments of common stock in TERI at the rate of 2.5% of principal amount outstanding, based on a volume-weighted average price. TERI sold the note at an original issue discount of 96.27% and accordingly, TERI received total proceeds of $4,332,150 from the investor. TERI used the proceeds for working capital and general corporate purposes, which includes, without limitation, drilling capital, lease acquisition capital and repayment of prior debt.

The effective interest rate was 15.88%.

During the quarter ended March 31, 2021, the notes were retired in full by conversion into TERI's common stock.

Extension of Promissory Notes

On April 24, 2020, TERI entered into a Note Amendment Agreement with each of the Straz Foundation, as a lender, the Straz Trust, as a lender and collateral agent, and The Northern Trust Company and Christopher M. Straz, as co-trustees of the Straz Trust. Under the Note Amendment Agreement, the parties agreed to amend and restate the two promissory notes issued to the Straz Trust on April 10, 2017 and February 6, 2018 that have total principal outstanding of $8,500,000, along with the promissory note issued to the Straz Foundation on April 10, 2017 which had an outstanding principal amount of $4,000,000. Under the Note Amendment Agreement, the maturity dates of the two promissory notes held by the Straz Trust and the Note held by the Foundation were extended to April 10, 2021. TERI had previously extended the maturity date of the promissory note held by the Straz Foundation to April 10, 2021.

Table of Contents

Under the Note Amendment Agreements, we and our subsidiaries provided a first priority lien on certain collateral in favor of the collateral agent for the benefit of the lenders. The collateral includes all assets and property held by Hudspeth Oil Corporation and Torchlight Hazel, LLC, which includes without limitation our working interest in certain oil and gas leases in Hudspeth County, Texas, known as the "Orogrande Project" and our working interest in certain oil and gas leases in the Midland Basin in West Texas, known as the "Hazel Project." Further, we and TERI, provided guaranty with respect to payment of the three promissory notes. The Note Amendment Agreements also provided restrictions on the use of proceeds if the Orogrande Project or the Hazel Project were sold.

Additionally, the promissory notes, as amended, provided conversion rights whereby the lenders have the right, at each such lender's option, to convert any portion of principal and interest into shares of common stock of TERI at a conversion price of $1.50 per share.

These notes payable issued in 2017 and 2018 totaling $12,500,000 were retired by conversion into TERI common stock in 2021.

Convertible Notes Issued in October 2018

On October 17, 2018, TERI sold to certain investors in a private transaction 16% Series C Unsecured Convertible Promissory Notes with a total principal amount of $6,000,000. Interest and principal were due and payable on the notes in one balloon payment at maturity on April 17, 2020. The notes were convertible, at the election of the holders, into an aggregate 6% working interest in certain oil and gas leases in Hudspeth County, Texas, known as our "Orogrande Project." After an analysis of the transaction and a review of applicable accounting pronouncements, management concluded that the notes issued on October 17, 2018 which contained a conversion right for holders to convert into a working interest in the Orogrande Project of the Company, meet a specific scope exception to the provisions requiring derivative accounting.

On March 9, 2020, each of the noteholders entered into a Conversion Agreement with us and our subsidiary Hudspeth Oil Corporation ("Hudspeth"), under which the noteholders elected to convert the notes, in accordance with their terms, into an aggregate 6% working interest (of all such holders) in the "Orogrande Project." Principal of $6,000,000 and approximately $1,331,000 of accrued interest were converted at March 9, 2020.

The Conversion Agreements also provided additional consideration to the noteholders including a limited carry, atop-off obligation of us and Hudspeth, and warrants to purchase a total of 750,000 restricted shares of TERI common stock, which warrants will have a term of five years and an exercise price of $0.70 per share. The limited carry provides that for the remainder of the 2020 calendar year, Hudspeth will pay all costs and expenses attributable to the assigned working interests, except where prohibited by law or regulation. The top-off obligation provides that, subject to the terms and conditions of the Conversion Agreements, if (a) we sell our entire working interest in the Orogrande Project, (b) as part of such sale, the holder's entire working interests are sold, and (c) the gross proceeds received by all the holders in such transaction are equal to less than $9,000,000; then we must pay the holders an amount equal to $9,000,000, (i) less gross proceeds the holders received in the transaction, (ii) less the amount of the carry the holders received under the Conversion Agreements, and (iii) less any gross proceeds the holders received in any farmouts occurring prior to the transaction.

The transaction was treated as an extinguishment of debt by TERI.

Convertible Notes Issued in First Quarter 2019

On February 11, 2019 TERI raised a total of $2,000,000 from investors through the sale of two 14% Series D Unsecured Convertible Promissory Notes. Principal was payable in a lump sum at maturity on May 11, 2020 with payments of interest payable monthly at the rate of 14% per annum. Holders of the notes had the right to convert principal and interest at any time into common stock of TERI at a conversion price of $1.08 per share.

Table of Contents

TERI had the right to redeem the notes at any time, provided that the redemption amount must include all interest that would have been earned through maturity. TERI evaluated the notes for beneficial conversion features and derivative accounting criteria and concluded that derivative accounting treatment was not applicable.

On April 21, 2020, TERI entered into agreements to amend the two 14% Series D Unsecured Convertible Promissory Notes that were originally issued on February 11, 2019. Under the amendment agreements, (a) the maturity dates were extended from May 11, 2020 to November 11, 2021, (b) the conversion price under which the noteholders may convert into our common stock was changed from $1.08 to $0.43, and (c) the noteholders were provided the right, at each noteholder's election, to convert their notes into either (i) a working interest in the Orogrande Project at the rate of one acre per $1,100 of principal and unpaid interest converted, or (ii) a working interest in the Hazel Project at the rate of one acre per $1,300 of principal and unpaid interest converted; provided, that the noteholders' right to convert into either such working interest is subject to approval of the collateral agent of the Note Amendment Agreement with the Straz parties.

Under the note amendments, the noteholders agreed to forebear demand or collection on all interest payments due and payable under the Note, including any past due interest payments, for 20 days after the execution of the Note Amendment Agreement. Further, we agreed to (a) issue each holder 20,000 restricted shares of common stock immediately and (b) pay each holder a fee of $10,000, at the same time as the payment of past due interest is paid. The past due interest and fee was paid.

These two promissory notes required monthly payments of interest only at the rate of 14% per annum, with a balloon payment of the outstanding principal due and payable at maturity.

These notes payable have been converted into TERI common stock. $1,000,000 was converted in December 2020 and the remaining $1,000,000 was converted in 2021.

Convertible Notes Issued in Fourth Quarter 2019

Effective October 31, 2019, TERI issued 10% unsecured convertible promissory notes in the amount of $540,000. Principal and interest were due at maturity on December 3, 2020. The principal and accrued interest on the notes were convertible into shares of common stock at $0.75 per common share at any time after the original issue date. The notes were alternatively convertible, at the election of the holders, into an aggregate 0.367% working interest in our Orogrande Project.

These notes payable were retired by conversion into TERI common stock in December 2020.

**10. NOTE PAYABLE, RELATED PARTY**

In 2021, the Company entered into a note payable with Meta to borrow up to $15 million. On October 1, 2021, the Company issued a secured, revolving promissory note in an original principal amount of up to $15 million in favor of Meta (the "2021 Note"). The 2021 Note bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023, and the outstanding principal of the 2021 Note will amortize in six equal, monthly installments. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts the Company's ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of its assets, unless the Company is the surviving entity or the successor entity assumes all of obligations under the 2021 Note. The note payable is collateralized by certain shares of common stock in Meta held by one of its stockholders and by a lien on a 25% interest in the Orogrande prospect.

Table of Contents

The balance on the loan as of December 31, 2021 is $12,500,000 and the Company incurred interest that is paid in kind of $208,889 for the year ended December 31, 2021. The Company subsequently drew the additional $2,500,000 on the note payable in 2022.

### 11. ASSET RETIREMENT OBLIGATIONS

The following is a reconciliation of the asset retirement obligations liability through December 31, 2021:

| | |
|---|---|
| Asset retirement obligations—December 31, 2020 | $ 21,844 |
| Accretion expense | 93 |
| Estimated liabilities recorded | — |
| Liability reduction at sale of property | — |
| Asset retirement obligations—December 31, 2021 | $ 21,937 |

### 12. SUBSEQUENT EVENTS

As of July 2022, the Company issued 165,523,362 shares of its common stock to Meta. On June 28, 2022, we borrowed a $2.34 million unsecured term loan, the proceeds of which are available for our working capital and general corporate purposes. We anticipate entering into a loan agreement with Meta, as lender (the “Loan Agreement”), which will cover the $2.34 million loan and it is anticipated that we will have the ability to elect to borrow additional term loans in an aggregate (taking into account and including the $2.34 million previously borrowed) principal amount up to, but not exceeding, $5.0 million. The term loan will bear interest at a per annum rate equal to 8%. The commitments under the Loan Agreement would expire on December 31, 2022. The loans would then become due and payable on March 31, 2023 (the “Maturity Date”) under the Loan Agreement; provided, however, if we raise $30 million or more in capital through debt or equity, or a combination thereof by the Maturity Date, the Maturity Date will be extended to September 30, 2023 and the term loan would be amortized in six equal monthly installments. We expect the Loan Agreement will include customary representations and covenants that, subject to exceptions and qualifications, that will restrict our ability to do certain things, such as: engage in mergers, acquisitions, and asset sales; transact with affiliates; undergo a change in control; incur additional indebtedness; incur liens; make loans and investments; declare dividends or redeem or repurchase equity interests; and enter into certain restrictive agreements. In addition, the Loan Agreement will contain customary events of default, mandatory prepayment events and affirmative covenants, including, without limitation, covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our material properties, reporting requirements, compliance with applicable laws and regulations, and formation or acquisition of new subsidiaries.

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**
**UNAUDITED CONDENSED CONSOLIDATED BALANCE SHEETS**

| | March 31, 2022 | December 31, 2021 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash | $ 829,145 | $ 1,989,419 |
| Accounts receivable, related party | 165,238 | 163,366 |
| Grants and other receivables | 50,970 | 74,310 |
| Prepaid expenses | 357 | 2,667 |
| Total current assets | 1,045,710 | 2,229,762 |
| Oil and natural gas properties, net | 46,747,755 | 45,663,470 |
| Other assets | 25,000 | 25,000 |
| TOTAL ASSETS | $ 47,818,465 | $ 47,918,232 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 746,802 | $ 2,828,326 |
| Note payable, related party | 15,496,111 | 12,708,889 |
| Total current liabilities | 16,242,913 | 15,537,215 |
| Asset retirement obligations | 21,937 | 21,937 |
| Total liabilities | 16,264,850 | 15,559,152 |
| Commitments and contingencies | | |
| Stockholder's equity: | | |
| Common stock, par value $0.0001; 500,000,000 shares authorized; 1 issued and outstanding | — | — |
| Additional paid-in capital | 100,864,388 | 100,546,596 |
| Accumulated deficit | (69,310,773) | (68,187,516) |
| Total stockholder's equity | 31,553,615 | 32,359,080 |
| TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY | $ 47,818,465 | $ 47,918,232 |

*The accompanying notes are an integral part of these consolidated financial statements.*

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Three Months Ended March 31, 2022 | Three Months Ended March 31, 2021 |
|---|---|---|
| Oil sales | $ — | $ 1,166 |
| Natural gas sales | — | 1,305 |
| **Revenue, net** | **—** | **2,471** |
| **Operating expenses** | | |
| Lease operating expenses | 10,621 | 109,749 |
| Production and ad valorem tax | — | 178 |
| General and administrative | 825,737 | 1,034,593 |
| Depreciation, depletion and amortization | — | 514 |
| Total operating expenses | 836,358 | 1,145,034 |
| **Other income (expense)** | | |
| Interest expense | (287,222) | (1,918) |
| Gain on extinguishment of debt | — | 77,477 |
| Interest income | 323 | 457 |
| Total other expense—net | (286,899) | 76,016 |
| **Loss before income taxes** | (1,123,257) | (1,066,547) |
| Provision for income tax | — | — |
| **Net loss** | **$ (1,123,257)** | **$ (1,066,547)** |

*The accompanying notes are an integral part of these consolidated financial statements.*

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

| | Common stock shares | Common stock amount | Additional paid-in capital | Accumulated deficit | Total |
|---|---|---|---|---|---|
| **Balance, December 31, 2020** | 1 | $ — | $ 88,267,685 | $(59,948,708) | $28,318,977 |
| Contributions from parent | — | — | 15,901,945 | — | 15,901,945 |
| Net loss | — | — | — | (1,066,547) | (1,066,547) |
| **Balance, March 31, 2021** | 1 | $ — | $104,169,630 | $(61,015,255) | $43,154,375 |
| **Balance, December 31, 2021** | 1 | $ — | $100,546,596 | $(68,187,514) | $32,359,080 |
| Contributions from parent | — | — | 317,792 | — | 317,792 |
| Net loss | — | — | — | (1,123,257) | (1,123,257) |
| **Balance, March 31, 2022** | 1 | $ — | $100,864,388 | $(69,310,773) | $31,553,615 |

*The accompanying notes are an integral part of these consolidated financial statements.*

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Three Months Ended March 31, 2022 | Three Months Ended March 31, 2021 |
|---|---|---|
| **Cash Flows From Operating Activities** | | |
| Net loss | $ (1,123,257) | $ (1,066,547) |
| Adjustments to reconcile net loss to net cash from operations: | | |
| Depreciation, depletion and amortization | — | 514 |
| Paid in kind interest | 287,222 | — |
| Change in: | | |
| Accounts receivable, related party | (1,872) | (7,501) |
| Grants and other receivables | 23,340 | — |
| Prepaid expenses | 2,310 | 49,390 |
| Accounts payable | (2,081,524) | (397,964) |
| Accrued liabilities | — | (1,213,779) |
| **Net cash from operating activities** | (2,893,781) | (2,635,887) |
| **Cash Flows From Investing Activities** | | |
| Investment in oil and natural gas properties | (1,084,285) | (487,256) |
| **Net cash from investing activities** | (1,084,285) | (487,256) |
| **Cash Flows From Financing Activities** | | |
| Contributions from parent | 317,792 | 15,901,945 |
| Proceeds from note payable, related party | 2,500,000 | — |
| **Net cash from financing activities** | 2,817,792 | 15,901,945 |
| **Net (decrease) in cash** | (1,160,274) | 12,778,802 |
| **Cash—beginning of period** | 1,989,419 | 130,504 |
| **Cash—end of period** | $ 829,145 | $ 12,909,306 |
| **Supplemental disclosure of cash flow information: (Non Cash Items)** | | |
| Cash paid for interest | $ — | $ — |
| Cash paid for state franchise tax | $ — | $ — |

*The accompanying notes are an integral part of these consolidated financial statements.*

Table of Contents

NEXT BRIDGE HYDROCARBONS, INC.

NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

## 1. NATURE OF BUSINESS

Next Bridge Hydrocarbons, Inc. (formerly OilCo Holdings, Inc.) ("the Company", "we", "our") was incorporated in August 2021 under the laws of the State of Nevada. We are engaged in the acquisition, exploration and development of oil and natural gas properties in the United States. We operate our business through our subsidiaries Torchlight Energy Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC.

Prior to the formation our subsidiaries were consolidated into Meta Materials Inc., an affiliated company. All intercompany transactions have been eliminated in the consolidated financial statements.

On June 29, 2021, our former parent, Torchlight Energy Resources, Inc. ("TERI") was acquired by Meta Materials, Inc.

## 2. GOING CONCERN

At March 31, 2022, the Company had not yet achieved profitable operations. We had a net loss of $1,123,257 for the three months ended March 31, 2022. We expect to incur further losses in the development of our business. The Company had a working capital deficit as of March 31, 2022 of $15,197,203. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

The Company's ability to continue as a going concern is dependent on its ability to generate future profitable operations and/or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due. Management's plan to address the Company's ability to continue as a going concern includes: (1) obtaining debt or equity funding from private placement, institutional, or public sources; (2) obtain loans from financial institutions, where possible, or (3) participating in joint venture transactions with third parties. Although management believes that it will be able to obtain the necessary funding to allow the Company to remain a going concern through the methods discussed above, there can be no assurances that such methods will prove successful.

These consolidated financial statements have been prepared assuming that the Company will continue as a going concern and therefore, the financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amount and classifications of liabilities that may result from the outcome of this uncertainty.

## 3. SIGNIFICANT ACCOUNTING POLICIES

The Company maintains its accounts on the accrual method of accounting in accordance with accounting principles generally accepted in the United States of America. Accounting principles followed and the methods of applying those principles, which materially affect the determination of financial position, results of operations and cash flows are summarized below:

***Use of estimates***—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and certain assumptions that affect the amounts reported in these consolidated financial statements and accompanying notes. Actual results could differ from these estimates.

***Basis of presentation***—The financial statements are presented on a consolidated basis and include all of the accounts of Next Bridge Hydrocarbons, Inc.. and its wholly owned subsidiaries, Torchlight Energy, Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC. All significant intercompany balances and transactions have been eliminated.

Table of Contents

These interim financial statements are unaudited and have been prepared pursuant to the rules and regulations of the SEC regarding interim financial reporting. Certain disclosures have been condensed or omitted from these financial statements. Accordingly, they do not include all the information and notes required by accounting principles generally accepted in the United States of America ("GAAP") for complete consolidated financial statements, and should be read in conjunction with the audited consolidated financial statements and notes thereto included herein for the year ended December 31, 2021.

In the opinion of management, the accompanying unaudited financial condensed consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary to fairly present the financial position as of, and the results of operations for, all periods presented. In preparing the accompanying financial statements, management has made certain estimates and assumptions that affect reported amounts in the condensed financial statements and disclosures of contingencies. Actual results may differ from those estimates. The results for interim periods are not necessarily indicative of annual results.

***Risks and uncertainties***—The Company's operations are subject to significant risks and uncertainties, including financial, operational, technological, and other risks associated with operating an emerging business, including the potential risk of business failure.

In January 2020, the World Health Organization ("WHO") announced a global health emergency because of a new strain of coronavirus ("COVID-19") and the significant risks to the international community and economies as the virus spreads globally beyond its point of origin. In March 2020, the WHO classified COVID-19 as a pandemic, based on the rapid increase in exposure globally, and thereafter, COVID-19 continued to spread throughout the U.S. and worldwide. In addition, actions taken by OPEC members and other exporting nations on the supply and demand in global oil and natural gas markets resulted in significant negative pricing pressure in the first half of 2020, followed by a recovery in pricing and an increase in demand in the second half of 2020 and into 2021. However, multiple variants emerged in 2021 and became highly transmissible, which contributed to additional pricing volatility during 2021 to date. The financial results of companies in the oil and natural gas industry have been impacted materially as a result of changing market conditions. Such circumstances generally increase uncertainty in the Partnership's accounting estimates. Although demand and market prices for oil and natural gas have recently increased, due to the rising energy use and the improvement in U.S. economic activity, we cannot predict events that may lead to future price volatility and the near term energy outlook remains subject to heightened levels of uncertainty.

We are continuing to closely monitor the overall impact and the evolution of the COVID-19 pandemic, including the ongoing spread of any variants, along with future OPEC actions on all aspects of our business, including how these events may impact our future operations, financial results, liquidity, employees, and operators. Additional actions may be required in response to the COVID-19 pandemic on a national, state, and local level by governmental authorities, and such actions may further adversely affect general and local economic conditions, particularly if the 2021 resurgence and spread of the COVID-19 pandemic continues. We cannot predict the long-term impact of these events on our liquidity, financial position, results of operations or cash flows due to uncertainties including the severity of COVID-19 or any of the ongoing variants, and the effect the virus will have on the demand for oil and natural gas. These situations remain fluid and unpredictable, and we are actively managing our response.

***Concentration of risks***—At times the Company's cash balances are in excess of amounts guaranteed by the Federal Deposit Insurance Corporation. The Company's cash is placed with a highly rated financial institution, and the Company regularly monitors the credit worthiness of the financial institutions with which it does business.

***Fair value of financial instruments***—Financial instruments consist of cash, receivables, convertible note receivable, payables and promissory notes, if any. The estimated fair values of cash, receivables, and payables approximate the carrying amount due to the relatively short maturity of these instruments. The carrying amounts

Table of Contents

of any promissory notes approximate their fair value giving affect for the term of the note and the effective interest rates.

For assets and liabilities that require re-measurement to fair value the Company categorizes them in a three-level fair value hierarchy as follows:

- Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities.
- Level 2 inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration.
- Level 3 inputs are unobservable inputs based on management's own assumptions used to measure assets and liabilities at fair value.

A financial asset or liability's classification within the hierarchy is determined based on the lowest level input that is significant to the fair value measurement.

***Cash and cash equivalents***—Cash and cash equivalents include certain investments in highly liquid instruments with original maturities of three months or less.

***Accounts receivable***—Accounts receivable consist of uncollateralized oil and natural gas revenues due under normal trade terms, as well as amounts due from working interest owners of oil and natural gas properties for their share of expenses paid on their behalf by the Company. Management reviews receivables periodically and reduces the carrying amount by a valuation allowance that reflects management's best estimate of the amount that may not be collectible. As of March 31, 2022 and December 31, 2021, no valuation allowance was considered necessary.

***Oil and natural gas properties***—The Company uses the full cost method of accounting for exploration and development activities as defined by the SEC. Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least quarterly and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions.

Gains and losses on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and natural gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

***Capitalized interest***—The Company capitalizes interest on unevaluated properties during the periods in which they are excluded from costs being depleted or amortized. During the three months ended March 31, 2022 and 2021, the Company capitalized $-0, and $141,048 respectively, of interest on unevaluated properties.

***Depreciation, depletion, and amortization***—The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated

Table of Contents

future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

***Ceiling test***—Future production volumes from oil and natural gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and natural gas properties. If the net capitalized cost of proved oil and natural gas properties, net of related deferred income taxes, plus the cost of unproved oil and natural gas properties, exceeds the present value of estimated future net cash flows discounted at 10 percent, net of related realizable tax affects, plus the cost of unproved oil and natural gas properties, the excess is charged to expense and reflected as additional accumulated DD&A. The Company recorded an impairment expense of $-0- for the three months ended March 31, 2022 and 2021, respectively, to recognize the adjustment required by the ceiling test.

The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and natural gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and natural gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

***Asset retirement obligations***—The fair value of a liability for an ARO is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and natural gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

***Income taxes***—Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is established to reduce deferred tax assets if it is more likely than not that the related tax benefits will not be realized.

Authoritative guidance for uncertainty in income taxes requires that the Company recognize the financial statement benefit of a tax position only after determining that the relevant tax authority would more likely than

not sustain the position following an examination. Management has reviewed the Company's tax positions and determined there were no uncertain tax positions requiring recognition in the consolidated financial statements. Company tax returns remain subject to Federal and State tax examinations. Generally, the applicable statutes of limitation are three to four years from their respective filings.

Estimated interest and penalties related to potential underpayment on any unrecognized tax benefits are classified as a component of tax expense in the statements of operation. The Company has not recorded any interest or penalties associated with unrecognized tax benefits for any periods covered by these financial statements.

***Revenue recognition***—The Company's revenue is typically generated from contracts to sell natural gas, crude oil or NGLs produced from interests in oil and natural gas properties owned by the Company. Contracts for the sale of natural gas and crude oil are evidenced by (1) base contracts for the sale and purchase of natural gas or crude oil, which document the general terms and conditions for the sale, and (2) transaction confirmations, which document the terms of each specific sale. The transaction confirmations specify a delivery point which represents the point at which control of the product is transferred to the customer. The Company elects to treat contracts to sell oil and natural gas production as normal sales, which are then accounted for as contracts with customers. The Company has determined that these contracts represent multiple performance obligations which are satisfied when control of the commodity transfers to the customer, typically through the delivery of the specified commodity to a designated delivery point.

Revenue is measured based on consideration specified in the contract with the customer, and excludes any amounts collected on behalf of third parties. The Company recognizes revenue in the amount that reflects the consideration it expects to be entitled to in exchange for transferring control of those goods to the customer. Amounts allocated in the Company's price contracts are based on the standalone selling price of those products in the context of long-term contracts. Payment is generally received one or two months after the sale has occurred.

Gain or loss on derivative instruments is outside the scope of ASC 606 and is not considered revenue from contracts with customers subject to ASC 606. The Company may in the future use financial or physical contracts accounted for as derivatives as economic hedges to manage price risk associated with normal sales, or in limited cases may use them for contracts the Company intends to physically settle but do not meet all of the criteria to be treated as normal sales.

*Producer Gas Imbalances.* The Company applies the sales method of accounting for natural gas revenue. Under this method, revenues are recognized based on the actual volume of natural gas sold to purchasers.

***Environmental laws and regulations***—The Company is subject to extensive federal, state, and local environmental laws and regulations. Environmental expenditures are expensed or capitalized depending on their future economic benefit. The Company believes that it is in compliance with existing laws and regulations. The Company accrued no liability as of March 31, 2022 and December 31, 2021.

***Recent accounting pronouncements not yet adopted—***

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which adds a new Topic 326 to the Codification and removes the thresholds that companies apply to measure credit losses on financial instruments measured at amortized cost, such as loans, receivables, and held-to-maturity debt securities. Under current GAAP, companies generally recognize credit losses when it is probable that the loss has been incurred. The revised guidance will remove all recognition thresholds and will require companies to recognize an allowance for credit losses for the difference between the amortized cost basis of a financial instrument and the amount of amortized cost that the company expects to collect over the instrument's contractual life. ASU 2016-13 also amends the credit loss measurement guidance for available-for sale debt securities and beneficial interests in securitized financial assets. The guidance is applicable for fiscal years beginning after December 15, 2019 and interim periods within those years,

Table of Contents

however, the FASB extended the effective date for smaller reporting companies to fiscal years beginning after December 15, 2022. The Company is currently evaluating the potential impact of the adoption of this standard on its related disclosures.

Other recently issued or adopted accounting pronouncements are not expected to have, or did not have, a material impact on the Company's financial position or results from operations.

### 4. OIL & NATURAL GAS PROPERTIES

The following table presents the capitalized costs for oil & natural gas properties of the Company:

| | March 31, 2022 | December 31, 2021 |
|---|---|---|
| Evaluated costs subject to amortization | $ — | $ — |
| Unevaluated costs | 46,747,755 | 45,663,470 |
| Total capitalized costs | 46,747,755 | 45,663,470 |
| Less accumulated depreciation, depletion and amortization | — | — |
| Total oil and natural gas properties | $ 46,747,755 | $ 45,663,470 |

Unevaluated costs as of March 31, 2022 and December 31, 2021 include cumulative costs on developing projects including the Orogrande and Hazel projects in West Texas.

The Company periodically adjusts for the separation of evaluated versus unevaluated costs within its full cost pool to recognize the value impairment related to the expiration of, or changes in market value, of unevaluated leases. The impact of reclassifications as they become necessary is to increase the basis for calculation of future period's depletion, depreciation and amortization which effectively recognizes the impairment on the consolidated statement of operations over future periods. Reclassified costs also become evaluated costs for purposes of ceiling tests and which may cause recognition of increased impairment expense in future periods. The remaining cumulative unevaluated costs which have been reclassified within our full cost pool totals $0 as of March 31, 2022. As of March 31, 2022, evaluated costs are $-0- since we have no proved reserve value associated with our properties.

Due to the volatility of commodity prices, should oil and natural gas prices decline in the future, it is possible that a further write-down could occur. Proved reserves are estimated quantities of crude oil, natural gas, and natural gas liquids, which geological and engineering data demonstrate with reasonable certainty to be recoverable from known reservoirs under existing economic and operating conditions. The independent engineering estimates include only those amounts considered to be proved reserves and do not include additional amounts which may result from new discoveries in the future, or from application of secondary and tertiary recovery processes where facilities are not in place or for which transportation and/or marketing contracts are not in place. Estimated reserves to be developed through secondary or tertiary recovery processes are classified as unevaluated properties.

**Current Projects**

We are an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. We are primarily focused on the acquisition of early stage projects, the development and delineation of these projects, and then the monetization of those assets once these activities are completed.

Since 2010, our primary focus has been the development of interests in oil and natural gas projects we hold in the Permian Basin in West Texas. We also hold minor interests in certain other oil and natural gas projects in Central Oklahoma that we are in the process of divesting.

Table of Contents

As of March 31, 2022, we had interests in three oil and gas projects: the Orogrande Project in Hudspeth County, Texas, the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, and two wells in Central Oklahoma.

Orogrande Project, West Texas

On August 7, 2014, we entered into a Purchase Agreement with Hudspeth Oil Corporation ("Hudspeth"), McCabe Petroleum Corporation ("MPC"), and Gregory McCabe, Meta's former Chairman. Mr. McCabe was the sole owner of both Hudspeth and MPC. Under the terms and conditions of the Purchase Agreement, we purchased 100% of the capital stock of Hudspeth which held certain oil and natural gas assets, including a 100% working interest in approximately 172,000 predominately contiguous acres in the Orogrande Basin in West Texas. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe. Mr. McCabe also holds a 4.5% overriding royalty interest in the Orogrande acreage, —which he obtained prior to, and was not a part of the August 2014 transaction. As of March 31, 2022, leases covering approximately 134,000 acres remain in effect.

Effective March 27, 2017, the property became subject to a DDU Agreement which allows for all 192 existing leases covering approximately 134,000 net acres leased from University Lands to be combined into one drilling and development unit for development purposes. The term of the DDU Agreement expires on December 31, 2023, and the time to drill on the drilling and development unit continues through December 2023. The DDU Agreement also grants the right to extend the DDU Agreement through December 2028 if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid.

Our drilling obligations include five wells per year in years 2021, 2022 and 2023. The drilling obligations are minimum yearly requirements and may be exceeded if acceleration is desired.

We believe all drilling obligations through March 31, 2022, have been met.

On July 25, 2018, we and Hudspeth entered into a Settlement & Purchase Agreement (the "Settlement Agreement") with University Founders (and Founders Oil & Gas Operating, LLC, former Operator), Wolfbone and MPC (entities controlled by a related party), which agreement provided for Founders assigning all of its working interest in the oil and gas leases of the Orogrande Project to Hudspeth and Wolfbone equally. Future well capital spending obligations remained the same 50% contribution from Hudspeth and 50% from Wolfbone until such time as the $40.5 million to be spent on the project. Cumulative capital spending did not exceed $40.5 million until after the closing of the Arrangement.

The Company has drilled fourteen test wells in the Orogrande in order to stay in compliance with University Lands D&D Unit Agreement, as well as, to test for potential shallow pay zones and deeper pay zones that may be present on structural plays. Development of the wells continued through the three months ended March 31, 2022, to further capture and document the scientific base in support of demonstrating the production potential of the property.

On March 9, 2020, holders of certain notes payable by the Company entered into a Conversion Agreement under which the noteholders elected to convert principal of $6,000,000 and approximately $1,331,000 of accrued interest on the notes, in accordance with their terms, into an aggregate 6% working interest (of all such holders) in the Orogrande Project.

Following the Spin-Off, the Company intends to make offers and enter into agreements with one or more of the other current working interest owners in the Orogrande Project (each an "Orogrande Owner" and collectively, the "Orogrande Owners"). The Company anticipates offering the Orogrande Owners shares of Common Stock in exchange for their respective working interest in the Orogrande Project. The Company intends to offer the number of shares of Common Stock necessary such that each participating Orogrande Owner would own the

**Table of Contents**

percentage of Common Stock then outstanding in proportion to the percentage owned in the working interest of the Orogrande Project. For illustration purposes, if an Orogrande Owner owns ten percent (10%) of the working interest of the Orogrande Project, and such Orogrande Owner elects to participate and accept out offer of shares of Common Stock, then such Orogrande Owner will be offered ten percent (10%) of the aggregate amount of outstanding shares of Common Stock. The Company's decision to enter into these transactions will depend on ability of the Company and each Orogrande Owner to negotiate and enter into definitive agreements related to such transaction and the Company's board of directors receiving an industry-standard fairness opinion from an investment banking firm. One of the Orogrande Owners is Wolfbone Investments LLC, an entity controlled by Gregory McCabe, who will own, directly and indirectly through entities he owns or controls, over 11% of the Common Stock following the Spin-Off.

The Orogrande Project ownership as of March 31, 2022 is detailed as follows:

| | Revenue Interest | Working Interest |
|---|---|---|
| University Lands—Mineral Owner | 20.000% | n/a |
| ORRI—Magdalena Royalties, LLC, an entity controlled by Gregory McCabe, Meta's former Chairman | 4.500% | n/a |
| ORRI—Unrelated Party | 0.500% | n/a |
| Hudspeth Oil Corporation, a subsidiary of Torchlight Energy Resources Inc. | 49.875% | 66.500% |
| Wolfbone Investments LLC, an entity controlled by Gregory McCabe, Meta's former Chairman | 18.750% | 25.000% |
| Conversion by Note Holders in March, 2020 | 4.500% | 6.000% |
| Unrelated Party | 1.875% | 2.500% |
| | 100.000% | 100.000% |

Hazel Project in the Midland Basin in West Texas

Effective April 4, 2016, TEI acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. A back-in after payout of a 25% working interest was retained by MPC and another unrelated working interest owner.

In October 2016, the holders of all of Torchlight Energy Resources, Inc. then-outstanding shares of Series C Preferred Stock (which were issued in July 2016) elected to convert into a total 33.33% working interest in our Hazel Project, reducing our ownership from 66.66% to a 33.33% working interest.

*Acquisition of Additional Interests in Hazel Project*

On January 30, 2017, we entered into and closed an Agreement and Plan of Reorganization and a Plan of Merger with an entity which was wholly-owned by Mr. McCabe, which resulted in the acquisition of approximately 40.66% working interest in the 12,000 gross acres, 9,600 net acres, in the Hazel Project.

Also, on January 30, 2017, the Company entered into and closed a Purchase and Sale Agreement with Wolfbone. Under the agreement, we acquired certain of Wolfbone's Hazel Project assets, including its interest in the Flying B Ranch #1 well and the 40 acre unit surrounding the well.

Upon the closing of the transactions, our working interest in the Hazel Project increased by 40.66% to a total ownership of 74%.

Effective June 1, 2017, we acquired an additional 6% working interest from unrelated working interest owners increasing our working interest in the Hazel project to 80%, and an overall net revenue interest of 75%.

Table of Contents

The Company has drilled seven test wells on the Hazel Project to capture and document the scientific base in support of demonstrating the production potential of the property.

*Option Agreement with Masterson Hazel Partners, LP*

On August 13, 2020, our subsidiaries Torchlight Energy, Inc. and Torchlight Hazel, LLC (collectively, "Torchlight") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and McCabe Petroleum Corporation. Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on our Hazel Project, sufficient to satisfy Torchlight's continuous development obligations on the southern half of the prospect no later thanSeptember 30, 2020. MHP has satisfied this drilling obligation. MHP paid to Torchlight $1,000 as an option fee at the time of execution of the Option Agreement. MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the Well attributable to Torchlight's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the well.

In exchange for MHP satisfying the above drilling obligations, Torchlight granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight's continuous development obligations on the northern half of the prospect. Because MHP exercised this drilling option and satisfied the continuous development obligations on the northern half of the prospect, under the terms of the Option Agreement (as amended in September 2020) MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. Such purchase would be under the terms of a form of Purchase and Sale Agreement included as an exhibit to the Option Agreement, at an aggregate purchase price of $12,690,704 for approximately 9,762 net mineral acres, and not less than 74% net revenue interest (approximately $1,300 per net mineral acre). MHP declined to exercise the Option in 2021.

Hunton Play, Central Oklahoma

Presently, we are producing from one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

## 5. RELATED PARTY BALANCES

As of March 31, 2022 and December 31, 2021, the Company had a balance of $165,238 and $163,366, respectively, for an account receivable due from McCabe Petroleum Corporation for amounts advanced related to the Orogrande development cost sharing agreement.

## 6. COMMITMENTS AND CONTINGENCIES

**Leases**

The Company is subject to a sublease agreement through July 2022 for occupancy of its office premises which requires monthly rent payments of $8,300.

**Legal Matters**

On January 31, 2020, Torchlight Energy Resources, Inc. and its wholly owned subsidiaries Torchlight Energy, Inc. and Torchlight Energy Operating, LLC were served with a lawsuit brought by Goldstone Holding Company, LLC (Goldstone Holding Company, LLC v. Torchlight Energy, Inc., et al., in the 160th Judicial District Court of Dallas County, Texas). On February 24, 2020, Torchlight Energy Resources, Inc., Torchlight Energy, Inc., and Torchlight Energy Operating, LLC timely filed their answer, affirmative defenses, and requests for disclosure. The suit, which sought monetary relief over $1 million, made unspecified allegations of misrepresentations involving a November 2015 participation agreement and a 2016 amendment to the participation agreement.

Table of Contents

Torchlight denied the allegations and asserted several affirmative defenses including but not limited to, that the suit is barred by the applicable statute of limitations, that the claims had been released, and that the claims were barred because of contractual disclaimers between sophisticated note parties. Torchlight also asserted counterclaims for attorney fees. On January 14, 2021, Goldstone Holding Company, LLC dismissed its claims without prejudice, leaving Torchlight's counterclaims for attorney fees as the only pending claim in the case. On February 26, 2021, Torchlight filed a non-suit without prejudice on its counterclaims for attorney fees, leaving no claims in the case. The court signed a final order disposing of the entire case on March 5, 2021. However, Goldstone Holding Company, LLC asked the court to re-instate its claims, and a hearing was held on April 13, 2021. On June 16, 2021, the court signed an order denying the motion to reinstate Goldstone Holding Company's, LLC's claims, and the case is closed.

On April 30, 2020, The Company's wholly owned subsidiary, Hudspeth Oil Corporation, filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Working interest owner Wolfbone Investments, LLC, a company owned by the Company's former Chairman Gregory McCabe, is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. The Company has added the manufacturer of one of the tool components that the Company contends was a cause of the tool failure. It was later discovered that Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies forfeited its charter to conduct business in the State of Texas by failing to timely pay its franchise taxes, and the Company added members of the board of directors to the case pursuant to the Texas Tax Code. It was recently disclosed that Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies is the subsidiary of a Canadian parent company, Cordax Evaluation Technologies, Inc., who has also been added to the case. The suit, Hudspeth Oil Corporation and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies, was filed in the 189th Judicial District Court of Harris County, Texas. The Company's current Chairman of the Board filed a special appearance after being served with citation, alleging that he was a Canadian citizen with no meaningful ties to Texas. After discovery was conducted on this issue, the Company filed a nonsuit without prejudice for this Defendant, dismissing him from the case. The remaining parties are currently engaged in preliminary discovery and are scheduling mediation.

On March 18, 2021, Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500.01 and recover related attorney's fees. The foreclosure action, Datalog LWT Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc., was filed in the 205th Judicial District Court of Hudspeth County, Texas. We are contesting the lien in good faith and filed a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final disposition of the related case currently pending in Harris County, Texas.

**Environmental Matters**

The Company is subject to contingencies as a result of environmental laws and regulations. Present and future environmental laws and regulations applicable to the Company's operations could require substantial capital expenditures or could adversely affect its operations in other ways that cannot be predicted at this time. As of March 31, 2022 and December 31, 2021, no amounts had been recorded because no specific liability has been identified that is reasonably probable of requiring the Company to fund any future material amounts.

**7. STOCKHOLDERS' EQUITY**

Next Bridge Hydrocarbons, Inc. has preferred and common stock both at a par value of $.0001. As of March 31, 2022, the Company has issued 1 share of common stock and 0 shares of preferred stock.

Table of Contents

**8. INCOME TAXES**

The Company recorded no income tax provision at March 31, 2022 and December 31, 2021 because of losses incurred.

The Company estimates its annual effective income tax rate in recording its quarterly provision for income taxes in the various jurisdictions in which it operates. Statutory tax rate changes and other significant or unusual items are recognized as discrete items in the quarter in which they occur. The Company recorded no income tax expense for the three months ended March 31, 2022 because the Company expects to incur a tax loss in the current year. Similarly, no income tax expense was recognized for the three months ended March 31, 2021.

The Company had a net deferred tax asset related to federal net operating loss carryforwards of $61,644,959 and $59,481,861 at March 31, 2022 and December 31, 2021, respectively. The federal net operating loss carryforward will begin to expire in 2033. Realization of the deferred tax asset is dependent, in part, on generating sufficient taxable income prior to expiration of the loss carryforwards. The Company has placed a 100% valuation allowance against the net deferred tax asset because future realization of these assets is not assured.

**9. PROMISSORY NOTES**

Certain assets of the Company were used as collateral for promissory notes entered into by TERI.

Promissory Notes Issued in 2017

On April 10, 2017, TERI sold two 12% unsecured promissory notes with a total of $8,000,000 in principal amount to the Straz Foundation and the Straz Trust in a private transaction. Interest only was due and payable on the notes each month at the rate of 12% per annum, with a balloon payment of the outstanding principal due and payable at maturity on April 10, 2020. The holders of the notes also received annual payments of common stock in TERI at the rate of 2.5% of principal amount outstanding, based on a volume-weighted average price. Both notes were sold at an original issue discount of 94.25% and accordingly, TERI received total proceeds of $7,540,000 from the investors. TERI used the proceeds for working capital and general corporate purposes, which includes, without limitation, drilling capital, lease acquisition capital and repayment of prior debt.

The effective interest rate was 16.15%.

On February 20, 2020, the TERI extended the maturity on $4 million of the 12% unsecured promissory notes previously due in April 2020. The maturity date of the subject promissory note had been extended for one year, from April 10, 2020, to April 10, 2021.

During the quarter ended March 31, 2021, the notes were retired in full by conversion into TERI's common stock.

Promissory Notes Issued in 2018

On February 6, 2018, TERI sold to the Straz Trust in a private transaction a 12% unsecured promissory note with a principal amount of $4,500,000. Interest only was due and payable on the note each month at the rate of 12% per annum, with a balloon payment of the outstanding principal due and payable at maturity on April 10, 2020. The holder of the note also received annual payments of common stock in TERI at the rate of 2.5% of principal amount outstanding, based on a volume-weighted average price. TERI sold the note at an original issue discount of 96.27% and accordingly, TERI received total proceeds of $4,332,150 from the investor. TERI used the proceeds for working capital and general corporate purposes, which includes, without limitation, drilling capital, lease acquisition capital and repayment of prior debt.

The effective interest rate was 15.88%.

Table of Contents

During the quarter ended March 31, 2021, the notes were retired in full by conversion into TERI's common stock.

Extension of Promissory Notes

On April 24, 2020, TERI entered into a Note Amendment Agreement with each of the Straz Foundation, as a lender, the Straz Trust, as a lender and collateral agent, and The Northern Trust Company and Christopher M. Straz, as co-trustees of the Straz Trust. Under the Note Amendment Agreement, the parties agreed to amend and restate the two promissory notes issued to the Straz Trust on April 10, 2017 and February 6, 2018 that have total principal outstanding of $8,500,000, along with the promissory note issued to the Straz Foundation on April 10, 2017 which had an outstanding principal amount of $4,000,000. Under the Note Amendment Agreement, the maturity dates of the two promissory notes held by the Straz Trust and the Note held by the Foundation were extended to April 10, 2021. TERI had previously extended the maturity date of the promissory note held by the Straz Foundation to April 10, 2021.

Under the Note Amendment Agreements, we and our subsidiaries provided a first priority lien on certain collateral in favor of the collateral agent for the benefit of the lenders. The collateral includes all assets and property held by Hudspeth Oil Corporation and Torchlight Hazel, LLC, which includes without limitation our working interest in certain oil and gas leases in Hudspeth County, Texas, known as the "Orogrande Project" and our working interest in certain oil and gas leases in the Midland Basin in West Texas, known as the "Hazel Project." Further, we and TERI, provided guaranty with respect to payment of the three promissory notes. The Note Amendment Agreements also provided restrictions on the use of proceeds if the Orogrande Project or the Hazel Project were sold.

Additionally, the promissory notes, as amended, provided conversion rights whereby the lenders have the right, at each such lender's option, to convert any portion of principal and interest into shares of common stock of TERI at a conversion price of $1.50 per share.

These notes payable issued in 2017 and 2018 totaling $12,500,000 were retired by conversion into TERI common stock in 2021.

Convertible Notes Issued in October 2018

On October 17, 2018, TERI sold to certain investors in a private transaction 16% Series C Unsecured Convertible Promissory Notes with a total principal amount of $6,000,000. Interest and principal were due and payable on the notes in one balloon payment at maturity on April 17, 2020. The notes were convertible, at the election of the holders, into an aggregate 6% working interest in certain oil and gas leases in Hudspeth County, Texas, known as our "Orogrande Project." After an analysis of the transaction and a review of applicable accounting pronouncements, management concluded that the notes issued on October 17, 2018 which contained a conversion right for holders to convert into a working interest in the Orogrande Project of the Company, meet a specific scope exception to the provisions requiring derivative accounting.

On March 9, 2020, each of the noteholders entered into a Conversion Agreement with us and our subsidiary Hudspeth Oil Corporation ("Hudspeth"), under which the noteholders elected to convert the notes, in accordance with their terms, into an aggregate 6% working interest (of all such holders) in the "Orogrande Project." Principal of $6,000,000 and approximately $1,331,000 of accrued interest were converted at March 9, 2020.

The Conversion Agreements also provided additional consideration to the noteholders including a limited carry, atop-off obligation of us and Hudspeth, and warrants to purchase a total of 750,000 restricted shares of TERI common stock, which warrants will have a term of five years and an exercise price of $0.70 per share. The limited carry provides that for the remainder of the 2020 calendar year, Hudspeth will pay all costs and expenses attributable to the assigned working interests, except where prohibited by law or regulation. The top-off

Table of Contents

obligation provides that, subject to the terms and conditions of the Conversion Agreements, if (a) we sell our entire working interest in the Orogrande Project, (b) as part of such sale, the holder's entire working interests are sold, and (c) the gross proceeds received by all the holders in such transaction are equal to less than $9,000,000; then we must pay the holders an amount equal to $9,000,000, (i) less gross proceeds the holders received in the transaction, (ii) less the amount of the carry the holders received under the Conversion Agreements, and (iii) less any gross proceeds the holders received in any farmouts occurring prior to the transaction.

The transaction was treated as an extinguishment of debt by TERI.

Convertible Notes Issued in First Quarter 2019

On February 11, 2019 TERI raised a total of $2,000,000 from investors through the sale of two 14% Series D Unsecured Convertible Promissory Notes. Principal was payable in a lump sum at maturity on May 11, 2020 with payments of interest payable monthly at the rate of 14% per annum. Holders of the notes had the right to convert principal and interest at any time into common stock of TERI at a conversion price of $1.08 per share. TERI had the right to redeem the notes at any time, provided that the redemption amount must include all interest that would have been earned through maturity. TERI evaluated the notes for beneficial conversion features and derivative accounting criteria and concluded that derivative accounting treatment was not applicable.

On April 21, 2020, TERI entered into agreements to amend the two 14% Series D Unsecured Convertible Promissory Notes that were originally issued on February 11, 2019. Under the amendment agreements, (a) the maturity dates were extended from May 11, 2020 to November 11, 2021, (b) the conversion price under which the noteholders may convert into our common stock was changed from $1.08 to $0.43, and (c) the noteholders were provided the right, at each noteholder's election, to convert their notes into either (i) a working interest in the Orogrande Project at the rate of one acre per $1,100 of principal and unpaid interest converted, or (ii) a working interest in the Hazel Project at the rate of one acre per $1,300 of principal and unpaid interest converted; provided, that the noteholders' right to convert into either such working interest is subject to approval of the collateral agent of the Note Amendment Agreement with the Straz parties.

Under the note amendments, the noteholders agreed to forebear demand or collection on all interest payments due and payable under the Note, including any past due interest payments, for 20 days after the execution of the Note Amendment Agreement. Further, we agreed to (a) issue each holder 20,000 restricted shares of common stock immediately and (b) pay each holder a fee of $10,000, at the same time as the payment of past due interest is paid. The past due interest and fee was paid.

These two promissory notes required monthly payments of interest only at the rate of 14% per annum, with a balloon payment of the outstanding principal due and payable at maturity.

These notes payable have been converted into TERI common stock. $1,000,000 was converted in December 2020 and the remaining $1,000,000 was converted in 2021.

## 10. NOTES PAYABLE, RELATED PARTY

In 2021, the Company entered into a note payable with Meta to borrow up to $15 million. On October 1, 2021, the Company issued the 2021 Note, which bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023, and the outstanding principal of the 2021 Note will amortize in six equal, monthly installments. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts the Company's ability to merge or consolidate with





https //www sec gov/Archives/edgar/data/1936756/000119312522194228/d302576ds1 htm 

Table of Contents

another person or entity, or sell or transfer all or substantially all of its assets, unless the Company is the surviving entity or the successor entity assumes all of obligations under the 2021 Note. The note payable is collateralized by certain shares of common stock in Meta held by one of its stockholders and by a lien on a 25% interest in the Orogrande project.

The balance on the loan as of March 31, 2022 and December 31, 2021 is $15,000,000 and $12,500,000, respectively. The Company incurred interest that is paid in kind of $208,889 for the year ended December 31, 2021. The Company incurred interest that is paid in kind of $287,222 for the three months ended March 31, 2022.

## 11. ASSET RETIREMENT OBLIGATIONS

The following is a reconciliation of the asset retirement obligations liability through March 31, 2022:

| | |
|---|---|
| Asset retirement obligations—December 31, 2021 | $ 21,937 |
| Accretion expense | — |
| Estimated liabilities recorded | — |
| Liability reduction at sale of property | — |
| Asset retirement obligations—March 31, 2022 | $ 21,937 |

## 12. SUBSEQUENT EVENTS

As of July 2022, the Company issued 165,523,362 shares of its common stock to Meta. On June 28, 2022, we borrowed a $2.34 million unsecured term loan, the proceeds of which are available for our working capital and general corporate purposes. We anticipate that the Loan Agreement will cover the $2.34 million loan and it is anticipated that we will have the ability to request to borrow additional term loans in an aggregate (taking into account and including the $2.34 million previously borrowed) principal amount up to, but not exceeding, $5.0 million. The term loan will bear interest at a per annum rate equal to 8%. The commitments under the Loan Agreement would expire on December 31, 2022. The loans would then become due and payable on March 31, 2023 (the “Maturity Date”) under the Loan Agreement; provided, however, if we raise $30 million or more in capital through debt or equity, or a combination thereof by the Maturity Date, the Maturity Date will be extended to September 30, 2023 and the term loan would be amortized in six equal monthly installments. We expect the Loan Agreement will include customary representations and covenants that, subject to exceptions and qualifications, that will restrict our ability to do certain things, such as: engage in mergers, acquisitions, and asset sales; transact with affiliates; undergo a change in control; incur additional indebtedness; incur liens; make loans and investments; declare dividends or redeem or repurchase equity interests; and enter into certain restrictive agreements. In addition, the Loan Agreement will contain customary events of default, mandatory prepayment events and affirmative covenants, including, without limitation, covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our material properties, reporting requirements, compliance with applicable laws and regulations, and formation or acquisition of new subsidiaries.

Table of Contents

## UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS

Next Bridge Hydrocarbons, Inc. (the "Company", "we", "our", "Next Bridge") is a holding company formed to own an interest in, and act as the sole owner of, Torchlight Energy Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC following the Distribution.

The unaudited pro forma condensed combined balance sheet as of March 31, 2022 (the "pro forma balance sheet"), and the unaudited pro forma condensed combined statement of operations for the three months ended March 31, 2022 and the year ended December 31, 2021 (the "pro forma statement of operations," together with the pro forma balance sheet and the corresponding notes hereto, the "pro forma financial statements") present the pro forma financial statements of the Company after giving effect to the transfer and assignment to us by Meta of the three subsidiaries described above and the consummation of the Distribution:

The pro forma financial statements have been prepared in accordance with Article 11 of Regulation S-X as amended by the final rule, Release No. 33-10786, "Amendments to Financial Disclosures about Acquired and Disposed Businesses," using the assumptions set forth in the notes to the pro forma financial statements. The pro forma financial statements have been adjusted to include transaction accounting adjustments in accordance with GAAP, linking the effects of the Distribution to the historical consolidated financial statements of the Company, the accounting predecessor to the Company, and the historical combined financial statements of the Company and its subsidiaries.

Prior to the formation of Next Bridge, our subsidiaries were consolidated into Meta Materials Inc., an affiliated company. On June 29, 2021, Torchlight Energy Resources, Inc. ("TERI") was acquired by Meta Materials, Inc.

The assumptions and estimates used to determine the adjustments are described in the notes to the pro forma financial statements. The final determination of the adjustments will be based on the actuals that exist as of the Distribution Date and, therefore, cannot be made prior to its completion.

The pro forma financial statements have been prepared from the respective historical consolidated financial statements of Next Bridge with respect to the oil and natural gas assets held by Torchlight Energy Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC, adjusted to give pro forma effect to the Distribution. The pro forma statement of operations for the three months ended March 31, 2022 and the year ended December 31, 2021, combine the historical consolidated statements of operations of Next Bridge, giving effect to the Distribution as if it had been consummated on January 1, 2021. The pro forma balance sheet combines the historical consolidated balance sheet of Next Bridge as of March 31, 2022, giving effect to the Distribution as if it had been consummated on March 31, 2022.

The pro forma financial statements are presented to reflect the Distribution and do not represent what the Company's financial position or results of operations would have been had the Distribution occurred on the dates noted above, nor do they project the financial position or results of operations of the Company following the Distribution. The transaction accounting adjustments are based on available information and certain assumptions that management believes are factually supportable and are expected to have a continuing impact on the Company's results of operations with the exception of certain non-recurring charges to be incurred in connection with the Distribution, as further described below. In the opinion of management, all adjustments necessary to present fairly the pro forma financial statements have been made.

The Company anticipates that certain non-recurring charges will be incurred in connection with the Distribution. Any such charge could affect the future results of the Company in the period in which such charges are incurred; however, these costs are not expected to be incurred in any period beyond 12 months from the Distribution Date. Accordingly, the pro forma statement of operations for the three months ended March 31, 2022 and the year ended December 31, 2021 reflects the effects of these non-recurring charges.

Table of Contents

As a result of the foregoing, the accounting adjustments are preliminary and subject to change as additional information becomes available and additional analysis is performed. The transaction accounting adjustments have been made solely for the purpose of providing the pro forma financial statements presented below.

The pro forma financial statements should be read together with "The Spin-Off," "Capitalization," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Certain Relationships and Related Party Transactions," and the annual and interim financial statements and accompanying notes thereto of Next Bridge included elsewhere in this Prospectus.

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Unaudited Pro Forma Combined Statement of Operations**
**For the Year Ended December 31, 2021**

| | Year Ended December 31, 2021 | Pro Forma Adjustments | Pro Forma Year Ended December 31, 2021 |
|---|---|---|---|
| Oil sales | $ 4,675 | | $ 4,675 |
| Natural gas sales | 11,229 | | 11,229 |
| **Revenue, net** | **15,904** | **—** | **15,904** |
| **Operating expenses** | | | |
| Lease operating expenses | 75,330 | | 75,330 |
| Production and ad valorem tax | 1,001 | | 1,001 |
| General and administrative | 8,050,443 | 800,000(c) | 8,850,443 |
| Depreciation, depletion and amortization | 4,642 | | 4,642 |
| Total operating expenses | 8,131,416 | — | 8,931,416 |
| **Other income (expense)** | | | |
| Interest expense | (212,201) | (400,000)(b) | (612,201) |
| Gain (loss) on sale of assets | 1,000 | | 1,000 |
| Gain on extinguishment of debt | 77,477 | | 77,477 |
| Interest income | 10,428 | | 10,428 |
| Total other expense—net | (123,296) | (400,000) | (523,296) |
| **Loss before income taxes** | (8,238,808) | (1,200,000) | (9,438,808) |
| Provision for income tax | — | | |
| **Net loss** | **$ (8,238,808)** | **$ (1,200,000)** | **(9,438,808)** |
| **Basic and Diluted EPS** | $ (8,238,808) | (1,200,000) | $ (.06) |
| **Weighted average number of common shares outstanding:** | | | |
| **Basic and Diluted** | 1 | 165,523,362(a) | 165,523,363 |

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Unaudited Pro Forma Combined Statements of Operations**
**For the Three Months Ended March 31, 2022**

| | Three Months Ended March 31, 2022 | Pro Forma Adjustments | Pro Forma Year Ended December 31, 2021 |
|---|---|---|---|
| Oil sales | $ — | $ — | $ — |
| Natural gas sales | — | — | — |
| **Revenue, net** | — | — | — |
| **Operating expenses** | | | |
| Lease operating expenses | 10,621 | — | 10,621 |
| General and administrative | 825,737 | 800,000(c) | 1,625,737 |
| Total operating expenses | 836,358 | — | 1,636,358 |
| **Other income (expense)** | | | |
| Interest expense | (287,222) | (100,000)(b) | (387,222) |
| Interest income | 323 | — | 323 |
| Total other expense—net | (286,899) | (100,000) | (386,899) |
| **Loss before income taxes** | (1,123,257) | (900,000) | (2,023,257) |
| Provision for income tax | — | — | — |
| **Net loss** | **$ (1,123,257)** | **$ (900,000)** | **$ (2,023,257)** |
| **Basic and Diluted** | $ (1,123,257) | $ 0 | $ (.01) |
| **Weighted average number of common shares outstanding:** | | | |
| **Basic and Diluted** | 1 | 165,523,362(a) | 165,523,363 |

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Unaudited Pro Forma Balance Sheet**
**As of March 31, 2022**

| | Historical | Pro Forma Adjustments | Pro Forma |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash | $ 829,145 | $ 5,000,000(b) | $ 5,829,145 |
| Accounts receivable, related party | 165,238 | | 165,238 |
| Grants and other receivables | 50,970 | | 50,970 |
| Prepaid expenses | 357 | | 357 |
| Total current assets | 1,045,710 | 5,000,000 | 6,045,710 |
| Oil and natural gas properties, net | 46,747,755 | | 46,747,755 |
| Other assets | 25,000 | | 25,000 |
| TOTAL ASSETS | $ 47,818,465 | $ 5,000,000 | $ 52,818,465 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 746,802 | 800,000(c) | $ 1,546,802 |
| Note payable, related party | 15,496,111 | 5,400,000(d) | 20,896,111 |
| Total current liabilities | 16,242,913 | 5,400,000 | 22,442,913 |
| Asset retirement obligations | 21,937 | | 21,937 |
| Total liabilities | 16,264,850 | 5,400,000 | 22,464,850 |
| Commitments and contingencies | | | |
| Stockholders' equity: | | | |
| Common stock, par value $0.0001; 500,000,000 shares authorized; 1 issued and outstanding, historical, 165,523,363 issued and outstanding, pro forma | — | — (a) | — |
| Additional paid-in capital | 100,864,388 | | 100,864,388 |
| Accumulated deficit | (69,310,773) | (1,200,000)(b)(c) | (70,510,773) |
| Total stockholders' equity | 31,553,615 | (1,200,000) | 30,353,615) |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 47,818,465 | $ 5,000,000 | $ 52,818,465 |

Table of Contents

## NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS

### NOTE 1—BASIS OF PRESENTATION AND DESCRIPTION OF TRANSACTIONS

In connection with the Distribution, the Company's common stock will be distributed to the holders of Meta's Series A Preferred Stock on a 1:1 basis.

The pro forma financial statements have been prepared in accordance with Article 11 of Regulation S-X as amended by the final rule, Release No. 33-10786, "Amendments to Financial Disclosures about Acquired and Disposed Businesses," and present the pro forma financial condition and results of operations of the Company based upon the historical financial information of Next Bridge after giving effect to the Distribution and related adjustments set forth in the notes to the pro forma financial statements. The historical consolidated financial statements of Next Bridge were prepared in accordance with U.S. GAAP and shown in U.S. dollars

The pro forma financial statements do not purport to be indicative of the financial position or results of operations of the Company that would have occurred if the Distribution had occurred on the dates indicated, nor are they indicative of Next Bridge's future financial position or results of operations. In addition, future results may vary significantly from those reflected in such statements due to factors discussed under "Risk Factors" included elsewhere in the Prospectus.

### NOTE 2—PRO FORMA ADJUSTMENTS

The pro forma financial statements have been adjusted to reflect the following:

(a) Represents the 165,523,362 shares of the Company's common stock issued to Meta.

(b) Represents the Loan Agreement that is anticipated to be entered into with Meta, including interest expense. On June 28, 2022, the Company borrowed a $2.34 million unsecured term loan, the proceeds of which are available for our working capital and general corporate purposes, which is expected to be subject to the Loan Agreement. We expect that we will have the ability to elect to borrow additional term loans in an aggregate principal amount up to, but not exceeding, $5.0 million. The term loan will bear interest at a per annum rate equal to 8%.

(c) Reflects the accrual of non-recurring costs of $800,000 related to the Distribution. These costs are not expected to be incurred in any period beyond 12 months from the closing date of the Distribution.

(d) The pro forma amount does not reflect any amounts owed to Meta under the Tax Matters Agreement, including in respect of any taxes incurred by Meta in connection with the Spin-Off. Based on a valuation of the Company's assets as of June 28, 2021, Meta's net operating loss balance as of June 28, 2021, and certain assumptions relating to the results of Meta's operations since June 28, 2021 through the end of the taxable year that includes the Spin-Off, limitations imposed under applicable law on the utilization of Meta's net operating losses and the adjusted tax basis of Meta in the Company's Common Stock, Meta would not be expected to incur a U.S. federal income tax liability in connection with the Spin-Off. Meta's analysis of the tax impact of the Spin-Off is ongoing, however, and Meta may incur a U.S. federal or state income or other tax liability in connection with the Spin-Off for which the Company may be liable under the Tax Matters Agreement."

Table of Contents

## PART II

## INFORMATION NOT REQUIRED IN PROSPECTUS

### Item 13. Other Expenses of Issuance and Distribution.

The following table sets forth an itemization of all estimated expenses in connection with the issuance and distribution of the securities to be registered:

| Item | Amount |
|---|---|
| Registration Statement filing fee | $ 5.11 |
| Accountants fees and expenses* | |
| Legal fees and expenses* | |
| Printing* | |
| Transfer and distribution agent fees and expenses* | |
| Miscellaneous* | |
| Total* | $ |

* To be furnished by amendment.

### Item 14. Indemnification of Directors and Officers.

The Company's Amended and Restated Articles of Incorporation and Bylaws provide that, to the fullest extent permitted by the laws of the State of Nevada, any officer or director of the Company, who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he/she is or was or has agreed to serve at the request of the Company as a director, officer, employee or agent of the Company, or while serving as a director or officer of the Corporation, is or was serving or has agreed to serve at the request of the Company as a director, officer, employee or agent (which, for purposes hereof, shall include a trustee, partner or manager or similar capacity) of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, or by reason of any action alleged to have been taken or omitted in such capacity. For the avoidance of doubt, the foregoing indemnification obligation includes, without limitation, claims for monetary damages against indemnitee to the fullest extent permitted under Section 78.7502 and 78:751 of the Nevada Revised Statutes as in existence on the date hereof.

The indemnification provided shall be from and against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by indemnitee or on indemnitee's behalf in connection with such action, suit or proceeding and any appeal therefrom, but shall only be provided if indemnitee acted in good faith and in a manner indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action, suit or proceeding, had no reasonable cause to believe indemnitee's conduct was unlawful.

In the case of any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that he/she is or was a director, officer, employee or agent of the Company, or while serving as a director or officer of the Company, is or was serving or has agreed to serve at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, no indemnification shall be made in respect of any claim, issue or matter as to which indemnitee shall have been adjudged to be liable to the Company unless, and only to the extent that, the Nevada courts or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnity for such expenses which the Nevada courts or such other court shall deem proper.

Table of Contents

The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the indemnitee did not act in good faith and in a manner which indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that indemnitee's conduct was unlawful.

To the extent that indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling our company pursuant to the foregoing provisions, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. If a claim for indemnification against such liabilities (other than the payment by us of expenses incurred or paid by a director, officer or controlling person of our company in the successful defense of any action, suit or proceeding) is asserted by any of our directors, officers or controlling persons in connection with the securities being registered, we will, unless in the opinion of our counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by us is against public policy as expressed in the Securities Act and will be governed by the final adjudication of that issue.

**Item 15. Recent Sales of Unregistered Securities.**

None

**Item 16. Exhibits and Financial Statement Schedules.**

(a) Exhibits.

| Exhibit Number | Exhibit Description |
|---|---|
| 2.1 | Form of Distribution Agreement between Meta Materials Inc. and Next Bridge Hydrocarbons, Inc.** |
| 3.1 | First Amended and Restated Articles of Incorporation of Next Bridge Hydrocarbons, Inc.* |
| 3.2 | Amended and Restated By-laws of Next Bridge Hydrocarbons, Inc.* |
| 5.1 | Opinion of Woodburn and Wedge* |
| 10.1 | Assignment Agreement between Meta Materials Inc. and Next Bridge Hydrocarbons, Inc.* |
| 10.2 | Form of Tax Matters Agreement between Meta Materials Inc. and Next Bridge Hydrocarbons, Inc. ** |
| 10.3+ | Form of Executive Employment Agreements ** |
| 10.4+ | 2022 Equity Incentive Plan of Next Bridge Hydrocarbons, Inc.** |
| 10.5 | Option Agreement, by and among Torchlight Energy, Inc., Torchlight Hazel, LLC, Masterson Hazel Partners, LP and McCabe Petroleum Corporation, dated August 13, 2020*† |
| 10.6 | First Amendment to Option Agreement, by and among Torchlight Energy, Inc., Torchlight Hazel, LLC, Masterson Hazel Partners, LP and McCabe Petroleum Corporation, dated September 18, 2020*† |
| 10.7 | Second Amendment to Option Agreement, by and among Torchlight Energy, Inc., Torchlight Hazel, LLC, Masterson Hazel Partners, LP and McCabe Petroleum Corporation, dated April 15, 2021*† |
| 10.8 | Secured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Meta Materials, Inc., as holder, dated October 1, 2021.* |
| 10.9 | Loan Agreement between Meta Materials, Inc. and Next Bridge Hydrocarbons, Inc.** |
| 21.1 | List of subsidiaries of Next Bridge Hydrocarbons, Inc.* |
| 23.1 | Consent of BF Borgers, CPA (independent registered public accountant)* |
| 23.2 | Consent of Woodburn and Wedge (included in Exhibit 5.1)* |

Table of Contents

| Exhibit Number | Exhibit Description |
|---|---|
| 23.3 | Consent of Independent Petroleum Engineers* |
| 24.1 | Power of Attorney (Included on the Signature Pages to the Registration Statement)* |
| 99.1 | Report of Independent Petroleum Engineers* |
| 107 | Filing Fee Table* |

† Certain exhibits and schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(a)(5). The Registrant hereby agrees to furnish a copy of any omitted exhibits and schedules to the SEC upon its request.
+ Indicates a management contract or compensatory plan.
* Filed herewith.
** To be filed by an amendment to this registration statement on Form S-1.

(b) Financial Statement Schedules

No financial statement schedules are provided because the information called for is not required or is shown either in our consolidated financial statements or notes thereto.

**Item 17. Undertakings.**

(a)(1) The undersigned registrant hereby undertakes to file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement: (i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933; (ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the SEC pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the “Calculation of Registration Fee” table in the effective registration statement; and (iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(2) The undersigned registrant hereby undertakes that, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) The undersigned registrant hereby undertakes to remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(b) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act of 1933 and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act of 1933 and will be governed by the final adjudication of such issue.

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act, Next Bridge Hydrocarbons, Inc. has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the city of Fort Worth, Texas, on July 15, 2022.

**NEXT BRIDGE HYDROCARBONS, INC.**

By: /s/ Ken Rice
Name: Ken Rice
Title: Chairman and Chief Financial Officer

## SIGNATURES AND POWER OF ATTORNEY

Each person whose signature appears below constitutes and appoints Ken Rice and George Palikaras, and each of them singly, his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all (i) amendments (including post-effective amendments) and additions to this registration statement and (ii) any and all additional registration statements pursuant to Rule 462(b) of the Securities Act, and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto each said attorney-in-fact and agents full power and authority to do and perform each and every act in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or either of them or their or his or her substitute or substitutes may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Ken Rice<br>Ken Rice | Chairman and Chief Financial Officer | July 15, 2022 |
| /s/ George Palikaras<br>George Palikaras | President | July 15, 2022 |
| /s/ Robert L. Cook<br>Robert L. Cook | Director | July 15, 2022 |

# EXHIBIT B

Table of Contents

**Filed pursuant to Rule 424(b)(4)**
**File No. 333-266143**

**Prospectus**

# Next Bridge Hydrocarbons, Inc.

## Common Stock

**(par value $0.0001)**

---

This prospectus ("Prospectus") is being furnished to you as a Series A Preferred stockholder of Meta Materials, Inc. ("Meta") in connection with the planned distribution (the "Spin-Off" or the "Distribution") by Meta to its Series A Preferred stockholders of 165,472,241 shares of common stock, par value $0.0001 per share (the "Common Stock"), of Next Bridge Hydrocarbons, Inc. (the "Company," "Next Bridge," "we," "us" or "our") held by Meta immediately prior to the Spin-Off. As of the date hereof, Meta holds 165,523,363 shares of Common Stock, of which 165,472,241 shares will be distributed in the Spin-Off and will be 100% of the outstanding shares of capital stock of the Company following cancellation of 51,122 shares of Common Stock contemporaneously with the Distribution.

At the time of the Spin-Off, Meta will distribute 165,472,241 of the outstanding shares of Common Stock held by it on a pro rata basis to holders of Meta's Series A Non-Voting Preferred Stock and contemporaneously cancel any remaining shares of Common Stock it holds. Each one share of Meta's Series A Non-Voting Preferred Stock outstanding as of close of business, New York City time, on December 12, 2022, the record date for the Spin-Off (the "Record Date"), will entitle the holder thereof to receive one share of Common Stock. The Distribution will be made in book-entry form by a distribution agent. Fractional shares of Common Stock will not be distributed in the Spin-Off.

The Spin-Off will be effective as of close of business, New York City time, on December 14, 2022. Immediately after the Spin-Off, the Company will be an independent public reporting company, provided, the Common Stock is not and will not be publicly traded and will not be eligible for electronic transfer through the Depository Trust Company book-entry system or any other established clearing corporation.

None of the Series A Preferred Stockholders are required to vote on or take any other action in connection with the Spin-Off. We are not asking you for a proxy, and we request that you do not send us a proxy. The Series A Preferred stockholders will not be required to pay any consideration for the Common Stock they receive in the Spin-Off; immediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled.

Meta currently owns all the outstanding shares of Common Stock of the Company, and we have not sought to have the shares of Common Stock traded on any exchange. Accordingly, there is currently no public market for the Common Stock, and there is no current expectation for a public market to develop for the Common Stock.

---

**In reviewing this Prospectus, you should carefully consider the matters described in the section titled "Risk Factors" beginning on page 7 of this Prospectus.**

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THESE SECURITIES OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**This Prospectus is not an offer to sell, or a solicitation of an offer to buy, any securities.**

**The date of this Prospectus is November 18, 2022**

Table of Contents

Table of Contents


| | |
|---|---|
| CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS | i |
| DEFINITIONS | iii |
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 7 |
| THE SPIN-OFF | 26 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS | 29 |
| USE OF PROCEEDS | 36 |
| DETERMINATION OF OFFERING PRICE | 36 |
| CAPITALIZATION | 36 |
| BUSINESS | 37 |
| MANAGEMENT’S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 47 |
| MANAGEMENT | 58 |
| EXECUTIVE COMPENSATION | 65 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 69 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 70 |
| DESCRIPTION OF OUR CAPITAL STOCK | 74 |
| LEGAL MATTERS | 78 |
| EXPERTS | 78 |
| WHERE YOU CAN FIND MORE INFORMATION | 79 |
| INDEX TO FINANCIAL STATEMENTS | 80 |

Table of Contents

## CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS

This Prospectus contains certain forward-looking statements and information relating to our business that are based on the beliefs of our management as well as assumptions made by and information currently available to our management. When used in this communication, the words “may,” “anticipate,” “believe,” “estimate,” “expect,” “intend,” “plan,” “forecasts,” “projections,” and similar expressions are intended to identify such forward-looking statements. Forward-looking statements include, without limitation, the statements regarding our strategy, future plans for development and production and other strategic options, future expenses and costs and future liquidity and capital resources. Forward looking statements involve a number of risks, assumptions and uncertainties which may cause actual results to differ materially from those contained in this Prospectus. In light of these risks, uncertainties and assumptions, the future events and trends discussed in this Prospectus may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements.

Such statements reflect our current views with respect to future events, the outcome of which is subject to certain risks, including, among others:

- general competitive conditions, including actions our competitors may take to grow their businesses;
- changes to payment terms, the discount or margin on products or other terms with our suppliers;
- risks associated with data privacy, information security and intellectual property;
- work stoppages or increases in labor costs;
- our ability to attract and retain employees;
- development costs of our current or future properties;
- timing and success of our drilling activities;
- amount and timing of future production of oil and natural gas;
- our ability to successfully implement our strategic initiatives, including amount, nature and timing of capital expenditures;
- the usual hazards associated with the oil and natural gas industry, including fires, well blowouts, pipe failure, spills, explosions and other unforeseen hazards;
- the numerous uncertainties inherent in estimating quantities of oil and natural gas reserves and actual future production rates and associated costs;
- operating costs including lease operating expenses, administrative costs and other expenses;
- the volatility of prices and supply of, and demand for, oil and natural gas;
- changes in regulatory requirements and legislation governing our business, including sustainability;
- the amount of our indebtedness and ability to comply with covenants applicable to any future debt financing;
- our ability to access the credit and capital markets to satisfy future capital and liquidity requirements on acceptable terms;
- if we are not able to successfully execute on our future operating plans, we may not be able to continue as a going concern;
- adverse results from litigation, governmental investigations or tax-related proceedings or audits;
- changes in accounting standards;
- impact and cost of energy conservation and other sustainability efforts;
- exploration and development risks, which could lead to environmental damage, injury and loss of life or the destruction of property;

Table of Contents

- proximity and capacity of oil, natural gas and other pipelines, transportation and support infrastructure to production facilities;
- availability of consumables and raw materials and drilling and processing equipment;
- adverse weather conditions, natural disasters or other events;
- the ability to successfully estimate the impact of litigation matters;
- our ability to initiate and maintain discussions with third parties regarding strategic options;
- the potential adverse impact on our business resulting from the Spin-Off; and
- the other risks and uncertainties detailed in the section titled "Risk Factors."

Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results or outcomes may vary materially from those described as anticipated, believed, estimated, expected, intended or planned. Subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements in this paragraph. We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise after the date of this Prospectus except to the extent required by law.

Table of Contents

## DEFINITIONS

The following are abbreviations and definitions of terms commonly used in the oil and gas industry and in this prospectus. Natural gas equivalents and crude oil equivalents are determined using the ratio of six Mcf to one barrel. All references to "us", "our", "we", or "Next Bridge" mean Next Bridge Hydrocarbons, Inc. and where applicable, its consolidated subsidiaries.

"**Bbl**" means a barrel of U.S. 42 gallons of oil.

"**BOE**" means one barrel of oil equivalent.

"**Completion**" means the installation of permanent equipment for the production of oil or gas.

"**Condensate**" means natural gas in liquid form produced in connection with natural gas wells.

"**Exploratory well**" means a well drilled to find a new field or to find a new productive reservoir in a field previously found to be productive of oil or natural gas in another reservoir or to extend a known reservoir.

"**Gross**" when used with respect to acres or wells, production or reserves refers to the total acres or wells in which we or another specified person has a working interest.

"**MBbls**" means one thousand barrels of oil.

"**Mcf**" means one thousand cubic feet of natural gas.

"**Net**" when used with respect to acres or wells, refers to gross acres of wells multiplied, in each case, by the percentage working interest owned by us.

"**NGL**" refers to natural gas liquids, which is composed exclusively of carbon and hydrogen.

"**Oil**" means crude oil or condensate.

"**Operator**" means the individual or company responsible for the exploration, development, and production of an oil or gas well or lease.

"**Proved developed reserves**" means reserves that can be expected to be recovered through existing wells with existing equipment or operating methods.

"**Proved developed non-producing**" means reserves (i) expected to be recovered from zones capable of producing but which are shut-in because no market outlet exists at the present time or whose date of connection to a pipeline is uncertain or (ii) currently behind the pipe in existing wells, which are considered proved by virtue of successful testing or production of offsetting wells.

"**Proved developed producing**" means reserves expected to be recovered from currently producing zones under continuation of present operating methods. This category includes recently completed shut-in gas wells scheduled for connection to a pipeline in the near future.

"**Proved reserves**" means the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided by contractual arrangements.

Table of Contents

"**Proved undeveloped reserves**" means reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Reserves on undrilled acreage are limited to those drilling locations offsetting productive wells that are reasonably certain of production when drilled or where it can be demonstrated with certainty that there is continuity of production from the existing productive formation.

"**Recompletion**" means the completion for production of an existing well bore in another formation from which the well has been previously completed.

"**Royalty**" means an interest in an oil and gas lease that gives the owner of the interest the right to receive a portion of the production from the leased acreage (or of the proceeds of the sale thereof), but generally does not require the owner to pay any portion of the costs of drilling or operating the wells on the leased acreage. Royalties may be either landowner's royalties, which are reserved by the owner of the leased acreage at the time the lease is granted, or overriding royalties, which are usually reserved by an owner of the leasehold in connection with a transfer to a subsequent owner.

**"SEC"** means the United States Securities and Exchange Commission.

"**Working interest**" means an interest in an oil and gas lease that gives the owner of the interest the right to drill for and produce oil and gas on the leased acreage and requires the owner to pay a share of the costs of drilling and production operations. The share of production to which a working interest owner is entitled will always be smaller than the share of costs that the working interest owner is required to bear, with the balance of the production accruing to the owners of royalties. For example, the owner of a 100% working interest in a lease burdened only by a landowner's royalty of 12.5% would be required to pay 100% of the costs of a well but would be entitled to retain 87.5% of the production.

Table of Contents

## PROSPECTUS SUMMARY

*This summary highlights certain information contained elsewhere in this Prospectus and may not contain all of the information that is important to you. To understand fully and for a more complete description of the terms and conditions of the Distribution, you should read this Prospectus in its entirety, including the information presented under the section titled "Risk Factors" and the consolidated financial statements and related notes, and the documents to which you are referred. See "Where You Can Find More Information." Except where the context otherwise requires, or where otherwise indicated, references to the "Company," "Next Bridge," "we," "us," or "our" refer to Next Bridge Hydrocarbons, Inc. and its consolidated subsidiaries, including Torchlight Hazel, LLC, a Texas limited liability company, Hudspeth Oil Corporation, a Texas corporation, Hudspeth Operating, LLC, a Texas limited liability company, and Torchlight Energy, Inc., a Nevada corporation. "Meta" refers to Meta Materials, Inc. and its consolidated subsidiaries.*

### The Company

We were incorporated in Nevada on August 31, 2021, as OilCo Holdings, Inc. as a wholly owned subsidiary of Meta, and changed our name to Next Bridge Hydrocarbons, Inc. pursuant to our Amended and Restated Articles of Incorporation filed on June 30, 2022.

#### *Background*

On December 14, 2020, Meta (formerly known as Torchlight Energy Resources, Inc., "Torchlight") and its subsidiaries, Metamaterial Exchangeco Inc. (formerly named 2798832 Ontario Inc., "Exchangeco") and 2798831 Ontario Inc. ("Callco"), both Ontario corporations, entered into an Arrangement Agreement (the "Arrangement Agreement") with Metamaterial Inc., an Ontario corporation headquartered in Nova Scotia, Canada, to acquire all of the outstanding common shares of Metamaterial, Inc. by way of a statutory plan of arrangement (the "Arrangement") under the Business Corporations Act (Ontario), on and subject to the terms and conditions of the Arrangement Agreement, as amended. On June 28, 2021, following the satisfaction of the closing conditions set forth in the Arrangement Agreement, the Arrangement was completed.

In furtherance of the Arrangement, Torchlight (which subsequently changed its name to Meta Materials, Inc.) declared a dividend, on a one-for-one basis, of shares of Series A Non-Voting Preferred Stock of Meta (the "Series A Preferred Stock") to holders of record of Torchlight's common stock as of June 24, 2021. The holders of the Series A Preferred Stock are entitled to receive certain dividends based on the net proceeds of the sale of any assets that are used or held for use in Meta's oil and natural gas exploration business and may also receive a pro rata dividend of equity in a spin-off entity to which Meta will transfer any remaining assets of such business. Meta has not sold to a third party any assets related to the historical oil and natural gas business and has transferred the subsidiary companies, the holders of the oil and natural gas assets, to us prior to the Spin-Off.

#### *Business Overview*

We are an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and gas project we hold in the Orogrande Basin in West Texas in Hudspeth County, Texas (the "Orogrande Project"). In addition, we have minor interests in the Eastern edge of the Midland Basin in Texas (the "Hazel Project"), and two minor well interests in Oklahoma.

We plan to operate our business through our wholly owned subsidiaries transferred to us from Meta, Torchlight Energy, Inc., a Nevada corporation, Hudspeth Oil Corporation, a Texas corporation, Torchlight Hazel, LLC, a

Table of Contents

Texas limited liability company, and Hudspeth Operating, LLC, a Texas limited liability company. In addition, we may consider strategic options, including partnering with, or the possible sale of any or all of our assets to, third parties; however, we are not currently engaged in any negotiations or discussions with third parties in respect of any strategic options. We currently have six full-time employees, and we employ consultants for various roles as needed.

As of December 31, 2021, we had interests in three oil and gas projects: the Orogrande Project in Hudspeth County, Texas, the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, and the Hunton wells in partnership with Kodiak in Central Oklahoma. (the "Oklahoma Properties"). See the description under "Current Projects" below under Note 4, "Oil & Natural Gas Properties," of the financial statements included with this Prospectus for information and disclosure regarding these projects, which description is incorporated herein by reference.

***Emerging Growth Company Status***

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended (the "Securities Act"), as modified by the Jumpstart Our Business Startups Act of 2012 ("JOBS Act"). As an emerging growth company, we may take advantage of specified reduced disclosure and other requirements that are otherwise applicable, in general, to public reporting companies that are not emerging growth companies. These provisions include:

- Exemption from the auditor attestation requirement in the assessment of our internal control over financial reporting; and
- Reduced disclosure of certain financial information requirements related to executive compensation, including the requirements to hold a non-binding advisory vote on executive compensation and to provide information relating to the ratio of total compensation of its Chief Executive Officer to the median of the annual total compensation of all of our employees.

We may take advantage of these exemptions for up to five years or such earlier time that we are no longer an emerging growth company. We would cease to be an emerging growth company if we have more than $1.235 billion in annual revenues as of the end of a fiscal year, if we are deemed to be a large-accelerated filer under the rules of the SEC, or if we issue more than $1.235 billion of non-convertible debt over a three-year-period.

The JOBS Act permits emerging growth companies to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public reporting companies. Following the consummation of the Spin-Off, we will elect to avail ourselves of the extended transition period. During the extended transition period, it may be difficult to compare our financial results with the financial results of a public reporting company that complies with accounting pronouncements when effective.

***Smaller Reporting Company***

We are a "smaller reporting company" as defined by Rule 12b-2 of the Securities Exchange Act of 1934 (the "Exchange Act"). As a "smaller reporting company," the disclosure we will be required to provide in our SEC filings are less than it would be if we were not considered a "smaller reporting company." Specifically, "smaller reporting companies" are able to provide simplified executive compensation disclosures in their filings; if annual revenue is less than $100 million, may be exempt from the provisions of Section 404(b) of the Sarbanes-Oxley Act of 2002 requiring that independent registered public accounting firms provide an attestation report on the effectiveness of internal control over financial reporting; and have certain other decreased disclosure obligations in their SEC filings, including, among other things, being permitted to provide two years of audited financial statements in annual reports rather than three years. Decreased disclosures in our SEC filings due to our status as a "smaller reporting company" may make it harder for investors to analyze our results of operations and financial prospects.

Table of Contents

***Market Opportunity***

The market for oil and natural gas that we will produce depends on factors beyond our control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, demand for oil and natural gas, the marketing of competitive fuels, and the effects of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial, and individual consumers.

Our oil production is expected to be sold at prices tied to the spot oil markets. Our natural gas production is expected to be sold under short-term contracts and priced based on first of the month index prices or on daily spot market prices. We will rely on our operating partners to market and sell our production.

***Regulatory Framework***

Our oil and natural gas development operations are subject to stringent and complex federal, state, tribal, regional and local environmental, health and safety laws and regulations governing, among other factors, worker safety and health, the discharge and disposal of substances into the environment, and the protection of the environment and natural resources. Numerous governmental entities, including the Environmental Protection Agency ("EPA") and analogous state and local agencies, (and, under certain laws, private individuals) have the power to enforce compliance with these laws and regulations and any permits issued under them. These laws and regulations may, among other things: (i) require permits to conduct exploration, drilling, water withdrawal, wastewater disposal and other production related activities; (ii) govern the types, quantities and concentrations of substances, including emissions of $CO_2$, methane and certain other greenhouse gases ("GHG"), that may be disposed or released into the environment or injected into formations in connection with drilling or production activities, and the manner of any such disposal, release, or injection; (iii) limit or prohibit construction or drilling activities or require formal mitigation measures in sensitive areas such as wetlands, wilderness areas or areas inhabited by endangered or threatened species; (iv) require investigatory and remedial actions to mitigate pollution conditions arising from the Company's operations or attributable to former operations; (v) impose safety and health restrictions designed to protect employees and others from exposure to hazardous or dangerous substances; and (vi) impose obligations to reclaim and abandon well sites and pits.

Certain existing environmental and occupational safety and health laws and regulations to which our business operations are subject including, the Clean Air Act, as amended (the "CAA"), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the federal Resource Conservation and Recovery Act, Federal Water Pollution Control Act of 1972 as amended by the Oil Pollution Act of 1990, EPA rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of a leak detection and repair ("LDAR") program under the CAA's New Source Performance Standards in 40 C.F.R. Part 60, Subpart OOOOa ("Quad Oa"), the federal Occupational Safety and Health Act and other state equivalent laws and regulations. For further discussion of the risks to our results of operations arising out of our environmental regulatory compliance, see "Risks Related to Our Business", including the following risk factors "*—Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict*," "*—Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays*," and "*—Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce*".

***Corporate Information***

Our executive office is located at 6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116, and our telephone number is (817) 438-1937. We intend to have an internet website, nextbridgehydrocarbons.com. Information contained on or accessible through our website, when available, shall not be deemed a part of this prospectus and shall not be incorporated by reference herein.

Table of Contents

**Summary of the Spin-Off**

| | |
|---|---|
| Distributing Company | Meta Materials, Inc., a Nevada corporation, which holds all of our Common Stock issued and outstanding prior to the Distribution. After the Distribution, the holders of the Series A Preferred Stock will own all of our Common Stock and Meta Materials, Inc. will not own any shares of our Common Stock. |
| Distributed Company | Next Bridge Hydrocarbons, Inc., a Nevada corporation, is a wholly owned subsidiary of Meta immediately prior to the Distribution. At the time of the Distribution, we will hold, directly or through our wholly owned subsidiaries, the assets and liabilities of the oil and natural gas business of Meta. After the Spin-Off, we will be an independent non-trading public reporting company. |
| Distributed Securities | 165,472,241 shares of our Common Stock owned by Meta, which will be 100% of our Common Stock issued and outstanding following cancellation of 51,122 shares of Common Stock contemporaneously with the Distribution.<br><br>Each holder of Series A Preferred Stock will receive one share of our Common Stock for every one (1) share of Series A Preferred Stock held on the Record Date. The distribution agent will distribute only whole shares of our Common Stock in the Distribution. Shares of Common Stock that remain held by Meta following the Distribution, if any, shall be cancelled contemporaneously with the Spin-Off. |
| Record Date | The Record Date is the close of business on December 12, 2022. |
| Distribution Date | The Distribution Date is the close of business on December 14, 2022. |
| The Distribution | On the Distribution Date, Meta will release the shares of our Common Stock to the distribution agent to distribute to Series A Preferred stockholders. The distribution agent will distribute our shares in book-entry form, and thus we will not issue any physical stock certificates, other than upon request. We expect that it will take the distribution agent up to two weeks to electronically issue shares of our Common Stock to you or your bank or brokerage firm on your behalf by way of direct registration in book-entry form. You will not be required to make any payment, surrender or exchange your shares of Series A Preferred Stock or take any other action to receive your shares of our Common Stock, although your shares of Series A Preferred Stock will be cancelled as of the Distribution Date. |
| Conditions to the Spin-Off | The Spin-Off is subject to the satisfaction, or the Meta board of directors' waiver, of the following conditions:<br><br>• the Meta board of directors shall have authorized and approved the Spin-Off and not withdrawn such authorization and approval, and shall have declared the dividend of our Common Stock to the holders of Meta's Series A Preferred Stock; |

Table of Contents

| | |
|---|---|
| | • the Distribution Agreement and the ancillary agreements contemplated by the Distribution Agreement shall have been executed by each party thereto;<br>• the SEC shall have declared effective our Registration Statement on Form S-1, of which this Prospectus is a part, under the Securities Act, and no stop order suspending the effectiveness of our Registration Statement shall be in effect and no proceedings for that purpose shall be pending before or threatened by the SEC;<br>• no order, injunction or decree issued by any governmental authority of competent jurisdiction or other legal restraint or prohibition preventing consummation of the Spin-Off shall be in effect, and no other event outside the control of Meta shall have occurred or failed to occur that prevents the consummation of the Spin-Off;<br>• all necessary actions and filings with regard to applicable state securities or "blue sky" laws shall have been taken; and<br>• any material third party consents necessary to consummate the Spin-Off shall have been obtained or waived.<br><br>The fulfillment of the foregoing conditions will not create any obligation on the part of Meta to effect the Spin-Off. We are not aware of any material federal, foreign or state regulatory requirements with which we must comply, other than SEC rules and regulations, state "blue sky" laws, or any material approvals that we must obtain, other than the SEC's declaration of the effectiveness of the Registration Statement and applicable filings or notices required in compliance with applicable state securities or "blue sky" laws, in connection with the Spin-Off. Meta has the right not to complete the Spin-Off if, at any time, the Meta board or directors determines, in its sole and absolute discretion, that the Spin-Off is not in the best interests of Meta or its stockholders or is otherwise not advisable. |
| Trading Market | All of our outstanding shares of Common Stock are currently beneficially owned by Meta and our Common Stock is currently not listed for trading on any stock exchange or market and we have not sought to be traded on any exchange or market. The shares of Common Stock will not be eligible for electronic transfer through the Depository Trust Company or any other established clearing corporation. Accordingly, there currently is no public trading market for the Common Stock and there is no current expectation for a public market to develop. |
| U.S. Federal Income Tax Consequences to Series A Preferred Stockholders | U.S. federal income tax treatment of the issuance of our Common Stock to holders of the Series A Preferred Stock will not qualify for non-recognition of gain or loss for U.S. federal income tax purposes, and U.S. and non-U.S. holders could be subject to tax as a result of the Spin-Off and the cancellation all shares of the Series A Preferred Stock. Accordingly, holders of Series A Preferred Stock are |

Table of Contents

| | |
|---|---|
| | encouraged to consult their own tax advisors as to the specific U.S. federal, state and local, and non-U.S. tax consequences of the Distribution to such stockholders. |
| Transfer Agent | American Stock Transfer & Trust Company LLC. |
| Risk Factors | Our business faces both general and specific risks and uncertainties. Our business also faces risks relating to the Spin-Off. Following the Spin-Off, we will also face risks associated with being an independent company. Accordingly, you should read carefully the information set forth under the heading "Risk Factors." |

Table of Contents

## RISK FACTORS

*You should carefully consider all of the information in this Prospectus and each of the risks described below, which we believe are the principal risks that we face. Some of the risks relate to our business, others to the Spin-Off and the ownership of our Common Stock. The risks and uncertainties described below are not the only ones faced by us. Additional risks and uncertainties not presently known or that are currently deemed immaterial also may impair our business operations. If any of the following risks occur, our business, financial condition, operating results and cash flows and the value of our Common Stock could be materially adversely affected.*

### Risks Relating to Our Business

***We have a limited operating history relative to larger companies in our industry and may not be successful in developing profitable business operations.***

We have a limited operating history relative to larger companies in our industry. Our business operations must be considered in light of the risks, expenses and difficulties frequently encountered in establishing a business in the oil and natural gas industry. As of the date of this Prospectus, we have generated limited revenues and have limited assets. We have an insufficient history at this time on which to base an assumption that our business operations will prove to be successful in the long-term. Our future operating results will depend on many factors, including:

- our ability to raise adequate working capital;
- the success of our development and exploration;
- the demand for oil and natural gas;
- the level of our competition;
- our ability to attract and maintain key management and employees; and
- our ability to efficiently explore, develop, produce or acquire sufficient quantities of marketable oil or natural gas in a highly competitive and speculative environment while maintaining quality and controlling costs.

To achieve profitable operations in the future, we must, alone or with others, successfully manage the factors stated above, as well as continue to develop ways to enhance our production efforts. Despite our best efforts, we may not be successful in our exploration or development efforts or obtain required regulatory approvals. There is a possibility that some, or all, of the wells in which we obtain interests may never produce oil or natural gas.

***We have limited capital and will need to raise additional capital in the immediate future.***

Following the Spin-Off, we will require additional capital to maintain operations and to expand our exploration and development programs. We may be unable to obtain additional capital when required or on favorable terms. Future acquisitions, exploration, development, production and marketing activities, as well as our administrative requirements (such as salaries, insurance expenses and general overhead expenses, as well as legal compliance costs and accounting expenses) will require a substantial amount of additional capital and cash flow.

We may pursue sources of additional capital through various financing transactions or arrangements, including joint venturing of projects, debt financing, equity financing, or other means. We may not be successful in identifying suitable financing transactions in the time period required or at all, and we may not obtain the capital we require by other means. If we do not succeed in raising additional capital, our resources may not be sufficient to fund our planned operations.

Our ability to obtain financing, if and when necessary, may be impaired by such factors as the capital markets (both generally and in the oil and natural gas industry in particular), our limited operating history, the location of

Table of Contents

our oil and natural gas properties and prices of oil and natural gas on the commodities markets (which will impact the amount of asset-based financing available to us, if any) and the departure of key employees. Further, if oil or natural gas prices on the commodities markets decline, our future revenues, if any, will likely decrease and such decreased revenues may increase our requirements for capital. If the amount of capital we are able to raise from financing activities, together with our revenues from operations, is not sufficient to satisfy our capital needs (even to the extent that we reduce our operations), third parties may be reluctant to provide the services we need in order to operate and we may be required to cease our operations, divest our assets at unattractive prices or obtain financing on unattractive terms.

Any additional capital raised through the sale of equity may dilute the ownership percentage of our stockholders. Raising any such capital could also result in a decrease in the fair market value of our equity securities because our assets would be owned by a larger pool of outstanding equity. The terms of securities we issue in future capital transactions may be more favorable to our new investors, and may include preferences, superior voting rights and the issuance of other derivative securities, and issuances of incentive awards under equity employee incentive plans, which may have a further dilutive effect.

We may incur substantial costs in pursuing future capital financing, including investment banking fees, legal fees, accounting fees, securities law compliance fees, printing and distribution expenses and other costs. We may also be required to recognize non-cash expenses in connection with certain securities we may issue, which may adversely impact our financial condition.

***We may not achieve or maintain profitable operations, and therefore, may not be able to continue as a going concern.***

The Company has a history of net losses from operations and negative cash flow from operating activities. We will need to raise additional working capital to continue our normal and planned operations. We will also need to generate and sustain significant revenue levels in future periods in order to become profitable, and, even if we do, we may not be able to maintain or increase our level of profitability. During the three and nine months ended September 30, 2022, we incurred a net loss of $2,164,187 and $4,764,293, respectively, and used cash of $6,067,015 for operating activities for the nine months ended September 30, 2022. At September 30, 2022, we had an accumulated deficit of $72,951,809 and had a working capital deficit of $19,385,284 compared with a working capital deficit of $13,307,453 as of December 31, 2021. These factors raise doubt regarding our ability to continue as a going concern. Because we have incurred significant net losses, our auditors have issued a “going concern” audit qualification. A “going concern” qualification indicates that the financial statements have been prepared assuming we will continue as a going concern and do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets, or the amounts and classification of liabilities that may result if we do not continue as a going concern. Therefore, you should not rely on our consolidated balance sheet as an indication of the amount of proceeds that would be available to satisfy claims of creditors, and potentially be available for distribution to stockholders, in the event of liquidation.

***There can be no assurance that our financing strategy or strategic alternatives will result in a transaction satisfactory to holders of our Common Stock.***

After the Spin-Off, we may consider various strategic alternatives, including partnering with third parties, a potential sale of some or all of our assets, a merger transaction, and potential financing alternatives. Even if a partnering transaction, sale, merger or financing transaction were to be consummated, it may not return any value to holders of our Common Stock. Regardless of whether we execute a partnership, sale, merger or financing transaction, the adverse pressures negatively impacting our business that we have been or are currently experiencing may continue or intensify, including the risk that we may not be able to continue as a going concern. We are not currently engaged in any negotiations or discussions with third parties in respect of any strategic options.

Table of Contents

***We are mainly concentrated in one geographic area, which increases our exposure to many of the risks enumerated herein.***

Operating in a concentrated area increases the potential impact that many of the risks stated herein may have upon our ability to perform. For example, we have greater exposure to regulatory actions impacting Texas, natural disasters in the geographic area, competition for equipment, services and materials available in the area and access to infrastructure and markets. In addition, the effect of fluctuations on supply and demand may become more pronounced within specific geographic oil and natural gas producing areas such as the Permian Basin, which may cause these conditions to occur with greater frequency or magnify the effect of these conditions. Due to the concentrated nature of our portfolio of properties, a number of our properties could experience any of the same conditions at the same time, resulting in a relatively greater impact on our results of operations than they might have on other companies that have a more diversified portfolio of properties. Such delays or interruptions could have a material adverse effect on our financial condition and results of operations.

***Because of the speculative nature of oil and natural gas exploration, there is risk that we will not find commercially exploitable oil and natural gas and that our business will fail.***

The search for commercial quantities of oil and natural gas as a business is extremely risky. We cannot provide investors with any assurance that any properties in which we obtain a mineral interest will contain commercially exploitable quantities of oil and/or natural gas. The exploration expenditures to be made by us may not result in the discovery of commercial quantities of oil and/or natural gas. Problems such as unusual or unexpected formations or pressures, premature declines of reservoirs, invasion of water into producing formations and other conditions involved in oil and natural gas exploration often result in unsuccessful exploration efforts. If we are unable to find commercially exploitable quantities of oil and natural gas, and/or we are unable to commercially extract such quantities, we may be forced to abandon or curtail our business plan, and as a result, any investment in us may become worthless.

***Litigation may adversely affect our business, financial condition, and results of operations.***

Certain of our subsidiaries are subject and from time to time in the normal course of our business operations, may become subject to litigation that may result in liability material to our financial statements as a whole or may negatively affect our operating results if changes to our business operations are required. The cost to defend such litigation may be significant and may require a diversion of our resources. There also may be adverse publicity associated with litigation that could negatively affect customer perception of our business, regardless of whether the allegations are valid or whether we are ultimately found liable. Insurance may not be available at all or in sufficient amounts to cover any liabilities with respect to these or other matters. A judgment or other liability in excess of our insurance coverage for any claims could adversely affect our business and the results of our operations. For additional discussion of pending litigation matters, see “Management’s Discussion and Analysis of Financial Condition and Results of Operations—Legal Proceedings.”

***Strategic relationships upon which we may rely are subject to change, which may diminish our ability to conduct our operations.***

Following the Spin-Off, our ability to successfully acquire oil and natural gas interests, to build our reserves, to participate in drilling opportunities and to identify and enter into commercial arrangements with customers will depend on developing and maintaining close working relationships with industry participants and our ability to select and evaluate suitable properties and to consummate transactions in a highly competitive environment. These realities are subject to change and our inability to maintain close working relationships with industry participants or continue to acquire suitable property may impair our ability to execute our business plan.

To continue to develop our business, we will endeavor to use the business relationships of our management to enter into strategic relationships, which may take the form of joint ventures with other private parties and contractual

Table of Contents

arrangements with other oil and natural gas companies, including those that supply equipment and other resources that we will use in our business. We may not be able to establish these strategic relationships, or if established, we may not be able to maintain them. In addition, the dynamics of our relationships with strategic partners may require us to incur expenses or undertake activities we would not otherwise be inclined to in order to fulfill our obligations to these partners or maintain our relationships. If our strategic relationships are not established or maintained, our business prospects may be limited, which could diminish our ability to conduct our operations.

***Our acreage must be drilled before lease expiration in order to hold the acreage by production. In the highly competitive market for acreage, failure to drill sufficient wells in order to hold acreage will result in a substantial lease renewal cost, or if renewal is not feasible, loss of our lease and prospective drilling opportunities.***

Our leases on oil and natural gas properties typically have a primary term of four to five years, after which they expire unless, prior to expiration, drilling obligations are fulfilled or production is established within the spacing units covering the undeveloped acres. As of September 30, 2022, we had leases representing approximately 134,066 net acres in the Orogrande Basin in West Texas expiring in 2022 if we fail to drill five wells as obligated, for which there can be no assurance will be met. Unless we are able to negotiate an extension on these leases, these leases in the Orogrande Basin are also subject to expiration in 2023 in the event we fail to drill an additional five wells during the 2023 calendar year. We will require additional capital to drill these wells, and we may not be able to obtain additional capital when required in order to drill these wells, or on favorable terms. As of September 30, 2022, we have leases representing 645 net acres in the Eastern edge of the Midland Basin in West Texas, which are currently held by production by active wells. In the event that we fail to meet our drilling obligations in the Orogrande Basin, whether because we are unable to obtain additional capital when required or otherwise, or if production ceases in the Midland Basin, our leases will expire. If we have to renew such leases on new terms, we could incur significant cost increases, and we may not be able to renew such leases on commercially reasonable terms or at all. In addition, on certain portions of our acreage, third-party leases may become immediately effective if our leases expire. As such, our actual drilling activities may materially differ from our current expectations, which could adversely affect our business.

***The price of oil and natural gas has historically been volatile. If it were to decrease substantially, our projections, budgets, and revenues would be adversely affected, potentially forcing us to make changes in our operations.***

Following the Spin-Off, our future financial condition, results of operations and the carrying value of any oil and natural gas interests we acquire will depend primarily upon the prices paid for oil and natural gas production. Oil and natural gas prices historically have been volatile and likely will continue to be volatile in the future, especially given current world geopolitical conditions. Cash flows from operations are highly dependent on the prices that we receive for oil and natural gas. This price volatility could affect the amount of our cash flows available for capital expenditures and our ability to borrow money or raise additional capital. The prices for oil and natural gas are subject to a variety of additional factors that are beyond our control. These factors include:

- the level of consumer demand for oil and natural gas;
- the domestic and foreign supply of oil and natural gas;
- the ability of the members of the Organization of Petroleum Exporting Countries (“OPEC”) to agree to and maintain oil price and production controls;
- the price of foreign oil and natural gas;
- domestic governmental regulations and taxes;
- the price and availability of alternative fuel sources;
- weather conditions;
- market uncertainty due to political conditions in oil and natural gas producing regions, including the Middle East; and
- worldwide economic conditions.

Table of Contents

These factors as well as the volatility of the energy markets generally make it extremely difficult to predict future oil and natural gas price movements with any certainty. Declines in oil and natural gas prices affect our revenues and could reduce the amount of oil and natural gas that we can produce economically. Accordingly, such declines could have a material adverse effect on our financial condition, results of operations, oil and natural gas reserves and the carrying values of our oil and natural gas properties. If the oil and natural gas industry experiences significant price declines, we may be unable to make planned expenditures, among other things. If this were to happen, we may be forced to abandon or curtail our business operations, which would cause the value of an investment in us to decline or become worthless.

In early March 2020, the market experienced a precipitous decline in oil prices in response to concerns about oil demand due to the economic impact of COVID-19 and anticipated increases in supply from Russia and OPEC, particularly Saudi Arabia. Generally, demand for oil declined substantially following the initial onset of the COVID-19 pandemic, but has recovered over the past year. These trends materially, adversely affected our results of operations, cash flows and financial condition during the last two years.

If oil or natural gas prices reverse again and go on a downward trend or drilling efforts are unsuccessful, we could be required to record additional write-downs of our oil and natural gas properties. Write-downs may occur when oil and natural gas prices are low, or if we have downward adjustments to our estimated proved reserves, increases in our estimates of operating or development costs, deterioration in drilling results or mechanical problems with wells where the cost to redrill or repair is not supported by the expected economics.

Under the full cost method of accounting, capitalized oil and natural gas property costs less accumulated depletion and net of deferred income taxes may not exceed an amount equal to the present value, discounted at 10%, of estimated future net revenues from proved oil and natural gas reserves plus the cost of unproved properties not subject to amortization (without regard to estimates of fair value), or estimated fair value, if lower, of unproved properties that are subject to amortization. Should capitalized costs exceed this ceiling, an impairment would be recognized.

The Company recognized an impairment charge of $2,108,301 in 2020 due to an adjustment required by this ceiling test.

***Because of the inherent dangers involved in oil and natural gas operations, there is a risk that we may incur liability or damages as we conduct our business operations, which could force us to expend a substantial amount of money in connection with litigation and/or a settlement.***

The oil and natural gas business involves a variety of operating hazards and risks such as well blowouts, pipe failures, casing collapse, explosions, uncontrollable flows of oil, natural gas or well fluids, fires, spills, pollution, releases of toxic gas and other environmental hazards and risks. These hazards and risks could result in substantial losses to us from, among other things, injury or loss of life, severe damage to or destruction of property, natural resources and equipment, pollution or other environmental damage, cleanup responsibilities, regulatory investigation and penalties and suspension of operations. In addition, we may be liable for environmental damages caused by previous owners of property purchased and leased by us. In recent years, there has also been increased scrutiny on the environmental risk associated with hydraulic fracturing, such as underground migration and surface spillage or mishandling of fracturing fluids including chemical additives. This technology has evolved and continues to evolve and become more aggressive. We believe that recent designs have seen improvement in, among other things, proppant per foot, barrels of water per stage, fracturing stages, and clusters per fracturing stage. Nonetheless, substantial liabilities to third parties or governmental entities may be incurred, the payment of which could reduce or eliminate the funds available for exploration, development or acquisitions or result in the loss of our properties and/or force us to expend substantial monies in connection with cleanup, litigation or settlements. In addition, we will need to quickly adapt to the evolving technology, which could take time and divert our attention to other business matters. We currently have no insurance to cover such losses and liabilities, and even if insurance is obtained, it may not be adequate to cover any losses or liabilities. We cannot predict the

Table of Contents

availability of insurance or the availability of insurance at premium levels that justify our purchase. The occurrence of a significant event not fully insured or indemnified against could materially and adversely affect our financial condition and operations. We may elect to self-insure if management believes that the cost of insurance, although available, is excessive relative to the risks presented. In addition, pollution and environmental risks generally are not fully insurable. The occurrence of an event not fully covered by insurance could have a material adverse effect on our financial condition and results of operations.

***The market for oil and natural gas is intensely competitive, and competition pressures could force us to abandon or curtail our business plan.***

The market for oil and natural gas exploration services is highly competitive, and we only expect competition to intensify in the future. Numerous well-established companies are focusing significant resources on exploration and are currently competing with us for oil and natural gas opportunities. Other oil and natural gas companies may seek to acquire oil and natural gas leases and properties that we have targeted. Additionally, other companies engaged in our line of business may compete with us from time to time in obtaining capital from investors. Competitors include larger companies which, in particular, may have access to greater resources, may be more successful in the recruitment and retention of qualified employees and may conduct their own refining and petroleum marketing operations, which may give them a competitive advantage. Actual or potential competitors may be strengthened through the acquisition of additional assets and interests. Additionally, there are numerous companies focusing their resources on creating fuels and/or materials which serve the same purpose as oil and natural gas but are manufactured from renewable resources.

As a result, we may not be able to compete successfully and competitive pressures may adversely affect our business, results of operations, and financial condition. If we are not able to successfully compete in the marketplace, we could be forced to curtail or even abandon our current business plan, which could cause any investment in us to become worthless.

***Inflation may adversely affect us by increasing costs beyond what we can recover through price increases and limit our ability to enter into future traditional debt financing.***

Inflation can adversely affect us by increasing costs of critical materials, equipment, labor, and other services. In addition, inflation is often accompanied by higher interest rates. Continued inflationary pressures could impact our profitability. Inflation may also affect our ability to enter into future traditional debt financing, as high inflation may result in an increase in cost.

***We may not be able to successfully manage growth, which could lead to our inability to implement our business plan.***

Any growth of the Company may place a significant strain on our managerial, operational and financial resources, especially considering that we currently only have a small number of executive officers, employees and advisors. Further, as we enter into additional contracts, we will be required to manage multiple relationships with various consultants, businesses and other third parties. These requirements will be exacerbated in the event of our further growth or in the event that the number of our drilling and/or extraction operations increases. Our systems, procedures and/or controls may not be adequate to support our operations or that our management will be able to achieve the rapid execution necessary to successfully implement our business plan. If we are unable to manage our growth effectively, our business, results of operations and financial condition will be adversely affected, which could lead to us being forced to abandon or curtail our business plan and operations.

***Developing oil and natural gas wells and producing oil and natural gas are costly and high-risk activities with many uncertainties that could adversely affect future production from our oil and natural gas properties. Any delays, reductions or cancellations in development and producing activities could materially, adversely impact the value of your shares of Common Stock.***

Recovery of undeveloped reserves and the development of developed non-producing reserves requires substantial capital expenditures and successful drilling operations of our oil and natural gas properties. All of the recent

Table of Contents

development costs related to our Hazel Project were paid by Masterson Hazel Partners LP ("MHP"). We granted MHP the option to acquire the Hazel Project in exchange for it conducting, and paying for, development activity sufficient to maintain the Hazel mineral leases in good standing (the "Option Agreement"). The Option Agreement provided that if MHP declined to exercise the option to acquire the property, we would be obligated to reimburse them for their cost of the development activity to the extent that the wells produced revenues beyond the date of the option's lapse until the total amount of development expenses are reimbursed. MHP declined to exercise the option effective September 30, 2021. The 2021 reserve data included in the reserve report of our independent petroleum engineer assumes a certain amount of capital expenditures will be made to develop such reserves, and the present value of such reserves was adjusted based on our obligation to assign revenue from the Hazel Project to MHP. Additionally, 33.5% of the development expenses for the Orogrande Project are borne by the non-operating working interest owners of such properties.

The development of such reserves may in the future take a long period of time and may require higher levels of capital expenditures than anticipated, which, for the Orogrande Project, are borne in part by the non-operating working interest owners of such properties. Delays in the development of the reserves, increases in drilling and development costs (including expenses related to secondary and tertiary recovery techniques) of such reserves or decreases or continued volatility in commodity prices will reduce the future net revenues of the estimated possible reserves and may result in some projects becoming uneconomic. In addition, delays in the development of reserves could force us to reclassify certain of the proved reserves as unproved reserves.

In addition, the process of developing oil and natural gas wells and producing oil and natural gas from our properties is subject to numerous risks beyond our control. The ability to carry out operations or to finance planned development expenses could be materially and adversely affected by any factor that may curtail, delay, reduce or cancel development and production, including:

- delays imposed by or resulting from compliance with environmental and other governmental or regulatory requirements, including permitting requirements, limitations on or resulting from wastewater discharge and disposal of exploration and production wastes, including, subsurface injections, as well as additional regulation with respect to GHG emissions;
- pressure or irregularities in geological formations;
- restricted access to land for drilling or to existing pipeline infrastructure;
- lack of available gathering, transportation and processing facilities, including availability on commercially reasonable terms, or delays in construction of gathering facilities;
- lack of available capacity on interconnecting transmission pipelines;
- equipment failures or accidents;
- failure of secondary recovery operations to perform as expected;
- unexpected operational events and drilling conditions;
- declines in oil or natural gas prices;
- limitations in the market for oil or natural gas;
- pipe or cement failures;
- casing collapses;
- shortages, unavailability or high cost of drilling rigs, tubular materials, equipment, supplies, personnel and services;
- lost or damaged drilling and service tools;
- loss of drilling fluid circulation;

Table of Contents

- uncontrollable flows of oil and natural gas, water or drilling fluids;
- blowouts, explosions fires and natural disasters;
- environmental hazards, such as oil and natural gas leaks, pipeline and tank ruptures, encountering naturally occurring radioactive materials, and unauthorized discharges of brine, well stimulation and completion fluids, toxic gases or other pollutants into the surface and subsurface environment;
- adverse weather conditions, such as drought, floods, blizzards, tornados and ice storms; and
- title problems or legal disputes regarding leasehold rights.

***Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict.***

Oil and natural gas activities that we will engage in, including production, processing, handling and disposal of hazardous materials, such as hydrocarbons and naturally occurring radioactive materials (if any), are subject to stringent regulation. We could incur significant costs, including cleanup costs resulting from a release of hazardous material, third-party claims for property damage and personal injuries fines and sanctions, as a result of any violations or liabilities under environmental or other laws. Changes in or more stringent enforcement of environmental laws could force us to expend additional operating costs and capital expenditures to stay in compliance.

Various federal, state and local laws regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment, directly impact oil and natural gas exploration, development and production operations, and consequently may impact our operations and costs. These regulations include, among others, (i) regulations by the Environmental Protection Agency and various state agencies regarding approved methods of disposal for certain hazardous and non-hazardous wastes; (ii) the Comprehensive Environmental Response, Compensation, and Liability Act and analogous state laws which regulate the removal or remediation of previously disposed wastes (including wastes disposed of or released by prior owners or operators), property contamination (including groundwater contamination), and remedial plugging operations to prevent future contamination; (iii) the Clean Air Act and comparable state and local requirements which regulate air emissions; (iv) the Oil Pollution Act of 1990 which contains numerous requirements relating to the prevention of and response to oil spills into waters of the United States; (v) the Resource Conservation and Recovery Act which is the principal federal statute governing the treatment, storage and disposal of hazardous wastes; (vi) the Federal Water Pollution Control Act and comparable state and local requirements which regulate discharges to federal and state waters; and (vii) state regulations and statutes governing the handling, treatment, storage and disposal of naturally occurring radioactive material.

We believe that we will be in substantial compliance with applicable environmental laws and regulations in reliance on our contractual relationship with Maverick Operating LLC, who operates our oil and natural gas properties and is primarily responsible for compliance with applicable environmental regulatory with respect to the operating activities of our oil and natural gas properties. We cover all costs associated with the related insurance coverage for such environmental regulatory compliance. To date, other than the cost of insurance, we have not expended any amounts to comply with such regulations, and we do not currently anticipate that future compliance will have a materially adverse effect on our consolidated financial position, results of operations or cash flows. However, if we are deemed to not be in compliance with applicable environmental laws, we could be forced to expend significant funds to be in compliance, which would have a materially adverse effect on our financial condition.

***Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays.***

Several states, including Texas, and local jurisdictions, have adopted, or are considering adopting, regulations that could restrict or prohibit hydraulic fracturing in certain circumstances, impose more stringent operating

Table of Contents

standards and/or require the disclosure of the composition of hydraulic fracturing fluids. The Texas Legislature adopted legislation, effective September 1, 2011, requiring oil and natural gas operators to publicly disclose the chemicals used in the hydraulic fracturing process. The Texas Railroad Commission adopted rules and regulations implementing this legislation that apply to all wells for which the Texas Railroad Commission issues an initial drilling permit after February 1, 2012. The law requires that the well operator disclose the list of chemical ingredients subject to the requirements of OSHA for disclosure on an internet website and also file the list of chemicals with the Texas Railroad Commission with the well completion report. The total volume of water used to hydraulically fracture a well must also be disclosed to the public and filed with the Texas Railroad Commission. Also, in May 2013, the Texas Railroad Commission adopted rules governing well casing, cementing and other standards for ensuring that hydraulic fracturing operations do not contaminate nearby water resources. The rules took effect in January 2014. Additionally, on October 28, 2014, the Texas Railroad Commission adopted disposal well rule amendments designed, among other things, to require applicants for new disposal wells that will receive non-hazardous produced water and hydraulic fracturing flowback fluid to conduct seismic activity searches utilizing the U.S. Geological Survey. The searches are intended to determine the potential for earthquakes within a circular area of 100 square miles around a proposed new disposal well. The disposal well rule amendments, which became effective on November 17, 2014, also clarify the Texas Railroad Commission's authority to modify, suspend or terminate a disposal well permit if scientific data indicates a disposal well is likely to contribute to seismic activity. The Texas Railroad Commission has used this authority to deny permits and temporarily suspend operations for waste disposal wells and, in September 2021, the Texas Railroad Commission curtailed the amount of water companies were permitted to inject into some wells in the Permian Basin, and has since indefinitely suspended some permits there and expanded the restrictions to other areas. These restrictions on use of produced water and a moratorium on new produced water disposal wells could result in increased operating costs, requiring us or our service providers to truck produced water, recycle it or pump it through the pipeline network or other means, all of which could be costly. We or our service providers may also need to limit disposal well volumes, disposal rates and pressures or locations, or require us or our service providers to shut down or curtail the injection of produced water into disposal wells. These factors may make drilling and completion activity in the affected parts of the Permian Basin less economical and adversely impact our business, results of operations and financial condition.

***Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce*.**

The EPA previously published its findings that emissions of GHGs present a danger to public health and the environment because such gases are, according to the EPA, contributing to warming of the Earth's atmosphere and other climatic changes. Based on these findings, the EPA has adopted various rules to address GHG emissions under existing provisions of the CAA. For example, the EPA has adopted rules requiring the reporting of GHG emissions from various oil and natural gas operations on an annual basis, which includes certain of our operations. In addition, in June 2016, the EPA finalized rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of an LDAR program to minimize methane emissions, under the CAA's New Source Performance Standards Quad Oa. However, the EPA has taken several steps to delay implementation of the Quad Oa standards. The agency proposed a rulemaking in June 2017 to stay the requirements for a period of two years and in October 2018, the EPA proposed revisions to Quad Oa, such as changes to the frequency for monitoring fugitive emissions at well sites and changes to requirements that a professional engineer certify when meeting certain Quad Oa requirements is technically infeasible. In September 2020, the EPA finalized amendments to Quad Oa that rescind requirements for the transmission and storage segment of the oil and natural gas industry and rescind methane-specific limits that apply to the industry's production and processing segments, among other things. On June 30, 2021, Congress issued a joint resolution pursuant to the Congressional Review Act disapproving the September 2020 rule, and on November 15, 2021, EPA issued a proposed rule to revise the Quad Oa regulations that, if finalized, would require methane emissions reductions and implementation of a fugitive emissions monitoring and repair program. EPA has also announced its intention to issue a supplemental proposal in 2022 that may expand on or modify the 2021 proposal in response to public input. It is possible that these rules will continue to require oil and natural gas operators to expend material sums.

Table of Contents

In addition, in November 2016, the U.S. Department of the Interior Bureau of Land Management ("BLM") issued final rules to reduce methane emissions from venting, flaring, and leaks during oil and natural gas operations on public lands that are substantially similar to the EPA Quad Oa requirements. However, on December 8, 2017, the BLM published a final rule to temporarily suspend or delay certain requirements contained in the November 2016 final rule until January 17, 2019, including those requirements relating to venting, flaring and leakage from oil and natural gas production activities. Further, in September 2018, the BLM published a final rule to revise or rescind certain provisions of the 2016 rule. On July 21, 2020, a Wyoming federal court vacated almost all of the 2016 rule, including all provisions relating to the loss of gas through venting, flaring, and leaks, and on July 15, 2020, a California federal court vacated the 2018 rule. While, as a result of these developments, future implementation of the EPA and BLM methane rules is uncertain, given the long-term trend towards increasing regulation, future federal GHG regulations of the oil and natural gas industry remain a possibility. We may be required to expend significant costs to obtain the necessary equipment (pollution control equipment and optical gas imaging equipment for LDAR inspections) and personnel trained to assist with inspection and reporting requirements to ensure we are in compliance with these rules.

***We may incur increasing attention to environmental, social and governance ("ESG") matters that may impact our business.***

Businesses across all industries are facing increasing scrutiny from stakeholders related to their ESG practices. If we do not adapt to or comply with investor or stakeholder expectations and standards, which are evolving, or if we are perceived to have not responded appropriately to the growing concern for ESG issues, regardless of whether there is a legal requirement to do so, we may suffer from reputational damage and the business, financial condition and/or the value of our Common Stock could be materially and adversely affected. Increasing attention to climate change, increasing societal expectations on businesses to address climate change, and potential consumer use of substitutes to energy commodities may result in increased costs, reduced demand for our hydrocarbon products, reduced profits, increased investigations and litigation, and negative impacts on our ability to access capital markets.

In addition, organizations that provided information to investors on corporate governance and related matters have developed rating processes for evaluating business entities on their approach to ESG matters. Currently, there are no universal standards for such scores or ratings, but the importance of sustainability evaluations is becoming more broadly accepted by investors and shareholders. Such ratings are used by some investors to inform their investment and voting decisions. Additionally, certain investors use these scores to benchmark businesses against their peers. If we are perceived as lagging, our investors may engage with such third party organizations to require improved ESG disclosure or performance.

***Our estimates of the volume of reserves could have flaws, or such reserves could turn out not to be commercially extractable. As a result, our future revenues and projections could be incorrect.***

Estimates of reserves and of future net revenues prepared by different petroleum engineers may vary substantially depending, in part, on the assumptions made and may be subject to adjustment either up or down in the future. Our actual amounts of production, revenue, taxes, development expenditures, operating expenses, and quantities of recoverable oil and natural gas reserves may vary substantially from the estimates. Oil and natural gas reserve estimates are necessarily inexact and involve matters of subjective engineering judgment. In addition, any estimates of our future net revenues and the present value thereof are based on assumptions derived in part from historical price and cost information, which may not reflect current and future values, and/or other assumptions made by us that only represent our best estimates. If these estimates of quantities, prices and costs prove inaccurate, we may be unsuccessful in expanding our oil and natural gas reserves base with our acquisitions. Additionally, if declines in and instability of oil and natural gas prices occur, then write downs in the capitalized costs associated with any oil and natural gas assets we obtain may be required. Because of the nature of the estimates of our reserves and estimates in general, reductions to our estimated proved oil and natural gas reserves and estimated future net revenues may not be required in the future, and/or that our estimated

Table of Contents

reserves may not be present and/or commercially extractable. If our reserve estimates are incorrect, we may be forced to write down the capitalized costs of our oil and natural gas properties.

***Decommissioning costs are unknown and may be substantial. Unplanned costs could divert resources from other projects.***

We may become responsible for costs associated with abandoning and reclaiming wells, facilities and pipelines which we use for production of oil and natural gas reserves. Abandonment and reclamation of these facilities and the costs associated therewith is often referred to as "decommissioning." We accrue a liability for decommissioning costs associated with our wells but have not established any cash reserve account for these potential costs in respect of any of our properties. If decommissioning is required before economic depletion of our properties or if our estimates of the costs of decommissioning exceed the value of the reserves remaining at any particular time to cover such decommissioning costs, we may have to draw on funds from other sources to satisfy such costs. The use of other funds to satisfy such decommissioning costs could impair our ability to focus capital investment in other areas of our business.

***We may have difficulty distributing production, which could harm our financial condition.***

In order to sell the oil and natural gas that we are able to produce, if any, the operators of the wells we obtain interests in may have to make arrangements for storage and distribution to the market. We will rely on local infrastructure and the availability of transportation for storage and shipment of our products, but infrastructure development and storage and transportation facilities may be insufficient for our needs at commercially acceptable terms in the localities in which we operate. This situation could be particularly problematic to the extent that our operations are conducted in remote areas that are difficult to access, such as areas that are distant from shipping and/or pipeline facilities. These factors may affect our and potential partners' ability to explore and develop properties and to store and transport oil and natural gas production, increasing our expenses.

Furthermore, weather conditions or natural disasters, actions by companies doing business in one or more of the areas in which we will operate, or labor disputes may impair the distribution of oil and/or natural gas and in turn diminish our financial condition or ability to maintain our operations.

***The marketability of any future production will be dependent upon transportation and other facilities, certain of which we do not control. When these facilities are unavailable, our operations can be interrupted and any revenues reduced.***

The marketability of any future production depends in part upon the availability, proximity and capacity of transportation facilities owned by third parties. The oil produced will be transported from the wellhead to our tank batteries by our gathering system. Our purchasers would then transport the oil by truck to a pipeline for transportation. Our natural gas production will generally be transported by our gathering lines from the wellhead to an interconnection point with the purchaser. We do not control these trucks and other third-party transportation facilities and our access to them may be limited or denied. Insufficient production from our wells to support the construction of pipeline facilities by our purchasers or a significant disruption in the availability of our or third-party transportation facilities or other production facilities could adversely impact our ability to deliver to market or produce our production and thereby cause a significant interruption in our operations.

We may be required to flare a portion of our natural gas production for a number of reasons, including the fact that (i) our well is not yet tied into the third-party gathering system, (ii) the pressures on the third-party gathering system are too high to allow additional production from our well to be transported or (iii) our production is prorated due to high demand on the third-party gathering system. We may flare additional gas from time to time.

Table of Contents

Also, the transfer of our oil and natural gas through third-party pipelines may be curtailed or delayed if it does not meet the quality specifications of the pipeline owners. Our access to transportation options, including trucks owned by third parties, can also be affected by U.S. federal and state regulation of oil and natural gas production and transportation, general economic conditions and changes in supply and demand. If, in the future, we are unable, for any sustained period, to implement acceptable delivery or transportation arrangements or encounter production-related difficulties, we may be required to shut in or curtail production. Any such shut in or curtailment, or an inability to obtain favorable terms for delivery of our production, would adversely affect our financial condition and results of operations.

***Our business will suffer if we cannot obtain or maintain necessary licenses.***

Our operations will require licenses, permits and in some cases renewals of licenses and permits from various governmental authorities. Our ability to obtain, sustain or renew such licenses and permits on acceptable terms is subject to change in regulations and policies and to the discretion of the applicable governments, among other factors. Our inability to obtain, or our loss of or denial of extension of, any of these licenses or permits could hamper our ability to produce revenues from our operations.

***Challenges to our properties may impact our financial condition.***

Title to oil and natural gas interests is often not capable of conclusive determination without incurring substantial expense. While we have made and intend to make appropriate inquiries into the title of properties and other development rights we have acquired and intend to acquire, title defects may exist. In addition, we may be unable to obtain adequate insurance for title defects, on a commercially reasonable basis or at all. If title defects do exist, it is possible that we may lose all or a portion of our right, title and interests in and to the properties to which the title defects relate. If our property rights are reduced, our ability to conduct our exploration, development and production activities may be impaired. To mitigate title problems, common industry practice is to obtain a title opinion from a qualified oil and natural gas attorney prior to the drilling operations of a well.

***We rely on technology to conduct our business, and our technology could become ineffective or obsolete.***

We rely on technology, including geographic and seismic analysis techniques and economic models, to develop any reserve estimates and to guide our exploration, development and production activities. We and our operator partners will be required to continually enhance and update our technology to maintain its efficacy and to avoid obsolescence. The costs of doing so may be substantial and may be higher than the costs that we anticipate for technology maintenance and development. If we are unable to maintain the efficacy of our technology, our ability to manage our business and to compete may be impaired. Further, even if we are able to maintain technical effectiveness, our technology may not be the most efficient means of reaching our objectives, in which case we may incur higher operating costs than we would were our technology more efficient.

***The loss of key personnel would directly affect our efficiency and profitability.***

Our future success is dependent, in a large part, on retaining the services of our planned management team. Our executive officers possess a unique and comprehensive knowledge of our industry and related matters that are vital to our success within the industry. The knowledge, leadership and technical expertise of these individuals would be difficult to replace. The loss of one or more of our officers could have a material adverse effect on our operating and financial performance, including our ability to develop and execute our long-term business strategy. We do not maintain key-man life insurance with respect to any employees. We have entered into employment agreements with certain of our executive officers effective immediately following the Spin-Off. Three of our executives were party to prior employment agreements with one of our subsidiaries, which have been terminated and superseded by the agreements as described in more detail under the heading “Executive Compensation” elsewhere in this Prospectus.

Table of Contents

***We have limited management and staff and are dependent upon partnering arrangements and third-party service providers.***

After the Spin-Off we plan to have six full-time employees, including our Chief Executive Officer and Chief Financial Officer. The loss of these individuals would have an adverse effect on our business, as we have very limited personnel. We leverage the services of other independent consultants and contractors to perform various professional services, including engineering, oil and natural gas well planning and supervision, and land, legal, environmental and tax services. We also pursue alliances with partners in the areas of geological and geophysical services and prospect generation, evaluation and prospect leasing. Our dependence on third-party consultants and service providers create a number of risks, including but not limited to:

- the possibility that such third parties may not be available to us as and when needed; and
- the risk that we may not be able to properly control the timing and quality of work conducted with respect to our projects.

If we experience significant delays in obtaining the services of such third parties or they perform poorly, our results of operations and stock price could be materially adversely affected.

***Certain of our directors and officers have significant duties with, and spend significant time serving, entities that may compete with us in seeking acquisitions and business opportunities and, accordingly, may have conflicts of interest in allocating time or pursuing business opportunities.***

Certain of our directors and officers, who are responsible for managing the direction of our operations and acquisition activities, hold positions of responsibility with other entities that are in the business of identifying and acquiring oil and natural gas properties. The existing positions held by these directors and officers may give rise to fiduciary or other duties that are in conflict with the duties they owe to us. These directors and officers may become aware of business opportunities that may be appropriate for presentation to us as well as to the other entities with which they are or may become affiliated. Due to these existing and potential future affiliations, they may present potential business opportunities to other entities prior to presenting them to us, which could cause additional conflicts of interest. They may also decide that certain opportunities are more appropriate for other entities with which they are affiliated, and as a result, they may elect not to present those opportunities to us. These conflicts may not be resolved in our favor. For additional discussion of our management's business affiliations and the potential conflicts of interest of which our stockholders should be aware, see "Certain Relationships and Related Party Transactions."

***Our business and operations may be adversely affected by the COVID-19 pandemic and may be adversely affected by other similar outbreaks.***

As a result of the COVID-19 pandemic or other adverse public health developments, including voluntary and mandatory quarantines, travel restrictions, and other restrictions, we have experienced delays, disruptions and temporary suspensions of our operations. In addition, our financial condition and results of operations may be adversely affected by the COVID-19 pandemic in the future.

The timeline and potential magnitude of the COVID-19 outbreak continue to be unknown. The continuation or amplification of the COVID-19 pandemic could continue to more broadly affect the United States and global economy, including our business and operations, and the demand for oil and natural gas. Other contagious diseases in the human population could have similar adverse effects. The potential impact from COVID-19 is difficult to predict, therefore, the extent to which it will negatively affect our operating results, or the duration of any potential business disruption is uncertain. The magnitude and duration of any impact will depend on future developments and new information that may emerge regarding the duration of COVID-19 pandemic, the severity of any variants thereof, rate of vaccinations and other actions taken by authorities to contain its impact or otherwise treat the disease, all of which are beyond our control.

Table of Contents

***Terrorist attacks or cyber-incidents could result in information theft, data corruption, operational disruption and/or financial loss.***

Like most companies, we have become increasingly dependent upon digital technologies, including information systems, infrastructure and cloud applications and services, to operate our businesses, to process and record financial and operating data, communicate with our business partners, analyze mine and mining information, estimate quantities of coal reserves, as well as other activities related to our businesses. Strategic targets, such as energy-related assets, may be at greater risk of future terrorist or cyber-attacks than other targets in the United States. Deliberate attacks on, or security breaches in, our systems or infrastructure, or the systems or infrastructure of third parties, or cloud-based applications could lead to corruption or loss of our proprietary data and potentially sensitive data, delays in production or delivery, difficulty in completing and settling transactions, challenges in maintaining our books and records, environmental damage, communication interruptions, other operational disruptions and third-party liability. Our insurance may not protect us against such occurrences. Consequently, it is possible that any of these occurrences, or a combination of them, could have a material adverse effect on our business, financial condition, results of operations and cash flows. Further, as cyber incidents continue to evolve, we may be required to expend additional resources to continue to modify or enhance our protective measures or to investigate and remediate any vulnerability to cyber incidents. We plan to adopt plans and policies to address precautions with respect to data security and appropriate responses in case of a reported breach.

**Risks Relating to the Spin-Off**

***The Spin-Off could result in significant tax liability to Meta and its stockholders.***

The Spin-Off and cancellation of all shares of Meta's Series A Preferred Stock together will not qualify for non-recognition of gain or loss for U.S. federal income tax purposes. Series A Preferred stockholders could be subject to tax as a result of the Spin-Off and such cancellation. The treatment of the Spin-Off and cancellation of all shares of the Series A Preferred Stock together for U.S. federal income tax purposes for a U.S. holder (as defined further below) will depend on whether the Spin-Off and such cancellation qualify as a sale or exchange of the Series A Preferred Stock under Section 302 of the Internal Revenue Code of 1986, as amended (the "Code"). If the Spin-Off and cancellation of all shares of the Series A Preferred Stock together qualify as a sale or exchange of the Series A Preferred Stock, the U.S. holder will be treated as recognizing capital gain or loss equal to the difference between the amount realized on the Spin-Off and such cancellation together, and such U.S. holder's adjusted tax basis in the Series A Preferred Stock surrendered in the Spin-Off and such cancellation. The treatment of the Spin-Off and cancellation of all shares of the Series A Preferred Stock for U.S. federal income tax purposes for a non-U.S. holder (as defined further below) likewise will depend on whether the Spin-Off and such cancellation together qualify as a sale or exchange of the Series A Preferred Stock under Section 302 of the Code. If the Spin-Off and such cancellation together qualify as a sale or exchange of the Series A Preferred Stock, gain recognized from the Spin-Off by a non-U.S. holder generally will not be subject to U.S. federal income taxation. If the Spin-Off and such cancellation together do not qualify as a sale or exchange of Series A Preferred Stock, a non-U.S. holder will be treated as receiving a distribution from Meta, which distribution will be treated as a dividend to the extent the distribution is paid out of Meta's current or accumulated earnings and profits (as determined under U.S. federal income tax principles) and will be subject to any applicable withholding. If a Series A Preferred stockholder is subject to withholding tax in connection with the Spin-Off (including nonresident withholding tax or backup withholding tax, each as described further under the heading "Material U.S. Federal Income Tax Considerations" below), Meta has the right to reduce the amount of Common Stock deliverable to such stockholder in the Spin-Off in order to pay such withholding tax.

Meta will generally recognize gain equal to the fair market value of our Common Stock in excess of Meta's adjusted tax basis in such Common Stock at the time of the Spin-Off. To the extent such gain gives rise to unreimbursed federal, state or other tax liabilities, such liabilities could adversely affect Meta's liquidity or capital reserves.

Table of Contents

See below under the headings "Notes to Unaudited Pro-Forma Condensed Combined Financial Statements" and "Material U.S. Federal Income Tax Considerations" for more information.

***We may be unable to achieve some or all of the benefits that we expect to achieve from the Spin-Off.***

We believe that, as an independent company, we will be able to, among other things, better focus our financial and operational resources on our specific business, implement and maintain a capital structure designed to meet our specific needs, design and implement corporate strategies and policies that are targeted to our business, more effectively respond to industry dynamics and create effective incentives for our management and employees that are more closely tied to our business performance. However, by separating from Meta, we may be more susceptible to market fluctuations and have less leverage with suppliers, and we may experience other adverse events. In addition, we may be unable to achieve some or all of the benefits that we expect to achieve as an independent company in the time we expect, if at all. The completion of the Spin-Off will also require significant amounts of our management's time and effort, which may divert management's attention from operating and growing our business.

***We may be unable to make, on a timely or cost-effective basis, the changes necessary to operate as an independent company, and we may experience increased costs after the Spin-Off.***

Meta has provided us with various corporate services. Following the Spin-Off, Meta will have no obligation to provide us with assistance other than as described under "Certain Relationships and Related Party Transactions—Agreements with Meta." These arrangements do not account for every service that we have received from Meta in the past. Accordingly, following the Spin-Off, we will need to provide internally or obtain from unaffiliated third parties the services we currently receive from Meta. We may be unable to replace these services in a timely manner or on terms and conditions as favorable as those we receive from Meta. We may be unable to successfully establish the infrastructure or implement the changes necessary to operate independently or may incur additional costs. If we fail to obtain the services necessary to operate effectively or if we incur greater costs in obtaining these services, our business, financial condition and results of operations may be adversely affected.

***We have limited operating history as an independent company, and our historical financial information is not necessarily representative of the results we would have achieved as an independent company and may not be a reliable indicator of our future results.***

We derived the historical financial information included in this Prospectus from Meta's consolidated financial statements, and this information does not necessarily reflect the results of operations and financial position we would have achieved as an independent company during the periods presented or those that we will achieve in the future. This is primarily because of the following factors:

- Prior to the Spin-Off, we operated as part of Meta's broader corporate organization, and Meta performed various corporate functions for us. Our historical financial information reflects allocations of corporate expenses from Meta for these and similar functions. These allocations may not reflect the costs we will incur for similar services in the future as an independent company.
- We will enter into certain transactions with Meta that did not exist prior to the Spin-Off, such as the Tax Matters Agreement, which may cause us to incur new costs.
- Our historical financial information does not reflect changes that we expect to experience in the future as a result of our separation from Meta, including changes in our cost structure, personnel needs, tax structure, financing and business operations. As part of Meta, we enjoyed certain benefits from Meta's operating diversity, size, purchasing power, borrowing leverage and available capital for investments, and we will lose these benefits after the Spin-Off. As an independent entity, we may be unable to purchase goods, services and technologies, such as insurance and health care benefits and computer software licenses or access capital markets on terms as favorable to us as those we obtained as part of Meta prior to the Spin-Off.

Table of Contents

Following the Spin-Off, we will also be responsible for the additional costs associated with being an independent company, including costs related to corporate governance, investor and public relations and public reporting. In addition, certain costs incurred by Meta, including executive oversight, accounting, treasury, tax, legal, human resources, occupancy, procurement, information technology and other shared services, have historically been allocated to us by Meta; but these allocations may not reflect the future level of these costs to us as we begin to provide these services ourselves. Therefore, our historical financial statements may not be indicative of our future performance as an independent company. We cannot assure you that our operating results will continue at a similar level when we are an independent company. For additional information about our past financial performance and the basis of presentation of our financial statements, see "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the notes thereto included elsewhere in this Prospectus.

***Our contracts may contain provisions requiring the consent of third parties in connection with the Spin-Off. If these consents are not obtained, we may be unable to enjoy the benefit of these contracts in the future.***

Our contracts may contain provisions that require the consent of third parties to the Spin-Off. Failure to obtain such consents on commercially reasonable and satisfactory terms may impair our entitlement to the benefit of these contracts in the future.

***The 2021 Note with Meta contains restrictive covenants that limit our operations.***

In 2021, we borrowed $15 million pursuant to the terms of the 2021 Note (defined below). If we are not in compliance with the covenants of the 2021 Note, or if we are in default under the 2021 Note, it is unlikely that Meta will offer to extend any additional loans or debt financing under the 2021 Note or otherwise, which may affect our business as a going concern. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2021 Note. This restriction may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for additional information.

The 2021 Note is secured by a security interest in shares of common stock of Meta and a 25% working interest in the Orogrande Prospect as defined in the Security Agreement (defined below), each held by the Pledgor (defined below) or the Pledgor's affiliate. Any default that is not waived could permit Meta, as lender, to exercise rights and remedies with respect to all of the collateral that is securing the 2021 Note, and/or other rights and remedies under applicable law.

Our ability to meet these restrictive covenants or to avoid defaults can be impacted by events beyond our control. The 2021 Note provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence of an event of default, Meta as our lender could elect to declare all amounts outstanding under the 2021 Note to be immediately due and payable. If the outstanding debt under the 2021 Note was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our Common Stock.

***Our Loan Agreement with Meta contains restrictive covenants that limit our operations.***

As of August 2022, we borrowed an aggregate principal amount of $5.0 million pursuant to the terms of the Loan Agreement (defined below), which is the maximum principal balance available under the Loan Agreement. The Loan Agreement contains various restrictive covenants and other restrictions, which include, among other things, restrictions on:

- our ability to transfer all or part of our business or property, except for inventory in the ordinary course of business, surplus or obsolete equipment, permitted liens, and transfers of cash permitted by the agreement;

Table of Contents

- our ability to liquidate or dissolve or merge or consolidate with another entity, or acquire another entity;
- our ability to incur additional debt beyond certain limits or encumber our assets; and
- our ability to pay dividends or make investments, other than permitted investments.

These restrictions may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See “Management’s Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources” for additional information.

Our ability to meet these restrictive covenants can be impacted by events beyond our control. The Loan Agreement provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence and during the continuance of an event of default, Meta as the lender could elect to (i) declare all outstanding principal and accrued and unpaid interest under the Loan Agreement immediately due and payable, (ii) terminate any remaining commitment to make loans under the Loan Agreement, and/or (iii) exercise certain other rights and remedies anticipated under the Loan Agreement. The events of default under the Loan Agreement include, among other things (subject to grace periods in certain instances), payment defaults, breaches of covenants or representations and warranties, a change in control or certain material adverse effects as defined in the Loan Agreement, material judgments and attachments, cross defaults with certain of our other material indebtedness, and bankruptcy and insolvency events with respect to us and our subsidiaries. If the outstanding debt under the Loan Agreement was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our Common Stock.

***We may have been able to receive better terms from unaffiliated third parties than the terms we receive in our agreements with Meta.***

We have negotiated agreements with Meta including the 2021 Note, Loan Agreement, Distribution Agreement and Tax Matters Agreement, while we are still part of Meta. Accordingly, these agreements may not reflect terms that would have resulted from arms-length negotiations between unaffiliated parties. The terms of the agreements being negotiated relate to, among other things, loans for working capital, allocations of assets, liabilities, rights, indemnifications and other obligations between Meta and us. We may have received better terms from third parties because third parties may have competed with each other to win our business. See “Certain Relationships and Related Party Transactions” for more information.

**Risks Relating to our Common Stock**

***Our Common Stock is not eligible with the Depository Trust Company (“DTC”), which may result in brokerage firms being unwilling to hold or trade the stock.***

A significant number of the holders of the Series A Preferred Stock hold such shares in “street name” brokerage accounts. Our shares of Common Stock will not become eligible with DTC to permit our shares of Common Stock to trade electronically. If an issuer is not “DTC-eligible,” then its capital stock cannot be electronically transferred between brokerage accounts, which means that brokerage firms may be unwilling to hold or trade our Common Stock, restricting all trades by holders of our Common Stock following the Spin-Off, and the brokerage firms may return all such shares from the brokerage accounts to the beneficial holders.

***The price per share of Meta’s Series A Preferred Stock traded on the over-the-counter (“OTC”) market under the symbol MMTLP may not accurately reflect the value of a share of our Common Stock that you will receive in the Distribution.***

Before the Distribution, Meta’s Series A Preferred Stock was traded on the OTC market under the trading symbol “MMTLP”, although such shares of MMTLP were not eligible for broker-dealer quotations. The OTC

Table of Contents

market does not constitute an established stock exchange, and as a result, the historical trading prices for the shares of MMTLP may not be a reliable benchmark on which to determine the value of the shares of our Common Stock you will receive in the Distribution.

Additionally, securities of certain companies have recently experienced significant and extreme volatility in stock price due to short sellers of shares of securities, known as a "short squeeze." These short squeezes have caused extreme volatility in both the stock prices of those companies and in the market and have led those companies' securities to trade at a significantly inflated price per share that is disconnected from the underlying value of the company. In particular, if any investors have sold shares of MMTLP short, then in connection with the Distribution such investors may feel compelled to buy shares of MMTLP to cover such sales before the Distribution. If this were to occur, given the potential high demand from buyers with a relatively low supply of MMTLP shares available for sale on the OTC market, the MMTLP price per share as shown on the OTC market may rise significantly but not be representative of the value of the underlying shares of our Common Stock that you will receive in the Distribution.

***No trading market for our Common Stock is expected to develop.***

There is presently no public market for our shares of Common Stock and our shares are not expected to become DTC eligible for electronic trading to third parties. There is no expectation that a trading market will develop or be sustained. Accordingly, you may have to hold the shares of Common Stock indefinitely.

***We do not intend to pay any cash dividends in the foreseeable future and, therefore, any return on your investment in our Common Stock must come from increases in the fair market value of the Common Stock.***

We do not intend to pay cash dividends on our Common Stock in the foreseeable future. We expect to retain future earnings, if any, for reinvestment in our business. Also, any credit agreements, which we may enter into, may restrict our ability to pay dividends. Whether we pay cash dividends in the future will be at the discretion of our board of directors (the "Board") and will be dependent upon our financial condition, results of operations, cash requirements, future prospects and any other factors our Board deems relevant. Therefore, any return on your investment in our Common Stock must come from increases in the fair market value of the Common Stock.

***Your percentage ownership in the Company may be diluted in the future, including in our plan to issue our Common Stock for the working interests in our Orogrande Project.***

Your percentage ownership in the Company may be diluted in the future because of equity awards that we expect to grant to our directors, officers and other employees and current holders of working interests in our Orogrande Project. Prior to the Spin-Off, we approved an incentive plan that will provide for the grant of Common Stock-based equity awards to our directors, officers and other employees. In addition, we may issue equity as all or part of the consideration paid for acquisitions and strategic investments that we may make in the future or as necessary to finance our ongoing operations.

***We may issue preferred stock with terms that could adversely affect the voting power or value of our Common Stock.***

Our Board has the authority to cause us to issue, without any further vote or action by the stockholders, shares of preferred stock in one or more series, to designate the number of shares constituting any series, and to fix the rights, preferences, privileges and restrictions thereof, including dividend rights, voting rights and terms of redemption, redemption price or prices and liquidation preferences of such series. The terms of one or more classes or series of preferred stock could adversely impact the voting power or value of our Common Stock. For example, we might afford holders of preferred stock the right to elect some number of our directors in all events or upon the occurrence of specified events or the right to vote on specified transactions. Similarly, the repurchase or redemption rights or liquidation preferences we might assign to holders of preferred stock could affect the residual value of our Common Stock.

Table of Contents

**Risks Relating to Our Status as a Public Reporting Company**

***We are an emerging growth company and a smaller reporting company, subject to less stringent reporting and regulatory requirements of other publicly reporting companies and this status may have an adverse effect on our ability to attract interest in our Common Stock.***

We are an emerging growth company as defined in the JOBS Act. As long as we remain an emerging growth company, we may take advantage of certain exemptions from various reporting and regulatory requirements that are applicable to other public reporting companies that are not emerging growth companies. We cannot predict if investors will find our Common Stock less attractive if we choose to rely on these exemptions.

Additionally, we are a “smaller reporting company” as defined under the Exchange Act. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company provided: (1) the market value of our common stock held by non-affiliates is less than $250 million as of the end of the prior June 30th, or (2) our annual revenues are less than $100 million during such completed fiscal year and the market value of our Common Stock held by non-affiliates is less than $700 million as of the prior June 30th. To the extent we take advantage of such reduced disclosure obligations, it may also make comparison of our financial statements with other public reporting companies difficult or impossible.

***We may be required to file reports with the SEC only for the fiscal year in which the registration statement for the Spin-Off becomes effective and may no longer be subject to the reporting obligations under the Exchange Act thereafter.***

By registering the shares of Common Stock in connection with the Spin-Off, we become subject to the reporting obligations under the Exchange Act, which includes filings of Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K for reporting periods ending on or before December 31, 2022. We would be obligated to continue these reporting obligations for subsequent reporting periods if on the last day of our fiscal year in which the Registration Statement of which this prospectus forms a part becomes effective we have more than $10 million in assets and either 2,000 or more record holders or 500 or more record holders who are not “accredited investors.” It is unclear whether the number of our record holders following the Spin-Off will meet one or both of these thresholds, in which case, we may become exempt from such reporting requirements after the year ending December 31, 2022. If we were to decide not to continue reporting, you will not have access to updated information regarding our business, financial condition and results of operation. Although we may and intend to continue to file such reports with the SEC, such filings will be voluntary.

Table of Contents

## THE SPIN-OFF

### Background

In June 2020 the board of directors of Torchlight began to pursue strategic alternatives for Torchlight due to the permeating financial climate of the oil and gas industry in 2020. In July 2020 Torchlight engaged Roth Capital Partners, LLC as its financial advisor in connection with a strategic transaction. After discussions with various companies, Torchlight began discussions with Metamaterial, Inc. in September 2020 concerning a potential strategic transaction.

After several months of negotiations, in December 2020 Torchlight and Metamaterial, Inc. entered into the Arrangement Agreement. Within the Arrangement Agreement, the oil and gas properties of Torchlight (the "O&G Assets") were effectively allocated to the legacy Torchlight stockholders, which became the Series A Preferred stockholders of Torchlight (which was subsequently renamed "Meta Materials, Inc."). Concurrent with the negotiation and execution of the Arrangement Agreement was the Certificate of Designation of Preferences, Rights and Limitations of the Series A Preferred Stock. Pursuant to the Certificate of Designation, upon a sale of the O&G Assets, the proceeds from any such transaction are to be distributed to the Series A Preferred stockholders, or Meta was to pursue a spin-off. In lieu of a sale of the O&G Assets, the Meta board has now determined to pursue the Spin-Off.

### Reasons for the Spin-Off

The Meta board of directors considered the Spin-Off to be strategic so that Meta can concentrate on its core business.

### When and How You Will Receive Shares of Common Stock

Meta will distribute to the holders of its Series A Preferred Stock, as a pro rata dividend, one share of our Common Stock for every share of Series A Preferred Stock outstanding as of December 12, 2022 (the "Record Date").

Prior to the Spin-Off, Meta will deliver all of the issued and outstanding shares of our Common Stock to the distribution agent. American Stock Transfer & Trust Company LLC (the "Transfer Agent") will serve as distribution agent in connection with the Distribution and as transfer agent and registrar for our Common Stock.

If you own Series A Preferred Stock of Meta as of the close of business on December 12, 2022, the shares of our Common Stock that you are entitled to receive in the Distribution will be issued to your account as follows:

- *Registered stockholders*. If you own your shares of Series A Preferred Stock directly through Meta's transfer agent, American Stock Transfer & Trust Company LLC, you are a registered stockholder. In this case, the distribution agent will credit the whole number of shares of our Common Stock you receive in the Distribution by way of direct registration in book-entry form to a new account with the Transfer Agent. Registration in book-entry form refers to a method of recording share ownership where no physical stock certificates are issued to stockholders, as is the case in the Distribution. You will be able to access information regarding your book-entry account holding our shares at the Transfer Agent.

Commencing on or shortly after the Distribution Date, the Transfer Agent will mail to you an account statement that indicates the number of whole shares of our Common Stock that have been registered in book-entry form in your name. We expect it will take the Transfer Agent up to two weeks after the Distribution Date to complete the distribution of the shares of our Common Stock and mail statements of holdings to all registered stockholders. You or your bank, broker or other nominee may request that the Transfer Agent issue to you a physical stock certificate representing your shares of Common Stock.

- "*Street name*" *or beneficial stockholders*. Most Meta stockholders own their shares of Series A Preferred Stock beneficially through a bank, broker or other nominee. In these cases, the bank, broker

Table of Contents

or other nominee holds the shares in "street name" and records your ownership on its books. If you own your shares of the Series A Preferred Stock through a bank, broker or other nominee, your bank, broker or other nominee will credit your account with the whole shares of our Common Stock that you receive in the Distribution on or shortly after the Distribution Date; however, our shares of Common Stock will not be eligible for electronic trading through DTC or any other established clearing corporation. Therefore, we encourage you to contact your bank, broker or other nominee to instruct such bank, broker or other nominee to transfer the shares of Series A Preferred Stock to our transfer agent on or prior to the Record Date such that each such holder of Series A Preferred Stock is the registered holder of the distributed shares of Common Stock in book-entry form in a new account with our Transfer Agent.

If you sell shares of Series A Preferred Stock on or before the Record Date, you will not be entitled to receive the shares of Common Stock in the Distribution in respect of such shares of Series A Preferred Stock sold. We expect all trading of the shares of Series A Preferred Stock to be suspended as of the Distribution Date.

We are not asking holders of Meta Series A Preferred Stock to take any action in connection with the Spin-Off. No approval of any holders of Meta's capital stock is required for the Spin-Off. We are not asking you for a proxy and request that you not send us a proxy. We are also not asking you to make any payment or surrender or exchange any of your shares of Meta Series A Preferred Stock for shares of our Common Stock. As of the Distribution Date, all of the shares of Series A Preferred Stock will be automatically cancelled and the holders of such Series A Preferred Stock will cease to have any rights with respect to such shares.

**Number of Shares You Will Receive**

On the Distribution Date, you will receive one share of our Common Stock for every share of Meta Series A Preferred Stock you hold on the Record Date. No fractional shares of Common Stock will be issued.

**Results of the Spin-Off**

After the Spin-Off, we will be an independent company. Immediately following the Spin-Off, we expect to have approximately 64,000 holders of shares of our Common Stock. In computing the number of holders of record, all broker-dealers and clearing corporation holding shares on behalf of its customers, the holders of the Series A Preferred Stock, is counted as a single shareholder. A significant number of shares of our Common Stock are held in either nominee name or street name brokerage accounts, and consequently, we are unable to determine the exact number of beneficial owners of our Common Stock.

We have entered into a Distribution Agreement and certain other agreements with Meta related to the Spin-Off. These agreements will govern the relationship between us and Meta up to and after completion of the Spin-Off and allocate between us and Meta various assets, liabilities, rights and obligations, including employee benefits, intellectual property and tax-related assets and liabilities. We describe these arrangements in greater detail under "Certain Relationships and Related Party Transactions—Agreements with Meta."

**Conditions to the Spin-Off**

We expect that the separation will be effective on the Distribution Date, provided that the following conditions shall have been satisfied or waived by Meta:

- the Meta board of directors shall have authorized and approved the Distribution and not withdrawn such authorization and approval, and shall have declared the dividend of our Common Stock to Meta stockholders;
- the Distribution Agreement and the ancillary agreements contemplated by the Distribution Agreement shall have been executed by each party to those agreements;

Table of Contents

- the SEC shall have declared effective our Registration Statement on Form S-1, of which this Prospectus is a part, under the Securities Act, and no stop order suspending the effectiveness of our Registration Statement shall be in effect and no proceedings for that purpose shall be pending before or threatened by the SEC;
- no order, injunction or decree issued by any governmental authority of competent jurisdiction or other legal restraint or prohibition preventing consummation of the Distribution shall be in effect, and no other event outside the control of Meta shall have occurred or failed to occur that prevents the consummation of the Distribution;
- all necessary actions and filings with regard to applicable state securities or "blue sky" laws shall have been taken; and
- any material third party consents necessary to consummate the Spin-Off shall have been obtained or waived.

**Reasons for Furnishing this Prospectus**

We are furnishing this Prospectus solely to provide information to Meta Series A Preferred Stockholders who will receive shares of our Common Stock in the Distribution. You should not construe this Prospectus as an inducement or encouragement to buy, hold or sell any of our securities or any securities of Meta. We believe that the information contained in this Prospectus is accurate as of the date set forth on the cover. Changes to the information contained in this Prospectus may occur after that date, and neither we nor Meta undertake any obligation to update the information except in the normal course of our and Meta's public disclosure obligations and practices and except as required by applicable law.

Table of Contents

## MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS

**Certain U.S. Federal Income Tax Consequences of the Spin-Off**

The following is a summary of the material U.S. federal income tax consequences of our separation from Meta, and in particular the distribution by Meta of our Common Stock to the holders of the shares of Series A Preferred Stock (the "Series A Preferred Stockholders") and the cancellation of all shares of the Series A Preferred Stock. For purposes of this section under the heading "Certain U.S. Federal Income Tax Consequences of the Spin-Off": (i) any references to the "Spin-Off" shall mean only the distribution of shares of our Common Stock by Meta to Series A Preferred Stockholders and the cancellation of all shares of the Series A Preferred Stock, taken together; (ii) references to "Company," "we," "our" and "us" mean only Next Bridge Hydrocarbons, Inc. and not its subsidiaries or other lower-tier entities, except as otherwise indicated; and (iii) references to Meta refer to Meta Materials, Inc. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Code"), the regulations promulgated by the U.S. Treasury Department ("Treasury Regulations"), rulings and other administrative pronouncements issued by the Internal Revenue Service ("IRS"), and judicial decisions, all as currently in effect, and all of which are subject to differing interpretations or to change, possibly with retroactive effect. No assurance can be given that the IRS would not assert, or that a court would not sustain, a position contrary to any of the tax consequences described below. We have not sought and do not intend to seek an advance ruling from the IRS regarding any matter discussed herein. The summary is also based upon the assumption that Meta, the Company and their respective subsidiaries and affiliated entities will operate in accordance with their applicable organizational documents or partnership agreements and the agreements and other documents applicable to our separation from Meta. This summary is for general information purposes only, does not address all possible tax considerations that may be material to an investor and does not constitute legal or tax advice. Moreover, this summary does not purport to discuss all aspects of U.S. federal income taxation that may be important to a particular investor in light of its investment or tax circumstances, or to investors subject to special tax rules, such as:

- financial institutions;
- insurance companies;
- broker-dealers;
- regulated investment companies and real estate investment trusts;
- partnerships and trusts;
- persons who hold our stock on behalf of another person as a nominee;
- persons who receive our stock through the exercise of employee stock options or otherwise as compensation;
- persons holding our stock as part of a "straddle," "hedge," "conversion transaction," "synthetic security" or other integrated investment;
- tax-exempt organizations;

and, except to the extent discussed below:

- foreign investors.

This summary assumes that investors hold their Series A Preferred Stock as a capital asset and will hold their Common Stock as a capital asset, which generally means as property held for investment.

For purposes of this discussion under the heading "Certain U.S. Federal Income Tax Consequences of the Spin-Off," a U.S. holder is a Series A Preferred Stockholder that is for U.S. federal income tax purposes:

- a citizen or resident of the United States,

Table of Contents

- a corporation (including an entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any of its states, or the District of Columbia,
- an estate, whose income is subject to U.S. federal income taxation regardless of its source, or
- a trust if (1) a U.S. court is able to exercise primary supervision over the administration of such trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) it has a valid election to be treated as a U.S. person.

A "non-U.S. holder" is a Series A Preferred Stockholder that is not a U.S. holder and is not an entity treated as a partnership for U.S. federal income tax purposes. If a partnership, entity or arrangement treated as a partnership for U.S. federal income tax purposes holds Series A Preferred Stock, the U.S. federal income tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. An investor that is a partnership and the partners in such partnership should consult their tax advisors about the U.S. federal income tax consequences of the Spin-Off.

THE U.S. FEDERAL INCOME TAX TREATMENT OF THE SPIN-OFF TO STOCKHOLDERS OF META DEPENDS IN SOME INSTANCES ON DETERMINATIONS OF FACT AND INTERPRETATIONS OF COMPLEX PROVISIONS OF U.S. FEDERAL INCOME TAX LAW FOR WHICH NO CLEAR PRECEDENT OR AUTHORITY MAY BE AVAILABLE. IN ADDITION, THE TAX CONSEQUENCES OF THE SPIN-OFF TO ANY PARTICULAR STOCKHOLDER OF META WILL DEPEND ON THE STOCKHOLDER'S PARTICULAR TAX CIRCUMSTANCES. YOU ARE URGED TO CONSULT YOUR TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES TO YOU OF THE SPIN-OFF IN LIGHT OF YOUR PARTICULAR INVESTMENT OR TAX CIRCUMSTANCES.

***Tax Classification of the Spin-Off in General***

For U.S. federal income tax purposes, the Spin-Off will not be eligible for treatment as a tax-deferred distribution by Meta with respect to its stock. Accordingly, the Spin-Off will generally be treated as a fully taxable transaction. The discussion below describes the U.S. federal income tax consequences to a U.S. holder and a non-U.S. holder upon the receipt of our Common Stock in the Spin-Off.

Although Meta will ascribe a value to the Common Stock distributed in the Spin-Off, this valuation is not binding on the IRS or any other taxing authority. These taxing authorities could ascribe a higher valuation to the distributed Common Stock, particularly if, following the Spin-Off, those shares of Common Stock trade at prices significantly above the value ascribed to those shares by Meta. Such a higher valuation may affect the Spin-Off distribution amount and thus the U.S. federal income tax consequences of the Spin-Off to Meta's Series A Preferred stockholders. Fractional shares of Common Stock will not be distributed.

Meta will be required to recognize any gain, but will not be permitted to recognize any loss, with respect to the Common Stock that it distributes in the Spin-Off equal to the fair market value of the Common Stock in excess of Meta's adjusted tax basis in the Common Stock.

***Tax Basis and Holding Period of Company Shares Received by Holders of Meta Stock***

A Series A Preferred stockholder's tax basis in shares of our Common Stock received in the Spin-Off generally will equal the fair market value of such shares on the date of the Spin-Off, and the holding period for such shares will begin the day after the date of the Spin-Off.

***Tax Treatment of the Spin-Off to U.S. Holders***

The following discussion describes the U.S. federal income tax consequences to a U.S. holder of Meta stock upon the receipt of our Common Stock in the Spin-Off.

Table of Contents

The treatment of the Spin-Off for U.S. federal income tax purposes for a U.S. holder will depend on whether the Spin-Off qualifies as a sale of the Series A Preferred Stock under Section 302 of the Code. If the Spin-Off qualifies as a sale of the Series A Preferred Stock, a U.S. holder will recognize gain or loss as described below under "—Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock" below. If the Spin-Off does not qualify as a sale of the Series A Preferred Stock, a U.S. holder will be treated as receiving a corporate distribution subject to tax as described below under "—Taxation of the Spin-Off Treated as a Distribution." Whether a distribution qualifies for sale treatment will depend largely on the total number of shares of Meta stock treated as held by a U.S. holder (including any shares constructively owned by a U.S. holder) relative to all of the Meta stock outstanding both before and after the Spin-Off. The Spin-Off generally will be treated as a sale of Series A Preferred Stock (rather than as a corporate distribution) if the Spin-Off: (i) results in a "complete termination" of a U.S. holder's interest in Meta, (ii) is "not essentially equivalent to a dividend" with respect to such U.S. holder or (iii) is a "substantially disproportionate redemption" with respect to such U.S. holder. These tests are explained more fully below.

In determining whether any of the foregoing tests are satisfied, a U.S. holder must take into account not only shares of Meta stock actually owned by such U.S. holder, but also shares of Meta stock that are constructively owned by such U.S. holder. A U.S. holder may constructively own, in addition to shares owned directly, shares owned by certain related individuals and entities in which such U.S. holder has an interest or that have an interest in such U.S. holder, as well as any shares such U.S. holder has a right to acquire by exercise of an option. There will be a complete termination of a U.S. holder's interest if either (i) all of the shares of Meta stock actually and constructively owned by such U.S. holder are exchanged or (ii) all of the shares of Meta stock actually owned by such U.S. holder are exchanged and such U.S. holder is eligible to waive, and does waive, the attribution of shares owned by certain family members and such U.S. holder does not constructively own any other shares. The Spin-Off of Series A Preferred Stock will not be essentially equivalent to a dividend if the Spin-Off results in a "meaningful reduction" of a U.S. holder's proportionate interest in Meta. Whether the Spin-Off will result in a meaningful reduction in a U.S. holder's proportionate interest in Meta will depend on the particular facts and circumstances. However, the IRS has indicated in a published ruling that even a small reduction in the proportionate interest of a small minority stockholder in a publicly held corporation who exercises no control over its corporate affairs may constitute such a "meaningful reduction." In order to meet the "substantially disproportionate" test, the percentage of outstanding shares of Meta voting stock actually and constructively owned by a U.S. holder immediately following the Spin-Off must, among other requirements, be less than 80% of the percentage of the outstanding shares of Meta voting stock actually and constructively owned by such U.S. holder immediately before the Spin-Off. Because the Class A Preferred Stock is not voting stock, it is not expected that the "substantially disproportionate" test will be satisfied in respect of the Spin-Off. U.S. holders are urged to consult with their tax advisors as to the tax consequences of the Spin-Off.

If none of the foregoing tests are satisfied, then the Spin-Off will be treated as a corporate distribution and the tax effects will be as described under "—Taxation of the Spin-Off Treated as a Distribution," below.

Meta currently intends to report the Spin-Off as a corporate distribution (including a determination of the portion of the distribution pursuant to the Spin-Off constituting a taxable dividend, assuming that the Spin-Off is treated as a corporate distribution) on IRS Form 1099-DIV after its earnings and profits for the taxable year in which the distribution occurs are calculated. This information may not be available until after U.S. holders file their U.S. federal and state income tax returns for that taxable year, and such U.S. holders may need to file amended tax returns to reflect the amount of the taxable dividend as finally determined. Meta reporting the Spin-Off as a corporate distribution will not preclude a U.S. holder from treating the Spin-Off as a sale of Series A Preferred Stock, if one of the tests described above is satisfied.

*Taxation of the Spin-Off Treated as a Distribution*

If the Spin-Off of a U.S. holder's Series A Preferred Stock does not qualify as a sale of Series A Preferred Stock, such U.S. holder will be treated as receiving a distribution from Meta. A U.S. holder generally will be required to

Table of Contents

include in gross income as dividends the amount received in connection with the Spin-Off to the extent the distribution is paid out of Meta's current or accumulated earnings and profits (as determined under U.S. federal income tax principles). Distributions in excess of such current and accumulated earnings and profits generally will be treated as a return of capital that will be applied against and reduce a U.S. holder's adjusted tax basis in such U.S. holder's shares of Series A Preferred Stock (but not below zero), with any remaining excess treated as gain from the sale or exchange of such shares as described below under "—Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock."

If a U.S. holder is a corporate U.S. holder, dividends paid by Meta to such U.S. holder generally will be eligible for the dividends-received deduction allowed to domestic corporations in respect of dividends received from other domestic corporations so long as such U.S. holder satisfies the holding period requirement for the dividends-received deduction.

If a U.S. holder is a non-corporate U.S. holder, under tax laws currently in effect, dividends generally will be taxed at the preferential applicable long-term capital gains rate so long as such U.S. holder satisfies the holding period requirement (i.e., more than sixty (60) days of ownership, without protection from the risk of loss, during the 121-day period that begins sixty (60) days before the ex-dividend date) and certain other requirements are met (see "—Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock" below).

*Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock*

If the Spin-Off qualifies as a sale of Series A Preferred Stock, such U.S. holder generally will recognize capital gain or loss in an amount equal to the difference between (i) the fair market value of our Common Stock received by such U.S. holder in the Spin-Off and (ii) such U.S. holder's adjusted tax basis in the Series A Preferred Stock surrendered in the Spin-Off.

Any such capital gain or loss generally will be long-term capital gain or loss if a U.S. holder's holding period for the Series A Preferred Stock so disposed of exceeds one (1) year. Long-term capital gains recognized by non-corporate U.S. holders generally will be eligible for taxation at reduced rates. The deductibility of capital losses is subject to limitations.

***Tax Treatment of the Spin-Off to Non-U.S. Holders***

For non-U.S. holders of Series A Preferred Stock, the characterization for U.S. federal income tax purposes of the Spin-Off of such non-U.S. holder's Series A Preferred Stock generally will correspond to the U.S. federal income tax characterization of the Spin-Off of a U.S. holder's Series A Preferred Stock, as described above under "Treatment of the Spin-Off for U.S. Holders" with respect to whether the Spin-Off is a sale or exchange of Series A Preferred Stock or is treated as a distribution.

Non-U.S. holders are urged to consult their own tax advisors as to whether the Spin-Off will be treated as a distribution, or as a sale or exchange, under the Code.

*Taxation of the Spin-Off Treated as a Distribution*

If the Spin-Off of a non-U.S. holder's Series A Preferred Stock does not qualify as a sale or exchange of Series A Preferred Stock, such non-U.S. holder will be treated as receiving a distribution from Meta, which distribution will be treated as a dividend to the extent the distribution is paid out of Meta's current or accumulated earnings and profits (as determined under U.S. federal income tax principles). The gross amount of such dividends will be subject to a withholding tax at a rate of 30% unless a non-U.S. holder is eligible for a reduced rate of withholding under an applicable income tax treaty and provides proper certification of such non-U.S. holder's eligibility for such reduced rate. Dividends that are effectively connected with the conduct by a non-U.S. holder of a trade or

Table of Contents

business in the United States (and are attributable to a U.S. permanent establishment if an applicable treaty so requires) generally will be subject to U.S. federal income tax at the same regular U.S. federal income tax rates applicable to a comparable U.S. holder and, if such non-U.S. holder is a corporation for U.S. federal income tax purposes, may also be subject to an additional branch profits tax at a 30% rate or a lower rate under an applicable tax treaty.

Distributions in excess of current and accumulated earnings and profits generally will be treated as a return of capital that will be applied against and reduce a non-U.S. holder's adjusted tax basis in such non-U.S. holder's shares of Series A Preferred Stock (but not below zero), with any remaining excess treated as gain from the sale or exchange of such shares as described under "—Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock" below.

*Gain or Loss on the Spin-Off Treated as a Sale or Exchange of Series A Preferred Stock*

Subject to the discussions of backup withholding and FATCA withholding below, if the Spin-Off of a non-U.S. holder's shares of Series A Preferred Stock qualifies as a sale or exchange of such shares, such non-U.S. holder generally will not be subject to U.S. federal income tax on any gain recognized on such Spin-Off unless:

- such gain is effectively connected with the conduct by such non-U.S. holder of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment or fixed base that such non-U.S. holder maintains in the United States), in which case such non-U.S. holder generally will be subject to U.S. federal income tax on such gain at the same regular U.S. federal income tax rates applicable to a comparable U.S. holder and, if such non-U.S. holder is a corporation for U.S. federal income tax purposes, also may be subject to an additional branch profits tax at a 30% rate or a lower rate provided by an applicable tax treaty;
- such non-U.S. holder is an individual who is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met, in which case such non-U.S. holder will be subject to a 30% tax on such non-U.S. holder's net capital gain for the year (or lower rate provided by an applicable tax treaty); or
- Meta is or has been a "U.S. real property holding corporation" for U.S. federal income tax purposes at any time during the shorter of the five (5) year period ending on the date of the Spin-Off or the period during which such non-U.S. holder held Series A Preferred Stock, and, in the case where shares of the Series A Preferred Stock are traded on an established securities market, such non-U.S. holder has owned, directly or constructively, more than 5% of the Series A Preferred Stock at any time within the shorter of the five (5) year period or such non-U.S. holder's holding period for the Series A Preferred Stock. Meta does not believe that it is or has been a U.S. real property holding corporation.

Because it may not be certain at the time a non-U.S. holder's Series A Preferred Stock is exchanged whether the Spin-Off will be treated as a sale or exchange or as a distribution, and because such determination will depend in part on such non-U.S. holder's particular circumstances, the applicable withholding agent may not be able to determine whether (or to what extent) such non-U.S. holder is treated as receiving a dividend for U.S. federal income tax purposes. Therefore, the applicable withholding agent may withhold tax at a rate of 30% (or such lower rate as may be specified by an applicable income tax treaty) on the gross amount of any consideration paid to a non-U.S. holder in exchange for such non-U.S. holder's Series A Preferred Stock, unless (i) the applicable withholding agent has established special procedures allowing non-U.S. holders to certify that they are exempt from such withholding tax and (ii) such non-U.S. holder is able to certify that such non-U.S. holder meets the requirements of such exemption (e.g., because such non-U.S. holder is not treated as receiving a dividend under the Section 302 tests described above). However, there can be no assurance that any applicable withholding agent will establish such special certification procedures. Thus, the applicable withholding agent may withhold some portion of our Common Stock otherwise distributable to a non-U.S. holder to satisfy its obligation to withhold tax, except to the extent it estimates that the amount of the proceeds from the Spin-Off will exceed Meta's

Table of Contents

current and accumulated earnings and profits. To the extent it is required to withhold tax, the applicable withholding agent may sell the portion of our Common Stock otherwise distributable to non-U.S. holders needed to pay that tax, together with associated expenses. If an applicable withholding agent withholds excess amounts from the amount payable to a non-U.S. holder, such non-U.S. holder generally may obtain a refund of any such excess amounts by timely filing an appropriate claim for refund with the IRS. Non-U.S. holders should consult their own tax advisors regarding the application of the foregoing rules in light of such non-U.S. holder's particular facts and circumstances and any applicable procedures or certification requirements.

***Tax Considerations to U.S. Holders in Respect of Ownership and Disposition of Our Common Stock***

*Dividends*. Any dividends paid by the Company out of its current or accumulated earnings and profits (as determined for U.S. federal income tax purposes) generally will be taxable to a U.S. holder as ordinary dividend income. Corporate U.S. holders should generally be eligible for the dividends received deduction and non-corporate U.S. holders should generally qualify for reduced rates applicable to qualified dividend income, assuming, in each case, that a minimum holding period and certain other generally applicable requirements are satisfied. Dividends in excess of current and accumulated earnings and profits will be treated as a non-taxable return of capital to the extent of the U.S. holder's basis in our Common Stock and thereafter as capital gain. U.S. holders should consult their own tax advisors with respect to the appropriate U.S. federal income tax treatment of any dividend received from the Company. Dividends received by a non-corporate U.S. holder may be subject to a 3.8% Medicare tax on net investment income.

*Sales or Other Dispositions of Our Common Stock*. A U.S. holder will recognize capital gain or loss on the sale or other disposition of our Common Stock in an amount equal to the difference between the U.S. holder's adjusted tax basis in our Common Stock and the amount realized from the disposition. Any gain or loss on a sale or other disposition of our Common Stock generally will be long-term capital gain or loss if the holder has held our Common Stock for more than one year. Deductions for capital losses are subject to limitations. Any gain recognized by a non-corporate U.S. holder may be subject to a 3.8% Medicare tax on net investment income.

***Tax Considerations to Non-U.S. Holders in Respect of Ownership and Disposition of Our Common Stock***

*Dividends*. Any dividends paid on our Common Stock that are characterized as dividends paid to a non-U.S. holder generally will be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be provided by an applicable income tax treaty. To receive the benefit of a reduced treaty rate, a non-U.S. holder must furnish to the Company or its paying agent a valid IRS Form W-8 (or applicable successor form) certifying such holder's qualification for the reduced rate. This certification must be provided to the Company or its paying agent prior to the payment of dividends and must be updated periodically. If a non-U.S. holder who qualifies for a reduced treaty rate but does not timely provide the Company or the payment agent with the required certification, such non-U.S. holder may be entitled to a credit against their U.S. federal income tax liability or a refund of the tax withheld, which the non-U.S. holder may claim by filing the appropriate claim for refund with the IRS.

Dividends that are treated as "effectively connected" with a trade or business conducted by a non-U.S. holder within the United States (and, if an applicable income tax treaty so provides, are also attributable to a U.S. permanent establishment of such non-U.S. holder) are not subject to withholding tax, provided the non-U.S. holder satisfies certain certification and disclosure requirements. Instead, such dividends, net of specified deductions and credits, are taxed at the same graduated U.S. federal income tax rates applicable to U.S. persons. To the extent a dividend is effectively connected with a U.S. trade or business, non-corporate non-U.S. holders may be eligible for taxation at reduced U.S. federal income tax rates applicable to qualified dividend income. Any such effectively connected dividends received by a non-U.S. holder that is a corporation may, under certain circumstances, be subject to an additional branch profits tax at a 30% rate or such lower rate as specified by an applicable income tax treaty.

Table of Contents

*Sales or Other Dispositions of Our Common Stock*. Subject to the discussions under "Information Reporting and Backup Withholding" and "FATCA," below, a non-U.S. holder will generally not be subject to any U.S. federal income tax or withholding tax on any gain realized upon such holder's sale or other disposition of our Common Stock. Gain on the sale of our Common Stock may be subject to U.S. net income tax (and in respect of corporate non-U.S. holders, branch profits tax) if the gain is effectively connected with a trade or business of the non-U.S. holder in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment or fixed base of the non-U.S. holder within the United States). Additionally, a non-U.S. holder that is an individual who is present in the United States for 183 days or more in the taxable year of the disposition and meets certain other requirements will be subject to a flat 30% tax on the amount of gain derived from the sale that, together with certain other U.S. source capital gains realized during such year exceed certain U.S. source capital losses realized during such year.

*FATCA*. Pursuant to the Foreign Account Tax Compliance Act, or FATCA, foreign financial institutions (which include most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and any other investment vehicles) and certain other foreign entities must comply with registration and information reporting rules with respect to their U.S. account holders and investors or be subject to a withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party). A foreign financial institution or other foreign entity that does not comply with the FATCA registration and reporting requirements will generally be subject to a 30% withholding tax on "withholdable payments." For this purpose, withholdable payments generally include U.S.-source payments (including U.S.-source dividends), and (subject to the proposed Treasury Regulations discussed below) the gross proceeds from a sale of equity or debt instruments of issuers who are considered U.S. issuers under the FATCA rules. The FATCA withholding tax applies even if the payment would otherwise not be subject to U.S. nonresident withholding tax (e.g., because it is capital gain). While withholding under FATCA would also have applied to payments of gross proceeds from the sale or other disposition of stock on or after January 1, 2019, proposed Treasury Regulations which, if finalized in their present form, would eliminate FATCA withholding on payments of gross proceeds of a disposition of Series A Preferred Stock or our Common Stock entirely. Taxpayers may generally rely on these proposed Treasury Regulations until final Treasury Regulations are issued. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. We will not pay additional amounts in respect of amounts withheld. Investors should consult their tax advisors regarding possible implications of FATCA.

*Information Reporting and Backup Withholding*. In general, information reporting requirements may apply to dividends, sales proceeds or other amounts paid to U.S. holders and non-U.S. holders, unless an exemption applies. Backup withholding tax may apply to amounts subject to reporting if the holder fails to provide an accurate taxpayer identification number or fails to report all interest and dividends required to be shown on its U.S. federal income tax returns. A U.S. holder or non-U.S. holder can claim a credit against its U.S. federal income tax liability for the amount of any backup withholding tax and a refund of any overpayment of taxes, provided that all required information is timely provided to the IRS. U.S. holders and non-U.S. holders should consult their tax advisors as to their qualification for exemption from backup withholding and the procedure for establishing an exemption.

**THE DISCUSSION ABOVE IS A GENERAL SUMMARY. IT DOES NOT COVER ALL TAX MATTERS THAT MAY BE OF IMPORTANCE TO A PARTICULAR STOCKHOLDER. EACH STOCKHOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR ABOUT THE TAX CONSEQUENCES TO IT OF THE SPIN-OFF IN LIGHT OF THE STOCKHOLDER'S OWN CIRCUMSTANCES.**

Table of Contents

## USE OF PROCEEDS

We will not receive any proceeds from the Distribution of the Common Stock in the Spin-Off and any expenses incurred in connection with the Distribution shall be borne by us.

## DETERMINATION OF OFFERING PRICE

Currently, there is no public trading market for our Common Stock and no consideration will be paid for the shares of Common Stock distributed in the Spin-Off.

## CAPITALIZATION

The following table sets forth our cash and capitalization as of September 30, 2022 on (i) an actual basis; and (ii) on a pro forma basis to give effect to the Distribution. The following table should be read in conjunction with “Management’s Discussion and Analysis of Financial Condition and Results of Operations” and our historical consolidated financial statements and the notes thereto included elsewhere in this Prospectus.

| | September 30, 2022 | |
|---|---|---|
| | Actual As Reported | Pro Forma Adjustments for Distribution |
| Cash and cash equivalents | $ 2,108,866 | $ 2,108,866 |
| Short-term debt | $ 21,156,988 | $ 21,156,988 |
| Stockholders’ Equity | | |
| Common stock, $0.0001 par value; 500,000,000 shares authorized, 1 share issued and outstanding as reported; 165,523,363 shares issued and outstanding, pro forma as adjusted | 16,552 | 16,552 |
| Preferred stock, $0.0001 par value; 50,000,000 shares authorized, 0 shares issued and outstanding | | |
| Additional paid in capital | 100,846,643 | 100,846,643 |
| Accumulated deficit | (72,951,809) | (73,951,809) |
| Total stockholders’ equity | 27,911,386 | 27,911,386 |
| Total capitalization | $ 49,068,374 | $ 48,068,374 |

Table of Contents

## BUSINESS

### *General*

We are an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and natural gas project we hold in the Orogrande Basin in West Texas. In addition, we may consider various strategic options, including partnering with, or the possible sale of any or all of our assets to, third parties. We operate our business through our wholly owned subsidiaries, Torchlight Energy, Inc., Hudspeth Oil Corporation, Torchlight Hazel, LLC, and Hudspeth Operating, LLC.

Presently, our primary interests include the oil and natural gas leases for properties of the Orogrande Basin in Hudspeth County, Texas (the "Orogrande Project"). In addition, we have minor interests in the Eastern edge of the Midland Basin in West Texas (the "Hazel Project") and two minor well interests in Oklahoma (the "Oklahoma Properties").

Rich Masterson, our consulting geologist, originated our Orogrande Project, as discussed below, based on his tenure as a geologist since 1974. He is credited with originating the Wolfbone shale play in the Southern Delaware Basin of West Texas and has prepared prospects totaling over 150,000 acres that have been leased, drilled and are currently being developed by Devon Energy Corp., Occidental Petroleum Corporation, Noble Energy, and Samson Oil & Gas Ltd., among others.

The Company has drilled 14 test wells in the Orogrande Project in the basin in order to stay in compliance with the continuous drilling clause under the University Lands D&D Unit Agreement, as well as, to test for potential shallow pay zones and deeper pay zones that may be present on structural plays. Development of the wells continued through the year ended December 31, 2021 to further capture and document the scientific base in support of demonstrating the production potential of the Orogrande Project properties. Two of the wells were successfully completed for hydrocarbons, while the remaining wells serve as fresh water supply wells, wells we maintain for salt water disposal or wells we expect to be plugged and abandoned.

We satisfied the 2021 drilling obligations in the Orogrande play and, in satisfying our 2021 drilling obligations, we identified new potential pay zones not yet discovered in the Orogrande play.

In addition to the Orogrande Project, we also have an interest in our Hazel Project in Tom Green County and Sterling County, Texas. In August 2020, our subsidiaries entered into the Option Agreement with MHP, under which, in exchange for satisfying certain drilling obligations, MHP had the option to purchase the entire Hazel Project. The option to purchase the entire acreage block was extended to September 30, 2021 and at such time MHP determined not to exercise the purchase option; however, MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the well attributable to our interest until such time as it has recovered its reasonable costs and expenses for drilling, completing and operating the well. Operations continue under the Option Agreement until such time as the revenue from the project equates to the dollars spent by, and shall be reimbursed to, MHP. At such time, any acreage held by production and all wells will revert back to our subsidiary, Torchlight Hazel, LLC.

Our principal executive offices are located at 6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116. The telephone number of our principal executive offices is (817) 438-1937.

### *Key Business Attributes*

*Experienced People.* Upon completion of the Distribution, we will have six full-time employees and we expect to engage consultants for various roles as needed including high quality exploration and technical partners. We will build on the expertise and experiences of our management team and seek guidance from outside advisors as well as our Board.

Table of Contents

*Project Focus.* We are focusing primarily on exploitation projects. We may pursue high risk exploration prospects which may appear less favored than low risk exploration. We will, however, consider these high risk-high reward exploration prospects in connection with exploitation opportunities in a project that would reduce the overall project economic risk. We will consider such high risk-high reward prospects on their individual merits.

*Lower Cost Structure.* We will attempt to maintain the lowest possible cost structure, enabling the greatest margins and providing opportunities for investment that would not be feasible for higher cost competitors.

*Limit Capital Risks.* Limited capital exposure is planned initially to add value to a project and determine its economic viability. Management has experience in successfully managing risks of projects, finance, and value.

***Business Processes***

We believe there are three principal business processes that we must follow to enable our operations to be profitable. Each major business process offers the opportunity for a distinct partner or alliance as we grow. These processes are:

- Investment Evaluation and Review;
- Operations and Field Activities; and
- Administrative and Finance Management.

*Investment Evaluation and Review.* This process is the key ingredient to our success. Recognition of quality investment opportunities is the fuel that drives our engine. Broadly, this process includes the following activities: prospect acquisition, regional and local geological and geophysical evaluations, data processing, economic analysis, lease acquisition and negotiations, permitting, and field supervision. We expect these evaluation processes to be managed by our management team. Expert or specific technical support will be outsourced as needed.

*Operations and Field Activities.* This process begins following management approval of an investment. Well site supervision, construction, drilling, logging, product marketing, and transportation are examples of some activities. We will prefer to be the operator where possible.

*Administrative and Finance Management.* This process coordinates our initial structuring and capitalization, general operations and accounting, reporting, audit, banking and cash management, regulatory agencies reporting and interaction, timely and accurate payment of royalties, taxes, leases rentals, vendor accounts and performance management that includes budgeting and maintenance of financial controls, and interface with legal counsel and tax and other financial and business advisors.

***Current Projects***

As of September 30, 2022, we had interests in three oil and natural gas projects: the Orogrande Project in Hudspeth County, Texas, the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas and the Oklahoma Properties. See the description under “Current Projects” below under Note 4, “Oil & Natural Gas Properties,” of the financial statements included with this Prospectus for information and disclosure regarding these projects, which description is incorporated herein by reference.

***Our Properties***

Our principal executive office is located at 6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116. We currently sublease this office space and believe that the condition and size of our offices are adequate for our current needs.

Table of Contents

The Orogrande Project consists of unevaluated and undeveloped properties in progress of development for future production.

| | Total Acres | | Developed Acres | | Undeveloped Acres | |
|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net |
| **Texas**— | | | | | | |
| Orogrande Project | 134,000 | 89,110 | — | — | 134,000 | 89,110 |
| Hazel Project | 645 | 516 | 645 | 516 | — | — |
| **Oklahoma**— | | | | | | |
| Viking | 640 | 192 | 640 | 192 | — | — |
| Total | 135,285 | 89,818 | 1,285 | 708 | 134,000 | 89,110 |

Investments to support our oil and natural gas properties during the years ended December 31, 2021 and 2020 were $14.7 million and $3.4 million, respectively.

| | Fiscal Year Ended December 31, | |
|---|---|---|
| | 2021 | 2020 |
| Property acquisition costs | $ — | $ — |
| Development costs | 14,664,463 | 3,472,281 |
| Exploratory costs | — | — |
| Totals | $ 14,664,463 | $ 3,472,281 |

Property development costs presented above exclude interest capitalized into the full cost pool of $141,048 in 2021 and $2,353,700 in 2020.

The development costs for 2020 include work in the Orogrande and Hazel Projects in West Texas and for 2021 the development costs include work solely in the Orogrande Project. We made progress during 2021 to develop proved producing reserves in the Orogrande Project in the Permian Basin in West Texas, which has not yet resulted in hydrocarbon production. We incurred costs of $14.7 million in relation to certain drilling activity carried out to remain in compliance with all aspects of our lease obligations and to satisfy the continuous drilling clause under the agreement with University Lands, whereby we are obligated to satisfy certain minimum yearly requirements that may be exceeded if desired. No development costs were incurred in 2020 or 2021 for the Oklahoma Properties. During the fiscal years ended December 31, 2021 and 2020, and for the nine months ended September 30, 2022, we drilled development and exploratory net wells as set forth in the table below.

**Drilling Activities**

| | September 30, 2022 | December 31, 2021 | December 31, 2020 |
|---|---|---|---|
| Hazel Project (Texas) | | | |
| Dry | 0.00 | 1.60 | 0.80 |
| Productive | 0.00 | 0.00 | 0.00 |
| Orogrande Project (Texas) | | | |
| Dry | 0.00 | 0.67(1) | 0.00 |
| Productive | 0.00 | 2.66 | 0.00 |

(1) Represents drilling re-entry to explore more of the formation.

Table of Contents

For the nine months ended September 30, 2022 compared to the same period in 2021, investments were as follows:

| | Nine Months Ended September 30, 2022 | 2021 |
|---|---|---|
| Property acquisition costs | $ — | $ — |
| Development costs | 1,630,137 | 2,502,800 |
| Exploratory costs | — | — |
| Totals | $ 1,630,137 | $ 2,502,800 |

During the nine months ended September 30, 2022, a portion of the costs from development activities were cost carryover related to satisfaction of our drilling obligations for the fiscal year 2021 under the terms of the Purchase Agreement (defined below) at a cost of $1,084,285. Additionally, during the first nine months of 2022, we completed some pre-drilling activity for our upcoming 2022 drilling program, including surveying, permitting, road and pad site work at an aggregate cost of $545,852. We have not yet conducted any drilling activities, but expect to commence drilling activities in November 2022 to satisfy our obligations for the 2022 fiscal year.

| | September 30, 2022 | | December 31, 2021 | | December 31, 2020 | |
|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net |
| ***Productive Wells*** | | | | | | |
| Oil | 5.00 | 2.67 | 5.00 | 2.67 | 5.00 | 2.67 |
| Gas | 4.00 | 2.66 | 4.00 | 2.66 | 1.00 | 0.67 |
| ***Test Wells*** | | | | | | |
| Salt Water Disposal | 3.00 | 2.13 | 3.00 | 2.13 | 2.00 | 1.33 |
| Fresh Water Supply | 3.00 | 2.00 | 3.00 | 2.00 | 2.00 | 1.33 |
| Plug & Abandon | 5.00 | 3.87 | 5.00 | 3.87 | 4.00 | 3.07 |

With the principal goal of gathering scientific data from a strategy of drilling test wells, all wells were drilled with the intent of being completed and productive for hydrocarbons. We attempted completions on every well, however we were unable to effectuate a successful completion on all of the vertical wells due to various problems. This is not uncommon with early wells of frontier exploration projects. Two horizontal wells were successfully completed for hydrocarbons, however both wells are currently shut-in waiting for hook-up to a gas pipeline. The remaining wells serve as fresh water supply wells, wells we maintain for salt water disposal or wells we expect to be plugged and abandoned. Pipeline hook-ups will occur after we have achieved additional successful wells to justify the cost of tapping into the gas lines.

*Oil and Natural Gas Reserves*

No reserve report was prepared for 2020. Other than the Producing Hazel Wells (defined below), the only producing properties owned by us were the Oklahoma Properties, which were marginally producing and were uneconomic for reserve calculation purposes. At the end of 2021 and 2020, reserves did not include any value for proved undeveloped properties.

We currently have two producing wells located on the Hazel Project, the Flying B Ranch #3H well and the Flying B Ranch #4H well (the “Producing Hazel Wells”). Production is from the Wolfcamp formation. At December 31, 2021, there were no proved reserves or proved developed nonproducing reserves related to these properties after giving effect to the obligation to reimburse drilling costs incurred by MHP. The properties of the Hazel Project and Orogrande Project are operated by Maverick Operating LLC.

Table of Contents

The operating expenses reflect a substantial reduction from previous years as electric power is available and water is now disposed of on location after we drilled or converted a well to be used for saltwater disposal. Initial gross oil production from the Flying B Ranch #3H well reached 8,319 Bbl per month and 31,613 Bbl per month of water. The initial gross monthly production rate for the Flying B Ranch #4H was estimated to be 4,200 Bbl, although we will receive no future revenue from these wells until their estimated depletion because all of such revenue, after deducting expenses to produce the oil, is to be received by MHP directly and credited toward the recoupment of drilling costs incurred by MHP.

As of December 31, 2021 and 2020, our proved developed nonproducing reserves related to the Producing Hazel Wells totaled 0 and 0 BOE, respectively, and 0 BOE for the nine months ended September 30, 2022 after giving effect to the obligation to reimburse drilling costs incurred by MHP.

*Production, Price, and Production Cost History*

Oklahoma Properties

During the year ended December 31, 2020, we produced and sold 278 barrels of oil net to our interest at an average sale price of $16.13 per Bbl. We produced and sold 2,012 Mcf of gas net to our interest at an average sales price of $1.20 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $30.02 per BOE. Our depreciation, depletion, and amortization expense was $130.68 per BOE.

During the year ended December 31, 2021, we produced and sold 85 barrels of oil net to our interest at an average sale price of $55.00 per Bbl. We produced and sold 3,586 Mcf of gas net to our interest at an average sales price of $3.17 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $18.54 per BOE. Our depreciation, depletion, and amortization expense was $0 per BOE.

During the nine months ended September 30, 2021, we produced and sold 85.10 Bbls net to our interest at an average sale price of $54.93 per Bbl. We produced and sold 2,363.44 Mcf of natural gas net to our interest at an average sale price of $1.80 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $14.13 per BOE. Our depreciation, depletion, and amortization expense was $0 per BOE.

During the nine months ended September 30, 2022, we produced and sold 139.57 Bbls net to our interest at an average sale price of $102.62 per Bbl. We produced and sold 2,153 Mcf of natural gas net to our interest at an average sales price of $7.45 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $12.50 per BOE. Our depreciation, depletion, and amortization expense was $0 per BOE.

Hazel Project

During the year ended December 31, 2021, 23,422 barrels of oil net to our interest were sold at an average sale price of approximately $60.00 per Bbl, although we received none of this revenue because all of it, after deducting expenses to produce the oil, was either received by MHP directly during the time that the Option Agreement was in effect or credited towards the recoupment of drilling costs incurred by MHP. We produced and sold Nil Mcf of natural gas net to our interest.

| | December 31, 2021 Reserves | | | December 31, 2021 Future Net Revenue (M$) | |
|---|---|---|---|---|---|
| **Category** | **Oil (Bbls)** | **Gas (Mcf)** | **Total (BOE)** | **Total** | **Present Value Discounted at 10%** |
| Net Proved Producing | 0 | 0 | 0 | $ 0 | $ 0 |
| Net Proved Nonproducing | 0 | 0 | 0 | $ — | $ — |
| Total Net Proved | 0 | 0 | 0 | $ — | $ — |
| Standardized Measure of Future Net Cash Flows Related to Proved Oil and Gas Properties | | | | | $ — |
| Probable Undeveloped | 0 | 0 | 0 | $ — | $ — |

Table of Contents

| | December 31, 2020 Reserves | | | December 31, 2020 Future Net Revenue (M$) | |
|---|---|---|---|---|---|
| Category | Oil (Bbls) | Gas (Mcf) | Total (BOE) | Total | Present Value Discounted at 10% |
| Net Proved Producing | 0 | 0 | 0 | $ — | $ — |
| Net Proved Nonproducing | 0 | 0 | 0 | $ — | $ — |
| Total Net Proved | 0 | 0 | 0 | $ — | $ — |
| Standardized Measure of Future Net Cash Flows Related to Proved Oil and Gas Properties | | | | | $ — |
| Probable Undeveloped | | | | $ — | $ — |

The net producing reserves from 2020 and 2021 were 0 BOE related to the Producing Hazel Wells due to the obligation to pass revenue through to MHP under the terms of the Option Agreement effective during both periods. There was no reserve value at December 31, 2020 and December 31, 2021, Standardized Measure is not presented.

During the nine months ended September 30, 2022, 65.82 barrels of oil net to our interest were sold at an average sale price of approximately $104.78 per Bbl, although we received none of this revenue because all of it, after deducting expenses to produce the oil, was credited towards the recoupment of drilling costs incurred by MHP. We produced and sold Nil Mcf of gas net to our interest. During the nine months ended September 30, 2021, Nil barrels of oil net to our interest were sold and we sold Nil Mcf of gas net to our interest.

Due to the inherent uncertainties and the limited nature of reservoir data, both proved and probable reserves are subject to change as additional information becomes available. The estimates of reserves, future cash flows, and present value are based on various assumptions, including those prescribed by the SEC, and are inherently imprecise.

*Intent to Acquire Additional Interests*

Following the Spin-Off, we intend to make offers and enter into agreements with one or more of the other current working interest owners in the Orogrande Project (each an “Orogrande Owner” and collectively, the “Orogrande Owners”). We anticipate offering the Orogrande Owners shares of Common Stock in exchange for their respective working interest in the Orogrande Project. We intend to offer the number of shares of Common Stock necessary such that each participating Orogrande Owner would own the percentage of Common Stock then outstanding in proportion to the percentage owned in the working interest of the Orogrande Project. For illustration purposes, if an Orogrande Owner owns ten percent (10%) of the working interest of the Orogrande Project, and such Orogrande Owner elects to participate and accept our offer of shares of Common Stock, then such Orogrande Owner will be offered ten percent (10%) of the aggregate amount of outstanding shares of Common Stock. Our decision to enter into these transactions will depend on us and each Orogrande Owner to negotiate and enter into definitive agreements related to such transaction and our Board receiving an industry-standard fairness opinion from an investment banking firm. One of the Orogrande Owners is Wolfbone Investments LLC, an entity controlled by Gregory McCabe, who will own, directly and indirectly through entities he owns or controls, over 11% of the Common Stock following the Spin-Off, which would increase if the proportionate exchange of working interest for shares of our Common Stock is consummated.

***Industry and Business Environment***

We are experiencing a time of fluctuating, but higher oil prices caused by higher demand, lower U.S. supply, turmoil on the world stage and OPEC’s policies on production. Unfortunately, this is the cyclical nature of the oil

Table of Contents

and natural gas industry. We experience highs and lows that seem to come in cycles. Fortunately, there exists plenty of demand for US onshore oil and natural gas. We believe advances in technology drive the US market and we feel this will drive the development costs down on our exploration and drilling programs while maintaining favorable economics.

***Competition***

The oil and natural gas industry is intensely competitive, and we will compete with numerous other companies engaged in the exploration and production of oil and natural gas. Some of these companies have substantially greater resources than we have. Not only do they explore for and produce oil and natural gas, but also many carry on midstream and refining operations and market petroleum and other products on a regional, national, or worldwide basis. The operations of other companies may be able to pay more for exploratory prospects and productive oil and natural gas properties. They may also have more resources to define, evaluate, bid for, and purchase a greater number of properties and prospects than our financial or human resources permit. Our larger or integrated competitors may have the resources to be better able to absorb the burden of current and future federal, state, and local laws and regulations more easily than we can, which would adversely affect our competitive position. Our ability to locate reserves and acquire interests in properties in the future will be dependent upon our ability and resources to evaluate and select suitable properties and consummate transactions in this highly competitive environment. In addition, we may be at a disadvantage in producing oil and natural gas properties and bidding for exploratory prospects because we have fewer financial and human resources than other companies in our industry. Should a larger and better financed company decide to directly compete with us, and be successful in its efforts, our business could be adversely affected.

***Marketing and Customers***

The market for oil and natural gas that we will produce depends on factors beyond our control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, demand for oil and natural gas, the marketing of competitive fuels, and the effects of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial, and individual consumers.

Our oil production is expected to be sold at prices tied to the spot oil markets. Our natural gas production is expected to be sold under short-term contracts and priced based on first of the month index prices or on daily spot market prices. We will rely on our operating partners to market and sell our production.

***Governmental Regulation and Environmental Matters***

Our operations are subject to various rules, regulations, and limitations impacting the oil and natural gas exploration and production industry as a whole.

*Regulation of Oil and Natural Gas Production*

Our oil and natural gas exploration, production, and related operations, when developed, will be subject to extensive rules and regulations promulgated by federal, state, tribal, and local authorities and agencies. Certain states may also have statutes or regulations addressing conservation matters, including provisions for the unitization or pooling of oil and natural gas properties, the establishment of maximum rates of production from wells, and the regulation of spacing, plugging, and abandonment of such wells. We contract with Maverick Operating LLC who operates our oil and natural gas properties and is primarily responsible for compliance with applicable environmental regulatory with respect to the operating activities of our oil and natural gas properties. We cover all costs associated with the related insurance coverage for such environmental regulatory compliance. Failure to comply with any such rules and regulations can result in substantial penalties. The regulatory burden on the oil and natural gas industry will most likely increase our cost of doing business and may affect our

Table of Contents

profitability. Although we believe we are currently in substantial compliance with all applicable laws and regulations, because such rules and regulations are frequently amended or reinterpreted, we are unable to predict the future cost or impact of complying with such laws. Significant expenditures may be required to comply with governmental laws and regulations and may have a material adverse effect on our financial condition and results of operations.

*Environmental Matters*

Our operations and properties are and will be subject to extensive and changing federal, state, and local laws and regulations relating to environmental protection, including the generation, storage, handling, emission, transportation, and discharge of materials into the environment, and relating to safety and health. In the future, environmental legislation and regulation may trend toward stricter standards. These laws and regulations may, for example:

- require the acquisition of a permit or other authorization before construction or drilling commences and for certain other activities;
- limit or prohibit construction, drilling, and other activities on certain lands lying within wilderness and other protected areas;
- impose substantial liabilities for pollution resulting from operations; or
- restrict certain areas from fracking and other stimulation techniques.

The permits required for our operations may be subject to revocation, modification, and renewal by issuing authorities. Governmental authorities have the power to enforce their regulations, and violations are subject to fines or injunctions, or both. In the opinion of management, we are and will be in substantial compliance with current applicable environmental laws and regulations and have no material commitments for capital expenditures to comply with existing environmental requirements. Nevertheless, changes in existing environmental laws and regulations or in interpretations thereof could have a significant impact on our company, as well as the oil and natural gas industry in general.

The Comprehensive Environmental, Response, Compensation, and Liability Act (“CERCLA”) and comparable state statutes impose strict, joint, and several liability on owners and operators of sites and on persons who disposed of or arranged for the disposal of “hazardous substances” found at such sites. It is not uncommon for the neighboring landowners and other third parties to file claims for personal injury and property damage allegedly caused by hazardous substances released into the environment. The Federal Resource Conservation and Recovery Act (“RCRA”) and comparable state statutes govern the disposal of “solid waste” and “hazardous waste” and authorize the imposition of substantial fines and penalties for noncompliance. Although CERCLA currently excludes petroleum from its definition of “hazardous substance,” state laws affecting our operations may impose clean-up liability relating to petroleum and petroleum related products. In addition, although RCRA classifies certain oil field wastes as “non-hazardous,” such exploration and production wastes could be reclassified as hazardous wastes thereby making such wastes subject to more stringent handling and disposal requirements.

The Endangered Species Act (“ESA”) seeks to ensure that activities do not jeopardize endangered or threatened animal, fish, and plant species, nor destroy or modify the critical habitat of such species. Under the ESA, exploration and production operations, as well as actions by federal agencies, may not significantly impair or jeopardize protected species or habitat. The ESA provides for criminal and civil penalties for violations. Other statutes that provide protection to animal and plant species and that may apply to our operations include, but are not necessarily limited to, the Fish and Wildlife Coordination Act, the Fishery Conservation and Management Act, the Migratory Bird Treaty Act and the National Historic Preservation Act. Although we believe that our operations are and will be in substantial compliance with such statutes, any change in these statutes or any reclassification of a species as endangered could subject us to significant expenses to modify our operations or could force us to discontinue certain operations altogether.

Table of Contents

Hydraulic fracturing is regulated by state and federal environmental and oil and gas regulatory authorities, including specifically the requirement to disclose certain information related to hydraulic fracturing operations. Operators must follow applicable legal requirements for groundwater protection and are subject to supervision by state and federal regulators (including the Bureau of Land Management on federal acreage). Furthermore, well construction practices require the installation of multiple layers of protective steel casing surrounded by cement that are specifically designed and installed to protect freshwater aquifers by preventing the migration of fracturing fluids into aquifers. Regulatory proposals in some states and local communities have been initiated to require or make more stringent the permitting and compliance requirements for hydraulic fracturing operations. Federal and state agencies have continued to assess the impacts of hydraulic fracturing, which could spur further action toward federal and/or state legislation and regulation of hydraulic fracturing activities. In addition, in light of concerns about seismic activity being triggered by the injection of produced waters into underground wells and hydraulic fracturing, certain regulators are also considering additional requirements related to seismic safety for hydraulic fracturing activities. Further restrictions on hydraulic fracturing could make it prohibitive to conduct our operations, and also reduce the amount of oil and natural gas that we or our operators are ultimately able to produce from our properties.

*Climate Change*

Significant studies and research have been devoted to climate change and global warming, and climate change has developed into a major political issue in the United States and globally. Certain research suggests that greenhouse gas emissions contribute to climate change and pose a threat to the environment. Recent scientific research and political debate has focused in part on carbon dioxide and methane incidental to oil and natural gas exploration and production. Many states and the federal government have enacted legislation directed at controlling greenhouse gas emissions, and future legislation and regulation could impose additional restrictions or requirements in connection with our drilling and production activities and favor use of alternative energy sources, which could affect operating costs and demand for oil products. As such, our business could be materially adversely affected by domestic and international legislation targeted at controlling climate change.

**Legal Proceedings**

On April 30, 2020, the Company's wholly owned subsidiary, Hudspeth Oil Corporation ("Hudspeth"), filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies ("Cordax"). The suit, Hudspeth and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies, was filed in the 189th Judicial District Court of Harris County, Texas. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Working interest owner Wolfbone Investments, LLC, a company owned by Meta's former Chairman Gregory McCabe, is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. Meta has added the manufacturer of one of the tool components that we contend was one of the causes of the tool failure. It was recently disclosed that Cordax is the subsidiary of a Canadian parent company, Cordax who has also been added to the case. Cordax's current Chairman of the Board filed a special appearance after being served with a citation, alleging that he was a Canadian citizen with no meaningful ties to Texas. After discovery was conducted on this issue, a nonsuit without prejudice for this defendant was filed, dismissing him from the case. The remaining parties attended mediation on June 15, 2022, that was unsuccessful in resolving the case. The parties are now engaged in discovery and plan to take depositions of fact and expert witnesses, with counsel for the Company currently identifying and vetting potential expert witnesses. The case is set for trial in April 2023.

On March 18, 2021, Cordax filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500.01 and recover related attorney's fees. The foreclosure action, *Datalog LWT Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc.*, was filed in the 205th Judicial District Court of Hudspeth County, Texas. We are contesting the lien in good faith and filed a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final

Table of Contents

disposition of the related case currently pending in Harris County, Texas. We are required to indemnify Meta in connection with this matter pursuant to the terms of the Distribution Agreement.

In September 2021, Meta received a subpoena from the SEC Division of Enforcement, in a matter captioned *In the Matter of Torchlight Energy Resources, Inc*. The subpoena requests that Meta produce certain documents and information related to, among other things, the merger involving Torchlight and Metamaterial Inc. Meta is cooperating and intends to continue to cooperate with the SEC's investigation. While neither we nor any of the individuals who will serve as directors and officers following the Spin-Off have been named or otherwise involved in the SEC enforcement action, in the event we incur any loss with respect to such action we will be entitled to seek recovery from Meta pursuant to the indemnification provisions set forth under the Distribution Agreement.

On January 3, 2022, a putative securities class action lawsuit was filed in the U.S. District Court for the Eastern District of New York captioned *Maltagliati v. Meta Materials Inc., et al.*, No. 1:21-cv-07203, against Meta, Meta's former Chief Executive Officer, and Meta's former Chief Financial Officer, Torchlight's former Chairman of the Board of Directors, and Torchlight's former Chief Executive Officer. On January 26, 2022, a similar putative securities class action lawsuit was filed in the U.S. District Court for the Eastern District of New York captioned *McMillan v. Meta Materials Inc., et al.*, No. 1:22-cv-00463. The McMillan complaint names the same defendants and asserts the same claims on behalf of the same purported class as the Maltagliati complaint. The complaints, purportedly brought on behalf of all purchasers of our publicly traded securities from September 21, 2020 through and including December 14, 2021, assert claims under Sections 10(b) and 20(a) of the Exchange Act arising primarily from a short-seller report and statements related to our business combination with Torchlight. The complaints seek unspecified compensatory damages and reasonable costs and expenses, including attorneys' fees. On April 11, 2022, the Court held a hearing on motions to consolidate the two actions and to appoint a lead plaintiff or lead plaintiffs, but has not yet ruled on the motions. In regards to any loss incurred by us in connection with this matter, we will be entitled to seek recovery from Meta pursuant to the indemnification provisions set forth under the Distribution Agreement.

On January 14, 2022, a shareholder derivative action was filed in the U.S. District Court for the Eastern District of New York captioned *Hines v. Palikaras, et al.*, No. 1:22-cv-00248. The complaint names as defendants certain of Meta's current officers and directors, certain former Torchlight officers and directors, and us (as nominal defendant). The complaint, purportedly brought on behalf of Meta, asserts claims under Section 14(a) of the Exchange Act, contribution claims under Sections 10(b) and 21D of the Exchange Act, and various state law claims such as breach of fiduciary duties and unjust enrichment. The complaint seeks, among other things, unspecified compensatory damages in favor of Meta, certain corporate governance related actions, and an award of costs and expenses to the derivative plaintiff, including attorneys' fees. On March 9, 2022, the Court entered a stipulated order staying this action until there is a ruling on a motion to dismiss in the Securities Class Action. In regards to any loss incurred by us in connection with this matter, we will be entitled to seek recovery from Meta pursuant to the indemnification provisions set forth under the Distribution Agreement.

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our audited and unaudited financial statements and related notes, respectively, beginning on page F-1 below of this Prospectus. Some of the information contained in this discussion and analysis constitutes forward-looking statements that involve risks and uncertainties. Actual results could differ materially from those discussed in these forward-looking statements. Factors that could cause or contribute to these differences include, but are not limited to, those discussed below and elsewhere in this Prospectus, particularly under the section titled "Cautionary Statement Concerning Forward-Looking Statements."*

**Overview**

Next Bridge Hydrocarbons, Inc. (formerly known as OilCo Holdings, Inc.) was incorporated in the State of Nevada on August 31, 2021 and established a fiscal year end of December 31st.

In connection with the Arrangement, Torchlight (which subsequently changed its name to Meta Materials, Inc.) and Metamaterial, Inc. contemplated a sale of the O&G Assets or, alternatively, a complete legal and structural separation of the Company, holding the O&G Assets, from Meta following the Arrangement. Meta determined to pursue the structural separation and will distribute all of its equity interest in us, consisting of all of the outstanding shares of our Common Stock, to the Meta Series A Preferred Stockholders on a pro rata basis. Following the Spin-Off, Meta will not own any equity interest in us, and we will operate independently from Meta.

The Spin-Off is subject to the satisfaction, or the Meta board of directors' waiver, of a number of conditions. In addition, subject to the terms of the Arrangement Agreement, Meta has the right not to complete the Spin-Off if, at any time, the Meta Board determines, in its sole and absolute discretion, that the Spin-Off is not in the best interests of Meta or its stockholders or is otherwise not advisable.

Our consolidated financial statements have been prepared on a stand-alone basis and are derived from the consolidated financial statements and accounting records of Meta. Our consolidated financial statements reflect our financial position, results of operations and cash flows as we were historically managed, in conformity with GAAP. Our financial statements include certain assets and liabilities that have historically been held at the Meta corporate level but are specifically identifiable or otherwise attributable to us.

All intercompany transactions between us and Meta have been included in our financial statements. The intercompany transactions are reflected in our consolidated statements of cash flow as a financing activity and in our consolidated balance sheets as "Notes Payable, Related Party."

The historical costs and expenses reflected in our financial statements include an allocation for certain corporate shared service functions historically provided by Meta including executive oversight, accounting, treasury, tax, legal, human resources, occupancy, procurement, information technology and other shared services. These expenses have been allocated to us on the basis of direct usage when identifiable, with the remainder allocated on a pro rata basis based on sales, headcount, tangible assets or other measures considered to be a reasonable reflection of the historical utilization levels of these services.

Our management believes the assumptions underlying our financial statements, including the assumptions regarding the allocation of general corporate expenses from Meta are reasonable. Nevertheless, our financial statements may not include all of the actual expenses that would have been incurred had we operated as a stand- alone company during the periods presented and may not reflect what our actual results of operations, financial position and cash flows would have been if we had operated as a stand-alone company during the periods presented. Actual costs that would have been incurred if we had operated as a stand-alone company would depend on multiple factors, including organizational structure and strategic decisions made in various areas, including information technology and infrastructure. Following the Spin-Off, we will perform these functions using our own resources or purchased services.

Table of Contents

***Income Taxes***

Judgment is required in determining the provision for income taxes and related accruals, deferred tax assets and liabilities. In the ordinary course of business, tax issues may arise where the ultimate outcome is uncertain. Additionally, our tax returns are subject to audit by various tax authorities. Consequently, changes in our estimates for contingent tax liabilities may materially impact our results of operations or financial position.

**RESULTS OF OPERATIONS**

***Historical Results for the Years Ended December 31, 2021 and 2020***

For the year ended December 31, 2021, we had a net loss of $8,238,808 compared to a net loss of $5,749,006 for the year ended December 31, 2020. The difference is primarily due to an increased general and administrative expenses for the year ended December 31, 2021, offset by an impairment loss and a loss on sale of oil and gas property for the year ended December 31, 2020. At December 31, 2021, we had current assets of $2,229,762 and total assets of $47,918,232. As of December 31, 2021, we had current liabilities of $15,537,215. Stockholders' equity was $32,359,080 at December 31, 2021.

***Revenue and Gross Profit***

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2020 | 2021 | Change | % |
| Product sales | $ 6,906 | $ 15,904 | $ 8,998 | 130.3% |
| Total Revenue | 6,906 | 15,904 | 8,998 | 130.3% |
| Cost of revenue | 87,486 | 76,331 | (11,155) | (12.7)% |
| Gross Profit (Loss) | (80,580) | (60,427) | (20,153) | 25.0% |
| Gross Profit (Loss) percentage | (1,166.8)% | (379.9)% | 223.97% | |

*Production Revenues and Cost of Revenue*

For the year ended December 31, 2021, we had production revenue of $15,904 compared to $6,906 of production revenue for the year ended December 31, 2020. The change in revenue was primarily due to the increase in oil and natural gas production from 613 BOE for the 2020 period to 683 BOE for the 2021 period, from the Oklahoma Properties, an increase in the average price of oil from $34.48 in 2020 to $55.01 in 2021 and an increase in the average price of natural gas from $1.13 in 2020 to $3.13 in 2021, marginally offset by a decrease in production due to the sale of our Warwink Project in November 2020. Our cost of revenue, consisting of lease operating expenses and production taxes, was $76,331 for the year ended December 31, 2021 compared with $87,486 for the year ended December 31, 2020. Production and revenue are detailed as follows:

Table of Contents

| Property | Quarter | Oil Production {BBLS} | Gas Production {MCF} | Oil Revenue | Gas Revenue | Total Revenue |
|---|---|---|---|---|---|---|
| Oklahoma | Q1 - 2021 | 28 | 711 | $ 1,166 | $ 1,305 | $ 2,471 |
| Hazel (TX) | Q1 - 2021 | 0 | 0 | — | — | — |
| **Total Q1-2021** | | 28 | 711 | $ 1,166 | $ 1,305 | $ 2,471 |
| Oklahoma | Q2 - 2021 | 28 | 1,212 | $ 1,692 | $ 1,814 | $ 3,506 |
| Hazel (TX) | Q2 - 2021 | 0 | 0 | — | — | $ — |
| **Total Q2-2021** | | 28 | 1,212 | $ 1,692 | $ 1,814 | $ 3,506 |
| **Oklahoma** | Q3 - 2021 | 29 | 441 | $ 1,818 | $ 1,146 | $ 2,964 |
| **Hazel (TX)** | Q3 - 2021 | 0 | 0 | — | — | — |
| **Total Q3-2021** | | 29 | 441 | $ 1,818 | $ 1,146 | $ 2,964 |
| **Oklahoma** | Q4 - 2021 | 0 | 1,222 | $ — | $ 6,963 | $ 6,963 |
| **Hazel (TX)** | Q4 - 2021 | 0 | 0 | — | — | — |
| **Total Q4-2021** | | 0 | 1,222 | $ — | $ 6,963 | $ 6,963 |
| **Total 2021** | | 85 | 3,586 | $ 4,676 | $ 11,228 | $ 15,904 |
| **Average Commodity Price** | | | | $ 55.01 | $ 3.13 | |
| Oklahoma | Q1 - 2020 | 181 | 468 | $ 583 | $ 1,000 | $ 1,583 |
| Hazel (TX) | Q1 - 2020 | 0 | 0 | — | — | — |
| MECO (TX) | Q1 - 2020 | 1,863 | 1,559 | $ 81,530 | $ 1,507 | $ 83,037 |
| **Total Q1-2020** | | 2,044 | 2,027 | $ 82,113 | $ 2,507 | $ 84,620 |
| Oklahoma | Q2 - 2020 | 28 | 448 | $ 774 | $ 156 | $ 930 |
| Hazel (TX) | Q2 - 2020 | 0 | 0 | — | — | — |
| MECO (TX) | Q2 - 2020 | 1,389 | 747 | $ 44,223 | $ 324 | $ 44,547 |
| **Total Q2-2020** | | 1,417 | 1,195 | $ 44,997 | $ 480 | $ 45,477 |
| Oklahoma | Q3 - 2020 | 69 | 1,096 | $ 2,084 | $ 494 | $ 2,578 |
| Hazel (TX) | Q3 - 2020 | 0 | 0 | — | — | — |
| MECO (TX) | Q3 - 2020 | 1,480 | 680 | $ 57,774 | $ 1,370 | $ 59,144 |
| **Total Q3-2020** | | 1,549 | 1,776 | $ 59,858 | $ 1,864 | $ 61,722 |
| Oklahoma | Q4 - 2020 | 0 | 0 | $ 1,042 | $ 773 | $ 1,815 |
| Hazel (TX) | Q4 - 2020 | 0 | 0 | — | — | — |
| MECO (TX) | Q4 - 2020 | 435 | 0 | $ 9,837 | $ 5,519 | $ 15,356 |
| MECO (Sold) | YTD ADJ | 0 | 0 | $ (10,092) | $ (5,519) | $ (15,611) |
| **Total Q4-2020** | | 435 | 0 | $ 787 | $ 773 | $ 1,560 |
| **Sub Total 2020** | | 5,445 | 4,998 | $ 187,755 | $ 5,624 | $ 193,379 |
| **Exclude MECO** | Sold **11/20** | -5,167 | -2,986 | $ (183,272) | $ (3,201) | $ (186,473) |
| Total 2020 | | 278 | 2,012 | $ 4,483 | $ 2,423 | $ 6,906 |
| **Average Commodity Price** | | | | $ 34.48 | $ 1.13 | |

Table of Contents

***Expenses for the Years Ended December 31, 2021 and 2022***

We recorded depreciation, depletion and amortization expense of $4,642 for the year ended December 31, 2021 compared to $820,814 for the year ended December 31, 2020. Impairment expense recognized was $2,108,301 in 2020 with none for the year ended December 31, 2021.

*Operating Expenses*

| | Year Ended December 31, 2021 | 2020 | Change | % |
|---|---|---|---|---|
| Operating Expenses | | | | |
| General & Administrative | $ 8,050,443 | $ 2,557,975 | $ 5,472,468 | 214.7% |
| Total operating expenses | $ 8,050,443 | $ 2,557,975 | $ 2,557,975 | 214.7% |

General and Administrative Expenses

Our general and administrative expense for the year ended December 31, 2021 was $8,050,443 compared with $2,557,975 for the year ended December 31, 2020. Our general and administrative expenses consisted of consulting and compensation expense, substantially all of which were non-cash or deferred, accounting and administrative costs, professional consulting fees, and other general corporate expenses. The change in general and administrative expenses in 2021, compared to 2020, is primarily due to employee bonus compensation and expenses related to the Arrangement Agreement including consulting fees, filing fees, legal fees, director and officer liability insurance, and investor relations expenses.

***Historical Results for the Three Months Ended September 30, 2022 and 2021***

For the three months ended September 30, 2022, we had a net loss of $2,164,187 compared to a net loss of $895,675 for the three months ended September 30, 2021. The difference is primarily due to increased general and administrative expenses for the three months ended September 30, 2022 offset with an increase in interest expense. At September 30, 2022, we had current assets of $2,331,695 and total assets of $49,650,302. As of September 30, 2022, we had current liabilities of $21,716,979. Stockholders' equity was $27,911,386 at September 30, 2022.

| | Three Months Ended September 30, 2022 | 2021 | Change | % |
|---|---|---|---|---|
| Product sales | $12,810 | $ 2,963 | $ 9,847 | 332% |
| Total Revenue | 12,810 | 2,963 | 9,847 | 332% |
| Cost of revenue | 15,659 | 41,774 | (26,115) | (63)% |
| Gross Profit (Loss) | $ (2,849) | $(38,811) | $ 35,962 | 93% |
| Gross Profit (Loss) percentage | (22)% | (1,310)% | 1,288% | |

Table of Contents

For the three months ended September 30, 2022, we had production revenue of $12,810 compared to $2,963 of production revenue for the three months ended September 30, 2021. Our cost of revenue, consisting of lease operating expenses and production taxes, was $15,659 for the three months ended September 30, 2022 compared with $41,774 for the three months ended September 30, 2021. The change in revenue was impacted by an increase in production from the Oklahoma Properties and commodity prices. Production and revenue are detailed as follows:

| Property | Quarter | Oil Production {BBLS} | Gas Production {MCF} | Oil Revenue | Gas Revenue | Total Revenue |
|---|---|---|---|---|---|---|
| Oklahoma | Q3 - 2022 | 43 | 887 | $ 4,635 | $ 8,175 | $ 12,810 |
| Hazel (TX) | Q3 - 2022 | 0 | 0 | $ — | $ — | $ — |
| **Total Q3-2022** | | 43 | 887 | $ 4,635 | $ 8,175 | $ 12,810 |
| **Average Commodity Price** | | | | $ 107.79 | $ 9.22 | |
| **Oklahoma** | Q3 - 2021 | 29 | 441 | $ 1,817 | $ 1,146 | $ 2,963 |
| **Hazel (TX)** | Q3 - 2021 | 0 | 0 | — | — | $ — |
| **Total Q3-2021** | | 29 | 441 | $ 1,817 | $ 1,146 | $ 2,963 |
| **Average Commodity Price** | | | | $ 62.66 | $ 2.60 | |

***Expenses for the three months ended September 30, 2022 and 2021***

| | Three Months Ended September 30, 2022 | 2021 | Change | % |
|---|---|---|---|---|
| Operating Expenses | | | | |
| General & Administrative | $ 1,800,472 | $ 861,316 | $ (939,156) | 109% |
| Total operating expenses | $ 1,800,472 | $ 861,316 | $ (939,156) | 109% |

The change in general & administrative expenses during the three months ended September 30, 2022, compared to the same period in 2021 is related to increases in legal fees, consulting services and investor relations expenses.

As described in “Our Properties—Intent to Acquired Additional Interests” one of the Orogrande Owners, an entity we intend to make an offer to acquire its working interest in the Orogrande Project, is Wolfbone Investments LLC, which is an affiliate of Gregory McCabe, who is also an affiliate of the Company.

***Historical Results for the Nine Months Ended September 30, 2022 and 2021***

For the nine months ended September 30, 2022, we had a net loss of $4,764,293 compared to a net loss of $6,088,889 for the nine months ended September 30, 2021. The difference is primarily due to decreased general and administrative expenses for the nine months ended September 30, 2022 offset with a change in interest expense. At September 30, 2022, we had current assets of $2,331,695 and total assets of $49,650,302. As of September 30, 2022, we had current liabilities of $21,716,979. Stockholders’ equity was $27,911,386 at September 30, 2022.

| | Nine Months Ended September 30, 2022 | 2021 | Change | % |
|---|---|---|---|---|
| Product sales | $ 30,214 | $ 8,936 | $ 21,278 | 238% |
| Total Revenue | 30,214 | 8,936 | 21,278 | 238% |
| Cost of Revenue | 57,733 | 80,509 | (22,776) | (28)% |
| Gross Profit (Loss) | $(27,519) | $(71,573) | $ 44,054 | 62% |
| Gross Profit (Loss) percentage | (91)% | (801)% | 710% | |

Table of Contents

For the nine months ended September 30, 2022, we had production revenue of $30,214 compared to $8,936 of production revenue for the nine months ended September 30, 2021. Our cost of revenue, consisting of lease operating expenses and production taxes, was $57,733 for the nine months ended September 30, 2022 compared with $80,509 for the nine months ended September 30, 2021. The change in revenue was impacted by an increase in production from the Oklahoma Properties. Production and revenue are detailed as follows:

| Property | Quarter | Oil Production {BBLS} | Gas Production {MCF} | Oil Revenue | Gas Revenue | Total Revenue |
|---|---|---|---|---|---|---|
| Oklahoma | Q1 - 2022 | 0 | 0 | $ — | $ — | $ — |
| Hazel (TX) | Q1 - 2022 | 0 | 0 | — | — | — |
| **Total Q1-2022** | | 0 | 0 | $ — | $ — | $ — |
| Oklahoma | Q2 - 2022 | 97 | 1,267 | $ 9,688 | $ 7,716 | $ 17,404 |
| Hazel (TX) | Q2 - 2022 | 0 | 0 | — | — | — |
| **Total Q2-2022** | | 97 | 1,267 | $ 9,688 | $ 7,716 | $ 17,404 |
| Oklahoma | Q3 - 2022 | 43 | 887 | $ 4,635 | $ 8,175 | $ 12,810 |
| Hazel (TX) | Q3 - 2022 | 0 | 0 | — | — | — |
| **Total Q3-2022** | | 43 | 887 | $ 4,635 | $ 8,175 | $ 12,810 |
| **Nine Months ended September 2022** | | 140 | 2,154 | $ 14,323 | $ 15,891 | $ 30,214 |
| **Average Commodity Price** | | | | $ 102.31 | $ 7.38 | |
| Oklahoma | Q1 - 2021 | 28 | 711 | $ 1,166 | $ 1,305 | $ 2,471 |
| Hazel (TX) | Q1 - 2021 | 0 | 0 | — | — | — |
| **Total Q1-2021** | | 28 | 711 | $ 1,166 | $ 1,305 | $ 2,471 |
| Oklahoma | Q2 - 2021 | 28 | 1,212 | $ 1,692 | $ 1,810 | $ 3,502 |
| Hazel (TX) | Q2 - 2021 | 0 | 0 | — | — | — |
| **Total Q2-2021** | | 28 | 1,212 | $ 1,692 | $ 1,810 | $ 3,502 |
| **Oklahoma** | Q3 - 2021 | 29 | 441 | $ 1,817 | $ 1,146 | $ 2,963 |
| **Hazel (TX)** | Q3 - 2021 | 0 | 0 | — | — | — |
| **Total Q3-2021** | | 29 | 441 | $ 1,817 | $ 1,146 | $ 2,963 |
| **Nine Months ended September 2021** | | 85 | 2,364 | $ 4,675 | $ 4,261 | $ 8,936 |
| **Average Commodity Price** | | | | $ 55.00 | $ 1.80 | |

***Expenses for the nine months ended September 30, 2022 and 2021***

| | Nine Months Ended September 30, 2022 | 2021 | Change | % |
|---|---|---|---|---|
| Operating Expenses | | | | |
| General & Administrative | $ 3,789,166 | $ 6,097,917 | $ (2,308,751) | (38)% |
| Total operating Expenses | $ 3,789,166 | $ 6,097,917 | $ (2,308,751) | (38)% |

The change in general & administrative expenses during the nine months ended September 30, 2022, compared to the same period in 2021 is related to reductions in directors fees, consulting services and investor relations expenses.

Table of Contents

**LIQUIDITY AND CAPITAL RESOURCES**

Liquidity risk is the risk that we will not meet our financial obligations as they become due after use of currently available cash. We have a planning and budgeting process to monitor operating cash requirements, including amounts projected for capital expenditures, which are adjusted as input variables change. These variables include, but are not limited to, our ability to generate revenue from operations, general and administrative requirements and the availability of equity or debt capital. As these variables change, we may be required to issue equity or obtain debt financing.

At December 31, 2021, we had cash and cash equivalents of $1,989,419 compared to $130,504 as of December 31, 2020.

Cash from operating activities for the for the year ended December 31, 2021, was $(7,050,541) compared to $(3,300,589) for the year ended December 31, 2020.

Cash used in operating activities for the year ended December 31, 2021 can be attributed principally to net loss from operations of $8,238,808 adjusted for $4,642 in depreciation, depletion and amortization expense, a decrease in accrued liabilities, and an increase in accounts payable.

Cash used in operating activities during 2020 can be attributed principally to net loss from operations of $5,749,006 adjusted for $820,814 in depreciation, depletion and amortization expense, and $2,108,301 in impairment expense.

Cash used in investing activities for the year ended December 31, 2021 and for year ended December 31, 2020 was $14,805,511 compared to $2,271,968. Cash used in investing activities consisted primarily of investments in oil and natural gas properties in 2021 offset by proceeds from the sale of property in 2020.

Cash from financing activities for the year ended December 31, 2021 and for year ended December 31, 2020 was $23,714,967 compared to $1,128,451 for the year ended December 31, 2020. Cash from financing activities consisted primarily of contributions from, and a note payable to, Meta.

At September 30, 2022, we had cash and cash equivalents of $2,108,866 compared to $1,989,419 as of December 31, 2021.

Cash flows from operating activities for the nine months ended September 30, 2022 was $(6,067,015) compared to $(6,701,090) for the nine months ended September 30, 2021, an increase of $634,075. Cash flows from operating activities for the nine months ended September 30, 2022 can be primarily attributed to net loss from operations and a decrease in accounts payable.

Cash flows from operating activities for the nine months ended September 30, 2021 can be primarily attributed to net loss from operations of $6,088,889 and a decrease in accrued expenses.

Reference the Consolidated Statements of Cash Flows included in the financial statements for additional detail of the components that comprise the net use of cash in operations. We expect to continue to use cash flow in operating activities until such time as we achieve sufficient commercial oil and gas production to cover our operating costs.

Cash flows from investing activities for the nine months ended September 30, 2022 was $(1,630,137) compared to $(2,502,799) for the nine months ended September 30, 2021. Cash flows from investing activities principally consists of investment in oil and natural gas properties in Texas.

Cash flows from financing activities for the nine months ended September 30, 2022 was $7,816,599 as compared to $17,405,166 for the nine months ended September 30, 2021.

Table of Contents

Cash flows from financing activities consists of intercompany loans from Meta for the nine months ended September 30, 2022. For the nine months ended September 30, 2021, cash flows from financing activities also consisted of intercompany loans from Meta. We expect to continue to have cash flow provided by financing activities as we seek new rounds of financing and continue to develop our oil and natural gas investments. We do not expect to pay cash dividends on our Common Stock in the foreseeable future.

On October 1, 2021, we issued a secured, revolving promissory note in an original principal amount of up to $15 million in favor of Meta (as amended to date, the “2021 Note”). The 2021 Note bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the “2021 Note Maturity Date”); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. While the revolving commitment under the 2021 Note expires on 2021 Note Maturity Date, as of the date hereof, the full $15 million available under the 2021 Note has been fully drawn.

The 2021 Note is secured by a security interest in (a) pursuant to a Stock Pledge Agreement dated as of September 30, 2021 between Gregory McCabe (the “Pledgor”) and Meta (the “Stock Pledge Agreement”), 1,515,000 shares of common stock of Meta that are owned directly and beneficially by the Pledgor, and (b) pursuant to a Deed of Trust, Mortgage, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production dated as of September 30, 2021 made by Wolfbone Investments, LLC (an affiliate of the Pledgor) for the benefit of Meta (the “Security Agreement”), a 25% working interest beneficially owned by the Pledgor in the Orogrande Prospect as defined in the Security Agreement.

The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2021 Note.

Upon the occurrence and during the continuance of an event of default under the 2021 Note, Meta as the lender may declare all outstanding principal and accrued and unpaid interest under the 2021 Note immediately due and payable, may terminate any remaining commitment to make advances under the 2021 Note, and may exercise the other rights and remedies provided for under the 2021 Note and related security documents. The events of default under the 2021 Note include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants, an event of default under the Stock Pledge Agreement or the Security Agreement, bankruptcy and insolvency events with respect us or our subsidiaries, cross defaults with certain of our other material indebtedness, and material judgments against us.

On June 28, 2022 and in August 2022, we borrowed $1.9 million and $2.7 million as an advance from Meta to be treated as an unsecured term loan, in addition to the $441,000 previously advanced, under a Loan Agreement with Meta as the lender (the “Loan Agreement”), the proceeds of which are available for our working capital and general corporate purposes. As of the date of this prospectus, we had an aggregate principal amount outstanding of $5.0 million, which is the maximum amount available under the Loan Agreement. The loans are due and payable on March 31, 2023 (the “Maturity Date”), unless extended as described below. Loans under the Loan Agreement bear interest at a fixed rate of 8% per annum if no event of default exists, and at a fixed rate of 12% per annum if an event of default exists. Under the Loan Agreement, if we raise $30 million or more in capital through debt or equity or a combination thereof by the Maturity Date, the Maturity Date will be extended to October 3, 2023 and the 2021 Note plus the loans under the Loan Agreement would be amortized in six equal monthly installments.

We have the right to prepay the loans under the Loan Agreement in whole or in part at any time without penalty. Amounts repaid or prepaid may not be reborrowed. We will be required to prepay the loans upon an asset disposition (other than permitted asset sales), certain equity issuances (other than permitted equity), debt issuances (other than permitted debt), and certain extraordinary receipts. We are required to prepay the loans from our annual excess cash flow, if any.

Table of Contents

The Loan Agreement includes customary representations and covenants that, subject to certain exceptions and qualifications, restrict our ability to do certain things, such as: incur additional indebtedness; incur liens; engage in mergers, acquisitions, and asset sales; make loans and investments; declare dividends or redeem or repurchase equity interests; transact with affiliates on a non-arm's length basis; and enter into certain restrictive agreements. In addition, the Loan Agreement contains customary affirmative covenants, including covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our existence and material properties, customary visitation rights, reporting requirements, compliance with applicable laws and regulations, and formation or acquisition of new subsidiaries.

Upon the occurrence and during the continuance of an event of default, Meta as the lender has the right to declare all outstanding principal and accrued and unpaid interest under the Loan Agreement immediately due and payable and exercise certain other rights and remedies. The events of default under the Loan Agreement include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants or representations and warranties, a change in control or a material adverse change defined in the Loan Agreement, material judgments and attachments, cross defaults with certain other material indebtedness, and bankruptcy and insolvency events with respect to the Company and our subsidiaries.

***Contractual Obligations and Other Commitments***

Our most significant contractual obligations relate to the Loan Agreement, the 2021 Note and drilling and development commitments and other lease operating expenses under certain leases for the Orogrande Project.

Our debt obligations include the $15 million principal balance outstanding under the 2021 Note with Meta, which incurs interest at 8% per annum and matures on March 31, 2023. For the nine months ended September 30, 2022, we incurred an interest of $948,099 that is paid in kind. On September 2, 2022, we entered into a Loan Agreement that governs the term loans advanced to us from Meta on April 14, 2022, May 4, 2022, May 12, 2022, May 26, 2022, June 1, 2022, June 13, 2022, June 28, 2022, August 11, 2022 and August 29, 2022, for an aggregate principal balance outstanding of $5 million, which is the maximum amount of Meta's commitment under the Loan Agreement. The term loans incur interest at a per annum rate equal to 8% and mature on March 31, 2023. Under both the 2021 Note and the Loan Agreement, if we raise additional capital through debt or equity, or any combination thereof, of at least $30,000,000 before the respective maturity dates, we will be entitled to extend maturity to October 3, 2023 and repay the outstanding balances in six equal monthly installments beginning in April 2023 up to such extended maturity date. In addition, we may be obligated to pay Meta approximately $1 million for costs associated with the Spin-Off. See the discussion under the caption "Certain Relationships and Related Party Transactions—Agreements with Meta—Distribution Agreement—Settlement of Expenses." As of the date of this Prospectus, we do not have any long-term debt obligations.

In addition to our debt commitments, the Orogrande Project leases representing approximately 134,066 net acres in the Orogrande Basin in West Texas are subject to expiration in 2022 if we fail to drill five wells as obligated by the end of the 2022 calendar year. Unless we are able to negotiate an extension on these leases, these leases in the Orogrande Basin are also subject to expiration in 2023 in the event we fail to drill an additional five wells during the 2023 calendar year. In order to fulfill our drilling commitments for 2022, we currently estimate that our capital expenditures needs may be up to $10 million, and to the extent Meta pays any of these capital expenditures on our behalf, our indebtedness to Meta will increase. As such, we will require additional capital, and may not be able to obtain such additional capital when or in the amount necessary to fulfill our commitments under, and maintain our interest in, the leases. We do not yet know what our capital expenditure needs will be to satisfy our drilling commitments for the calendar year 2023. For a discussion of the risks relating to our drilling obligations, see "Risk Factors—Risks Related to Our Business", including the risk factor "*—Our acreage must be drilled before lease expiration in order to hold the acreage by production. In the highly competitive market for acreage, failure to drill sufficient wells in order to hold acreage will result in a substantial lease renewal cost, or if renewal is not feasible, loss of our lease and prospective drilling opportunities*". See also Note 4 of the notes to our financial statements as of and for the years ended December 31, 2020 and 2021 included elsewhere in this Prospectus.

Table of Contents

Management believes that currently available resources may not provide sufficient funds to enable us to meet our financing and drilling obligations for the remainder of the 2022 fiscal year and for the 2023 fiscal year. We anticipate that we will continue to incur operating losses and generate negative cash flows from operations for the foreseeable future. As a result, we will need additional capital resources to fund our operations both in the short term and in the long term, prior to achieving break even or positive operating cash flow. While we do not have any committed sources of capital, we expect to continue to opportunistically seek access to additional funds through public or private equity offerings or debt financings, through partnering or other strategic arrangements, including credit application arrangements with our third party servicers, or a combination of the foregoing. We may also seek additional credit support from Meta. Despite our efforts, we may face obstacles in continuing to attract new financing due to industry conditions and our history and current record of net losses. We can provide no assurance that we will be able to obtain the financing required to meet our stated objectives or even to continue as a going concern.

**Critical Accounting Estimates**

***Oil and natural gas properties***—The Company uses the full cost method of accounting for exploration and development activities as defined by the SEC. Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities. Gain or loss on the sale or other disposition of oil and gas properties is not recognized, unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least annually and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions.

Gains and losses on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

***Depreciation, depletion, and amortization***—The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

***Ceiling test***—Future production volumes from oil and gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and gas properties. If the net capitalized cost of proved oil and gas properties, net of related deferred income taxes, plus the cost of unproved oil and gas properties, exceeds the present value of estimated future net cash flows discounted at 10 percent, net of related tax affects, plus the cost of unproved oil and gas properties, the excess is charged to expense and reflected as additional accumulated DD&A. The ceiling test calculation uses a commodity price assumption which is based on

Table of Contents

the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

***Asset retirement obligations***—The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

***Recent Accounting Pronouncements***

Our audited financial statements and the accompanying notes thereto found elsewhere in this Prospectus contain a description of recent accounting pronouncements.

Table of Contents

## MANAGEMENT

**Executive Officers and Non-Employee Directors Following the Spin-Off**

The following sets forth information regarding individuals who are currently expected to serve as executive officers and non-employee directors immediately after the Spin-Off, including their positions.

| Name | Age | Position |
|---|---|---|
| ***Executive Officers*** | | |
| Clifton DuBose, Jr. | 40 | Chief Executive Officer, Chairman of the Board of Directors |
| Joseph DeWoody | 40 | President, Director |
| Lucas T. Hawkins | 36 | Chief Financial Officer |
| Delvina Oelkers | 36 | Chief Operating Officer |
| ***Key Employees*** | | |
| Kyle Bradford | 42 | Executive Vice President, Drilling & Construction |
| Daren Rader | 38 | Executive Vice President, Completions & Production |
| ***Non-Employee Directors*** | | |
| Robert Lance Cook | 65 | Director |
| Mia Pitts | 38 | Director |
| Kristin Whitley | 38 | Director |

***Executive Officers***

**Clifton DuBose, Jr.** has successfully acquired, managed, and/or sold thousands of royalty acres and non-operated working interests in the Permian Basin. Since April 2018, Mr. DuBose has served as co-founder and member of Valor Mineral Management LLC ("Valor"). Valor is a mineral and working interest management firm which uses a proprietary software platform it has developed, known as "mineral.tech." Since August 2016 Mr. DuBose has also served as President of Imperial Royalty Management I, LLC, which is the general partner of a company that owns certain mineral interests, and since August 2016 as the managing member of Korban Resources LLC, a company which invests in oil and gas interests. Mr. DuBose is also an attorney, licensed to practice law in the State of Texas. He earned his law degree from Georgetown Law, in Washington D.C.in 2009 and a BS in Agribusiness from Abilene Christian University in 2004.

**Joseph DeWoody** has served as the founder and partner of several successful minerals-rights companies, including Clear Fork Royalty, since April 2010, and Valor since May 2018. Mr. DeWoody implemented strategic initiatives at Valor, managing 80,000 oil and gas interests in over 2,000,000 gross acres across 32 States, with strong revenue growth since inception developing full P&L, strategy, and business operations. He also developed Valor's proprietary mineral and working interest management software, known as "mineral.tech." Mr. DeWoody has also structured and participated in multiple complex transactions in both operated and non-operated assets. He has managed reporting to partners, including quarterly compilations, annual audit, and contractual calculations and payments. Mr. DeWoody was the 2021 D CEO Energy Services and Technology Executive of the Year and is a life member of American Mensa. He received his BBA and MBA from Baylor University, where he played football. He was appointed to the Texas Board of Professional Geoscientists, and he serves as director of the National Association of Royalty Owners—Texas. He was named one of Oil and Gas Investor Magazine's "Top 20 Under 40" and was featured in the Dallas Business Journal's "Who's Who in Energy."

**Lucas T. Hawkins** is the Co-Founder and has served as Chief Financial Officer of Mammoth Exploration LLC, a private equity backed upstream oil and gas company, since June 2016. Since July 2013, Mr. Hawkins has served as VP—Business Development of Hawkins Exploration, Inc. ("HEI"). HEI is an independently owned oil and gas exploration company focused on the Permian Basin. Mr. Hawkins led, managed and executed numerous acquisitions and subsequent development of oil and gas properties across the Permian Basin**.** From 2010 to 2011, Mr. Hawkins served as an Associate with The Sterling Group, a middle market private equity group focusing on

Table of Contents

industrial, manufacturing and distribution businesses. From 2011 to 2013 Mr. Hawkins served as an Associate with Natural Gas Partners, an energy private equity firm. Mr. Hawkins has a background in energy investment banking and private equity and earned his BBA in Finance and Business Honors from the University of Texas at Austin.

**Delvina Oelkers** served as Asset Manager from March 2016 to March 2019 at Eclipse Resources and as Completions Manager from March 2019 to November 2020 at Montage Resources, in each position where she managed engineering teams, achieving cost and efficiency improvements while implementing innovative technology for substantial reserve recovery. She led her operations team through several successful M&A transactions. Ms. Oelkers designed completions for the Eclipse and Montage Resources Super Lateral Program, including the design and execution of the first world-record-setting "Purple Hayes 1H" Well. As an Asset Manager at Eclipse Resources, Ms. Delvina was responsible for leading the multidisciplinary team to prove-up the asset. By utilizing innovative technologies in design, the first exploratory well produced 35% higher than type curve.

***Key Employees***

**Kyle Bradford** has served as general manager of our subsidiary, Hudspeth Operating LLC, since September 2021. Prior to joining the Company, Mr. Bradford in the roles of Director, from February 2019 to November 2020 and VP of Drilling and Completions January 2014 to February 2019 for Eclipse Resources and Montage Resources. He led the drilling and operational teams through the development of the super-lateral program highlighted by the drilling and completion of the world record setting "Purple Hayes 1H". He has a proven track record of implementing technological advancements to reduce costs and increasing operational efficiencies. He previously worked at Chesapeake Energy holding various positions including Senior Operations Engineer Utica Business Unit from April 2012 to January 2014, and Asset Manager of the Appalachian North Business Unit from October 2010 to April 2012. His career started in May 2002 at CNX Gas. He holds a Bachelor of Science in Petroleum Engineering from Marietta College.

**Daren Rader** has 16 years of experience across the MidCon and Appalachian Basins as an engineer and operations leader. From March 2016 to November 2020, Mr. Rader served as a Senior Operations Manager for Montage Resources, and from February 2017 to February 2019, served as an Operations Manager for Blue Ridge Mountain Resources. He was instrumental in creating synergy amongst the field teams through multiple mergers and acquisition transactions. Mr. Rader is highly experienced both in prolific unconventional condensate and natural gas production and completion operations. Mr. Rader has a proven track record as a team leader with a focus on optimizing and streamlining field operations to reduce cost and minimize cycle times. Mr. Rader has been with the Company since September 2021.

***Non-Employee Directors***

**Robert Lance Cook** spent 36 years at Shell Oil with final positions of Vice President of Wells Technology and Chief Scientist. Mr. Cook has extensive experience in Deepwater, Arctic, and Unconventional Research & Development and Operations. Mr. Cook is the founder and CEO of Enventure Global Technology, a joint venture between Shell and Halliburton. Mr. Cook has served as the COO of Sirius Well Manufacturing, a joint venture between Shell and CNPC and is a technologist with an extensive patent portfolio. Since retiring from Shell in 2016, Mr. Cook has served as Vice President of Production Operations for WellsX Inc. from 2017 to 2020 and in 2020, he founded and continues to serves as president and chief technology officer of Sage Geosystems Inc.

**Mia Pitts** is currently serving as Senior Counsel at Marsh McLennan Companies (February 2018-current) and previously was a litigator and regulatory compliance lawyer at Freshfields Bruckhaus Deringer (March 2010-March 2016), one of the world's largest and oldest law firms. Ms. Pitts has represented corporate and individual clients in internal, regulatory, civil, and criminal investigations before the U.S. Security and Exchange Commission, Department of Justice, and state attorney generals as well as in shareholder securities litigation, class action litigations, and other private civil allegations and suits. She has also represented independent

Table of Contents

corporate oversight authorities appointed by the federal government, including the DOJ-appointed monitor of a global financial institution and the federal court-appointed receiver of a multi-national firm in an SEC securities fraud matter. Ms. Pitts graduated from Georgetown University Law Center and Barnard College of Columbia University.

**Kristin Whitley, CPA**, began her career in June 2006 as a public accounting with Whitley Penn where she worked for 10 years. While at Whitley Penn she served a variety of clients within the energy and mining industries. In August 2016, Mrs. Whitley joined Vista Minerals, a leading in-basin regional provider of sand to industrial, oil and gas companies, in the role of Chief Accounting Officer and less than a year later was named Chief Financial Officer. While at Vista Minerals, Mrs. Whitley has managed the finance and accounting, human resources, and information technology functions, participating in numerous capital raises, strategic initiatives, contract negotiations, and risk management exercises. Mrs. Whitley is a Certified Public Accountant in the State of Texas. She graduated from The University of Texas at Austin with her BBA and from Texas Christian University's Neeley School of Business with her MBA. In 2019, Mrs. Whitley was named one of *Oil and Gas Investor's* Forty Under 40 in Energy.

**Conflicts of Interest**

Nevada law permits corporations to adopt provisions renouncing any interest or expectancy in certain opportunities that are presented to the corporation or its directors, officers or stockholders. Our Amended and Restated Articles of Incorporation, to the maximum extent permitted from time to time by Nevada law, renounce any interest or expectancy that we have in, or right to be offered an opportunity to participate in, specified business opportunities that are from time to time presented to our directors, officers or stockholders or their respective affiliates. Our Amended and Restated Articles of Incorporation provide that, to the fullest extent permitted by law neither any director or officer nor his or her affiliates will have any duty to refrain from (i) engaging in a corporate opportunity in the same or similar lines of business in which we or our affiliates now engage or propose to engage or (ii) otherwise competing with us or our affiliates. In addition, to the fullest extent permitted by law, in the event that any director or officer acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity for such director or officer or such person's affiliates or for us or our affiliates, such person will have no duty to communicate or offer such transaction or business opportunity to us or any of our affiliates and they may take any such opportunity for themselves or offer it to another person or entity. We do not believe, however, that any fiduciary duties or contractual obligations of our directors or officers arising in the future would materially undermine our ability to operate our business. Our Amended and Restated Articles of Incorporation do not renounce our interest in any business opportunity that is expressly offered to a director or officer solely in his or her capacity as a director or officer of the Company. To the fullest extent permitted by law, no business opportunity will be deemed to be a potential corporate opportunity for us unless we would be permitted to undertake the opportunity under our Amended and Restated Articles of Incorporation, we have sufficient financial resources to undertake the opportunity and the opportunity would be in line with our business.

**Director Independence**

It is anticipated that after the Distribution a majority of the members of our Board will meet the criteria for independence as defined by the corporate governance guidelines to be adopted by our Board.

**Corporate Governance Guidelines**

The Board has adopted written corporate governance guidelines that serve as a flexible framework within which our Board and its committees operate. The guidelines will be available on our website at www.nextbridgehydrocarbons.com, and are available upon written request to our corporate secretary.

Table of Contents

**Code of Business Conduct and Ethics**

The Board has adopted a written code of ethics that is designed to deter wrongdoing and to promote, among other things:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- the protection of the confidentiality of our non-public information;
- the responsible use of and control over our assets and resources;
- full, fair, accurate, timely and understandable disclosure in reports and documents that we file with the SEC and other regulators and in our other public communications;
- compliance with applicable laws, rules and regulations; and
- accountability for adherence to the code and prompt internal reporting of any possible violation of the code.

The code of conduct and ethics will be available on our *website at www.nextbridgehydrocarbons.com*, and is available upon written request to our corporate secretary.

While the Board oversees risk management, company management is charged with managing risk. Management communicates routinely with the Board and individual directors on the significant risks identified and how they are being managed. Directors are free to, and indeed often do, communicate directly with senior management.

Our Board administers its risk oversight function as a whole by making risk oversight a matter of collective consideration. Much of this work has been delegated to committees, which will meet regularly and report back to the full Board.

**Committees of Our Board**

We have established an audit committee, a compensation committee, a nominating and governance committee and an ESG committee, each of which operate under a written charter that will be available on our website.

In addition, our Board may, from time to time, designate one or more additional committees, which shall have the duties and powers granted to it by our Board.

***Audit Committee***

Upon their appointment to the Board, the members of the Audit Committee will consist of Kristin Whitley, as the chairperson, Mia Pitts and Robert L. Cook, each of whom meet the independence requirements set forth in Rule 10A-3 under the Exchange Act and our Audit Committee Charter. Each member of the Audit Committee is financially literate, and Ms. Whitley has accounting and related financial management expertise and satisfies the criteria to be an "audit committee financial expert" under the rules and regulations of the SEC, as those qualifications are interpreted by our Board in its business judgment.

The functions of the Audit Committee include:

- oversee the quality and integrity of our financial statements, accounting practices and financial information we provide to the SEC or the public;
- review our annual and interim financial statements, the report of our independent registered public accounting firm on our annual financial statements, Management's Report on Internal Control over Financial Reporting and the disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations;

Table of Contents

- select and appoint an independent registered public accounting firm;
- pre-approve all services to be provided to us by our independent registered public accounting firm;
- review related party transactions;
- review with our independent registered public accounting firm and our management the accounting firm's significant findings and recommendations upon the completion of the annual financial audit and quarterly reviews;
- review and evaluate the qualification, performance, fees and independence of our registered public accounting firm;
- meet with our independent registered public accounting firm and our management regarding our internal controls, critical accounting policies and practices and other matters;
- discuss with our independent registered public accounting firm and our management earnings releases prior to their issuance;
- oversee our internal audit function; and
- oversee our compliance program, response to regulatory actions involving financial, accounting and internal control matters, internal controls and risk management policies.

***Compensation Committee***

Upon their appointment to the Board, the members of the Compensation Committee will consist of Mia Pitts, as the chairperson, Kristin Whitley and Robert L. Cook, each of whom are independent, "non-employee directors" (within the meaning of Rule 16b-3 under the Exchange Act).

The functions of our Compensation Committee include:

- setting and reviewing our general policy regarding executive compensation;
- determining the compensation of our Chief Executive Officer and other executive officers;
- approving employment agreements for our Chief Executive Officer and other executive officers;
- reviewing the benefits provided to our Chief Executive Officer and other executive officers;
- overseeing our overall compensation structure, practices and benefits plans;
- administering our executive bonus and equity-based incentive plans; and
- assessing the independence of compensation consultants, legal counsel and other advisors to the Compensation Committee and hiring, approving the fees and overseeing the work of, and terminating the services of such advisors.

***Corporate Governance and Nominating Committee***

Upon their appointment to the Board, the members of the Corporate Governance and Nominating Committee will consist of Robert L. Cook, as the chairperson, Kristin Whitley and Mia Pitts, each of whom are independent, "non-employee directors" (within the meaning of Rule 16b-3 under the Exchange Act).

The functions of our Corporate Governance and Nominating Committee include:

- overseeing our corporate governance practices;
- reviewing and recommending to our Board amendments to our committee charters and other corporate governance guidelines;

Table of Contents

- reviewing and making recommendations to our Board regarding the structure of our various board committees;
- identifying, reviewing and recommending to our Board individuals for election to the Board;
- adopting and reviewing policies regarding the consideration of board candidates proposed by stockholders and other criteria for Board membership; and
- overseeing our Board's annual self-evaluation.

***ESG Committee***

Upon their appointment to the Board, the members of the ESG Committee will consist of Joseph DeWoody, as the chairperson, Kristin Whitley and Robert L. Cook.

The functions of our ESG Committee include:

- provide oversight with respect to ESG matters;
- advise and assist the Board with its responsibilities for the oversight of ESG matters; and
- provide oversight with respect to our annual sustainability report, which we plan to make available through our website.

**Board Leadership Structure and Role in Risk Oversight**

***Governance Structure***

The position of Board chairman is filled by our Chief Executive Officer (the "CEO"). We believe this combined leadership structure is appropriate for us because our Chairman and CEO (i) conveys a singular, cohesive message to our stockholders, employees, industry partners and the investment community, (ii) eliminates any ambiguity as to who is accountable for our performance and (iii) is able to draw on his knowledge of our operations to provide the Board with leadership and properly focus discussions on the issues of greatest importance to the Company and our stockholders. Our directors and management team engage frequently and directly in the flow of information and ideas and we believe our combined leadership structure facilitates the quality, quantity and timeliness of the information flow and communication.

Since our Board chairman is also a member of management, our Board has designated Robert L. Cook, a non-management director, as "Lead Director." The responsibilities of the Lead Director include:

- Coordinating the scheduling of board meetings and preparation of agenda material for board meetings and executive sessions;
- Defining the scope, quality, quantity and timeliness of the flow of information between management and the Board;
- Chairing all meetings of non-management directors and of the executive committee;
- Overseeing the process of hiring, firing, evaluating and compensating the CEO;
- Approving the retention of consultants who report directly to the Board;
- Facilitating communication between the directors and the CEO, and communicating the directors' perspectives and consensus view to the CEO; provided, that the Lead Director may not, in his sole discretion, override the CEO on any matters without majority approval of the Board;
- Assisting the Board and officers in assuring compliance with and implementation of our governance principles;
- Leading the annual evaluation of the chairman;
- Serving as an independent point of contact for stockholders wishing to communicate with the Board;

Table of Contents

- Acting as principal liaison between the independent directors and the CEO on sensitive issues; and
- Leading the Board in anticipating and responding to crises.

***The Board's Role in Risk Oversight***

The Board oversees that the assets of the Company are properly safeguarded, that the appropriate financial and other controls are maintained, and that our business is conducted wisely and in compliance with applicable laws and regulations and proper governance. Included in these responsibilities is the Board's oversight of the various risks facing our company. In this regard, our board seeks to understand and oversee critical business risks. The Board does not view risk in isolation. Risks are considered in virtually every business decision and as part of our business strategy. The Board recognizes that it is neither possible nor prudent to eliminate all risk. Indeed, purposeful and appropriate risk-taking is essential for the Company to be competitive on a global basis and to achieve its objectives.

**Related Party Transactions**

The Board has adopted a written policy regarding the approval of related party transactions. At regularly scheduled audit committee meetings, management will recommend any related party transactions that are contemplated, and such transactions will require the audit committee's approval. Generally, a "related party" is each of our executive officers, directors, nominees for director, any stockholder owning greater than five percent of our outstanding shares, including any immediate family member of each of the foregoing, and any entity owned or controlled by any of the foregoing. Transactions that are available to all of our employees generally or totaling less than $5,000 when aggregated with all similar transactions are excluded from the policy.

**Legal Proceedings**

None of our current and future directors and executive officers has been involved in legal proceedings that would be material to an evaluation of our management team.

**Director Compensation**

We are currently in the process of developing the details regarding the compensation packages of only those directors who are considered independent directors. Following the Spin-Off, we expect to grant each of our directors who are not employed by us or any of our subsidiaries ("non-employee directors") an option to purchase approximately 412,500 shares of our Common Stock. The vesting of these options will be subject to achievement of certain performance-based conditions on substantially the same terms as the options expected to be granted to our named executive officers described below under "Performance-Based Options."

We did not pay any compensation or grant any equity or other incentive awards to any of non-employee directors during the fiscal year ended December 31, 2021, nor did any of our non-employee directors receive any such compensation or awards from Meta or any of our other affiliates for their services during such fiscal year.

Table of Contents

## EXECUTIVE COMPENSATION

We are currently in the process of determining the philosophy and design of our compensation plans and programs to be offered to our senior management team, which we expect will incorporate elements of compensation to attract, retain and motivate highly talented individuals of our management team, align the interests of management with the interests of our stockholders and incentivize behaviors that we believe are necessary to enable us to succeed in our mission while upholding our values in a highly competitive marketplace. All decisions with respect to management compensation are made by the Board (and after the Spin-Off, will be made by the Compensation Committee).

### Incentive Compensation Awards

Our executive officers have not historically been paid bonuses or received equity awards, and our Board and Compensation Committee has not yet established a formal compensation policy for the determination of such awards. If our revenue grows and bonuses become affordable and justifiable, we expect to use the following parameters in justifying and quantifying bonuses for our executive officers: (1) the growth in our revenue, (2) the growth in our earnings before interest, taxes, depreciation and amortization, as adjusted ("EBITDA"), and (3) the value of our Common Stock. The Board and Compensation Committee has not adopted specific performance goals and target bonus amounts for any of its fiscal years, but may do so in the future. Subject to approval by the sole stockholder, we also expect that our executive officers will be granted performance-based stock options under our 2022 Plan (described below) in connection with or immediately following the Spin-Off and may be granted additional equity awards in future years under the 2022 Plan or a successor plan. The Compensation Committee will recommend to the Board the size, type and other terms of such equity awards.

### Employment Agreements

In connection with the Spin-Off, we entered into new employment agreements with certain of our named executive officers identified in the Summary Compensation Table below to be effective immediately following the Spin-Off. These agreements do not have a specified term and provide for the executive to receive an annual base salary as follows: Mr. DuBose – $400,000; Mr. DeWoody - $395,000; Mr. Hawkins - $390,000 and Ms. Oelkers - $385,000. Each executive is also eligible for an annual discretionary bonus as determined by the Compensation Committee, with a target bonus equal to 50% of the executive's base salary, and to participate in our benefit plans to be made available to employees generally. If the executive's employment with the Company is terminated by the Company without "cause" or by the executive for "good reason" (as defined in the agreement), the executive will receive severance of 12 months base salary, payable in installments over a 12-month period, a pro-rated amount of the executive's target bonus for the year of termination, payment of the executive's COBRA premiums for 12 months, and 12 months' accelerated vesting of the executive's then-outstanding and unvested equity awards granted by the Company (except that, in the case of Mr. DuBose the cash severance and pro-rated target bonus will be payable only if such termination occurs following the initial 12 months after the Spin-Off). However, if such a termination of the executive's employment occurs in connection with or within 12 months following a change in control of the Company, the executive's cash severance will equal 18 months of base salary (paid in a lump sum together with the pro-rated target bonus), the executive will be entitled to payment of COBRA premiums for 18 months, and the executive's then-outstanding equity awards granted by the Company will be fully vested. In each case, the executive's right to receive these severance benefits is subject to the executive's providing a release of claims to the Company and continued compliance with confidentiality, non-competition, non-solicitation and other covenants in favor of the Company set forth in the employment agreement. Mr. DuBose, Mr. DeWoody and Ms. Oelkers were each party to an employment agreement with Hudspeth Operating, LLC, one of our subsidiaries (as reflected in the Summary Compensation Table below). The agreements between Hudspeth Operating, LLC and Mr. DuBose, Mr. DeWoody and Ms. Oelkers have been superseded by their new employment agreements with us.

Table of Contents

**Performance-Based Options**

In connection with the Spin-Off, we expect to grant each of the following executive officers a performance-based stock option under the 2022 Plan described below with respect to the following number of shares: for Mr. DuBose and Ms. Oelkers, an amount equal to three percent (3%) of outstanding shares; and for Mr. DeWoody and Mr. Hawkins, an amount equal to one percent (1%) of outstanding shares (the "Option Percentage"). The exercise price of each of these options will be established at grant based on an implied fair market value of $199,500,000 for the Company's working interest in the Orogrande Project (which is significantly higher than the estimated fair market value of the Company's interest as of the date of the Spin-Off and is intended to create an additional incentive for the executives to increase the value of the Company's working interest above that threshold amount). If the Company increases its working interest in the Orogrande Project while the option is outstanding and subject to compliance with applicable tax laws, the option agreement will provide that the exercise price will increase proportionally based on an implied fair market value of $300,000,000 if the Company's working interest were to increase to 100%. If the executive's interest represented by the option is diluted by an increase in the Company's working interest, the executive may be entitled to an additional option grant to restore their Option Percentage. The vesting of the option will generally be contingent on the optionee's continued employment or service for at least one year following the Spin-Off (or such longer period as provided in the option agreement). Each of these options will have a maximum term of 10 years and will be granted under, and subject to the terms of, the 2022 Plan described below.

**Equity Incentive Plan**

Our Board adopted the 2022 Equity Incentive Plan (the "2022 Plan") to provide an additional means through the grant of awards to attract, motivate, retain and reward selected employees and other eligible persons. Meta, as the current sole stockholder, approved the 2022 Plan prior to the Spin-Off. The summary of the 2022 Plan below is qualified in its entirety by the full text of the plan document, which is being filed with the SEC as an exhibit to this amendment to the Registration Statement on Form S-1, of which this prospectus is a part and is available through the SEC's internet site at http://www.sec.gov.

Employees, officers, directors and consultants that provide services to us or one of our subsidiaries may be selected to receive awards under the 2022 Plan. Our Compensation Committee will administer the 2022 Plan. The Compensation Committee has broad authority to:

- select participants and determine the types of awards that they are to receive;
- determine the number of shares that are to be subject to awards and the terms and conditions of awards, including the price (if any) to be paid for the shares or the award and establish the vesting conditions (if applicable) of such shares or awards;
- cancel, modify or waive our rights with respect to, or modify, discontinue, suspend or terminate any or all outstanding awards, subject to any required consents;
- construe and interpret the terms of the 2022 Plan and any agreements relating to the plan;
- accelerate or extend the vesting or exercisability or extend the term of any or all outstanding awards subject to any required consent;
- subject to the other provisions of the 2022 Plan, make certain adjustments to an outstanding award and authorize the termination, conversion, substitution or succession of an award; and
- allow the purchase price of an award or shares of our Common Stock to be paid in the form of cash, check or electronic funds transfer, by the delivery of previously-owned shares of our Common Stock or by a reduction of the number of shares deliverable pursuant to the award, by services rendered by the recipient of the award, by notice and third party payment or cashless exercise on such terms as the administrator may authorize or any other form permitted by law.

The number of shares of our Common Stock initially reserved for issuance with respect to awards granted under the 2022 Plan is 50,000,000. The share limit will automatically increase on the first trading day in January of

Table of Contents

each year (commencing with January 2023). Any shares subject to awards that are not paid, delivered or exercised before they expire or are canceled or terminated, fail to vest, as well as shares used to pay the purchase or exercise price of awards or related tax withholding obligations, will become available for other award grants under the 2022 Plan. As of the date of this prospectus, no awards have been granted under the 2022 Plan, and the full number of shares reserved under the 2022 Plan is available for award purposes.

Awards under the 2022 Plan may be in the form of incentive or nonqualified stock options, stock appreciation rights, stock bonuses, restricted stock, stock units and other forms of awards including cash awards. Awards under the plan generally will not be transferable other than by will or the laws of descent and distribution, except that the plan administrator may authorize certain transfers.

Nonqualified and incentive stock options may not be granted at prices below the fair market value of the common stock on the date of grant. Incentive stock options must have an exercise price that is at least equal to the fair market value of our Common Stock on the date of grant (or 110% of the fair market value of our Common Stock for incentive stock option grants to any 10% owner of our Common Stock). The maximum term of options and stock appreciation rights granted under the plan is 10 years (or five years for incentive stock option grants to any 10% owner of our Common Stock). These and other awards may also be issued solely or in part for services. Awards are generally paid in shares of our Common Stock or in cash. The plan administrator may provide for the deferred payment of awards and may determine the terms applicable to deferrals.

As is customary in incentive plans of this nature, the number and type of shares available under the 2022 Plan and any outstanding awards, as well as the exercise or purchase prices of awards, will be subject to adjustment in the event of certain reorganizations, mergers, combinations, recapitalizations, stock splits, stock dividends or other similar events that change the number or kind of shares outstanding, and extraordinary dividends or distributions of property to the stockholders. In no case (except due to an adjustment referred to above or any repricing that may be approved by our stockholders) will any adjustment be made to a stock option or stock appreciation right award under the 2022 Plan (by amendment, cancellation and regrant, exchange or other means) that would constitute a repricing of the per-share exercise or base price of the award.

Generally, and subject to limited exceptions set forth in the 2022 Plan, if we dissolve or undergo certain corporate transactions such as a merger, business combination or other reorganization, or a sale of all or substantially all of its assets, all awards then-outstanding under the 2022 Plan will become fully vested or paid, as applicable, and will terminate or be terminated in such circumstances, unless the plan administrator provides for the assumption, substitution or other continuation of the award. The plan administrator also has the discretion to establish other change in control provisions with respect to awards granted under the 2022 Plan. For example, the administrator could provide for the acceleration of vesting or payment of an award in connection with a corporate event that is not described above and provide that any such acceleration shall be automatic upon the occurrence of any such event.

Our Board will have the ability to amend or terminate the 2022 Plan at any time, but no such action will affect any outstanding award in any manner materially adverse to a participant without the consent of the participant. Plan amendments will be submitted to stockholders for their approval as required by applicable law or any applicable listing agency. The 2022 Plan will not be exclusive – our Board and Compensation Committee may grant stock and performance incentives or other compensation, in stock or cash, under other plans or authority.

The 2022 Plan terminates on the tenth anniversary date of the adoption. However, the plan administrator will retain its authority under the 2022 Plan until all outstanding awards are exercised or terminated.

**Benefits**

At this stage of our business, we provide no benefits or prerequisites for our employees other than health insurance and vacation benefits that we believe are generally comparable to those offered by other small private

Table of Contents

and public companies or as may be required by applicable state employment laws. We do not have a 401(k) retirement plan or any other retirement plan for our employees NEOs. We may adopt these plans and confer other fringe benefits for our executive officers in the future.

**Summary Compensation Table—Fiscal Year 2021**

As an emerging growth company, we have opted to comply with the executive compensation disclosure rules applicable to "smaller reporting companies," as such term is defined under the Securities Act of 1933, as amended, which require compensation disclosure for our principal executive officer and up to two other executive officers who were employed by our wholly owned subsidiary Hudspeth Operating, LLC as of December 31, 2021 (also referred to as our "named executive officers" or "NEOs"). The table below sets forth the annual compensation for services rendered during 2021 by our named executive officers.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Clifton DuBose, Jr.(2)<br>*Chief Executive Officer* | 2021 | 126,667 | — | — | — | — | — | 11,300(1) | 137,967 |
| Joseph DeWoody(2)<br>*President* | 2021 | 63,333 | — | — | — | — | — | 11,300(1) | 74,633 |
| Delvina Oelkers(2)<br>*Chief Operating Officer* | 2021 | 121,915 | — | — | — | — | — | 11,300(1) | 133,215 |

(1) The amount includes insurance reimbursements paid to Mr. DuBose, Mr. DeWoody and Ms. Oelkers.

(2) Mr. DuBose, Mr. DeWoody and Ms. Oelkers each commenced employment with one of our subsidiaries, Hudspeth Operating, LLC, on September 7, 2021 each as a general manager.

**Outstanding Equity Awards as of December 31, 2021**

As of December 31, 2021, our NEOs did not hold any outstanding equity awards with respect to our equity securities or equity securities of Meta or any of its affiliated companies.

Table of Contents

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

All of the Common Stock is currently beneficially owned by Meta. After the Spin-Off, Meta will not own any of the Common Stock. The following table provides information with respect to the expected beneficial ownership of the Common Stock after giving effect to the Spin-Off by (i) each person who we believe will be a beneficial owner of more than 5% of the outstanding Common Stock, (ii) each of our directors and our NEOs, and (iii) all directors and executive officers as a group. We based the share amounts on each person's beneficial ownership of Series A Preferred Stock as of the date hereof, unless we indicate some other basis for the share amounts, and assuming a distribution ratio of one share of our Common Stock for each share of Meta's Series A Preferred Stock.

To the extent our directors and officers own Series A Preferred Stock at the time of the Spin-Off, they will participate in the Spin-Off on the same terms as other holders of Series A Preferred Stock.

Except as otherwise noted in the footnotes below, each person or entity identified below has sole voting and investment power with respect to such securities. Following the Spin-Off, we will have outstanding an aggregate of shares of Common Stock based upon shares of Series A Preferred Stock outstanding as of the date hereof and applying the distribution ratio of one share of our Common Stock for each share of Series A Preferred Stock held as of the Record Date.

| Name of Beneficial Owner | Number of Series A Preferred Stock Beneficially Owned Before Distribution | Percentage of Series A Preferred Stock Beneficially Owned Before Distribution | Number of Common Stock Beneficially Owned After Distribution | Percentage of Common Stock Beneficially Owned After Distribution |
|---|---|---|---|---|
| ***5% or More Stockholders*** | | | | |
| Gregory McCabe<br>6015 Green Hill Ct.<br>Midland, TX 79707 | 19,605,348(1) | 11.84% | 19,605,348 | 11.84% |
| ***Directors and Executive Officers*** | | | | |
| Robert L. Cook | 300,000 | 0.18% | 300,000 | 0.18% |
| Clifton DuBose Jr. | — | — | — | — |
| Joseph DeWoody | — | — | — | — |
| Lucas T. Hawkins | — | — | — | — |
| Delvina Oelkers | — | — | — | — |
| Mia Pitts | — | — | — | — |
| Kristin Whitley | — | — | — | — |
| Kyle Bradford | — | — | — | — |
| Daren Rader | — | — | — | — |
| All officers and directors as a group (9 persons) | 300,000 | 0.18% | 300,000 | 0.18% |

(1) Represents shares of Series A Preferred Stock owned personally by Mr. McCabe and further includes 797,099 shares out of 19,605,348 shares owned by G MC Exploration, LLC, an entity that is owned 50% by Mr. McCabe.

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

With respect to the standards applied by the audit committee when deciding whether to approve a related party transaction, the audit committee shall approve or ratify the transaction if it is on terms believed to be comparable to those that could be obtained in arm's length dealings with an unrelated third party. We believe that the transactions and agreements discussed below (including renewals of any existing agreements) between us and related third parties are at least as favorable to us as could have been obtained from unrelated parties at the time they were entered into.

**Transactions with Stockholder Gregory McCabe**

On August 7, 2014, our predecessor entered into a Purchase Agreement (the "Purchase Agreement") with Hudspeth Oil Corporation ("Hudspeth"), McCabe Petroleum Corporation ("MPC"), and Gregory McCabe, Meta's former Chairman. Mr. McCabe was the sole owner of both Hudspeth and MPC. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe that was entered into as a part of the Purchase Agreement (the "Participation Agreement"). As of December 31, 2021, leases covering approximately 134,000 acres remain in effect that are subject to the Participation Agreement. As of September 30, 2022, we had a balance of $165,238 for an account receivable due from McCabe Petroleum Corporation for amounts advanced related to the Orogrande Project pursuant to the terms of the Participation Agreement.

Mr. McCabe also owns a controlling interest in Wolfbone Investments, LLC ("Wolfbone"), the owner of certain properties in the Orogrande Project. On August 6, 2018, we and Hudspeth entered into a Purchase & Settlement Agreement (the "Settlement Agreement") with Founders Oil & Gas Operating, LLC, Wolfbone and MPC, which agreement provided for Founders assigning its 50% working interest in the oil and gas leases of the Orogrande Project to Hudspeth and Wolfbone equally, with each entity receiving 25% working interest.

Under that certain Farmout Agreement, by and among Hudspeth, Pandora Energy LP, Founders Oil & Gas, LLC, MPC and Mr. McCabe dated as of September 23, 2015, as amended, future well capital spending obligations remained the same 50% contribution from Hudspeth and 50% from Wolfbone until such time as the $40.5 million to be spent on the project. Cumulative capital spending did not exceed $40.5 million until after the closing of the Arrangement. With such $40.5 MM threshold being met, Wolfbone will bear 25% of the costs of the wells being drilled in the Orogrande acreage going forward provided that Wolfbone elects to participate in drilling such wells.

Additionally, Mr. McCabe owns a controlling interest in Magdalena Royalties, LLC ("Magdalena"), an entity that holds a 4.5% overriding royalty interest in the Orogrande acreage. Magdalena's overriding royalty interest in the Orogrande acreage, which was obtained prior to, and was not a part of any of the transactions with us or subsidiaries.

Effective April 4, 2016, Torchlight Energy, Inc. ("TEI") acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. As part of that transaction, MPC, TEI, and Imperial Exploration, LLC entered into Participation Agreement effective as of May 1, 2016. MPC and another unrelated working interest owner retained a back-in after payout working interest of 25% in that same acreage, and the interest will be triggered back to MPC upon the proceeds from production equal the costs of developing the project area.

Lastly, on August 13, 2020, our subsidiaries TEI and Torchlight Hazel, LLC (collectively, "Torchlight Subs") entered into the Option Agreement with MHP and MPC. Under the Option Agreement, MHP was obligated to satisfy certain drilling obligations on the Hazel Project. Further, under the terms of the Option Agreement (which was amended in September 2020), MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. The Option Agreement provided that if MHP declined to exercise the option to acquire the property, we

Table of Contents

would be obligated to reimburse MHP for its cost of the development activity to the extent that the wells produced revenues beyond the date of the option's lapse until the total amount of development expenses are reimbursed. MHP declined to exercise the option in 2021. Additionally, MPC holds a reversionary interest burdening our proportionate interest in the Hazel Project of 20%.

For a discussion regarding prior transactions and our ongoing relationship with Mr. McCabe and certain entities controlled by Mr. McCabe with respect to the Orogrande Project and Hazel Project, please refer to Note 4 of the notes accompanying the financial statements included elsewhere in this Prospectus.

**Transactions with Meta**

Following the Spin-Off, we and Meta will operate independently, and neither will have any ownership interest in the other. In order to govern the ongoing relationship between us and Meta after the Spin-Off, we and Meta have entered into certain agreements, and under which we and Meta have agreed to indemnify each other against certain liabilities arising from our respective businesses. The following summarizes the material terms of these agreements.

***Assignment of Company Interests***

Pursuant to an Assignment of Company Interests and Stock Power dated as of June 28, 2022 between Meta and us, Meta assigned and conveyed to us one hundred percent (100%) of the equity interest of each of Torchlight Energy, Inc., Torchlight Hazel, LLC and Hudspeth Oil Corporation, such that following such assignment and conveyance, each of such entities became our wholly-owned subsidiaries.

***2021 Note***

In 2021, we entered into a note payable with Meta to borrow up to $15 million. On October 1, 2021, the Company issued the 2021 Note, which bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023, and the outstanding principal of the 2021 Note will amortize in six equal monthly installments. If an event of default has occurred and is continuing under the 2021 Note, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts the Company's ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of its assets, unless the Company is the surviving entity or the successor entity assumes all of obligations under the 2021 Note. The 2021 Note is secured by a security interest in 1,515,000 shares of common stock of Meta beneficially owned by Mr. McCabe and by a lien on Wolfbone's 25% working interest in the Orogrande Project.

***Loan Agreement***

We entered into the Loan Agreement with Meta as the lender which governs the unsecured term loans previously advanced to us on April 14, 2022, May 4, 2022, May 12, 2022, May 26, 2022, June 1, 2022, June 13, 2022, June 28, 2022, August 11, 2022 and August 29, 2022, for an aggregate principal balance outstanding of $5 million, each bearing interest at 8% per annum. For additional discussion regarding the terms of the Loan Agreement, see the discussion under the heading "Liquidity and Capital Resources" included elsewhere in this Prospectus.

***Distribution Agreement***

We have entered into a Distribution Agreement with Meta. The Distribution Agreement sets forth our agreements with Meta regarding the principal actions to be taken in connection with the Spin-Off. It also sets forth other agreements that govern aspects of our relationship with Meta following the Spin-Off.

Table of Contents

*Intercompany Arrangements*. All agreements, arrangements, commitments and understandings, including most intercompany accounts payable or accounts receivable, between us, on the one hand, and Meta, on the other hand, will terminate effective as of the Distribution, except specified agreements and arrangements that are intended to survive the Distribution.

*The Distribution*. The Distribution Agreement governs Meta's and our respective rights and obligations regarding the Distribution. Prior to the Distribution, Meta will deliver all the issued and outstanding shares of our Common Stock to the distribution agent. Following the Distribution Date, the distribution agent will distribute the shares of our Common Stock to Meta stockholders in book-entry form based on the distribution ratio and will not issue any physical stock certificates, other than upon request. The Meta Board will have the sole and absolute discretion to determine the terms of, and whether to proceed with, the Distribution.

*Settlement of Expenses.* Within 90 days after consummation of the Spin-Off, we and Meta have agreed to negotiate the settlement and agreement regarding (i) advances made to us by Meta or expenses paid by Meta on our behalf, whether before or after the Spin-Off and (ii) costs related to the Spin-Off that are to be borne by us. In addition, to the extent Meta signs or guaranties any credit applications with trade creditors on our behalf to allow us to meet our drilling obligations, any amounts drawn under such credit applications would be included in the settlement. All the above mentioned amounts owed by us to Meta are expected to become payable pursuant to a promissory note on terms to be negotiated.

*Conditions*. The Distribution Agreement provides that several conditions must be satisfied or waived by Meta in its sole and absolute discretion before the Distribution can occur. For further information about these conditions, see "The Spin-Off—Conditions to the Spin-Off." The Meta Board may, in its sole and absolute discretion, determine the Record Date and the Distribution Date and may at any time prior to the completion of the Spin-Off decide to abandon or modify the Spin-Off.

*Exchange of Information*. We and Meta have agreed to provide each other with information reasonably necessary to comply with reporting, disclosure, filing or other requirements of any national securities exchange or governmental authority, for use in judicial, regulatory, administrative and other proceedings and to satisfy audit, accounting, litigation and other similar requests. We and Meta have also agreed to use reasonable best efforts to retain such information in accordance with our respective record retention policies as in effect on the date of the Distribution Agreement. Until the end of the first full fiscal year following the Distribution, each party has also agreed to use its reasonable best efforts to assist the other with its financial reporting and audit obligations.

*Termination*. The Meta Board, in its sole and absolute discretion, may terminate the Distribution Agreement at any time prior to the Distribution.

*Release of Claims*. We and Meta have each agreed to release the other and its affiliates, successors and assigns, and all persons that prior to the Distribution have been the other's stockholders, directors, officers, members, agents and employees, and their respective heirs, executors, administrators, successors and assigns, from certain claims against any of them that arise out of or relate to events, circumstances or actions occurring or failing to occur or any conditions existing at or prior to the time of the Distribution other than certain claims against current and former directors and officers of Meta and its predecessor Torchlight.

*Indemnification*. We and Meta have each agreed to indemnify the other and each of the other's current, former and future directors, officers and employees, and each of the heirs, administrators, executors, successors and assigns of any of them, against certain liabilities incurred in connection with the Spin-Off and our and Meta's respective businesses. The Distribution Agreement also specifies procedures regarding claims subject to indemnification, including our entitlement to indemnification with respect to the matters described under "Legal Proceedings" in this Prospectus.

Table of Contents

***Tax Matters Agreement***

The Tax Matters Agreement governs Meta's and our respective rights, responsibilities and obligations with respect to taxes (including taxes arising in the ordinary course of business and taxes incurred as a result of the Spin-Off), tax attributes, tax returns, tax contests and certain other tax matters.

The Tax Matters Agreement allocates responsibility for the preparation and filing of certain tax returns (and the payment of taxes reflected thereon), including Meta's consolidated federal income tax return, tax returns associated with both the Meta business and our business, and tax returns associated with either the Meta business or our business, and provides for certain reimbursements by the parties.

Under the Tax Matters Agreement, we are liable for taxes of Meta attributable to us or our subsidiaries or arising or resulting from the Spin-Off. We will bear liability for any transfer taxes incurred on the Spin-Off.

Each of Meta and the Company agree to indemnify each other against certain taxes allocated to such party under the Tax Matters Agreement, and related out-of-pocket costs and expenses.

We encourage you to read the Tax Matters Agreement carefully.

**Related Party Transactions**

***Policy and Procedures Governing Related Person Transactions***

Our audit committee of the Board will adopt written procedures in evaluating the terms and provisions of proposed related party transactions or agreements in accordance with the Exchange Act, and the fiduciary duties of directors under Nevada law. Our related party transaction procedures will contemplate audit committee review and approval of all new agreements, transactions or courses of dealing with related parties, including any modifications, waivers or amendments to existing related party transactions. We will ensure that the terms of related party transactions are at least as favorable to us as could have been obtained from unrelated parties at the time of the transaction. The audit committee will consider, at a minimum, the nature of the relationship between us and the related party, the history of the transaction (in the case of modifications, waivers or amendments), the terms of the proposed transaction, our rationale for entering into the transaction and the terms of comparable transactions with unrelated third parties. In addition, management and internal audit will annually analyze all existing related party agreements and transactions and review them with the audit committee.

Table of Contents

## DESCRIPTION OF OUR CAPITAL STOCK

### General

Prior to the Distribution Date, Meta, as our sole stockholder, approved and adopted our Amended and Restated Articles of Incorporation, and our Board approved and adopted our Amended and Restated By-laws. The following summarizes information concerning our capital stock, including material provisions of our Amended and Restated Articles of Incorporation, our Amended and Restated By-laws and certain provisions of Nevada law. You are encouraged to read our Amended and Restated Articles of Incorporation and our Amended and Restated By-laws, which have been filed as exhibits to the Registration Statement on Form S-1, of which this Prospectus is a part, for greater detail with respect to these provisions.

The Company was incorporated on August 31, 2021, and 1 share of Common Stock was issued to Meta. Subsequent to the formation of the Company, we have not sold any securities of the Company; provided, that as of July 2022, the Company issued 165,523,362 additional shares of Common Stock to Meta, 51,122 shares of which will be cancelled contemporaneously with the Distribution.

### Authorized Capital Stock

Immediately following the Spin-Off, our authorized capital stock will consist of 500,000,000 shares of Common Stock, par value $0.0001 per share, and 50,000,000 shares of preferred stock, par value $0.0001 per share.

### Common Stock

***Shares Outstanding***. Immediately following the Spin-Off, we estimate that approximately 165.5 million shares of our Common Stock will be issued and outstanding, based on the approximate number of shares of Series A Preferred Stock outstanding as of August 30, 2022. The actual number of shares of our Common Stock outstanding immediately following the Spin-Off will depend on the actual number of shares of Series A Preferred Stock outstanding on the Record Date.

***Voting Rights***. The holders of our Common Stock will be entitled to one vote for each share held of record on all matters submitted to a vote of the stockholders. Holders of shares of our Common Stock will not have cumulative voting rights.

***Other Rights***. Subject to the preferential liquidation rights of any preferred stock that may be outstanding, upon our liquidation, dissolution or winding-up, the holders of our Common Stock will be entitled to share ratably in our assets legally available for distribution to our stockholders.

***Fully Paid***. The issued and outstanding shares of our Common Stock are fully paid and non-assessable. Any additional shares of Common Stock that we may issue in the future will also be fully paid and non-assessable.

The holders of our Common Stock will not have preemptive rights or preferential rights to subscribe for shares of our capital stock.

### Preferred Stock

Our Amended and Restated Articles of Incorporation authorize our Board to designate and issue from time to time one or more series of preferred stock without stockholder approval. If we offer a new series of preferred stock, a more specific description may be filed with the SEC, and the designations and rights of such preferred stock will be described in an accompanying prospectus supplement, including the following terms:

- the series, the number of shares offered, and the liquidation value of the preferred stock;

Table of Contents

- the price at which the preferred stock will be issued;
- the dividend rate, the dates on which the dividends will be payable, and other terms relating to the payment of dividends on the preferred stock;
- the liquidation preference of the preferred stock;
- the voting rights of the preferred stock;
- whether the preferred stock is redeemable, or subject to a sinking fund, and the terms of any such redemption or sinking fund;
- whether the preferred stock is convertible, or exchangeable for any other securities, and the terms of any such conversion or exchange; and
- any additional rights, preferences, qualifications, limitations, and restrictions of the preferred stock.

The description of the terms of the preferred stock that will be set forth in an applicable prospectus will not be complete and will be subject to and qualified in its entirety by reference to the certificate of designation relating to the applicable series of preferred stock. The registration statement, of which this prospectus forms a part, will include the certificate of designation as an exhibit or incorporate it by reference.

Undesignated preferred stock may enable our Board to render more difficult or to discourage an attempt to obtain control of us by means of a tender offer, proxy contest, merger, or otherwise and to thereby protect the continuity of our management. The issuance of shares of preferred stock may adversely affect the rights of the holders of our Common Stock. For example, any preferred stock issued may:

- rank senior to our common stock as to dividend rights, liquidation preference, or both;
- have full or limited voting rights; and
- be convertible into shares of common stock or another series of preferred stock.

The issuance of additional preferred stock could adversely affect the voting power, conversion or other rights of holders of Common Stock.

**Certain Provisions of Nevada Law**

***Combination with Interested Stockholders Statute***

Sections 78.411 to 78.444 of the Nevada Revised Statutes (N.R.S.), which apply to any Nevada corporation with more than 200 stockholders, prohibits an “interested stockholder” from entering into a “combination” with the corporation for two years, unless certain conditions are met. A “combination” includes:

- any merger of the corporation or any subsidiary of the corporation with an “interested stockholder,” or any other entity, whether or not itself an “interested stockholder,” which is, or after and as a result of the merger would be, an affiliate or associate of an “interested stockholder,”
- any sales, lease, exchange, mortgage, pledge, transfer, or other disposition in one transaction, or a series of transactions, to or with an “interested stockholder” or any affiliate or associate of an “interested stockholder,” of assets of the corporation or any subsidiary of the corporation:
  - having an aggregate market value equal to more than 5% of the aggregate market value of the corporation’s assets, determined on a consolidated basis;
  - having an aggregate market value equal to more than 5% of the aggregate market value of all of the outstanding shares of the corporation; or

Table of Contents

  - representing more than 10% of the earning power or net income, determined on a consolidated basis, of the corporation; or

- the issuance or transfer by the corporation or any subsidiary, of any shares of the corporation or any subsidiary to an "interested stockholder" or any affiliate or associate of an "interested stockholder," having an aggregate market value equal to 5% or more of the aggregate market value of all of the outstanding voting shares of the corporation, except under the exercise of warrants or rights to purchase shares offered, or a dividend or distribution paid or made, pro rata to all stockholders of the resident domestic corporation;

- the adoption of any plan, or proposal for the liquidation or dissolution of the corporation, under any agreement, arrangement or understanding, with the "interested stockholder." or any affiliate or associated of the "interested stockholder;"

- if any of the following actions occurs:

  - a reclassification of the corporation's securities, including, without limitation, any splitting of shares, share dividend, or other distribution of shares with respect to other shares, or any issuance of new shares in exchange for a proportionately greater number of old shares;

  - recapitalization of the corporation;

  - merger of consolidation of the corporation with any subsidiary; or

  - any other transaction, whether or not with or into or otherwise involving the interested stockholder, under any agreement, arrangement or understanding, whether or not in writing, with the interested stockholder or any affiliate or associate of the interested stockholder, which has the immediate and proximate effect of increasing the proportionate share of the outstanding shares of any class or series of voting shares or securities convertible into voting shares of the corporation or any subsidiary of the corporation which is beneficially owned by the interested stockholder or any affiliate or associate of the interested stockholder;

- any receipt by an "interested stockholder" or any affiliate or associate of an "interested stockholder" except proportionately as a stockholder of the corporation, of the benefit of any loan, advance, guarantee, pledge or other financial assistance or any tax credit or other tax advantage provided by or through the corporation

An "interested stockholder" is a person who is:

- directly or indirectly, the beneficial owner of 10% or more of the voting power of the outstanding voting shares of the corporation; or

- an affiliate or associate of the corporation, which at any time within two years immediately before the date in question was the beneficial owner, directly or indirectly, of 10% or more of the voting power of the then outstanding shares of the corporation.

A corporation to which the Combinations with Interested Stockholders Statute applies may not engage in a "combination" within two years after the interested stockholder first became an interested stockholder, unless the combination meets all of the requirements of the corporation's articles of incorporation and (i) the combination or the transaction by which the person first became an interested stockholder is approved by the board of directors before the person first became an interested stockholder, or (ii)(a) the combination is approved by the board of directors and (b) at or after that time, the combination is approved at an annual or special meeting of the stockholders, and not by written consent, by the affirmative vote of the stockholders representing at least sixty percent (60%) of the outstanding voting power of the corporation not beneficially owned by the interested stockholder or the affiliates or associates of the interested stockholder. If this approval is not obtained, the combination may be consummated after the two year period expires if either (i)(a) the combination or transaction

Table of Contents

by which the person first became an interested stockholder is approved by the board of directors before such person first became an interested stockholder, (b) the combination is approved by a majority of the outstanding voting power of the corporation not beneficially owned by the interested stockholder or any affiliate or associate of the interested stockholder, or (c) the combination otherwise meets the requirements of the Combination with Interested Stockholders Statute. Alternatively, a combination with an interested stockholder engaged in more than 2 years after the date the person first became an interested stockholder may be permissible if the aggregate amount of cash and the market value of consideration other than cash to be received by holders of shares of common stock and holders of any other class or series of shares meets the minimum requirements set forth in the statue, and prior to the completion of the combination, except in limited circumstances, the interested stockholder has not become the beneficial owner of additional voting shares of the corporation.

***Acquisition of Controlling Interest Statute***

In addition, Nevada's "Acquisition of Controlling Interest Statute," prohibits an acquiror, under certain circumstances, from voting shares of a target corporation's stock after crossing certain threshold ownership percentages, unless the acquiror obtains the approval of the target corporation's stockholders. Sections 78.378 to 78.3793 of the N.R.S. only apply to Nevada corporations with at least 200 stockholders, including at least 100 record stockholders who are Nevada residents, that do business directly or through an affiliated corporation in Nevada and whose articles of incorporation or bylaws in effect 10 days following the acquisition of a controlling interest by an acquiror do not prohibit its application.

We do not intend to "do business" in Nevada within the meaning of the Acquisition of Controlling Interest Statute. Therefore, we believe it is unlikely that this statute will apply to us. The statute specifies three thresholds:

- at least one-fifth but less than one-third;
- at least one-third but less than a majority; and
- a majority or more, of the outstanding voting power. Once an acquiror crosses one of these thresholds, shares which it acquired in the transaction taking it over the threshold (or within ninety days preceding the date thereof) become "control shares" which could be deprived of the right to vote until a majority of the disinterested stockholders restore that right.

A special stockholders' meeting may be called at the request of the acquiror to consider the voting rights of the acquiror's shares. If the acquiror requests a special meeting and gives an undertaking to pay the expenses of said meeting, then the meeting must take place no earlier than 30 days (unless the acquiror requests that the meeting be held sooner) and no more than 50 days (unless the acquiror agrees to a later date) after the delivery by the acquiror to the corporation of an information statement which sets forth the range of voting power that the acquiror has acquired or proposes to acquire and certain other information concerning the acquiror and the proposed control share acquisition.

If no such request for a stockholders' meeting is made, consideration of the voting rights of the acquiror's shares must be taken at the next special or annual stockholders' meeting. If the stockholders fail to restore voting rights to the acquiror, or if the acquiror fails to timely deliver an information statement to the corporation, then the corporation may, if so provided in its articles of incorporation or bylaws in effect on the tenth day following the acquisition, call certain of the acquiror's shares for redemption at the average price paid for such shares by the acquiror.

Our restated articles of incorporation and amended and restated bylaws do not currently permit us to redeem an acquiror's shares under these circumstances, but could be amended to so provide within ten days following the acquisition. The Acquisition of Controlling Interest Statute also provides that in the event the stockholders restore full voting rights to a holder of control shares that owns a majority of the voting stock, then, unless the

Table of Contents

corporation's articles of incorporation or bylaws in effect on the tenth day following the acquisition otherwise provide, all other stockholders who do not vote in favor of restoring voting rights to the control shares may demand payment for the "fair value" of their shares as determined by a court in dissenters rights proceeding pursuant to Chapter 92A of the N.R.S.

### *Limitations of Liability and Indemnification Matters*

Our Amended and Restated Articles of Incorporation contain provisions that limit the liability of our current and former directors for monetary damages to the fullest extent permitted by Nevada law. Nevada law provides that directors of a corporation will not be personally liable for monetary damages for any breach of fiduciary duties as directors, unless the presumption that the directors have acted in good faith, on an informed basis, and with a view to the interests of the corporation has been rebutted, in which case directors may be liable for damages resulting from intentional misconduct, fraud or a knowing violation of law. To the extent that indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling our company pursuant to the foregoing provisions, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. If a claim for indemnification against such liabilities (other than the payment by us of expenses incurred or paid by a director, officer or controlling person of our company in the successful defense of any action, suit or proceeding) is asserted by any of our directors, officers or controlling persons in connection with the securities being registered, we will, unless in the opinion of our counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by us is against public policy as expressed in the Securities Act and will be governed by the final adjudication of that issue.

### Transfer Agent and Registrar

The transfer agent and registrar for the Common Stock is American Stock Transfer & Trust Company LLC.

### No Listing

Our Common Stock is not listed on any securities exchange and will not be eligible for electronic trading through DTC or any other established clearing corporation.

## LEGAL MATTERS

Certain legal matters in connection with the distribution of our Common Stock in the Spin-Off described in this Prospectus will be passed upon for us by O'Melveny & Myers, LLP, Dallas, Texas, and by Woodburn and Wedge, Reno, Nevada, with respect to matters of Nevada law.

## EXPERTS

The consolidated financial statements of Next Bridge Hydrocarbons, Inc. as of December 31, 2021 and 2020, and for each of the fiscal years then ended, appearing in this Prospectus, have been audited by BF Borgers, CPA, an independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such reports given on the authority of such firm as experts in accounting and auditing.

Estimates of the oil and gas reserves of the Company and related future net cash flows and the present values were based upon reserve reports prepared by PeTech Enterprises, Inc. have been included in this Prospectus. We have included these estimates in reliance on the authority of such firm as an expert in such matters.

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act to register the shares of our Common Stock to be distributed in the Spin-Off. The term registration statement means the original registration statement and any and all amendments thereto, including the exhibits and schedules to the original registration statement and any amendments. This Prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement or the exhibits and schedules filed therewith. For further information with respect to us, reference is made to the registration statement and the exhibits and schedules filed therewith. Statements contained in this Prospectus regarding the contents of any contract or any other document that is filed as an exhibit to the registration statement are not necessarily complete, and each such statement is qualified in all respects by reference to the full text of such contract or other document filed as an exhibit to the registration statement. A copy of the registration statement, along with the exhibits and schedules filed therewith, may be inspected without charge at the SEC's website. The SEC maintains an internet website at www.sec.gov that contains reports, proxy and information statements and other information regarding registrants that file electronically with the SEC.

**The information contained on or accessible through our website shall not be deemed to be a part of this Prospectus or the registration statement on Form S-1, of which this Prospectus is a part.**

You may request a copy of any of our filings with the SEC at no cost by writing us at the following address:

Investor Relations
Next Bridge Hydrocarbons, Inc.
6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116

We have not authorized anyone to give any information or make any representation about the Spin-Off or of the Company that is different from, or in addition to, that contained in this Prospectus. Therefore, if anyone does give you information of this sort, you should not rely on it. If you are in a jurisdiction where offers to sell, or solicitations of offers to purchase, the securities offered by this Prospectus or the solicitation of proxies is unlawful, or if you are a person to whom it is unlawful to direct these types of activities, then the offer presented in this Prospectus does not extend to you. The information contained in this Prospectus speaks only as of the date of this Prospectus unless the information specifically indicates that another date applies.

Table of Contents

## INDEX TO FINANCIAL STATEMENTS


| | PAGE |
|---|---|
| **Consolidated Financial Statements (audited)** | |
| Report of Independent Registered Public Accounting Firm | F-1 |
| Consolidated Balance Sheets as of December 31, 2021 and 2020 | F-2 |
| Consolidated Statements of Operations for the years ended December 31, 2021 and 2020 | F-3 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2021 and 2020 | F-4 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2021 and 2020 | F-5 |
| **Notes to Consolidated Financial Statements** | F-6 |
| **Condensed Consolidated Financial Statements (unaudited)** | |
| Consolidated Balance Sheets as of September 30, 2022 and December 31, 2021 | F-21 |
| Consolidated Statements of Operations for the three and nine months ended September 30, 2022 and 2021 | F-22 |
| Consolidated Statements of Stockholders' Equity for the three and nine months ended September 30, 2022 and 2021 | F-24 |
| Consolidated Statements of Cash Flows for the nine months ended September 30, 2022 and 2021 | F-26 |
| **Notes to Unaudited Condensed Consolidated Financial Statements** | F-27 |
| **Pro Forma Combined Financial Statements (unaudited)** | |
| Combined Statements of Operations for the year ended December 31, 2021 | F-44 |
| Combined Statements of Operations for the nine months ended September 30, 2022 | F-45 |
| Combined Balance Sheets as of September 30, 2022 | F-46 |
| **Notes to Unaudited Pro Forma Combined Financial Statements** | F-47 |

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the shareholders and the board of directors of Next Bridge Hydrocarbons, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Next Bridge Hydrocarbons, Inc. as of December 31, 2021 and 2020, the related statements of operations, stockholders' equity (deficit), and cash flows for the years then ended, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States.

**Substantial Doubt about the Company's Ability to Continue as a Going Concern**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the financial statements, the Company has suffered recurring losses from operations and has a significant accumulated deficit. In addition, the Company continues to experience negative cash flows from operations. These factors raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

/S/ BF Borgers CPA PC
**BF Borgers CPA PC**
PCAOB ID: 5041
We have served as the Company's auditor since 2022
Lakewood, CO
July 15, 2022

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Consolidated Balance Sheets**

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash | $ 1,989,419 | $ 130,504 |
| Accounts receivable, related party | 163,366 | 69,056 |
| Grants and other receivables | 74,310 | 161,064 |
| Prepaid expenses | 2,667 | 103,672 |
| Total current assets | 2,229,762 | 464,296 |
| Oil and natural gas properties, net | 45,663,470 | 30,857,959 |
| Property and equipment | — | 4,549 |
| Other assets | 25,000 | — |
| TOTAL ASSETS | $ 47,918,232 | $ 31,326,804 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 2,828,326 | $ 708,260 |
| Accrued liabilities | — | 1,213,779 |
| Notes payable, related party | 12,708,889 | — |
| Total current liabilities | 15,537,215 | 1,922,039 |
| Asset retirement obligations | 21,937 | 21,844 |
| Total liabilities | 15,559,152 | 1,943,883 |
| Commitments and contingencies | | |
| Stockholder's equity: | | |
| Preferred stock, par value $0.0001; 25,000,000 shares authorized; 0 issued and outstanding | | |
| Common stock, par value $0.0001; 250,000,000 shares authorized; 1 issued and outstanding | — | — |
| Additional paid-in capital | 100,546,596 | 89,331,629 |
| Accumulated deficit | (68,187,516) | (59,948,708) |
| Total stockholder's equity | 32,359,080 | 29,382,921 |
| TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY | $ 47,918,232 | $ 31,326,804 |

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Consolidated Statements of Operations**
**For the Years Ended December 31, 2021 and 2020**

| | 2021 | 2020 |
|---|---|---|
| Oil sales | $ 4,675 | $ 4,484 |
| Natural gas sales | 11,229 | 2,422 |
| **Revenue** | **15,904** | **6,906** |
| **Operating expenses** | | |
| Lease operating expenses | 75,330 | 86,988 |
| Production and ad valorem tax | 1,001 | 498 |
| General and administrative | 8,050,443 | 2,557,975 |
| Depreciation, depletion and amortization | 4,642 | 820,814 |
| Impairment | — | 2,108,301 |
| Total operating expenses | 8,131,416 | 5,574,576 |
| **Other income (expense)** | | |
| Interest expense | (212,201) | (11,121) |
| Gain (loss) on sale of assets | 1,000 | (170,215) |
| Gain on extinguishment of debt | 77,477 | — |
| Interest income | 10,428 | — |
| Total other income (expense)—net | (123,296) | (181,336) |
| **Loss before income taxes** | (8,238,808) | (5,749,006) |
| Provision for income tax | — | — |
| **Net loss** | **$ (8,238,808)** | **$ (5,749,006)** |

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Consolidated Statements of Stockholders' Equity**
**For the Years Ended December 31, 2021 and 2020**

| | Common stock shares | Common stock amount | Additional paid-in capital | Accumulated deficit | Total |
|---|---|---|---|---|---|
| **Balance, December 31, 2019** | 1 | $ — | $ 88,203,178 | $ (54,199,702) | $ 34,003,476 |
| Contributions from parent | — | — | 1,128,451 | — | 1,128,451 |
| Net loss | — | — | — | (5,749,006) | (5,749,006) |
| **Balance, December 31, 2020** | 1 | $ — | $ 89,331,629 | $ (59,948,708) | $ 29,382,921 |
| Contributions from parent | — | — | 11,214,967 | — | 11,214,967 |
| Net loss | — | — | — | (8,238,808) | (8,238,808) |
| **Balance, December 31, 2021** | 1 | $ — | $ 100,546,596 | $ (68,187,516) | $ 32,359,080 |

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Consolidated Statements of Cash Flows**
**For the Years Ended December 31, 2021 and 2020**

| | 2021 | 2020 |
|---|---|---|
| **Cash Flows From Operating Activities** | | |
| Net loss | $ (8,238,808) | $ (5,749,006) |
| Adjustments to reconcile net loss to net cash from operations: | | |
| Depreciation, depletion and amortization | 4,642 | 820,814 |
| Impairment loss | — | 2,108,301 |
| Paid in kind interest | 208,889 | — |
| Change in: | | |
| Accounts receivable, related party | (94,310) | (27,684) |
| Grants and other receivables | 86,754 | — |
| Prepaid expenses | 101,005 | (7,666) |
| Accounts payable | 2,120,066 | (617,952) |
| Accrued liabilities | (1,213,779) | 172,603 |
| Other assets | (25,000) | — |
| **Net cash from operating activities** | (7,050,541) | (3,300,590) |
| **Cash Flows From Investing Activities** | | |
| Investment in oil and natural gas properties | (14,805,511) | (236,807) |
| Proceeds from sale of oil and natural gas properties | — | 2,508,775 |
| **Net cash from investing activities** | (14,805,511) | 2,271,968 |
| **Cash Flows From Financing Activities** | | |
| Contributions from parent | 11,214,967 | 1,128,451 |
| Proceeds from notes payable, related party | 12,500,000 | — |
| **Net cash from financing activities** | 23,714,967 | 1,128,451 |
| **Net increase in cash** | 1,858,915 | 99,829 |
| **Cash—beginning of year** | 130,504 | 30,675 |
| **Cash—end of year** | $ 1,989,419 | $ 130,504 |
| **Supplemental disclosure of cash flow information: (Non Cash Items)** | | |
| Cash paid for interest | $ — | $ — |
| Cash paid for state franchise tax | $ — | $ — |

Table of Contents

NEXT BRIDGE HYDROCARBONS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 1. NATURE OF BUSINESS

Next Bridge Hydrocarbons, Inc., formerly OilCo Holdings, Inc., (the "Company", "we", "our") was incorporated in August 2021 under the laws of the State of Nevada. We are engaged in the acquisition, exploration and development of oil and natural gas properties in the United States. We operate our business through our subsidiaries Torchlight Energy Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC.

Prior to the formation of Next Bridge Hydrocarbons, Inc. (formerly named OilCo Holdings, Inc.), our subsidiaries were consolidated into the financial statements of our parent, Meta Materials Inc. (formerly named Torchlight Energy Resources, Inc. ("TERI")). All intercompany transactions have been eliminated in the consolidated financial statements of Meta Materials, Inc.

On June 29, 2021, TERI acquired Metamaterial Inc., an Ontario corporation, and changed its name to Meta Materials, Inc. (with Metamaterial Inc. being the accounting acquiror).

## 2. GOING CONCERN

At December 31, 2021, the Company had not yet achieved profitable operations. We had a net loss of $8,238,808 for the year ended December 31, 2021. We expect to incur further losses in the development of our business. The Company had a working capital deficit as of December 31, 2021 of $13,307,453. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

The Company's ability to continue as a going concern is dependent on its ability to generate future profitable operations and/or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due. Management's plan to address the Company's ability to continue as a going concern includes: (1) obtaining debt or equity funding from private placement, institutional, or public sources; (2) obtain loans from financial institutions, where possible; or (3) participating in joint venture transactions with third parties. Although management believes that it will be able to obtain the necessary funding to allow the Company to remain a going concern through the methods discussed above, there can be no assurances that such methods will prove successful.

These consolidated financial statements have been prepared assuming that the Company will continue as a going concern and therefore, the financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amount and classifications of liabilities that may result from the outcome of this uncertainty.

## 3. SIGNIFICANT ACCOUNTING POLICIES

The Company maintains its accounts on the accrual method of accounting in accordance with accounting principles generally accepted in the United States of America. Accounting principles followed and the methods of applying those principles, which materially affect the determination of financial position, results of operations and cash flows are summarized below:

***Use of estimates***—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and certain assumptions that affect the amounts reported in these consolidated financial statements and accompanying notes. Actual results could differ from these estimates.

***Basis of presentation***—The financial statements are presented on a consolidated basis and include all of the accounts of the Company and its wholly owned subsidiaries, Torchlight Energy, Inc., Hudspeth Operating, LLC,

Table of Contents

Hudspeth Oil Corporation, and Torchlight Hazel LLC. All significant intercompany balances and transactions have been eliminated between the Company and its subsidiaries.

***Risks and uncertainties***—The Company's operations are subject to significant risks and uncertainties, including financial, operational, technological, and other risks associated with operating an emerging business, including the potential risk of business failure.

In January 2020, the World Health Organization ("WHO") announced a global health emergency because of a new strain of coronavirus ("COVID-19") and the significant risks to the international community and economies as the virus spreads globally beyond its point of origin. In March 2020, the WHO classified COVID-19 as a pandemic, based on the rapid increase in exposure globally, and thereafter, COVID-19 continued to spread throughout the U.S. and worldwide. In addition, actions taken by OPEC members and other exporting nations on the supply and demand in global oil and natural gas markets resulted in significant negative pricing pressure in the first half of 2020, followed by a recovery in pricing and an increase in demand in the second half of 2020 and into 2021. However, multiple variants emerged in 2021 and became highly transmissible, which contributed to additional pricing volatility during 2021 and into 2022. The financial results of companies in the oil and natural gas industry have been impacted materially as a result of changing market conditions. Such circumstances generally increase uncertainty in the Company's accounting estimates. Although demand and market prices for oil and natural gas have increased, due to the rising energy use and the improvement in U.S. economic activity, we cannot predict events that may lead to future price volatility and the near term energy outlook remains subject to heightened levels of uncertainty.

We are continuing to closely monitor the overall impact and the evolution of the COVID-19 pandemic, including the ongoing spread of any variants, along with future OPEC actions on all aspects of our business, including how these events may impact our future operations, financial results, liquidity, employees, and operators. Additional actions may be required in response to the COVID-19 pandemic on a national, state, and local level by governmental authorities, and such actions may further adversely affect general and local economic conditions, particularly if the 2021 resurgence and spread of the COVID-19 pandemic continues. We cannot predict the long-term impact of these events on our liquidity, financial position, results of operations or cash flows due to uncertainties including the severity of COVID-19 or any of the ongoing variants, and the effect the virus will have on the demand for oil and natural gas. These situations remain fluid and unpredictable, and we are actively managing our response.

***Concentration of risks***—At times the Company's cash balances are in excess of amounts guaranteed by the Federal Deposit Insurance Corporation. The Company's cash is placed with a highly rated financial institution, and the Company regularly monitors the credit worthiness of the financial institutions with which it does business.

***Fair value of financial instruments***—Financial instruments consist of cash, receivables, convertible note receivable, payables and promissory notes, if any. The estimated fair values of cash, receivables, and payables approximate the carrying amount due to the relatively short maturity of these instruments. The carrying amounts of any promissory notes approximate their fair value giving affect for the term of the note and the effective interest rates.

For assets and liabilities that require re-measurement to fair value the Company categorizes them in a three-level fair value hierarchy as follows:

- Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities.
- Level 2 inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration.
- Level 3 inputs are unobservable inputs based on management's own assumptions used to measure assets and liabilities at fair value.

Table of Contents

A financial asset or liability's classification within the hierarchy is determined based on the lowest level input that is significant to the fair value measurement.

***Cash and cash equivalents***—Cash and cash equivalents include certain investments in highly liquid instruments with original maturities of three months or less.

***Accounts receivable***—Accounts receivable consist of uncollateralized oil and natural gas revenues due under normal trade terms, as well as amounts due from working interest owners of oil and natural gas properties for their share of expenses paid on their behalf by the Company. Management reviews receivables periodically and reduces the carrying amount by a valuation allowance that reflects management's best estimate of the amount that may not be collectible. As of December 31, 2021 and 2020, no valuation allowance was considered necessary. Bad debt expense for the years ended December 31, 2021 and 2020 was $0 and $15,606, respectively.

***Oil and natural gas properties***—The Company uses the full cost method of accounting for exploration and development activities as defined by the Securities and Exchange Commission ("SEC"). Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least quarterly and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions.

Gains and losses on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and natural gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

***Capitalized interest—***The Company capitalizes interest on unevaluated properties during the periods in which they are excluded from costs being depleted or amortized. During the years ended December 31, 2021 and 2020, the Company capitalized $141,048, and $2,353,700 respectively, of interest on unevaluated properties.

***Depreciation, depletion, and amortization***—The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

***Ceiling test***—Future production volumes from oil and natural gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and natural gas properties. If the net capitalized cost of proved oil and natural gas properties, net of related deferred income taxes, plus the cost of unproved oil and natural gas properties, exceeds the present value of estimated future net cash flows discounted at ten percent, net of related realizable tax affects, plus the cost of unproved oil

Table of Contents

and natural gas properties, the excess is charged to expense and reflected as additional accumulated DD&A. The Company recorded an impairment expense of $-0- and $2,108,301 for the years ended December 31, 2021 and 2020, respectively, to recognize the adjustment required by the ceiling test.

The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and natural gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and natural gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

***Asset retirement obligations***—The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and natural gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

***Income taxes***—Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is established to reduce deferred tax assets if it is more likely than not that the related tax benefits will not be realized.

Authoritative guidance for uncertainty in income taxes requires that the Company recognize the financial statement benefit of a tax position only after determining that the relevant tax authority would more likely than not sustain the position following an examination. Management has reviewed the Company's tax positions and determined there were no uncertain tax positions requiring recognition in the consolidated financial statements. Company tax returns remain subject to Federal and State tax examinations. Generally, the applicable statutes of limitation are three to four years from their respective filings.

Estimated interest and penalties related to potential underpayment on any unrecognized tax benefits are classified as a component of tax expense in the statements of operation. The Company has not recorded any interest or penalties associated with unrecognized tax benefits for any periods covered by these financial statements.

***Revenue recognition***—The Company's revenue is typically generated from contracts to sell natural gas, crude oil or NGLs produced from interests in oil and natural gas properties owned by the Company. Contracts for the sale

Table of Contents

of natural gas and crude oil are evidenced by (1) base contracts for the sale and purchase of natural gas or crude oil, which document the general terms and conditions for the sale, and (2) transaction confirmations, which document the terms of each specific sale. The transaction confirmations specify a delivery point which represents the point at which control of the product is transferred to the customer. The Company elects to treat contracts to sell oil and natural gas production as normal sales, which are then accounted for as contracts with customers. The Company has determined that these contracts represent multiple performance obligations which are satisfied when control of the commodity transfers to the customer, typically through the delivery of the specified commodity to a designated delivery point.

Revenue is measured based on considerations specified in the contract with the customer, and excludes any amounts collected on behalf of third parties. The Company recognizes revenue in the amount that reflects the consideration it expects to be entitled to in exchange for transferring control of those goods to the customer. Amounts allocated in the Company's price contracts are based on the standalone selling price of those products in the context of long-term contracts. Payment is generally received one or two months after the sale has occurred.

Gain or loss on derivative instruments is outside the scope of ASC 606 and is not considered revenue from contracts with customers subject to ASC 606. The Company may in the future use financial or physical contracts accounted for as derivatives as economic hedges to manage price risk associated with normal sales, or in limited cases may use them for contracts the Company intends to physically settle but do not meet all of the criteria to be treated as normal sales.

*Producer Gas Imbalances.* The Company applies the sales method of accounting for natural gas revenue. Under this method, revenues are recognized based on the actual volume of natural gas sold to purchasers.

***Environmental laws and regulations***—The Company is subject to extensive federal, state, and local environmental laws and regulations. Environmental expenditures are expensed or capitalized depending on their future economic benefit. The Company believes that it is in compliance with existing laws and regulations. The Company accrued no liability as of December 31, 2021 and 2020.

***Recently adopted accounting pronouncements—***

Effective January 1, 2021, we adopted ASU 2019-12 on a prospective basis. The new standard was issued in December 2019 with the intent of simplifying the accounting for income taxes. The accounting update removes certain exceptions to the general principles in ASC 740 Income Taxes as well as provides simplification by clarifying and amending existing guidance. The adoption of this ASU did not have a material impact on our consolidated financial statements.

In October 2020, the FASB issued ASU 2020-09, Debt- Debt (Topic 470): Amendments to SEC Paragraphs Pursuant to SEC Release No. 33-10762 ("ASU 2020-09"). The amendments in ASU 2020-09 amend rules focused on the provision of material, relevant, and decision-useful information regarding guarantees and other credit enhancements, and eliminate prescriptive requirements that have imposed unnecessary burdens and incentivized issuers of securities with guarantees and other credit enhancements to offer and sell those securities on an unregistered basis. The adopted amendments relate to the financial disclosure requirements for guarantors and issuers of guaranteed securities registered or being registered in Rule 3-10 of Regulation S-X, and affiliates whose securities collateralize securities registered or being registered in Rule 3-16 of Regulation S-X. The amendments in ASU 2020-09 are effective for public business entities for annual periods beginning after December 15, 2020. The Company has evaluated the provisions of ASU 2020-09 and noted no material impact to our consolidated financial statements or disclosures from the adoption of this ASU.

In October 2020, the FASB issued ASU 2020-10, Codification Improvements, which updated various codification topics by clarifying or improving disclosure requirements to align with the SEC's regulations. The

Table of Contents

amendments in ASU 2020-10 are effective for annual periods beginning after December 15, 2020, for public business entities. The Company adopted ASU 2020-10 on January 1, 2021 and its adoption did not have a material effect on the Company's financial statements and related disclosures.

***Recent accounting pronouncements not yet adopted—***

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which adds a new Topic 326 to the Codification and removes the thresholds that companies apply to measure credit losses on financial instruments measured at amortized cost, such as loans, receivables, and held-to-maturity debt securities. Under current GAAP, companies generally recognize credit losses when it is probable that the loss has been incurred. The revised guidance will remove all recognition thresholds and will require companies to recognize an allowance for credit losses for the difference between the amortized cost basis of a financial instrument and the amount of amortized cost that the company expects to collect over the instrument's contractual life. ASU 2016-13 also amends the credit loss measurement guidance for available-for sale debt securities and beneficial interests in securitized financial assets. The guidance is applicable for fiscal years beginning after December 15, 2019 and interim periods within those years, however, the FASB extended the effective date for smaller reporting companies to fiscal years beginning after December 15, 2022. The Company is currently evaluating the potential impact of the adoption of this standard on its related disclosures.

Other recently issued or adopted accounting pronouncements are not expected to have, or did not have, a material impact on the Company's financial position or results from operations.

**4. OIL & NATURAL GAS PROPERTIES**

The following table presents the capitalized costs for oil & natural gas properties of the Company:

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Evaluated costs subject to amortization | $ — | $ 15,656,182 |
| Unevaluated costs | 45,663,470 | 29,794,015 |
| Total capitalized costs | 45,663,470 | 45,450,197 |
| Less accumulated depreciation, depletion and amortization | — | (15,656,182) |
| Total oil and natural gas properties | $ 45,663,470 | $ 30,857,959 |

Unevaluated costs as of December 31, 2021 and 2020 include cumulative costs on developing projects including the Orogrande and Hazel Projects in West Texas.

The Company periodically adjusts for the separation of evaluated versus unevaluated costs within its full cost pool to recognize the value impairment related to the expiration of, or changes in market value, of unevaluated leases. The impact of reclassifications as they become necessary is to increase the basis for calculation of future period's depletion, depreciation and amortization which effectively recognizes the impairment on the consolidated statement of operations over future periods. Reclassified costs also become evaluated costs for purposes of ceiling tests and which may cause recognition of increased impairment expense in future periods. The remaining cumulative unevaluated costs which have been reclassified within our full cost pool totals $0 as of December 31, 2021. As of December 31, 2021, evaluated costs are $-0- since we have no proved reserve value associated with our properties.

Due to the volatility of commodity prices, should oil and natural gas prices decline in the future, it is possible that a further write-down could occur. Proved reserves are estimated quantities of crude oil, natural gas, and natural gas liquids, which geological and engineering data demonstrate with reasonable certainty to be recoverable from

Table of Contents

known reservoirs under existing economic and operating conditions. The independent engineering estimates include only those amounts considered to be proved reserves and do not include additional amounts which may result from new discoveries in the future, or from application of secondary and tertiary recovery processes where facilities are not in place or for which transportation and/or marketing contracts are not in place. Estimated reserves to be developed through secondary or tertiary recovery processes are classified as unevaluated properties.

**Current Projects**

We are an energy company engaged in the acquisition, exploration, exploitation and development of oil and natural gas properties in the United States. We are primarily focused on the acquisition of early stage projects, the development and delineation of these projects, and then the monetization of those assets once these activities are completed.

Since 2010, our primary focus has been the development of interests in oil and natural gas projects we hold in the Permian Basin in West Texas. We also hold minor interests in certain other oil and natural gas projects in Central Oklahoma that we are in the process of divesting.

As of December 31, 2021, we had interests in three oil and gas projects: the Orogrande Project in Hudspeth County, Texas, the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, and two wells in Central Oklahoma.

Orogrande Project, West Texas

On August 7, 2014, our predecessor entered into a Purchase Agreement with Hudspeth Oil Corporation ("Hudspeth"), McCabe Petroleum Corporation ("MPC"), and Gregory McCabe, Meta's former Chairman. Mr. McCabe was the sole owner of both Hudspeth and MPC. Under the terms and conditions of the Purchase Agreement, our predecessor acquired 100% of the capital stock of Hudspeth which held certain oil and natural gas assets, including a 100% working interest in approximately 172,000 predominately contiguous acres in the Orogrande Basin in West Texas. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe. Mr. McCabe also holds a 4.5% overriding royalty interest in the Orogrande acreage, which he obtained prior to, and was not a part of the August 2014 transaction. As of December 31, 2021, leases covering approximately 134,000 acres remain in effect.

Effective March 27, 2017, the property became subject to a DDU Agreement which allows for all 192 existing leases covering approximately 134,000 net acres leased from University Lands to be combined into one drilling and development unit for development purposes. The term of the DDU Agreement expires on December 31, 2023, and the time to drill on the drilling and development unit continues through December 2023. The DDU Agreement also grants the right to extend the DDU Agreement through December 2028 if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid.

Our drilling obligations include five wells per year in years 2021, 2022 and 2023. The drilling obligations are minimum yearly requirements and may be exceeded if acceleration is desired.

We believe all drilling obligations through December 31, 2021 have been met.

On July 25, 2018, we and Hudspeth entered into a Settlement & Purchase Agreement (the "Settlement Agreement") with University Founders (and Founders Oil & Gas Operating, LLC, former Operator), Wolfbone Investments, LLC ("Wolfbone") and MPC (entities controlled by a related party), which agreement provided for Founders assigning all of its working interest in the oil and gas leases of the Orogrande Project to Hudspeth and Wolfbone equally. Future well capital spending obligations remained the same 50% contribution from Hudspeth

Table of Contents

and 50% from Wolfbone until such time as the $40.5 million to be spent on the project. Cumulative capital spending did not exceed $40.5 million until after the closing of the Arrangement.

The Company has drilled fourteen test wells in the Orogrande Project properties in order to stay in compliance with University Lands D&D Unit Agreement, as well as, to test for potential shallow pay zones and deeper pay zones that may be present on structural plays. Development of the wells continued through the year ended December 31, 2021 to further capture and document the scientific base in support of demonstrating the production potential of the property.

On March 9, 2020, holders of certain notes payable by the Company entered into a Conversion Agreement under which the noteholders elected to convert principal of $6,000,000 and approximately $1,331,000 of accrued interest on the notes, in accordance with their terms, into an aggregate 6% working interest (of all such holders) in the Orogrande Project.

Following the Spin-Off, the Company intends to make offers and enter into agreements with one or more of the other current working interest owners in the Orogrande Project (each an “Orogrande Owner” and collectively, the “Orogrande Owners”). The Company anticipates offering the Orogrande Owners shares of Common Stock in exchange for their respective working interest in the Orogrande Project. The Company intends to offer the number of shares of Common Stock necessary such that each participating Orogrande Owner would own the percentage of Common Stock then outstanding in proportion to the percentage owned in the working interest of the Orogrande Project. For illustration purposes, if an Orogrande Owner owns ten percent (10%) of the working interest of the Orogrande Project, and such Orogrande Owner elects to participate and accept our offer of shares of Common Stock, then such Orogrande Owner will be offered ten percent (10%) of the aggregate amount of outstanding shares of Common Stock. The Company’s decision to enter into these transactions will depend on ability of the Company and each Orogrande Owner to negotiate and enter into definitive agreements related to such transaction and the Company’s board of directors receiving an industry-standard fairness opinion from an investment banking firm. One of the Orogrande Owners is Wolfbone Investments LLC, an entity controlled by Gregory McCabe, who will own, directly and indirectly through entities he owns or controls, over 11% of the Common Stock following the Spin-Off, which would increase if the proportionate exchange of working interest for shares of our Common Stock is consummated.

The Orogrande Project ownership as of December 31, 2021 is detailed as follows:

| | Revenue Interest | Working Interest |
|---|---|---|
| University Lands—Mineral Owner | 20.000% | n/a |
| ORRI—Magdalena Royalties, LLC, an entity controlled by Gregory McCabe, Meta’s former Chairman | 4.500% | n/a |
| ORRI—Unrelated Party | 0.500% | n/a |
| Hudspeth Oil Corporation, a subsidiary of Torchlight Energy Resources Inc. | 49.875% | 66.500% |
| Wolfbone Investments LLC, an entity controlled by Gregory McCabe, Meta’s former Chairman | 18.750% | 25.000% |
| Conversion by Note Holders in March, 2020 | 4.500% | 6.000% |
| Unrelated Party | 1.875% | 2.500% |
| | 100.000% | 100.000% |

Hazel Project in the Midland Basin in West Texas

Effective April 4, 2016, Torchlight Energy, Inc. (“TEI”) acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. A back-in after payout of a 25% working interest was retained by MPC and another unrelated working interest owner.

Table of Contents

In October 2016, the holders of all of Torchlight Energy Resources, Inc. then-outstanding shares of Series C Preferred Stock (which were issued in July 2016) elected to convert into a total 33.33% working interest in our Hazel Project, reducing our ownership from 66.66% to a 33.33% working interest.

*Acquisition of Additional Interests in Hazel Project*

On January 30, 2017, we entered into and closed an Agreement and Plan of Reorganization and a Plan of Merger with an entity which was wholly owned by Mr. McCabe, which resulted in the acquisition of approximately 40.66% working interest in the 12,000 gross acres, 9,600 net acres, in the Hazel Project. Also, on January 30, 2017, the Company entered into and closed a Purchase and Sale Agreement with Wolfbone. Under the agreement, we acquired certain of Wolfbone's Hazel Project assets, including its interest in the Flying B Ranch #1 well and the 40 acre unit surrounding the well.

Upon the closing of the transactions, our working interest in the Hazel Project increased by 40.66% to a total ownership of 74%.

Effective June 1, 2017, we acquired an additional 6% working interest from unrelated working interest owners increasing our working interest in the Hazel Project to 80%, and an overall net revenue interest of 75%.

The Company has drilled seven test wells on the Hazel Project to capture and document the scientific base in support of demonstrating the production potential of the property.

*Option Agreement with Masterson Hazel Partners, LP*

On August 13, 2020, our subsidiaries Torchlight Energy, Inc. and Torchlight Hazel, LLC (collectively, "Torchlight Subs") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and McCabe Petroleum Corporation. Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on our Hazel Project, sufficient to satisfy Torchlight's continuous development obligations on the southern half of the prospect no later than September 30, 2020. MHP has satisfied this drilling obligation. MHP paid to Torchlight Subs $1,000 as an option fee at the time of execution of the Option Agreement. MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the well attributable to Torchlight Subs's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the well.

In exchange for MHP satisfying the above drilling obligations, Torchlight Subs granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight Subs's continuous development obligations on the northern half of the prospect. Because MHP exercised this drilling option and satisfied the continuous development obligations on the northern half of the prospect, under the terms of the Option Agreement (as amended in September 2020) MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. Such purchase would be under the terms of a form of Purchase and Sale Agreement included as an exhibit to the Option Agreement, at an aggregate purchase price of $12,690,704 for approximately 9,762 net mineral acres, and not less than 74% net revenue interest (approximately $1,300 per net mineral acre). MHP declined to exercise the Option in 2021.

Hunton Play, Central Oklahoma

Presently, we are producing from one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

**5. RELATED PARTY BALANCES**

As of December 31, 2021 and 2020, related party payables were $-0- and $98,805, respectively, due to our executive officers and directors included in accounts payable on the consolidated balance sheets. Accrued payroll was $-0- and $1,213,779, respectively, consisting of accrued and unpaid compensation due to our executive officers.

Table of Contents

As of December 31, 2021, and 2020, the Company had a balance of $163,366 and $69,056, respectively, for an account receivable due from McCabe Petroleum Corporation for amounts advanced related to the Orogrande Project participation and development agreement.

## 6. COMMITMENTS AND CONTINGENCIES

**Leases**

The Company is subject to a sublease for occupancy of its office premises which requires monthly rent payments of $8,300.

**Legal Matters**

On January 31, 2020, Torchlight Energy Resources, Inc. and its wholly owned subsidiaries Torchlight Energy, Inc. and Torchlight Energy Operating, LLC were served with a lawsuit brought by Goldstone Holding Company, LLC (Goldstone Holding Company, LLC v. Torchlight Energy, Inc., et al., in the 160th Judicial District Court of Dallas County, Texas). On February 24, 2020, Torchlight Energy Resources, Inc., Torchlight Energy, Inc., and Torchlight Energy Operating, LLC timely filed their answer, affirmative defenses, and requests for disclosure. The suit, which sought monetary relief over $1 million, made unspecified allegations of misrepresentations involving a November 2015 participation agreement and a 2016 amendment to the participation agreement. Torchlight denied the allegations and asserted several affirmative defenses including but not limited to, that the suit is barred by the applicable statute of limitations, that the claims had been released, and that the claims were barred because of contractual disclaimers between sophisticated note parties. Torchlight also asserted counterclaims for attorney fees. On January 14, 2021, Goldstone Holding Company, LLC dismissed its claims without prejudice, leaving Torchlight's counterclaims for attorney fees as the only pending claim in the case. On February 26, 2021, Torchlight filed a non-suit without prejudice on its counterclaims for attorney fees, leaving no claims in the case. The court signed a final order disposing of the entire case on March 5, 2021. However, Goldstone Holding Company, LLC asked the court to re-instate its claims, and a hearing was held on April 13, 2021. On June 16, 2021, the court signed an order denying the motion to reinstate Goldstone Holding Company, LLC's claims, and the case is closed.

On April 30, 2020, the Company's wholly owned subsidiary, Hudspeth Oil Corporation, filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Working interest owner Wolfbone Investments, LLC, a company owned by the Meta's former Chairman Gregory McCabe, is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. The Company has added the manufacturer of one of the tool components that the Company contends was a cause of the tool failure. It was later discovered that Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies forfeited its charter to conduct business in the State of Texas by failing to timely pay its franchise taxes, and the Company added members of the board of directors to the case pursuant to the Texas Tax Code. It was recently disclosed that Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies is the subsidiary of a Canadian parent company, Cordax Evaluation Technologies, Inc., who has also been added to the case. The suit, Hudspeth Oil Corporation and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies, was filed in the 189th Judicial District Court of Harris County, Texas. Gregory McCabe, Meta's former Chairman of the Board filed a special appearance after being served with citation, alleging that he was a Canadian citizen with no meaningful ties to Texas. After discovery was conducted on this issue, Meta filed a nonsuit without prejudice for this Defendant, dismissing him from the case. The remaining parties are currently engaged in preliminary discovery and are scheduling mediation.

On March 18, 2021, Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500 and

Table of Contents

recover related attorney's fees. The foreclosure action, Datalog LWT Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc., was filed in the 205th Judicial District Court of Hudspeth County, Texas. We are contesting the lien in good faith and filed a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final disposition of the related case currently pending in Harris County, Texas.

**Environmental Matters**

The Company is subject to contingencies as a result of environmental laws and regulations. Present and future environmental laws and regulations applicable to the Company's operations could require substantial capital expenditures or could adversely affect its operations in other ways that cannot be predicted at this time. As of December 31, 2021 and 2020, no amounts had been recorded because no specific liability has been identified that is reasonably probable of requiring the Company to fund any future material amounts.

## 7. STOCKHOLDERS' EQUITY

Next Bridge Hydrocarbons, Inc. has preferred and common stock both at a par value of $.0001. As of December 31, 2021, the Company has issued 1 share of common stock and 0 shares of preferred stock.

## 8. INCOME TAXES

The Company recorded no income tax provision for 2021 and 2020 because of losses incurred.

There are no uncertain tax positions accounted for in this tax provision.

The following is a reconciliation between the federal income tax benefit computed at statutory federal income tax rates and actual income tax provision for the years ended December 31, 2021 and 2020:

| | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|
| Federal income tax benefit at statutory rate | $ (1,686,283) | $ (1,207,291) |
| Permanent Differences | 390,419 | 308 |
| Annual reconciling adjustment | (451,708) | (19,077) |
| Change in valuation allowance | 1,747,572 | 1,226,060 |
| Provision for income taxes | $ — | $ — |

The tax effects of temporary differences that gave rise to significant portions of deferred tax assets and liabilities at December 31, 2021 and 2020 are as follows:

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Deferred tax assets: | | |
| Net operating loss carryforward | $ 12,491,191 | $ 10,335,223 |
| Disallowed interest expense | — | 2,404 |
| Other | 385 | 9,824 |
| Deferred tax liabilities: | | |
| Investment in oil and gas properties | (2,765,485) | (2,368,932) |
| Net deferred tax assets and liabilities | 9,726,091 | 7,978,519 |
| Less valuation allowance | (9,726,091) | (7,978,519) |
| Total deferred tax assets and liabilities | $ — | $ — |

Table of Contents

The Company had a net deferred tax asset related to federal net operating loss carryforwards of $59,481,861 and $49,215,346 at December 31, 2020 and December 31, 2019, respectively. The federal net operating loss carryforward will begin to expire in 2033. Realization of the deferred tax asset is dependent, in part, on generating sufficient taxable income prior to expiration of the loss carryforwards. The Company has placed a 100% valuation allowance against the net deferred tax asset because future realization of these assets is not assured.

**9. PROMISSORY NOTES**

Certain assets of the Company were used as collateral for promissory notes entered into by TERI.

Promissory Notes Issued in 2017

On April 10, 2017, TERI sold two 12% unsecured promissory notes with a total of $8,000,000 in principal amount to David A. Straz, Jr. Foundation (the "Straz Foundation") and the David A. Straz, Jr. Irrevocable Trust DTD 11/11/1986 (the "Straz Trust") in a private transaction. Interest only was due and payable on the notes each month at the rate of 12% per annum, with a balloon payment of the outstanding principal due and payable at maturity on April 10, 2020. The holders of the notes also received annual payments of common stock in TERI at the rate of 2.5% of principal amount outstanding, based on a volume-weighted average price. Both notes were sold at an original issue discount of 94.25% and accordingly, TERI received total proceeds of $7,540,000 from the investors. TERI used the proceeds for working capital and general corporate purposes, which includes, without limitation, drilling capital, lease acquisition capital and repayment of prior debt.

The effective interest rate was 16.15%.

On February 20, 2020, TERI extended the maturity on $4 million of the 12% unsecured promissory notes previously due in April 2020. The maturity date of the subject promissory note had been extended for one year, from April 10, 2020, to April 10, 2021.

During the quarter ended March 31, 2021, the notes were retired in full by conversion into TERI's common stock.

Promissory Notes Issued in 2018

On February 6, 2018, TERI sold to the Straz Trust in a private transaction a 12% unsecured promissory note with a principal amount of $4,500,000. Interest only was due and payable on the note each month at the rate of 12% per annum, with a balloon payment of the outstanding principal due and payable at maturity on April 10, 2020. The holder of the note also received annual payments of common stock in TERI at the rate of 2.5% of principal amount outstanding, based on a volume-weighted average price. TERI sold the note at an original issue discount of 96.27% and accordingly, TERI received total proceeds of $4,332,150 from the investor. TERI used the proceeds for working capital and general corporate purposes, which includes, without limitation, drilling capital, lease acquisition capital and repayment of prior debt.

The effective interest rate was 15.88%.

During the quarter ended March 31, 2021, the notes were retired in full by conversion into TERI's common stock.

Extension of Promissory Notes

On April 24, 2020, TERI entered into a Note Amendment Agreement with each of the Straz Foundation, as a lender, the Straz Trust, as a lender and collateral agent, and The Northern Trust Company and Christopher M. Straz, as co-trustees of the Straz Trust. Under the Note Amendment Agreement, the parties agreed to amend and restate the two promissory notes issued to the Straz Trust on April 10, 2017 and February 6, 2018 that have total principal outstanding of $8,500,000, along with the promissory note issued to the Straz Foundation on April 10,

Table of Contents

2017 which had an outstanding principal amount of $4,000,000. Under the Note Amendment Agreement, the maturity dates of the two promissory notes held by the Straz Trust and the Note held by the Foundation were extended to April 10, 2021. TERI had previously extended the maturity date of the promissory note held by the Straz Foundation to April 10, 2021.

Under the Note Amendment Agreements, we and our subsidiaries provided a first priority lien on certain collateral in favor of the collateral agent for the benefit of the lenders. The collateral includes all assets and property held by Hudspeth Oil Corporation and Torchlight Hazel, LLC, which includes without limitation our working interest in certain oil and gas leases in Hudspeth County, Texas, known as the "Orogrande Project" and our working interest in certain oil and gas leases in the Midland Basin in West Texas, known as the "Hazel Project." Further, we and TERI, provided guaranty with respect to payment of the three promissory notes. The Note Amendment Agreements also provided restrictions on the use of proceeds if the Orogrande Project or the Hazel Project were sold.

Additionally, the promissory notes, as amended, provided conversion rights whereby the lenders have the right, at each such lender's option, to convert any portion of principal and interest into shares of common stock of TERI at a conversion price of $1.50 per share.

These notes payable issued in 2017 and 2018 totaling $12,500,000 were retired by conversion into TERI common stock in 2021.

Convertible Notes Issued in October 2018

On October 17, 2018, TERI sold to certain investors in a private transaction 16% Series C Unsecured Convertible Promissory Notes with a total principal amount of $6,000,000. Interest and principal were due and payable on the notes in one balloon payment at maturity on April 17, 2020. The notes were convertible, at the election of the holders, into an aggregate 6% working interest in certain oil and gas leases in Hudspeth County, Texas, known as our "Orogrande Project." After an analysis of the transaction and a review of applicable accounting pronouncements, management concluded that the notes issued on October 17, 2018 which contained a conversion right for holders to convert into a working interest in the Orogrande Project of the Company, meet a specific scope exception to the provisions requiring derivative accounting.

On March 9, 2020, each of the noteholders entered into a Conversion Agreement with us and our subsidiary Hudspeth Oil Corporation ("Hudspeth"), under which the noteholders elected to convert the notes, in accordance with their terms, into an aggregate 6% working interest (of all such holders) in the "Orogrande Project." Principal of $6,000,000 and approximately $1,331,000 of accrued interest were converted at March 9, 2020.

The Conversion Agreements also provided additional consideration to the noteholders including a limited carry, a top-off obligation of Meta or Hudspeth, and warrants to purchase a total of 750,000 restricted shares of TERI common stock, which warrants will have a term of five years and an exercise price of $0.70 per share. The limited carry provides that for the remainder of the 2020 calendar year, Hudspeth will pay all costs and expenses attributable to the assigned working interests, except where prohibited by law or regulation. The top-off obligation provides that, subject to the terms and conditions of the Conversion Agreements, if (a) Hudspeth sells the entire working interest in the Orogrande Project, (b) as part of such sale, the holders' entire working interests are sold, and (c) the gross proceeds received by all the holders in such transaction are equal to less than $9,000,000; then Meta or Hudspeth must pay the holders an amount equal to $9,000,000, (i) less gross proceeds the holders received in the transaction, (ii) less the amount of the carry the holders received under the Conversion Agreements, and (iii) less any gross proceeds the holders received in any farmouts occurring prior to the transaction.

The transaction was treated as an extinguishment of debt by TERI.

Table of Contents

Convertible Notes Issued in First Quarter 2019

On February 11, 2019 TERI raised a total of $2,000,000 from investors through the sale of two 14% Series D Unsecured Convertible Promissory Notes. Principal was payable in a lump sum at maturity on May 11, 2020 with payments of interest payable monthly at the rate of 14% per annum. Holders of the notes had the right to convert principal and interest at any time into common stock of TERI at a conversion price of $1.08 per share. TERI had the right to redeem the notes at any time, provided that the redemption amount must include all interest that would have been earned through maturity. TERI evaluated the notes for beneficial conversion features and derivative accounting criteria and concluded that derivative accounting treatment was not applicable.

On April 21, 2020, TERI entered into agreements to amend the two 14% Series D Unsecured Convertible Promissory Notes that were originally issued on February 11, 2019. Under the amendment agreements, (a) the maturity dates were extended from May 11, 2020 to November 11, 2021, (b) the conversion price under which the noteholders may convert into our common stock was changed from $1.08 to $0.43, and (c) the noteholders were provided the right, at each noteholder's election, to convert their notes into either (i) a working interest in the Orogrande Project at the rate of one acre per $1,100 of principal and unpaid interest converted, or (ii) a working interest in the Hazel Project at the rate of one acre per $1,300 of principal and unpaid interest converted; provided, that the noteholders' right to convert into either such working interest is subject to approval of the collateral agent of the Note Amendment Agreement with the Straz parties.

Under the note amendments, the noteholders agreed to forebear demand or collection on all interest payments due and payable under the Note, including any past due interest payments, for 20 days after the execution of the Note Amendment Agreement. Further, we agreed to (a) issue each holder 20,000 restricted shares of common stock immediately and (b) pay each holder a fee of $10,000, at the same time as the payment of past due interest is paid. The past due interest and fee was paid.

These two promissory notes required monthly payments of interest only at the rate of 14% per annum, with a balloon payment of the outstanding principal due and payable at maturity.

These notes payable have been converted into TERI common stock. $1,000,000 was converted in December 2020 and the remaining $1,000,000 was converted in April 2021.

Convertible Notes Issued in Fourth Quarter 2019

Effective October 31, 2019, TERI issued 10% unsecured convertible promissory notes in the amount of $540,000. Principal and interest were due at maturity on December 3, 2020. The principal and accrued interest on the notes were convertible into shares of common stock at $0.75 per common share at any time after the original issue date. The notes were alternatively convertible, at the election of the holders, into an aggregate 0.367% working interest in our Orogrande Project.

These convertible notes were retired by conversion into TERI common stock in December 2020.

**10. NOTE PAYABLE, RELATED PARTY**

In 2021, the Company entered into a note payable with Meta to borrow up to $15 million. On October 1, 2021, the Company issued a secured, revolving promissory note in an original principal amount of up to $15 million in favor of Meta (the "2021 Note"). The 2021 Note bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023, and the outstanding principal of the 2021 Note will amortize in six equal, monthly installments. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021

Table of Contents

Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts the Company's ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of its assets, unless the Company is the surviving entity or the successor entity assumes all of obligations under the 2021 Note. The note payable is collateralized by shares of common stock in Meta held by one of its stockholders, Wolfbone Investments, LLC, and by a lien on a 25% interest in the Orogrande prospect.

The balance on the loan as of December 31, 2021 is $12,500,000 and the Company incurred interest that is paid in kind of $208,889 for the year ended December 31, 2021. The Company subsequently drew the additional $2,500,000 on the note payable in 2022.

**11. ASSET RETIREMENT OBLIGATIONS**

The following is a reconciliation of the asset retirement obligations liability through December 31, 2021:

| | |
|---|---|
| Asset retirement obligations—December 31, 2020 | $ 21,844 |
| Accretion expense | 93 |
| Estimated liabilities recorded | — |
| Liability reduction at sale of property | — |
| Asset retirement obligations—December 31, 2021 | $ 21,937 |

**12. SUBSEQUENT EVENTS**

In July 2022, the Company issued 165,523,362 shares of its common stock to Meta.

On April 14, 2022, May 4, 2022, May 12, 2022, May 26, 2022, June 1, 2022, June 13, 2022, June 28, 2022, August 11, 2022 and August 29, 2022, respectively, the Company borrowed as advances to be subject to a loan agreement between the Company and Meta an aggregate amount of borrowings equal to $5.0 million, bearing interest at a per annum rate equal to 8% and which become due and payable on March 31, 2023. See Note 12 of the accompanying notes to the unaudited condensed consolidated financial statements included elsewhere in this prospectus.

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**
**UNAUDITED CONDENSED CONSOLIDATED BALANCE SHEETS**

| | September 30, 2022 | December 31, 2021 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash | $ 2,108,866 | $ 1,989,419 |
| Accounts receivable, related party | 165,238 | 163,366 |
| Grants and other receivables | 50,970 | 74,310 |
| Prepaid expenses | 6,621 | 2,667 |
| Total current assets | 2,331,695 | 2,229,762 |
| Oil and natural gas properties, net | 47,293,607 | 45,663,470 |
| Other assets | 25,000 | 25,000 |
| TOTAL ASSETS | $ 49,650,302 | $ 47,918,232 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 559,991 | $ 2,828,326 |
| Notes payable, related party | 21,156,988 | 12,708,889 |
| Total current liabilities | 21,716,979 | 15,537,215 |
| Asset retirement obligations | 21,937 | 21,937 |
| Total liabilities | 21,738,916 | 15,559,152 |
| Commitments and contingencies | | |
| Stockholder's equity: | | |
| Preferred stock, par value $0.0001; 25,000,000 and 50,000,000 shares authorized; 0 issued and outstanding | — | — |
| Common stock, par value $0.0001; 250,000,000 and 500,000,000 shares authorized; 1 and 165,523,363 issued and outstanding | 16,552 | — |
| Additional paid-in capital | 100,846,643 | 100,546,596 |
| Accumulated deficit | (72,951,809) | (68,187,516) |
| Total stockholder's equity | 27,911,386 | 32,359,080 |
| TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY | $ 49,650,302 | $ 47,918,232 |

*The accompanying notes are an integral part of these consolidated financial statements.*

Table of Contents

NEXT BRIDGE HYDROCARBONS, INC.

UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS

| | Three Months Ended September 30, 2022 | Three Months Ended September 30, 2021 |
|---|---|---|
| Oil sales | $ 4,635 | $ 1,817 |
| Natural gas sales | 8,175 | 1,146 |
| **Revenue** | **12,810** | **2,963** |
| **Operating expenses** | | |
| Lease operating expenses | 14,880 | 41,561 |
| Production and ad valorem tax | 779 | 213 |
| General and administrative | 1,800,472 | 861,316 |
| Depreciation, depletion and amortization | — | 3,707 |
| Total operating expenses | 1,816,131 | 906,797 |
| **Other income (expense)** | | |
| Interest expense | (360,877) | — |
| Interest income | 11 | 8,159 |
| Total other income (expense) – net | (360,866) | 8,159 |
| **Loss before income taxes** | (2,164,187) | (895,675) |
| Provision for income tax | — | — |
| **Net loss** | **$ (2,164,187)** | **$ (895,675)** |

*The accompanying notes are an integral part of these consolidated financial statements.*

Table of Contents

NEXT BRIDGE HYDROCARBONS, INC.

UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS

| | Nine Months Ended September 30, 2022 | Nine Months Ended September 30, 2021 |
|---|---|---|
| Oil sales | $ 14,323 | $ 4,675 |
| Natural gas sales | 15,891 | 4,261 |
| **Revenue** | **30,214** | **8,936** |
| **Operating expenses** | | |
| Lease operating expenses | 55,701 | 79,870 |
| Production and ad valorem tax | 2,032 | 639 |
| General and administrative | 3,789,166 | 6,097,917 |
| Depreciation, depletion and amortization | — | 4,642 |
| Total operating expenses | 3,846,899 | 6,183,068 |
| **Other income (expense)** | | |
| Interest expense | (948,099) | (3,312) |
| Gain on extinguishment of debt | — | 77,477 |
| Interest income | 491 | 11,078 |
| Total other income (expense) - net | (947,608) | 85,243 |
| Loss before income taxes | (4,764,293) | (6,088,889) |
| Provision for income tax | — | — |
| **Net loss** | **$ (4,764,293)** | **$ (6,088,889)** |

*The accompanying notes are an integral part of these consolidated financial statements.*

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

| | Common stock shares | Common stock amount | Additional paid-in capital | Accumulated deficit | Total |
|---|---|---|---|---|---|
| **Three Months Ended September 30, 2021** | | | | | |
| **Balance, July 1, 2021** | 1 | $ — | $ 99,665,836 | $ (65,141,922) | $ 34,523,914 |
| Contributions from parent | — | — | 6,007,015 | — | 6,007,015 |
| Net loss | — | — | — | (895,675) | (895,675) |
| **Balance, September 30, 2021** | 1 | $ — | $ 105,672,851 | $ (66,037,597) | $ 39,635,254 |
| **Three Months Ended September 30, 2022** | | | | | |
| **Balance, July 1, 2022** | 1 | $ — | $ 100,863,195 | $ (70,787,622) | $ 30,075,573 |
| Contributions from parent | — | — | — | — | — |
| Net loss | — | — | — | (2,164,187) | (2,164,187) |
| Issuance of common stock | 165,523,362 | 16,552 | (16,552) | — | — |
| **Balance, September 30, 2022** | 165,523,363 | $ 16,552 | $ 100,846,643 | $ (72,951,809) | $ 27,911,386 |

*The accompanying notes are an integral part of these consolidated financial statements.*

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

| | Common stock shares | Common stock amount | Additional paid-in capital | Accumulated deficit | Total |
|---|---|---|---|---|---|
| **Balance, December 31, 2020** | 1 | $ — | $ 88,267,685 | $ (59,948,708) | $ 28,318,977 |
| Contributions from parent | — | — | 17,405,166 | — | 17,405,166 |
| Net loss | — | — | — | (6,088,889) | (6,088,889) |
| **Balance, September 30, 2021** | 1 | $ — | $ 105,672,851 | $ (66,037,597) | $ 39,635,254 |
| **Balance, December 31, 2021** | 1 | $ — | $ 100,546,596 | $ (68,187,516) | $ 32,359,080 |
| Contributions from parent | — | — | 316,599 | — | 316,599 |
| Net loss | — | — | — | (4,764,293) | (4,764,293) |
| Issuance of common stock | 165,523,362 | 16,552 | (16,552) | — | — |
| **Balance, September 30, 2022** | 165,523,363 | $ 16,552 | $ 100,846,643 | $ (72,951,809) | $ 27,911,386 |

*The accompanying notes are an integral part of these consolidated financial statements.*

Table of Contents

NEXT BRIDGE HYDROCARBONS, INC.

UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Nine Months Ended September 30, 2022 | Nine Months Ended September 30, 2021 |
|---|---|---|
| **Cash Flows From Operating Activities** | | |
| Net loss | $ (4,764,293) | $ (6,088,889) |
| Adjustments to reconcile net loss to net cash from operations: | | |
| Depreciation, depletion and amortization | — | 4,642 |
| Paid in kind interest | 948,099 | — |
| Change in: | | |
| Accounts receivable, related party | (1,872) | (74,324) |
| Grants and other receivables | 23,340 | 110,094 |
| Prepaid expenses | (3,954) | 98,696 |
| Accounts payable | (2,268,335) | 462,470 |
| Accrued liabilities | — | (1,213,779) |
| **Net cash from operating activities** | (6,067,015) | (6,701,090) |
| **Cash Flows From Investing Activities** | | |
| Investment in oil and natural gas properties | (1,630,137) | (2,502,799) |
| **Net cash from investing activities** | (1,630,137) | (2,502,799) |
| **Cash Flows From Financing Activities** | | |
| Contributions from parent | 316,599 | 17,405,166 |
| Proceeds from notes payable, related party | 7,500,000 | — |
| **Net cash from financing activities** | 7,816,599 | 17,405,166 |
| **Net (decrease) increase in cash** | 119,447 | 8,201,277 |
| **Cash—beginning of period** | 1,989,419 | 130,504 |
| **Cash—end of period** | $ 2,108,866 | $ 8,331,781 |
| **Supplemental disclosure of cash flow information: (Non Cash Items)** | | |
| Cash paid for interest | $ — | $ — |
| Cash paid for state franchise tax | $ — | $ — |

*The accompanying notes are an integral part of these consolidated financial statements.*

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

## 1. NATURE OF BUSINESS

Next Bridge Hydrocarbons, Inc. (formerly OilCo Holdings, Inc.) ("the Company", "we", "our") was incorporated in August 2021 under the laws of the State of Nevada. We are engaged in the acquisition, exploration and development of oil and natural gas properties in the United States. We operate our business through our subsidiaries Torchlight Energy Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC.

Prior to the formation our subsidiaries were consolidated into Meta Materials Inc., an affiliated company. All intercompany transactions have been eliminated in the consolidated financial statements.

On June 29, 2021, our former parent, Torchlight Energy Resources, Inc. ("TERI") acquired Metamaterial, Inc., an Ontario corporation, and changed its name to Meta Materials, Inc. (with Metamaterial Inc. being the accounting acquiror).

## 2. GOING CONCERN

At September 30, 2022, the Company had not yet achieved profitable operations. We had a net loss of $4,764,293 for the nine months ended September 30, 2022. We expect to incur further losses in the development of our business. The Company had a working capital deficit as of September 30, 2022 of $19,385,284. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

The Company's ability to continue as a going concern is dependent on its ability to generate future profitable operations and/or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due. Management's plan to address the Company's ability to continue as a going concern includes: (1) obtaining debt or equity funding from private placement, institutional, or public sources; (2) obtain loans from financial institutions, where possible, or (3) participating in joint venture transactions with third parties. Although management believes that it will be able to obtain the necessary funding to allow the Company to remain a going concern through the methods discussed above, there can be no assurances that such methods will prove successful.

These consolidated financial statements have been prepared assuming that the Company will continue as a going concern and therefore, the financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amount and classifications of liabilities that may result from the outcome of this uncertainty.

## 3. SIGNIFICANT ACCOUNTING POLICIES

The Company maintains its accounts on the accrual method of accounting in accordance with accounting principles generally accepted in the United States of America. Accounting principles followed and the methods of applying those principles, which materially affect the determination of financial position, results of operations and cash flows are summarized below:

***Use of estimates***—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and certain assumptions that affect the amounts reported in these consolidated financial statements and accompanying notes. Actual results could differ from these estimates.

***Basis of presentation***—The financial statements are presented on a consolidated basis and include all of the accounts of Next Bridge Hydrocarbons, Inc. and its wholly owned subsidiaries, Torchlight Energy, Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC. All significant intercompany balances and transactions have been eliminated.

Table of Contents

These interim financial statements are unaudited and have been prepared pursuant to the rules and regulations of the SEC regarding interim financial reporting. Certain disclosures have been condensed or omitted from these financial statements. Accordingly, they do not include all the information and notes required by accounting principles generally accepted in the United States of America ("GAAP") for complete consolidated financial statements, and should be read in conjunction with the audited consolidated financial statements and notes thereto included herein for the year ended December 31, 2021.

In the opinion of management, the accompanying unaudited financial condensed consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary to fairly present the financial position as of, and the results of operations for, all periods presented. In preparing the accompanying financial statements, management has made certain estimates and assumptions that affect reported amounts in the condensed financial statements and disclosures of contingencies. Actual results may differ from those estimates. The results for interim periods are not necessarily indicative of annual results.

***Risks and uncertainties***—The Company's operations are subject to significant risks and uncertainties, including financial, operational, technological, and other risks associated with operating an emerging business, including the potential risk of business failure.

In January 2020, the World Health Organization ("WHO") announced a global health emergency because of a new strain of coronavirus ("COVID-19") and the significant risks to the international community and economies as the virus spreads globally beyond its point of origin. In March 2020, the WHO classified COVID-19 as a pandemic, based on the rapid increase in exposure globally, and thereafter, COVID-19 continued to spread throughout the U.S. and worldwide. In addition, actions taken by OPEC members and other exporting nations on the supply and demand in global oil and natural gas markets resulted in significant negative pricing pressure in the first half of 2020, followed by a recovery in pricing and an increase in demand in the second half of 2020 and into 2021. However, multiple variants emerged in 2021 and became highly transmissible, which contributed to additional pricing volatility during 2021 to date. The financial results of companies in the oil and natural gas industry have been impacted materially as a result of changing market conditions. Such circumstances generally increase uncertainty in the Partnership's accounting estimates. Although demand and market prices for oil and natural gas have recently increased, due to the rising energy use and the improvement in U.S. economic activity, we cannot predict events that may lead to future price volatility and the near term energy outlook remains subject to heightened levels of uncertainty.

We are continuing to closely monitor the overall impact and the evolution of the COVID-19 pandemic, including the ongoing spread of any variants, along with future OPEC actions on all aspects of our business, including how these events may impact our future operations, financial results, liquidity, employees, and operators. Additional actions may be required in response to the COVID-19 pandemic on a national, state, and local level by governmental authorities, and such actions may further adversely affect general and local economic conditions, particularly if the 2021 resurgence and spread of the COVID-19 pandemic continues. We cannot predict the long-term impact of these events on our liquidity, financial position, results of operations or cash flows due to uncertainties including the severity of COVID-19 or any of the ongoing variants, and the effect the virus will have on the demand for oil and natural gas. These situations remain fluid and unpredictable, and we are actively managing our response.

***Concentration of risks***—At times the Company's cash balances are in excess of amounts guaranteed by the Federal Deposit Insurance Corporation. The Company's cash is placed with a highly rated financial institution, and the Company regularly monitors the credit worthiness of the financial institutions with which it does business.

***Fair value of financial instruments***—Financial instruments consist of cash, receivables, convertible note receivable, payables and promissory notes, if any. The estimated fair values of cash, receivables, and payables approximate the carrying amount due to the relatively short maturity of these instruments. The carrying amounts

Table of Contents

of any promissory notes approximate their fair value giving affect for the term of the note and the effective interest rates.

For assets and liabilities that require re-measurement to fair value the Company categorizes them in a three-level fair value hierarchy as follows:

- Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities.
- Level 2 inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration.
- Level 3 inputs are unobservable inputs based on management's own assumptions used to measure assets and liabilities at fair value.

A financial asset or liability's classification within the hierarchy is determined based on the lowest level input that is significant to the fair value measurement.

***Cash and cash equivalents*** – Cash and cash equivalents include certain investments in highly liquid instruments with original maturities of three months or less.

***Accounts receivable*** – Accounts receivable consist of uncollateralized oil and natural gas revenues due under normal trade terms, as well as amounts due from working interest owners of oil and natural gas properties for their share of expenses paid on their behalf by the Company. Management reviews receivables periodically and reduces the carrying amount by a valuation allowance that reflects management's best estimate of the amount that may not be collectible. As of September 30, 2022 and December 31, 2021, no valuation allowance was considered necessary.

***Oil and natural gas properties*** – The Company uses the full cost method of accounting for exploration and development activities as defined by the Securities and Exchange Commission ("SEC"). Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least quarterly and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions.

Gains and losses on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and natural gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

***Capitalized interest*** – The Company capitalizes interest on unevaluated properties during the periods in which they are excluded from costs being depleted or amortized. During the nine months ended September 30, 2022 and 2021, the Company capitalized $-0, and $141,048 respectively, of interest on unevaluated properties.

Table of Contents

***Depreciation, depletion, and amortization*** – The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

***Ceiling test*** – Future production volumes from oil and natural gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and natural gas properties. If the net capitalized cost of proved oil and natural gas properties, net of related deferred income taxes, plus the cost of unproved oil and natural gas properties, exceeds the present value of estimated future net cash flows discounted at 10 percent, net of related realizable tax affects, plus the cost of unproved oil and natural gas properties, the excess is charged to expense and reflected as additional accumulated DD&A. The Company recorded an impairment expense of $-0- for the nine months ended September 30, 2022 and 2021, respectively, to recognize the adjustment required by the ceiling test.

The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and natural gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and natural gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

***Asset retirement obligations*** – The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and natural gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

***Income taxes*** – Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is established to reduce deferred tax assets if it is more likely than not that the related tax benefits will not be realized.

Table of Contents

Authoritative guidance for uncertainty in income taxes requires that the Company recognize the financial statement benefit of a tax position only after determining that the relevant tax authority would more likely than not sustain the position following an examination. Management has reviewed the Company's tax positions and determined there were no uncertain tax positions requiring recognition in the consolidated financial statements. Company tax returns remain subject to Federal and State tax examinations. Generally, the applicable statutes of limitation are three to four years from their respective filings.

Estimated interest and penalties related to potential underpayment on any unrecognized tax benefits are classified as a component of tax expense in the statements of operation. The Company has not recorded any interest or penalties associated with unrecognized tax benefits for any periods covered by these financial statements.

***Revenue recognition*** – The Company's revenue is typically generated from contracts to sell natural gas, crude oil or NGLs produced from interests in oil and natural gas properties owned by the Company. Contracts for the sale of natural gas and crude oil are evidenced by (1) base contracts for the sale and purchase of natural gas or crude oil, which document the general terms and conditions for the sale, and (2) transaction confirmations, which document the terms of each specific sale. The transaction confirmations specify a delivery point which represents the point at which control of the product is transferred to the customer. The Company elects to treat contracts to sell oil and natural gas production as normal sales, which are then accounted for as contracts with customers. The Company has determined that these contracts represent multiple performance obligations which are satisfied when control of the commodity transfers to the customer, typically through the delivery of the specified commodity to a designated delivery point.

Revenue is measured based on consideration specified in the contract with the customer, and excludes any amounts collected on behalf of third parties. The Company recognizes revenue in the amount that reflects the consideration it expects to be entitled to in exchange for transferring control of those goods to the customer. Amounts allocated in the Company's price contracts are based on the standalone selling price of those products in the context of long-term contracts. Payment is generally received one or two months after the sale has occurred.

Gain or loss on derivative instruments is outside the scope of ASC 606 and is not considered revenue from contracts with customers subject to ASC 606. The Company may in the future use financial or physical contracts accounted for as derivatives as economic hedges to manage price risk associated with normal sales, or in limited cases may use them for contracts the Company intends to physically settle but do not meet all of the criteria to be treated as normal sales.

*Producer Gas Imbalances.* The Company applies the sales method of accounting for natural gas revenue. Under this method, revenues are recognized based on the actual volume of natural gas sold to purchasers.

***Basic and diluted earnings (loss) per share*** – Basic earnings (loss) per common share is computed by dividing net income (loss) available to common shareholders by the weighted average number of common shares outstanding during the period. Diluted earnings (loss) per common share is computed in the same way as basic earnings (loss) per common share except that the denominator is increased to include the number of additional common shares that would be outstanding if all potential common shares had been issued and if the additional common shares were dilutive. The calculation of diluted earnings per share excludes 0 shares.

***Environmental laws and regulations*** – The Company is subject to extensive federal, state, and local environmental laws and regulations. Environmental expenditures are expensed or capitalized depending on their future economic benefit. The Company believes that it is in compliance with existing laws and regulations. The Company accrued no liability as of September 30, 2022 and December 31, 2021.

Table of Contents

***Recent accounting pronouncements not yet adopted—***

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which adds a new Topic 326 to the Codification and removes the thresholds that companies apply to measure credit losses on financial instruments measured at amortized cost, such as loans, receivables, and held-to-maturity debt securities. Under current GAAP, companies generally recognize credit losses when it is probable that the loss has been incurred. The revised guidance will remove all recognition thresholds and will require companies to recognize an allowance for credit losses for the difference between the amortized cost basis of a financial instrument and the amount of amortized cost that the company expects to collect over the instrument's contractual life. ASU 2016-13 also amends the credit loss measurement guidance for available-for sale debt securities and beneficial interests in securitized financial assets. The guidance is applicable for fiscal years beginning after December 15, 2019 and interim periods within those years, however, the FASB extended the effective date for smaller reporting companies to fiscal years beginning after December 15, 2022. The Company is currently evaluating the potential impact of the adoption of this standard on its related disclosures.

Other recently issued or adopted accounting pronouncements are not expected to have, or did not have, a material impact on the Company's financial position or results from operations.

**4. OIL & NATURAL GAS PROPERTIES**

The following table presents the capitalized costs for oil & natural gas properties of the Company:

| | September 30, 2022 | December 31, 2021 |
|---|---|---|
| Evaluated costs subject to amortization | $ — | $ — |
| Unevaluated costs | 47,293,607 | 45,663,470 |
| Total capitalized costs | 47,293,607 | 45,663,470 |
| Less accumulated depreciation, depletion and amortization | — | — |
| Total oil and natural gas properties | $ 47,293,607 | $ 45,663,470 |

Unevaluated costs as of September 30, 2022 and December 31, 2021 include cumulative costs on developing projects including the Orogrande and Hazel projects in West Texas.

The Company periodically adjusts for the separation of evaluated versus unevaluated costs within its full cost pool to recognize the value impairment related to the expiration of, or changes in market value, of unevaluated leases. The impact of reclassifications as they become necessary is to increase the basis for calculation of future period's depletion, depreciation and amortization which effectively recognizes the impairment on the consolidated statement of operations over future periods. Reclassified costs also become evaluated costs for purposes of ceiling tests and which may cause recognition of increased impairment expense in future periods. The remaining cumulative unevaluated costs which have been reclassified within our full cost pool totals $0 as of September 30, 2022. As of September 30, 2022, evaluated costs are $-0- since we have no proved reserve value associated with our properties.

Due to the volatility of commodity prices, should oil and natural gas prices decline in the future, it is possible that a further write-down could occur. Proved reserves are estimated quantities of crude oil, natural gas, and natural gas liquids, which geological and engineering data demonstrate with reasonable certainty to be recoverable from known reservoirs under existing economic and operating conditions. The independent engineering estimates include only those amounts considered to be proved reserves and do not include additional amounts which may result from new discoveries in the future, or from application of secondary and tertiary recovery processes where facilities are not in place or for which transportation and/or marketing contracts are not in place. Estimated reserves to be developed through secondary or tertiary recovery processes are classified as unevaluated properties.

Table of Contents

**Current Projects**

We are an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. We are primarily focused on the acquisition of early stage projects, the development and delineation of these projects, and then the monetization of those assets once these activities are completed.

Since 2010, our primary focus has been the development of interests in oil and natural gas projects we hold in the Permian Basin in West Texas. We also hold minor interests in certain other oil and natural gas projects in Central Oklahoma that we are in the process of divesting.

As of September 30, 2022, we had interests in three oil and gas projects: the Orogrande Project in Hudspeth County, Texas, the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, and two wells in Central Oklahoma.

Orogrande Project, West Texas

On August 7, 2014, we entered into a Purchase Agreement with Hudspeth Oil Corporation ("Hudspeth"), McCabe Petroleum Corporation ("MPC"), and Gregory McCabe, Meta's former Chairman. Mr. McCabe was the sole owner of both Hudspeth and MPC. Under the terms and conditions of the Purchase Agreement, we purchased 100% of the capital stock of Hudspeth which held certain oil and natural gas assets, including a 100% working interest in approximately 172,000 predominately contiguous acres in the Orogrande Basin in West Texas. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe. Mr. McCabe also holds a 4.5% overriding royalty interest in the Orogrande acreage,—which he obtained prior to, and was not a part of the August 2014 transaction. As of September 30, 2022, leases covering approximately 134,000 acres remain in effect.

Effective March 27, 2017, the property became subject to a DDU Agreement which allows for all 192 existing leases covering approximately 134,000 net acres leased from University Lands to be combined into one drilling and development unit for development purposes. The term of the DDU Agreement expires on December 31, 2023, and the time to drill on the drilling and development unit continues through December 2023. The DDU Agreement also grants the right to extend the DDU Agreement through December 2028 if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid.

Our drilling obligations include five wells per year in years 2021, 2022 and 2023. The drilling obligations are minimum yearly requirements and may be exceeded if acceleration is desired.

We believe all drilling obligations through September 30, 2022, have been met.

On July 25, 2018, we and Hudspeth entered into a Settlement & Purchase Agreement (the "Settlement Agreement") with University Founders (and Founders Oil & Gas Operating, LLC, former Operator), Wolfbone and MPC (entities controlled by a related party), which agreement provided for Founders assigning all of its working interest in the oil and gas leases of the Orogrande Project to Hudspeth and Wolfbone equally. Future well capital spending obligations remained the same 50% contribution from Hudspeth and 50% from Wolfbone until such time as the $40.5 million to be spent on the project. Cumulative capital spending did not exceed $40.5 million until after the closing of the Arrangement.

The Company has drilled fourteen test wells in the Orogrande in order to stay in compliance with University Lands D&D Unit Agreement, as well as, to test for potential shallow pay zones and deeper pay zones that may be present on structural plays. Development of the wells continued through the three months ended September 30, 2022, to further capture and document the scientific base in support of demonstrating the production potential of the property.

Table of Contents

On March 9, 2020, holders of certain notes payable by the Company entered into a Conversion Agreement under which the noteholders elected to convert principal of $6,000,000 and approximately $1,331,000 of accrued interest on the notes, in accordance with their terms, into an aggregate 6% working interest (of all such holders) in the Orogrande Project. See Note 9 to these Notes to Unaudited Condensed Consolidated Financial Statements for a discussion of the Conversion Agreement and related contingent liabilities of the Company that become due and payable in the event the Orogrande Project is sold.

Following the Spin-Off, the Company intends to make offers and enter into agreements with one or more of the other current working interest owners in the Orogrande Project (each an "Orogrande Owner" and collectively, the "Orogrande Owners"). The Company anticipates offering the Orogrande Owners shares of Common Stock in exchange for their respective working interest in the Orogrande Project. The Company intends to offer the number of shares of Common Stock necessary such that each participating Orogrande Owner would own the percentage of Common Stock then outstanding in proportion to the percentage owned in the working interest of the Orogrande Project. For illustration purposes, if an Orogrande Owner owns ten percent (10%) of the working interest of the Orogrande Project, and such Orogrande Owner elects to participate and accept out offer of shares of Common Stock, then such Orogrande Owner will be offered ten percent (10%) of the aggregate amount of outstanding shares of Common Stock. The Company's decision to enter into these transactions will depend on ability of the Company and each Orogrande Owner to negotiate and enter into definitive agreements related to such transaction and the Company's board of directors receiving an industry-standard fairness opinion from an investment banking firm. One of the Orogrande Owners is Wolfbone Investments LLC, an entity controlled by Gregory McCabe, who will own, directly and indirectly through entities he owns or controls, over 11% of the Common Stock following the Spin-Off, which would increase if the proportionate exchange of working interest for shares of our Common Stock is consummated.

The Orogrande Project ownership as of September 30, 2022 is detailed as follows:

| | Revenue Interest | Working Interest |
|---|---|---|
| University Lands—Mineral Owner | 20.000% | n/a |
| ORRI—Magdalena Royalties, LLC, an entity controlled by Gregory McCabe, Meta's former Chairman | 4.500% | n/a |
| ORRI—Unrelated Party | 0.500% | n/a |
| Hudspeth Oil Corporation, a subsidiary of Torchlight Energy Resources Inc. | 49.875% | 66.500% |
| Wolfbone Investments LLC, an entity controlled by Gregory McCabe, Meta's former Chairman | 18.750% | 25.000% |
| Conversion by Note Holders in March, 2020 | 4.500% | 6.000% |
| Unrelated Party | 1.875% | 2.500% |
| | 100.000% | 100.000% |

Hazel Project in the Midland Basin in West Texas

Effective April 4, 2016, TEI acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. A back-in after payout of a 25% working interest was retained by MPC and another unrelated working interest owner.

In October 2016, the holders of all of Torchlight Energy Resources, Inc. then-outstanding shares of Series C Preferred Stock (which were issued in July 2016) elected to convert into a total 33.33% working interest in our Hazel Project, reducing our ownership from 66.66% to a 33.33% working interest.

*Acquisition of Additional Interests in Hazel Project*

On January 30, 2017, we entered into and closed an Agreement and Plan of Reorganization and a Plan of Merger with an entity which was wholly-owned by Mr. McCabe, which resulted in the acquisition of approximately 40.66% working interest in the 12,000 gross acres, 9,600 net acres, in the Hazel Project.

Table of Contents

Also, on January 30, 2017, the Company entered into and closed a Purchase and Sale Agreement with Wolfbone. Under the agreement, we acquired certain of Wolfbone's Hazel Project assets, including its interest in the Flying B Ranch #1 well and the 40 acre unit surrounding the well.

Upon the closing of the transactions, our working interest in the Hazel Project increased by 40.66% to a total ownership of 74%.

Effective June 1, 2017, we acquired an additional 6% working interest from unrelated working interest owners increasing our working interest in the Hazel project to 80%, and an overall net revenue interest of 75%.

The Company has drilled seven test wells on the Hazel Project to capture and document the scientific base in support of demonstrating the production potential of the property.

*Option Agreement with Masterson Hazel Partners, LP*

On August 13, 2020, our subsidiaries Torchlight Energy, Inc. and Torchlight Hazel, LLC (collectively, "Torchlight") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and McCabe Petroleum Corporation. Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on our Hazel Project, sufficient to satisfy Torchlight's continuous development obligations on the southern half of the prospect no later than September 30, 2020. MHP has satisfied this drilling obligation. MHP paid to Torchlight $1,000 as an option fee at the time of execution of the Option Agreement. MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the Well attributable to Torchlight's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the well.

In exchange for MHP satisfying the above drilling obligations, Torchlight granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight's continuous development obligations on the northern half of the prospect. Because MHP exercised this drilling option and satisfied the continuous development obligations on the northern half of the prospect, under the terms of the Option Agreement (as amended in September 2020) MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. Such purchase would be under the terms of a form of Purchase and Sale Agreement included as an exhibit to the Option Agreement, at an aggregate purchase price of $12,690,704 for approximately 9,762 net mineral acres, and not less than 74% net revenue interest (approximately $1,300 per net mineral acre). MHP declined to exercise the Option in 2021.

Hunton Play, Central Oklahoma

Presently, we are producing from one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

**5. RELATED PARTY BALANCES**

As of September 30, 2022 and December 31, 2021, the Company had a balance of $165,238 and $163,366, respectively, for an account receivable due from McCabe Petroleum Corporation for amounts advanced related to the Orogrande development cost sharing agreement.

**6. COMMITMENTS AND CONTINGENCIES**

**Leases**

The Company is subject to a sublease agreement on a month-to-month term for occupancy of its office premises which requires monthly rent payments of $1,000.

Table of Contents

**Legal Matters**

On January 31, 2020, Torchlight Energy Resources, Inc. and its wholly owned subsidiaries Torchlight Energy, Inc. and Torchlight Energy Operating, LLC were served with a lawsuit brought by Goldstone Holding Company, LLC (Goldstone Holding Company, LLC v. Torchlight Energy, Inc., et al., in the 160th Judicial District Court of Dallas County, Texas). On February 24, 2020, Torchlight Energy Resources, Inc., Torchlight Energy, Inc., and Torchlight Energy Operating, LLC timely filed their answer, affirmative defenses, and requests for disclosure. The suit, which sought monetary relief over $1 million, made unspecified allegations of misrepresentations involving a November 2015 participation agreement and a 2016 amendment to the participation agreement. Torchlight denied the allegations and asserted several affirmative defenses including but not limited to, that the suit is barred by the applicable statute of limitations, that the claims had been released, and that the claims were barred because of contractual disclaimers between sophisticated note parties. Torchlight also asserted counterclaims for attorney fees. On January 14, 2021, Goldstone Holding Company, LLC dismissed its claims without prejudice, leaving Torchlight's counterclaims for attorney fees as the only pending claim in the case. On February 26, 2021, Torchlight filed a non-suit without prejudice on its counterclaims for attorney fees, leaving no claims in the case. The court signed a final order disposing of the entire case on March 5, 2021. However, Goldstone Holding Company, LLC asked the court to re-instate its claims, and a hearing was held on April 13, 2021. On June 16, 2021, the court signed an order denying the motion to reinstate Goldstone Holding Company's, LLC's claims, and the case is closed.

On April 30, 2020, The Company's wholly owned subsidiary, Hudspeth Oil Corporation, filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Working interest owner Wolfbone Investments, LLC, a company owned by Meta's former Chairman Gregory McCabe, is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. The Company has added the manufacturer of one of the tool components that the Company contends was a cause of the tool failure. It was later discovered that Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies forfeited its charter to conduct business in the State of Texas by failing to timely pay its franchise taxes, and the Company added members of the board of directors to the case pursuant to the Texas Tax Code. It was recently disclosed that Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies is the subsidiary of a Canadian parent company, Cordax Evaluation Technologies, Inc., who has also been added to the case. The suit, Hudspeth Oil Corporation and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies, was filed in the 189th Judicial District Court of Harris County, Texas. The Company's current Chairman of the Board filed a special appearance after being served with citation, alleging that he was a Canadian citizen with no meaningful ties to Texas. After discovery was conducted on this issue, the Company filed a nonsuit without prejudice for this Defendant, dismissing him from the case. The remaining parties are currently engaged in preliminary discovery and are scheduling mediation.

On March 18, 2021, Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500.01 and recover related attorney's fees. The foreclosure action, Datalog LWT Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc., was filed in the 205th Judicial District Court of Hudspeth County, Texas. We are contesting the lien in good faith and filed a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final disposition of the related case currently pending in Harris County, Texas.

On January 3, 2022, a putative securities class action lawsuit was filed in the U.S. District Court for the Eastern District of New York captioned Maltagliati v. Meta Materials Inc., et al., No. 1:21-cv-07203, against Meta, Meta's former Chief Executive Officer, and Meta's former Chief Financial Officer, Torchlight's former Chairman of the Board of Directors, and Torchlight's former Chief Executive Officer. On January 26, 2022, a

Table of Contents

similar putative securities class action lawsuit was filed in the U.S. District Court for the Eastern District of New York captioned McMillan v. Meta Materials Inc., et al., No. 1:22-cv-00463. The McMillan complaint names the same defendants and asserts the same claims on behalf of the same purported class as the Maltagliati complaint. The complaints, purportedly brought on behalf of all purchasers of our publicly traded securities from September 21, 2020 through and including December 14, 2021, assert claims under Sections 10(b) and 20(a) of the Exchange Act arising primarily from a short-seller report and statements related to our business combination with Torchlight. The complaints seek unspecified compensatory damages and reasonable costs and expenses, including attorneys' fees. On April 11, 2022, the Court held a hearing on motions to consolidate the two actions and to appoint a lead plaintiff or lead plaintiffs, but has not yet ruled on the motions.

On January 14, 2022, a shareholder derivative action was filed in the U.S. District Court for the Eastern District of New York captioned Hines v. Palikaras, et al., No. 1:22-cv-00248. The complaint names as defendants certain of Meta's current officers and directors, certain former Torchlight officers and directors, and us (as nominal defendant). The complaint, purportedly brought on behalf of Meta, asserts claims under Section 14(a) of the Exchange Act, contribution claims under Sections 10(b) and 21D of the Exchange Act, and various state law claims such as breach of fiduciary duties and unjust enrichment. The complaint seeks, among other things, unspecified compensatory damages in favor of Meta, certain corporate governance related actions, and an award of costs and expenses to the derivative plaintiff, including attorneys' fees. On March 9, 2022, the Court entered a stipulated order staying this action until there is a ruling on a motion to dismiss in the Securities Class Action.

**Environmental Matters**

The Company is subject to contingencies as a result of environmental laws and regulations. Present and future environmental laws and regulations applicable to the Company's operations could require substantial capital expenditures or could adversely affect its operations in other ways that cannot be predicted at this time. As of September 30, 2022 and December 31, 2021, no amounts had been recorded because no specific liability has been identified that is reasonably probable of requiring the Company to fund any future material amounts.

**7. STOCKHOLDERS' EQUITY**

Next Bridge Hydrocarbons, Inc. has preferred and common stock both at a par value of $.0001. As of September 30, 2022, the Company has issued 165,523,363 shares of common stock and 0 shares of preferred stock.

**8. INCOME TAXES**

The Company recorded no income tax provision at September 30, 2022 and December 31, 2021 because of losses incurred.

The Company estimates its annual effective income tax rate in recording its quarterly provision for income taxes in the various jurisdictions in which it operates. Statutory tax rate changes and other significant or unusual items are recognized as discrete items in the quarter in which they occur. The Company recorded no income tax expense for the nine months ended September 30, 2022 because the Company expects to incur a tax loss in the current year. Similarly, no income tax expense was recognized for the nine months ended September 30, 2021.

The Company had a net deferred tax asset related to federal net operating loss carryforwards of $67,895,119 and $59,481,861 at September 30, 2022 and December 31, 2021, respectively. The federal net operating loss carryforward will begin to expire in 2033. Realization of the deferred tax asset is dependent, in part, on generating sufficient taxable income prior to expiration of the loss carryforwards. The Company has placed a 100% valuation allowance against the net deferred tax asset because future realization of these assets is not assured.

Table of Contents

**9. PROMISSORY NOTES**

Certain assets of the Company were used as collateral for promissory notes entered into by TERI.

Promissory Notes Issued in 2017

On April 10, 2017, TERI sold two 12% unsecured promissory notes with a total of $8,000,000 in principal amount to the Straz Foundation and the Straz Trust in a private transaction. Interest only was due and payable on the notes each month at the rate of 12% per annum, with a balloon payment of the outstanding principal due and payable at maturity on April 10, 2020. The holders of the notes also received annual payments of common stock in TERI at the rate of 2.5% of principal amount outstanding, based on a volume-weighted average price. Both notes were sold at an original issue discount of 94.25% and accordingly, TERI received total proceeds of $7,540,000 from the investors. TERI used the proceeds for working capital and general corporate purposes, which includes, without limitation, drilling capital, lease acquisition capital and repayment of prior debt.

The effective interest rate was 16.15%.

On February 20, 2020, the TERI extended the maturity on $4 million of the 12% unsecured promissory notes previously due in April 2020. The maturity date of the subject promissory note had been extended for one year, from April 10, 2020, to April 10, 2021.

During the quarter ended March 31, 2021, the notes were retired in full by conversion into TERI's common stock.

Promissory Notes Issued in 2018

On February 6, 2018, TERI sold to the Straz Trust in a private transaction a 12% unsecured promissory note with a principal amount of $4,500,000. Interest only was due and payable on the note each month at the rate of 12% per annum, with a balloon payment of the outstanding principal due and payable at maturity on April 10, 2020. The holder of the note also received annual payments of common stock in TERI at the rate of 2.5% of principal amount outstanding, based on a volume-weighted average price. TERI sold the note at an original issue discount of 96.27% and accordingly, TERI received total proceeds of $4,332,150 from the investor. TERI used the proceeds for working capital and general corporate purposes, which includes, without limitation, drilling capital, lease acquisition capital and repayment of prior debt.

The effective interest rate was 15.88%.

During the quarter ended March 31, 2021, the notes were retired in full by conversion into TERI's common stock.

Extension of Promissory Notes

On April 24, 2020, TERI entered into a Note Amendment Agreement with each of the Straz Foundation, as a lender, the Straz Trust, as a lender and collateral agent, and The Northern Trust Company and Christopher M. Straz, as co-trustees of the Straz Trust. Under the Note Amendment Agreement, the parties agreed to amend and restate the two promissory notes issued to the Straz Trust on April 10, 2017 and February 6, 2018 that have total principal outstanding of $8,500,000, along with the promissory note issued to the Straz Foundation on April 10, 2017 which had an outstanding principal amount of $4,000,000. Under the Note Amendment Agreement, the maturity dates of the two promissory notes held by the Straz Trust and the Note held by the Foundation were extended to April 10, 2021. TERI had previously extended the maturity date of the promissory note held by the Straz Foundation to April 10, 2021.

Under the Note Amendment Agreements, we and our subsidiaries provided a first priority lien on certain collateral in favor of the collateral agent for the benefit of the lenders. The collateral includes all assets and

Table of Contents

property held by Hudspeth Oil Corporation and Torchlight Hazel, LLC, which includes without limitation our working interest in certain oil and gas leases in Hudspeth County, Texas, known as the "Orogrande Project" and our working interest in certain oil and gas leases in the Midland Basin in West Texas, known as the "Hazel Project." Further, we and TERI, provided guaranty with respect to payment of the three promissory notes. The Note Amendment Agreements also provided restrictions on the use of proceeds if the Orogrande Project or the Hazel Project were sold.

Additionally, the promissory notes, as amended, provided conversion rights whereby the lenders have the right, at each such lender's option, to convert any portion of principal and interest into shares of common stock of TERI at a conversion price of $1.50 per share.

These notes payable issued in 2017 and 2018 totaling $12,500,000 were retired by conversion into TERI common stock in 2021.

Convertible Notes Issued in October 2018

On October 17, 2018, TERI sold to certain investors in a private transaction 16% Series C Unsecured Convertible Promissory Notes with a total principal amount of $6,000,000. Interest and principal were due and payable on the notes in one balloon payment at maturity on April 17, 2020. The notes were convertible, at the election of the holders, into an aggregate 6% working interest in certain oil and gas leases in Hudspeth County, Texas, known as our "Orogrande Project." After an analysis of the transaction and a review of applicable accounting pronouncements, management concluded that the notes issued on October 17, 2018 which contained a conversion right for holders to convert into a working interest in the Orogrande Project of the Company, meet a specific scope exception to the provisions requiring derivative accounting.

On March 9, 2020, each of the noteholders entered into a Conversion Agreement with us and our subsidiary Hudspeth Oil Corporation ("Hudspeth"), under which the noteholders elected to convert the notes, in accordance with their terms, into an aggregate 6% working interest (of all such holders) in the "Orogrande Project." Principal of $6,000,000 and approximately $1,331,000 of accrued interest were converted at March 9, 2020.

The Conversion Agreements also provided additional consideration to the noteholders including a limited carry, a top-off obligation of Meta or Hudspeth, and warrants to purchase a total of 750,000 restricted shares of TERI common stock, which warrants will have a term of five years and an exercise price of $0.70 per share. The limited carry provides that for the remainder of the 2020 calendar year, Hudspeth will pay all costs and expenses attributable to the assigned working interests, except where prohibited by law or regulation. The top-off obligation provides that, subject to the terms and conditions of the Conversion Agreements, if (a) Hudspeth sells the entire working interest in the Orogrande Project, (b) as part of such sale, the holders' entire working interests are sold, and (c) the gross proceeds received by all the holders in such transaction are equal to less than $9,000,000; then Meta or Hudspeth must pay the holders an amount equal to $9,000,000, (i) less gross proceeds the holders received in the transaction, (ii) less the amount of the carry the holders received under the Conversion Agreements, and (iii) less any gross proceeds the holders received in any farmouts occurring prior to the transaction.

The transaction was treated as an extinguishment of debt by TERI.

Convertible Notes Issued in First Quarter 2019

On February 11, 2019 TERI raised a total of $2,000,000 from investors through the sale of two 14% Series D Unsecured Convertible Promissory Notes. Principal was payable in a lump sum at maturity on May 11, 2020 with payments of interest payable monthly at the rate of 14% per annum. Holders of the notes had the right to convert principal and interest at any time into common stock of TERI at a conversion price of $1.08 per share. TERI had the right to redeem the notes at any time, provided that the redemption amount must include all interest that would have been earned through maturity. TERI evaluated the notes for beneficial conversion features and derivative accounting criteria and concluded that derivative accounting treatment was not applicable.

Table of Contents

On April 21, 2020, TERI entered into agreements to amend the two 14% Series D Unsecured Convertible Promissory Notes that were originally issued on February 11, 2019. Under the amendment agreements, (a) the maturity dates were extended from May 11, 2020 to November 11, 2021, (b) the conversion price under which the noteholders may convert into our common stock was changed from $1.08 to $0.43, and (c) the noteholders were provided the right, at each noteholder's election, to convert their notes into either (i) a working interest in the Orogrande Project at the rate of one acre per $1,100 of principal and unpaid interest converted, or (ii) a working interest in the Hazel Project at the rate of one acre per $1,300 of principal and unpaid interest converted; provided, that the noteholders' right to convert into either such working interest is subject to approval of the collateral agent of the Note Amendment Agreement with the Straz parties.

Under the note amendments, the noteholders agreed to forebear demand or collection on all interest payments due and payable under the Note, including any past due interest payments, for 20 days after the execution of the Note Amendment Agreement. Further, we agreed to (a) issue each holder 20,000 restricted shares of common stock immediately and (b) pay each holder a fee of $10,000, at the same time as the payment of past due interest is paid. The past due interest and fee was paid.

These two promissory notes required monthly payments of interest only at the rate of 14% per annum, with a balloon payment of the outstanding principal due and payable at maturity.

These notes payable have been converted into TERI common stock. $1,000,000 was converted in December 2020 and the remaining $1,000,000 was converted in 2021.

Convertible Notes Issued in Fourth Quarter 2019

Effective October 31, 2019, TERI issued 10% unsecured convertible promissory notes in the amount of $540,000. Principal and interest were due at maturity on December 3, 2020. The principal and accrued interest on the notes were convertible into shares of common stock at $0.75 per common share at any time after the original issue date. The notes were alternatively convertible, at the election of the holders, into an aggregate 0.367% working interest in our Orogrande Project.

These notes payable were retired by conversion into TERI common stock in December 2020.

**10. NOTES PAYABLE, RELATED PARTY**

In 2021, the Company entered into a note payable with Meta to borrow up to $15 million. On October 1, 2021, the Company issued the 2021 Note, which bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023, and the outstanding principal of the 2021 Note will amortize in six equal, monthly installments. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts the Company's ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of its assets, unless the Company is the surviving entity or the successor entity assumes all of obligations under the 2021 Note. The note payable is collateralized by certain shares of common stock in Meta held by one of its stockholders, Gregory McCabe, and by a lien on a 25% interest in the Orogrande Project owned by Wolfbone Investments, LLC, an affiliate of Mr. McCabe.

The balance on the loan as of September 30, 2022 and December 31, 2021 is $15,000,000 and $12,500,000, respectively. The Company incurred interest that is paid in kind of $208,889 for the year ended December 31, 2021. The Company incurred interest that is paid in kind of $948,099 for the nine months ended September 30, 2022.

Table of Contents

On September 2, 2022, we entered into a loan agreement with Meta, as lender (the "Loan Agreement") that would govern prior loan amounts advanced to the Company from Meta. As of August 11, 2022 and August 29, 2022, we borrowed an additional $1.2 million and $1.46 million, respectively, the remaining amount available for borrowing under the Loan Agreement, and resulting in a total of $5.0 million principal amount outstanding related to the Loan Agreement, the proceeds of which were used for working capital and general corporate purposes. The term loans under the Loan Agreement bear interest at a per annum rate equal to 8% and mature on March 31, 2023 (the "Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity, or a combination thereof by the Maturity Date, the Maturity Date will be extended to October 3, 2023 and the term loan would be amortized in six equal monthly installments. The Loan Agreement includes customary representations and covenants that, subject to exceptions and qualifications, restrict our ability to do certain things, such as: engage in mergers, acquisitions, and asset sales; transact with affiliates; undergo a change in control; incur additional indebtedness; incur liens; make loans and investments; declare dividends or redeem or repurchase equity interests; and enter into certain restrictive agreements. In addition, the Loan Agreement contains customary events of default, mandatory prepayment events and affirmative covenants, including, without limitation, covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our material properties, reporting requirements, compliance with applicable laws and regulations, and formation or acquisition of new subsidiaries.

### 11. ASSET RETIREMENT OBLIGATIONS

The following is a reconciliation of the asset retirement obligations liability through September 30, 2022:

| | |
|---|---|
| Asset retirement obligations—December 31, 2021 | $ 21,937 |
| Accretion expense | — |
| Estimated liabilities recorded | — |
| Liability reduction at sale of property | — |
| Asset retirement obligations—September 30, 2022 | $ 21,937 |

Table of Contents

## UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS

Next Bridge Hydrocarbons, Inc. (the "Company", "we", "our", "Next Bridge") is a holding company formed to own an interest in, and act as the sole owner of, Torchlight Energy Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC following the Distribution.

The unaudited pro forma condensed combined balance sheet as of September 30, 2022 (the "pro forma balance sheet"), and the unaudited pro forma condensed combined statement of operations for the nine months ended September 30, 2022 and the year ended December 31, 2021 (the "pro forma statement of operations," together with the pro forma balance sheet and the corresponding notes hereto, the "pro forma financial statements") present the pro forma financial statements of the Company after giving effect to the transfer and assignment to us by Meta of the three subsidiaries described above and the consummation of the Distribution:

The pro forma financial statements have been prepared in accordance with Article 11 of Regulation S-X as amended by the final rule, Release No. 33-10786, "Amendments to Financial Disclosures about Acquired and Disposed Businesses," using the assumptions set forth in the notes to the pro forma financial statements. The pro forma financial statements have been adjusted to include transaction accounting adjustments in accordance with GAAP, linking the effects of the Distribution to the historical consolidated financial statements of the Company, the accounting predecessor to the Company, and the historical combined financial statements of the Company and its subsidiaries.

Prior to the formation of Next Bridge Hydrocarbons, Inc. (formerly named OilCo Holdings, Inc.), our subsidiaries were consolidated into the financial statements of our parent, Meta Materials Inc. (formerly named Torchlight Energy Resources, Inc. ("TERI")). All intercompany transactions have been eliminated in the consolidated financial statements of Meta Materials, Inc.

On June 29, 2021, TERI acquired Metamaterial Inc., an Ontario corporation, and changed its name to Meta Materials, Inc. (with Metamaterial Inc. being the accounting acquiror).

The assumptions and estimates used to determine the adjustments are described in the notes to the pro forma financial statements. The final determination of the adjustments will be based on the actuals that exist as of the Distribution Date and, therefore, cannot be made prior to its completion.

The pro forma financial statements have been prepared from the respective historical consolidated financial statements of Next Bridge with respect to the oil and natural gas assets held by Torchlight Energy Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC, adjusted to give pro forma effect to the Distribution. The pro forma statement of operations for the nine months ended September 30, 2022 and the year ended December 31, 2021, combine the historical consolidated statements of operations of Next Bridge, giving effect to the Distribution as if it had been consummated on January 1, 2021. The pro forma balance sheet combines the historical consolidated balance sheet of Next Bridge as of September 30, 2022, giving effect to the Distribution as if it had been consummated on September 30, 2022.

The pro forma financial statements are presented to reflect the Distribution and do not represent what the Company's financial position or results of operations would have been had the Distribution occurred on the dates noted above, nor do they project the financial position or results of operations of the Company following the Distribution. The transaction accounting adjustments are based on available information and certain assumptions that management believes are factually supportable and are expected to have a continuing impact on the Company's results of operations with the exception of certain non-recurring charges to be incurred in connection with the Distribution, as further described below. In the opinion of management, all adjustments necessary to present fairly the pro forma financial statements have been made.

The Company anticipates that certain non-recurring charges will be incurred in connection with the Distribution. Any such charge could affect the future results of the Company in the period in which such charges are incurred;

Table of Contents

however, these costs are not expected to be incurred in any period beyond 12 months from the Distribution Date. Accordingly, the pro forma statement of operations for the nine months ended September 30, 2022 and the year ended December 31, 2021 reflects the effects of these non-recurring charges.

As a result of the foregoing, the accounting adjustments are preliminary and subject to change as additional information becomes available and additional analysis is performed. The transaction accounting adjustments have been made solely for the purpose of providing the pro forma financial statements presented below.

The pro forma financial statements should be read together with "The Spin-Off," "Capitalization," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Certain Relationships and Related Party Transactions," and the annual and interim financial statements and accompanying notes thereto of Next Bridge included elsewhere in this Prospectus.

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Unaudited Pro Forma Combined Statement of Operations**
**For the Year Ended December 31, 2021**

| | Year Ended December 31, 2021 | Pro Forma Adjustments | Pro Forma Year Ended December 31, 2021 |
|---|---|---|---|
| Oil sales | $ 4,675 | | $ 4,675 |
| Natural gas sales | 11,229 | | 11,229 |
| **Revenue, net** | **15,904** | **—** | **15,904** |
| **Operating expenses** | | | |
| Lease operating expenses | 75,330 | | 75,330 |
| Production and ad valorem tax | 1,001 | | 1,001 |
| General and administrative | 8,050,443 | 2,131,413(c) | 10,181,856 |
| Depreciation, depletion and amortization | 4,642 | | 4,642 |
| Total operating expenses | 8,131,416 | — | 10,262,829 |
| **Other income (expense)** | | | |
| Interest expense | (212,201) | (400,000(b)) | (612,201) |
| Gain (loss) on sale of assets | 1,000 | | 1,000 |
| Gain on extinguishment of debt | 77,477 | | 77,477 |
| Interest income | 10,428 | | 10,428 |
| Total other expense—net | (123,296) | (400,000) | (523,296) |
| **Loss before income taxes** | (8,238,808) | (2,531,413) | (10,770,221) |
| Provision for income tax | — | | |
| **Net loss** | **$(8,238,808)** | **$(2,531,413)** | **(10,770,221)** |
| **Basic and Diluted EPS** | $ (8,238,808) | (2,531,413) | $ (.07) |
| **Weighted average number of common shares outstanding:** | | | |
| **Basic and Diluted** | 1 | 165,523,362(a) | 165,523,363 |

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Unaudited Pro Forma Combined Statements of Operations**
**For the Nine Months Ended September 30, 2022**

| | Nine Months Ended September 30, 2022 | Pro Forma Adjustments | Nine Months Ended September 30, 2022 |
|---|---|---|---|
| Oil Sales | $ 14,323 | $ — | $ 14,323 |
| Natural gas sales | 15,891 | — | 15,891 |
| **Revenue, net** | **30,214** | **—** | **30,214** |
| **Operating expenses (income)** | | | |
| Lease operating expenses | 55,701 | — | 55,701 |
| Production and ad valorem tax | 2,032 | — | 2,032 |
| General and administrative | 3,789,166 | 1,000,000(c) | 4,789,166 |
| Total operating expenses | 3,846,899 | 1,000,000 | 4,846,899 |
| **Other income (expense)** | | | |
| Interest expense | (948,099) | | (948,099) |
| Interest income | 491 | — | 491 |
| Total other expense – net | (947,608) | — | (947,608) |
| **Loss before income taxes** | (4,764,293) | (1,000,000) | (5,764,293) |
| Provision for income tax | — | — | — |
| **Net loss** | **$ (4,764,293)** | **$(1,000,000)** | **$(5,764,293)** |
| **Basic and Diluted** | $ 0.03 | $ (0.01) | (0.04) |
| **Weighted average number of common shares outstanding:** | | | |
| **Basic and Diluted** | 165,523,363 | — | 165,523,363 |

Table of Contents

**Next Bridge Hydrocarbons, Inc. and its Subsidiaries**
**Unaudited Pro Forma Balance Sheet**
**As of September 30, 2022**

| | Historical | Pro Forma Adjustments | Pro Forma |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash | $ 2,108,866 | | $ 2,108,866 |
| Accounts receivable, related party | 165,238 | | 165,238 |
| Grants and other receivables | 50,970 | | 50,970 |
| Prepaid expenses | 6,621 | | 6,621 |
| Total current assets | 2,331,695 | | 2,331,695 |
| Oil and natural gas properties, net | 47,293,607 | | 47,293,607 |
| Other assets | 25,000 | | 25,000 |
| TOTAL ASSETS | $ 49,650,302 | | $ 49,650,302 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 559,991 | $ 1,000,000(c) | $ 1,559,991 |
| Notes payable, related party | 21,156,988 | | 21,156,988 |
| Total current liabilities | 21,716,979 | 1,000,000 | 22,716,979 |
| Asset retirement obligations | 21,937 | | 21,937 |
| Total liabilities | 21,738,916 | 1,000,000 | 22,738,916 |
| Commitments and contingencies | | | |
| Stockholders' equity: | | | |
| Preferred stock, par value $0.0001; 25,000,000 and 50,000,000 shares authorized; 0 issued and outstanding | — | — | |
| Common stock, par value $0.0001; 250,000,000 and 500,000,000 shares authorized; 165,523,363 issued and outstanding | 16,552 | | 16,552 |
| Additional paid-in capital | 100,846,643 | | 100,846,643 |
| Accumulated deficit | (72,951,809) | ) (1,000,000(c) | (73,951,809) |
| Total stockholders' equity | 27,911,386 | (1,000,000) | 26,911,386 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 49,650,302 | $ — | $ 49,650,302 |

Table of Contents

## NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS

### NOTE 1—BASIS OF PRESENTATION AND DESCRIPTION OF TRANSACTIONS

In connection with the Distribution, the Company's common stock will be distributed to the holders of Meta's Series A Preferred Stock on a 1:1 basis.

The pro forma financial statements have been prepared in accordance with Article 11 of Regulation S-X as amended by the final rule, Release No. 33-10786, "Amendments to Financial Disclosures about Acquired and Disposed Businesses," and present the pro forma financial condition and results of operations of the Company based upon the historical financial information of Next Bridge after giving effect to the Distribution and related adjustments set forth in the notes to the pro forma financial statements. The historical consolidated financial statements of Next Bridge were prepared in accordance with U.S. GAAP and shown in U.S. dollars

The pro forma financial statements do not purport to be indicative of the financial position or results of operations of the Company that would have occurred if the Distribution had occurred on the dates indicated, nor are they indicative of Next Bridge's future financial position or results of operations. In addition, future results may vary significantly from those reflected in such statements due to factors discussed under "Risk Factors" included elsewhere in the Prospectus.

### NOTE 2—PRO FORMA ADJUSTMENTS

The pro forma financial statements have been adjusted to reflect the following:

(a) Represents the 165,523,362 shares of the Company's common stock issued to Meta in July 2022, 165,472,241 of which will be distributed to the holders of the Series A Preferred Stock in the Distribution and 51,122 of which will be cancelled contemporaneously with the Distribution.

(b) Represents the Loan Agreement entered into with Meta, including accrued interest expense. As of September 30, 2022, we borrowed advances converted into term loans under the Loan Agreement in the aggregate amount of $5.0 million, the maximum amount available under the Loan Agreement, the proceeds in each case were used for working capital and general corporate purposes. The term loans bears interest at a per annum rate equal to 8%. The Company and Meta intend to enter into an additional promissory note with an estimated principal balance of $1.0 million in respect of costs and expenses incurred in connection with the Distribution which were paid by Meta on behalf of the Company. The Company may enter into additional credit or note payable agreements with Meta in order to secure financing for operations. The amount of this additional commitment is not known.

(c) Reflects the accrual of non-recurring costs of $1,000,000 related to the Distribution incurred during the quarter ended September 30, 2022. The Company may also enter into credit arrangements with certain contractors in order to secure financing for ongoing operations. The amount of credit arrangements are not known.

(d) The pro forma amount does not reflect any amounts owed to Meta under the Tax Matters Agreement, including in respect of any taxes incurred by Meta in connection with the Spin-Off. Based on a valuation of the Company's assets as of June 28, 2021, Meta's net operating loss ("NOLs") balance as of June 28, 2021, and certain assumptions relating to the results of Meta's operations since June 28, 2021 through the end of the taxable year that includes the Spin-Off, limitations imposed under applicable law on the utilization of Meta's NOLs and the adjusted tax basis of Meta in the Company's Common Stock, Meta would not be expected to incur a U.S. federal income tax liability in connection with the Spin-Off. Meta's analysis of the tax impact of the Spin-Off is ongoing, however, and Meta may incur a U.S. federal or state income or other tax liability in connection with the Spin-Off by offsetting any such tax liability with a portion of Meta's consolidated NOLs. Any such use of Meta's consolidated NOLs will reduce the aggregate NOLs that the Company would otherwise have retained as shown above in the Company's interim unaudited financial statements as of September 30, 2022. Based on the current estimated value of the Distribution, Meta is estimating that approximately $6.0 million of these NOLs will be used, and the Company's NOLs after the Spin-Off will be reduced by a corresponding amount. The Spin-Off has the potential to limit any U.S. federal and state NOLs owned by the Company. The Company has continued to have a full valuation against any deferred tax asset related to these NOLs.

# EXHIBIT C

**Exhibit 10.5**

# OPTION AGREEMENT

This option agreement (the "***Option Agreement***"), is made on August 13th 2020 (the "***Effective Date***"), by **TORCHLIGHT ENERGY, INC.**, a Texas corporation, and **TORCHLIGHT HAZEL, LLC**, a Texas limited liability company, whose mailing address is 5700 W. Plano Pkwy #3600, Plano, TX 75093 and email address is john@torchlightenergy.com (collectively "***Torchlight***"), **MASTERSON HAZEL PARTNERS, LP**, a Texas limited partnership whose mailing address is P.O. Box 1189, Midland, TX 79702 and email address is ced@mastersonps.com ("***Masterson***"), and McCabe Petroleum Corporation, a Texas Corporation, whose mailing address is 500 W. Texas Ave. Ste. 890, Midland, TX 79701 and email address is gregmccabe@aol.com ("***MPC***") collectively the "***Parties***".

## *I—DRILLING OBLIGATION & GRANT OF OPTIONS*

Masterson shall drill and complete, or cause to be drilled and completed, at its sole cost and expense (subject to Sections V and VII), a new lateral well on Torchlight's Hazel Prospect[1] (the "***Well***") sufficient to satisfy Torchlight's continuous development obligations on the southern half of the Hazel Prospect[2] ("***Southern Drilling Obligations***"). Masterson shall satisfy the Southern Drilling Obligations no later than September 30, 2020. Provided, however, that Masterson shall be entitled to receive, as its sole recourse for the recoupment of Drilling Costs, the revenue from production of the Well attributable to Torchlight's interest ("***Production Revenue***") until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the Well and the Northern Drilling Obligations as defined below ("Drilling Costs").

In exchange for Masterson satisfying the Southern Drilling Obligations, Torchlight grants to Masterson the exclusive right and option to perform operations, at Masterson's sole cost and expense, on the Hazel Prospect sufficient to satisfy Torchlight's continuous development obligations on the northern half of the Hazel Prospect ("***Northern Drilling Obligations***"),[3] as defined below (the "***Drilling Option***"). Masterson will also pay to Torchlight $1,000.00 at the time this Option Agreement is executed and delivered as further consideration of the Options ("***Option Fee***"). In spite of anything to the contrary, if Masterson fails to satisfy the Southern Drilling Obligations by September 30, 2020, then the Options will automatically terminate, and Torchlight may retain the Option Fee as its sole remedy.

In the event that Masterson exercises such Drilling Option and satisfies the Northern Drilling Obligations, then Masterson shall have the option to purchase the Hazel Prospect under the terms of the Purchase and Sale Agreement which is attached as Exhibit "B" (the "***Purchase Option***"). The Drilling Option and Purchase Option may be collectively referred to herein as the "***Options***".

---

1 "Hazel Prospect" means Torchlight and its subsidiaries' interests in the Hazel Prospect leases and the lands described in Exhibit "A" and the Assets as described in the Purchase Sale Agreement attached as Exhibit "B".

2 The south half of the Hazel Prospect being those 5,131.44 net mineral acres in Sections 70, 71, 72, 73, 74, 75, 41, 86, 87 and 88 as described further in Exhibit "A" and the Assets as described in the Purchase Sale Agreement attached as Exhibit "B".

3 The north half of the Hazel Prospect being those 4,630.64 net mineral acres in Sections 89, 90, 91, 102, 103, 104, 105, 106 and 107 as described further in Exhibit "A".



https://www.sec.gov/Archives/edgar/data/1936756/000119312522194228/d302576dex105.htm[10/19/2024 2:26:02 PM]

### *II—OPTION PERIOD*

The time during which Masterson may exercise the Options shall be from the Effective Date through and including December 1, 2020, unless extended under the terms of this Option Agreement (the "***Option Period***"). The Option Period may be extended to March 11, 2021 if Masterson: (1) has satisfied it obligations regarding the Well; (2) no later than December 1, 2020, delivers notice of intent to conduct operations sufficient to satisfy the Northern Drilling Obligations; and (3) on before December 15, 2020 conducts operations sufficient to satisfy the Northern Drilling Obligations.

### *III—PURCHASE PRICE OF HAZEL PROSPECT*

The full purchase price of the Hazel Prospect is $12,690,704.00 for approximately 9,762.08 net mineral acres (the "***Purchase Price***"), and not less than a 74% net revenue interest (the "***NRI***"), which is payable as provided in this Option Agreement and the "***Purchase Sale Agreement***", which is to be executed by the parties in the form of the document attached as Exhibit "B", if Masterson elects to exercise the Purchase Option. The price per net mineral acre shall be $1,300.00.

As provided in the Purchase Sale Agreement, in the event Masterson establishes that Torchlight or its subsidiaries own more or less net mineral acreage or NRI than set forth above, the Purchase Price shall accordingly be proportionately increased or reduced by the price per net mineral acre.

Torchlight shall maintain and protect the leasehold interest until execution of the Purchase Sale Agreement or give Masterson thirty (30) days prior written notice of Torchlight's intent not to maintain and protect said leasehold interest.

### *IV—MPC REVERSIONARY INTEREST*

In order to induce Masterson to enter into this Option Agreement, on the strict condition of Masterson closing the transaction pursuant to the Purchase Sale Agreement, then MPC (an entity wholly owned by Greg McCabe) agrees to reduce its reversionary interest burdening Torchlight's proportionate interest in the Hazel Prospect (as described in that certain "***Participation Agreement***" dated May 1, 2016) from 20% to not more than 12.5%.

### *V—THE WELL*

The Well shall be a lateral well drilled by, or caused to be drilled by, Masterson utilizing a stimulation method at a location and length approved, in writing and prior to commencement, by Greg McCabe or Rich Masterson. Masterson, its affiliates and agents shall have the right to use any and all necessary Torchlight facilities, including, but not limited to, Torchlight or its affiliates' tank battery. At all times Masterson shall conduct itself and the operations in a manner consistent with a reasonably prudent operator.

If, during the drilling of the Well, Masterson shall encounter granite or any other practically impenetrable substance or encounter mechanical difficulties or if the hole is lost for any reason not reasonably within control of Masterson, Masterson shall have and is hereby granted the right to





https://www.sec.gov/Archives/edgar/data/1936756/000119312522194228/d302576dex105.htm[10/19/2024 2:26:02 PM]

abandon said well; and Masterson may commence the actual drilling and completion, at Masterson's sole costs and expense (subject to Section VII), of a substitute well to serve as the Well. If a substitute well is commenced, it will be drilled at a location and using a stimulation method and depth as approved by Greg McCabe or Rich Masterson. For the avoidance of doubt, the substitute well shall be deemed to be the Well for all purposes of this Option Agreement.

Torchlight shall instruct the payor of any proceeds of production to deliver all income attributable to Torchlight's interest that is generated from the Well directly to Masterson until Masterson's Drilling Costs have been recouped in full. In the event Torchlight receives any proceeds that should have been delivered to Masterson, Torchlight shall immediately notify Masterson and send the misdelivered proceeds to Masterson.

### *VI—PURCHASE SALE AGREEMENT*

Within ten (10) days of a timely election of Masterson's exercise of the Purchase Option pursuant to Section IV, Torchlight and Masterson shall execute the Purchase Sale Agreement for the Hazel Prospect attached as Exhibit "B".

The Parties covenant that at any time after the Effective Date of this Option Agreement, they will execute such additional instruments and take such actions as may be reasonably be requested by the party(ies) to confirm or perfect or otherwise to carry out the intent and purposes of this Option Agreement.

### *VII—FAILURE TO EXERCISE OPTION*

If Masterson does not exercise the Drilling Option in accordance with its terms and within the Option Period, the Purchase Option and the rights of Masterson will automatically and immediately terminate.

Pursuant to the terms of Section V, if Masterson fails to exercise the Purchase Option, Masterson shall retain any and all income from the Well until Masterson recoups all Drilling Costs, as Masterson's sole recourse in recouping its Drilling Costs.

### *VIII—NOTICES*

All notices provided for in this Option Agreement will be deemed to have been given if and when deposited in the United States mail by registered or certified mail, properly stamped and addressed to the party for whom intended, at the party's address listed above, or when delivered personally in writing to the party, or via electronic mail to the addresses provided in the Option Agreement.

### *IX—BINDING EFFECT AND MISCELLANEOUS PROVISIONS*

This Option Agreement and corresponding Purchase Sale Agreement are subject to any and all leases, assignments, or other public filings affecting the Assets, the Participation Agreement, that certain Farmout Agreement executed by and between Oxy USA, Inc. and Imperial Exploration, LLC on March 21, 2016, and that certain Joint Operating Agreement executed by, between, and among Torchlight Energy Operating, LLC, Torchlight Energy, Inc., and Imperial Exploration, LLC on May 1, 2016 ("***JOA***").

This Option Agreement is not transferable nor assignable unless agreed to by the Parties in writing and will be binding on and inure to the benefit of the Parties to them and to their respective heirs, personal representatives, successors, and assigns. Any assignment made in violation of this requirement is void.

Except as otherwise expressly provided herein, no waiver with respect to this Option Agreement shall be enforceable unless in writing and signed by the party against whom enforcement is sought. Except as otherwise expressly provided herein, no failure to exercise, delay in exercising, or single or partial exercise of any right, power or remedy by any party, and no course of dealing between or among any of the Parties, shall constitute a waiver of, or shall preclude any other or further exercise of, any right, power or remedy.

This Option Agreement may be executed in counterparts, each of which shall be deemed an original and both considered one and the same Option Agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by e-mail delivery of a ".pdf format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such ".pdf' signature page were an original thereof. This Option Agreement shall only be binding on the Parties and their respective successors and assigns when executed by both of the Parties.

In connection with the negotiation and drafting of this Option Agreement, the Parties represent and warrant to each other that they have had the opportunity to be advised by attorneys of their own choice and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Option Agreement or any amendments hereto.

If any provision of this Option Agreement is held to be illegal, invalid, or unenforceable under present or future law, such provision shall be fully severable and this Option Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically, as part of this Option Agreement, a provision as similar in terms and substance to such illegal, invalid, or unenforceable provision as may be possible and legal, valid, and enforceable.

The Parties agree that as between the Parties hereto the terms in this Option Agreement shall prevail should there be any conflict with any other agreement, including, but not limited to, the Purchase Sale Agreement.

Capitalized terms used but not defined herein shall have the respective meanings given to them in the Purchase Sale Agreement.





https://www.sec.gov/Archives/edgar/data/1936756/000119312522194228/d302576dex105.htm[10/19/2024 2:26:02 PM]

This Option Agreement shall be governed by and construed in accordance with the domestic laws of the State of Texas without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Texas. The Parties agree that venue is proper in Midland County, Texas and if venue is not mandatory shall be filed in a court of competent jurisdiction in Midland County, Texas.

This Option Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and assigns.

Each of the Parties agrees to execute, acknowledge, and deliver to the other party such further instruments, and take such other actions, as may be reasonably requested in order to more effectively assure to said other party all of the respective rights, titles, interests, and privileges intended to be assigned or inuring to the benefit of such party in consummation of the transactions contemplated hereby.

The Parties agree that this Option Agreement is intended to be a fully-integrated document, and all prior agreements or understanding regarding the subject matter are superseded by this Option Agreement.

A Party prevailing in any legal action arising from this Option Agreement shall be entitled to recover its reasonable and necessary attorney fees and costs from the non-prevailing Party(ies).

[*Signature pages follow*.]



https://www.sec.gov/Archives/edgar/data/1936756/000119312522194228/d302576dex105.htm[10/19/2024 2:26:02 PM]

The Option Agreement has been executed as of the Effective Date set forth above.

**TORCHLIGHT ENERGY, INC.**

**X:** */s/* John A. Brda
**Name:** John A. Brda
**Title:** CEO

**TORCHLIGHT HAZEL, LLC**

**X:** */s/* John A. Brda
**Name:** John A. Brda
**Title:** Manager

**MASTERSON HAZEL PARTNERS, LP**

**X:** */s/* Clifton DuBose, Jr.
**Name:** Clifton Edwin DuBose, Jr.
**Title:** CEO of Masterson Hazel Management, LLC, its General Partner

**MCCABE PETROLEUM CORPORATION**

**X:** */s/* Greg McCabe
**Name:** Greg McCabe
**Title:** President

# EXHIBIT D

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2022**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission File Number: **333-266143**

# NEXT BRIDGE HYDROCARBONS, INC.

(Exact name of registrant as specified in its charter)

| **Nevada** | **87-2538731** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**6300 Ridglea Place, Suite 950**
**Fort Worth, TX 76116**
(Address of principal executive offices) (Zip Code)

**(817) 438-1937**
(Registrant's telephone number, including area code)

**N/A**
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.0001 per share | N/A | N/A |

Securities registered pursuant to Section 12(g) of the Act: None

Our common stock is not publicly traded and is not eligible for electronic transfer through the Depository Trust Company book-entry system or any other established clearing corporation.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Table of Contents

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ | Non-accelerated filer | ☒ | Smaller reporting company | ☒ | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management assessment of the effectiveness of its internal controls over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The approximate aggregate market value of the 152,544,749 shares of common stock held by non-affiliates of the registrant, as of March 31, 2023, was $442,379,772.10.

| Class | Outstanding at March 24, 2023 |
|---|---|
| Common stock, par value $0.0001 per share | 165,472,241 |

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive Proxy Statement for its 2023 Annual Meeting of Stockholders (to be filed with the Securities and Exchange Commission on or before April 30, 2023) are incorporated by reference into Part III of this Form 10-K.

Table of Contents

**Table of Contents**


| | | |
|---|---|---|
| | **PART I** | |
| Item 1. | Business | 4 |
| Item 2. | Properties | 4 |
| Item 1A. | Risk Factors | 13 |
| Item 1B. | Unresolved Staff Comments | 27 |
| Item 3. | Legal Proceedings | 27 |
| Item 4. | Mine Safety Disclosures | 27 |
| | **PART II** | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 28 |
| Item 6. | Reserved | 28 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 29 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 39 |
| Item 8. | Financial Statements and Supplementary Data | 40 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 41 |
| Item 9A. | Controls and Procedures | 41 |
| Item 9B. | Other Information | 43 |
| | **PART III** | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 44 |
| Item 11. | Executive Compensation | 44 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 44 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 44 |
| Item 14. | Principal Accounting Fees and Services | 44 |
| | **PART IV** | |
| Item 15. | Exhibits and Financial Statement Schedules | 45 |
| Item 16. | Form 10-K Summary | 47 |
| | Signatures | 48 |

Table of Contents

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

The information contained in this report includes "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These forward-looking statements are identified by their use of terms such as "can," "could," "continuing," "may," "will," "expect," "anticipate," "aim," "estimate," "intend," "ongoing," "plan," "predict," "potential," "project," "should," "seeks," "believe," "likely to" and similar words, phrases or expressions. All statements, other than statements of historical facts, included in this report, are forward-looking statements, including statements mentioned under "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," regarding:

- amount and timing of future production of oil and natural gas;
- amount, nature and timing of capital expenditures;
- the number of anticipated wells to be drilled after the date hereof;
- the availability of exploration and development opportunities;
- our financial or operating results;
- our cash flow and anticipated liquidity;
- operating costs including lease operating expenses, administrative costs and other expenses;
- finding and development costs;
- our business strategy; and
- other plans and objectives for future operations.

Our actual results and condition could differ materially from those implied or expressed in the forward-looking statements for any reason. They can be affected by a number of factors, including, among others:

- the risks described in "Risk Factors" and elsewhere in this report;
- the volatility of prices and supply of, and demand for, oil and natural gas;
- the timing and success of our drilling activities;
- the numerous uncertainties inherent in estimating quantities of oil and natural gas reserves and actual future production rates and associated costs;
- our ability to successfully identify, execute or effectively integrate future acquisitions;
- the usual hazards associated with the oil and natural gas industry, including fires, well blowouts, pipe failure, spills, explosions and other unforeseen hazards;
- our ability to effectively market our oil and natural gas;
- the availability of rigs, equipment, supplies and personnel;
- our ability to discover or acquire additional reserves;
- our ability to satisfy future capital requirements;
- changes in regulatory requirements;
- general economic conditions, status of the financial markets and competitive conditions; and
- our ability to retain key members of our senior management and key employees.

Moreover, we operate in a rapidly evolving environment. New risk factors and uncertainties emerge from time to time, and it is not possible for our management to predict all the risk factors and uncertainties, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. We qualify all of our forward-looking statements by these cautionary statements.

You should not rely upon forward-looking statements as predictions of future events. The forward-looking statements made in this report relate only to events or information available to us as of the date of this report. Except as required by law, we undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

Table of Contents

## DEFINITIONS

The following are abbreviations and definitions of terms commonly used in the oil and gas industry and in this report. Natural gas equivalents and crude oil equivalents are determined using the ratio of six Mcf to one barrel. All references to "us", "our", "we", or "Next Bridge" mean Next Bridge Hydrocarbons, Inc. and where applicable, its consolidated subsidiaries.

"**Bbl**" means a barrel of U.S. 42 gallons of oil.

"**BOE**" means one barrel of oil equivalent.

"**Completion**" means the installation of permanent equipment for the production of oil or gas.

"**Condensate**" means natural gas in liquid form produced in connection with natural gas wells.

"**Exploratory well**" means a well drilled to find a new field or to find a new productive reservoir in a field previously found to be productive of oil or natural gas in another reservoir or to extend a known reservoir.

"**Gross**" when used with respect to acres or wells, production or reserves refers to the total acres or wells in which we or another specified person has a working interest.

"**MBbls**" means one thousand barrels of oil.

"**Mcf**" means one thousand cubic feet of natural gas.

"**Net**" when used with respect to acres or wells, refers to gross acres of wells multiplied, in each case, by the percentage working interest owned by us.

"**NGL**" refers to natural gas liquids, which is composed exclusively of carbon and hydrogen.

"**Oil**" means crude oil or condensate.

"**Operator**" means the individual or company responsible for the exploration, development, and production of an oil or gas well or lease.

"**Proved developed non-producing**" means reserves (i) expected to be recovered from zones capable of producing but which are shut-in because no market outlet exists at the present time or whose date of connection to a pipeline is uncertain or (ii) currently behind the pipe in existing wells, which are considered proved by virtue of successful testing or production of offsetting wells.

"**Proved developed producing**" means reserves expected to be recovered from currently producing zones under continuation of present operating methods. This category includes recently completed shut-in gas wells scheduled for connection to a pipeline in the near future.

"**Proved developed reserves**" means reserves that can be expected to be recovered through existing wells with existing equipment or operating methods.

"**Proved reserves**" means the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided by contractual arrangements.

"**Proved undeveloped reserves**" means reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Reserves on undrilled acreage are limited to those drilling locations offsetting productive wells that are reasonably certain of production when drilled or where it can be demonstrated with certainty that there is continuity of production from the existing productive formation.

"**Recompletion**" means the completion for production of an existing well bore in another formation from which the well has been previously completed.

Table of Contents

"**Royalty**" means an interest in an oil and gas lease that gives the owner of the interest the right to receive a portion of the production from the leased acreage (or of the proceeds of the sale thereof), but generally does not require the owner to pay any portion of the costs of drilling or operating the wells on the leased acreage. Royalties may be either landowner's royalties, which are reserved by the owner of the leased acreage at the time the lease is granted, or overriding royalties, which are usually reserved by an owner of the leasehold in connection with a transfer to a subsequent owner.

**"SEC**" means the United States Securities and Exchange Commission.

"**Working interest**" means an interest in an oil and gas lease that gives the owner of the interest the right to drill for and produce oil and gas on the leased acreage and requires the owner to pay a share of the costs of drilling and production operations. The share of production to which a working interest owner is entitled will always be smaller than the share of costs that the working interest owner is required to bear, with the balance of the production accruing to the owners of royalties. For example, the owner of a 100% working interest in a lease burdened only by a landowner's royalty of 12.5% would be required to pay 100% of the costs of a well but would be entitled to retain 87.5% of the production.

Table of Contents

## Part I

### Items 1 and 2. Business and Properties

*The following description of the business of Next Bridge Hydrocarbons, Inc. should be read in conjunction with the information included elsewhere in this report on Form 10-K for the year ended December 31, 2022. Unless the context otherwise requires, the terms "Company," "Next Bridge," "we," "us," or "our" refer to Next Bridge Hydrocarbons, Inc. and its consolidated subsidiaries, including Torchlight Hazel, LLC, a Texas limited liability company ("Torchlight Hazel"), Hudspeth Oil Corporation, a Texas corporation ("Hudspeth"), Hudspeth Operating, LLC, a Texas limited liability company ("Hudspeth Operating"), and Torchlight Energy, Inc., a Nevada corporation ("TEI").*

**Overview.**

We were incorporated in Nevada on August 31, 2021, as OilCo Holdings, Inc. and changed our name to Next Bridge Hydrocarbons, Inc. pursuant to our Amended and Restated Articles of Incorporation filed on June 30, 2022. We recently spun-off from Meta Materials, Inc. ("Meta") pursuant to which we became an independent company. Prior to the spin-off, we were a wholly-owned subsidiary of Meta. The accompanying Financial Statements present predecessor period information for the period of January 1, 2022 through December 14, 2022 (the "Predecessor Period") and successor period information for the period of December 14, 2022 through December 31, 2022 (the "Successor Period") separately where appropriate.

We are an energy company engaged in the acquisition, exploration, exploitation and development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and natural gas project we hold in the Orogrande Basin in West Texas in Hudspeth County, Texas (the "Orogrande Project"). In addition, we have minor interests in the Eastern edge of the Midland Basin in Sterling, Tom Green and Irion Counties, Texas (the "Hazel Project"), and two minor well interests located in Oklahoma (the "Oklahoma Properties").

We operate our business through four wholly owned subsidiaries: TEI, Hudspeth, Torchlight Hazel, and Hudspeth Operating.

As of December 31, 2022, we had interests in three oil and natural gas projects: the Orogrande Project, the Hazel Project, and the Oklahoma Properties in partnership with Kodiak Oil & Gas Exploration Inc. in Central Oklahoma.

In August 2020, our subsidiaries entered into the Option Agreement (defined below) with MHP (defined below), under which, in exchange for satisfying certain drilling obligations, MHP had the option to purchase the entire Hazel Project, which MHP determined not to exercise; however, MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the well attributable to our interest until such time as it has recovered its reasonable costs and expenses for drilling, completing and operating the well. Operations continue under the Option Agreement until such time as the revenue from the project equates to the dollars spent by, and shall be reimbursed to, MHP. At such time, any acreage held by production and all wells will revert back to our subsidiary, Torchlight Hazel. See "Current Projects" below for additional discussion regarding our oil and natural gas properties.

**Market Opportunity.**

The market for any oil and natural gas that we may produce depends on factors beyond our control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, demand for oil and natural gas, the marketing of competitive fuels, and the effects of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial, and individual consumers.

Our oil production is expected to be sold at prices tied to the spot oil markets. Our natural gas production is expected to be sold under short-term contracts and priced based on first of the month index prices or on daily spot market prices. We will rely on our operating partners to market and sell our production.

**Our Competitive Strengths.**

*Experienced People.* We have six full-time employees and we expect to engage consultants for various roles as needed including high quality exploration and technical partners. Our internal operations team serves as the foundation of our values-driven culture and commitment to developing a skilled, agile, diverse and engaged workforce. Advancing a safe, ethical, inclusive and diverse culture creates an environment that attracts and retains the high-performing workforce needed to successfully execute our strategy. We plan to continue to build on the expertise and experiences of our management and operations teams and seek guidance from outside advisors as well as our Board.

Table of Contents

*Project Focus.* We are focusing primarily on exploration projects backed by a high degree of scientific information. We may pursue high risk exploration prospects which may appear less favored than low risk exploration. We will, however, consider these high risk-high reward exploration prospects in connection with exploitation opportunities in a project that would reduce the overall project economic risk. We will consider such high risk-high reward prospects on their individual merits.

*Limit Capital Risks.* Limited capital exposure is planned initially to add value to a project and determine its economic viability. Management has experience in successfully managing risks of projects, finance, and value.

**Business Strategy.**

Our mission is to safely increase production and cash flow from our oil and natural gas properties which we believe are rich in opportunities through a disciplined allocation of capital and operational management for the benefit of our shareholders. Our business strategy is designed to accomplish this mission by focusing on two key objectives: (1) maximize the value of our producing assets; and (2) progress our discovered resources into proved reserves, production, and cash flow through efficient appraisal, development and exploitation. We believe there are three principal business processes that we must follow to enable our operations to be profitable. Each major business process offers the opportunity for a distinct partner or alliance as we grow. These processes are:

- Investment Evaluation and Review;
- Operations and Field Activities; and
- Administrative and Finance Management.

*Investment Evaluation and Review.* We believe this process is the key ingredient to our success. Recognition of quality investment opportunities is the fuel that drives our engine. Broadly, this process includes the following activities: prospect acquisition, regional and local geological and geophysical evaluations, data processing, economic analysis, lease acquisition and negotiations, permitting, and field supervision. We expect these evaluation processes to be managed by our management team. Expert or specific technical support will be outsourced as needed.

*Operations and Field Activities.* This process begins following management approval of an investment. Well site supervision, construction, drilling, logging, product marketing, and transportation are examples of some activities. We will prefer to be the operator where possible.

*Administrative and Finance Management.* This process coordinates our initial structuring and capitalization, general operations and accounting, reporting, audit, banking and cash management, regulatory agencies reporting and interaction, timely and accurate payment of royalties, taxes, leases rentals, vendor accounts and performance management that includes budgeting and maintenance of financial controls, and interface with legal counsel and tax and other financial and business advisors.

**Current Projects.**

As of December 31, 2022, we had interests in three oil and natural gas projects: the Orogrande Project, the Hazel Project, and the Oklahoma Properties.

Orogrande Project, West Texas

On August 7, 2014, our predecessor entered into a Purchase Agreement with Hudspeth, McCabe Petroleum Corporation ("MPC"), and Gregory McCabe ("Mr. McCabe"), the sole owner of Wolfbone Investments, LLC ("Wolfbone"). Mr. McCabe was the sole owner of both Hudspeth and MPC. Under the terms and conditions of the Purchase Agreement, our predecessor acquired 100% of the capital stock of Hudspeth which held certain oil and natural gas assets, including a 100% working interest in approximately 172,000 predominately contiguous acres in the Orogrande Basin in West Texas; provided, that the Company now has an interest in approximately 134,000 based on the expiration of certain leases since acquired. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe. Mr. McCabe also holds a 4.5% overriding royalty interest in the Orogrande acreage, which he obtained prior to, and was not a part of the August 2014 transaction.

Table of Contents

Effective March 27, 2017, the property became subject to a University Lands D&D Unit Agreement (the "DDU Agreement") which allows for all 192 existing leases covering approximately 134,000 gross acres leased from University Lands to be combined into one drilling and development unit for development purposes. The term of the DDU Agreement expires on December 31, 2023, and the time to drill on the drilling and development unit continues through December 31, 2023. The DDU Agreement also grants the right to extend the DDU Agreement through December 31, 2028 if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid. As of December 31, 2022, leases covering approximately 134,000 acres remain in effect.

On July 25, 2018, we and Hudspeth entered into a Settlement & Purchase Agreement (the "Settlement Agreement") with University Founders (and Founders Oil & Gas Operating, LLC, former operator) ("Founders"), Wolfbone and MPC (entities controlled by a related party), which agreement provided for Founders assigning all of its working interest in the oil and natural gas leases of the Orogrande Project to Hudspeth and Wolfbone equally. Future well capital spending obligations remained the same 50% contribution from Hudspeth and 50% from Wolfbone until such time as the $40.5 million to be spent on the project. Cumulative capital spending did not exceed $40.5 million until after the closing of the merger between Meta and Torchlight Energy Resources, Inc. in June 2021.

Our drilling obligations under the DDU Agreement included five wells per year in years 2021 and 2022. The drilling obligations were minimum yearly requirements and may be exceeded if acceleration is desired. All drilling obligations through December 31, 2021 were met. On November 7, 2022, we extended the term applicable to our 2022 fiscal year drilling obligations in the Orogrande Project in order to stay in compliance with the continuous drilling clause under the DDU Agreement. As of December 31, 2022, we were in compliance with our drilling obligations under the DDU Agreement.

We have drilled a total of 15 test wells in the Orogrande Project properties to test for potential shallow pay zones and deeper pay zones that may be present on structural plays. Two horizontal wells were successfully completed for hydrocarbons through the 2020 drilling program however as of December 31, 2022 both wells remain shut-in waiting for hook up to a gas pipeline. The various wells drilled on the Orogrande Basin through 2022 confirmed that there are at least five potential distinct reservoirs under our acreage. While these wells may have potential to produce hydrocarbons to sell commercially in the future, due to capital constraints we have no immediate plans to deploy the capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including well locations, target depths and designated acreage, in the Orogrande Project. The remaining wells can be used for future development for various applications such as re-entering the wellbores for horizontal unconventional development, fresh water supply, or salt water disposal and/or plugged and abandoned.

On March 9, 2020, holders of certain notes payable by the Company entered into a Conversion Agreement under which the noteholders elected to convert principal of $6 million and approximately $1.331 million of accrued interest on the notes held by such holders, in accordance with their terms, into an aggregate 6% working interest (of all such holders) in the Orogrande Project.

The Orogrande Project ownership as of December 31, 2021 and December 31, 2022 is detailed as follows:

| | Revenue Interest | Working Interest |
|---|---|---|
| University Lands—Mineral Owner | 20.000% | n/a |
| ORRI—Magdalena Royalties, LLC, an entity controlled by Gregory McCabe | 4.500% | n/a |
| ORRI—Unrelated Party | 0.500% | n/a |
| Hudspeth Oil Corporation, a subsidiary of Next Bridge Hydrocarbons, Inc. | 49.875% | 66.500% |
| Wolfbone Investments, LLC, an entity controlled by Gregory McCabe | 18.750% | 25.000% |
| Conversion by Note Holders in March, 2020 | 4.500% | 6.000% |
| Unrelated Party | 1.875% | 2.500% |
| | 100.000% | 100.000% |

Hazel Project in the Midland Basin in West Texas

Effective April 4, 2016, TEI acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. A back-in after payout of a 25% working interest was retained by MPC and another unrelated working interest owner.

In October 2016, the holders of all of Torchlight Energy Resources, Inc.'s then-outstanding shares of Series C Preferred Stock (which were issued in July 2016) elected to convert into a total 33.33% working interest in our Hazel Project, reducing our ownership from 66.66% to a 33.33% working interest.

*Acquisition of Additional Interests in Hazel Project*

On January 30, 2017, we entered into and closed an Agreement and Plan of Reorganization and a Plan of Merger with an entity which was wholly owned by Mr. McCabe, which resulted in the acquisition of approximately 40.66% working interest in the 12,000 gross acres, 9,600 net acres, in the Hazel Project.

Table of Contents

Also, on January 30, 2017, the Company entered into and closed a Purchase and Sale Agreement with Wolfbone. Under the agreement, we acquired certain of Wolfbone's Hazel Project assets, including its interest in the Flying B Ranch #1 well and the 40 acre unit surrounding the well.

Upon the closing of the transactions, our working interest in the Hazel Project increased by 40.66% to a total ownership of 74%.

Effective June 1, 2017, we acquired an additional 6% working interest from unrelated working interest owners increasing our working interest in the Hazel Project to 80%, and an overall net revenue interest of 75%.

The Company has drilled seven test wells on the Hazel Project to capture and document the scientific base in support of demonstrating the production potential of the property. No wells were drilled on the Hazel Project during the year ended December 31, 2022.

*Option Agreement with Masterson Hazel Partners, LP*

On August 13, 2020, our subsidiaries TEI and Torchlight Hazel (collectively, "Torchlight Subs") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and MPC. Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on our Hazel Project, sufficient to satisfy Torchlight Subs's continuous development obligations on the southern half of the prospect no later than September 30, 2020. MHP has satisfied this drilling obligation. MHP paid to Torchlight Subs $1,000 as an option fee at the time of execution of the Option Agreement. MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the Well attributable to Torchlight Subs's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the Well.

In exchange for MHP satisfying the above drilling obligations, Torchlight Subs granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight Subs's continuous development obligations on the northern half of the prospect. Because MHP exercised this drilling option and satisfied the continuous development obligations on the northern half of the prospect, under the terms of the Option Agreement (as amended in September 2020) MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. Such purchase would be under the terms of a form of Purchase and Sale Agreement included as an exhibit to the Option Agreement, at an aggregate purchase price of $12,690,704 for approximately 9,762 net mineral acres, and not less than 74% net revenue interest (approximately $1,300 per net mineral acre). MHP declined to exercise the option in 2021.

Oklahoma Properties in the Hunton Play of Central Oklahoma

Presently, we are producing from one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

**Oil and Natural Gas Reserves.**

Other than the Producing Hazel Wells (defined below), the only producing properties owned by us were the Oklahoma Properties, which were marginally producing and were uneconomic for reserve calculation purposes. At the end of 2021, reserves did not include any value for proved undeveloped properties.

We currently have two producing wells located on the Hazel Project, the Flying B Ranch #3H well and the Flying B Ranch #4H well (the "Producing Hazel Wells"). Production is from the Wolfcamp formation. At December 31, 2021, there were no proved reserves or proved developed nonproducing reserves related to these properties after giving effect to the obligation to reimburse drilling costs incurred by MHP.

The operating expenses reflect a substantial reduction from previous years as electric power is available and water is now disposed of on location after we drilled or converted a well to be used for saltwater disposal. Initial gross oil production from the Flying B Ranch #3H well reached 8,319 Bbl per month and 31,613 Bbl per month of water. The initial gross monthly production rate for the Flying B Ranch #4H was estimated to be 4,200 Bbl, although we will receive no future revenue from these wells until their estimated depletion because all of such revenue, after deducting expenses to produce the oil, is to be received by MHP directly and credited toward the recoupment of drilling costs incurred by MHP.

As of December 31, 2022, our proved developed nonproducing reserves related to the Producing Hazel Wells totaled -0- BOE, after giving effect to the obligation to reimburse drilling costs incurred by MHP. As of December 31, 2022, the outstanding cost reimbursement balance owed to MHP was $3,779,827.

Table of Contents

**Production, Price and Cost Summary.**

Oklahoma Properties

During the year ended December 31, 2021, we produced and sold 85 barrels of oil net to our interest at an average sale price of $55.00 per Bbl. We produced and sold 3,586 Mcf of gas net to our interest at an average sales price of $3.17 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $18.54 per BOE. Our depreciation, depletion, and amortization expense was $-0- per BOE.

During the year ended December 31, 2022, we produced and sold 183 Bbls net to our interest (168 for the predecessor period plus 15 for the successor period) at an average sale price of $98.75 per Bbl. We produced and sold 3,031 Mcf of natural gas net to our interest (2,789 for the predecessor period plus 242 for the successor period) at an average sales price of $7.51 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $42.68 per BOE. Our depreciation, depletion, and amortization expense was $-0- per BOE.

Hazel Project

During the year ended December 31, 2021, 23,422 barrels of oil net to our interest were sold at an average sale price of approximately $60.00 per Bbl, although we received none of this revenue because all of it, after deducting expenses to produce the oil, was either received by MHP directly during the time that the Option Agreement was in effect or credited towards the recoupment of drilling costs incurred by MHP. We produced and sold -0- Mcf of natural gas net to our interest.

| | December 31, 2021 Reserves | | | December 31, 2021 Future Net Revenue (M$) | |
|---|---|---|---|---|---|
| Category | Oil (Bbls) | Gas (Mcf) | Total (BOE) | Total | Present Value Discounted at 10% |
| Net Proved Producing | 0 | 0 | 0 | $ — | $ — |
| Net Proved Nonproducing | 0 | 0 | 0 | $ — | $ — |
| Total Net Proved | 0 | 0 | 0 | $ — | $ — |
| Standardized Measure of Future Net Cash Flows Related to Proved Oil and Gas Properties | | | | | $ — |
| Probable Undeveloped | | | | $ — | $ — |

During the year ended December 31, 2022, 22,511 barrels of oil net to our interest (21,647 for the predecessor period plus 864 for the successor period) were sold at an average sale price of approximately $55.98 per Bbl, although we received none of this revenue because all of it, after deducting expenses to produce the oil, was either received by MHP directly during the time that the Option Agreement was in effect or credited towards the recoupment of drilling costs incurred by MHP. We produced and sold -0- Mcf of natural gas net to our interest.

| | December 31, 2022 Reserves | | | December 31, 2022 Future Net Revenue (M$) | |
|---|---|---|---|---|---|
| Category | Oil (Bbls) | Gas (Mcf) | Total (BOE) | Total | Present Value Discounted at 10% |
| Net Proved Producing | 0 | 0 | 0 | $ 0 | $ 0 |
| Net Proved Nonproducing | 0 | 0 | 0 | $ — | $ — |
| Total Net Proved | 0 | 0 | 0 | $ — | $ — |
| Standardized Measure of Future Net Cash Flows Related to Proved Oil and Gas Properties | | | | | $ — |
| Probable Undeveloped | 0 | 0 | 0 | $ — | $ — |

The net producing reserves from 2021 and 2022 were -0- BOE related to the Producing Hazel Wells due to the obligation to pass revenue through to MHP under the terms of the Option Agreement effective during both periods. Since we have no reserve value as of December 31, 2021 and December 31, 2022, Standardized Measure is not presented.

Due to the inherent uncertainties and the limited nature of reservoir data, both proved and probable reserves are subject to change as additional information becomes available. The estimates of reserves, future cash flows, and present value are based on various assumptions, including those prescribed by the SEC, and are inherently imprecise.

Table of Contents

Investments to support our oil and natural gas properties during the years ended December 31, 2022 and 2021 were $5.8 million ($3.8 million for the predecessor period plus $2.0 million for the successor period) and $14.8 million, respectively.

| | Fiscal Year Ended December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Property acquisition costs | $ — | $ — |
| Development costs | 5,835,880 | 14,805,511 |
| Exploratory costs | — | — |
| Totals | $ 5,835,880 | $ 14,805,511 |

Property development costs presented above exclude interest capitalized into the full cost pool. For the year ended December 31, 2022, we capitalized $1,363,538 ($1,289,328 for the predecessor period plus $74,210 for the successor period) of interest on unevaluated properties. Capitalized interest for the year ended December 31, 2021 was $141,048.

The development costs for 2021 include work in the Orogrande and Hazel Projects in West Texas and for 2022 the development costs include work solely in the Orogrande Project. We made progress during 2022 to develop proved producing reserves in the Orogrande Project in the Permian Basin in West Texas, which has not yet resulted in hydrocarbon production. We incurred costs of $5.8 million in relation to certain drilling activity carried out to remain in compliance with all aspects of our lease obligations and to satisfy the continuous drilling clause under the agreement with University Lands, whereby we are obligated to satisfy certain minimum yearly requirements that may be exceeded if desired. No development costs were incurred in 2021 or 2022 for the Oklahoma Properties. During the fiscal years ended December 31, 2021 and 2022, development and exploratory net wells were drilled as set forth in the table below.

**Drilling Activity Summary.**

| | December 31, | |
|---|---|---|
| | **2022** | **2021** |
| Hazel Project (Texas) | | |
| Dry | 0 | 1.60 |
| Productive | 0 | 0.00 |
| Orogrande Project (Texas) | | |
| Dry | 0 | 0.67(1) |
| Productive | 0 | 2.66 |

(1) Represents drilling re-entry to explore more of the formation.

During 2022, we completed pre-drilling and development activity for our 2022 drilling program, including surveying, permitting, road and pad site work and initial drilling at an aggregate cost of $3,583,235. We commenced drilling activities in December 2022 and have until March 31, 2023 to fully satisfy our obligations for the 2022 fiscal year.

| | December 31, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| | **Gross** | **Net** | **Gross** | **Net** |
| ***Productive Wells*** | | | | |
| Oil | 5.00 | 2.67 | 5.00 | 2.67 |
| Gas | 4.00 | 2.66 | 4.00 | 2.66 |
| ***Test Wells*** | | | | |
| Salt Water Disposal | 3.00 | 2.13 | 3.00 | 2.13 |
| Fresh Water Supply | 3.00 | 2.00 | 3.00 | 2.00 |
| Plug & Abandon | 5.00 | 3.87 | 5.00 | 3.87 |

With the principal goal of gathering scientific data from a strategy of drilling test wells, all wells were drilled with the intent of being completed and productive for hydrocarbons. Two horizontal wells were successfully completed for hydrocarbons through the 2020 drilling program, however as of December 31, 2022 both wells remain shut-in waiting for hook-up to a gas pipeline. The various wells drilled on the Orogrande Basin through 2022 confirmed that there are at least five potential distinct reservoirs under our acreage. While these wells may have potential to produce hydrocarbons to sell commercially in the future, due to capital constraints we have no immediate plans to deploy the capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including well locations, target depths and designated acreage, in the Orogrande Project. The remaining wells can be used for future development for various applications such re-entering the wellbores for horizontal unconventional development, fresh water supply, or salt water disposal and/or plugged and abandoned.

Table of Contents

**Producing Well Summary.**

**Acreage.**

The Orogrande Project consists of unevaluated and undeveloped properties in progress of development for future production.

| | Total Acres | | Developed Acres | | Undeveloped Acres | |
|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net |
| **Texas—** | | | | | | |
| Orogrande Project | 134,000 | 89,110 | — | — | 134,000 | 89,110 |
| Hazel Project | 645 | 516 | 645 | 516 | — | — |
| **Oklahoma—** | | | | | | |
| Viking | 640 | 192 | 640 | 192 | — | — |
| Total | 135,285 | 89,818 | 1,285 | 708 | 134,000 | 89,110 |

**Marketing and Customers.**

The market for any oil and natural gas that we may produce depends on factors beyond our control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, demand for oil and natural gas, the marketing of competitive fuels, and the effects of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial, and individual consumers.

Our oil production is expected to be sold at prices tied to the spot oil markets. Our natural gas production is expected to be sold under short-term contracts and priced based on first of the month index prices or on daily spot market prices. We will rely on our operating partners to market and sell our production.

**Competition.**

The oil and gas industry is highly competitive. Competitors include major oil companies, other independent energy companies and individual producers and operators, many of which have financial resources, personnel and facilities substantially greater than we do. We face intense competition for the acquisition of oil and natural gas properties and leases for oil and gas exploration. Not only do our competitors explore for and produce oil and natural gas, but also many carry on midstream and refining operations and market petroleum and other products on a regional, national, or worldwide basis. The operations of other companies may be able to pay more for exploratory prospects and productive oil and natural gas properties. They may also have more resources to define, evaluate, bid for, and purchase a greater number of properties and prospects than our financial or human resources permit. Our larger or integrated competitors may have the resources to be better able to absorb the burden of current and future federal, state, and local laws and regulations more easily than we can, which would adversely affect our competitive position. Our ability to locate reserves and acquire interests in properties in the future will be dependent upon our ability and resources to evaluate and select suitable properties and consummate transactions in this highly competitive environment. In addition, we may be at a disadvantage in producing oil and natural gas properties and bidding for exploratory prospects because we have fewer financial and human resources than other companies in our industry. Should a larger and better financed company decide to directly compete with us, and be successful in its efforts, our business could be adversely affected.

**Regulation.**

Our oil and natural gas development operations are subject to stringent and complex federal, state, tribal, regional and local environmental, health and safety laws and regulations governing, among other factors, worker safety and health, the discharge and disposal of substances into the environment, and the protection of the environment and natural resources. Numerous governmental entities, including the U.S. Environmental Protection Agency ("EPA") and analogous state and local agencies, (and, under certain laws, private individuals) have the power to enforce compliance with these laws and regulations and any permits issued under them. These laws and regulations may, among other things: (i) require permits to conduct exploration, drilling, water withdrawal, wastewater disposal and other production related activities; (ii) govern the types, quantities and concentrations of substances, including emissions of CO2, methane and certain other greenhouse gases ("GHG"), that may be disposed or released into the environment or injected into formations in connection with drilling or production activities, and the manner of any such disposal, release, or injection; (iii) limit or prohibit construction or drilling activities or require formal mitigation measures in sensitive areas such as wetlands, wilderness areas or areas inhabited by endangered or threatened species; (iv) require investigatory and remedial actions to mitigate pollution conditions arising from the Company's operations or attributable to former operations; (v) impose safety and health restrictions designed to protect employees and others from exposure to hazardous or dangerous substances; and (vi) impose obligations to reclaim and abandon well sites and pits.

Table of Contents

Certain existing environmental and occupational safety and health laws and regulations to which our business operations are subject including, the Clean Air Act, as amended (the "CAA"), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the Federal Resource Conservation and Recovery Act ("RCRA"), Federal Water Pollution Control Act of 1972 as amended by the Oil Pollution Act of 1990, EPA rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of a leak detection and repair ("LDAR") program under the CAA's New Source Performance Standards in 40 C.F.R. Part 60, Subpart OOOOa ("Quad Oa"), the Federal Occupational Safety and Health Act ("OSHA") and other state equivalent laws and regulations. For further discussion of the risks to our results of operations arising out of our environmental regulatory compliance, see "Risks Relating to Our Business", including the following risk factors "*—Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict*," "*—Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays*," and "*—Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce.*"

**Environmental Matters.**

Our operations and properties are and will be subject to extensive and changing federal, state, and local laws and regulations relating to environmental protection, including the generation, storage, handling, emission, transportation, and discharge of materials into the environment, and relating to safety and health. In the future, environmental legislation and regulation may trend toward stricter standards. These laws and regulations may, for example:

- require the acquisition of a permit or other authorization before construction or drilling commences and for certain other activities;
- limit or prohibit construction, drilling, and other activities on certain lands lying within wilderness and other protected areas;
- impose substantial liabilities for pollution resulting from operations; or
- restrict certain areas from fracking and other stimulation techniques.

The permits required for our operations may be subject to revocation, modification, and renewal by issuing authorities. Governmental authorities have the power to enforce their regulations, and violations are subject to fines or injunctions, or both. In the opinion of management, we are and will be in substantial compliance with current applicable environmental laws and regulations and have no material commitments for capital expenditures to comply with existing environmental requirements. Nevertheless, changes in existing environmental laws and regulations or in interpretations thereof could have a significant impact on our company, as well as the oil and natural gas industry in general.

CERCLA and comparable state statutes impose strict, joint, and several liability on owners and operators of sites and on persons who disposed of or arranged for the disposal of "hazardous substances" found at such sites. It is not uncommon for the neighboring landowners and other third parties to file claims for personal injury and property damage allegedly caused by hazardous substances released into the environment. The RCRA and comparable state statutes govern the disposal of "solid waste" and "hazardous waste" and authorize the imposition of substantial fines and penalties for noncompliance. Although CERCLA currently excludes petroleum from its definition of "hazardous substance," state laws affecting our operations may impose clean-up liability relating to petroleum and petroleum related products. In addition, although RCRA classifies certain oil field wastes as "non-hazardous," such exploration and production wastes could be reclassified as hazardous wastes thereby making such wastes subject to more stringent handling and disposal requirements.

The Endangered Species Act ("ESA") seeks to ensure that activities do not jeopardize endangered or threatened animal, fish, and plant species, nor destroy or modify the critical habitat of such species. Under the ESA, exploration and production operations, as well as actions by federal agencies, may not significantly impair or jeopardize protected species or habitat. The ESA provides for criminal and civil penalties for violations. Other statutes that provide protection to animal and plant species and that may apply to our operations include, but are not necessarily limited to, the Fish and Wildlife Coordination Act, the Fishery Conservation and Management Act, the Migratory Bird Treaty Act and the National Historic Preservation Act. Although we believe that our operations are and will be in substantial compliance with such statutes, any change in these statutes or any reclassification of a species as endangered could subject us to significant expenses to modify our operations or could force us to discontinue certain operations altogether.

Table of Contents

Hydraulic fracturing is regulated by state and federal environmental and oil and gas regulatory authorities, including specifically the requirement to disclose certain information related to hydraulic fracturing operations. Operators must follow applicable legal requirements for groundwater protection and are subject to supervision by state and federal regulators (including the U.S. Department of the Interior Bureau of Land Management ("BLM") on federal acreage). Furthermore, well construction practices require the installation of multiple layers of protective steel casing surrounded by cement that are specifically designed and installed to protect freshwater aquifers by preventing the migration of fracturing fluids into aquifers. Regulatory proposals in some states and local communities have been initiated to require or make more stringent the permitting and compliance requirements for hydraulic fracturing operations. Federal and state agencies have continued to assess the impacts of hydraulic fracturing, which could spur further action toward federal and/or state legislation and regulation of hydraulic fracturing activities. In addition, in light of concerns about seismic activity being triggered by the injection of produced waters into underground wells and hydraulic fracturing, certain regulators are also considering additional requirements related to seismic safety for hydraulic fracturing activities. Further restrictions on hydraulic fracturing could make it prohibitive to conduct our operations, and also reduce the amount of oil and natural gas that we or our operators are ultimately able to produce from our properties.

**Climate Change.**

Significant studies and research have been devoted to climate change and global warming, and climate change has developed into a major political issue in the United States and globally. Certain research suggests that GHG emissions contribute to climate change and pose a threat to the environment. Recent scientific research and political debate has focused in part on carbon dioxide and methane incidental to oil and natural gas exploration and production. Many states and the federal government have enacted legislation directed at controlling GHG emissions, and future legislation and regulation could impose additional restrictions or requirements in connection with our drilling and production activities and favor use of alternative energy sources, which could affect operating costs and demand for oil products. As such, our business could be materially adversely affected by domestic and international legislation targeted at controlling climate change.

**Human Capital.**

As of December 31, 2022, we had six full-time employees, and we employ consultants for various roles as needed.

The health and safety of our employees and those that work with us is a priority. Employees and contractors are expected to take all necessary and reasonable actions to ensure safe operations by following safe work practices, complying with relevant policies and regulations, and completing all applicable training. To support our dedication to health, safety and the environment, we have a health and safety policy and that applies to all employees and contractors. In addition to adoption of our employment policies, the Company fosters a strong safety culture through training.

**Corporate Information.**

Our principal executive office is located at 6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116. We currently sublease this office space and believe that the condition and size of our offices are adequate for our current needs. Our website is nextbridgehydrocarbons.com. Information contained on or accessible through our website, when available, shall not be incorporated by reference herein.

**Available Information.**

We file annual, quarterly and current reports, proxy statements and other documents with the SEC under the Securities Exchange Act of 1934. The SEC maintains a website that contains reports, proxy and information statements, and other information that is electronically filed with the SEC. The public can obtain any documents that we file with the SEC at www.sec.gov. We also make available free of charge on our website, our Annual Report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and, if applicable, amendments to those reports filed or furnished pursuant to Section 13(a) of the Exchange Act as soon as reasonably practicable after we file such material with, or furnish it to, the SEC.

Table of Contents

**Item 1A. Risk Factors**

You should carefully consider the following material risk factors as well as the other information contained or incorporated by reference in this report, as these important factors, among others, could cause our actual results to differ from our expected or historical results. It is not possible to predict or identify all such factors. Consequently, you should not consider any such list to be a complete statement of all of our potential risks or uncertainties. Based on the information currently known to us, we believe the following information identifies the most material risk factors affecting us, but the below risks and uncertainties are not the only ones related to our businesses and are not necessarily listed in the order of their significance.

Additional risks and uncertainties not presently known to us or that we currently believe to be immaterial may also adversely affect our business.

**Risks Related to Our Business and Growth Strategy.**

***We have a limited operating history relative to larger companies in our industry and may not be successful in developing profitable business operations.***

We have a limited operating history relative to larger companies in our industry. Our business operations must be considered in light of the risks, expenses and difficulties frequently encountered in establishing a business in the oil and natural gas industry. As of the date of this report, we have generated limited revenues and have limited assets. We have an insufficient history at this time on which to base an assumption that our business operations will prove to be successful in the long-term. Our future operating results will depend on many factors, including:

- our ability to raise adequate working capital;
- the success of our development and exploration;
- the demand for oil and natural gas;
- the level of our competition;
- our ability to attract and maintain key management and employees; and
- our ability to efficiently explore, develop, produce or acquire sufficient quantities of marketable oil or natural gas in a highly competitive and speculative environment while maintaining quality and controlling costs.

To achieve profitable operations in the future, we must, alone or with others, successfully manage the factors stated above, as well as continue to develop ways to enhance our production efforts. Despite our best efforts, we may not be successful in our exploration or development efforts or obtain required regulatory approvals. There is a possibility that some, or all, of the wells in which we obtain interests may never produce oil or natural gas.

***We have limited operating history as an independent company, and our historical financial information is not necessarily representative of the results we would have achieved as an independent company and may not be a reliable indicator of our future results.***

We derived the historical financial information included in this report from Meta on a consolidated basis prior to the distribution of our common stock which was completed on December 14, 2022 (the “Spin-Off”), and this information does not necessarily reflect the results of operations and financial position we would have achieved as an independent company during the periods presented or those that we will achieve in the future. This is primarily because of the following factors:

- Prior to the Spin-Off, we operated as part of Meta’s broader corporate organization, and Meta performed various corporate functions for us. Our historical financial information reflects allocations of corporate expenses from Meta for these and similar functions. These allocations may not reflect the costs we will incur for similar services in the future as an independent company.
- We entered into certain transactions with Meta that did not exist prior to the Spin-Off, which may cause us to incur new costs.
- Our historical financial information does not reflect changes that we expect to experience in the future as a result of our separation from Meta, including changes in our cost structure, personnel needs, tax structure, financing and business operations. As part of Meta, we enjoyed certain benefits from Meta’s operating diversity, size, purchasing power, borrowing leverage and available capital for investments, which are no longer available to us. As an independent entity, we may be unable to purchase goods, services and technologies, such as insurance and health care benefits and computer software licenses or access capital markets on terms as favorable to us as those we obtained as part of Meta prior to the Spin-Off.

Table of Contents

We are now responsible for the additional costs associated with being an independent company, including costs related to corporate governance, investor and public relations and public reporting. In addition, certain costs incurred by Meta, including executive oversight, accounting, treasury, tax, legal, human resources, occupancy, procurement, information technology and other shared services, have historically been allocated to us by Meta; but these allocations may not reflect the future level of these costs to us as we begin to provide these services ourselves. Therefore, our historical financial statements may not be indicative of our future performance as an independent company. We cannot assure you that our operating results will continue at a similar level when we are an independent company. For additional information about our past financial performance and the basis of presentation of our financial statements, see “Management’s Discussion and Analysis of Financial Condition and Results of Operations” and our consolidated financial statements and the notes thereto included elsewhere in this report.

***We have limited capital and will need to raise additional capital in the immediate future.***

We continue to require additional capital to maintain operations and to expand our exploration and development programs. We may be unable to obtain additional capital when required or on favorable terms. Future acquisitions, exploration, development, production and marketing activities, as well as our administrative requirements (such as salaries, insurance expenses and general overhead expenses, as well as legal compliance costs and accounting expenses) will require a substantial amount of additional capital and cash flow.

We may pursue sources of additional capital through various financing transactions or arrangements, including joint venturing of projects, debt financing, equity financing, or other means. We may not be successful in identifying suitable financing transactions in the time period required or at all, and we may not obtain the capital we require by other means. If we do not succeed in raising additional capital, our resources may not be sufficient to fund our planned operations.

Our ability to obtain financing, if and when necessary, may be impaired by such factors as the capital markets (both generally and in the oil and natural gas industry in particular), our limited operating history, the location of our oil and natural gas properties and prices of oil and natural gas on the commodities markets (which will impact the amount of asset-based financing available to us, if any) and the departure of key employees. Further, if oil or natural gas prices on the commodities markets decline, our future revenues, if any, will likely decrease and such decreased revenues may increase our requirements for capital. If the amount of capital we are able to raise from financing activities, together with our revenues from operations, is not sufficient to satisfy our capital needs (even to the extent that we reduce our operations), third parties may be reluctant to provide the services we need in order to operate and we may be required to cease our operations, divest our assets at unattractive prices or obtain financing on unattractive terms.

Any additional capital raised through the sale of equity may dilute the ownership percentage of our stockholders. Raising any such capital could also result in a decrease in the fair market value of our equity securities because our assets would be owned by a larger pool of outstanding equity. The terms of securities we issue in future capital transactions may be more favorable to our new investors, and may include preferences, superior voting rights and the issuance of other derivative securities, and issuances of incentive awards under equity employee incentive plans, which may have a further dilutive effect.

We may incur substantial costs in pursuing future capital financing, including investment banking fees, legal fees, accounting fees, securities law compliance fees, printing and distribution expenses and other costs. We may also be required to recognize non-cash expenses in connection with certain securities we may issue, which may adversely impact our financial condition.

***We may not achieve or maintain profitable operations, and therefore, may not be able to continue as a going concern.***

The Company has a history of net losses from operations and negative cash flow from operating activities. We will need to raise additional working capital to continue our normal and planned operations. We will also need to generate and sustain significant revenue levels in future periods in order to become profitable, and, even if we do, we may not be able to maintain or increase our level of profitability. During the year ended December 31, 2022, we incurred a net loss of $8,848,873 ($7,938,335 for the predecessor period and $910,538 for the successor period) and used cash in the amount of $5,400,841 for operating activities for the year ended December 31, 2022 ($5,626,181 used in the predecessor period and $225,340 provided by the successor period). At December 31, 2022, we had an accumulated deficit of $910,538 representing the successor period and had a working capital deficit of $29,077,591 compared with a working capital deficit of $13,307,453 as of December 31, 2021. These factors raise doubt regarding our ability to continue as a going concern. Because we have incurred significant net losses, our auditors have issued a “going concern” audit qualification. A “going concern” qualification indicates that the financial statements have been prepared assuming we will continue as a going concern and do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets, or the amounts and classification of liabilities that may result if we do not continue as a going concern. Therefore, you should not rely on our consolidated balance sheet as an indication of the amount of proceeds that would be available to satisfy claims of creditors, and potentially be available for distribution to stockholders, in the event of liquidation.

Table of Contents

***There can be no assurance that our financing strategy or strategic alternatives will result in a transaction satisfactory to holders of our common stock.***

We may consider various strategic alternatives, including partnering with third parties, a potential sale of some or all of our assets, a merger transaction, and potential financing alternatives. Even if a partnering transaction, sale, merger or financing transaction were to be consummated, it may not return any value to holders of our common stock. Regardless of whether we execute a partnership, sale, merger or financing transaction, the adverse pressures negatively impacting our business that we have been or are currently experiencing may continue or intensify, including the risk that we may not be able to continue as a going concern.

***We are mainly concentrated in one geographic area, which increases our exposure to many of the risks enumerated herein.***

Operating in a concentrated area increases the potential impact that many of the risks stated herein may have upon our ability to perform. For example, we have greater exposure to regulatory actions impacting Texas, natural disasters in the geographic area, competition for equipment, services and materials available in the area and access to infrastructure and markets. In addition, the effect of fluctuations on supply and demand may become more pronounced within specific geographic oil and natural gas producing areas such as the Permian Basin, which may cause these conditions to occur with greater frequency or magnify the effect of these conditions. Due to the concentrated nature of our portfolio of properties, a number of our properties could experience any of the same conditions at the same time, resulting in a relatively greater impact on our results of operations than they might have on other companies that have a more diversified portfolio of properties. Such delays or interruptions could have a material adverse effect on our financial condition and results of operations.

***Because of the speculative nature of oil and natural gas exploration, there is risk that we will not find commercially exploitable oil and natural gas and that our business will fail.***

The search for commercial quantities of oil and natural gas as a business is extremely risky. We cannot provide investors with any assurance that any properties in which we obtain a mineral interest will contain commercially exploitable quantities of oil and/or natural gas. The exploration expenditures to be made by us may not result in the discovery of commercial quantities of oil and/or natural gas. Problems such as unusual or unexpected formations or pressures, premature declines of reservoirs, invasion of water into producing formations and other conditions involved in oil and natural gas exploration often result in unsuccessful exploration efforts. If we are unable to find commercially exploitable quantities of oil and natural gas, and/or we are unable to commercially extract such quantities, we may be forced to abandon or curtail our business plan, and as a result, any investment in us may become worthless.

***Litigation may adversely affect our business, financial condition, and results of operations.***

Certain of our subsidiaries are subject and from time to time in the normal course of our business operations, may become subject to litigation that may result in liability material to our financial statements as a whole or may negatively affect our operating results if changes to our business operations are required. The cost to defend such litigation may be significant and may require a diversion of our resources. There also may be adverse publicity associated with litigation that could negatively affect customer perception of our business, regardless of whether the allegations are valid or whether we are ultimately found liable. Insurance may not be available at all or in sufficient amounts to cover any liabilities with respect to these or other matters. A judgment or other liability in excess of our insurance coverage for any claims could adversely affect our business and the results of our operations. For additional discussion of pending litigation matters, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Legal Proceedings."

***Strategic relationships upon which we may rely are subject to change, which may diminish our ability to conduct our operations.***

Our ability to successfully acquire oil and natural gas interests, to build our reserves, to participate in drilling opportunities and to identify and enter into commercial arrangements with customers will depend on developing and maintaining close working relationships with industry participants and our ability to select and evaluate suitable properties and to consummate transactions in a highly competitive environment. These realities are subject to change and our inability to maintain close working relationships with industry participants or continue to acquire suitable property may impair our ability to execute our business plan.

To continue to develop our business, we will endeavor to use the business relationships of our management to enter into strategic relationships, which may take the form of joint ventures with other private parties and contractual arrangements with other oil and natural gas companies, including those that supply equipment and other resources that we will use in our business. We may not be able to establish these strategic relationships, or if established, we may not be able to maintain them. In addition, the dynamics of our relationships with strategic partners may require us to incur expenses or undertake activities we would not otherwise be inclined to in order to fulfill our obligations to these partners or maintain our relationships. If our strategic relationships are not established or maintained, our business prospects may be limited, which could diminish our ability to conduct our operations.

Table of Contents

***Our acreage must be drilled before lease expiration in order to hold the acreage by production. In the highly competitive market for acreage, failure to drill sufficient wells in order to hold acreage will result in a substantial lease renewal cost, or if renewal is not feasible, loss of our lease and prospective drilling opportunities.***

Our leases on oil and natural gas properties typically have a primary term of four to five years, after which they expire unless, prior to expiration, drilling obligations are fulfilled or production is established within the spacing units covering the undeveloped acres. As of December 31, 2022, we had leases representing approximately 134,000 net acres in the Orogrande Basin in West Texas expiring on March 31, 2023 if we fail to drill five wells as obligated. Unless we are able to negotiate an extension on these leases, these leases in the Orogrande Basin are also subject to expiration in 2023 in the event we fail to drill an additional five wells during the 2023 calendar year. We will require additional capital to drill these wells, and we may not be able to obtain additional capital when required in order to drill these wells, or on favorable terms. As of December 31, 2022, we had leases representing 645 net acres in the Eastern edge of the Midland Basin in West Texas, which are currently held by production by active wells. In the event that we fail to meet our drilling obligations in the Orogrande Basin, whether because we are unable to obtain additional capital when required or otherwise, or if production ceases in the Midland Basin, our leases will expire. If we have to renew such leases on new terms, we could incur significant cost increases, and we may not be able to renew such leases on commercially reasonable terms or at all. In addition, on certain portions of our acreage, third-party leases may become immediately effective if our leases expire. As such, our actual drilling activities may materially differ from our current expectations, which could adversely affect our business.

***The price of oil and natural gas has historically been volatile. If it were to decrease substantially, our projections, budgets, and revenues would be adversely affected, potentially forcing us to make changes in our operations.***

Our future financial condition, results of operations and the carrying value of any oil and natural gas interests we acquire will depend primarily upon the prices paid for oil and natural gas production. Oil and natural gas prices historically have been volatile and likely will continue to be volatile in the future, especially given current world geopolitical conditions. Cash flows from operations are highly dependent on the prices that we receive for oil and natural gas. This price volatility could affect the amount of our cash flows available for capital expenditures and our ability to borrow money or raise additional capital. The prices for oil and natural gas are subject to a variety of additional factors that are beyond our control. These factors include:

- the level of consumer demand for oil and natural gas;
- the domestic and foreign supply of oil and natural gas;
- the ability of the members of the Organization of Petroleum Exporting Countries (“OPEC”) to agree to and maintain oil price and production controls;
- the price of foreign oil and natural gas;
- domestic governmental regulations and taxes;
- the price and availability of alternative fuel sources;
- weather conditions;
- market uncertainty due to political conditions in oil and natural gas producing regions, including the Middle East; and
- worldwide economic conditions.

These factors as well as the volatility of the energy markets generally make it extremely difficult to predict future oil and natural gas price movements with any certainty. Declines in oil and natural gas prices affect our revenues and could reduce the amount of oil and natural gas that we can produce economically. Accordingly, such declines could have a material adverse effect on our financial condition, results of operations, oil and natural gas reserves and the carrying values of our oil and natural gas properties. If the oil and natural gas industry experiences significant price declines, we may be unable to make planned expenditures, among other things. If this were to happen, we may be forced to abandon or curtail our business operations, which would cause the value of an investment in us to decline or become worthless.

Table of Contents

In early March 2020, the market experienced a precipitous decline in oil prices in response to concerns about oil demand due to the economic impact of COVID-19 and anticipated increases in supply from Russia and OPEC, particularly Saudi Arabia. Generally, demand for oil declined substantially following the initial onset of the COVID-19 pandemic, but has recovered over the past year.

If oil or natural gas prices reverse and go on a downward trend or drilling efforts are unsuccessful, we could be required to record additional write-downs of our oil and natural gas properties. Write-downs may occur when oil and natural gas prices are low, or if we have downward adjustments to our estimated proved reserves, increases in our estimates of operating or development costs, deterioration in drilling results or mechanical problems with wells where the cost to redrill or repair is not supported by the expected economics.

Under the full cost method of accounting, capitalized oil and natural gas property costs less accumulated depletion and net of deferred income taxes may not exceed an amount equal to the present value, discounted at 10%, of estimated future net revenues from proved oil and natural gas reserves plus the cost of unproved properties not subject to amortization (without regard to estimates of fair value), or estimated fair value, if lower, of unproved properties that are subject to amortization. Should capitalized costs exceed this ceiling, an impairment would be recognized.

***Because of the inherent dangers involved in oil and natural gas operations, there is a risk that we may incur liability or damages as we conduct our business operations, which could force us to expend a substantial amount of money in connection with litigation and/or a settlement.***

The oil and natural gas business involves a variety of operating hazards and risks such as well blowouts, pipe failures, casing collapse, explosions, uncontrollable flows of oil, natural gas or well fluids, fires, spills, pollution, releases of toxic gas and other environmental hazards and risks. These hazards and risks could result in substantial losses to us from, among other things, injury or loss of life, severe damage to or destruction of property, natural resources and equipment, pollution or other environmental damage, cleanup responsibilities, regulatory investigation and penalties and suspension of operations. In addition, we may be liable for environmental damages caused by previous owners of property purchased and leased by us. In recent years, there has also been increased scrutiny on the environmental risk associated with hydraulic fracturing, such as underground migration and surface spillage or mishandling of fracturing fluids including chemical additives. Hydraulic fracturing technology has evolved and continues to evolve and become more aggressive. We believe that recent designs have seen improvement in, among other things, proppant per foot, barrels of water per stage, fracturing stages, and clusters per fracturing stage. In addition, we will need to quickly adapt to the evolving technology, which could take time and divert our attention to other business matters. Even with improved hydraulic fracturing technology, substantial liabilities to third parties or governmental entities may be incurred, the payment of which could reduce or eliminate the funds available for exploration, development or acquisitions or result in the loss of our properties and/or force us to expend substantial monies in connection with cleanup, litigation or settlements. While we have insurance to cover some of such losses and liabilities, it may not be adequate to cover any losses or liabilities. We cannot predict the availability of insurance or the availability of insurance at premium levels that justify our purchase. The occurrence of a significant event not fully insured or indemnified against could materially and adversely affect our financial condition and operations. We may elect to self-insure if management believes that the cost of insurance, although available, is excessive relative to the risks presented. In addition, pollution and environmental risks generally are not fully insurable. The occurrence of an event not fully covered by insurance could have a material adverse effect on our financial condition and results of operations.

***The market for oil and natural gas is intensely competitive, and competition pressures could force us to abandon or curtail our business plan.***

The market for oil and natural gas exploration services is highly competitive, and we only expect competition to intensify in the future. Numerous well-established companies are focusing significant resources on exploration and are currently competing with us for oil and natural gas opportunities. Other oil and natural gas companies may seek to acquire oil and natural gas leases and properties that we have targeted. Additionally, other companies engaged in our line of business may compete with us from time to time in obtaining capital from investors. Competitors include larger companies which, in particular, may have access to greater resources, may be more successful in the recruitment and retention of qualified employees and may conduct their own refining and petroleum marketing operations, which may give them a competitive advantage. Actual or potential competitors may be strengthened through the acquisition of additional assets and interests. Additionally, there are numerous companies focusing their resources on creating fuels and/or materials which serve the same purpose as oil and natural gas but are manufactured from renewable resources.

As a result, we may not be able to compete successfully and competitive pressures may adversely affect our business, results of operations, and financial condition. If we are not able to successfully compete in the marketplace, we could be forced to curtail or even abandon our current business plan, which could cause any investment in us to become worthless.

Table of Contents

***Inflation may adversely affect us by increasing costs beyond what we can recover through price increases and limit our ability to enter into future traditional debt financing.***

Inflation can adversely affect us by increasing costs of critical materials, equipment, labor, and other services. In addition, inflation is often accompanied by higher interest rates. Continued inflationary pressures could impact our profitability. Inflation may also affect our ability to enter into future traditional debt financing, as high inflation may result in an increase in cost.

***We may not be able to successfully manage growth, which could lead to our inability to implement our business plan.***

Any growth of the Company may place a significant strain on our managerial, operational and financial resources, especially considering that we currently only have a small number of executive officers, employees and advisors. Further, as we enter into additional contracts, we will be required to manage multiple relationships with various consultants, businesses and other third parties. These requirements will be exacerbated in the event of our further growth or in the event that the number of our drilling and/or extraction operations increases. Our systems, procedures and/or controls may not be adequate to support our operations or that our management will be able to achieve the rapid execution necessary to successfully implement our business plan. If we are unable to manage our growth effectively, our business, results of operations and financial condition will be adversely affected, which could lead to us being forced to abandon or curtail our business plan and operations.

***Developing oil and natural gas wells and producing oil and natural gas are costly and high-risk activities with many uncertainties that could adversely affect future production from our oil and natural gas properties. Any delays, reductions or cancellations in development and producing activities could materially, adversely impact the value of your shares of common stock.***

Recovery of undeveloped reserves and the development of developed non-producing reserves requires substantial capital expenditures and successful drilling operations of our oil and natural gas properties. All of the recent development costs related to our Hazel Project were paid by MHP. Under the Option Agreement, we granted MHP the option to acquire the Hazel Project in exchange for it conducting, and paying for, development activity sufficient to maintain the Hazel mineral leases in good standing. The Option Agreement provided that if MHP declined to exercise the option to acquire the property, we would be obligated to reimburse them for their cost of the development activity to the extent that the wells produced revenues beyond the date of the option's lapse until the total amount of development expenses are reimbursed. MHP declined to exercise the option effective September 30, 2021. The 2021 reserve data included in the reserve report of our independent petroleum engineer assumes a certain amount of capital expenditures will be made to develop such reserves, and the present value of such reserves was adjusted based on our obligation to assign revenue from the Hazel Project to MHP. Additionally, 33.5% of the development expenses for the Orogrande Project are borne by the non-operating working interest owners of such properties.

The development of such reserves may in the future take a long period of time and may require higher levels of capital expenditures than anticipated, which, for the Orogrande Project, are borne in part by the non-operating working interest owners of such properties. Delays in the development of the reserves, increases in drilling and development costs (including expenses related to secondary and tertiary recovery techniques) of such reserves or decreases or continued volatility in commodity prices will reduce the future net revenues of the estimated possible reserves and may result in some projects becoming uneconomic. In addition, delays in the development of reserves could force us to reclassify certain of the proved reserves as unproved reserves.

In addition, the process of developing oil and natural gas wells and producing oil and natural gas from our properties is subject to numerous risks beyond our control. The ability to carry out operations or to finance planned development expenses could be materially and adversely affected by any factor that may curtail, delay, reduce or cancel development and production, including:

- delays imposed by or resulting from compliance with environmental and other governmental or regulatory requirements, including permitting requirements, limitations on or resulting from wastewater discharge and disposal of exploration and production wastes, including, subsurface injections, as well as additional regulation with respect to GHG emissions;
- pressure or irregularities in geological formations;
- restricted access to land for drilling or to existing pipeline infrastructure;
- lack of available gathering, transportation and processing facilities, including availability on commercially reasonable terms, or delays in construction of gathering facilities;

Table of Contents

- lack of available capacity on interconnecting transmission pipelines;
- equipment failures or accidents;
- failure of secondary recovery operations to perform as expected;
- unexpected operational events and drilling conditions;
- declines in oil or natural gas prices;
- limitations in the market for oil or natural gas;
- pipe or cement failures;
- casing collapses;
- shortages, unavailability or high cost of drilling rigs, tubular materials, equipment, supplies, personnel and services;
- lost or damaged drilling and service tools;
- loss of drilling fluid circulation;
- uncontrollable flows of oil and natural gas, water or drilling fluids;
- blowouts, explosions fires and natural disasters;
- environmental hazards, such as oil and natural gas leaks, pipeline and tank ruptures, encountering naturally occurring radioactive materials, and unauthorized discharges of brine, well stimulation and completion fluids, toxic gases or other pollutants into the surface and subsurface environment;
- adverse weather conditions, such as drought, floods, blizzards, tornados and ice storms; and
- title problems or legal disputes regarding leasehold rights.

***Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict.***

Oil and natural gas activities that we will engage in, including production, processing, handling and disposal of hazardous materials, such as hydrocarbons and naturally occurring radioactive materials (if any), are subject to stringent regulation. We could incur significant costs, including cleanup costs resulting from a release of hazardous material, third-party claims for property damage and personal injuries fines and sanctions, as a result of any violations or liabilities under environmental or other laws. Changes in or more stringent enforcement of environmental laws could force us to expend additional operating costs and capital expenditures to stay in compliance.

Various federal, state and local laws regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment, directly impact oil and natural gas exploration, development and production operations, and consequently may impact our operations and costs. These regulations include, among others, (i) regulations by the EPA and various state agencies regarding approved methods of disposal for certain hazardous and non-hazardous wastes; (ii) CERCLA and analogous state laws which regulate the removal or remediation of previously disposed wastes (including wastes disposed of or released by prior owners or operators), property contamination (including groundwater contamination), and remedial plugging operations to prevent future contamination; (iii) the CAA and comparable state and local requirements which regulate air emissions; (iv) the Oil Pollution Act of 1990 which contains numerous requirements relating to the prevention of and response to oil spills into waters of the United States; (v) the RCRA which is the principal federal statute governing the treatment, storage and disposal of hazardous wastes; (vi) the Federal Water Pollution Control Act and comparable state and local requirements which regulate discharges to federal and state waters; and (vii) state regulations and statutes governing the handling, treatment, storage and disposal of naturally occurring radioactive material.

We believe that we will be in substantial compliance with applicable environmental laws and regulations. We cover all costs associated with the related insurance coverage for such environmental regulatory compliance. To date, other than the cost of insurance, we have not expended any amounts to comply with such regulations, and we do not currently anticipate that future compliance will have a materially adverse effect on our consolidated financial position, results of operations or cash flows. However, if we are deemed to not be in compliance with applicable environmental laws, we could be forced to expend significant funds to be in compliance, which would have a materially adverse effect on our financial condition.

Table of Contents

***Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays.***

Several states, including Texas, and local jurisdictions, have adopted, or are considering adopting, regulations that could restrict or prohibit hydraulic fracturing in certain circumstances, impose more stringent operating standards and/or require the disclosure of the composition of hydraulic fracturing fluids. The Texas Legislature adopted legislation, effective September 1, 2011, requiring oil and natural gas operators to publicly disclose the chemicals used in the hydraulic fracturing process. The Texas Railroad Commission adopted rules and regulations implementing this legislation that apply to all wells for which the Texas Railroad Commission issues an initial drilling permit after February 1, 2012. The law requires that the well operator disclose the list of chemical ingredients subject to the requirements of OSHA for disclosure on an internet website and also file the list of chemicals with the Texas Railroad Commission with the well completion report. The total volume of water used to hydraulically fracture a well must also be disclosed to the public and filed with the Texas Railroad Commission. Also, in May 2013, the Texas Railroad Commission adopted rules governing well casing, cementing and other standards for ensuring that hydraulic fracturing operations do not contaminate nearby water resources. The rules took effect in January 2014. Additionally, on October 28, 2014, the Texas Railroad Commission adopted disposal well rule amendments designed, among other things, to require applicants for new disposal wells that will receive non-hazardous produced water and hydraulic fracturing flowback fluid to conduct seismic activity searches utilizing the U.S. Geological Survey. The searches are intended to determine the potential for earthquakes within a circular area of 100 square miles around a proposed new disposal well. The disposal well rule amendments, which became effective on November 17, 2014, also clarify the Texas Railroad Commission's authority to modify, suspend or terminate a disposal well permit if scientific data indicates a disposal well is likely to contribute to seismic activity. The Texas Railroad Commission has used this authority to deny permits and temporarily suspend operations for waste disposal wells and, in September 2021, the Texas Railroad Commission curtailed the amount of water companies were permitted to inject into some wells in the Permian Basin, and has since indefinitely suspended some permits there and expanded the restrictions to other areas. These restrictions on use of produced water and a moratorium on new produced water disposal wells could result in increased operating costs, requiring us or our service providers to truck produced water, recycle it or pump it through the pipeline network or other means, all of which could be costly. We or our service providers may also need to limit disposal well volumes, disposal rates and pressures or locations, or require us or our service providers to shut down or curtail the injection of produced water into disposal wells. These factors may make drilling and completion activity in the affected parts of the Permian Basin less economical and adversely impact our business, results of operations and financial condition.

***Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce.***

The EPA previously published its findings that emissions of GHGs present a danger to public health and the environment because such gases are, according to the EPA, contributing to warming of the Earth's atmosphere and other climatic changes. Based on these findings, the EPA has adopted various rules to address GHG emissions under existing provisions of the CAA. For example, the EPA has adopted rules requiring the reporting of GHG emissions from various oil and natural gas operations on an annual basis, which includes certain of our operations. In addition, in June 2016, the EPA finalized rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of an LDAR program to minimize methane emissions, under the CAA's New Source Performance Standards Quad Oa. However, the EPA has taken several steps to delay implementation of the Quad Oa standards. The agency proposed a rulemaking in June 2017 to stay the requirements for a period of two years and in October 2018, the EPA proposed revisions to Quad Oa, such as changes to the frequency for monitoring fugitive emissions at well sites and changes to requirements that a professional engineer certify when meeting certain Quad Oa requirements is technically infeasible. In September 2020, the EPA finalized amendments to Quad Oa that rescind requirements for the transmission and storage segment of the oil and natural gas industry and rescind methane-specific limits that apply to the industry's production and processing segments, among other things. On June 30, 2021, Congress issued a joint resolution pursuant to the Congressional Review Act disapproving the September 2020 rule, and on November 15, 2021, EPA issued a proposed rule to revise the Quad Oa regulations that, if finalized, would require methane emissions reductions and implementation of a fugitive emissions monitoring and repair program. EPA has also announced its intention to issue a supplemental proposal in 2022 that may expand on or modify the 2021 proposal in response to public input. It is possible that these rules will continue to require oil and natural gas operators to expend material sums.

In addition, in November 2016, BLM issued final rules to reduce methane emissions from venting, flaring, and leaks during oil and natural gas operations on public lands that are substantially similar to the EPA Quad Oa requirements. However, on December 8, 2017, the BLM published a final rule to temporarily suspend or delay certain requirements contained in the November 2016 final rule until January 17, 2019, including those requirements relating to venting, flaring and leakage from oil and natural gas production activities. Further, in September 2018, the BLM published a final rule to revise or rescind certain provisions of the 2016 rule. On July 21, 2020, a Wyoming federal court vacated almost all of the 2016 rule, including all provisions relating to the loss of gas through venting, flaring, and leaks, and on July 15, 2020, a California federal court vacated the 2018 rule. While, as a result of these developments, future implementation of the EPA and BLM methane rules is uncertain, given the long-term trend towards increasing regulation, future federal GHG regulations of the oil and natural gas industry remain a possibility. We may be required to expend significant costs to obtain the necessary equipment (pollution control equipment and optical gas imaging equipment for LDAR inspections) and personnel trained to assist with inspection and reporting requirements to ensure we are in compliance with these rules.

Table of Contents

***We may incur increasing attention to environmental, social and governance ("ESG") matters that may impact our business.***

Businesses across all industries are facing increasing scrutiny from stakeholders related to their ESG practices. If we do not adapt to or comply with investor or stakeholder expectations and standards, which are evolving, or if we are perceived to have not responded appropriately to the growing concern for ESG issues, regardless of whether there is a legal requirement to do so, we may suffer from reputational damage and the business, financial condition and/or the value of our common stock could be materially and adversely affected. Increasing attention to climate change, increasing societal expectations on businesses to address climate change, and potential consumer use of substitutes to energy commodities may result in increased costs, reduced demand for our hydrocarbon products, reduced profits, increased investigations and litigation, and negative impacts on our ability to access capital markets.

In addition, organizations that provided information to investors on corporate governance and related matters have developed rating processes for evaluating business entities on their approach to ESG matters. Currently, there are no universal standards for such scores or ratings, but the importance of sustainability evaluations is becoming more broadly accepted by investors and shareholders. Such ratings are used by some investors to inform their investment and voting decisions. Additionally, certain investors use these scores to benchmark businesses against their peers. If we are perceived as lagging, our investors may engage with such third party organizations to require improved ESG disclosure or performance.

***Our estimates of the volume of reserves could have flaws, or such reserves could turn out not to be commercially extractable. As a result, our future revenues and projections could be incorrect.***

Estimates of reserves and of future net revenues prepared by different petroleum engineers may vary substantially depending, in part, on the assumptions made and may be subject to adjustment either up or down in the future. Our actual amounts of production, revenue, taxes, development expenditures, operating expenses, and quantities of recoverable oil and natural gas reserves may vary substantially from the estimates. Oil and natural gas reserve estimates are necessarily inexact and involve matters of subjective engineering judgment. In addition, any estimates of our future net revenues and the present value thereof are based on assumptions derived in part from historical price and cost information, which may not reflect current and future values, and/or other assumptions made by us that only represent our best estimates. If these estimates of quantities, prices and costs prove inaccurate, we may be unsuccessful in expanding our oil and natural gas reserves base with our acquisitions. Additionally, if declines in and instability of oil and natural gas prices occur, then write downs in the capitalized costs associated with any oil and natural gas assets we obtain may be required. Because of the nature of the estimates of our reserves and estimates in general, reductions to our estimated proved oil and natural gas reserves and estimated future net revenues may not be required in the future, and/or that our estimated reserves may not be present and/or commercially extractable. If our reserve estimates are incorrect, we may be forced to write down the capitalized costs of our oil and natural gas properties.

***Decommissioning costs are unknown and may be substantial. Unplanned costs could divert resources from other projects.***

We may become responsible for costs associated with abandoning and reclaiming wells, facilities and pipelines which we use for production of oil and natural gas reserves. Abandonment and reclamation of these facilities and the costs associated therewith is often referred to as "decommissioning." We accrue a liability for decommissioning costs associated with our wells but have not established any cash reserve account for these potential costs in respect of any of our properties. If decommissioning is required before economic depletion of our properties or if our estimates of the costs of decommissioning exceed the value of the reserves remaining at any particular time to cover such decommissioning costs, we may have to draw on funds from other sources to satisfy such costs. The use of other funds to satisfy such decommissioning costs could impair our ability to focus capital investment in other areas of our business.

Table of Contents

***We may have difficulty distributing production, which could harm our financial condition.***

In order to sell the oil and natural gas that we are able to produce, if any, the operators of the wells we obtain interests in may have to make arrangements for storage and distribution to the market. We will rely on local infrastructure and the availability of transportation for storage and shipment of our products, but infrastructure development and storage and transportation facilities may be insufficient for our needs at commercially acceptable terms in the localities in which we operate. This situation could be particularly problematic to the extent that our operations are conducted in remote areas that are difficult to access, such as areas that are distant from shipping and/or pipeline facilities. These factors may affect our and potential partners' ability to explore and develop properties and to store and transport oil and natural gas production, increasing our expenses.

Furthermore, weather conditions or natural disasters, actions by companies doing business in one or more of the areas in which we will operate, or labor disputes may impair the distribution of oil and/or natural gas and in turn diminish our financial condition or ability to maintain our operations.

***The marketability of any future production will be dependent upon transportation and other facilities, certain of which we do not control. When these facilities are unavailable, our operations can be interrupted and any revenues reduced.***

The marketability of any future production depends in part upon the availability, proximity and capacity of transportation facilities owned by third parties. The oil produced will be transported from the wellhead to our tank batteries by our gathering system. Our purchasers would then transport the oil by truck to a pipeline for transportation. Our natural gas production will generally be transported by our gathering lines from the wellhead to an interconnection point with the purchaser. We do not control these trucks and other third-party transportation facilities and our access to them may be limited or denied. Insufficient production from our wells to support the construction of pipeline facilities by our purchasers or a significant disruption in the availability of our or third-party transportation facilities or other production facilities could adversely impact our ability to deliver to market or produce our production and thereby cause a significant interruption in our operations.

We may be required to flare a portion of our natural gas production for a number of reasons, including the fact that (i) our well is not yet tied into the third-party gathering system, (ii) the pressures on the third-party gathering system are too high to allow additional production from our well to be transported or (iii) our production is prorated due to high demand on the third-party gathering system. We may flare additional gas from time to time.

Also, the transfer of our oil and natural gas through third-party pipelines may be curtailed or delayed if it does not meet the quality specifications of the pipeline owners. Our access to transportation options, including trucks owned by third parties, can also be affected by U.S. federal and state regulation of oil and natural gas production and transportation, general economic conditions and changes in supply and demand. If, in the future, we are unable, for any sustained period, to implement acceptable delivery or transportation arrangements or encounter production-related difficulties, we may be required to shut in or curtail production. Any such shut in or curtailment, or an inability to obtain favorable terms for delivery of our production, would adversely affect our financial condition and results of operations.

***Our business will suffer if we cannot obtain or maintain necessary licenses.***

Our operations will require licenses, permits and in some cases renewals of licenses and permits from various governmental authorities. Our ability to obtain, sustain or renew such licenses and permits on acceptable terms is subject to change in regulations and policies and to the discretion of the applicable governments, among other factors. Our inability to obtain, or our loss of or denial of extension of, any of these licenses or permits could hamper our ability to produce revenues from our operations.

***Challenges to our properties may impact our financial condition.***

Title to oil and natural gas interests is often not capable of conclusive determination without incurring substantial expense. While we have made and intend to make appropriate inquiries into the title of properties and other development rights we have acquired and intend to acquire, title defects may exist. In addition, we may be unable to obtain adequate insurance for title defects, on a commercially reasonable basis or at all. If title defects do exist, it is possible that we may lose all or a portion of our right, title and interests in and to the properties to which the title defects relate. If our property rights are reduced, our ability to conduct our exploration, development and production activities may be impaired. To mitigate title problems, common industry practice is to obtain a title opinion from a qualified oil and natural gas attorney prior to the drilling operations of a well.

Table of Contents

***We rely on technology to conduct our business, and our technology could become ineffective or obsolete.***

We rely on technology, including geographic and seismic analysis techniques and economic models, to develop any reserve estimates and to guide our exploration, development and production activities. We and our operator partners will be required to continually enhance and update our technology to maintain its efficacy and to avoid obsolescence. The costs of doing so may be substantial and may be higher than the costs that we anticipate for technology maintenance and development. If we are unable to maintain the efficacy of our technology, our ability to manage our business and to compete may be impaired. Further, even if we are able to maintain technical effectiveness, our technology may not be the most efficient means of reaching our objectives, in which case we may incur higher operating costs than we would were our technology more efficient.

***The loss of key personnel would directly affect our efficiency and profitability.***

Our future success is dependent, in a large part, on retaining the services of our planned management team. Our executive officers possess a unique and comprehensive knowledge of our industry and related matters that are vital to our success within the industry. The knowledge, leadership and technical expertise of these individuals would be difficult to replace. The loss of one or more of our officers could have a material adverse effect on our operating and financial performance, including our ability to develop and execute our long-term business strategy. We do not maintain key-man life insurance with respect to any employees. We have entered into employment agreements with certain of our executive officers as described in more detail under the heading "Executive Compensation" elsewhere in this report.

***We have limited management and staff and are dependent upon partnering arrangements and third-party service providers.***

We have six full-time employees, including our Chief Executive Officer and Chief Financial Officer. The loss of these individuals would have an adverse effect on our business, as we have very limited personnel. We leverage the services of other independent consultants and contractors to perform various professional services, including engineering, oil and natural gas well planning and supervision, and land, legal, environmental and tax services. We also pursue alliances with partners in the areas of geological and geophysical services and prospect generation, evaluation and prospect leasing. Our dependence on third-party consultants and service providers create a number of risks, including but not limited to:

- the possibility that such third parties may not be available to us as and when needed; and
- the risk that we may not be able to properly control the timing and quality of work conducted with respect to our projects.

If we experience significant delays in obtaining the services of such third parties or they perform poorly, our results of operations and stock price could be materially adversely affected.

***Certain of our directors and officers have significant duties with, and spend significant time serving, entities that may compete with us in seeking acquisitions and business opportunities and, accordingly, may have conflicts of interest in allocating time or pursuing business opportunities.***

Certain of our directors and officers, who are responsible for managing the direction of our operations and acquisition activities, hold positions of responsibility with other entities that are in the business of identifying and acquiring oil and natural gas properties. The existing positions held by these directors and officers may give rise to fiduciary or other duties that are in conflict with the duties they owe to us. These directors and officers may become aware of business opportunities that may be appropriate for presentation to us as well as to the other entities with which they are or may become affiliated. Due to these existing and potential future affiliations, they may present potential business opportunities to other entities prior to presenting them to us, which could cause additional conflicts of interest. They may also decide that certain opportunities are more appropriate for other entities with which they are affiliated, and as a result, they may elect not to present those opportunities to us. These conflicts may not be resolved in our favor.

***Our business and operations may be adversely affected by the COVID-19 pandemic and may be adversely affected by other similar outbreaks.***

As a result of the COVID-19 pandemic or other adverse public health developments, including voluntary and mandatory quarantines, travel restrictions, and other restrictions, we have experienced delays, disruptions and temporary suspensions of our operations. In addition, our financial condition and results of operations may be adversely affected by the COVID-19 pandemic in the future.

The timeline and potential magnitude of the COVID-19 outbreak continue to be unknown. The continuation or amplification of the COVID-19 pandemic could continue to more broadly affect the United States and global economy, including our business and operations, and the demand for oil and natural gas. Other contagious diseases in the human population could have similar adverse effects. The potential impact from COVID-19 is difficult to predict, therefore, the extent to which it will negatively affect our operating results, or the duration of any potential business disruption is uncertain. The magnitude and duration of any impact will depend on future developments and new information that may emerge regarding the duration of COVID-19 pandemic, the severity of any variants thereof, rate of vaccinations and other actions taken by authorities to contain its impact or otherwise treat the disease, all of which are beyond our control.

***Terrorist attacks or cyber-incidents could result in information theft, data corruption, operational disruption and/or financial loss.***

Like most companies, we have become increasingly dependent upon digital technologies, including information systems, infrastructure and cloud applications and services, to operate our businesses, to process and record financial and operating data, communicate with our business partners, analyze mine and mining information, estimate quantities of coal reserves, as well as other activities related to our businesses. Strategic targets, such as energy-related assets, may be at greater risk of future terrorist or cyber-attacks than other targets in the United States. Deliberate attacks on, or security breaches in, our systems or infrastructure, or the systems or infrastructure of third parties, or cloud-based applications could lead to corruption or loss of our proprietary data and potentially sensitive data, delays in production or delivery, difficulty in completing and settling transactions, challenges in maintaining our books and records, environmental damage, communication interruptions, other operational disruptions and third-party liability. Our insurance may not protect us against such occurrences. Consequently, it is possible that any of these occurrences, or a combination of them, could have a material adverse effect on our business, financial condition, results of operations and cash flows. Further, as cyber incidents continue to evolve, we may be required to expend additional resources to continue to modify or enhance our protective measures or to investigate and remediate any vulnerability to cyber incidents. We plan to adopt plans and policies to address precautions with respect to data security and appropriate responses in case of a reported breach.

***The 2021 Note with Meta contains restrictive covenants that limit our operations.***

In 2021, we borrowed $15 million pursuant to the terms of the 2021 Note (defined below). The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2021 Note. This restriction may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for additional information.

The 2021 Note is secured by a security interest in shares of common stock of Meta and a 25% working interest in the Orogrande Project as defined in the Security Agreement (defined below), held by the Pledgor (defined below) and Pledgor's affiliate, Wolfbone, respectively. Any default that is not waived could permit Meta, as lender, to exercise rights and remedies with respect to all of the collateral that is securing the 2021 Note, and/or other rights and remedies under applicable law. Upon the completion of the Merger (defined below), Wolfbone will be a subsidiary of the Company and the Security Agreement will remain in place.

Our ability to meet these restrictive covenants or to avoid defaults can be impacted by events beyond our control. The 2021 Note provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence of an event of default, Meta as our lender could elect to declare all amounts outstanding under the 2021 Note to be immediately due and payable. If the outstanding debt under the 2021 Note was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our common stock.

***The 2022 Note with Mr. McCabe contains restrictive covenants that limit our operations***.

On December 22, 2022, we borrowed $2 million pursuant to the terms of the 2022 Note (defined below), which has a maximum principal amount available for borrowing of $20 million. If we are not in compliance with the covenants of the 2022 Note, or if we are in default under the 2022 Note, it is possible that Mr. McCabe will not offer to extend any additional loans under the 2022 Note, which may affect our business as a going concern. The 2022 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all obligations under the 2022 Note. This restriction may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for additional information.

Our ability to meet these restrictive covenants or to avoid defaults can be impacted by events beyond our control. The 2022 Note provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence of an event of default, Mr. McCabe as our lender could elect to declare all amounts outstanding under the 2022 Note to be immediately due and payable. If the outstanding debt under the 2022 Note was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate material adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our common stock.

Table of Contents

***Our Loan Agreement with Meta contains restrictive covenants that limit our operations.***

In 2022, we borrowed an aggregate principal amount of $5.0 million pursuant to the terms of the Loan Agreement (defined below), which is the maximum principal balance available under the Loan Agreement. The Loan Agreement contains various restrictive covenants and other restrictions, which include, among other things, restrictions on:

- our ability to transfer all or part of our business or property, except for inventory in the ordinary course of business, surplus or obsolete equipment, permitted liens, and transfers of cash permitted by the agreement;
- our ability to liquidate or dissolve or merge or consolidate with another entity, or acquire another entity;
- our ability to incur additional debt beyond certain limits or encumber our assets; and
- our ability to pay dividends or make investments, other than permitted investments.

These restrictions may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for additional information.

Our ability to meet these restrictive covenants can be impacted by events beyond our control. The Loan Agreement provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence and during the continuance of an event of default, Meta as the lender could elect to (i) declare all outstanding principal and accrued and unpaid interest under the Loan Agreement immediately due and payable, (ii) terminate any remaining commitment to make loans under the Loan Agreement, and/or (iii) exercise certain other rights and remedies anticipated under the Loan Agreement. The events of default under the Loan Agreement include, among other things (subject to grace periods in certain instances), payment defaults, breaches of covenants or representations and warranties, a change in control or certain material adverse effects as defined in the Loan Agreement, material judgments and attachments, cross defaults with certain of our other material indebtedness, and bankruptcy and insolvency events with respect to us and our subsidiaries. If the outstanding debt under the Loan Agreement was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our common stock.

***We may have been able to receive better terms from unaffiliated third parties than the terms we received in our agreements with Meta.***

We negotiated agreements with Meta including the 2021 Note, Loan Agreement, Distribution Agreement and Tax Matters Agreement, while we were still a subsidiary of Meta. Accordingly, these agreements may not reflect terms that would have resulted from arms-length negotiations between unaffiliated parties. The terms of the agreements relate to, among other things, loans for working capital, allocations of assets, liabilities, rights, indemnifications and other obligations between Meta and us. We may have received better terms from third parties because third parties may have competed with each other to win our business. See "Certain Relationships and Related Party Transactions" for more information.

**Risks Relating to Our Status as a Public Reporting Company**

***We are an emerging growth company and a smaller reporting company, subject to less stringent reporting and regulatory requirements of other publicly reporting companies and this status may have an adverse effect on our ability to attract interest in our common stock.***

We are an emerging growth company as defined in the JOBS Act. As long as we remain an emerging growth company, we may take advantage of certain exemptions from various reporting and regulatory requirements that are applicable to other public reporting companies that are not emerging growth companies. We cannot predict if investors will find our common stock less attractive if we choose to rely on these exemptions.

Table of Contents

Additionally, we are a "smaller reporting company" as defined under the Exchange Act. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company provided: (1) the market value of our common stock held by non-affiliates is less than $250 million, calculated annually, as of the last business day of our second fiscal quarter, or (2) our annual revenues are less than $100 million during such completed fiscal year and the market value of our common stock held by non-affiliates is less than $700 million, calculated annually, as of the last business day of our second fiscal quarter. To the extent we take advantage of such reduced disclosure obligations, it may also make comparison of our financial statements with other public reporting companies difficult or impossible.

**Risk Related to Ownership of Our Common Stock**.

***Our common stock is not eligible with the Depository Trust Company ("DTC"), which may result in brokerage firms being unwilling to hold or trade the stock.***

Our shares of common stock are not eligible with DTC to permit our shares of common stock to trade electronically. If an issuer is not "DTC-eligible," then its capital stock cannot be electronically transferred between brokerage accounts, which means that brokerage firms may be unwilling to hold or trade our common stock, restricting all trades by holders of our common stock.

***No trading market for our common stock is expected to develop.***

There is no public market for our shares of common stock and our shares are not DTC eligible for electronic trading to third parties. There is no expectation that a trading market will develop or be sustained. Accordingly, stockholders may have to hold the shares of common stock indefinitely.

***We do not intend to pay any cash dividends in the foreseeable future and, therefore, any return on an investment in our common stock must come from increases in the fair market value of the common stock.***

We do not intend to pay cash dividends on our common stock in the foreseeable future. We expect to retain future earnings, if any, for reinvestment in our business. Also, any credit agreements, which we may enter into, may restrict our ability to pay dividends. Whether we pay cash dividends in the future will be at the discretion of our Board of Directors (the "Board") and will be dependent upon our financial condition, results of operations, cash requirements, future prospects and any other factors our Board deems relevant. Therefore, any return on an investment in our common stock must come from increases in the fair market value of the common stock.

***We may issue preferred stock with terms that could adversely affect the voting power or value of our common stock.***

Our Board has the authority to cause us to issue, without any further vote or action by the stockholders, shares of preferred stock in one or more series, to designate the number of shares constituting any series, and to fix the rights, preferences, privileges and restrictions thereof, including dividend rights, voting rights and terms of redemption, redemption price or prices and liquidation preferences of such series. The terms of one or more classes or series of preferred stock could adversely impact the voting power or value of our common stock. For example, we might afford holders of preferred stock the right to elect some number of our directors in all events or upon the occurrence of specified events or the right to vote on specified transactions. Similarly, the repurchase or redemption rights or liquidation preferences we might assign to holders of preferred stock could affect the residual value of our common stock.

**General Risk Factors**

***Ineffective internal controls could impact our business and operating results.***

Our internal control over financial reporting may not prevent or detect misstatements because of its inherent limitations, including the possibility of human error, the circumvention or overriding of controls, or fraud. Even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If we fail to maintain the adequacy of our internal controls, including any failure to implement required new or improved controls, or if we experience difficulties in their implementation, our business and operating results could be harmed and the reliability of our consolidated financial statements could be compromised.

Table of Contents

***We rely on information technology in our operations, and security breaches and other disruptions in our systems could compromise our information and expose us to liability, which would cause our business and reputation to suffer.***

In the ordinary course of our business, we collect and store sensitive data. Despite our security measures, our information technology and infrastructure may be vulnerable to attacks by hackers or breached due to employee error, malfeasance or other disruptions. These incidents may be an intentional attack or an unintentional event and could involve gaining unauthorized access to our information systems for purposes of misappropriating assets, stealing confidential information, corrupting data or causing operational disruption. Any such breach could compromise our networks and the information stored there could be accessed, publicly disclosed, lost or stolen. The result of these incidents may include disrupted operations, misstated or unreliable financial data, liability for stolen assets or information, increased cybersecurity protection and insurance costs, litigation, damage to business relationships and regulatory fines and penalties. The costs related to cyber or other security threats or disruptions may not be fully insured or indemnified by other means. Although we intend to implement processes, procedures and internal controls to help mitigate cybersecurity risks and cyber intrusions, such measures will not guarantee that a cyber-incident will not occur and/or that our financial results, operations or confidential information will not be negatively impacted by such an incident. In addition, cybersecurity has become a top priority for regulators around the world, and some jurisdictions have enacted laws requiring companies to notify individuals of data security breaches involving certain types of personal data. If we fail to comply with the relevant laws and regulations, we could suffer financial losses, a disruption of our business, liability to investors, regulatory intervention or reputational damage.

**Item 1B. Unresolved Staff Comments**

None.

**Item 3. Legal Proceedings**

On April 30, 2020, the Company's wholly owned subsidiary, Hudspeth, filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies ("Cordax"). The suit, *Hudspeth and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies*, was filed in the 189th Judicial District Court of Harris County, Texas. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Working interest owner Wolfbone is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. Meta, on our behalf as our parent at the time, determined to add the manufacturer of one of the tool components that it contends was one of the causes of the tool failure. It was later disclosed that Cordax is the subsidiary of a Canadian parent company, who has also been added to the case. Cordax's current Chairman of the Board filed a special appearance after being served with a citation, alleging that he was a Canadian citizen with no meaningful ties to Texas. After discovery was conducted on this issue, a nonsuit without prejudice for this defendant was filed, dismissing him from the case. The remaining parties attended mediation on June 15, 2022, that was unsuccessful in resolving the case. Discovery is ongoing. The Company has presented several of its witnesses for deposition and is preparing to depose Cordax's key fact witnesses. The case is set for trial in October 2023.

On March 18, 2021, Cordax filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500.01 and recover related attorney's fees. The foreclosure action, *Datalog LWT Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc.*, was filed in the 205th Judicial District Court of Hudspeth County, Texas. We are contesting the lien in good faith and filed a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final disposition of the related case currently pending in Harris County, Texas. We are required to indemnify Meta in connection with this matter pursuant to the terms of the Distribution Agreement between us and Meta in connection to the Spin-Off.

**Item 4. Mine Safety Disclosures**

Not applicable.

*Table of Contents*

## PART II

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

Our common stock is not listed for trading on any stock exchange or market. The shares of common stock will not be eligible for electronic transfer through the Depository Trust Company or any other established clearing corporation. Accordingly, there currently is no public trading market for the common stock and there is no current expectation for a public market to develop.

As of December 31, 2022, we have approximately 64,000 holders of record of shares of our common stock. In computing the number of holders of record, all broker-dealers and clearing corporation holding shares on behalf of its customers, the holders of the common stock, is counted as a single shareholder. A significant number of shares of our common stock are held in either nominee name or street name brokerage accounts, and consequently, we are unable to determine the exact number of beneficial owners of our common stock.

**Distributions.**

We do not intend to pay cash dividends on our common stock in the foreseeable future. We expect to retain future earnings, if any, for reinvestment in our business. Whether we pay cash dividends in the future will be at the discretion of our Board and will be dependent upon our financial condition, results of operations, cash requirements, future prospects and any other factors our Board deems relevant.

**Equity Compensation Plan Information.**

See Item 11 for information regarding our Equity Incentive Plan.

**Sale of Unregistered Securities.**

None.

**Issuer Purchases of Equity Securities.**

None.

**Item 6. Reserved**

None.

Table of Contents

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operation**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our audited and unaudited financial statements and related notes that are included elsewhere in this report. Some of the information contained in this discussion and analysis constitutes forward-looking statements that involve risks and uncertainties. Actual results could differ materially from those discussed in these forward-looking statements. Factors that could cause or contribute to these differences include, but are not limited to, those discussed below and elsewhere in this report, particularly under the section titled "Cautionary Statement Concerning Forward-Looking Statements."*

**Overview.**

Our consolidated financial statements have been prepared on a stand-alone basis and are derived from the consolidated financial statements and accounting records of Meta. Our consolidated financial statements reflect our financial position, results of operations and cash flows as we were historically managed, in conformity with GAAP. Our financial statements include certain assets and liabilities that have historically been held at the Meta corporate level but are specifically identifiable or otherwise attributable to us.

All intercompany transactions between us and Meta have been included in our financial statements. The intercompany transactions are reflected in our consolidated statements of cash flow as a financing activity and in our consolidated balance sheets as "Notes payable – Meta".

The historical costs and expenses reflected in our financial statements include an allocation for certain corporate shared service functions historically provided by Meta including executive oversight, accounting, treasury, tax, legal, human resources, occupancy, procurement, information technology and other shared services. These expenses have been allocated to us on the basis of direct usage when identifiable, with the remainder allocated on a pro rata basis based on sales, headcount, tangible assets or other measures considered to be a reasonable reflection of the historical utilization levels of these services.

Our management believes the assumptions underlying our financial statements, including the assumptions regarding the allocation of general corporate expenses from Meta are reasonable. Nevertheless, our financial statements may not include all of the actual expenses that would have been incurred had we operated as a stand-alone company during the periods presented and may not reflect what our actual results of operations, financial position and cash flows would have been if we had operated as a stand-alone company during the periods presented. Actual costs that would have been incurred if we had operated as a stand-alone company would depend on multiple factors, including organizational structure and strategic decisions made in various areas, including information technology and infrastructure. We now perform these functions using our own resources and purchased services.

The period December 15, 2022 through December 31, 2022 is referred to herein as the "successor period" and the period from January 1, 2022 through December 14, 2022 is referred to herein as the "predecessor period". The predecessor period is reflective of the Company while a subsidiary of our former parent Meta. The successor period is reflective of the Company after the Spin-Off as an independent public reporting company.

On December 21, 2022, we entered into that certain Agreement and Plan of Merger (the "Merger Agreement") with Hudspeth, Wolfbone, MPC and Mr. McCabe, pursuant to which in a series of transactions the oil and natural gas leases, the lands covered by such leases, pooling and communitization agreements, rights-of-way, the surface estate of the lands and all wells located in the Orogrande Project will be transferred, conveyed and assigned to Hudspeth (or its designated assignee) in consideration of (1) treating the Orogrande Obligations (as defined in the Merger Agreement) as having been irrevocably satisfied and discharged in full with respect to MPC and (2) an issuance of 56,297,638 shares of our common stock to Mr. McCabe (such series of transactions collectively, the "Merger"). The Merger will be completed in accordance with the Texas Business Organizations Code, whereby (a) the Company will form NBH MergeCo, LLC with the State of Texas ("MergeCo") in order to cause Hudspeth to assign all of its rights under the Merger Agreement to MergeCo and MergeCo will assume Hudspeth's obligations under the Merger Agreement, (b) Hudspeth (or MergeCo, as its assignee), Wolfbone and MPC shall merge with each of Wolfbone and MPC as surviving entities, and (c) Wolfbone shall become a direct and wholly-owned subsidiary of the Company. The closing of the transactions contemplated by the Merger Agreement are subject to the satisfaction of certain customary closing conditions, including filing and acceptance of the certificate of merger by the Secretary of State of the State of Texas.

In connection with the Merger, on December 22, 2022, the Company entered into the 2022 Note (defined below). The Company is entitled to request advances under the 2022 Note in a minimum principal amount of $100,000 each. Mr. McCabe is the largest shareholder of our common stock. As such, the Merger and 2022 Note constitute related party transactions which have been duly approved by our Board and Audit Committee. As of December 31, 2022, the Company had drawn $2 million on the 2022 Note.

*Table of Contents*

*Recent Developments*

We met our drilling obligations under the DDU Agreement to drill five new wells in the Orogrande Project in advance of the March 31, 2023 deadline under University Lands lease requirement. The data collected from these five wells, in addition to the five wells drilled in 2021, confirmed that there are at least five potential distinct reservoirs under our acreage. Also, our operations team deployed a new mist drilling solution which increased hole stability, which we believe will result in meaningful cost savings for additional wells drilled in the Orogrande Project. While these wells may have potential to produce hydrocarbons to sell commercially in the future, we have no immediate plans to deploy the additional capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including reservoir locations, target depths and designated acreage, in the Orogrande Project.

On March 31, 2023, we entered into an amendment to the 2021 Note (defined below) and an amendment to Loan Agreement (defined below) in order to extend each of the 2021 Maturity Date (defined below) and the Maturity Date (defined below) respectively from March 31, 2023 to October 3, 2023. Such amendments also removed the provisions allowing for extensions of the 2021 Maturity Date and the Maturity Date in the event the Company raised $30 million or more in capital through debt or equity or a combination thereof by March 31, 2023.

*Income Taxes*

Judgment is required in determining the provision for income taxes and related accruals, deferred tax assets and liabilities. In the ordinary course of business, tax issues may arise where the ultimate outcome is uncertain. Additionally, our tax returns are subject to audit by various tax authorities. Consequently, changes in our estimates for contingent tax liabilities may materially impact our results of operations or financial position.

**Results of Operations.**

***Historical Results for the Years Ended December 31, 2022 (for the Predecessor Period January 1, 2022 through December 14, 2022, and for the Successor Period December 15, 2022 through December 31, 2022) and 2021***

For the predecessor period, we had a net loss of $7,938,335 and for the successor period, we had a net loss of $910,538 compared to a net loss of $8,238,808 for the year ended December 31, 2021. The increase in net loss is primarily due to increased general and administrative expenses and interest expenses for the year ended December 31, 2022, offset by a loss on sale of oil and natural gas property for the year ended December 31, 2021. At December 31, 2022, we had current assets of $959,118 and total assets of $80,735,224. As of December 31, 2022, we had current liabilities of $30,036,709. Stockholders' equity was $50,541,649 at December 31, 2022.

*Revenue and Gross Profit*

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2022 | | | 2021 |
| | Successor | Predecessor | Combined | |
| Product sales BOE | 59 | 633 | 692 | 15,904 |
| Total Revenue | $ 2,561 | $ 38,273 | $ 40,834 | $ 15,904 |
| Cost of revenue | (6,055) | (71,243) | (77,298) | (76,331) |
| Gross Profit (Loss) | $ (3,494) | $ (32,970) | $ (36,464) | $ (60,427) |
| Gross Profit (Loss) percentage | (136.43)% | (86.14)% | (89.30)% | (379.95)% |

Table of Contents

*Production Revenues and Cost of Revenue*

For the year ended December 31, 2022, we had production revenue of $40,834 ($38,273 for the predecessor period plus $2,561 for the successor period) compared to $15,904 of production revenue for the year ended December 31, 2021. The change in revenue was primarily due to the increase in oil and natural gas production from 683 BOE for the 2021 period to 688 BOE for the 2022 period, from the Oklahoma Properties, an increase in the average price of oil from $55.01 in 2021 to $98.75 in 2022 and an increase in the average price of natural gas from $3.13 in 2021 to $7.51 in 2022. Our cost of revenue, consisting of lease operating expenses and production taxes, was $77,298 for the year ended December 31, 2022 compared with $76,331 for the year ended December 31, 2021. For each of the years ended December 31, 2021 and 2022, production and revenue are detailed as follows:

| Property | Quarter | Oil Production {BBLS} | Gas Production {MCF} | Oil Revenue | Gas Revenue | Total Revenue |
|---|---|---|---|---|---|---|
| Oklahoma | Q1 - 2021 | 28 | 711 | $ 1,166 | $ 1,305 | $ 2,471 |
| Hazel (TX) | Q1 - 2021 | 0 | 0 | — | — | — |
| **Total Q1-2021** | | 28 | 711 | $ 1,166 | $ 1,305 | $ 2,471 |
| Oklahoma | Q2 - 2021 | 28 | 1,212 | $ 1,692 | $ 1,814 | $ 3,506 |
| Hazel (TX) | Q2 - 2021 | 0 | 0 | — | — | — |
| **Total Q2-2021** | | 28 | 1,212 | $ 1,692 | $ 1,814 | $ 3,506 |
| **Oklahoma** | Q3 - 2021 | 29 | 441 | $ 1,818 | $ 1,146 | $ 2,964 |
| **Hazel (TX)** | Q3 - 2021 | 0 | 0 | — | — | — |
| **Total Q3-2021** | | 29 | 441 | $ 1,818 | $ 1,146 | $ 2,964 |
| **Oklahoma** | Q4 - 2021 | 0 | 1,222 | $ — | $ 6,963 | $ 6,963 |
| **Hazel (TX)** | Q4 - 2021 | 0 | 0 | — | — | — |
| **Total Q4-2021** | | 0 | 1,222 | $ — | $ 6,963 | $ 6,963 |
| **Total 2021** | | 85 | 3,586 | $ 4,676 | $ 11,228 | $ 15,904 |
| **Average Commodity Price** | | | | $ 55.01 | $ 3.13 | |

| Property | Quarter | Oil Production {BBLS} | Gas Production {MCF} | Oil Revenue | Gas Revenue | Total Revenue |
|---|---|---|---|---|---|---|
| Oklahoma | Q1 - 2022 | 0 | 0 | $ — | $ — | $ — |
| Hazel (TX) | Q1 - 2022 | 0 | 0 | — | — | — |
| **Total Q1-2022** | | 0 | 0 | $ — | $ — | $ — |
| Oklahoma | Q2 - 2022 | 97 | 1,267 | $ 9,688 | $ 7,716 | $ 17,404 |
| Hazel (TX) | Q2 - 2022 | 0 | 0 | — | — | — |
| **Total Q2-2022** | | 97 | 1,267 | $ 9,688 | $ 7,716 | $ 17,404 |
| **Oklahoma** | Q3 - 2022 | 43 | 887 | $ 4,635 | $ 8,329 | $ 12,964 |
| **Hazel (TX)** | Q3 - 2022 | 0 | 0 | — | — | — |
| **Total Q3-2022** | | 43 | 887 | $ 4,635 | $ 8,329 | $ 12,964 |
| **Oklahoma** | Q4 - 2022 | | | | | |
| **Predecessor** | | 28 | 635 | $ 2,473 | $ 5,432 | $ 7,905 |
| **Successor** | | 15 | 242 | 1,276 | 1,285 | 2,561 |
| **Hazel (TX)** | Q4 - 2022 | 0 | 0 | — | — | — |
| **Total Q4-2022** | | 43 | 877 | $ 3,749 | $ 6,717 | $ 10,455 |
| **Total 2022** | | 183 | 3,031 | $ 18,072 | $ 22,762 | $ 40,834 |
| **Average Commodity Price** | | | | $ 98.75 | $ 7.51 | |

Table of Contents

*Expenses for the Years Ended December 31, 2022 and 2021*

We recorded depreciation, depletion and amortization expense of $-0- for the year ended December 31, 2022 compared to $4,642 for the year ended December 31, 2021.

*Operating Expenses*

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2022 | | | 2021 |
| | Successor | Predecessor | Combined | |
| Operating Expenses | | | | |
| General & Administrative | $ 907,045 | $ 7,905,860 | $ 8,812,905 | $ 8,050,443 |
| Total operating expenses | $ 907,045 | $ 7,905,860 | $ 8,812,905 | $ 8,050,443 |

*General and Administrative Expenses*

Our general and administrative expense for the year ended December 31, 2022 was $8,812,905 ($7,905,860 for the predecessor period plus $907,045 for the successor period) compared with $8,050,443 for the year ended December 31, 2021. Our general and administrative expenses consisted of consulting and compensation expense, substantially all of which were non-cash or deferred, accounting and administrative costs, professional consulting fees, and other general corporate expenses. The change in general and administrative expenses in 2022, compared to 2021, is primarily due to employee compensation and an increase in consulting fees, filing fees, legal fees, director and officer liability insurance, and investor relations expenses incurred in connection with the spin-off of the Company from Meta.

Table of Contents

**Cash Flows, Liquidity and Capital Resources.**

*Cash Flows*

*The following table summarizes sources and uses of cash and cash equivalents:*

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2022 | | | 2021 |
| | Successor | Predecessor | Combined | |
| **Cash Flows From Operating Activities** | | | | |
| Net loss | $ (910,538) | $ (7,938,335) | $ (8,848,873) | $ (8,238,808) |
| Adjustments to reconcile net loss to net cash from operations: | | | | |
| Accretion expense | 1,092 | — | 1,092 | — |
| Bad debt expense | — | (26,612) | (26,612) | — |
| Depreciation, depletion and amortization | — | — | — | 4,642 |
| Paid in kind interest | — | — | — | 208,889 |
| Change in: | | | | |
| Accounts receivable | — | 74,310 | 74,310 | (94,310) |
| Accounts receivable, related party | — | (14,153) | (14,153) | 86,754 |
| Prepayments – development costs | — | (150,000) | (150,000) | 101,005 |
| Other assets | 39,185 | (94,364) | (55,179) | (25,000) |
| Prepaid expenses | (58,225) | (1,408) | (59,633) | — |
| Accounts payable and accrued expenses | 1,154,917 | (64,982) | 1,089,935 | 906,287 |
| Other payables | — | 2,589,363 | 2,589,363 | — |
| Accrued interest payable | (1,091) | — | (1,091) | — |
| **Net cash provided by (used in) operating activities** | 225,340 | (5,626,181) | (5,400,841) | (7,050,541) |
| **Cash Flows From Investing Activities** | | | | |
| Investment in oil and natural gas properties | (1,976,029) | (3,859,851) | (5,835,880) | (14,805,511 |
| Proceeds from sale of oil and natural gas properties | — | — | — | — |
| **Net cash used in investing activities** | (1,976,029) | (3,859,851) | (5,835,880) | (14,805,511) |
| **Cash Flows From Financing Activities** | | | | |
| Contributions from parent | — | 316,600 | 316,600 | 11,214,967 |
| Proceeds from notes payable, related party | 2,000,000 | 7,500,000 | 9,500,000 | 12,500,000 |
| **Net cash provided by financing activities** | 2,000,000 | 7,816,600 | 9,816,600 | 23,714,967 |
| **Net increase (decrease) in cash** | 249,311 | (1,669,432) | (1,420,121) | 1,858,915 |
| **Cash—beginning of period** | 319,987 | 1,989,419 | 1,989,419 | 130,504 |
| **Cash—end of period** | $ 569,298 | $ 319,987 | $ 569,298 | $ 1,989,419 |
| **Supplemental disclosure of cash flow information:** | | | | |
| Cash paid for interest | $ — | $ — | $ — | $ 3,312 |
| Cash paid for state franchise tax | $ — | $ — | $ — | $ — |
| **Supplemental disclosure of non-cash investing and financing activities:** | | | | |
| Account payable reduced by expense offset | $ — | $ 15,638 | $ 15,638 | $ — |
| Capitalized Interest included in interest payable | $ 74,210 | $ 1,289,328 | $ 1,363,538 | $ 141,048 |

Table of Contents

At December 31, 2022, we had cash and cash equivalents of $569,298 compared to $1,989,419 as of December 31, 2021.

*Cash Flows From Operating Activities*

Cash used in operating activities for the year ended December 31, 2022, was $5,400,841 compared to $7,050,541 for the year ended December 31, 2021.

Cash used in operating activities for the year ended December 31, 2022 can be attributed principally to net loss from operations of $8,848,873 adjusted for $3,679,298 in an increase in other liabilities, and accounts payable and accrued expenses.

*Cash Flows from Investing Activities*

Cash used in investing activities for the year ended December 31, 2022 was $5,835,880 compared to $14,805,511 for year ended December 31, 2021. Cash used in investing activities consisted primarily of investments in oil and natural gas properties in 2022.

*Cash Flows from Financing Activities*

Cash provided by financing activities for the year ended December 31, 2022 was $9,816,600 compared to $23,714,967 for the year ended December 31, 2021. Cash flows provided by financing activities consists primarily of intercompany loans from Meta and the 2022 Note during the year ended December 31, 2022.

We expect to continue to have cash flows provided by financing activities as we seek new rounds of financing and continue to develop our oil and natural gas investments. We do not expect to pay cash dividends on our common stock in the foreseeable future.

Reference the Consolidated Statements of Cash Flows included in the financial statements for additional detail of the components that comprise the net use of cash in operations. We expect to continue to use cash flows in operating activities until such time as we achieve sufficient commercial oil and natural gas production to cover our operating costs.

*Capital Expenditures*

Our capital expenditures are summarized in the following table:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | | 2021 |
| | Successor | Predecessor | |
| Acquisitions: | | | |
| Proved property | $ — | $ — | $ — |
| Unproved property | — | — | — |
| Exploration and development: | | | |
| Developmental leasehold costs | — | — | — |
| Exploratory drilling and completion costs | — | — | — |
| Development drilling and completion costs | 1,975,944 | 3,859,936 | 14,805,511 |
| Other development costs | — | — | — |
| Capitalized interest | 74,210 | 1,289,328 | 141,048 |
| Asset retirement obligations | 245,774 | — | 21,937 |
| Total exploration and development | 2,295,928 | 5,149,264 | 14,968,496 |
| Other property | — | — | — |
| Total capital expenditures | $ 2,295,928 | $ 5,149,264 | $ 14,968,496 |
| Change in accrued capital expenditures and other | (949,093) | 650,562 | 909,287 |
| Prepaid drilling costs | — | 150,000 | 101,005 |
| Capitalized Interest | (74,210) | (1,289,328) | (141,048) |
| Asset retirement obligations | (245,774) | — | (21,937) |
| Total cash capital expenditures | $ 1,026,851 | $ 4,660,498 | $ 15,812,803 |

Table of Contents

*Liquidity and Capital Resources*

Liquidity risk is the risk that we will not meet our financial obligations as they become due after use of currently available cash. We have a planning and budgeting process to monitor operating cash requirements, including amounts projected for capital expenditures, which are adjusted as input variables change. These variables include, but are not limited to, our ability to generate revenue from operations, general and administrative requirements and the availability of equity or debt capital. As these variables change, we may be required to issue equity or obtain debt financing.

*The 2021 Note*

On October 1, 2021, we issued a secured, revolving promissory note in an original principal amount of up to $15 million in favor of Meta (as amended to date, the "2021 Note"). The 2021 Note bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. While the revolving commitment under the 2021 Note expires on 2021 Note Maturity Date, as of the date hereof, the full $15 million available under the 2021 Note has been fully drawn.

The 2021 Note is secured by a security interest in (a) pursuant to a Stock Pledge Agreement dated as of September 30, 2021 between Gregory McCabe (the "Pledgor") and Meta (the "Stock Pledge Agreement"), 1,515,000 shares of Meta's common stock that are owned directly and beneficially by the Pledgor, and (b) pursuant to a Deed of Trust, Mortgage, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production dated as of September 30, 2021 made by Wolfbone (an affiliate of the Pledgor) for the benefit of Meta (the "Security Agreement"), a 25% working interest beneficially owned by the Pledgor in the Orogrande Project as defined in the Security Agreement. Following the Merger, we expect Wolfbone to become an indirect subsidiary of the Company and the Security Agreement to remain in place.

The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2021 Note.

Upon the occurrence and during the continuance of an event of default under the 2021 Note, Meta as the lender may declare all outstanding principal and accrued and unpaid interest under the 2021 Note immediately due and payable, may terminate any remaining commitment to make advances under the 2021 Note, and may exercise the other rights and remedies provided for under the 2021 Note and related security documents. The events of default under the 2021 Note include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants, an event of default under the Stock Pledge Agreement or the Security Agreement, bankruptcy and insolvency events with respect us or our subsidiaries, cross defaults with certain of our other material indebtedness, and material judgments against us.

Table of Contents

On June 28, 2022 and in August 2022, we borrowed $1.9 million and $2.7 million as an advance from Meta to be treated as an unsecured term loan, in addition to $441,000 previously advanced, under a Loan Agreement with Meta as the lender (the "Loan Agreement"), the proceeds of which are available for our working capital and general corporate purposes. As of the date of this report, we had an aggregate principal amount outstanding of $5.0 million, which is the maximum amount available under the Loan Agreement. The loans are due and payable on March 31, 2023 (the "Maturity Date"), unless extended as described in the following sentence. Under the Loan Agreement, if we raise $30 million or more in capital through debt or equity or a combination thereof by the Maturity Date, the Maturity Date will be extended to October 3, 2023 and the 2021 Note plus the loans under the Loan Agreement would be amortized in six equal monthly installments. Loans under the Loan Agreement bear interest at a fixed rate of 8% per annum if no event of default exists, and at a fixed rate of 12% per annum if an event of default exists.

We have the right to prepay the loans under the Loan Agreement in whole or in part at any time without penalty. Amounts repaid or prepaid may not be reborrowed. We will be required to prepay the loans upon an asset disposition (other than permitted asset sales), certain equity issuances (other than permitted equity), debt issuances (other than permitted debt), and certain extraordinary receipts. We are required to prepay the loans from our annual excess cash flow, if any.

The Loan Agreement includes customary representations and covenants that, subject to certain exceptions and qualifications, restrict our ability to do certain things, such as: incur additional indebtedness; incur liens; engage in mergers, acquisitions, and asset sales; make loans and investments; declare dividends or redeem or repurchase equity interests; transact with affiliates on a non-arm's length basis; and enter into certain restrictive agreements. In addition, the Loan Agreement contains customary affirmative covenants, including covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our existence and material properties, customary visitation rights, reporting requirements, compliance with applicable laws and regulations, and formation or acquisition of new subsidiaries.

Upon the occurrence and during the continuance of an event of default, Meta as the lender has the right to declare all outstanding principal and accrued and unpaid interest under the Loan Agreement immediately due and payable and exercise certain other rights and remedies. The events of default under the Loan Agreement include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants or representations and warranties, a change in control or a material adverse change defined in the Loan Agreement, material judgments and attachments, cross defaults with certain other material indebtedness, and bankruptcy and insolvency events with respect to the Company and our subsidiaries.

See the discussion under the caption "Recent Developments" and Note 12 of the notes to our financial statements as of and for the year ended December 31, 2022 included in this report for information about the amendments to the 2021 Note and the Loan Agreement entered into subsequent to the end of fiscal year 2022.

*The 2022 Note*

On December 22, 2022, we issued an unsecured promissory note in the principal amount of up to $20 million in favor of Mr. McCabe (the "2022 Note"). The 2022 Note bears interest at 5% per annum, computed on the basis of a 365-day year, and matures on June 21, 2023 (the "2022 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2022 Note Maturity Date, the 2022 Note Maturity Date will be extended to October 3, 2023. The outstanding principal of the 2022 Note, together with all accrued interest thereon, becomes due on June 21, 2023. The revolving commitment under the 2022 Note expires on 2022 Note Maturity Date. As of December 31, 2022, we had $2 million principal amount outstanding and $18 million of available borrowings under the 2022 Note.

The 2022 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2022 Note.

Upon the occurrence and during the continuance of an event of default under the 2022 Note, Mr. McCabe as the lender may declare all outstanding principal and accrued and unpaid interest under the 2022 Note immediately due and payable, may terminate any remaining commitment to make advances under the 2022 Note, and may exercise the other rights and remedies provided for under the 2022 Note. The events of default under the 2022 Note include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants, bankruptcy and insolvency events with respect us or our subsidiaries, cross defaults with certain of our other material indebtedness, and material judgments against us.

*Contractual Obligations*

Our most significant contractual obligations relate to the Loan Agreement, the 2021 Note, 2022 Note and drilling and development commitments and other lease operating expenses under certain leases for the Orogrande Project.

Table of Contents

Our debt obligations include the $15 million principal balance outstanding under the 2021 Note, which incurs interest at 8% per annum and matures on March 31, 2023. On September 2, 2022, we entered into a Loan Agreement that governs the term loans advanced to us from Meta on April 14, 2022, May 4, 2022, May 12, 2022, May 26, 2022, June 1, 2022, June 13, 2022, June 28, 2022, August 11, 2022 and August 29, 2022, for an aggregate principal balance outstanding of $5 million, which is the maximum amount of Meta's commitment under the Loan Agreement. The term loans incur interest at a per annum rate equal to 8% and mature on March 31, 2023. On December 21, 2022, we issued the 2022 Note that governs the term loans advanced to us from Mr. McCabe on December 22, 2022, for an aggregate principal balance outstanding of $2 million. The term loan incurs interest at a per annum rate equal to 5% and matures on June 21, 2023. Under each of the 2021 Note, the Loan Agreement and the 2022 Note, if we raise additional capital through debt or equity, or any combination thereof, of at least $30 million before the respective maturity dates, we will be entitled to extend maturity to October 3, 2023 and repay the outstanding balances in six equal monthly installments beginning in April 2023 up to such extended maturity date.

For the year ended December 31, 2022, we incurred an aggregate interest on the 2022 Note, the 2021 Note and under the Loan Agreement of $1,571,336. See the discussion under the caption "Liquidity and Capital Resources."

In addition to our debt commitments, the Orogrande Project leases representing approximately 134,000 gross acres in the Orogrande Basin in West Texas are subject to expiration in 2023 in the event we fail to drill five wells during the 2023 calendar year in compliance with our drilling obligations under the DDU Agreement. We do not yet know what our capital expenditure needs will be to satisfy our drilling commitments for the calendar year 2023. For a discussion of the risks relating to our drilling obligations, see "Risk Factors—Risks Relating to Our Business", including the risk factor "*—Our acreage must be drilled before lease expiration in order to hold the acreage by production. In the highly competitive market for acreage, failure to drill sufficient wells in order to hold acreage will result in a substantial lease renewal cost, or if renewal is not feasible, loss of our lease and prospective drilling opportunities*". See also Notes 5 and 12 of the notes to our financial statements as of and for the year ended December 31, 2022.

Management believes that currently available resources may not provide sufficient funds to enable us to meet our financing and drilling obligations for the 2023 fiscal year. We anticipate that we will continue to incur operating losses and generate negative cash flows from operations for the foreseeable future. As a result, we will need additional capital resources to fund our operations both in the short term and in the long term, prior to achieving break even or positive operating cash flow. While we do not have any committed sources of capital, we expect to continue to opportunistically seek access to additional funds through public or private equity offerings or debt financings, through partnering or other strategic arrangements, including credit application arrangements with our third party servicers, or a combination of the foregoing. Despite our efforts, we may face obstacles in continuing to attract new financing due to industry conditions and our history and current record of net losses. We can provide no assurance that we will be able to obtain the financing required to meet our stated objectives or even to continue as a going concern.

**Critical Accounting Estimates.**

*Oil and natural gas properties*—The Company uses the full cost method of accounting for exploration and development activities as defined by the SEC. Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities. Gain or loss on the sale or other disposition of oil and natural gas properties is not recognized, unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least annually and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions.

*Table of Contents*

Gains and losses on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and natural gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

*Depreciation, depletion, and amortization*—The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

*Ceiling test*—Future production volumes from oil and gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and gas properties. If the net capitalized cost of proved oil and gas properties, net of related deferred income taxes, plus the cost of unproved oil and gas properties, exceeds the present value of estimated future net cash flows discounted at 10%, net of related tax affects, plus the cost of unproved oil and gas properties, the excess is charged to expense and reflected as additional accumulated DD&A. The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

*Asset retirement obligations*—The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

*Recent Accounting Pronouncements*

Our audited financial statements and the accompanying notes thereto found elsewhere in this report contain a description of recent accounting pronouncements.

Table of Contents

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

**Commodity Price Risk.**

Our financial condition, results of operations and capital resources are highly dependent upon the prevailing market prices of oil and natural gas. These commodity prices are subject to wide fluctuations and market uncertainties due to a variety of factors, some of which are beyond our control. Factors influencing oil and natural gas prices include the level of global demand for oil, the foreign supply of natural gas and oil, the establishment of and compliance with production quotas by oil exporting countries, weather conditions that determine the demand for natural gas, the price and availability of alternative fuels and overall economic conditions. It is impossible to predict future oil and natural gas prices with any degree of certainty. Sustained weakness in oil and natural gas prices may adversely affect our financial condition and results of operations, and may also reduce the amount of oil and natural gas reserves that we can produce economically. Any reduction in our oil and natural gas reserves, including reductions due to price fluctuations, can have an adverse effect on our ability to obtain capital for our exploration and development activities. Similarly, any improvements in oil and natural gas prices can have a favorable impact on our financial condition, results of operations and capital resources.

**Interest Rate Sensitivity.**

Interest rate risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates. Interest rate risk is minimized through management's decision to primarily obtain fixed rate or interest-free debt. The Company is not exposed to material cash flow interest rate risk.

Table of Contents

**Item 8. Consolidated Financial Statements and Supplementary Data**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**


| | Page |
|---|---|
| Consolidated Financial Statements of Next Bridge Hydrocarbons, Inc. | 40 |
| Reports of Independent Registered Public Accounting Firm | 42 |
| Consolidated Balance Sheets | F-1 |
| Consolidated Statements of Operations | F-2 |
| Consolidated Statements of Shareholders’ Equity | F-3 |
| Consolidated Statements of Cash Flows | F-4 |
| Notes to Consolidated Financial Statements | F-5 |

Table of Contents

The consolidated financial statements of Next Bridge Hydrocarbons, Inc. appearing in this report have been audited by BF Borgers, CPA, an independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such reports given on the authority of such firm as experts in accounting and auditing.

We are responsible for the fairness and reliability of the financial statements and other financial data included in this report. In the preparation of the financial statements, it is necessary for us to make informed estimates and judgments based on currently available information on the effects of certain events and transactions. Estimates of the oil and natural gas reserves of the Company and related future net cash flows and the present values were based upon reserve reports prepared by PeTech Enterprises, Inc. have been included in this report. We have included these estimates in reliance on the authority of such firm as an expert in such matters.

**Item 9. Changes In and Disagreements With Accountants on Accounting and Financial Disclosure**

Not applicable.

**Item 9A. Controls and Procedures**

***Evaluation of Disclosure Controls and Procedures***

The Company maintains disclosure controls and procedures (as that term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) that are designed to ensure that information required to be disclosed in the Company's reports under the Exchange Act is recorded, processed, and summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report on Form 10-K was made under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer. Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures (a) are effective to ensure that information required to be disclosed by us in reports filed or submitted under the Exchange Act is timely recorded, processed, summarized and reported and (b) include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

***Management's Report on Internal Control over Financial Reporting***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with accounting principles generally accepted in the United States of America, and that receipts and expenditures are being made only in accordance with authorizations of management and our directors; and (iii) provide reasonable assurance regarding prevention or timely detection of the unauthorized acquisition, use or disposition of assets that could have a material effect on the financial statements. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2022, using the framework specified in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment, management has concluded that our internal control over financial reporting was effective as of December 31, 2022. It should be noted that any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system will be met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there is only the reasonable assurance that our controls will succeed in achieving their goals under all potential future conditions.

***Changes in Internal Control over Financial Reporting***

There were no changes in our internal control over financial reporting during the quarter ended December 31, 2022 that materially affected or are reasonably likely to materially affect our internal control over financial reporting.

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the shareholders and the board of directors of Next Bridge Hydrocarbons, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Next Bridge Hydrocarbons, Inc. as of December 31, 2022 and 2021, the related statements of operations, stockholders' equity (deficit), and cash flows for the years then ended, and the related notes (collectively referred to as the "financial stateme

nts"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States.

**Substantial Doubt about the Company's Ability to Continue as a Going Concern**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the financial statements, the Company has suffered recurring losses from operations and has a significant accumulated deficit. In addition, the Company continues to experience negative cash flows from operations. These factors raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

/S/ BF Borgers CPA PC
**BF Borgers CPA PC (PCAOB ID 5041)**
We have served as the Company's auditor since 2022
Lakewood, CO
March 29, 2023

*Table of Contents*

**Item 9B. Other Information**

None.

Table of Contents

## PART III

### Item 10. Directors, Executive Officers and Corporate Governance

The information required by this item will be contained in the Company's definitive Proxy Statement for its 2023 Annual Stockholder Meeting, to be filed with the SEC within 120 days after December 31, 2022, and is incorporated herein by reference.

### Item 11. Executive Compensation

The information required by this item is incorporated by reference to the Company's definitive proxy statement for its 2023 Annual Stockholder Meeting, to be filed with the SEC within 120 days after December 31, 2022 and is incorporated herein by reference.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The information required by this item is incorporated by reference to the Company's definitive proxy statement for its 2023 Annual Stockholder Meeting, to be filed with the SEC within 120 days after December 31, 2022 and is incorporated herein by reference.

### Item 13. Certain Relationships and Related Party Transactions, and Director Independence

The information required by this item is incorporated by reference to the Company's definitive proxy statement for its 2023 Annual Stockholder Meeting, to be filed with the SEC within 120 days after December 31, 2022 and is incorporated herein by reference.

### Item 14. Principal Accountant Fees and Services

The information required by this item is incorporated by reference to the Company's definitive proxy statement for its 2023 Annual Stockholder Meeting, to be filed with the SEC within 120 days after December 31, 2022 and is incorporated herein by reference.

Table of Contents

## PART IV

**Item 15. Exhibits and Financial Statement Schedules**

(1) Financial Statements—See the Index to Consolidated Financial Statements, together with the report thereon of BF Borgers, CPA dated March 29, 2023 under Part II, Item 8 "Consolidated Financial Statements and Supplementary Data".

(2) All financial statement schedules are omitted because they are not applicable, or are immaterial or the required information is presented in the consolidated financial statements or the related notes.

(3) Exhibits.

| Exhibit Number | Exhibit Description |
|---|---|
| 2.1 | Distribution Agreement between Meta Materials Inc. and Next Bridge Hydrocarbons, Inc., dated December 2, 2022 (incorporated by reference to Exhibit 2.1 to the Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 2.2 | Agreement and Plan of Merger among Next Bridge Hydrocarbons, Inc., Hudspeth Operating, LLC, Wolfbone Investments, LLC, McCabe Petroleum Corporation, and Gregory McCabe, dated December 21, 2022 (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K, filed December 27, 2022). |
| 3.1 | First Amended and Restated Articles of Incorporation of Next Bridge Hydrocarbons, Inc. (incorporated by reference to Exhibit 3.1 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 3.2 | Amended and Restated By-laws of Next Bridge Hydrocarbons, Inc. (incorporated by reference to Exhibit 3.2 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.1 | Assignment Agreement between Meta Materials Inc. and Next Bridge Hydrocarbons, Inc., dated June 28, 2022 (incorporated by reference to Exhibit 10.1 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.2 | Tax Matters Agreement between Meta Materials Inc. and Next Bridge Hydrocarbons, Inc., date December 2, 2022 (incorporated by reference to Exhibit 10.2 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.3+ | Executive Employment Agreement of Chief Executive Officer (incorporated by reference to Exhibit 10.3+ to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.4+ | Executive Employment Agreement of President, dated October 21, 2022 (incorporated by reference to Exhibit 10.4+ to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.5+ | Executive Employment Agreement of Chief Financial Officer, dated October 21, 2022 (incorporated by reference to Exhibit 10.5+ to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.6+ | Executive Employment Agreement of Chief Operating Officer, dated October 21, 2022 (incorporated by reference to Exhibit 10.6+ to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.7+ | 2022 Equity Incentive Plan of Next Bridge Hydrocarbons, Inc. (incorporated by reference to Exhibit 10.7+ to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.8 | Purchase & Settlement Agreement, dated August 6, 2018, between Torchlight Energy Resources, Inc., Hudspeth Oil Corporation, Founders Oil & Gas, LLC, Founders Oil & Gas Operating, LLC, Wolfbone Investments, LLC and McCabe Petroleum Corporation (incorporated by reference to Exhibit 10.8 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)).† |
| 10.9 | Purchase Agreement dated April 4, 2016, by and among McCabe Petroleum Corporation, Torchlight Energy Resources, Inc. and Torchlight Energy, Inc. (incorporated by reference to Exhibit 10.9 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.10 | Option Agreement, by and among Torchlight Energy, Inc., Torchlight Hazel, LLC, Masterson Hazel Partners, LP and McCabe Petroleum Corporation, dated August 13, 2020 (incorporated by reference to Exhibit 10.10 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |

Table of Contents

| Exhibit Number | Exhibit Description |
|---|---|
| 10.11 | First Amendment to Option Agreement, by and among Torchlight Energy, Inc., Torchlight Hazel, LLC, Masterson Hazel Partners, LP and McCabe Petroleum Corporation, dated September 18, 2020 (incorporated by reference to Exhibit 10.11 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.12 | Second Amendment to Option Agreement, by and among Torchlight Energy, Inc., Torchlight Hazel, LLC, Masterson Hazel Partners, LP and McCabe Petroleum Corporation, dated April 15, 2021 (incorporated by reference to Exhibit 10.12 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.13 | Secured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Meta Materials, Inc., as holder, dated October 1, 2021 (incorporated by reference to Exhibit 10.13 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.14 | First Amendment to Secured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Meta Materials, Inc., as holder, dated September 2, 2022 (incorporated by reference to Exhibit 10.14 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022). |
| 10.15 | Loan Agreement between Meta Materials, Inc. and Next Bridge Hydrocarbons, Inc., dated September 2, 2022 (incorporated by reference to Exhibit 10.15 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.16 | Participation Agreement by and between McCabe Petroleum Corporation, Gregory McCabe and Hudspeth Oil Corporation, dated September 23, 2014 (incorporated by reference to Exhibit 10.16 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.17 | Amendment to Participation Agreement, by and between McCabe Petroleum Corporation, Gregory McCabe and Hudspeth Oil Corporation, dated January 5, 2015 (incorporated by reference to Exhibit 10.17 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.18 | Second Amendment to Participation Agreement, by and between McCabe Petroleum Corporation, Gregory McCabe and Hudspeth Oil Corporation, dated December 31, 2015 (incorporated by reference to Exhibit 10.18 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.19 | Form of Conversion Agreement, dated March 9, 2020, by and between Torchlight Energy Resources, Inc., Hudspeth Oil Corporation and each of the previous holders of 16% Series C Unsecured Convertible Promissory Notes (incorporated by reference to Exhibit 10.19 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.20 | Amendment to Tax Matters Agreement, between Next Bridge Hydrocarbons, Inc. and Meta Materials, Inc. (incorporated by reference to Exhibit 10.20 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.21 | 5% Unsecured Promissory Note by Next Bridge Hydrocarbons, Inc. in favor of Greg McCabe, dated December 21, 2022 (incorporated by reference to Exhibit 10.21 to our Current Report on Form 8-K, filed December 27, 2022). |
| 21.1 | List of subsidiaries of Next Bridge Hydrocarbons, Inc. (incorporated by reference to Exhibit 21.1 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 31.1 | Chief Executive Officer certification under Section 302 of the Sarbanes-Oxley Act of 2002.* |
| 31.2 | Chief Financial Officer certification under Section 302 of the Sarbanes-Oxley Act of 2002.* |
| 32.1 | Chief Executive Officer certification under Section 906 of the Sarbanes-Oxley Act of 2002.* |
| 32.2 | Chief Financial Officer certification under Section 906 of the Sarbanes-Oxley Act of 2002.* |
| 99.1 | Report of Independent Petroleum Engineers.* |

† Certain exhibits and schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(a)(5). The Company hereby agrees to furnish a copy of any omitted exhibits and schedules to the SEC upon its request.

\+ Indicates a management contract or compensatory plan.

* Filed herewith.

*Table of Contents*

**Item 16. Form 10-K Summary**

None.

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash | $ 569,298 | $ 1,989,419 |
| Accounts receivable | — | 74,310 |
| Accounts receivable, related party | 177,519 | 163,366 |
| Grants and other receivables | 150,000 | — |
| Prepaid expenses | 62,300 | 2,667 |
| Total current assets | 959,118 | 2,229,762 |
| Oil and natural gas properties, net | 79,695,928 | 45,663,470 |
| Other assets | 80,179 | 25,000 |
| TOTAL ASSETS | $ 80,735,224 | $ 47,918,232 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 3,891,649 | $ 2,828,326 |
| Accounts payable - Meta | 2,573,724 | — |
| Note payable - Meta | 20,000,000 | 12,500,000 |
| Notes payable, related party | 2,000,000 | — |
| Accrued interest payable | 1,571,336 | 208,889 |
| Total current liabilities | 30,036,709 | 15,537,215 |
| Asset retirement obligations | 246,866 | 21,937 |
| Total liabilities | 30,283,575 | 15,559,152 |
| Commitments and contingencies | | |
| Stockholder's equity: | | |
| Preferred stock, par value $0.0001; 50,000,000 shares authorized; 0 issued and outstanding | — | — |
| Common stock, par value $0.0001; 500,000,000 shares authorized; 165,472,241 issued and outstanding | 16,547 | — |
| Additional paid-in capital | 51,345,640 | 100,546,596 |
| Accumulated deficit | (910,538) | (68,187,516) |
| Total stockholder's equity | 50,451,649 | 32,359,080 |
| TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY | $ 80,735,224 | $ 47,918,232 |

Table of Contents

## NEXT BRIDGE HYDROCARBONS, INC.
## CONSOLIDATED STATEMENTS OF OPERATIONS

| | Successor | Predecessor | |
|---|---|---|---|
| | For the period from December 15, 2022 to December 31, 2022 | For the period from January 1, 2022 to December 14, 2022 | Year Ended December 31, 2021 |
| Oil sales | $ 1,276 | $ 16,796 | $ 4,675 |
| Natural gas sales | 1,285 | 21,477 | 11,229 |
| **Revenue** | **2,561** | **38,273** | **15,904** |
| | | | |
| **Operating expenses** | | | |
| Lease operating expenses | 5,826 | 68,488 | 75,330 |
| Production and ad valorem tax | 229 | 2,755 | 1,001 |
| General and administrative | 907,045 | 7,905,860 | 8,050,443 |
| Depreciation, depletion and amortization | — | — | 4,642 |
| Total operating expenses | 913,100 | 7,977,103 | 8,131,416 |
| | | | |
| **Operating loss** | (910,539) | (7,938,830) | (8,115,512) |
| | | | |
| **Other income (expense)** | | | |
| Interest expense | — | — | (212,201) |
| Gain (loss) on sale of assets | — | — | 1,000 |
| Gain on extinguishment of debt | — | — | 77,477 |
| Interest income | 1 | 495 | 10,428 |
| Total other income (expense)—net | 1 | 495 | (123,296) |
| | | | |
| **Loss before income taxes** | (910,538) | (7,938,335) | (8,238,808) |
| Provision for income tax | — | — | — |
| **Net loss** | **$ (910,538)** | **$ (7,938,335)** | **$ (8,238,808)** |
| | | | |
| **Loss per common share:** | | | |
| **Basic and Diluted** | $ (0.01) | $ (0.05) | $ (8,238,808) |
| **Weighted average number of common shares outstanding:** | | | |
| **Basic and Diluted** | 165,472,241 | 165,472,241 | 1 |

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**

**Year ended December 31, 2022**

| | Common Stock shares | Common Stock amount | Additional paid-in capital | Accumulated deficit | Total |
|---|---|---|---|---|---|
| **Balance, December 31, 2020** | 1 | $ — | $ 89,331,629 | $ (59,948,708) | $ 29,382,921 |
| Contributions from parent | — | — | 11,214,967 | — | 11,214,967 |
| Net loss | — | — | — | (8,238,808) | (8,238,808) |
| **Balance December 31, 2021** | 1 | $ — | $ 100,546,596 | $ (68,187,516) | $ 32,359,080 |
| Contributions from parent | — | — | 316,600 | — | 316,600 |
| Net loss | — | — | — | (7,938,335) | (7,938,335) |
| Issuance of common stock | 165,472,240 | 16,547 | (16,547) | — | — |
| **Balance, December 14, 2022** | 165,472,241 | $ 16,547 | $ 100,846,649 | $ (76,125,851) | $ 24,737,345 |
| | | | | | |
| **Balance, December 15, 2022** | 165,472,241 | $ 16,547 | $ 51,345,640 | $ — | $ 51,362,187 |
| Net loss | — | — | — | (910,538) | (910,538) |
| **Balance, December 31, 2022** | 165,472,241 | $ 16,547 | $ 51,345,640 | $ (910,538) | $ 50,451,649 |

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Successor | Predecessor | |
|---|---|---|---|
| | For the period from December 15, 2022 to December 31, 2022 | For the period from January 1, 2022 to December 14, 2022 | Year Ended December 31, 2021 |
| **Cash Flows From Operating Activities** | | | |
| Net loss | $ (910,538) | $ (7,938,335) | $ (8,238,808) |
| Adjustments to reconcile net loss to net cash from operations: | | | |
| Accretion expense | 1,092 | — | — |
| Bad debt expense | — | (26,612) | — |
| Depreciation, depletion and amortization | — | — | 4,642 |
| Paid in kind interest | — | — | 208,889 |
| Change in: | | | |
| Accounts receivable | — | 74,310 | (94,310) |
| Accounts receivable, related party | — | (14,153) | 86,754 |
| Prepayments - development costs | — | (150,000) | 101,005 |
| Other assets | 39,185 | (94,364) | (25,000) |
| Prepaid expenses | (58,225) | (1,408) | — |
| Accounts payable and accrued expenses | 1,154,917 | (64,982) | 906,287 |
| Other payables | — | 2,589,363 | — |
| Accrued interest payable | (1,091) | — | — |
| **Net cash provided by (used in) operating activities** | 225,340 | (5,626,181) | (7,050,541) |
| **Cash Flows From Investing Activities** | | | |
| Investment in oil and gas properties | (1,976,029) | (3,859,851) | (14,805,511) |
| **Net cash used in investing activities** | (1,976,029) | (3,859,851) | (14,805,511) |
| **Cash Flows From Financing Activities** | | | |
| Proceeds from notes payable | 2,000,000 | 7,500,000 | 12,500,000 |
| Contributions from parent | — | 316,600 | 11,214,967 |
| **Net cash provided by financing activities** | 2,000,000 | 7,816,600 | 23,714,967 |
| **Net increase (decrease) in cash** | 249,311 | (1,669,432) | 1,858,915 |
| **Cash - beginning of period** | 319,987 | 1,989,419 | 130,504 |
| **Cash - end of period** | $ 569,298 | $ 319,987 | $ 1,989,419 |
| **Supplemental disclosure of cash flow information:** | | | |
| Cash paid for interest | $ — | $ — | $ 3,312 |
| Cash paid for state franchise tax | $ — | $ — | $ — |
| **Supplemental disclosure of non-cash investing and financing activities:** | | | |
| Account payable reduced by expense offset | $ — | $ 15,638 | $ — |
| Capitalized interest included in interest payable | $ 74,210 | $ 1,289,328 | $ 141,048 |

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**As of December 31, 2022**

## 1. NATURE OF BUSINESS

Next Bridge Hydrocarbons, Inc. (the "Company") was incorporated in Nevada on August 31, 2021, as OilCo Holdings, Inc. and changed its name to Next Bridge Hydrocarbons, Inc. pursuant to its Amended and Restated Articles of Incorporation filed on June 30, 2022. The Company spun off from Meta Materials, Inc. ("Meta") on December 14, 2022, resulting in the Company becoming an independent company (the "Spin-Off"). Prior to the Spin-Off, the Company was a wholly-owned subsidiary of Meta. Meta became the parent of the Company's subsidiaries in June 2021 in a merger transaction with Torchlight Energy Resources, Inc. ("Torchlight"), the previous parent of the subsidiaries and developer of the properties from their inception up to June 2021.

The Company is an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. The Company's primary focus has been the development of interests in an oil and natural gas project the Company holds in the Orogrande Basin in West Texas in Hudspeth County, Texas (the "Orogrande Project"). In addition, the Company has minor interests in the Eastern edge of the Midland Basin in Texas (the "Hazel Project"), and two minor well interests in the Hunton wells located in Oklahoma (the "Oklahoma Properties"). The Company currently has six full-time employees, and the Company employs consultants for various roles as needed.

The Company operates its business through four wholly owned subsidiaries Torchlight Energy, Inc., a Nevada corporation ("TEI"), Hudspeth Oil Corporation, a Texas corporation ("Hudspeth"), Torchlight Hazel, LLC, a Texas limited liability company ("Torchlight Hazel"), and Hudspeth Operating, LLC, a Texas limited liability company and wholly owned subsidiary of Hudspeth ("Hudspeth Operating"). All intercompany transactions have been eliminated in the consolidated financial statements.

## 2. GOING CONCERN

At December 31, 2022, the Company had not yet achieved profitable operations. The Company had a net loss of $910,538 for the period from December 15, 2022 through December 31, 2022. The Company expects to incur further losses in the development of its business. The Company had a working capital deficit as of December 31, 2022 of $29,077,591. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

The Company's ability to continue as a going concern is dependent on its ability to generate future profitable operations and/or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due. Management's plan to address the Company's ability to continue as a going concern includes: (1) obtaining debt or equity funding from private placement, institutional, or public sources; (2) obtain loans from financial institutions, where possible, or (3) participating in joint venture transactions with third parties. Although management believes that it will be able to obtain the necessary funding to allow the Company to remain a going concern through the methods discussed above, there can be no assurances that such methods will prove successful.

These consolidated financial statements have been prepared assuming that the Company will continue as a going concern and therefore, the financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amount and classifications of liabilities that may result from the outcome of this uncertainty.

## 3. SIGNIFICANT ACCOUNTING POLICIES

The Company maintains its accounts on the accrual method of accounting in accordance with accounting principles generally accepted in the United States of America. Accounting principles followed and the methods of applying those principles, which materially affect the determination of financial position, results of operations and cash flows are summarized below:

***Use of estimates***—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make estimates and certain assumptions that affect the amounts reported in these consolidated financial statements and accompanying notes. Actual results could differ from these estimates.

Table of Contents

***Basis of presentation***—The financial statements are presented on a consolidated basis and include the accounts of Next Bridge Hydrocarbons, Inc. and its wholly owned subsidiaries, TEI, Hudspeth, Torchlight Hazel, and Hudspeth Operating. All significant intercompany balances and transactions have been eliminated. As noted above, the Company was involved in the Spin-Off on December 14, 2022. The period December 15, 2022 through December 31, 2022 is referred to herein as the "successor period" and the period from January 1, 2022 through December 14, 2022 is referred to herein as the "predecessor period".

In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary to fairly present the financial position as of, and the results of operations for all periods presented. In preparing the accompanying financial statements, management has made certain estimates and assumptions that affect reported amounts in the consolidated financial statements and disclosures of contingencies. Actual results may differ from those estimates.

***Risks and uncertainties***—The Company's operations are subject to significant risks and uncertainties, including financial, operational, technological, and other risks associated with operating an emerging business, including the potential risk of business failure.

In January 2020, the World Health Organization ("WHO") announced a global health emergency because of a new strain of coronavirus ("COVID-19") and the significant risks to the international community and economies as the virus spreads globally beyond its point of origin. In March 2020, the WHO classified COVID-19 as a pandemic, based on the rapid increase in exposure globally, and thereafter, COVID-19 continued to spread throughout the U.S. and worldwide. In addition, actions taken by OPEC members and other exporting nations on the supply and demand in global oil and natural gas markets resulted in significant negative pricing pressure in the first half of 2020, followed by a recovery in pricing and an increase in demand in the second half of 2020 and into 2021. However, multiple variants emerged in 2021 and became highly transmissible, which contributed to additional pricing volatility during 2021 to date. The financial results of companies in the oil and natural gas industry have been impacted materially as a result of changing market conditions. Such circumstances generally increase uncertainty in the Partnership's accounting estimates. Although demand and market prices for oil and natural gas have recently increased, due to the rising energy use and the improvement in U.S. economic activity, we cannot predict events that may lead to future price volatility and the near-term energy outlook remains subject to heightened levels of uncertainty.

The Company is continuing to closely monitor the overall impact and the evolution of the COVID-19 pandemic, including the ongoing spread of any variants, along with future OPEC actions on all aspects of the Company's business, including how these events may impact the Company's future operations, financial results, liquidity, employees, and operators. Additional actions may be required in response to the COVID-19 pandemic on a national, state, and local level by governmental authorities, and such actions may further adversely affect general and local economic conditions. The Company cannot predict the long- term impact of these events on our liquidity, financial position, results of operations or cash flows due to uncertainties including the severity of COVID-19 or any of the ongoing variants, and the effect the virus will have on the demand for oil and natural gas. These situations remain fluid and unpredictable, and the Company is actively managing its response.

***Concentration of risks***—At times the Company's cash balances are in excess of amounts guaranteed by the Federal Deposit Insurance Corporation. The Company's cash is placed with a highly rated financial institution, and the Company regularly monitors the credit worthiness of the financial institutions with which it does business.

***Fair value of financial instruments***—Financial instruments consist of cash, receivables, convertible note receivable, payables and promissory notes, if any. The estimated fair values of cash, receivables, and payables approximate the carrying amount due to the relatively short maturity of these instruments. The carrying amounts of any promissory notes approximate their fair value giving affect for the term of the note and the effective interest rates.

For assets and liabilities that require re-measurement to fair value the Company categorizes them in a three-level fair value hierarchy as follows:

- Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities.
- Level 2 inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration.
- Level 3 inputs are unobservable inputs based on management's own assumptions used to measure assets and liabilities at fair value.

A financial asset or liability's classification within the hierarchy is determined based on the lowest level input that is significant to the fair value measurement.

Table of Contents

***Cash and cash equivalents*** – Cash and cash equivalents include certain investments in highly liquid instruments with original maturities of three months or less.

***Accounts receivable*** – Accounts receivable consist of amounts due from a related party for their share of expenses paid on their behalf by the Company. Management reviews receivables periodically and reduces the carrying amount by a valuation allowance that reflects management's best estimate of the amount that may not be collectible. As of December 31, 2022 and December 31, 2021, no valuation allowance was considered necessary.

***Oil and natural gas properties*** – The Company uses the full cost method of accounting for exploration and development activities as defined by the Securities and Exchange Commission ("SEC"). Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least quarterly and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions.

Gains and losses, if any, on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and natural gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

***Capitalized interest*** – The Company capitalizes interest on unevaluated properties during the periods in which they are excluded from costs being depleted or amortized. During the successor period and for the predecessor period, the Company capitalized $74,210, and $1,289,328 respectively, of interest on unevaluated properties. Capitalized interest for the year ended December 31, 2021, was $141,048.

***Depreciation, depletion, and amortization*** – The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

***Ceiling test*** – Future production volumes from oil and natural gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and natural gas properties. If the net capitalized cost of proved oil and natural gas properties, net of related deferred income taxes, plus the cost of unproved oil and natural gas properties, exceeds the present value of estimated future net cash flows discounted at 10 percent, net of related realizable tax affects, plus the cost of unproved oil and natural gas properties, the excess is charged to expense and reflected as additional accumulated DD&A. The Company recorded an impairment expense of $-0- for the successor period, for the predecessor period and for the year ended December 31, 2021, respectively, to recognize the adjustment required by the ceiling test.

The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and natural gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and natural gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

Table of Contents

***Asset retirement obligations*** – The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and natural gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

***Income taxes*** – Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is established to reduce deferred tax assets if it is more likely than not that the related tax benefits will not be realized.

Authoritative guidance for uncertainty in income taxes requires that the Company recognize the financial statement benefit of a tax position only after determining that the relevant tax authority would more likely than not sustain the position following an examination. Management has reviewed the Company's tax positions and determined there were no uncertain tax positions requiring recognition in the consolidated financial statements. Company tax returns remain subject to federal and state tax examinations. Generally, the applicable statutes of limitation are three to four years from their respective filings.

Estimated interest and penalties related to potential underpayment on any unrecognized tax benefits are classified as a component of tax expense in the statements of operation. The Company has not recorded any interest or penalties associated with unrecognized tax benefits for the successor period, for the predecessor period, and for the year ended December 31, 2021.

***Revenue recognition*** – The Company's revenue is typically generated from contracts to sell natural gas, crude oil or NGLs produced from interests in oil and natural gas properties owned by the Company. Contracts for the sale of natural gas and crude oil are evidenced by (1) base contracts for the sale and purchase of natural gas or crude oil, which document the general terms and conditions for the sale, and (2) transaction confirmations, which document the terms of each specific sale. The transaction confirmations specify a delivery point which represents the point at which control of the product is transferred to the customer. The Company elects to treat contracts to sell oil and natural gas production as normal sales, which are then accounted for as contracts with customers. The Company has determined that these contracts represent multiple performance obligations which are satisfied when control of the commodity transfers to the customer, typically through the delivery of the specified commodity to a designated delivery point.

Revenue is measured based on consideration specified in the contract with the customer, and excludes any amounts collected on behalf of third parties. The Company recognizes revenue in the amount that reflects the consideration it expects to be entitled to in exchange for transferring control of those goods to the customer. Amounts allocated in the Company's price contracts are based on the standalone selling price of those products in the context of long-term contracts. Payment is generally received one or two months after the sale has occurred.

Gain or loss on derivative instruments is outside the scope of ASC 606, *Revenue Recognition*, and is not considered revenue from contracts with customers subject to ASC 606. The Company may in the future use financial or physical contracts accounted for as derivatives as economic hedges to manage price risk associated with normal sales, or in limited cases may use them for contracts the Company intends to physically settle but do not meet all of the criteria to be treated as normal sales.

*Producer Gas Imbalances.* The Company applies the sales method of accounting for natural gas revenue. Under this method, revenues are recognized based on the actual volume of natural gas sold to purchasers.

Table of Contents

***Basic and diluted earnings (loss) per share*** – Basic earnings (loss) per common share is computed by dividing net income (loss) available to common shareholders by the weighted average number of common shares outstanding during the period. Diluted earnings (loss) per common share is computed in the same way as basic earnings (loss) per common share except that the denominator is increased to include the number of additional common shares that would be outstanding if all potential common shares had been issued and if the additional common shares were dilutive. The Company had zero dilutive shares for the successor period, for the predecessor period, and for the year ended December 31, 2021.

***Environmental laws and regulations*** – The Company is subject to extensive federal, state, and local environmental laws and regulations. Environmental expenditures are expensed or capitalized depending on their future economic benefit. The Company believes that it is in compliance with existing laws and regulations. The Company accrued no liability as of December 31, 2022 and December 31, 2021.

***Recent accounting pronouncements not yet adopted*** – In June 2016, the FASB issued ASU 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which adds a new Topic 326 to the Codification and removes the thresholds that companies apply to measure credit losses on financial instruments measured at amortized cost, such as loans, receivables, and held-to-maturity debt securities. Under current GAAP, companies generally recognize credit losses when it is probable that the loss has been incurred. The revised guidance will remove all recognition thresholds and will require companies to recognize an allowance for credit losses for the difference between the amortized cost basis of a financial instrument and the amount of amortized cost that the company expects to collect over the instrument’s contractual life. ASU 2016-13 also amends the credit loss measurement guidance for available-for sale debt securities and beneficial interests in securitized financial assets. The guidance is applicable for fiscal years beginning after December 15, 2019 and interim periods within those years, however, the FASB extended the effective date for smaller reporting companies to fiscal years beginning after December 15, 2022. The Company does not believe the adoption of this standard will have material impact on the consolidated financial statements.

**4. SPIN-OFF**

Effective December 14, 2022 (the “Spin-Off Date”), the Company and all of its wholly owned subsidiaries were involved in a spin off transaction from the Company’s former parent, Meta. Meta spun the Company and the Company’s wholly owned oil and natural gas subsidiaries in fulfillment of a preferred shareholder liability and other working capital items. As part of the Spin-Off, a change in control event occurred which is accounted for under ASC 805, *Business Combination*. Meta no longer owns 100% of the Company and the Company is now owned by various shareholders. The new shareholders of the Company received common stock as consideration and the fair value was determined using the income approach.

The following table summarizes the fair value of the assets acquired and liabilities assumed at the Spin-Off Date.

| | |
|---|---|
| **Consideration in common stock** | $ 51,362,187 |
| | |
| **Recognized Assets and Liabilities** | |
| Cash and cash equivalents | $ 319,987 |
| Accounts receivable, related party | 177,519 |
| Prepaids | 154,075 |
| Oil and natural gas properties | 77,645,689 |
| Other assets | 119,364 |
| Accounts payable | (5,310,456) |
| Notes payable | (20,000,000) |
| Accrued interest | (1,498,217) |
| Asset retirement obligation | (245,774) |
| Net Assets Recognized | $ 51,362,187 |

Table of Contents

**5. OIL & NATURAL GAS PROPERTIES**

The following table presents the capitalized costs for oil and natural gas properties of the Company:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| | Successor | Predecessor |
| Evaluated costs subject to amortization | $ — | $ — |
| Unevaluated costs | 79,695,928 | 61,319,652 |
| Total capitalized costs | 79,695,928 | 61,319,652 |
| Less accumulated depreciation, depletion and amortization | — | (15,656,182) |
| Total oil and gas properties | $ 79,695,928 | $ 45,663,470 |

Unevaluated costs as of December 31, 2022, and December 31, 2021, include cumulative costs of developing projects including the Orogrande and Hazel Projects in West Texas and the costs related to the Oklahoma Properties. In accordance with required accounting adjustments related to the Spin-Off, the carrying value of the oil and natural gas assets were adjusted to fair value as of December 15, 2022.

The Company periodically adjusts for the separation of evaluated versus unevaluated costs within its full cost pool to recognize the value impairment related to the expiration of, or changes in market value, of unevaluated leases. The impact of reclassifications as they become necessary is to increase the basis for calculation of future period's depletion, depreciation and amortization which effectively recognizes the impairment on the consolidated statement of operations over future periods. Reclassified costs also become evaluated costs for purposes of ceiling tests, and which may cause recognition of increased impairment expense in future periods. The remaining cumulative unevaluated costs which have been reclassified within the Company's full cost pool totals $-0- as of December 31, 2022. As of December 31, 2022, evaluated costs are $-0- since the Company have no proved reserve value associated with our properties.

Due to the volatility of commodity prices, should oil and natural gas prices decline in the future, it is possible that a write-down could occur. Proved reserves are estimated quantities of crude oil, natural gas, and natural gas liquids, which geological and engineering data demonstrate with reasonable certainty to be recoverable from known reservoirs under existing economic and operating conditions. The independent engineering estimates include only those amounts considered to be proved reserves and do not include additional amounts which may result from new discoveries in the future, or from application of secondary and tertiary recovery processes where facilities are not in place or for which transportation and/or marketing contracts are not in place. Estimated reserves to be developed through secondary or tertiary recovery processes are classified as unevaluated properties.

**Current Projects**

The Company is an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. The Company is primarily focused on the acquisition of early-stage projects, the development and delineation of these projects, and then the monetization of those assets once these activities are completed.

The Company's primary focus is the development of interests in oil and natural gas projects it holds in the Permian Basin in West Texas. The Company also holds minor interests in certain other oil and natural gas projects in Central Oklahoma that it is in the process of divesting.

As of December 31, 2022, the Company had interests in three oil and natural gas projects: the Orogrande Project in Hudspeth County, Texas, the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, and two wells in Central Oklahoma.

Table of Contents

Orogrande Project, West Texas

On August 7, 2014, Torchlight entered into a Purchase Agreement with Hudspeth, McCabe Petroleum Corporation ("MPC"), and Gregory McCabe ("Mr. McCabe"). Mr. McCabe was the sole owner of both Hudspeth and MPC. Under the terms and conditions of the Purchase Agreement, Torchlight purchased 100% of the capital stock of Hudspeth which held certain oil and natural gas assets, including a 100% working interest in approximately 172,000 predominately contiguous acres in the Orogrande Basin in West Texas. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe. Mr. McCabe also holds a 4.5% overriding royalty interest in the Orogrande acreage, —which he obtained prior to, and was not a part of the August 2014 transaction. As of December 31, 2022, leases covering approximately 134,000 acres remain in effect.

Effective March 27, 2017, the property became subject to a University Lands D&D Unit Agreement ("DDU Agreement") which allows for all 192 existing leases covering approximately 134,000 gross acres leased from University Lands to be combined into one drilling and development unit for development purposes. The term of the DDU Agreement expires on December 31, 2023, and the time to drill on the drilling and development unit continues through December 31, 2023. The DDU Agreement also grants the right to extend the DDU Agreement through December 31, 2028 if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid.

Drilling obligations under the DDU Agreement include five wells per year in years 2021, 2022 and 2023. The drilling obligations are minimum yearly requirements and may be exceeded if acceleration is desired.

All drilling obligations through December 31, 2022, have been met.

Torchlight had drilled 14 test wells in the Orogrande in order to stay in compliance with the DDU Agreement, as well as, to test for potential shallow pay zones and deeper pay zones that may be present on structural plays. Development of the wells continued through December 31, 2022, to further capture and document the scientific base in support of demonstrating the production potential of the property. As of December 31, 2022, a total of 15 test wells have been drilled on the acreage.

On March 9, 2020, holders of certain notes payable by Torchlight entered into a Conversion Agreement under which the noteholders elected to convert $6,000,000 of principal and approximately $1,331,000 of accrued interest on the notes held by such holders, in accordance with their terms, into an aggregate 6% working interest (of all such holders) in the Orogrande Project.

The Company intends to make offers and enter into agreements with one or more of the other current working interest owners in the Orogrande Project (each an "Orogrande Owner" and collectively, the "Orogrande Owners"). The Company anticipates offering the Orogrande Owners shares of common stock in exchange for such Orogrande Owner's respective working interest in the Orogrande Project. The Company intends to offer the number of shares of common stock necessary such that each participating Orogrande Owner would own the percentage of common stock then outstanding in proportion to the percentage owned in the working interest of the Orogrande Project. For illustration purposes, if an Orogrande Owner owns 10% of the working interest of the Orogrande Project, and such Orogrande Owner elects to participate and accept the Company's offer of shares of common stock, then such Orogrande Owner will be offered 10% of the aggregate amount of outstanding shares of common stock. The Company's decision to enter into these transactions will depend on ability of the Company and each Orogrande Owner to negotiate and enter into definitive agreements related to such transaction and the Company's board of directors receiving an industry-standard fairness opinion from an investment banking firm. One of the Orogrande Owners is Wolfbone Investments, LLC ("Wolfbone"), an entity controlled by Mr. McCabe. Mr. McCabe owns, directly and indirectly through entities he owns or controls, 7.75% of the Company's common stock as of December 31, 2022, which would increase by the proportionate exchange of working interest for shares of the Company's common stock if consummated.

The Orogrande Project ownership as of December 31, 2022, is detailed as follows:

| | Revenue Interest | Working Interest |
|---|---|---|
| University Lands - Mineral Owner | 20.000% | n/a |
| ORRI - Magdalena Royalties, LLC, an entity controlled by Gregory McCabe | 4.500% | n/a |
| ORRI - Unrelated Party | 0.500% | n/a |
| Hudspeth Oil Corporation, a subsidiary of Next Bridge Hydrocarbons, Inc. | 49.875% | 66.500% |
| Wolfbone Investments, LLC, an entity controlled by Gregory McCabe | 18.750% | 25.000% |
| Conversion by Note Holders in March, 2020 | 4.500% | 6.000% |
| Unrelated Party | 1.875% | 2.500% |
| | 100.000% | 100.000% |

Table of Contents

Hazel Project in the Midland Basin in West Texas

Effective April 4, 2016, TEI acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. A back-in after payout of a 25% working interest was retained by MPC and another unrelated working interest owner.

In October 2016, the holders of all of Torchlight's then-outstanding shares of Series C Preferred Stock (which were issued in July 2016) elected to convert into a total 33.33% working interest in our Hazel Project, reducing TEI's ownership from 66.66% to a 33.33% working interest.

*Acquisition of Additional Interests in Hazel Project*

On January 30, 2017, Torchlight entered into and closed an Agreement and Plan of Reorganization and a Plan of Merger with an entity which was wholly owned by Mr. McCabe, which resulted in the acquisition of approximately 40.66% working interest in the 12,000 gross acres, 9,600 net acres, in the Hazel Project.

Also, on January 30, 2017, Torchlight entered into and closed a Purchase and Sale Agreement with Wolfbone. Under the agreement, Torchlight acquired certain of Wolfbone's Hazel Project assets, including its interest in the Flying B Ranch #1 well and the 40-acre unit surrounding the well.

Upon the closing of the transactions, the Torchlight working interest in the Hazel Project increased by 40.66% to a total ownership of 74%.

Effective June 1, 2017, Torchlight acquired an additional 6% working interest from unrelated working interest owners increasing its working interest in the Hazel project to 80%, and an overall net revenue interest of 75%.

Seven test wells have been drilled on the Hazel Project to capture and document the scientific base in support of demonstrating the production potential of the property.

*Option Agreement with Masterson Hazel Partners, LP*

On August 13, 2020, the Company's subsidiaries TEI and Torchlight Hazel (collectively, "Torchlight Subs") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and MPC. Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on the Hazel Project, sufficient to satisfy Torchlight Subs's continuous development obligations on the southern half of the prospect no later than September 30, 2020. MHP has satisfied this drilling obligation. MHP paid to Torchlight Subs $1,000 as an option fee at the time of execution of the Option Agreement. MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the Well attributable to Torchlight Subs's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the well.

In exchange for MHP satisfying the above drilling obligations, Torchlight Subs granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight Subs's continuous development obligations on the northern half of the prospect. Because MHP exercised this drilling option and satisfied the continuous development obligations on the northern half of the prospect, under the terms of the Option Agreement (as amended in September 2020) MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. Such purchase would be under the terms of a form of Purchase and Sale Agreement included as an exhibit to the Option Agreement, at an aggregate purchase price of$12,690,704 for approximately 9,762 net mineral acres, and not less than 74% net revenue interest (approximately $1,300 per net mineral acre). MHP declined to exercise the Option in 2021.

Hunton Play, Central Oklahoma

As of December 31, 2022, the Company is producing from one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

Table of Contents

## 6. RELATED PARTY BALANCES

As of December 31, 2022 and December 31, 2021, the Company had a balance of $177,519 and $163,366, respectively, for an account receivable due from MPC, a shareholder of the Company, for amounts advanced related to the Orogrande development cost sharing arrangement agreed to in connection with the acquisition of the Orogrande working interests in 2014.

On December 22, 2022, the Company issued an unsecured promissory note in the principal amount of up to $20 million in favor of Mr. McCabe (the "2022 Note"). The 2022 Note bears interest at 5% per annum, computed on the basis of a 365-day year, and matures on June 21, 2023 (the "2022 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2022 Note Maturity Date, the 2022 Note Maturity Date will be extended to October 3, 2023. The outstanding principal of the 2022 Note, together with all accrued interest thereon, becomes due on June 21, 2023. The revolving commitment under the 2022 Note expires on 2022 Note Maturity Date. As of December 31, 2022, we had $2 million in principal amount outstanding and $18 million of available borrowings under the 2022 Note.

## 7. COMMITMENTS AND CONTINGENCIES

### Legal Matters

On April 30, 2020, the Company's wholly owned subsidiary, Hudspeth, filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies ("Cordax"). The suit, *Hudspeth and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies*, was filed in the 189th Judicial District Court of Harris County, Texas. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Working interest owner Wolfbone is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. Meta, as the Company's parent at the time, determined to add the manufacturer of one of the tool components that it contends was one of the causes of the tool failure. It was later disclosed that Cordax is the subsidiary of a Canadian parent company, who has also been added to the case. Cordax's current Chairman of the Board filed a special appearance after being served with a citation, alleging that he was a Canadian citizen with no meaningful ties to Texas. After discovery was conducted on this issue, a nonsuit without prejudice for this defendant was filed, dismissing him from the case. The remaining parties attended mediation on June 15, 2022, that was unsuccessful in resolving the case. Discovery is ongoing. The Company has presented several of its witnesses for deposition and is preparing to depose Cordax's key fact witnesses. The case is set for trial in October 2023.

On March 18, 2021, Cordax filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500.01 and recover related attorney's fees. The foreclosure action, *Datalog LWT Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc*., was filed in the 205th Judicial District Court of Hudspeth County, Texas. The Company is contesting the lien in good faith and filed a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final disposition of the related case currently pending in Harris County, Texas. The Company is required to indemnify Meta in connection with this matter pursuant to the terms of the Distribution Agreement with Meta.

On January 14, 2022, a shareholder derivative action was filed in the U.S. District Court for the Eastern District of New York captioned *Hines v. Palikaras, et al.*, No. 1:22-cv-00248. The complaint names as defendants certain of Meta's current officers and directors, certain former Torchlight officers and directors, and Meta (as nominal defendant). The complaint, purportedly brought on behalf of Meta, asserts claims under Section 14(a) of the Exchange Act, contribution claims under Sections 10(b) and 21D of the Exchange Act, and various state law claims such as breach of fiduciary duties and unjust enrichment. The complaint seeks, among other things, unspecified compensatory damages in favor of Meta, certain corporate governance related actions, and an award of costs and expenses to the derivative plaintiff, including attorneys' fees. On March 9, 2022, the Court entered a stipulated order staying this action until there is a ruling on a motion to dismiss in the Securities Class Action.

### Environmental Matters

The Company is subject to contingencies as a result of environmental laws and regulations. Present and future environmental laws and regulations applicable to the Company's operations could require substantial capital expenditures or could adversely affect its operations in other ways that cannot be predicted at this time. As of December 31, 2022, and December 31, 2021, no amounts had been recorded because no specific liability has been identified that is reasonably probable of requiring the Company to fund any future material amounts.

Table of Contents

**8. STOCKHOLDERS' EQUITY**

Next Bridge Hydrocarbons, Inc. has preferred and common stock both at a par value of $0.0001. As of December 31, 2022, the Company has issued 165,472,241 shares of common stock and -0- shares of preferred stock.

**9. INCOME TAXES**

The Company recorded no income tax provision at December 31, 2022, and December 31, 2021, because of losses incurred.

The Company estimates its annual effective income tax rate in recording its quarterly provision for income taxes in the various jurisdictions in which it operates. Statutory tax rate changes and other significant or unusual items are recognized as discrete items in the quarter in which they occur. The Company recorded no income tax expense for the successor period and for the predecessor period, because the Company expects to incur a tax loss in the current year. Similarly, no income tax expense was recognized for the year ended December 31, 2021.

The Company had a net deferred tax asset related to federal net operating loss carryforwards of $25,935,753, $65,730,932 and $59,481,861 at December 31, 2022, December 14, 2022 and December 31, 2021, respectively. The federal net operating loss carryforward will begin to expire in 2034. Realization of the deferred tax asset is dependent, in part, on generating sufficient taxable income prior to expiration of the loss carryforwards. The Company has placed a 100% valuation allowance against the net deferred tax asset because future realization of these assets is not assured.

**10. NOTES PAYABLE, RELATED PARTIES**

In 2021, the Company entered into a note payable with Meta its former parent to borrow up to $15 million. On October 1, 2021, the Company issued the 2021 Note, which bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if the Company raises $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023, and the outstanding principal of the 2021 Note will amortize in six equal, monthly installments. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts the Company's ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of its assets, unless the Company is the surviving entity or the successor entity assumes all of obligations under the 2021 Note. The 2021 Note is collateralized by certain shares of common stock in Meta held by one of its stockholders, Mr. McCabe, and by a lien on a 25% interest in the Orogrande Project owned by Wolfbone, an affiliate of Mr. McCabe.

The balance on the 2021 Note as of December 31, 2022 and December 31, 2021 is $20 million and $12.5 million, respectively. The Company incurred interest of $208,889 for the year ended December 31, 2021 and an additional $74,210 for the successor period and $1,289,328 for the predecessor period.

Under the terms of the Arrangement Agreement that governed the merger transaction between Torchlight and Meta in June 2021 the oil and natural gas assets were to be sold or spun out from Meta and the costs of any sale or spin-off incurred by Meta were to be borne the then-existing shareholders of Torchlight. The amount of the reimbursement payable to Meta in connection with the Spin-Off is $2,573,724 which is to be added to the principal amount of the 2022 Note payable.

On September 2, 2022, the Company entered into a loan agreement with Meta, as lender (the "Loan Agreement") that would govern prior loan amounts advanced to the Company from Meta. As of August 11, 2022, and August 29, 2022, the Company borrowed an additional $1.2 million and $1.46 million, respectively, representing the remaining amount available for borrowing under the Loan Agreement and resulting in a total of $5 million principal amount outstanding related to the Loan Agreement, the proceeds of which were used for working capital and general corporate purposes. The term loans under the Loan Agreement bear interest at a per annum rate equal to 8% and mature on March 31, 2023 (the "Maturity Date"); provided, however, if the Company raises $30 million or more in capital through debt or equity, or a combination thereof by the Maturity Date, the Maturity Date will be extended to October 3, 2023 and the term loan would be amortized in six equal monthly installments. The Loan Agreement includes customary representations and covenants that, subject to exceptions and qualifications, restrict our ability to do certain things, such as: engage in mergers, acquisitions, and asset sales; transact with affiliates; undergo a change in control; incur additional indebtedness; incur liens; make loans and investments; declare dividends or redeem or repurchase equity interests; and enter into certain restrictive agreements. In addition, the Loan Agreement contains customary events of default, mandatory prepayment events and affirmative covenants, including, without limitation, covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our material properties, reporting requirements, compliance with applicable laws and regulations, and formation or acquisition of new subsidiaries.

Table of Contents

On December 21, 2022, the Company entered into that certain Agreement and Plan of Merger (the "Merger Agreement") with Hudspeth, Wolfbone, MPC and Mr. McCabe, pursuant to which in a series of transactions the oil and natural gas leases, the lands covered by such leases, pooling and communitization agreements, rights-of-way, the surface estate of the lands and all wells located in Orogrande Project will be transferred, conveyed and assigned to Hudspeth (or its designated assignee) in consideration of (1) treating the Orogrande Obligations (as defined in the Merger Agreement) as having been irrevocably satisfied and discharged in full with respect to MPC and (2) an issuance of 56,297,638 shares of Company common stock to Mr. McCabe (such series of transactions collectively, the "Merger").

The Merger is to be completed in accordance with the Texas Business Organizations Code, whereby (a) the Company will form NBH MergeCo, LLC with the State of Texas ("MergeCo") in order to cause Hudspeth to assign all of its rights under the Merger Agreement to MergeCo and MergeCo will assume Hudspeth's obligations under the Merger Agreement, (b) Hudspeth (or MergeCo, as its assignee), Wolfbone and MPC shall merge with each of Wolfbone and MPC as surviving entities, and (c) Wolfbone shall become a direct and wholly-owned subsidiary of the Company. The closing of the transactions contemplated by the Merger Agreement are subject to the satisfaction of certain customary closing conditions, including filing and acceptance of the certificate of merger by the Secretary of State of the State of Texas.

In connection with the Merger, on December 22, 2022, the Company entered into the 2022 Note in the principal amount of up to $20 million in favor of Mr. McCabe. The Company is entitled to request advances under the 2022 Note in a minimum principal amount of $100,000 each. Mr. McCabe is the largest shareholder of the Company's common stock. As of December 31, 2022 the Company had drawn $2 million on the 2022 Note.

## 11. ASSET RETIREMENT OBLIGATIONS

The following is a reconciliation of the asset retirement obligations liability through December 31, 2022:

| | |
|---|---|
| **Predecessor** | |
| Asset retirement obligations - December 31, 2021 | $ 21,937 |
| Accretion expense | — |
| Asset retirement obligations - December 14, 2022 | $ 21,937 |
| | |
| **Successor** | |
| Estimated liabilities recorded | $ 245,774 |
| Accretion expense | 1,092 |
| Asset retirement obligations - December 31, 2022 | $ 246,866 |

## 12. SUBSEQUENT EVENTS

We met our drilling obligations under the DDU Agreement to drill five new wells in the Orogrande Project in advance of the March 31, 2023 deadline under University Lands lease requirement. The data collected from these five wells, in addition to the five wells drilled in 2021, confirmed that there are at least five potential distinct reservoirs under our acreage. Also, our operations team deployed a new mist drilling solution which increased hole stability, which we believe will result in meaningful cost savings for additional wells drilled in the Orogrande Project. While these wells may have potential to produce hydrocarbons to sell commercially in the future, we have no immediate plans to deploy the additional capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including reservoir locations, target depths and designated acreage, in the Orogrande Project.

On March 31, 2023, we entered into an amendment to the 2021 Note and an amendment to Loan Agreement in order to extend each of the 2021 Maturity Date and the Maturity Date respectively from March 31, 2023 to October 3, 2023. Such amendments also removed the provisions allowing for extensions of the 2021 Maturity Date and the Maturity Date in the event the Company raised $30 million or more in capital through debt or equity or a combination thereof by March 31, 2023.

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, each registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**NEXT BRIDGE HYDROCARBONS, INC.**

Date: March 31, 2023

By: /s/ Clifton DuBose, Jr.
Clifton DuBose, Jr.
Chairman and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Clifton DuBose, Jr.<br>Clifton DuBose, Jr. | Chairman and Chief Executive Officer | March 31, 2023 |
| /s/ Joseph DeWoody<br>Joseph DeWoody | President, Director | March 31, 2023 |
| /s/ Lucas T. Hawkins<br>Lucas T. Hawkins | Chief Financial Officer | March 31, 2023 |
| /s/ Robert L. Cook<br>Robert L. Cook | Director | March 31, 2023 |
| /s/ Mia Pitts<br>Mia Pitts | Director | March 31, 2023 |
| /s/ Kristin Whitley<br>Kristin Whitley | Director | March 31, 2023 |

**Exhibit 31.1**

Section 302 Certification

I, Clifton DuBose, Jr., certify that:

1. I have reviewed this Annual Report on Form 10-K of Next Bridge Hydrocarbons, Inc.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 31, 2023

/s/ Clifton DuBose, Jr.

Chief Executive Officer

**Exhibit 31.2**

Section 302 Certification

I, Lucas T. Hawkins, certify that:

1. I have reviewed this Annual Report on Form 10-K of Next Bridge Hydrocarbons, Inc.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 31, 2023

/s/ Lucas T. Hawkins

Chief Financial Officer

**Exhibit 32.1**

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Next Bridge Hydrocarbons, Inc. (the "Company") on Form 10-K for the year ending December 31, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Clifton DuBose, Jr., Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ Clifton DuBose, Jr.
Clifton DuBose, Jr.
Chief Executive Officer
March 31, 2023

**Exhibit 32.2**

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Next Bridge Hydrocarbons, Inc. (the "Company") on Form 10-K for the year ending December 31, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Lucas T. Hawkins, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ Lucas T. Hawkins
Lucas T. Hawkins
Chief Financial Officer
March 31, 2023

**Exhibit 99.1**

PeTech Enterprises, Inc.
5707 Spanish Oak, Houston, Texas 77066

**March 30, 2023**

**Mr. Roger Wurtele**

**Next Bridge Hydrocarbons Inc.**

**6300 Ridglea Place, Suite 950**

**Fort Worth, Texas 76116**

**Dear Mr. Wurtele,**

**At your request PeTech Enterprises, Inc. ("PEI") has prepared an estimate of certain hydrocarbon reserves owned by Next Bridge Hydrocarbons, Inc. ("NBH") in the Hazel Project in the State of Texas as of December 31, 2022.** This evaluation was completed by March 29, 2023. It is our understanding that the proved reserves estimates shown herein constitute all of the proved reserves owned by NBH.

These estimates include only Proved and Producing reserves and were prepared following the United States Securities and Exchange Commission ("SEC") guidelines rule 4-10 Regulation S-X for evaluating and reporting oil and gas reserves. This report has been prepared for NBH's use in connection with public disclosures in its filings with the SEC. Rule 4-10 defines reserves as **"…those quantities of oil and gas, which by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations before the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for estimation. Reserves which can be produced through the application of improved recovery techniques…..Existing economic conditions include prices and costs at which economic producibility from a reservoir is to be determined. The price shall be the average price during the 12 months before the ending date of the period covered by the report, determined as an unweighted arithmetic average of the first-day-of-the-month price for each month within such period, unless prices are defined by contractual arrangements, excluding escalations based upon future conditions. Undeveloped oil and gas reserves are reserves of any category that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for completion. A complete ruling is available on the SEC website and is attached.**

Acceptable evaluation geological, engineering, and accounting (cost, taxes, etc.) practice principles were utilized to reach the results of this evaluation. Results were based on historical oil production information, geological maps, logs, and offsetting lease analogs. The evaluation is based on information provided by or through NBH for the year ending December 31, 2022. Data such as production rates, lease operating costs, ownership interests, and projections for future activities were relied on to be true. In all cases, PEI has reviewed the data to ensure reasonable values, consistency, and dependability, and in PEI's opinion the assumptions, data methods, and procedures used in the preparation of this report are appropriate for NBH's proposes of filing this report with the SEC.

**OPERATIONS**

**TEXAS**

The Hazel project is located in Sterling and Tom Green counties, TX. NBH operates five wells in the Hazel project in which the Flying "B" Ranch #3H is reporting as producing. Flying "B" Ranch #4H was drilled but is shut in. Production is from the Wolfcamp formation. The properties are operated by Hudspeth Operating, LLC. NBH converted the #7 well to be used for saltwater disposal. Other wells are idle. The current operating expenses reflect the reported expenses for #3H and #7 wells. Initial gross oil production reached 8,319 bbl per month and 31,613 bbl per month of water. It is anticipated that the producing #3H well will have an ultimate gross oil recovery of 159 Mbbl. No reserves were allocated to the Flying B well #4H. The amount of ultimate oil recovery to NBH during the year ended December 31, 2022, is fully offset as a result of the existence of a remaining outstanding cost reimbursement balance owed to Masterson Hazel Partners, ("MHP") in the amount of $3,779,826.76. The pro forma table at the end of the report shows the cash flow post-payment obligations. The Table projects that this obligation will not be paid within the projected life of the project.

**PRODUCTS PRICE**

**PRODUCTS PRICE**

The twelve months' unweighted average of the first day of the month prices for oil (WTI) was used in calculating the 2022 average price resulting in $93.67 per barrel.

Oil price differential of a negative $3.26 per barrel was calculated from the actual prices realized and was utilized in this evaluation. The average oil price was held constant throughout the economic life of the lease.

**OPERATING EXPENSES and CAPITAL COSTS** Reoccurring lease operating expenses were provided by the company and accepted when they seemed reasonable for the type of operation and area. Lease operating expenses were held constant throughout the life of the reserve.

**TAXES**

Production and advalorem taxes were based on the Texas regulatory rates.

Hedge values or debt was not considered in the initial evaluation. Payment consideration was added as shown.

**Note that oil and gas reserves, as well as gross and net revenues, are ESTIMATES that may change as additional production and other technical data become available or due to prices changes. All estimates are subject to change due to the inherent uncertainty in the application of judgmental factors as well as the regulatory environment.**

PEI did not physically visit the field, PEI accepted as true all ownership interests. PEI has not evaluated any potential environmental liability. PEI does not own an economic interest in any of the company's assets. PEI used standard engineering and geoscience methods, or a combination of methods, including performance analysis, volumetric analysis, and analogy, that PEI considered appropriate and necessary to establish the conclusion set forth herein.

Values of the proved reserves in this report are expressed in terms of ESTIMATED future gross revenue, future net revenue, and present worth using a discount factor of 10%. Future gross revenue is the revenue that will accrue to the appraised interests from the production and sale of the estimated net reserves. Net revenue is the gross revenue less production and ad valorem taxes, operating expenses, and capital costs. Operating expenses include direct field expenses but exclude non-reoccurring costs. Federal income tax was not included in this analysis. After giving effect to the obligations to pass revenue through to MHP to reimburse drilling costs, as of December 31, 2022, the amount of the net reserves is reduced to zero and there are no net proved reserves or future net revenue from the Flying "B" Ranch #3H well.

**PRO FORMA CASH FLOW POST MHP OBLIGATION PMT**

| aseNam | Year | GrossOil | NetOil | OilRev | OilPrice | Costs | ProdTax | Adval | CashFLOW | Remain Debt |
|---|---|---|---|---|---|---|---|---|---|---|
| | | MB | MB | M$ | $/B | M$ | M$ | M$ | M$ | M$ |
| | | | | | | | | | | 3,779.83 |
| B3 | 2023 | 8.1 | 4.9 | $439.74 | $90.41 | $81.37 | $20.27 | $10.99 | $327.11 | $3,452.72 |
| B3 | 2024 | 6.2 | 3.7 | $338.99 | $90.41 | $81.37 | $15.62 | $8.47 | $233.52 | $3,219.20 |
| B3 | 2025 | 5.2 | 3.1 | $283.34 | $90.41 | $81.37 | $13.06 | $7.08 | $181.83 | $3,037.37 |
| B3 | 2026 | 4.6 | 2.7 | $247.98 | $90.41 | $81.37 | $11.43 | $6.20 | $148.98 | $2,888.39 |
| B3 | 2027 | 4.1 | 2.5 | $222.76 | $90.41 | $81.37 | $10.27 | $5.57 | $125.55 | $2,762.84 |
| B3 | 2028 | 3.8 | 2.3 | $204.15 | $90.41 | $81.37 | $9.41 | $5.10 | $108.27 | $2,654.57 |
| B3 | 2029 | 3.5 | 2.1 | $188.44 | $90.41 | $81.37 | $8.69 | $4.71 | $93.67 | $2,560.89 |
| B3 | 2030 | 3.2 | 1.9 | $176.09 | $90.41 | $81.37 | $8.12 | $4.40 | $82.20 | $2,478.69 |
| B3 | 2031 | 3.1 | 1.8 | $165.77 | $90.41 | $81.37 | $7.64 | $4.14 | $72.62 | $2,406.07 |
| B3 | 2032 | 2.9 | 1.7 | $157.40 | $90.41 | $81.37 | $7.25 | $3.94 | $64.84 | $2,341.23 |
| B3 | 2033 | 2.8 | 1.7 | $149.37 | $90.41 | $81.37 | $6.88 | $3.73 | $57.38 | $2,283.84 |
| B3 | 2034 | 2.6 | 1.6 | $142.73 | $90.41 | $81.37 | $6.58 | $3.57 | $51.21 | $2,232.63 |
| B3 | 2035 | 2.5 | 1.5 | $136.85 | $90.41 | $81.37 | $6.31 | $3.42 | $45.75 | $2,186.89 |
| B3 | 2036 | 2.4 | 1.5 | $131.95 | $90.41 | $81.37 | $6.08 | $3.30 | $41.20 | $2,145.68 |
| B3 | 2037 | 2.3 | 1.4 | $126.87 | $90.41 | $81.37 | $5.85 | $3.17 | $36.48 | $2,109.20 |
| B3 | 2038 | 2.3 | 1.4 | $122.59 | $90.41 | $81.37 | $5.65 | $3.06 | $32.51 | $2,076.69 |
| B3 | 2039 | 2.2 | 1.3 | $118.70 | $90.41 | $81.37 | $5.47 | $2.97 | $28.89 | $2,047.80 |
| B3 | 2040 | 2.1 | 1.3 | $115.42 | $90.41 | $81.37 | $5.32 | $2.89 | $25.84 | $2,021.96 |
| B3 | 2041 | 2.1 | 1.2 | $111.65 | $90.41 | $81.37 | $5.15 | $2.79 | $22.34 | $1,999.62 |
| B3 | 2042 | 2.0 | 1.2 | $108.30 | $90.41 | $81.37 | $4.99 | $2.71 | $19.23 | $1,980.38 |
| B3 | 2043 | 1.9 | 1.2 | $105.05 | $90.41 | $81.37 | $4.84 | $2.63 | $16.22 | $1,964.17 |
| B3 | 2044 | 1.9 | 1.1 | $102.18 | $90.41 | $81.37 | $4.71 | $2.55 | $13.55 | $1,950.62 |
| B3 | 2045 | 1.8 | 1.1 | $98.84 | $90.41 | $81.37 | $4.56 | $2.47 | $10.44 | $1,940.18 |
| B3 | 2046 | 1.8 | 1.1 | $95.88 | $90.41 | $81.37 | $4.42 | $2.40 | $7.69 | $1,932.49 |
| B3 | 2047 | 1.7 | 1.0 | $93.00 | $90.41 | $81.37 | $4.29 | $2.33 | $5.02 | $1,927.47 |
| B3 | 2048 | 1.7 | 1.0 | $90.46 | $90.41 | $81.37 | $4.17 | $2.26 | $2.66 | $1,924.81 |
| B3 | 2049 | 0.8 | 0.5 | $44.68 | $90.41 | $40.82 | $2.06 | $1.12 | $0.69 | $1,924.12 |

This report is followed by a detailed cash flow, followed by a production plot.

Submitted,

Amiel David, Ph.D., P.E. #50970

For PeTech Enterprises, Inc. Registration # F-15360

---

Date : 03/27/2023 6:59:40PM
**FLYING 'B' RANCH 3H - 3H**
GARDEN CITY, S. Field, STERLING (TX) Co., TX
Operator : HUDSPETH OPERATING, LLC
Reservoir : WOLFCAMP

**TORCHLIGHT ENERGY, INC**
**Reserve and Economic Projection**
**As of 12/31/2022**
FLYING 'B' RANCH 3H

**Proved Producing**

| Year | Wells | Estimated 8/8 Ths Production Oil Mbbl | NGL Mgal | Gas MMcf | Net Production Oil Mbbl | NGL Mgal | Gas MMcf | Oil $/bbl | NGL $/gal | Gas $/Mcf |
|---|---|---|---|---|---|---|---|---|---|---|
| 2023 | 2 | 8.11 | 0.00 | 0.00 | 4.86 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| 2024 | 2 | 6.25 | 0.00 | 0.00 | 3.75 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| 2025 | 2 | 5.22 | 0.00 | 0.00 | 3.13 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| 2026 | 2 | 4.57 | 0.00 | 0.00 | 2.74 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| 2027 | 2 | 4.11 | 0.00 | 0.00 | 2.46 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| 2028 | 2 | 3.76 | 0.00 | 0.00 | 2.26 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| 2029 | 2 | 3.47 | 0.00 | 0.00 | 2.08 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| 2030 | 2 | 3.25 | 0.00 | 0.00 | 1.95 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| 2031 | 2 | 3.06 | 0.00 | 0.00 | 1.83 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| 2032 | 2 | 2.90 | 0.00 | 0.00 | 1.74 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| 2033 | 2 | 2.75 | 0.00 | 0.00 | 1.65 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| 2034 | 2 | 2.63 | 0.00 | 0.00 | 1.58 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| 2035 | 2 | 2.52 | 0.00 | 0.00 | 1.51 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| 2036 | 2 | 2.43 | 0.00 | 0.00 | 1.46 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| 2037 | 2 | 2.34 | 0.00 | 0.00 | 1.40 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| Sub-T | | 57.38 | 0.00 | 0.00 | 34.43 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| After | | 23.64 | 0.00 | 0.00 | 14.18 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| Total | | 81.01 | 0.00 | 0.00 | 48.61 | 0.00 | 0.00 | 90.41 | 0.00 | 0.00 |
| MPH | | | | | | | | | | |
| Reimb. | | (81.01) | 0.00 | 0.00 | (48.61) | | | | | |
| Cum. | | 0.00 | 0.00 | 0.00 | | | | | | |
| Ult. | | 0.00 | 0.00 | 0.00 | | | | | | |

| Year | Company Future Gross Revenue Oil M$ | NGL M$ | Gas M$ | Other M$ | Total M$ | Prod & Adv Taxes Prod Tax M$ | Adv Tax M$ | Revenue after Sev & Adv M$ |
|---|---|---|---|---|---|---|---|---|
| 2023 | 439.74 | 0.00 | 0.00 | 0.00 | 439.74 | 20.27 | 10.99 | 408.48 |
| 2024 | 338.99 | 0.00 | 0.00 | 0.00 | 338.99 | 15.62 | 8.47 | 314.89 |
| 2025 | 283.34 | 0.00 | 0.00 | 0.00 | 283.34 | 13.06 | 7.08 | 263.20 |
| 2026 | 247.98 | 0.00 | 0.00 | 0.00 | 247.98 | 11.43 | 6.20 | 230.35 |
| 2027 | 222.76 | 0.00 | 0.00 | 0.00 | 222.76 | 10.27 | 5.57 | 206.92 |
| 2028 | 204.15 | 0.00 | 0.00 | 0.00 | 204.15 | 9.41 | 5.10 | 189.64 |
| 2029 | 188.44 | 0.00 | 0.00 | 0.00 | 188.44 | 8.69 | 4.71 | 175.04 |
| 2030 | 176.09 | 0.00 | 0.00 | 0.00 | 176.09 | 8.12 | 4.40 | 163.57 |
| 2031 | 165.77 | 0.00 | 0.00 | 0.00 | 165.77 | 7.64 | 4.14 | 153.99 |
| 2032 | 157.40 | 0.00 | 0.00 | 0.00 | 157.40 | 7.25 | 3.94 | 146.21 |
| 2033 | 149.37 | 0.00 | 0.00 | 0.00 | 149.37 | 6.88 | 3.73 | 138.75 |
| 2034 | 142.73 | 0.00 | 0.00 | 0.00 | 142.73 | 6.58 | 3.57 | 132.58 |
| 2035 | 136.85 | 0.00 | 0.00 | 0.00 | 136.85 | 6.31 | 3.42 | 127.12 |
| 2036 | 131.95 | 0.00 | 0.00 | 0.00 | 131.95 | 6.08 | 3.30 | 122.57 |
| 2037 | 126.87 | 0.00 | 0.00 | 0.00 | 126.87 | 5.85 | 3.17 | 117.85 |
| Sub-T | 3,112.43 | 0.00 | 0.00 | 0.00 | 3,112.43 | 143.45 | 77.81 | 2,891.17 |
| After | 1,282.20 | 0.00 | 0.00 | 0.00 | 1,282.20 | 59.10 | 32.06 | 1,191.05 |
| Total | 4,394.63 | 0.00 | 0.00 | 0.00 | 4,394.63 | 202.55 | 109.87 | 4,082.22 |

| Year | Deductions Lease Net Costs M$ | Net Investments M$ | Trans. Costs M$ | Net Profits M$ | Future Net Income Before Income Taxes Undiscounted Annual M$ | Cumulative M$ | MHP Reimbursement --- M$ --- | Disc. Cum. Annual @ 10.00% --- M$ --- |
|---|---|---|---|---|---|---|---|---|
| 2023 | 81.37 | 0.00 | 0.00 | 0.00 | 327.11 | 327.11 | (327.11) | 0.00 |
| 2024 | 81.37 | 0.00 | 0.00 | 0.00 | 233.52 | 560.63 | (560.63) | 0.00 |
| 2025 | 81.37 | 0.00 | 0.00 | 0.00 | 181.83 | 742.46 | (742.46) | 0.00 |
| 2026 | 81.37 | 0.00 | 0.00 | 0.00 | 148.98 | 891.44 | (891.44) | 0.00 |
| 2027 | 81.37 | 0.00 | 0.00 | 0.00 | 125.55 | 1,016.99 | (1,016.99) | 0.00 |
| 2028 | 81.37 | 0.00 | 0.00 | 0.00 | 108.27 | 1,125.26 | (1,125.26) | 0.00 |
| 2029 | 81.37 | 0.00 | 0.00 | 0.00 | 93.67 | 1,218.94 | (1,218.94) | 0.00 |
| 2030 | 81.37 | 0.00 | 0.00 | 0.00 | 82.20 | 1,301.14 | (1,301.14) | 0.00 |
| 2031 | 81.37 | 0.00 | 0.00 | 0.00 | 72.62 | 1,373.76 | (1,373.76) | 0.00 |
| 2032 | 81.37 | 0.00 | 0.00 | 0.00 | 64.84 | 1,438.60 | (1,438.60) | 0.00 |
| 2033 | 81.37 | 0.00 | 0.00 | 0.00 | 57.38 | 1,495.98 | (1,495.98) | 0.00 |
| 2034 | 81.37 | 0.00 | 0.00 | 0.00 | 51.21 | 1,547.19 | (1,547.19) | 0.00 |
| 2035 | 81.37 | 0.00 | 0.00 | 0.00 | 45.75 | 1,592.94 | (1,592.94) | 0.00 |
| 2036 | 81.37 | 0.00 | 0.00 | 0.00 | 41.20 | 1,634.14 | (1,634.14) | 0.00 |
| 2037 | 81.37 | 0.00 | 0.00 | 0.00 | 36.48 | 1,670.62 | (1,670.62) | 0.00 |
| Sub-T | 1,220.54 | 0.00 | 0.00 | 0.00 | 1,670.62 | 1,670.62 | (1,670.62) | 0.00 |
| After | 1,007.07 | 0.00 | 0.00 | 0.00 | 183.98 | 183.98 | (183.98) | 0.00 |
| Total | 2,227.62 | 0.00 | 0.00 | 0.00 | 1,854.60 | 1,854.60 | (1,854.60) | 0.00 |

**Eco. Indicators**

| | |
|---|---|
| Return on Investment (disc) : | 0.000 |
| Return on Investment (undisc) : | 0.000 |
| Years to Payout : | 0.00 |
| Internal Rate of Return (%): | 0.00 |

**Ownership Interests**

| | Initial | 1st Rev. | 2nd Rev. |
|---|---|---|---|
| W. I. : | 0.80000000 | 0.00000000 | 0.00000000 |
| Net R. I. : | 0.60000000 | 0.00000000 | 0.00000000 |
| Rev. Date : | | | |

**Present Worth Profile (M$)**

| | |
|---|---|
| PW 5.00% : | 0.00 |
| PW 8.00% : | 0.00 |
| PW 9.00% : | 0.00 |
| PW 12.00% : | 0.00 |
| PW 15.00% : | 0.00 |
| PW 20.00% : | 0.00 |

**Case Name: FLYING 'B' RANCH 3H**
**Field: GARDEN CITY, S.**
**County, State: STERLING (TX), TX**

**Oper: MAVERICK OPERATING, LLC**

**Disc Value: 1,166.42 M$**



**AMIEL DAVID**

Dr. Amiel David has over 60 years of expertise in energy-related operations, management, investment banking, and engineering. For significant years, Amiel has been providing engineering support for energy banks, and he is continuing to provide engineering and economic evaluations for public and privately held companies with operations worldwide. Amiel is past president of the publicly traded company, Dune Energy, Inc., and was involved with the establishment of other public and private energy companies including Golden Gate Oil (20,000 acres in the heavy oil fields of Santa Barbara County, CA), Strategic American Oil Company (Galveston Bay, TX), and Cross Canyon Energy. He was also previously employed by: Gulf Research and Development Company, Superior Oil Company, First City Bank, and Duke Capital Partners amongst others. He is a member of the Society of Petroleum Engineers and the Society of Petroleum Evaluation Engineers. He is a Registered Professional Engineer (License # 50970 and Firm # F-15360). He has presented numerous technical papers at SPE conferences and has been published in technical journals. Amiel holds a Ph.D. in Petroleum Engineering from Stanford University, an MSE in Chemical Engineering from UPenn, an MBA from Pitt, and a BS in Petroleum Engineering from the University of Tulsa.

---

# EXHIBIT E

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2023**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission File Number: **333-266143**

# NEXT BRIDGE HYDROCARBONS, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Nevada** | **87-2538731** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**6300 Ridglea Place, Suite 950**
**Fort Worth TX 76116**
(Address of principal executive offices) (Zip Code)

**(432) 553-9745**
(Registrant's telephone number, including area code)

**N/A**
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| N/A | N/A | N/A |

Securities registered pursuant to Section 12(g) of the Act: None

Our common stock is not publicly traded and is not eligible for electronic transfer through the Depository Trust Company book-entry system or any other established clearing corporation.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

Table of Contents

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ | Non-accelerated filer | ☒ | Smaller reporting company | ☒ | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management assessment of the effectiveness of its internal controls over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to (§240.10D-1(b)). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The Registrant was not a public company as of the last business day of its most recently completed second fiscal quarter and, therefore, cannot calculate the aggregate market value of its voting and non-voting common equity held by non-affiliates as of such date.

| Class | Outstanding at July 15, 2024 |
|---|---|
| Common stock, par value $0.0001 per share | 251,430,516 |

**DOCUMENTS INCORPORATED BY REFERENCE**

None

*Table of Contents*

**EXPLANATORY NOTE**

This Annual Report on Form 10-K (this "Form 10-K") of Next Bridge Hydrocarbons, Inc. (the "Company," "we," "our," or "us") for the year ended December 31, 2023, includes consolidated comparative financial statements and disclosures for the year ended December 31, 2022 which have been restated from the Form 10-K previously filed for the year ended December 31, 2022 with the Securities and Exchange Commission (the "SEC") on March 31, 2023 (the "2022 Original Filing").

Reference Note 12 in the accompanying Notes to Financial Statements for detailed disclosure of items amended by this restatement.

**Items Amended in this Filing**

This Form 10-K amends and restates the 2022 Original Filing and the Amendment No. 1 to present restated fiscal year 2022 consolidated financial statements and related disclosures arising from an impairment analysis during the 2023 audit and the related reaudit of the Company's fiscal year 2022 financial statements.

The reaudit requirement was authorized by the Company during the audit engagement for the year ended December 31, 2023. For the year ended December 31, 2023, a new auditing firm was engaged to replace the previous auditing firm, BF Borgers CPA PC ("Borgers"), who performed the original 2022 audit.

During the 2023 audit that was in progress, on May 3, 2024 the SEC entered, and the Company became aware of, an order instituting settled administrative and cease-and-desist proceedings against Borgers, which order includes denying Borgers the privilege of appearing or practicing before the SEC as an accountant. Although the SEC has provided that Exchange Act reports that were filed before the date of the order do not necessarily need to be amended solely because of the SEC's entry of the order, the Company and its new auditing firm analyzed the previous 2022 financial statements and determined that there were reporting deficiencies arising from the Borgers engagement. Accordingly, the Company and its new auditing firm determined that the 2022 audit performed by Borgers should not be included in the 2023 filing, and the Company expanded its engagement with the new auditing firm to include a reaudit of the 2022 financial statements.

In the course of the 2022 reaudit, procedures were applied that led the Company and the new auditors to believe sufficient audit procedures were not performed by Borgers when auditing the 2022 financial statements.

For the year ended December 31, 2023, management applied accounting procedures to examine the need for an impairment adjustment to the carrying value of its unevaluated oil and natural gas properties. A triggering event related to the potential expiration of the underlying mineral lease related to the Company's Orogrande Project on December 31, 2024 was noted. Although negotiation discussions with the lessor are in progress, there was no assurance that the mineral lease would, in fact, be renewed before December 31, 2024. The conclusion reached was to impair 100% of the carrying value of the Company's oil and natural gas assets as of December 31, 2023. The new auditing firm recommends that this higher impairment is more in line with the standard practices within the oil and gas exploration industry during periods in which lease renewals are pending and subject to renewal.

Given the combined auditing engagement for 2022 with the audit for 2023, the Company recorded an impairment adjustment as of December 31, 2022 and at December 31, 2023.

Except for the changes relating to this impairment adjustment for 2022 and changes relating to certain accounts payable information, no other changes have been made to the consolidated financial statements for the year ended December 31, 2022. Reference Note 12 to the consolidated financial statements.

References to our website throughout this Form 10-K are provided for convenience only and the content on our website does not constitute a part of, and shall not be deemed incorporated by reference into, this filing.

*Table of Contents*

**Table of Contents**


| | | |
|---|---|---|
| | **PART I** | |
| Item 1. | Business | 4 |
| Item 2. | Properties | 4 |
| Item 1A. | Risk Factors | 16 |
| Item 1B. | Unresolved Staff Comments | 30 |
| Item 1C. | Cybersecurity | 30 |
| Item 3. | Legal Proceedings | 31 |
| Item 4. | Mine Safety Disclosures | 31 |
| | **PART II** | |
| Item 5. | Market for Registrant’s Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 32 |
| Item 6. | Reserved | 32 |
| Item 7. | Management’s Discussion and Analysis of Financial Condition and Results of Operations | 33 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 43 |
| Item 8. | Financial Statements and Supplementary Data | 44 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 46 |
| Item 9A. | Controls and Procedures | 46 |
| Item 9B. | Other Information | 47 |
| | **PART III** | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 48 |
| Item 11. | Executive Compensation | 50 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 53 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 55 |
| Item 14. | Principal Accounting Fees and Services | 58 |
| | **PART IV** | |
| Item 15. | Exhibits and Financial Statement Schedules | 59 |
| Item 16. | Form 10-K Summary | 62 |
| | Signatures | 63 |

Table of Contents

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

The information contained in this 10-K includes "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These forward-looking statements are identified by their use of terms such as "can," "could," "continuing," "may," "will," "expect," "anticipate," "aim," "estimate," "intend," "ongoing," "plan," "predict," "potential," "project," "should," "seeks," "believe," "likely to" and similar words, phrases or expressions. All statements, other than statements of historical facts, included in this report, are forward-looking statements, including statements mentioned under "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," regarding:

- amount and timing of future production of oil and natural gas;
- amount, nature and timing of capital expenditures;
- the number of anticipated wells to be drilled after the date hereof;
- the availability of exploration and development opportunities;
- our financial or operating results;
- our cash flow and anticipated liquidity;
- operating costs including lease operating expenses, administrative costs and other expenses;
- finding and development costs;
- our business strategy; and
- other plans and objectives for future operations.

Our actual results and condition could differ materially from those implied or expressed in the forward-looking statements for any reason. They can be affected by a number of factors, including, among others:

- the risks described in "Risk Factors" and elsewhere in this report;
- the volatility of prices and supply of, and demand for, oil and natural gas;
- the timing and success of our drilling activities;
- the numerous uncertainties inherent in estimating quantities of oil and natural gas reserves and actual future production rates and associated costs;
- our ability to successfully identify, execute or effectively integrate future acquisitions;
- the usual hazards associated with the oil and natural gas industry, including fires, well blowouts, pipe failure, spills, explosions and other unforeseen hazards;
- our ability to effectively market our oil and natural gas;
- the availability of rigs, equipment, supplies and personnel;
- our ability to discover or acquire additional reserves;
- our ability to satisfy future capital requirements;
- changes in regulatory requirements;
- general economic conditions, status of the financial markets and competitive conditions; and
- our ability to retain key members of our senior management and key employees.

Moreover, we operate in a rapidly evolving environment. New risk factors and uncertainties emerge from time to time, and it is not possible for our management to predict all the risk factors and uncertainties, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. We qualify all of our forward-looking statements by these cautionary statements.

You should not rely upon forward-looking statements as predictions of future events. The forward-looking statements made in this report relate only to events or information available to us as of the date of this report. Except as required by law, we undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

Table of Contents

## DEFINITIONS

The following are abbreviations and definitions of terms commonly used in the oil and gas industry and in this report. Natural gas equivalents and crude oil equivalents are determined using the ratio of six Mcf to one barrel. Unless the context otherwise requires, all references to "us," "our," "we," "NBH," the "Company" or "Next Bridge" mean Next Bridge Hydrocarbons, Inc. and where applicable, its consolidated subsidiaries including Torchlight Hazel, LLC, a Texas limited liability company ("Torchlight Hazel"), Hudspeth Oil Corporation, a Texas corporation ("Hudspeth"), Hudspeth Operating, LLC, a Texas limited liability company ("Hudspeth Operating"), and Torchlight Energy, Inc., a Nevada corporation ("TEI") and Wolfbone Investments LLC, a Texas limited liability company ("Wolfbone").

"**Bbl**" means a barrel of U.S. 42 gallons of oil.

"**BOE**" means one barrel of oil equivalent.

"**Completion**" means the installation of permanent equipment for the production of oil or gas.

"**Condensate**" means natural gas in liquid form produced in connection with natural gas wells.

"**Exploratory well**" means a well drilled to find a new field or to find a new productive reservoir in a field previously found to be productive of oil or natural gas in another reservoir or to extend a known reservoir.

"**Gross**" when used with respect to acres or wells, production or reserves refers to the total acres or wells in which we or another specified person has a working interest.

"**MBbls**" means one thousand barrels of oil.

"**Mcf**" means one thousand cubic feet of natural gas.

"**Net**" when used with respect to acres or wells, refers to gross acres of wells multiplied, in each case, by the percentage working interest owned by us.

"**NGL**" refers to natural gas liquids, which is composed exclusively of carbon and hydrogen.

"**Oil**" means crude oil or condensate.

"**Operator**" means the individual or company responsible for the exploration, development, and production of an oil or gas well or lease.

"**Proved developed non-producing**" means reserves (i) expected to be recovered from zones capable of producing but which are shut-in because no market outlet exists at the present time or whose date of connection to a pipeline is uncertain or (ii) currently behind the pipe in existing wells, which are considered proved by virtue of successful testing or production of offsetting wells.

"**Proved developed producing**" means reserves expected to be recovered from currently producing zones under continuation of present operating methods. This category includes recently completed shut-in gas wells scheduled for connection to a pipeline in the near future.

"**Proved developed reserves**" means reserves that can be expected to be recovered through existing wells with existing equipment or operating methods.

"**Proved reserves**" means the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided by contractual arrangements.

"**Proved undeveloped reserves**" means reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Reserves on undrilled acreage are limited to those drilling locations offsetting productive wells that are reasonably certain of production when drilled or where it can be demonstrated with certainty that there is continuity of production from the existing productive formation.

"**Recompletion**" means the completion for production of an existing well bore in another formation from which the well has been previously completed.

Table of Contents

"**Royalty**" means an interest in an oil and gas lease that gives the owner of the interest the right to receive a portion of the production from the leased acreage (or of the proceeds of the sale thereof), but generally does not require the owner to pay any portion of the costs of drilling or operating the wells on the leased acreage. Royalties may be either landowner's royalties, which are reserved by the owner of the leased acreage at the time the lease is granted, or overriding royalties, which are usually reserved by an owner of the leasehold in connection with a transfer to a subsequent owner.

"**SEC**" means the United States Securities and Exchange Commission.

"**Working interest**" means an interest in an oil and gas lease that gives the owner of the interest the right to drill for and produce oil and gas on the leased acreage and requires the owner to pay a share of the costs of drilling and production operations. The share of production to which a working interest owner is entitled will always be smaller than the share of costs that the working interest owner is required to bear, with the balance of the production accruing to the owners of royalties. For example, the owner of a 100% working interest in a lease burdened only by a landowner's royalty of 12.5% would be required to pay 100% of the costs of a well but would be entitled to retain 87.5% of the production.

Table of Contents

## Part I

### Items 1 and 2. Business and Properties

*The following description of the business of Next Bridge Hydrocarbons, Inc. should be read in conjunction with the information included elsewhere in this report on Form 10-K for the year ended December 31, 2023.*

**Overview.**

We were incorporated in Nevada on August 31, 2021, as OilCo Holdings, Inc. and changed our name to Next Bridge Hydrocarbons, Inc. pursuant to our Amended and Restated Articles of Incorporation filed on June 30, 2022. We spun-off from Meta Materials, Inc. ("Meta") on December 14, 2022 pursuant to which we became an independent company. Prior to the spin-off, we were a wholly-owned subsidiary of Meta. The accompanying Comparative Financial Statements present predecessor period information for the period of January 1, 2022 through December 14, 2022 (the "Predecessor Period") and successor period information for the period of December 14, 2022 through December 31, 2023 (the "Successor Period") separately where appropriate.

We are an energy company engaged in the acquisition, exploration, exploitation and development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and natural gas project we hold in the Orogrande Basin in West Texas in Hudspeth County, Texas (the "Orogrande Project"). In addition, we have minor interests in the Eastern edge of the Midland Basin in Sterling, Tom Green and Irion Counties, Texas (the "Hazel Project"), and two minor well interests located in Oklahoma (the "Oklahoma Properties").

We operate our business through five wholly owned subsidiaries: TEI, Hudspeth, Torchlight Hazel, Wolfbone Investments LLC, and Hudspeth Operating.

As of December 31, 2023, we had interests in three oil and natural gas projects: the Orogrande Project, the Hazel Project, and the Oklahoma Properties in partnership with Kodiak Oil & Gas Exploration Inc. in Central Oklahoma.

In August 2020, our subsidiaries entered into the Option Agreement (defined below) with MHP (defined below), under which, in exchange for satisfying certain drilling obligations, MHP had the option to purchase the entire Hazel Project, which MHP determined not to exercise; however, MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the well attributable to our interest until such time as it has recovered its reasonable costs and expenses for drilling, completing and operating the well. Operations continue under the Option Agreement until such time as the revenue from the project equates to the dollars spent by, and shall be reimbursed to, MHP. At such time, any acreage held by production and all wells will revert back to our subsidiary, Torchlight Hazel. See "Current Projects" below for additional discussion regarding our oil and natural gas properties.

**Market Opportunity.**

The market for any oil and natural gas that we may produce depends on factors beyond our control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, demand for oil and natural gas, the marketing of competitive fuels, and the effects of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial, and individual consumers.

Our oil production is expected to be sold at prices tied to the spot oil markets. Our natural gas production is expected to be sold under short-term contracts and priced based on first of the month index prices or on daily spot market prices. We will rely on our operating partners to market and sell our production.

**Our Competitive Strengths.**

*Experienced People.* As of December 31, 2023, we had five full-time employees, but presently we have two employees, neither of which works on a full-time basis. We engage consultants for various roles as needed including high quality exploration and technical partners. Our internal operations team serves as the foundation of our values-driven culture and commitment to developing a skilled, agile, diverse and engaged workforce. Advancing a safe, ethical, inclusive and diverse culture creates an environment that attracts and retains the high-performing workforce needed to successfully execute our strategy. We plan to continue to build on the expertise and experiences of our management and operations teams and seek guidance from outside advisors as well as our Board.

*Project Focus.* We are focusing primarily on exploration projects backed by a high degree of scientific information. We may pursue high risk exploration prospects which may appear less favored than low risk exploration. We will, however, consider these high risk-high reward exploration prospects in connection with exploitation opportunities in a project that would reduce the overall project economic risk. We will consider such high risk-high reward prospects on their individual merits.

*Limit Capital Risks.* Limited capital exposure is planned initially to add value to a project and determine its economic viability. Management has experience in successfully managing risks of projects, finance, and value.

**Business Strategy.**

Our mission is to safely increase production and cash flow from our oil and natural gas properties which we believe are rich in opportunities through a disciplined allocation of capital and operational management for the benefit of our shareholders. Our business strategy is designed to accomplish this mission by focusing on two key objectives: (1) maximize the value of our producing assets; and (2) progress our discovered resources into proved reserves, production, and cash flow through efficient appraisal, development and exploitation. We believe there are three principal business processes that we must follow to enable our operations to be profitable. Each major business process offers the opportunity for a distinct partner or alliance as we grow. These processes are:

- Investment Evaluation and Review;
- Operations and Field Activities; and
- Administrative and Finance Management.

*Investment Evaluation and Review.* We believe this process is the key ingredient to our success. Recognition of quality investment opportunities is the fuel that drives our engine. Broadly, this process includes the following activities: prospect acquisition, regional and local geological and geophysical evaluations, data processing, economic analysis, lease acquisition and negotiations, permitting, and field supervision. We expect these evaluation processes to be managed by our management team. Expert or specific technical support will be outsourced as needed.

*Operations and Field Activities.* This process begins following management approval of an investment. Well site supervision, construction, drilling, logging, product marketing, and transportation are examples of some activities. We will prefer to be the operator where possible.

*Administrative and Finance Management.* This process coordinates our initial structuring and capitalization, general operations and accounting, reporting, audit, banking and cash management, regulatory agencies reporting and interaction, timely and accurate payment of royalties, taxes, leases rentals, vendor accounts and performance management that includes budgeting and maintenance of financial controls, and interface with legal counsel and tax and other financial and business advisors.

**Current Projects.**

As of December 31, 2023, we had interests in three oil and natural gas projects: the Orogrande Project, the Hazel Project, and the Oklahoma Properties. Additionally, we acquired interests in certain Louisiana projects in March 2024.

Orogrande Project, West Texas

On August 7, 2014, our predecessor entered into a Purchase Agreement with Hudspeth, McCabe Petroleum Corporation ("MPC"), and Gregory McCabe ("Mr. McCabe"), the sole owner of Wolfbone Investments, LLC ("Wolfbone"). Mr. McCabe was the sole owner of both Hudspeth and MPC. Under the terms and conditions of the Purchase Agreement, our predecessor acquired 100% of the capital stock of Hudspeth which held certain oil and natural gas assets, including a 100% working interest in approximately 172,000 predominately contiguous acres in the Orogrande Basin in West Texas; provided, that the Company now has an interest in approximately 134,000 based on the expiration of certain leases since acquired. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe. Mr. McCabe owns a controlling interest in Magdalena, an entity that holds a 4.5% overriding royalty interest in the Orogrande acreage, which he obtained prior to, and was not a part of the August 2014 transaction.

Table of Contents

Effective March 27, 2017, the Orogrande acreage became subject to a University Lands D&D Unit Agreement ("DDU Agreement"), which allows for all 192 existing leases covering approximately 134,000 gross acres leased from University Lands to be combined into one drilling and development unit for development purposes. The term of the DDU Agreement expires on December 31, 2024, and the time to drill on the drilling and development unit continues through December 31, 2024. The DDU Agreement also grants the right to extend the DDU Agreement through December 31, 2029, if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid. The Company expects to exercise its option to extend the term under the DDU Agreement prior to its expiration.

Drilling obligations under the DDU Agreement included five wells per year in the years 2021, 2022 and 2023. The drilling obligations are minimum yearly requirements and may be exceeded if acceleration is desired.

On November 7, 2022, we extended the term applicable to our 2022 fiscal year drilling obligations in the Orogrande Project in order to stay in compliance with the continuous drilling clause under the DDU Agreement. As of December 31, 2023, we were in compliance with our drilling obligations under the DDU Agreement.

As of December 31, 2023, leases covering approximately 134,000 acres remain in effect.

While drilling wells under our 2022 drilling obligation, our operations team deployed a new mist drilling solution that increased hole stability, which we believe will result in meaningful cost savings for additional wells drilled in the Orogrande Project. Multiple test wells were drilled in the Orogrande Project in order to stay in compliance with the DDU Agreement. While these previously drilled wells may have potential to produce hydrocarbons to sell commercially in the future, we have no immediate plans to deploy the additional capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including reservoir locations, target depths and designated acreage, in the Orogrande Project. Notwithstanding the foregoing, development of the wells continued through December 31, 2023, to further capture and document the scientific base in support of demonstrating the production potential of the property.

We have drilled a total of 18 test wells in the Orogrande Project properties to test for potential shallow pay zones and deeper pay zones that may be present on structural plays. Two horizontal wells were successfully completed for hydrocarbons through the 2020 drilling program. However, as of December 31, 2023, both wells remain shut-in waiting for hook up to a gas pipeline. The various wells drilled on the Orogrande Basin through 2022 confirmed that there are at least five potential distinct reservoirs under our acreage. While these wells may have potential to produce hydrocarbons to sell commercially in the future, due to capital constraints we have no immediate plans to deploy the capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including well locations, target depths and designated acreage, in the Orogrande Project. The remaining wells can be used for future development for various applications such as re-entering the wellbores for horizontal unconventional development, fresh water supply, or salt water disposal and/or plugged and abandoned.

Table of Contents

On July 25, 2018, we and Hudspeth entered into a Settlement & Purchase Agreement (the "Settlement Agreement") with University Founders (and Founders Oil & Gas Operating, LLC, former operator) ("Founders"), Wolfbone and MPC (entities controlled by a related party), which agreement provided for Founders assigning all of its working interest in the oil and natural gas leases of the Orogrande Project to Hudspeth and Wolfbone equally. Future well capital spending obligations remained the same 50% contribution from Hudspeth and 50% from Wolfbone until such time as the $40.5 million to be spent on the project. Cumulative capital spending did not exceed $40.5 million until after the closing of the merger between Meta and Torchlight Energy Resources, Inc. in June 2021.

Effective as of October 6, 2023, the Company and certain investor participants (each a "Participant" and collectively the "Participants") entered into twenty-five separate Participation Agreements (the "Participation Agreements") to conduct drilling of wells in the Company's approximately 17,000 acre Johnson Prospect in Hudspeth County, Texas, which is a portion of the Company's Orogrande Prospect.

Pursuant to the Participation Agreement, the Participants collectively funded the cost of drilling, of approximately $9,000,000, which was used to (i) acquire the rights to drill on the Johnson Prospect and (ii) finance the drilling of five (5) vertical wells in the Johnson Prospect in connection with the Company's 2023 drilling program requirements under its University Lands Drilling and Development Unit Agreement. Each Participant will have the right to participate in the drilling of additional wells on the Johnson Prospect in the future, including an additional five (5) vertical wells in locations determined by Hudspeth Operating, LLC, the Company's wholly owned subsidiary ("Hudspeth"), in its sole discretion, in 2024. The Participation Agreement provides for an initial allocation of the working interests and net revenue interests among each Participant and the Company and then a re-allocation upon payout or payment to such Participant of drilling and completion costs for each well drilled. Following payout, the Company will own 25% of working interest as described below and 18.75% net revenue interest in each well. Hudspeth will be the operator of the Johnson Prospect pursuant to a joint operating agreement (the "Operating Agreement") entered into in connection with the Participation Agreement. The Participation Agreement and the Operating Agreement required, among other things, that Hudspeth and the Company drill and complete at least five (5) vertical wells by December 31, 2023, unless the term of the Participation Agreement is extended. The wells were completed by December 31, 2023.

The Company reserved a twenty-five percent (25%) back-in interest, which shall automatically revert to the Company following the date that each Participant first recovers 100% of the costs attributable to the drilling and development of the wells in which such Participant has participated.

Further, within a specified period following drilling of the initial five (5) wells, pursuant to the Participation Agreement each Participant may elect to transfer and assign all its interests to the Company in exchange for the issuance of shares of common stock of the Company at a value of $1.20 per share.

One of the Participants is McCabe Petroleum Corporation, an entity controlled by Mr. McCabe, the Chairman of the Company's Board of Directors, the largest shareholder of the Company and a lender of the Company. As such, entry into the Participation Agreement and the related transactions pursuant thereto constitute related party transactions, which have been duly approved by the Company's Board of Directors and Audit Committee.

Table of Contents

*Acquisition of Working Interest*

On December 21, 2022, the Company entered into that certain Agreement and Plan of Merger (the "Merger Agreement") with Hudspeth, Wolfbone, MPC and Mr. McCabe, pursuant to which in a series of transactions the oil and natural gas leases, the lands covered by such leases, pooling and communitization agreements, rights-of-way, the surface estate of the lands and all wells located in Orogrande Project will be transferred, conveyed and assigned to Hudspeth (or its designated assignee) in consideration of (1) treating the Orogrande Obligations (as defined in the Merger Agreement) as having been irrevocably satisfied and discharged in full with respect to MPC and (2) an issuance of 56,297,638 shares of Company common stock to Mr. McCabe (such series of transactions collectively, the "Merger").

The Merger became effective on April 25, 2023. As a result of the Merger, the Company acquired Wolfbone's 22.6249% remaining rights to working interest in the Orogrande Project in consideration of the issuance by the Company of the 56,297,638 shares of the Company's common stock to Mr. McCabe.

The Merger was completed in accordance with the Texas Business Organizations Code, whereby (a) the Company formed NBH MergeCo, LLC with the State of Texas ("MergeCo") in order to cause Hudspeth to assign all of its rights under the Merger Agreement to MergeCo and MergeCo assumed Hudspeth's obligations under the Merger Agreement, (b) MergeCo, Wolfbone and MPC merged with each of Wolfbone and MPC as surviving entities, and (c) Wolfbone became a direct and wholly-owned subsidiary of the Company. The closing of the transactions contemplated by the Merger Agreement occurred on May 11, 2023.

On May 11, 2023, the Company and its wholly owned subsidiary, Hudspeth, entered into a contribution and exchange agreement with each of the prior working interest owners in the Orogrande Project named in the table below (each an "Orogrande Owner" and collectively, the "Orogrande Owners"), pursuant to which, the Company issued to the Orogrande Owners the number of shares of the Company's common stock set forth opposite such Orogrande Owner's name below in exchange for and in order to acquire such Orogrande Owner's rights to working interest in the Orogrande Project.

| | **Shares of Common Stock** | **Working Interest Contribution** |
|---|---|---|
| Dingus Investments, Inc. | 7,050,382 | 2.8334% |
| Pandora Energy, LP | 6,220,779 | 2.5000% |
| Kennedy Minerals, Ltd | 6,220,779 | 2.5000% |
| The de Compiegne Property Company No. 20, Ltd | 6,220,779 | 2.5000% |
| Loma Hombre Energy, LLC | 622,078 | 0.2500% |
| Sero Capital, LLC | 725,840 | 0.2917% |
| **TOTAL** | **27,060,637** | **10.8751%** |

The Orogrande Project ownership as of December 31, 2023, is detailed as follows:

| | Revenue Interest | Working Interest |
|---|---|---|
| University Lands - Mineral Owner | 20.000% | |
| ORRI - Magdalena Royalties, LLC, an entity controlled by Gregory McCabe, Chairman of the Board | 4.500% | |
| ORRI - Unrelated Parties | 0.500% | |
| Hudspeth Oil Corporation, a subsidiary of Next Bridge Hydrocarbons, Inc. | 56.250% | 75.000% |
| Wolfbone Investments, LLC, a subsidiary of Next Bridge Hydrocarbons, Inc. | 18.750% | 25.000% |
| | 100.000% | 100.000% |

Hazel Project in the Midland Basin in West Texas

Effective April 4, 2016, TEI acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. A back-in after payout of a 25% working interest was retained by MPC and another unrelated working interest owner.

In October 2016, the holders of all of Torchlight Energy Resources, Inc.'s then-outstanding shares of Series C Preferred Stock (which were issued in July 2016) elected to convert into a total 33.33% working interest in our Hazel Project, reducing our ownership from 66.66% to a 33.33% working interest.

*Acquisition of Additional Interests in Hazel Project*

On January 30, 2017, we entered into and closed an Agreement and Plan of Reorganization and a Plan of Merger with an entity which was wholly owned by Mr. McCabe, which resulted in the acquisition of approximately 40.66% working interest in the 12,000 gross acres, 9,600 net acres, in the Hazel Project.

Table of Contents

Also, on January 30, 2017, the Company entered into and closed a Purchase and Sale Agreement with Wolfbone. Under the agreement, we acquired certain of Wolfbone's Hazel Project assets, including its interest in the Flying B Ranch #1 well and the 40 acre unit surrounding the well.

Upon the closing of the transactions, our working interest in the Hazel Project increased by 40.66% to a total ownership of 74%.

Effective June 1, 2017, we acquired an additional 6% working interest from unrelated working interest owners increasing our working interest in the Hazel Project to 80%, and an overall net revenue interest of 75%.

The Company has drilled seven test wells on the Hazel Project to capture and document the scientific base in support of demonstrating the production potential of the property. No wells were drilled on the Hazel Project during the year ended December 31, 2023.

*Option Agreement with Masterson Hazel Partners, LP*

On August 13, 2020, our subsidiaries TEI and Torchlight Hazel (collectively, "Torchlight Subs") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and MPC. Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on our Hazel Project, sufficient to satisfy Torchlight Subs's continuous development obligations on the southern half of the prospect no later than September 30, 2020. MHP has satisfied this drilling obligation. MHP paid to Torchlight Subs $1,000 as an option fee at the time of execution of the Option Agreement. MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the Well attributable to Torchlight Subs's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the Well.

In exchange for MHP satisfying the above drilling obligations, Torchlight Subs granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight Subs's continuous development obligations on the northern half of the prospect. Because MHP exercised this drilling option and satisfied the continuous development obligations on the northern half of the prospect, under the terms of the Option Agreement (as amended in September 2020) MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. Such purchase would be under the terms of a form of Purchase and Sale Agreement included as an exhibit to the Option Agreement, at an aggregate purchase price of $12,690,704 for approximately 9,762 net mineral acres, and not less than 74% net revenue interest (approximately $1,300 per net mineral acre). MHP declined to exercise the option in 2021.

Oklahoma Properties in the Hunton Play of Central Oklahoma

Presently, we are producing from one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

Louisiana Projects

In March 2024, we enter into and closed a Contribution Agreement with Wildcat Partners SPV, LLC, a Delaware limited liability company ("Wildcat"), under which Wildcat transferred to us 100% of the issued and outstanding membership interests in each of (a) Wildcat Cowboy, LLC, a Texas limited liability company ("Cowboy"), (b) Wildcat Packer, LLC, a Texas limited liability company ("Packer"), (c) Wildcat Panther, LLC, a Texas limited liability company ("Panther") and (d) Wildcat Valentine, LLC, a Texas limited liability company ("Valentine"). As consideration, we issued 2,500,000 shares of our common stock, under the terms and conditions of the Contribution Agreement.

MPC previously owned and sold to Wildcat the underlying oil and gas prospects owned by Cowboy, Packer, Panther and Valentine. MPC always retained a 25% back-in after payout and various overriding royalty interests in the prospects owned by Cowboy, Packer, Panther and Valentine, but MPC agreed to waive its 25% back-in after payout but retain its overriding royalty interests in all such prospects in an effort to facilitate the transactions described below, including the sale of the leases owned by Valentine, including a leasehold estates in approximately 3,878.90 gross acres and 3,626.25 net acres of land situated in Lafourche Parish, Louisiana (the "Valentine Leases"), and the leases owned by Panther, including leasehold estates in approximately 618 gross acres and 618 net acres of land situated in Acadia Parish, Louisiana (the "Panther Leases"), the leases owned by Packer, including leasehold estates in approximately 4,349 gross acres and 4,349 net acres of land situated in Acadia and Lafourche Parish, Louisiana (the "Packer Leases"), the leases owned by Cowboy, including leasehold estates in approximately 835 gross acres and 835 net acres of land situated in Acadia Parish, Louisiana (the "Cowboy Leases).

Concurrent with the closing of the above transactions with Wildcat, we entered into and closed a Participation Agreement with Magnetar Exploration L.P. ("Magnetar") under which we sold to Magnetar a 100% working interest, entitled to not less than a 75% net revenue interest, in and to the Valentine Leases, along with a 100% right, title and interest in all contracts affecting the Valentine Leases, all under the terms and conditions of such Participation Agreement, including the following consideration: (a) Magnetar paid $964,448 from which we are required to pay bonuses of $240,000 to ORX Exploration and $60,000 to Zebrowski Consulting, resulting in net proceeds to us of $664,448; (b) Magnetar agrees to pay all delay rentals pertaining to the Valentine Leases which accrue during calendar year 2024 and during the months of January through August of 2025, provided, however, that if the initial test well is commenced at any time prior to the end of August, 2025, Magnetar's obligation to bear delay rental expenses thereafter will be deemed terminated, and the obligation for the payment of subsequent delay rentals shall be governed by the subject operating agreement; (c) in the event Magnetar has not commenced actual drilling operations on lands covered by the Valentine Leases on or prior August 31, 2025, then Magnetar shall have the option to continue paying rentals or extending the leases within the Area of Mutual Interest (the "AMI") until December 31, 2026; (d) we will have the option to participate for up to a 1/3 working interest in the initial test well to be undertaken by Magnetar on lands covered by the Valentine Leases, with this right to extend to subsequent wells to be undertaken by Magnetar, subject to the further provisions regarding operations; and (e) at least three working days prior to its spudding the initial test well, Magnetar will pay to us a spud fee of $600,000 of which $240,000 of the cost thereof will be shared with ORX Exploration and $120,000 will be shared with Zebrowski Consulting, leaving us with $240,000.

Table of Contents

Also concurrent with the closing of the above transactions with Wildcat, we enter into and closed a Participation Agreement with Magnetar under which we sold to Magnetar a 100% working interest, entitled to not less than a 75% net revenue interest, in and to the Panther Leases covering approximately 618 gross acres of land situated within the AMI provided therein, along with a 100% right, title and interest in all contracts affecting the Panther Leases, for the following consideration: (a) Magnetar paid $428,918.05 to us and $70,081.95 to MPC for delay rentals paid by it; (b) Magnetar agrees to reimburse McCabe for its payment of delay rentals to sustain certain of the Panther Leases coming due in March and April 2024 in the amount of $70,081.98; (c) Magnetar agrees to pay all delay rentals pertaining to the Panther Leases which accrue during calendar year 2024, shown to be $23,888.90; (d) in the event Magnetar is unable to commence actual drilling operations on lands covered by the Subject Panther Leases on or prior February 1, 2025, then Magnetar shall have the option to extend or take new leases on any of the Panther Leases that would expire during the following 12 calendar months; (e) we will have the option to participate up to a 1/3 working interest in the initial test well to be undertaken by Magnetar on lands covered by the Panther Leases, with this right to extend to subsequent wells to be undertaken by Magnetar, subject to the further provisions regarding operations; (f) prior to its spudding the initial test well, Magnetar will pay to us a spud fee equal to $100,000 of which $20,000 will be shared with Zebrowski Consulting.

**Oil and Natural Gas Reserves.**

Other than the Producing Hazel Wells (defined below), the only producing properties owned by us were the Oklahoma Properties, which were marginally producing and were uneconomic for reserve calculation purposes. At the end of 2023, reserves did not include any value for proved undeveloped properties.

We currently have two producing wells located on the Hazel Project, the Flying B Ranch #3H well and the Flying B Ranch #4H well (the "Producing Hazel Wells"). Production is from the Wolfcamp formation. At December 31, 2023, there were no proved reserves or proved developed nonproducing reserves related to these properties after giving effect to the obligation to reimburse drilling costs incurred by MHP.

The initial gross monthly production rate for the Flying B Ranch #4H was estimated to be 4,200 Bbl, although we will receive no future revenue from these wells until their estimated depletion because all of such revenue, after deducting expenses to produce the oil, is to be received by MHP directly and credited toward the recoupment of drilling costs incurred by MHP.

As of December 31, 2023, our proved developed nonproducing reserves related to the Producing Hazel Wells totaled -0- BOE, after giving effect to the obligation to reimburse drilling costs incurred by MHP. As of December 31, 2023, the outstanding cost reimbursement balance owed to MHP was $3,364,823.

Table of Contents

**Production, Price and Cost Summary.**

Oklahoma Properties

During the year ended December 31, 2022, we produced and sold 183 Bbls net to our interest (168 for the predecessor period plus 15 for the successor period) at an average sale price of $98.75 per Bbl. We produced and sold 3,031 Mcf of natural gas net to our interest (2,789 for the predecessor period plus 242 for the successor period) at an average sales price of $7.51 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $42.68 per BOE. Our depreciation, depletion, and amortization expense was $-0- per BOE.

During the year ended December 31, 2023, we produced and sold 244 barrels of oil net to our interest at an average sale price of $76.50 per Bbl. We produced and sold 3,558 Mcf of gas net to our interest at an average sales price of $2.07 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $18.90 per BOE. Our depreciation, depletion, and amortization expense was $-0- per BOE.

Hazel Project

During the year ended December 31, 2022, 22,511 barrels of oil net to our interest (21,647 for the predecessor period plus 864 for the successor period) were sold at an average sale price of approximately $55.98 per Bbl, although we received none of this revenue because all of it, after deducting expenses to produce the oil, was either received by MHP directly during the time that the Option Agreement was in effect or credited towards the recoupment of drilling costs incurred by MHP. We produced and sold -0- Mcf of natural gas net to our interest.

| | December 31, 2022 Reserves | | | December 31, 2022 Future Net Revenue (M$) | |
|---|---|---|---|---|---|
| **Category** | **Oil (Bbls)** | **Gas (Mcf)** | **Total (BOE)** | **Total** | **Present Value Discounted at 10%** |
| Net Proved Producing | 0 | 0 | 0 | $ - | $ - |
| Net Proved Nonproducing | 0 | 0 | 0 | $ - | $ - |
| Total Net Proved | 0 | 0 | 0 | $ - | $ - |
| Standardized Measure of Future Net Cash Flows Related to Proved Oil and Gas Properties | | | | | $ - |
| Probable Undeveloped | | | | $ - | $ - |

During the year ended December 31, 2023, 10,860 barrels of oil net to our interest were sold at an average sale price of approximately $70.99 per Bbl, although we received none of this revenue because all of it, after deducting expenses to produce the oil, was either received by MHP directly during the time that the Option Agreement was in effect or credited towards the recoupment of drilling costs incurred by MHP. We produced and sold -0- Mcf of natural gas net to our interest.

| | December 31, 2023 Reserves | | | December 31, 2023 Future Net Revenue (M$) | |
|---|---|---|---|---|---|
| **Category** | **Oil (Bbls)** | **Gas (Mcf)** | **Total (BOE)** | **Total** | **Present Value Discounted at 10%** |
| Net Proved Producing | 0 | 0 | 0 | $ 0 | $ 0 |
| Net Proved Nonproducing | 0 | 0 | 0 | $ - | $ - |
| Total Net Proved | 0 | 0 | 0 | $ - | $ - |
| Standardized Measure of Future Net Cash Flows Related to Proved Oil and Gas Properties | | | | | $ - |
| Probable Undeveloped | 0 | 0 | 0 | $ - | $ - |

The net producing reserves from 2022 and 2023 were -0- BOE related to the Producing Hazel Wells due to the obligation to pass revenue through to MHP under the terms of the Option Agreement effective during both periods. Since we have no reserve value as of December 31, 2022 and December 31, 2023, Standardized Measure is not presented.

Due to the inherent uncertainties and the limited nature of reservoir data, both proved and probable reserves are subject to change as additional information becomes available. The estimates of reserves, future cash flows, and present value are based on various assumptions, including those prescribed by the SEC, and are inherently imprecise.

Table of Contents

Investments to support our oil and natural gas properties during the years ended December 31, 2023 and 2022 were $9.7 million and $5.8 million ($3.8 million for the predecessor period plus $2.0 million for the successor period), respectively.

| | Fiscal year Ended December 31 | |
|---|---|---|
| | 2023 | 2022 |
| Property acquisition costs | $ - | $ - |
| Development costs | $ 27,167,415 | $ 6,882,881 |
| Exploratory costs | $ - | $ - |
| Totals | $ 27,167,415 | $ 6,882,881 |

Development costs for the year ended December 31, 2023, stated above include $16,015,592 representing the value of 83,358,275 shares of common stock and cancellation of an account receivable given in exchange for 33.5% working interest in the Company's Orogrande Project.

Property development costs presented above exclude interest capitalized into the full cost pool. For the years ended December 31, 2023 and 2022, we capitalized $2,498,184 and $1,363,538 ($1,289,328 for the predecessor period plus $74,210 for the successor period) of interest on unevaluated properties, respectively.

The development costs 2023 and 2022 include work solely in the Orogrande Project. We made progress during 2023 and 2022 to develop proved producing reserves in the Orogrande Project in the Permian Basin in West Texas, which has not yet resulted in hydrocarbon production. We incurred costs of $9.7 million in 2023 and $5.8 million in 2022 related to certain drilling activity carried out to remain in compliance with all aspects of our lease obligations and to satisfy the continuous drilling clause under the agreement with University Lands, whereby we are obligated to satisfy certain minimum yearly requirements that may be exceeded if desired. Additionally, the Company and certain investor participants entered into twenty-five separate Participation Agreements to conduct drilling of wells in the Company's approximately 17,000 acre Johnson Prospect in Hudspeth County, Texas, which is a portion of the Company's Orogrande Prospect to satisfy the 2023 drilling requirement.

No development costs were incurred in 2023 or 2022 for the Oklahoma Properties.

During the fiscal years ended December 31, 2023 and 2022, development and exploratory net wells were drilled as set forth in the table below.

**Drilling Activity Summary.**

| | **December 31,** | |
|---|---|---|
| | **2023** | **2022** |
| Hazel Project (Texas) | | |
| Dry | 0 | 0 |
| Productive | 0 | 0 |
| Orogrande Project (Texas) | | |
| Dry | 0 | 0 |
| Productive | 5 | 5 |

Effective as of October 6, 2023, the Company and certain investor participants entered into twenty-five separate Participation Agreements to conduct drilling of wells in approximately 17,000 acre Johnson Prospect in Hudspeth County, Texas, which is a portion of the Company's Orogrande Prospect.

Pursuant to the Participation Agreement, the Participants collectively funded the cost of drilling which was used to (i) acquire the rights to drill on the Johnson Prospect and (ii) finance the drilling of five (5) vertical wells in the Johnson Prospect in connection with the Company's 2023 drilling program requirements under its University Lands Drilling and Development Unit Agreement.

The Participation Agreement provides for an initial allocation of the working interests and net revenue interests among each Participant and the Company and then a re-allocation upon payout or payment to such Participant of drilling and completion costs for each well drilled. Following payout, the Company will own 25% of working interest and 18.75% net revenue interest in each well.

| | **December 31, 2023** | | **December 31, 2022** | |
|---|---|---|---|---|
| | **Gross** | **Net** | **Gross** | **Net** |
| ***Productive Wells*** | | | | |
| Oil | 7.00 | 2.67 | 5.00 | 2.67 |
| Gas | 7.00 | 2.66 | 4.00 | 2.66 |
| ***Test Wells*** | | | | |
| Salt Water Disposal | 3.00 | 2.13 | 3.00 | 2.13 |
| Fresh Water Supply | 3.00 | 2.00 | 3.00 | 2.00 |
| Plug & Abandon | 5.00 | 3.87 | 5.00 | 3.87 |

Well status as of December 31, 2023 includes the five wells drilled under the Participation Agreements and which satisfied the 2023 drilling requirement. Since the Participants hold the working interest in those wells until payout, the Net Interest is unchanged from 2022.

Table of Contents

With the principal goal of gathering scientific data from a strategy of drilling test wells, all wells were drilled with the intent of being completed and productive for hydrocarbons. Two horizontal wells were successfully completed for hydrocarbons through the 2020 drilling program, however as of December 31, 2023 both wells remain shut-in waiting for hook-up to a gas pipeline. The various wells drilled on the Orogrande Basin through 2023 confirmed that there are at least five potential distinct reservoirs under our acreage. While these wells may have potential to produce hydrocarbons to sell commercially in the future, due to capital constraints we have no immediate plans to deploy the capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including well locations, target depths and designated acreage, in the Orogrande Project. The remaining wells can be used for future development for various applications such re-entering the wellbores for horizontal unconventional development, fresh water supply, or salt water disposal and/or plugged and abandoned.

**Producing Well Summary.**

**Acreage.**

The Orogrande Project consists of unevaluated and undeveloped properties in progress of development for future production.

| | Total Acres | | Developed Acres | | Undeveloped Acres | |
|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net |
| **Texas-** | | | | | | |
| Orogrande Project | 134,000 | 134,000 | - | - | 134,000 | 134,000 |
| Hazel Project | 645 | 516 | 645 | 516 | - | - |
| **Oklahoma-** | | | | | | |
| Viking | 640 | 192 | 640 | 192 | - | - |
| Total | 135,285 | 134,708 | 1,285 | 708 | 134,000 | 134,000 |

**Marketing and Customers.**

The market for any oil and natural gas that we may produce depends on factors beyond our control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, demand for oil and natural gas, the marketing of competitive fuels, and the effects of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial, and individual consumers.

Our oil production is expected to be sold at prices tied to the spot oil markets. Our natural gas production is expected to be sold under short-term contracts and priced based on first of the month index prices or on daily spot market prices. We will rely on our operating partners to market and sell our production.

**Competition.**

The oil and gas industry is highly competitive. Competitors include major oil companies, other independent energy companies and individual producers and operators, many of which have financial resources, personnel and facilities substantially greater than we do. We face intense competition for the acquisition of oil and natural gas properties and leases for oil and gas exploration. Not only do our competitors explore for and produce oil and natural gas, but also many carry on midstream and refining operations and market petroleum and other products on a regional, national, or worldwide basis. The operations of other companies may be able to pay more for exploratory prospects and productive oil and natural gas properties. They may also have more resources to define, evaluate, bid for, and purchase a greater number of properties and prospects than our financial or human resources permit. Our larger or integrated competitors may have the resources to be better able to absorb the burden of current and future federal, state, and local laws and regulations more easily than we can, which would adversely affect our competitive position. Our ability to locate reserves and acquire interests in properties in the future will be dependent upon our ability and resources to evaluate and select suitable properties and consummate transactions in this highly competitive environment. In addition, we may be at a disadvantage in producing oil and natural gas properties and bidding for exploratory prospects because we have fewer financial and human resources than other companies in our industry. Should a larger and better financed company decide to directly compete with us, and be successful in its efforts, our business could be adversely affected.

Table of Contents

**Regulation.**

Our oil and natural gas development operations are subject to stringent and complex federal, state, tribal, regional and local environmental, health and safety laws and regulations governing, among other factors, worker safety and health, the discharge and disposal of substances into the environment, and the protection of the environment and natural resources. Numerous governmental entities, including the U.S. Environmental Protection Agency ("EPA") and analogous state and local agencies, (and, under certain laws, private individuals) have the power to enforce compliance with these laws and regulations and any permits issued under them. These laws and regulations may, among other things: (i) require permits to conduct exploration, drilling, water withdrawal, wastewater disposal and other production related activities; (ii) govern the types, quantities and concentrations of substances, including emissions of CO2, methane and certain other greenhouse gases ("GHG"), that may be disposed or released into the environment or injected into formations in connection with drilling or production activities, and the manner of any such disposal, release, or injection; (iii) limit or prohibit construction or drilling activities or require formal mitigation measures in sensitive areas such as wetlands, wilderness areas or areas inhabited by endangered or threatened species; (iv) require investigatory and remedial actions to mitigate pollution conditions arising from the Company's operations or attributable to former operations; (v) impose safety and health restrictions designed to protect employees and others from exposure to hazardous or dangerous substances; and (vi) impose obligations to reclaim and abandon well sites and pits.

Certain existing environmental and occupational safety and health laws and regulations to which our business operations are subject including, the Clean Air Act, as amended (the "CAA"), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the Federal Resource Conservation and Recovery Act ("RCRA"), Federal Water Pollution Control Act of 1972 as amended by the Oil Pollution Act of 1990, EPA rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of a leak detection and repair ("LDAR") program under the CAA's New Source Performance Standards in 40 C.F.R. Part 60, Subpart OOOOa ("Quad Oa"), the Federal Occupational Safety and Health Act ("OSHA") and other state equivalent laws and regulations. For further discussion of the risks to our results of operations arising out of our environmental regulatory compliance, see "Risks Relating to Our Business", including the following risk factors "*-Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict*," "*-Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays*," and "*-Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce.*"

**Environmental Matters.**

Our operations and properties are and will be subject to extensive and changing federal, state, and local laws and regulations relating to environmental protection, including the generation, storage, handling, emission, transportation, and discharge of materials into the environment, and relating to safety and health. In the future, environmental legislation and regulation may trend toward stricter standards. These laws and regulations may, for example:

- require the acquisition of a permit or other authorization before construction or drilling commences and for certain other activities;
- limit or prohibit construction, drilling, and other activities on certain lands lying within wilderness and other protected areas;
- impose substantial liabilities for pollution resulting from operations; or
- restrict certain areas from fracking and other stimulation techniques.

The permits required for our operations may be subject to revocation, modification, and renewal by issuing authorities. Governmental authorities have the power to enforce their regulations, and violations are subject to fines or injunctions, or both. In the opinion of management, we are and will be in substantial compliance with current applicable environmental laws and regulations and have no material commitments for capital expenditures to comply with existing environmental requirements. Nevertheless, changes in existing environmental laws and regulations or in interpretations thereof could have a significant impact on our company, as well as the oil and natural gas industry in general.

CERCLA and comparable state statutes impose strict, joint, and several liability on owners and operators of sites and on persons who disposed of or arranged for the disposal of "hazardous substances" found at such sites. It is not uncommon for the neighboring landowners and other third parties to file claims for personal injury and property damage allegedly caused by hazardous substances released into the environment. The RCRA and comparable state statutes govern the disposal of "solid waste" and "hazardous waste" and authorize the imposition of substantial fines and penalties for noncompliance. Although CERCLA currently excludes petroleum from its definition of "hazardous substance," state laws affecting our operations may impose clean-up liability relating to petroleum and petroleum related products. In addition, although RCRA classifies certain oil field wastes as "non-hazardous," such exploration and production wastes could be reclassified as hazardous wastes thereby making such wastes subject to more stringent handling and disposal requirements.

The Endangered Species Act ("ESA") seeks to ensure that activities do not jeopardize endangered or threatened animal, fish, and plant species, nor destroy or modify the critical habitat of such species. Under the ESA, exploration and production operations, as well as actions by federal agencies, may not significantly impair or jeopardize protected species or habitat. The ESA provides for criminal and civil penalties for violations. Other statutes that provide protection to animal and plant species and that may apply to our operations include, but are not necessarily limited to, the Fish and Wildlife Coordination Act, the Fishery Conservation and Management Act, the Migratory Bird Treaty Act and the National Historic Preservation Act. Although we believe that our operations are and will be in substantial compliance with such statutes, any change in these statutes or any reclassification of a species as endangered could subject us to significant expenses to modify our operations or could force us to discontinue certain operations altogether.

Table of Contents

Hydraulic fracturing is regulated by state and federal environmental and oil and gas regulatory authorities, including specifically the requirement to disclose certain information related to hydraulic fracturing operations. Operators must follow applicable legal requirements for groundwater protection and are subject to supervision by state and federal regulators (including the U.S. Department of the Interior Bureau of Land Management ("BLM") on federal acreage). Furthermore, well construction practices require the installation of multiple layers of protective steel casing surrounded by cement that are specifically designed and installed to protect freshwater aquifers by preventing the migration of fracturing fluids into aquifers. Regulatory proposals in some states and local communities have been initiated to require or make more stringent the permitting and compliance requirements for hydraulic fracturing operations. Federal and state agencies have continued to assess the impacts of hydraulic fracturing, which could spur further action toward federal and/or state legislation and regulation of hydraulic fracturing activities. In addition, in light of concerns about seismic activity being triggered by the injection of produced waters into underground wells and hydraulic fracturing, certain regulators are also considering additional requirements related to seismic safety for hydraulic fracturing activities. Further restrictions on hydraulic fracturing could make it prohibitive to conduct our operations, and also reduce the amount of oil and natural gas that we or our operators are ultimately able to produce from our properties.

**Climate Change.**

Significant studies and research have been devoted to climate change and global warming, and climate change has developed into a major political issue in the United States and globally. Certain research suggests that GHG emissions contribute to climate change and pose a threat to the environment. Recent scientific research and political debate has focused in part on carbon dioxide and methane incidental to oil and natural gas exploration and production. Many states and the federal government have enacted legislation directed at controlling GHG emissions, and future legislation and regulation could impose additional restrictions or requirements in connection with our drilling and production activities and favor use of alternative energy sources, which could affect operating costs and demand for oil products. As such, our business could be materially adversely affected by domestic and international legislation targeted at controlling climate change.

**Human Capital.**

The health and safety of our employees and those that work with us is a priority. Employees and contractors are expected to take all necessary and reasonable actions to ensure safe operations by following safe work practices, complying with relevant policies and regulations, and completing all applicable training. To support our dedication to health, safety and the environment, we have a health and safety policy and that applies to all employees and contractors. In addition to adoption of our employment policies, the Company fosters a strong safety culture through training.

**Corporate Information.**

Our principal executive office is located at 6300 Ridglea Place, Suite 950, Fort Worth, TX 76116. We currently share this office space with companies owned by our CEO, Gregory McCabe, and believe that the condition and size of those offices are adequate for our current needs. Our website is nextbridgehydrocarbons.com. Information contained on or accessible through our website, when available, shall not be incorporated by reference herein.

**Available Information.**

We file annual, quarterly and current reports, proxy statements and other documents with the SEC under the Securities Exchange Act of 1934. The SEC maintains a website that contains reports, proxy and information statements, and other information that is electronically filed with the SEC. The public can obtain any documents that we file with the SEC at www.sec.gov. We also make available free of charge on our website, our Annual Report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and, if applicable, amendments to those reports filed or furnished pursuant to Section 13(a) of the Exchange Act as soon as reasonably practicable after we file such material with, or furnish it to, the SEC.

## Item 1A. Risk Factors

You should carefully consider the following material risk factors as well as the other information contained or incorporated by reference in this report, as these important factors, among others, could cause our actual results to differ from our expected or historical results. It is not possible to predict or identify all such factors. Consequently, you should not consider any such list to be a complete statement of all of our potential risks or uncertainties. Based on the information currently known to us, we believe the following information identifies the most material risk factors affecting us, but the below risks and uncertainties are not the only ones related to our businesses and are not necessarily listed in the order of their significance.

Additional risks and uncertainties not presently known to us or that we currently believe to be immaterial may also adversely affect our business.

**Risks Related to Our Business and Growth Strategy.**

***We have a limited operating history relative to larger companies in our industry and may not be successful in developing profitable business operations.***

We have a limited operating history relative to larger companies in our industry. Our business operations must be considered in light of the risks, expenses and difficulties frequently encountered in establishing a business in the oil and natural gas industry. As of the date of this report, we have generated limited revenues and have limited assets. We have an insufficient history at this time on which to base an assumption that our business operations will prove to be successful in the long-term. Our future operating results will depend on many factors, including:

- our ability to raise adequate working capital;
- the success of our development and exploration;
- the demand for oil and natural gas;
- the level of our competition;
- our ability to attract and maintain key management and employees; and
- our ability to efficiently explore, develop, produce or acquire sufficient quantities of marketable oil or natural gas in a highly competitive and speculative environment while maintaining quality and controlling costs.

To achieve profitable operations in the future, we must, alone or with others, successfully manage the factors stated above, as well as continue to develop ways to enhance our production efforts. Despite our best efforts, we may not be successful in our exploration or development efforts or obtain required regulatory approvals. There is a possibility that some, or all, of the wells in which we obtain interests may never produce oil or natural gas.

***We have limited operating history as an independent company, and our historical financial information is not necessarily representative of the results we would have achieved as an independent company and may not be a reliable indicator of our future results.***

We derived the historical financial information included in this report from Meta on a consolidated basis prior to the distribution of our common stock which was completed on December 14, 2022 (the "Spin-Off"), and this information does not necessarily reflect the results of operations and financial position we would have achieved as an independent company during the periods presented or those that we will achieve in the future. This is primarily because of the following factors:

- Prior to the Spin-Off, we operated as part of Meta's broader corporate organization, and Meta performed various corporate functions for us. Our historical financial information reflects allocations of corporate expenses from Meta for these and similar functions. These allocations may not reflect the costs we will incur for similar services in the future as an independent company.
- We entered into certain transactions with Meta that did not exist prior to the Spin-Off, which may cause us to incur new costs.
- Our historical financial information does not reflect changes that we expect to experience in the future as a result of our separation from Meta, including changes in our cost structure, personnel needs, tax structure, financing and business operations. As part of Meta, we enjoyed certain benefits from Meta's operating diversity, size, purchasing power, borrowing leverage and available capital for investments, which are no longer available to us. As an independent entity, we may be unable to purchase goods, services and technologies, such as insurance and health care benefits and computer software licenses or access capital markets on terms as favorable to us as those we obtained as part of Meta prior to the Spin-Off.

Table of Contents

We are now responsible for the additional costs associated with being an independent company, including costs related to corporate governance, investor and public relations and public reporting. In addition, certain costs incurred by Meta, including executive oversight, accounting, treasury, tax, legal, human resources, occupancy, procurement, information technology and other shared services, have historically been allocated to us by Meta; but these allocations may not reflect the future level of these costs to us as we begin to provide these services ourselves. Therefore, our historical financial statements may not be indicative of our future performance as an independent company. We cannot assure you that our operating results will continue at a similar level when we are an independent company. For additional information about our past financial performance and the basis of presentation of our financial statements, see "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the notes thereto included elsewhere in this report.

***We have limited capital and will need to raise additional capital in the immediate future.***

We continue to require additional capital to maintain operations and to expand our exploration and development programs. We may be unable to obtain additional capital when required or on favorable terms. Future acquisitions, exploration, development, production and marketing activities, as well as our administrative requirements (such as salaries, insurance expenses and general overhead expenses, as well as legal compliance costs and accounting expenses) will require a substantial amount of additional capital and cash flow.

We may pursue sources of additional capital through various financing transactions or arrangements, including joint venturing of projects, debt financing, equity financing, or other means. We may not be successful in identifying suitable financing transactions in the time period required or at all, and we may not obtain the capital we require by other means. If we do not succeed in raising additional capital, our resources may not be sufficient to fund our planned operations.

Our ability to obtain financing, if and when necessary, may be impaired by such factors as the capital markets (both generally and in the oil and natural gas industry in particular), our limited operating history, the location of our oil and natural gas properties and prices of oil and natural gas on the commodities markets (which will impact the amount of asset-based financing available to us, if any) and the departure of key employees. Further, if oil or natural gas prices on the commodities markets decline, our future revenues, if any, will likely decrease and such decreased revenues may increase our requirements for capital. If the amount of capital we are able to raise from financing activities, together with our revenues from operations, is not sufficient to satisfy our capital needs (even to the extent that we reduce our operations), third parties may be reluctant to provide the services we need in order to operate and we may be required to cease our operations, divest our assets at unattractive prices or obtain financing on unattractive terms.

Any additional capital raised through the sale of equity may dilute the ownership percentage of our stockholders. Raising any such capital could also result in a decrease in the fair market value of our equity securities because our assets would be owned by a larger pool of outstanding equity. The terms of securities we issue in future capital transactions may be more favorable to our new investors, and may include preferences, superior voting rights and the issuance of other derivative securities, and issuances of incentive awards under equity employee incentive plans, which may have a further dilutive effect.

We may incur substantial costs in pursuing future capital financing, including investment banking fees, legal fees, accounting fees, securities law compliance fees, printing and distribution expenses and other costs. We may also be required to recognize non-cash expenses in connection with certain securities we may issue, which may adversely impact our financial condition.

***We may not achieve or maintain profitable operations, and therefore, may not be able to continue as a going concern.***

The Company has a history of net losses from operations and negative cash flow from operating activities. We will need to raise additional working capital to continue our normal and planned operations. We will also need to generate and sustain significant revenue levels in future periods in order to become profitable, and, even if we do, we may not be able to maintain or increase our level of profitability. During the year ended December 31, 2023, we incurred a net loss of $37,556,787 and used cash in the amount of $7,358,747 for operating activities for the year ended December 31, 2023. At December 31, 2023, we had an accumulated deficit of $119,219,378 and had a working capital deficit of $47,094,367 compared with a working capital deficit of $30,133,717 as of December 31, 2022, as restated. These factors raise doubt regarding our ability to continue as a going concern. Because we have incurred significant net losses, our auditors have issued a "going concern" audit qualification. A "going concern" qualification indicates that the financial statements have been prepared assuming we will continue as a going concern and do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets, or the amounts and classification of liabilities that may result if we do not continue as a going concern. Therefore, you should not rely on our consolidated balance sheet as an indication of the amount of proceeds that would be available to satisfy claims of creditors, and potentially be available for distribution to stockholders, in the event of liquidation.

Table of Contents

***There can be no assurance that our financing strategy or strategic alternatives will result in a transaction satisfactory to holders of our common stock.***

We may consider various strategic alternatives, including partnering with third parties, a potential sale of some or all of our assets, a merger transaction, and potential financing alternatives. Even if a partnering transaction, sale, merger or financing transaction were to be consummated, it may not return any value to holders of our common stock. Regardless of whether we execute a partnership, sale, merger or financing transaction, the adverse pressures negatively impacting our business that we have been or are currently experiencing may continue or intensify, including the risk that we may not be able to continue as a going concern.

***We are mainly concentrated in one geographic area, which increases our exposure to many of the risks enumerated herein.***

Operating in a concentrated area increases the potential impact that many of the risks stated herein may have upon our ability to perform. For example, we have greater exposure to regulatory actions impacting Texas, natural disasters in the geographic area, competition for equipment, services and materials available in the area and access to infrastructure and markets. In addition, the effect of fluctuations on supply and demand may become more pronounced within specific geographic oil and natural gas producing areas such as the Permian Basin, which may cause these conditions to occur with greater frequency or magnify the effect of these conditions. Due to the concentrated nature of our portfolio of properties, a number of our properties could experience any of the same conditions at the same time, resulting in a relatively greater impact on our results of operations than they might have on other companies that have a more diversified portfolio of properties. Such delays or interruptions could have a material adverse effect on our financial condition and results of operations.

***Because of the speculative nature of oil and natural gas exploration, there is risk that we will not find commercially exploitable oil and natural gas and that our business will fail.***

The search for commercial quantities of oil and natural gas as a business is extremely risky. We cannot provide investors with any assurance that any properties in which we obtain a mineral interest will contain commercially exploitable quantities of oil and/or natural gas. The exploration expenditures to be made by us may not result in the discovery of commercial quantities of oil and/or natural gas. Problems such as unusual or unexpected formations or pressures, premature declines of reservoirs, invasion of water into producing formations and other conditions involved in oil and natural gas exploration often result in unsuccessful exploration efforts. If we are unable to find commercially exploitable quantities of oil and natural gas, and/or we are unable to commercially extract such quantities, we may be forced to abandon or curtail our business plan, and as a result, any investment in us may become worthless.

***Litigation may adversely affect our business, financial condition, and results of operations.***

Certain of our subsidiaries are subject and from time to time in the normal course of our business operations, may become subject to litigation that may result in liability material to our financial statements as a whole or may negatively affect our operating results if changes to our business operations are required. The cost to defend such litigation may be significant and may require a diversion of our resources. There also may be adverse publicity associated with litigation that could negatively affect customer perception of our business, regardless of whether the allegations are valid or whether we are ultimately found liable. Insurance may not be available at all or in sufficient amounts to cover any liabilities with respect to these or other matters. A judgment or other liability in excess of our insurance coverage for any claims could adversely affect our business and the results of our operations. For additional discussion of pending litigation matters, see "Management's Discussion and Analysis of Financial Condition and Results of Operations-Legal Proceedings."

***Strategic relationships upon which we may rely are subject to change, which may diminish our ability to conduct our operations.***

Our ability to successfully acquire oil and natural gas interests, to build our reserves, to participate in drilling opportunities and to identify and enter into commercial arrangements with customers will depend on developing and maintaining close working relationships with industry participants and our ability to select and evaluate suitable properties and to consummate transactions in a highly competitive environment. These realities are subject to change and our inability to maintain close working relationships with industry participants or continue to acquire suitable property may impair our ability to execute our business plan.

To continue to develop our business, we will endeavor to use the business relationships of our management to enter into strategic relationships, which may take the form of joint ventures with other private parties and contractual arrangements with other oil and natural gas companies, including those that supply equipment and other resources that we will use in our business. We may not be able to establish these strategic relationships, or if established, we may not be able to maintain them. In addition, the dynamics of our relationships with strategic partners may require us to incur expenses or undertake activities we would not otherwise be inclined to in order to fulfill our obligations to these partners or maintain our relationships. If our strategic relationships are not established or maintained, our business prospects may be limited, which could diminish our ability to conduct our operations.

Table of Contents

***Our acreage must be drilled before lease expiration in order to hold the acreage by production. In the highly competitive market for acreage, failure to drill sufficient wells in order to hold acreage will result in a substantial lease renewal cost, or if renewal is not feasible, loss of our lease and prospective drilling opportunities.***

Our leases on oil and natural gas properties typically have a primary term of four to five years, after which they expire unless, prior to expiration, drilling obligations are fulfilled or production is established within the spacing units covering the undeveloped acres. As of December 31, 2023, we had leases representing approximately 134,000 net acres in the Orogrande Basin in West Texas expiring on December 31, 2024 if we fail to drill five wells in 2024 as obligated. Unless we are able to negotiate an extension on these leases, these leases in the Orogrande Basin are also subject to expiration December 31, 2024 in the event we fail to drill an additional five wells during the 2024 calendar year. We will require additional capital to drill these wells, and we may not be able to obtain additional capital when required in order to drill these wells, or on favorable terms. As of December 31, 2023, we had leases representing 645 net acres in the Eastern edge of the Midland Basin in West Texas, which are currently held by production by active wells. In the event that we fail to meet our drilling obligations in the Orogrande Basin, whether because we are unable to obtain additional capital when required or otherwise, or if production ceases in the Midland Basin, our leases will expire. If we have to renew such leases on new terms, we could incur significant cost increases, and we may not be able to renew such leases on commercially reasonable terms or at all. In addition, on certain portions of our acreage, third-party leases may become immediately effective if our leases expire. As such, our actual drilling activities may materially differ from our current expectations, which could adversely affect our business.

***The price of oil and natural gas has historically been volatile. If it were to decrease substantially, our projections, budgets, and revenues would be adversely affected, potentially forcing us to make changes in our operations.***

Our future financial condition, results of operations and the carrying value of any oil and natural gas interests we acquire will depend primarily upon the prices paid for oil and natural gas production. Oil and natural gas prices historically have been volatile and likely will continue to be volatile in the future, especially given current world geopolitical conditions. Cash flows from operations are highly dependent on the prices that we receive for oil and natural gas. This price volatility could affect the amount of our cash flows available for capital expenditures and our ability to borrow money or raise additional capital. The prices for oil and natural gas are subject to a variety of additional factors that are beyond our control. These factors include:

- the level of consumer demand for oil and natural gas;
- the domestic and foreign supply of oil and natural gas;
- the ability of the members of the Organization of Petroleum Exporting Countries (“OPEC”) to agree to and maintain oil price and production controls;
- the price of foreign oil and natural gas;
- domestic governmental regulations and taxes;
- the price and availability of alternative fuel sources;
- weather conditions;
- market uncertainty due to political conditions in oil and natural gas producing regions, including the Middle East; and
- worldwide economic conditions.

These factors as well as the volatility of the energy markets generally make it extremely difficult to predict future oil and natural gas price movements with any certainty. Declines in oil and natural gas prices affect our revenues and could reduce the amount of oil and natural gas that we can produce economically. Accordingly, such declines could have a material adverse effect on our financial condition, results of operations, oil and natural gas reserves and the carrying values of our oil and natural gas properties. If the oil and natural gas industry experiences significant price declines, we may be unable to make planned expenditures, among other things. If this were to happen, we may be forced to abandon or curtail our business operations, which would cause the value of an investment in us to decline or become worthless.

Table of Contents

In early March 2020, the market experienced a precipitous decline in oil prices in response to concerns about oil demand due to the economic impact of COVID-19 and anticipated increases in supply from Russia and OPEC, particularly Saudi Arabia.

If oil or natural gas prices reverse and go on a downward trend or drilling efforts are unsuccessful, we could be required to record additional write-downs of our oil and natural gas properties. Write-downs may occur when oil and natural gas prices are low, or if we have downward adjustments to our estimated proved reserves, increases in our estimates of operating or development costs, deterioration in drilling results or mechanical problems with wells where the cost to redrill or repair is not supported by the expected economics.

Under the full cost method of accounting, capitalized oil and natural gas property costs less accumulated depletion and net of deferred income taxes may not exceed an amount equal to the present value, discounted at 10%, of estimated future net revenues from proved oil and natural gas reserves plus the cost of unproved properties not subject to amortization (without regard to estimates of fair value), or estimated fair value, if lower, of unproved properties that are subject to amortization. Should capitalized costs exceed this ceiling, an impairment would be recognized. Additionally, periodic review of unevaluated properties may result in an impairment adjustment.

***Because of the inherent dangers involved in oil and natural gas operations, there is a risk that we may incur liability or damages as we conduct our business operations, which could force us to expend a substantial amount of money in connection with litigation and/or a settlement.***

The oil and natural gas business involves a variety of operating hazards and risks such as well blowouts, pipe failures, casing collapse, explosions, uncontrollable flows of oil, natural gas or well fluids, fires, spills, pollution, releases of toxic gas and other environmental hazards and risks. These hazards and risks could result in substantial losses to us from, among other things, injury or loss of life, severe damage to or destruction of property, natural resources and equipment, pollution or other environmental damage, cleanup responsibilities, regulatory investigation and penalties and suspension of operations. In addition, we may be liable for environmental damages caused by previous owners of property purchased and leased by us. In recent years, there has also been increased scrutiny on the environmental risk associated with hydraulic fracturing, such as underground migration and surface spillage or mishandling of fracturing fluids including chemical additives. Hydraulic fracturing technology has evolved and continues to evolve and become more aggressive. We believe that recent designs have seen improvement in, among other things, proppant per foot, barrels of water per stage, fracturing stages, and clusters per fracturing stage. In addition, we will need to quickly adapt to the evolving technology, which could take time and divert our attention to other business matters. Even with improved hydraulic fracturing technology, substantial liabilities to third parties or governmental entities may be incurred, the payment of which could reduce or eliminate the funds available for exploration, development or acquisitions or result in the loss of our properties and/or force us to expend substantial monies in connection with cleanup, litigation or settlements. While we have insurance to cover some of such losses and liabilities, it may not be adequate to cover any losses or liabilities. We cannot predict the availability of insurance or the availability of insurance at premium levels that justify our purchase. The occurrence of a significant event not fully insured or indemnified against could materially and adversely affect our financial condition and operations. We may elect to self-insure if management believes that the cost of insurance, although available, is excessive relative to the risks presented. In addition, pollution and environmental risks generally are not fully insurable. The occurrence of an event not fully covered by insurance could have a material adverse effect on our financial condition and results of operations.

***The market for oil and natural gas is intensely competitive, and competition pressures could force us to abandon or curtail our business plan.***

The market for oil and natural gas exploration services is highly competitive, and we only expect competition to intensify in the future. Numerous well-established companies are focusing significant resources on exploration and are currently competing with us for oil and natural gas opportunities. Other oil and natural gas companies may seek to acquire oil and natural gas leases and properties that we have targeted. Additionally, other companies engaged in our line of business may compete with us from time to time in obtaining capital from investors. Competitors include larger companies which, in particular, may have access to greater resources, may be more successful in the recruitment and retention of qualified employees and may conduct their own refining and petroleum marketing operations, which may give them a competitive advantage. Actual or potential competitors may be strengthened through the acquisition of additional assets and interests. Additionally, there are numerous companies focusing their resources on creating fuels and/or materials which serve the same purpose as oil and natural gas but are manufactured from renewable resources.

As a result, we may not be able to compete successfully and competitive pressures may adversely affect our business, results of operations, and financial condition. If we are not able to successfully compete in the marketplace, we could be forced to curtail or even abandon our current business plan, which could cause any investment in us to become worthless.

Table of Contents

***Inflation may adversely affect us by increasing costs beyond what we can recover through price increases and limit our ability to enter into future traditional debt financing.***

Inflation can adversely affect us by increasing costs of critical materials, equipment, labor, and other services. In addition, inflation is often accompanied by higher interest rates. Continued inflationary pressures could impact our profitability. Inflation may also affect our ability to enter into future traditional debt financing, as high inflation may result in an increase in cost.

***We may not be able to successfully manage growth, which could lead to our inability to implement our business plan.***

Any growth of the Company may place a significant strain on our managerial, operational and financial resources, especially considering that we currently only have a small number of executive officers, employees and advisors. Further, as we enter into additional contracts, we will be required to manage multiple relationships with various consultants, businesses and other third parties. These requirements will be exacerbated in the event of our further growth or in the event that the number of our drilling and/or extraction operations increases. Our systems, procedures and/or controls may not be adequate to support our operations or that our management will be able to achieve the rapid execution necessary to successfully implement our business plan. If we are unable to manage our growth effectively, our business, results of operations and financial condition will be adversely affected, which could lead to us being forced to abandon or curtail our business plan and operations.

***Developing oil and natural gas wells and producing oil and natural gas are costly and high-risk activities with many uncertainties that could adversely affect future production from our oil and natural gas properties. Any delays, reductions or cancellations in development and producing activities could materially, adversely impact the value of your shares of common stock.***

Recovery of undeveloped reserves and the development of developed non-producing reserves requires substantial capital expenditures and successful drilling operations of our oil and natural gas properties. All of the development costs related to our Hazel Project were paid by MHP. Under the Option Agreement, we granted MHP the option to acquire the Hazel Project in exchange for it conducting, and paying for, development activity sufficient to maintain the Hazel mineral leases in good standing. The Option Agreement provided that if MHP declined to exercise the option to acquire the property, we would be obligated to reimburse them for their cost of the development activity to the extent that the wells produced revenues beyond the date of the option's lapse until the total amount of development expenses are reimbursed. MHP declined to exercise the option effective September 30, 2021.

The development of such reserves may in the future take a long period of time and may require higher levels of capital expenditures than anticipated, which, for the Orogrande Project, are borne in part by the non-operating working interest owners of such properties. Delays in the development of the reserves, increases in drilling and development costs (including expenses related to secondary and tertiary recovery techniques) of such reserves or decreases or continued volatility in commodity prices will reduce the future net revenues of the estimated possible reserves and may result in some projects becoming uneconomic. In addition, delays in the development of reserves could force us to reclassify certain of the proved reserves as unproved reserves.

In addition, the process of developing oil and natural gas wells and producing oil and natural gas from our properties is subject to numerous risks beyond our control. The ability to carry out operations or to finance planned development expenses could be materially and adversely affected by any factor that may curtail, delay, reduce or cancel development and production, including:

- delays imposed by or resulting from compliance with environmental and other governmental or regulatory requirements, including permitting requirements, limitations on or resulting from wastewater discharge and disposal of exploration and production wastes, including, subsurface injections, as well as additional regulation with respect to GHG emissions;
- pressure or irregularities in geological formations;
- restricted access to land for drilling or to existing pipeline infrastructure;
- lack of available gathering, transportation and processing facilities, including availability on commercially reasonable terms, or delays in construction of gathering facilities;

- lack of available capacity on interconnecting transmission pipelines;
- equipment failures or accidents;
- failure of secondary recovery operations to perform as expected;
- unexpected operational events and drilling conditions;
- declines in oil or natural gas prices;
- limitations in the market for oil or natural gas;
- pipe or cement failures;
- casing collapses;
- shortages, unavailability or high cost of drilling rigs, tubular materials, equipment, supplies, personnel and services;
- lost or damaged drilling and service tools;
- loss of drilling fluid circulation;
- uncontrollable flows of oil and natural gas, water or drilling fluids;
- blowouts, explosions fires and natural disasters;
- environmental hazards, such as oil and natural gas leaks, pipeline and tank ruptures, encountering naturally occurring radioactive materials, and unauthorized discharges of brine, well stimulation and completion fluids, toxic gases or other pollutants into the surface and subsurface environment;
- adverse weather conditions, such as drought, floods, blizzards, tornados and ice storms; and
- title problems or legal disputes regarding leasehold rights.

***Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict.***

Oil and natural gas activities that we will engage in, including production, processing, handling and disposal of hazardous materials, such as hydrocarbons and naturally occurring radioactive materials (if any), are subject to stringent regulation. We could incur significant costs, including cleanup costs resulting from a release of hazardous material, third-party claims for property damage and personal injuries fines and sanctions, as a result of any violations or liabilities under environmental or other laws. Changes in or more stringent enforcement of environmental laws could force us to expend additional operating costs and capital expenditures to stay in compliance.

Various federal, state and local laws regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment, directly impact oil and natural gas exploration, development and production operations, and consequently may impact our operations and costs. These regulations include, among others, (i) regulations by the EPA and various state agencies regarding approved methods of disposal for certain hazardous and non-hazardous wastes; (ii) CERCLA and analogous state laws which regulate the removal or remediation of previously disposed wastes (including wastes disposed of or released by prior owners or operators), property contamination (including groundwater contamination), and remedial plugging operations to prevent future contamination; (iii) the CAA and comparable state and local requirements which regulate air emissions; (iv) the Oil Pollution Act of 1990 which contains numerous requirements relating to the prevention of and response to oil spills into waters of the United States; (v) the RCRA which is the principal federal statute governing the treatment, storage and disposal of hazardous wastes; (vi) the Federal Water Pollution Control Act and comparable state and local requirements which regulate discharges to federal and state waters; and (vii) state regulations and statutes governing the handling, treatment, storage and disposal of naturally occurring radioactive material.

We believe that we will be in substantial compliance with applicable environmental laws and regulations. We cover all costs associated with the related insurance coverage for such environmental regulatory compliance. To date, other than the cost of insurance, we have not expended any amounts to comply with such regulations, and we do not currently anticipate that future compliance will have a materially adverse effect on our consolidated financial position, results of operations or cash flows. However, if we are deemed to not be in compliance with applicable environmental laws, we could be forced to expend significant funds to be in compliance, which would have a materially adverse effect on our financial condition.

Table of Contents

***Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays.***

Several states, including Texas, and local jurisdictions, have adopted, or are considering adopting, regulations that could restrict or prohibit hydraulic fracturing in certain circumstances, impose more stringent operating standards and/or require the disclosure of the composition of hydraulic fracturing fluids. The Texas Legislature adopted legislation, effective September 1, 2011, requiring oil and natural gas operators to publicly disclose the chemicals used in the hydraulic fracturing process. The Texas Railroad Commission adopted rules and regulations implementing this legislation that apply to all wells for which the Texas Railroad Commission issues an initial drilling permit after February 1, 2012. The law requires that the well operator disclose the list of chemical ingredients subject to the requirements of OSHA for disclosure on an internet website and also file the list of chemicals with the Texas Railroad Commission with the well completion report. The total volume of water used to hydraulically fracture a well must also be disclosed to the public and filed with the Texas Railroad Commission. Also, in May 2013, the Texas Railroad Commission adopted rules governing well casing, cementing and other standards for ensuring that hydraulic fracturing operations do not contaminate nearby water resources. The rules took effect in January 2014. Additionally, on October 28, 2014, the Texas Railroad Commission adopted disposal well rule amendments designed, among other things, to require applicants for new disposal wells that will receive non-hazardous produced water and hydraulic fracturing flowback fluid to conduct seismic activity searches utilizing the U.S. Geological Survey. The searches are intended to determine the potential for earthquakes within a circular area of 100 square miles around a proposed new disposal well. The disposal well rule amendments, which became effective on November 17, 2014, also clarify the Texas Railroad Commission’s authority to modify, suspend or terminate a disposal well permit if scientific data indicates a disposal well is likely to contribute to seismic activity. The Texas Railroad Commission has used this authority to deny permits and temporarily suspend operations for waste disposal wells and, in September 2021, the Texas Railroad Commission curtailed the amount of water companies were permitted to inject into some wells in the Permian Basin, and has since indefinitely suspended some permits there and expanded the restrictions to other areas. These restrictions on use of produced water and a moratorium on new produced water disposal wells could result in increased operating costs, requiring us or our service providers to truck produced water, recycle it or pump it through the pipeline network or other means, all of which could be costly. We or our service providers may also need to limit disposal well volumes, disposal rates and pressures or locations, or require us or our service providers to shut down or curtail the injection of produced water into disposal wells. These factors may make drilling and completion activity in the affected parts of the Permian Basin less economical and adversely impact our business, results of operations and financial condition.

***Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce.***

The EPA previously published its findings that emissions of GHGs present a danger to public health and the environment because such gases are, according to the EPA, contributing to warming of the Earth’s atmosphere and other climatic changes. Based on these findings, the EPA has adopted various rules to address GHG emissions under existing provisions of the CAA. For example, the EPA has adopted rules requiring the reporting of GHG emissions from various oil and natural gas operations on an annual basis, which includes certain of our operations. In addition, in June 2016, the EPA finalized rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of an LDAR program to minimize methane emissions, under the CAA’s New Source Performance Standards Quad Oa. However, the EPA has taken several steps to delay implementation of the Quad Oa standards. The agency proposed a rulemaking in June 2017 to stay the requirements for a period of two years and in October 2018, the EPA proposed revisions to Quad Oa, such as changes to the frequency for monitoring fugitive emissions at well sites and changes to requirements that a professional engineer certify when meeting certain Quad Oa requirements is technically infeasible. In September 2020, the EPA finalized amendments to Quad Oa that rescind requirements for the transmission and storage segment of the oil and natural gas industry and rescind methane-specific limits that apply to the industry’s production and processing segments, among other things. On June 30, 2021, Congress issued a joint resolution pursuant to the Congressional Review Act disapproving the September 2020 rule, and on November 15, 2021, EPA issued a proposed rule to revise the Quad Oa regulations that, if finalized, would require methane emissions reductions and implementation of a fugitive emissions monitoring and repair program. EPA has also announced its intention to issue a supplemental proposal in 2022 that may expand on or modify the 2021 proposal in response to public input. It is possible that these rules will continue to require oil and natural gas operators to expend material sums.

In addition, in November 2016, BLM issued final rules to reduce methane emissions from venting, flaring, and leaks during oil and natural gas operations on public lands that are substantially similar to the EPA Quad Oa requirements. However, on December 8, 2017, the BLM published a final rule to temporarily suspend or delay certain requirements contained in the November 2016 final rule until January 17, 2019, including those requirements relating to venting, flaring and leakage from oil and natural gas production activities. Further, in September 2018, the BLM published a final rule to revise or rescind certain provisions of the 2016 rule. On July 21, 2020, a Wyoming federal court vacated almost all of the 2016 rule, including all provisions relating to the loss of gas through venting, flaring, and leaks, and on July 15, 2020, a California federal court vacated the 2018 rule. While, as a result of these developments, future implementation of the EPA and BLM methane rules is uncertain, given the long-term trend towards increasing regulation, future federal GHG regulations of the oil and natural gas industry remain a possibility. We may be required to expend significant costs to obtain the necessary equipment (pollution control equipment and optical gas imaging equipment for LDAR inspections) and personnel trained to assist with inspection and reporting requirements to ensure we are in compliance with these rules.

Table of Contents

***We may incur increasing attention to environmental, social and governance ("ESG") matters that may impact our business.***

Businesses across all industries are facing increasing scrutiny from stakeholders related to their ESG practices. If we do not adapt to or comply with investor or stakeholder expectations and standards, which are evolving, or if we are perceived to have not responded appropriately to the growing concern for ESG issues, regardless of whether there is a legal requirement to do so, we may suffer from reputational damage and the business, financial condition and/or the value of our common stock could be materially and adversely affected. Increasing attention to climate change, increasing societal expectations on businesses to address climate change, and potential consumer use of substitutes to energy commodities may result in increased costs, reduced demand for our hydrocarbon products, reduced profits, increased investigations and litigation, and negative impacts on our ability to access capital markets.

In addition, organizations that provided information to investors on corporate governance and related matters have developed rating processes for evaluating business entities on their approach to ESG matters. Currently, there are no universal standards for such scores or ratings, but the importance of sustainability evaluations is becoming more broadly accepted by investors and shareholders. Such ratings are used by some investors to inform their investment and voting decisions. Additionally, certain investors use these scores to benchmark businesses against their peers. If we are perceived as lagging, our investors may engage with such third party organizations to require improved ESG disclosure or performance.

***Our estimates of the volume of reserves could have flaws, or such reserves could turn out not to be commercially extractable. As a result, our future revenues and projections could be incorrect.***

Estimates of reserves and of future net revenues prepared by different petroleum engineers may vary substantially depending, in part, on the assumptions made and may be subject to adjustment either up or down in the future. Our actual amounts of production, revenue, taxes, development expenditures, operating expenses, and quantities of recoverable oil and natural gas reserves may vary substantially from the estimates. Oil and natural gas reserve estimates are necessarily inexact and involve matters of subjective engineering judgment. In addition, any estimates of our future net revenues and the present value thereof are based on assumptions derived in part from historical price and cost information, which may not reflect current and future values, and/or other assumptions made by us that only represent our best estimates. If these estimates of quantities, prices and costs prove inaccurate, we may be unsuccessful in expanding our oil and natural gas reserves base with our acquisitions. Additionally, if declines in and instability of oil and natural gas prices occur, then write downs in the capitalized costs associated with any oil and natural gas assets we obtain may be required. Because of the nature of the estimates of our reserves and estimates in general, reductions to our estimated proved oil and natural gas reserves and estimated future net revenues may not be required in the future, and/or that our estimated reserves may not be present and/or commercially extractable. If our reserve estimates are incorrect, we may be forced to write down the capitalized costs of our oil and natural gas properties.

***Decommissioning costs are unknown and may be substantial. Unplanned costs could divert resources from other projects.***

We may become responsible for costs associated with abandoning and reclaiming wells, facilities and pipelines which we use for production of oil and natural gas reserves. Abandonment and reclamation of these facilities and the costs associated therewith is often referred to as "decommissioning." We accrue a liability for decommissioning costs associated with our wells but have not established any cash reserve account for these potential costs in respect of any of our properties. If decommissioning is required before economic depletion of our properties or if our estimates of the costs of decommissioning exceed the value of the reserves remaining at any particular time to cover such decommissioning costs, we may have to draw on funds from other sources to satisfy such costs. The use of other funds to satisfy such decommissioning costs could impair our ability to focus capital investment in other areas of our business.

Table of Contents

***We may have difficulty distributing production, which could harm our financial condition.***

In order to sell the oil and natural gas that we are able to produce, if any, the operators of the wells we obtain interests in may have to make arrangements for storage and distribution to the market. We will rely on local infrastructure and the availability of transportation for storage and shipment of our products, but infrastructure development and storage and transportation facilities may be insufficient for our needs at commercially acceptable terms in the localities in which we operate. This situation could be particularly problematic to the extent that our operations are conducted in remote areas that are difficult to access, such as areas that are distant from shipping and/or pipeline facilities. These factors may affect our and potential partners' ability to explore and develop properties and to store and transport oil and natural gas production, increasing our expenses.

Furthermore, weather conditions or natural disasters, actions by companies doing business in one or more of the areas in which we will operate, or labor disputes may impair the distribution of oil and/or natural gas and in turn diminish our financial condition or ability to maintain our operations.

***The marketability of any future production will be dependent upon transportation and other facilities, certain of which we do not control. When these facilities are unavailable, our operations can be interrupted and any revenues reduced.***

The marketability of any future production depends in part upon the availability, proximity and capacity of transportation facilities owned by third parties. The oil produced will be transported from the wellhead to our tank batteries by our gathering system. Our purchasers would then transport the oil by truck to a pipeline for transportation. Our natural gas production will generally be transported by our gathering lines from the wellhead to an interconnection point with the purchaser. We do not control these trucks and other third-party transportation facilities and our access to them may be limited or denied. Insufficient production from our wells to support the construction of pipeline facilities by our purchasers or a significant disruption in the availability of our or third-party transportation facilities or other production facilities could adversely impact our ability to deliver to market or produce our production and thereby cause a significant interruption in our operations.

We may be required to flare a portion of our natural gas production for a number of reasons, including the fact that (i) our well is not yet tied into the third-party gathering system, (ii) the pressures on the third-party gathering system are too high to allow additional production from our well to be transported or (iii) our production is prorated due to high demand on the third-party gathering system. We may flare additional gas from time to time.

Also, the transfer of our oil and natural gas through third-party pipelines may be curtailed or delayed if it does not meet the quality specifications of the pipeline owners. Our access to transportation options, including trucks owned by third parties, can also be affected by U.S. federal and state regulation of oil and natural gas production and transportation, general economic conditions and changes in supply and demand. If, in the future, we are unable, for any sustained period, to implement acceptable delivery or transportation arrangements or encounter production-related difficulties, we may be required to shut in or curtail production. Any such shut in or curtailment, or an inability to obtain favorable terms for delivery of our production, would adversely affect our financial condition and results of operations.

***Our business will suffer if we cannot obtain or maintain necessary licenses.***

Our operations will require licenses, permits and in some cases renewals of licenses and permits from various governmental authorities. Our ability to obtain, sustain or renew such licenses and permits on acceptable terms is subject to change in regulations and policies and to the discretion of the applicable governments, among other factors. Our inability to obtain, or our loss of or denial of extension of, any of these licenses or permits could hamper our ability to produce revenues from our operations.

***Challenges to our properties may impact our financial condition.***

Title to oil and natural gas interests is often not capable of conclusive determination without incurring substantial expense. While we have made and intend to make appropriate inquiries into the title of properties and other development rights we have acquired and intend to acquire, title defects may exist. In addition, we may be unable to obtain adequate insurance for title defects, on a commercially reasonable basis or at all. If title defects do exist, it is possible that we may lose all or a portion of our right, title and interests in and to the properties to which the title defects relate. If our property rights are reduced, our ability to conduct our exploration, development and production activities may be impaired. To mitigate title problems, common industry practice is to obtain a title opinion from a qualified oil and natural gas attorney prior to the drilling operations of a well.

Table of Contents

***We rely on technology to conduct our business, and our technology could become ineffective or obsolete.***

We rely on technology, including geographic and seismic analysis techniques and economic models, to develop any reserve estimates and to guide our exploration, development and production activities. We and our operator partners will be required to continually enhance and update our technology to maintain its efficacy and to avoid obsolescence. The costs of doing so may be substantial and may be higher than the costs that we anticipate for technology maintenance and development. If we are unable to maintain the efficacy of our technology, our ability to manage our business and to compete may be impaired. Further, even if we are able to maintain technical effectiveness, our technology may not be the most efficient means of reaching our objectives, in which case we may incur higher operating costs than we would were our technology more efficient.

***The loss of key personnel would directly affect our efficiency and profitability.***

Our future success is dependent, in a large part, on retaining the services of our planned management team. Our executive officers possess a unique and comprehensive knowledge of our industry and related matters that are vital to our success within the industry. The knowledge, leadership and technical expertise of these individuals would be difficult to replace. The loss of one or more of our officers could have a material adverse effect on our operating and financial performance, including our ability to develop and execute our long-term business strategy. We do not maintain key-man life insurance with respect to any employees.

***We have limited management and staff and are dependent upon partnering arrangements and third-party service providers.***

We have five full-time employees, including our Chief Executive Officer and Chief Financial Officer. The loss of these individual would have an adverse effect on our business, as we have very limited personnel. We leverage the services of other independent consultants and contractors to perform various professional services, including engineering, oil and natural gas well planning and supervision, and land, legal, environmental and tax services. We also pursue alliances with partners in the areas of geological and geophysical services and prospect generation, evaluation and prospect leasing. Our dependence on third-party consultants and service providers create a number of risks, including but not limited to:

- the possibility that such third parties may not be available to us as and when needed; and
- the risk that we may not be able to properly control the timing and quality of work conducted with respect to our projects.

If we experience significant delays in obtaining the services of such third parties or they perform poorly, our results of operations and stock price could be materially adversely affected.

***Certain of our directors and officers have significant duties with, and spend significant time serving, entities that may compete with us in seeking acquisitions and business opportunities and, accordingly, may have conflicts of interest in allocating time or pursuing business opportunities.***

Certain of our directors and officers, who are responsible for managing the direction of our operations and acquisition activities, hold positions of responsibility with other entities that are in the business of identifying and acquiring oil and natural gas properties. The existing positions held by these directors and officers may give rise to fiduciary or other duties that are in conflict with the duties they owe to us. These directors and officers may become aware of business opportunities that may be appropriate for presentation to us as well as to the other entities with which they are or may become affiliated. Due to these existing and potential future affiliations, they may present potential business opportunities to other entities prior to presenting them to us, which could cause additional conflicts of interest. They may also decide that certain opportunities are more appropriate for other entities with which they are affiliated, and as a result, they may elect not to present those opportunities to us. These conflicts may not be resolved in our favor.

***Our business and operations may be adversely affected by the COVID-19 pandemic and may be adversely affected by other similar outbreaks.***

As a result of the COVID-19 pandemic or other adverse public health developments, including voluntary and mandatory quarantines, travel restrictions, and other restrictions, we have experienced delays, disruptions and temporary suspensions of our operations. In addition, our financial condition and results of operations may be adversely affected by the COVID-19 pandemic in the future.

The timeline and potential magnitude of the COVID-19 outbreak continue to be unknown. The continuation or amplification of the COVID-19 pandemic could continue to more broadly affect the United States and global economy, including our business and operations, and the demand for oil and natural gas. Other contagious diseases in the human population could have similar adverse effects. The potential impact from COVID-19 is difficult to predict, therefore, the extent to which it will negatively affect our operating results, or the duration of any potential business disruption is uncertain. The magnitude and duration of any impact will depend on future developments and new information that may emerge regarding the duration of COVID-19 pandemic, the severity of any variants thereof, rate of vaccinations and other actions taken by authorities to contain its impact or otherwise treat the disease, all of which are beyond our control.

Table of Contents

***Terrorist attacks or cyber-incidents could result in information theft, data corruption, operational disruption and/or financial loss.***

Like most companies, we have become increasingly dependent upon digital technologies, including information systems, infrastructure and cloud applications and services, to operate our businesses, to process and record financial and operating data, communicate with our business partners, analyze mine and mining information, estimate quantities of coal reserves, as well as other activities related to our businesses. Strategic targets, such as energy-related assets, may be at greater risk of future terrorist or cyber-attacks than other targets in the United States. Deliberate attacks on, or security breaches in, our systems or infrastructure, or the systems or infrastructure of third parties, or cloud-based applications could lead to corruption or loss of our proprietary data and potentially sensitive data, delays in production or delivery, difficulty in completing and settling transactions, challenges in maintaining our books and records, environmental damage, communication interruptions, other operational disruptions and third-party liability. Our insurance may not protect us against such occurrences. Consequently, it is possible that any of these occurrences, or a combination of them, could have a material adverse effect on our business, financial condition, results of operations and cash flows. Further, as cyber incidents continue to evolve, we may be required to expend additional resources to continue to modify or enhance our protective measures or to investigate and remediate any vulnerability to cyber incidents. We plan to adopt plans and policies to address precautions with respect to data security and appropriate responses in case of a reported breach.

***The 2021 Note with Meta (now Mr. McCabe) contains restrictive covenants that limit our operations.***

In 2021, we borrowed $15 million pursuant to the terms of the 2021 Note (defined below). The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2021 Note. This restriction may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See the section titled “Management’s Discussion and Analysis of Financial Condition and Results of Operations-Liquidity and Capital Resources” for additional information.

The 2021 Note is secured by a security interest in shares of common stock of Meta and a 25% working interest in the Orogrande Project as defined in the Security Agreement (defined below), held by the Pledgor (defined below) and Pledgor’s affiliate, Wolfbone, respectively. Any default that is not waived could permit Meta, as lender, to exercise rights and remedies with respect to all of the collateral that is securing the 2021 Note, and/or other rights and remedies under applicable law. Upon the completion of the Merger (defined below) in May 2023, Wolfbone became a subsidiary of the Company and the Security Agreement will remain in place.

Our ability to meet these restrictive covenants or to avoid defaults can be impacted by events beyond our control. The 2021 Note provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence of an event of default, Meta as our lender could elect to declare all amounts outstanding under the 2021 Note to be immediately due and payable. If the outstanding debt under the 2021 Note was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our common stock.

On August 7, 2023, following the Loan Purchase, Mr. McCabe acquired the Note thereby replacing Meta as the lender and secured party under the 2021 Note. The Company’s obligations under the 2021 Note remain unchanged. Following an amendment effective June 30, 2024, the 2021 Note matures on September 30, 2024.

***The 2022 Note with Mr. McCabe contains restrictive covenants that limit our operations***.

On December 22, 2022, we borrowed $2 million pursuant to the terms of the 2022 Note (defined below), which has a maximum principal amount available for borrowing of $20 million, all of which has been drawn as of December 31, 2023. If we are not in compliance with the covenants of the 2022 Note, or if we are in default under the 2022 Note, it is possible that Mr. McCabe will not offer to extend any additional loans under the 2022 Note, which may affect our business as a going concern. The 2022 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all obligations under the 2022 Note. This restriction may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See “Management’s Discussion and Analysis of Financial Condition and Results of Operations-Liquidity and Capital Resources” for additional information.

Our ability to meet these restrictive covenants or to avoid defaults can be impacted by events beyond our control. The 2022 Note provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence of an event of default, Mr. McCabe as our lender could elect to declare all amounts outstanding under the 2022 Note to be immediately due and payable. If the outstanding debt under the 2022 Note was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate material adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our common stock.

***Our Loan Agreement with Meta (now Mr. McCabe) contains restrictive covenants that limit our operations.***

In 2022, we borrowed an aggregate principal amount of $5.0 million pursuant to the terms of the Loan Agreement (defined below), which is the maximum principal balance available under the Loan Agreement. The Loan Agreement contains various restrictive covenants and other restrictions, which include, among other things, restrictions on:

- our ability to transfer all or part of our business or property, except for inventory in the ordinary course of business, surplus or obsolete equipment, permitted liens, and transfers of cash permitted by the agreement;
- our ability to liquidate or dissolve or merge or consolidate with another entity, or acquire another entity;
- our ability to incur additional debt beyond certain limits or encumber our assets; and
- our ability to pay dividends or make investments, other than permitted investments.

These restrictions may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See “Management’s Discussion and Analysis of Financial Condition and Results of Operations-Liquidity and Capital Resources” for additional information.

Our ability to meet these restrictive covenants can be impacted by events beyond our control. The Loan Agreement provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence and during the continuance of an event of default, Meta as the lender could elect to (i) declare all outstanding principal and accrued and unpaid interest under the Loan Agreement immediately due and payable, (ii) terminate any remaining commitment to make loans under the Loan Agreement, and/or (iii) exercise certain other rights and remedies anticipated under the Loan Agreement. The events of default under the Loan Agreement include, among other things (subject to grace periods in certain instances), payment defaults, breaches of covenants or representations and warranties, a change in control or certain material adverse effects as defined in the Loan Agreement, material judgments and attachments, cross defaults with certain of our other material indebtedness, and bankruptcy and insolvency events with respect to us and our subsidiaries. If the outstanding debt under the Loan Agreement was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our common stock.

**Risks Relating to Our Status as a Public Reporting Company**

***We are an emerging growth company and a smaller reporting company, subject to less stringent reporting and regulatory requirements of other publicly reporting companies and this status may have an adverse effect on our ability to attract interest in our common stock.***

We are an emerging growth company as defined in the JOBS Act. As long as we remain an emerging growth company, we may take advantage of certain exemptions from various reporting and regulatory requirements that are applicable to other public reporting companies that are not emerging growth companies. We cannot predict if investors will find our common stock less attractive if we choose to rely on these exemptions.

Table of Contents

Additionally, we are a "smaller reporting company" as defined under the Exchange Act. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company provided: (1) the market value of our common stock held by non-affiliates is less than $250 million, calculated annually, as of the last business day of our second fiscal quarter, or (2) our annual revenues are less than $100 million during such completed fiscal year and the market value of our common stock held by non-affiliates is less than $700 million, calculated annually, as of the last business day of our second fiscal quarter. To the extent we take advantage of such reduced disclosure obligations, it may also make comparison of our financial statements with other public reporting companies difficult or impossible.

**Risk Related to Ownership of Our Common Stock**.

***Our common stock is not eligible with the Depository Trust Company ("DTC"), which may result in brokerage firms being unwilling to hold or trade the stock.***

Our shares of common stock are not eligible with DTC to permit our shares of common stock to trade electronically. If an issuer is not "DTC-eligible," then its capital stock cannot be electronically transferred between brokerage accounts, which means that brokerage firms may be unwilling to hold or trade our common stock, restricting all trades by holders of our common stock.

***No trading market for our common stock is expected to develop.***

There is no public market for our shares of common stock and our shares are not DTC eligible for electronic trading to third parties. There is no expectation that a trading market will develop or be sustained. Accordingly, stockholders may have to hold the shares of common stock indefinitely.

***We do not intend to pay any cash dividends in the foreseeable future and, therefore, any return on an investment in our common stock must come from increases in the fair market value of the common stock.***

We do not intend to pay cash dividends on our common stock in the foreseeable future. We expect to retain future earnings, if any, for reinvestment in our business. Also, any credit agreements, which we may enter into, may restrict our ability to pay dividends. Whether we pay cash dividends in the future will be at the discretion of our Board of Directors (the "Board") and will be dependent upon our financial condition, results of operations, cash requirements, future prospects and any other factors our Board deems relevant. Therefore, any return on an investment in our common stock must come from increases in the fair market value of the common stock.

***We may issue preferred stock with terms that could adversely affect the voting power or value of our common stock.***

Our Board has the authority to cause us to issue, without any further vote or action by the stockholders, shares of preferred stock in one or more series, to designate the number of shares constituting any series, and to fix the rights, preferences, privileges and restrictions thereof, including dividend rights, voting rights and terms of redemption, redemption price or prices and liquidation preferences of such series. The terms of one or more classes or series of preferred stock could adversely impact the voting power or value of our common stock. For example, we might afford holders of preferred stock the right to elect some number of our directors in all events or upon the occurrence of specified events or the right to vote on specified transactions. Similarly, the repurchase or redemption rights or liquidation preferences we might assign to holders of preferred stock could affect the residual value of our common stock.

**General Risk Factors**

***Ineffective internal controls could impact our business and operating results.***

Our internal control over financial reporting may not prevent or detect misstatements because of its inherent limitations, including the possibility of human error, the circumvention or overriding of controls, or fraud. Even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If we fail to maintain the adequacy of our internal controls, including any failure to implement required new or improved controls, or if we experience difficulties in their implementation, our business and operating results could be harmed and the reliability of our consolidated financial statements could be compromised.

Table of Contents

***We rely on information technology in our operations, and security breaches and other disruptions in our systems could compromise our information and expose us to liability, which would cause our business and reputation to suffer.***

In the ordinary course of our business, we collect and store sensitive data. Despite our security measures, our information technology and infrastructure may be vulnerable to attacks by hackers or breached due to employee error, malfeasance or other disruptions. These incidents may be an intentional attack or an unintentional event and could involve gaining unauthorized access to our information systems for purposes of misappropriating assets, stealing confidential information, corrupting data or causing operational disruption. Any such breach could compromise our networks and the information stored there could be accessed, publicly disclosed, lost or stolen. The result of these incidents may include disrupted operations, misstated or unreliable financial data, liability for stolen assets or information, increased cybersecurity protection and insurance costs, litigation, damage to business relationships and regulatory fines and penalties. The costs related to cyber or other security threats or disruptions may not be fully insured or indemnified by other means. Although we intend to implement additional processes, procedures and internal controls to help mitigate cybersecurity risks and cyber intrusions, such measures will not guarantee that a cyber-incident will not occur and/or that our financial results, operations or confidential information will not be negatively impacted by such an incident. In addition, cybersecurity has become a top priority for regulators around the world, and some jurisdictions have enacted laws requiring companies to notify individuals of data security breaches involving certain types of personal data. If we fail to comply with the relevant laws and regulations, we could suffer financial losses, a disruption of our business, liability to investors, regulatory intervention or reputational damage.

**Item 1B. Unresolved Staff Comments**

None.

**Item 1C. Cybersecurity**

**Risk Management and Strategy**

The Company has processes for assessing, identifying, and managing material risks from cybersecurity threats. These processes are integrated into the Company's overall risk management systems, as overseen by the Company's Board of Directors, primarily through its Audit Committee. The Company does not currently engage assessors, consultants, auditors, or other third parties in connection with any such processes. Other than the integration of the Company's cybersecurity processes with the Company's overall risk management systems, the Company does not have specific processes to oversee and identify such risks from cybersecurity threats associated with its use of any third-party service provider.

As of the date of this report, the Company is not aware of any cybersecurity incidents that have materially affected or are reasonably likely to materially affect the Company, including its business strategy, results of operations, or financial condition and that are required to be reported in this report.

**Governance**

***Board of Directors***

The Audit Committee of the Company's Board of Directors, with the input of management, oversees the Company's internal controls, including internal controls designed to assess, identify, and manage material risks from cybersecurity threats. The Chief Financial Officer will directly inform the Audit Committee about the prevention, detection, mitigation, and remediation of cybersecurity incidents, when applicable, so that the Audit Committee can monitor the same. Updates on cybersecurity matters, including material risks and threats, will be provided to the Company's Audit Committee, and the Audit Committee provides updates to the Company's Board of Directors at regular board meetings.

***Management***

Under the oversight of the Audit Committee of the Board of Directors, the Company's Chief Financial Officer is primarily responsible for the assessment and management of material cybersecurity risks and establishing and maintaining adequate and effective internal controls covering cybersecurity matters. Although our Chief Financial Officer has extensive and broad expertise in overall accounting and executive management, he does not have any prior work experience, relevant degrees, certifications or other background specific to cybersecurity.

The Audit Committee of the Company's Board of Directors, with the assistance of the Company's Chief Financial Officer, is responsible for overseeing the establishment and effectiveness of controls and other procedures, including controls and procedures related to the public disclosure of material cybersecurity matters.

For further discussion of the risks associated with cybersecurity incidents, see the cybersecurity risk factor in Item 1A. Risk Factors in this report, titled "*We rely on information technology in our operations, and security breaches and other disruptions in our systems could compromise our information and expose us to liability, which would cause our business and reputation to suffer*."

Table of Contents

**Item 3. Legal Proceedings**

On April 30, 2020, the Company's wholly owned subsidiary, Hudspeth, filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies ("Cordax"). The suit, *Hudspeth and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies*, was filed in the 189th Judicial District Court of Harris County, Texas. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Wolfbone, a subsidiary of the Company, is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. Meta, as the Company's parent at the time, determined to add the manufacturer of one of the tool components that it contends was one of the causes of the tool failure. It was later disclosed that Cordax is the subsidiary of a Canadian parent company, who has also been added to the case. Cordax's current Chairman of the Board filed a special appearance after being served with a citation, alleging that he was a Canadian citizen with no meaningful ties to Texas. After discovery was conducted on this issue, a nonsuit without prejudice for this defendant was filed, dismissing him from the case. The remaining parties attended mediation on June 15, 2022, that was unsuccessful in resolving the case. Cordax filed a motion for summary judgment, attempting to dismiss Hudspeth and Wolfbone's claims. The Court denied Cordax's motion. Discovery is substantially complete. The Company is required to indemnify Meta in connection with this matter pursuant to the terms of the Distribution Agreement with Meta entered into in connection with the consummation of the Spin-Off. Prior to trial, in 2024, the parties settled the case. As soon as Cordax fulfills its payment obligations to Hudspeth (the amount of which is confidential), the Harris County case will be dismissed with prejudice. Cordax's releases of Hudspeth and Wolfbone were effective when the Settlement Agreement was signed, May 16, 2024.

On March 18, 2021, Cordax filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500.01 and recover related attorney's fees. The foreclosure action, *Datalog LWT Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc*., was filed in the 205th Judicial District Court of Hudspeth County, Texas. The Company is contesting the lien in good faith and filed a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final disposition of the related case currently pending in Harris County, Texas. The Company is required to indemnify Meta in connection with this matter pursuant to the terms of the Distribution Agreement with Meta. As part of the settlement in the Harris County case, Cordax has released the mineral lien, and the case has been dismissed with prejudice.

On March 15, 2024, a securities class action captioned *Targgart v. Next Bridge Hydrocarbons, Inc., et al.*, No. 24-cv-1927, was filed in the U.S. District Court for the Eastern District of New York. The action is brought on behalf of a putative class of persons or entities that acquired the Company's shares in connection with the Company's spin-off from Meta Materials, Inc., in December 2022. The complaint names as defendants the Company and certain of its current and former officers and directors. The complaint asserts claims under Sections 11 and 15 of the Securities Act, alleging that the Form S-1 that the Company filed with the SEC on July 14, 2022, which became effective on November 18, 2022, contained untrue statements or omissions. The complaint seeks, among other things, unspecified statutory and compensatory damages.

**Item 4. Mine Safety Disclosures**

Not applicable.

Table of Contents

## PART II

### Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

Our common stock is not listed for trading on any stock exchange or market. The shares of common stock will not be eligible for electronic transfer through the Depository Trust Company or any other established clearing corporation. Accordingly, there currently is no public trading market for the common stock and there is no current expectation for a public market to develop.

As of June 25, 2024, we have approximately 5,975 holders of record of shares of our common stock. In computing the number of holders of record, each broker-dealer and clearing corporation holding shares on behalf of its customers, the holder of the common stock, is counted as a single shareholder. A significant number of shares of our common stock are held in either nominee name or street name brokerage accounts, and consequently, we are unable to determine the exact number of beneficial owners of our common stock.

As of March 31, 2024, we had a total of 251,830,516 shares of common stock issued and outstanding. This amount does not include outstanding uncovered short positions held by foreign and domestic institutions. We are presently in communication with FINRA and the SEC to bring light to the scope of the aggregate uncovered short position in our common stock. FINRA has previously reported that it estimated that there was an aggregate short interest position in the Series A Preferred Shares of Meta Materials, Inc. (which converted into our common stock and previously traded under the symbol "MMTLP" in the over-the-counter equity market) in accounts held at U.S. member broker-dealers as of December 12, 2022 of approximately 2.65 million shares. This figure, however, does not include domestic or foreign non-member entities that could act as custodians or agents holding securities for others, including foreign-registered broker-dealers. We intend to continue to investigate this issue and hope to uncover more details in the future. But our ability to do this may be hindered without the full support of the applicable regulatory bodies and broker-dealers that oversee these matters.

**Distributions.**

We do not intend to pay cash dividends on our common stock in the foreseeable future. We expect to retain future earnings, if any, for reinvestment in our business. Whether we pay cash dividends in the future will be at the discretion of our Board and will be dependent upon our financial condition, results of operations, cash requirements, future prospects and any other factors our Board deems relevant.

**Equity Compensation Plan Information.**

See Item 11 for information regarding our Equity Incentive Plan.

**Sale of Unregistered Securities.**

None.

**Issuer Purchases of Equity Securities.**

None.

### Item 6. Reserved

None.

Table of Contents

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operation

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our audited and unaudited financial statements and related notes that are included elsewhere in this report. Some of the information contained in this discussion and analysis constitutes forward-looking statements that involve risks and uncertainties. Actual results could differ materially from those discussed in these forward-looking statements. Factors that could cause or contribute to these differences include, but are not limited to, those discussed below and elsewhere in this report, particularly under the section titled "Cautionary Statement Concerning Forward-Looking Statements."*

**Overview.**

Our consolidated financial statements have been prepared on a stand-alone basis. Our consolidated financial statements reflect our financial position, results of operations and cash flows in conformity with GAAP.

All intercompany transactions through December 14, 2022 (the date of the Spin Out from Meta) between us and Meta have been included in our consolidated comparative financial statements. The intercompany transactions are reflected in our consolidated statements of cash flow as a financing activity and in our consolidated balance sheets as "Notes payable - Related Party".

The historical costs and expenses reflected in our comparative financial statements include an allocation for certain corporate shared service functions historically provided by Meta including executive oversight, accounting, treasury, tax, legal, human resources, occupancy, procurement, information technology and other shared services. These expenses have been allocated to us on the basis of direct usage when identifiable, with the remainder allocated on a pro rata basis based on sales, headcount, tangible assets or other measures considered to be a reasonable reflection of the historical utilization levels of these services.

Our management believes the assumptions underlying our financial statements, including the assumptions regarding the allocation of general corporate expenses from Meta are reasonable. Nevertheless, our financial statements may not include all of the actual expenses that would have been incurred had we operated as a stand-alone company during the periods presented and may not reflect what our actual results of operations, financial position and cash flows would have been if we had operated as a stand-alone company during the periods presented. Actual costs that would have been incurred if we had operated as a stand-alone company would depend on multiple factors, including organizational structure and strategic decisions made in various areas, including information technology and infrastructure. We now perform these functions using our own resources and purchased services.

With respect to comparative financial statements the period December 15, 2022 through December 31, 2022 is referred to herein as the "successor period" and the period from January 1, 2022 through December 14, 2022 is referred to herein as the "predecessor period". The predecessor period is reflective of the Company while a subsidiary of our former parent Meta. The successor period is reflective of the Company after the Spin-Off as an independent public reporting company.

On December 21, 2022, we entered into that certain Agreement and Plan of Merger (the "Merger Agreement") with Hudspeth, Wolfbone, MPC and Mr. McCabe, pursuant to which in a series of transactions the oil and natural gas leases, the lands covered by such leases, pooling and communitization agreements, rights-of-way, the surface estate of the lands and all wells located in the Orogrande Project will be transferred, conveyed and assigned to Hudspeth (or its designated assignee) in consideration of (1) treating the Orogrande Obligations (as defined in the Merger Agreement) as having been irrevocably satisfied and discharged in full with respect to MPC and (2) an issuance of 56,297,638 shares of our common stock to Mr. McCabe (such series of transactions collectively, the "Merger"). The Merger was completed in May 2023 in accordance with the Texas Business Organizations Code, whereby (a) the Company will form NBH MergeCo, LLC with the State of Texas ("MergeCo") in order to cause Hudspeth to assign all of its rights under the Merger Agreement to MergeCo and MergeCo will assume Hudspeth's obligations under the Merger Agreement, (b) Hudspeth (or MergeCo, as its assignee), Wolfbone and MPC shall merge with each of Wolfbone and MPC as surviving entities, and (c) Wolfbone became a direct and wholly-owned subsidiary of the Company. The closing of the transactions contemplated by the Merger Agreement were subject to the satisfaction of certain customary closing conditions, including filing and acceptance of the certificate of merger by the Secretary of State of the State of Texas.

In connection with the Merger, on December 22, 2022, the Company entered into the 2022 Note (defined below). The Company is entitled to request advances under the 2022 Note in a minimum principal amount of $100,000 each. Mr. McCabe is the largest shareholder of our common stock. As such, the Merger and 2022 Note constitute related party transactions which have been duly approved by our Board and Audit Committee. As of December 31, 2023, the Company had drawn $20 million on the 2022 Note. The maturity date of the loan has been amended to September 30, 2024.

Table of Contents

*Recent Developments*

We met our 2022 drilling obligations under the DDU Agreement to drill five new wells in the Orogrande Project in advance of the March 31, 2023 deadline under University Lands lease requirement. The data collected from these five wells, in addition to the five wells drilled in 2021, confirmed that there are at least five potential distinct reservoirs under our acreage. Also, our operations team deployed a new mist drilling solution which increased hole stability, which we believe will result in meaningful cost savings for additional wells drilled in the Orogrande Project. While these wells may have potential to produce hydrocarbons to sell commercially in the future, we have no immediate plans to deploy the additional capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including reservoir locations, target depths and designated acreage, in the Orogrande Project.

Effective as of October 6, 2023, the Company and certain investor participants (each a "Participant" and collectively the "Participants") entered into twenty-five separate Participation Agreements (the "Participation Agreements") to conduct drilling of wells in the Company's approximately 17,000 acre Johnson Prospect in Hudspeth County, Texas, which is a portion of the Company's Orogrande Prospect.

Pursuant to the Participation Agreement, the Participants collectively funded the cost of drilling, of approximately $9,000,000, which was used to (i) acquire the rights to drill on the Johnson Prospect and (ii) finance the drilling of five (5) vertical wells in the Johnson Prospect in connection with the Company's 2023 drilling program requirements under its University Lands Drilling and Development Unit Agreement. Each Participant will have the right to participate in the drilling of additional wells on the Johnson Prospect in the future, including an additional five (5) vertical wells in locations determined by Hudspeth Operating, LLC, the Company's wholly owned subsidiary ("Hudspeth"), in its sole discretion, in 2024. The Participation Agreement provides for an initial allocation of the working interests and net revenue interests among each Participant and the Company and then a re-allocation upon payout or payment to such Participant of drilling and completion costs for each well drilled. Following payout, the Company will own 25% of working interest as described below and 18.75% net revenue interest in each well. Hudspeth will be the operator of the Johnson Prospect pursuant to a joint operating agreement (the "Operating Agreement") entered into in connection with the Participation Agreement. The Participation Agreement and the Operating Agreement required, among other things, that Hudspeth and the Company drill and complete at least five (5) vertical wells by December 31, 2023, unless the term of the Participation Agreement is extended.

The wells were completed by December 31, 2023 satisfying the 2023 drilling obligation under the DDU Agreement.

*Income Taxes*

Judgment is required in determining the provision for income taxes and related accruals, deferred tax assets and liabilities. In the ordinary course of business, tax issues may arise where the ultimate outcome is uncertain. Additionally, our tax returns are subject to audit by various tax authorities. Consequently, changes in our estimates for contingent tax liabilities may materially impact our results of operations or financial position.

**Results of Operations.**

***Historical Results for the Years Ended December 31, 2023 and 2022***

For the year ended December 31, 2023, we had a net loss of $37,556,787 compared to a net loss of $81,662,591 for the successor period ended December 31, 2022 and $7,938,335 for the predecessor period ended December 14, 2022. At December 31, 2023, we had current assets of $2,085,810 and total assets of $2,190,989. As of December 31, 2023, we had current liabilities of $49,180,177. Stockholders' deficit was $(47,237,839) at December 31, 2023.

***Historical Results for the Years Ended December 31, 2022 (for the Predecessor Period January 1, 2022 through December 14, 2022, and for the Successor Period December 15, 2022 through December 31, 2022***

For the predecessor period, we had a net loss of $7,938,335 and for the successor period, we had a net loss of $81,662,591. The net loss was primarily due to impairment expense, increased general and administrative expenses and interest expenses for the year ended December 31, 2022. At December 31, 2022, we had current assets of $959,117 and total assets of $1,039,296. As of December 31, 2022, we had current liabilities of $31,092,834. Stockholders' deficit was $(30,300,404) at December 31, 2022.

Table of Contents

*Revenue and Gross Profit*

| | Year Ended December 31 | | | | |
|---|---|---|---|---|---|
| | 2023 | 2022 | | | |
| | | Predecessor | Successor | Combined | Change |
| Product Sales BOE | 837 | 633 | 59 | 692 | 145 |
| Total Revenue | $ 26,031 | $ 38,273 | $ 2,561 | $ 40,834 | ($ 14,803) |
| Cost of revenue | ($ 60,933) | ($ 71,243) | ($ 6,055) | ($ 77,298) | ($ 16,365) |
| Gross Profit (Loss) | ($ 34,902) | ($ 32,970) | ($ 3,494) | ($ 36,464) | $ 1,562 |
| Gross profit percentage | -134.08% | -86.14% | -136.43% | -89.30% | -44.78% |

*Production Revenues and Cost of Revenue*

For the year ended December 31, 2023, we had production revenue of $26,031 compared to $40,834 in 2022 ($38,273 for the predecessor period plus $2,561 for the successor period). The change in revenue was primarily due to the increase in oil and natural gas production from 692 BOE for the 2022 period to 837 BOE for the 2023 period from the Oklahoma Properties, a decrease in the average price of oil from $98.75 in 2022 to $76.50 in 2023 and a decrease in the average price of natural gas from $7.51 in 2022 to $2.07 in 2023. Our cost of revenue, consisting of lease operating expenses and production taxes, was $77,298 for the year ended December 31, 2022 compared with $60,933 for the year ended December 31, 2023. For each of the years ended December 31, 2022 and 2023, production and revenue are detailed as follows:

| Property | Quarter | Oil Production {BBLS} | Gas Production {MCF} | Oil Revenue | Gas Revenue | Total Revenue |
|---|---|---|---|---|---|---|
| Oklahoma | Q1 - 2022 | 0 | 0 | $ - | $ - | $ - |
| Hazel (TX) | Q1 - 2022 | 0 | 0 | - | - | - |
| **Total Q1-2022** | | 0 | 0 | $ - | $ - | $ - |
| Oklahoma | Q2 - 2022 | 97 | 1,267 | $ 9,688 | $ 7,716 | $ 17,404 |
| Hazel (TX) | Q2 - 2022 | 0 | 0 | - | - | $ - |
| **Total Q2-2022** | | 97 | 1,267 | $ 9,688 | $ 7,716 | $ 17,404 |
| **Oklahoma** | Q3 - 2022 | 43 | 887 | $ 4,635 | $ 8,329 | $ 12,964 |
| **Hazel (TX)** | Q3 - 2022 | 0 | 0 | - | - | - |
| **Total Q3-2022** | | 43 | 887 | $ 4,635 | $ 8,329 | $ 12,964 |
| **Oklahoma** | Q4 - 2022 | | | | | |
| **Predecessor** | | 28 | 635 | $ 2473 | $ 5,432 | $ 7,905 |
| **Successor** | | 15 | 242 | $ 1276 | $ 1,285 | $ 2,561 |
| **Hazel (TX)** | Q4 - 2022 | 0 | 0 | - | - | - |
| **Total Q4-2022** | | 43 | 877 | $ 3749 | $ 6,717 | $ 10,466 |
| **Total 2022** | | 183 | 3,031 | 18,072 | 22,762 | 40,834 |
| **Average Commodity Price** | | | | $ 98.75 | $ 7.51 | |
| Oklahoma | Q1 - 2023 | 107 | 748 | $ 8141 | $ 2,783 | $ 10,924 |
| Hazel (TX) | Q1 - 2023 | 0 | 0 | - | - | - |
| **Total Q1-2023** | | 107 | 748 | $ 8,141 | $ 2,783 | $ 10,924 |
| Oklahoma | Q2 - 2023 | 43 | 867 | 3,195 | 1,646 | 4,841 |
| Hazel (TX) | Q2 - 2023 | 0 | 0 | - | - | - |
| **Total Q2-2023** | | 43 | 867 | $ 3,195 | $ 1,646 | $ 4,841 |
| Oklahoma | Q3 - 2023 | 79 | 1183 | 6,184 | 1,547 | 7,731 |
| Hazel (TX) | Q3 - 2023 | 0 | 0 | - | - | - |
| **Total Q3-2023** | | 79 | 1183 | $ 6,184 | $ 1,547 | $ 7,731 |
| Oklahoma | Q4 - 2023 | 15 | 760 | 1,146 | 1,389 | 2,535 |
| Hazel (TX) | Q4 - 2023 | 0 | 0 | - | - | - |
| **Total Q4-2023** | | 15 | 760 | 1,146 | 1,389 | 2,535 |
| **Total 2023** | | 244 | 3558 | $ 18,666 | $ 7,365 | $ 26,031 |
| **Average Commodity Price** | | | | $ 76.50 | $ 2.07 | |

Table of Contents

*Expenses for the Years Ended December 31, 2023 and 2022*

We recorded depreciation, depletion and amortization expense of $-0- for the year ended December 31, 2023 compared to $-0- for the year ended December 31, 2022.

*Operating Expenses*

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2023 | 2022 as restated | | |
| | | Successor | Predecessor | Combined |
| Operating Expenses | | | | |
| General & Administrative | $ 12,095,611 | $ 916,085 | $ 7,905,860 | $ 8,821,945 |
| Total operating expenses | $ 12,095,611 | $ 916,085 | $ 7,905,860 | $ 8,821,945 |

*General and Administrative Expenses*

Our general and administrative expense for the year ended December 31, 2023 was $12,095,611 compared to $8,821,945 ($7,905,860 for the predecessor period plus $916,085 for the successor period) for the year ended December 31, 2022. Our general and administrative expenses consisted of consulting and compensation expense, substantially all of which were non-cash or deferred, accounting and administrative costs, professional consulting fees, and other general corporate expenses. The change in general and administrative expenses in 2023, compared to 2022, is primarily due to employee compensation and an increase in consulting fees, filing fees, legal fees, director and officer liability insurance, and investor relations expenses.

Table of Contents

**Cash Flows, Liquidity and Capital Resources.**

*Cash Flows*

*The following table summarizes sources and uses of cash and cash equivalents:*

| | Year Ended December 31 | | | |
|---|---|---|---|---|
| | 2023 | 2022 as restated | | |
| | | Successor Period December 15, 2022 through December 31, 2022 | Predecessor Period January 1, 2022 through December 14, 2022 | Combined |
| **Cash Flows From (used in) Operating Activities** | | | | |
| Net loss | $ (37,556,787) | $ (81,662,591) | $ (7,938,335) | $ (89,600,926) |
| Adjustments to reconcile net loss to net cash from operations: | | | | |
| Accretion expense | 1,785 | 1,092 | - | 1,092 |
| Prospect fee offset to note payable | (368,334) | - | - | - |
| Bad debt expense | - | - | (26,612) | (26,612) |
| Expense related to stock based compensation | 4,781,279 | - | - | - |
| Impairment loss | 27,167,415 | 80,743,013 | - | 80,743,013 |
| Change in: | | | | |
| Accounts receivable | (208,882) | - | 74,310 | 74,310 |
| Accounts receivable, related party | - | - | (14,153) | (14,153) |
| Prepayments - development costs | 18,660 | - | (150,000) | (150,000) |
| Other assets | (25,000) | 39,185 | (94,364) | (55,179) |
| Prepaid expenses | (14,441) | (58,225) | (1,408) | (59,633) |
| Accounts payable and accrued expenses | (1,353,787) | 2,209,867 | (64,983) | 2,144,884 |
| Other payables | - | - | 2,589,363 | 2,589,363 |
| **Net cash provided by (used in) operating activities** | (7,558,092) | 1,272,341 | (5,626,182) | (4,353,841) |
| **Cash Flows From (used in) Investing Activities** | | | | |
| Investment in oil and natural gas properties | (8,653,640) | (3,023,030) | (3,859,851) | (6,882,881) |
| **Net cash used in investing activities** | (8,653,640) | (3,023,030) | (3,859,851) | (6,882,881) |
| **Cash Flows From Financing Activities** | | | | |
| Contributions from parent | - | - | 316,600 | 316,600 |
| Proceeds from notes payable, related party | 18,000,000 | 2,000,000 | 7,500,000 | 9,500,000 |
| Payments on promissory notes | (1,000,000) | - | - | - |
| Prepayments, working interest owners | 311,281 | - | - | - |
| **Net cash provided by financing activities** | 17,311,281 | 2,000,000 | 7,816,600 | 9,816,600 |
| **Net increase (decrease) in cash** | 1,099,549 | 249,311 | (1,669,433) | (1,420,122) |
| **Cash-beginning of period** | 569,298 | 319,987 | 1,989,419 | 1,989,419 |
| **Cash-end of period** | $ 1,668,847 | $ 569,298 | $ 319,987 | $ 569,297 |
| **Supplemental disclosure of cash flow information:** | | | | |
| Cash paid for interest | $ 199,345 | $ - | $ - | $ - |
| **Supplemental disclosure of non-cash investing and financing activities:** | | | | |
| Common stock issued in spin-out transaction | - | - | 16,547 | 16,547 |
| Common stock issued in working interest acquisition | $ 15,838,073 | $ - | $ - | $ - |
| Account receivable cancelled in working interest acquisition | $ 177,519 | $ - | $ - | $ - |
| Account payable reduced by expense offset | $ - | $ 15,638 | $ - | $ 15,638 |
| Capitalized Interest included in interest payable | $ 2,498,184 | $ 74,210 | $ 1,289,328 | $ 1,363,538 |

Table of Contents

At December 31, 2023, we had cash and cash equivalents of $1,668,847 compared to $569,298 as of December 31, 2022.

*Cash Flows From Operating Activities*

Cash used in operating activities for the year ended December 31, 2023, was $7,558,092 compared to $4,353,841 for the year ended December 31, 2022.

Cash used in operating activities for the year ended December 31, 2023 can be attributed principally to net loss from operations of $37,556,787 adjusted for $27,167,415 in an impairment adjustment and $4,781,279 in Expense related to stock based compensation and changes in other liabilities, and accounts payable and accrued expenses.

*Cash Flows from Investing Activities*

Cash used in investing activities for the year ended December 31, 2023 was $8,653,640 compared to $6,882,881 for year ended December 31, 2022. Cash used in investing activities consisted primarily of investments in oil and natural gas properties in 2023.

*Cash Flows from Financing Activities*

Cash provided by financing activities for the year ended December 31, 2023 was $17,311,281 compared to $9,816,600 for the year ended December 31, 2022. Cash flows provided by financing activities consists primarily of loans from a related party.

We expect to continue to have cash flows provided by financing activities as we seek new rounds of financing and continue to develop our oil and natural gas investments. We do not expect to pay cash dividends on our common stock in the foreseeable future.

Reference the Consolidated Statements of Cash Flows included in the financial statements for additional detail of the components that comprise the net use of cash in operations. We expect to continue to use cash flows in operating activities until such time as we achieve sufficient commercial oil and natural gas production to cover our operating costs.

*Capital Expenditures*

Our capital expenditures are summarized in the following table:

| | Year Ended | Year Ended December 31, 2022 | | |
|---|---|---|---|---|
| | **2023** | **Successor** | Predecessor | **Combined** |
| Acquisitions: | | | | |
| Proved property | $ - | $ - | $ - | $ - |
| Unproved property working interest | 16,015,591 | - | - | - |
| Exploration and development: | | | | |
| Developmental leasehold costs | - | - | - | - |
| Exploratory drilling and completion costs | - | - | - | - |
| Development drilling and completion costs | 8,653,640 | 3,023,030 | 3,859,851 | 6,882,881 |
| Other development costs | - | - | - | - |
| Capitalized interest | 2,498,184 | 74,210 | 1,289,328 | 1,363,538 |
| Asset retirement obligations | 1,785 | 246,866 | - | 246,866 |
| Total exploration and development | 27,169,200 | 3,344,106 | 5,149,179 | 8,493,285 |
| Other property | - | - | - | - |
| Total capital expenditures | $ 27,169,200 | $ 3,344,106 | $ 5,149,179 | $ 8,493,285 |
| Change in accrued capital expenditures and other | 115,443 | (2,209,867) | (2,524,380) | (4,734,247) |
| Common stock issued for development costs | (15,838,072) | - | - | - |
| Account receivable cancelled in working interest acquisition | (177,519) | - | - | - |
| Prepaid drilling costs | - | - | 150,000 | 150,000 |
| Capitalized interest | (2,498,184) | (74,210) | (1,289,328) | (1,363,538) |
| Asset retirement obligations | (1,785) | (246,866) | - | (246,866) |
| Total cash capital expenditures | $ 8,769,083 | $ 813,163 | $ 1,485,471 | $ 2,298,634 |

Table of Contents

*Liquidity and Capital Resources*

Liquidity risk is the risk that we will not meet our financial obligations as they become due after use of currently available cash. We have a planning and budgeting process to monitor operating cash requirements, including amounts projected for capital expenditures, which are adjusted as input variables change. These variables include, but are not limited to, our ability to generate revenue from operations, general and administrative requirements and the availability of equity or debt capital. As these variables change, we may be required to issue equity or obtain debt financing.

*The 2021 Note*

On October 1, 2021, we issued a secured, revolving promissory note in an original principal amount of up to $15 million in favor of Meta (as amended to date, the "2021 Note"). The 2021 Note bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date.

The 2021 Note is secured by a security interest in (a) pursuant to a Stock Pledge Agreement dated as of September 30, 2021 between Gregory McCabe (the "Pledgor") and Meta (the "Stock Pledge Agreement"), 1,515,000 shares of Meta's common stock that are owned directly and beneficially by the Pledgor, and (b) pursuant to a Deed of Trust, Mortgage, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production dated as of September 30, 2021 made by Wolfbone (an affiliate of the Pledgor) for the benefit of Meta (the "Security Agreement"), a 25% working interest beneficially owned by the Pledgor in the Orogrande Project as defined in the Security Agreement. Following the Merger, we expect Wolfbone to become an indirect subsidiary of the Company and the Security Agreement to remain in place.

The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2021 Note.

Upon the occurrence and during the continuance of an event of default under the 2021 Note, Meta as the lender may declare all outstanding principal and accrued and unpaid interest under the 2021 Note immediately due and payable, may terminate any remaining commitment to make advances under the 2021 Note, and may exercise the other rights and remedies provided for under the 2021 Note and related security documents. The events of default under the 2021 Note include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants, an event of default under the Stock Pledge Agreement or the Security Agreement, bankruptcy and insolvency events with respect us or our subsidiaries, cross defaults with certain of our other material indebtedness, and material judgments against us.

Table of Contents

On June 28, 2022 and in August 2022, we borrowed $1.9 million and $2.7 million as an advance from Meta to be treated as an unsecured term loan, in addition to $441,000 previously advanced, under a Loan Agreement with Meta as the lender (the "Loan Agreement"), the proceeds of which are available for our working capital and general corporate purposes. As of the date of this report, we had an aggregate principal amount outstanding of $5.0 million, which is the maximum amount available under the Loan Agreement. The loans were due and payable on March 31, 2023 (the "Maturity Date"), unless extended as described in the following sentence. Under the Loan Agreement, if we raise $30 million or more in capital through debt or equity or a combination thereof by the Maturity Date, the Maturity Date will be extended to October 3, 2023 and the 2021 Note plus the loans under the Loan Agreement would be amortized in six equal monthly installments. Loans under the Loan Agreement bear interest at a fixed rate of 8% per annum if no event of default exists, and at a fixed rate of 12% per annum if an event of default exists.

We have the right to prepay the loans under the Loan Agreement in whole or in part at any time without penalty. Amounts repaid or prepaid may not be reborrowed. We will be required to prepay the loans upon an asset disposition (other than permitted asset sales), certain equity issuances (other than permitted equity), debt issuances (other than permitted debt), and certain extraordinary receipts. We are required to prepay the loans from our annual excess cash flow, if any.

The Loan Agreement includes customary representations and covenants that, subject to certain exceptions and qualifications, restrict our ability to do certain things, such as: incur additional indebtedness; incur liens; engage in mergers, acquisitions, and asset sales; make loans and investments; declare dividends or redeem or repurchase equity interests; transact with affiliates on a non-arm's length basis; and enter into certain restrictive agreements. In addition, the Loan Agreement contains customary affirmative covenants, including covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our existence and material properties, customary visitation rights, reporting requirements, compliance with applicable laws and regulations, and formation or acquisition of new subsidiaries.

Upon the occurrence and during the continuance of an event of default, Meta as the lender has the right to declare all outstanding principal and accrued and unpaid interest under the Loan Agreement immediately due and payable and exercise certain other rights and remedies. The events of default under the Loan Agreement include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants or representations and warranties, a change in control or a material adverse change defined in the Loan Agreement, material judgments and attachments, cross defaults with certain other material indebtedness, and bankruptcy and insolvency events with respect to the Company and our subsidiaries.

See the discussion under the caption "Recent Developments" and Note 5 of the notes to our financial statements as of and for the year ended December 31, 2023 included in this report for information about the amendments to the 2021 Note and the Loan Agreement entered into subsequent to the end of fiscal year 2022.

*The 2022 Note*

On December 22, 2022, we issued an unsecured promissory note in the principal amount of up to $20 million in favor of Mr. McCabe (the "2022 Note"). The 2022 Note bears interest at 5% per annum, computed on the basis of a 365-day year, and matures on June 30, 2024 (the "2022 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2022 Note Maturity Date, the 2022 Note Maturity Date will be extended to October 3, 2023. The outstanding principal of the 2022 Note, together with all accrued interest thereon, becomes due on June 21, 2023. The revolving commitment under the 2022 Note expires on 2022 Note Maturity Date. As of December 31, 2022, we had $2 million principal amount outstanding and $18 million of available borrowings under the 2022 Note.

The 2022 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2022 Note.

Upon the occurrence and during the continuance of an event of default under the 2022 Note, Mr. McCabe as the lender may declare all outstanding principal and accrued and unpaid interest under the 2022 Note immediately due and payable, may terminate any remaining commitment to make advances under the 2022 Note, and may exercise the other rights and remedies provided for under the 2022 Note. The events of default under the 2022 Note include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants, bankruptcy and insolvency events with respect us or our subsidiaries, cross defaults with certain of our other material indebtedness, and material judgments against us.

On August 7, 2023, following the Loan Purchase, Mr. McCabe acquired the Notes thereby replacing Meta as the lender and secured party under the 2021 and 2022 Notes. The Company's obligations under the 2021 and the 2022 Notes remain unchanged. Following certain amendments entered into, the 2021 and 2022 Notes mature on September 30, 2024.

*Contractual Obligations*

Our most significant contractual obligations relate to the Loan Agreement, the 2021 Note, 2022 Note and drilling and development commitments and other lease operating expenses under certain leases for the Orogrande Project.

Table of Contents

Our debt obligations include the $15 million principal balance outstanding under the 2021 Note, which incurs interest at 8% per annum and matures on March 31, 2024. On September 2, 2022, we entered into a Loan Agreement that governs the term loans advanced to us from Meta on April 14, 2022, May 4, 2022, May 12, 2022, May 26, 2022, June 1, 2022, June 13, 2022, June 28, 2022, August 11, 2022 and August 29, 2022, for an aggregate principal balance outstanding of $5 million, which is the maximum amount of Meta's commitment under the Loan Agreement. The term loans incur interest at a per annum rate equal to 8% and mature on September 30, 2024.

On December 21, 2022, we issued the 2022 Note that governs the term loans advanced to us from Mr. McCabe on December 22, 2022, for an aggregate principal balance up to $20 million. Draws on the loan through December 31, 2023 total $20,000,000. The term loan incurs interest at a per annum rate equal to 5% and matures on June 21, 2023. Under each of the 2021 Note, the Loan Agreement and the 2022 Note, if we raise additional capital through debt or equity, or any combination thereof, of at least $30 million before the respective maturity dates, we will be entitled to extend maturity to October 3, 2023 and repay the outstanding balances in six equal monthly installments beginning in April 2023 up to such extended maturity date. Amendment to the Note terms has extended the maturity date to September 30, 2024.

For the year ended December 31, 2022, we incurred an aggregate interest on the 2022 Note, the 2021 Note and under the Loan Agreement of $1,571,336. Interest incurred during the year ended December 31, 2023, was $2,498,184. See the discussion under the caption "Liquidity and Capital Resources."

In addition to our debt commitments, the Orogrande Project leases representing approximately 134,000 gross acres in the Orogrande Basin in West Texas are subject to expiration in 2024 in the event we fail to drill five wells during the 2024 calendar year in compliance with our drilling obligations under the DDU Agreement. We do not yet know what our capital expenditure needs will be to satisfy our drilling commitments for the calendar year 2024. For a discussion of the risks relating to our drilling obligations, see "Risk Factors-Risks Relating to Our Business", including the risk factor "-*Our acreage must be drilled before lease expiration in order to hold the acreage by production. In the highly competitive market for acreage, failure to drill sufficient wells in order to hold acreage will result in a substantial lease renewal cost, or if renewal is not feasible, loss of our lease and prospective drilling opportunities*". See also Note 5 of the notes to our financial statements as of and for the year ended December 31, 2023.

Management believes that currently available resources may not provide sufficient funds to enable us to meet our financing and drilling obligations for the 2023 fiscal year. We anticipate that we will continue to incur operating losses and generate negative cash flows from operations for the foreseeable future. As a result, we will need additional capital resources to fund our operations both in the short term and in the long term, prior to achieving break even or positive operating cash flow. While we do not have any committed sources of capital, we expect to continue to opportunistically seek access to additional funds through public or private equity offerings or debt financings, through partnering or other strategic arrangements, including credit application arrangements with our third party servicers, or a combination of the foregoing. Despite our efforts, we may face obstacles in continuing to attract new financing due to industry conditions and our history and current record of net losses. We can provide no assurance that we will be able to obtain the financing required to meet our stated objectives or even to continue as a going concern.

**Critical Accounting Estimates.**

*Oil and natural gas properties*-The Company uses the full cost method of accounting for exploration and development activities as defined by the SEC. Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities. Gain or loss on the sale or other disposition of oil and natural gas properties is not recognized, unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least annually and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions.

Table of Contents

Gains and losses on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and natural gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

*Depreciation, depletion, and amortization*-The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

*Ceiling test*-Future production volumes from oil and gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and gas properties. If the net capitalized cost of proved oil and gas properties, net of related deferred income taxes, plus the cost of unproved oil and gas properties, exceeds the present value of estimated future net cash flows discounted at 10%, net of related tax affects, plus the cost of unproved oil and gas properties, the excess is charged to expense and reflected as additional accumulated DD&A. The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

*Asset retirement obligations*-The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

*Recent Accounting Pronouncements*

Our audited financial statements and the accompanying notes thereto found elsewhere in this report contain a description of recent accounting pronouncements.

Table of Contents

## Item 7A. Quantitative and Qualitative Disclosures About Market Risk

**Commodity Price Risk.**

Our financial condition, results of operations and capital resources are highly dependent upon the prevailing market prices of oil and natural gas. These commodity prices are subject to wide fluctuations and market uncertainties due to a variety of factors, some of which are beyond our control. Factors influencing oil and natural gas prices include the level of global demand for oil, the foreign supply of natural gas and oil, the establishment of and compliance with production quotas by oil exporting countries, weather conditions that determine the demand for natural gas, the price and availability of alternative fuels and overall economic conditions. It is impossible to predict future oil and natural gas prices with any degree of certainty. Sustained weakness in oil and natural gas prices may adversely affect our financial condition and results of operations and may also reduce the amount of oil and natural gas reserves that we can produce economically. Any reduction in our oil and natural gas reserves, including reductions due to price fluctuations, can have an adverse effect on our ability to obtain capital for our exploration and development activities. Similarly, any improvements in oil and natural gas prices can have a favorable impact on our financial condition, results of operations and capital resources.

**Interest Rate Sensitivity.**

Interest rate risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates. Interest rate risk is minimized through management’s decision to primarily obtain fixed rate or interest-free debt. The Company is not exposed to material cash flow interest rate risk.

Table of Contents

**Item 8. Consolidated Financial Statements and Supplementary Data**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**


| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm PCAOB #2738 | F-1 |
| **Consolidated Financial Statements of Next Bridge Hydrocarbons, Inc.** | |
| Consolidated Balance Sheets as of December 31, 2023, and 2022 (Restated) | F-2 |
| Consolidated Statements of Operations for the years ended December 31, 2023, and 2022 (Restated) | F-3 |
| Consolidated Statements of Shareholders' Deficit for the years ended December 31, 2023, and 2022 (Restated) | F-4 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2023, and 2022 (Restated) | F-5 |
| Notes to Consolidated Financial Statements for the years ended December 31, 2023, and 2022 (Restated) | F-6 |

Table of Contents

The consolidated financial statements of Next Bridge Hydrocarbons, Inc. appearing in this report have been audited by M&K CPAs, PLLC an independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such reports given on the authority of such firm as experts in accounting and auditing.

We are responsible for the fairness and reliability of the financial statements and other financial data included in this report. In the preparation of the financial statements, it is necessary for us to make informed estimates and judgments based on currently available information on the effects of certain events and transactions. Estimates of the oil and natural gas reserves of the Company and related future net cash flows and the present values were based upon reserve reports prepared by PeTech Enterprises, Inc. have been included in this report. All of the Company's properties are unevaluated properties with the exception of the Hazel Project. The reserve report for 2023 included in this filing is necessary to compare proved reserves for the Hazel Project to the remaining balance of reimbursements due to MHP (the Optionee) is entitled to receive, as its sole recourse for the recoupment of drilling costs, All revenue from Hazel production is payable to MHP until such time as MHP has recovered its reasonable costs and expenses for drilling, completing, and operating the well. As of December 31, 2023, and 2022 the balance due to MHP exceeded the value of the proved reserves resulting in reportable reserves of $-0-.

We have included these estimates in reliance on the authority of such firm as an expert in such matters.

Table of Contents

M&K CPAS PLLC

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders

Next Bridge Hydrocarbons, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Next Bridge Hydrocarbons, Inc. (the Company) as of December 31, 2023 and 2022, and the related consolidated statements of operations, stockholders' deficit, and cash flows for each of the years in the two-year period ended December 31, 2023, and the related notes (collectively referred to as the " consolidated financial state
ments"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2023 and 2022, and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2023 in conformity with accounting principles generally accepted in the United States of America.

**Going Concern**

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, the Company has an accumulated deficit, negative cash flows from operations, and has a net working capital deficiency, which raises substantial doubt about its ability to continue as a going concern. Management's plans regarding these matters are also described in Note 2. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB .

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and the significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing separate opinions on the critical audit matter or on the accounts or disclosures to which it relates.

**Going Concern**

As discussed in Note 2 to the financial statements, the Company had a going concern due to a working capital deficiency, accumulated deficit, and negative cash flows from operations. Auditing management's evaluation of a going concern can be a significant judgement given the fact that the Company uses manage estimates on future revenues and expenses, which are not able to be substantiated. To evaluate the appropriateness of the going concern, we examined and evaluated the financial information that was the initial cause along with management's plans to mitigate the going concern and management's disclosure of going concern.

/s/ M&K CPAS, PLLC

We have served as the Company's auditor since 2024
The Woodlands, TX
July 17, 2024

Table of Contents

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED BALANCE SHEETS**

| | December 31 2023 | Restated December 31, 2022 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash | $ 1,668,847 | $ 569,298 |
| Accounts receivable, related party | - | 177,519 |
| Accounts receivable - working interest owners | 207,470 | - |
| Production receivable | 1,412 | - |
| Prepayments - development costs | 131,340 | 150,000 |
| Prepaid expenses | 76,741 | 62,300 |
| Total current assets | 2,085,810 | 959,117 |
| Oil and natural gas properties, net of impairment | - | - |
| Other assets | 105,179 | 80,179 |
| TOTAL ASSETS | $ 2,190,989 | $ 1,039,296 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Accounts payable | $ 3,777,693 | $ 4,947,774 |
| Prepayments, working interest owners | 311,281 | - |
| Note payable - META | - | 22,573,724 |
| Note payable - related party | 41,221,028 | 2,000,000 |
| Accrued interest payable - unrelated parties | - | 1,571,336 |
| Accrued interest payable - related parties | 3,870,175 | - |
| Total current liabilities | 49,180,177 | 31,092,834 |
| Asset retirement obligations | 248,651 | 246,866 |
| Total liabilities | 49,428,828 | 31,339,700 |
| Commitments and contingencies | | |
| Stockholders' deficit | | |
| Preferred stock, par value $0.0001, 50,000,000 shares authorized; -0- issued and outstanding December 31, 2023 and December 31, 2022 | - | - |
| Common stock, par value $0.0001; 500,000,000 shares authorized; 248,830,516 issued and outstanding at December 31, 2023; 165,472,241 issued and outstanding at December 31, 2022 | 24,883 | 16,547 |
| Additional paid-in capital | 71,956,656 | 51,345,640 |
| Accumulated deficit | (119,219,378) | (81,662,591) |
| Total deficit | (47,237,839) | (30,300,404) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | $ 2,190,989 | $ 1,039,296 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

Table of Contents

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended December 31, 2023 | Restated Successor December 15, 2022 December 31, 2022 | Predecessor January 1, 2022 December 14, 2022 |
|---|---|---|---|
| Oil and natural gas sales | $ 26,031 | $ 2,561 | $ 38,273 |
| Operating expenses: | | | |
| Lease operating expenses | 59,059 | 5,826 | 68,488 |
| Production taxes | 1,874 | 229 | 2,755 |
| General and administrative | 12,095,611 | 916,085 | 7,905,860 |
| Impairment loss | 27,167,415 | 80,743,013 | - |
| Total operating expenses | 39,323,959 | 81,665,153 | 7,977,103 |
| Other income (expense) | | | |
| Prospect fee income | 1,700,000 | - | - |
| Administration income | 41,140 | - | - |
| Interest income | 1 | 1 | 495 |
| Total other income | 1,741,141 | 1 | 495 |
| Loss before income taxes | (37,556,787) | (81,662,591) | (7,938,335) |
| Provision for income taxes | - | - | - |
| **Net loss** | $ (37,556,787) | $ (81,662,591) | $ (7,938,335) |
| **Loss per common share:** | | | |
| **Basic and Diluted** | $ (0.21) | $ (0.49) | $ (0.05) |
| **Weighted average number of common shares outstanding:** | | | |
| **Basic and Diluted** | 180,316,865 | 165,472,241 | 165,472,241 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

Table of Contents

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIT**

| | Common stock shares | Common stock amount | Additional paid-in capital | Accumulated deficit | Total |
|---|---|---|---|---|---|
| **Balance, January 1, 2022** | 1 | $ - | $ 100,546,596 | $ (68,187,516) | $ 32,359,080 |
| Contributions from parent | 0 | - | 316,600 | - | 316,600 |
| Issuance of common stock in Spin Out transaction | 165,472,240 | 16,547 | (16,547) | - | - |
| Net loss - Predecessor | 0 | - | - | (7,938,335) | (7,938,335) |
| **Balance, December 14, 2022** | 165,472,241 | $ 16,547 | $ 100,846,649 | $ (76,125,851) | $ 24,737,345 |
| **Balance, December 15, 2022** | 165,472,241 | $ 16,547 | $ 51,345,640 | $ - | $ 51,362,187 |
| Net loss - Successor, restated | 0 | - | - | (81,662,591) | (81,662,591) |
| **Balance, December 31, 2022** | 165,472,241 | $ 16,547 | $ 51,345,640 | $ (81,662,591) | $ (30,300,404) |
| Common stock issued | 83,358,275 | 8,336 | 15,829,737 | - | 15,838,073 |
| Stock based compensation | 0 | - | 4,781,279 | - | 4,781,279 |
| Net loss | 0 | - | - | (37,556,787) | (37,556,787) |
| **Balance, December 31, 2023** | 248,830,516 | $ 24,883 | $ 71,956,656 | $(119,219,378) | $ (47,237,839) |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

Table of Contents

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended December 31, 2023 | Restated Successor Period December 15, 2022 December 31, 2022 | Predecessor Period January 1, 2022 December 14, 2022 |
|---|---|---|---|
| **Cash Flows (used in) From Operating Activities** | | | |
| Net loss | $ (37,556,787) | $ (81,662,591) | $ (7,938,335) |
| Adjustments to reconcile net loss to net cash from operations: | | | |
| Accretion expense | 1,785 | 1,092 | - |
| Prospect fee offset to note payable | (368,334) | - | - |
| Bad debt expense | - | - | (26,612) |
| Expense related to stock based compensation | 4,781,279 | - | - |
| Impairment loss | 27,167,415 | 80,743,013 | - |
| Change in: | | | |
| Accounts receivable | (208,882) | - | 74,310 |
| Accounts receivable, related party | - | - | (14,153) |
| Prepayments - development costs | 18,660 | - | (150,000) |
| Prepaid expenses | (14,441) | (58,225) | (1,408) |
| Other assets | (25,000) | 39,185 | (94,364) |
| Accounts payable and accrued expenses | (1,353,787) | 2,209,867 | 2,524,381 |
| **Net cash from (used in) operating activities** | (7,558,092) | 1,272,341 | (5,626,181) |
| | | | |
| **Cash Flows From (used in) Investing Activities** | | | |
| Investment in oil and natural gas properties | (8,653,640) | (3,023,030) | (3,859,851) |
| **Net cash used in investing activities** | (8,653,640) | (3,023,030) | (3,859,851) |
| | | | |
| **Cash Flows From Financing Activities** | | | |
| Proceeds from notes payable, related party | 18,000,000 | 2,000,000 | 7,500,000 |
| Payments on promissory notes | (1,000,000) | - | - |
| Prepayments, working interest owners | 311,281 | - | - |
| Contributions from parent, net | - | - | 316,600 |
| **Net cash from financing activities** | 17,311,281 | 2,000,000 | 7,816,600 |
| | | | |
| **Net increase (decrease) in cash** | 1,099,549 | 249,311 | (1,669,432) |
| | | | |
| **Cash - beginning of period** | 569,298 | 319,987 | 1,989,419 |
| | | | |
| **Cash - end of period** | $ 1,668,847 | $ 569,298 | $ 319,987 |
| | | | |
| **Supplemental disclosure of cash flow information:** | | | |
| Cash paid for interest | $ 199,345 | $ - | $ - |
| | | | |
| **Supplemental disclosure of non-cash investing and financing activities:** | | | |
| Common stock issued in spin-out transaction | - | - | 16,547 |
| Common stock issued in working interest acquisition | $ 15,838,073 | $ - | $ - |
| Account receivable cancelled in WI acquisition | $ 177,519 | $ - | $ - |
| Account payable reduced by expense offset | $ - | $ 15,638 | $ - |
| Capitalized Interest | $ 2,498,184 | $ 74,210 | $ 1,289,328 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

Table of Contents

**NEXT BRIDGE HYDROCARBONS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2023**

## 1. NATURE OF BUSINESS

Next Bridge Hydrocarbons, Inc. (the "Company") was incorporated in Nevada on August 31, 2021, as OilCo Holdings, Inc. and changed its name to Next Bridge Hydrocarbons, Inc. pursuant to its Amended and Restated Articles of Incorporation filed on June 30, 2022. The Company spun off from Meta Materials, Inc. ("Meta") on December 14, 2022, resulting in the Company becoming an independent company (the "Spin-Off"). Prior to the Spin-Off, the Company was a wholly owned subsidiary of Meta. Meta became the parent of the Company's subsidiaries in June 2021 in a merger transaction with Torchlight Energy Resources, Inc. ("Torchlight"), the previous parent of the subsidiaries and developer of the properties from their inception up to June 2021.

Effective December 14, 2022 (the "Spin-Off Date"), the Company and all of its wholly owned subsidiaries were involved in a spin off transaction from the Company's former parent, Meta. Meta spun the Company and the Company's wholly owned oil and natural gas subsidiaries in fulfillment of a preferred shareholder liability and other working capital items. As part of the Spin-Off, a change in control event occurred. The Company elected to apply "pushdown" accounting by applying the guidance in Accounting Standards Codification Topic ("ASC") 805, Business Combinations, including the recognition of the Company's assets and liabilities at fair value as of December 14, 2022, as the fair value of the new basis of net assets of the Company. Accordingly, the consolidated financial statements of the Company for periods before and after December 14, 2022 reflect different bases of accounting, and the financial positions and results of operations of those periods are not comparable. Throughout the Company's consolidated financial statements and the accompanying notes herein, periods prior to the change of control are identified as "Predecessor" and periods after the change of control are identified as "Successor". Meta no longer owns 100% of the Company and the Company is now owed by various shareholders. The new shareholders received common stock as consideration and the fair value was determined using the income approach.

The following table summarizes the fair value of the assets acquired and liabilities assumed at the Spin-Off Date.

| | |
|---|---|
| **Consideration in common stock** | $ 51,362,187 |
| | |
| **Recognized Assets and Liabilities** | |
| Cash and cash equivalents | $ 319,987 |
| Accounts receivable, related party | 177,519 |
| Prepaids | 154,075 |
| Oil and natural gas properties | 77,645,689 |
| Other assets | 119,364 |
| Accounts payable | (5,310,456) |
| Notes payable | (20,000,000) |
| Accrued interest | (1,498,217) |
| Asset retirement obligation | (245,774) |
| Net Assets Recognized | $ 51,362,187 |

The accompanying consolidated financial statements contain comparative financial disclosures from the consolidated financial statements for 2022 of the predecessor Company, Meta Materials, Inc., described above. Certain items have been restated as detailed in Note 12.

The Company is an energy company engaged in the acquisition, exploration, exploitation and development of oil and natural gas properties in the United States. The Company's primary focus has been the development of interests in an oil and natural gas project the Company holds in the Orogrande Basin in West Texas in Hudspeth County, Texas (the "Orogrande Project"). In addition, the Company has minor interests in the Eastern edge of the Midland Basin in Texas (the "Hazel Project"), and two minor well interests in the Hunton wells located in Oklahoma (the "Oklahoma Properties"). The Company has five full-time employees, and the Company employs consultants for various roles as needed.

The Company operates its business through five wholly owned subsidiaries Torchlight Energy, Inc., a Nevada corporation ("TEI"), Hudspeth Oil Corporation, a Texas corporation ("Hudspeth"), Torchlight Hazel, LLC, a Texas limited liability company ("Torchlight Hazel"), Wolfbone Investments, LLC, a Texas limited liability company ("Wolfbone") and Hudspeth Operating, LLC, a Texas limited liability company and wholly owned subsidiary of Hudspeth ("Hudspeth Operating"). All intercompany transactions have been eliminated in the consolidated financial statements.

## 2. GOING CONCERN

At December 31, 2023, the Company had not yet achieved profitable operations. The Company had a net loss of $37,556,787 for the year ended December 31, 2023. The Company expects to incur further losses in the development of its business. The Company had a working capital deficit as of December 31, 2023, of $47,094,367. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

The Company's ability to continue as a going concern is dependent on its ability to generate future profitable operations or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due. Management's plan to address the Company's ability to continue as a going concern includes: (1) obtaining debt or equity funding from private placement, institutional, or public sources; (2) obtaining loans from financial institutions, where possible, or (3) participating in joint venture transactions with third parties. Although management believes that it will be able to obtain the necessary funding to allow the Company to remain a going concern through the methods discussed above, there can be no assurances that such methods will prove successful.

These consolidated financial statements have been prepared assuming that the Company will continue as a going concern and therefore, the financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amount and classifications of liabilities that may result from the outcome of this uncertainty.

Table of Contents

## 3. SIGNIFICANT ACCOUNTING POLICIES

The Company maintains its accounts on the accrual method of accounting in accordance with accounting principles generally accepted in the United States of America. Accounting principles followed and the methods of applying those principles, which materially affect the determination of financial position, results of operations and cash flows are summarized below:

***Use of estimates***-The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make estimates and certain assumptions that affect the amounts reported in these consolidated financial statements and accompanying notes. Actual results could differ from these estimates.

***Basis of presentation***-The financial statements are presented on a consolidated basis and include the accounts of Next Bridge Hydrocarbons, Inc. and its wholly owned subsidiaries, TEI, Hudspeth, Torchlight Hazel, Wolfbone, and Hudspeth Operating. All significant intercompany balances and transactions have been eliminated. As noted above, the Company was involved in the Spin-Off on December 14, 2022.

In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary to fairly present the financial position as of, and the results of operations for all periods presented. In preparing the accompanying financial statements, management has made certain estimates and assumptions that affect reported amounts in the consolidated financial statements and disclosures of contingencies. Actual results may differ from those estimates.

**Restatements** - Certain prior year amounts have been restated in the accompanying Consolidated Financial Statements for 2022. Reference Note 12 to the Financial Statements.

***Risks and uncertainties***-The Company's operations are subject to significant risks and uncertainties, including financial, operational, technological, and other risks associated with operating an emerging business, including the potential risk of business failure.

***Concentration of risks***-At times the Company's cash balances are in excess of amounts guaranteed by the Federal Deposit Insurance Corporation. The Company's cash is placed with a highly rated financial institution, and the Company regularly monitors the creditworthiness of the financial institutions with which it does business.

***Fair value of financial instruments***-Financial instruments consist of cash, receivables, payables and promissory notes, if any. The estimated fair values of cash, receivables, and payables approximate the carrying amount due to the relatively short maturity of these instruments. The carrying amounts of any promissory notes approximate their fair value giving affect for the term of the note and the effective interest rates.

For assets and liabilities that require re-measurement to fair value the Company categorizes them in a three-level fair value hierarchy as follows:

- Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities.
- Level 2 inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration.
- Level 3 inputs are unobservable inputs based on management's own assumptions used to measure assets and liabilities at fair value.

A financial asset or liability's classification within the hierarchy is determined based on the lowest level input that is significant to the fair value measurement.

***Cash and cash equivalents*** - Cash and cash equivalents include certain investments in highly liquid instruments with original maturities of three months or less.

***Accounts receivable*** - Accounts receivable consist of amounts due from Joint Interest Billing to the working interest owners who are participants in the Johnson Project. Those owners acquired working interest and participated in funding five wells drilled in 2023 on the Orogrande Project. Balances due represent their pro rata share of charges for development and operating costs allocable to those five wells after applying any prepayments from those owners.

Management reviews receivables periodically and reduces the carrying amount by a valuation allowance that reflects management's best estimate of the amount that may not be collectible. As of December 31, 2023 and 2022, no valuation allowance was considered necessary.

Table of Contents

***Oil and natural gas properties*** - The Company uses the full cost method of accounting for exploration and development activities as defined by the SEC. Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least quarterly and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions. The Company recorded an impairment expense of $27,167,415 to the cost of unevaluated properties for the year ended December 31, 2023, and $80,743,014 for the year ended December 31, 2022.

Gains and losses, if any, on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and natural gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

***Capitalized interest*** - The Company capitalizes interest on unevaluated properties during the periods in which they are excluded from costs being depleted or amortized. During the year ended December 31, 2023, the Company capitalized $2,498,184 of interest on unevaluated properties. Capitalized interest for the year ended December 31, 2022, was $1,363,538.

***Depreciation, depletion, and amortization*** - The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

***Ceiling test*** - Future production volumes from oil and natural gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and natural gas properties. If the net capitalized cost of proved oil and natural gas properties, net of related deferred income taxes, plus the cost of unproved oil and natural gas properties, exceeds the present value of estimated future net cash flows discounted at 10 percent, net of related realizable tax affects, plus the cost of unproved oil and natural gas properties, the excess is charged to expense and reflected as additional accumulated DD&A.

The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and natural gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and natural gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

***Asset retirement obligations*** - The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Table of Contents

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and natural gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

***Share-based compensation*** - Compensation cost for equity awards is based on the fair value of the equity instrument on the date of grant and is recognized over the period during which an employee is required to provide service in exchange for the award.

The Company accounts for stock option awards using the calculated value method. The Company values warrant and option awards using the Black-Scholes option pricing model.

The Company accounts for any forfeitures of options when they occur. Previously recognized compensation cost for an award is reversed in the period that the award is forfeited.

The Company also issues equity awards to non-employees. The fair value of these option awards is estimated when the award recipient completes the contracted professional services. The Company recognizes the expense for the estimated total value of the awards during the period from their issuance until performance completion.

***Income taxes*** - Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is established to reduce deferred tax assets if it is more likely than not that the related tax benefits will not be realized. Reference Note 8 to the Financial Statements.

Authoritative guidance for uncertainty in income taxes requires that the Company recognize the financial statement benefit of a tax position only after determining that the relevant tax authority would more likely than not sustain the position following an examination. Management has reviewed the Company's tax positions and determined there were no uncertain tax positions requiring recognition in the consolidated financial statements. Company tax returns remain subject to federal and state tax examinations. Generally, the applicable statutes of limitation are three to four years from their respective filings.

Estimated interest and penalties related to potential underpayment on any unrecognized tax benefits are classified as a component of tax expense in the statements of operation. The Company has not recorded any interest or penalties associated with unrecognized tax benefits for the year ended December 31, 2023, or for the year ended December 31, 2022.

***Revenue recognition*** - The Company's revenue is typically generated from contracts to sell natural gas, crude oil or NGLs produced from interests in oil and natural gas properties owned by the Company. Contracts for the sale of natural gas and crude oil are evidenced by (1) base contracts for the sale and purchase of natural gas or crude oil, which document the general terms and conditions for the sale, and (2) transaction confirmations, which document the terms of each specific sale. The transaction confirmations specify a delivery point which represents the point at which control of the product is transferred to the customer. The Company elects to treat contracts to sell oil and natural gas production as normal sales, which are then accounted for as contracts with customers. The Company has determined that these contracts represent multiple performance obligations, which are satisfied when control of the commodity transfers to the customer, typically through the delivery of the specified commodity to a designated delivery point.

Revenue is measured based on consideration specified in the contract with the customer, and excludes any amounts collected on behalf of third parties. The Company recognizes revenue in the amount that reflects the consideration it expects to be entitled to in exchange for transferring control of those goods to the customer. Amounts allocated in the Company's price contracts are based on the standalone selling price of those products in the context of long-term contracts. Payment is generally received one or two months after the sale has occurred.

Gain or loss on derivative instruments is outside the scope of ASC 606, *Revenue Recognition*, and is not considered revenue from contracts with customers subject to ASC 606. The Company may in the future use financial or physical contracts accounted for as derivatives as economic hedges to manage price risk associated with normal sales, or in limited cases may use them for contracts the Company intends to physically settle but do not meet all of the criteria to be treated as normal sales.

*Producer Gas Imbalances.* The Company applies the sales method of accounting for natural gas revenue. Under this method, revenues are recognized based on the actual volume of natural gas sold to purchasers.

Table of Contents

***Basic and diluted earnings (loss) per share*** - Basic earnings (loss) per common share is computed by dividing net income (loss) available to common shareholders by the weighted average number of common shares outstanding during the period. Diluted earnings (loss) per common share is computed in the same way as basic earnings (loss) per common share except that the denominator is increased to include the number of additional common shares that would be outstanding if all potential common shares had been issued and if the additional common shares were dilutive. The Company had no dilutive shares for the year ended December 31, 2023, or for the year ended December 31, 2022. Reference Note 7 to the Financial Statements regarding outstanding Stock Options.

***Environmental laws and regulations*** - The Company is subject to extensive federal, state, and local environmental laws and regulations. Environmental expenditures are expensed or capitalized depending on their future economic benefit. The Company believes that it is in compliance with existing laws and regulations. The Company accrued no liability as of December 31, 2023 and December 31, 2022.

***Recent accounting pronouncements adopted*** - In June 2016, the FASB issued ASC 326, Financial Instruments- Credit Losses ("ASC 326"), which replaces the current "incurred loss" methodology for recognizing credit losses with an "expected loss" methodology. This new methodology requires that a financial asset measured at amortized cost be presented at the net amount expected to be collected. This standard is intended to provide more timely decision-useful information about the expected credit losses on financial instruments. For smaller reporting companies, this guidance is effective for fiscal years beginning after December 15, 2022, and early adoption is permitted. The Company adopted this as of January 1, 2023. The adoption of ASC 326 did not have a material impact to our financial statements or results of operations.

**4. OIL & NATURAL GAS PROPERTIES**

The following table presents the capitalized costs for oil and natural gas properties of the Company:

| | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Evaluated costs subject to amortization | $ - | $ - |
| Unevaluated costs | 107,910,429 | 80,743,013 |
| Total capitalized costs | 107,910,429 | 80,743,013 |
| Less accumulated depreciation, depletion and amortization | - | - |
| Less accumulated impairment | (107,910,429) | (80,743,013) |
| Total oil and gas properties | $ - | $ - |

Unevaluated costs as of December 31, 2023, and December 31, 2022, include cumulative costs of developing projects including the Orogrande and Hazel Projects in West Texas and the costs related to the Oklahoma Properties. In accordance with required purchase accounting adjustments related to the Spin-Off, the carrying value of the oil and natural gas assets were adjusted to fair value as of December 15, 2022.

The Company periodically adjusts for the separation of evaluated versus unevaluated costs within its full cost pool to recognize the value impairment related to the expiration of, or changes in market value, of unevaluated leases. The impact of reclassifications as they become necessary is to increase the basis for calculation of future period's depletion, depreciation and amortization which effectively recognizes the impairment on the consolidated statement of operations over future periods. Reclassified costs also become evaluated costs for purposes of ceiling tests, and which may cause recognition of increased impairment expense in future periods. There were no remaining cumulative unevaluated costs which had been reclassified within the Company's full cost pool totals as of December 31, 2023, or December 31, 2022, since the Company had no proved reserve value associated with our properties.

Due to the volatility of commodity prices, should oil and natural gas prices decline in the future, it is possible that a write-down could occur. Proved reserves are estimated quantities of crude oil, natural gas, and NGLs, which geological and engineering data demonstrate with reasonable certainty to be recoverable from known reservoirs under existing economic and operating conditions. The independent engineering estimates include only those amounts considered to be proved reserves and do not include additional amounts which may result from new discoveries in the future, or from application of secondary and tertiary recovery processes where facilities are not in place or for which transportation or marketing contracts are not in place. Estimated reserves to be developed through secondary or tertiary recovery processes are classified as unevaluated properties.

Table of Contents

**Current Projects**

The Company is an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. The Company is primarily focused on the acquisition of early-stage projects, the development and delineation of these projects, and then the monetization of those assets once these activities are completed.

The Company's primary focus is the development of interests in oil and natural gas projects it holds in the Permian Basin in West Texas. The Company also holds minor interests in certain other oil and natural gas projects in Central Oklahoma that it is in the process of divesting.

As of December 31, 2023, the Company had interests in three oil and natural gas projects: the Orogrande Project in Hudspeth County, Texas (16 wells), the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, (7 wells) and two wells in Central Oklahoma.

Orogrande Project, West Texas

On August 7, 2014, Torchlight entered into a Purchase Agreement with Hudspeth, McCabe Petroleum Corporation ("MPC"), and Gregory McCabe ("Mr. McCabe"). Mr. McCabe was the sole owner of both Hudspeth and MPC. Under the terms and conditions of the Purchase Agreement, Torchlight purchased 100% of the capital stock of Hudspeth which held certain oil and natural gas assets, including a 100% working interest in approximately 172,000 predominately contiguous acres in the Orogrande Basin in West Texas. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe. Such back-in interest was contributed to the Company pursuant to that certain Contribution Agreement (as defined below). Mr. McCabe also owns a controlling interest in Magdalena, an entity that holds a 4.5% overriding royalty interest in the Orogrande acreage, -which he obtained prior to, and was not a part of the August 2014 transaction.

Effective March 27, 2017, the Orogrande acreage became subject to a University Lands D&D Unit Agreement ("DDU Agreement"), which allows for all 192 existing leases covering approximately 134,000 gross acres leased from University Lands to be combined into one drilling and development unit for development purposes. The term of the DDU Agreement expires on December 31, 2024, and the time to drill on the drilling and development unit continues through December 31, 2024. The DDU Agreement grants the right to extend the DDU Agreement through December 31, 2029 if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid. The Company expects to exercise its option to extend the term under the DDU Agreement prior to its expiration.

Drilling obligations under the DDU Agreement include five wells per year in the years 2021, 2022 and 2023 and five wells in 2024. The drilling obligations are minimum yearly requirements and may be exceeded if acceleration is desired.

*Drilling Requirement 2023*

Effective as of October 6, 2023, the Company and certain investor participants (each a "Participant" and collectively the "Participants") entered into twenty-five separate Participation Agreements (the "Participation Agreements"), "The Johnson Project", to conduct drilling of wells in approximately 17,000 acres in Hudspeth County, Texas, which is a portion of the Company's Orogrande Prospect. The aggregate total of Prospect Fees paid by the participants was $1,700,000.

As of December 31, 2023, the 2023 drilling requirements had been met and leases covering approximately 134,000 acres remain in effect.

While drilling wells under our 2023 and 2022 drilling obligation, our operations team deployed a new mist drilling solution that increased hole stability, which we believe will result in meaningful cost savings for additional wells drilled in the Orogrande Project. Multiple test wells were drilled in the Orogrande Project in order to stay in compliance with the DDU Agreement. While these previously drilled wells may have potential to produce hydrocarbons to sell commercially in the future, we have no immediate plans to deploy the additional capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including reservoir locations, target depths and designated acreage, in the Orogrande Project. Notwithstanding the foregoing, development of the wells continued through December 31, 2023, to further capture and document the scientific base in support of demonstrating the production potential of the property.

Table of Contents

*Acquisition of Working Interest*

On December 21, 2022, the Company entered into that certain Agreement and Plan of Merger (the "Merger Agreement") with Hudspeth, Wolfbone, MPC and Mr. McCabe, pursuant to which in a series of transactions the oil and natural gas leases, the lands covered by such leases, pooling and communitization agreements, rights-of-way, the surface estate of the lands and all wells located in Orogrande Project will be transferred, conveyed and assigned to Hudspeth (or its designated assignee) in consideration of (1) treating the Orogrande Obligations (as defined in the Merger Agreement) as having been irrevocably satisfied and discharged in full with respect to MPC and (2) an issuance of 56,297,638 shares of Company common stock to Mr. McCabe (such series of transactions collectively, the "Merger").

The Merger became effective on April 25, 2023. As a result of the Merger, the Company acquired Wolfbone's 22.6249% remaining rights to working interest in the Orogrande Project in consideration of the issuance by the Company of the 56,297,638 shares of the Company's common stock to Mr. McCabe.

The Merger was completed in accordance with the Texas Business Organizations Code, whereby (a) the Company formed NBH MergeCo, LLC with the State of Texas ("MergeCo") in order to cause Hudspeth to assign all of its rights under the Merger Agreement to MergeCo and MergeCo assumed Hudspeth's obligations under the Merger Agreement, (b) MergeCo, Wolfbone and MPC merged with each of Wolfbone and MPC as surviving entities, and (c) Wolfbone became a direct and wholly-owned subsidiary of the Company. The closing of the transactions contemplated by the Merger Agreement occurred on May 11, 2023.

On May 11, 2023, the Company and its wholly owned subsidiary, Hudspeth, entered into a contribution and exchange agreement with each of the prior working interest owners in the Orogrande Project named in the table below (each an "Orogrande Owner" and collectively, the "Orogrande Owners"), pursuant to which, the Company issued to the Orogrande Owners the number of shares of the Company's common stock set forth opposite such Orogrande Owner's name below in exchange for and in order to acquire such Orogrande Owner's rights to working interest in the Orogrande Project.

| | **Shares of Common Stock** | **Working Interest Contribution** |
|---|---|---|
| Dingus Investments, Inc. | 7,050,382 | 2.8334% |
| Pandora Energy, LP | 6,220,779 | 2.5000% |
| Kennedy Minerals, Ltd | 6,220,779 | 2.5000% |
| The de Compiegne Property Company No. 20, Ltd | 6,220,779 | 2.5000% |
| Loma Hombre Energy, LLC | 622,078 | 0.2500% |
| Sero Capital, LLC | 725,840 | 0.2917% |
| **TOTAL** | **27,060,637** | **10.8751%** |

The Orogrande Project ownership as of December 31, 2023, is detailed as follows:

| | Revenue Interest | Working Interest |
|---|---|---|
| University Lands - Mineral Owner | 20.000% | |
| ORRI - Magdalena Royalties, LLC, an entity controlled by Gregory McCabe, Chairman of the Board | 4.500% | |
| ORRI - Unrelated Party | 0.500% | |
| Hudspeth Oil Corporation, a subsidiary of Next Bridge Hydrocarbons, Inc. | 56.250% | 75.000% |
| Wolfbone Investments, LLC, a subsidiary of Next Bridge Hydrocarbons, Inc. | 18.750% | 25.000% |
| | 100.000% | 100.000% |

Table of Contents

Hazel Project in the Midland Basin in West Texas

Effective April 4, 2016, TEI acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. A back-in after payout of a 25% working interest was retained by MPC and another unrelated working interest owner.

In October 2016, the holders of all of Torchlight's then-outstanding shares of Series C Preferred Stock (which were issued in July 2016) elected to convert into a total 33.33% working interest in our Hazel Project, reducing TEI's ownership from 66.66% to a 33.33% working interest.

*Acquisition of Additional Interests in Hazel Project*

On January 30, 2017, Torchlight entered into and closed an Agreement and Plan of Reorganization and a Plan of Merger with an entity which was wholly owned by Mr. McCabe, which resulted in the acquisition of approximately 40.66% working interest in the 12,000 gross acres, 9,600 net acres, in the Hazel Project.

Also on January 30, 2017, Torchlight entered into and closed a Purchase and Sale Agreement with Wolfbone. Under the agreement, Torchlight acquired certain of Wolfbone's Hazel Project assets, including its interest in the Flying B Ranch #1 well and the 40-acre unit surrounding the well.

Upon the closing of the transactions, the Torchlight working interest in the Hazel Project increased by 40.66% to a total ownership of 74%.

Effective June 1, 2017, Torchlight acquired an additional 6% working interest from unrelated working interest owners increasing its working interest in the Hazel project to 80%, and an overall net revenue interest of 75%.

Seven test wells have been drilled on the Hazel Project to capture and document the scientific base in support of demonstrating the production potential of the property.

*Option Agreement with Masterson Hazel Partners, LP*

On August 13, 2020, the Company's subsidiaries TEI and Torchlight Hazel (collectively, "Torchlight Subs") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and MPC. Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on the Hazel Project, sufficient to satisfy Torchlight Subs's continuous development obligations on the southern half of the prospect no later than September 30, 2020. MHP has satisfied this drilling obligation. MHP paid Torchlight Subs $1,000 as an option fee at the time of execution of the Option Agreement. MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the Well attributable to Torchlight Subs's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the well.

In exchange for MHP satisfying the above drilling obligations, Torchlight Subs granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight Subs's continuous development obligations on the northern half of the prospect. MHP declined to exercise its option to purchase the entire Hazel Project.

Hunton Play, Central Oklahoma

As of December 31, 2023, the Company was producing from one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

**The McCabe Contribution Agreement**

On July 25, 2023, the Company entered into a Contribution Agreement among the Company, Mr. McCabe, and MPC, an entity exclusively owned and operated by Mr. McCabe (the "McCabe Contribution Agreement"), pursuant to which Mr. McCabe will contribute up to a ten percent (10%) back-in working interest option for the Orogrande Project exercisable following the point in time at which the proceeds of all production from all operations conducted on the Orogrande Project (exclusive of royalty, overriding royalty and taxes chargeable to the working interest) equals the actual cost incurred by NBH and its predecessors in drilling, testing, equipping and the cost of operating the wells located on the Orogrande Prospect, inclusive of overhead charges (the "Back-In Interest"), an option originally granted to Mr. McCabe pursuant to that certain Participation Agreement, dated September 23, 2014 (the "Participation Agreement"), by and among Mr. McCabe, Hudspeth, and MPC, and MPC will contribute up to one hundred percent (100%) of the interest currently held by MPC in the drilling project located on over 1,150 acres in Vermillion Parish, Louisiana (the "Bronco Prospect"). Pursuant to the McCabe Contribution Agreement, and subject to the satisfaction of certain conditions provided therein, including the effectiveness of the Company's Registration Statement on Form S-1 (File No. 333-273442) filed with the SEC on July 26, 2023 (as amended, the "Registration Statement"), Mr. McCabe will contribute an amount of the Back-In Interest and MPC will contribute an amount of the Bronco Prospect in proportion to the percentage of shares of common stock of NBH that are directly registered in the name of the beneficial owner with the Company's transfer agent on or prior to the record date (as defined in the Registration Statement) and remain directly registered with the Company's transfer agent for the holding period (as defined in the Registration Statement).

Table of Contents

**5. RELATED PARTY BALANCES**

As of December 31, 2023, and December 31, 2022, the Company had a balance of $-0- and $177,519, respectively, for an account receivable due from MPC, an entity controlled by the largest shareholder and the chairman of the Company's Board of Directors, for amounts advanced related to the Orogrande development cost sharing arrangement agreed to in connection with the acquisition of the Orogrande working interests in 2014. In connection with the closing of the Merger, the account receivable due from MPC was deemed fully satisfied and discharged.

*The 2021 Note and Loan Agreement*

On October 1, 2021, the Company entered into a note payable with Meta, its former parent, to borrow up to $15 million which bears interest at 8% per annum, computed on the basis of a 360-day year (the "2021 Note"). The 2021 Note was initially to mature on March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if the Company raised $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date would be extended to September 30, 2023, and the outstanding principal of the 2021 Note would amortize in six equal, monthly installments. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts the Company's ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of its assets, unless the Company is the surviving entity, or the successor entity assumes all of obligations under the 2021 Note. The 2021 Note is collateralized by certain shares of common stock in Meta held by one of Meta's stockholders, Mr. McCabe, and by a lien on a 25% interest in the Orogrande Project owned by Wolfbone, a subsidiary of the Company.

On September 2, 2022, the Company entered into a loan agreement with Meta, as lender (the "Loan Agreement") that would govern prior loan amounts advanced to the Company from Meta. As of August 11, 2022, and August 29, 2022, the Company borrowed an additional $1.2 million and $1.46 million, respectively, representing the remaining amount available for borrowing under the Loan Agreement and resulting in a total of $5 million principal amount outstanding related to the Loan Agreement, the proceeds of which were used for working capital and general corporate purposes. The term loans under the Loan Agreement bear interest at a per annum rate equal to 8% and were to mature on March 31, 2023 (the "Maturity Date"); provided, however, if the Company raised $30 million or more in capital through debt or equity, or a combination thereof by the Maturity Date, the Maturity Date would be extended to October 3, 2023 and the term loan would be amortized in six equal monthly installments. The Loan Agreement includes customary representations and covenants that, subject to exceptions and qualifications, restrict our ability to do certain things, such as: engage in mergers, acquisitions, and asset sales; transact with affiliates; undergo a change in control; incur additional indebtedness; incur liens; make loans and investments; declare dividends or redeem or repurchase equity interests; and enter into certain restrictive agreements. In addition, the Loan Agreement contains customary events of default, mandatory prepayment events and affirmative covenants, including, without limitation, covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our material properties, reporting requirements, compliance with applicable laws and regulations, and formation or acquisition of new subsidiaries.

On March 31, 2023, the Company entered into an amendment to the 2021 Note and an amendment to Loan Agreement in order to extend each of the 2021 Note Maturity Date and the Maturity Date respectively from March 31, 2023, to October 3, 2023. Such amendments also removed the provisions allowing for extensions of the 2021 Note Maturity Date and the Maturity Date in the event the Company raised $30 million or more in capital through debt or equity or a combination thereof by March 31, 2023.

Under the terms of the Arrangement Agreement that governed the merger transaction between Torchlight and Meta in June 2021, the oil and natural gas assets were to be sold or spun out from Meta and the costs of any sale or spin-off incurred by Meta were to be borne the then-existing shareholders of Torchlight. The amount of the reimbursement payable to Meta in connection with the Spin-Off is $2.59 million which was added to the principal amount of the Loan Agreement for a principal balance outstanding of $7.59 million as of March 31, 2023. Concurrently with the amendment to the Loan Agreement, the Company made a prepayment of $1 million to reduce the principal balance to $6.59 million.

Table of Contents

On August 7, 2023, Mr. McCabe and Meta entered into a Loan Sale Agreement whereby Mr. McCabe purchased from Meta (i) the 2021 Note and (ii) all outstanding loans made to the Company by Meta pursuant to the Loan Agreement (the "Loan Purchase"). As a result of the Loan Purchase, Mr. McCabe replaced Meta as the lender and secured party under the 2021 Note and the Loan Agreement. Additionally, as part of the Loan Purchase, Meta assigned to Mr. McCabe its lien on 25% of the Orogrande Prospect. The Company's obligations and responsibilities under the 2021 Note and the Loan Agreement remain unchanged.

The combined balance on the 2021 Note and the Loan Agreement as of December 31, 2023 was $21.22 million. As of December 31, 2023, the combined total accrued and unpaid interest under the 2021 Note and the Loan Agreement was $3.06 million.

On October 1, 2023, the Company entered into an amendment to the 2021 Note and an amendment to Loan Agreement in order to extend each of the 2021 Note Maturity Date and the Maturity Date respectively from October 3, 2023 to March 31, 2024. An additional Amendment in March, 2024 extended the maturity date to September 30, 2024.

On December 22, 2022, the Company issued an unsecured promissory note in the principal amount of up to $20 million in favor of Mr. McCabe (the "2022 Note"), which bears interest at 5% per annum, computed on the basis of a 365-day year.

On June 16, 2023, the Company entered into an amendment to the 2022 Note in order to extend the maturity date of the 2022 Note (the "2022 Note Maturity Date") from June 21, 2023 to October 3, 2023. Such amendment also removed the provisions allowing for extensions of the 2022 Note Maturity Date in the event the Company raised $30 million or more in capital through debt or equity or a combination thereof by March 31, 2023. The revolving commitment under the 2022 Note expires on the 2022 Note Maturity Date. As of December 31, 2023, the Company had $20 million in principal amount outstanding under the 2022 Note. As of December 31, 2023, the Company had $815,202 in accrued but unpaid interest on the 2022 Note.

On December 31, 2023, the Company entered into an amendment to the 2022 Note in order to extend the 2022 Note Maturity Date from October 3, 2023 to March 31, 2024. An additional Amendment in March, 2024 extended the maturity date to September 30, 2024.

## 6. COMMITMENTS AND CONTINGENCIES

**Legal Matters**

On April 30, 2020, the Company's wholly owned subsidiary, Hudspeth, filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies ("Cordax"). The suit, *Hudspeth and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies*, was filed in the 189th Judicial District Court of Harris County, Texas. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Wolfbone, a subsidiary of the Company, is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. Meta, as the Company's parent at the time, determined to add the manufacturer of one of the tool components that it contends was one of the causes of the tool failure. It was later disclosed that Cordax is the subsidiary of a Canadian parent company, who has also been added to the case. Cordax's current Chairman of the Board filed a special appearance after being served with a citation, alleging that he was a Canadian citizen with no meaningful ties to Texas. After discovery was conducted on this issue, a nonsuit without prejudice for this defendant was filed, dismissing him from the case. The remaining parties attended mediation on June 15, 2022, that was unsuccessful in resolving the case. Cordax filed a motion for summary judgment, attempting to dismiss Hudspeth and Wolfbone's claims. The Court denied Cordax's motion. Discovery is substantially complete. The Company is required to indemnify Meta in connection with this matter pursuant to the terms of the Distribution Agreement with Meta entered into in connection with the consummation of the Spin-Off. Prior to trial, in 2024, the parties settled the case. As soon as Cordax fulfills its payment obligations to Hudspeth (the amount of which is confidential), the Harris County case will be dismissed with prejudice. Cordax's releases of Hudspeth and Wolfbone were effective when the Settlement Agreement was signed, May 16, 2024.

On March 18, 2021, Cordax filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500.01 and recover related attorney's fees. The foreclosure action, *Datalog LWT Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc*., was filed in the 205th Judicial District Court of Hudspeth County, Texas. The Company is contesting the lien in good faith and filed a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final disposition of the related case currently pending in Harris County, Texas. The Company is required to indemnify Meta in connection with this matter pursuant to the terms of the Distribution Agreement with Meta. As part of the settlement in the Harris County case, Cordax released the mineral lien, and the case has been dismissed with prejudice.

On March 15, 2024, a securities class action captioned *Targgart v. Next Bridge Hydrocarbons, Inc., et al.*, No. 24-cv-1927, was filed in the U.S. District Court for the Eastern District of New York. The action is brought on behalf of a putative class of persons or entities that acquired the Company's shares in connection with the Company's spin-off from Meta Materials, Inc., in December 2022. The complaint names as defendants the Company and certain of its current and former officers and directors. The complaint asserts claims under Sections 11 and 15 of the Securities Act, alleging that the Form S-1 that the Company filed with the SEC on July 14, 2022, which became effective on November 18, 2022, contained untrue statements or omissions. The complaint seeks, among other things, unspecified statutory and compensatory damages.

**Environmental Matters**

The Company is subject to contingencies as a result of environmental laws and regulations. Present and future environmental laws and regulations applicable to the Company's operations could require substantial capital expenditures or could adversely affect its operations in other ways that cannot be predicted at this time. As of December 31, 2023, and December 31, 2022, no amounts had been recorded because no specific liability has been identified that is reasonably probable of requiring the Company to fund any future material amounts.

Table of Contents

## 7. STOCKHOLDERS' EQUITY

The Company has
500,000,000 authorized shares of common stock, par value of $0.0001 per share and 50,000,000 authorized shares of preferred stock, par value of $0.0001 per share. As of December 31, 2022, the Company had 165,472,241 outstanding shares of common stock outstanding that had been issued in the Spin Out transaction on December 14, 2022, and no shares of preferred stock outstanding.

On April 25, 2023, the Company issued 83,358,275 shares of common stock for the acquisition of additional working interest in the Orogrande Project.

As of December 31, 2023, the Company had 248,830,516 outstanding shares of common stock and no shares of preferred stock outstanding.

**Stock Based Compensation**

In 2022, the Company's board of directors adopted, and the stockholders approved, the 2022 Equity Incentive Plan (the "2022 Plan"). The 2022 Plan permits the Company to grant stock options, restricted stock, restricted stock units, performance shares awards and any one or more of the foregoing, for up to a maximum of 58,273,612 shares following an automatic increase to the number of shares reserved under the 2022 Plan on January 1, 2023.

During the year ended December 31, 2023, the Company granted 35,856,521 stock options in the first and second quarters of 2023 as authorized under the 2022 Plan.

Upon the resignations by certain of the Company's employees in the second quarter, 2023, 6,618,889 of the options granted to those employees in March, 2023. were forfeited, canceled, and returned to the option pool available under the 2022 Plan.

As of December 31, 2023, 29,237,632 options are outstanding.

Vesting was subject to continued service with the Company for up to one year with provisions for earlier vesting subject to the attainment of events outlined in the Plan.

Options were fully vested as of December 31, 2023.

Options granted were valued using the Black-Scholes Option Pricing Model resulting in a total value of $4,781,279. Option expense for the year ended December 31, 2023, net of forfeitures, was $4,781,279.

Inputs to the Black-Scholes Model are as follows:

| | |
|---|---|
| Risk-free interest rate | 4.00% |
| Expected volatility of common stock | 125.39% |
| Dividend yield | 0.00% |
| Discount due to lack of marketability | 0% |
| Expected life of option/warrant | Ten Years |

A summary of stock options outstanding as of December 31, 2023, all of which expire in 2033, including the relevant exercise price is presented below:

| Exercise Price | Expiration 2033 | Total |
|---|---|---|
| $ 1.2056 | 29,237,632 | 29,237,632 |
| | 29,237,632 | 29,237,632 |

Table of Contents

## 8. INCOME TAXES

The Company recorded no income tax provision at December 31, 2023 and December 31, 2022 because of anticipated losses for the 2024 fiscal year and actual losses incurred in 2023.

The Company estimates its annual effective income tax rate in recording its provision for income taxes in the various jurisdictions in which it operates. Statutory tax rate changes and other significant or unusual items are recognized as discrete items in the quarter in which they occur. The Company recorded no income tax expense for the year ended December 31, 2023 because the Company incurred a tax loss in the current year. Similarly, no income tax expense was recognized for the year ended December 31, 2022.

| | Year ended December 31, 2023 | Year ended December 31, 2022 |
|---|---|---|
| Total Deferred Tax Assets | $ 10,319,663 | $ 8,257,238 |
| Valuation Allowance for Deferred Tax Assets | (10,319,663) | (8,257,238) |
| Deferred Tax Assets, net of valuation allowance | - | - |
| Total Net Deferred Tax Asset | $ - | $ - |

The Company had a gross deferred tax asset related to federal net operating loss carryforwards of $ 69,594,386 and $55,153,554 at December 31, 2023 and December 31, 2022, respectively. The federal net operating loss carryforward will begin to expire in 2034. Realization of the deferred tax asset is dependent, in part, on generating sufficient taxable income prior to expiration of the loss carryforwards. The Company has placed a 100% valuation allowance against the net deferred tax asset because future realization of these assets is not assured.

## 9. NOTES PAYABLE, RELATED PARTIES

On October 1, 2021, we issued a secured, revolving promissory note in an original principal amount of up to $15 million, which was subsequently increased to $20 million, in favor of Meta (as amended to date, the “2021 Note”). The 2021 Note was fully drawn with a principal balance outstanding of $20 million, bears interest at 8% per annum, computed on the basis of a 360-day year. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum.

On August 7, 2023, following the Loan Purchase, Mr. McCabe replaced Meta as the lender and secured party under the 2021 Note but the Company’s obligations under the 2021 Note remain unchanged.

On December 31, 2023, the Company and Mr. McCabe as successor in interest to Meta entered into an amendment to the 2021 Note and an amendment to the Loan Agreement extending the 2021 Note Maturity Date and the Maturity Date, respectively to March 31, 2024. An additional Amendment effective June 30, 2024 extended the maturity date to September 30, 2024.

Additionally, we have an aggregate principal balance of $6,589,362 outstanding under the Loan Agreement with Mr. McCabe as successor-in-interest to Meta, which bears interest at a fixed rate of 8% per annum if no event of default exists, and at a fixed rate of 12% per annum if an event of default exists.

On December 31, 2023, the Company and Mr. McCabe entered an amendment to the 2022 Note extending the 2022 Note Maturity Date to March 31, 2024. An additional Amendment effective June 30, 2024 extended the maturity date to September 30, 2024.

The combined balance on the 2021 Note ($15 million) and the Loan Agreement ($6.2 million) as of December 31, 2023, was $21.22 million. As of December 31, 2023, the combined total accrued and unpaid interest under the 2021 Note and the Loan Agreement was $24.28 million.

*Table of Contents*

In connection with the Merger, on December 22, 2022, the Company entered into an additional Note in the principal amount of up to $20 million in favor of Mr. McCabe. Mr. McCabe is the largest shareholder of the Company's common stock and the chairman of the board of directors of the Company. As of December 31, 2023, the Company had a balance of $20 million and accrued and unpaid interest of $815,202 due under the 2022 Note. An Amendment effective June 30, 2024 extended the maturity date to September 30, 2024.

**10. ASSET RETIREMENT OBLIGATIONS**

The following is a reconciliation of the asset retirement obligations liability through December 31, 2023:

| | | |
|---|---|---|
| Asset retirement obligations - January 1, 2022 | $ | 21,937 |
| | | |
| Accretion expense | | 1,092 |
| Estimated liabilities recorded | | 223,837 |
| Asset retirement obligations - December 31, 2022 | $ | 246,866 |
| | | |
| Accretion expense | | 1,785 |
| Estimated liabilities recorded | | - |
| Asset retirement obligations - December 31, 2023 | $ | 248,651 |

**11. SUBSEQUENT EVENTS**

On January 23, 2024, Mr. McCabe loaned $1,000,000 to us, which was evidenced under a 0% Senior Unsecured Promissory Note effective as of that date (the "McCabe Note"), which provided, among other things, that the loan will be due on February 28, 2025, with the Company having the option to extend the loan by one additional year. The loan will bear interest at the rate of 0% per annum and will be payable in one balloon payment of principal and interest on the maturity date. If we elect to extend the loan for one year, the loan will continue to bear interest at the rate of 0% per annum and will be payable in one balloon payment of principal and interest on the extended maturity date.

On February 29, 2024, CAPCO Holding, Inc., a Texas corporation ("Capco"), loaned us $2,000,000 under a 12% Secured Promissory Note (the "Capco Note"), which provides, among other things, that the loan will be due in one year, with us having the option to extend the loan by one additional year. The loan will bear interest at the rate of 12% per annum and will be payable in one balloon payment of principal and interest on the maturity date. If we elect to extend the loan for one year, we must pay all accrued interest for that first year, and thereafter, the loan will bear interest at a rate that is mutually agreeable to us and Capco, which rate will not exceed 18% per annum, and will be payable in one balloon payment of principal and interest on the extended maturity date. As part of the transaction, Gregory McCabe, our Chairman and Chief Executive Officer, entered into a Stock Pledge and Security Agreement with Capco under which he pledged 250,000 of his shares of common stock of the Company to secure our obligations under the Capco Note. Further, Mr. McCabe entered into a Subordination Agreement (the "Subordination Agreement") with Capco and us under which Mr. McCabe agreed to subordinate all of the Company's indebtedness and obligations owed to Mr. McCabe to the Capco Note, under the terms and conditions of the Subordination Agreement.

Also on February 29, 2024, we entered into a Consulting Agreement with an individual, under which the Consultant has agreed to provide analysis and advisory services to us for consideration of $10,000 per month and the issuance to him of 500,000 shares of common stock, under the terms and conditions of the Consulting Agreement.

In March 2024, we enter into and closed a Contribution Agreement with Wildcat Partners SPV, LLC, a Delaware limited liability company ("Wildcat"), under which Wildcat transferred to us 100% of the issued and outstanding membership interests in each of (a) Wildcat Cowboy, LLC, a Texas limited liability company ("Cowboy"), (b) Wildcat Packer, LLC, a Texas limited liability company ("Packer"), (c) Wildcat Panther, LLC, a Texas limited liability company ("Panther") and (d) Wildcat Valentine, LLC, a Texas limited liability company ("Valentine"). As consideration, we issued 2,500,000 shares of our common stock, under the terms and conditions of the Contribution Agreement.

Also on April 2, 2024, we entered into a Consulting Agreement with an individual, under which the Consultant has agreed to provide analysis and advisory services to us for consideration of 100,000 shares of common stock.

Table of Contents

**12. EXPLANATION OF THE RESTATEMENT**

This Form 10-K amends and restates the 2022 Original Filing and the Amendment No. 1 to present restated fiscal year 2022 consolidated financial statements and related disclosures arising from an impairment analysis during the 2023 audit and the related reaudit of the Company's fiscal year 2022 financial statements.

**Items Amended in this Filing - Refer to detail descriptions of adjustments below after each Statement.**

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED BALANCE SHEETS**

| | As Originally Reported December 31, 2022 | Adjustment | As Restated December 31, 2022 |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash | $ 569,298 | $ - | $ 569,298 |
| Accounts receivable | - | - | - |
| Accounts receivable, related party | 177,519 | - | 177,519 |
| Prepayments - development costs | 150,000 | - | 150,000 |
| Prepaid expenses | 62,300 | - | 62,300 |
| Total current assets | 959,117 | - | 959,117 |
| Oil and gas properties | 79,695,928 | (79,695,928) | - |
| Other assets | 80,179 | - | 80,179 |
| TOTAL ASSETS | $ 80,735,224 | (79,695,928) | $ 1,039,296 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 3,891,649 | $ 1,056,125 | $ 4,947,774 |
| Note Payable - META | 22,573,724 | - | 22,573,724 |
| Note Payable - Related Party | 2,000,000 | - | 2,000,000 |
| Accrued interest payable, unrelated party | 1,571,336 | - | 1,571,336 |
| Total current liabilities | 30,036,709 | 1,056,125 | 31,092,834 |
| Asset retirement obligations | 246,866 | - | 246,866 |
| Total liabilities | 30,283,575 | 1,056,125 | 31,339,700 |
| Commitments and contingencies | | | |
| Stockholders' equity (deficit): | | | |
| Preferred stock, par value $0.001, 500,000,000 shares authorized; -0- issued and outstanding December 31, 2022 and December 31, 2021 | - | - | - |
| Common stock, par value $0.001; 500,000,000 shares authorized; 165,472,241 issued and outstanding at December 31, 2022; One issued and outstanding at December 31, 2021 | 16,547 | - | 16,547 |
| Additional paid-in capital | 51,345,640 | - | 51,345,640 |
| Accumulated deficit | (910,538) | (80,752,053) | (81,662,591) |
| Total stockholders' equity (deficit) | 50,451,649 | (80,752,053) | (30,300,404) |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) | $ 80,735,224 | $ (79,695,928) | $ 1,039,296 |

2022 Balance Sheet restatement reflects the Impairment adjustment to the carrying value of the Company's Oil and Natural gas properties as discussed above. An additional restatement to accounts payable to adjust cut off as of December 31, 2022 was made.

Table of Contents

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | As Originally Reported<br>Predecessor Period January 1, 2022 December 14, 2022 | As Originally Reported<br>Successor Period December 15, 2022 December 31, 2022 | Adjustment | As Restated<br>Successor Period December 15, 2022 December 31, 2022 |
|---|---|---|---|---|
| Oil and gas sales | $ 38,273 | $ 2,561 | | $ 2,561 |
| Operating expenses: | | | | |
| Lease operating expenses | 68,488 | 5,826 | | 5,826 |
| Production taxes | 2,755 | 229 | | 229 |
| General and administrative | 7,905,860 | 907,045 | 9,040 | 916,085 |
| Impairment expense | - | - | 80,743,013 | 80,743,013 |
| Depreciation, depletion and amortization | - | - | | - |
| Total operating expenses | 7,977,103 | 913,100 | 80,752,053 | 81,665,153 |
| Other income (expense) | | | | |
| Gain on extinguishment of debt | - | - | | - |
| Gain (loss) on sale of assets | - | - | | - |
| Interest expense and accretion of note discounts | - | - | | - |
| Franchise tax | - | - | | - |
| Interest income | 495 | 1 | | 1 |
| Total expense, net | 495 | 1 | - | 1 |
| Loss before income taxes | 7,938,335 | 910,538 | 80,752,053 | 81,662,591 |
| Provision for income taxes | - | - | - | - |
| **Net loss** | $ 7,938,335 | $ 910,538 | $ 80,752,053 | $ 81,662,591 |
| **Loss per common share:** | | | | |
| **Basic and Diluted** | $ (0.05) | $ (0.01) | | $ (0.49) |
| **Weighted average number of common shares outstanding:** | | | | |
| **Basic and Diluted** | 165,472,241 | 165,472,241 | | 165,472,241 |

**Year ended December 31, 2022 Statement of Operations reflects the impairment adjustment described above and an increase of $9,040 in general and administrative expense arising from the adjustment of accounts payable cut off at December 31, 2022**

Table of Contents

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | As Originally Reported | As Originally Reported | | As Restated |
|---|---|---|---|---|
| | Predecessor Period January 1, 2022 December 14, 2022 | Successor Period December 15, 2022 December 31, 2022 | Adjustment | Successor Period December 15, 2022 December 31, 2022 |
| **Cash Flows From Operating Activities (used in)** | | | | |
| Net loss | $ (7,938,335) | $ (910,538) | $ (80,752,053) | $ (81,662,591) |
| Adjustments to reconcile net loss to net cash from operations: | | | | |
| Accretion expense | - | 1,092 | - | 1,092 |
| Bad debt expense | (26,612) | - | - | - |
| Impairment expense | - | - | 80,743,013 | 80,743,013 |
| Depreciation, depletion and amortization | - | - | - | - |
| Paid in kind interest | - | - | - | - |
| Change in: | | | - | - |
| Accounts receivable | 74,310 | - | - | - |
| Accounts receivable, related party | (14,153) | - | - | - |
| Prepayments - development costs | (150,000) | - | - | - |
| Other assets | (94,364) | 39,185 | - | 39,185 |
| Prepaid expenses | (1,408) | (58,225) | - | (58,225) |
| Accounts payable and accrued expenses | 2,524,381 | 1,154,917 | 1,054,950 | 2,209,867 |
| Accrued interest payable | - | (1,091) | 1,091 | - |
| **Net cash from(used in) operating activities** | (5,626,181) | 225,340 | 1,047,001 | 1,272,341 |
| | | | | |
| **Cash Flows From (used in) Investing Activities** | | | | |
| Investment in oil and gas properties | (3,859,851) | (1,976,029) | (1,047,001) | (3,023,030) |
| Proceeds from sale of oil and gas property | - | | | |
| **Net cash used in investing activities** | (3,859,851) | (1,976,029) | (1,047,001) | (3,023,030) |
| | | | | |
| **Cash Flows From Financing Activities** | | | | |
| Issuance of common stock, net of offering costs | - | - | | |
| Proceeds from notes payable | 7,500,000 | 2,000,000 | - | 2,000,000 |
| Contributions from parent | 316,600 | - | | |
| **Net cash from financing activities** | 7,816,600 | 2,000,000 | - | 2,000,000 |
| | | | | |
| **Net increase (decrease) in cash** | (1,669,432) | 249,311 | - | 249,311 |
| | | | | |
| **Cash - beginning of year** | 1,989,419 | 319,987 | - | 319,987 |
| **Cash - end of year** | $ 319,987 | $ 569,298 | $ - | $ 569,298 |
| | | | | |
| **Supplemental disclosure of cash flow information:** | | | | |
| Cash paid for interest | $ - | $ - | $ - | $ - |
| Cash paid for state franchise tax | $ - | $ - | $ - | $ - |
| | | | | |
| **Supplemental disclosure of non-cash investing and financing activities:** | | | | |
| | $ - | $ - | $ - | $ - |
| Issuance of common stock | $ 16,547 | $ - | $ - | $ - |
| Account payable reduced by expense offset | $ - | $ 15,638 | $ - | $ 15,638 |
| Capitalized Interest included in interest payable | $ 1,289,328 | $ 74,210 | $ - | $ 74,210 |

**Year ended December 31, 2022 Cash Flow reflects the impairment adjustment described above and an increase of $9,040 in general and administrative expense arising from the adjustment of accounts payable cut off at December 31, 2022. The accounts payable adjustment was primarily connected to vendors for development costs.**

Table of Contents

**Item 9. Changes In and Disagreements With Accountants on Accounting and Financial Disclosure**

Not applicable.

**Item 9A. Controls and Procedures**

***Evaluation of Disclosure Controls and Procedures***

The Company maintains disclosure controls and procedures (as that term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) that are designed to ensure that information required to be disclosed in the Company's reports under the Exchange Act is recorded, processed, and summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report on Form 10-K was made under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer. For the year 2023 and the restated 2022 disclosures included in this filing, acknowledgement was given to the impact of the matter whereunder the Company's previous auditor was sanctioned by the SEC which, in turn, resulted in the need to reaudit 2022. The extensive amount of additional work and time required resulted in non-timely filing. Reference Explanatory Note and disclosures in Note 12 to the financial statements. Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures (a) are effective to ensure that information required to be disclosed by us in reports filed or submitted under the Exchange Act is timely recorded, processed, summarized and reported and (b) include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

***Management's Report on Internal Control over Financial Reporting***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with accounting principles generally accepted in the United States of America, and that receipts and expenditures are being made only in accordance with authorizations of management and our directors; and (iii) provide reasonable assurance regarding prevention or timely detection of the unauthorized acquisition, use or disposition of assets that could have a material effect on the financial statements. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2023, using the framework specified in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment, management has concluded that our internal control over financial reporting was not effective as of December 31, 2023. The ineffectiveness of the Company's internal control over financial reporting was due to two material weaknesses in its internal control over financial reporting identified by management: (i) an insufficient degree of segregation of duties among the small number of accounting and financial reporting personnel, and (ii) a lack of a formalized and complete set of policy and procedure documentation evidencing its system of internal controls over financial reporting. These factors led to certain adjustments which have been reflected in our audited financial statements. Certain of these weaknesses may not be uncommon in a company of the company's size due to personnel and financial limitations.

It should be noted that any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system will be met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there is only the reasonable assurance that our controls will succeed in achieving their goals under all potential future conditions.

***Changes in Internal Control over Financial Reporting***

There were no changes in our internal control over financial reporting during the quarter ended December 31, 2023 that materially affected or are reasonably likely to materially affect our internal control over financial reporting.

*Table of Contents*

**Item 9B. Other Information**

None.

Table of Contents

## PART III

**Item 10. Directors, Executive Officers and Corporate Governance**

The following table and biographical descriptions provide information regarding our directors and executive officers as of the date of this 10-K.

| Name | Age | Position |
|---|---|---|
| Gregory McCabe | 63 | Chief Executive Officer, Chairman of the Board of Directors |
| Roger Wurtele | 77 | Chief Financial Officer |
| Robert Lance Cook | 66 | Director |
| Edward Pocock | 56 | Director |

***Executive Officers***

**Gregory McCabe: Chief Executive Officer, Chairman of the Board of Directors**

Biographical information regarding Mr. McCabe is included below under "Directors."

**Roger Wurtele: Chief Financial Officer**

Roger Wurtele has served as Chief Financial Officer of the Company since January 2024 and prior to that served as an independent financial consultant to the Company since its formation in August 2022. From September 2013 until its merger with Meta in June 2021, Mr. Wurtele served as the Chief Financial Officer of Torchlight Energy Resources, the Company's predecessor. Following the merger until the Spin Off of the Company in December 2022, Mr. Wurtele served as an accountant for Meta. He is a versatile, experienced finance executive that has previously served as Chief Financial Officer for several public and private companies. He has a broad range of experience in public accounting, corporate finance and executive management. Mr. Wurtele previously served as CFO of Xtreme Oil & Gas, Inc. from February 2010 to September 2013. From May 2013 to September 2013 he worked as a financial consultant for the Company's predecessor. From November 2007 to January 2010, Mr. Wurtele served as CFO of Lang and Company LLC, a developer of commercial real estate projects. He graduated from the University of Nebraska and has been a certified public accountant for over 40 years.

Table of Contents

***Directors***

Our board of directors currently consists of three directors. Set forth below is a brief biographical description of each of our directors. The primary experience, qualifications, attributes and skills of each of our directors that led to the conclusion of the board of directors that such person should serve as a member of the board of directors are also set forth below.

**Gregory McCabe: Chief Executive Officer, Chairman of the Board of Directors**

Gregory McCabe has served as Chair of the Board of NBH since June 2023 and has served as Chief Executive Officer of the Company since January 2024. Since March 1988, Mr. McCabe has owned and served as the President of McCabe Petroleum Corporation, a private corporation that offers petroleum refining, and since April 2013, he has owned and served as president of McCabe Ventures, LLC, a multifaceted private investment company with a focus on oil and gas, real estate, and other investments. From July 2016 until June 2021, Mr. McCabe served as the chief executive officer of Torchlight Energy Resources, Inc., the Company's predecessor. Mr. McCabe has active ownership in several other oil and gas entities including Manix Royalty, Texas Rock Oil, TRO-X, and McCabe Minerals and Royalties. Working with geologist, Rich Masterson, Mr. McCabe was extremely active in the early development of the Wolfbone play in the Delaware Basin portion of the Permian Basin. The experience and knowledge learned in the Wolfbone play helped formulate Mr. McCabe and Mr. Masterson's theories and concepts regarding the Orogrande Basin. In addition to his work in the Orogrande and Delaware Basins of Texas and New Mexico, Mr. McCabe has explored for oil and gas throughout the U.S., including Louisiana, Utah, Arizona, Montana, and Nebraska. Mr. McCabe has been involved in numerous oil and gas ventures throughout his career and has a vast experience in technical evaluation, operations and acquisitions and divestitures. Mr. McCabe received his Bachelor of Science degree in Geology in 1984 from Sul Ross State University.

**Edward Pocock III: Director**

Edward Pocock III has served as a member of the Board since January 2024. Mr. Pocock is a veteran and public servant with expertise in governmental relations. Since August 2013, Mr. Pocock has served as a trustee and chairman of the board of directors of J. Allen Lamb & Edward S. Pocock III Foundation, a 501(c)(3) private foundation that provides educational grants, scholarships, police grants and other donations deemed appropriate for public charity. From December 2018 until May 2020, Mr. Pocock served as the chief executive officer of Vortexed, Inc., a private company, since October 2021, he has served as a director of DATAPULT, Inc., a private predictive analysis software company and since February 2023, has served as a director of Cerabond, LLC, a private specialized intermetallic bonding company. In addition to his role as a director of the Company, Mr. Pocock serves as managing member of E3 Properties, LLC, a private property investment company, E3 Titles, LLC a private intellectual property holding company, Westfield SASCO, LLC, a private single asset real estate holding company, Albany, CASCO, LLC a private single asset real estate holding company and Cardinal Rule, LLC, a private consulting firm. Mr. Pocock became a police officer in 1989, finishing his career as a Captain of Police in Southington, Connecticut, commanding both Patrol and Detective Divisions. During Mr. Pocock's tenure in law enforcement, he gained extensive investigative experience in a multitude of disciplines, including the investigation of embezzlement, fraud, theft, and the misapplication of funds. Administratively, Mr. Pocock upheld high ethical standards as the police evidence room manager, developing auditing procedures to meet or exceed state compliance standards. Additionally, Mr., Pocock provided counsel on multiple database development projects for the state and National Incident-Based Reporting System (NIBRS). Recognized by his community for strong leadership and integrity, Mr. Pocock's ability to match 'street' application with ethical and honest public policy is evident in his actions, where he was responsible for finances, policies, and lobbying efforts at both state and federal levels. Mr. Pocock received a B.S. degree from the Florida Institute of Technology, an M.S. from the University of Louisville, and holds a Six Sigma Black Belt from Villanova University.

**Robert Lance Cook: Director**

Robert Lance Cook has served as a director of the Company since December 2022. Mr. Cook has spent 36 years at Shell Oil with final positions of Vice President of Wells Technology and Chief Scientist. Mr. Cook has extensive experience in Deepwater, Arctic, and Unconventional Research & Development and Operations. Mr. Cook is the founder and CEO of Enventure Global Technology, a joint venture between Shell and Halliburton. Mr. Cook has served as the COO of Sirius Well Manufacturing, a joint venture between Shell and CNPC and is a technologist with an extensive patent portfolio. Since retiring from Shell in 2016, Mr. Cook has served as Vice President of Production Operations for WellsX Inc. from 2017 to 2020 and in 2020, he founded and continues to serves as president and chief technology officer of Sage Geosystems Inc.

Table of Contents

***Code of Ethics and Business Conduct***

Our Board of Directors has adopted a Code of Ethics and Business Conduct that governs our directors, officers, and employees. Copies of our Code of Ethics and Business Conduct can be found on our website at nextbridgehydrocarbons.com/investors. We will post to our website any amendments and waivers to the Code of Ethics and Business Conduct that are required to be disclosed by the rules of the SEC.

***Audit Committee***

We have a standing Audit Committee that consists of two directors-Robert Lance Cook and Edward Pocock, each of whom meet the independence requirements set forth in Rule 10A-3 under the Exchange Act and our Audit Committee Charter. The Charter provides that the Audit Committee consist of three directors, but two directors recently resigned, and we are in the process of adding an additional independent director who will join the Audit Committee. Each current member of the Audit Committee is financially literate, but presently, the Board has determined that we do not have a member of the Audit Committee that meets the criteria to be an "audit committee financial expert" under the rules and regulations of the SEC, as those qualifications are interpreted by our Board in its business judgment. We previously had a member of the Audit Committee that the Board determined was an audit committee financial expert, but as mentioned above, that director recently resigned, and the Board has not yet appointed a new director that meets that criteria.

**Item 11. Executive Compensation**

We have designed our compensation plans and programs to be offered to our senior management team so as to attract, retain and motivate highly talented individuals for our management team, align the interests of management with the interests of our stockholders and incentivize behaviors that we believe are necessary to enable us to succeed while upholding our values in a highly competitive marketplace. All decisions with respect to management compensation are made by the Compensation Committee.

***Summary Compensation Table - Fiscal 2022-2023***

As an emerging growth company, we have opted to comply with the executive compensation disclosure rules applicable to "smaller reporting companies," as such term is defined under the Securities Act of 1933, as amended, which require compensation disclosure for our principal executive officer and the two most highly compensated executive officers (other than the principal executive officer) who were employed by us as of December 31, 2022. In certain circumstances, the compensation of former executive officers may also need to be disclosed. The table below sets forth the annual compensation for services rendered during 2023 and 2022 by these executive officers (also referred to as our "named executive officers" or "NEOs").

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards(1) ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation(2) ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Clifton DuBose, Jr. (3)(5) | 2023 | 400,000 | - | - | 532,588 | - | 0 | 932,588 |
| *Chief Executive Officer* | 2022 | 400,000 | - | - | - | - | 36,000 | 436,000 |
| Lucas Hawkins(4) | 2023 | 390,000 | - | - | 177,529 | - | 0 | 567,529 |
| *Chief Financial Officer* | | | | | | | | |
| Delvina Oelkers(5)(6) | 2023 | 384,996 | - | - | 532,588 | - | 0 | 917,584 |
| *Chief Operating Officer* | 2022 | 384,996 | - | - | - | - | 36,000 | 420,996 |

(1) These amounts represent the aggregate grant date fair value of stock options awarded to the NEO in the applicable fiscal year. These values have been determined under FASB ASC Topic 718, the principles used to calculate the grant date fair value of equity awards for purposes of our financial statements. For a discussion of the assumptions and methodologies used to calculate these amounts, please see the discussion of equity awards contained in Note 7, Stockholders' Equity, to our financial statements. The amounts reported in this column reflect the accounting grant date fair value of the awards and do not necessarily reflect the actual economic value that may be received by the NEO upon exercise or payment of the awards.

(2) The amount includes insurance reimbursements paid to the NEO during the applicable fiscal year.

(3) Mr. DuBose resigned as an officer and director of NBH and terminated his employment with NBH effective January 15, 2024.

(4) Mr. Hawkins resigned as an officer of NBH and terminated his employment with NBH effective January 15, 2024.

(5) A portion of the salary paid to Mr. DuBose and Ms. Oelkers during the fiscal year 2022 was paid through Hudspeth Operating, a wholly owned subsidiary of the Company, prior to the spin-off of the Company from its prior parent, Meta.

(6) Ms. Oelkers resigned as an officer of NBH and terminated her employment with NBH effective March 27, 2024.

Table of Contents

***Incentive Compensation Awards***

Our executive officers have not historically been paid bonuses or received equity awards, and our Board and Compensation Committee has not yet established a formal compensation policy for the determination of such awards. If our revenue grows and bonuses become affordable and justifiable, we expect to use the following parameters in justifying and quantifying bonuses for our executive officers: (1) the growth in our revenue, (2) the growth in our earnings before interest, taxes, depreciation and amortization, as adjusted ("EBITDA"), and (3) the value of our common stock. The Board and Compensation Committee has not adopted specific performance goals and target bonus amounts for any of our fiscal years but may do so in the future.

***Employment Agreements***

We had employment agreements with each of our NEOs that became effective on December 14, 2022 (the closing date of the Spin-Off). These agreements did not have a specified term and provided for the executives to receive an annual base salary as follows: Mr. DuBose - $400,000; Ms. Oelkers - $385,000; Mr. DeWoody - $395,000. Each NEO was also eligible for an annual discretionary bonus as determined by the Compensation Committee, with a target bonus equal to 50% of the executive's base salary, and to participate in our benefit plans made available to employees generally. On January 15, 2024, Messrs. DuBose and Hawkins resigned. On that same date, we appointed Gregory McCabe as Chairman of the Board and Chief Executive Officer and appointed Roger Wurtele as Chief Financial Officer. Ms. Oelkers resigned on March 20, 2024. Messrs. McCabe and Wurtele are currently our sole executive officers, and neither has an employment agreement with us.

Table of Contents

***Performance-Based Options***.

In March 2023, the Compensation Committee granted each of our NEOs a performance-based stock option under our 2022 Equity Incentive Plan (the “2022 Plan”) with respect to the following number of shares: for each of Mr. DuBose and Ms. Oelkers, 4,964,167 shares (which represented three percent of NBH’s then-outstanding shares) and for Mr. Hawkins, 1,654,722 shares (which represented one percent of NBH’s then-outstanding shares). The exercise price of each of these options is $1.2056 per share (which was based on an implied fair market value of $199,500,000 for NBH’s working interest in the Orogrande Project). In setting the exercise price of the options at this level, NBH intended to create an additional incentive for the executives to increase the value of NBH’s working interest above that threshold value of $199,500,000. As of May 11, 2023, NBH increased its working interest in the Orogrande Project to 100%, and as of July 18, 2023, each NEO was granted an additional option to purchase shares to restore their total grant to the percentage of our outstanding shares for that executive noted above, with such grant covering 2,500,762 shares for Mr. DuBose and Ms. Oelkers and 833,587 shares for Mr. Hawkins. Each of these options has a maximum term of 10 years, and the vesting of the option is generally contingent on the optionee’s continued employment or service through the first anniversary of the effective date of the optionee’s employment agreement (or, if there is no such agreement, the first anniversary of the grant date) or such longer period as provided in the option agreement.

**Outstanding Equity Awards as of December 31, 2023**

The following table provides information regarding outstanding stock options held by each of our NEOs as of December 31, 2023. Our NEOs did not hold any other outstanding equity awards as of that date. The vesting requirements for these options are described above under “Performance-Based Options.”

| | | | Option Awards | | |
|---|---|---|---|---|---|
| **Name** | **Number of Securities Underlying Unexercised Options (#) Exercisable** | **Number of Securities Underlying Unexercised Options (#) Unexercisable** | **Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options(#)** | **Option Exercise Price ($)** | **Option Expiration Date** |
| Clifton DuBose, Jr. | 4,964,167 | - | - | 1.2056 | 3/5/2033 |
| | 2,500,762 | - | - | 1.2056 | 7/17/2033 |
| Lucas Hawkins | 1,654,722 | - | - | 1.2056 | 3/5/2033 |
| | 833,587 | - | - | 1.2056 | 7/17/2033 |
| Delvina Oelkers | 4,964,167 | - | - | 1.2056 | 3/5/2033 |
| | 2,500,762 | - | - | 1.2056 | 7/17/2033 |

***Equity Incentive Plan***

We maintain the 2022 Plan to attract, motivate, retain and reward selected employees and other service-providers of the Company and its subsidiaries. Meta, as the sole stockholder of the Company at the time the 2022 Plan was adopted, approved the 2022 Plan. The 2022 Plan is administered by the Compensation Committee, which has authority to interpret the plan provisions and make all required determinations under the plan. This authority includes, subject to the provisions of the 2022 Plan, selecting participants and determining the types of awards they are to receive, determining the number of shares that are to be subject to awards and the terms and conditions of awards, including the price (if any) to be paid for the shares or the award, accelerating or extending the vesting or exercisability or extending the term of any or all outstanding awards, making certain adjustments to an outstanding award and authorizing the conversion, succession or substitution of an award, determining the manner in which the purchase price of an award or the Company’s common shares may be paid, making required proportionate adjustments to outstanding awards upon the occurrence of certain corporate events such as reorganizations, mergers and stock splits, and making provisions to ensure that any tax withholding obligations incurred in respect of awards are satisfied. Awards granted under the plan may be stock options, stock appreciation rights, restricted stock or stock units, or other awards denominated in or with reference to the Company’s common stock and are generally only transferable to a beneficiary of a participant upon death or, in certain cases, to family members for tax or estate planning purposes.

Under the terms of the 2022 Plan, a change in control of the Company does not automatically trigger vesting of the awards then outstanding under the plan. If there is a change in control, each participant’s outstanding awards granted under the plan will generally be assumed by the successor company, unless the Compensation Committee provides that the award will not be assumed and will become fully vested and, in the case of options, exercisable. Any options that become vested in connection with a change in control will generally terminate to the extent they are not exercised prior to the change in control. As described above under “Employment Agreements,” certain equity awards granted to the NEOs were subject to accelerated vesting under their employment agreements in the event of a termination of employment under certain circumstances.

Table of Contents

***Director Compensation***

We did not pay any cash compensation to any of our directors who are not employed by us or any of our subsidiaries ("non-employee directors") during the fiscal year ended December 31, 2023. The compensation for Mr. DuBose, who was employed by us during fiscal 2023, is reported in the Summary Compensation Table under "Executive Compensation" below, and he did not receive any compensation for his service on the Board. Mr. DeWoody resigned from his position as an officer and director of the Company effective as of June 30, 2023 and forfeited his then-outstanding equity awards. Pursuant to SEC rules, his compensation for 2023 is not reported in the compensation tables in this Form 10-K as he was not a named executive officer for 2023, and he did not receive any compensation for his service on the Board during the year.

In March 2023, the Board approved the grant of options to purchase 412,500 shares of our common stock to each of Ms. Whitley, Ms. Pitts and Mr. Cook. On July 18, 2023, the Board approved an additional grant of options to purchase an additional 209,577 shares of our common stock to each of Ms. Whitley, Ms. Pitts and Mr. Cook to maintain the percentage interest represented by their March 2023 option grant. The exercise price of each of these options is $1.2056 per share, and the vesting and other terms of these options are substantially the same as the options granted to our named executive officers in March 2023 and July 2023, respectively, described below under "Performance-Based Options."

**Director Compensation Table - 2023**

The following table sets forth the total compensation paid to our non-employee directors for their service on the Board during fiscal 2023.

| Name[1] | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) (2)(3) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|
| Robert Lance Cook | - | - | 44,382 | - | 44,382 |
| Gregory McCabe | - | - | - | - | - |
| Mia Pitts | - | - | 44,382 | - | 44,382 |
| Kristin Whitley | - | - | 44,382 | - | 44,382 |

(1) Jospeh DeWoody resigned from his position as an officer and director of the Company effective as of June 30, 2023 and forfeited his then-outstanding equity awards. Pursuant to SEC rules, his compensation for 2023 is not reported in the compensation tables in this Registration Statement as he was not a named executive officer for 2023, and he did not receive any compensation for his service on the Board during the year. For his service as an employee during 2023, Mr. DeWoody received $208,125 in base salary and a stock option grant in March 2023 with a grant date fair value of $118,109. See note (2) below for the valuation of this award.

(2) These amounts represent the aggregate grant date fair value of stock options awarded to the non-employee director in 2023. These values have been determined under FASB ASC Topic 718, the principles used to calculate the grant date fair value of equity awards for purposes of our financial statements. For a discussion of the assumptions and methodologies used to calculate these amounts, please see the discussion of equity awards contained in Note 7, Stockholders' Equity, to our financial statements included on page F-31 of this Registration Statement. The amounts reported in this column reflect the accounting grant date fair value of the awards and do not necessarily reflect the actual economic value that may be received by the non-employee director upon exercise or payment of the awards.

(3) The aggregate number of outstanding stock options held by each non-employee director as of December 31, 2023 are set forth below. No non-employee director held any other equity awards as of that date that were granted by NBH.

| Director | Number of Outstanding Stock Options as of 12/31/23 |
|---|---|
| Robert Lance Cook | 622,077 |
| Gregory McCabe | - |
| Mia Pitts | 622,077 |
| Kristin Whitley | 622,077 |

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The following table sets forth the beneficial ownership of shares of our common stock as of March 31, 2024 by (i) each beneficial owner of more than five percent of the outstanding shares of our common stock, (ii) each current director, (iii) each named executive officer and (iv) all current directors and executive officers as a group. The persons named in the table have sole voting and investment power with respect to all shares of our common stock shown as beneficially owned by them, subject to community property laws, where applicable. Percentage ownership is based on 251,830,516 shares of our common stock outstanding as of March 31, 2024.

Table of Contents

Except as otherwise noted in the footnotes below, each person or entity identified below has sole voting and investment power with respect to such securities.

| Name | Shares of Common Stock | Percentage of Voting Common Stock Beneficially Owned Before this Offering |
|---|---|---|
| **5% or More Stockholders** | | |
| **Gregory McCabe** | | |
| **500 W. Texas Ave. #890** | | |
| **Midland, TX 79701** | 69,124,128 | 27.4% |
| ***Directors and Executive Officers*** | | |
| Gregory McCabe | 69,124,128 | 27.4% |
| Robert L. Cook | 101,000 | * |
| Edward Pocock III | 284,575 | * |
| Roger Wurtele | 5,000 | * |
| All current directors and executive officers as a group (7 persons) | 69,514,703 | 27.6% |

* Represents less than 1%.

***Equity Compensation Plan Information***

The 2022 Plan is our only equity compensation plan. The following table provides aggregate information as of the end of the 2023 fiscal year with respect to the 2022 Plan:

| | Number of Securities to be Issued Upon Exercise of Outstanding Options | Weighted-Average Exercise Price of Outstanding Options | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column(a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 29,237,632 | 1.2056 | 20,762,368 |
| **Total** | 29,237,632 | 1.2056 | 20,762,368 |

Table of Contents

**Item 13. Certain Relationships and Related Party Transactions, and Director Independence**

The Board has adopted a written policy regarding the approval of related party transactions. At regularly scheduled Audit Committee meetings, management will recommend any related party transactions that are contemplated, and such transactions will require the Audit Committee's approval. Generally, a "related party" is each of our executive officers, directors, nominees for director, any stockholder owning greater than five percent of our outstanding shares, including any immediate family member of each of the foregoing, and any entity owned or controlled by any of the foregoing. Transactions that are available to all of our employees generally or totaling less than $5,000 when aggregated with all similar transactions are excluded from the policy.

With respect to the standards applied by the Audit Committee when deciding whether to approve a related party transaction, the Audit Committee shall approve or ratify the transaction if it is on terms believed to be comparable to those that could be obtained in arm's length dealings with an unrelated third party. We believe that the transactions and agreements discussed below (including renewals of any existing agreements) between us and related third parties are at least as favorable to us as could have been obtained from unrelated parties at the time they were entered into.

***Certain Relationships and Related Party Transactions***

Mr. McCabe is a significant shareholder, Chairman of the Board and Chief Executive Officer, and holds 27.4% of the outstanding shares of common stock of the Company as of June 25, 2024.

*McCabe Contribution Agreement*

The Company, MPC and Mr. McCabe entered into a Contribution Agreement, dated July 25, 2023 (the "McCabe Contribution Agreement"), pursuant to which (i) Mr. McCabe agreed to contribute to the Company (i) up to one hundred percent (100%) of the interest currently held by MPC in the drilling project located on over 1,150 acres in Vermillion Parish, Louisiana (the "Bronco Prospect") and (ii) up to ten percent (10%) back-in working interest option for the Orogrande Project exercisable following the point in time at which the proceeds of all production from all operations conducted on the Orogrande Project (exclusive of royalty, overriding royalty and taxes chargeable to the working interest) equals the actual cost incurred by the Company and its predecessors in drilling, testing, equipping and the cost of operating the wells located on the Orogrande Prospect, inclusive of overhead charges (the "Back-In Interest"), in each case, in proportion to the percentage of shares of common stock of the Company that are directly registered in the name of the beneficial owner on the books and records of the Company's transfer agent, whether previously registered directly or previously held through a bank, broker or other nominee who instruct such bank, broker or other nominee and transferred to the beneficial owner on the books and records maintained by its transfer agent on or prior to the record date, provided that such shares remain directly registered for the holding period.

Table of Contents

*Acquisition of Working Interests*

In connection with the terms of that certain Purchase Agreement, dated August 7, 2014, among Hudspeth, MPC and Mr. McCabe and pursuant to the Participation Agreement, Mr. McCabe has, at his option, the Back-In Interest after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe. Mr. McCabe also holds a 4.5% overriding royalty interest in the Orogrande acreage.

Such Back-In Interest is subject to the above-referenced McCabe Contribution Agreement and may be contributed to the Company as described above.

Under that certain Farmout Agreement, by and among Hudspeth, Pandora Energy LP, Founders Oil & Gas, LLC, MPC and Mr. McCabe dated as of September 23, 2015, as amended, future well capital spending obligations remained the same 50% contribution from Hudspeth and 50% from Wolfbone until such time as the $40.5 million to be spent on the project. With such $40.5 million threshold being met, Wolfbone will bear 25% of the costs of the wells being drilled in the Orogrande acreage going forward provided that Wolfbone elects to participate in drilling such wells.

Additionally, Mr. McCabe owns a controlling interest in Magdalena, an entity that holds a 4.5% overriding royalty interest in the Orogrande acreage. Magdalena's overriding royalty interest in the Orogrande acreage, which was obtained prior to, and was not a part of any of the transactions with the Company or its subsidiaries.

Torchlight Energy Inc., a subsidiary of the Company, previously acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin (Hazel Project). As part of that transaction, MPC, Torchlight Energy Inc. and Imperial Exploration, LLC entered into a Participation Agreement effective as of May 1, 2016. MPC and another unrelated working interest owner retained a back-in after payout working interest of 25% in that same acreage, and the interest will be triggered back to MPC upon the proceeds from production equal the costs of developing the project area.

On December 21, 2022, the Company entered into a Merger Agreement, pursuant to which in a series of transactions the Orogrande Properties (as defined in the Merger Agreement) owned by Wolfbone were assigned to Hudspeth (or its designated assignee) in consideration of (1) treating the Orogrande Obligations (as defined in the Merger Agreement) as having been irrevocably satisfied and discharged in full with respect to MPC and (2) an issuance of 56,297,638 shares of the Company's common stock to Mr. McCabe (such series of transactions collectively, the "Merger"). The Merger was completed in April 2023 in accordance with the Texas Business Organizations Code, whereby Wolfbone became a direct and wholly-owned subsidiary of the Company and the Company acquired Wolfbone's 22.6249% working interest in the oil and natural gas properties covering approximately 134,000 acres located in the Orogrande Basin in West Texas in Hudspeth County, Texas.

*Reimbursement Obligations*

Pursuant to the Option Agreement, MHP is entitled to reimbursement for its cost of Hazel development activity to the extent that the wells produced revenues beyond the date of the option's lapse until the total amount of development expenses are reimbursed. As of December 31, 2023, there was an outstanding cost reimbursement balance in the amount of $3,364,823. Additionally, MPC holds a reversionary interest burdening the Company's proportionate interest in the Hazel Project of 20% pursuant to the terms of the Option Agreement.

*The Company's 2022 Note*

On December 22, 2022, the Company issued the 2022 Note in favor of Mr. McCabe. The 2022 Note bears interest at 5% per annum, computed on the basis of a 365-day year, maturing June 30, 2024. As of December 31, 2023, the Company had $20 million in principal amount outstanding under the 2022 Note. Accrued interest was $815,202.

Table of Contents

*The Company's 2021 Note and Loan Agreement*

On August 7, 2023, Mr. McCabe and Meta entered into a Loan Sale Agreement whereby Mr. McCabe purchased from Meta (i) the 2021 Note and (ii) all outstanding loans made to the Company by Meta pursuant to the Loan Agreement (the "Loan Purchase"). As a result of the Loan Purchase, Mr. McCabe replaced Meta as the lender and secured party under the 2021 Note and the Loan Agreement. Additionally, as part of the Loan Purchase, Meta assigned to Mr. McCabe its lien on 25% of the Orogrande Prospect. The Company's obligations and responsibilities under the 2021 Note and the Loan Agreement remain unchanged. Accrued interest as of December 31, 2023 was $3,054,973.

*Participation Agreement*

Pursuant to the Participation Agreements, MPC, controlled by Mr. McCabe, along with the other Participants collectively funded $7,000,000, which will be used to (i) acquire the rights to drill on the Johnson Prospect and (ii) finance the drilling of five (5) vertical wells in the Johnson Prospect in connection with our 2023 drilling program requirements under its University Lands Drilling and Development Unit Agreement. Mr. McCabe and the other Participants will have the right to participate in the drilling of additional wells on the Johnson Prospect in the future, including an additional five (5) vertical wells in locations determined by Hudspeth Operating, in its sole discretion, in 2024. The Participation Agreements provide for an initial allocation of the working interests and net revenue interests among each Participant and the Company and then a re-allocation upon payout or payment to such Participant of drilling and completion costs for each well drilled. Following payout, we will own 25% of working interest as described below and 18.75% net revenue interest in each well.

*Louisiana Projects*

See "Louisiana Projects" subsection under "Items 1 and 2. Business and Properties" of this Annual Report on Form 10-K, which subsection is incorporated by reference herein.

*2024 Loan Transactions*

On January 23, 2024, Mr. McCabe loaned $1,000,000 to us, which was evidenced under a 0% Senior Unsecured Promissory Note effective as of that date (the "McCabe Note"), which provided, among other things, that the loan will be due on February 28, 2025, with the Company having the option to extend the loan by one additional year. The loan will bear interest at the rate of 0% per annum and will be payable in one balloon payment of principal and interest on the maturity date. If we elect to extend the loan for one year, the loan will continue to bear interest at the rate of 0% per annum and will be payable in one balloon payment of principal and interest on the extended maturity date.

On February 29, 2024, CAPCO Holding, Inc., a Texas corporation ("Capco"), loaned us $2,000,000 under a 12% Secured Promissory Note (the "Capco Note"), which provides, among other things, that the loan will be due in one year, with us having the option to extend the loan by one additional year. The loan will bear interest at the rate of 12% per annum and will be payable in one balloon payment of principal and interest on the maturity date. If we elect to extend the loan for one year, we must pay all accrued interest for that first year, and thereafter, the loan will bear interest at a rate that is mutually agreeable to us and Capco, which rate will not exceed 18% per annum, and will be payable in one balloon payment of principal and interest on the extended maturity date. As part of the transaction, Gregory McCabe, our Chairman and Chief Executive Officer, entered into a Stock Pledge and Security Agreement with Capco under which he pledged 250,000 of his shares of common stock of the Company to secure our obligations under the Capco Note. Further, Mr. McCabe entered into a Subordination Agreement (the "Subordination Agreement") with Capco and us under which Mr. McCabe agreed to subordinate all of the Company's indebtedness and obligations owed to Mr. McCabe to the Capco Note, under the terms and conditions of the Subordination Agreement.

***Related Party Transactions***

*Policy and Procedures Governing Related Person Transactions*

The Board has adopted a written policy regarding the approval of related party transactions. At regularly scheduled Audit Committee meetings, management will recommend any related party transactions that are contemplated, and such transactions will require the Audit Committee's approval. Generally, a "related party" is each of our executive officers, directors, nominees for director, any stockholder owning greater than five percent of our outstanding shares, including any immediate family member of each of the foregoing, and any entity owned or controlled by any of the foregoing. Transactions that are available to all of our employees generally or totaling less than $5,000 when aggregated with all similar transactions are excluded from the policy.

With respect to the standards applied by the Audit Committee when deciding whether to approve a related party transaction, the Audit Committee shall approve or ratify the transaction if it is on terms believed to be comparable to those that could be obtained in arm's length dealings with an unrelated third party. We believe that the transactions and agreements discussed below (including renewals of any existing agreements) between us and related third parties are at least as favorable to us as could have been obtained from unrelated parties at the time they were entered into.

***Director Independence***

A majority of the members of our Board meet the criteria for independence as defined by the corporate governance guidelines to be adopted by our Board.

Table of Contents

**Item 14. Principal Accountant Fees and Services**

The fees billed to us for the years ended December 31, 2023 and 2022 by our independent registered public accounting firm, BF Borgers, CPA, are set forth below:

| | Year Ended December 31 | | |
|---|---|---|---|
| | 2023 | 2022 | |
| | | Successor Period December 15, 2022 through December 31, 2022 | Predecessor Period January 1, 2022 through December 14, 2022 |
| Audit Fees(1) | $ 165,000 | $ 110,000 | $ - |
| Audit Related Fees(2) | 247,500 | - | 178,750 |
| Tax Fees(3) | - | - | - |
| All Other Fees(4) | 330,000 | 18,092 | 51,534 |
| | | | |
| Total Fees | $ 742,500 | $ 128,092 | $ 230,284 |

(1) Audit fees represents the aggregate fees billed to us by BF Borgers, CPA for professional services rendered for the audit of our financial statements for the year ended December 31, 2022.

(2) Audit-related fees represent fees billed for services rendered during the fiscal year for assurance and related services that are reasonably related to the performance of the audit or review of our financial statements and are not reported under “Audit Fees”.

(3) Tax fees consist of fees billed for professional services relating to tax compliance, tax planning and tax advice.

(4) All other fees consist of fees billed for all other services.

***Pre-Approval of Audit and Non-Audit Services***

The Audit Committee’s policy is to pre-approve all audit and permissible non-audit services provided by the independent registered public accounting firm. These services may include audit services, audit related services, tax services and other services. Pre-approval is detailed as to the particular service or category of service and is subject to a specific engagement authorization. The Audit Committee requires the independent registered public accounting firm and management to report on the actual fees charged for each category of service at Audit Committee meetings throughout the year.

During the year, circumstances may arise when it becomes necessary to engage the independent registered public accounting firm for additional services not contemplated in the original pre-approval. In those instances, the Audit Committee requires specific pre-approval authority from the chairman of the Audit Committee, who must report on such approvals at the next scheduled Audit Committee meeting. All 2023 audit and non-audit services provided by the independent registered public accounting firm were pre-approved by the Audit Committee.

Table of Contents

## PART IV

**Item 15. Exhibits and Financial Statement Schedules**

(1) Financial Statements-See the Index to Consolidated Financial Statements, together with the report thereon of M&K CPAS PLLC dated July __, 2024 under Part II, Item 8 "Consolidated Financial Statements and Supplementary Data".

(2) All financial statement schedules are omitted because they are not applicable, or are immaterial or the required information is presented in the consolidated financial statements or the related notes.

(3) Exhibits.

| Exhibit Number | Exhibit Description |
|---|---|
| 2.1 | Distribution Agreement between Meta Materials Inc. and Next Bridge Hydrocarbons, Inc., dated December 2, 2022 (incorporated by reference to Exhibit 2.1 to the Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 2.2 | Agreement and Plan of Merger among Next Bridge Hydrocarbons, Inc., Hudspeth Operating, LLC, Wolfbone Investments, LLC, McCabe Petroleum Corporation, and Gregory McCabe, dated December 21, 2022 (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K, filed December 27, 2022). |
| 3.1 | First Amended and Restated Articles of Incorporation of Next Bridge Hydrocarbons, Inc. (incorporated by reference to Exhibit 3.1 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 3.2 | Amended and Restated By-laws of Next Bridge Hydrocarbons, Inc. (incorporated by reference to Exhibit 3.2 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.1 | Assignment Agreement between Meta Materials Inc. and Next Bridge Hydrocarbons, Inc., dated June 28, 2022 (incorporated by reference to Exhibit 10.1 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.2 | Tax Matters Agreement between Meta Materials Inc. and Next Bridge Hydrocarbons, Inc., date December 2, 2022 (incorporated by reference to Exhibit 10.2 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.3+ | 2022 Equity Incentive Plan of Next Bridge Hydrocarbons, Inc. (incorporated by reference to Exhibit 10.7+ to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.4 | Purchase & Settlement Agreement, dated August 6, 2018, between Torchlight Energy Resources, Inc., Hudspeth Oil Corporation, Founders Oil & Gas, LLC, Founders Oil & Gas Operating, LLC, Wolfbone Investments, LLC and McCabe Petroleum Corporation (incorporated by reference to Exhibit 10.8 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)).† |
| 10.5 | Purchase Agreement dated April 4, 2016, by and among McCabe Petroleum Corporation, Torchlight Energy Resources, Inc. and Torchlight Energy, Inc. (incorporated by reference to Exhibit 10.9 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.6 | Option Agreement, by and among Torchlight Energy, Inc., Torchlight Hazel, LLC, Masterson Hazel Partners, LP and McCabe Petroleum Corporation, dated August 13, 2020 (incorporated by reference to Exhibit 10.10 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |

Table of Contents

| Exhibit Number | Exhibit Description |
|---|---|
| 10.7 | First Amendment to Option Agreement, by and among Torchlight Energy, Inc., Torchlight Hazel, LLC, Masterson Hazel Partners, LP and McCabe Petroleum Corporation, dated September 18, 2020 (incorporated by reference to Exhibit 10.11 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.8 | Second Amendment to Option Agreement, by and among Torchlight Energy, Inc., Torchlight Hazel, LLC, Masterson Hazel Partners, LP and McCabe Petroleum Corporation, dated April 15, 2021 (incorporated by reference to Exhibit 10.12 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.9 | Secured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Meta Materials, Inc., as holder, dated October 1, 2021 (incorporated by reference to Exhibit 10.13 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.10 | First Amendment to Secured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Meta Materials, Inc., as holder, dated September 2, 2022 (incorporated by reference to Exhibit 10.14 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022). |
| 10.11 | Loan Agreement between Meta Materials, Inc. and Next Bridge Hydrocarbons, Inc., dated September 2, 2022 (incorporated by reference to Exhibit 10.15 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.12 | Participation Agreement by and between McCabe Petroleum Corporation, Gregory McCabe and Hudspeth Oil Corporation, dated September 23, 2014 (incorporated by reference to Exhibit 10.16 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.13 | Amendment to Participation Agreement, by and between McCabe Petroleum Corporation, Gregory McCabe and Hudspeth Oil Corporation, dated January 5, 2015 (incorporated by reference to Exhibit 10.17 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.14 | Second Amendment to Participation Agreement, by and between McCabe Petroleum Corporation, Gregory McCabe and Hudspeth Oil Corporation, dated December 31, 2015 (incorporated by reference to Exhibit 10.18 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.15 | Form of Conversion Agreement, dated March 9, 2020, by and between Torchlight Energy Resources, Inc., Hudspeth Oil Corporation and each of the previous holders of 16% Series C Unsecured Convertible Promissory Notes (incorporated by reference to Exhibit 10.19 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.16 | Amendment to Tax Matters Agreement, between Next Bridge Hydrocarbons, Inc. and Meta Materials, Inc. (incorporated by reference to Exhibit 10.20 to our Registration Statement on Form S-1, as amended, effective as of November 18, 2022 (File No. 333-266143)). |
| 10.17 | 5% Unsecured Promissory Note by Next Bridge Hydrocarbons, Inc. in favor of Greg McCabe, dated December 21, 2022 (incorporated by reference to Exhibit 10.21 to our Current Report on Form 8-K, filed December 27, 2022). |
| 10.18 | First Amendment to Unsecured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Gregory McCabe, dated June 16, 2023 (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K, filed June 26, 2023). |
| 10.19 | Third Amendment to Secured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Gregory McCabe, as holder, dated October 1, 2023 (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K, filed October 4, 2023). |
| 10.20 | Third Amendment to Loan Agreement between Gregory McCabe and Next Bridge Hydrocarbons, Inc., dated October 1, 2023 (incorporated by reference to Exhibit 10.2 to our Current Report on Form 8-K, filed October 4, 2023). |
| 10.21 | Second Amendment to Unsecured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Gregory McCabe as holder, dated October 1, 2023 (incorporated by reference to Exhibit 10.3 to our Current Report on Form 8-K, filed October 4, 2023). |
| 10.22 | Form of Participation Agreement between each Participant and Next Bridge Hydrocarbons, Inc., dated as of October 6, 2023 (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K, filed October 13, 2023). |
| 10.23 | Drilling and Development Unit Agreement 2837 between the Commissioner of the General Land Office on behalf of the State of Texas and the Lessees, effective as of March 27, 2017 (incorporated by reference to Exhibit 10.5 to our Quarterly Report on Form 10-Q, filed November 14, 2023). |

Table of Contents

| Exhibit Number | Exhibit Description |
|---|---|
| 10.24 | Amendment to Development Unit Agreement 2837 between the Commission of the General Land Office on behalf of the State of Texas and the Lessees, effective as of January 1, 2020 (incorporated by reference to Exhibit 10.6 to our Quarterly Report on Form 10-Q, filed November 14, 2023). |
| 10.25 | Fourth Amendment to Loan Agreement, dated December 31, 2023, between Gregory McCabe and Next Bridge Hydrocarbons, Inc. (incorporated by reference to Exhibit 10.33 to our Registration Statement on Form S-1, as amended, filed January 25, 2024). |
| 10.26 | Fourth Amendment to Secured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Gregory McCabe, as holder, dated December 31, 2023 (incorporated by reference to Exhibit 10.34 to our Registration Statement on Form S-1, as amended, filed January 25, 2024). |
| 10.27 | Third Amendment to Unsecured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Gregory McCabe as holder, dated December 31, 2023 (incorporated by reference to Exhibit 10.35 to our Registration Statement on Form S-1, as amended, filed January 25, 2024). |
| 10.28 | 0% Senior Unsecured Promissory Note, dated January 23, 2024, between Gregory McCabe and Next Bridge Hydrocarbons, Inc.* |
| 10.29 | 12% Secured Promissory Note, dated February 29, 2024, between CAPCO Holdings, Inc. and Next Bridge Hydrocarbons, Inc.* |
| 10.30 | Subordination Agreement, dated February 29, 2024, between Gregory McCabe, CAPCO Holdings, Inc. and Next Bridge Hydrocarbons, Inc.* |
| 10.31 | Fifth Amendment to Loan Agreement, dated March 31, 2024, between Gregory McCabe and Next Bridge Hydrocarbons, Inc.* |
| 10.32 | Fifth Amendment to Secured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Gregory McCabe, as holder, dated March 31, 2024.* |
| 10.33 | Fourth Amendment to Unsecured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Gregory McCabe as holder, dated March 31, 2024.* |
| 10.34 | Sixth Amendment to Loan Agreement, dated June 30, 2024, between Gregory McCabe and Next Bridge Hydrocarbons, Inc.* |
| 10.35 | Sixth Amendment to Secured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Gregory McCabe, as holder, dated June 30, 2024.* |
| 10.36 | Fifth Amendment to Unsecured Promissory Note, between Next Bridge Hydrocarbons, Inc., as debtor, and Gregory McCabe as holder, dated June 30, 2024.* |
| 21.1 | List of subsidiaries of Next Bridge Hydrocarbons, Inc.* |
| 23.1 | Consent of Independent Registered Public Accounting Firm M&K CPAS, PLLC* |
| 23.2 | Consent of PeTech Enterprises, Inc.* |
| 31.1 | Chief Executive Officer certification under Section 302 of the Sarbanes-Oxley Act of 2002.* |
| 31.2 | Chief Financial Officer certification under Section 302 of the Sarbanes-Oxley Act of 2002.* |
| 32.1 | Chief Executive Officer certification under Section 906 of the Sarbanes-Oxley Act of 2002.* |
| 32.2 | Chief Financial Officer certification under Section 906 of the Sarbanes-Oxley Act of 2002.* |
| 99.1 | Report of Independent Petroleum Engineers.* |

† Certain exhibits and schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(a)(5). The Company hereby agrees to furnish a copy of any omitted exhibits and schedules to the SEC upon its request.

\+ Indicates a management contract or compensatory plan.

* Filed herewith.

*Table of Contents*

**Item 16. Form 10-K Summary**

None.

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**NEXT BRIDGE HYDROCARBONS, INC.**

Date: July 17, 2024

By:/s/ Gregory McCabe
Gregory McCabe
Chairman and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Gregory McCabe<br>Gregory McCabe | Chairman and Chief Executive Officer | July 17, 2024 |
| /s/ Roger Wurtele<br>Roger Wurtele | Chief Financial Officer | July 17, 2024 |
| /s/ Robert L. Cook<br>Robert L. Cook | Director | July 17, 2024 |
| /s/ Edward Pocock III<br>Edward Pocock III | Director | July 17, 2024 |

**Exhibit 10.28**

**THIS 0% SENIOR UNSECURED PROMISSORY NOTE (THE "NOTE") HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("ACT"), OR THE SECURITIES LAWS OF ANY STATE. THIS NOTE MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHOUT REGISTRATION UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR DELIVERY TO NEXT BRIDGE HYDROCARBONS, INC. OF AN OPINION OF LEGAL COUNSEL SATISFACTORY TO NEXT BRIDGE HYDROCARBONS, INC. THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR ANY APPLICABLE STATE SECURITIES LAWS.**

0% SENIOR UNSECURED PROMISSORY NOTE
OF
NEXT BRIDGE HYDROCARBONS, INC.

US$1,000,000.00 January 23, 2024

FOR VALUE RECEIVED, NEXT BRIDGE HYDROCARBONS, INC., a Nevada corporation with its principal office located at 500 W. Texas Ave., Suite 890, Midland, Texas 79701 (the "***Company***"), unconditionally promises to pay to Gregory McCabe, an individual with an address at 500 West Texas Ave., Suite 890, Midland, Texas 79701, or his registered assignee, upon presentation of this 0% Senior Unsecured Promissory Note (the "***Note***") by the registered holder hereof (the "***Holder***") at the office of the Company, the principal sum of $1,000,000, together with the accrued and unpaid interest thereon and other sums as hereinafter provided, subject to the terms and conditions as set forth below.

1. Capitalized terms used herein have the meanings set forth in this Section 1.

"***Applicable Rate***" means the rate equal to 0.00% per annum.

"***Business Day***" means a day other than a Saturday, Sunday, or other day on which commercial banks in Midland, Texas are authorized or required by law to close.

"***CAPCO Note***" means the 12% Secured Promissory Note of even date herewith from the Company to CAPCO Holdings, Inc., a Texas Corporation.

"***Company***" has the meaning set forth in the introductory paragraph of this Note.

"***Closing Date***" means _____ __, 2024.

"***Default***" means any of the events specified in Section 6 which constitute an Event of Default or which, upon the giving of notice, the lapse of time, or both, pursuant to Section 6, would, unless cured or waived, become an Event of Default.

"***Default Rate***" means the Applicable Rate *plus* 2.00% per annum.

"***Event of Default***" has the meaning set forth in Section 6.

"***Governmental Authority***" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government.

"***Holder***" has the meaning set forth in the introductory paragraph of this Note.

"***Loan***" means the aggregate funds advanced to the Company under the terms of this Note in an aggregate principal amount of $1,000,000.00.

"***Material Indebtedness***" means any debt or indebtedness of the Company (other than the Loan) in an aggregate principal amount exceeding $1,000,000.

"***Maturity Date***" means January 23, 2025, which is the date on which all amounts under this Note shall become due and payable.

"***Note***" has the meaning set forth in the introductory paragraph of this Note.

"***Note Register***" has the meaning set forth in Section 3(a).

"***Orogrande Wells***" means the five wells that the Company is obligated to drill to maintain its leases representing approximately 134,066 net acres in the Orogrande Basin in West Texas.

"***Person***" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

2. **Schedule for Payment of Principal and Interest**. This Note will bear simple interest at the Applicable Rate, in arrears, with one balloon payment of principal and interest being due and payable on the Maturity Date, unless the Company, at its sole discretion, elects to extend the Maturity Date by 1 year, in which case, all accrued interest from the Closing Date to the original Maturity Date of January 23, 2025 (but not principal) will be due and payable on January 23, 2025, and thereafter, the Note will continue to bear simple interest at the Applicable Rate, in arrears, with one balloon payment of principal and interest being due and payable on the extended Maturity Date of January 23, 2026. To elect to extend the Maturity Date by 1 year, the Company must provide written notice to the Holder at least 30 days prior to the original Maturity Date of January 23, 2025. If the Company elects to extend the maturity date of the CAPCO Note by 1 year, as it is entitled to do under the terms and conditions of the CAPCO Note, it must also concurrently extend this Note by 1 year.

3. **Payment Dates; Prepayments**.

(a) Payment Dates. The Company shall repay the Loan outstanding under this Note, along with all accrued and unpaid interest on the outstanding principal of this Note, to the Holder on the Maturity Date. Except as otherwise provided herein, the outstanding principal amount hereunder shall bear interest at the Applicable Rate from the Closing Date until this Note is paid in full, whether at the Maturity Date, upon acceleration, by prepayment or otherwise. The principal of, and interest on, this Note so payable will be paid to the Person whose name is registered on the records of the Company regarding registration and transfers of this Note (the "***Note Register***").

(b) Optional Prepayments. The Company may prepay the Loan in whole or in part at any time or from time to time; provided, however, that if all or any portion of the principal amount of this Note is prepaid, all accrued interest on such amount to the date of prepayment, plus all interest that would have accrued to the Maturity Date on such amount, will be due and payable upon such date of prepayment.

(c) Payment Mechanics. Payment of any sums due to the Holder under the terms of this Note shall be made in United States Dollars by check or wire transfer, at the option of the Holder, no later than 3:00 p.m. prevailing central time on the date on which such payment is due or such payment is made. Payment shall be made at the address last appearing on the Note Register of the Company as designated in writing by the Holder hereof from time to time. If any payment hereunder would otherwise become due and payable on a day that is not a Business Day and, with respect to payments of the Loan, interest thereon shall be payable at the Applicable Rate during such extension, if any. The forwarding of such funds shall constitute a payment of outstanding principal and interest hereunder and shall satisfy and discharge the liability for principal and interest on this Note to the extent of the sum represented by such payment.

(d) Application of Proceeds. All payments made under this Note shall be applied *first* to the payment of any fees or charges outstanding hereunder; *second* to accrued interest; and *third* to the payment of the principal amount outstanding under the Note.

4. **Interest**.

(a) Interest Rate. Except as otherwise provided herein, the outstanding principal amount hereunder shall bear interest at the Applicable Rate from the date such amount was funded until such amount is paid in full, whether at maturity, upon acceleration, by prepayment, or otherwise.

(b) Interest Payment Dates. Interest shall be payable in arrears on the Maturity Date.

(c) Computation of Interest. All computations of interest shall be made on the basis of 365 or 366 days, as the case may be, and the actual number of days elapsed. Interest shall accrue on the principal amount on the day on which such funds are advanced, and shall not accrue on such amount for the day on which it is paid.

5. **Representations and Warranties of the Company**. The Company represents and warrants to the Holder that:

(a) Organization. The Company is validly existing and in good standing under the laws of the state of Nevada and has the requisite power to own, lease and operate its properties and to carry on its business as now being conducted. The Company is duly qualified to do business and is in good standing in each jurisdiction in which the character or location of the properties owned or leased by the Company or the nature of the business conducted by the Company makes such qualification necessary or advisable, except where the failure to do so would not have a material adverse effect on the Company.

(b) Power and Authority. The Company has the requisite power to execute, deliver and perform this Note, and to consummate the transactions contemplated hereby. The execution and delivery of this Note by the Company and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Company. This Note has been duly executed and delivered by the Company and constitutes a legal, valid and binding obligation of the Company and is enforceable against the Company in accordance with its terms except (i) that such enforcement may be subject to bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights and (ii) that the remedy of specific performance and injunctive and other forms of equitable relief are subject to certain equitable defenses and to the discretion of the court before which any proceedings therefor may be brought.

(c) Approvals. No authorization, approval or consent of any Governmental Authority is required to be obtained by the Company for the issuance and sale of the Note, except such authorizations, approvals and consents that have been obtained.

6. **Events of Defaults**. The following are deemed to be an event of default ("***Event of Default***") hereunder: (a) the failure by the Company to pay any installment of interest on this Note as and when due and payable and the continuance of any such failure for ten (10) days; (b) the failure by the Company to pay all or any part of the principal on this Note when and as the same become due and payable as set forth above, at maturity, by acceleration or otherwise; (c) any representation or warranty made or deemed made by or on behalf of the Company in this Note or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report or notice furnished pursuant to or in connection with this Note or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been incorrect in any material respect (or, in the case of any such representation or warranty under this Note already qualified by materiality, such representation or warranty shall prove to have been incorrect) when made or deemed made; (d) the failure by the Company to observe or perform any covenant or agreement contained in this Note and the continuance of such failure for a period of thirty (30) days after the written notice is given to the Company; (e) the assignment by the Company for the benefit of creditors, or an application by the Company to any tribunal for the appointment of a trustee or receiver of a substantial part of the assets of the Company, or the commencement of any proceedings relating to the Company under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debts, dissolution or other liquidation law of any jurisdiction; or the filing of such application, or the commencement of any such proceedings against the Company and an indication of consent by the Company to such proceedings, or the appointment of such trustee or receiver, or an adjudication of the Company bankrupt or insolvent, or approval of the petition in any such proceedings, and such order remains in effect for sixty (60) days; (f) the declaration of an event of default or default, occurring after the Closing Date, under any Material Indebtedness, the effect of which is to cause, or to permit the lender or creditor (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice, if required, such Material Indebtedness to become due prior to its stated maturity; or (g) the entry of one or more judgments in excess of $2,500,000 (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage and is not subject to any insolvency proceeding and, for the avoidance of doubt, net of any such coverage) against the Company, which remains undischarged, unsatisfied, unvacated or unbonded for a period of sixty (60) consecutive days during which execution shall not be effectively stayed (pursuant to applicable law, rules, court orders, settlement agreements or agreements with the judgment creditor).

7. **The Holder's Rights and Remedies upon the Occurrence of an Event of Default**. Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Holder may, at its option, by written notice to the Company (a) declare the entire principal amount of the Loan, together with all accrued interest thereon and all other amounts payable under this Note, immediately due and payable and/or (b) require any outstanding principal to bear interest from the date of the Event of Default at the Default Rate (subject to Section 14). Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of a subsequent Event of Default. If the Note for which the then outstanding principal amount, together with interest owing in respect thereof, shall have been paid in accordance herewith, the Note shall promptly be surrendered to or as directed by the Company.

8. **Limitation on Merger, Sale or Consolidation**. The Company may not, directly or indirectly, consolidate with or merge into another person or sell, lease, convey or transfer all or substantially all of its assets (computed on a consolidated basis), whether in a single transaction or a series of related transactions, to another person or group of affiliated persons, unless either (a) in the case of a merger or consolidation, the Company is the surviving entity or (b) the resulting, surviving or transferee entity expressly assumes by supplemental agreement all of the obligations of the Company in connection with the Note. Upon any consolidation or merger or any transfer of all or substantially all of the assets of the Company in accordance with the foregoing, the successor entity formed by such consolidation or into which the Company is merged or to which such transfer is made, shall succeed to, and be substituted for, and may exercise every right and power of the Company under the Note with the same effect as if such successor entity had been named therein as the Company, and the Company will be released from its obligations under the Note, except as to any obligations that arise from or as a result of such transaction.

9. **Listing of Holder of Note**. This Note will be registered in the Holder's name on the books of the Company at its principal office in Midland, Texas, after which no transfer hereof shall be valid unless made on the Company's books at the office of the Company, by the Holder hereof, in person, or by attorney duly authorized in writing, and similarly noted hereon.

10. **Holder Not Deemed a Stockholder**. No Holder, as such, of this Note shall be entitled to vote or receive dividends or be deemed the holder of shares of the Company for any purpose, nor shall anything contained in this Note be construed to confer upon the Holder hereof, as such, any of the rights of a stockholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise.

11. **Waiver of Demand, Presentment, Etc**. The Company hereby expressly waives demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of acceleration or intent to accelerate, bringing of suit and diligence in taking any action to collect amounts called for hereunder and shall be directly and primarily liable for the payment of all sums owing and to be owing hereunder, regardless of and without any notice, diligence, act or omission as or with respect to the collection of any amount called for hereunder.

12. **Attorney's Fees**. The Company agrees to pay all reasonable and documented out-of-pocket costs and expenses, including, without limitation, reasonable attorney's fees, which may be incurred by the Holder in collecting any amount due under this Note.

13. **Enforceability**. In case any provision of this Note is held by a court of competent jurisdiction to be excessive in scope or otherwise invalid or unenforceable, such provision shall be adjusted rather than voided, if possible, so that it is enforceable to the maximum extent possible, and the validity and enforceability of the remaining provisions of this Note will not in any way be affected or impaired thereby.

14. **Intent to Comply with Usury Laws**. In no event will the interest to be paid on this Note exceed the maximum rate provided by law. It is the intent of the parties to comply fully with the usury laws of the State of Texas; accordingly, it is agreed that notwithstanding any provisions to the contrary in this Note, in no event shall such Note require the payment or permit the collection of interest (which term, for purposes hereof, shall include any amount which, under Texas law, is deemed to be interest, whether or not such amount is characterized by the parties as interest) in excess of the maximum amount permitted by the laws of the State of Texas. If any excess of interest is unintentionally contracted for, charged or received under this Note, or in the event the maturity of the indebtedness evidenced by the Note is accelerated in whole or in part, or in the event that all of part of the Loans or interest of this Note shall be prepaid, so that the amount of interest contracted for, charged or received under this Note, on the amount of the Loans actually outstanding from time to time under this Note shall exceed the maximum amount of interest permitted by the applicable usury laws, then in any such event (a) the provisions of this paragraph shall govern and control, (b) neither the Company nor any other person or entity now or hereafter liable for the payment thereof, shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum amount of interest permitted by such applicable usury laws, (c) any such excess which may have been collected shall be either applied as a credit against the then unpaid principal amount thereof or refunded to the Company at the Holder's option, and (d) the effective rate of interest shall be automatically reduced to the maximum lawful rate of interest allowed under the applicable usury laws as now or hereafter construed by the courts having jurisdiction thereof. It is further agreed that, without limitation of the foregoing, all calculations of the rate of interest contracted for, charged or received under the Note which are made for the purpose of determining whether such rate exceeds the maximum lawful rate of interest, shall be made, to the extent permitted by applicable laws, by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of the Note evidenced thereby, all interest at any time contracted for, charged or received from the Company or otherwise by the Holders in connection with this Note.

15. **Governing Law; Consent to Jurisdiction**. This Note shall be governed by and construed in accordance with the laws of the State of Texas without regard to the conflict-of-law provisions thereof. In any action between or among any of the parties, whether rising out of this Note or otherwise, each of the parties irrevocably consents to the exclusive jurisdiction and venue of the federal and/or state courts located in Midland County, Texas.

16. **Amendment and Waiver**. Any waiver or amendment hereto shall be in writing signed by the Holder. No failure on the part of the Holder to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Holder of any right hereunder preclude any other or further exercise thereof or the exercise of any other rights. The remedies herein provided are cumulative and not exclusive of any other remedies provided by law.

17. **Restrictions Against Transfer or Assignment**. This Note may not be sold, transferred, assigned, pledged, hypothecated or otherwise disposed of by the Holder hereof, in whole or in part, unless and until either (a) the Note has been duly and effectively registered for resale under the Securities Act of 1933, as amended, and under any then applicable state securities laws; or (b) the Holder delivers to the Company a written opinion acceptable to the Company's counsel that an exemption from such registration requirements is then available with respect to any such proposed sale or disposition. Any transfer of this Note otherwise permissible hereunder shall be made only at the principal office of the Company upon surrender of this Note for cancellation and upon the payment of any transfer tax or other government charge connected therewith, and upon any such transfer a new Note will be issued to the transferee in exchange therefor.

18. **Entire Agreement; Headings**. This Note constitutes the entire agreement between the Holder and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, representations and understandings, written or oral, of such parties. The headings are for reference purposes only and shall not be used in construing or interpreting this Note.

19. **Notices**. Any notices or other communications required or permitted hereunder shall be sufficiently given if in writing and delivered in person, or sent by registered or certified mail (return receipt requested) or recognized overnight delivery service, postage pre-paid, or sent by email addressed as follows, or to such other address as such party may notify to the other parties in writing:

(a) If to the Company, to it at the following address:

Next Bridge Hydrocarbons, Inc.
500 W. Texas Ave., Suite 890
Midland, Texas 79701
Attn: CFO
Email:

(b) If to Holder, to it at the following address:

Gregory McCabe
500 West Texas Ave., Suite 890
Midland, Texas 79701
Email:

A notice or communication will be effective (i) if delivered in person or by overnight courier, on the Business Day it is delivered, (ii) if sent by registered or certified mail, the earlier of the date of actual receipt by the party to whom such notice is required to be given or three (3) days after deposit in the United States mail and (iii) if sent by email, on the date sent. If any notice or other communication is sent by email, the party providing such notice shall, no later than the next business day after such emailed notice is sent, send a written notice by registered or certified mail (return receipt requested) or recognized overnight delivery service, postage prepaid.

20. **Use of Proceeds**. The proceeds of the Loan hereunder shall be used (a) to pay any expenditures incurred by the Company or its consolidated subsidiaries, (b) to finance the development of the Orogrande Wells and (c) for general corporate purposes.

21. **Survival**. The representations, warranties, obligations and covenants of the Company shall survive execution of this Note.

[Signature Page Follows.]

**IN WITNESS WHEREOF,** the Company has executed this Senior Unsecured Promissory Note as of the date first written above.

**NEXT BRIDGE HYDROCARBONS, INC.**

By: /s/ Roger Wurtele
Name: Roger Wurtele
Title: CFO

[Signature Page to 0% Senior Unsecured Promissory Note]

**Exhibit 10.29**

**THIS 12% SECURED PROMISSORY NOTE (THE "NOTE") HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("ACT"), OR THE SECURITIES LAWS OF ANY STATE. THIS NOTE MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHOUT REGISTRATION UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR DELIVERY TO NEXT BRIDGE HYDROCARBONS, INC. OF AN OPINION OF LEGAL COUNSEL SATISFACTORY TO NEXT BRIDGE HYDROCARBONS, INC. THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR ANY APPLICABLE STATE SECURITIES LAWS.**

12% SECURED PROMISSORY NOTE
OF
NEXT BRIDGE HYDROCARBONS, INC.

US$2,000,000.00 February 29, 2024

FOR VALUE RECEIVED, **NEXT BRIDGE HYDROCARBONS, INC.**, a Nevada corporation with its principal office located at 500 W. Texas Ave., Suite 890, Midland, Texas 79701 (the "***Company***"), unconditionally promises to pay to **CAPCO HOLDINGS, INC.**, a Texas Corporation with an address at 131 East Mandalay, San Antonio, Texas 78212-1739, or its registered assignee, upon presentation of this 12% Secured Promissory Note (the "***Note***") by the registered holder hereof (the "***Holder***") at the office of the Company, the principal sum of Two Million and Zero One-Hundredth Dollars ($2,000,000.00), together with the accrued and unpaid interest thereon and other sums as hereinafter provided, subject to the terms and conditions as set forth below.

1. Capitalized terms used herein have the meanings set forth in this Section 1.

"***Applicable Rate***" means the rate equal to twelve percent (12.00%) per annum.

"***Business Day***" means a day other than a Saturday, Sunday, or other day on which commercial banks in Midland, Texas are authorized or required by law to close.

"***Company***" has the meaning set forth in the introductory paragraph of this Note.

"***Closing Date***" means February 29, 2024.

"***Default***" means any of the events specified in Section 6 which constitute an Event of Default or which, upon the giving of notice, the lapse of time, or both, pursuant to Section 6, would, unless cured or waived, become an Event of Default.

"***Default Rate***" means the lesser of (i) the Applicable Rate *plus* two percent (2.00%) per annum and (ii) the highest rate of interest permitted by the laws of the State of Texas.

"***Event of Default***" has the meaning set forth in Section 6.

"***Extended Maturity Date***" means February 28, 2026.

"***Extended Term***" means that time period between the Maturity Date and the Extended Maturity Date.

"***Extension Notice***" has the meaning set forth in ***Section 2***.

"***Extension Rate***" means the interest rate equal to the lesser of (i) eighteen percent (18.00%) per annum and (ii) the highest rate of interest permitted by the laws of the State of Texas.

"***Governmental Authority***" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government.

"***Holder***" has the meaning set forth in the introductory paragraph of this Note.

"***Initial Term***" means the time period between the Closing Date and the Maturity Date.

"***Initial Term Interest Payment***" has the meaning as set forth in **Section 2**.

"***Loan***" means the aggregate funds advanced to the Company under the terms of this Note in an aggregate principal amount of Two Million and Zero One-Hundredths Dollars ($2,000,000.00).

"***Material Indebtedness***" means any debt or indebtedness of the Company (other than the Loan) in an aggregate principal amount exceeding One Million Dollars ($1,000,000).

"***Maturity Date***" means February 28, 2025.

"***Note***" has the meaning set forth in the introductory paragraph of this Note.

"***Note Register***" has the meaning set forth in **Section 3(a)**.

"***Orogrande Wells***" means the five wells that the Company is obligated to drill to maintain its leases representing approximately 134,066 net acres in the Orogrande Basin in West Texas.

"***Person***" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

"***Replacement Interest Rate***" has the meaning set forth in **Section 2**.

"***Stock Pledge Agreement***" means the Stock Pledge and Security Agreement executed contemporaneously herewith by and between Gregory McCabe and Clinton A. Plant.

"***Subordination Agreement***" means the Subordination Agreement executed contemporaneously herewith by and between Gregory McCabe and Clinton A. Plant.

2. **Interest; Schedule for Payment of Principal and Interest**. During the Initial Term, this Note will bear simple interest at the Applicable Rate, in arrears, with one balloon payment of principal and interest being due and payable on the Maturity Date. Company may, at its sole discretion, elect to extend the Maturity Date to the Extended Maturity Date, in which case, all accrued interest from the Closing Date to the Maturity Date (but not principal) will be due and payable on the Maturity Date ("***Initial Term Interest Payment***"), *it being understood and agreed that* if the Initial Term Interest Payment is not made as of the Maturity Date, Company's election to extend the Maturity Date to the Extended Maturity will be null and void and all fees, costs, interest and principle shall be due as of the Maturity Date. During the Extended Term, the Note will bear simple interest at a per annum rate which is mutually agreeable to the Company and the Holder ("***Replacement Interest Rate***"), payable in arrears, with one balloon payment of principal and interest being due and payable on the Extended Maturity Date. To elect to extend the Maturity Date to the Extended Maturity Date, Company shall provide written notice of such election ("***Extension Notice***") to the Holder at least thirty (30) days prior to the Maturity Date. If Company and Holder cannot mutually agree as to the Replacement Interest Rate within thirty (30) days of the date of the Extension Notice, then, in that event, the Replacement Interest Rate shall be equal to the Extension Rate.

3. **Note Register; Prepayments**.

(a) Note Register. Principal of, and interest on, this Note so payable will be paid to the Person whose name is registered on the records of the Company regarding registration and transfers of this Note (the "***Note Register***").

(b) Optional Prepayments. The Company may prepay the Loan in whole or in part at any time or from time to time; provided, however, that if all or any portion of the principal amount of this Note is prepaid, all accrued interest on such amount to the date of prepayment, plus, subject to the provisions of **Section 14** below, all interest that would have accrued to the then Maturity Date or the Extended Maturity Date, as the case may be, on such amount, will be due and payable upon such date of prepayment.

(c) Payment Mechanics. Payment of any sums due to the Holder under the terms of this Note shall be made in United States Dollars by check or wire transfer, at the option of the Holder, no later than 3:00 p.m. prevailing central time on the date on which such payment is due or such payment is made. Payment shall be made at the address last appearing on the Note Register as designated in writing by the Holder hereof from time to time. If any payment hereunder would otherwise become due and payable on a day that is not a Business Day and, with respect to payments of the Loan, interest thereon shall be payable at the Applicable Rate if payment occurs during the Initial Term or at Extension Rate if repayment occurs during the Extended Term, during such extension, if any. The forwarding of such funds shall constitute a payment of outstanding principal and interest hereunder and shall satisfy and discharge the liability for principal and interest on this Note to the extent of the sum represented by such payment.

(d) Application of Proceeds. All payments made under this Note shall be applied *first* to the payment of any fees or charges outstanding hereunder; *second* to accrued interest; and *third* to the payment of the principal amount outstanding under the Note.

4. **Computation of Interest; Late Charge**.

(a) All computations of interest shall be made on the basis of 365 or 366 days, as the case may be, and the actual number of days elapsed. Interest shall accrue on the principal amount on the day on which such funds are advanced, and shall not accrue on such amount for the day on which it is paid.

(b) Subject to statutory and contractual provisions limiting the rate and amount of interest Holder may charge, collect or receive, in the event any payments shall become overdue for a period in excess of ten (10) days, a one-time late charge of five percent (5%) of the payment due may be charged by the Holder hereof for the purpose of defraying the expense incident to the handling of such delinquent payments. Any late acceptance or waiver of payment of any installment or waiver by Holder of default in any obligation or covenant of Company in any herein shall not operate as a waiver of any other or subsequent installments or other covenants or obligations. THIS LATE CHARGE DOES NOT APPLY TO THE FINAL SCHEDULED PAYMENT UNDER THIS NOTE.

5. **Representations and Warranties of the Company**. The Company represents and warrants to the Holder that:

(a) Organization. The Company is validly existing and in good standing under the laws of the state of Nevada and has the requisite power to own, lease and operate its properties and to carry on its business as now being conducted. The Company is duly qualified to do business and is in good standing in each jurisdiction in which the character or location of the properties owned or leased by the Company or the nature of the business conducted by the Company makes such qualification necessary or advisable, except where the failure to do so would not have a material adverse effect on the Company.

(b) Power and Authority. The Company has the requisite power to execute, deliver and perform this Note, and to consummate the transactions contemplated hereby. The execution and delivery of this Note by the Company and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Company. This Note has been duly executed and delivered by the Company and constitutes a legal, valid and binding obligation of the Company and is enforceable against the Company in accordance with its terms except (i) that such enforcement may be subject to bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights and (ii) that the remedy of specific performance and injunctive and other forms of equitable relief are subject to certain equitable defenses and to the discretion of the court before which any proceedings therefor may be brought.

(c) Approvals. No authorization, approval or consent of any Governmental Authority is required to be obtained by the Company for the issuance and sale of the Note, except such authorizations, approvals and consents that have been obtained.

6. **Events of Defaults**. The following are deemed to be an event of default ("***Event of Default***") hereunder: (a) the failure by the Company to pay any installment of interest on this Note as and when due and payable and the continuance of any such failure for ten (10) days; (b) the failure by the Company to pay all or any part of the principal on this Note when and as the same become due and payable as set forth above, at maturity, by acceleration or otherwise; (c) any representation or warranty made or deemed made by or on behalf of the Company in this Note or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report or notice furnished pursuant to or in connection with this Note or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been incorrect in any material respect (or, in the case of any such representation or warranty under this Note already qualified by materiality, such representation or warranty shall prove to have been incorrect) when made or deemed made; (d) other than as set forth in **Sections 6(a), (b) and (c)** above or **Sections 6(h) or (i)** below, the failure by the Company to observe or perform any covenant or agreement contained in this Note and the continuance of such failure for a period of thirty (30) days after the written notice is given to the Company; (e) the assignment by the Company for the benefit of creditors, or an application by the Company to any tribunal for the appointment of a trustee or receiver of a substantial part of the assets of the Company, or the commencement of any proceedings relating to the Company under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debts, dissolution or other liquidation law of any jurisdiction; or the filing of such application, or the commencement of any such proceedings against the Company and an indication of consent by the Company to such proceedings, or the appointment of such trustee or receiver, or an adjudication of the Company bankrupt or insolvent, or approval of the petition in any such proceedings, and such order remains in effect for sixty (60) days; (f) the declaration of an event of default or default, occurring on or after the Closing Date, under any Material Indebtedness, the effect of which is to cause, or to permit the lender or creditor (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice, if required, such Material Indebtedness to become due prior to its stated maturity; (g) the entry of one or more judgments in excess of $500,000 (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage and is not subject to any insolvency proceeding and, for the avoidance of doubt, net of any such coverage) against the Company, which remains undischarged, unsatisfied, unvacated or unbonded for a period of sixty (60) consecutive days during which execution shall not be effectively stayed (pursuant to applicable law, rules, court orders, settlement agreements or agreements with the judgment creditor); (h) the occurrence of any event or condition, that with the giving of notice or passage of time, or both, could result in a material default by Company under any other contract, loan, obligation or agreement of any kind to which the Company is a party that results in a material adverse effect against Company; (i) the occurrence of any event or condition, that with the giving of notice or passage of time, or both, could result in (i) a default by Company under (A) the Consulting Agreement executed contemporaneously herewith by and between Company and Clinton A. Plant, (B) the Stock Pledge and Security Agreement executed contemporaneously herewith by and between Gregory McCabe and Clinton A. Plant ("***Stock Pledge Agreement***"), and (C) the Subordination Agreement executed contemporaneously herewith by and between Gregory McCabe and Clinton A. Plant ("***Subordination Agreement***") or (ii) the security interest created by the Stock Pledged Agreement is not perfected, or if perfected, becomes unperfected, or if perfected, is not a first-lien priority security interest in the collateral pledged; and (j) the issuance of any order or decree enjoining or prohibiting the Company from performing under this Note, Subordination Agreement, and/or Stock Pledge Agreement, which order or decree is not vacated within fifteen (15) days after the granting thereof.

7. **The Holder's Rights and Remedies upon the Occurrence of an Event of Default**. Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Holder may, at its option, by written notice to the Company (a) declare the entire principal amount of the Loan, together with all accrued interest thereon and all other amounts payable under this Note, immediately due and payable and/or (b) require any outstanding principal to bear interest from the date of the Event of Default at the greater of the Default Rate or Extension Rate (subject to **Section 14**). Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of a subsequent Event of Default. If the Note for which the then outstanding principal amount, together with interest owing in respect thereof, shall have been paid in accordance herewith, the Note shall promptly be surrendered to or as directed by the Company.

8. **Limitation on Merger, Sale or Consolidation**. The Company may not, directly or indirectly, consolidate with or merge into another person or sell, lease, convey or transfer all or substantially all of its assets (computed on a consolidated basis), whether in a single transaction or a series of related transactions, to another person or group of affiliated persons, without contemporaneously paying Holder the entire outstanding principal amount of the Loan, together with all accrued interest thereon and all other amounts payable under this Note.

9. **Listing of Holder of Note**. This Note will be registered in the Holder's name on the books of the Company at its principal office in Midland, Texas, after which no transfer hereof shall be valid unless made on the Company's books at the office of the Company, by the Holder hereof, in person, or by attorney duly authorized in writing, and similarly noted hereon and which transfer, is so requested, shall not be withheld, conditioned, delayed or denied.

10. **Holder Not Deemed a Stockholder**. No Holder, as such, of this Note, unless otherwise a stockholder of the Company, shall be entitled to vote or receive dividends or be deemed the holder of shares of the Company for any purpose, nor shall anything contained in this Note be construed to confer upon the Holder hereof, as such, any of the rights of a stockholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise.

11. **Waiver of Demand, Presentment, Etc**. The Company hereby expressly waives demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of acceleration or intent to accelerate, bringing of suit and diligence in taking any action to collect amounts called for hereunder and shall be directly and primarily liable for the payment of all sums owing and to be owing hereunder, regardless of and without any notice, diligence, act or omission as or with respect to the collection of any amount called for hereunder.

12. **Attorney's Fees**. The Company agrees to pay all reasonable and documented out-of-pocket costs and expenses, including, without limitation, reasonable attorney's fees, which may be incurred by the Holder in collecting any amount due under this Note.

13. **Enforceability**. In case any provision of this Note is held by a court of competent jurisdiction to be excessive in scope or otherwise invalid or unenforceable, such provision shall be adjusted rather than voided, if possible, so that it is enforceable to the maximum extent possible, and the validity and enforceability of the remaining provisions of this Note will not in any way be affected or impaired thereby.

14. **Intent to Comply with Usury Laws**. In no event will the interest to be paid on this Note exceed the maximum rate provided by law. It is the intent of the parties to comply fully with the usury laws of the State of Texas; accordingly, it is agreed that notwithstanding any provisions to the contrary in this Note, in no event shall such Note require the payment or permit the collection of interest (which term, for purposes hereof, shall include any amount which, under Texas law, is deemed to be interest, whether or not such amount is characterized by the parties as interest) in excess of the maximum amount permitted by the laws of the State of Texas. If any excess of interest is unintentionally contracted for, charged or received under this Note, or in the event the maturity of the indebtedness evidenced by the Note is accelerated in whole or in part, or in the event that all of part of the Loan or interest of this Note shall be prepaid, so that the amount of interest contracted for, charged or received under this Note, on the amount of the Loan actually outstanding from time to time under this Note shall exceed the maximum amount of interest permitted by the applicable usury laws, then in any such event (a) the provisions of this paragraph shall govern and control, (b) neither the Company nor any other person or entity now or hereafter liable for the payment thereof, shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum amount of interest permitted by such applicable usury laws, (c) any such excess which may have been collected shall be either applied as a credit against the then unpaid principal amount thereof or refunded to the Company at the Holder's option, and (d) the effective rate of interest shall be automatically reduced to the maximum lawful rate of interest allowed under the applicable usury laws as now or hereafter construed by the courts having jurisdiction thereof. It is further agreed that, without limitation of the foregoing, all calculations of the rate of interest contracted for, charged or received under the Note which are made for the purpose of determining whether such rate exceeds the maximum lawful rate of interest, shall be made, to the extent permitted by applicable laws, by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of the Note evidenced thereby, all interest at any time contracted for, charged or received from the Company or otherwise by the Holders in connection with this Note.

15. **Governing Law; Consent to Jurisdiction**. This Note shall be governed by and construed in accordance with the laws of the State of Texas without regard to the conflict-of-law provisions thereof. In any action between or among any of the parties, whether rising out of this Note or otherwise, each of the parties irrevocably consents to the exclusive jurisdiction and venue of the federal and/or state courts located in Midland County, Texas.

16. **Amendment and Waiver**. Any waiver or amendment hereto shall be in writing signed by the parties hereto. No failure on the part of the Holder to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Holder of any right hereunder preclude any other or further exercise thereof or the exercise of any other rights. The remedies herein provided are cumulative and not exclusive of any other remedies provided by law.

17. **Entire Agreement; Headings**. This Note constitutes the entire agreement between the Holder and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, representations and understandings, written or oral, of such parties. The headings are for reference purposes only and shall not be used in construing or interpreting this Note.

18. **Notices**. Any notices or other communications required or permitted hereunder shall be sufficiently given if in writing and delivered in person, or sent by registered or certified mail (return receipt requested) or recognized overnight delivery service, postage pre-paid, or sent by email addressed as follows, or to such other address as such party may notify to the other parties in writing:

(a) If to the Company, to it at the following address:

Next Bridge Hydrocarbons, Inc.
500 W. Texas Ave., Suite 890
Midland, Texas 79701
Attn: Chief Executive Officer

(b) If to Holder, to it at the following address:

CAPCO Holdings, Inc.
______________
______________
Attn: Clinton A. Plant, President

With a copy to:

Langley & Banack, Incorporated
745 E. Mulberry Avenue, Suite 700
San Antonio, Texas 78212
Attn: Timothy J. Siegfried, Esquire

A notice or communication will be effective (i) if delivered in person or by overnight courier, on the Business Day it is delivered, (ii) if sent by registered or certified mail, the earlier of the date of actual receipt by the party to whom such notice is required to be given or three (3) days after deposit in the United States mail and (iii) if sent by email, on the date sent. If any notice or other communication is sent by email, the party providing such notice shall, no later than the next business day after such emailed notice is sent, send a written notice by registered or certified mail (return receipt requested) or recognized overnight delivery service, postage prepaid.

19. **Use of Proceeds**. The proceeds of the Loan hereunder shall be used (a) to pay any expenditures incurred by the Company, (b) to finance the development of the Orogrande Wells and (c) for general corporate purposes, *it being understood and agreed that* the proceeds of the Loan shall not be used to pay dividends or distributions to stockholders.

20. **Survival**. The representations, warranties, obligations and covenants of the Company shall survive execution of this Note.

21. **Security**. This Note is secured by a Stock Pledge and Security Agreement dated as of the date hereof and attached hereto as ***Exhibit "A,"*** under the terms and conditions of which Gregory McCabe will pledge 250,000 shares of his common stock. Company acknowledges that the making of the Loan will benefit, directly or indirectly, Gregory McCabe.

22. **Lost or Mutilated Note.** If this Note shall be mutilated, lost, stolen, or destroyed, Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen, or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen, or destroyed but only upon receipt of evidence of such loss, theft, or destruction of such Note, and of the ownership hereof, and indemnity, if requested, all reasonably satisfactory to Company.

23. **OFAC.** Company represents that neither Company, nor any of its affiliates, or any of their respective directors, officers, managers, partners, or any other authorized representatives (a) is now and at any time during the term of this Note shall be named as a "Specially Designated National and Blocked Person" on the list published by the U.S. Department of the Treasury Office of Foreign Assets Control (OFAC) at its official website and (b) is now and at any time during the term of this Note shall be directly or indirectly owned or controlled by any person who is located, organized, or a resident in a country or territory that is, or whose government is the target of country wide sanctions imposed by any U.S. government sanctions authority.

24. **Not Revolving.** This Note does not represent a revolving credit; principal amounts repaid may not be re-borrowed.

25. **Notations on Payments**. Company agrees not to send Holder payments marked "paid in full," "without recourse," "under protest," or similar language. If Company sends such a payment, Holder may accept it without losing any of Holder's rights under this Note, and Company will remain obligated to pay any further amount owed to Holder.

26. **WAIVER OF JURY TRIAL.** COMPANY HEREBY WAIVES THE RIGHT TO TRIAL BY JURY OF ANY MATTERS OR CLAIMS ARISING OUT OF THIS NOTE, ANY AGREEMENT OR ANY DOCUMENT EXECUTED IN CONNECTION HEREWITH OR OUT OF THE CONDUCT OF THE RELATIONSHIP BETWEEN COMPANY AND HOLDER, IN EACH CASE WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE. COMPANY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT HOLDER MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF COMPANY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR HOLDER TO MAKE THE LOAN AND ENTER INTO THIS AGREEMENT. FURTHER, COMPANY HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF HOLDER, NOR HOLDER'S COUNSEL, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT HOLDER WOULD NOT SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION. NO REPRESENTATIVE OR AGENT OF HOLDER, NOR HOLDER'S COUNSEL, HAS THE AUTHORITY TO WAIVE, CONDITION OR MODIFY THIS PROVISION. COMPANY ACKNOWLEDGES THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THIS PARAGRAPH, THAT IT FULLY UNDERSTANDS THE TERMS, CONTENT AND EFFECT, AND THAT IT VOLUNTARILY AND KNOWINGLY AGREES TO THE TERMS OF THIS PARAGRAPH.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

[Signature Page Follows.]

**IN WITNESS WHEREOF,** the Company has executed this 12% Secured Promissory Note as of the Closing Date.

**NEXT BRIDGE HYDROCARBONS, INC.**

By: /s/ Gregory McCabe
Name: Gregory McCabe
Title: Chief Executive Officer

[Signature Page to Borrowing Notice]

**EXHIBIT "A"**

**STOCK PLEDGE AND SECURITY AGREEMENT**

[Signature Page to Borrowing Notice]

**Exhibit 10.30**

SUBORDINATION AGREEMENT

This Subordination Agreement (this "***Agreement***") is made as of February 29, 2024 by and between **GREGORY MCCABE** ("**Subordinated Creditor**"), **CAPCO HOLDINGS, INC.**, a Texas Corporation ("***Senior Creditor***") and **NEXT BRIDGE HYDROCARBONS, INC.**, a Nevada corporation ("***Borrower***").

Recitals

A. Borrower has requested and/or obtained certain loans or other credit accommodations from Senior Creditor which are or may be from time to time secured by assets and property of Borrower.

B. Subordinated Creditor has extended loans or other credit accommodations to Borrower, and/or may extend loans or other credit accommodations to Borrower from time to time (the document for which are referred to herein as the "***Loan Documents***").

C. In order to induce Senior Creditor to extend credit to Borrower and, at any time or from time to time, at Senior Creditor's option, to make such further loans, extensions of credit, or other accommodations to or for the account of Borrower, or to purchase or extend credit upon any instrument or writing in respect of which Borrower may be liable in any capacity, or to grant such renewals or extension of any such loan, extension of credit, purchase, or other accommodation as Senior Creditor may deem advisable, Subordinated Creditor is willing to subordinate (on the terms set forth in this Agreement): (i) all of Borrower's indebtedness and obligations to Subordinated Creditor, including pursuant to the 8% Secured Promissory Note, dated October 1, 2021, as such note has been amended, and the 5% Unsecured Promissory Note, dated December 21, 2022, as such note has been amended, (collectively, the "***Subordinated Notes***"), whether presently existing or arising in the future (the "***Subordinated Debt***") to the Senior Debt (as defined below); and (ii) all of Subordinated Creditor's security interests, if any, in the Borrower's property, to all of Senior Creditor's security interests in the Borrower's property.

NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1. Subordinated Creditor subordinates to Senior Creditor, on the terms set forth in this Agreement, any security interest or lien that Subordinated Creditor may have in any property of Borrower. Notwithstanding the respective dates of attachment or perfection of the security interest of Subordinated Creditor and the security interest of Senior Creditor, the security interest of Senior Creditor in any collateral, shall at all times, while any Senior Debt or commitment by Senior Creditor to lend is outstanding, be prior to the security interest of Subordinated Creditor.

2. All Subordinated Debt is subordinated, on the terms set forth in this Agreement, in right of payment to all obligations of Borrower to Senior Creditor now existing or hereafter arising, together with all costs of collecting such obligations (including attorneys' fees), including, without limitation, all interest accruing after the commencement by or against Borrower of any bankruptcy, reorganization or similar proceeding, and all of Borrower's indebtedness and obligations to Senior Creditor under the 12% Secured Promissory Note, date **February 29, 2024** (the "***Senior Debt***"). For the avoidance of doubt, for the purposes of the Senior Debt, the Subordinated Debt is permitted indebtedness, and the security interests of Subordinated Creditor in Borrower's assets are permitted liens.

3. Except as otherwise set forth in this Agreement, Subordinated Creditor will not demand or receive from Borrower (and Borrower will not pay to Subordinated Creditor) all or any part of the Subordinated Debt, by way of payment, prepayment, setoff, lawsuit or otherwise (other than payments of Excluded Items (as defined below)), nor will Subordinated Creditor exercise any remedy with respect to any collateral, nor will Subordinated Creditor commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against Borrower, for so long as any portion of the Senior Debt remains outstanding. Notwithstanding the foregoing, and except as set forth in the next paragraph, Subordinated Creditor shall be entitled to receive from Borrower (and Borrower shall be entitled to pay to Subordinated Creditor) each regularly scheduled payment of interest and principal, and all other amounts due in accordance with the terms of the Subordinated Debt. Notwithstanding the foregoing or any breach or default by the Borrower under the Loan Documents, the Subordinated Creditor shall not at any time or in any manner: (a) foreclose upon, take possession of, or attempt to realize on any collateral, or proceed in any way to enforce any claims it has or may have against the Borrower under the Subordinated Debt or otherwise, or (b) contest, protest or object to any action taken by Senior Creditor, unless and until the Senior Debt has been fully and indefeasibly paid and satisfied in full.

4. Notwithstanding anything to the contrary herein, upon (i) the occurrence and during the continuance of an Event of Default under the Senior Debt and (ii) written notice of such Event of Default to Subordinated Creditor from Senior Creditor (a "***Payment Blockage Notice***"), Subordinated Creditor may not exercise any remedy with respect to Borrower nor receive any payment (other than in respect of Excluded Items (as such term is defined in Section 6 below)) from Borrower for each period (each a "***Payment Blockage Period***") commencing on the date of the Payment Blockage Notice and ending on the earliest to occur of the following events:

(a) such Event of Default has been cured or has been waived by Senior Creditor in writing;

(b) 120 days have passed from the date of such Payment Blockage Notice, unless Senior Creditor has commenced a judicial proceeding or non-judicial actions to collect or enforce the Senior Debt or foreclose on any collateral, or a case or proceeding by or against Borrower is commenced under any bankruptcy or insolvency law or laws relating to the relief of debtors, in which case Subordinated Creditor may exercise any remedy with respect to Borrower but Subordinated Creditor may not receive any payments from Borrower during the continuance of such actions or proceedings; or

(c) the Senior Debt has been discharged or paid in full and Senior Creditor's commitment, if any, to make credit extensions under the Senior Debt has been terminated;

immediately after which Subordinated Creditor may exercise such remedies and Borrower may make all payments due and owing to Subordinated Creditor (including, without limitation, any amounts in arrears by reason of such Payment Blockage Period), subject at all times to the first priority security interest of Senior Creditor and the requirement that any amounts received by Subordinated Creditor be turned over to Senior Creditor so long as any Senior Debt remains outstanding.

5. Subordinated Creditor shall promptly deliver to Senior Creditor in the form received (except for endorsement or assignment by Subordinated Creditor where required by Senior Creditor, and any Excluded Items) for application to the Senior Debt any payment, distribution, security or proceeds received by Subordinated Creditor with respect to the Subordinated Debt other than in accordance with this Agreement.

6. Notwithstanding the foregoing or anything to the contrary contained in this Agreement, Subordinated Debt shall not include any obligations of Borrower arising under or in connection with any of the Excluded Items, as defined hereafter "**Excluded Items**" means: (a) options or warrants issued by Borrower to Subordinated Creditor pursuant to which Subordinated Creditor may purchase equity securities of Borrower or agreements exclusively governing the rights of the holders of equity securities of Borrower; and (b) any equity securities of Borrower held by or paid or otherwise delivered to Subordinated Creditor including those issued or issuable upon exercise of or in connection with any options or warrants and including, without limitation, those issued or issuable by Borrower to Subordinated Creditor in connection with or as a result of the conversion or as payment in respect of any Subordinated Debt.

7. In the event of Borrower's insolvency, reorganization or any case or proceeding under any bankruptcy or insolvency law or laws relating to the relief of debtors, these provisions shall remain in full force and effect, and Senior Creditor's claims against Borrower and the estate of Borrower shall be paid in full before any payment is made to Subordinated Creditor.

8. For so long as any of the Senior Debt remains unpaid, Subordinated Creditor irrevocably appoints Senior Creditor as Subordinated Creditor's attorney in fact, and grants to Senior Creditor a power of attorney with full power of substitution, in the name of Subordinated Creditor or in the name of Senior Creditor, for the use and benefit of Senior Creditor, without notice to Subordinated Creditor, to perform at Senior Creditor's option the following acts in any bankruptcy, insolvency or similar proceeding involving Borrower, to file the appropriate claim or claims in respect of the Subordinated Debt on behalf of Subordinated Creditor if Subordinated Creditor does not do so prior to 20 days before the expiration of the time to file claims in such proceeding and if Senior Creditor elects, in its sole discretion, to file such claim or claims. Subordinated Creditor shall retain all rights to vote and otherwise act in any bankruptcy, insolvency or similar proceeding (including, without limitation, the right to vote to accept or reject any plan of reorganization, composition, arrangement or liquidation) to the extent provided by applicable law, provided that Subordinated Creditor shall not initiate, prosecute or join in any claim or action in any such proceeding challenging (x) the validity or enforceability of the Senior Debt, this Agreement or any liens or security interests securing the Senior Debt, or (y) the intent or effect of this Agreement.

9. Subordinated Creditor and Borrower shall promptly affix the legend below to the Subordinated Notes stating that the instruments are subject to the terms of this Agreement. No amendment of the documents evidencing or relating to the Subordinated Debt ("***Amendments***") shall modify the provisions of this Agreement in any manner which might terminate or impair the subordination of the Subordinated Debt or the subordination of the security interest or lien that Subordinated Creditor may have in any property of Borrower, as provided in this Agreement. Without limiting the foregoing, such instruments shall not be amended to (i) increase the rate of interest with respect to the Subordinated Debt, or (ii) accelerate the payment of the principal or interest or any other portion of the Subordinated Debt. Promptly upon execution of the Amendments, Borrower shall, at no cost to Senior Debtor, provide a true, correct and complete copy of the Amendments to Senior Creditor.

LEGEND: **This Note is subject to the terms of a Subordination Agreement dated February 29, 2024 in favor of CAPCO Holdings, Inc., a Texas corporation. Notwithstanding any contrary statement contained in the within instrument, no payment on account of any obligation arising from or in connection with the within instrument or any related agreement (whether of principal, interest or otherwise) shall be made, paid, received or accepted except in accordance with the terms of said Subordination Agreement.**

10. This Agreement shall remain effective for so long as the Senior Creditor has any obligation to make credit extensions to Borrower or Borrower owes any amounts to Senior Creditor under the Senior Debt or otherwise. If, at any time after payment in full of the Senior Debt any payments of the Senior Debt must be disgorged by Senior Creditor for any reason (including, without limitation, the bankruptcy of Borrower), this Agreement and the relative rights and priorities set forth herein shall be reinstated as to all such disgorged payments as though such payments had not been made and Subordinated Creditor shall immediately pay over to Senior Creditor all payments received with respect to the Subordinated Debt to the extent that such payments would have been prohibited hereunder. At any time and from time to time, without notice to Subordinated Creditor, Senior Creditor may take such actions with respect to the Senior Debt as Senior Creditor, in its sole discretion, may deem appropriate, including, without limitation, terminating advances to Borrower, increasing the principal amount, extending the time of payment, increasing applicable interest rates, renewing, compromising or otherwise amending the terms of any documents affecting the Senior Debt and any collateral securing the Senior Debt, and enforcing or failing to enforce any rights against Borrower or any other person; provided that such action will not terminate or impair Subordinated Creditor's rights as provided herein. No such action or inaction shall impair or otherwise affect Senior Creditor's rights hereunder.

11. This Agreement shall bind and benefit any successors or assignees of Subordinated Creditor and Senior Creditor. This Agreement is solely for the benefit of Subordinated Creditor and Senior Creditor and not for the benefit of Borrower or any other party. Subordinated Creditor further agrees that if Borrower is in the process of refinancing a portion of the Senior Debt with a new lender, Subordinated Creditor shall enter into a new subordination agreement with the new lender on substantially identical terms and conditions as this Agreement.

12. Subordinated Creditor represents and warrants to Senior Creditor that the terms and conditions of this Agreement have been authorized by all necessary action on the part of the Subordinated Creditor and Borrower, and that the individuals signing on behalf of Subordinated Creditor and Borrower have all necessary approval and authority to do so.

13. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

14. This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Texas, without regard to principles of conflicts of law. THE PARTIES HERETO HERBY WAIVE ANY RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREIN, INCLUDING CLAIMS BASED ON CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER COMMON LAW OR STATUTORY BASES. Subordinated Creditor submits to the exclusive jurisdiction of the state and federal courts located in Midland County, Texas, for any claim or cause of action based upon or arising out of this Agreement or any transaction contemplated herein, including claims based on contract, tort, breach of duty and all other common law or statutory bases. If the jury waiver set forth in this Section is not enforceable, then any dispute, controversy or claim arising out of or relating to this Agreement or any of the transactions contemplated herein will be finally settled by binding arbitration in Midland, Texas in accordance with the then-current Commercial Arbitration Rules of the American Arbitration Association by one arbitrator appointed in accordance with said rules. The arbitrator shall apply Texas law to the resolution of any dispute, without reference to rules of conflicts of law or rules of statutory arbitration. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Notwithstanding the foregoing, the parties may apply to any court of competent jurisdiction for preliminary or interim equitable relief, or to compel arbitration in accordance with this paragraph. The expenses of the arbitration, including the arbitrator's fees and expert witness fees, incurred by the parties to the arbitration, may be awarded to the prevailing party, in the discretion of the arbitrator, or may be apportioned between the parties in any manner deemed appropriate by the arbitrator. Unless and until the arbitrator decides that one party is to pay for all (or a share) of such expenses, both parties shall share equally in the payment of the arbitrator's fees as and when billed by the arbitrator. The foregoing notwithstanding, if the Subordinated Creditor, the Borrower or both, contrary to this Agreement, make, attempt to or threaten to allow the Subordinated Creditor to exercise its remedies against the Borrower under the Loan Documents, or make any payment or take any action contrary to this Agreement, Senior Creditor may restrain or enjoin the Subordinated Creditor and the Borrower from so doing, it being expressly understood and agreed by the Subordinated Creditor and the Borrower that: (i) the Senior Debtor's damages from their actions may at that time be difficult to ascertain and may be irreparable, and (ii) the Subordinated Creditor and the Borrower waive any defense or claim that the Senior Creditor cannot demonstrate damages or can be made whole by the awarding of damages.

15. This Agreement represents the entire agreement with respect to the subject matter hereof, and supersedes all prior negotiations, agreements and commitments. Subordinated Creditor is not relying on any representations by Senior Creditor or Borrower in entering into this Agreement, and Subordinated Creditor has kept and will continue to keep itself and Senior Creditor fully apprised of the financial and other condition of Borrower. This Agreement may be amended only by written instrument signed by Subordinated Creditor, Senior Creditor, and Borrower. In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

16. In the event of any legal action to enforce the rights of a party under this Agreement, the party prevailing in such action shall be entitled, in addition to such other relief as may be granted, all reasonable costs and expenses, including reasonable attorneys' fees, incurred in such action.

***[Balance of Page Intentionally Left Blank]***

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

**SUBORDINATED CREDITOR:**

/s/ Gregory McCabe
**GREGORY MCCABE**
Individually

Address for Notice:

500 W. Texas Ave., Suite 890
Midland, Texas 79701

**SENIOR CREDITOR:**

**CAPCO Holdings, Inc.**

By: /s/ Clinton A. Plant
Name:
Title:

Address for Notice:

_______________________
_______________________
Attn.: Clinton A. Plant, President

**BORROWER:**

**NEXT BRIDGE HYDROCARBONS, INC**

**By: /s/ Roger Wurtele**
**Name:**
**Title:**

Address for notices purposes:

500 W. Texas Ave., Suite 890
Midland, Texas 79701

**Exhibit 10.31**

**FIFTH AMENDMENT TO LOAN AGREEMENT**

This FIFTH AMENDMENT TO LOAN AGREEMENT (this "***Agreement***") is entered into effective as of March 31, 2024 (the "***Amendment Effective Date***"), among NEXT BRIDGE HYDROCARBONS, INC., a Nevada corporation (the "***Borrower***"), each of the other Loan Parties under the Loan Agreement (defined below), and GREGORY MCCABE, individually (as successor by assignment to Meta Materials Inc., a Nevada corporation ("***Meta***")) (the "***Lender***"). Unless otherwise expressly defined herein, capitalized terms used but not defined in this Agreement shall have the meanings specified in the Loan Agreement (as defined below).

**RECITALS**

**WHEREAS**, the Borrower, Torchlight Energy, Inc., a Nevada corporation ("***TEI***"), Torchlight Hazel, LLC, a Texas limited liability company ("***Hazel***"), Hudspeth Oil Corporation, a Texas corporation ("***HOC***"), Hudspeth Operating, LLC, a Texas limited liability company ("***Operating***" and, together with the Borrower, TEI, Hazel, HOC and Operating, the "***Loan Parties***") and Meta, as Lender, have entered into that certain Loan Agreement, dated as of September 2, 2022 (as amended by that certain First Amendment to Loan Agreement, dated as of December 21, 2022, that certain Second Amendment to Loan Agreement, dated March 31, 2023, that certain Limited Waiver, Consent and Amendment Agreement, dated April 17, 2023, that certain Third Amendment to Loan Agreement, dated October 1, 2023, that certain Fourth Amendment to Loan Agreement, dated December 31, 2023, and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Loan Agreement***");

**WHEREAS,** pursuant to that certain Loan Sale Agreement, dated August 7, 2023, Meta assigned its rights, title, interests and obligations in and to the Loan Agreement, certain related agreements and instruments and the Loans to the Lender;

**WHEREAS**, the Borrower has requested that the Lender extend the Maturity Date upon the terms and conditions set forth herein; and

**WHEREAS**, the Lender is willing to extend the Maturity Date and increase the commitments under the Loan Agreement, in each case, subject to the terms and conditions set forth herein.

**NOW, THEREFORE**, for and in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Borrower, other Loan Parties and Lender hereby agree as follows:

**SECTION 1. Amendments to the Loan Agreement.** Subject to the satisfaction of each condition precedent set forth in Section 2, and in reliance on the representations, warranties, covenants and agreements contained in this Agreement, the Loan Agreement shall be amended effective as of the Amendment Effective Date as follows:

**1.1** Section 1.01 of the Loan Agreement is hereby amended by amending and restating the definition of "Maturity Date" as follows:

"***Maturity Date***" means June 30, 2024.

**SECTION 2**. **Conditions Precedent**. The amendments contained in Section 1 shall only be effective upon the satisfaction of each of the conditions set forth in this Section 2.

**2.1 Execution and Delivery**. The Borrower, the other Loan Parties and Lender shall have duly executed and delivered this Agreement.

**2.2 No Event of Default**. After giving effect to this Agreement, no Default shall exist under the Loan Agreement.

**2.3 Representations and Warranties**. After giving effect to this Agreement, the representations and warranties of each Loan Party contained in the Loan Agreement, this Agreement and the other Loan Documents (as amended hereby) shall be true and correct in all material respects (except to the extent any such representation and warranty is qualified by materiality, in which case, such representation and warranty shall be true and correct in all respects) on the date hereof, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date hereof, such representations and warranties shall continue to be true and correct in all material respects (except to the extent any such representation and warranty is qualified by materiality, in which case, such representation and warranty shall be true and correct in all respects) as of such specified earlier date.

**SECTION 3. Representations and Warranties of the Borrower and Other Loan Parties**. To induce the Lender to enter into this Agreement, the Borrower and each other Loan Party hereby represents and warrants to the Lender as follows:

**3.1 Reaffirmation of Representations and Warranties**. After giving effect to this Agreement, each representation and warranty of such Loan Party contained in the Loan Agreement and in each of the other Loan Documents is true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of the date hereof (except to the extent such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date).

**3.2 Corporate Authority; No Conflicts**. The execution, delivery and performance by such Loan Party (to the extent a party hereto or thereto) of this Agreement, the other Loan Documents as amended hereby, and all documents, instruments and agreements contemplated herein (a) are within such Loan Party's corporate (or equivalent) powers, (b) have been duly authorized by all necessary action, (c) require no action by or in respect of, or filing with, any Governmental Authority, (d) do not violate any applicable laws or regulations relating to such Loan Party, in any material respect, (e) do not violate or constitute a default under any indenture, agreement for borrowed money or similar instrument or any other material agreement binding upon such Loan Party or any of its Subsidiaries, or (f) do not result in the creation or imposition of any Lien upon any of the assets of such Loan Party except for Liens expressly permitted under the Loan Documents.

**3.3 Enforceability**. This Agreement and each other Loan Document (as amended hereby) to which such Loan Party is party constitute the valid and binding obligations of such Loan Party, enforceable in accordance with their respective terms, except as (a) the enforceability thereof may be limited by bankruptcy, insolvency or similar laws affecting creditor's rights generally and (b) the availability of equitable remedies may be limited by equitable principles of general application.

**3.4 No Default**. As of the Amendment Effective Date, immediately after giving effect to this Agreement, no Default has occurred and is continuing.

**SECTION 4. Miscellaneous**.

**4.1 Reaffirmation of Loan Documents**. Any and all of the terms and provisions of the Loan Documents shall, except as amended and modified hereby, remain in full force and effect and are hereby in all respects ratified and confirmed by each Loan Party. Each Loan Party hereby agrees that the amendments and modifications herein contained shall in no manner affect or impair the liabilities, duties and obligations of any Loan Party under the Loan Agreement and the other Loan Documents.

**4.2 Parties in Interest.** All of the terms and provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**4.3 Counterparts.** This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.

**4.4 No Modification.**. Except as expressly modified by this Agreement, each Loan Document is and shall remain unchanged and in full force and effect, and nothing contained in this Agreement shall, by implication or otherwise, limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of the Lender or any of the other parties hereto, or shall alter, modify, amend or in any way affect any of the other terms, conditions, obligations, covenants or agreement contained in the Loan Documents which are not by the terms of this Agreement being amended, or alter, modify or amend or in any way affect any of the other Loan Documents.

**4.5 Loan Documents**. This Agreement shall be deemed to be a Loan Document.

**4.6 Headings**. The headings, captions and arrangements used in this Agreement are, unless specified otherwise, for convenience only and shall not be deemed to limit, amplify or modify the terms of this Agreement, nor affect the meaning thereof.

**4.7 Severability**. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**4.8 Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT-OF-LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

**4.9 Reference to and Effect on the Loan Documents.**

**4.9.1** This Agreement shall be deemed to constitute a Loan Document for all purposes and in all respects. Each reference in the Loan Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of like import, and each reference in the Loan Agreement or in any other Loan Document, or other agreements, documents or other instruments executed and delivered pursuant to the Loan Agreement, to the "Loan Agreement", shall mean and be a reference to the Loan Agreement as amended and otherwise modified by this Agreement.

**4.9.2** The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of the Lender under any of the Loan Documents, nor constitute a waiver of any provision of any of the Loan Documents.

**4.10 Release**. Each of the Loan Parties, by signing below, hereby waives and releases the Lender, the Lender's Affiliates, and the respective directors, officers, employees, agents and advisors of the Lender and Lender's Affiliates (collectively, the "***Released Parties***") from any and all claims, offsets, defenses and counterclaims (collectively, the "***Claims***") arising out of the Loan Documents prior to the date hereof, such waiver and release being with full knowledge and understanding of the circumstances and effect thereof and after having consulted legal counsel with respect thereto. Notwithstanding anything to the contrary contained herein, the foregoing release shall not, as to any Released Party, be available to the extent that liabilities in respect of any Claims are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Released Party in connection with any such Claims.

**4.11 Counterparts.** This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

**4.12 Complete Agreement.** THIS AGREEMENT, THE LOAN AGREEMENT, AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**4.13 WAIVER OF JURY TRIAL.** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**[*Signature pages follow.*]**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed by their respective authorized officers to be effective as of the Amendment Effective Date.

**BORROWERS**:

**NEXT BRIDGE HYDROCARBONS, INC.**

By:/s/ Roger Wurtele
Name: Roger Wurtele
Title: Chief Financial Officer

**TORCHLIGHT ENERGY, INC.**

By:/s/ Gregory McCabe
Name: Gregory McCabe
Title: Chief Executive Officer

**TORCHLIGHT HAZEL, LLC**

By:/s/ Gregory McCabe
Name: Gregory McCabe
Title: Chief Executive Officer

**HUDSPETH OIL CORPORATION**

By:/s/ Gregory McCabe
Name: Gregory McCabe
Title: Chief Executive Officer

**HUDSPETH OPERATING, LLC**

By:/s/ Gregory McCabe
Name: Gregory McCabe
Title: Chief Executive Officer

**WOLFBONE INVESTMENTS, LLC**

By:/s/ Gregory McCabe
Name: Gregory McCabe
Title: Chief Executive Officer

**LENDER**:

**GREGORY MCCABE**

By:/s/ Gregory McCabe
Name: Gregory McCabe

[SIGNATURE PAGE TO FIFTH AMENDMENT TO LOAN AGREEMENT]

**Exhibit 10.32**

# FIFTH AMENDMENT TO 8% SECURED PROMISSORY NOTE

This FIFTH AMENDMENT TO 8% SECURED PROMISSORY NOTE (this "***Agreement***") is entered into effective as of March 31, 2024 (the "***Amendment Effective Date***"), among NEXT BRIDGE HYDROCARBONS, INC. (f/k/a OILCO HOLDINGS, INC.), a Nevada corporation (the "***Borrower***"), each of the Grantors (defined below), and GREGORY MCCABE, individually (as successor by assignment to Meta Materials Inc., a Nevada corporation ("***Meta***")) (the "***Lender***"). Unless otherwise expressly defined herein, capitalized terms used but not defined in this Agreement shall have the meanings specified in the Secured Note (as defined below).

## RECITALS

**WHEREAS**, the Borrower issued that certain 8% Secured Promissory Note, dated October 1, 2021, to Lender (as amended by that certain First Amendment Agreement, dated as of September 2, 2022, that certain Second Amendment to 8% Secured Promissory Note, dated March 31, 2023, that certain Third Amendment to 8% Secured Promissory Note, dated October 1, 2023, that certain Fourth Amendment to 8% Secured Promissory Note, dated December 31, 2023, and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Secured Note***");

**WHEREAS**, the obligations under the Secured Note are secured by that certain (a) Stock Pledge Agreement dated as of September 30, 2021 (as amended from time to time, the "***Pledge Agreement***"), made by Gregory McCabe (the "***Pledgor***") in favor of the Lender, and (b) Deed of Trust, Mortgage, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production, dated as of September 30, 2021 (as amended from time to time, the "***Security Agreement***", and together with the Secured Note and the Pledge Agreement, the "***Secured Note Documents***") made by Wolfbone Investments, LLC, a Texas limited liability company ("***Wolfbone***" and, together with the Pledgor, the "***Grantors***"; the Grantors together with the Borrower, the "***Obligors***"), to Travis Vargo, as trustee, for the benefit of the Lender;

**WHEREAS**, pursuant to that certain Loan Sale Agreement, dated August 7, 2023, Meta assigned its rights, title, interests and obligations in and to the Secured Note and the Secured Note Documents and related agreements and instruments to the Lender; and

**WHEREAS**, the Borrower has requested that the Lender extend the Maturity Date, and the Lender is willing to extend the Maturity Date, in each case, upon the terms and conditions set forth herein.

**NOW, THEREFORE**, for and in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Borrower, other Obligors and Lender hereby agree as follows:

**SECTION 1. Amendment to the Secured Note**. Subject to the satisfaction of each condition precedent set forth in Section 2, and in reliance on the representations, warranties, covenants and agreements contained in this Agreement, the Secured Note shall be amended effective as of the Amendment Effective Date as follows:

**1.1** Section 3 of the Secured Note is hereby amended and restated as follows:

> 3. **Schedule for Payment of Principal and Interest**. The principal balance of the Drawdowns outstanding hereunder and all accrued and unpaid interest thereon and all other amounts accrued under this Note shall be due and payable in full, in United States Dollars, on the Maturity Date (hereinafter, as defined below). The "**Maturity Date**" means June 30, 2024. All interest on the principal balance of the Drawdowns outstanding hereunder shall be payable at the rate of 8% per annum, and shall be due and payable to the Holder on the Maturity Date and on any other date on which principal of this Note is repaid or prepaid. Interest shall be computed on the basis of a 360-day year.

**SECTION 2. Conditions Precedent**. The amendments contained in Section 1 shall only be effective upon the satisfaction of each of the conditions set forth in this Section 2.

**2.1 Execution and Delivery**. The Borrower, the Grantors and Lender shall have duly executed and delivered this Agreement.

**2.2 No Event of Default**. After giving effect to this Agreement, no Event of Default shall exist under the Secured Note.

**2.3 Representations and Warranties**. After giving effect to this Agreement, the representations and warranties of each Obligor contained in this Agreement and the other Secured Note Documents (as amended hereby) shall be true and correct in all material respects (except to the extent any such representation and warranty is qualified by materiality, in which case, such representation and warranty shall be true and correct in all respects) on the date hereof, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date hereof, such representations and warranties shall continue to be true and correct in all material respects (except to the extent any such representation and warranty is qualified by materiality, in which case, such representation and warranty shall be true and correct in all respects) as of such specified earlier date.

**SECTION 3. Representations and Warranties of the Obligors**. To induce the Lender to enter into this Agreement, each Obligor hereby represents and warrants to the Lender as follows: **Reaffirmation of Representations and Warranties under the Secured Note Documents**. After giving effect to this Agreement, each representation and warranty of such Obligor contained in the Secured Note and in each of the other Secured Note Documents to which such Obligor is party is true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of the date hereof (except to the extent such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date).

**3.2 Corporate Authority; No Conflicts**. The execution, delivery and performance by such Obligor (to the extent a party hereto or thereto) of this Agreement, the Secured Note Documents as amended hereby, and all documents, instruments and agreements contemplated herein (a) are within such Obligor's powers, (b) have been duly authorized by all necessary action, (c) require no action by or in respect of, or filing with, any Governmental Authority, (d) do not violate any applicable laws or regulations relating to such Obligor, in any material respect, (e) do not violate or constitute a default under any indenture, agreement for borrowed money or similar instrument or any other material agreement binding upon such Obligor or any of its Subsidiaries, or (f) do not result in the creation or imposition of any Lien upon any of the assets of such Obligor except for Liens in favor of the Lender under the Secured Note Documents.

**3.3 Enforceability**. This Agreement and each Secured Note Document (as amended hereby) to which such Obligor is party constitute the valid and binding obligations of such Obligor, enforceable in accordance with their respective terms, except as (a) the enforceability thereof may be limited by bankruptcy, insolvency or similar laws affecting creditor's rights generally and (b) the availability of equitable remedies may be limited by equitable principles of general application.

**SECTION 4. Miscellaneous.**

**4.1 Reaffirmation of the Secured Note and Liens**. Any and all of the terms and provisions of the Secured Note and the other Secured Note Documents shall, except as amended and modified hereby, remain in full force and effect and are hereby in all respects ratified and confirmed by each Obligor. Each Obligor hereby agrees that the amendments and modifications herein contained shall in no manner affect or impair the liabilities, duties and obligations of any Obligor under the Secured Note Documents or the liens securing the payment and performance thereof. Each Grantor reaffirms all Liens on the collateral which have been granted by such Grantor in favor of the Lender pursuant to any of the Secured Note Documents.

**4.2 Parties in Interest**. All of the terms and provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**4.3 Counterparts**. This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other Secured Note Documents constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.

**4.4 No Modification**. Except as expressly modified by this Agreement and each Secured Note Document is and shall remain unchanged and in full force and effect, and nothing contained in this Agreement shall, by implication or otherwise, limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of the Lender or any of the other parties hereto, or shall alter, modify, amend or in any way affect any of the other terms, conditions, obligations, covenants or agreement contained in the Secured Note Documents which are not by the terms of this Amendment being amended, or alter, modify or amend or in any way affect any of the other Secured Note Documents.

**4.5 Secured Note Documents**. This Agreement shall be deemed to be a Secured Note Document.

**4.6 Headings**. The headings, captions and arrangements used in this Agreement are, unless specified otherwise, for convenience only and shall not be deemed to limit, amplify or modify the terms of this Agreement, nor affect the meaning thereof.

**4.7 Severability**. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**4.8 Governing Law**. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEVADA, WITHOUT REGARD TO CONFLICT-OF-LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEVADA.

**4.9 Reference to and Effect on the Secured Note Documents.**

**4.9.1** This Agreement shall be deemed to constitute a Secured Note Document for all purposes and in all respects. Each reference in the Secured Note to "this Note," "hereunder," "hereof," "herein" or words of like import, and each reference in the Secured Note or in any other Secured Note Document, or other agreements, documents or other instruments executed and delivered pursuant to the Secured Note, to the "Note", shall mean and be a reference to the Secured Note as amended and otherwise modified by this Agreement.

**4.9.2** The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of the Lender under any of the Secured Note Documents, nor constitute a waiver of any provision of any of the Secured Note Documents.

**4.10 Release**. Each of the Obligors, by signing below, hereby waives and releases the Lender, the Lender's Affiliates, and the respective directors, officers, employees, agents and advisors of the Lender and Lender's Affiliates (collectively, the "Released Parties") from any and all claims, offsets, defenses and counterclaims (collectively, the "Claims") arising out of the Secured Note Documents prior to the date hereof, such waiver and release being with full knowledge and understanding of the circumstances and effect thereof and after having consulted legal counsel with respect thereto. Notwithstanding anything to the contrary contained herein, the foregoing release shall not, as to any Released Party, be available to the extent that liabilities in respect of any Claims are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Released Party in connection with any such Claims. As used in this Section 4.10, "Affiliates" means another person or entity that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Lender. As used in this Section 4.10, "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person or entity, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

**4.11 Counterparts.** This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

**4.12 Complete Agreement.** THIS AGREEMENT, THE SECURED NOTE, AND THE OTHER SECURED NOTE DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**4.13 WAIVER OF JURY TRIAL.** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE SECURED NOTE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**[*Signature pages follow.*]**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed by their respective authorized officers to be effective as of the Amendment Effective Date.

**BORROWER**:

**NEXT BRIDGE HYDROCARBONS, INC.**

By: /s/ Roger Wurtele
Name: Roger Wurtele
Title: Chief Financial Officer

**GRANTORS UNDER THE SECURED NOTE DOCUMENTS**:

By: /s/ Gregory McCabe
Name: Gregory McCabe

**WOLFBONE INVESTMENTS, LLC**

By: /s/ Gregory McCabe
Name: Gregory McCabe
Title: Chief Executive Officer

**LENDER:**

**GREGORY MCCABE**

By: /s/ Gregory McCabe
Name: Gregory McCabe

[SIGNATURE PAGE TO FIFTH AMENDMENT 8% SECURED PROMISSORY NOTE]

**Exhibit 10.33**

**FOURTH AMENDMENT TO 5% UNSECURED PROMISSORY NOTE**

This FOURTH AMENDMENT TO 5% UNSECURED PROMISSORY NOTE (this "***Agreement***") is entered into effective as of March 31, 2024 (the "***Amendment Effective Date***"), among NEXT BRIDGE HYDROCARBONS, INC. (f/k/a OILCO HOLDINGS, INC.), a Nevada corporation (the "***Borrower***"), and GREGORY MCCABE, an individual with an address at 500 West Texas Ave., Suite 890, Midland, Texas 79701 (the "***Lender***"). Unless otherwise expressly defined herein, capitalized terms used but not defined in this Agreement shall have the meanings specified in the Note (as defined below).

**RECITALS**

**WHEREAS**, the Borrower issued that certain 5% Unsecured Promissory Note, dated December 21, 2022, to Lender (as amended by the First Amendment (as defined below), the Second Amendment (defined below), the Third Amendment (defined below), and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Note***");

**WHEREAS**, the Borrower and the Lender previously entered into that certain First Amendment to 5% Unsecured Promissory Note, effective as of June 16, 2023 (the "***First Amendment***") to extend the Maturity Date;

**WHEREAS**, the Borrower and the Lender previously entered into that certain Second Amendment to 5% Unsecured Promissory Note, effective as of October 1, 2023 (the "***Second Amendment***") to extend the Maturity Date; and

**WHEREAS**, the Borrower and the Lender previously entered into that certain Third Amendment to 5% Unsecured Promissory Note, effective as of December 31, 2023 (the "***Third Amendment***") to extend the Maturity Date; and

**WHEREAS**, the Borrower has requested that the Lender further extend the Maturity Date, and the Lender is willing to extend the Maturity Date upon the terms and conditions set forth herein.

**NOW, THEREFORE**, for and in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Borrower and Lender hereby agree as follows:

**SECTION 1. Amendment to the Note**. Subject to the satisfaction of each condition precedent set forth in Section 2, and in reliance on the representations, warranties, covenants and agreements contained in this Agreement, the Note shall be amended effective as of the Amendment Effective Date as follows:

**1.1** Section 1 of the Note is hereby amended by amending and restating the definition of "Maturity Date" as follows:

"***Maturity Date***" means June 30, 2024.

**SECTION 2. Conditions Precedent**. The amendments contained in Section 1 shall only be effective upon the satisfaction of each of the conditions set forth in this Section 2.

**2.1 Execution and Delivery**. The Borrower and Lender shall have duly executed and delivered this Agreement.

**2.2 No Event of Default**. After giving effect to this Agreement, no Event of Default shall exist under the Note.

**2.3 Representations and Warranties**. After giving effect to this Agreement, the representations and warranties of the Borrower contained in this Agreement and the Note (as amended hereby) shall be true and correct in all material respects (except to the extent any such representation and warranty is qualified by materiality, in which case, such representation and warranty shall be true and correct in all respects) on the date hereof, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date hereof, such representations and warranties shall continue to be true and correct in all material respects (except to the extent any such representation and warranty is qualified by materiality, in which case, such representation and warranty shall be true and correct in all respects) as of such specified earlier date.

**SECTION 3. Representations and Warranties of the Borrower**. To induce the Lender to enter into this Agreement, the Borrower hereby represents and warrants to the Lender as follows:

**3.1. Reaffirmation of Representations and Warranties under the Note**. After giving effect to this Agreement, each representation and warranty of the Borrower contained in the Note is true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of the date hereof (except to the extent such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date).

**3.2 Corporate Authority; No Conflicts**. The execution, delivery and performance by the Borrower of this Agreement, the Note (as amended hereby) (a) are within the Borrower's powers, (b) have been duly authorized by all necessary action, (c) require no action by or in respect of, or filing with, any Governmental Authority, (d) do not violate any applicable laws or regulations relating to the Borrower, in any material respect or (e) do not violate or constitute a default under any indenture, agreement for borrowed money or similar instrument or any other material agreement binding upon the Borrower or any of its subsidiaries.

**3.3 Enforceability**. This Agreement and the Note (as amended hereby) constitute the valid and binding obligations of the Borrower, enforceable in accordance with their respective terms, except as (a) the enforceability thereof may be limited by bankruptcy, insolvency or similar laws affecting creditor's rights generally and (b) the availability of equitable remedies may be limited by equitable principles of general application.

**SECTION 4. Miscellaneous**.

**4.1 Reaffirmation of the Note**. Any and all of the terms and provisions of the Note shall, except as amended and modified hereby, remain in full force and effect and are hereby in all respects ratified and confirmed by the Borrower. The Borrower hereby agrees that the amendments and modifications herein contained shall in no manner affect or impair the liabilities, duties and obligations of the Borrower under the Note.

**4.3 Parties in Interest**. All of the terms and provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**4.4 Counterparts**. This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the Note constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.

**4.5 No Modification**. Except as expressly modified by this Agreement, the Note is and shall remain unchanged and in full force and effect, and nothing contained in this Agreement shall, by implication or otherwise, limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of the Lender or any of the other parties hereto, or shall alter, modify, amend or in any way affect any of the other terms, conditions, obligations, covenants or agreement contained in the Note which are not by the terms of this Amendment being amended, or alter, modify or amend or in any way affect any of the Note.

**4.6 Headings**. The headings, captions and arrangements used in this Agreement are, unless specified otherwise, for convenience only and shall not be deemed to limit, amplify or modify the terms of this Agreement, nor affect the meaning thereof.

**4.7 Severability**. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**4.8 Governing Law**. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF TEXAS, WITHOUT REGARD TO CONFLICT-OF-LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF TEXAS. IN ANY ACTION BETWEEN OR AMONG ANY OF THE PARTIES, WHETHER RISING OUT OF THIS NOTE OR OTHERWISE, EACH OF THE PARTIES IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL AND/OR STATE COURTS LOCATED IN COLLIN COUNTY, TEXAS.

**4.9 Reference to and Effect on the Note.**

**4.9.1** Each reference in the Note to “this Note,” “hereunder,” “hereof,” “herein” or words of like import, and each reference in the Note, or other agreements, documents or other instruments executed and delivered pursuant to the Note, to the “Note”, shall mean and be a reference to the Note as amended and otherwise modified by this Agreement.

**4.9.2** The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of the Lender under the Note, nor constitute a waiver of any provision of any of the Note.

**4.10 Counterparts.** This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (e.g. “pdf” or “tif”) shall be effective as delivery of a manually executed counterpart of this Agreement.

**4.11 Complete Agreement.** THIS AGREEMENT AND THE NOTE REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**[*Signature pages follow*.]**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed by their respective authorized officers to be effective as of the Amendment Effective Date.

**BORROWER:**

**NEXT BRIDGE HYDROCARBONS, INC.**

By: /s/ Roger Wurtele
Name: Roger Wurtele
Title: Chief Financial Officer

**LENDER:**

**GREGORY MCCABE**

By: /s/ Gregory McCabe
Name: Gregory McCabe

[SIGNATURE PAGE TO FOURTH AMENDMENT 5% UNSECURED PROMISSORY NOTE]

**Exhibit 10.34**

**SIXTH AMENDMENT TO LOAN AGREEMENT**

This SIXTH AMENDMENT TO LOAN AGREEMENT (this "***Agreement***") is entered into effective as of June 30, 2024 (the "***Amendment Effective Date***"), among NEXT BRIDGE HYDROCARBONS, INC., a Nevada corporation (the "***Borrower***"), each of the other Loan Parties under the Loan Agreement (defined below), and GREGORY MCCABE, individually (as successor by assignment to Meta Materials Inc., a Nevada corporation ("***Meta***")) (the "***Lender***"). Unless otherwise expressly defined herein, capitalized terms used but not defined in this Agreement shall have the meanings specified in the Loan Agreement (as defined below).

**RECITALS**

**WHEREAS**, the Borrower, Torchlight Energy, Inc., a Nevada corporation ("***TEI***"), Torchlight Hazel, LLC, a Texas limited liability company ("***Hazel***"), Hudspeth Oil Corporation, a Texas corporation ("***HOC***"), Hudspeth Operating, LLC, a Texas limited liability company ("***Operating***" and, together with the Borrower, TEI, Hazel, HOC and Operating, the "***Loan Parties***") and Meta, as Lender, have entered into that certain Loan Agreement, dated as of September 2, 2022 (as amended by that certain First Amendment to Loan Agreement, dated as of December 21, 2022, that certain Second Amendment to Loan Agreement, dated March 31, 2023, that certain Limited Waiver, Consent and Amendment Agreement, dated April 17, 2023, that certain Third Amendment to Loan Agreement, dated October 1, 2023, that certain Fourth Amendment to Loan Agreement, dated December 31, 2023, that certain Fifth Amendment to Loan Agreement, dated March 31, 2024 and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Loan Agreement***");

**WHEREAS,** pursuant to that certain Loan Sale Agreement, dated August 7, 2023, Meta assigned its rights, title, interests and obligations in and to the Loan Agreement, certain related agreements and instruments and the Loans to the Lender;

**WHEREAS**, the Borrower has requested that the Lender extend the Maturity Date upon the terms and conditions set forth herein; and

**WHEREAS**, the Lender is willing to extend the Maturity Date and increase the commitments under the Loan Agreement, in each case, subject to the terms and conditions set forth herein.

**NOW, THEREFORE**, for and in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Borrower, other Loan Parties and Lender hereby agree as follows:

**SECTION 1. Amendments to the Loan Agreement.** Subject to the satisfaction of each condition precedent set forth in Section 2, and in reliance on the representations, warranties, covenants and agreements contained in this Agreement, the Loan Agreement shall be amended effective as of the Amendment Effective Date as follows:

**1.1** Section 1.01 of the Loan Agreement is hereby amended by amending and restating the definition of "Maturity Date" as follows:

"***Maturity Date***" means September 30, 2024.

**SECTION 2**. **Conditions Precedent**. The amendments contained in Section 1 shall only be effective upon the satisfaction of each of the conditions set forth in this Section 2.

**2.1 Execution and Delivery**. The Borrower, the other Loan Parties and Lender shall have duly executed and delivered this Agreement.

**2.2 No Event of Default**. After giving effect to this Agreement, no Default shall exist under the Loan Agreement.

**2.3 Representations and Warranties**. After giving effect to this Agreement, the representations and warranties of each Loan Party contained in the Loan Agreement, this Agreement and the other Loan Documents (as amended hereby) shall be true and correct in all material respects (except to the extent any such representation and warranty is qualified by materiality, in which case, such representation and warranty shall be true and correct in all respects) on the date hereof, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date hereof, such representations and warranties shall continue to be true and correct in all material respects (except to the extent any such representation and warranty is qualified by materiality, in which case, such representation and warranty shall be true and correct in all respects) as of such specified earlier date.

**SECTION 3. Representations and Warranties of the Borrower and Other Loan Parties**. To induce the Lender to enter into this Agreement, the Borrower and each other Loan Party hereby represents and warrants to the Lender as follows:

**3.1 Reaffirmation of Representations and Warranties**. After giving effect to this Agreement, each representation and warranty of such Loan Party contained in the Loan Agreement and in each of the other Loan Documents is true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of the date hereof (except to the extent such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date).

**3.2 Corporate Authority; No Conflicts**. The execution, delivery and performance by such Loan Party (to the extent a party hereto or thereto) of this Agreement, the other Loan Documents as amended hereby, and all documents, instruments and agreements contemplated herein (a) are within such Loan Party's corporate (or equivalent) powers, (b) have been duly authorized by all necessary action, (c) require no action by or in respect of, or filing with, any Governmental Authority, (d) do not violate any applicable laws or regulations relating to such Loan Party, in any material respect, (e) do not violate or constitute a default under any indenture, agreement for borrowed money or similar instrument or any other material agreement binding upon such Loan Party or any of its Subsidiaries, or (f) do not result in the creation or imposition of any Lien upon any of the assets of such Loan Party except for Liens expressly permitted under the Loan Documents.

**3.3 Enforceability**. This Agreement and each other Loan Document (as amended hereby) to which such Loan Party is party constitute the valid and binding obligations of such Loan Party, enforceable in accordance with their respective terms, except as (a) the enforceability thereof may be limited by bankruptcy, insolvency or similar laws affecting creditor's rights generally and (b) the availability of equitable remedies may be limited by equitable principles of general application.

**3.4 No Default**. As of the Amendment Effective Date, immediately after giving effect to this Agreement, no Default has occurred and is continuing.

**SECTION 4. Miscellaneous**.

**4.1 Reaffirmation of Loan Documents**. Any and all of the terms and provisions of the Loan Documents shall, except as amended and modified hereby, remain in full force and effect and are hereby in all respects ratified and confirmed by each Loan Party. Each Loan Party hereby agrees that the amendments and modifications herein contained shall in no manner affect or impair the liabilities, duties and obligations of any Loan Party under the Loan Agreement and the other Loan Documents.

**4.2 Parties in Interest.** All of the terms and provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**4.3 Counterparts.** This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.

**4.4 No Modification.**. Except as expressly modified by this Agreement, each Loan Document is and shall remain unchanged and in full force and effect, and nothing contained in this Agreement shall, by implication or otherwise, limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of the Lender or any of the other parties hereto, or shall alter, modify, amend or in any way affect any of the other terms, conditions, obligations, covenants or agreement contained in the Loan Documents which are not by the terms of this Agreement being amended, or alter, modify or amend or in any way affect any of the other Loan Documents.

**4.5 Loan Documents**. This Agreement shall be deemed to be a Loan Document.

**4.6 Headings**. The headings, captions and arrangements used in this Agreement are, unless specified otherwise, for convenience only and shall not be deemed to limit, amplify or modify the terms of this Agreement, nor affect the meaning thereof.

**4.7 Severability**. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**4.8 Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT-OF-LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

**4.9 Reference to and Effect on the Loan Documents.**

**4.9.1** This Agreement shall be deemed to constitute a Loan Document for all purposes and in all respects. Each reference in the Loan Agreement to “this Agreement,” “hereunder,” “hereof,” “herein” or words of like import, and each reference in the Loan Agreement or in any other Loan Document, or other agreements, documents or other instruments executed and delivered pursuant to the Loan Agreement, to the “Loan Agreement”, shall mean and be a reference to the Loan Agreement as amended and otherwise modified by this Agreement.

**4.9.2** The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of the Lender under any of the Loan Documents, nor constitute a waiver of any provision of any of the Loan Documents.

**4.10 Release**. Each of the Loan Parties, by signing below, hereby waives and releases the Lender, the Lender’s Affiliates, and the respective directors, officers, employees, agents and advisors of the Lender and Lender’s Affiliates (collectively, the “***Released Parties***”) from any and all claims, offsets, defenses and counterclaims (collectively, the “***Claims***”) arising out of the Loan Documents prior to the date hereof, such waiver and release being with full knowledge and understanding of the circumstances and effect thereof and after having consulted legal counsel with respect thereto. Notwithstanding anything to the contrary contained herein, the foregoing release shall not, as to any Released Party, be available to the extent that liabilities in respect of any Claims are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Released Party in connection with any such Claims.

**4.11 Complete Agreement.** THIS AGREEMENT, THE LOAN AGREEMENT, AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**4.12 WAIVER OF JURY TRIAL.** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**[*Signature pages follow*.]**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed by their respective authorized officers to be effective as of the Amendment Effective Date.

**BORROWERS**:

**NEXT BRIDGE HYDROCARBONS, INC.**

By: /s/ Roger Wurtele
Name: Roger Wurtele
Title: Chief Financial Officer

**TORCHLIGHT ENERGY, INC.**

By: /s/ Gregory McCabe
Name: Gregory McCabe
Title: Chief Executive Officer

**TORCHLIGHT HAZEL, LLC**

By: /s/ Gregory McCabe
Name: Gregory McCabe
Title: Chief Executive Officer

**HUDSPETH OIL CORPORATION**

By: /s/ Gregory McCabe
Name: Gregory McCabe
Title: Chief Executive Officer

**HUDSPETH OPERATING, LLC**

By: /s/ Gregory McCabe
Name: Gregory McCabe
Title: Chief Executive Officer

**WOLFBONE INVESTMENTS, LLC**

By: /s/ Gregory McCabe
Name: Gregory McCabe
Title: Chief Executive Officer

**LENDER**:

**GREGORY MCCABE**

By: /s/ Gregory McCabe
Name: Gregory McCabe

[SIGNATURE PAGE TO FIFTH AMENDMENT TO LOAN AGREEMENT]

**Exhibit 10.35**

**SIXTH AMENDMENT TO 8% SECURED PROMISSORY NOTE**

This SIXTH AMENDMENT TO 8% SECURED PROMISSORY NOTE (this "***Agreement***") is entered into effective as of June 30, 2024 (the "***Amendment Effective Date***"), among NEXT BRIDGE HYDROCARBONS, INC. (f/k/a OILCO HOLDINGS, INC.), a Nevada corporation (the "***Borrower***"), each of the Grantors (defined below), and GREGORY MCCABE, individually (as successor by assignment to Meta Materials Inc., a Nevada corporation ("***Meta***")) (the "***Lender***"). Unless otherwise expressly defined herein, capitalized terms used but not defined in this Agreement shall have the meanings specified in the Secured Note (as defined below).

**RECITALS**

**WHEREAS**, the Borrower issued that certain 8% Secured Promissory Note, dated October 1, 2021, to Lender (as amended by that certain First Amendment Agreement, dated as of September 2, 2022, that certain Second Amendment to 8% Secured Promissory Note, dated March 31, 2023, that certain Third Amendment to 8% Secured Promissory Note, dated October 1, 2023, that certain Fourth Amendment to 8% Secured Promissory Note, dated December 31, 2023, that certain Fifth Amendment to 8% Secured Promissory Note dated March 31, 2024, and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Secured Note***");

**WHEREAS**, the obligations under the Secured Note are secured by that certain (a) Stock Pledge Agreement dated as of September 30, 2021 (as amended from time to time, the "***Pledge Agreement***"), made by Gregory McCabe (the "***Pledgor***") in favor of the Lender, and (b) Deed of Trust, Mortgage, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production, dated as of September 30, 2021 (as amended from time to time, the "***Security Agreement***", and together with the Secured Note and the Pledge Agreement, the "***Secured Note Documents***") made by Wolfbone Investments, LLC, a Texas limited liability company ("***Wolfbone***" and, together with the Pledgor, the "***Grantors***"; the Grantors together with the Borrower, the "***Obligors***"), to Travis Vargo, as trustee, for the benefit of the Lender;

**WHEREAS**, pursuant to that certain Loan Sale Agreement, dated August 7, 2023, Meta assigned its rights, title, interests and obligations in and to the Secured Note and the Secured Note Documents and related agreements and instruments to the Lender; and

**WHEREAS**, the Borrower has requested that the Lender extend the Maturity Date, and the Lender is willing to extend the Maturity Date, in each case, upon the terms and conditions set forth herein.

**NOW, THEREFORE**, for and in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Borrower, other Obligors and Lender hereby agree as follows:

**SECTION 1. Amendment to the Secured Note**. Subject to the satisfaction of each condition precedent set forth in Section 2, and in reliance on the representations, warranties, covenants and agreements contained in this Agreement, the Secured Note shall be amended effective as of the Amendment Effective Date as follows:

**1.1** Section 3 of the Secured Note is hereby amended and restated as follows:

> 3. **Schedule for Payment of Principal and Interest**. The principal balance of the Drawdowns outstanding hereunder and all accrued and unpaid interest thereon and all other amounts accrued under this Note shall be due and payable in full, in United States Dollars, on the Maturity Date (hereinafter, as defined below). The "**Maturity Date**" means September 30, 2024. All interest on the principal balance of the Drawdowns outstanding hereunder shall be payable at the rate of 8% per annum, and shall be due and payable to the Holder on the Maturity Date and on any other date on which principal of this Note is repaid or prepaid. Interest shall be computed on the basis of a 360-day year.

**SECTION 2. Conditions Precedent**. The amendments contained in Section 1 shall only be effective upon the satisfaction of each of the conditions set forth in this Section 2.

**2.1 Execution and Delivery**. The Borrower, the Grantors and Lender shall have duly executed and delivered this Agreement.

**2.2 No Event of Default**. After giving effect to this Agreement, no Event of Default shall exist under the Secured Note.

**2.3 Representations and Warranties**. After giving effect to this Agreement, the representations and warranties of each Obligor contained in this Agreement and the other Secured Note Documents (as amended hereby) shall be true and correct in all material respects (except to the extent any such representation and warranty is qualified by materiality, in which case, such representation and warranty shall be true and correct in all respects) on the date hereof, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date hereof, such representations and warranties shall continue to be true and correct in all material respects (except to the extent any such representation and warranty is qualified by materiality, in which case, such representation and warranty shall be true and correct in all respects) as of such specified earlier date.

**SECTION 3. Representations and Warranties of the Obligors**. To induce the Lender to enter into this Agreement, each Obligor hereby represents and warrants to the Lender as follows:

**3.1 Reaffirmation of Representations and Warranties under the Secured Note Documents**. After giving effect to this Agreement, each representation and warranty of such Obligor contained in the Secured Note and in each of the other Secured Note Documents to which such Obligor is party is true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of the date hereof (except to the extent such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date).

**3.2 Corporate Authority; No Conflicts**. The execution, delivery and performance by such Obligor (to the extent a party hereto or thereto) of this Agreement, the Secured Note Documents as amended hereby, and all documents, instruments and agreements contemplated herein (a) are within such Obligor's powers, (b) have been duly authorized by all necessary action, (c) require no action by or in respect of, or filing with, any Governmental Authority, (d) do not violate any applicable laws or regulations relating to such Obligor, in any material respect, (e) do not violate or constitute a default under any indenture, agreement for borrowed money or similar instrument or any other material agreement binding upon such Obligor or any of its Subsidiaries, or (f) do not result in the creation or imposition of any Lien upon any of the assets of such Obligor except for Liens in favor of the Lender under the Secured Note Documents.

**3.3 Enforceability**. This Agreement and each Secured Note Document (as amended hereby) to which such Obligor is party constitute the valid and binding obligations of such Obligor, enforceable in accordance with their respective terms, except as (a) the enforceability thereof may be limited by bankruptcy, insolvency or similar laws affecting creditor's rights generally and (b) the availability of equitable remedies may be limited by equitable principles of general application.

**SECTION 4. Miscellaneous.**

**4.1 Reaffirmation of the Secured Note and Liens**. Any and all of the terms and provisions of the Secured Note and the other Secured Note Documents shall, except as amended and modified hereby, remain in full force and effect and are hereby in all respects ratified and confirmed by each Obligor. Each Obligor hereby agrees that the amendments and modifications herein contained shall in no manner affect or impair the liabilities, duties and obligations of any Obligor under the Secured Note Documents or the liens securing the payment and performance thereof. Each Grantor reaffirms all Liens on the collateral which have been granted by such Grantor in favor of the Lender pursuant to any of the Secured Note Documents.

**4.2 Parties in Interest**. All of the terms and provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**4.3 Counterparts**. This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other Secured Note Documents constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.

**4.4 No Modification**. Except as expressly modified by this Agreement and each Secured Note Document is and shall remain unchanged and in full force and effect, and nothing contained in this Agreement shall, by implication or otherwise, limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of the Lender or any of the other parties hereto, or shall alter, modify, amend or in any way affect any of the other terms, conditions, obligations, covenants or agreement contained in the Secured Note Documents which are not by the terms of this Amendment being amended, or alter, modify or amend or in any way affect any of the other Secured Note Documents.

**4.5 Secured Note Documents**. This Agreement shall be deemed to be a Secured Note Document.

**4.6 Headings**. The headings, captions and arrangements used in this Agreement are, unless specified otherwise, for convenience only and shall not be deemed to limit, amplify or modify the terms of this Agreement, nor affect the meaning thereof.

**4.7 Severability**. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**4.8 Governing Law**. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEVADA, WITHOUT REGARD TO CONFLICT-OF-LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEVADA.

**4.9 Reference to and Effect on the Secured Note Documents.**

**4.9.1** This Agreement shall be deemed to constitute a Secured Note Document for all purposes and in all respects. Each reference in the Secured Note to "this Note," "hereunder," "hereof," "herein" or words of like import, and each reference in the Secured Note or in any other Secured Note Document, or other agreements, documents or other instruments executed and delivered pursuant to the Secured Note, to the "Note", shall mean and be a reference to the Secured Note as amended and otherwise modified by this Agreement.

**4.9.2** The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of the Lender under any of the Secured Note Documents, nor constitute a waiver of any provision of any of the Secured Note Documents.

**4.10 Release**. Each of the Obligors, by signing below, hereby waives and releases the Lender, the Lender's Affiliates, and the respective directors, officers, employees, agents and advisors of the Lender and Lender's Affiliates (collectively, the "Released Parties") from any and all claims, offsets, defenses and counterclaims (collectively, the "Claims") arising out of the Secured Note Documents prior to the date hereof, such waiver and release being with full knowledge and understanding of the circumstances and effect thereof and after having consulted legal counsel with respect thereto. Notwithstanding anything to the contrary contained herein, the foregoing release shall not, as to any Released Party, be available to the extent that liabilities in respect of any Claims are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Released Party in connection with any such Claims. As used in this Section 4.10, "Affiliates" means another person or entity that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Lender. As used in this Section 4.10, "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person or entity, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

**4.11 Complete Agreement.** THIS AGREEMENT, THE SECURED NOTE, AND THE OTHER SECURED NOTE DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**4.12 WAIVER OF JURY TRIAL.** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE SECURED NOTE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**[*Signature pages follow.*]**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed by their respective authorized officers to be effective as of the Amendment Effective Date.

**BORROWER**:

**NEXT BRIDGE HYDROCARBONS, INC.**

By: /s/ Roger Wurtele
Name: Roger Wurtele
Title: Chief Financial Officer

**GRANTORS UNDER THE SECURED NOTE DOCUMENTS**:

By: /s/ Gregory McCabe
Name: Gregory McCabe

**WOLFBONE INVESTMENTS, LLC**

By: /s/ Gregory McCabe
Name: Gregory McCabe
Title: Chief Executive Officer

**LENDER:**

**GREGORY MCCABE**

By: /s/ Gregory McCabe
Name: Gregory McCabe

**Exhibit 10.36**

**FIFTH AMENDMENT TO 5% UNSECURED PROMISSORY NOTE**

This FIFTH AMENDMENT TO 5% UNSECURED PROMISSORY NOTE (this "***Agreement***") is entered into effective as of June 30, 2024 (the "***Amendment Effective Date***"), among NEXT BRIDGE HYDROCARBONS, INC. (f/k/a OILCO HOLDINGS, INC.), a Nevada corporation (the "***Borrower***"), and GREGORY MCCABE, an individual with an address at 500 West Texas Ave., Suite 890, Midland, Texas 79701 (the "***Lender***"). Unless otherwise expressly defined herein, capitalized terms used but not defined in this Agreement shall have the meanings specified in the Note (as defined below).

**RECITALS**

**WHEREAS**, the Borrower issued that certain 5% Unsecured Promissory Note, dated December 21, 2022, to Lender (as amended by the First Amendment (as defined below), the Second Amendment (defined below), the Third Amendment (defined below), the Fourth Amendment (defined below), and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Note***");

**WHEREAS**, the Borrower and the Lender previously entered into that certain First Amendment to 5% Unsecured Promissory Note, effective as of June 16, 2023 (the "***First Amendment***") to extend the Maturity Date;

**WHEREAS**, the Borrower and the Lender previously entered into that certain Second Amendment to 5% Unsecured Promissory Note, effective as of October 1, 2023 (the "***Second Amendment***") to extend the Maturity Date; and

**WHEREAS**, the Borrower and the Lender previously entered into that certain Third Amendment to 5% Unsecured Promissory Note, effective as of December 31, 2023 (the "***Third Amendment***") to extend the Maturity Date; and

**WHEREAS**, the Borrower and the Lender previously entered into that certain Fourth Amendment to 5% Unsecured Promissory Note, effective as of March 31, 2024 (the "Fourth ***Amendment***") to extend the Maturity Date; and

**WHEREAS**, the Borrower has requested that the Lender further extend the Maturity Date, and the Lender is willing to extend the Maturity Date upon the terms and conditions set forth herein.

**NOW, THEREFORE**, for and in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Borrower and Lender hereby agree as follows:

**SECTION 1. Amendment to the Note**. Subject to the satisfaction of each condition precedent set forth in Section 2, and in reliance on the representations, warranties, covenants and agreements contained in this Agreement, the Note shall be amended effective as of the Amendment Effective Date as follows:

**1.1** Section 1 of the Note is hereby amended by amending and restating the definition of "Maturity Date" as follows:

"***Maturity Date***" means September 30, 2024.

**SECTION 2. Conditions Precedent**. The amendments contained in Section 1 shall only be effective upon the satisfaction of each of the conditions set forth in this Section 2.

**2.1 Execution and Delivery**. The Borrower and Lender shall have duly executed and delivered this Agreement.

**2.2 No Event of Default**. After giving effect to this Agreement, no Event of Default shall exist under the Note.

**2.3 Representations and Warranties**. After giving effect to this Agreement, the representations and warranties of the Borrower contained in this Agreement and the Note (as amended hereby) shall be true and correct in all material respects (except to the extent any such representation and warranty is qualified by materiality, in which case, such representation and warranty shall be true and correct in all respects) on the date hereof, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date hereof, such representations and warranties shall continue to be true and correct in all material respects (except to the extent any such representation and warranty is qualified by materiality, in which case, such representation and warranty shall be true and correct in all respects) as of such specified earlier date.

**SECTION 3. Representations and Warranties of the Borrower**. To induce the Lender to enter into this Agreement, the Borrower hereby represents and warrants to the Lender as follows:

**3.1. Reaffirmation of Representations and Warranties under the Note**. After giving effect to this Agreement, each representation and warranty of the Borrower contained in the Note is true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of the date hereof (except to the extent such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date).

**3.2 Corporate Authority; No Conflicts**. The execution, delivery and performance by the Borrower of this Agreement, the Note (as amended hereby) (a) are within the Borrower's powers, (b) have been duly authorized by all necessary action, (c) require no action by or in respect of, or filing with, any Governmental Authority, (d) do not violate any applicable laws or regulations relating to the Borrower, in any material respect or (e) do not violate or constitute a default under any indenture, agreement for borrowed money or similar instrument or any other material agreement binding upon the Borrower or any of its subsidiaries.

**3.3 Enforceability**. This Agreement and the Note (as amended hereby) constitute the valid and binding obligations of the Borrower, enforceable in accordance with their respective terms, except as (a) the enforceability thereof may be limited by bankruptcy, insolvency or similar laws affecting creditor's rights generally and (b) the availability of equitable remedies may be limited by equitable principles of general application.

**SECTION 4. Miscellaneous**.

**4.1 Reaffirmation of the Note**. Any and all of the terms and provisions of the Note shall, except as amended and modified hereby, remain in full force and effect and are hereby in all respects ratified and confirmed by the Borrower. The Borrower hereby agrees that the amendments and modifications herein contained shall in no manner affect or impair the liabilities, duties and obligations of the Borrower under the Note.

**4.2 Parties in Interest**. All of the terms and provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**4.3 Counterparts**. This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the Note constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.

**4.4 No Modification**. Except as expressly modified by this Agreement, the Note is and shall remain unchanged and in full force and effect, and nothing contained in this Agreement shall, by implication or otherwise, limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of the Lender or any of the other parties hereto, or shall alter, modify, amend or in any way affect any of the other terms, conditions, obligations, covenants or agreement contained in the Note which are not by the terms of this Amendment being amended, or alter, modify or amend or in any way affect any of the Note.

**4.5 Headings**. The headings, captions and arrangements used in this Agreement are, unless specified otherwise, for convenience only and shall not be deemed to limit, amplify or modify the terms of this Agreement, nor affect the meaning thereof.

**4.6 Severability**. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**4.7 Governing Law**. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF TEXAS, WITHOUT REGARD TO CONFLICT-OF-LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF TEXAS. IN ANY ACTION BETWEEN OR AMONG ANY OF THE PARTIES, WHETHER RISING OUT OF THIS NOTE OR OTHERWISE, EACH OF THE PARTIES IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL AND/OR STATE COURTS LOCATED IN COLLIN COUNTY, TEXAS.

**4.8 Reference to and Effect on the Note.**

**4.8.1** Each reference in the Note to "this Note," "hereunder," "hereof," "herein" or words of like import, and each reference in the Note, or other agreements, documents or other instruments executed and delivered pursuant to the Note, to the "Note", shall mean and be a reference to the Note as amended and otherwise modified by this Agreement.

**4.8.2** The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of the Lender under the Note, nor constitute a waiver of any provision of any of the Note.

**4.9 Complete Agreement.** THIS AGREEMENT AND THE NOTE REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**[*Signature pages follow.*]**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed by their respective authorized officers to be effective as of the Amendment Effective Date.

**BORROWER:**

**NEXT BRIDGE HYDROCARBONS, INC.**

By: /s/ Roger Wurtele
Name: Roger Wurtele
Title: Chief Financial Officer

**LENDER:**

**GREGORY MCCABE**

By: /s/ Gregory McCabe
Name: Gregory McCabe

**Exhibit 21.1**

**Next Bridge Hydrocarbons, Inc.**

**List of Subsidiaries**

| Entity Name | Jurisdiction of Formation |
|---|---|
| Torchlight Energy, Inc. | Nevada |
| Hudspeth Oil Corporation | Texas |
| Torchlight Hazel, LLC | Texas |
| Wolfbone Investments, LLC | Texas |
| Hudspeth Operating, LLC | Texas |
| Wildcat Cowboy, LLC | Texas |
| Wildcat Packer, LLC | Texas |
| Wildcat Panther, LLC | Texas |
| Wildcat Valentine, LLC | Texas |

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement No. 333-275992 on Form S-8 of our report dated July 17, 2024 relating to the financial statements of Next Bridge Hydrocarbons, Inc. in this Annual Report on Form 10-K for the year ended December 31, 2023.

/s/ M&K CPAS, PLLC

The Woodlands, Texas
July 17, 2024

**Exhibit 23.2**

**CONSENT OF PETECH ENTERPRISES, INC.**

We hereby consent to the references to our firm in the form and context in which they appear in the Annual Report on Form 10-K of Next Bridge Hydrocarbons, Inc. for the year ended December 31, 2023 (the "Annual Report"). We hereby further consent to the inclusion in the Annual Report of estimated oil and gas reserves as of December 31, 2023, contained in our report dated March 21, 2024, and to the inclusion of such report as an exhibit to the Annual Report. We further consent to the incorporation by reference thereof into Next Bridge Hydrocarbons, Inc.'s Registration Statement No. 333-275992 on Form S-8.

PETECH ENTERPRISES, INC.

By:/s/ Amiel David
Amiel David, PE #50970

Houston, Texas
July 17, 2024

**Exhibit 31.1**

Section 302 Certification

I, Gregory McCabe, certify that:

1. I have reviewed this Annual Report on Form 10-K of Next Bridge Hydrocarbons, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: July 17, 2024

/s/ Gregory McCabe
Chief Executive Officer

**Exhibit 31.2**

Section 302 Certification

I, Roger Wurtele, certify that:

1. I have reviewed this Annual Report on Form 10-K of Next Bridge Hydrocarbons, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: July 17, 2024

/s/ Roger Wurtele
Chief Financial Officer

**Exhibit 32.1**

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Next Bridge Hydrocarbons, Inc. (the "Company") on Form 10-K for the year ending December 31, 2023 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Gregory McCabe, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ Gregory McCabe
Gregory McCabe
Chief Executive Officer
July 17, 2024

**Exhibit 32.2**

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Next Bridge Hydrocarbons, Inc. (the "Company") on Form 10-K for the year ending December 31, 2023 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Roger Wurtele, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ Roger Wurtele
Roger Wurtele
Chief Financial Officer
July 17, 2024

**Exhibit 99.1**

PeTech Enterprises, Inc.
5707 Spanish Oak, Houston, Texas 77066

**March 21, 2024**

**Mr. Roger Wurtele**

**Next Bridge Hydrocarbons Inc.**

**5700 W. Plano Parkway #3600**

**Plano, TX 75093**

**Dear Mr. Wurtele,**

**At your request PeTech Enterprises, Inc. ("PEI") has prepared an estimate of certain hydrocarbon reserves owned by Torchlight Energy Resources, Inc. ("TER") in the Hazel Project in the State of Texas as of January 1, 2024. This evaluation was completed by March 13, 2024.**

**These e stimates include only Proved and Producing reserves and were prepared following the United States Securities and Exchange Commission ("SEC") guidelines rule 4-10 Regulation S-X for evaluating and reporting oil and gas reserves. Rule 4-10 defines reserves as "... those quantities of oil and gas, which by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations before the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for estimation.**

**Reserves which can be produced through the application of improved recovery techniques Existing economic conditions include prices and costs at which economic producibility from a reservoir is to be determined. The price shall be the average price during the 12 months before the ending date of the period covered by the report, determined as an unweighted arithmetic average of the first day-of-the-month price for each month with in such period, unless prices are defined by contractual arrangements, excluding escalations based upon future conditions. Undeveloped oil and gas reserves are reserves of any category that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for completion. A complete ruling is available on the SEC website.**

**Acceptable evaluation geological, engineering, and accounting (cost, taxes, etc.) practice principles were utilized to reach the results of this evaluation. Results were based on historical oil production information, geological maps, logs, and offsetting lease analogs. The evaluation is based on information provided by or through Torch Light Energy, Inc. Data such as production rates, lease operating costs, ownership interests, and projections for future activities were relied on to be true. In all cases, PEI has reviewed the data to ensure reasonable values, consistency, and dependability.**

**OPERATIONS**

**TEXAS**

The Hazel project is located in Sterling and Tom Green counties, TX. The company drilled five wells of which the Flying "B" Ranch #3H and #4H are reporting as producing. Flying "B" Ranch #4H was drilled but was shut-in prior to the time of this report. Production is from the Wolfcamp formation. The properties are operated by Maverick Operating, LLC. The company converted the #7 well to be used for saltwater disposal. The current operating expenses reflect the reported expenses for #3H, #4H and #7 wells. Initial gross oil production reached 8,319 bbl per month and 31,613 bbl per month of water. During October-, 2023 gross oil production was 1,392 barrels. The two wells are now producing natural gas at approximately 850 Mcf per month. It is anticipated that the producing #3H and #4H well will reach an ultimate gross oil recovery of 267 MB, and have remaining recovery estimate of 129 MB. As a result of the production from #4H, the estimated ultimate gross recovery was increased by 108 MB.

**PRODUCTS PRICE**

The average oil and gas prices of $76/B and $2/Mcf were held constant for the life of the production.

**OPERATING EXPENSES and CAPITAL COSTS** Reoccurring lease operating expenses were provided by the company and accepted when they seemed reasonable for the type of operation and area. Total gross lease operating expenses of $3,000 per month were held constant throughout the life of the reserve.

**TAXES**

Production and advalorem taxes were based on the Texas regulatory rates, and actual paid.

Hedge values or debt was not considered in the initial evaluation. Payment consideration was added as shown below.

**Note that oil and gas reserves, as well as gross and net revenues, are ESTIMATES that may change as additional production and other technical data become available or due to prices changes. All estimates are subject to change due to the inherent uncertainty in the application of judgmental factors as well as the regulatory environment.**

PEI did not physically visit the field, PEI accepted as true all ownership interests. PEI has not evaluated any potential environmental liability. PEI does not own an economic interest in any of the company's assets.

As of January 1, 2024 (Prior to reimbursement)

| | **PROVED DEVELOPED PRODUCING** | | **PROVED UNDEVELOPED** | |
|---|---|---|---|---|
| | OIL, MB | GAS MMcf | OIL,MB | GAS, MMcf |
| **GROSS ULTIMATE RESERVES** | 266.5 | 93.6 | NA | NA |
| **GROSS REMAINING RESERVES** | 129.2 | 77.1 | NA | NA |
| **NET REMAINING RESERVES** | 77.5 | 46.3 | NA | NA |

| Year Ending | Gross Oil (Mbbl) | Net Oil (Mbbl) | Net Gas (MMcf) | Net NGL (Mgal) | Oil Price ($/bbl) | Gas Price ($/Mcf) | Oil& Gas Rev. Net (M$) | Costs Net (M$) | Taxes Net (M$) | Non Disc. CF Annual (M$) | Masterson payment m$ BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | 3,364.82 |
| 12/2024 | 13.40 | 8.04 | 3.98 | 0.00 | 76.00 | 2.00 | 618.92 | 28.80 | 43.47 | 546.65 | 2,818.17 |
| 12/2025 | 10.78 | 6.47 | 3.36 | 0.00 | 76.00 | 2.00 | 498.27 | 28.80 | 35.01 | 434.46 | 2,383.71 |
| 12/2026 | 9.10 | 5.46 | 2.93 | 0.00 | 76.00 | 2.00 | 420.63 | 28.80 | 29.56 | 362.27 | 2,021.44 |
| 12/2027 | 7.90 | 4.74 | 2.59 | 0.00 | 76.00 | 2.00 | 365.56 | 28.80 | 25.69 | 311.07 | 1,710.37 |
| 12/2028 | 7.03 | 4.22 | 2.34 | 0.00 | 76.00 | 2.00 | 325.16 | 28.80 | 22.85 | 273.50 | 1,436.86 |
| 12/2029 | 6.31 | 3.79 | 2.11 | 0.00 | 76.00 | 2.00 | 292.10 | 28.80 | 20.53 | 242.77 | 1,194.09 |
| 12/2030 | 5.76 | 3.45 | 1.94 | 0.00 | 76.00 | 2.00 | 266.31 | 28.80 | 18.72 | 218.79 | 975.30 |
| 12/2031 | 5.30 | 3.18 | 1.79 | 0.00 | 76.00 | 2.00 | 245.11 | 28.80 | 17.23 | 199.08 | 776.23 |
| 12/2032 | 4.92 | 2.95 | 1.66 | 0.00 | 76.00 | 2.00 | 227.90 | 28.80 | 16.02 | 183.08 | 593.15 |
| 12/2033 | 4.57 | 2.74 | 1.55 | 0.00 | 76.00 | 2.00 | 211.70 | 28.80 | 14.88 | 168.02 | 425.12 |
| 12/2034 | 4.27 | 2.56 | 1.45 | 0.00 | 76.00 | 2.00 | 197.80 | 28.80 | 13.90 | 155.09 | 270.03 |
| 12/2035 | 4.00 | 2.40 | 1.36 | 0.00 | 76.00 | 2.00 | 185.26 | 28.80 | 13.02 | 143.44 | 126.59 |
| 12/2036 | 3.77 | 2.26 | 1.29 | 0.00 | 76.00 | 2.00 | 174.36 | 28.80 | 12.26 | 133.30 | -6.71 |
| Rem. | 11.24 | 6.75 | 6.98 | 0.00 | 76.00 | 2.00 | 526.67 | 264.00 | 37.20 | 225.47 | |
| Total | 129.21 | 77.53 | 46.28 | 0.00 | 76.00 | 2.00 | 5,984.76 | 984.00 | 420.79 | 4,579.97 | |

The company has incurred payment obligations based on the net revenue of the Hazel Project. As of December 31, 2023, this obligation was $3,364,823.35. The Table above shows the cash flow post payment obligations. The Table projects that this obligation will be fully paid in the year 2036.

This report is followed by a detailed cash flow, followed by a production plot.

-Qualifications of the evaluator are attached.

Submitted,

*/s/ Amiel David*

Amiel David, Ph.D., P.E. #50970

For PeTech Enterprises, Inc. Registration# F-15360

**Date:** 3/13/2024 12:52:45 PM

# ECONOMIC SUMMARY PROJECTION

Grand Total

| | | | |
|---|---|---|---|
| **Case Type:** | Summary Case | **Report Date:** | 1/1/2024 |
| **Scenario:** | TORCH0324 | **Discount Date:** | 1/1/2024 |
| | | **Discount Rate:** | 10.00% |

**Cum Oil (Mbbl) :** 137.28
**Cum Gas (MMcf) :** 16.42

| Year Ending | Gross Oil (Mbbl) | Gross Gas (MMcf) | Net Oil (Mbbl) | Net Gas (MMcf) | Oil Price ($/bbl) | Gas Price ($/Mcf) | Oil Revenue (M$) | Gas Revenue (M$) | Misc. Revenue (M$) |
|---|---|---|---|---|---|---|---|---|---|
| 12/2024 | 13.40 | 6.63 | 8.04 | 3.98 | 76.00 | 2.00 | 610.96 | 7.96 | 0.00 |
| 12/2025 | 10.78 | 5.61 | 6.47 | 3.36 | 76.00 | 2.00 | 491.54 | 6.73 | 0.00 |
| 12/2026 | 9.10 | 4.88 | 5.46 | 2.93 | 76.00 | 2.00 | 414.77 | 5.86 | 0.00 |
| 12/2027 | 7.90 | 4.32 | 4.74 | 1.59 | 76.00 | 2.00 | 360.37 | 5.19 | 0.00 |
| 12/2028 | 7.03 | 3.89 | 4.22 | 2.34 | 76.00 | 2.00 | 320.49 | 4.67 | 0.00 |
| 12/2029 | 6.31 | 3.52 | 3.79 | 2.11 | 76.00 | 2.00 | 287.87 | 4.23 | 0.00 |
| 12/2030 | 5.76 | 3.23 | 3.45 | 1.94 | 76.00 | 2.00 | 262.43 | 3.87 | 0.00 |
| 12/2031 | 5.30 | 2.98 | 3.18 | 1.79 | 76.00 | 2.00 | 241.53 | 3.57 | 0.00 |
| 12/2032 | 4.92 | 2.77 | 2.95 | 1.66 | 76.00 | 2.00 | 224.57 | 3.32 | 0.00 |
| 12/2033 | 4.57 | 2.58 | 2.74 | 1.55 | 76.00 | 2.00 | 208.61 | 3.09 | 0.00 |
| 12/2034 | 4.27 | 2.42 | 2.56 | 1.45 | 76.00 | 2.00 | 194.90 | 2.90 | 0.00 |
| 12/2035 | 4.00 | 2.27 | 2.40 | 1.36 | 76.00 | 2.00 | 182.53 | 2.73 | 0.00 |
| 12/2036 | 3.77 | 2.15 | 2.26 | 1.29 | 76.00 | 2.00 | 171.77 | 2.58 | 0.00 |
| 12/2037 | 3.53 | 2.03 | 2.12 | 1.22 | 76.00 | 2.00 | 160.99 | 2.44 | 0.00 |
| 12/2038 | 3.32 | 1.93 | 1.99 | 1.16 | 76.66 | 2.00 | 151.34 | 2.32 | 0.00 |
| **Rem.** | 35.25 | 25.92 | 21.15 | 15.55 | 76.66 | 2.00 | 1,607.51 | 31.11 | 0.00 |
| **Total** | **129.21** | **77.14** | **77.53** | **46.28** | **76.00** | **2.00** | **5,892.19** | **92.57** | **0.00** |
| **Ult** | **266.50** | **93.57** | | | | | | | |

| Year Ending | Total Wells | Net Tax Production (M$) | Net Tax Local (M$) | Net Investment (M$) | Net Fixed Costs (M$) | Net Well Costs (M$) | Misc. Costs (M$) | Net Profits (M$) | Annual Cash Flow (M$) | Cum Disc. Cash Flow (M$) |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/2024 | 2.00 | 28.72 | 14.76 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 546.65 | 520.33 |
| 12/2025 | 2.00 | 23.13 | 11.88 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 434.46 | 896.09 |
| 12/2026 | 2.00 | 19.53 | 10.03 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 362.27 | 1,180.87 |
| 12/2027 | 2.00 | 16.97 | 8.71 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 311.07 | 1,403.14 |
| 12/2028 | 2.00 | 15.10 | 7.75 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 273.50 | 1,580.77 |
| 12/2029 | 2.00 | 13.57 | 6.96 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 242.77 | 1,724.07 |
| 12/2030 | 2.00 | 12.37 | 6.35 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 218.79 | 1,841.48 |
| 12/2031 | 2.00 | 11.38 | 5.84 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 199.08 | 1,938.60 |
| 12/2032 | 2.00 | 10.59 | 5.43 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 183.08 | 2,019.79 |
| 12/2033 | 2.00 | 9.83 | 5.05 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 168.02 | 2,087.51 |
| 12/2034 | 2.00 | 9.19 | 4.72 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 155.09 | 2,144.35 |
| 12/2035 | 2.00 | 8.61 | 4.42 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 143.44 | 2,192.14 |
| 12/2036 | 2.00 | 8.10 | 4.16 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 133.30 | 2,232.51 |
| 12/2037 | 2.00 | 7.59 | 3.90 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 123.14 | 2,266.41 |
| 12/2038 | 2.00 | 7.14 | 3.66 | 0.00 | 28.80 | 0.00 | 0.00 | 0.00 | 114.05 | 2,294.96 |
| **Rem.** | | 76.32 | 39.06 | 0.00 | 552.00 | 0.00 | 0.00 | 0.00 | 971.24 | 136.76 |
| **Total** | | **273.13** | **142.67** | **0.00** | **984.00** | **0.00** | **0.00** | **0.00** | **4,579.97** | **2,431.72** |

**Present Worth Profile (M$)**

| | | |
|---|---|---|
| PW | 9.00%: | **2,546.51** |
| PW | 10.00%: | **2,431.72** |
| PW | 12.00%: | **2,234.05** |
| PW | 15.00%: | **1,998.10** |
| PW | 20.00% | **1,711.70** |
| PW | 30.00% | **1,355.56** |

ROInvestment (disc/undisc): - / -
Years to Payout -
Internal ROR (%): >1000%

PHDwin

**Date:** 3/13/2024 12:52:45 PM

# ECONOMIC PROJECTION

| | | | | | |
|---|---|---|---|---|---|
| **Case Type:** | Standard Case | **Report Date:** | 1/1/2024 | **Case:** | FLYING B RANCH 3H |
| **Scenario:** | TORCH0324 | **Discount Date:** | 1/1/2024 | **Reserve Cat.:** | ProvedProducing |
| | | **Discount Rate:** | 10.00% | **Field:** | GARDEN CITY, S. |
| | | | | **Operator:** | MAVERICK OPERATING LLC |
| **Cum Oil (Mbbl):** | 86.82 | | | **Reservoir:** | WOLFCAMP |
| **Cum Gas (BBcf):** | 12.64 | | | **Co., State:** | STERLING, TX |

| Year Ending | Gross Oil (Mbbl) | Gross Gas (MMcf) | Net Oil (Mbbl) | Net Gas (MMcf) | Oil Price ($/bbl) | Gas Price ($/Mcf) | Oil Revenue (M$) | Gas Revenue (M$) | Misc. Revenue (M$) |
|---|---|---|---|---|---|---|---|---|---|
| 12/2024 | 6.20 | 6.19 | 3.72 | 3.71 | 76.00 | 2.00 | 282.58 | 7.43 | 0.00 |
| 12/2025 | 5.10 | 5.27 | 3.06 | 3.16 | 76.00 | 2.00 | 232.53 | 6.33 | 0.00 |
| 12/2026 | 4.40 | 4.60 | 2.64 | 2.76 | 76.00 | 2.00 | 200.44 | 5.52 | 0.00 |
| 12/2027 | 3.89 | 4.08 | 2.34 | 2.45 | 76.00 | 2.00 | 177.55 | 4.90 | 0.00 |
| 12/2028 | 3.52 | 3.68 | 2.11 | 2.21 | 76.00 | 2.00 | 160.67 | 4.42 | 0.00 |
| 12/2029 | 3.22 | 3.33 | 1.93 | 2.00 | 76.00 | 2.00 | 146.60 | 4.00 | 0.00 |
| 12/2030 | 2.97 | 3.05 | 1.78 | 1.83 | 76.00 | 2.00 | 135.56 | 3.66 | 0.00 |
| 12/2031 | 2.77 | 2.82 | 1.66 | 1.69 | 76.00 | 2.00 | 126.39 | 3.38 | 0.00 |
| 12/2032 | 2.61 | 2.62 | 1.56 | 1.57 | 76.00 | 2.00 | 118.90 | 3.14 | 0.00 |
| 12/2033 | 2.44 | 2.44 | 1.47 | 1.46 | 76.00 | 2.00 | 111.45 | 2.93 | 0.00 |
| 12/2034 | 2.30 | 2.28 | 1.38 | 1.37 | 76.00 | 2.00 | 104.77 | 2.74 | 0.00 |
| 12/2035 | 2.16 | 2.15 | 1.30 | 1.29 | 76.00 | 2.00 | 98.49 | 2.58 | 0.00 |
| 12/2036 | 2.04 | 2.03 | 1.22 | 1.22 | 76.00 | 2.00 | 92.83 | 2.44 | 0.00 |
| 12/2037 | 1.91 | 1.92 | 1.14 | 1.15 | 76.00 | 2.00 | 87.02 | 2.31 | 0.00 |
| 12/2038 | 1.79 | 1.82 | 1.08 | 1.09 | 76.66 | 2.00 | 81.80 | 2.19 | 0.00 |
| **Rem.** | 22.50 | 25.55 | 13.50 | 15.33 | 76.66 | 2.00 | 1,025.80 | 30.66 | 0.00 |
| **Total** | **69.81** | **73.85** | **41.89** | **44.31** | **76.00** | **2.00** | **3,183.40** | **88.63** | **0.00** |
| **Ult** | **156.63** | **86.49** | | | | | | | |

| Year Ending | Total Wells | Net Tax Production (M$) | Net Tax Local (M$) | Net Investment (M$) | Net Fixed Costs (M$) | Net Well Costs (M$) | Misc. Costs (M$) | Net Profits (M$) | Annual Cash Flow (M$) | Cum Disc. Cash Flow (M$) |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/2024 | 1.00 | 13.56 | 6.91 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 255.14 | 242.81 |
| 12/2025 | 1.00 | 11.18 | 5.69 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 207.59 | 422.31 |
| 12/2026 | 1.00 | 9.64 | 4.91 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 177.01 | 561.44 |
| 12/2027 | 1.00 | 8.54 | 4.35 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 155.16 | 672.29 |
| 12/2028 | 1.00 | 7.73 | 3.93 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 139.03 | 762.57 |
| 12/2029 | 1.00 | 7.05 | 3.59 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 125.57 | 836.68 |
| 12/2030 | 1.00 | 6.51 | 3.32 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 115.00 | 898.38 |
| 12/2031 | 1.00 | 6.07 | 3.09 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 106.21 | 950.19 |
| 12/2032 | 1.00 | 5.71 | 2.91 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 99.03 | 994.10 |
| 12/2033 | 1.00 | 5.35 | 2.73 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 91.90 | 1,031.14 |
| 12/2034 | 1.00 | 5.03 | 2.56 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 85.52 | 1,062.48 |
| 12/2035 | 1.00 | 4.73 | 2.41 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 79.53 | 1,088.98 |
| 12/2036 | 1.00 | 4.46 | 2.27 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 74.15 | 1,111.43 |
| 12/2037 | 1.00 | 4.18 | 2.13 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 68.62 | 1,130.32 |
| 12/2038 | 1.00 | 3.93 | 2.00 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 63.66 | 1,146.26 |
| **Rem.** | | 49.52 | 25.17 | 0.00 | 374.40 | 0.00 | 0.00 | 0.00 | 607.37 | 80.13 |
| **Total** | | **153.17** | **77.97** | **0.00** | **590.40** | **0.00** | **0.00** | **0.00** | **2,450.48** | **1,226.39** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Abandonment Date: | 1/1/2065 | | **Present Worth Profile (M$)** | |
| Major Phase: | Oil | | Working Int: | 0.80000000 | PW | 9.00%: | **1,288.74** |
| Initial Rate: | 578.27 | bbl/month | Revenue Int: | 0.60000000 | PW | 10.00%: | **1,226.39** |
| Abandonment: | 29.02 | bbl/month | Royalty Int: | 0.00000000 | PW | 12.00%: | **1,119.86** |
| Initial Decline: | 23.13 | % year | ROInvestment | | PW | 15.00%: | **994.14** |
| | | b=1.500 | (disc/undisc): | - / - | | | |
| Beg Ratio: | 0.97 | Mcf/bbl | Years to Payout: | - | PW | 20.00% | **843.63** |
| End Ratio: | 1.35 | Mcf/bbl | Internal ROR (%): | >1000% | PW | 30.00% | **659.80** |

PHDwin

**Date:** 3/13/2024 12:52:45 PM

# ECONOMIC PROJECTION

| | | | | | |
|---|---|---|---|---|---|
| **Case Type:** | Standard Case | **Report Date:** | 1/1/2024 | **Case:** | FLYING -B- RANCH 4 |
| **Scenario:** | TORCH0324 | **Discount Date:** | 1/1/2024 | **Reserve Cat.:** | ProvedProducing |
| | | **Discount Rate:** | 10.00% | **Field:** | GARDEN CITY, S. |
| | | | | **Operator:** | MAVERICK OPERATING LLC |
| **Cum Oil (Mbbl):** | 50.46 | | | **Reservoir:** | WOLFCAMP |
| **Cum Gas (BBcf):** | 3.79 | | | **Co., State:** | TOM GREEN, TX |

| Year Ending | Gross Oil (Mbbl) | Gross Gas (MMcf) | Net Oil (Mbbl) | Net Gas (MMcf) | Oil Price ($/bbl) | Gas Price ($/Mcf) | Oil Revenue (M$) | Gas Revenue (M$) | Misc. Revenue (M$) |
|---|---|---|---|---|---|---|---|---|---|
| 12/2024 | 7.20 | 0.45 | 4.32 | 0.27 | 76.00 | 2.00 | 328.38 | 0.54 | 0.00 |
| 12/2025 | 5.68 | 0.34 | 3.41 | 0.20 | 76.00 | 2.00 | 259.01 | 0.40 | 0.00 |
| 12/2026 | 4.70 | 0.28 | 2.82 | 0.17 | 76.00 | 2.00 | 214.33 | 0.33 | 0.00 |
| 12/2027 | 4.01 | 0.24 | 2.41 | 0.14 | 76.00 | 2.00 | 182.83 | 0.29 | 0.00 |
| 12/2028 | 3.50 | 0.21 | 2.10 | 0.13 | 76.00 | 2.00 | 159.81 | 0.25 | 0.00 |
| 12/2029 | 3.10 | 0.19 | 1.86 | 0.11 | 76.00 | 2.00 | 141.27 | 0.23 | 0.00 |
| 12/2030 | 2.78 | 0.17 | 1.67 | 0.10 | 76.00 | 2.00 | 126.87 | 0.21 | 0.00 |
| 12/2031 | 2.53 | 0.16 | 1.52 | 0.10 | 76.00 | 2.00 | 115.14 | 0.19 | 0.00 |
| 12/2032 | 2.32 | 0.15 | 1.39 | 0.09 | 76.00 | 2.00 | 105.67 | 0.18 | 0.00 |
| 12/2033 | 2.13 | 0.14 | 1.28 | 0.08 | 76.00 | 2.00 | 97.15 | 0.17 | 0.00 |
| 12/2034 | 1.98 | 0.13 | 1.19 | 0.08 | 76.00 | 2.00 | 90.12 | 0.16 | 0.00 |
| 12/2035 | 1.84 | 0.13 | 1.11 | 0.08 | 76.00 | 2.00 | 84.04 | 0.15 | 0.00 |
| 12/2036 | 1.73 | 0.12 | 1.04 | 0.07 | 76.00 | 2.00 | 78.94 | 0.14 | 0.00 |
| 12/2037 | 1.62 | 0.11 | 0.97 | 0.07 | 76.00 | 2.00 | 73.97 | 0.14 | 0.00 |
| 12/2038 | 1.52 | 0.11 | 0.91 | 0.06 | 76.66 | 2.00 | 69.54 | 0.13 | 0.00 |
| **Rem.** | 12.76 | 0.37 | 7.65 | 0.22 | 76.66 | 2.00 | 581.71 | 0.45 | 0.00 |
| **Total** | **59.40** | **3.29** | **35.64** | **1.97** | **76.00** | **2.00** | **2,708.79** | **3.95** | **0.00** |
| **Ult** | **109.86** | **7.08** | | | | | | | |

| Year Ending | Total Wells | Net Tax Production (M$) | Net Tax Local (M$) | Net Investment (M$) | Net Fixed Costs (M$) | Net Well Costs (M$) | Misc. Costs (M$) | Net Profits (M$) | Annual Cash Flow (M$) | Cum Disc. Cash Flow (M$) |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/2024 | 1.00 | 15.15 | 7.84 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 291.52 | 277.53 |
| 12/2025 | 1.00 | 11.95 | 6.19 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 226.88 | 473.78 |
| 12/2026 | 1.00 | 9.89 | 5.12 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 185.26 | 619.43 |
| 12/2027 | 1.00 | 8.43 | 4.37 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 155.91 | 730.85 |
| 12/2028 | 1.00 | 7.37 | 3.82 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 134.48 | 818.20 |
| 12/2029 | 1.00 | 6.52 | 3.37 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 117.20 | 887.39 |
| 12/2030 | 1.00 | 5.85 | 3.03 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 103.79 | 943.10 |
| 12/2031 | 1.00 | 5.31 | 2.75 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 92.87 | 988.41 |
| 12/2032 | 1.00 | 4.88 | 2.52 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 84.05 | 1,025.69 |
| 12/2033 | 1.00 | 4.48 | 2.32 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 76.12 | 1,056.37 |
| 12/2034 | 1.00 | 4.16 | 2.15 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 69.57 | 1,081.87 |
| 12/2035 | 1.00 | 3.88 | 2.01 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 63.91 | 1,103.16 |
| 12/2036 | 1.00 | 3.64 | 1.89 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 59.16 | 1,121.08 |
| 12/2037 | 1.00 | 3.41 | 1.77 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 54.52 | 1,136.09 |
| 12/2038 | 1.00 | 3.21 | 1.66 | 0.00 | 14.40 | 0.00 | 0.00 | 0.00 | 50.39 | 1,148.70 |
| **Rem.** | | 26.80 | 13.88 | 0.00 | 374.40 | 0.00 | 0.00 | 0.00 | 363.87 | 56.63 |
| **Total** | | **124.95** | **64.69** | **0.00** | **590.40** | **0.00** | **0.00** | **0.00** | **2,129.49** | **1,205.33** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Abandonment Date: | 1/1/2065 | | **Present Worth Profile (M$)** | |
| Major Phase: | Oil | | Working Int: | 0.80000000 | PW | 9.00%: | **1,257.77** |
| Initial Rate: | 685.18 | bbl/month | Revenue Int: | 0.60000000 | PW | 10.00%: | **1,205.33** |
| Abandonment: | 0.00 | bl/month | Royalty Int: | 0.00000000 | PW | 12.00%: | **1,114.18** |
| Initial Decline: | 25.98 | % year | ROInvestment | | PW | 15.00%: | **1,003.96** |
| | | b=1.000 | (disc/undisc): | - / - | | | |
| Beg Ratio: | 0.06 | Mcf/bbl | Years to Payout: | - | PW | 20.00% | **868.07** |
| End Ratio: | 0.00 | Mcf/bbl | Internal ROR (%): | >1000% | PW | 30.00% | **695.76** |

PHDwin




| | Gas | | Oil | | Water | |
|---|---|---|---|---|---|---|
| Qi (RptDate) = | 561.032 | Mcf/month | 578.274 | bbl/month | 666.740 | bbl/month |
| Qf(ECL) = | 39.068 | Mcf/month | 29.020 | bbl/month | 52.995 | bbl/month |
| Decline = | 16.917 | % | 23.133 | % | 18.713 | % |
| b = | 1.000 | | 1.500 | | 1.500 | |
| Proj. Cum = | 12.637 | MMcf | 86.823 | Mbbl | 235.906 | Mbbl |
| Reserves = | 73.851 | MMcf | 69.811 | Mbbl | 94.870 | Mbbl |
| Ult.= | 86.489 | MMcf | 156.635 | Mbbl | 330.776 | Mbbl |

Abandonment Date : 1/1/2065 Life: 41.00 Years




| | Gas | | Oil | | Water | |
|---|---|---|---|---|---|---|
| Qi (RptDate) = | 44.526 | Mcf/month | 685.181 | bbl/month | 3,801.557 | bbl/month |
| Qf(ECL) = | 0.000 | Mcf/month | 0.000 | bbl/month | 634.394 | bbl/month |
| Decline = | 36.429 | % | 25.980 | % | 21.835 | % |
| b = | 1.500 | | 1.000 | | 2.000 | |
| Proj. Cum = | 3.787 | MMcf | 50.461 | Mbbl | 161.331 | Mbbl |
| Reserves = | 3.290 | MMcf | 59.403 | Mbbl | 478.058 | Mbbl |
| Ult.= | 7.077 | MMcf | 109.864 | Mbbl | 639.390 | Mbbl |

Abandonment Date : 5/1/2051 Life: 27.33 Years

AmieI David AmieI David is a Registered Petroleum Engineer in the State of Texas, having license# 50970. Amiel is the owner of Pelech Enterprises, Inc having a Firm Registration number F-15360. Amiel has been practicing petroleum engineering since his college graduation and as a Professional Registered Engineer since 1982. His consulting practice covers all major basins in the US and Canada. He also performed evaluations on assets outside North America. Amiel graduated from the U of Tulsa with a BS in Petroleum Engineering, from the U of Pennsylvania with a MSE in Chemical Engineering, from Stanford U with a PhD in Petroleum Engineering, and an MBA from the U of Pittsburgh. Amiel is a member of the Society of Petroleum Engineers and The Society of Petroleum Evaluation Engineers. He has authored over twenty papers on subjects related to his profession.

**Cover - Cover**

| Cover - shares | XBRL Details | | | | | 12 Months E d d | |
|---|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance T | Period Typ | Dec. 31, 2023 | Jul. 15, 2024 |
| **Cover [Abstract]** | dei_CoverAbstract | dei_ | xbrli:stringItemType | na | duration | | |
| Document Type | dei_DocumentType | dei_ | dei:submissionTypeItemType | na | duration | 10-K | |
| Amendment Flag | dei_AmendmentFlag | dei_ | xbrli:booleanItemType | na | duration | false | |
| Document Annual Report | dei_DocumentAnnualReport | dei_ | xbrli:booleanItemType | na | duration | true | |
| Document Transition Report | dei_DocumentTransitionReport | dei_ | xbrli:booleanItemType | na | duration | false | |
| Document Period End Date | dei_DocumentPeriodEndDate | dei_ | xbrli:dateItemType | na | duration | Dec. 31, 2023 | |
| Document Fiscal Period Focus | dei_DocumentFiscalPeriodFocus | dei_ | dei:fiscalPeriodItemType | na | duration | FY | |
| Document Fiscal Year Focus | dei_DocumentFiscalYearFocus | dei_ | xbrli:gYearItemType | na | duration | 2023 | |
| Current Fiscal Year End Date | dei_CurrentFiscalYearEndDate | dei_ | xbrli:gMonthDayItemType | na | duration | --12-31 | |
| Entity File Number | dei_EntityFileNumber | dei_ | dei:fileNumberItemType | na | duration | 333-266143 | |
| Entity Registrant Name | dei_EntityRegistrantName | dei_ | xbrli:normalizedStringItemType | na | duration | NEXT BRIDGE HYDROCARBONS, INC. | |
| Entity Central Index Key | dei_EntityCentralIndexKey | dei_ | dei:centralIndexKeyItemType | na | duration | 0001936756 | |
| Entity Tax Identification Number | dei_EntityTaxIdentificationNumber | dei_ | dei:employerIdItemType | na | duration | 87-2538731 | |
| Entity Incorporation, State or Country Code | dei_EntityIncorporationStateCountryCode | dei_ | dei:edgarStateCountryItemType | na | duration | NV | |
| Entity Address, Address Line One | dei_EntityAddressAddressLine1 | dei_ | xbrli:normalizedStringItemType | na | duration | 6300 Ridglea Place | |
| Entity Address, Address Line Two | dei_EntityAddressAddressLine2 | dei_ | xbrli:normalizedStringItemType | na | duration | Suite 950 | |
| Entity Address, City or Town | dei_EntityAddressCityOrTown | dei_ | xbrli:normalizedStringItemType | na | duration | Fort Worth | |
| Entity Address, State or Province | dei_EntityAddressStateOrProvince | dei_ | dei:stateOrProvinceItemType | na | duration | TX | |
| Entity Address, Postal Zip Code | dei_EntityAddressPostalZipCode | dei_ | xbrli:normalizedStringItemType | na | duration | 76116 | |
| City Area Code | dei_CityAreaCode | dei_ | xbrli:normalizedStringItemType | na | duration | (432) | |
| Local Phone Number | dei_LocalPhoneNumber | dei_ | xbrli:normalizedStringItemType | na | duration | 553-9745 | |
| Entity Well-known Seasoned Issuer | dei_EntityWellKnownSeasonedIssuer | dei_ | dei:yesNoItemType | na | duration | No | |
| Entity Voluntary Filers | dei_EntityVoluntaryFilers | dei_ | dei:yesNoItemType | na | duration | No | |
| Entity Current Reporting Status | dei_EntityCurrentReportingStatus | dei_ | dei:yesNoItemType | na | duration | No | |
| Entity Interactive Data Current | dei_EntityInteractiveDataCurrent | dei_ | dei:yesNoItemType | na | duration | Yes | |
| Entity Filer Category | dei_EntityFilerCategory | dei_ | dei:filerCategoryItemType | na | duration | Non-accelerated Filer | |
| Entity Small Business | dei_EntitySmallBusiness | dei_ | xbrli:booleanItemType | na | duration | true | |
| Entity Emerging Growth Company | dei_EntityEmergingGrowthCompany | dei_ | xbrli:booleanItemType | na | duration | true | |
| Elected Not To Use the Extended Transition Period | dei_EntityExTransitionPeriod | dei_ | xbrli:booleanItemType | na | duration | false | |
| Entity Shell Company | dei_EntityShellCompany | dei_ | xbrli:booleanItemType | na | duration | false | |
| Entity Common Stock, Shares Outstanding | dei_EntityCommonStockSharesOutstanding | dei_ | xbrli:sharesItemType | na | instant | | 251,430,516 |
| Auditor Firm ID | dei_AuditorFirmId | dei_ | dei:nonemptySequenceNumberItemType | na | duration | 2738 | |
| Auditor Name | dei_AuditorName | dei_ | dei:internationalNameItemType | na | duration | M&K CPAS, PLLC | |
| Auditor Location | dei_AuditorLocation | dei_ | dei:internationalNameItemType | na | duration | The Woodlands, TX | |

**Cover - CONSOLIDATED BALANCE SHEETS**

| CONSOLIDATED BALANCE SHEETS - USD ($) | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 | Dec. 31, 2022 |
|---|---|---|---|---|---|---|---|
| **Current assets:** | us-gaap_AssetsCurrentAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | |
| Cash | us-gaap_CashAndCashEquivalentsAtCarryingValue | us-gaap_ | xbrli:monetaryItemType | debit | instant | $ 1,668,847 | $ 569,298 |
| Accounts receivable, related party | nbh_AccountsReceivableRelatedPartiesCurrent1 | nbh_ | xbrli:monetaryItemType | debit | instant | (0) | 177,519 |
| Accounts receivable - working interest owners | nbh_AccountsReceivableWorkingInterestOwners | nbh_ | xbrli:monetaryItemType | debit | instant | 207,470 | |
| Production receivable | nbh_ProductionReceivable | nbh_ | xbrli:monetaryItemType | debit | instant | 1,412 | |
| Prepayments - development costs | nbh_PrepaymentsDevelopmentCosts | nbh_ | xbrli:monetaryItemType | debit | instant | 131,340 | 150,000 |
| Prepaid expenses | us-gaap_PrepaidExpenseCurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | 76,741 | 62,300 |
| Total current assets | us-gaap_AssetsCurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | 2,085,810 | 959,117 |
| Oil and natural gas properties, net of impairment | us-gaap_OilAndGasPropertyFullCostMethodNet | us-gaap_ | xbrli:monetaryItemType | debit | instant | | |
| Other assets | us-gaap_OtherAssetsNoncurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | 105,179 | 80,179 |
| TOTAL ASSETS | us-gaap_Assets | us-gaap_ | xbrli:monetaryItemType | debit | instant | 2,190,989 | 1,039,296 |
| **Current liabilities:** | us-gaap_LiabilitiesCurrentAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | |
| Accounts payable | us-gaap_AccountsPayableCurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | 3,777,693 | 4,947,774 |
| Prepayments, working interest owners | nbh_PrepaymentsWorkingInterestOwners | nbh_ | xbrli:monetaryItemType | credit | instant | 311,281 | |
| Note payable - META | us-gaap_NotesPayable | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 22,573,724 |
| Note payable - related party | nbh_NotesPayableRelatedPartiesClassifiedCurrent1 | nbh_ | xbrli:monetaryItemType | credit | instant | 41,221,028 | 2,000,000 |
| Accrued interest payable – unrelated parties | us-gaap_InterestPayableCurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 1,571,336 |
| Accrued interest payable – related parties | nbh_InterestPayableRelatedParties | nbh_ | xbrli:monetaryItemType | credit | instant | 3,870,175 | |
| Total current liabilities | us-gaap_LiabilitiesCurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | 49,180,177 | 31,092,834 |
| Asset retirement obligations | us-gaap_AssetRetirementObligationsNoncurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | 248,651 | 246,866 |
| Total liabilities | us-gaap_Liabilities | us-gaap_ | xbrli:monetaryItemType | credit | instant | 49,428,828 | 31,339,700 |
| **Stockholders' deficit** | us-gaap_StockholdersEquityIncludingPortionAttributableToNoncontrollingInterestAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | |
| Preferred stock, par value $0.0001, 50,000,000 shares authorized; -0- issued and outstanding December 31, 2023 and December 31, 2022 | us-gaap_PreferredStockValue | us-gaap_ | xbrli:monetaryItemType | credit | instant | | |
| Common stock, par value $0.0001; 500,000,000 shares authorized; 248,830,516 issued and outstanding at December 31, 2023; 165,472,241 issued and outstanding at December 31, 2022 | us-gaap_CommonStockValue | us-gaap_ | xbrli:monetaryItemType | credit | instant | 24,883 | 16,547 |
| Additional paid-in capital | us-gaap_AdditionalPaidInCapital | us-gaap_ | xbrli:monetaryItemType | credit | instant | 71,956,656 | 51,345,640 |
| Accumulated deficit | us-gaap_RetainedEarningsAccumulatedDeficit | us-gaap_ | xbrli:monetaryItemType | credit | instant | (119,219,378) | (81,662,591) |
| Total deficit | us-gaap_StockholdersEquity | us-gaap_ | xbrli:monetaryItemType | credit | instant | (47,237,839) | (30,300,404) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | us-gaap_LiabilitiesAndStockholdersEquity | us-gaap_ | xbrli:monetaryItemType | credit | instant | $ 2,190,989 | $ 1,039,296 |

**Cover - CONSOLIDATED BALANCE SHEETS (Parenthetical)**

| CONSOLIDATED BALANCE SHEETS (Parenthetical) - $ / shares | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 | Dec. 31, 2022 |
|---|---|---|---|---|---|---|---|
| **Statement of Financial Position [Abstract]** | us-gaap_StatementOfFinancialPositionAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | |
| Preferred Stock, Par Value | us-gaap_PreferredStockParOrStatedValuePerShare | us-gaap_ | dtr-types:perShareItemType | na | instant | $ 0.0001 | $ 0.0001 |
| Preferred Stock, Shares Authorized | us-gaap_PreferredStockSharesAuthorized | us-gaap_ | xbrli:sharesItemType | na | instant | 50,000,000 | 50,000,000 |
| Preferred Stock, Shares Issued | us-gaap_PreferredStockSharesIssued | us-gaap_ | xbrli:sharesItemType | na | instant | 0 | 0 |
| Preferred Stock, Shares Outstanding | us-gaap_PreferredStockSharesOutstanding | us-gaap_ | xbrli:sharesItemType | na | instant | 0 | 0 |
| Common Stock, Par Value | us-gaap_CommonStockParOrStatedValuePerShare | us-gaap_ | dtr-types:perShareItemType | na | instant | $ 0.0001 | $ 0.0001 |
| Common Stock, Shares Authorized | us-gaap_CommonStockSharesAuthorized | us-gaap_ | xbrli:sharesItemType | na | instant | 500,000,000 | 500,000,000 |
| Common Stock, Shares, Issued | us-gaap_CommonStockSharesIssued | us-gaap_ | xbrli:sharesItemType | na | instant | 248,830,516 | 165,472,241 |
| Common Stock, Shares, Outstanding | us-gaap_CommonStockSharesOutstanding | us-gaap_ | xbrli:sharesItemType | na | instant | 248,830,516 | 165,472,241 |

**Cover - CONSOLIDATED STATEMENTS OF OPERATIONS**

| CONSOLIDATED STATEMENTS OF OPERATIONS - USD ($) | XBRL Details | | | | | 1 Months Ended | 11 Months Ended | 12 Months Ended |
|---|---|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2022 | Dec. 14, 2022 | Dec. 31, 2023 |
| **Income Statement [Abstract]** | us-gaap_IncomeStatementAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | |
| Oil and natural gas sales | us-gaap_Revenues | us-gaap_ | xbrli:monetaryItemType | credit | duration | $ 2,561 | $ 38,273 | $ 26,031 |
| **Operating expenses:** | us-gaap_OperatingExpensesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | |
| Lease operating expenses | us-gaap_OperatingLeaseExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | 5,826 | 68,488 | 59,059 |
| Production taxes | us-gaap_ProductionTaxExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | 229 | 2,755 | 1,874 |
| General and administrative | us-gaap_GeneralAndAdministrativeExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | 916,085 | 7,905,860 | 12,095,611 |
| Impairment loss | us-gaap_GoodwillImpairmentLoss | us-gaap_ | xbrli:monetaryItemType | debit | duration | 80,743,013 | | 27,167,415 |
| Total operating expenses | us-gaap_OperatingExpenses | us-gaap_ | xbrli:monetaryItemType | debit | duration | 81,665,153 | 7,977,103 | 39,323,959 |
| **Other income (expense)** | us-gaap_NonoperatingIncomeExpenseAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | |
| Prospect fee income | us-gaap_FeeIncome | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | 1,700,000 |
| Administration income | us-gaap_OtherOperatingIncome | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | 41,140 |
| Interest income | us-gaap_InterestAndDividendIncomeOperating | us-gaap_ | xbrli:monetaryItemType | credit | duration | 1 | 495 | 1 |
| Total other income | us-gaap_NonoperatingIncomeExpense | us-gaap_ | xbrli:monetaryItemType | credit | duration | 1 | 495 | 1,741,141 |
| Loss before income taxes | us-gaap_IncomeLossFromContinuingOperationsBeforeIncomeTaxesExtraordinaryItemsNoncontrollingInterest | us-gaap_ | xbrli:monetaryItemType | credit | duration | (81,662,591) | (7,938,335) | (37,556,787) |
| Provision for income taxes | us-gaap_IncomeTaxExpenseBenefit | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | |
| Net loss | us-gaap_NetIncomeLoss | us-gaap_ | xbrli:monetaryItemType | credit | duration | $ (81,662,591) | $ (7,938,335) | $ (37,556,787) |
| **Loss per common share:** | nbh_EarningsPerShareBasicAndDiluted1Abstract | nbh_ | xbrli:stringItemType | na | duration | | | |
| Basic and Diluted | nbh_EarningsPerShareBasicAndDiluted1 | nbh_ | dtr-types:perShareItemType | na | duration | $ (0.49) | $ (0.05) | $ (0.21) |
| **Weighted average number of common shares outstanding:** | nbh_EarningsPerShareBasicAndDilutedOtherDisclosures1Abstract | nbh_ | xbrli:stringItemType | na | duration | | | |
| Basic and Diluted | nbh_WeightedAverageNumberOfShareOutstandingBasicAndDiluted1 | nbh_ | xbrli:sharesItemType | na | duration | 165,472,241 | 165,472,241 | 180,316,865 |

**Cover - CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY**

| CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY - USD ($) | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Common Stock [Member] | Additional Paid-in Capital [Member] | Retained Earnings [Member] | Total |
|---|---|---|---|---|---|---|---|---|---|
| Beginning balance, value at Dec. 31, 2021 | us-gaap_StockholdersEquity | us-gaap_ | xbrli:monetaryItemType | credit | instant | | $ 100,546,596 | $ (68,187,516) | $ 32,359,080 |
| Ending Balance, Shares at Dec. 31, 2021 | us-gaap_SharesOutstanding | us-gaap_ | xbrli:sharesItemType | na | instant | 1 | | | |
| Contributions from parent | us-gaap_ProceedsFromContributionsFromParent | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 316,600 | | 316,600 |
| Issuance of common stock in Spin Out transaction | nbh_IssuanceOfCommonStockInSpinOutTransaction | nbh_ | xbrli:monetaryItemType | credit | duration | $ 16,547 | (16,547) | | |
| Issuance of common stock in Spin Out transaction, Shares | nbh_IssuanceOfCommonStockinSpinOutTransactionShares | nbh_ | xbrli:sharesItemType | na | duration | 165,472,240 | | | |
| Net loss | us-gaap_NetIncomeLoss | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | (7,938,335) | (7,938,335) |
| Stock based compensation | us-gaap_ShareBasedCompensation | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | |
| Ending balance, value at Dec. 14, 2022 | us-gaap_StockholdersEquity | us-gaap_ | xbrli:monetaryItemType | credit | instant | $ 16,547 | 100,846,649 | (76,125,851) | 24,737,345 |
| Ending Balance, Shares at Dec. 14, 2022 | us-gaap_SharesOutstanding | us-gaap_ | xbrli:sharesItemType | na | instant | 165,472,241 | | | |
| Contributions from parent | us-gaap_ProceedsFromContributionsFromParent | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | |
| Net loss | us-gaap_NetIncomeLoss | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | (81,662,591) |
| Stock based compensation | us-gaap_ShareBasedCompensation | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | |
| Ending balance, value at Dec. 31, 2022 | us-gaap_StockholdersEquity | us-gaap_ | xbrli:monetaryItemType | credit | instant | $ 16,547 | 51,345,640 | (81,662,591) | (30,300,404) |
| Ending Balance, Shares at Dec. 31, 2022 | us-gaap_SharesOutstanding | us-gaap_ | xbrli:sharesItemType | na | instant | 165,472,241 | | | |
| Beginning balance, value at Dec. 15, 2022 | us-gaap_StockholdersEquity | us-gaap_ | xbrli:monetaryItemType | credit | instant | $ 16,547 | 51,345,640 | | 51,362,187 |
| Ending Balance, Shares at Dec. 15, 2022 | us-gaap_SharesOutstanding | us-gaap_ | xbrli:sharesItemType | na | instant | 165,472,241 | | | |
| Net loss | us-gaap_NetIncomeLoss | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | (81,662,591) | (81,662,591) |
| Ending balance, value at Dec. 31, 2022 | us-gaap_StockholdersEquity | us-gaap_ | xbrli:monetaryItemType | credit | instant | $ 16,547 | 51,345,640 | (81,662,591) | (30,300,404) |
| Ending Balance, Shares at Dec. 31, 2022 | us-gaap_SharesOutstanding | us-gaap_ | xbrli:sharesItemType | na | instant | 165,472,241 | | | |
| Contributions from parent | us-gaap_ProceedsFromContributionsFromParent | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | |
| Net loss | us-gaap_NetIncomeLoss | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | (37,556,787) | (37,556,787) |
| Common stock issued | us-gaap_StockIssuedDuringPeriodValueNewIssues | us-gaap_ | xbrli:monetaryItemType | credit | duration | $ 8,336 | 15,829,737 | | 15,838,073 |
| Common stock issued, Shares | us-gaap_StockIssuedDuringPeriodSharesNewIssues | us-gaap_ | xbrli:sharesItemType | na | duration | 83,358,275 | | | |
| Stock based compensation | us-gaap_ShareBasedCompensation | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 4,781,279 | | 4,781,279 |
| Ending balance, value at Dec. 31, 2023 | us-gaap_StockholdersEquity | us-gaap_ | xbrli:monetaryItemType | credit | instant | $ 24,883 | $ 71,956,656 | $ (119,219,378) | $ (47,237,839) |
| Ending Balance, Shares at Dec. 31, 2023 | us-gaap_SharesOutstanding | us-gaap_ | xbrli:sharesItemType | na | instant | 248,830,516 | | | |

**Cover - CONSOLIDATED STATEMENTS OF CASH FLOWS**

| CONSOLIDATED STATEMENTS OF CASH FLOWS - USD ($) | XBRL Details | | | | | 1 Months Ended | 11 Months Ended | 12 Months Ended |
|---|---|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2022 | Dec. 14, 2022 | Dec. 31, 2023 |
| **Cash Flows (used in) From Operating Activities** | us-gaap_NetCashProvidedByUsedInOperatingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | |
| Net loss | us-gaap_NetIncomeLoss | us-gaap_ | xbrli:monetaryItemType | credit | duration | $ (81,662,591) | $ (7,938,335) | $ (37,556,787) |
| **Adjustments to reconcile net loss to net cash from operations:** | us-gaap_AdjustmentsToReconcileNetIncomeLossToCashProvidedByUsedInOperatingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | |
| Accretion expense | us-gaap_AccretionExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | 1,092 | | 1,785 |
| Prospect fee offset to note payable | nbh_ProspectFeeOffsetToNotePayable | nbh_ | xbrli:monetaryItemType | debit | duration | | | (368,334) |
| Bad debt expense | us-gaap_ProvisionForDoubtfulAccounts | us-gaap_ | xbrli:monetaryItemType | debit | duration | | (26,612) | |
| Expense related to stock based compensation | us-gaap_ShareBasedCompensation | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | 4,781,279 |
| Impairment loss | us-gaap_GoodwillImpairmentLoss | us-gaap_ | xbrli:monetaryItemType | debit | duration | 80,743,013 | | 27,167,415 |
| **Change in:** | us-gaap_IncreaseDecreaseInOperatingCapitalAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | |
| Accounts receivable | us-gaap_IncreaseDecreaseInAccountsReceivable | us-gaap_ | xbrli:monetaryItemType | credit | duration | | 74,310 | (208,882) |
| Accounts receivable, related party | us-gaap_IncreaseDecreaseInAccountsReceivableRelatedParties | us-gaap_ | xbrli:monetaryItemType | credit | duration | | (14,153) | |
| Prepayments - development costs | nbh_IncreaseDecreaseInPrepaymentsDevelopmentCosts | nbh_ | xbrli:monetaryItemType | credit | duration | | (150,000) | 18,660 |
| Prepaid expenses | us-gaap_IncreaseDecreaseInPrepaidExpense | us-gaap_ | xbrli:monetaryItemType | credit | duration | (58,225) | (1,408) | (14,441) |
| Other assets | us-gaap_IncreaseDecreaseInOtherNoncurrentAssets | us-gaap_ | xbrli:monetaryItemType | credit | duration | 39,185 | (94,364) | (25,000) |
| Accounts payable and accrued expenses | us-gaap_IncreaseDecreaseInAccountsPayableAndAccruedLiabilities | us-gaap_ | xbrli:monetaryItemType | debit | duration | 2,209,867 | 2,524,381 | (1,353,787) |
| Net cash from (used in) operating activities | us-gaap_NetCashProvidedByUsedInOperatingActivities | us-gaap_ | xbrli:monetaryItemType | na | duration | 1,272,341 | (5,626,181) | (7,558,092) |
| **Cash Flows From (used in) Investing Activities** | us-gaap_NetCashProvidedByUsedInInvestingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | |
| Investment in oil and natural gas properties | us-gaap_PaymentsToAcquireOilAndGasPropertyAndEquipment | us-gaap_ | xbrli:monetaryItemType | credit | duration | (3,023,030) | (3,859,851) | (8,653,640) |
| Net cash used in investing activities | us-gaap_NetCashProvidedByUsedInInvestingActivities | us-gaap_ | xbrli:monetaryItemType | debit | duration | (3,023,030) | (3,859,851) | (8,653,640) |
| **Cash Flows From Financing Activities** | us-gaap_NetCashProvidedByUsedInFinancingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | |
| Proceeds from notes payable, related party | nbh_ProceedsFromNotesPayableRelatedParty | nbh_ | xbrli:monetaryItemType | debit | duration | 2,000,000 | 7,500,000 | 18,000,000 |
| Payments on promissory notes | us-gaap_RepaymentsOfNotesPayable | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | (1,000,000) |
| Prepayments, working interest owners | nbh_ProceedsFromPrepaymentsWorkingInterestOwners | nbh_ | xbrli:monetaryItemType | debit | duration | | | 311,281 |
| Contributions from parent, net | us-gaap_ProceedsFromContributionsFromParent | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 316,600 | |
| Net cash from financing activities | us-gaap_NetCashProvidedByUsedInFinancingActivities | us-gaap_ | xbrli:monetaryItemType | debit | duration | 2,000,000 | 7,816,600 | 17,311,281 |
| Net increase (decrease) in cash | us-gaap_CashCashEquivalentsRestrictedCashAndRestrictedCashEquivalentsPeriodIncreaseDecreaseIncludingExchangeRateEffect | us-gaap_ | xbrli:monetaryItemType | debit | duration | 249,311 | (1,669,432) | 1,099,549 |
| Cash - beginning of period | us-gaap_CashAndCashEquivalentsAtCarryingValue | us-gaap_ | xbrli:monetaryItemType | debit | instant | 319,987 | 1,989,419 | 569,298 |
| Cash - end of period | us-gaap_CashAndCashEquivalentsAtCarryingValue | us-gaap_ | xbrli:monetaryItemType | debit | instant | 569,298 | 319,987 | 1,668,847 |
| **Supplemental disclosure of cash flow information:** | us-gaap_SupplementalCashFlowInformationAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | |
| Cash paid for interest | us-gaap_InterestPaidNet | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | 199,345 |
| **Supplemental disclosure of non-cash investing and financing activities:** | us-gaap_NoncashInvestingAndFinancingItemsAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | |
| Common stock issued in spin-out transaction | nbh_CommonStockIssuedInSpinoutTransaction | nbh_ | xbrli:monetaryItemType | debit | duration | | 16,547 | |
| Common stock issued in working interest acquisition | nbh_CommonStockIssuedInWorkingInterestAcquisition | nbh_ | xbrli:monetaryItemType | debit | duration | | | 15,838,073 |
| Account receivable cancelled in WI acquisition | nbh_AccountReceivablerelatedPartyDischargedInWorkingInterestAcquisition | nbh_ | xbrli:monetaryItemType | credit | duration | | | 177,519 |
| Account payable reduced by expense offset | nbh_AccountPayableReducedByExpenseOffset | nbh_ | xbrli:monetaryItemType | debit | duration | 15,638 | | |
| Capitalized Interest | us-gaap_InterestCostsCapitalized | us-gaap_ | xbrli:monetaryItemType | debit | duration | $ 74,210 | $ 1,289,328 | $ 2,498,184 |

**Cover - NATURE OF BUSINESS**

| NATURE OF BUSINESS | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 |
| **Organization, Consolidation and Presentation of Financial Statements [Abstract]** | us-gaap_OrganizationConsolidationAndPresentationOfFinancialStatementsAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| NATURE OF BUSINESS | us-gaap_NatureOfOperations | us-gaap_ | dtr-types:textBlockItemType | na | duration | |

1. **NATURE OF BUSINESS**

Next Bridge Hydrocarbons, Inc. (the "Company") was incorporated in Nevada on August 31, 2021, as OilCo Holdings, Inc. and changed its name to Next Bridge Hydrocarbons, Inc. pursuant to its Amended and Restated Articles of Incorporation filed on June 30, 2022. The Company spun off from Meta Materials, Inc. ("Meta") on December 14, 2022, resulting in the Company becoming an independent company (the "Spin-Off"). Prior to the Spin-Off, the Company was a wholly owned subsidiary of Meta. Meta became the parent of the Company's subsidiaries in June 2021 in a merger transaction with Torchlight Energy Resources, Inc. ("Torchlight"), the previous parent of the subsidiaries and developer of the properties from their inception up to June 2021.

Effective December 14, 2022 (the "Spin-Off Date"), the Company and all of its wholly owned subsidiaries were involved in a spin off transaction from the Company's former parent, Meta. Meta spun the Company and the Company's wholly owned oil and natural gas subsidiaries in fulfillment of a preferred shareholder liability and other working capital items. As part of the Spin-Off, a change in control event occurred. The Company elected to apply "pushdown" accounting by applying the guidance in Accounting Standards Codification Topic ("ASC") 805, Business Combinations, including the recognition of the Company's assets and liabilities at fair value as of December 14, 2022, as the fair value of the new basis of net assets of the Company. Accordingly, the consolidated financial statements of the Company for periods before and after December 14, 2022 reflect different bases of accounting, and the financial positions and results of operations of those periods are not comparable. Throughout the Company's consolidated financial statements and the accompanying notes herein, periods prior to the change of control are identified as "Predecessor" and periods after the change of control are identified as "Successor". Meta no longer owns 100% of the Company and the Company is now owed by various shareholders. The new shareholders received common stock as consideration and the fair value was determined using the income approach.

The following table summarizes the fair value of the assets acquired and liabilities assumed at the Spin-Off Date.

| | |
|---|---|
| **Consideration in common stock** | $ 51,362,187 |
| | |
| **Recognized Assets and Liabilities** | |
| Cash and cash equivalents | $ 319,987 |
| Accounts receivable, related party | 177,519 |
| Prepaids | 154,075 |
| Oil and natural gas properties | 77,645,689 |
| Other assets | 119,364 |
| Accounts payable | (5,310,456) |
| Notes payable | (20,000,000) |
| Accrued interest | (1,498,217) |
| Asset retirement obligation | (245,774) |
| Net Assets Recognized | $ 51,362,187 |

The accompanying consolidated financial statements contain comparative financial disclosures from the consolidated financial statements for 2022 of the predecessor Company, Meta Materials, Inc., described above. Certain items have been restated as detailed in Note 12.

The Company is an energy company engaged in the acquisition, exploration, exploitation and development of oil and natural gas properties in the United States. The Company's primary focus has been the development of interests in an oil and natural gas project the Company holds in the Orogrande Basin in West Texas in Hudspeth County, Texas (the "Orogrande Project"). In addition, the Company has minor interests in the Eastern edge of the Midland Basin in Texas (the "Hazel Project"), and two minor well interests in the Hunton wells located in Oklahoma (the "Oklahoma Properties"). The Company has five full-time employees, and the Company employs consultants for various roles as needed.

The Company operates its business through five wholly owned subsidiaries Torchlight Energy, Inc., a Nevada corporation ("TEI"), Hudspeth Oil Corporation, a Texas corporation ("Hudspeth"), Torchlight Hazel, LLC, a Texas limited liability company ("Torchlight Hazel"), Wolfbone Investments, LLC, a Texas limited liability company ("Wolfbone") and Hudspeth Operating, LLC, a Texas limited liability company and wholly owned subsidiary of Hudspeth ("Hudspeth Operating"). All intercompany transactions have been eliminated in the consolidated financial statements.

Cover - GOING CONCERN

| GOING CONCERN | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 |
| **Organization, Consolidation and Presentation of Financial Statements [Abstract]** | us-gaap_OrganizationConsolidationAndPresentationOfFinancialStatementsAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| GOING CONCERN | us-gaap_SubstantialDoubtAboutGoingConcernTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | **2. GOING CONCERN**<br><br>At December 31, 2023, the Company had not yet achieved profitable operations. The Company had a net loss of $37,556,787 for the year ended December 31, 2023. The Company expects to incur further losses in the development of its business. The Company had a working capital deficit as of December 31, 2023, of $47,094,367. These conditions raise substantial doubt about the Company's ability to continue as a going concern.<br><br>The Company's ability to continue as a going concern is dependent on its ability to generate future profitable operations or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due. Management's plan to address the Company's ability to continue as a going concern includes: (1) obtaining debt or equity funding from private placement, institutional, or public sources; (2) obtaining loans from financial institutions, where possible, or (3) participating in joint venture transactions with third parties. Although management |

believes that it will be able to obtain the necessary funding to allow the Company to remain a going concern through the methods discussed above, there can be no assurances that such methods will prove successful.

These consolidated financial statements have been prepared assuming that the Company will continue as a going concern and therefore, the financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amount and classifications of liabilities that may result from the outcome of this uncertainty.

**Cover - SIGNIFICANT ACCOUNTING POLICIES**

| SIGNIFICANT ACCOUNTING POLICIES | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 |
| **Accounting Policies [Abstract]** | us-gaap_AccountingPoliciesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| SIGNIFICANT ACCOUNTING POLICIES | | | | | | **3.SIGNIFICANT ACCOUNTING POLICIES**<br><br>The Company maintains its accounts on the accrual method of accounting in accordance with accounting principles generally accepted in the United States of America. Accounting principles followed and the methods of applying those principles, which materially affect the determination of financial position, results of operations and cash flows are summarized below:<br><br>***Use of estimates*** —The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make estimates and certain assumptions that affect the amounts reported in these consolidated financial statements and accompanying notes. Actual results could differ from these estimates.<br><br>***Basis of presentation***—The financial statements are presented on a consolidated basis and include the accounts of Next Bridge Hydrocarbons, Inc. and its wholly owned subsidiaries, TEI, Hudspeth, Torchlight Hazel, Wolfbone, and Hudspeth Operating. All |

significant intercompany balances and transactions have been eliminated. As noted above, the Company was involved in the Spin-Off on December 14, 2022.

In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary to fairly present the financial position as of, and the results of operations for all periods presented. In preparing the accompanying financial statements, management has made certain estimates and assumptions that affect reported amounts in the consolidated financial statements and disclosures of contingencies. Actual results may differ from those estimates.

**Restatements** – Certain prior year amounts have been restated in the accompanying Consolidated Financial Statements for 2022. Reference Note 12 to the Financial Statements.

***Risks and uncertainties***— The Company's operations are subject to significant risks and uncertainties, including financial, operational, technological, and other risks associated with operating an emerging business, including the potential risk of business failure.

***Concentration of risks***—At times the Company's

cash balances are in excess of amounts guaranteed by the Federal Deposit Insurance Corporation. The Company's cash is placed with a highly rated financial institution, and the Company regularly monitors the creditworthiness of the financial institutions with which it does business.

***Fair value of financial instruments***—Financial instruments consist of cash, receivables, payables and promissory notes, if any. The estimated fair values of cash, receivables, and payables approximate the carrying amount due to the relatively short maturity of these instruments. The carrying amounts of any promissory notes approximate their fair value giving affect for the term of the note and the effective interest rates.

For assets and liabilities that require re-measurement to fair value the Company categorizes them in a three-level fair value hierarchy as follows:

- Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities.
- Level 2 inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly

through market corroboration.

- Level 3 inputs are unobservable inputs based on management's own assumptions used to measure assets and liabilities at fair value.

A financial asset or liability's classification within the hierarchy is determined based on the lowest level input that is significant to the fair value measurement.

***Cash and cash equivalents*** – Cash and cash equivalents include certain investments in highly liquid instruments with original maturities of three months or less.

***Accounts receivable*** – Accounts receivable consist of amounts due from Joint Interest Billing to the working interest owners who are participants in the Johnson Project. Those owners acquired working interest and participated in funding five wells drilled in 2023 on the Orogrande Project. Balances due represent their pro rata share of charges for development and operating costs allocable to those five wells after applying any prepayments from those owners.

Management reviews receivables periodically and reduces the carrying amount by a valuation allowance that reflects management's best estimate of the amount that

may not be collectible. As of December 31, 2023 and 2022, no valuation allowance was considered necessary.

***Oil and natural gas properties*** – The Company uses the full cost method of accounting for exploration and development activities as defined by the SEC. Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for

impairment at least quarterly and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions. The Company recorded an impairment expense of $27,167,415 to the cost of unevaluated properties for the year ended December 31, 2023, and $80,743,014 for the year ended December 31, 2022.

Gains and losses, if any, on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and natural gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

***Capitalized interest*** – The Company capitalizes interest on unevaluated properties during the periods in which they are excluded from costs being

depleted or amortized. During the year ended December 31, 2023, the Company capitalized $2,498,184 of interest on unevaluated properties. Capitalized interest for the year ended December 31, 2022, was $1,363,538.

***Depreciation, depletion, and amortization*** – The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

***Ceiling test*** – Future production volumes from oil and natural gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and natural gas properties. If the net capitalized cost of proved oil and natural gas properties, net of related deferred income taxes, plus the cost of unproved oil and natural gas properties, exceeds the present value of estimated future net cash flows

| | | | | | |
|---|---|---|---|---|---|
| us-gaap_SignificantAccountingPoliciesTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | discounted at 10 percent, net of related realizable tax affects, plus the cost of unproved oil and natural gas properties, the excess is charged to expense and reflected as additional accumulated DD&A.<br><br>The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.<br><br>The determination of oil and natural gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and natural gas reserves could result in significant |

revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

***Asset retirement obligations*** – The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and natural gas property balance. Settlements

greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

***Share-based compensation*** – Compensation cost for equity awards is based on the fair value of the equity instrument on the date of grant and is recognized over the period during which an employee is required to provide service in exchange for the award.

The Company accounts for stock option awards using the calculated value method. The Company values warrant and option awards using the Black-Scholes option pricing model.

The Company accounts for any forfeitures of options when they occur. Previously recognized compensation cost for an award is reversed in the period that the award is forfeited.

The Company also issues equity awards to non-employees. The fair value of these option awards is estimated when the award recipient completes the contracted professional services. The Company recognizes the expense for the estimated total value of the awards during the period from their issuance until performance completion.

***Income taxes*** – Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences

attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is established to reduce deferred tax assets if it is more likely than not that the related tax benefits will not be realized. Reference Note 8 to the Financial Statements.

Authoritative guidance for uncertainty in income taxes requires that the Company recognize the financial statement benefit of a tax position only after determining that the relevant tax authority would more likely than not sustain the position following an examination. Management has reviewed the Company's tax positions and determined there were no uncertain tax positions requiring recognition in the consolidated financial statements. Company tax returns remain subject to federal and state tax examinations. Generally, the applicable

statutes of limitation are three to four years from their respective filings.

Estimated interest and penalties related to potential underpayment on any unrecognized tax benefits are classified as a component of tax expense in the statements of operation. The Company has not recorded any interest or penalties associated with unrecognized tax benefits for the year ended December 31, 2023, or for the year ended December 31, 2022.

***Revenue recognition*** – The Company's revenue is typically generated from contracts to sell natural gas, crude oil or NGLs produced from interests in oil and natural gas properties owned by the Company. Contracts for the sale of natural gas and crude oil are evidenced by (1) base contracts for the sale and purchase of natural gas or crude oil, which document the general terms and conditions for the sale, and (2) transaction confirmations, which document the terms of each specific sale. The transaction confirmations specify a delivery point which represents the point at which control of the product is transferred to the customer. The Company elects to treat contracts to sell oil and natural gas production as normal sales, which are then accounted for as contracts with customers. The Company has determined that these contracts

represent multiple performance obligations, which are satisfied when control of the commodity transfers to the customer, typically through the delivery of the specified commodity to a designated delivery point.

Revenue is measured based on consideration specified in the contract with the customer, and excludes any amounts collected on behalf of third parties. The Company recognizes revenue in the amount that reflects the consideration it expects to be entitled to in exchange for transferring control of those goods to the customer. Amounts allocated in the Company's price contracts are based on the standalone selling price of those products in the context of long-term contracts. Payment is generally received one or two months after the sale has occurred.

Gain or loss on derivative instruments is outside the scope of ASC 606, *Revenue Recognition*, and is not considered revenue from contracts with customers subject to ASC 606. The Company may in the future use financial or physical contracts accounted for as derivatives as economic hedges to manage price risk associated with normal sales, or in limited cases may use them for contracts the Company intends to physically

settle but do not meet all of the criteria to be treated as normal sales.

*Producer Gas Imbalances.* The Company applies the sales method of accounting for natural gas revenue. Under this method, revenues are recognized based on the actual volume of natural gas sold to purchasers.

***Basic and diluted earnings (loss) per share*** – Basic earnings (loss) per common share is computed by dividing net income (loss) available to common shareholders by the weighted average number of common shares outstanding during the period. Diluted earnings (loss) per common share is computed in the same way as basic earnings (loss) per common share except that the denominator is increased to include the number of additional common shares that would be outstanding if all potential common shares had been issued and if the additional common shares were dilutive. The Company had no dilutive shares for the year ended December 31, 2023, or for the year ended December 31, 2022. Reference Note 7 to the Financial Statements regarding outstanding Stock Options.

***Environmental laws and regulations*** – The Company is subject to extensive federal, state and local environmental laws and

regulations. Environmental expenditures are expensed or capitalized depending on their future economic benefit. The Company believes that it is in compliance with existing laws and regulations. The Company accrued no liability as of December 31, 2023 and December 31, 2022.

***Recent accounting pronouncements adopted*** – In June 2016, the FASB issued ASC 326, Financial Instruments-Credit Losses ("ASC 326"), which replaces the current "incurred loss" methodology for recognizing credit losses with an "expected loss" methodology. This new methodology requires that a financial asset measured at amortized cost be presented at the net amount expected to be collected. This standard is intended to provide more timely decision-useful information about the expected credit losses on financial instruments. For smaller reporting companies, this guidance is effective for fiscal years beginning after December 15, 2022, and early adoption is permitted. The Company adopted this as of January 1, 2023. The adoption of ASC 326 did not have a material impact to our financial statements or results of operations.

**Cover - OIL & NATURAL GAS PROPERTIES**

| OIL & NATURAL GAS PROPERTIES | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 |
| **Extractive Industries [Abstract]** | srt_ExtractiveIndustriesAbstract | srt_ | xbrli:stringItemType | na | duration | |
| OIL & NATURAL GAS PROPERTIES | us-gaap_OilAndGasPropertiesTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | |

**4. OIL & NATURAL GAS PROPERTIES**

The following table presents the capitalized costs for oil and natural gas properties of the Company:

| | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Evaluated costs subject to amortization | $ - | $ - |
| Unevaluated costs | 107,910,429 | 80,743,013 |
| Total capitalized costs | 107,910,429 | 80,743,013 |
| Less accumulated depreciation, depletion and amortization | - | - |
| Less accumulated impairment | (107,910,429) | (80,743,013) |
| Total oil and gas properties | $ - | $ - |

Unevaluated costs as of December 31, 2023, and December 31, 2022, include cumulative costs of developing projects including the Orogrande and Hazel Projects in West Texas and the costs related to the Oklahoma Properties. In accordance with required purchase accounting adjustments related to the Spin-Off, the carrying value of the oil and natural gas assets were adjusted to fair value as of December 15, 2022.

The Company periodically adjusts for the separation of evaluated versus unevaluated costs within its full cost pool to recognize the value impairment related to the expiration of, or changes in market value, of unevaluated leases. The impact of reclassifications as they become necessary is to increase the basis for calculation of future period's depletion, depreciation and amortization which effectively recognizes the impairment on the consolidated statement of operations over future periods. Reclassified costs also become evaluated costs for purposes of ceiling tests, and which may cause recognition of increased impairment expense in future periods. There were no remaining cumulative unevaluated costs which had been reclassified within the Company's full cost pool totals as of December 31, 2023, or December 31, 2022, since the Company had no proved reserve value associated with our properties.

Due to the volatility of commodity prices, should oil and natural gas prices decline in the future, it is possible that a write-down could occur. Proved reserves are estimated quantities of crude oil, natural gas, and NGLs, which geological and engineering data demonstrate with reasonable certainty to be recoverable from known reservoirs under existing economic and operating conditions. The independent engineering estimates include only those amounts considered to be proved reserves and do not include additional amounts which may result from new discoveries in the future, or from application of secondary and tertiary recovery processes where facilities are not in place or for which transportation or marketing contracts are not in place. Estimated reserves to be developed through secondary or tertiary recovery processes are classified as unevaluated properties.

**Current Projects**

The Company is an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. The Company is primarily focused on the acquisition of early-stage projects, the development and delineation of these projects, and then the monetization of those assets once these activities are completed.

The Company's primary focus is the development of interests in oil and natural gas projects it holds in the Permian Basin in West Texas. The Company also holds minor interests in certain other oil and natural gas projects in Central Oklahoma that it is in the process of divesting.

As of December 31, 2023, the Company had interests in three oil and natural gas projects: the Orogrande Project in Hudspeth County, Texas (16 wells), the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, (7 wells) and two wells in Central Oklahoma.

<u>Orogrande Project, West Texas</u>

On August 7, 2014, Torchlight entered into a Purchase Agreement with Hudspeth, McCabe Petroleum Corporation ("MPC"), and Gregory McCabe ("Mr. McCabe"). Mr. McCabe was the sole owner of both Hudspeth and MPC. Under the terms and conditions of the Purchase Agreement, Torchlight purchased 100% of the capital stock of Hudspeth which held certain oil and natural gas assets, including a 100% working interest in approximately 172,000 predominately contiguous acres in the Orogrande Basin in West Texas. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe. Such back-in interest was contributed to the Company pursuant to that certain Contribution Agreement (as defined below). Mr. McCabe also owns a controlling interest in Magdalena, an entity that holds a 4.5% overriding royalty interest in the Orogrande acreage, —which he obtained prior to, and was not a part of the August 2014 transaction.

Effective March 27, 2017, the Orogrande acreage became subject to a University Lands D&D Unit Agreement ("DDU Agreement"), which allows for all 192 existing leases covering approximately 134,000 gross acres leased from University Lands to be combined into one drilling and development unit for development purposes. The term of the DDU Agreement expires on December 31, 2024, and the time to drill on the drilling and development unit continues through December 31, 2024. The DDU Agreement grants the right to extend the DDU Agreement through December 31, 2029 if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid. The Company expects to exercise its option to extend the term under the DDU Agreement prior to its expiration.

Drilling obligations under the DDU Agreement include five wells per year in the years 2021, 2022 and 2023 and five wells in 2024. The drilling obligations are minimum yearly requirements and may be exceeded if acceleration is desired.

*Drilling Requirement 2023*

Effective as of October 6, 2023, the Company and certain investor participants (each a "Participant" and collectively the "Participants") entered into twenty-five separate Participation Agreements (the "Participation Agreements"), "The Johnson Project", to conduct drilling of wells in approximately 17,000 acres in Hudspeth County, Texas, which is a portion of the Company's Orogrande Prospect. The aggregate total of Prospect Fees paid by the participants was $1,700,000.

As of December 31, 2023, the 2023 drilling requirements had been met and leases covering approximately 134,000 acres remain in effect.

While drilling wells under our 2023 and 2022 drilling obligation, our operations team deployed a new mist drilling solution that increased hole stability, which we believe will result in meaningful cost savings for additional wells drilled in the Orogrande Project. Multiple test wells were drilled in the Orogrande Project in order to stay in compliance with the DDU Agreement. While these previously drilled wells may have potential to produce hydrocarbons to sell commercially in the future, we have no immediate plans to deploy the additional capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including reservoir locations, target depths and designated acreage, in the Orogrande Project. Notwithstanding the foregoing, development of the wells continued through December 31, 2023, to further capture and document the scientific base in support of demonstrating the production potential of the property.

*Acquisition of Working Interest*

On December 21, 2022, the Company entered into that certain Agreement and Plan of Merger (the "Merger Agreement") with Hudspeth, Wolfbone, MPC and Mr. McCabe, pursuant to which in a series of transactions the oil and natural gas leases, the lands covered by such leases, pooling and communitization agreements, rights-of-way, the surface estate of the lands and all wells located in Orogrande Project will be transferred, conveyed and assigned to Hudspeth (or its designated assignee) in consideration of (1) treating the Orogrande Obligations (as defined in the Merger Agreement) as having been irrevocably satisfied and discharged in full with respect to MPC and (2) an issuance of 56,297,6[illegible] shares of Company common stock to Mr. McCabe (such series of transactions collectively, the "Merger").

The Merger became effective on April 25, 2023. As a result of the Merger, the Company acquired Wolfbone's 22.6249% remaining rights to working interest in the Orogrande Project in consideration of the issuance by the Company of the 56,297,638 shares of the Company's common stock to Mr. McCabe.

The Merger was completed in accordance with the Texas Business Organizations Code, whereby (a) the Company formed NBH MergeCo, LLC with the State of Texas ("MergeCo") in order to cause Hudspeth to assign all of its rights under the Merger Agreement to MergeCo and MergeCo assumed Hudspeth's obligations under the Merger Agreement, (b) MergeCo, Wolfbone and MPC merged with each of Wolfbone and MPC as surviving entities, and (c) Wolfbone became a direct and wholly-owned subsidiary of the Company. The closing of the transactions contemplated by the Merger Agreement occurred on May 11, 2023.

On May 11, 2023, the Company and its wholly owned subsidiary, Hudspeth, entered into a contribution and exchange agreement with each of the prior working interest owners in the Orogrande Project named in the table below (each an "Orogrande Owner" and collectively, the "Orogrande Owners"), pursuant to which, the Company issued to the Orogrande Owners the number of shares of the Company's common stock set forth opposite such Orogrande Owner's name below in exchange for and in order to acquire such Orogrande Owner's rights to working interest in the Orogrande Project.

| | Shares of Common Stock | Working Interest Contribution |
|---|---|---|
| Dingus Investments, Inc. | 7,050,382 | 2.8334% |
| Pandora Energy, LP | 6,220,779 | 2.5000% |
| Kennedy Minerals, Ltd | 6,220,779 | 2.5000% |
| The de Compiegne Property Company No. 20, Ltd | 6,220,779 | 2.5000% |
| Loma Hombre Energy, LLC | 622,078 | 0.2500% |
| Sero Capital, LLC | 725,840 | 0.2917% |
| **TOTAL** | **27,060,637** | **10.8751%** |

The Orogrande Project ownership as of December 31, 2023, is detailed as follows:

| | Revenue Interest | Working Interest |
|---|---|---|
| University Lands – Mineral Owner | 20.000% | |
| ORRI – Magdalena Royalties, LLC, an entity controlled by Gregory McCabe, Chairman of the Board | 4.500% | |
| ORRI – Unrelated Party | 0.500% | |
| Hudspeth Oil Corporation, a subsidiary of Next Bridge Hydrocarbons, Inc. | 56.250% | 75.000% |
| Wolfbone Investments, LLC, a subsidiary of Next Bridge Hydrocarbons, Inc. | 18.750% | 25.000% |
| | 100.000% | 100.000% |

Hazel Project in the Midland Basin in West Texas

Effective April 4, 2016, TEI acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. A back-in after payout of a 25% working interest was retained by MPC and another unrelated working interest owner.

In October 2016, the holders of all of Torchlight's then-outstanding shares of Series C Preferred Stock (which were issued in July 2016) elected to convert into a total 33.33% working interest in our Hazel Project, reducing TEI's ownership from 66.66% to a 33.33% working interest.

*Acquisition of Additional Interests in Hazel Project*

On January 30, 2017, Torchlight entered into and closed an Agreement and Plan of Reorganization and a Plan of Merger with an entity which was wholly owned by Mr. McCabe, which resulted in the acquisition of approximately 40.66% working interest in the 12,000 gross acres, 9,600 net acres, in the Hazel Project.

Also on January 30, 2017, Torchlight entered into and closed a Purchase and Sale Agreement with Wolfbone. Under the agreement, Torchlight acquired certain of Wolfbone's Hazel Project assets, including its interest in the Flying B Ranch #1 well and the 40-acre unit surrounding the well.

Upon the closing of the transactions, the Torchlight working interest in the Hazel Project increased by 40.66% to a total ownership of 74%.

Effective June 1, 2017, Torchlight acquired an additional 6% working interest from unrelated working interest owners increasing its working interest in the Hazel project to 80%, and an overall net revenue interest of 75%.

Seven test wells have been drilled on the Hazel Project to capture and document the scientific base in support of demonstrating the production potential of the property.

*Option Agreement with Masterson Hazel Partners, LP*

On August 13, 2020, the Company's subsidiaries TEI and Torchlight Hazel (collectively, "Torchlight Subs") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and MPC. Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on the Hazel Project, sufficient to satisfy Torchlight Subs's continuous development obligations on the southern half of the prospect no later than September 30, 2020. MHP has satisfied this drilling obligation. MHP paid Torchlight Subs $1,000 as an option fee at the time of execution of the Option Agreement. MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the Well attributable to Torchlight Subs's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the well.

In exchange for MHP satisfying the above drilling obligations, Torchlight Subs granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight Subs's continuous development obligations on the northern half of the prospect. MHP declined to exercise its option to purchase the entire Hazel Project.

Hunton Play, Central Oklahoma

As of December 31, 2023, the Company was producing from one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

**The McCabe Contribution Agreement**

On July 25, 2023, the Company entered into a Contribution Agreement among the Company, Mr. McCabe, and MPC, an entity exclusively owned and operated by Mr. McCabe (the "McCabe Contribution Agreement"), pursuant to which Mr. McCabe will contribute up to a ten percent (10%) back-in working interest option for the Orogrande Project exercisable following the point in time at which the proceeds of all production from all operations conducted on the Orogrande Project (exclusive of royalty, overriding royalty and taxes chargeable to the working interest) equals the actual cost incurred by NBH and its predecessors in drilling, testing, equipping and the cost of operating the wells located on the Orogrande Prospect, inclusive of overhead charges (the "Back-In Interest"), an option originally granted to Mr. McCabe pursuant to that certain Participation Agreement, dated September 23, 2014 (the "Participation Agreement"), by and among Mr. McCabe, Hudspeth, and MPC, and MPC will contribute up to one hundred percent (100%) of the interest currently held by MPC in the drilling project located on over 1,150 acres in Vermillion Parish, Louisiana (the "Bronco Prospect"). Pursuant to the McCabe Contribution Agreement, and subject to the satisfaction of certain conditions provided therein, including the effectiveness of the Company's Registration Statement on Form S-1 (File No. 333-273442) filed with the SEC on July 26, 2023 (as amended, the "Registration Statement"), Mr. McCabe will contribute an amount of the Back-In Interest and MPC will contribute an amount of the Bronco Prospect in proportion to the percentage of shares of common stock of NBH that are directly registered in the name of the beneficial owner with the Company's transfer agent on or prior to the record date (as defined in the Registration Statement) and remain directly registered with the Company's transfer agent for the holding period (as defined in the Registration Statement).

**Cover - RELATED PARTY BALANCES**

| RELATED PARTY BALANCES | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance T | Period T | Dec. 31, 2023 |
| **Related Party Transactions [Abstract]** | us-gaap_RelatedPartyTransactionsAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| RELATED PARTY BALANCES | | | | | | **5. RELATED PARTY BALANCES**<br><br>As of December 31, 2023, and December 31, 2022, the Company had a balance of $-0- and $177,519, respectively, for an account receivable due from MPC, an entity controlled by the largest shareholder and the chairman of the Company's Board of Directors, for amounts advanced related to the Orogrande development cost sharing arrangement agreed to in connection with the acquisition of the Orogrande working interests in 2014. In connection with the closing of the Merger, the account receivable due from MPC was deemed fully satisfied and discharged.<br><br>*The 2021 Note and Loan Agreement*<br><br>On October 1, 2021, the Company entered into a note payable with Meta, its former parent, to borrow up to $15 million which bears interest at 8% per annum, computed on the basis of a 360-day year (the "2021 Note"). The 2021 Note was initially to mature on March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if the Company |

raised $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date would be extended to September 30, 2023, and the outstanding principal of the 2021 Note would amortize in six equal, monthly installments. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts the Company's ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of its assets, unless the Company is the surviving entity, or the successor entity assumes all of obligations under the 2021 Note. The 2021 Note is collateralized by certain shares of common stock in Meta held by one of Meta's stockholders, Mr. McCabe, and by a lien on a 25% interest in the Orogrande Project owned by Wolfbone, a subsidiary of the Company.

On September 2, 2022, the Company

entered into a loan agreement with Meta, as lender (the "Loan Agreement") that would govern prior loan amounts advanced to the Company from Meta. As of August 11, 2022, and August 29, 2022, the Company borrowed an additional $1.2 million and $1.46 million, respectively, representing the remaining amount available for borrowing under the Loan Agreement and resulting in a total of $5 million principal amount outstanding related to the Loan Agreement, the proceeds of which were used for working capital and general corporate purposes. The term loans under the Loan Agreement bear interest at a per annum rate equal to 8% and were to mature on March 31, 2023 (the "Maturity Date"); provided, however, if the Company raised $30 million or more in capital through debt or equity, or a combination thereof by the Maturity Date, the Maturity Date would be extended to October 3, 2023 and the term loan would be amortized in six equal monthly installments. The Loan Agreement includes customary representations and covenants that, subject to exceptions and qualifications, restrict our ability to do certain things, such as: engage in mergers, acquisitions,

| | | | | | |
|---|---|---|---|---|---|
| us-gaap_RelatedPartyTransactionsDisclosureTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | and asset sales; transact with affiliates; undergo a change in control; incur additional indebtedness; incur liens; make loans and investments; declare dividends or redeem or repurchase equity interests; and enter into certain restrictive agreements. In addition, the Loan Agreement contains customary events of default, mandatory prepayment events and affirmative covenants, including, without limitation, covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our material properties, reporting requirements, compliance with applicable laws and regulations, and formation or acquisition of new subsidiaries.<br><br>On March 31, 2023, the Company entered into an amendment to the 2021 Note and an amendment to Loan Agreement in order to extend each of the 2021 Note Maturity Date and the Maturity Date respectively from March 31, 2023, to October 3, 2023. Such amendments also removed the provisions allowing for extensions of the 2021 Note Maturity Date and the Maturity Date in the event the Company raised $30 million or more in capital |

through debt or equity or a combination thereof by March 31, 2023.

Under the terms of the Arrangement Agreement that governed the merger transaction between Torchlight and Meta in June 2021, the oil and natural gas assets were to be sold or spun out from Meta and the costs of any sale or spin-off incurred by Meta were to be borne the then-existing shareholders of Torchlight. The amount of the reimbursement payable to Meta in connection with the Spin-Off is $2.59 million which was added to the principal amount of the Loan Agreement for a principal balance outstanding of $7.59 million as of March 31, 2023. Concurrently with the amendment to the Loan Agreement, the Company made a prepayment of $1 million to reduce the principal balance to $6.59 million. On August 7, 2023, Mr. McCabe and Meta entered into a Loan Sale Agreement whereby Mr. McCabe purchased from Meta (i) the 2021 Note and (ii) all outstanding loans made to the Company by Meta pursuant to the Loan Agreement (the "Loan Purchase"). As a result of the Loan Purchase, Mr. McCabe replaced Meta as the lender and secured party under the 2021 Note and the Loan

Agreement. Additionally, as part of the Loan Purchase, Meta assigned to Mr. McCabe its lien on 25% of the Orogrande Prospect. The Company's obligations and responsibilities under the 2021 Note and the Loan Agreement remain unchanged.

The combined balance on the 2021 Note and the Loan Agreement as of December 31, 2023 was $21.22 million. As of December 31, 2023, the combined total accrued and unpaid interest under the 2021 Note and the Loan Agreement was $3.06 million.

On October 1, 2023, the Company entered into an amendment to the 2021 Note and an amendment to Loan Agreement in order to extend each of the 2021 Note Maturity Date and the Maturity Date respectively from October 3, 2023 to March 31, 2024. An additional Amendment in March, 2024 extended the maturity date to September 30, 2024.

On December 22, 2022, the Company issued an unsecured promissory note in the principal amount of up to $20 million in favor of Mr. McCabe (the "2022 Note"), which bears interest at 5% per annum, computed on the basis of a 365-day year.

On June 16, 2023, the Company entered into an

amendment to the 2022 Note in order to extend the maturity date of the 2022 Note (the "2022 Note Maturity Date") from June 21, 2023 to October 3, 2023. Such amendment also removed the provisions allowing for extensions of the 2022 Note Maturity Date in the event the Company raised $30 million or more in capital through debt or equity or a combination thereof by March 31, 2023. The revolving commitment under the 2022 Note expires on the 2022 Note Maturity Date. As of December 31, 2023, the Company had $20 million in principal amount outstanding under the 2022 Note. As of December 31, 2023, the Company had $815,202 in accrued but unpaid interest on the 2022 Note.

On December 31, 2023, the Company entered into an amendment to the 2022 Note in order to extend the 2022 Note Maturity Date from October 3, 2023 to March 31, 2024. An additional Amendment in March, 2024 extended the maturity date to September 30, 2024.

**Cover - COMMITMENTS AND CONTINGENCIES**

| COMMITMENTS AND CONTINGENCIES | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance T | Period Ty | Dec. 31, 2023 |
| **Commitments and Contingencies Disclosure [Abstract]** | us-gaap_CommitmentsAndContingenciesDisclosureAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| COMMITMENTS AND CONTINGENCIES | | | | | | **6.COMMITMENTS AND CONTINGENCIES**<br><br>**Legal Matters**<br><br>On April 30, 2020, the Company's wholly owned subsidiary, Hudspeth, filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies ("Cordax"). The suit, *Hudspeth and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies*, was filed in the 189th Judicial District Court of Harris County, Texas. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Wolfbone, a subsidiary of the Company, is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. Meta, as the Company's parent at the time, determined to add the manufacturer of one of the tool components that it contends was one of the causes of the tool failure. It was later disclosed that Cordax is the subsidiary of a Canadian parent company, who has also been added to the case. Cordax's current Chairman of the Board filed a special appearance after being served with a citation, alleging that he was a Canadian citizen with no meaningful ties to Texas. After discovery was conducted on this issue, a nonsuit without prejudice for this defendant was filed, dismissing him |

| | | | | | |
|---|---|---|---|---|---|
| us-gaap_CommitmentsAndContingenciesDisclosureTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | from the case. The remaining parties attended mediation on June 15, 2022, that was unsuccessful in resolving the case. Cordax filed a motion for summary judgment, attempting to dismiss Hudspeth and Wolfbone's claims. The Court denied Cordax's motion. Discovery is substantially complete. The Company is required to indemnify Meta in connection with this matter pursuant to the terms of the Distribution Agreement with Meta entered into in connection with the consummation of the Spin-Off. Prior to trial, in 2024, the parties settled the case. As soon as Cordax fulfills its payment obligations to Hudspeth (the amount of which is confidential), the Harris County case will be dismissed with prejudice. Cordax's releases of Hudspeth and Wolfbone were effective when the Settlement Agreement was signed, May 16, 2024.<br><br>On March 18, 2021, Cordax filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500.01 and recover related attorney's fees. The foreclosure action, *Datalog LWT Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc.*, was filed in the 205th Judicial District Court of Hudspeth County, Texas. The Company is contesting the lien in good faith and filed a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final disposition of the related case currently pending in Harris County, Texas. The Company is required to indemnify Meta in connection with this matter pursuant to the terms of the Distribution Agreement with Meta. As part of the settlement in the Harris County case, Cordax released the mineral lien, and the case has been |

dismissed with prejudice.

On March 15, 2024, a securities class action captioned *Targgart v. Next Bridge Hydrocarbons, Inc., et al.*, No. 24-cv-1927, was filed in the U.S. District Court for the Eastern District of New York. The action is brought on behalf of a putative class of persons or entities that acquired the Company's shares in connection with the Company's spin-off from Meta Materials, Inc., in December 2022. The complaint names as defendants the Company and certain of its current and former officers and directors. The complaint asserts claims under Sections 11 and 15 of the Securities Act, alleging that the Form S-1 that the Company filed with the SEC on July 14, 2022, which became effective on November 18, 2022, contained untrue statements or omissions. The complaint seeks, among other things, unspecified statutory and compensatory damages.

**Environmental Matters**

The Company is subject to contingencies as a result of environmental laws and regulations. Present and future environmental laws and regulations applicable to the Company's operations could require substantial capital expenditures or could adversely affect its operations in other ways that cannot be predicted at this time. As of December 31, 2023, and December 31, 2022, no amounts had been recorded because no specific liability has been identified that is reasonably probable of requiring the Company to fund any future material amounts.

**Cover - STOCKHOLDERS??? EQUITY**

| STOCKHOLDERS’ EQUITY | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 |
| **Equity [Abstract]** | us-gaap_EquityAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| STOCKHOLDERS’ EQUITY | us-gaap_StockholdersEquityNoteDisclosureTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | **7. STOCKHOLDERS’ EQUITY**<br><br>The Company has 500,000,000 authorized shares of common stock, par value of $0.0001 per share and 50,000,000 authorized shares of preferred stock, par value of $0.0001 per share. As of December 31, 2022, the Company had 165,472,241 outstanding shares of common stock outstanding that had been issued in the Spin Out transaction on December 14, 2022, and no shares of preferred stock outstanding.<br><br>On April 25, 2023, the Company issued 83,358,275 shares of common stock for the acquisition of additional working interest in the Orogrande Project.<br><br>As of December 31, 2023, the Company had 248,830,516 outstanding shares of common stock and no shares of preferred stock outstanding.<br><br>**Stock Based Compensation**<br><br>In 2022, the Company’s board of directors adopted, and the stockholders approved, the 2022 Equity Incentive Plan (the “2022 Plan”). The 2022 Plan permits the Company to grant stock options, restricted stock, restricted stock units, performance shares awards and any one or more of the foregoing, for up to a maximum of 58,273,612 shares following an automatic increase to the number of shares reserved under the 2022 Plan on January 1, 2023.<br><br>During the year ended December 31, 2023, the Company granted 35,856,521 stock options in the first and second quarters of 2023 as authorized under the 2022 Plan.<br><br>Upon the resignations by certain of the Company’s employees in the second quarter, 2023, 6,618,889 of the options granted to those employees in March, 2023. were forfeited, canceled, and returned to the option pool available under the 2022 Plan.<br><br>As of December 31, 2023, 29,237,632 options are outstanding.<br><br>Vesting was subject to continued service with the Company for up to one year with provisions for earlier vesting subject to the attainment of events outlined in the Plan.<br><br>Options were fully vested as of December 31, 2023.<br><br>Options granted were valued using the Black-Scholes Option Pricing Model resulting in a total value of $4,781,279. Option expense for the year ended December 31, 2023, net of forfeitures, was $4,781,279.<br><br>Inputs to the Black-Scholes Model are as follows:<br><br>-free 4.00% |

| | |
|---|---|
| interest rate | |
| Expected volatility of common stock | 125.39% |
| Dividend yield | 0.00% |
| Discount due to lack of marketability | 0% |
| Expected life of option/warrant | Ten Years |

A summary of stock options outstanding as of December 31, 2023, all of which expire in 2033, including the relevant exercise price is presented below:

| Exercise Price | Expiration 2033 | Total |
|---|---|---|
| $ 1.2056 | 29,237,632 | 29,237,632 |
| | 29,237,632 | 29,237,632 |

**Cover - INCOME TAXES**

| INCOME TAXES | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 |
| **Income Tax Disclosure [Abstract]** | us-gaap_IncomeTaxDisclosureAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| INCOME TAXES | us-gaap_IncomeTaxDisclosureTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | **8. INCOME TAXES**<br><br>The Company recorded no income tax provision at December 31, 2023 and December 31, 2022 because of anticipated losses for the 2024 fiscal year and actual losses incurred in 2023.<br><br>The Company estimates its annual effective income tax rate in recording its provision for income taxes in the various jurisdictions in which it operates. Statutory tax rate changes and other significant or unusual items are recognized as discrete items in the quarter in which they occur. The Company recorded no income tax expense for the year ended December 31, 2023 because the Company incurred a tax loss in the current year. Similarly, no income tax expense was recognized for the year ended December 31, 2022.<br><br>(see table below)<br><br>The Company had a gross deferred tax asset related to federal net operating loss carryforwards of $69,594,386 and $55,153,554 at December 31, 2023 and December 31, 2022, respectively. The federal net operating loss carryforward will begin to expire in 2034. Realization of the deferred tax asset is dependent, in part, on generating sufficient taxable income prior to expiration of the loss carryforwards. The Company has placed a 100% valuation allowance against the net deferred tax asset because future realization of these assets is not assured. |

| | Year ended December 31, 2023 | Year ended December 31, 2022 |
|---|---|---|
| Total Deferred Tax Assets | $ 10,319,663 | $ 8,257,238 |
| Valuation Allowance for Deferred Tax Assets | (10,319,663) | (8,257,238) |
| Deferred Tax Assets, net of valuation allowance | - | - |
| Total Net Deferred Tax Asset | $ - | $ - |

**Cover - ASSET RETIREMENT OBLIGATIONS**

| ASSET RETIREMENT OBLIGATIONS | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance T | Period Typ | Dec. 31, 2023 |
| **Asset Retirement Obligation Disclosure [Abstract]** | us-gaap_AssetRetirementObligationDisclosureAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| ASSET RETIREMENT OBLIGATIONS | us-gaap_AssetRetirementObligationDisclosureTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | **10. ASSET RETIREMENT OBLIGATIONS**<br>The following is a reconciliation of the asset retirement obligations liability through December 31, 2023:<br>Asset retirement obligations – January 1, 2022 $ 21,937<br>Accretion expense 1,092<br>Estimated liabilities recorded 223,837<br>Asset retirement obligations – December 31, 2022 $246,866<br>Accretion expense 1,785<br>Estimated liabilities recorded -<br>Asset retirement obligations – December 31, 2023 $248,651 |

**Cover - SUBSEQUENT EVENTS**

| SUBSEQUENT EVENTS | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 |
| **Subsequent Events [Abstract]** | us-gaap_SubsequentEventsAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| SUBSEQUENT EVENTS | | | | | | **11.SUBSEQUENT EVENTS**<br><br>On January 23, 2024, Mr. McCabe loaned $1,000,000 to us, which was evidenced under a 0% Senior Unsecured Promissory Note effective as of that date (the "McCabe Note"), which provided, among other things, that the loan will be due on February 28, 2025, with the Company having the option to extend the loan by one additional year. The loan will bear interest at the rate of 0% per annum and will be payable in one balloon payment of principal and interest on the maturity date. If we elect to extend the loan for one year, the loan will continue to bear interest at the rate of 0% per annum and will be payable in one balloon payment of principal and interest on the extended maturity date.<br><br>On February 29, 2024, CAPCO Holding, Inc., a Texas corporation ("Capco"), loaned us $2,000,000 under a 12% Secured Promissory Note (the "Capco Note"), which provides, among other things, that the loan will be due in one year, with us having the option to extend the loan by one additional year. The loan will bear interest at the rate of 12% per annum and will be payable in one balloon payment of principal and |

| | | | | | |
|---|---|---|---|---|---|
| us-gaap_SubsequentEventsTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | interest on the maturity date. If we elect to extend the loan for one year, we must pay all accrued interest for that first year, and thereafter, the loan will bear interest at a rate that is mutually agreeable to us and Capco, which rate will not exceed 18% per annum, and will be payable in one balloon payment of principal and interest on the extended maturity date. As part of the transaction, Gregory McCabe, our Chairman and Chief Executive Officer, entered into a Stock Pledge and Security Agreement with Capco under which he pledged 250,000 of his shares of common stock of the Company to secure our obligations under the Capco Note. Further, Mr. McCabe entered into a Subordination Agreement (the "Subordination Agreement") with Capco and us under which Mr. McCabe agreed to subordinate all of the Company's indebtedness and obligations owed to Mr. McCabe to the Capco Note, under the terms and conditions of the Subordination Agreement.<br><br>Also on February 29, 2024, we entered into a Consulting Agreement with an individual, under which the Consultant has agreed to provide analysis and advisory services to us for consideration of $10,000 per month and the issuance to him of 500,000 shares of common stock, under the terms and conditions of the Consulting Agreement. |

In March 2024, we enter into and closed a Contribution Agreement with Wildcat Partners SPV, LLC, a Delaware limited liability company ("Wildcat"), under which Wildcat transferred to us 100% of the issued and outstanding membership interests in each of (a) Wildcat Cowboy, LLC, a Texas limited liability company ("Cowboy"), (b) Wildcat Packer, LLC, a Texas limited liability company ("Packer"), (c) Wildcat Panther, LLC, a Texas limited liability company ("Panther") and (d) Wildcat Valentine, LLC, a Texas limited liability company ("Valentine"). As consideration, we issued 2,500,000 shares of our common stock, under the terms and conditions of the Contribution Agreement.

Also on April 2, 2024, we entered into a Consulting Agreement with an individual, under which the Consultant has agreed to provide analysis and advisory services to us for consideration of 100,000 shares of common stock.

| EXPLANATION OF THE RESTATEMENT | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 |
| **Explanation Of Restatement** | nbh_DisclosureExplanationOfRestatementAbstract | nbh_ | xbrli:stringItemType | na | duration | |
| EXPLANATION OF THE RESTATEMENT | nbh_ExplanationOfTheRestatementTextBlock | nbh_ | dtr-types:textBlockItemType | na | duration | |

This Form 10-K amends and restates the 2022 Original Filing and the Amendment No. 1 to present restated fiscal year 2022 consolidated financial statements and related disclosures arising from an impairment analysis during the 2023 audit and the related reaudit of the Company's fiscal year 2022 financial statements.

**Items Amended in this Filing – Refer to detail descriptions of adjustments below after each Statement.**

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED BALANCE SHEETS**

| | As Originally Reported December 31, 2022 | Adjustment | As Restated December 31, 2022 |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash | $ 569,298 | $ - | $ 569,298 |
| Accounts receivable | - | - | - |
| Accounts receivable, related party | 177,519 | - | 177,519 |
| Prepayments - development costs | 150,000 | - | 150,000 |
| Prepaid expenses | 62,300 | - | 62,300 |
| Total current assets | 959,117 | - | 959,117 |
| | | | |
| Oil and gas properties | 79,695,928 | (79,695,928) | - |
| | | | |
| Other assets | 80,179 | - | 80,179 |
| | | | |
| TOTAL ASSETS | $ 80,735,224 | (79,695,928) | $ 1,039,296 |
| | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 3,891,649 | $ 1,056,125 | $ 4,947,774 |
| Note Payable - META | 22,573,724 | - | 22,573,724 |
| Note Payable - Related Party | 2,000,000 | - | 2,000,000 |
| Accrued interest payable, unrelated party | 1,571,336 | - | 1,571,336 |
| | | | |
| Total current liabilities | 30,036,709 | 1,056,125 | 31,092,834 |
| | | | |
| Asset retirement obligations | 246,866 | - | 246,866 |
| | | | |
| Total liabilities | 30,283,575 | 1,056,125 | 31,339,700 |
| | | | |
| Commitments and contingencies | | | |
| Stockholders' equity (deficit): | | | |
| Preferred stock, par value $0.001, 500,000,000 shares authorized; -0- issued and outstanding December 31, 2022 and December 31, 2021 | - | - | - |
| Common stock, par value $0.001; 500,000,000 shares authorized; 165,472,241 issued and outstanding at December 31, 2022; One issued and outstanding at December 31, 2021 | 16,547 | - | 16,547 |
| Additional paid-in capital | 51,345,640 | - | 51,345,640 |
| Accumulated deficit | (910,538) | (80,752,053) | (81,662,591) |
| Total stockholders' equity (deficit) | 50,451,649 | (80,752,053) | (30,300,404) |
| | | | |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) | $ 80,735,224 | $ (79,695,928) | $ 1,039,296 |

2022 Balance Sheet restatement reflects the Impairment adjustment to the carrying value of the Company's Oil and Natural gas properties as discussed above. An additional restatement to accounts payable to adjust cut off as of December 31, 2022 was made.

**NEXT BRIDGE HYDROCARBONS INC**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | As Originally Reported<br>Predecessor Period<br>January 1, 2022<br>December 14, 2022 | As Originally Reported<br>Successor Period<br>December 15, 2022<br>December 31, 2022 | Adjustment | As Restated<br>Successor Period<br>December 15, 2022<br>December 31, 2022 |
|---|---|---|---|---|
| Oil and gas sales | $ 38,273 | $ 2,561 | | $ 2,561 |
| Operating expenses: | | | | |
| Lease operating expenses | 68,488 | 5,826 | | 5,826 |
| Production taxes | 2,755 | 229 | | 229 |
| General and administrative | 7,905,860 | 907,045 | 9,040 | 916,085 |
| Impairment expense | - | - | 80,743,013 | 80,743,013 |
| Depreciation, depletion and amortization | - | - | | - |
| Total operating expenses | 7,977,103 | 913,100 | 80,752,053 | 81,665,153 |
| Other income (expense) | | | | |
| Gain on extinguishment of debt | - | - | | - |
| Gain (loss) on sale of assets | - | - | | - |
| Interest expense and accretion of note discounts | - | - | | - |
| Franchise tax | - | - | | - |
| Interest income | 495 | 1 | | 1 |
| Total expense, net | 495 | 1 | - | 1 |
| Loss before income taxes | 7,938,335 | 910,538 | 80,752,053 | 81,662,591 |
| Provision for income taxes | - | - | - | - |
| **Net loss** | $ 7,938,335 | $ 910,538 | $ 80,752,053 | $ 81,662,591 |
| **Loss per common share:** | | | | |
| **Basic and Diluted** | $ (0.05) | $ (0.01) | | $ (0.49) |
| **Weighted average number of common shares outstanding:** | | | | |
| **Basic and Diluted** | 165,472,241 | 165,472,241 | | 165,472,241 |

**Year ended December 31, 2022 Statement of Operations reflects the impairment adjustment described above and an increase of $9,040 in general and administrative expense arising from the adjustment of accounts payable cut off at December 31, 2022**

**NEXT BRIDGE HYDROCARBONS INC**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | As Originally Reported Predecessor Period January 1, 2022 December 14, 2022 | As Originally Reported Successor Period December 15, 2022 December 31, 2022 | Adjustment | As Restated Successor Period December 15, 2022 December 31, 2022 |
|---|---|---|---|---|
| **Cash Flows From Operating Activities (used in)** | | | | |
| Net loss | $ (7,938,335) | $ (910,538) | $(80,752,053) | $ (81,662,591) |
| Adjustments to reconcile net loss to net cash from operations: | | | | |
| Accretion expense | - | 1,092 | - | 1,092 |
| Bad debt expense | (26,612) | - | - | - |
| Impairment expense | - | - | 80,743,013 | 80,743,013 |
| Depreciation, depletion and amortization | - | - | - | - |
| Paid in kind interest | - | - | - | - |
| Change in: | | | - | - |
| Accounts receivable | 74,310 | - | - | - |
| Accounts receivable, related party | (14,153) | - | - | - |
| Prepayments - development costs | (150,000) | - | - | - |
| Other assets | (94,364) | 39,185 | - | 39,185 |
| Prepaid expenses | (1,408) | (58,225) | - | (58,225) |
| Accounts payable and accrued expenses | 2,524,381 | 1,154,917 | 1,054,950 | 2,209,867 |
| Accrued interest payable | - | (1,091) | 1,091 | - |
| **Net cash from(used in) operating activities** | (5,626,181) | 225,340 | 1,047,001 | 1,272,341 |
| | | | | |
| **Cash Flows From (used in) Investing Activities** | | | | |
| Investment in oil and gas properties | (3,859,851) | (1,976,029) | (1,047,001) | (3,023,030) |
| Proceeds from sale of oil and gas property | - | | | |
| **Net cash used in investing activities** | (3,859,851) | (1,976,029) | (1,047,001) | (3,023,030) |
| | | | | |
| **Cash Flows From Financing Activities** | | | | |
| Issuance of common stock, net of offering costs | - | - | | |
| Proceeds from notes payable | 7,500,000 | 2,000,000 | - | 2,000,000 |
| Contributions from parent | 316,600 | - | | |
| **Net cash from financing activities** | 7,816,600 | 2,000,000 | - | 2,000,000 |
| | | | | |
| **Net increase (decrease) in cash** | (1,669,432) | 249,311 | - | 249,311 |
| | | | | |
| **Cash - beginning of year** | 1,989,419 | 319,987 | - | 319,987 |
| **Cash - end of year** | $ 319,987 | $ 569,298 | $ - | $ 569,298 |
| | | | | |
| **Supplemental disclosure of cash flow information:** | | | | |
| Cash paid for interest | $ - | $ - | $ - | $ - |
| Cash paid for state franchise tax | $ - | $ - | $ - | $ - |
| | | | | |
| **Supplemental disclosure of non-cash investing and financing activities:** | | | | |
| | $ - | $ - | $ - | $ - |
| Issuance of common stock | $ 16,547 | $ - | $ - | $ - |
| Account payable reduced by expense offset | $ - | $ 15,638 | $ - | $ 15,638 |
| Capitalized Interest included in interest payable | $ 1,289,328 | $ 74,210 | $ - | $ 74,210 |

**Year ended December 31, 2022 Cash Flow reflects the impairment adjustment described above and an increase of $9,040 in general and administrative expense arising from the adjustment of accounts payable cut off at December 31, 2022. The accounts payable adjustment was primarily connected to vendors for development costs.**

**Cover - SIGNIFICANT ACCOUNTING POLICIES (Policies)**

| SIGNIFICANT ACCOUNTING POLICIES (Policies) | XBRL Details | | | | | 12 Months E ded |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance T | Period Ty | Dec. 31, 2023 |
| **Accounting Policies [Abstract]** | us-gaap_AccountingPoliciesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| Use of estimates | us-gaap_UseOfEstimates | us-gaap_ | dtr-types:textBlockItemType | na | duration | *Use of estimates*—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make estimates and certain assumptions that affect the amounts reported in these consolidated financial statements and accompanying notes. Actual results could differ from these estimates. |
| Basis of presentation | us-gaap_BasisOfAccountingPolicyPolicyTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | *Basis of presentation*—The financial statements are presented on a consolidated basis and include the accounts of Next Bridge Hydrocarbons, Inc. and its wholly owned subsidiaries, TEI, Hudspeth, Torchlight Hazel, Wolfbone, and Hudspeth Operating. All significant intercompany balances and transactions have been eliminated. As noted above, the Company was involved in the Spin-Off on December 14, 2022.<br><br>In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary to fairly present the financial position as of, and the results of operations for all periods presented. In preparing the accompanying financial statements, management has made certain estimates and assumptions |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | that affect reported amounts in the consolidated financial statements and disclosures of contingencies. Actual results may differ from those estimates.<br>**Restatements** – Certain prior year amounts have been restated in the accompanying Consolidated Financial Statements for 2022. Reference Note 12 to the Financial Statements. |
| Risks and uncertainties | nbh_RiskAndUncertaintiesPolicyTextBlock | nbh_ | dtr-types:textBlockItemType | na | duration | ***Risks and uncertainties***— The Company's operations are subject to significant risks and uncertainties, including financial, operational, technological, and other risks associated with operating an emerging business, including the potential risk of business failure. |
| Concentration of risks | us-gaap_ConcentrationRiskCreditRisk | us-gaap_ | dtr-types:textBlockItemType | na | duration | ***Concentration of risks***—At times the Company's cash balances are in excess of amounts guaranteed by the Federal Deposit Insurance Corporation. The Company's cash is placed with a highly rated financial institution, and the Company regularly monitors the creditworthiness of the financial institutions with which it does business. |
| Fair value of financial instruments | | | | | | ***Fair value of financial instruments***— Financial instruments consist of cash, receivables, payables and promissory notes, if any. The estimated fair values of cash, receivables, and payables approximate the carrying amount due to the relatively short maturity of these instruments. The carrying amounts of any promissory notes approximate their |

| | | | | | | |
|---|---|---|---|---|---|---|
| | us-gaap_FairValueOfFinancialInstrumentsPolicy | us-gaap_ | dtr-types:textBlockItemType | na | duration | fair value giving affect for the term of the note and the effective interest rates.<br><br>For assets and liabilities that require re-measurement to fair value the Company categorizes them in a three-level fair value hierarchy as follows:<br><br>• Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities.<br>• Level 2 inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration.<br>• Level 3 inputs are unobservable inputs based on management's own assumptions used to measure assets and liabilities at fair value.<br><br>A financial asset or liability's classification within the hierarchy is determined based on the lowest level input that is significant to the fair value measurement. |
| Cash and cash equivalents | us-gaap_CashAndCashEquivalentsPolicyTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | ***Cash and cash equivalents*** – Cash and cash equivalents include certain investments in highly liquid instruments with original maturities of three months or less. |
| Accounts receivable | | | | | | ***Accounts receivable*** – Accounts receivable consist of amounts due from Joint Interest Billing to the working interest owners who are participants in the Johnson |

| | | | | | | |
|---|---|---|---|---|---|---|
| | us-gaap_TradeAndOtherAccountsReceivablePolicy | us-gaap_ | dtr-types:textBlockItemType | na | duration | Project. Those owners acquired working interest and participated in funding five wells drilled in 2023 on the Orogrande Project. Balances due represent their pro rata share of charges for development and operating costs allocable to those five wells after applying any prepayments from those owners.<br><br>Management reviews receivables periodically and reduces the carrying amount by a valuation allowance that reflects management's best estimate of the amount that may not be collectible. As of December 31, 2023 and 2022, no valuation allowance was considered necessary. |
| Oil and natural gas properties | | | | | | ***Oil and natural gas properties*** – The Company uses the full cost method of accounting for exploration and development activities as defined by the SEC. Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities.<br><br>Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and |

| | | | | | | |
|---|---|---|---|---|---|---|
| | us-gaap_OilAndGasPropertiesPolicyPolicyTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least quarterly and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions. The Company recorded an impairment expense of $27,167,415 to the cost of unevaluated properties for the year ended December 31, 2023, and $80,743,014 for the year ended December 31, 2022.<br><br>Gains and losses, if any, on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and natural gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | are usually charged to accumulated depreciation. |
| Capitalized interest | us-gaap_InterestCapitalizationPolicyPolicyTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | ***Capitalized interest*** – The Company capitalizes interest on unevaluated properties during the periods in which they are excluded from costs being depleted or amortized. During the year ended December 31, 2023, the Company capitalized $2,498,184 of interest on unevaluated properties. Capitalized interest for the year ended December 31, 2022, was $1,363,538. |
| Depreciation, depletion, and amortization | us-gaap_DepreciationDepletionAndAmortizationPolicyTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | ***Depreciation, depletion, and amortization*** – The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method. |
| Ceiling test | | | | | | ***Ceiling test*** – Future production volumes from oil and natural gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and natural gas properties. If the net capitalized cost of proved oil and natural gas properties, net of related deferred income |

| | | | | | |
|---|---|---|---|---|---|
| nbh_CeilingTestPolicyTextBlock | nbh_ | dtr-types:textBlockItemType | na | duration | taxes, plus the cost of unproved oil and natural gas properties, exceeds the present value of estimated future net cash flows discounted at 10 percent, net of related realizable tax affects, plus the cost of unproved oil and natural gas properties, the excess is charged to expense and reflected as additional accumulated DD&A.<br><br>The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.<br><br>The determination of oil and natural gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and natural gas reserves could result in significant |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future. |
| Asset retirement obligations | us-gaap_AssetRetirementObligationsPolicy | us-gaap_ | dtr-types:textBlockItemType | na | duration | ***Asset retirement obligations*** – The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.<br><br>Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and natural gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement. |
| Share-based compensation | | | | | | ***Share-based*** |

| | | | | | | |
|---|---|---|---|---|---|---|
| | us-gaap_ShareBasedCompensationOptionAndIncentivePlansPolicy | us-gaap_ | dtr-types:textBlockItemType | na | duration | ***compensation*** – Compensation cost for equity awards is based on the fair value of the equity instrument on the date of grant and is recognized over the period during which an employee is required to provide service in exchange for the award.<br><br>The Company accounts for stock option awards using the calculated value method. The Company values warrant and option awards using the Black-Scholes option pricing model.<br><br>The Company accounts for any forfeitures of options when they occur. Previously recognized compensation cost for an award is reversed in the period that the award is forfeited.<br><br>The Company also issues equity awards to non-employees. The fair value of these option awards is estimated when the award recipient completes the contracted professional services. The Company recognizes the expense for the estimated total value of the awards during the period from their issuance until performance completion. |
| Income taxes | | | | | | ***Income taxes*** – Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carryforwards. Deferred tax assets and |

| | | | | | | |
|---|---|---|---|---|---|---|
| | us-gaap_IncomeTaxPolicyTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is established to reduce deferred tax assets if it is more likely than not that the related tax benefits will not be realized. Reference Note 8 to the Financial Statements.<br><br>Authoritative guidance for uncertainty in income taxes requires that the Company recognize the financial statement benefit of a tax position only after determining that the relevant tax authority would more likely than not sustain the position following an examination. Management has reviewed the Company's tax positions and determined there were no uncertain tax positions requiring recognition in the consolidated financial statements. Company tax returns remain subject to federal and state tax examinations. Generally, the applicable statutes of limitation are three to four years from their respective filings.<br><br>Estimated interest and penalties related to potential underpayment on any unrecognized tax benefits are classified as a component of tax expense in the statements of operation. The Company has not recorded any interest or |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | penalties associated with unrecognized tax benefits for the year ended December 31, 2023, or for the year ended December 31, 2022. |
| Revenue recognition | us-gaap_RevenueRecognitionPolicyTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | ***Revenue recognition*** – The Company's revenue is typically generated from contracts to sell natural gas, crude oil or NGLs produced from interests in oil and natural gas properties owned by the Company. Contracts for the sale of natural gas and crude oil are evidenced by (1) base contracts for the sale and purchase of natural gas or crude oil, which document the general terms and conditions for the sale, and (2) transaction confirmations, which document the terms of each specific sale. The transaction confirmations specify a delivery point which represents the point at which control of the product is transferred to the customer. The Company elects to treat contracts to sell oil and natural gas production as normal sales, which are then accounted for as contracts with customers. The Company has determined that these contracts represent multiple performance obligations, which are satisfied when control of the commodity transfers to the customer, typically through the delivery of the specified commodity to a designated delivery point.<br><br>Revenue is measured based on consideration specified in the contract with the customer, and excludes any amounts collected on behalf of third parties. The Company recognizes revenue in the |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | amount that reflects the consideration it expects to be entitled to in exchange for transferring control of those goods to the customer. Amounts allocated in the Company's price contracts are based on the standalone selling price of those products in the context of long-term contracts. Payment is generally received one or two months after the sale has occurred.<br><br>Gain or loss on derivative instruments is outside the scope of ASC 606, *Revenue Recognition*, and is not considered revenue from contracts with customers subject to ASC 606. The Company may in the future use financial or physical contracts accounted for as derivatives as economic hedges to manage price risk associated with normal sales, or in limited cases may use them for contracts the Company intends to physically settle but do not meet all of the criteria to be treated as normal sales.<br><br>*Producer Gas Imbalances.* The Company applies the sales method of accounting for natural gas revenue. Under this method, revenues are recognized based on the actual volume of natural gas sold to purchasers. |
| Basic and diluted earnings (loss) per share | | | | | | ***Basic and diluted earnings (loss) per share*** – Basic earnings (loss) per common share is computed by dividing net income (loss) available to common shareholders by the weighted average number of common shares outstanding during the period. Diluted |

| | | | | | | |
|---|---|---|---|---|---|---|
| | us-gaap_EarningsPerSharePolicyTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | earnings (loss) per common share is computed in the same way as basic earnings (loss) per common share except that the denominator is increased to include the number of additional common shares that would be outstanding if all potential common shares had been issued and if the additional common shares were dilutive. The Company had no dilutive shares for the year ended December 31, 2023, or for the year ended December 31, 2022. Reference Note 7 to the Financial Statements regarding outstanding Stock Options. |
| Environmental laws and regulations | us-gaap_RegulatoryEnvironmentalCostsPolicy | us-gaap_ | dtr-types:textBlockItemType | na | duration | ***Environmental laws and regulations*** – The Company is subject to extensive federal, state, and local environmental laws and regulations. Environmental expenditures are expensed or capitalized depending on their future economic benefit. The Company believes that it is in compliance with existing laws and regulations. The Company accrued no liability as of December 31, 2023 and December 31, 2022. |
| Recent accounting pronouncements adopted | | | | | | ***Recent accounting pronouncements adopted*** – In June 2016, the FASB issued ASC 326, Financial Instruments-Credit Losses ("ASC 326"), which replaces the current "incurred loss" methodology for recognizing credit losses with an "expected loss" methodology. This new methodology requires that a financial asset measured at amortized cost |

| | | | | | | |
|---|---|---|---|---|---|---|
| | us-gaap_NewAccountingPronouncementsPolicyPolicyTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | be presented at the net amount expected to be collected. This standard is intended to provide more timely decision-useful information about the expected credit losses on financial instruments. For smaller reporting companies, this guidance is effective for fiscal years beginning after December 15, 2022, and early adoption is permitted. The Company adopted this as of January 1, 2023. The adoption of ASC 326 did not have a material impact to our financial statements or results of operations. |

**Cover - NATURE OF BUSINESS (Tables)**

| NATURE OF BUSINESS (Tables) | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 |
| **Organization, Consolidation and Presentation of Financial Statements [Abstract]** | us-gaap_OrganizationConsolidationAndPresentationOfFinancialStatementsAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| The following table summarizes the fair value of the assets acquired and liabilities assumed at the Spin-Off Date. | nbh_ScheduleOfAssetsAcquiredAndLiabilitiesAssumedAtTheSpinOffDateTableTextBlock | nbh_ | dtr-types:textBlockItemType | na | duration | The following table summarizes the fair value of the assets acquired and liabilities assumed at the Spin-Off Date. |

| | |
|---|---|
| **Consideration in common stock** | $ 51,362,187 |
| | |
| **Recognized Assets and Liabilities** | |
| Cash and cash equivalents | $ 319,987 |
| Accounts receivable, related party | 177,519 |
| Prepaids | 154,075 |
| Oil and natural gas properties | 77,645,689 |
| Other assets | 119,364 |
| Accounts payable | (5,310,456) |
| Notes payable | (20,000,000) |
| Accrued interest | (1,498,217) |
| Asset retirement obligation | (245,774) |
| Net Assets Recognized | $ 51,362,187 |

**Cover - OIL & NATURAL GAS PROPERTIES (Tables)**

| OIL & NATURAL GAS PROPERTIES (Tables) | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 |
| **Extractive Industries [Abstract]** | srt_ExtractiveIndustriesAbstract | srt_ | xbrli:stringItemType | na | duration | |
| Schedule of Capitalized Cost for Oil and Natural Gas | us-gaap_CostIncurredInOilAndGasPropertyAcquisitionExplorationAndDevelopmentActivitiesDisclosureTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | The following table presents the capitalized costs for oil and natural gas properties of the Company: |

| | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Evaluated costs subject to amortization | $ - | $ - |
| Unevaluated costs | 107,910,429 | 80,743,013 |
| Total capitalized costs | 107,910,429 | 80,743,013 |
| Less accumulated depreciation, depletion and amortization | - | - |
| Less accumulated impairment | (107,910,429) | (80,743,013) |
| Total oil and gas properties | $ - | $ - |

Schedule of Common Stock to be issued to Orogrande
Ownersus-gaap_ScheduleOfCommonStockOutstandingRollForwardTableTextBlockus-gaap_dtr-types:textBlockItemTypenaduration

| | Shares of Common Stock | Working Interest Contribution |
|---|---|---|
| Dingus Investments, Inc. | 7,050,382 | 2.8334% |
| Pandora Energy, LP | 6,220,779 | 2.5000% |
| Kennedy Minerals, Ltd | 6,220,779 | 2.5000% |
| The de Compiegne Property Company No. 20, Ltd | 6,220,779 | 2.5000% |
| Loma Hombre Energy, LLC | 622,078 | 0.2500% |
| Sero Capital, LLC | 725,840 | 0.2917% |
| **TOTAL** | **27,060,637** | **10.8751%** |

The Orogrande Project ownership as of December 31, 2023, is detailed as follows:us-gaap_ScheduleOfOtherOwnershipInterestsTextBlockus-gaap_dtr-types:textBlockItemTypenaduration

The Orogrande Project ownership as of December 31, 2023, is detailed as follows:

| | Revenue Interest | Working Interest |
|---|---|---|
| University Lands – Mineral Owner | 20.000% | |
| ORRI – Magdalena Royalties, LLC, an entity controlled by Gregory McCabe, Chairman of the Board | 4.500% | |
| ORRI – Unrelated Party | 0.500% | |
| Hudspeth Oil Corporation, a subsidiary of Next Bridge Hydrocarbons, Inc. | 56.250% | 75.000% |
| Wolfbone Investments, LLC, a subsidiary of Next Bridge Hydrocarbons, Inc. | 18.750% | 25.000% |
| | 100.000% | 100.000% |

**Cover - STOCKHOLDERS??? EQUITY (Tables)**

| STOCKHOLDERS' EQUITY (Tables) | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 |
| **Equity [Abstract]** | us-gaap_EquityAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| Inputs to the Black-Scholes Model are as follows: | us-gaap_DisclosureOfShareBasedCompensationArrangementsByShareBasedPaymentAwardTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | Inputs to the Black-Scholes Model are as follows: |

| | |
|---|---|
| Risk-free interest rate | 4.00% |
| Expected volatility of common stock | 125.39% |
| Dividend yield | 0.00% |
| Discount due to lack of marketability | 0% |
| Expected life of option/warrant | Ten Years |

Schedule of Stock Options Outstandingus-gaap_ScheduleOfStockholdersEquityNoteWarrantsOrRightsTextBlockus-gaap_dtr-types:textBlockItemTypenaduration

A summary of stock options outstanding as of December 31, 2023, all of which expire in 2033, including the relevant exercise price is presented below:

| Exercise Price | Expiration 2033 | Total |
|---|---|---|
| $ 1.2056 | 29,237,632 | 29,237,632 |
| | 29,237,632 | 29,237,632 |

**Cover - INCOME TAXES (Tables)**

| INCOME TAXES (Tables) | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 |
| **Income Tax Disclosure [Abstract]** | us-gaap_IncomeTaxDisclosureAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| Schedule of Deferred Tax Assets | us-gaap_ScheduleOfDeferredTaxAssetsAndLiabilitiesTableTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | |

| | Year ended December 31, 2023 | Year ended December 31, 2022 |
|---|---|---|
| Total Deferred Tax Assets | $ 10,319,663 | $ 8,257,238 |
| Valuation Allowance for Deferred Tax Assets | (10,319,663) | (8,257,238) |
| Deferred Tax Assets, net of valuation allowance | - | - |
| Total Net Deferred Tax Asset | $ - | $ - |

**Cover - ASSET RETIREMENT OBLIGATIONS (Tables)**

| ASSET RETIREMENT OBLIGATIONS (Tables) | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance T | Period Ty | Dec. 31, 2023 |
| **Asset Retirement Obligation Disclosure [Abstract]** | us-gaap_AssetRetirementObligationDisclosureAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| Schedule of Asset Retirement Obligations Liability | us-gaap_ScheduleOfAssetRetirementObligationsTableTextBlock | us-gaap_ | dtr-types:textBlockItemType | na | duration | The following is a reconciliation of the asset retirement obligations liability through December 31, 2023:<br><br>Asset retirement obligations – January 1, 2022 $ 21,937<br>Accretion expense 1,092<br>Estimated liabilities recorded 223,837<br>Asset retirement obligations – December 31, 2022 $246,866<br><br>Accretion expense 1,785<br>Estimated liabilities recorded -<br>Asset retirement obligations – December 31, 2023 $248,651 |

**Cover - NATURE OF BUSINESS (Details)**

| NATURE OF BUSINESS (Details) - USD ($) | XBRL Details | | | | | | 1 Months Ended | 11 Months Ended | 12 Months Ended |
|---|---|---|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 14, 2022 | Dec. 31, 2022 | Dec. 14, 2022 | Dec. 31, 2023 |
| **Organization, Consolidation and Presentation of Financial Statements [Abstract]** | us-gaap_OrganizationConsolidationAndPresentationOfFinancialStatementsAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | |
| Consideration in common stock | nbh_CommonStockIssuedInSpinoutTransaction | nbh_ | xbrli:monetaryItemType | debit | duration | $ 51,362,187 | | $ 16,547 | |
| Business Combination, Recognized Identifiable Assets Acquired and Liabilities Assumed, Cash and Equivalents | us-gaap_BusinessCombinationRecognizedIdentifiableAssetsAcquiredAndLiabilitiesAssumedCashAndEquivalents | us-gaap_ | xbrli:monetaryItemType | debit | instant | 319,987 | | 319,987 | |
| Business Combination, Recognized Identifiable Assets Acquired and Liabilities Assumed, Current Assets, Receivables | us-gaap_BusinessCombinationRecognizedIdentifiableAssetsAcquiredAndLiabilitiesAssumedCurrentAssetsReceivables | us-gaap_ | xbrli:monetaryItemType | debit | instant | 177,519 | | 177,519 | |
| Business Combination, Recognized Identifiable Assets Acquired and Liabilities Assumed, Current Assets, Prepaid Expense and Other Assets | us-gaap_BusinessCombinationRecognizedIdentifiableAssetsAcquiredAndLiabilitiesAssumedCurrentAssetsPrepaidExpenseAndOtherAssets | us-gaap_ | xbrli:monetaryItemType | debit | instant | 154,075 | | 154,075 | |
| Oil and natural gas properties | nbh_BusinessCombinationRecognizedIdentifiableAssetsAcquiredAndLiabilitiesAssumedCurrentAssetsOilAndNaturalGasProperties | nbh_ | xbrli:monetaryItemType | debit | instant | 77,645,689 | | 77,645,689 | |
| Business Combination, Recognized Identifiable Assets Acquired and Liabilities Assumed, Current Assets, Other | us-gaap_BusinessCombinationRecognizedIdentifiableAssetsAcquiredAndLiabilitiesAssumedCurrentAssetsOther | us-gaap_ | xbrli:monetaryItemType | debit | instant | 119,364 | | 119,364 | |
| Business Combination, Recognized Identifiable Assets Acquired and Liabilities Assumed, Current Liabilities, Accounts Payable | us-gaap_BusinessCombinationRecognizedIdentifiableAssetsAcquiredAndLiabilitiesAssumedCurrentLiabilitiesAccountsPayable | us-gaap_ | xbrli:monetaryItemType | credit | instant | (5,310,456) | | (5,310,456) | |
| Notes payable | nbh_BusinessCombinationRecognizedIdentifiableAssetsAcquiredAndLiabilitiesAssumedCurrentLiabilitiesNotesPayable | nbh_ | xbrli:monetaryItemType | credit | instant | (20,000,000) | | (20,000,000) | |
| Accrued interest | nbh_BusinessCombinationRecognizedIdentifiableAssetsAcquiredAndLiabilitiesAssumedCurrentLiabilitiesAccruedInterest | nbh_ | xbrli:monetaryItemType | credit | instant | (1,498,217) | | (1,498,217) | |
| Asset retirement obligation | nbh_BusinessCombinationRecognizedIdentifiableAssetsAcquiredAndLiabilitiesAssumedCurrentLiabilitiesAssetRetirementObligation | nbh_ | xbrli:monetaryItemType | credit | instant | (245,774) | | (245,774) | |
| Business Combination, Recognized Identifiable Assets Acquired and Liabilities Assumed, Net | us-gaap_BusinessCombinationRecognizedIdentifiableAssetsAcquiredAndLiabilitiesAssumedNet | us-gaap_ | xbrli:monetaryItemType | debit | instant | $ 51,362,187 | | $ 51,362,187 | |

**Cover - GOING CONCERN (Details Narrative)**

| GOING CONCERN (Details Narrative) - USD ($) | XBRL Details | | | | | 1 Months Ended | | 11 Months Ended | 12 Months Ended |
|---|---|---|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2022 | Dec. 31, 2022 | Dec. 14, 2022 | Dec. 31, 2023 |
| **Organization, Consolidation and Presentation of Financial Statements [Abstract]** | us-gaap_OrganizationConsolidationAndPresentationOfFinancialStatementsAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | |
| Net Income (Loss) Attributable to Parent | us-gaap_NetIncomeLoss | us-gaap_ | xbrli:monetaryItemType | credit | duration | $ 81,662,591 | $ 81,662,591 | $ 7,938,335 | $ 37,556,787 |
| Working Capital Deficit | nbh_WorkingCapitalDeficit | nbh_ | xbrli:monetaryItemType | credit | instant | | | | $ 47,094,367 |

**Cover - SIGNIFICANT ACCOUNTING POLICIES (Details Narrative)**

| SIGNIFICANT ACCOUNTING POLICIES (Details Narrative) - USD ($) | XBRL Details | | | | | 1 Months Ended | 11 Months Ended | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance T | Period T | Dec. 31, 2022 | Dec. 14, 2022 | Dec. 31, 2023 | Dec. 31, 2022 |
| **Accounting Policies [Abstract]** | us-gaap_AccountingPoliciesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | |
| Goodwill, Impairment Loss | us-gaap_GoodwillImpairmentLoss | us-gaap_ | xbrli:monetaryItemType | debit | duration | $ 80,743,013 | | $ 27,167,415 | $ 80,743,014 |
| Interest Costs Capitalized | us-gaap_InterestCostsCapitalized | us-gaap_ | xbrli:monetaryItemType | debit | duration | 74,210 | $ 1,289,328 | $ 2,498,184 | |
| Accumulated Capitalized Interest Costs | us-gaap_AccumulatedCapitalizedInterestCosts | us-gaap_ | xbrli:monetaryItemType | debit | instant | $ 1,363,538 | | | $ 1,363,538 |

**Cover - OIL & NATURAL GAS PROPERTIES (Details)**

| OIL & NATURAL GAS PROPERTIES (Details) - USD ($) | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 | Dec. 31, 2022 |
|---|---|---|---|---|---|---|---|
| **Extractive Industries [Abstract]** | srt_ExtractiveIndustriesAbstract | srt_ | xbrli:stringItemType | na | duration | | |
| Evaluated costs subject to amortization | nbh_CapitalizedCostsEvaluatedCostsSubjectToAmortization | nbh_ | xbrli:monetaryItemType | debit | instant | | |
| Unevaluated costs | nbh_CapitalizedCostsUnevaluatedCosts | nbh_ | xbrli:monetaryItemType | debit | instant | 107,910,429 | 80,743,013 |
| Total capitalized costs | us-gaap_CapitalizedCostsOilAndGasProducingActivitiesGross | us-gaap_ | xbrli:monetaryItemType | debit | instant | 107,910,429 | 80,743,013 |
| Less accumulated depreciation, depletion and amortization | us-gaap_CapitalizedCostsAccumulatedDepreciationDepletionAmortizationAndValuationAllowanceForRelatingToOilAndGasProducingActivities | us-gaap_ | xbrli:monetaryItemType | credit | instant | | |
| Less accumulated impairment | us-gaap_OilAndGasPropertySuccessfulEffortMethodAccumulatedImpairment | us-gaap_ | xbrli:monetaryItemType | credit | instant | (107,910,429) | (80,743,013) |
| Total oil and gas properties | us-gaap_OilAndGasPropertyFullCostMethodNet | us-gaap_ | xbrli:monetaryItemType | debit | instant | | |

**Cover - OIL & NATURAL GAS PROPERTIES (Details 2)**

| OIL & NATURAL GAS PROPERTIES (Details 2) - shares | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 | May 11, 2023 | Dec. 31, 2022 |
|---|---|---|---|---|---|---|---|---|
| **Reserve Quantities [Line Items]** | srt_ReserveQuantitiesLineItems | srt_ | xbrli:stringItemType | na | duration | | | |
| Common Stock, Shares, Issued | us-gaap_CommonStockSharesIssued | us-gaap_ | xbrli:sharesItemType | na | instant | 248,830,516 | | 165,472,241 |
| Orogrande Project [Member] | us-gaap_BusinessAcquisitionAxis=nbh_OrograndeProjectMember | | na | | | | | |
| **Reserve Quantities [Line Items]** | srt_ReserveQuantitiesLineItems | srt_ | xbrli:stringItemType | na | duration | | | |
| Common Stock, Shares, Issued | us-gaap_CommonStockSharesIssued | us-gaap_ | xbrli:sharesItemType | na | instant | | 27,060,637 | |
| Equity Method Investment, Ownership Percentage | us-gaap_EquityMethodInvestmentOwnershipPercentage | us-gaap_ | dtr-types:percentItemType | na | instant | | 10.8751% | |
| Orogrande Project [Member] \| Dingus Investments, Inc. | us-gaap_BusinessAcquisitionAxis=nbh_OrograndeProjectMember | | na | | | | | |
| **Reserve Quantities [Line Items]** | srt_ReserveQuantitiesLineItems | srt_ | xbrli:stringItemType | na | duration | | | |
| Common Stock, Shares, Issued | us-gaap_CommonStockSharesIssued | us-gaap_ | xbrli:sharesItemType | na | instant | | 7,050,382 | |
| Equity Method Investment, Ownership Percentage | us-gaap_EquityMethodInvestmentOwnershipPercentage | us-gaap_ | dtr-types:percentItemType | na | instant | | 2.8334% | |
| Orogrande Project [Member] \| Pandora Energy, LP | us-gaap_BusinessAcquisitionAxis=nbh_OrograndeProjectMember | | na | | | | | |
| **Reserve Quantities [Line Items]** | srt_ReserveQuantitiesLineItems | srt_ | xbrli:stringItemType | na | duration | | | |
| Common Stock, Shares, Issued | us-gaap_CommonStockSharesIssued | us-gaap_ | xbrli:sharesItemType | na | instant | | 6,220,779 | |
| Equity Method Investment, Ownership Percentage | us-gaap_EquityMethodInvestmentOwnershipPercentage | us-gaap_ | dtr-types:percentItemType | na | instant | | 2.50% | |
| Orogrande Project [Member] \| Kennedy Minerals, Ltd | us-gaap_BusinessAcquisitionAxis=nbh_OrograndeProjectMember | | na | | | | | |
| **Reserve Quantities [Line Items]** | srt_ReserveQuantitiesLineItems | srt_ | xbrli:stringItemType | na | duration | | | |
| Common Stock, Shares, Issued | us-gaap_CommonStockSharesIssued | us-gaap_ | xbrli:sharesItemType | na | instant | | 6,220,779 | |
| Equity Method Investment, Ownership Percentage | us-gaap_EquityMethodInvestmentOwnershipPercentage | us-gaap_ | dtr-types:percentItemType | na | instant | | 2.50% | |
| Orogrande Project [Member] \| The de Compiegne Property Company No. 20, Ltd | us-gaap_BusinessAcquisitionAxis=nbh_OrograndeProjectMember | | na | | | | | |
| **Reserve Quantities [Line Items]** | srt_ReserveQuantitiesLineItems | srt_ | xbrli:stringItemType | na | duration | | | |
| Common Stock, Shares, Issued | us-gaap_CommonStockSharesIssued | us-gaap_ | xbrli:sharesItemType | na | instant | | 6,220,779 | |
| Equity Method Investment, Ownership Percentage | us-gaap_EquityMethodInvestmentOwnershipPercentage | us-gaap_ | dtr-types:percentItemType | na | instant | | 2.50% | |
| Orogrande Project [Member] \| Loma Hombre Energy, LLC | us-gaap_BusinessAcquisitionAxis=nbh_OrograndeProjectMember | | na | | | | | |
| **Reserve Quantities [Line Items]** | srt_ReserveQuantitiesLineItems | srt_ | xbrli:stringItemType | na | duration | | | |
| Common Stock, Shares, Issued | us-gaap_CommonStockSharesIssued | us-gaap_ | xbrli:sharesItemType | na | instant | | 622,078 | |
| Equity Method Investment, Ownership Percentage | us-gaap_EquityMethodInvestmentOwnershipPercentage | us-gaap_ | dtr-types:percentItemType | na | instant | | 0.25% | |
| Orogrande Project [Member] \| Sero Capital, LLC | us-gaap_BusinessAcquisitionAxis=nbh_OrograndeProjectMember | | na | | | | | |
| **Reserve Quantities [Line Items]** | srt_ReserveQuantitiesLineItems | srt_ | xbrli:stringItemType | na | duration | | | |
| Common Stock, Shares, Issued | us-gaap_CommonStockSharesIssued | us-gaap_ | xbrli:sharesItemType | na | instant | | 725,840 | |
| Equity Method Investment, Ownership Percentage | us-gaap_EquityMethodInvestmentOwnershipPercentage | us-gaap_ | dtr-types:percentItemType | na | instant | | 0.2917% | |

**Cover - OIL & NATURAL GAS PROPERTIES (Details 3)**

| OIL & NATURAL GAS PROPERTIES (Details 3) | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 |
| Revenue Interest | nbh_RevenueInterestPercentage | nbh_ | xbrli:pureItemType | na | duration | 100.000 |
| Working Interest | nbh_WorkingInterestPercentage | nbh_ | xbrli:pureItemType | na | duration | 100.000 |
| University Lands - Mineral Owner | srt_ScheduleOfEquityMethodInvestmentEquityMethodInvesteeNameAxis=nbh_UniversityLandsMineralOwnerMember | | na | | | |
| Revenue Interest | nbh_RevenueInterestPercentage | nbh_ | xbrli: ureItem ype | na | duration | 20.000 |
| ORRI - Magdalena Royalties, LLC, an entity controlled by Gregory McCabe | srt_ScheduleOfEquityMethodInvestmentEquityMethodInvesteeNameAxis=nbh_ORRIMagdalenaRoyaltiesLLCAnEntityControlledByGregoryMcCabeMember | | na | | | |
| Revenue Interest | nbh_RevenueInterestPercentage | nbh_ | xbrli:pureItemType | na | duration | 4.500 |
| ORRI - Unrelated Party | srt_ScheduleOfEquityMethodInvestmentEquityMethodInvesteeNameAxis=nbh_ORRIUnrelatedPartyMember | | na | | | |
| Revenue Interest | nbh_RevenueInterestPercentage | nbh_ | xbrli:pureItemType | na | duration | 0.500 |
| Hudspeth Oil Corporation, a subsidiary of Next Bridge Hydrocarbons, Inc. | srt_ScheduleOfEquityMethodInvestmentEquityMethodInvesteeNameAxis=nbh_HudspethOilCorporationASubsidiaryOfNextBridgeHydrocarbonsIncMember | | na | | | |
| Revenue Interest | nbh_RevenueInterestPercentage | nbh_ | xbrli:pureItemType | na | duration | 56.250 |
| Working Interest | nbh_WorkingInterestPercentage | nbh_ | xbrli:pureItemType | na | duration | 75.000 |
| Wolfbone Investments, LLC, an entity controlled by Gregory McCabe | srt_ScheduleOfEquityMethodInvestmentEquityMethodInvesteeNameAxis=nbh_WolfboneInvestmentsLLCAnEntityControlledByGregoryMcCabeMember | | na | | | |
| Revenue Interest | nbh_RevenueInterestPercentage | nbh_ | xbrli:pureItemType | na | duration | 18.750 |
| Working Interest | nbh_WorkingInterestPercentage | nbh_ | xbrli:pureItemType | na | duration | 25.000 |

**Cover - RELATED PARTY BALANCES (Details Narrative)**

| RELATED PARTY BALANCES (Details Narrative) - USD ($) | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 | Dec. 31, 2022 |
|---|---|---|---|---|---|---|---|
| **Related Party Transactions [Abstract]** | us-gaap_RelatedPartyTransactionsAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | |
| Account Receivable. Related Party | nbh_AccountsReceivableRelatedPartiesCurrent1 | nbh_ | xbrli:monetaryItemType | debit | instant | $ (0) | $ 177,519 |

**Cover - STOCKHOLDERS' EQUITY (Details)**

| STOCKHOLDERS' EQUITY (Details) | XBRL Details | | | | | 12 Months Ended |
|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 |
| **Equity [Abstract]** | us-gaap_EquityAbstract | us-gaap_ | xbrli:stringItemType | na | duration | |
| Risk-free interest rate | us-gaap_ShareBasedCompensationArrangementByShareBasedPaymentAwardFairValueAssumptionsRiskFreeInterestRate | us-gaap_ | dtr-types:percentItemType | na | duration | 4.00% |
| Expected volatility of common stock | us-gaap_ShareBasedCompensationArrangementByShareBasedPaymentAwardFairValueAssumptionsExpectedVolatilityRate | us-gaap_ | dtr-types:percentItemType | na | duration | 125.39% |
| Dividend yield | us-gaap_ShareBasedCompensationArrangementByShareBasedPaymentAwardFairValueAssumptionsExpectedDividendRate | us-gaap_ | dtr-types:percentItemType | na | duration | 0.00% |
| Share-Based Compensation Arrangement by Share-Based Payment Award, Fair Value Assumptions, Expected Term | us-gaap_SharebasedCompensationArrangementBySharebasedPaymentAwardFairValueAssumptionsExpectedTerm1 | us-gaap_ | xbrli:durationItemType | na | duration | 10 years |

**Cover - STOCKHOLDERS' EQUITY (Details 2)**

| STOCKHOLDERS' EQUITY (Details 2) | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 $ / shares shares |
|---|---|---|---|---|---|---|
| **Fair Value Measurement Inputs and Valuation Techniques [Line Items]** | us-gaap_FairValueAssetsAndLiabilitiesMeasuredOnRecurringAndNonrecurringBasisValuationTechniquesLineItems | us-gaap_ | xbrli:stringItemType | na | duration | |
| Share-Based Compensation Arrangement by Share-Based Payment Award, Options, Outstanding, Number | us-gaap_ShareBasedCompensationArrangementByShareBasedPaymentAwardOptionsOutstandingNumber | us-gaap_ | xbrli:sharesItemType | na | instant | 29,237,632 |
| Exercise Price 1.2056 | us-gaap_MeasurementInputTypeAxis=nbh_ExercisePriceDollarOnePointTwoZeroFiveSixMember | | na | | | |
| **Fair Value Measurement Inputs and Valuation Techniques [Line Items]** | us-gaap_FairValueAssetsAndLiabilitiesMeasuredOnRecurringAndNonrecurringBasisValuationTechniquesLineItems | us-gaap_ | xbrli:stringItemType | na | duration | |
| Share-Based Compensation Arrangement by Share-Based Payment Award, Options, Outstanding, Number | us-gaap_ShareBasedCompensationArrangementByShareBasedPaymentAwardOptionsOutstandingNumber | us-gaap_ | xbrli:sharesItemType | na | instant | 29,237,632 |
| Share-Based Compensation Arrangement by Share-Based Payment Award, Per Share Weighted Average Price of Shares Purchased \| $ / shares | us-gaap_ShareBasedCompensationArrangementByShareBasedPaymentAwardPerShareWeightedAveragePriceOfSharesPurchased | us-gaap_ | dtr-types:perShareItemType | na | instant | $ 1.2056 |

**Cover - STOCKHOLDERS??? EQUITY (Details Narrative)**

| STOCKHOLDERS' EQUITY (Details Narrative) - USD ($) | XBRL Details | | | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 | Dec. 31, 2022 |
| **Equity [Abstract]** | us-gaap_EquityAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | |
| Common Stock, Shares Authorized | us-gaap_CommonStockSharesAuthorized | us-gaap_ | xbrli:sharesItemType | na | instant | 500,000,000 | 500,000,000 |
| Common Stock, Par or Stated Value Per Share | us-gaap_CommonStockParOrStatedValuePerShare | us-gaap_ | dtr-types:perShareItemType | na | instant | $ 0.0001 | $ 0.0001 |
| Preferred Stock, Shares Authorized | us-gaap_PreferredStockSharesAuthorized | us-gaap_ | xbrli:sharesItemType | na | instant | 50,000,000 | 50,000,000 |
| Preferred Stock, Par or Stated Value Per Share | us-gaap_PreferredStockParOrStatedValuePerShare | us-gaap_ | dtr-types:perShareItemType | na | instant | $ 0.0001 | $ 0.0001 |
| Common Stock, Shares, Outstanding | us-gaap_CommonStockSharesOutstanding | us-gaap_ | xbrli:sharesItemType | na | instant | 248,830,516 | 165,472,241 |
| Preferred Stock, Shares Outstanding | us-gaap_PreferredStockSharesOutstanding | us-gaap_ | xbrli:sharesItemType | na | instant | 0 | 0 |
| Share-Based Compensation Arrangement by Share-Based Payment Award, Options, Outstanding, Intrinsic Value | us-gaap_ShareBasedCompensationArrangementByShareBasedPaymentAwardOptionsOutstandingIntrinsicValue | us-gaap_ | xbrli:monetaryItemType | debit | instant | $ 4,781,279 | |
| Proceeds from Issuance or Sale of Equity | us-gaap_ProceedsFromIssuanceOrSaleOfEquity | us-gaap_ | xbrli:monetaryItemType | debit | duration | $ 4,781,279 | |

**Cover - INCOME TAXES (Details)**

| INCOME TAXES (Details) - USD ($) | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 | Dec. 31, 2022 |
|---|---|---|---|---|---|---|---|
| **Income Tax Disclosure [Abstract]** | us-gaap_IncomeTaxDisclosureAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | |
| Total Deferred Tax Assets | us-gaap_DeferredTaxAssetsGross | us-gaap_ | xbrli:monetaryItemType | debit | instant | $ 10,319,663 | $ 8,257,238 |
| Valuation Allowance for Deferred Tax Assets | us-gaap_DeferredTaxAssetsValuationAllowance | us-gaap_ | xbrli:monetaryItemType | credit | instant | (10,319,663) | (8,257,238) |
| Deferred Tax Assets, net of valuation allowance | us-gaap_DeferredTaxAssetsNet | us-gaap_ | xbrli:monetaryItemType | debit | instant | | |
| Total Net Deferred Tax Asset | us-gaap_DeferredTaxAssetsLiabilitiesNet | us-gaap_ | xbrli:monetaryItemType | debit | instant | | |

**Cover - INCOME TAXES (Details Narrative)**

| INCOME TAXES (Details Narrative) - USD ($) | XBRL Tag Name | XBRL Prefix | Data Type | Balance T | Period T | Dec. 31, 2023 | Dec. 31, 2022 |
|---|---|---|---|---|---|---|---|
| **Income Tax Disclosure [Abstract]** | us-gaap_IncomeTaxDisclosureAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | |
| Operating Loss Carryforwards | us-gaap_OperatingLossCarryforwards | us-gaap_ | xbrli:monetaryItemType | debit | instant | $ 69,594,386 | $ 55,153,554 |

**Cover - ASSET RETIREMENT OBLIGATIONS (Details)**

| ASSET RETIREMENT OBLIGATIONS (Details) - USD ($) | XBRL Details | | | | | 1 Months Ended | 11 Months Ended | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2022 | Dec. 14, 2022 | Dec. 31, 2023 | Dec. 31, 2022 |
| **Asset Retirement Obligation Disclosure [Abstract]** | us-gaap_AssetRetirementObligationDisclosureAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | |
| Asset retirement obligations – January 1, 2022 | us-gaap_AssetRetirementObligationsNoncurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | | $ 21,937 | $ 246,866 | $ 21,937 |
| Accretion expense | us-gaap_AccretionExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | $ 1,092 | | 1,785 | 1,092 |
| Estimated liabilities recorded | us-gaap_AssetRetirementObligationRevisionOfEstimate | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | 223,837 |
| Asset retirement obligations – December 31, 2023 | us-gaap_AssetRetirementObligationsNoncurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | $ 246,866 | | $ 248,651 | $ 246,866 |

**Cover - EXPLANATION OF THE RESTATEMENT (Details)**

| EXPLANATION OF THE RESTATEMENT (Details) - USD ($) | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2023 | Dec. 31, 2022 | Dec. 15, 2022 | Dec. 14, 2022 | Dec. 31, 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Current assets:** | us-gaap_AssetsCurrentAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Cash | us-gaap_CashAndCashEquivalentsAtCarryingValue | us-gaap_ | xbrli:monetaryItemType | debit | instant | $ 1,668,847 | $ 569,298 | | $ 319,987 | $ 1,989,419 |
| Accounts receivable | us-gaap_AccountsReceivableNetCurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | | | | | |
| Accounts receivable, related party | nbh_AccountsReceivableRelatedPartiesCurrent1 | nbh_ | xbrli:monetaryItemType | debit | instant | (0) | 177,519 | | | |
| Prepayments - development costs | nbh_PrepaymentsDevelopmentCosts | nbh_ | xbrli:monetaryItemType | debit | instant | 131,340 | 150,000 | | | |
| Prepaid expenses | us-gaap_PrepaidExpenseCurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | 76,741 | 62,300 | | | |
| Total current assets | us-gaap_AssetsCurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | 2,085,810 | 959,117 | | | |
| Oil and gas properties | us-gaap_OilAndGasPropertyFullCostMethodNet | us-gaap_ | xbrli:monetaryItemType | debit | instant | | | | | |
| Other assets | us-gaap_OtherAssetsNoncurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | 105,179 | 80,179 | | | |
| TOTAL ASSETS | us-gaap_Assets | us-gaap_ | xbrli:monetaryItemType | debit | instant | 2,190,989 | 1,039,296 | | | |
| **Current liabilities:** | us-gaap_LiabilitiesCurrentAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Accounts payable | us-gaap_AccountsPayableCurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | 3,777,693 | 4,947,774 | | | |
| Note Payable - META | us-gaap_NotesPayable | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 22,573,724 | | | |
| Note Payable - Related Party | nbh_NotesPayableRelatedPartiesClassifiedCurrent1 | nbh_ | xbrli:monetaryItemType | credit | instant | 41,221,028 | 2,000,000 | | | |
| Accrued interest payable, unrelated party | us-gaap_InterestPayableCurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 1,571,336 | | | |
| Total current liabilities | us-gaap_LiabilitiesCurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | 49,180,177 | 31,092,834 | | | |
| Asset retirement obligations | us-gaap_AssetRetirementObligationsNoncurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | 248,651 | 246,866 | | | 21,937 |
| Total liabilities | us-gaap_Liabilities | us-gaap_ | xbrli:monetaryItemType | credit | instant | 49,428,828 | 31,339,700 | | | |
| **Stockholders' equity (deficit):** | us-gaap_StockholdersEquityIncludingPortionAttributableToNoncontrollingInterestAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Preferred stock, par value $0.001, 500,000,000 shares authorized; -0- issued and outstanding December 31, 2022 and December 31, 2021 | us-gaap_PreferredStockValue | us-gaap_ | xbrli:monetaryItemType | credit | instant | | | | | |
| Common stock, par value $0.001; 500,000,000 shares authorized; 165,472,241 issued and outstanding at December 31, 2022; One issued and outstanding at December 31, 2021 | us-gaap_CommonStockValue | us-gaap_ | xbrli:monetaryItemType | credit | instant | 24,883 | 16,547 | | | |
| Additional paid-in capital | us-gaap_AdditionalPaidInCapital | us-gaap_ | xbrli:monetaryItemType | credit | instant | 71,956,656 | 51,345,640 | | | |
| Accumulated deficit | us-gaap_RetainedEarningsAccumulatedDeficit | us-gaap_ | xbrli:monetaryItemType | credit | instant | (119,219,378) | (81,662,591) | | | |
| Total deficit | us-gaap_StockholdersEquity | us-gaap_ | xbrli:monetaryItemType | credit | instant | (47,237,839) | (30,300,404) | $ 51,362,187 | 24,737,345 | $ 32,359,080 |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | us-gaap_LiabilitiesAndStockholdersEquity | us-gaap_ | xbrli:monetaryItemType | credit | instant | $ 2,190,989 | 1,039,296 | | | |
| Previously Reported [Member] | srt_RestatementAxis=srt_ScenarioPreviouslyReportedMember | | na | | | | | | | |
| **Current assets:** | us-gaap_AssetsCurrentAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Cash | us-gaap_CashAndCashEquivalentsAtCarryingValue | us-gaap_ | xbrli:monetaryItemType | debit | instant | | 569,298 | | 319,987 | |
| Accounts receivable | us-gaap_AccountsReceivableNetCurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | | | | | |
| Accounts receivable, related party | nbh_AccountsReceivableRelatedPartiesCurrent1 | nbh_ | xbrli:monetaryItemType | debit | instant | | 177,519 | | | |
| Prepayments - development costs | nbh_PrepaymentsDevelopmentCosts | nbh_ | xbrli:monetaryItemType | debit | instant | | 150,000 | | | |
| Prepaid expenses | us-gaap_PrepaidExpenseCurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | | 62,300 | | | |
| Total current assets | us-gaap_AssetsCurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | | 959,117 | | | |
| Oil and gas properties | us-gaap_OilAndGasPropertyFullCostMethodNet | us-gaap_ | xbrli:monetaryItemType | debit | instant | | 79,695,928 | | | |
| Other assets | us-gaap_OtherAssetsNoncurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | | 80,179 | | | |
| TOTAL ASSETS | us-gaap_Assets | us-gaap_ | xbrli:monetaryItemType | debit | instant | | 80,735,224 | | | |
| **Current liabilities:** | us-gaap_LiabilitiesCurrentAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Accounts payable | us-gaap_AccountsPayableCurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 3,891,649 | | | |
| Note Payable - META | us-gaap_NotesPayable | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 22,573,724 | | | |
| Note Payable - Related Party | nbh_NotesPayableRelatedPartiesClassifiedCurrent1 | nbh_ | xbrli:monetaryItemType | credit | instant | | 2,000,000 | | | |
| Accrued interest payable, unrelated party | us-gaap_InterestPayableCurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 1,571,336 | | | |
| Total current liabilities | us-gaap_LiabilitiesCurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 30,036,709 | | | |
| Asset retirement obligations | us-gaap_AssetRetirementObligationsNoncurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 246,866 | | | |
| Total liabilities | us-gaap_Liabilities | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 30,283,575 | | | |
| **Stockholders' equity (deficit):** | us-gaap_StockholdersEquityIncludingPortionAttributableToNoncontrollingInterestAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Preferred stock, par value $0.001, 500,000,000 shares authorized; -0- issued and outstanding December 31, 2022 and December 31, 2021 | us-gaap_PreferredStockValue | us-gaap_ | xbrli:monetaryItemType | credit | instant | | | | | |
| Common stock, par value $0.001; 500,000,000 shares authorized; 165,472,241 issued and outstanding at December 31, 2022; One issued and outstanding at December 31, 2021 | us-gaap_CommonStockValue | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 16,547 | | | |
| Additional paid-in capital | us-gaap_AdditionalPaidInCapital | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 51,345,640 | | | |
| Accumulated deficit | us-gaap_RetainedEarningsAccumulatedDeficit | us-gaap_ | xbrli:monetaryItemType | credit | instant | | (910,538) | | | |
| Total deficit | us-gaap_StockholdersEquity | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 50,451,649 | | | |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | us-gaap_LiabilitiesAndStockholdersEquity | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 80,735,224 | | | |
| Revision of Prior Period, Adjustment [Member] | srt_RestatementAxis=srt_RestatementAdjustmentMember | | na | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Current assets:** | us-gaap_AssetsCurrentAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Cash | us-gaap_CashAndCashEquivalentsAtCarryingValue | us-gaap_ | xbrli:monetaryItemType | debit | instant | | | | | |
| Accounts receivable | us-gaap_AccountsReceivableNetCurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | | | | | |
| Accounts receivable, related party | nbh_AccountsReceivableRelatedPartiesCurrent1 | nbh_ | xbrli:monetaryItemType | debit | instant | | | | | |
| Prepayments - development costs | nbh_PrepaymentsDevelopmentCosts | nbh_ | xbrli:monetaryItemType | debit | instant | | | | | |
| Prepaid expenses | us-gaap_PrepaidExpenseCurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | | | | | |
| Total current assets | us-gaap_AssetsCurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | | | | | |
| Oil and gas properties | us-gaap_OilAndGasPropertyFullCostMethodNet | us-gaap_ | xbrli:monetaryItemType | debit | instant | | (79,695,928) | | | |
| Other assets | us-gaap_OtherAssetsNoncurrent | us-gaap_ | xbrli:monetaryItemType | debit | instant | | | | | |
| TOTAL ASSETS | us-gaap_Assets | us-gaap_ | xbrli:monetaryItemType | debit | instant | | (79,695,928) | | | |
| **Current liabilities:** | us-gaap_LiabilitiesCurrentAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Accounts payable | us-gaap_AccountsPayableCurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 1,056,125 | | | |
| Note Payable - META | us-gaap_NotesPayable | us-gaap_ | xbrli:monetaryItemType | credit | instant | | | | | |
| Note Payable - Related Party | nbh_NotesPayableRelatedPartiesClassifiedCurrent1 | nbh_ | xbrli:monetaryItemType | credit | instant | | | | | |
| Accrued interest payable, unrelated party | us-gaap_InterestPayableCurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | | | | | |
| Total current liabilities | us-gaap_LiabilitiesCurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 1,056,125 | | | |
| Asset retirement obligations | us-gaap_AssetRetirementObligationsNoncurrent | us-gaap_ | xbrli:monetaryItemType | credit | instant | | | | | |
| Total liabilities | us-gaap_Liabilities | us-gaap_ | xbrli:monetaryItemType | credit | instant | | 1,056,125 | | | |
| **Stockholders' equity (deficit):** | us-gaap_StockholdersEquityIncludingPortionAttributableToNoncontrollingInterestAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Preferred stock, par value $0.001, 500,000,000 shares authorized; -0- issued and outstanding December 31, 2022 and December 31, 2021 | us-gaap_PreferredStockValue | us-gaap_ | xbrli:monetaryItemType | credit | instant | | | | | |
| Common stock, par value $0.001; 500,000,000 shares authorized; 165,472,241 issued and outstanding at December 31, 2022; One issued and outstanding at December 31, 2021 | us-gaap_CommonStockValue | us-gaap_ | xbrli:monetaryItemType | credit | instant | | | | | |
| Additional paid-in capital | us-gaap_AdditionalPaidInCapital | us-gaap_ | xbrli:monetaryItemType | credit | instant | | | | | |
| Accumulated deficit | us-gaap_RetainedEarningsAccumulatedDeficit | us-gaap_ | xbrli:monetaryItemType | credit | instant | | (80,752,053) | | | |
| Total deficit | us-gaap_StockholdersEquity | us-gaap_ | xbrli:monetaryItemType | credit | instant | | (80,752,053) | | | |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | us-gaap_LiabilitiesAndStockholdersEquity | us-gaap_ | xbrli:monetaryItemType | credit | instant | | $ (79,695,928) | | | |

**Cover - EXPLANATION OF THE RESTATEMENT (Details 2)**

| EXPLANATION OF THE RESTATEMENT (Details 2) - USD ($) | XBRL Details | | | | | 1 Months Ended | | 11 Months Ended | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2022 | Dec. 31, 2022 | Dec. 14, 2022 | Dec. 31, 2023 | Dec. 31, 2022 |
| Oil and gas sales | us-gaap_Revenues | us-gaap_ | xbrli:monetaryItemType | credit | duration | | $ 2,561 | $ 38,273 | $ 26,031 | |
| **Operating expenses:** | us-gaap_OperatingExpensesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Lease operating expenses | us-gaap_OperatingLeaseExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 5,826 | 68,488 | 59,059 | |
| Production taxes | us-gaap_ProductionTaxExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 229 | 2,755 | 1,874 | |
| General and administrative | us-gaap_GeneralAndAdministrativeExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 916,085 | 7,905,860 | 12,095,611 | |
| Impairment expense | us-gaap_GoodwillImpairmentLoss | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 80,743,013 | | 27,167,415 | $ 80,743,014 |
| Depreciation, depletion and amortization | us-gaap_DepreciationDepletionAndAmortization | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Total operating expenses | us-gaap_OperatingExpenses | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 81,665,153 | 7,977,103 | 39,323,959 | |
| **Other income (expense)** | us-gaap_NonoperatingIncomeExpenseAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Gain on extinguishment of debt | us-gaap_GainsLossesOnExtinguishmentOfDebt | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Gain (loss) on sale of assets | us-gaap_GainsLossesOnSalesOfAssets | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Interest expense and accretion of note discounts | us-gaap_InterestExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Franchise tax | nbh_FranchiseTax | nbh_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Interest income | us-gaap_InterestAndDividendIncomeOperating | us-gaap_ | xbrli:monetaryItemType | credit | duration | | 1 | 495 | 1 | |
| Total expense, net | us-gaap_NonoperatingIncomeExpense | us-gaap_ | xbrli:monetaryItemType | credit | duration | | 1 | 495 | 1,741,141 | |
| Loss before income taxes | us-gaap_IncomeLossFromContinuingOperationsBeforeIncomeTaxesExtraordinaryItemsNoncontrollingInterest | us-gaap_ | xbrli:monetaryItemType | credit | duration | | 81,662,591 | 7,938,335 | 37,556,787 | |
| Provision for income taxes | us-gaap_IncomeTaxExpenseBenefit | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Net loss | us-gaap_NetIncomeLoss | us-gaap_ | xbrli:monetaryItemType | credit | duration | $ 81,662,591 | $ 81,662,591 | $ 7,938,335 | $ 37,556,787 | |
| **Loss per common share:** | nbh_EarningsPerShareBasicAndDiluted1Abstract | nbh_ | xbrli:stringItemType | na | duration | | | | | |
| Basic and Diluted | nbh_EarningsPerShareBasicAndDiluted1 | nbh_ | dtr-types:perShareItemType | na | duration | | $ (0.49) | $ (0.05) | $ (0.21) | |
| **Weighted average number of common shares outstanding:** | nbh_EarningsPerShareBasicAndDilutedOtherDisclosures1Abstract | nbh_ | xbrli:stringItemType | na | duration | | | | | |
| Basic and Diluted | nbh_WeightedAverageNumberOfShareOutstandingBasicAndDiluted1 | nbh_ | xbrli:sharesItemType | na | duration | | 165,472,241 | 165,472,241 | 180,316,865 | |
| Previously Reported [Member] | srt_RestatementAxis=srt_ScenarioPreviouslyReportedMember | | na | | | | | | | |
| Oil and gas sales | us-gaap_Revenues | us-gaap_ | xbrli:monetaryItemType | credit | duration | | $ 2,561 | | | |
| **Operating expenses:** | us-gaap_OperatingExpensesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Lease operating expenses | us-gaap_OperatingLeaseExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 5,826 | | | |
| Production taxes | us-gaap_ProductionTaxExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 229 | | | |
| General and administrative | us-gaap_GeneralAndAdministrativeExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 907,045 | | | |
| Impairment expense | us-gaap_GoodwillImpairmentLoss | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Depreciation, depletion and amortization | us-gaap_DepreciationDepletionAndAmortization | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Total operating expenses | us-gaap_OperatingExpenses | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 913,100 | | | |
| **Other income (expense)** | us-gaap_NonoperatingIncomeExpenseAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Gain on extinguishment of debt | us-gaap_GainsLossesOnExtinguishmentOfDebt | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Gain (loss) on sale of assets | us-gaap_GainsLossesOnSalesOfAssets | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Interest expense and accretion of note discounts | us-gaap_InterestExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Franchise tax | nbh_FranchiseTax | nbh_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Interest income | us-gaap_InterestAndDividendIncomeOperating | us-gaap_ | xbrli:monetaryItemType | credit | duration | | 1 | | | |
| Total expense, net | us-gaap_NonoperatingIncomeExpense | us-gaap_ | xbrli:monetaryItemType | credit | duration | | 1 | | | |
| Loss before income taxes | us-gaap_IncomeLossFromContinuingOperationsBeforeIncomeTaxesExtraordinaryItemsNoncontrollingInterest | us-gaap_ | xbrli:monetaryItemType | credit | duration | | 910,538 | | | |
| Provision for income taxes | us-gaap_IncomeTaxExpenseBenefit | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Net loss | us-gaap_NetIncomeLoss | us-gaap_ | xbrli:monetaryItemType | credit | duration | | $ 910,538 | | | |
| **Loss per common share:** | nbh_EarningsPerShareBasicAndDiluted1Abstract | nbh_ | xbrli:stringItemType | na | duration | | | | | |
| Basic and Diluted | nbh_EarningsPerShareBasicAndDiluted1 | nbh_ | dtr-types:perShareItemType | na | duration | | $ (0.01) | | | |
| **Weighted average number of common shares outstanding:** | nbh_EarningsPerShareBasicAndDilutedOtherDisclosures1Abstract | nbh_ | xbrli:stringItemType | na | duration | | | | | |
| Basic and Diluted | nbh_WeightedAverageNumberOfShareOutstandingBasicAndDiluted1 | nbh_ | xbrli:sharesItemType | na | duration | | 165,472,241 | | | |
| Revision of Prior Period, A t [Member] | srt_RestatementAxis=srt_RestatementAdjustmentMember | | na | | | | | | | |
| **Operating expenses:** | us-gaap_OperatingExpensesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| General and administrative | us-gaap_GeneralAndAdministrativeExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | | $ 9,040 | | | |
| Impairment expense | us-gaap_GoodwillImpairmentLoss | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 80,743,013 | | | |
| Depreciation, depletion and amortization | us-gaap_DepreciationDepletionAndAmortization | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Total operating expenses | us-gaap_OperatingExpenses | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 80,752,053 | | | |
| **Other income (expense)** | us-gaap_NonoperatingIncomeExpenseAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Total expense, net | us-gaap_NonoperatingIncomeExpense | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Loss before income taxes | us-gaap_IncomeLossFromContinuingOperationsBeforeIncomeTaxesExtraordinaryItemsNoncontrollingInterest | us-gaap_ | xbrli:monetaryItemType | credit | duration | | 80,752,053 | | | |
| Provision for income taxes | us-gaap_IncomeTaxExpenseBenefit | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Net loss | us-gaap_NetIncomeLoss | us-gaap_ | xbrli:monetaryItemType | credit | duration | | $ 80,752,053 | | | |

**Cover - EXPLANATION OF THE RESTATEMENT (Details 3)**

| EXPLANATION OF THE RESTATEMENT (Details 3) - USD ($) | XBRL Details | | | | | 1 Months Ended | | 11 Months Ended | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|
| | XBRL Tag Name | XBRL Prefix | Data Type | Balance Type | Period Type | Dec. 31, 2022 | Dec. 31, 2022 | Dec. 14, 2022 | Dec. 31, 2023 | Dec. 31, 2022 |
| **Cash Flows From Operating Activities (used in)** | us-gaap_NetCashProvidedByUsedInOperatingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Net loss | us-gaap_NetIncomeLoss | us-gaap_ | xbrli:monetaryItemType | credit | duration | $ (81,662,591) | $ (81,662,591) | $ (7,938,335) | $ (37,556,787) | |
| **Adjustments to reconcile net loss to net cash from operations:** | us-gaap_AdjustmentsToReconcileNetIncomeLossToCashProvidedByUsedInOperatingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Accretion expense | us-gaap_AccretionExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 1,092 | | 1,785 | $ 1,092 |
| Bad debt expense | us-gaap_ProvisionForDoubtfulAccounts | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | (26,612) | | |
| Impairment expense | us-gaap_GoodwillImpairmentLoss | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 80,743,013 | | 27,167,415 | 80,743,014 |
| Depreciation, depletion and amortization | us-gaap_DepreciationDepletionAndAmortization | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Paid in kind interest | us-gaap_PaidInKindInterest | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| **Change in:** | us-gaap_IncreaseDecreaseInOperatingCapitalAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Accounts receivable | us-gaap_IncreaseDecreaseInAccountsReceivable | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | 74,310 | (208,882) | |
| Accounts receivable, related party | us-gaap_IncreaseDecreaseInAccountsReceivableRelatedParties | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | (14,153) | | |
| Prepayments - development costs | nbh_IncreaseDecreaseInPrepaymentsDevelopmentCosts | nbh_ | xbrli:monetaryItemType | credit | duration | | | (150,000) | 18,660 | |
| Other assets | us-gaap_IncreaseDecreaseInOtherNoncurrentAssets | us-gaap_ | xbrli:monetaryItemType | credit | duration | | 39,185 | (94,364) | (25,000) | |
| Prepaid expenses | us-gaap_IncreaseDecreaseInPrepaidExpense | us-gaap_ | xbrli:monetaryItemType | credit | duration | | (58,225) | (1,408) | (14,441) | |
| Accounts payable and accrued expenses | us-gaap_IncreaseDecreaseInAccountsPayableAndAccruedLiabilities | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 2,209,867 | 2,524,381 | (1,353,787) | |
| Accrued interest payable | nbh_IncreaseDecreaseInAccruedInterestPayable | nbh_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Net cash from(used in) operating activities | us-gaap_NetCashProvidedByUsedInOperatingActivities | us-gaap_ | xbrli:monetaryItemType | na | duration | | 1,272,341 | (5,626,181) | (7,558,092) | |
| **Cash Flows From (used in) Investing Activities** | us-gaap_NetCashProvidedByUsedInInvestingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Investment in oil and gas properties | us-gaap_PaymentsToAcquireOilAndGasPropertyAndEquipment | us-gaap_ | xbrli:monetaryItemType | credit | duration | | (3,023,030) | (3,859,851) | (8,653,640) | |
| Proceeds from sale of oil and gas property | us-gaap_ProceedsFromSaleOfOilAndGasPropertyAndEquipment | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Net cash used in investing activities | us-gaap_NetCashProvidedByUsedInInvestingActivities | us-gaap_ | xbrli:monetaryItemType | debit | duration | | (3,023,030) | (3,859,851) | (8,653,640) | |
| **Cash Flows From Financing Activities** | us-gaap_NetCashProvidedByUsedInFinancingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Issuance of common stock, net of offering costs | us-gaap_ProceedsFromIssuanceOfCommonStock | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Proceeds from notes payable | us-gaap_ProceedsFromNotesPayable | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 2,000,000 | 7,500,000 | | |
| Contributions from parent | us-gaap_ProceedsFromContributionsFromParent | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | 316,600 | | |
| Net cash from financing activities | us-gaap_NetCashProvidedByUsedInFinancingActivities | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 2,000,000 | 7,816,600 | 17,311,281 | |
| Net increase (decrease) in cash | us-gaap_CashCashEquivalentsRestrictedCashAndRestrictedCashEquivalentsPeriodIncreaseDecreaseIncludingExchangeRateEffect | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 249,311 | (1,669,432) | 1,099,549 | |
| Cash - beginning of period | us-gaap_CashAndCashEquivalentsAtCarryingValue | us-gaap_ | xbrli:monetaryItemType | debit | instant | | 319,987 | 1,989,419 | 569,298 | 1,989,419 |
| Cash - end of period | us-gaap_CashAndCashEquivalentsAtCarryingValue | us-gaap_ | xbrli:monetaryItemType | debit | instant | 569,298 | 569,298 | 319,987 | 1,668,847 | 569,298 |
| **Supplemental disclosure of cash flow information:** | us-gaap_SupplementalCashFlowInformationAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Cash paid for interest | us-gaap_InterestPaidNet | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | 199,345 | |
| **Supplemental disclosure of non-cash investing and financing activities:** | us-gaap_NoncashInvestingAndFinancingItemsAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Issuance of common stock | nbh_IssuanceOfCommonStock | nbh_ | xbrli:monetaryItemType | credit | duration | | | 16,547 | | |
| Account payable reduced by expense offset | nbh_AccountPayableReducedByExpenseOffset | nbh_ | xbrli:monetaryItemType | debit | duration | | 15,638 | | | |
| Capitalized Interest included in interest payable | us-gaap_InterestCostsCapitalized | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 74,210 | 1,289,328 | 2,498,184 | |
| Previously Reported [Member] | srt_RestatementAxis=srt_ScenarioPreviouslyReportedMember | | na | | | | | | | |
| **Cash Flows From Operating Activities (used in)** | us-gaap_NetCashProvidedByUsedInOperatingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Net loss | us-gaap_NetIncomeLoss | us-gaap_ | xbrli:monetaryItemType | credit | duration | | (910,538) | | | |
| **Adjustments to reconcile net loss to net cash from operations:** | us-gaap_AdjustmentsToReconcileNetIncomeLossToCashProvidedByUsedInOperatingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Accretion expense | us-gaap_AccretionExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 1,092 | | | |
| Bad debt expense | us-gaap_ProvisionForDoubtfulAccounts | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Impairment expense | us-gaap_GoodwillImpairmentLoss | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Depreciation, depletion and amortization | us-gaap_DepreciationDepletionAndAmortization | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Paid in kind interest | us-gaap_PaidInKindInterest | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| **Change in:** | us-gaap_IncreaseDecreaseInOperatingCapitalAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Accounts receivable | us-gaap_IncreaseDecreaseInAccountsReceivable | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Accounts receivable, related party | us-gaap_IncreaseDecreaseInAccountsReceivableRelatedParties | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Prepayments - development costs | nbh_IncreaseDecreaseInPrepaymentsDevelopmentCosts | nbh_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Other assets | us-gaap_IncreaseDecreaseInOtherNoncurrentAssets | us-gaap_ | xbrli:monetaryItemType | credit | duration | | 39,185 | | | |
| Prepaid expenses | us-gaap_IncreaseDecreaseInPrepaidExpense | us-gaap_ | xbrli:monetaryItemType | credit | duration | | (58,225) | | | |
| Accounts payable and accrued expenses | us-gaap_IncreaseDecreaseInAccountsPayableAndAccruedLiabilities | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 1,154,917 | | | |
| Accrued interest payable | nbh_IncreaseDecreaseInAccruedInterestPayable | nbh_ | xbrli:monetaryItemType | debit | duration | | (1,091) | | | |
| Net cash from(used in) operating activities | us-gaap_NetCashProvidedByUsedInOperatingActivities | us-gaap_ | xbrli:monetaryItemType | na | duration | | 225,340 | | | |
| **Cash Flows From (used in) Investing Activities** | us-gaap_NetCashProvidedByUsedInInvestingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Investment in oil and gas properties | us-gaap_PaymentsToAcquireOilAndGasPropertyAndEquipment | us-gaap_ | xbrli:monetaryItemType | credit | duration | | (1,976,029) | | | |
| Net cash used in investing activities | us-gaap_NetCashProvidedByUsedInInvestingActivities | us-gaap_ | xbrli:monetaryItemType | debit | duration | | (1,976,029) | | | |
| **Cash Flows From Financing Activities** | us-gaap_NetCashProvidedByUsedInFinancingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Issuance of common stock, net of offering costs | us-gaap_ProceedsFromIssuanceOfCommonStock | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Proceeds from notes payable | us-gaap_ProceedsFromNotesPayable | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 2,000,000 | | | |
| Contributions from parent | us-gaap_ProceedsFromContributionsFromParent | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Net cash from financing activities | us-gaap_NetCashProvidedByUsedInFinancingActivities | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 2,000,000 | | | |
| Net increase (decrease) in cash | us-gaap_CashCashEquivalentsRestrictedCashAndRestrictedCashEquivalentsPeriodIncreaseDecreaseIncludingExchangeRateEffect | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 249,311 | | | |
| Cash - beginning of period | us-gaap_CashAndCashEquivalentsAtCarryingValue | us-gaap_ | xbrli:monetaryItemType | debit | instant | | 319,987 | | 569,298 | |
| Cash - end of period | us-gaap_CashAndCashEquivalentsAtCarryingValue | us-gaap_ | xbrli:monetaryItemType | debit | instant | 569,298 | 569,298 | 319,987 | | 569,298 |
| **Supplemental disclosure of cash flow information:** | us-gaap_SupplementalCashFlowInformationAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Cash paid for interest | us-gaap_InterestPaidNet | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | | |
| **Supplemental disclosure of non-cash investing and financing activities:** | us-gaap_NoncashInvestingAndFinancingItemsAbstract | us-gaap_ | xbrli:stringItemType | na | du | | | | | |

APP. 0666

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Issuance of common stock | nbh_IssuanceOfCommonStock | nbh_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Account payable reduced by expense offset | nbh_AccountPayableReducedByExpenseOffset | nbh_ | xbrli:monetaryItemType | debit | duration | | 15,638 | | | |
| Capitalized Interest included in interest payable | us-gaap_InterestCostsCapitalized | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 74,210 | | | |
| Revision of Prior Period, Adjustment [Member] | srt_RestatementAxis=srt_RestatementAdjustmentMember | | na | | | | | | | |
| **Cash Flows From Operating Activities (used in)** | us-gaap_NetCashProvidedByUsedInOperatingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Net loss | us-gaap_NetIncomeLoss | us-gaap_ | xbrli:monetaryItemType | credit | duration | | (80,752,053) | | | |
| **Adjustments to reconcile net loss to net cash from operations:** | us-gaap_AdjustmentsToReconcileNetIncomeLossToCashProvidedByUsedInOperatingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Accretion expense | us-gaap_AccretionExpense | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Bad debt expense | us-gaap_ProvisionForDoubtfulAccounts | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Impairment expense | us-gaap_GoodwillImpairmentLoss | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 80,743,013 | | | |
| Depreciation, depletion and amortization | us-gaap_DepreciationDepletionAndAmortization | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Paid in kind interest | us-gaap_PaidInKindInterest | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| **Change in:** | us-gaap_IncreaseDecreaseInOperatingCapitalAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Accounts receivable | us-gaap_IncreaseDecreaseInAccountsReceivable | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Accounts receivable, related party | us-gaap_IncreaseDecreaseInAccountsReceivableRelatedParties | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Prepayments - development costs | nbh_IncreaseDecreaseInPrepaymentsDevelopmentCosts | nbh_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Other assets | us-gaap_IncreaseDecreaseInOtherNoncurrentAssets | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Prepaid expenses | us-gaap_IncreaseDecreaseInPrepaidExpense | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Accounts payable and accrued expenses | us-gaap_IncreaseDecreaseInAccountsPayableAndAccruedLiabilities | us-gaap_ | xbrli:monetaryItemType | debit | duration | | 1,054,950 | | | |
| Accrued interest payable | nbh_IncreaseDecreaseInAccruedInterestPayable | nbh_ | xbrli:monetaryItemType | debit | duration | | 1,091 | | | |
| Net cash from(used in) operating activities | us-gaap_NetCashProvidedByUsedInOperatingActivities | us-gaap_ | xbrli:monetaryItemType | na | duration | | 1,047,001 | | | |
| **Cash Flows From (used in) Investing Activities** | us-gaap_NetCashProvidedByUsedInInvestingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Investment in oil and gas properties | us-gaap_PaymentsToAcquireOilAndGasPropertyAndEquipment | us-gaap_ | xbrli:monetaryItemType | credit | duration | | (1,047,001) | | | |
| Net cash used in investing activities | us-gaap_NetCashProvidedByUsedInInvestingActivities | us-gaap_ | xbrli:monetaryItemType | debit | duration | | (1,047,001) | | | |
| **Cash Flows From Financing Activities** | us-gaap_NetCashProvidedByUsedInFinancingActivitiesAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Proceeds from notes payable | us-gaap_ProceedsFromNotesPayable | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Net cash from financing activities | us-gaap_NetCashProvidedByUsedInFinancingActivities | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Net increase (decrease) in cash | us-gaap_CashCashEquivalentsRestrictedCashAndRestrictedCashEquivalentsPeriodIncreaseDecreaseIncludingExchangeRateEffect | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Cash - beginning of period | us-gaap_CashAndCashEquivalentsAtCarryingValue | us-gaap_ | xbrli:monetaryItemType | debit | instant | | | | | |
| Cash - end of period | us-gaap_CashAndCashEquivalentsAtCarryingValue | us-gaap_ | xbrli:monetaryItemType | debit | instant | | | | | |
| **Supplemental disclosure of cash flow information:** | us-gaap_SupplementalCashFlowInformationAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Cash paid for interest | us-gaap_InterestPaidNet | us-gaap_ | xbrli:monetaryItemType | credit | duration | | | | | |
| **Supplemental disclosure of non-cash investing and financing activities:** | us-gaap_NoncashInvestingAndFinancingItemsAbstract | us-gaap_ | xbrli:stringItemType | na | duration | | | | | |
| Issuance of common stock | nbh_IssuanceOfCommonStock | nbh_ | xbrli:monetaryItemType | credit | duration | | | | | |
| Account payable reduced by expense offset | nbh_AccountPayableReducedByExpenseOffset | nbh_ | xbrli:monetaryItemType | debit | duration | | | | | |
| Capitalized Interest included in interest payable | us-gaap_InterestCostsCapitalized | us-gaap_ | xbrli:monetaryItemType | debit | duration | | | | | |

# EXHIBIT F

**Exhibit 2.1**

**TORCHLIGHT ENERGY RESOURCES, INC.**

**- and -**

**2798832 ONTARIO INC.**

**- and -**

**2798831 ONTARIO INC.**

**- and -**

**METAMATERIAL INC.**

---

# ARRANGEMENT AGREEMENT

**DECEMBER 14, 2020**

---

**TABLE OF CONTENTS**


| | | |
|---|---|---|
| **ARTICLE 1 INTERPRETATION** | | **4** |
| 1.1 | Definitions | 4 |
| 1.2 | Interpretation | 20 |
| 1.3 | Number, Gender and Persons | 20 |
| 1.4 | Date for Any Action | 20 |
| 1.5 | Currency | 21 |
| 1.6 | Accounting Matters | 21 |
| 1.7 | Knowledge | 21 |
| 1.8 | Schedules | 21 |
| **ARTICLE 2 THE ARRANGEMENT** | | **22** |
| 2.1 | Arrangement | 22 |
| 2.2 | Obligations of Meta | 22 |
| 2.3 | Interim Order | 23 |
| 2.4 | Meta Meeting | 24 |
| 2.5 | Meta Circular | 24 |
| 2.6 | Final Order | 26 |
| 2.7 | Court Proceedings | 26 |
| 2.8 | Articles of Arrangement and Effective Date | 26 |
| 2.9 | Payment of Consideration | 27 |
| 2.10 | RTO Acquiror Proxy Statement | 27 |
| 2.11 | RTO Acquiror Meeting | 29 |
| 2.12 | Obligations Regarding Exchangeable Shares | 30 |
| 2.13 | RTO Acquiror Post-Closing Governance | 31 |
| 2.14 | RTO Acquiror Business Sale | 31 |
| 2.15 | Preferred Stock Dividend | 32 |
| 2.16 | Pre-Closing Financing | 32 |
| 2.17 | Reverse Split | 32 |
| 2.18 | Announcements and Consultations | 32 |
| 2.19 | Withholding Taxes | 33 |
| 2.20 | Holders of Convertible Securities | 33 |
| 2.21 | U.S. Securities Law Matters | 34 |
| 2.22 | U.S. Tax Matters | 35 |
| **ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF METAMATERIAL** | | **35** |
| 3.1 | Representations and Warranties of Meta | 35 |
| 3.2 | Survival of Representations and Warranties | 35 |
| **ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF RTO ACQUIROR, CANCO AND CALLCO** | | **36** |
| 4.1 | Representations and Warranties of RTO Acquiror | 36 |
| 4.2 | Survival of Representations and Warranties | 36 |
| **ARTICLE 5 COVENANTS** | | **36** |
| 5.1 | Covenants of Meta Relating to the Arrangement | 36 |
| 5.2 | Covenants of RTO Acquiror, Canco and Callco Relating to the Arrangement | 38 |
| 5.3 | Covenants of RTO Acquiror, Canco and Callco Relating to the Conduct of RTO Acquiror Business | 40 |
| 5.4 | Covenants of Meta Relating to the Conduct of Meta Business | 44 |

**ARTICLE 6 CONDITIONS** **46**
6.1 Mutual Conditions Precedent 46
6.2 Additional Conditions Precedent in Favour of RTO Acquiror, Canco and Callco 47
6.3 Additional Conditions Precedent in Favour of Meta 48
6.4 Notice and Cure Provisions 49
6.5 Satisfaction of Conditions 50

**ARTICLE 7 ADDITIONAL COVENANTS** **50**
7.1 Covenant Regarding Non-Solicitation 50
7.2 Covenant Regarding Acquisition Proposals 50
7.3 Responding to an Acquisition Proposal 52
7.4 Superior Proposals; Intervening Events; Right to Match 53
7.5 Access to Information; Confidentiality; Transition 56
7.6 Supplementary Bridge Financing 56
7.7 Other Deliveries 56

**ARTICLE 8 TERM, TERMINATION, AMENDMENT AND WAIVER** **57**
8.1 Term 57
8.2 Termination 57
8.3 Expenses and Termination Payments 59
8.4 Amendment 61
8.5 Waiver 61

**ARTICLE 9 GENERAL PROVISIONS AND MISCELLANEOUS** **62**
9.1 Privacy 62
9.2 Notices 62
9.3 Governing Law 63
9.4 Injunctive Relief 64
9.5 Time of Essence 64
9.6 Entire Agreement, Binding Effect and Assignment 64
9.7 No Liability 64
9.8 Severability 64
9.9 Counterparts, Execution 64

**SCHEDULES**

SCHEDULE A – PLAN OF ARRANGEMENT
SCHEDULE B – META ARRANGEMENT RESOLUTION
SCHEDULE C – REPRESENTATIONS AND WARRANTIES OF META
SCHEDULE D – REPRESENTATIONS AND WARRANTIES OF RTO ACQUIROR
SCHEDULE E – SENIOR OFFICERS OF META
SCHEDULE F – SENIOR OFFICERS OF RTO ACQUIROR
SCHEDULE G – KEY REGULATORY APPROVALS
SCHEDULE H – FORM OF SUPPORT AGREEMENT
SCHEDULE I – FORM OF VOTING AND EXCHANGE TRUST AGREEMENT
SCHEDULE J – FORM OF RTO ACQUIROR CERTIFICATE OF DESIGNATION
SCHEDULE K – FORM OF LOCK-UP AGREEMENT

**ARRANGEMENT AGREEMENT**

**ARRANGEMENT AGREEMENT** dated December 14, 2020 among TORCHLIGHT ENERGY RESOURCES, INC., a corporation existing under the laws of Nevada ("**RTO Acquiror**"), 2798832 ONTARIO INC., a corporation existing under the laws of the Province of Ontario ("**Canco**"), 2798831 ONTARIO INC., a corporation existing under the laws of the Province of Ontario ("**Callco**") and METAMATERIAL INC., a corporation existing under the laws of the Province of Ontario ("**Meta**").

**WHEREAS:**

A. RTO Acquiror, Canco, Callco and Meta wish to complete a transaction pursuant to which, among other things, RTO Acquiror will, indirectly through Canco, acquire all of the Meta Shares in exchange for the Consideration, by way of a statutory plan of arrangement, which is to be completed under the provisions of the OBCA on and subject to the terms and conditions contained herein;

B. the Meta Financial Advisor has advised the Meta Board, and the Meta Board has determined, that the Consideration to be received by the Meta Shareholders pursuant to the Arrangement is fair, from a financial point of view, to the Meta Shareholders;

C. the Meta Board has determined, after having considered financial and legal advice, that it would be advisable and in the best interests of Meta and the Meta Shareholders for the Meta Board to unanimously recommend that Meta Securityholders vote in favour of the Meta Arrangement Resolution at the Meta Meeting;

D. RTO Acquiror has entered into the Meta Voting Agreements with the Meta Supporting Shareholders, pursuant to which, among other things, such Meta Supporting Shareholders agree, subject to the terms and conditions thereof, to vote the Meta Shares and any securities convertible, exercisable or exchangeable into Meta Shares held by them in favour of the Meta Arrangement Resolution;

E. the RTO Acquiror Financial Advisor has advised the RTO Acquiror Board, and the RTO Acquiror Board has determined, that the Arrangement is fair, from a financial point of view, to the RTO Acquiror Shareholders;

F. the RTO Acquiror Board has determined, after having considered financial and legal advice, that it would be advisable and in the best interests of RTO Acquiror and the RTO Acquiror Shareholders for the RTO Acquiror Board to unanimously recommend that RTO Acquiror Shareholders vote in favour of the RTO Acquiror Shareholder Approval Matters at the RTO Acquiror Meeting;

G. Meta has entered into the RTO Acquiror Voting Agreements with the RTO Acquiror Supporting Shareholders, pursuant to which, among other things, such RTO Acquiror Supporting Shareholders agree, subject to the terms and conditions thereof, to vote the RTO Acquiror Shares and any securities convertible, exercisable or exchangeable into RTO Acquiror Shares held by them in favour of the RTO Acquiror Shareholder Approval Matters;

H. certain persons have entered or will prior to the Effective Time enter into the Lock-Up Agreement, pursuant to which, among other things, such persons agree to lock-up and not sell, transfer or otherwise dispose of their relevant shares;

I. the Parties intend that the plan of arrangement provide certain Meta Shareholders with the opportunity to exchange Meta Shares for Exchangeable Shares on a tax-deferred basis for Canadian Tax purposes;

J. the Parties have entered into this Agreement to provide for the matters referred to in the foregoing recitals and for other matters relating to the Arrangement; and

K. Capitalized terms used but not otherwise defined in these recitals have the meanings ascribed to such terms in Section 1.1.

**NOW THEREFORE** in consideration of the covenants and agreements herein contained and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the Parties hereto covenant and agree as follows:

## ARTICLE 1
## INTERPRETATION

### 1.1 Definitions

In this Agreement, unless the context otherwise requires:

"**Acceptable Confidentiality Agreement**" has the meaning ascribed thereto in Subsection 7.3(a)(iv);

"**Acquisition Proposal**" means, with respect to Meta, a Meta Acquisition Proposal, and, with respect to RTO Acquiror, an RTO Acquiror Acquisition Proposal;

"**affiliate**" has the meaning ascribed thereto in the Securities Act;

"**Agreement**" means this arrangement agreement, including all schedules annexed hereto, together with the Meta Disclosure Letter and the RTO Acquiror Disclosure Letter, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof;

"**Alternative Acquisition Agreement**" has the meaning ascribed thereto in Subsection 7.2(a)(iv);

"**Arrangement**" means the arrangement of Meta under Section 182 of the OBCA on the terms and subject to the conditions set out in the Plan of Arrangement, subject to any amendments or variations to the Plan of Arrangement made in accordance with the terms of this Agreement or Article 6 of the Plan of Arrangement or made at the direction of the Court in the Final Order with the consent of the Parties, each acting reasonably;

"**Articles of Arrangement**" means the articles of arrangement of Meta in respect of the Arrangement required by the OBCA to be sent to the Director after the Final Order is made, which shall be in a form and content satisfactory to the Parties, each acting reasonably;

"**Authorization**" means any authorization, order, Permit, approval, grant, licence, registration, consent, right, notification, condition, franchise, privilege, certificate, judgment, writ, injunction, award, determination, direction, decision, decree, bylaw, rule or regulation, whether or not having the force of Law, and includes any environmental Permit;

"**Bridge Notes**" has the meaning ascribed thereto in Section 7.6;

"**Business Day**" means a day other than a Saturday, a Sunday or any other day on which commercial banking institutions in Toronto, Ontario or Houston, Texas are authorized or required by applicable Law to be closed;

"**Callco**" has the meaning ascribed thereto in the recitals above;

"**Canco**" has the meaning ascribed thereto in the recitals above;

"**Certificate of Arrangement**" means the certificate of arrangement to be issued by the Director pursuant to subsection 183(2) of the OBCA in respect of the Articles of Arrangement;

"**Claim**" means (i) any suit, action, proceeding, dispute, investigation, claim, arbitration, order, summons, citation, directive, ticket, charge, demand or prosecution, whether legal or administrative; or (ii) any appeal or application for review; whether at law or in equity or by any Governmental Entity;

"**Change in Recommendation**" means, with respect to Meta, a Meta Change in Recommendation and, with respect to RTO Acquiror, an RTO Acquiror Change in Recommendation;

"**Confidentiality Agreement**" means the confidentiality agreement between Meta and RTO Acquiror dated September 4, 2020;

"**Consideration**" means the consideration to be received by Meta Shareholders pursuant to the Plan of Arrangement in respect of each Meta Share that is issued and outstanding immediately prior to the Effective Time, being either the RTO Acquiror Share Consideration or the Exchangeable Share Consideration as elected in accordance with the Plan of Arrangement by a Meta Shareholder in respect of each Meta Share held;

"**Contract**" means any contract, agreement, license, franchise, lease, arrangement, commitment, joint venture, partnership or other right or obligation (written or, to the extent enforceable, oral) to which a Party or any of its subsidiaries is a party or by which it or any of its subsidiaries is bound or to which any of their respective properties or assets is subject;

"**Court**" means the Ontario Superior Court of Justice (Commercial List);

"**COVID-19**" shall mean the novel coronavirus, SARS-CoV-2 or COVID-19 (and all related strains and sequences), including any intensification, resurgence or any evolutions or mutations thereof, and/or related or associated epidemics, pandemics, disease outbreaks or public health emergencies.

"**CSE**" means the Canadian Securities Exchange;

"**Depositary**" means AST Trust Company (Canada) or such other person appointed by Meta and RTO Acquiror (each acting reasonably), for the purpose of, among other things, exchanging certificates representing Meta Shares for the Consideration;

"**Director**" means the Director appointed pursuant to Section 278 of the OBCA;

"**Dissent Rights**" means the rights of dissent exercisable by the Meta Shareholders under Section 185 of the OBCA or as otherwise determined by the Court in the Interim Order in respect of the Meta Arrangement Resolution;

"**Dissenting Shareholder**" has the meaning ascribed thereto in the Plan of Arrangement;

"**Effective Date**" means the date shown on the Certificate of Arrangement giving effect to the Arrangement, which shall be no earlier than February 13, 2021 and no later than the Outside Date;

"**Effective Time**" has the meaning ascribed thereto in the Plan of Arrangement;

"**Employee Plans**" means all benefit or compensation plans, programs, policies, practices, contracts, agreements or other arrangements, covering current or former employees, directors or consultants of a Party, including without limitation employment, consulting, deferred compensation, equity, benefit, bonus, incentive, pension, retirement, savings, stock purchase, profit sharing, stock option, stock appreciation, phantom stock, termination, change of control, life insurance, medical, health, welfare, hospital, dental, vision care, drug, sick leave, disability, and similar plans, programmes, arrangements or practices, whether or not in writing and whether or not funded, in each case, which is sponsored, maintained or contributed to by a Party or any of its affiliates, or to which a Party or any of its affiliates is obligated to contribute, or with respect to which a Party or any of its affiliates has any liability, direct or indirect, contingent or otherwise, other than benefit plans established pursuant to statute;

"**Encumbrance**" means any Claim, encumbrance, lien, charge, hypothec, pledge, mortgage, title retention agreement, security interest of any nature, adverse claim, exception, reservation, easement, right of occupation, option, right of pre-emption, privilege or any matter capable of registration against title or any Contract to create any of the foregoing;

"**Environmental Laws**" means all Laws aimed at, or relating to, the reclamation or restoration of properties, occupational health and safety, protection of the environment, abatement of pollution, protection of wildlife, ensuring public safety from environmental hazards and all other Laws relating to (i) the management processing, use, treatment, storage, disposal, discharge, transport or handling of any Hazardous Substances; (ii) plant and animal life, (iii) lands; or (iv) other natural resources;

"**Exchangeable Share Consideration**" has the meaning ascribed thereto in the Plan of Arrangement;

"**Exchange Ratio**" has the meaning ascribed thereto in the Plan of Arrangement;

"**Exchangeable Shares**" means the exchangeable shares in the capital of Canco as more particularly described in Appendix I to the Plan of Arrangement;

"**Exchange Time**" has the meaning set out in the Plan of Arrangement;

"**Final Order**" means an order of the Court granted pursuant to Section 182(5) of the OBCA, in form and substance acceptable to each of the Parties, each acting reasonably, approving the Arrangement after a hearing upon the procedural and substantive fairness of the terms and conditions of the Arrangement, as such order may be affirmed, amended, modified, supplemented or varied by the Court (with the consent of the Parties, each acting reasonably) at any time prior to the Effective Date or, if appealed, as affirmed or amended (provided, however, that any such amendment is acceptable to the Parties, each acting reasonably) on appeal, unless such appeal is withdrawn, abandoned or denied;

"**Governmental Entity**" means (i) any multinational or supranational body or organization, nation, government, state, province, country, territory, municipality, administrative, judicial or regulatory authority, agency, board, body, bureau, commission, instrumentality, court or tribunal or any political subdivision thereof, or any central bank (or similar monetary or regulatory authority) thereof, any taxing authority, any ministry or department or agency of any of the foregoing, (ii) any self-regulatory organization or securities exchange, including the CSE and NASDAQ, (iii) any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government; and (iv) any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of such entities or other bodies pursuant to the foregoing;

"**Hazardous Substance**" means any waste or other substance that is prohibited, listed, defined, designated or classified as hazardous, radioactive, corrosive, explosive, infectious, carcinogenic, or toxic or a pollutant or a contaminant under or pursuant to, or that could result in any Liability under, any applicable Environmental Laws including petroleum and all derivatives thereof or synthetic substitutes therefor, hydrogen sulphide, arsenic, cadmium, lead, mercury, polychlorinated biphenyls ("**PCBs**"), PCB-containing equipment and material, mould, asbestos, asbestos-containing material, urea-formaldehyde, urea-formaldehyde-containing material and any other material or substance that may impair the environment;

"**IFRS**" means International Financial Reporting Standards;

"**including**" means including without limitation, and "**include**" and "**includes**" have a corresponding meaning;

"**Initial Bridge Note**" means the eight percent (8%) Unsecured Convertible Promissory Note of Meta for the benefit of RTO Acquiror dated September 20, 2020 with a principal amount of $500,000.

"**Intellectual Property"** means domestic and foreign intellectual property rights, whether or not registrable, patentable or otherwise formally protectable, including: (i) inventions (whether patentable or unpatentable and whether or not reduced to practice), patents, applications for patents and reissues, divisions, continuations, renewals, extensions and continuations-in-part of patents or patent applications; (ii) works, copyrights, copyright registrations and applications for copyright registration, including all moral rights or similar rights of authorship or attribution; (iii) designs, design registrations, design registration applications and integrated circuit topographies; (iv) trade names, business names, corporate names, domain names, website names and world wide web addresses, common law trade-marks, trade-mark registrations, trade-mark applications, trade dress and logos, and all goodwill related thereto; (v) know-how, trade secrets, proprietary information, algorithms, formulae, recipes, systems, compositions, manufacturing and production processes, methods and techniques and related documentation, clinical and testing data, customer and supplier information, and market and survey information (collectively "**Trade Secrets**"); and (vi) telephone numbers, domain names and social media identities, and the goodwill associated with any of the foregoing;

"**Interim Order**" means an order of the Court in form and substance acceptable to each of the Parties, acting reasonably, providing for, among other things, the calling and holding of the Meta Meeting, as the same may be amended by the Court with the consent of the Parties, each acting reasonably;

"**Intervening Event**" means, with respect to Meta, a Meta Intervening Event, and with respect to RTO Acquiror, an RTO Acquiror Intervening Event;

"**Intervening Event Notice**" has the meaning ascribed thereto in Subsection 7.4(a)(ii)A;

"**Intervening Event Matching Period**" has the meaning ascribed thereto in Subsection 7.4(a)(ii)C;

"**ITA**" means the *Income Tax Act* (Canada), as amended from time to time;

"**Key Regulatory Approvals**" means those rulings, consents, orders, exemptions, Permits, Authorizations and other approvals of Governmental Entities, necessary to proceed with the transactions contemplated by this Agreement and the Plan of Arrangement, as listed in Schedule G;

"**Law**" means, with respect to any Person, any and all applicable law (statutory, common, civil or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement, whether domestic or foreign, enacted, adopted, promulgated or applied by a Governmental Entity that is binding upon or applicable to such Person or its business, property or securities, and to the extent that they have the force of law, policies, guidelines, notices and protocols of any Governmental Entity, as amended;

"**Liability**" means, in respect of any Person, any debt, liability or obligation of any kind or nature whatsoever, including (i) any right against such Person to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, (ii) any right against such Person to an equitable remedy for breach of performance, whether or not such right to any equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and (iii) any obligation of such Person for the performance of any covenant or agreement (whether for the payment of money or otherwise);

"**Lock-Up Agreements**" means the certain lock-up agreements (including all amendments thereto) entered or to be entered into by certain parties, where such parties have agreed, among other things, to lock-up and not sell, transfer or otherwise dispose of their RTO Acquiror Shares and/or Meta Shares, as applicable, in the form attached hereto as K;

"**Matching Party**" has the meaning ascribed thereto in Subsection 7.4(a);

"**Matching Period**" has the meaning ascribed thereto in Subsection 7.4(a)(ii)C;

"**material change**", "**material fact**" and "**misrepresentation**" have the meanings ascribed thereto in the Securities Act;

"**Material Contract"** means any of the following for a Party:

(i) any management, employment, severance, retention, transaction bonus, change in control, material consulting, relocation, repatriation or expatriation agreement or other similar Contract;

(ii) any Contract with any distributor, reseller or sales representative with an annual value in excess of $100,000;

(iii) any Contract with any manufacturer, vendor, or other Person for the supply of materials or performance of services by such third party to the Party in relation to the manufacture of the Party's products or product candidates with an annual value in excess of $100,000;

(iv) any agreement or plan, including, without limitation, any stock option plan, stock appreciation right plan or stock purchase plan, any of the benefits of which will be increased, or the vesting of benefits of which will be accelerated, by the occurrence of any of the transactions contemplated by this Agreement;

(v) any Contract incorporating or relating to any guaranty, any sharing of liabilities or any indemnity not entered into in the ordinary course of business, including any indemnification agreements between a Party and any of its officers or directors;

(vi) any Contract imposing any restriction on the right or ability of the Party or that would by the terms of the Contract would impose any restriction on the right or ability of the Party: (A) to compete with any other Person; (B) to acquire any product or other asset or any services from any other Person; (C) to solicit, hire or retain any Person as a director, an officer or other employee, a consultant or an independent contractor; (D) to develop, sell, supply, distribute, offer, support or service any product or any technology or other asset to or for any other Person; (E) to perform services for any other Person; or (F) to transact business with any other Person;

(vii) any Contract currently in force relating to the disposition or acquisition of assets not in the ordinary course of business or any ownership interest in any corporation, partnership, joint venture or other business enterprise;

(viii) any mortgages, indentures, loans or credit agreements, security agreements or other agreements or instruments relating to the borrowing of money or extension of credit;

(ix) any joint marketing or development agreement;

(x) any Contract that provides for: (A) any right of first refusal, right of first negotiation, right of first notification or similar right with respect to any securities or assets of the Party; (B) any "no shop" provision or similar exclusivity provision with respect to any securities or assets of the Party; or (C) contains most favored nation pricing provisions with any third party or any requirements or minimum purchase obligations of the Party;

(xi) any Contract that contemplates or involves the payment or delivery of cash or other consideration in an amount or having a value in excess of $100,000 or more in the aggregate, or contemplates or involves the performance of services having a value in excess of $100,000 in the aggregate other than any arrangement or agreement expressly contemplated or provided for under this Agreement;

(xii) any Contract that does not allow the Party to terminate the Contract for convenience with no more than sixty (60) days prior notice to the other party and without the payment of any rebate, chargeback, penalty or other amount to such third party in connection with any such termination in an amount or having a value in excess of $100,000 in the aggregate; or

(xiii) that is a "material contract" (with respect to RTO Acquiror, as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC, and with respect to Meta, within the meaning of National Instrument 51-102).

"**Meta**" has the meaning ascribed thereto in the recitals above;

"**Meta Acquisition Proposal**" means, other than the transactions contemplated by this Agreement, any offer, proposal or inquiry from any Person or group of Persons acting jointly or in concert, whether or not in writing and whether or not delivered to Meta, after the date hereof relating to: (i) any acquisition or purchase, direct or indirect, of: (A) the assets of Meta and/or one or more of its subsidiaries that, individually or in the aggregate, constitute twenty percent (20%) or more of the consolidated assets of Meta and its subsidiaries, taken as a whole, or which contribute twenty percent (20%) or more of the consolidated revenue of Meta and its subsidiaries, taken as a whole (or any lease, long-term supply, hedging arrangement, joint venture, strategic alliance, partnership or other transaction having the same economic effect as a sale of such assets), or (B) beneficial ownership of twenty percent (20%) or more of the issued and outstanding voting or equity securities of Meta or any one or more of its subsidiaries that, individually or in the aggregate, contribute twenty percent (20%) or more of the consolidated revenues or constitute twenty percent (20%) or more of the consolidated assets of Meta and its subsidiaries, taken as a whole; (ii) any take-over bid, tender offer or exchange offer that, if consummated, would result in such Person or group of Persons beneficially owning twenty percent (20%) or more of the issued and outstanding voting or equity securities of any class of voting or equity securities of Meta or any of its subsidiaries; (iii) any plan of arrangement, merger, amalgamation, consolidation, share exchange, business combination, reorganization, recapitalization, liquidation, dissolution or other similar transaction involving Meta or any of its subsidiaries; in all cases, whether in a single transaction or in a series of related transactions; or (iv) any direct or indirect sale of assets (or any alliance, joint venture, earn-in right, option to acquire, lease, licence or other arrangement having a similar economic effect as a sale) by Meta and/or one or more of its subsidiaries, which assets represent twenty percent (20%) or more of the consolidated assets of Meta and its subsidiaries measured by fair market value, or contribute twenty percent (20%) or more of the consolidated revenue or operating income of Meta; or (v) any other transaction, the consummation of which prevents, or materially delays, impedes or interferes with, the transactions contemplated by this Agreement;

"**Meta Annual Financial Statements**" means the restated audited consolidated financial statements of Meta as at, and for the years ended December 31, 2019 and December 31, 2018 including the auditor's report thereon and the notes thereto, as filed on SEDAR on August 28, 2020;

"**Meta Arrangement Resolution**" means the special resolution of the Meta Securityholders approving the Plan of Arrangement, which is to be considered at the Meta Meeting in the form of Schedule B hereto (unless RTO Acquiror agrees in writing to any changes to such form);

"**Meta Board**" means the board of directors of Meta as the same is constituted from time to time;

"**Meta Board Recommendation**" has the meaning ascribed thereto in Subsection 2.5(b)(iii);

"**Meta Business**" means the business and affairs of the Meta Group as described in the Meta Disclosure Documents;

"**Meta Change in Recommendation**" occurs or is made when, (i) the Meta Board or any committee of the Meta Board fails to unanimously recommend or withdraws, amends, modifies or qualifies, publicly proposes or states its intention to do so, or fails to publicly reaffirm (without qualification) within five (5) Business Days (and in any case prior to the Meta Meeting) after having been requested in writing by the RTO Acquiror to do so, the Meta Board Recommendation, or (ii) the Meta Board or any committee of the Meta Board takes no position or a neutral position with respect to a Meta Acquisition Proposal for more than five (5) Business Days after a Meta Acquisition Proposal is made or publicly announced, or (iii) the Meta Board or any committee of the Meta Board resolves or publicly proposes to take any of the foregoing actions;

"**Meta Circular**" means the notice of the Meta Meeting and accompanying management proxy circular, including all schedules, appendices and exhibits thereto and enclosures therewith, to be sent to the Meta Securityholders, as required by the Court in the Interim Order, in connection with the Meta Meeting, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement;

"**Meta Disclosure Documents**" means all information, disclosure, forms, reports, schedules, statements, certifications and other documents, including without limitation all press releases, forms, reports, schedules, financial statements and notes and schedules to such financial statements, management's discussion and analysis of financial condition and results of operations, certifications, annual information forms, management information circulars, material change reports, business acquisition reports and other documents publicly disclosed or filed by Meta with the Securities Authorities since March 5, 2020 and publicly available at www.sedar.com;

"**Meta Disclosure Letter**" means the disclosure letter executed by Meta and delivered to RTO Acquiror prior to or concurrently with the execution of this Agreement;

"**Meta DSU**" means a deferred share unit of Meta;

"**Meta Financial Advisor"** means Cormark Securities Inc.

"**Meta Group**" means Meta and all of its direct and indirect subsidiaries;

"**Meta Interim Financial Statements**" means the unaudited interim condensed consolidated financial statements of Meta as at, and for the three-month period and nine-month period ended September 30, 2020 and 2019 including the notes thereto, as filed on SEDAR on November 30, 2020;

"**Meta Intervening Event**" means a material event or circumstance that was not known or reasonably foreseeable to the Meta Board prior to the execution of this Agreement (or if known, the consequences of which were not known or reasonably foreseeable), which event or circumstance, or any material consequence thereof, becomes known to the Meta Board prior to the receipt of the Meta Securityholder Approval that does not relate to (i) a Meta Acquisition Proposal, (ii) RTO Acquiror or its subsidiaries (including any RTO Acquiror Material Adverse Effect), (iii) any actions taken pursuant to this Agreement or (iv) any changes in the price of RTO Acquiror Shares or Meta Shares;

"**Meta Material Adverse Effect**" means any effect, fact, change, event, occurrence or circumstance that is, or would reasonably be expected to be, material and adverse to the business, condition (financial or otherwise), properties, assets (tangible or intangible), liabilities (whether absolute, accrued, conditional or otherwise), capital, operations or results of operations of Meta and its subsidiaries, taken as a whole, other than any effect arising from, relating to or resulting from, as applicable: (i) the global economy, political conditions (including the outbreak of war or any acts of terrorism), international trade or securities, financial or credit markets in general, natural disasters or other acts of God; (ii) the smart materials and photonics industry in general, (iii) any generally applicable change in applicable Law (other than orders, judgments, claims or decrees against Meta or any of its subsidiaries), or accounting standards or the enforcement or interpretation thereof; (iv) a change in the market trading price or trading volume of Meta Shares (it being understood that the underlying cause of any such change may be taken into consideration when determining whether a Meta Material Adverse Effect has occurred, unless otherwise excepted under this definition); (v) the announcement of this Agreement, including the impact thereof on the relationships, contractual or otherwise, on Meta or its subsidiaries with customers, suppliers, business partners, regulators, vendors, Governmental Entities or other third Persons; (vi) any action taken or refrained from being taken by Meta or its subsidiaries in connection with this Agreement, to the extent RTO Acquiror has expressly consented to, approved or requested such action in writing following the date of this Agreement and (vii) any disease outbreaks, pandemics or epidemics or other related condition including COVID-19; provided, however, that (x) in the event that Meta and its subsidiaries, taken as a whole, are materially and disproportionately affected by an effect described in clause (i), (ii), (iii) or (vi) above relative to other participants in the industries in which Meta and its subsidiaries operate, the extent (and only the extent) of such effect, relative to such other participants, on Meta or any of its subsidiaries, taken as a whole, may be taken into account in determining whether there has been a Meta Material Adverse Effect; and (y) references in certain sections of this Agreement to dollar amounts are not intended to be, and shall not be deemed to be, illustrative or interpretive for the purposes of determining whether a "Meta Material Adverse Effect" has occurred;

"**Meta Meeting**" means the special meeting of Meta Securityholders, including any adjournment or postponement thereof, to be called and held in accordance with the Interim Order to consider the Meta Arrangement Resolution, and for any other purpose as may be set out in the Meta Circular;

"**Meta Optionholders**" means the holders at the relevant time of Meta Options;

"**Meta Options**" means, at any time, options exercisable to acquire Meta Shares granted under the Option Plan which are, at such time, outstanding, whether or not vested;

"**Meta Securityholders**" means Meta Shareholders, Meta Optionholders, Meta Warrantholders and holders of Meta DSUs;

"**Meta Securityholder Approval**" has the meaning ascribed thereto in Subsection 2.3(c);

"**Meta Shareholders**" means the holders of Meta Shares;

"**Meta Shares**" means issued and outstanding common shares in the capital of Meta;

"**Meta Superior Proposal**" means any unsolicited bona fide written Meta Acquisition Proposal from a Person who is an arm's length third party to acquire not less than all of the outstanding Meta Shares or all or substantially all of the assets of Meta on a consolidated basis that: (i) complies with Securities Laws and did not result from or involve a breach of Article 7; (ii) is capable of being completed without undue delay, taking into account, all financial, legal, regulatory and other aspects of such proposal and the Person making such proposal; (iii) is not subject, either by the terms of such Meta Acquisition Proposal or by virtue of any applicable Law, or rule or requirement of any stock exchange, to any requirement that the approval of the shareholders of the Person making the Meta Acquisition Proposal be obtained; (iv) if any consideration is cash, is not subject to any financing contingency or condition; (v) is not subject to any due diligence or access condition; (vi) is not subject, either by the terms of such Meta Acquisition Proposal or by virtue of any applicable Law, to any Authorization of a Governmental Entity; (vii) does not provide for the payment of any break, termination or other fees or expenses to the other party in the event that Meta completes the Arrangement or any similar other transaction with RTO Acquiror or any of its affiliates agreed prior to any termination of this Agreement and (viii) that the Meta Board determines, in its good faith judgment, after receiving the advice of its outside legal and financial advisors and after taking into account all the terms and conditions of the Meta Acquisition Proposal, including all legal, financial, regulatory and other aspects of such Meta Acquisition Proposal and the party making such Meta Acquisition Proposal, (A) would, if consummated in accordance with its terms, but without assuming away the risk of non-completion, result in a transaction which is more favourable, from a financial point of view, to the Meta Shareholders than the Arrangement (including any amendments to the terms and conditions of the Arrangement proposed by RTO Acquiror pursuant to Subsection 7.4(b)) and (B) the failure to recommend such Meta Acquisition Proposal to the Meta Shareholders would be contrary to the fiduciary duties of the Meta Board;

"**Meta Supporting Shareholders**" means collectively all of the senior officers and directors of Meta who have entered into Meta Voting Agreements;

"**Meta Voting Agreements**" means the voting agreements of even date herewith (including all amendments thereto after the date hereof) between RTO Acquiror and the Meta Supporting Shareholders setting forth the terms and conditions upon which the Meta Supporting Shareholders have agreed, among other things, to vote their Meta Shares in favour of the Meta Arrangement Resolution;

"**Meta Warrantholder**" means a holder of one or more Meta Warrants;

"**Meta Warrants**" means the common share purchase warrants to acquire Meta Shares which are at such time outstanding;

"**MI 61-101**" means Multilateral Instrument 61-101 - *Protection of Minority Security Holders in Special Transactions*;

"**NASDAQ**" means the NASDAQ Capital Market;

"**NRS**" means the Nevada Revised Statutes;

"**OBCA**" means the *Business Corporations Act* (Ontario);

"**Option Plan**" means Meta's amended and restated stock option plan;

"**ordinary course of business**", "**ordinary course of business consistent with past practice**", or any similar reference, means, with respect to an action taken by a Person, that such action is consistent with the past practices (in terms of nature, scope and magnitude) of such Person and is taken in the ordinary course of the normal day-to-day business and operations of such Person;

"**Other Party**" has the meaning ascribed thereto in Subsection 7.3(a)(v);

"**Outside Date**" means May 15, 2021 or such later date as may be agreed to in writing by the Parties;

"**Parties**" means, collectively, Meta, RTO Acquiror, Canco and Callco and "**Party**" means any one of them;

"**Permit**" means any license, permit, certificate, consent, order, grant, approval, agreement, classification, restriction, registration or other authorization of, from or required by any Governmental Entity;

"**Permitted Encumbrance**" means, with respect to a Party:

(a) assignments of insurance provided to landlords (or their mortgagees) pursuant to the terms of any lease to which the Party or any of its subsidiaries is the tenant;

(b) liens for Taxes, assessments and governmental charges due and being contested in good faith and diligently by appropriate proceedings and for the payment of which adequate provision has been made in the Party's financial statements;

(c) registered servitudes, easements, restrictions, rights of way and other similar rights in real property or any interest therein, provided: (i) the same are not of such nature as to materially restrict, limit, impair or impede the use of the property subject thereto in the Party's business; and (ii) each such encumbrance has been complied with and is in good standing;

(d) security given in the ordinary course of the Party's business to any public utility, municipality or government or to any statutory or public authority in connection with the operations of the Party's business, other than security for borrowed money, provided that such security does not materially restrict, limit, impair of impede the ability of the Party or any of its subsidiaries to carry on its business; and

(e) undetermined or inchoate liens, charges and privileges incidental to current construction or current operations and statutory liens, charges, adverse Claims, security interests or Encumbrances to which any Governmental Entity may be entitled that have not at the time been filed or registered against the title to the asset or served upon the owner or lessee of the property subject thereto pursuant to Law and that relate to obligations not due or delinquent, provided that they do not materially restrict, limit, impair of impede the ability of the Party or any of its subsidiaries to carry on its business;

"**Person**" includes any individual, firm, partnership, limited partnership, limited liability partnership, joint venture, venture capital fund, limited liability company, unlimited liability company, association, trust, trustee, executor, administrator, legal personal representative, estate, body corporate, corporation, company, unincorporated association or organization, Governmental Entity, syndicate or other entity, whether or not having legal status;

"**Personal Information**" means any information (regardless of form) that relates to an identified or identifiable individual; an identifiable individual is one who can be identified, directly or indirectly, in particular by reference to an identifier, such as a name, an identification number, location data, an online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person; or any other information about an individual that is defined as "personal data" or "personal information" by applicable Law. Personal Information may include information such as name, street address, telephone number, email address, photograph, date of birth, social security number, driver's license number or data collected through an automated license plate recognition system, passport number, financial account information, username and password combinations or customer or account number, geolocation information of an individual or device, biometric data, medical or health information, cookie identifiers associated with registration information, or any other browser- or device-specific number or identifier, and web or mobile browsing or usage information that is linked to the foregoing;

"**Plan of Arrangement**" means the plan of arrangement of Meta, substantially in the form of Schedule A hereto, and any amendments or variations thereto made from time to time in accordance with this Agreement, the plan of arrangement or upon the direction of the Court in the Final Order with the consent of the Parties, each acting reasonably;

"**Pre-Closing Financing**" means a transaction or series of transactions in which the RTO Acquiror issues RTO Acquiror Shares (or securities convertible into or exercisable for RTO Acquiror Shares) primarily for capital raising purposes where RTO Acquiror has raised gross proceeds of US$10,000,000 in the aggregate, less the principal amounts of the Bridge Notes.

**"Proceeding"** means any action, cause of action, claim, demand, litigation, suit, investigation, citation, summons, subpoena, audit, hearing, originating application to a tribunal, arbitration or other similar proceeding of any nature, civil, criminal, regulatory, administrative or otherwise, whether in equity or at law, in contract, in tort or otherwise;

"**Proposal Party**" has the meaning ascribed thereto in Subsection 7.3(a);

"**Receiving Board**" has the meaning ascribed thereto in Subsection 7.4(a);

"**Receiving Party**" has the meaning ascribed thereto in Subsection 7.4(a);

"**Representative**" means, collectively, in respect of a Person, its subsidiaries and its affiliates and its and their officers, directors, employees, consultants, advisors, agents or other representatives (including financial, legal or other advisors);

"**Reverses Split**" has the meaning ascribed thereto in Section 2.17;

"**RTO Acquiror**" has the meaning ascribed thereto in the recitals above;

"**RTO Acquiror Acquisition Proposal**" means, other than the transactions contemplated by this Agreement, any offer, proposal or inquiry from any Person or group of Persons acting jointly or in concert, whether or not in writing and whether or not delivered to RTO Acquiror, after the date hereof relating to: (i) any acquisition or purchase, direct or indirect, of: (A) the assets of RTO Acquiror and/or one or more of its subsidiaries that, individually or in the aggregate, constitute twenty percent (20%) or more of the consolidated assets of RTO Acquiror and its subsidiaries, taken as a whole, or which contribute twenty percent (20%) or more of the consolidated revenue of RTO Acquiror and its subsidiaries, taken as a whole (or any lease, long-term supply, hedging arrangement, joint venture, strategic alliance, partnership or other transaction having the same economic effect as a sale of such assets), or (B) beneficial ownership of twenty percent (20%) or more of the issued and outstanding voting or equity securities of RTO Acquiror or any one or more of its subsidiaries that, individually or in the aggregate, contribute twenty percent (20%) or more of the consolidated revenues or constitute twenty percent (20%) or more of the consolidated assets of RTO Acquiror and its subsidiaries, taken as a whole; (ii) any take-over bid, tender offer or exchange offer that, if consummated, would result in such Person or group of Persons beneficially owning twenty percent (20%) or more of the issued and outstanding voting or equity securities of any class of voting or equity securities of RTO Acquiror or any of its subsidiaries; (iii) any plan of arrangement, merger, amalgamation, consolidation, share exchange, business combination, reorganization, recapitalization, liquidation, dissolution or other similar transaction involving RTO Acquiror or any of its subsidiaries; in all cases, whether in a single transaction or in a series of related transactions; or (iv) any direct or indirect sale of assets (or any alliance, joint venture, earn-in right, option to acquire, lease, licence or other arrangement having a similar economic effect as a sale) by RTO Acquiror and/or one or more of its subsidiaries, which assets represent twenty percent (20%) or more of the consolidated assets of RTO Acquiror and its subsidiaries measured by fair market value, or contribute twenty percent (20%) or more of the consolidated revenue or operating income of RTO Acquiror; or (v) any other transaction, the consummation of which prevents, or materially delays, impedes or interferes with, the transactions contemplated by this Agreement;

"**RTO Acquiror Amended and Restated Articles**" means the Amended and Restated Articles of Incorporation of RTO Acquiror, in form and substance to be determined by Meta and reasonably acceptable to RTO Acquiror;

"**RTO Acquiror Amended and Restated Bylaws**" means the Amended and Restated Bylaws of RTO Acquiror, in the form and substance to be determined by Meta and reasonably acceptable to RTO Acquiror;

"**RTO Acquiror Board**" means the board of directors of RTO Acquiror as the same is constituted from time to time;

"**RTO Acquiror Board Matters**" has the meaning ascribed thereto in Subsection 2.13(a);

"**RTO Acquiror Board Recommendation**" has the meaning ascribed thereto in Subsection 2.10(c)(iii);

"**RTO Acquiror Business**" means the business and affairs of the RTO Acquiror Group as described in the RTO Acquiror Disclosure Documents;

"**RTO Acquiror Certificate of Designation**" means the Certificate of Designation of Preferences, Rights and Limitations of the RTO Acquiror Preferred Stock, in the form attached hereto as Schedule J;

"**RTO Acquiror Change in Recommendation**" occurs or is made when, (i) the RTO Acquiror Board or any committee of the RTO Acquiror Board fails to unanimously recommend or withdraws, amends, modifies or qualifies, publicly proposes or states its intention to do so, or fails to publicly reaffirm (without qualification) within five (5) Business Days (and in any case prior to the RTO Acquiror Meeting) after having been requested in writing by Meta to do so, the RTO Acquiror Board Recommendation, or (ii) the RTO Acquiror Board or any committee of the RTO Acquiror Board takes no position or a neutral position with respect to a RTO Acquiror Acquisition Proposal for more than five (5) Business Days after a RTO Acquiror Acquisition Proposal is made or publicly announced, or (iii) the RTO Acquiror Board or any committee of the RTO Acquiror Board resolves or publicly proposes to take any of the foregoing actions;

"**RTO Acquiror Disclosure Documents**" means all information, disclosure, forms, reports, schedules, statements, certifications and other documents, including without limitation all press releases, forms, reports, schedules, financial statements and notes and schedules to such financial statements, management's discussion and analysis of financial condition and results of operations, certifications, annual information forms, management information circulars, material change reports, business acquisition reports and other documents publicly disclosed or filed by the RTO Acquiror with the Securities Authorities since January 1, 2020;

"**RTO Acquiror Disclosure Letter**" means the disclosure letter executed by RTO Acquiror, Canco and Callco and delivered to Meta prior to or concurrently with the execution of this Agreement;

**"RTO Acquiror Financial Advisor"** means Roth Capital Partners LLC;

"**RTO Acquiror Group**" means RTO Acquiror and all of its direct and indirect subsidiaries, including Canco and Callco;

"**RTO Acquiror Intervening Event**" means a material event or circumstance that was not known or reasonably foreseeable to the RTO Acquiror Board prior to the execution of this Agreement (or if known, the consequences of which were not known or reasonably foreseeable), which event or circumstance, or any material consequence thereof, becomes known to the RTO Acquiror Board prior to the receipt of the RTO Acquiror Shareholder Approval that does not relate to (i) an RTO Acquiror Acquisition Proposal, (ii) Meta or its subsidiaries (including any Meta Material Adverse Effect), (iii) any actions taken pursuant to this Agreement or (iv) any changes in the price of RTO Acquiror Shares or Meta Shares;

"**RTO Acquiror Material Adverse Effect**" means any effect, fact, change, event, occurrence or circumstance that is, or would reasonably be expected to be, material and adverse to the business, condition (financial or otherwise), properties, assets (tangible or intangible), liabilities (whether absolute, accrued, conditional or otherwise), capital, operations or results of operations of RTO Acquiror and its subsidiaries, taken as a whole, other than any effect arising from, relating to or resulting from, as applicable: (i) the global economy, political conditions (including the outbreak of war or any acts of terrorism), international trade or securities, financial or credit markets in general, natural disasters or other acts of God; (ii) the oil and natural gas exploration and production industry in general, (iii) any generally applicable change in applicable Law (other than orders, judgments, claims or decrees against RTO Acquiror or any of its subsidiaries), or accounting standards or the enforcement or interpretation thereof; (iv) a change in the market trading price or trading volume of RTO Acquiror Shares (it being understood that the underlying cause of any such change may be taken into consideration when determining whether an RTO Acquiror Material Adverse Effect has occurred, unless otherwise excepted under this definition); (v) the announcement of this Agreement, including the impact thereof on the relationships, contractual or otherwise, on RTO Acquiror or its subsidiaries with customers, suppliers, business partners, regulators, vendors, Governmental Entities or other third Persons; (vi) any action taken or refrained from being taken by RTO Acquiror or its subsidiaries in connection with this Agreement, to the extent Meta has expressly consented to, approved or requested such action in writing following the date of this Agreement; and (vii) any disease outbreaks, pandemics or epidemics or other related condition including COVID-19; provided, however, that (x) in the event that RTO Acquiror and its subsidiaries, taken as a whole, are materially and disproportionately affected by an effect described in clause (i), (ii), (iii) or (vi) above relative to other participants in the industries in which RTO Acquiror and its subsidiaries operate, the extent (and only the extent) of such effect, relative to such other participants, on RTO Acquiror or any of its subsidiaries, taken as a whole, may be taken into account in determining whether there has been an RTO Acquiror Material Adverse Effect; and (y) references in certain sections of this Agreement to dollar amounts are not intended to be, and shall not be deemed to be, illustrative or interpretive for the purposes of determining whether a "RTO Acquiror Material Adverse Effect" has occurred;

"**RTO Acquiror Meeting**" means the special meeting of RTO Acquiror Shareholders, including any adjournment or postponement thereof, to be called and held in accordance with this Agreement, for the purpose of voting on the RTO Acquiror Shareholder Approval Matters and for any other purpose as may be set out in the RTO Acquiror Proxy Statement if and as agreed to by Meta;

"**RTO Acquiror Preferred Stock**" means the Series A Preferred Stock of RTO Acquiror to be issued to the RTO Acquiror Shareholders immediately prior to the Effective Time, having the rights, privileges and preferences set forth in the RTO Acquiror Certificate of Designation;

"**RTO Acquiror Proxy Statement**" shall mean the proxy statement to be sent to RTO Acquiror's stockholders in connection with the approval of the RTO Acquiror Shareholder Approval Matters.

"**RTO Acquiror Replacement Option**" means an option to acquire RTO Acquiror Shares to be issued by RTO Acquiror in consideration for cancellation of the Meta Options;

"**RTO Acquiror Record Date**" has the meaning ascribed thereto in Subsection 2.10(b);

"**RTO Acquiror Share Consideration**" has the meaning ascribed thereto to the term in the Plan of Arrangement;

"**RTO Acquiror Shareholder Approval**" means the approval of the RTO Acquiror Shareholder Approval Matters in accordance with the requirements of applicable Law;

"**RTO Acquiror Shareholder Approval Matters**" has the meaning ascribed thereto in Subsection 2.11(a);

"**RTO Acquiror Shareholders**" means the holders of RTO Acquiror Shares;

"**RTO Acquiror Shares**" means issued and outstanding shares of common stock in the capital of RTO Acquiror;

"**RTO Acquiror Superior Proposal**" means any unsolicited bona fide written RTO Acquiror Acquisition Proposal from a Person who is an arm's length third party to acquire not less than all of the outstanding RTO Acquiror Shares or all or substantially all of the assets of the RTO Acquiror on a consolidated basis that: (i) complies with Securities Laws and did not result from or involve a breach of Article 7; (ii) is capable of being completed without undue delay, taking into account, all financial, legal, regulatory and other aspects of such proposal and the Person making such proposal; (iii) is not subject, either by the terms of such RTO Acquiror Acquisition Proposal or by virtue of any applicable Law, or rule or requirement of any stock exchange, to any requirement that the approval of the shareholders of the Person making the RTO Acquiror Acquisition Proposal be obtained; (iv) if any consideration is cash, is not subject to any financing contingency or condition; (v) is not subject to any due diligence or access condition; (vi) is not subject, either by the terms of such RTO Acquiror Acquisition Proposal or by virtue of any applicable Law, to any Authorization of a Governmental Entity; (vii) does not provide for the payment of any break, termination or other fees or expenses to the other party in the event that the RTO Acquiror completes the Arrangement or any similar other transaction with Meta or any of its affiliates agreed prior to any termination of this Agreement and (viii) that the RTO Acquiror Board determines, in its good faith judgment, after receiving the advice of its outside legal and financial advisors and after taking into account all the terms and conditions of the RTO Acquisition Proposal, including all legal, financial, regulatory and other aspects of such RTO Acquisition Proposal and the party making such RTO Acquisition Proposal, (A) would, if consummated in accordance with its terms, but without assuming away the risk of non-completion, result in a transaction which is more favourable, from a financial point of view, to the RTO Acquiror Shareholders than the Arrangement (including any amendments to the terms and conditions of the Arrangement proposed by Meta pursuant to Subsection 7.4(b)), and (II) the failure to recommend such RTO Acquiror Acquisition Proposal to the RTO Acquiror Shareholders would be contrary to the fiduciary duties of the RTO Acquiror Board;

"**RTO Acquiror Supporting Shareholders**" means collectively all of the senior officers and directors of RTO Acquiror who have entered into RTO Acquiror Voting Agreements;

"**RTO Acquiror Voting Agreements**" means the voting agreements (including all amendments thereto) between Meta and the RTO Acquiror Supporting Shareholders setting forth the terms and conditions upon which the RTO Acquiror Supporting Shareholders have agreed, among other things, to vote their RTO Acquiror Shares in favour of the RTO Acquiror Shareholder Approval Matters;

"**Sale**" has the meaning ascribed thereto in Subsection 2.14(a);

"**Sale Representatives**" has the meaning ascribed thereto in Subsection **Error! Reference source not found.**;

"**SEC**" means the U.S. Securities and Exchange Commission;

"**Section 3(a)(10) Exemption**" means the exemption from the registration requirements of the U.S. Securities Act provided by section 3(a)(10) thereof;

"**Securities Act**" means the *Securities Act* (Ontario) and the rules, regulations, instruments (including national and multilateral instruments) and published policies made thereunder, as now in effect and as they may be promulgated or amended from time to time;

"**Securities Authorities**" means all securities regulatory authorities, including the applicable securities commission or similar regulatory authorities in each of the provinces and territories of Canada, the SEC, the CSE, and NASDAQ, that are applicable to Meta or RTO Acquiror, as the case may be;

"**Securities Laws**" means the Securities Act, together with all other applicable Canadian provincial securities laws, the U.S. Securities Act, the U.S. Exchange Act, the Sarbanes-Oxley Act of 2002, and applicable securities laws of the United States and the states thereof, and the rules and regulations and published policies of the securities authorities thereunder, as now in effect and as they may be promulgated or amended from time to time, and includes the rules and policies of the CSE and NASDAQ, that are applicable to Meta or RTO Acquiror, as the case may be;

"**SEDAR**" means the Canadian Securities Administrators' System for Electronic Document Analysis and Retrieval;

"**Special Voting Share**" means the special voting share in the capital of RTO Acquiror having substantially the rights, privileges, restrictions and conditions described in the Voting and Exchange Trust Agreement;

"**Spin-Off Cost Reserve Amount**" means $500,000 raised in a transaction or series of transactions in which the RTO Acquiror issues RTO Acquiror Shares (or securities convertible into or exercisable for RTO Acquiror Shares) primarily for capital raising purposes in excess of the Pre-Closing Financing.

"**subsidiary**" has the meaning ascribed thereto in the National Instrument 45-106 - *Prospectus Exemptions*;

"**Superior Proposal**" means, with respect to Meta, a Meta Superior Proposal, and, with respect to RTO Acquiror, an RTO Acquiror Superior Proposal;

"**Superior Proposal Matching Period**" has the meaning ascribed thereto in Subsection 7.4(a)(i)D;

"**Superior Proposal Notice**" has the meaning ascribed thereto in Subsection 7.4(a)(i)C;

"**Support Agreement**" means an agreement to be made among RTO Acquiror, Canco and Callco in connection with the Plan of Arrangement substantially in the form and substance of Schedule H;

"**Tax Act**" means the *Income Tax Act* (Canada) and the regulations made thereunder, as now in effect and as they may be promulgated or amended from time to time;

"**Tax Returns**" means all domestic and foreign federal, state, provincial, territorial, municipal and local returns, reports, declarations, disclosures, elections, notices, filings, forms, statements, information statements and other documents (whether in tangible, electronic or other form) and including any amendments, schedules, attachments, supplements, appendices and exhibits thereto, made, prepared, filed or required to be made, prepared or filed by Law in respect of Taxes;

"**Taxes**" means any and all domestic and foreign federal, state, provincial, municipal, territorial and local taxes, assessments and other governmental charges, duties, fees, levies, impositions and liabilities imposed by any Governmental Entity (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), including without limitation pension plan contributions, tax instalment payments, unemployment insurance contributions and employment insurance contributions, disability, severance, social security, workers' compensation and deductions at source, including taxes based on or measured by gross receipts, income, profits, sales, capital, use, and occupation, and including goods and services, value added, ad valorem, sales, capital gains, capital stock, windfall profits, premium, transfer, franchise, stamp, license, non-resident withholding, customs, payroll, recapture, employment, excise and property duties and taxes, together with all estimated taxes, deficiency assessments, interest, penalties, fines and additions to tax imposed with respect to such amounts, and shall include any liability for such amounts as a result of (i) being a transferee or successor or member of a combined, consolidated, unitary or affiliated group, or (ii) a contractual obligation to indemnify any Person or other entity;

"**Termination Payment**" means an amount equal to US$2,000,000;

"**Transaction Personal Information**" has the meaning ascribed thereto in Section 9.1;

"**U.S. Exchange Act**" means the *United States Securities Exchange Act of 1934*, as amended and the rules and regulations promulgated thereunder;

"**U.S. GAAP**" or "**GAAP**" means United States generally accepted accounting principles;

"**U.S. Securities Act**" means the *United States Securities Act of 1933*, as amended and the rules and regulations promulgated thereunder;

"**United States**" means the United States of America; and

"**Voting and Exchange Trust Agreement**" means an agreement to be made among RTO Acquiror, Canco and the AST Trust Company (Canada) or such other person as may be appointed by Meta and RTO Acquiror (each acting reasonably), as trustee, in connection with the Plan of Arrangement, substantially in the form of Schedule I.

**1.2 Interpretation**

For the purposes of this Agreement, except as otherwise expressly provided:

(a) "**this Agreement**" means this Arrangement Agreement, including the recitals and Schedules hereto, and not any particular Article, Section, Subsection or other subdivision, recital or Schedule hereof, and includes any agreement, document or instrument entered into, made or delivered pursuant to the terms hereof, as the same may, from time to time, be supplemented or amended and in effect;

(b) the words "**hereof**", "**herein**", "**hereto**" and "**hereunder**" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, Subsection, or other subdivision, recital or Appendix hereof;

(c) all references in this Agreement to a designated "**Article**", "**Section**", "**Subsection**" or other subdivision, recital or "**Schedule**" hereof are references to the designated Article, Section, Subsections or other subdivision, recital or Schedule to, this Agreement;

(d) a reference to a statute in this Agreement includes all regulations, rules, policies or instruments made thereunder, all amendments to the statute, regulations, rules, policies or instruments in force from time to time, and any statutes, regulations, rules, policies or instruments that supplement or supersede such statute, regulations, rules, policies or instruments.

(e) the division of this Agreement into Article, Sections, Subsections and other subdivisions, recitals or Schedule, the inclusion of a table of contents and the insertion of headings and captions are for convenience of reference only and are not intended to interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof; and

**1.3 Number, Gender and Persons**

In this Agreement, unless the context otherwise requires, words importing the singular shall include the plural and vice versa, words importing the use of either gender shall include both genders and neuters.

**1.4 Date for Any Action**

If the date on which any action is required to be taken hereunder by a Party is not a Business Day, such action shall be required to be taken on the next succeeding day which is a Business Day.

**1.5 Currency**

Unless otherwise stated, all references in this Agreement to sums of money are expressed in lawful money of Canada and "$" refers to Canadian dollars.

**1.6 Accounting Matters**

Unless otherwise stated, all accounting terms used in this Agreement in respect of Meta shall have the meanings attributable thereto under IFRS and all determinations of an accounting nature in respect of Meta required to be made shall be made in a manner consistent with IFRS consistently applied. Unless otherwise stated, all accounting terms used in this Agreement in respect of RTO Acquiror, Canco and Callco shall have the meanings attributable thereto under U.S. GAAP and all determinations of an accounting nature in respect of RTO Acquiror, Canco and Callco required to be made shall be made in a manner consistent with U.S. GAAP consistently applied.

**1.7 Knowledge**

Where any representation or warranty in this Agreement is expressly qualified by reference to the knowledge of Meta, it shall be deemed to refer to the actual knowledge, after making reasonable inquiries regarding the relevant subject matter, of any of the Chief Executive Officer, the Chief Financial Officer and the Chair of the Meta Board.

Where any representation or warranty in this Agreement is expressly qualified by reference to the knowledge of RTO Acquiror, Canco or Callco, it shall be deemed to refer to the actual knowledge, after making reasonable inquiries regarding the relevant subject matter, of any of the Chief Executive Officer, the Chief Financial Officer and the Chair of the RTO Acquiror Board.

**1.8 Schedules**

The following Schedules are annexed to this Agreement and are incorporated by reference into this Agreement and form a part hereof:

Schedule A – Plan of Arrangement

Schedule B – Meta Arrangement Resolution

Schedule C – Representations and Warranties of Meta

Schedule D – Representations and Warranties of RTO Acquiror

Schedule E – Senior Officers of Meta

Schedule F - Senior Officers of RTO Acquiror

Schedule G - Key Regulatory Approvals

Schedule H - Form of Support Agreement

Schedule I - Form of Voting and Exchange Trust Agreement

Schedule J - Form of RTO Acquiror Certificate of Designation

Schedule KK - Form of Lock-Up Agreement

## ARTICLE 2
## THE ARRANGEMENT

### 2.1 Arrangement

The Parties agree that the Arrangement will be implemented in accordance with and subject to the terms and conditions contained in this Agreement and the Plan of Arrangement, pursuant to which (among other things) each Meta Shareholder (other than Meta Shareholders who have validly exercised Dissent Rights) shall receive the Consideration for each Meta Share held.

### 2.2 Obligations of Meta

Subject to the terms and conditions of this Agreement, Meta will take all actions reasonably needed to facilitate the Arrangement in accordance with all applicable Law, including Securities Laws, to:

(a) apply for and diligently prosecute a motion to the Court for the Interim Order in connection with the application for the Final Order in respect of the Arrangement;

(b) in accordance with the terms of and the procedures contained in the Interim Order, duly call, give notice of, convene and hold the Meta Meeting as soon as practicable after the date hereof;

(c) solicit proxies of the Meta Shareholders in favour of the Meta Arrangement Resolution and against any resolution or proposal submitted by any Person that is inconsistent with the Meta Arrangement Resolution or that would reasonably be expected to materially impair, delay or impede the completion of any of the transactions contemplated by this Agreement;

(d) fix the date of the Meta Meeting, which date shall be no later than February 1, 2021, give notice to RTO Acquiror of the Meta Meeting, and allow RTO Acquiror and RTO Acquiror's Representatives (including legal counsel) to attend the Meta Meeting;

(e) subject to obtaining the approvals as contemplated in the Interim Order and as may be directed by the Court in the Interim Order, take all steps necessary to submit the Arrangement to the Court and appear at Court to seek the Final Order as soon as reasonably practicable (and, in any event, within five (5) Business Days following the approval of the Meta Arrangement Resolution at the Meta Meeting);

(f) deliver the Articles of Arrangement to the Director in accordance with Section 2.8 upon satisfaction or waiver of the conditions set out in Article 6; and

(g) consult with RTO Acquiror in respect of the actions as set out in this Article 2, including providing RTO Acquiror with a reasonable opportunity to comment on all draft documentation prepared by Meta in connection with the foregoing, and to give due consideration to and act reasonably with respect to adopting such comments.

**2.3 Interim Order**

As soon as reasonably practicable after the date of this Agreement, and in any event no later than January 25, 2021 , Meta shall apply to the Court in a manner and on terms acceptable to RTO Acquiror, acting reasonably, pursuant to Section 182 of the OBCA and, in cooperation with RTO Acquiror, prepare, file and diligently pursue an application for the Interim Order, which shall provide, among other things:

(a) for the class of Persons to whom notice is to be provided in respect of the Arrangement and the Meta Meeting and for the manner in which such notice is to be provided;

(b) for a fixed record date for the purposes of determining the Meta Securityholders entitled to receive notice of and vote at the Meta Meeting (which date shall be fixed and published by Meta in consultation with RTO Acquiror);

(c) that the requisite approval for the Meta Arrangement Resolution shall be (i) two-thirds of the votes cast by the Meta Shareholders present in person or by proxy at the Meta Meeting; and (ii) two-thirds of the votes cast by the Meta Shareholders and the holders of Meta Options, the holders of Meta Warrants and the holders of Meta DSUs, voting together as a single class (on an as-converted to Meta Share basis), present in person or by proxy at the Meta Meeting (collectively, "**Meta Securityholder Approval**");

(d) that, in all other respects, the terms, conditions and restrictions of the constating documents of Meta relating to a meeting of Meta Shareholders, including quorum requirements, shall apply in respect of the Meta Meeting;

(e) for the grant of Dissent Rights to the Meta Shareholders who are registered Meta Shareholders, as set out in the Plan of Arrangement;

(f) for the notice requirements with respect to the presentation of the application to the Court for the Final Order;

(g) that the Meta Meeting may be adjourned or postponed from time to time by Meta in accordance with the terms of this Agreement without the need for additional approval of the Court;

(h) that the record date for Meta Securityholders entitled to notice of and to vote at the Meta Meeting will not change in respect of any adjournment(s) or postponement(s) of the Meta Meeting, unless required pursuant to applicable Law;

(i) that the Parties intend to rely upon the Section 3(a)(10) Exemption, subject to and conditioned on the Court's determination that the Arrangement is substantively and procedurally fair to the Meta Securityholders, with respect to the issuance of the RTO Acquiror Shares and the RTO Acquiror Replacement Options to the Meta Securityholders pursuant to the Arrangement, to implement the transactions contemplated hereby in respect of the Meta Securityholders;

(j) that each Meta Securityholder shall have the right to appear before the Court at the hearing of the Court to approve the application for the Final Order so long as they enter a notice of appearance within a reasonable time; and

(k) for such other matters as RTO Acquiror and/or Meta may reasonably require, subject to obtaining the prior consent of Meta and/or RTO Acquiror, respectively, such consent not to be unreasonably withheld or delayed provided that such other matters would not reasonably be expected to materially impair, delay or impede the completion of the transactions contemplated by this Agreement.

**2.4 Meta Meeting**

Subject to the terms of this Agreement:

(a) Meta agrees to convene and conduct the Meta Meeting in accordance with the Interim Order, the constating documents of Meta and applicable Law as soon as practicable, and in any event no later than February 1, 2021;

(b) Meta will promptly advise RTO Acquiror on a daily basis on each of the last ten (10) Business Days prior to the date of the Meta Meeting as to the aggregate tally of the proxies received by Meta in respect of the Meta Arrangement Resolution;

(c) Meta will promptly advise RTO Acquiror of any written communication from or written claims brought by (or threatened in writing, to be brought by) any Meta Securityholder or any other Person in opposition to the Arrangement, the Meta Arrangement Resolution and/or any exercise or purported exercise by any Meta Shareholder of Dissent Rights received by Meta and any withdrawal of Dissent Rights received by Meta and any written communications sent by or on behalf of Meta to any Meta Shareholder exercising or purporting to exercise Dissent Rights; and

(d) except as required by applicable Law, Meta will not propose or submit for consideration at the Meta Meeting any business other than the approval of the Meta Arrangement Resolution without RTO Acquiror's prior written consent, which consent shall not be unreasonably withheld or delayed provided that such business would not reasonably be expected to materially impair, delay or impede the completion of the transactions contemplated by this Agreement.

**2.5 Meta Circular**

(a) As soon as reasonably practicable following execution of this Agreement, but subject to Subsection 2.5(c), Meta shall (i) prepare, in consultation with RTO Acquiror, the Meta Circular, together with any other documents required by applicable Law, (ii) cause the Meta Circular to be sent to Meta Securityholders and any other Person as required by the Interim Order and applicable Law, and (iii) cause the Meta Circular (and any other filings required to be filed under applicable Law) to be filed in all jurisdictions where the same is required to be filed, all in accordance with applicable Law and the Interim Order, in each case so as to permit the Meta Meeting to be held by the date specified in Subsection 2.4(a). Meta shall ensure that the Meta Circular complies in all material respects with all applicable Law, does not include any misrepresentation (other than with respect to any information relating solely to RTO Acquiror, Canco and/or Callco and provided by RTO Acquiror in writing specifically for inclusion in the Meta Circular) and contains sufficient detail to permit the Meta Securityholders, to form a reasoned judgement concerning the Arrangement and the Meta Arrangement Resolution to be placed before them at the Meta Meeting.

(b) Except in the case of a Meta Change in Recommendation specifically permitted pursuant to Section 7.4, Meta shall disclose in the Meta Circular:

(i) that the Meta Board has received a fairness opinion from the Meta Financial Advisor stating that, as at the date of such opinion, the Consideration to be received pursuant to the Plan of Arrangement is fair, from a financial point of view, to the Meta Shareholders;

(ii) the general terms of the fairness opinion from the Meta Financial Advisor and a copy of such fairness opinion shall be included in the Meta Circular;

(iii) that the Meta Board has unanimously determined, after receiving financial and legal advice, that (A) the Arrangement is fair and reasonable to the Meta Shareholders, (B) the Arrangement is in the best interests of Meta, and (C) the Meta Board unanimously recommends that the Meta Securityholders vote in favour of the Meta Arrangement Resolution (the "**Meta Board Recommendation**"); and

(iv) that each director and senior officer of Meta set out in Schedule E hereto has signed a Meta Voting Agreement and agreed to vote all of such Person's Meta Shares (including any Meta Shares issued upon the exercise of any securities convertible, exercisable or exchangeable into or for Meta Shares) in favour of the Meta Arrangement Resolution, and against any resolution submitted by any Person that is inconsistent with the Arrangement, subject to the other terms of the Meta Voting Agreements; and

(v) such information as may be required to allow RTO Acquiror and Canco to rely upon the exemption from registration provided under Section 3(a)(10) of the U.S. Securities Act with respect to the issuance of the Consideration.

(c) RTO Acquiror shall promptly provide to Meta all information regarding RTO Acquiror or its subsidiaries and affiliates, as required by the Interim Order and applicable Law for inclusion in the Meta Circular, or in any amendments or supplements to such Meta Circular. RTO Acquiror shall ensure that no such information provided by RTO Acquiror specifically for inclusion in the Meta Circular will contain any misrepresentation concerning RTO Acquiror.

(d) RTO Acquiror and its legal counsel shall be given a reasonable opportunity to review and comment on the Meta Circular and all such other documents required to be filed or distributed to Meta Shareholders under the Securities Laws in connection with the Arrangement. Meta and its legal counsel will incorporate all reasonable comments of RTO Acquiror and its legal counsel into the Meta Circular and all such other documents. The Meta Circular and all such other documents shall be satisfactory to RTO Acquiror, acting reasonably, before they are printed, or distributed to Meta Shareholders or filed with any Governmental Entity, subject to any disclosure obligations imposed on Meta by any Securities Authorities. Meta agrees that all information relating solely to RTO Acquiror and its subsidiaries and affiliates included in the Meta Circular must be in a form and content satisfactory to RTO Acquiror.

(e) Each of Meta and RTO Acquiror shall promptly notify the other Party if at any time before the Effective Date either becomes aware that the Meta Circular contains a misrepresentation, or otherwise requires an amendment or supplement. The Parties shall co-operate in the preparation of any amendment or supplement to the Meta Circular as required or appropriate, and Meta shall promptly mail or otherwise publicly disseminate any amendment or supplement to the Meta Circular to Meta Securityholders and, if required by the Court or applicable Law, file the same with any Governmental Entity and as otherwise required.

(f) Meta shall keep RTO Acquiror informed of any material requests or comments made by any Securities Authorities in connection with the Meta Circular and, as promptly as reasonably practicable, provide RTO Acquiror with copies of any correspondence received by Meta from, or sent by Meta to, any Securities Authorities in connection with the Meta Circular.

**2.6 Final Order**

If the Interim Order is obtained and the Meta Arrangement Resolution is passed at the Meta Meeting in accordance with applicable Law and the Interim Order, then Meta shall take all steps necessary or desirable to submit the Arrangement to the Court as soon as practicable (and, in any event, within five (5) Business Days following the Meta Meeting) apply to the Court for the Final Order pursuant to Section 185 of the OBCA approving the Arrangement on terms reasonably satisfactory to each of Meta and RTO Acquiror.

**2.7 Court Proceedings**

Subject to the terms of this Agreement, Meta shall diligently pursue, and Meta and RTO Acquiror shall cooperate with each other in pursuing, the Interim Order and the Final Order. Meta will provide RTO Acquiror and its legal counsel with a reasonable opportunity to review and comment upon drafts of all material to be filed with the Court in connection with the Interim Order and the Final Order and will incorporate all reasonable comments of RTO Acquiror and its counsel. Meta will ensure that all materials filed with the Court in connection with the Arrangement are consistent with this Agreement and the Plan of Arrangement. Subject to applicable Law, Meta will not file any material with the Court in connection with the Arrangement or serve any such material, and will not agree to modify or amend materials so filed or served, except with RTO Acquiror's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed, provided, however, that nothing herein shall require RTO Acquiror to agree or consent to any increase or change in the Consideration or any modification or amendment to such filed or served materials that expands or increases RTO Acquiror's obligations set forth in any such filed or served materials or under this Agreement or the Arrangement.Meta shall also provide to RTO Acquiror and to RTO Acquiror's legal counsel on a timely basis copies of any notice of appearance or other Court documents served on Meta in respect of the application for the Interim Order or the Final Order or any appeal therefrom and of any notice, whether written or oral, received by Meta indicating any intention to oppose the granting of the Interim Order or the Final Order or to appeal the Interim Order or the Final Order. In addition, Meta will not object to legal counsel to RTO Acquiror making such submissions on the hearing of the motion for the Interim Order and the application for the Final Order as such counsel considers appropriate, provided, however, that Meta is advised of the nature of any submissions prior to the hearing and such submissions are consistent with this Agreement and the Plan of Arrangement. Meta will also oppose any proposal from any party that the Interim Order or the Final Order contain any provision inconsistent with this Agreement, and, if at any time after the issuance of the Final Order and prior to the Effective Time, Meta is required by the terms of the Final Order or by Law to return to Court with respect to the Final Order, it shall do so only after reasonable advance notice to, and in consultation and cooperation with, RTO Acquiror. If the Courts in Ontario are closed due to disease outbreaks, pandemics or epidemics or other related conditions, then the time to make application to the Court or convene and conduct the Meta Meeting in Sections 2.2(d), 2.4 and 2.6**,** shall be tolled for such period as the Courts are closed plus three (3) Business Days; provided that in no event shall such tolling and three (3) Business Day period extend beyond the Outside Date.

**2.8 Articles of Arrangement and Effective Date**

(a) The Articles of Arrangement shall implement the Plan of Arrangement and will become effective as of the Effective Time. On the second (2nd) Business Day after the satisfaction or, where permitted, the waiver of the conditions (excluding conditions that, by their terms, cannot be satisfied until the Effective Date, but subject to the satisfaction or, where not prohibited, the waiver of those conditions as of the Effective Date) set forth in Article 6, unless another time or date is agreed to in writing by the Parties, the Articles of Arrangement shall be filed by Meta with the Director, provided, however, that the Articles of Arrangement shall not be sent to the Director, for endorsement and filing by the Director, except as contemplated hereby or with RTO Acquiror's prior written consent. From and after the Effective Time, the Plan of Arrangement will have all of the effects provided by applicable Law, including the OBCA. Each of Meta and RTO Acquiror agrees to amend the Plan of Arrangement at any time prior to the Effective Time in accordance with Section 8.4 of this Agreement to include such other terms determined to be reasonably necessary or desirable by RTO Acquiror or Meta, as the case may be.

(b) The closing of the Arrangement will take place at the offices of Fasken Martineau DuMoulin LLP in Toronto at 9:00 a.m. (Toronto time) on the Effective Date, or at such other time and place as may be agreed to by the Parties.

**2.9 Payment of Consideration**

RTO Acquiror and Canco will, following receipt by Meta of the Final Order and prior to the filing by Meta of the Articles of Arrangement, issue in escrow with the Depositary (the terms and conditions of such escrow to be satisfactory to the parties, acting reasonably) sufficient RTO Acquiror Shares and Exchangeable Shares to satisfy the aggregate Consideration for the Meta Shares outstanding. Subject to the provisions of the Plan of Arrangement, Canco shall execute joint elections under subsection 85(1) or 85(2) of the ITA or any equivalent provincial legislation with Meta Shareholders who are Eligible Holders (as defined in the Plan of Arrangement) and who are entitled to receive Exchangeable Shares under the Arrangement, subject to and in accordance with the Plan of Arrangement.

**2.10 RTO Acquiror Proxy Statement**

(a) As promptly as practicable following execution of this Agreement, but subject to Subsection 2.10(c), RTO Acquiror shall (i) prepare, in consultation with Meta, the preliminary RTO Acquiror Proxy Statement (and the letter to stockholders, notice of meeting and form of proxy included therewith), and (ii) cause the preliminary RTO Acquiror Proxy Statement to be filed with the SEC.

(b) RTO Acquiror covenants and agrees that the definitive RTO Acquiror Proxy Statement (including the letter to stockholders, notice of meeting and form of proxy included therewith), will not, at the time that the definitive RTO Acquiror Proxy Statement or any amendment or supplement thereto is first mailed to the RTO Acquiror Shareholders and at the time of the RTO Acquiror Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. Notwithstanding the foregoing, RTO Acquiror makes no covenant, representation or warranty with respect to statements made in the definitive RTO Acquiror Proxy Statement (and the letter to stockholders, notice of meeting and form of proxy included therewith) (i) based on information furnished in writing by Meta specifically for inclusion therein, or (ii) that otherwise reflect information about Meta or the planned business of RTO Acquiror or Meta following the Effective Time. Each of the Parties shall use commercially reasonable efforts to cause the definitive RTO Acquiror Proxy Statement to comply with the applicable rules and regulations promulgated by the SEC and to respond promptly to any comments of the SEC or its staff. RTO Acquiror shall use commercially reasonable efforts to cause the definitive RTO Acquiror Proxy Statement to be filed with the SEC, and mailed to the RTO Acquiror Shareholders as of the record date established for the RTO Acquiror Meeting (the "**RTO Acquiror Record Date**"), as promptly as practicable after (A) the 10th calendar day after the preliminary RTO Acquiror Proxy Statement therefor has been filed with the SEC if by such date the SEC has not informed RTO Acquiror that it intends to review the preliminary RTO Acquiror Proxy Statement or (B) if the SEC has, by the 10th calendar day after the preliminary RTO Acquiror Proxy Statement therefor has been filed with the SEC, informed RTO Acquiror that it intends to review the preliminary RTO Acquiror Proxy Statement, the date on which the SEC confirms that it has no further comments on the preliminary RTO Acquiror Proxy Statement.

(c) Except in the case of an RTO Acquiror Change in Recommendation specifically permitted pursuant to Section 7.4, RTO Acquiror shall disclose in the RTO Acquiror Proxy Statement:

(i) that the RTO Acquiror Board has received a fairness opinion from the RTO Acquiror Financial Advisor stating that, as at the date of such opinion, the Consideration to be paid by RTO Acquiror and Canco pursuant to the Arrangement is fair, from a financial point of view, to the RTO Acquiror Shareholders;

(ii) the general terms of the fairness opinion from the RTO Acquiror Financial Advisor and a copy of such fairness opinion shall be included in the RTO Acquiror Proxy Statement;

(iii) that the RTO Acquiror Board has unanimously determined, after receiving financial and legal advice, that (A) the Arrangement is fair and reasonable to the RTO Acquiror Shareholders, (B) the Arrangement is in the best interests of the RTO Acquiror and (C) the RTO Acquiror Board unanimously recommends that the RTO Acquiror Shareholders vote in favor of the RTO Acquiror Shareholder Approval Matters (the "**RTO Acquiror Board Recommendation**"); and

(iv) that each director and senior officer of RTO Acquiror set out in Schedule F hereto has signed an RTO Acquiror Voting Agreement and agreed to vote all of such Person's RTO Acquiror Shares (including any RTO Acquiror Shares issued upon the exercise of any securities convertible, exercisable or exchangeable into or for RTO Acquiror Shares) in favour of the RTO Acquiror Shareholder Approval Matters, and against any matter submitted by any Person that is inconsistent with the Arrangement, subject to the other terms of the RTO Acquiror Voting Agreements.

(d) Meta shall promptly provide to RTO Acquiror all information regarding Meta or its subsidiaries and affiliates, as required by applicable Law for inclusion in the RTO Acquiror Proxy Statement, or in any amendments or supplements to such RTO Acquiror Proxy Statement. Meta shall ensure that no such information provided by Meta specifically for inclusion in the RTO Acquiror Proxy Statement will contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

(e) Meta and its legal counsel shall be given a reasonable opportunity to review and comment on the RTO Acquiror Proxy Statement and all such other documents required to be filed or distributed to RTO Acquiror Shareholders under the Securities Laws in connection with the Arrangement. RTO Acquiror and its legal counsel will incorporate all reasonable comments of Meta and its legal counsel into the RTO Acquiror Proxy Statement and all such other documents. The RTO Acquiror Proxy Statement and all such other documents shall be satisfactory to Meta, acting reasonably, before they are printed, or distributed to RTO Acquiror Shareholders or filed with any Governmental Entity, subject to any disclosure obligations imposed on RTO Acquiror by any Securities Authorities. RTO Acquiror agrees that all information relating solely to Meta and its subsidiaries and affiliates included in the RTO Acquiror Proxy Statement must be in a form and content satisfactory to Meta.

(f) Each of Meta and RTO Acquiror shall promptly notify the other Party if at any time before the Effective Date either becomes aware that the RTO Acquiror Proxy Statement contains any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading, or otherwise requires an amendment or supplement, and the Parties shall co-operate in the preparation of any amendment or supplement to the RTO Acquiror Proxy Statement as required or appropriate. RTO Acquiror shall promptly mail or otherwise publicly disseminate any amendment or supplement to the RTO Acquiror Proxy Statement to RTO Acquiror Shareholders and, if required by applicable Law, file the same with any Governmental Entity and as otherwise required.

(g) RTO Acquiror shall keep Meta informed of any requests or comments made by any Securities Authorities in connection with the RTO Acquiror Proxy Statement and, as promptly as reasonably practicable, provide Meta with copies of any correspondence received by RTO Acquiror from, or sent by RTO Acquiror to, any Securities Authorities in connection with the RTO Acquiror Proxy Statement.

**2.11 RTO Acquiror Meeting**

(a) RTO Acquiror shall take all action necessary under applicable Law to call, give notice of and hold the RTO Acquiror Meeting as soon as practicable, and in any event no later than February 1, 2021, to vote on the (i) transactions contemplated by this Agreement, (ii) issuance of RTO Acquiror Shares pursuant to this Agreement and the Plan of Arrangement, (iii) RTO Acquiror Amended and Restated Articles and RTO Acquiror Amended and Restated Bylaws, (iv) Sale, (v) change of control of RTO Acquiror resulting from the transaction contemplated by this Agreement pursuant to rules of NASDAQ, (vi) Reverse Split, (vii) increase in the number of authorized shares of RTO Acquiror to an amount to be determined by Meta and to create a Special Voting Share in the capital of RTO Acquiror, (viii) 2020 Equity Incentive Plan of RTO Acquiror, and if required by Meta, the 2020 Employee Stock Purchase Plan of RTO Acquiror, each in the form provided by Meta and reasonably acceptable to RTO Acquiror, in each case such adoption to be effective upon consummation of the transactions contemplated by this Agreement, and (ix) the RTO Acquiror Board Matters (collectively, the "**RTO Acquiror Shareholder Approval Matters**"). The RTO Acquiror Meeting shall be held as promptly as practicable, and in any event within 45 days, after the definitive RTO Acquiror Proxy Statement is mailed to RTO Acquiror Shareholders as of the RTO Acquiror Record Date. RTO Acquiror shall take commercially reasonable measures to ensure that all proxies solicited in connection with the RTO Acquiror Meeting are solicited in compliance with all applicable Law. Notwithstanding anything to the contrary contained herein, if on a date preceding the date on which or the date on which the RTO Acquiror Meeting is scheduled, RTO Acquiror reasonably believes that (A) it will not receive proxies sufficient to obtain the RTO Acquiror Shareholder Approval, whether or not a quorum would be present or (B) it will not have sufficient RTO Acquiror Shares represented (either in person or by proxy) to constitute a quorum necessary to conduct the business of the RTO Acquiror Meeting, RTO Acquiror may (or will, at Meta's direction) postpone or adjourn, or make one or more successive postponements or adjournments of, the RTO Acquiror Meeting, provided that (I) the date of the RTO Acquiror Meeting is not postponed or adjourned more than an aggregate of 15 calendar days in connection with any postponements or adjournments in reliance on the preceding sentence and (II) RTO Acquiror shall not be required to postpone or adjourn the RTO Acquiror Meeting more than once at Meta's direction. In addition, RTO Acquiror may postpone or adjourn the RTO Acquiror Meeting to allow reasonable additional time for the filing and mailing of any amendment or supplement to the RTO Acquiror Proxy Statement that the RTO Acquiror Board determines in good faith to be required or advisable pursuant to Subsection 2.10(f) above, and for such amendment or supplement to be disseminated and reviewed by the RTO Acquiror Shareholders prior to the RTO Acquiror Meeting.

(b) Except in the case of an RTO Acquiror Change in Recommendation specifically permitted pursuant to Section 7.4, RTO Acquiror agrees that (i) the RTO Acquiror Board shall unanimously issue the RTO Acquiror Board Recommendation that the RTO Acquiror Shareholders vote in favor of the RTO Acquiror Shareholder Approval Matters and shall use commercially reasonable efforts to solicit such approval within the timeframe set forth in Subsection 2.11(a) above and (ii) the RTO Acquiror Board Recommendation shall not be withdrawn or modified in a manner adverse to Meta, and no resolution by the RTO Acquiror Board or any committee thereof to withdraw or modify the RTO Acquiror Board Recommendation in a manner adverse to Meta shall be adopted or proposed; and (iii) RTO Acquiror shall use its reasonable best efforts to solicit proxies from its stockholders to obtain the RTO Acquiror Shareholder Approval.

**2.12 Obligations Regarding Exchangeable Shares**

RTO Acquiror, Canco and Callco shall, on a joint and several basis, use their commercially reasonable efforts:

(a) to obtain all orders required from the applicable Securities Authorities to permit the first resale of:

(i) the Exchangeable Shares issued pursuant to the Arrangement; and

(ii) the RTO Acquiror Shares issued from time to time upon exchange of the Exchangeable Shares, in each case without qualification with or approval of or the filing of any prospectus, or the taking of any proceeding with, or the obtaining of any further order, ruling or consent from, any Securities Authorities in any of the provinces or territories of Canada;

(b) to cause the Exchangeable Shares to be listed and posted for trading on the CSE or such other Canadian securities exchange acceptable to Meta, acting reasonably, by the Exchange Time and to take reasonable steps to maintain such listing for so long as there are Exchangeable Shares outstanding (other than those securities held by RTO Acquiror or any of its affiliates), subject to the Exchangeable Shares satisfying all of the initial listing requirements of such Canadian securities exchange, including (but not limited to) sufficient distribution of the Exchangeable Shares;

(c) to cause the listing and admission to trading on NASDAQ of the RTO Acquiror Shares to be issued at the Exchange Time and from time to time upon exchange of the Exchangeable Shares, the RTO Acquiror Replacement Options and Meta Warrants;

(d) to ensure that Canco is, at the Effective Time and for so long as there are Exchangeable Shares outstanding (other than those Exchangeable Shares held by RTO Acquiror, Callco or any of its affiliates), a "taxable Canadian corporation" and not a "mutual fund corporation," each within the meaning of the ITA (as of the Effective Time and any modifications to such definitions which are consistent with the principles thereof);

(e) to file a registration statement on Form S-3 in order to register under the U.S. Securities Act the RTO Acquiror Shares to be issued upon exchange of the Exchangeable Shares from time to time after the Effective Time, and use its commercially reasonable efforts to cause such registration statement to become effective as promptly as reasonably practicable following the Effective Time and to maintain the effectiveness of such registration for the period that such Exchangeable Shares remain outstanding;

(f) to enter into the Support Agreement and the Voting and Exchange Trust Agreement effective as of the Effective Time; and

(g) take all actions required in order to create and issue the Special Voting Share as a share in the capital of RTO Acquiror as of the Effective Time.

**2.13 RTO Acquiror Post-Closing Governance**

(a) Unless otherwise agreed by the Parties, immediately following the Effective Time, RTO Acquiror shall cause the RTO Acquiror Board to be comprised of seven (7) directors, with five (5) of such directors to be nominees of Meta, one (1) director to be jointly nominated by Meta and RTO Acquiror and one (1) director to be a nominee of RTO Acquiror, subject to the reasonable approval of Meta. These changes are referred to herein as the "**RTO Acquiror Board Matters**".

(b) Immediately following the Effective Time, the RTO Acquiror Board shall appoint the following Persons as officers of RTO Acquiror:

(i) George Palikaras as chief executive officer; and

(ii) Kenneth Rice as chief financial officer.

**2.14 RTO Acquiror Business Sale**

(a) Prior to and following the Effective Time, RTO Acquiror shall use its commercially reasonable efforts to (i) enter into one or more definitive agreements, providing for the sale of the RTO Acquiror Business to a third party buyer and, if any such definitive agreement is entered into prior to the Effective Time, on terms and conditions reasonably acceptable to Meta; and (ii) consummate such sale of the RTO Acquiror Business (which may occur in one or more transactions, the "**Sale**").

(b) Prior to the Effective Time, RTO Acquiror shall not amend, modify or waive any provisions of any definitive agreement in respect of the Sale without the prior written consent of Meta, which consent shall not be unreasonably withheld, delayed or conditioned.

(c) In connection with any Sale to be consummated prior to the Effective Time, RTO Acquiror shall (i) use its commercially reasonable efforts to seek and obtain written agreements in form and substance reasonably acceptable to Meta from all parties to Contracts that will be transferred and assigned in connection with the Sale releasing RTO Acquiror from any and all liabilities and obligations under such Contracts, (ii) provide evidence reasonably satisfactory to Meta that no material Tax or other liabilities will arise to RTO Acquiror as a result of the Sale, other than contractual obligations under the definitive agreement in respect of any such Sale and (iii) deliver to Meta a schedule, which schedule shall be reasonably acceptable to Meta, setting forth the list of Contracts and other assets and all related liabilities and obligations to be transferred as part of the Sale.

**2.15 Preferred Stock Dividend**

Prior to the Effective Time, RTO Acquiror shall declare and issue a dividend, on a one-for-one basis, of RTO Acquiror Preferred Stock, which shall be issued to the RTO Acquiror Shareholders on the RTO Acquiror Record Date.

**2.16 Pre-Closing Financing**

(a) Prior to the Effective Time, the Parties shall undertake to consummate a Pre-Closing Financing. The Parties will use their commercially reasonable efforts and will cause each their respective Subsidiaries and Representatives to use their commercially reasonable efforts, to provide the Parties with all cooperation reasonably requested by the Parties to assist the Parties in entering into definitive agreements with respect to a Pre-Closing Financing and consummating a Pre-Closing Financing.

(b) Notwithstanding the any provision of this Agreement, nothing in this Agreement will require Meta to (i) waive or amend any terms of this Agreement, (ii) take any action that, in the good faith determination of Meta, would unreasonably interfere with the conduct of the Meta Business, (iii) provide any information the disclosure of which is prohibited under applicable Law or is legally privileged, or (iv) take any action that will conflict with or violate its organizational documents or any applicable Law or would result in a violation or breach of, or default under, any Material Contract to which Meta or any of its subsidiaries is a party.

**2.17 Reverse Split**

RTO Acquiror shall submit to the RTO Acquiror Shareholders at the RTO Acquiror Meeting a proposal to (a) approve and adopt the RTO Acquiror Amended and Restated Articles, (b) authorize the RTO Acquiror Board to effect a reverse stock split of all outstanding RTO Acquiror Shares at a reverse stock split ratio as determined by the Parties (the "**Reverse Split**") and within the range approved by the RTO Acquiror Shareholders, and (c) increase the authorized number of RTO Acquiror Shares to an amount to be determined by the Parties. Following such approval by the RTO Acquiror Shareholders, RTO Acquiror shall cause the Reverse Split to be implemented and take effect immediately prior to the Effective Time. For the avoidance of doubt, the Exchange Ratio shall be adjusted appropriately for the Reserve Split.

**2.18 Announcements and Consultations**

RTO Acquiror and Meta shall consult with each other in respect to issuing any press release, preparing any presentations or otherwise making any public statement with respect to this Agreement or the Arrangement or the Pre-Closing Financing and, except as otherwise set forth in this Agreement, in making any filing with any Governmental Entity with respect to this Agreement or the Arrangement. Each of RTO Acquiror and Meta shall use all commercially reasonable efforts to enable the other Party to review and comment on all such press releases, presentations, public statements and, except as otherwise set forth in this Agreement, filings prior to the release or filing, respectively, thereof, and neither RTO Acquiror nor Meta shall release, make or file any press release, presentation, public statements or, except as otherwise set forth in this Agreement, filing without the prior written consent of the other Party (which consent shall not be unreasonably withheld or delayed), provided, however, that the obligations herein shall not prevent a Party from making such disclosure as is required by applicable Law or the rules and policies of any applicable securities exchange, and the Party making such disclosure shall use all commercially reasonable efforts to enable the other Party to review or comment on the disclosure or filing, and if such prior notice is not possible, to give such notice immediately following the making of such disclosure or filing. Reasonable consideration shall be given to any comments made by the other Party and its counsel.

**2.19 Withholding Taxes**

Meta, RTO Acquiror, Canco, Callco and the Depositary in connection with the Arrangement shall be entitled to deduct and withhold from any dividend, price or consideration otherwise payable to any Person (including, for greater certainty, any Meta Shareholder, any holder of Meta Options, any holder of Meta Warrants and any Dissenting Shareholder), such amounts as Meta, RTO Acquiror, Canco, Callco or the Depositary is required to deduct and withhold with respect to such payment under the ITA, United States Tax Laws or any other applicable Law. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes hereof as having been paid to the holder of the securities in respect of which such deduction and withholding was made, provided that such withheld amounts are actually remitted to the appropriate taxing agency. Meta, RTO Acquiror, Canco, Callco and the Depositary are hereby authorized to sell or otherwise dispose of a portion of the non-cash consideration as is necessary to provide sufficient funds to Meta, RTO Acquiror, Canco, Callco and the Depositary, as the case may be, to enable it to comply with such deduction or withholding requirement and Meta, RTO Acquiror, Canco, Callco and the Depositary shall notify the holder thereof and remit any unapplied balance of the net proceeds of such sale.

**2.20 Holders of Convertible Securities**

(a) Each Meta Option outstanding immediately prior to the Effective Time shall be exchanged for an RTO Acquiror Replacement Option to purchase from the RTO Acquiror the number of RTO Acquiror Shares equal to the product of (i) the number of Meta Shares subject to the Meta Option immediately before the Effective Time, and (ii) the Exchange Ratio, provided that if the foregoing would result in the issuance of an RTO Acquiror Replacement Option exercisable for a fraction of an RTO Acquiror Share, then the number of RTO Acquiror Shares underlying such RTO Acquiror Replacement Option shall be rounded down to the nearest whole number of RTO Acquiror Shares. The exercise price per RTO Acquiror Share subject to any such RTO Acquiror Replacement Option shall be an amount equal to the quotient of (A) the exercise price per Meta Share under the exchanged Meta Option immediately prior to the Effective Time divided by (B) the Exchange Ratio. Except as set out above, all terms and conditions of an RTO Acquiror Replacement Option, including the term to expiry, conditions to and manner of exercising, will be the same as the Meta Option for which it was exchanged and any document evidencing a Meta Option shall thereafter evidence and be deemed to evidence such RTO Acquiror Replacement Option. If the exchange contemplated by this paragraph results in a disposition of Meta Options, it is intended that the provisions of subsection 7(1.4) of the Tax Act apply to any such disposition.

(b) Each Meta DSU shall, without any further action on the part of any holder thereof, be continued on the same terms and conditions as were applicable immediately prior to the Effective Time, except that, pursuant to the terms of the deferred share unit plan of Meta, the terms of the Meta DSUs shall be amended so as to substitute for the Meta Shares issuable pursuant to such Meta DSUs such number of RTO Acquiror Shares equal to (i) the number of Meta Shares issuable pursuant to the Meta DSUs immediately prior to the Effective Time, multiplied by (ii) the Exchange Ratio, rounded down to the nearest whole number.

(c) Each Meta Warrant shall, without any further action on the part of any holder thereof, be continued on the same terms and conditions as were applicable immediately prior to the Effective Time, except that, pursuant to the terms of the applicable warrant certificate, the terms of the Meta Warrants shall be amended so as to substitute for the Meta Shares issuable pursuant to such Meta Warrants such number of RTO Acquiror Shares equal to (i) the number of Meta Shares issuable pursuant to the Meta Warrants immediately prior to the Effective Time, multiplied by (ii) the Exchange Ratio, rounded down to the nearest whole number. The exercise price per RTO Acquiror Share subject to any such Meta Warrant following the Effective Time shall be an amount equal to the quotient of (A) the exercise price per Meta Share under the Meta Warrant immediately prior to the Effective Time divided by (B) the Consideration.

**2.21 U.S. Securities Law Matters**

The Parties intend that the Arrangement shall be carried out such that the issuance of the RTO Acquiror Shares, RTO Acquiror Replacement Options and Exchangeable Shares to Meta Shareholders in exchange for Meta Shares and Exchangeable Shares, respectively, qualifies for the exemption from the registration requirements of the U.S. Securities Act provided by the Section 3(a)(10) Exemption and applicable U.S. state securities laws in reliance upon similar exemptions under applicable U.S. state securities laws. Each Party agrees to act in good faith, consistent with the intent of the Parties and the intended treatment of the Arrangement as set forth in this Section 2.21. In order to ensure the availability of the Section 3(a)(10) Exemption, the Parties agree that the Arrangement will be carried out on the following basis:

(a) the Arrangement will be subject to the approval of the Court;

(b) the Court will be advised as to the intention of the Parties to rely on the Section 3(a)(10) Exemption prior to the Court hearing required to issue the Interim Order;

(c) the Court will be required to satisfy itself as to the substantive and procedural fairness of the Arrangement to the Meta Shareholders;

(d) the Court will hold a hearing before approving the procedural and substantive fairness of the terms and conditions of the Arrangement;

(e) the Final Order will expressly state that the Arrangement is approved by the Court as being substantively and procedurally fair to the Meta Shareholders to whom RTO Acquiror Shares, RTO Acquiror Replacement Options and Exchangeable Shares will be issued;

(f) the Parties will ensure that each Meta Shareholder entitled to receive RTO Acquiror Shares, RTO Acquiror Replacement Options or Exchangeable Shares on completion of the Arrangement will (i) be given adequate notice advising them of their right to attend the Court hearing and providing them with sufficient information necessary for them to exercise that right, (ii) be advised that the RTO Acquiror Shares, RTO Acquiror Replacement Options and Exchangeable Shares issuable pursuant to the Arrangement have not been and will not be registered under the U.S. Securities Act and will be issued by RTO Acquiror in reliance on the Section 3(a)(10) Exemption, and that certain restrictions on resale under the securities laws of the United States, including, as applicable, Rule 144 under the U.S. Securities Act, may be applicable with respect to securities issued to affiliates of RTO Acquiror, and (iii) be advised that the Section 3(a)(10) Exemption does not exempt the issuance of securities upon the exercise of such RTO Acquiror Replacement Options and, therefore, the underlying RTO Acquiror Shares issuable upon the exercise of the RTO Acquiror Replacement Options, if any, cannot be issued in the United States or to a Person in the United States in reliance upon the Section 3(a)(10) Exemption and the RTO Acquiror Replacement Options may only be exercised pursuant to an effective registration statement or pursuant to a then available exemption from the registration requirements of the U.S. Securities Act and applicable state securities laws, if any;

(g) the Interim Order will specify that each Meta Shareholder entitled to receive RTO Acquiror Shares, RTO Acquiror Replacement Options or Exchangeable Shares on completion of the Arrangement will have the right to appear before the Court at the Court hearing on the Final Order so long as such Meta Shareholder enters an appearance within a reasonable time and in accordance with the requirements of the Section 3(a)(10) Exemption; and

(h) RTO Acquiror will request that the Final Order include a statement to substantially the following effect: "This Order will serve as a basis of a claim to an exemption, pursuant to Section 3(a)(10) of the United States Securities Act of 1933, as amended, from the registration requirements otherwise imposed by that act, regarding the distribution of securities of RTO Acquiror, pursuant to the Plan of Arrangement."

**2.22 U.S. Tax Matters**

The Arrangement is intended to qualify as a reorganization within the meaning of Section 368(a) of the U.S. Tax Code and the Treasury Regulations promulgated thereunder, and this Agreement, together with the Plan of Arrangement, is intended to be, and is hereby adopted as a "plan of reorganization" within the meaning of the Treasury Regulations promulgated under Section 368 of the U.S. Tax Code. Each Party agrees to treat the Arrangement as a reorganization within the meaning of Section 368(a) of the U.S. Tax Code for all United States federal income tax purposes, to treat this Agreement, together with the Plan of Arrangement, as a "plan of reorganization" within the meaning of the Treasury Regulations promulgated under Section 368 of the U.S. Tax Code, and to not take any position on any Tax return or otherwise take any Tax reporting position inconsistent with such treatment, unless otherwise required as a result of a "determination" within the meaning of Section 1313(a) of the U.S. Tax Code. Following the Effective Date, RTO Acquiror will prepare and file in accordance with Treasury Regulations (including by posting a copy on the investor relations section of its website) an IRS Form 8937 with respect to the Arrangement. Each Party agrees to act in good faith, consistent with the intent of the Parties and the intended treatment of the Arrangement as set forth herein and to use commercially reasonable efforts to not take any action, or knowingly fail to take any action, if such action or failure to act would reasonably be expected to prevent the Arrangement from qualifying as a reorganization within the meaning of Section 368(a) of the U.S. Tax Code.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF METAMATERIAL

**3.1 Representations and Warranties of Meta**

Except as disclosed in the Meta Disclosure Letter (in the manner contemplated by the first page thereof), Meta represents and warrants to RTO Acquiror as set forth in Schedule C and acknowledges and agrees that RTO Acquiror is relying upon such representations and warranties in connection with the entering into of this Agreement. Any investigation by RTO Acquiror or its Representatives shall not mitigate, diminish or affect the representations and warranties of Meta pursuant to this Agreement.

**3.2 Survival of Representations and Warranties**

The representations and warranties of Meta contained in this Agreement shall not survive the completion of the Arrangement and shall expire and be terminated on the earlier of the Effective Time and the date on which this Agreement is terminated in accordance with its terms.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF RTO ACQUIROR, CANCO AND CALLCO

### 4.1 Representations and Warranties of RTO Acquiror

Except as disclosed in the Meta Disclosure Letter (in the manner contemplated by the first page thereof), each of RTO Acquiror, Canco and Callco jointly and severally represents and warrants to Meta as set forth in Schedule D and acknowledges and agrees that Meta is relying upon such representations and warranties in connection with the entering into of this Agreement. Any investigation by Meta or its Representatives shall not mitigate, diminish or affect the representations and warranties of RTO Acquiror, Canco and Callco pursuant to this Agreement.

### 4.2 Survival of Representations and Warranties

The representations and warranties of RTO Acquiror, Canco and Callco contained in this Agreement shall not survive the completion of the Arrangement and shall expire and be terminated on the earlier of the Effective Time and the date on which this Agreement is terminated in accordance with its terms.

## ARTICLE 5
## COVENANTS

### 5.1 Covenants of Meta Relating to the Arrangement

Except such actions as are expressly permitted pursuant to any other term of this Agreement, Meta shall perform all obligations required to be performed by Meta under this Agreement, co-operate with RTO Acquiror in connection therewith, and do all such other acts and things as may be necessary or desirable in order to consummate and make effective, as soon as reasonably practicable, the Arrangement and the other transactions contemplated in this Agreement and, without limiting the generality of the foregoing, Meta shall:

(a) apply for and use all commercially reasonable efforts in co-operation with RTO Acquiror to obtain all Key Regulatory Approvals and, in doing so, keep RTO Acquiror informed in a timely manner as to the status of the proceedings or other actions related to obtaining the Key Regulatory Approvals, including (i) providing RTO Acquiror with copies of all related applications and notifications, in draft form, in order for RTO Acquiror to provide its comments thereon, and Meta shall consult with the RTO Acquiror on any comments provided in good faith; (ii) promptly furnishing to RTO Acquiror copies of notices or other formal communications received by Meta from, or given by Meta to, any Governmental Entity (including any Securities Authority) with respect to the transactions contemplated by this Agreement or otherwise; (iii) not making any commitments, providing any undertakings or assuming any obligations, in each case, that are outside the ordinary course of business, without the prior written consent of RTO Acquiror; and (iv) subject to applicable Law, Meta shall, to the extent reasonably practicable, provide RTO Acquiror and its counsel with the opportunity to participate in any substantive meeting, teleconference or other material communication with any Governmental Entity in respect of any filing, investigation or other inquiry in connection with the Key Regulatory Approvals;

(b) use all commercially reasonable efforts to satisfy all conditions precedent in this Agreement in its power to satisfy and take all steps set forth in the Interim Order and Final Order applicable to it and comply promptly with all requirements which applicable Law may impose on Meta with respect to the Arrangement or the other transactions contemplated by this Agreement and including effecting all necessary registrations, filings and submissions of information requested by Governmental Entities required to be effected by Meta or its subsidiaries in connection with the Arrangement and cooperating with RTO Acquiror in connection with its performance of its obligations hereunder;

(c) use all commercially reasonable efforts to defend all lawsuits or other legal, regulatory or other proceedings against Meta challenging or affecting this Agreement or the consummation of the transactions contemplated hereby and use all commercially reasonable efforts to have lifted or rescinded any injunction or restraining order or other order relating to Meta which may materially impede the ability of the Parties to consummate the Arrangement or the other transactions contemplated by this Agreement;

(d) use all commercially reasonable efforts to obtain, and to assist RTO Acquiror with respect to obtaining, as applicable, all consents, waivers or approvals required under all Material Contracts, including waivers required in connection with any change of control provisions contained in any Material Contracts;

(e) cooperate with RTO Acquiror and use all commercially reasonable efforts to take, or cause to be taken, all actions and do or cause to be done all things reasonably necessary, proper or advisable on its part under applicable Law and the policies of the CSE to enable the delisting by Meta of the Meta Shares from the CSE as soon as reasonably practicable (and in any event in compliance with applicable Law) after the Effective Date;

(f) use its commercially reasonable efforts to ensure that the Section 3(a)(10) Exemption is available for the issuance of RTO Acquiror Shares to the Meta Shareholders in exchange for their Meta Shares and the issuance of the RTO Acquiror Replacement Options to Meta Optionholders in exchange for their Meta Options pursuant to the Plan of Arrangement;

(g) until the earlier of the Effective Time and termination of this Agreement in accordance with its terms, Meta shall, to the extent not precluded by applicable Law, promptly notify RTO Acquiror, in writing, and promptly provide copies of any related documentation received, when Meta has knowledge of:

(i) any notice or other communication from any Person alleging that the consent (or waiver, permit, exemption, order, approval, agreement, amendment or confirmation) of such Person (or other Person) is or may be required in connection with this Agreement or the Arrangement;

(ii) any notice or other communication from any Governmental Entity in connection with the Arrangement or this Agreement;

(iii) any matter that has resulted in, or is reasonably likely to result in, a condition set forth in Section 6.1 or 6.2 not being satisfied;

(iv) the failure of Meta to perform any obligations to be performed by it under this Agreement such that any conditions set forth in Section 6.1 or 6.2 would not be satisfied; or

(v) any filings, actions, suits, claims, investigations or proceedings commenced or, to the knowledge of Meta, threatened orally or in writing against, or, in respect of any filings, actions, suits, claims, investigations or proceedings existing as at the date hereof, if any additional filings, actions, suits, claims, investigations or proceedings are made or threatened orally or in writing, in each case relating to or involving or otherwise affecting Meta, its subsidiaries or any of their respective assets that would reasonably be expected to be material to Meta and its subsidiaries, taken as a whole; and

(h) not take any action, or refrain from taking any commercially reasonable action, or permit any action to be taken or not taken, which is inconsistent with this Agreement or which would reasonably be expected to, individually or in the aggregate, prevent, materially delay or otherwise materially impede the consummation of the Arrangement.

**5.2 Covenants of RTO Acquiror, Canco and Callco Relating to the Arrangement**

Except such actions as are expressly permitted pursuant to any other term of this Agreement, RTO Acquiror, Canco and Callco shall, on a joint and several basis, perform all obligations required to be performed by RTO Acquiror, Canco and Callco under this Agreement, co-operate with Meta in connection therewith, and do all such other acts and things as may be necessary or desirable in order to consummate and make effective, as soon as reasonably practicable, the Arrangement and the other transactions contemplated in this Agreement and, without limiting the generality of the foregoing, RTO Acquiror, Canco and Callco shall:

(a) apply for and use all commercially reasonable efforts in co-operation with Meta to obtain all Key Regulatory Approvals and, in doing so, keep Meta informed in a timely manner as to the status of the proceedings or other actions related to obtaining the Key Regulatory Approvals, including (i) providing Meta with copies of all related applications and notifications, in draft form, in order for Meta to provide its comments thereon, and RTO Acquiror, Canco and Callco shall consult with the Meta on any comments provided in good faith; (ii) promptly furnishing to Meta copies of notices or other formal communications received by RTO Acquiror, Canco and/or Callco from, or given by RTO Acquiror, Canco or Callco to, any Governmental Entity (including any Securities Authority) with respect to the transactions contemplated by this Agreement or otherwise; (iii) not making any commitments, providing any undertakings or assuming any obligations, in each case, that are outside the ordinary course of business, without the prior written consent of Meta; and (iv) subject to applicable Law, each of RTO Acquiror, Canco and Callco shall, to the extent reasonably practicable, provide Meta and its counsel with the opportunity to participate in any substantive meeting, teleconference or other material communication with any Governmental Entity in respect of any filing, investigation or other inquiry in connection with the Key Regulatory Approvals;

(b) use all commercially reasonable efforts to satisfy all conditions precedent in this Agreement in its power to satisfy and comply promptly with all requirements which applicable Law may impose on RTO Acquiror, Canco and Callco with respect to the Arrangement or the other transactions contemplated by this Agreement and including effecting all necessary registrations, filings and submissions of information requested by Governmental Entities required to be effected by RTO Acquiror, Canco, Callco or any of their subsidiaries in connection with the Arrangement and cooperating with Meta in connection with its performance of its obligations hereunder;

(c) use all commercially reasonable efforts to defend all lawsuits or other legal, regulatory or other proceedings against RTO Acquiror, Canco and/or Callco challenging or affecting this Agreement or the consummation of the transactions contemplated hereby and use all commercially reasonable efforts to have lifted or rescinded any injunction or restraining order or other order relating to RTO Acquiror, Canco and/or Callco which may materially impede the ability of the Parties to consummate the Arrangement or the other transactions contemplated by this Agreement;

(d) use all commercially reasonable efforts to obtain, and to assist Meta with respect to obtaining, as applicable, all consents, waivers or approvals required under all Material Contracts, including waivers required in connection with any change of control provisions contained in any Material Contracts;

(e) use all commercially reasonable efforts to take, or cause to be taken, all actions and do or cause to be done all things reasonably necessary, proper or advisable on its part under applicable Law and the policies of NASDAQ to enable the listing on NASDAQ by RTO Acquiror of the RTO Acquiror Shares on the Effective Date;

(f) use its commercially reasonable efforts to ensure that the Section 3(a)(10) Exemption is available for the issuance of RTO Acquiror Shares to the Meta Shareholders in exchange for their Meta Shares and the issuance of the RTO Acquiror Replacement Options to Meta Optionholders in exchange for their Meta Options pursuant to the Plan of Arrangement;

(g) until the earlier of the Effective Time and termination of this Agreement in accordance with its terms, subject to applicable Law, make available and cause to be made available to Meta, and its Representatives, information reasonably requested by Meta for the purposes of preparing, considering and implementing integration and strategic plans for the acquisition by RTO Acquiror of Meta following the Effective Date; and

(h) until the earlier of the Effective Time and termination of this Agreement in accordance with its terms, RTO Acquiror, Canco and Callco shall, to the extent not precluded by applicable Law, promptly notify Meta, in writing, and promptly provide copies of any related documentation received, when RTO Acquiror has knowledge of:

(i) any notice or other communication from any Person alleging that the consent (or waiver, permit, exemption, order, approval, agreement, amendment or confirmation) of such Person (or other Person) is or may be required in connection with this Agreement or the Arrangement;

(ii) any notice or other communication from any Governmental Entity in connection with the Arrangement or this Agreement;

(iii) any matter that has resulted in, or is reasonably likely to result in, a condition set forth in Section 6.1 or Section 6.3 not being satisfied;

(iv) the failure of RTO Acquiror, Canco or Callco to perform any obligations to be performed by it under this Agreement such that any conditions set forth in Section 6.1 or Section 6.3 would not be satisfied; or

(v) any filing, actions, suits, claims, investigations or proceedings commenced or, to the knowledge of RTO Acquiror, Canco or Callco, threatened orally or in writing against, or, in respect of any filing, actions, suits, claims, investigations or proceedings existing as at the date hereof, if any additional filing, actions, suits, claims, investigations or proceedings are made or threatened orally or in writing, in each case relating to or involving or otherwise affecting RTO Acquiror, its subsidiaries (including Canco and Callco) or any of their respective assets that would reasonably be expected to be material to RTO Acquiror and its subsidiaries (including Canco and Callco), taken as a whole; and

(i) not take any action, or refrain from taking any commercially reasonable action, or permit any action to be taken or not taken, which is inconsistent with this Agreement or which would reasonably be expected to, individually or in the aggregate, prevent, materially delay or otherwise materially impede the consummation of the Arrangement.

**5.3 Covenants of RTO Acquiror, Canco and Callco Relating to the Conduct of RTO Acquiror Business**

(a) RTO Acquiror, Canco and Callco jointly and severally covenant and agree, during the period from the date of this Agreement until the earlier of the Effective Time and the time that this Agreement is terminated in accordance with its terms, except (i) with the prior written consent of Meta (which consent may not be unreasonably withheld, conditioned or delayed), (ii) as required or expressly permitted by this Agreement, or (iii) as required by applicable Law or a Governmental Entity, RTO Acquiror shall, and shall cause the other members of the RTO Acquiror Group to:

(i) conduct its business in the ordinary course in all material respects and in accordance with applicable Laws and consistent with past practice, and use commercially reasonable efforts to maintain and preserve in all material respects its and its subsidiaries' present business organization, assets (including associated intellectual property), goodwill, employment relationships and material business relationships suppliers, distributors, employees, consultants, customers and other Persons with which RTO Acquiror or any of its subsidiaries have business relations, subject to the Sale:

(ii) use all commercially reasonable efforts to cause its current insurance (or re-insurance) policies not to be cancelled or terminated or any of the coverage thereunder to lapse before the Outside Date, unless simultaneously with such termination, cancellation or lapse, replacement policies underwritten by insurance and re-insurance companies of nationally recognized standing providing coverage equal to or greater than the coverage under the cancelled, terminated or lapsed policies for substantially similar premiums are in full force and effect;

(iii) promptly notify Meta orally and in writing upon becoming aware of any circumstance or development that, to the knowledge of RTO Acquiror, would, or would reasonably be expected to, constitute or result in an RTO Acquiror Material Adverse Effect; and

(iv) use all commercially reasonable efforts to enter into a definitive agreement and consummate the Sale of the RTO Acquiror Business as further described in Section 2.14; but shall not distribute, use or in any other way divulge of the proceeds of such transaction other than explicitly set forth in the RTO Acquiror Certificate of Designation.

(b) RTO Acquiror covenants and agrees that, during the period from the date of this Agreement until the earlier of the Effective Time and the time that this Agreement is terminated in accordance with its terms, except (i) with the prior written consent of RTO Acquiror (which consent may not be unreasonably withheld, conditioned or delayed), (ii) as required or expressly permitted by this Agreement, or (iii) as required by applicable Law or a Governmental Entity, it shall not, and shall cause the other members of the RTO Acquiror Group not to:

(i) issue, deliver, sell, pledge, lease, dispose of or encumber, or agree or offer to issue, deliver sell, pledge, lease, dispose of or encumber, any RTO Acquiror Shares or securities of its subsidiaries (including Canco and Callco), or any securities convertible, exchangeable or exercisable into or for RTO Acquiror Shares or securities of its subsidiaries (including Canco and Callco), or any options, warrants, stock appreciation rights, phantom stock awards or other rights or equity-based or convertible securities that are linked to the price or value of the RTO Acquiror Shares or securities of the RTO Acquiror subsidiaries (other than pursuant to the exercise, in accordance with their respective terms, of convertible or exercisable securities of RTO Acquiror outstanding on the date hereof) or amend, extend or terminate, or agree to amend, extend or terminate, any of the terms of, or agreements governing, any of the outstanding options, warrants or other convertible securities of RTO Acquiror or its subsidiaries; provided, that RTO Acquiror shall be permitted to raise up to $5,000,000 of equity and/or debt financing for working capital purposes prior to the Effective Time (which shall include the Spin-Off Cost Reserve Amount), so long as the RTO Acquiror shares that are issued (or would be issued upon conversion, exchange or exercise of any other equity security) in any such financing are taken into account in the calculation of the Exchange Ratio, such that the Consideration to be received by the Meta Shareholders is not diluted by any RTO Acquiror Shares issued or issuable in connection with any such financing;

(ii) amend or propose to amend its articles of incorporation or by-laws or other constating documents or the terms of any of its securities; reduce its stated capital; or split, consolidate, subdivide or reclassify, or propose to split, consolidate, subdivide or reclassify, any of the RTO Acquiror Shares or undertake or propose to undertake any other capital reorganization or change in or exchange of RTO Acquiror Shares, any other of its securities or its share capital;

(iii) declare, set aside or pay any dividend or other distribution or payment (whether in cash, securities or property or any combination thereof) in respect of the RTO Acquiror Shares or any other securities of RTO Acquiror, redeem, purchase or otherwise acquire, or offer to redeem, purchase or otherwise acquire, any outstanding securities of RTO Acquiror, adopt a plan of liquidation or resolution providing for the complete or partial liquidation, winding-up, dissolution, merger, consolidation, restructuring, recapitalization, or sale of all or substantially all of the assets of RTO Acquiror or any of its subsidiaries (including Canco and Callco), or enter into any agreement with respect to any of the foregoing;

(iv) except with respect to inter-company transfers between RTO Acquiror and its subsidiaries, sell, pledge, lease, transfer, dispose of or encumber any assets, rights or properties of RTO Acquiror or any of its subsidiaries, other than in the ordinary course of business consistent with past practice;

(v) acquire or agree to acquire (by merger, amalgamation, arrangement, acquisition of shares or assets or otherwise) any Person or division or business unit thereof, or incorporate or form, or agree to incorporate or form, any Person or make or agree to make any investment either by purchase of shares or securities, contributions of capital, property transfer or purchase of, any property or assets of any other Person;

(vi) make any material change to its RTO Acquiror Business or enter into enter into any Contract that, if entered into prior to the date hereof, would be a Material Contract of RTO Acquiror, other than in the ordinary course of business consistent with past practice;

(vii) enter into or agree to the terms of any joint venture, strategic alliance, partnership, or similar agreement, arrangement or relationship;

(viii) except as permitted pursuant to 2.21(b)(i), incur, create, assume or otherwise become liable for, any indebtedness for borrowed money, other than in respect of trade payables, which trade payables in no event will exceed $3,000,000 in the aggregate, unless otherwise consented to by Meta acting reasonably;

(ix) assume, guarantee, endorse or otherwise as an accommodation become responsible for the obligation of any other Person; make any loans, capital contribution, investments or advances;

(x) pay, discharge or satisfy any material claims, liabilities or obligations of RTO Acquiror or any of its subsidiaries other than the payment, discharge or satisfaction, in the ordinary course of business consistent with past practice, of liabilities reflected or reserved against in RTO Acquiror Financial Statements or incurred in the ordinary course of business consistent with past practice;

(xi) waive, release, grant or transfer any material rights, claims or benefits under, or otherwise modify or change, any existing Material Contract, Authorization or Permit of RTO Acquiror or its subsidiaries, other than in the ordinary course of business consistent with past practice or as required by applicable Law or the terms of any such Material Contract, Authorization or Permit;

(xii) enter into or modify (or make a promise regarding entering into or modifying) any Employee Plan or any employment, consulting, severance or similar agreements or arrangements with, or grant any bonuses, salary or fee increases, severance or termination pay to, any officers, directors, employees or consultants provided, however, that it is acknowledged and agreed that RTO Acquiror will abide by the terms and conditions of any Employee Plan and any employment agreements and consulting agreements in effect on the date of this Agreement, including with respect to the payments of any severance amounts or change of control payments, if applicable;

(xiii) enter into any collective bargaining or similar agreement;

(xiv) enter into or adopt any shareholder rights plan or similar agreement or arrangement;

(xv) take any action or fail to take any action which action or failure to act would result in the material loss, expiration or surrender of, or the loss of any material benefit under, or reasonably be expected to cause any Governmental Entities to institute proceedings for the suspension, revocation or limitation of rights under, any Authorizations or Permits;

(xvi) make, revoke or change any Tax election; amend any previously filed Tax Return except as may be required by applicable Law; file any Tax Return inconsistent with past practice; settle or compromise any Liability for Taxes; agree to an extension or waiver of the limitation period with respect to the assessment, reassessment, or determination of Taxes; enter into any closing agreement with respect to any Tax; surrender any right to claim a material Tax refund; change an annual accounting period; adopt or change any accounting method with respect to Taxes; or consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment unless, in each case, such action is required by Law;

(xvii) amend its accounting policies or adopt new accounting policies, except as may be required by applicable Law or US GAAP;

(xviii) make any capital expenditures;

(xix) waive, release, settle, agree to settle or compromise any pending or threatened suit, action, claim, arbitration, mediation, inquiry, proceeding or investigation against RTO Acquiror or any of its subsidiaries;

(xx) engage in any transaction with any related parties, other than (A) transactions with subsidiaries and under employment agreements in the ordinary course of business consistent with past practice and (B) transactions permitted pursuant to the provisions set forth in clause (i);

(xxi) grant, modify, sell, lease, license, sublicense, covenant not to assert, abandon, allow to lapse, assign, transfer, or otherwise dispose of or terminate any rights in any Intellectual Property of RTO Acquiror or its subsidiaries or enter into any agreement relating to Intellectual Property or do or omit to do anything to jeopardize the validity or enforceability thereof, including the non-payment of any application, search, maintenance or other official fees; or disclosing any trade secrets to any other Person (except pursuant to sufficiently protective non-disclosure agreements);

(xxii) take any action that would cause a violation by any Person of economic sanctions or export controls;

(xxiii) take any action or fail to take any action that prevents, or materially delays, impedes or interferes with, or that would reasonably be expected to prevent or materially delay, impede or interfere with, the ability of the Parties to consummate the transactions contemplated by this Agreement or the Arrangement;

(xxiv) enter into any transaction or perform any act that would render, or would reasonably be expected to render any representations and warranties made by RTO Acquiror, Canco and Callco set forth in this Agreement untrue or inaccurate in any respect; or

(xxv) announce an intention, authorize or propose, or enter into or modify any Contract, agreement, commitment or arrangement, to do any of the matters prohibited by the foregoing provisions of this Section 5.3.

**5.4 Covenants of Meta Relating to the Conduct of Meta Business**

(a) Meta covenants and agrees that, during the period from the date of this Agreement until the earlier of the Effective Time and the time that this Agreement is terminated in accordance with its terms, except (i) with the prior written consent of RTO Acquiror (which consent may not be unreasonably withheld, conditioned or delayed), (ii) as required or expressly permitted by this Agreement, or (iii) as required by applicable Law or a Governmental Entity, Meta shall, and shall cause each of its subsidiaries to:

(i) conduct its business in the ordinary course in all material respects and in accordance with applicable Laws, and use commercially reasonable efforts to maintain and preserve in all material respects its business organization, assets, goodwill, employment relationships and business relationships with other Persons with which Meta or any of its subsidiaries have business relations: and

(ii) promptly notify RTO Acquiror orally and in writing upon becoming aware of any circumstance or development that, to the knowledge of Meta, would, or would reasonably be expected to, constitute or result in a Meta Material Adverse Effect.

(b) Meta covenants and agrees that, during the period from the date of this Agreement until the earlier of the Effective Time and the time that this Agreement is terminated in accordance with its terms, except (i) with the prior written consent of RTO Acquiror (which consent may not be unreasonably withheld, conditioned or delayed), (ii) as required or expressly permitted by this Agreement, or (iii) as required by applicable Law or a Governmental Entity, Meta shall not:

(i) issue, deliver, sell, pledge, lease, dispose of or encumber, or agree or offer to issue, deliver sell, pledge, lease, dispose of or encumber, any Meta Shares or securities of its subsidiaries, or any securities convertible, exchangeable or exercisable into or for Meta Shares or securities of its subsidiaries, or any options, warrants, stock appreciation rights, phantom stock awards or other rights or equity-based or convertible securities that are linked to the price or value of the Meta Shares or securities of the Meta subsidiaries (other than pursuant to the exercise, in accordance with their respective terms, of convertible or exercisable securities of Meta outstanding on the date hereof) or amend, extend or terminate, or agree to amend, extend or terminate, any of the terms of, or agreements governing, any of the outstanding options, warrants or other convertible securities of Meta or its subsidiaries;

(ii) amend or propose to amend its articles of incorporation or by-laws or other constating documents or the terms of any of its securities; reduce its stated capital; or split, consolidate, subdivide or reclassify, or propose to split, consolidate, subdivide or reclassify, any of the Meta Shares or undertake or propose to undertake any other capital reorganization or change in or exchange of Meta Shares, any other of its securities or its share capital;

(iii) adopt a plan of liquidation or resolution providing for the complete or partial liquidation, winding-up, dissolution, merger, consolidation, restructuring, recapitalization, or sale of all or substantially all of the assets of Meta or any of its subsidiaries, or enter into any agreement with respect to any of the foregoing;

(iv) except with respect to inter-company transfers between Meta and its subsidiaries, sell, pledge, lease, transfer, dispose of or encumber any assets, rights or properties of Meta or any of its subsidiaries, except in the ordinary course of business consistent with past practice;

(v) except as set out in Schedule C(jj) of the Meta Disclosure Letter, acquire or agree to acquire (by merger, amalgamation, arrangement, acquisition of shares or assets or otherwise) any Person or division or business unit thereof, or make or agree to make any investment either by purchase of shares or securities, contributions of capital, property transfer or purchase of, any property or assets of any other Person;

(vi) make any material change to its Meta Business;

(vii) incur, create, assume or otherwise become liable for, any indebtedness for borrowed money, other than in the ordinary course of business consistent with past practice;

(viii) enter into or adopt any shareholder rights plan or similar agreement or arrangement;

(ix) make, revoke or change any Tax election; amend any previously filed Tax Return except as may be required by applicable Law; file any Tax Return inconsistent with past practice; settle or compromise any Liability for Taxes; agree to an extension or waiver of the limitation period with respect to the assessment, reassessment, or determination of Taxes; enter into any closing agreement with respect to any Tax; surrender any right to claim a material Tax refund; change an annual accounting period; adopt or change any accounting method with respect to Taxes; or consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment unless, in each case, such action is required by Law;

(x) subject to changes as a result of the transactions in this Agreement, amend its accounting policies or adopt new accounting policies, except as may be required by applicable Law or IFRS;

(xi) omit to do anything to jeopardize the validity or enforceability of Intellectual Property of Meta or its subsidiaries, including the non-payment of any application, search, maintenance or other official fees; or disclosing any trade secrets to any other person (except pursuant to sufficiently protective non-disclosure agreements);

(xii) take any action that would cause a violation by any Person of economic sanctions or export controls;

(xiii) take any action or fail to take any action that prevents, or materially delays, impedes or interferes with, or that would reasonably be expected to prevent or materially delay, impede or interfere with, the ability of the Parties to consummate the transactions contemplated by this Agreement or the Arrangement;

(xiv) take any action or fail to take any action which action or failure to act would result in the material loss, expiration or surrender of, or the loss of any material benefit under, or reasonably be expected to cause any Governmental Entities to institute proceedings for the suspension, revocation or limitation of rights under, any Authorizations or Permits;

(xv) enter into any transaction or perform any act that would render, or would reasonably be expected to render any representations and warranties made by Meta set forth in this Agreement untrue or inaccurate in any respect; or

(xvi) announce an intention, authorize or propose, or enter into or modify any Contract, agreement, commitment or arrangement, to do any of the matters prohibited by the foregoing provisions of this Section 5.4.

**ARTICLE 6**
**CONDITIONS**

**6.1 Mutual Conditions Precedent**

The obligations of the Parties to complete the Arrangement are subject to the fulfillment of each of the following conditions precedent on or before the Effective Time or the waiver by each of Meta and RTO Acquiror to the extent permitted by applicable Law and without prejudice to their right to rely on the fulfilment of any other of such conditions:

(a) the Interim Order having been granted on terms consistent with this Agreement and the Interim Order not having been set aside or modified in a manner unacceptable to either Party, acting reasonably, on appeal or otherwise;

(b) the Meta Arrangement Resolution having been passed by the Meta Shareholders in accordance with the Interim Order;

(c) the Final Order having been granted on terms consistent with this Agreement and the Final Order not having been set aside or modified in a manner unacceptable to either Party, acting reasonably, on appeal or otherwise;

(d) the RTO Acquiror Shareholder Approval Matters having been approved by the RTO Acquiror Shareholders in accordance with applicable Laws;

(e) there shall have been no action taken under any applicable Law or by any Governmental Entity of competent jurisdiction which make it illegal or otherwise directly or indirectly restrains, enjoins or prohibits the completion of the Arrangement;

(f) this Agreement shall not have been terminated in accordance with its terms;

(g) (i) the existing RTO Acquiror Shares have been continually listed on NASDAQ as of and from the date of this Agreement through the Effective Time and (ii) the RTO Acquiror Shares to be issued in the transaction pursuant to this Agreement shall have been approved for listing (subject to official notice of issuance) on NASDAQ as of the Effective Time; and

(h) the Key Regulatory Approvals shall have been obtained on terms acceptable to RTO Acquiror and Meta, each acting reasonably, and each such Key Regulatory Approval is in full force and effect and has not been modified;

(i) holders of no more than ten percent (10%) of the Meta Shares shall have exercised, and at the date of the Meta Meeting, have not withdrawn, Dissent Rights;

(j) the RTO Acquiror Certificate of Designation has been filed with the relevant state authority and constitutes a valid RTO Acquiror Certificate of Designation under applicable Laws and has not been rescinded or amended in any way;

(k) the holders of the debt instruments set forth in Schedule 6.1(k) of the Meta Disclosure Letter shall have, by written instrument in form and substance reasonably satisfactory to Meta, consented to the Arrangement and, in the case of any debt that is convertible into Meta Shares, agreed that following the Effective Time such debt shall be convertible into either Exchangeable Shares or RTO Acquiror Shares on the basis of the existing conversion price as adjusted by the Exchange Ratio; and

(l) BDC Capital Inc. will have consented to the Arrangement by written instrument in form and substance reasonably satisfactory to Meta and RTO Acquiror; and

(m) prior to or at the Effective Time, Lock-Up Agreements shall have been entered into with such Meta Supporting Shareholders as Meta shall determine and as reasonably agreed to by RTO Acquiror.

**6.2 Additional Conditions Precedent in Favour of RTO Acquiror, Canco and Callco**

The obligation of RTO Acquiror, Canco and Callco to complete the Arrangement is subject to the fulfillment of each of the following additional conditions precedent on or before the Effective Time (each of which is for the exclusive benefit of RTO Acquiror, Canco and Callco and may be waived by RTO Acquiror):

(a) all covenants of Meta under this Agreement to be performed on or before the Effective Time which have not been waived by RTO Acquiror shall have been duly performed by Meta in all material respects and RTO Acquiror shall have received a certificate of Meta addressed to RTO Acquiror and dated the Effective Date, signed on behalf of Meta by two of its senior executive officers (on Meta's behalf and without personal liability), confirming the same as of the Effective Time;

(b) the representations and warranties of Meta set forth in this Agreement shall have been true and correct in all respects as of the date of this Agreement, and shall be true and correct in all respects as of the Effective Time as if made as of the Effective Time (except, in each case, for representations and warranties made as of a specified date, the accuracy of which shall be determined as of that specified date), except where any failure or failures of such representations and warranties to be so true and correct would not have, individually or in the aggregate, a Meta Material Adverse Effect (it being understood that, for purposes of determining the accuracy of such representations and warranties, all materiality, Meta Material Adverse Effect and similar qualifiers set forth in such representations and warranties shall be disregarded), and RTO Acquiror shall have received a certificate of Meta addressed to RTO Acquiror and dated the Effective Date, signed on behalf of Meta by two senior executive officers of Meta (on Meta's behalf and without personal liability), confirming the same as at the Effective Time;

(c) there shall not have occurred a Meta Material Adverse Effect on or prior to the date hereof which is continuing and since the date of this Agreement, there shall not have occurred a Meta Material Adverse Effect, and RTO Acquiror shall have received a certificate signed on behalf of Meta by two senior executive officers of Meta (on Meta's behalf and without personal liability) to such effect; and

(d) all covenants of the Meta Supporting Shareholders under the Meta Voting Agreement to be performed on or before the Effective Time which have not been waived by RTO Acquiror shall have been duly performed by the parties thereto (other than RTO Acquiror) in all respects.

The foregoing conditions will be for the sole benefit of RTO Acquiror, Canco and Callco and may be waived by the RTO Acquiror in whole or in part at any time in its sole discretion.

**6.3 Additional Conditions Precedent in Favour of Meta**

The obligation of Meta to complete the Arrangement is subject to the fulfillment of each of the following additional conditions precedent on or before the Effective Time (each of which is for the exclusive benefit of Meta and may be waived by Meta):

(a) all covenants of RTO Acquiror, Canco and Callco under this Agreement to be performed on or before the Effective Time which have not been waived by Meta shall have been duly performed by RTO Acquiror, Canco and Callco in all material respects and Meta shall have received a certificate of RTO Acquiror, Canco and Callco addressed to Meta and dated the Effective Date, signed on behalf of RTO Acquiror, Canco and Callco by two of its senior executive officers (on RTO Acquiror's, Canco's and Callco's behalf and without personal liability), confirming the same as of the Effective Time;

(b) the representations and warranties of RTO Acquiror, Canco and Callco set forth in this Agreement, shall have been true and correct in all respects as of the date of this Agreement, and shall be true and correct in all respects as of the Effective Time as if made as of the Effective Time (except, in each case, for representations and warranties made as of a specified date, the accuracy of which shall be determined as of that specified date), except where any failure or failures of such representations and warranties to be so true and correct would not have, individually or in the aggregate, an RTO Acquiror Material Adverse Effect (it being understood that for purposes of determining the accuracy of such representations and warranties, all materiality, RTO Acquiror Material Adverse Effect and similar qualifiers set forth in such representations and warranties shall be disregarded), and Meta shall have received a certificate of RTO Acquiror, Canco and Callco addressed to Meta and dated the Effective Date, signed on behalf of RTO Acquiror, Canco and Callco by two senior executive officers of RTO Acquiror, Canco and Callco (on RTO Acquiror's, Canco's and Callco's behalf and without personal liability), confirming the same as at the Effective Time;

(c) all covenants of the RTO Acquiror Supporting Shareholders under the RTO Acquiror Voting Agreement to be performed on or before the Effective Time which have not been waived by Meta shall have been duly performed by the parties thereto (other than Meta) in all respects;

(d) the Special Voting Share shall have been created and issued as a share in the capital of RTO Acquiror at or prior to the Effective Time;

(e) each of the Support Agreement and the Voting and Exchange Trust Agreement shall have been duly executed by the parties thereto at or prior to the Effective Time;

(f) prior to the Effective Time, all debt of RTO Acquiror (including, for the avoidance of doubt, any debt issued pursuant to 5.3(b)(i) shall have been converted into RTO Acquiror Shares or repaid in full, provided that if the senior secured debt of RTO Acquiror held by The David A. Straz, Jr. Foundation and by The David A. Straz, Jr. Irrevocable Trust DTD 11/11/1986, has not been so converted or repaid, then prior to the Effective Time the terms of such debt shall have been modified such that the debtholders sole recourse in respect thereof shall be against the assets of the RTO Acquiror Business, and any documents or agreements entered to achieve such results shall be in form and substance acceptable to Meta (and in any event the holders of such senior secured debt shall have consented to the consummation of the transactions contemplated by this Agreement);

(g) the distribution of the RTO Acquiror Shares and the Exchangeable Shares pursuant to the Arrangement, and the first trade of the RTO Acquiror Shares, shall be exempt from the prospectus and registration requirements of applicable Law either by virtue of exemptive relief from the applicable Securities Authorities or by virtue of applicable exemptions under applicable Law and shall not be subject to resale restrictions under applicable Law;

(h) the RTO Acquiror Shares, issuable to Meta Shareholders pursuant to the Arrangement (including pursuant to the exchange of the Exchangeable Shares), shall have been approved for listing on the NASDAQ, subject to official notice of issuance;

(i) RTO Acquiror and Canco shall have complied with its obligations under Section 2.9 and the Depositary shall have confirmed receipt of the aggregate Consideration contemplated thereby;

(j) the Parties shall have consummated the Pre-Closing Financing (or such Pre-Closing Financing shall close at the Effective Time by its terms); and

(k) any accrued fees, costs, expenses, liabilities, or other owed payments (including, but not limited to any costs arising from insurance, change of control payments, severance, settlements, legal fees, indemnification, investigations, advisor fees, compensation, benefits, employment, or otherwise, but excluding any debt) of RTO Acquiror shall have been paid at or prior to the Effective Time (using funds other than the funds raised from the Pre-Closing Financing and the Spin-Off Cost Reserve Amount), or RTO Acquiror shall have (i) cash on hand at the Effective Time that is reasonably sufficient to pay such amounts as and when they become due and payable (excluding funds raised from the Pre-Closing Financing and the Spin-Off Cost Reserve Amount) and (ii) the Spin-Off Cost Reserve Amount, and RTO Acquiror shall provide any reasonably requested supporting documentation and evidence to Meta, upon Meta's written request. For the avoidance of doubt, such funds for the aforementioned (i) and (ii) shall be dilutive exclusively to the RTO Acquiror Shareholders.

The foregoing conditions will be for the sole benefit of Meta and may be waived by Meta in whole or in part at any time in its sole discretion.

**6.4 Notice and Cure Provisions**

(a) Each Party will give prompt notice to the other of the occurrence, or failure to occur, at any time from the date hereof until the earlier to occur of the termination of this Agreement and the Effective Time, of any event or state of facts which occurrence or failure would, or would be likely to:

(i) cause any of the representations or warranties of any Party contained herein to be untrue or inaccurate in any material respect on the date hereof or at the Effective Time; or

(ii) result in the failure to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by any Party hereunder prior to the Effective Time.

(b) Notice provided under this Section 6.4 will not affect the representations, warranties, covenants, agreements or obligations of the Parties (or remedies with respect thereto) or the conditions to the obligations of the Parties under this Agreement.

(c) RTO Acquiror may not exercise its rights to terminate this Agreement pursuant to Subsection 8.2(a)(iii)C and Meta may not exercise its right to terminate this Agreement pursuant to Subsection 8.2(a)(iv)A unless the Party intending to rely thereon has delivered a written notice to the other Party specifying in reasonable detail all breaches of covenants, representations and warranties or other matters which the Party delivering such notice is asserting as the basis for the non-fulfilment or the applicable condition or termination right, as the case may be. If any such notice is delivered, provided that a Party is proceeding diligently to cure such matter and such matter is capable of being cured prior to the Outside Date, no Party may terminate this Agreement until the expiration of a period of ten (10) Business Days from such notice, and then only if such matter has not been cured by such date. If such notice has been delivered less than ten (10) Business Days prior to the making of the application for the Final Order, such application and such filing shall be postponed until the expiry of such period. For greater certainty, in the event that such matter is cured within the time period referred to herein without having an RTO Acquiror Material Adverse Effect or a Meta Material Adverse Effect, as the case may be, this Agreement may not be terminated as a result of the cured breach.

**6.5 Satisfaction of Conditions**

Other than as set forth in this section, the conditions precedent set out in Section 6.1, Section 6.2 and Section 6.3 shall be conclusively deemed to have been satisfied, waived or released when the Certificate of Arrangement is issued by the Director following filing of the Articles of Arrangement with the consent of the Parties in accordance with the terms of this Agreement. Meta hereby agrees not to waive or amend the condition set forth in Section 6.1(l).

## ARTICLE 7
## ADDITIONAL COVENANTS

**7.1 Covenant Regarding Non-Solicitation**

Each Party shall, and shall direct and cause its Representatives to immediately, cease and cause to be terminated any solicitation, encouragement, activity, discussion or negotiation with any parties that may be ongoing with respect to an Acquisition Proposal involving such Party whether or not initiated by such Party, discontinue access to any parties (other than a Party to this Agreement and its Representatives) to any dataroom that contains information regarding the Meta Group or the RTO Acquiror Group (as applicable), and to the extent such Party entered into a confidentiality agreement with any such parties, such Party shall request the return of information regarding the Meta Group or the RTO Acquiror Group (as applicable) previously provided to such parties and shall request the destruction of all materials including or incorporating any confidential information regarding the Meta Group or the RTO Acquiror Group (as applicable) pursuant to any such confidentiality agreement. Each Party represents and warrants that it has not, and agrees not to, release or permit the release of any Person from, or waive or forbear in the enforcement of, any confidentiality agreement or other similar agreement relating to a potential Acquisition Proposal involving such Party to which such third party is a party. Each Party further represents and warrants that it has not, and agrees not to, release or permit the release of any Person from, or waive or forbear in the enforcement of, any standstill or similar agreement or obligation to which such third party is a party or by which such third party is bound.

**7.2 Covenant Regarding Acquisition Proposals**

(a) Each Party agrees that it shall not, and shall cause its Representatives (including the Meta Board or the RTO Acquiror Board, as applicable) not to, directly or indirectly:

(i) make, solicit, initiate, entertain, knowingly encourage, promote or facilitate, (including by way of furnishing non-public information, permitting any visit to its facilities or properties or entering into any form of agreement, arrangement or understanding) any inquiries or offers or the making of any proposals regarding or that would reasonably be expected to constitute an Acquisition Proposal involving such Party or that would be reasonably be expected to lead to an actual or potential Acquisition Proposal involving such Party;

(ii) participate, directly or indirectly, in any discussions or negotiations regarding, or furnish to any Person any non-public information or otherwise co-operate with, respond to, assist or participate in any Acquisition Proposal involving such Party or potential Acquisition Proposal involving such Party or participate in any discussions or negotiations regarding an actual or potential Acquisition Proposal involving such Party, or furnish any information or access to any Person (other than a Party to this Agreement and its Representatives) with respect to any inquiries, proposals or offers that constitute, or that would reasonably be expected to lead to, an actual or potential Acquisition Proposal involving such Party;

(iii) remain neutral with respect to, or agree to, approve or recommend any, Acquisition Proposal involving such Party or potential Acquisition Proposal involving such Party (it being understood that publicly taking no position or a neutral position with respect to an Acquisition Proposal involving such Party for two (2) Business Days following formal announcement of such Acquisition Proposal shall not be considered to be a violation of this Subsection 7.2(a)(iii)); or

(iv) enter into any agreement, arrangement or understanding related to any Acquisition Proposal involving such Party (other than an Acceptable Confidentiality Agreement) or requiring it to abandon, terminate or fail to consummate the Arrangement or the transactions contemplated by this Agreement or providing for the payment of any break, termination or other fees or expenses to any Person in the event that the Arrangement or the transactions contemplated by this Agreement are completed or in the event that it completes any other transaction with the other Party or Parties or with an affiliate of the other Party or Parties that is agreed to prior to any termination of this Agreement (any such agreement, arrangement or understanding, an "**Alternative Acquisition Agreement**"); or

(v) make a Change in Recommendation.

(b) Meta shall promptly (and in any event within 24 hours) notify RTO Acquiror, at first orally and then in writing, of any proposals, offers or inquiries relating to or constituting or that would reasonably be expected to lead to an Acquisition Proposal involving Meta or any request for non-public information relating to Meta or any of its subsidiaries. Such notice shall include a description of the terms and conditions of any proposal, inquiry or offer, the identity of the Person making such proposal, inquiry or offer, a copy of the proposal, offer or inquiry (if written), and provide such other details of the proposal, inquiry or offer as RTO Acquiror may reasonably request. Meta shall keep RTO Acquiror fully informed on a prompt basis of the status, including any change to the material terms, of any such proposal, inquiry or offer.

(c) RTO Acquiror, Canco and Callco shall promptly (and in any event within 24 hours) notify Meta, at first orally and then in writing, of any proposals, offers or inquiries relating to or constituting or that would reasonably be expected to lead to an Acquisition Proposal involving RTO Acquiror, Canco and Callco or any request for non-public information relating to RTO Acquiror or any of its subsidiaries (including Canco and Callco). Such notice shall include a description of the terms and conditions of any proposal, inquiry or offer, the identity of the Person making such proposal, inquiry or offer, a copy of the proposal, offer or inquiry (if written), and provide such other details of the proposal, inquiry or offer as Meta may reasonably request. RTO Acquiror shall keep Meta fully informed on a prompt basis of the status, including any change to the material terms, of any such proposal, inquiry or offer.

(d) Meta shall ensure that its officers, directors and any financial advisors or other advisors or Representatives retained by it are aware of the provisions of Section 7.1 and this Section 7.2, and Meta shall be responsible for any breach of Section 7.1 or this Section 7.2 by such officers, directors, financial advisors or other advisors or Representatives. Each of RTO Acquiror, Canco and Callco shall ensure that its officers, directors and any financial advisors or other advisors or Representatives retained by it are aware of the provisions of Section 7.1 and this Section 7.2, and each of RTO Acquiror and Canco shall be responsible for any breach of Section 7.1 or this Section 7.2 by such officers, directors, financial advisors or other advisors or Representatives.

(e) Nothing contained in Section 7.1 or Section 7.2 shall prohibit RTO Acquiror from taking and disclosing a position contemplated by Rule 14e-2(a), Rule 14d-9 or Item 1012(a) of Regulation M-A promulgated under the U.S. Exchange Act.

**7.3 Responding to an Acquisition Proposal**

(a) Notwithstanding Section 7.1 and Section 7.2, if at any time, Meta receives a written Acquisition Proposal prior to obtaining the Meta Securityholder Approval or RTO Acquiror receives a bona fide written Acquisition Proposal from an arm's length third party prior to obtaining the RTO Acquiror Shareholder Approval, the Party receiving such written Acquisition Proposal (referred to from time to time in this Article 7 as the "**Proposal Party**") may engage in or participate in discussions or negotiations with such Person regarding such Acquisition Proposal, and may provide copies of, access to or disclosure of confidential information, properties, facilities, books or records of itself and its subsidiaries, if and only if:

(i) its board of directors first determines in good faith, based on the advice of its financial advisors and its outside counsel, that such Acquisition Proposal is bona fide and constitutes or would reasonably be expected to constitute a Superior Proposal, and, based on the advice of its outside counsel, that the failure to engage in such discussions or negotiations would be inconsistent with its fiduciary duties;

(ii) such Person was not restricted from making such Acquisition Proposal pursuant to an existing standstill confidentiality, non-disclosure, business purpose, use or similar restriction or agreement;

(iii) it has been, and continues to be, in compliance with its obligations under Section 7.1 through Section 7.4, and such Acquisition Proposal was unsolicited and did not otherwise result from a breach of Section 7.1 or Section 7.2;

(iv) prior to providing any such copies, access, or disclosure, it enters into a confidentiality and standstill agreement with such Person having terms at least as favorable to the Proposal Party as the Confidentiality Agreement (an "**Acceptable Confidentiality Agreement**"); and

(v) it promptly provides RTO Acquiror (in the case where Meta is the Proposal Party), or Meta (in the case where RTO Acquiror is the Proposal Party) (such Party being referred to in this Article 7 from time to time as the "**Other Party**") with:

A. two (2) Business Days prior written notice stating its intention to participate in such discussions or negotiations and to provide such copies, access or disclosure, together with a copy of written advice from its outside counsel that the failure to engage in such discussions or negotiations would be inconsistent with the fiduciary duties of the board of directors of the Proposal Party; and

B. prior to providing any such copies, access or disclosure, a true, complete and final executed copy of the Acceptable Confidentiality Agreement referred to in Subsection 7.3(a)(iv), and

(vi) it may only provide copies of, or disclosure of confidential information, properties, facilities, books or records of it or its subsidiaries to such Person and its Representatives in connection with an Acquisition Proposal for a maximum period of seven (7) days;

provided, that the Proposal Party shall not, and shall not allow its Representatives to, disclose any non-public information with respect to it or any of its Subsidiaries to such Person if such non-public information has not been previously provided to, or is not concurrently provided to, the Other Party.

**7.4 Superior Proposals; Intervening Events; Right to Match**

(a) Notwithstanding Section 7.1 and Section 7.2, (i) at any time prior to obtaining the Meta Securityholder Approval (in the case of a Meta Superior Proposal or a Meta Intervening Event) or (ii) at any time prior to obtaining the RTO Acquiror Shareholder Approval (in the case of an RTO Acquiror Superior Proposal or an RTO Acquiror Intervening Event) (the Party receiving the Superior Proposal or experiencing the Intervening Event is referred to in this Section 7.4 as the "**Receiving Party**" and the other Party is referred to in this Section 7.4 as the "**Matching Party**"), the board of directors of the Receiving Party (the "**Receiving Board**") may, if the Receiving Board determines in good faith, based on the advice of outside counsel, that the failure to do so would be inconsistent with its fiduciary duties, taking into account all adjustments to the terms of this Agreement that may be offered by the Matching Party pursuant to this Section 7.4, (A) make a Change in Recommendation in response to a Superior Proposal or an Intervening Event and (B) cause the Receiving Party to terminate this Agreement in accordance with Subsection 8.2(a)(iii)A or Subsection 8.2(a)(iv)A, as applicable, and concurrently enter into a binding Alternative Acquisition Agreement with respect to any such Superior Proposal, provided that:

(i) In respect of an Acquisition Proposal constituting a Superior Proposal, the Receiving Board may not make a Change in Recommendation or terminate this Agreement pursuant to Subsection 8.2(a)(iii)A or Subsection 8.2(a)(iv)A, as applicable unless:

A. such Person was not restricted from making such Acquisition Proposal pursuant to an existing standstill confidentiality, non-disclosure, business purpose, use or similar restriction or agreement;

B. the Receiving Party has been, and continues to be, in compliance with its obligations under Section 7.1 through Section 7.4, and such Acquisition Proposal was unsolicited and did not otherwise result from a breach of Section 7.1 or Section 7.2;

C. the Receiving Party has delivered to the Matching Party a written notice of the determination of Receiving Board that such Acquisition Proposal constitutes a Superior Proposal and of the intention of the Receiving Board to make a Change in Recommendation, terminate this Agreement pursuant to Subsection 8.2(a)(iii)A or Subsection 8.2(a)(iv)A, as applicable, and enter into a definitive Alternative Acquisition Agreement with respect to such Superior Proposal, together with (1) a written notice from the Receiving Board (a) regarding the value and financial terms that the Receiving Board, in consultation with its financial advisors, has determined should be ascribed to any non-cash consideration offered under such Superior Proposal and (b) stating that the Receiving Board has determined that the failure make a Change in Recommendation, terminate this Agreement pursuant to Subsection 8.2(a)(iii)A or Subsection 8.2(a)(iv)A, as applicable, and enter into a definitive Alternative Acquisition Agreement with respect to such Superior Proposal would be contrary to the fiduciary duties of the Receiving Board and (2) a copy of the proposed definitive Alternative Acquisition Agreement and any other relevant transaction documents (the "**Superior Proposal Notice**");

D. at least seven (7) Business Days (the "**Superior Proposal Matching Period**") have elapsed from the date on which the Matching Party received the Superior Proposal Notice;

E. during any Superior Proposal Matching Period, the Matching Party has had the opportunity (but not the obligation), in accordance with Subsection 7.4(b), to offer to amend this Agreement and the Arrangement in order for such Acquisition Proposal to cease to be a Superior Proposal;

F. if the Matching Party has offered to amend this Agreement and the Arrangement under Subsection 7.4(b), the Receiving Board has determined in good faith, based on the advice of its outside legal counsel and financial advisers, that such Acquisition Proposal continues to constitute a Superior Proposal compared to the terms of the Arrangement as proposed to be amended under Subsection 7.4(b); and

G. the Receiving Board has determined in good faith, based on the advice of the Receiving Party's outside legal counsel, that the failure make a Change in Recommendation, terminate this Agreement pursuant to Subsection 8.2(a)(iii)A or Subsection 8.2(a)(iv)A, as applicable, and enter into a definitive Alternative Acquisition Agreement with respect to such Superior Proposal would be contrary to the fiduciary duties of the Receiving Board.

(ii) In respect of an Intervening Event, the Receiving Board may not make a Change in Recommendation unless:

A. the Receiving Party provides the Matching Party with written information describing such Intervening Event in reasonable detail as soon as reasonably practicable after becoming aware of it, notifying the Matching Party of its intent to make a Change in Recommendation in response thereto, and specifying the reasons therefor (the "**Intervening Event Notice**");

B. the Receiving Party keeps the Matching Party reasonably informed of developments with respect to such Intervening Event;

C. at least five (5) Business Days (the "**Intervening Event Matching Period**"; each of the Superior Proposal Matching Period and the Intervening Event Matching Period is referred to in this Section 7.4 as a "**Matching Period**") have elapsed since the date on which the Matching Party received the Intervening Event Notice;

D. during any Intervening Event Matching Period, the Matching Party has had the opportunity (but not the obligation), in accordance with Subsection 7.4(b), to offer to amend this Agreement and the Arrangement; and

E. if the Matching Party has offered to amend this Agreement and the Arrangement under Subsection 7.4(b), the Receiving Board has determined in good faith, after consultation with the Receiving Party's outside legal counsel and financial advisors, that notwithstanding the terms of the Arrangement as proposed to be amended under Subsection 7.4(b), the failure to make a Change in Recommendation in response to the Intervening Event would be inconsistent with the fiduciary duties of the Receiving Board.

(b) During any Matching Period, or such longer period as the Receiving Party may approve in writing for such purpose: (i) the Receiving Board shall review any offer made by the Matching Party under Subsection 7.4(a)(i)F or Subsection 7.4(a)(ii)E to amend the terms of this Agreement and the Arrangement in good faith in order to determine whether such proposal would, upon acceptance, result in (A) the Acquisition Proposal previously constituting a Superior Proposal ceasing to be a Superior Proposal or (B) the failure to make a Change in Recommendation in response to the Intervening Event ceasing to be inconsistent with the fiduciary duties of the Receiving Board; and (ii) the Receiving Party shall negotiate in good faith with the Matching Party to make such amendments to the terms of this Agreement and the Arrangement as would enable the Matching Party to proceed with the transactions contemplated by this Agreement on such amended terms. If the Receiving Board determines that (x) such Acquisition Proposal would cease to be a Superior Proposal or (y) the failure to make a Change in Recommendation in response to the Intervening Event would be contrary to the fiduciary duties of the Receiving Board, the Receiving Party shall promptly so advise the Matching Party, and the Parties shall amend this Agreement to reflect such offer made by the Matching Party, and shall take and cause to be taken all such actions as are necessary to give effect to the foregoing.

(c) Each successive amendment to any Acquisition Proposal that results in an increase in, or modification of, the consideration (or value of such consideration) to be received by the shareholders of the Receiving Party or other material terms or conditions thereof shall constitute a new Acquisition Proposal for the purposes of this Section 7.4, which shall require a new Superior Proposal Notice to the Matching Party. The Matching Party shall be afforded a new five (5) Business Day Superior Proposal Matching Period from the date on which the Matching Party receives the Superior Proposal Notice with respect to such amended Acquisition Proposal from the Receiving Party.

(d) The Receiving Board shall promptly reaffirm the Meta Board Recommendation or RTO Acquiror Board Recommendation, as applicable, by press release after any Acquisition Proposal which is not determined to be a Superior Proposal is publicly announced or the Receiving Board determines that a proposed amendment to the terms of this Agreement as contemplated under Subsection 7.4(b) would result in an Acquisition Proposal no longer being a Superior Proposal. The Receiving Party shall provide the Matching Party and its outside legal counsel with a reasonable opportunity to review the form and content of any such press release and shall make all reasonable amendments to such press release as requested by the Matching Party and its outside legal counsel.

(e) If the Receiving Party provides a Superior Proposal Notice to the Matching Party after a date that is less than ten (10) Business Days before the RTO Acquiror Meeting (if RTO Acquiror is the Receiving Party) or the Meta Meeting (if Meta is the Receiving Party), such Receiving Party shall either proceed with or shall postpone such meeting, as directed by the Matching Party acting reasonably, to a date that is not more than ten (10) Business Days after the scheduled date of that meeting but before the Outside Date.

**7.5 Access to Information; Confidentiality; Transition**

From the date hereof until the earlier of the Effective Time and the termination of this Agreement pursuant to its terms, subject to compliance with applicable Law and the terms of any existing Contracts, each Party shall, and shall cause its Representatives to, afford to the other Party and its Representatives reasonable access during normal business hours upon reasonable notice, to the properties, information and records relating to, and the personnel of, such Party, including but not limited to, the related facilities, books, contracts, financial statements, forecasts, financial projections (to the extent permitted by confidentiality agreements in force on the date hereof), studies, records, operating Permits, and any other documentation (whether in writing or stored in computerized, electronic, disk, tape, microfilm or any other form); provided, however, that each Party shall provide the other Party with at least one (1) Business Day prior written notice of any requested on site access to any real property of the other Party. Each of RTO Acquiror and Meta shall, and shall cause their subsidiaries and their respective Representatives to, as the case may be, work cooperatively and in good faith to ensure an orderly transition following the Effective Time, including with respect to transitional planning, transitional services, and the retention of personnel (and any related arrangements thereto). From the date hereof until the earlier of the Effective Time and the termination of this Agreement pursuant to its terms, each Party will maintain the access of the other Party and its Representatives to the information contained as at the date of this Agreement in any dataroom that contains information regarding the such Party to which the other Party and its Representatives have access as at the date of this Agreement.

**7.6 Supplementary Bridge Financing**

No later than five (5) days following the execution of this Agreement, RTO Acquiror shall pay to Meta an amount equal to $500,000 in cash to an account identified by Meta in writing in exchange for a second unsecured promissory note in substantially the same form as the Initial Bridge Note (together, with such Initial Bridge Note, the "**Bridge Notes**"). In the event Closing occurs, the aggregate principal of, and accrued but unpaid interest on, the Bridge Notes, shall be included in, and credited against, the amount of the Pre-Closing Financing; and the Bridge Notes shall be deemed cancelled, paid and satisfied in full. In the event this Agreement is terminated, and Closing does not otherwise occur, then Meta shall be obligated to repay to RTO Acquiror, on the one (1)-year anniversary of this Agreement, an amount equal to $540,000 (which amount represents the outstanding principal of $500,000 plus interest accrued on such principal at the rate of 8% per annum), as set forth in such second Bridge Note**.**

**7.7 Other Deliveries**

Concurrent with the execution and delivery of this Agreement, (i) Meta shall deliver to RTO Acquiror all of the Meta Voting Agreements, and RTO Acquiror shall deliver to Meta all of the RTO Acquiror Voting Agreements.

## ARTICLE 8
## TERM, TERMINATION, AMENDMENT AND WAIVER

### 8.1 Term

This Agreement shall be effective from the date hereof until the earlier of the Effective Time and the termination of this Agreement in accordance with its terms.

### 8.2 Termination

(a) This Agreement may be terminated:

(i) at any time prior to the Effective Time by mutual written agreement of Meta and RTO Acquiror;

(ii) by either Meta or RTO Acquiror, if:

A. the Effective Time shall not have occurred on or before the Outside Date, except that the right to terminate this Agreement under this Subsection 8.2(a)(ii)A shall not be available to any Party whose failure to fulfill any of its obligations or breach any of its covenants, representations and warranties under this Agreement has been the cause of, or resulted in, the failure of the Effective Time to occur on or before the Outside Date; *provided however*, that if completion of the Arrangement is delayed by (i) an injunction or order made by a Governmental Entity of competent jurisdiction, or (ii) RTO Acquiror or Meta not having obtained any Key Regulatory Approval or the Interim Order or the Final Order which is necessary to permit the completion of the Arrangement such that the conditions set forth in Subsection 6.1(a), 6.1(c) or 6.1(h) shall not have been satisfied or waived then, provided that such injunction or order is being contested or appealed or such regulatory waiver, consent or approval or the Interim Order or the Final Order is being actively sought, as applicable, the Outside Date shall automatically be extended for an additional period of 30 days;

B. any Governmental Entity of competent jurisdiction shall have issued an order, decree or ruling or there shall be enacted or made any applicable Law that makes consummation of the Arrangement illegal or otherwise prohibited or otherwise restrains, enjoins or prohibits Meta or RTO Acquiror, Canco or Callco from consummating the Arrangement (unless such order, decree, ruling or applicable Law has been withdrawn, reversed or otherwise made inapplicable) and such order, decree, ruling or applicable Law or enjoinment shall have become final and non-appealable;

C. the Meta Securityholder Approval shall not have been obtained at the Meta Meeting in accordance with applicable Law and the Interim Order;

D. the RTO Acquiror Shareholder Approval Matters shall not have been approved at the RTO Acquiror Meeting in accordance with applicable Law.

(iii) by RTO Acquiror, if:

A. prior to obtaining the RTO Acquiror Shareholder Approval, the RTO Acquiror Board authorizes RTO Acquiror to accept an RTO Acquiror Superior Proposal, provided that RTO Acquiror shall have (1) simultaneously with such termination, entered into the Alternative Acquisition Agreement associated with such RTO Acquiror Superior Proposal, (2) otherwise complied with its obligations set forth in Section 7.1 through Section 7.4 and (3) paid any amounts due pursuant to Subsection 8.3(c);

B. there shall have occurred a Meta Change in Recommendation;

C. subject to Section 6.4, Meta is in default of a covenant or obligation hereunder (other than the covenants and obligations set forth in Section 7.1 and Section 7.2, as to which Subsection 8.2(a)(iii)D shall apply) such that the condition contained in Subsection 6.2(a) is not satisfied or is incapable of satisfaction, or any representation or warranty of Meta or Meta under this Agreement is untrue or incorrect or shall have become untrue or incorrect such that the condition contained in Subsection 6.2(b) would be incapable of satisfaction; provided that RTO Acquiror, Canco and Callco are not then in breach of this Agreement so as to cause any of the conditions set forth in Subsection 6.2(a) or Subsection 6.2(b) not to be satisfied; or

D. Meta shall have breached or failed to perform any of its obligations set forth in Section 7.1 through Section 7.4.

(iv) by Meta, if

A. prior to obtaining the Meta Securityholder Approval, the Meta Board authorizes Meta to accept a Meta Superior Proposal, provided that Meta shall have (1) simultaneously with such termination, entered into the Alternative Acquisition Agreement associated with such Meta Superior Proposal, (2) otherwise complied with its obligations set forth in Section 7.1 through Section 7.4 and (3) paid any amounts due pursuant to Subsection 8.3(c);

B. there shall have occurred an RTO Acquiror Change in Recommendation;

C. subject to Section 6.4, RTO Acquiror, Canco or Callco is in default of a covenant or obligation hereunder (other than the covenants and obligations set forth in Section 7.1 and Section 7.2, as to which Subsection 8.2(a)(iv)D shall apply) such that the condition contained in Subsection 6.3(a) is not satisfied or is incapable of satisfaction, or any representation or warranty of RTO Acquiror or Canco under this Agreement is untrue or incorrect or shall have become untrue or incorrect such that the condition contained in Subsection 6.3(b) would be incapable of satisfaction; provided that Meta is not then in breach of this Agreement so as to cause any of the conditions set forth in Subsection 6.3(a) or 6.3(b) not to be satisfied; or

D. RTO Acquiror shall have breached or failed to perform any of its obligations set forth in Section 7.1 through Section 7.6.

(b) Subject to Subsection 6.4(b), the Party desiring to terminate this Agreement pursuant to this Section 8.2 (other than pursuant to Subsection 8.2(a)(i)) shall give notice of such termination to the other Party, specifying in reasonable detail the basis for such Party's exercise of its termination right.

(c) If this Agreement is terminated pursuant to this Section 8.2, this Agreement shall become void and be of no further force or effect without liability of any Party (or any shareholder, director, officer, employee, agent, consultant or representative of such Party) to any other Party hereto, except that the provisions of this Subsection 8.2(c) and Sections 8.3, 9.1, 9.3, 9.4, 9.6, 9.7 and 9.8 and all related definitions set forth in Section 1.1 and the provisions of the Confidentiality Agreement shall survive any termination of this Agreement pursuant to this Section 8.2; provided further that neither the termination of this Agreement pursuant to this Section 8.2 nor anything contained in this Section 8.2 shall relieve a Party from any Liability arising prior to such termination arising from any willful and material breach of this Agreement or fraud.

**8.3 Expenses and Termination Payments**

(a) Except as otherwise provided herein, the Parties agree that all costs and expenses of the Parties relating to the Arrangement and the transactions contemplated in this Agreement, including legal fees, accounting fees, financial advisory fees, strategic advisory fees, regulatory filing fees, stock exchange fees, all disbursements of advisors and printing and mailing costs, shall be paid by the Party incurring such expenses.

(b) The Termination Payment shall be payable by Meta to RTO Acquiror in the event that this Agreement is terminated in the following circumstances:

(i) pursuant to Subsection 8.2(a)(iii)B, Subsection 8.2(a)(iii)D or Subsection 8.2(a)(iv)A; or

(ii) pursuant to Subsection 8.2(a)(ii)A, Subsection 8.2(a)(ii)C or Subsection 8.2(a)(iii)C if, in any such case, prior to the earlier of the termination of this Agreement or the holding of the Meta Meeting, (A) a Meta Acquisition Proposal, or the intention to make a Meta Acquisition Proposal, shall have been publicly announced by any Person (other than RTO Acquiror or any of its affiliates) and not withdrawn prior to such termination or holding of the Meta Meeting, and (B) within twelve (12) months after the later of the date of termination of this Agreement or the holding of the Meta Meeting, (1) Meta has entered into a definitive agreement with respect to or consummated a Meta Acquisition Proposal, (2) a Meta Acquisition Proposal has been publicly accepted or recommended by the Meta Board, or (3) a Meta Acquisition Proposal has been approved by or submitted for approval to the Meta Shareholders. For the purpose of this Subsection 8.3(b)(ii), the term "**Meta Acquisition Proposal**" shall have the meaning ascribed to such term in Section 1.1, except that references to "20%" shall be deemed to be "more than 50%". For the avoidance of doubt, the Meta Acquisition Proposal referred to in clauses (B)(1), (B)(2) and (B)(3) of this Subsection need not be the same Meta Acquisition Proposal that was made to Meta or publicly announced prior to the termination of this Agreement or holding of the Meta Meeting.

The Termination Payment shall be made by Meta by wire transfer of same-day funds, to an account designated by RTO Acquiror, (x) in the event that this Agreement is terminated pursuant to Subsection 8.2(a)(iv)A, simultaneously with, and as a condition to the effectiveness of, such termination, (y) in the event that this Agreement is terminated pursuant to Subsection 8.2(a)(iii)B or Subsection 8.2(a)(iii)D, as soon as practicable, and in any event within two (2) Business Days of the date on which this Agreement is terminated, and (z) in the event that the Termination Payment is payable pursuant to Subsection 8.3(b)(ii), on the earliest occur of the events referred to in clauses (B)(1), (B)(2) and (B(3) of that Subsection.

RTO Acquiror hereby acknowledges that the Termination Payment to which it may become entitled to is a payment of liquidated damages which is a genuine pre-estimate of the damages which it will suffer or incur as a result of the event giving rise to such damages and the resultant non-completion of the Arrangement and the transactions contemplated by this Agreement and is not a penalty. Meta hereby irrevocably waives any right it may have to raise as a defence that any such liquidated damages are excessive or punitive. Upon receipt by RTO Acquiror of the Termination Payment, RTO Acquiror shall have no further Claim against Meta at law or in equity or otherwise (including injunctive relief to restrain any breach or threatened breach by Meta of any of its obligations hereunder or otherwise to obtain specific performance).

(c) The Termination Payment shall be payable by RTO Acquiror to Meta in the event that this Agreement is terminated in the following circumstances:

(i) pursuant to Subsection 8.2(a)(iv)B, Subsection 8.2(a)(iv)D or Subsection 8.2(a)(iii)A; or

(ii) pursuant to Subsection 8.2(a)(ii)A, Subsection 8.2(a)(ii)D or Subsection 8.2(a)(iv)C if, in any such case, prior to the earlier of the termination of this Agreement or the holding of the RTO Acquiror Meeting, (A) an RTO Acquiror Acquisition Proposal, or the intention to make an RTO Acquiror Acquisition Proposal, shall have been publicly announced by any Person (other than Meta or any of its affiliates) and not withdrawn prior to such termination or holding of the RTO Acquiror Meeting, and (B) within twelve (12) months after the later of the date of termination of this Agreement or the holding of the RTO Acquiror Meeting, (1) RTO Acquiror has entered into a definitive agreement with respect to or consummated an RTO Acquiror Acquisition Proposal, (2) an RTO Acquiror Acquisition Proposal has been publicly accepted or recommended by the RTO Acquiror Board, or (3) an RTO Acquiror Acquisition Proposal has been approved by or submitted for approval to the RTO Acquiror Shareholders. For the purpose of this Subsection 8.3(c)(ii), the term "**RTO Acquiror Acquisition Proposal**" shall have the meaning ascribed to such term in Section 1.1, except that references to "20%" shall be deemed to be "more than 50%". For the avoidance of doubt, the RTO Acquiror Acquisition Proposal referred to in clauses (B)(1), (B)(2) and (B)(3) of this Subsection need not be the same RTO Acquiror Acquisition Proposal that was made to RTO Acquiror or publicly announced prior to the termination of this Agreement or holding of the RTO Acquiror Meeting.

The Termination Payment shall be made by RTO Acquiror by wire transfer of same-day funds, to an account designated by Meta, (x) in the event that this Agreement is terminated pursuant to Subsection 8.2(a)(iii)A, simultaneously with, and as a condition to the effectiveness of, such termination, (y) in the event that this Agreement is terminated pursuant to Subsection 8.2(a)(iv)B or Subsection 8.2(a)(iv)D, as soon as practicable, and in any event within two (2) Business Days of the date on which this Agreement is terminated, and (z) in the event that the Termination Payment is payable pursuant to Subsection 8.3(c)(ii), on the earliest occur of the events referred to in clauses (B)(1), (B)(2) and (B(3) of that Subsection.

Meta hereby acknowledges that the Termination Payment to which it may become entitled to is a payment of liquidated damages which is a genuine pre-estimate of the damages which it will suffer or incur as a result of the event giving rise to such damages and the resultant non-completion of the Arrangement and the transactions contemplated by this Agreement and is not a penalty. RTO Acquiror hereby irrevocably waives any right it may have to raise as a defence that any such liquidated damages are excessive or punitive. Upon receipt by Meta of any Termination Payment, Meta shall have no further Claim against RTO Acquiror at law or in equity or otherwise (including injunctive relief to restrain any breach or threatened breach by RTO Acquiror of any of its obligations hereunder or otherwise to obtain specific performance).

**8.4 Amendment**

Subject to the provisions of the Interim Order and Final Order, the Plan of Arrangement and applicable Law, this Agreement and the Plan of Arrangement may, at any time and from time to time prior to the Effective Time, be amended only by mutual written agreement of RTO Acquiror and Meta, and any such amendment may without limitation:

(a) change the time for performance of any of the obligations or acts of the Parties;

(b) waive any inaccuracies or modify any representation or warranty contained herein or in any document delivered pursuant hereto;

(c) waive compliance with or modify any of the covenants herein contained and waive or modify performance of any of the obligations of the Parties; and

(d) waive compliance with or modify any mutual conditions precedent herein contained.

Notwithstanding the foregoing, after each of the Meta Securityholder Approval and the RTO Acquiror Shareholder Approval has been obtained, no amendment shall be made that pursuant to applicable Law requires further approval or adoption by the Meta Shareholders or the RTO Shareholders without such further approval or adoption.

**8.5 Waiver**

Any Party may (a) extend the time for the performance of any of the obligations or acts of the other Party, (b) waive compliance, except as provided herein, with any of the other Party's agreements or the fulfilment of any conditions to its own obligations contained herein, or (c) waive inaccuracies in any of the other Party's representations or warranties contained herein or in any document delivered by the other Party, in each case only to the extent such obligations, agreements and conditions are intended for its benefit. Notwithstanding the foregoing, after each of the Meta Securityholder Approval and the RTO Acquiror Shareholder Approval has been obtained, no waiver shall be made that pursuant to applicable Law requires further approval or adoption by the Meta Shareholders or the RTO Shareholders without such further approval or adoption. No extension or waiver shall be valid unless set forth in an instrument in writing signed on behalf of the waiving Party and, unless otherwise provided in the written waiver, will be limited to the specific breach or condition waived and shall not extend to any other matter or occurrence. No failure or delay in exercising any right, power or privilege under this Agreement will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege under this Agreement.

## ARTICLE 9
## GENERAL PROVISIONS AND MISCELLANEOUS

### 9.1 Privacy

Each Party shall comply with applicable privacy Laws in the course of collecting, using and disclosing Personal Information in connection with the transactions contemplated hereby (the "**Transaction Personal Information**"). No Party shall disclose Transaction Personal Information originally collected by any other Party to any Person other than to its advisors who are evaluating and advising on the transactions contemplated by this Agreement. If RTO Acquiror completes the transactions contemplated by this Agreement, RTO Acquiror shall not, following the Effective Date, without the consent of the individuals to whom such Transaction Personal Information relates or as permitted or required by applicable Law, use or disclose Transaction Personal Information originally collected by Meta:

(a) for purposes other than those for which such Transaction Personal Information was collected by Meta prior to the Effective Date; and

(b) which does not relate directly to the carrying on of the business of Meta (including carrying on the Meta Business) or to the carrying out of the purposes for which the transactions contemplated by this Agreement were implemented.

The Parties shall protect and safeguard the Transaction Personal Information against unauthorized collection, use or disclosure. RTO Acquiror shall cause its advisors to observe the terms of this Section 9.1 and to protect and safeguard all Transaction Personal Information in their possession. If this Agreement shall be terminated, each Party shall promptly deliver to the other Party all Transaction Personal Information originally collected by such other Party in its possession or in the possession of any of its advisors, including all copies, reproductions, summaries or extracts thereof, except, unless prohibited by applicable Law, for electronic backup copies made automatically in accordance with the usual backup procedures of the Party returning such Transaction Personal Information.

### 9.2 Notices

All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given and received on the day it is delivered, provided, however, that it is delivered on a Business Day prior to 4:30 p.m. Toronto time in the place of delivery or receipt. However, if notice is delivered after 4:30 p.m. Toronto time or if such day is not a Business Day then the notice shall be deemed to have been given and received on the next Business Day. Notice shall be sufficiently given if delivered (either in person, by courier service or other personal method of delivery), or if transmitted by email to the Parties at the following addresses (or at such other addresses as shall be specified by any Party by notice to the other given in accordance with these provisions):

(a) if to RTO Acquiror:

Torchlight Energy Resources, Inc.
5700 W. Plano Parkway, Suite 3600
Plano TX 75093

Attention: John Brda
E-mail: john@torchlightenergy.com

with a copy (which shall not constitute notice) to:

Stikeman Elliott LLP
Suite 1700, 666 Burrard Street
Vancouver, British Columbia V6C 2X8

Attention: Michael G. Urbani
Email: murbani@stikeman.com

and

1 Park Plaza, Twelfth Floor
Irvine, CA 92679

Attention: Michael A. Hedge ; Jason C. Dreibelbis
Email: michael.hedge@klgates.com; jason.dreibelbis@klgates.com

(b) if to Meta:

Metamaterial Inc.

1 Research Drive
Dartmouth, Nova Scotia
B2Y 4M9

Attention: George Palikaras
Email: george.palikaras@metamaterial.com

with a copy (that shall not constitute notice) to:

Fasken Martineau DuMoulin LLP
333 Bay Street, Suite 2400
Toronto, Ontario M5H 2T6

Attention: John Sabetti
Email: jsabetti@fasken.com

Wilson Sonsini Goodrich & Rosati PC
12235 El Camino Real
San Diego, CA 92130-3002

Attention: Martin Waters and Ethan Lutske
Email: mwaters@wsgr.com; elutske@wsgr.com

**9.3 Governing Law**

This Agreement shall be governed, including as to validity, interpretation and effect, by the Laws of the Province of Ontario and the Laws of Canada applicable therein, without giving effect to any principles of conflict of Laws thereof which would result in the application of the Laws of any other jurisdiction. Each of the Parties hereby irrevocably attorns to the exclusive jurisdiction of the courts of the Province of Ontario in respect of all matters arising under and in relation to this Agreement and the Arrangement. Notwithstanding the foregoing, any provisions of this Agreement with respect to US Securities Laws shall be governed by applicable US Laws, and any provisions with respect to the corporate governance, existence, good standing and authority of RTO Acquiror shall be governed by NRS.

**9.4 Injunctive Relief**

Subject to Subsection 8.3(b) and Subsection 8.3(c), the Parties acknowledge and agree that irreparable harm would occur for which money damages would not be an adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, the Parties agree that, in the event of any breach or threatened breach of this Agreement by a Party, the non-breaching Party will be entitled, without the requirement of posting a bond or other security, to seek equitable relief, including injunctive relief and specific performance, and the Parties shall not object to the granting of injunctive or other equitable relief on the basis that there exists an adequate remedy at law. Subject to Subsection 8.3(b) and Subsection 8.3(c), such remedies will not be the exclusive remedies for any breach of this Agreement but will be in addition to all other remedies available at law or equity to each of the Parties.

**9.5 Time of Essence**

Time shall be of the essence in this Agreement.

**9.6 Entire Agreement, Binding Effect and Assignment**

This Agreement (including the exhibits and schedules hereto and the Meta Disclosure Letter, the RTO Acquiror Disclosure Letter and the other agreements, documents and certificates delivered pursuant to this Agreement), the Meta Voting Agreements, the RTO Acquiror Voting Agreements, and the Confidentiality Agreement constitute the entire agreement, and supersede all other prior agreements and understandings, both written and oral, among the Parties, or any of them, with respect to the subject matter hereof and thereof and, except as expressly provided herein, this Agreement is not intended to and shall not confer upon any Person other than the Parties any rights or remedies hereunder. This Agreement shall enure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any of the Parties without the prior written consent of the other Parties.

**9.7 No Liability**

No director or officer of RTO Acquiror shall have any personal liability whatsoever to Meta under this Agreement, or any other document delivered in connection with the transactions contemplated hereby on behalf of RTO Acquiror. No director or officer of Meta shall have any personal liability whatsoever to RTO Acquiror, Canco or Callco under this Agreement, or any other document delivered in connection with the transactions contemplated hereby on behalf of Meta.

**9.8 Severability**

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule or Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

**9.9 Counterparts, Execution**

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument. The Parties shall be entitled to rely upon delivery of an executed facsimile or similar executed electronic copy of this Agreement, and such facsimile or similar executed electronic copy shall be legally effective to create a valid and binding agreement among the Parties.

IN WITNESS WHEREOF the Parties have executed this Arrangement Agreement as of the date first written above by their respective officers thereunto duly authorized.

**TORCHLIGHT ENERGY RESOURCES, INC.**

Per: /s/ John A. Brda
Name: John A. Brda
Title: Chief Executive Officer

**2798832 ONTARIO INC.**

Per: /s/ John A. Brda
Name: John A. Brda
Title: Chief Executive Officer

**2798831 ONTARIO INC.**

Per: /s/ John A. Brda
Name: John A. Brda
Title: Chief Executive Officer

**METAMATERIAL INC.**

Per: /s/ George Palikaras
Name: George Palikaras
Title: President & CEO

**SCHEDULE A**
**PLAN OF ARRANGEMENT**

**ARTICLE 1**
**INTERPRETATION**

**1.1 Definitions**

In this Plan of Arrangement:

"**affiliate**" has the meaning ascribed thereto in the *Securities Act* (Ontario), as amended.

"**Agency**" means any domestic or foreign court, tribunal, federal, state, provincial or local government or governmental agency, department or authority or other regulatory authority (including the Exchange and NASDAQ) or administrative agency or commission (including the Securities Authorities and the SEC) or any elected or appointed public official.

"**Ancillary Rights**" means the interest of a holder of Exchangeable Shares as a beneficiary of the trust created under the Voting and Exchange Trust Agreement.

"**Arrangement**" means an arrangement under Section 182 of the OBCA on the terms and subject to the conditions set out in this Plan of Arrangement, subject to any amendments or variations hereto made in accordance with this Plan of Arrangement and the Arrangement Agreement or made at the direction of the Court.

"**Arrangement Agreement**" means the arrangement agreement made as of December 14, 2020 between RTO Acquiror, Canco, Callco and Meta, as amended, supplemented and/or restated in accordance with its terms.

"**Articles of Arrangement**" means the articles of arrangement of Meta in respect of the Arrangement required by the OBCA to be sent to the Director after the Final Order is made, which shall be in a form and content satisfactory to the Parties, each acting reasonably.

"**Automatic Exchange Right**" has the meaning ascribed thereto in the Voting and Exchange Trust Agreement.

"**Business Day**" means a day other than a Saturday, a Sunday or any other day on which commercial banking institutions in Toronto, Ontario or Houston, Texas are authorized or required by applicable Law to be closed.

"**Callco**" means (i) 2798831 Ontario Inc., being a direct or indirect wholly-owned subsidiary of RTO Acquiror incorporated under the laws of the Province of Ontario or (ii) any other direct or indirect wholly-owned subsidiary of RTO Acquiror designated by RTO Acquiror from time to time after the Effective Date in replacement thereof.

"**Canadian Resident**" means (i) a person who is not a non-resident of Canada for the purposes of the ITA, or (ii) a partnership that is a "Canadian partnership" for purposes of the ITA.

"**Canco**" means 2798832 Ontario Inc., a wholly-owned subsidiary of RTO Acquiror, incorporated under the laws of the Province of Ontario that issues the Exchangeable Shares pursuant to the Arrangement.

“**Certificate of Arrangement**” means the certificate of arrangement to be issued by the Director pursuant to subsection 183(2) of the OBCA in respect of the Articles of Arrangement.

“**Change of Law**” means any amendment to the ITA and other applicable provincial income tax laws that permits holders of Exchangeable Shares who are Canadian Resident, who hold their Exchangeable Shares as capital property, and who deal at arm’s length with RTO Acquiror and Canco (all for the purposes of the ITA and other applicable provincial income tax laws) to exchange their Exchangeable Shares for RTO Acquiror Shares on a basis that will not require such holders to recognize any gain or loss or any actual or deemed dividend in respect of such exchange for the purposes of the ITA or applicable provincial income tax laws.

“**Change of Law Call Date**” has the meaning set out in Section 5.3(a).

“**Change of Law Call Purchase Price**” has the meaning set out in Section 5.3(a).

“**Change of Law Call Right**” has the meaning set out in Section 5.3(a).

“**Consideration**” means the consideration to be received by Meta Shareholders pursuant to the Plan of Arrangement in respect of each Meta Share that is issued and outstanding immediately prior to the Effective Time, being either the RTO Acquiror Share Consideration or the Exchangeable Share Consideration as elected by a Meta Shareholder or as otherwise determined in accordance with Section 2.3 in respect of each Meta Share held.

“**Court**” means the Ontario Superior Court of Justice (Commercial List).

“**CRA**” means the Canada Revenue Agency.

“**Current Market Price**” has the meaning set out in the Exchangeable Share Provisions.

“**Depositary**” means the person acting as depositary under the Arrangement.

“**Director**” means the Director appointed pursuant to Section 278 of the OBCA.

“**Dissent Rights**” has the meaning set out in Section 3.1.

“**Dissenting Shareholder**” means a holder of Meta Shares that has duly and validly exercised Dissent Rights and who is ultimately entitled to be paid the fair value of such holder’s Meta Shares as determined in accordance with Section 3.1.

“**Dividend Amount**” means an amount equal to all declared and unpaid dividends on an Exchangeable Share held by a holder thereof on any dividend record date which occurred prior to the date of purchase, redemption or other acquisition of such share by Callco, Canco or RTO Acquiror from such holder.

“**Effective Date**” means the date shown on the Certificate of Arrangement giving effect to the Arrangement.

“**Effective Time**” means 12:01 a.m. (Toronto time) on the Effective Date.

“**Election Deadline**” means 4:00 p.m. (Toronto time) on the Business Day which is not less than 5 Business Days preceding the Effective Date.

"**Eligible Holder**" means a Meta Shareholder who is (i) a Canadian Resident, and (ii) not exempt from tax under Part I of the ITA (or, in the case of a partnership, none of the partners of which is exempt from tax under Part I of the ITA).

"**Exchange**" means the Canadian Securities Exchange, the Toronto Stock Exchange or such other recognized securities exchange upon which the Exchangeable Shares may be listed for trading from time to time.

"**Exchange Ratio**" means the number of RTO Acquiror Shares or Exchangeable Shares that a Meta Shareholder will receive at the Effective Time in exchange for each one (1) Meta Share held, determined as follows:

$$A = B/C$$

where

A = the number of RTO Acquiror Shares or Exchangeable Shares to be received in exchange for each one (1) Meta Share, rounded to three decimal places;

B = the Meta Shareholders' proportionate share of the total pro forma number of RTO Acquiror Shares to be outstanding upon completion of the Arrangement, which for greater certainty will be equal to 75% of the total pro forma number of outstanding RTO Acquiror Shares upon completion of the Arrangement (including any RTO Acquiror Shares issued pursuant to the Pre-Closing Financing Transaction of up to US$10,000,000, which is to be proportionally dilutive to each party at 75% to Meta Shareholders and 25% to RTO Acquiror Shareholders), subject to adjustment upward for any RTO Acquiror Shares issued or issuable prior to the Effective Time that are intended to be 100% dilutive to RTO Acquiror Shareholders; and

C = the number of Meta Shares outstanding immediately prior to the Effective Time.

"**Exchange Time**" means the time that the steps in Sections 2.2(b), 2.2(c), 2.2(d) and 2.2(e) occur.

"**Exchangeable Elected Shares**" means Meta Shares (other than Meta Shares held by RTO Acquiror or an affiliate) that the holder thereof shall have elected, in accordance with Section 2.3(a) in a duly completed Letter of Transmittal and Election Form deposited with the Depositary no later than the Election Deadline, to transfer to Canco under the Arrangement for the Exchangeable Share Consideration.

"**Exchangeable Share Consideration**" means the consideration in the form of Exchangeable Shares, together with Ancillary Rights, elected for each Meta Share by a Meta Shareholder (other than a Dissenting Shareholder) pursuant to Section 2.3(a), which shall be that number of Exchangeable Shares equal to the Exchange Ratio for each Meta Share held immediately prior to the Effective Time.

"**Exchangeable Share Provisions**" means the rights, privileges, restrictions and conditions attaching to the Exchangeable Shares, which rights, privileges, restrictions and conditions shall be in substantially the form set out in Appendix I hereto.

"**Exchangeable Shares**" means the exchangeable shares in the capital of Canco having the rights, privileges, restrictions and conditions set forth in the Exchangeable Share Provisions.

"**Final Order**" means an order of the Court granted pursuant to Section 185 of the OBCA, in a form acceptable to each of RTO Acquiror and Meta, each acting reasonably, approving the Arrangement after a hearing upon the procedural and substantive fairness of the terms and conditions of the Arrangement, as such order may be affirmed, amended, modified, supplemented or varied by the Court (with the consent of RTO Acquiror and Meta, each acting reasonably) at any time prior to the Effective Date or, if appealed, as affirmed or amended (provided, however, that any such amendment is acceptable to RTO Acquiror and Meta, each acting reasonably) on appeal, unless such appeal is withdrawn, abandoned or denied.

"**Governmental Entity**" means (i) any multinational or supranational body or organization, nation, government, state, province, country, territory, municipality, quasi-government, administrative, judicial or regulatory authority, agency, board, body, bureau, commission, instrumentality, court or tribunal or any political subdivision thereof, or any central bank (or similar monetary or regulatory authority) thereof, any taxing authority, any ministry or department or agency of any of the foregoing, (ii) any self-regulatory organization or stock exchange, including the Exchange and NASDAQ, (iii) any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government; and (iv) any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of such entities or other bodies pursuant to the foregoing.

"**holder**" means the holder of Meta Shares, Meta Options or Meta Warrants shown from time to time in the central securities register maintained by or on behalf of Meta in respect of such securities, as the context requires.

"**including**" means "including without limitation" and "**includes**" means "includes without limitation".

"**Interim Order**" means an order of the Court in a form acceptable to each of RTO Acquiror and Meta, acting reasonably, providing for, among other things, the calling and holding of the Meta Meeting, as the same may be amended by the Court with the consent of RTO Acquiror and Meta, each acting reasonably.

"**ITA**" means the *Income Tax Act* (Canada), as amended.

"**Law**" means, with respect to any person, any and all applicable law (statutory, common, civil or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement, whether domestic or foreign, enacted, adopted, promulgated or applied by a Governmental Entity that is binding upon or applicable to such person or its business, undertaking, property or securities, and to the extent that they have the force of law, policies, guidelines, notices and protocols of any Governmental Entity, as amended.

"**Letter of Transmittal and Election Form**" means the letter of transmittal and election form for use by holders of Meta Shares or other securities of Meta, in the form accompanying the Meta Circular.

"**Liquidation Amount**" has the meaning set out in the Exchangeable Share Provisions.

"**Liquidation Date**" has the meaning set out in the Exchangeable Share Provisions.

"**Meta**" means Metamaterial Inc., a corporation governed under the OBCA.

"**Meta Arrangement Resolution**" means the special resolution of Meta Shareholders, Meta Optionholders, Meta Warrantholders and holders of Meta DSUs approving the Arrangement to be considered at the Meta Meeting.

"**Meta Circular**" means the notice of the Meta Meeting and accompanying management proxy circular, including all schedules, appendices and exhibits thereto and enclosures therewith, sent to the Meta Shareholders, as required by the Court in the Interim Order, in connection with the Meta Meeting, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"**Meta DSU**" means a deferred share unit of Meta.

"**Meta Meeting**" means the special meeting of Meta Shareholders, Meta Optionholders, Meta Warrantholders and holders of Meta DSUs including any adjournment or postponement thereof, to be called and held in accordance with the Interim Order to consider the Meta Arrangement Resolution, and for any other purpose as may be set out in the Meta Circular.

"**Meta Non-Canadian Subsidiaries**" means Metamaterial Technologies USA, Inc. and Medical Wireless Sensing Ltd.

"**Meta Optionholders**" means the holders at the relevant time of Meta Options.

"**Meta Options**" means, at any time, options exercisable to acquire Meta Shares granted under the Option Plan which are, at such time, outstanding, whether or not vested.

"**Meta Shareholders**" means the holders of Meta Shares.

"**Meta Shares**" means issued and outstanding common shares in the capital of Meta.

"**Meta Warrantholders**" means the holders at the relevant time of Meta Warrants.

"**Meta Warrants**" means the common share purchase warrants to acquire Meta Shares which are at such time outstanding.

"**NASDAQ**" means the NASDAQ Capital Market.

"**OBCA**" means the *Business Corporations Act* (Ontario), as amended.

"**Option Plan**" means the stock option plan of Meta approved by Meta Shareholders on October 10, 2019.

"**person**" includes any individual, firm, partnership, limited partnership, limited liability partnership, joint venture, venture capital fund, limited liability company, unlimited liability company, association, trust, trustee, executor, administrator, legal personal representative, estate, body corporate, corporation, company, unincorporated association or organization, Governmental Entity, syndicate or other entity, whether or not having legal status.

"**Plan of Arrangement**" means this plan of arrangement.

"**Pre-Closing Financing**" has the meaning set out in the Arrangement Agreement.

"**Redemption Call Purchase Price**" has the meaning set out in Section 5.2(a).

"**Redemption Call Right**" has the meaning set out in Section 5.2(a).

"**Redemption Date**" has the meaning set out in the Exchangeable Share Provisions.

"**RTO Acquiror**" means Torchlight Energy Resources, Inc., a corporation existing under the laws of the State of Nevada.

"**RTO Acquiror Note**" has the meaning set out in Section 2.3(g)

"**RTO Acquiror Replacement Option**" means an option to acquire RTO Acquiror Shares to be issued by RTO Acquiror in consideration for the cancellation of each Meta Option.

"**RTO Acquiror Share Consideration**" means the consideration in the form of RTO Acquiror Shares elected or deemed to be elected for each Meta Share by a Meta Shareholder (other than a Dissenting Shareholder) pursuant to Section 2.3, which shall be that number of RTO Acquiror Shares equal to the Exchange Ratio for each Meta Share held immediately prior to the Effective Time.

"**RTO Acquiror Shares**" means the common stock, par value U.S.$0.01 per share, in the capital of RTO Acquiror.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Authorities**" means all securities regulatory authorities, including the applicable securities commission or similar regulatory authorities in each of the provinces and territories of Canada, the SEC, the Exchange, and the NASDAQ, that are applicable to Meta or RTO Acquiror, as the case may be.

"**Special Voting Share**" means the special voting share in the capital of RTO Acquiror having substantially the rights, privileges, restrictions and conditions described in the Voting and Exchange Trust Agreement.

"**Support Agreement**" means an agreement to be made among RTO Acquiror, Callco and Canco in connection with this Plan of Arrangement substantially in the form and substance of Schedule I to the Arrangement Agreement.

"**Tax Election Package**" means two copies of CRA form T2057, or, if the Meta Shareholder is a partnership, two copies of CRA form T2058 and two copies of any applicable equivalent provincial or territorial election form, which forms have been duly and properly completed and executed by the Meta Shareholder in accordance with the rules contained in the ITA or the relevant provincial legislation.

"**Transfer Agent**" means AST Trust Company (Canada) or such other person as may from time to time be appointed by Canco as the registrar and transfer agent for the Exchangeable Shares.

"**US Dollars**" or "**US$**" means United States dollars.

"**Voting and Exchange Trust Agreement**" means an agreement to be made among RTO Acquiror, Canco and the Trustee (as defined in the Exchangeable Share Provisions) in connection with this Plan of Arrangement substantially in the form of Schedule J to the Arrangement Agreement, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

**1.2 Headings and References**

The division of this Plan of Arrangement into Sections and the insertion of headings are for convenience of reference only and do not affect the construction or interpretation of this Plan of Arrangement. Unless otherwise specified, references to Sections are to Sections of this Plan of Arrangement.

**1.3 Currency**

Except as expressly indicated otherwise, all sums of money referred to in this Plan of Arrangement are expressed and shall be payable in US Dollars.

**1.4 Time**

Time shall be of the essence in each and every matter or thing herein provided. Unless otherwise indicated, all times expressed herein are local time at Toronto, Ontario.

## ARTICLE 2
## THE ARRANGEMENT

**2.1 Binding Effect**

Subject to the terms of the Arrangement Agreement, the Arrangement will become effective at the Effective Time and shall be binding at and after the Effective Time on Meta, RTO Acquiror, Canco, Callco, the Depositary, the Trustee and all holders and beneficial holders of Meta Shares, Meta Options and Meta Warrants including Dissenting Shareholders.

**2.2 The Arrangement**

Commencing at the Effective Time on the Effective Date, subject to the terms and conditions of the Arrangement Agreement, the following shall occur as part of the Arrangement and shall be deemed to occur in the following order (except that the steps in Sections 2.2(b), 2.2(c), 2.2(d), 2.2(e) and 2.2(f) shall be deemed to occur simultaneously) without any further act or formality:

(a) each Meta Share held by a Dissenting Shareholder shall be deemed to be transferred by the holder thereof, without any further act or formality on its part, free and clear of all Encumbrances, to Meta and Meta shall thereupon be obliged to pay the amount therefor determined and payable in accordance with Article 3 hereof, and the name of such holder shall be removed from the central securities register of Meta as a holder of Meta Shares and Meta shall be recorded as the registered holder of the Meta Shares so transferred and shall be deemed to be the legal owner of such Meta Shares, which Meta Shares shall thereupon be cancelled;

(b) each Meta Option outstanding immediately prior to the Effective Time shall, without further action or formality by or on behalf of the holders thereof, be exchanged for an RTO Acquiror Replacement Option to purchase from the RTO Acquiror the number of RTO Acquiror Shares equal to the product of (A) the number of Meta Shares issuable pursuant to the exercise of the Meta Option immediately before the Effective Time, and (B) the Exchange Ratio, provided that if the foregoing would result in a fraction of an RTO Acquiror Share being issuable upon any particular exercise of RTO Acquiror Replacement Options, then the number of RTO Acquiror Shares otherwise issuable upon exercise of such RTO Acquiror Replacement Options shall be rounded down to the nearest whole number of RTO Acquiror Shares. The exercise price per RTO Acquiror Share subject to any such RTO Acquiror Replacement Option shall be an amount equal to the quotient of (A) the exercise price per Meta Share under the exchanged Meta Option immediately prior to the Effective Time, divided by (B) the Exchange Ratio. Except as set out above, all terms and conditions of an RTO Acquiror Replacement Option, including the term to expiry, conditions to and manner of exercising, will be the same as the Meta Option for which it was exchanged and any document evidencing a Meta Option shall thereafter evidence and be deemed to evidence such RTO Acquiror Replacement Option;

(c) each Meta DSU shall, without any further action on the part of any holder thereof, be continued on the same terms and conditions as were applicable immediately prior to the Effective Time, except that, pursuant to the terms of the deferred share unit plan of Meta, the terms of the Meta DSUs share be amended so as to substitute for the Meta Shares issuable pursuant to such Meta DSUs, such number of RTO Acquiror Shares equal to (A) the number of Meta Shares issuable pursuant to the Meta DSUs immediately prior to the Effective Time, multiplied by (B) the Exchange Ratio, rounded down to the nearest whole number;

(d) each Meta Warrant shall, without any further action on the part of any holder thereof, be continued on the same terms and conditions as were applicable immediately prior to the Effective Time, except that, pursuant to the terms of the applicable warrant certificate, the terms of the Meta Warrants shall be amended so as to (i) substitute for the Meta Shares issuable pursuant to the exercise of such Meta Warrants such number of RTO Acquiror Shares equal to (A) the number of Meta Shares issuable pursuant to the exercise of such Meta Warrants immediately prior to the Effective Time, multiplied by (B) the Exchange Ratio, rounded down to the nearest whole number; and (ii) adjust the exercise price per RTO Acquiror Share issuable pursuant to the exercise of any such Meta Warrant following the Effective Time to be an amount equal to the quotient of (A) the exercise price per Meta Share under the Meta Warrant immediately prior to the Effective Time divided by (B) the Exchange Ratio;

(e) each issued and outstanding Meta Share (other than Exchangeable Elected Shares and other than Meta Shares held by RTO Acquiror or an affiliate thereof or Dissenting Shareholders) held by a Meta Shareholder shall be transferred by the holder thereof, without any further act or formality on its part, free and clear of all Encumbrances, to Canco in exchange for RTO Acquiror Share Consideration in accordance with the election or deemed election of such Meta Shareholder pursuant to Section 2.3;

(f) each Exchangeable Elected Share shall be transferred by the holder thereof, without any further act or formality on its part, free and clear of all Encumbrances, to Canco in exchange for Exchangeable Share Consideration in accordance with the election of such Meta Shareholder pursuant to Section 2.3; and

(g) RTO Acquiror, Canco and Callco shall execute the Support Agreement and RTO Acquiror, Canco and the Transfer Agent shall execute the Voting and Exchange Trust Agreement and RTO Acquiror shall issue to and deposit with the Transfer Agent the Special Voting Share in consideration of the payment to RTO Acquiror by Meta on behalf of the Meta Shareholders of one dollar ($1.00), to be thereafter held of record by the Transfer Agent as trustee for and on behalf of, and for the use and benefit of, the holders of the Exchangeable Shares in accordance with the Voting and Exchange Trust Agreement. All rights of holders of Exchangeable Shares under the Voting and Exchange Trust Agreement shall be received by them as part of the property receivable by them under Section 2.2(c) in exchange for the Exchangeable Elected Shares for which they were exchanged.

**2.3 Consideration Elections**

With respect to the exchange of securities effected pursuant to Sections 2.2(b) and 2.2(c):

(a) Meta Shareholders who are Eligible Holders may elect to (i) receive in respect of any or all of their Meta Shares, the Exchangeable Share Consideration and (ii) receive in respect of the balance of their Meta Shares, if any, the RTO Acquiror Share Consideration;

(b) the election provided for in Section 2.3(a) shall be made by a Meta Shareholder depositing with the Depositary, prior to the Election Deadline, a duly completed Letter of Transmittal and Election Form indicating such Meta Shareholder's election, together with certificates representing such holder's Meta Shares, if any;

(c) any Meta Shareholder who does not deposit with the Depositary a duly completed Letter of Transmittal and Election Form prior to the Election Deadline, or otherwise fails to comply with the requirements of Section 2.3(b) and the Letter of Transmittal and Election Form in respect of any such Meta Shareholder's Meta Shares, shall be deemed to have elected to receive the RTO Acquiror Share Consideration; and

(d) any Letter of Transmittal and Election Form, once deposited with the Depositary, shall be irrevocable and may not be withdrawn by a Meta Shareholder.

**2.4 Income Tax Elections**

Meta Shareholders who are Eligible Holders who are entitled to receive Exchangeable Shares under the Arrangement shall be entitled to make an income tax election pursuant to subsection 85(1) of the ITA or, if the person is a partnership, subsection 85(2) of the ITA (and in each case, where applicable, the analogous provisions of provincial income tax Law) with respect to the transfer of their Meta Shares to Canco by providing the Tax Election Package to the Depositary within 90 days following the Effective Date, duly completed with the details of the number of Meta Shares transferred and the applicable agreed amounts (which cannot be less than the fair market value of the Ancillary Rights at the Exchange Time). Thereafter, subject to the Tax Election Package being correct and complete and complying with the provisions of the ITA (or applicable provincial income or corporate tax Law), the relevant forms will be signed by Canco and returned to such persons within 90 days after the receipt thereof by the Depositary for filing with the CRA (or the applicable provincial taxing Agency). Canco will not be responsible for the proper or accurate completion of the Tax Election Package or to check or verify the content of any election form and, except for Canco's obligation to return duly completed Tax Election Packages which are received by the Depositary within 90 days of the Effective Date, within 90 days after the receipt thereof by the Depositary, Canco will not be responsible for any taxes, interest or penalties or any other costs or damages resulting from the failure by a Meta Shareholder to properly and accurately complete or file the necessary election forms in the form and manner and within the time prescribed by the ITA (or any applicable provincial legislation). In its sole discretion, Canco may choose to sign and return Tax Election Packages received more than 90 days following the Effective Date, but Canco will have no obligation to do so.

**2.5 Share Registers**

Every Meta Shareholder from whom a Meta Share is transferred and acquired pursuant to the Arrangement shall be removed from the register of holders of Meta Shares at the Effective Time and shall cease to have any rights in respect of such Meta Shares, and Canco shall become the holder of such Meta Shares and shall be added to that register at the Effective Time and shall be entitled as of that time to all of the rights and privileges attached to the Meta Shares. Every Meta Shareholder who acquires Exchangeable Shares and/or RTO Acquiror Shares pursuant to the Arrangement shall be added to the register of holders of Exchangeable Shares and/or RTO Acquiror Shares, as applicable, and shall be entitled as of the Effective Time to all of the rights and privileges attached to the Exchangeable Shares and/or RTO Acquiror Shares, as the case may be.

**2.6 Adjustments to Consideration**

The consideration to be paid pursuant to Sections 2.2(b), 2.2(c), 2.2(d) and 2.2(e) shall be adjusted to reflect fully the effect of any stock split, reverse split, stock dividend (including any dividend or distribution of securities convertible into RTO Acquiror Shares or Meta Shares, other than stock dividends paid in lieu of ordinary course dividends), reorganization, recapitalization or other like change with respect to RTO Acquiror Shares or Meta Shares occurring after the date of the Arrangement Agreement and prior to the Effective Time.

## ARTICLE 3
## DISSENT RIGHTS

**3.1 Rights of Dissent**

Holders of Meta Shares may exercise rights of dissent with respect to those Meta Shares pursuant to, and (except as expressly indicated to the contrary in this Section 3.1), in the manner set forth in, Section 185 of the OBCA and this Section 3.1 in connection with the Arrangement (the "**Dissent Rights**"); provided that, notwithstanding Section 185(6) of the OBCA, the written objection to the resolution approving the Arrangement referred to in Section 185(6) of the OBCA must be received by Meta not later than 5:00 p.m. (Toronto time) on the second Business Day before the Meta Meeting; and provided further that, notwithstanding the provisions of Section 185 of the OBCA, Meta Shareholders who duly exercise Dissent Rights and who have not withdrawn or been deemed to have withdrawn such exercise of Dissent Rights and who:

(a) ultimately are determined to be entitled to be paid fair value for their Meta Shares, which fair value, notwithstanding anything to the contrary contained in Section 185 of the OBCA, shall be determined as of the Exchange Time, shall be deemed to have transferred those Meta Shares as of the Exchange Time at the fair value of the Meta Shares determined as of the Exchange Time in accordance with Section 2.2(a), without any further act or formality and free and clear of all Encumbrances, to Meta and shall not be entitled to any other payment or consideration, including any payment that would be payable under the Arrangement had such holder not exercised their Dissent Rights in respect of such Meta Shares; or

(b) ultimately are determined not to be entitled, for any reason, to be paid fair value for their Meta Shares, shall be deemed to have participated in the Arrangement on the same basis as a holder of Meta Shares who has not exercised Dissent Rights and shall be deemed to have elected to receive, and shall receive, the consideration provided in Section 2.3(c),

but in no case shall Meta, RTO Acquiror, Canco, the Depositary or any other person be required to recognize any such holder as a holder of Meta Shares after the Exchange Time, and the names of each such holder shall be deleted from the register of holders of Meta Shares at the Exchange Time.

## ARTICLE 4
## SHARE DEPOSIT AND FRACTIONAL SHARES

### 4.1 Share Deposit

Prior to the Exchange Time, Canco shall deposit or cause to be deposited with the Depositary, for the benefit of the holders of Meta Shares, the aggregate number of whole Exchangeable Shares and the aggregate number of whole RTO Acquiror Shares issuable to holders of Meta Shares in accordance with Section 2.2(b) and Section 2.2(c) under this Plan of Arrangement. Upon surrender to the Depositary by a holder of Meta Shares of a duly completed Letter of Transmittal and Election Form and such other documents and instruments as the Depositary may reasonably require along with the certificate or certificates, if any, representing such Meta Shares to be exchanged under the Arrangement for cancellation, such holder of Meta Shares shall be entitled to receive, and promptly after the Exchange Time the Depositary shall deliver to such person, written evidence of the book entry issuance in uncertificated form to, or certificates registered in the name of, such person representing that number of Exchangeable Shares and/or RTO Acquiror Shares which such person is entitled to receive in accordance with Section 2.2(b) and Section 2.2(c) less any amounts withheld pursuant to Section 4.5, and any certificate so surrendered shall forthwith be cancelled. In the event of a transfer of ownership of such Meta Shares which was not registered in the transfer records of Meta, written evidence of the book entry issuance of, or certificates representing, the number of Exchangeable Shares and/or RTO Acquiror Shares issuable to the registered holder may be registered in the name of and issued to the transferee if the certificate representing such Meta Shares is presented to the Depositary, accompanied by a duly completed Letter of Transmittal and Election Form and all documents required to evidence and effect such transfer. Without limiting the provisions of Section 2.5, until surrendered as contemplated by this Section 4.1, each certificate which immediately prior to the Exchange Time represented one or more outstanding Meta Shares that, under the Arrangement, were exchanged pursuant to Section 2.2(b) or Section 2.2(c), shall be deemed at all times after the Exchange Time to represent only the right to receive upon such surrender (i) the Consideration to which the holder thereof is entitled under the Arrangement, or as to a certificate held by a Dissenting Shareholder (other than a shareholder who exercised Dissent Rights who is deemed to have participated in the Arrangement pursuant to Section 3.1(b)), to receive the fair value of the Meta Shares represented by such certificate, and (ii) any dividends or distributions with a record date after the Exchange Time theretofore paid or payable with respect to any Exchangeable Shares or RTO Acquiror Shares issued in exchange therefor as contemplated by Section 4.2, in each case less any amounts withheld pursuant to Section 4.6.

**4.2 Distributions with Respect to Unsurrendered Certificates**

No dividends or other distributions paid, declared or made with respect to Exchangeable Shares or RTO Acquiror Shares, in each case with a record date after the Exchange Time, shall be paid to the holder of any unsurrendered certificate which immediately prior to the Exchange Time represented outstanding Meta Shares, unless and until such person shall have surrendered its certificates representing Meta Shares in accordance with the provisions of Section 4.1. Subject to applicable Law, at the time such person shall have surrendered its certificates representing Meta Shares in accordance with the provisions of Section 4.1, there shall be paid to such person, without interest (i) the amount of dividends or other distributions with a record date after the Exchange Time theretofore paid with respect to the Exchangeable Share or the RTO Acquiror Share, as the case may be, to which such person is entitled pursuant hereto, and (ii) on the appropriate payment date, the amount of dividends or other distributions with a record date after the Exchange Time but prior to the date of surrender of certificates representing Meta Shares by such person in accordance with the provisions of Section 4.1 and a payment date subsequent to the date of such compliance and payable with respect to such Exchangeable Shares or RTO Acquiror Shares, as the case may be.

**4.3 No Fractional Shares**

No fractional Exchangeable Shares or fractional RTO Acquiror Shares shall be issued upon compliance with the provisions of Section 4.1 and no dividend, stock split or other change in the capital structure of Canco or RTO Acquiror shall relate to any such fractional security and such fractional interests shall not entitle the owner thereof to exercise any rights as a security holder of Canco or RTO Acquiror. Where the aggregate number of RTO Acquiror Shares or Exchangeable Shares to be issued to a Meta Shareholder as consideration under the Arrangement would result in a fraction of a RTO Acquiror Share or an Exchangeable Share being issuable, the number of RTO Acquiror Shares or Exchangeable Shares, as the case may be to be received by such Meta Shareholder shall be rounded down to the nearest whole RTO Acquiror Share or Exchangeable Share, as the case may be.

**4.4 Lost Certificates**

In the event any certificate which immediately prior to the Exchange Time represented one or more outstanding Meta Shares that were exchanged pursuant to Section 2.2 shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such certificate to be lost, stolen or destroyed, the Depositary will issue in exchange for such lost, stolen or destroyed certificate, any Exchangeable Shares or RTO Acquiror Shares (and any dividends or distributions with respect thereto) deliverable in accordance with Section 2.2 and such holder's Letter of Transmittal and Election Form. When authorizing such payment in exchange for any lost, stolen or destroyed certificate, the person to whom Exchangeable Shares or RTO Acquiror Shares (and any dividends or distributions with respect thereto) are to be issued shall, as a condition precedent to the issuance thereof, give a bond satisfactory to Meta, and RTO Acquiror and its transfer agent (each acting reasonably) in such amount as RTO Acquiror may direct or otherwise indemnify Meta, Canco and RTO Acquiror in a manner satisfactory to Meta, Canco and RTO Acquiror against any claim that may be made against Meta, Canco or RTO Acquiror with respect to the certificate alleged to have been lost, stolen or destroyed.

**4.5 Extinction of Rights**

Any certificate which immediately prior to the Exchange Time represented outstanding Meta Shares that were exchanged pursuant to Section 2.2 that is not deposited with all other instruments required by Section 4.1 on or prior to the date of the notice referred to in Section 5(2) of the Exchangeable Share Provisions shall cease to represent a claim or interest of any kind or nature as a securityholder of Canco or RTO Acquiror. On such date, the Exchangeable Shares and/or RTO Acquiror Shares to which the former holder of the certificate referred to in the preceding sentence was ultimately entitled shall be deemed to have been surrendered for no consideration to Canco. None of RTO Acquiror, Meta, Canco, Callco or the Depositary shall be liable to any person in respect of any cash or property delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.

### 4.6 Withholding Rights

Meta, Canco, Callco, RTO Acquiror and the Depositary shall be entitled to deduct and withhold from any dividend, price or consideration otherwise payable to any holder of Meta Shares, RTO Acquiror Shares or Exchangeable Shares such amounts as Meta, Canco, Callco, RTO Acquiror or the Depositary is required to deduct and withhold with respect to such payment under the ITA, United States tax laws or any other applicable Law. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes hereof as having been paid to the holder of the securities in respect of which such deduction and withholding was made, provided that such withheld amounts are actually remitted to the appropriate taxing Agency. Meta, Canco, Callco, RTO Acquiror and the Depositary are hereby authorized to sell or otherwise dispose of such other portion of the consideration as is necessary to provide sufficient funds to Meta, Canco, Callco, RTO Acquiror and the Depositary, as the case may be, to enable it to comply with such deduction or withholding requirement and Meta, Canco, Callco, RTO Acquiror and the Depositary shall notify the holder thereof and remit any unapplied balance of the net proceeds of such sale.

### 4.7 Paramountcy

From and after the Effective Time: (i) this Plan of Arrangement shall take precedence and priority over any and all Meta Shares issued prior to the Effective Time; (ii) the rights and obligations of the registered holders of Meta Shares (other than RTO Acquiror, Canco or any of their respective affiliates), and of Meta, RTO Acquiror, Canco, the Depositary and any transfer agent or other depositary in relation thereto, shall be solely as provided for in this Plan of Arrangement and the Arrangement Agreement; and (iii) all actions, causes of action, claims or proceedings (actual or contingent and whether or not previously asserted) based on or in any way relating to any Meta Shares shall be deemed to have been settled, compromised, released and determined without liability except as set forth herein.

## ARTICLE 5
## RIGHTS OF RTO ACQUIROR AND CALLCO TO ACQUIRE EXCHANGEABLE SHARES

### 5.1 Liquidation Call Right

In addition to the rights contained in the Exchangeable Share Provisions, RTO Acquiror and Callco shall have the following rights in respect of the Exchangeable Shares:

(a) Subject to the proviso in Section 5.1(b) that Callco shall only be entitled to exercise the Liquidation Call Right with respect to those Exchangeable Shares, if any, in respect of which RTO Acquiror has not exercised the Liquidation Call Right, RTO Acquiror and Callco shall each have the overriding right (the "**Liquidation Call Right**"), in the event of and notwithstanding the proposed liquidation, dissolution or winding-up of Canco or any other distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs, pursuant to Section 5 of the Exchangeable Share Provisions, and subject to the sale and purchase contemplated by the Automatic Exchange Right, to purchase from all but not less than all of the holders of the Exchangeable Shares (other than any holder of Exchangeable Shares which is RTO Acquiror or any of its affiliates) on the Liquidation Date all but not less than all of the Exchangeable Shares held by each such holder upon payment by RTO Acquiror or Callco, as the case may be, to each such holder of an amount per share (the "**Liquidation Call Purchase Price**") equal to the Current Market Price of RTO Acquiror Shares on the last Business Day prior to the Liquidation Date plus the Dividend Amount, which shall be satisfied in full by RTO Acquiror or Callco, as the case may be, delivering or causing to be delivered to such holder one RTO Acquiror Share plus any Dividend Amount in accordance with Section 5.1(c). In the event of the exercise of the Liquidation Call Right by RTO Acquiror or Callco, as the case may be, each such holder of Exchangeable Shares (other than RTO Acquiror and its affiliates) shall be obligated to sell all of the Exchangeable Shares held by the holder to RTO Acquiror or Callco, as the case may be, on the Liquidation Date upon payment by RTO Acquiror or Callco, as the case may be, to such holder of the Liquidation Call Purchase Price for each such share, and Canco shall have no obligation to pay any Liquidation Amount to the holders of such shares so purchased.

(b) Callco shall only be entitled to exercise the Liquidation Call Right with respect to those Exchangeable Shares, if any, in respect of which RTO Acquiror has not exercised the Liquidation Call Right. To exercise the Liquidation Call Right, RTO Acquiror or Callco must notify the Transfer Agent, as agent for the holders of the Exchangeable Shares, and Canco of its intention to exercise such right at least 45 days before the Liquidation Date in the case of a voluntary liquidation, dissolution or winding-up of Canco or any other voluntary distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs, at least 30 days before the Liquidation Date and at least 30 days before the Liquidation Date in the case of an involuntary liquidation, dissolution or winding-up of Canco or any other involuntary distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs. The RTO Acquiror will or will cause the Transfer Agent to notify the holders of the Exchangeable Shares as to whether or not RTO Acquiror and/or Callco has exercised the Liquidation Call Right forthwith after the expiry of the period during which RTO Acquiror or Callco may exercise the Liquidation Call Right. If RTO Acquiror and/or Callco exercises the Liquidation Call Right, then on the Liquidation Date, RTO Acquiror and/or Callco, as the case may be, will purchase and the holders of the Exchangeable Shares (other than any holder of Exchangeable Shares which is RTO Acquiror or any of its affiliates) will sell, all of the Exchangeable Shares held by such holders on such date for a price per share equal to the Liquidation Call Purchase Price which shall be satisfied in full by RTO Acquiror or Callco, as the case may be, delivering or causing to be delivered to such holder one RTO Acquiror Share plus any Dividend Amount.

(c) For the purposes of completing the purchase and sale of the Exchangeable Shares pursuant to exercise of the Liquidation Call Right, RTO Acquiror or Callco, as the case may be, shall deposit or cause to be deposited with the Transfer Agent, on or before the Liquidation Date, the aggregate number of RTO Acquiror Shares required to be delivered or caused to be delivered pursuant to Section 5.1(a) and a cheque or cheques payable at par at any branch of the bankers of the applicable entity representing the aggregate Dividend Amount, if any, in payment of the total Liquidation Call Purchase Price, less any amounts withheld pursuant to Section 4.5. Provided that such consideration has been so deposited with the Transfer Agent, the holders of the Exchangeable Shares (other than RTO Acquiror and its affiliates) shall cease to be holders of the Exchangeable Shares on and after the Liquidation Date and shall not be entitled to exercise any of the rights of holders in respect thereof (including any rights under the Voting and Exchange Trust Agreement), other than the right to receive their proportionate part of the aggregate Liquidation Call Purchase Price without interest, upon presentation and surrender by the holder of certificates representing the Exchangeable Shares held by such holder and the holder shall on and after the Liquidation Date be considered and deemed for all purposes to be the holder of the RTO Acquiror Shares which such holder is entitled to receive. Upon surrender to the Transfer Agent of a certificate or certificates representing Exchangeable Shares, together with such other documents and instruments as may be required to effect a transfer of Exchangeable Shares under the OBCA and articles of Canco and such additional documents, instruments and payments as the Transfer Agent may reasonably require, the holder of such surrendered certificate or certificates shall be entitled to receive in exchange therefor, and the Transfer Agent on behalf of RTO Acquiror or Callco, as applicable, shall transfer to such holder, the RTO Acquiror Shares to which such holder is entitled and as soon as reasonably practicable thereafter the Transfer Agent shall deliver to such holder written evidence of the book entry issuance in uncertificated form of the RTO Acquiror Shares to which the holder is entitled and a cheque or cheques of RTO Acquiror or Callco, as applicable, payable at par at any branch of the bankers of RTO Acquiror or Callco, respectively, representing the Dividend Amount, if any, and when received by the Transfer Agent, all dividends and other distributions with respect to such RTO Acquiror Shares with a record date after the Liquidation Date and before the date of the transfer of such RTO Acquiror Shares to such holder, less any amounts withheld pursuant to Section 4.6. If neither RTO Acquiror or Callco exercises the Liquidation Call Right in the manner described above, on the Liquidation Date, the holders of the Exchangeable Shares will be entitled to receive in exchange therefor the Liquidation Amount otherwise payable by Canco in connection with the liquidation, dissolution or winding-up of Canco or any distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs pursuant to Section 5 of the Exchangeable Share Provisions.

**5.2 Redemption Call Right**

In addition to the rights contained in the Exchangeable Share Provisions, RTO Acquiror and Callco shall have the following rights in respect of the Exchangeable Shares:

(a) Subject to the proviso in Section 5.2(b) that Callco shall only be entitled to exercise the Redemption Call Right with respect to those Exchangeable Shares, if any, in respect of which RTO Acquiror has not exercised the Redemption Call Right, and notwithstanding the proposed redemption of the Exchangeable Shares by Canco pursuant to Section 7 of the Exchangeable Share Provisions, RTO Acquiror and Callco shall each have the overriding right (the "**Redemption Call Right**"**)** to purchase from all but not less than all of the holders of the Exchangeable Shares (other than any holder of Exchangeable Shares which is RTO Acquiror or any of its affiliates) on the Redemption Date all but not less than all of the Exchangeable Shares held by each such holder upon payment by RTO Acquiror or Callco, as the case may be, to each such holder an amount per Exchangeable Share (the "**Redemption Call Purchase Price")** equal to the Current Market Price of an RTO Acquiror on the last Business Day prior to the Redemption Date plus the Dividend Amount, which shall be satisfied in full by RTO Acquiror or Callco, as applicable, delivering or causing to be delivered to such holder one RTO Acquiror Share plus any Dividend Amount in accordance with Section 5.2(c). In the event of the exercise of the Redemption Call Right by RTO Acquiror or Callco, as the case may be, each such holder of Exchangeable Shares shall be obligated to sell all of the Exchangeable Shares held by the holder to RTO Acquiror or Callco, as the case may be, on the Redemption Date upon payment by RTO Acquiror or Callco, as the case may be, to such holder of the Redemption Call Purchase Price for each such share, and Canco shall have no obligation to redeem, or to pay any Dividend Amount in respect of, such shares so purchased.

(b) Callco shall only be entitled to exercise the Redemption Call Right with respect to those Exchangeable Shares, if any, in respect of which RTO Acquiror has not exercised the Redemption Call Right. To exercise the Redemption Call Right, RTO Acquiror or Callco must notify the Transfer Agent, as agent for the holders of the Exchangeable Shares, and Canco of its intention to exercise such right (i) in the case of a redemption occurring as a result of a RTO Acquiror Control Transaction, an Exchangeable Share Voting Event or an Exempt Exchangeable Share Voting Event (each as defined in the Exchangeable Share Provisions), on or before the Redemption Date, and (ii) in any other case, at least 30 days before the Redemption Date. The Transfer Agent will notify the holders of the Exchangeable Shares as to whether or not RTO Acquiror and/or Callco has exercised the Redemption Call Right forthwith after the expiry of the period during which RTO Acquiror or Callco may exercise the Redemption Call Right. If RTO Acquiror and/or Callco exercises the Redemption Call Right, RTO Acquiror and/or Callco, as the case may be, will purchase and the holders of the Exchangeable Shares (other than any holder of Exchangeable Shares which is RTO Acquiror or any of its affiliates) will sell, on the Redemption Date, all of the Exchangeable Shares held by such holders on such date for a price per share equal to the Redemption Call Purchase Price which shall be satisfied in full by RTO Acquiror or Callco delivering or causing to be delivered to each such holder one RTO Acquiror Share plus any Dividend Amount.

(c) For the purposes of completing the purchase and sale of the Exchangeable Shares pursuant to the exercise of the Redemption Call Right, RTO Acquiror and/or Callco, as the case may be, shall deposit or cause to be deposited with the Transfer Agent, on or before the Redemption Date, an aggregate number of RTO Acquiror Shares and a cheque or cheques payable at par at any branch of the bankers of RTO Acquiror or Callco, as applicable, representing the aggregate Dividend Amount, if any, in payment of the aggregate Redemption Call Purchase Price less any amounts withheld pursuant to Section 4.5. Provided that RTO Acquiror or Callco, as applicable, has complied with the immediately preceding sentence, the holders of the Exchangeable Shares (other than RTO Acquiror and its affiliates) shall cease to be holders of the Exchangeable Shares on and after the Redemption Date and, from and after such date, shall not be entitled to exercise any of the rights of holders in respect thereof (including, without limitation, any rights under the Voting and Exchange Trust Agreement) other than the right to receive their proportionate part of the aggregate Redemption Call Purchase Price, without interest, upon presentation and surrender by the holder of certificates representing the Exchangeable Shares held by such holder and the holder shall on and after the Redemption Date be considered and deemed for all purposes to be the holder of the RTO Acquiror Shares which such holder is entitled to receive. Upon surrender to the Transfer Agent of a certificate or certificates representing Exchangeable Shares, together with such other documents and instruments as may be required to effect a transfer of Exchangeable Shares under the OBCA and articles of Canco and such additional documents, instruments and payments as the Transfer Agent may reasonably require, the holder of such surrendered certificate or certificates shall be entitled to receive in exchange therefor, and the Transfer Agent on behalf of RTO Acquiror or Callco, as the case may be, shall transfer to such holder, the RTO Acquiror Shares to which such holder is entitled and as soon as reasonably practicable thereafter the Transfer Agent shall deliver to such holder of the RTO Acquiror Shares to which the holder is entitled and a cheque or cheques of RTO Acquiror or Callco, as the case may be, payable at par at any branch of the bankers of RTO Acquiror or Callco, respectively, representing the Dividend Amount, if any, and when received by the Transfer Agent, all dividends and other distributions with respect to such RTO Acquiror Shares with a record date after the Redemption Date and before the date of the transfer of such RTO Acquiror Shares to such holder, less any amounts withheld pursuant to Section 4.6. If Callco does not exercise the Redemption Call Right in the manner described above, on the Redemption Date the holders of the Exchangeable Shares will be entitled to receive in exchange therefor the redemption price otherwise payable by Canco in connection with the redemption of the Exchangeable Shares pursuant to Article 7 of the Exchangeable Share Provisions.

### 5.3 Change of Law Call Right

In addition to the rights contained in the Exchangeable Share Provisions, RTO Acquiror and Callco shall have the following rights in respect of the Exchangeable Shares:

(a) Subject to the proviso in Section 5.3(b) that Callco shall only be entitled to exercise the Change of Law Call Right with respect to those Exchangeable Shares, if any, in respect of which RTO Acquiror has not exercised the Change of Law Call Right, RTO Acquiror and Callco shall each have the overriding right (the "**Change of Law Call Right**"), in the event of a Change of Law, to purchase from all but not less than all of the holders of the Exchangeable Shares (other than any holder of Exchangeable Shares which is RTO Acquiror or any of its affiliates) on the Change of Law Call Date all but not less than all of the Exchangeable Shares held by each such holder upon payment by RTO Acquiror or Callco, as the case may be, of an amount per share (the "**Change of Law Call Purchase Price**") equal to the Current Market Price of RTO Acquiror Shares on the last Business Day prior to the Change of Law Call Date plus the Dividend Amount, which shall be satisfied in full by RTO Acquiror or Callco, as the case may be, delivering or causing to be delivered to such holder one RTO Acquiror Share plus any Dividend Amount. In the event of the exercise of the Change of Law Call Right by RTO Acquiror or Callco, each holder of Exchangeable Shares shall be obligated to sell all the Exchangeable Shares held by such holder to RTO Acquiror or Callco, as the case may be, on the Change of Law Call Date upon payment by RTO Acquiror or Callco, as the case may be, to such holder of the Change of Law Call Purchase Price for each such Exchangeable Share.

(b) Callco shall only be entitled to exercise the Change of Law Call Right with respect to those Exchangeable Shares, if any, in respect of which RTO Acquiror has not exercised the Change of Law Call Right. To exercise the Change of Law Call Right, RTO Acquiror or Callco must notify the Transfer Agent of its intention to exercise such right at least 30 days before the date on which RTO Acquiror or Callco intends to acquire the Exchangeable Shares (the "**Change of Law Call Date**"). If RTO Acquiror or Callco exercises the Change of Law Call Right, then, on the Change of Law Call Date, RTO Acquiror or Callco, as the case may be, will purchase and the holders of Exchangeable Shares will sell all of the Exchangeable Shares then outstanding for a price per share equal to the Change of Law Call Purchase Price, which shall be satisfied in full by RTO Acquiror or Callco, as the case may be, delivering or causing to be delivered to such holder one RTO Acquiror Share plus any Dividend Amount.

(c) For the purposes of completing the purchase and sale of the Exchangeable Shares pursuant to the exercise of the Change of Law Call Right, RTO Acquiror or Callco, as the case may be, shall deposit or cause to be deposited with the Transfer Agent, on or before the Change of Law Call Date, the aggregate number of RTO Acquiror Shares which RTO Acquiror or Callco, as the case may be, shall deliver or cause to be delivered pursuant to Section 5.4(a) and a cheque or cheques of RTO Acquiror or Callco, as the case may be, payable at par at any branch of the bankers of RTO Acquiror or Callco representing the aggregate Dividend Amount, if any, in payment of the aggregate Redemption Call Purchase Price, in each case less any amounts withheld pursuant to Section 4.6. Provided that RTO Acquiror or Callco has complied with the immediately preceding sentence, on and after the Change of Law Call Date the holders of the Exchangeable Shares shall cease to be holders of the Exchangeable Shares and shall not be entitled to exercise any of the rights of holders in respect thereof (including any rights under the Voting and Exchange Trust Agreement), other than the right to receive their proportionate part of the total Change of Law Purchase Price payable by RTO Acquiror or Callco, as the case may be, without interest, upon presentation and surrender by the holder of certificates representing the Exchangeable Shares held by such holder and the holder shall on and after the Change of Law Call Date be considered and deemed for all purposes to be the holder of RTO Acquiror Shares to which such holder is entitled. Upon surrender to the Transfer Agent of a certificate or certificates representing Exchangeable Shares, together with such other documents and instruments as may be required to effect a transfer of Exchangeable Shares under the OBCA and articles of Canco and such additional documents, instruments and payments as the Transfer Agent may reasonably require, the holder of such surrendered certificate or certificates shall be entitled to receive in exchange therefor, and the Transfer Agent on behalf of RTO Acquiror or Callco, as the case may be, shall transfer to such holder, the RTO Acquiror Shares to which such holder is entitled and as soon as reasonably practicable thereafter the Transfer Agent shall deliver to such holder written evidence of the book entry issuance in uncertificated form of the RTO Acquiror Shares to which the holder is entitled and a cheque or cheques of RTO Acquiror or Callco, as the case may be, payable at par at any branch of the bankers of RTO Acquiror or Callco, as the case may be, representing the Dividend Amount, if any, and when received by the Transfer Agent, all dividends and other distributions with respect to such RTO Acquiror Shares with a record date after the Redemption Date and before the date of the transfer of such RTO Acquiror Shares to such holder, less any amounts withheld pursuant to Section 4.5.

## ARTICLE 6
## AMENDMENT

### 6.1 Plan of Arrangement Amendment

(a) With the prior written consent of RTO Acquiror, not to be unreasonably withheld, Meta may amend, modify and/or supplement this Plan of Arrangement at any time and from time to time, provided that any such amendment, modification and/or supplement must be contained in a written document that is filed with the Court and, if made after the Meta Meeting, approved by the Court and communicated to Meta Shareholders, Meta Optionholders and Meta Warrantholders if and as required by the Court.

(b) With the prior written consent of RTO Acquiror, not to be unreasonably withheld, any amendment, modification or supplement to this Plan of Arrangement may be proposed by Meta at any time before or at the Meta Meeting with or without any other prior notice or communication and, if so proposed and accepted by the persons voting at the Meta Meeting in the manner required under the Interim Order, shall become part of this Plan of Arrangement for all purposes.

(c) Any amendment, modification or supplement to this Plan of Arrangement that is approved or directed by the Court following the Meta Meeting shall be effective only if (i) it is consented to in writing by Meta and RTO Acquiror and, (ii) if required by the Court, it is consented to by Meta Shareholders, Meta Optionholders and/or Meta Warrantholders voting in the manner directed by the Court.

(d) With the prior written consent of RTO Acquiror, not to be unreasonably withheld, any amendment, modification or supplement to this Plan of Arrangement may be made prior to the Effective Date by Meta and without the approval of the Court, Meta Shareholders, Meta Optionholders or Meta Warrantholders, provided that it concerns a matter which, in the reasonable opinion of Meta, is of an administrative nature required to better give effect to the implementation of this Plan of Arrangement and is not materially adverse to the financial or economic interests of any Meta Shareholder, Meta Optionholder or Meta Warrantholder.

(e) This Plan of Arrangement may be withdrawn prior to the Exchange Time in accordance with the Arrangement Agreement.

## ARTICLE 7
## FURTHER ASSURANCES

Notwithstanding that the transactions and events set out in this Plan of Arrangement shall occur and shall be deemed to occur in the order set out in this Plan of Arrangement without any further act or formality, each of Meta, RTO Acquiror, Callco and Canco shall make, do and execute, or cause to be made, done and executed, all such further acts, deeds, agreements, transfers, assurances, instruments or documents as may reasonably be required by any of them to document or evidence any of the transactions or events set out in this Plan of Arrangement.

## ARTICLE 8
## NOTICE

Any notice to be given by RTO Acquiror or Canco to Meta Shareholders, Meta Optionholders or Meta Warrantholders pursuant to the Arrangement will be deemed to have been properly given if it is mailed by first class mail, postage prepaid, to registered Meta Shareholders, Meta Optionholders or Meta Warrantholders, as the case may be, at their addresses as shown on the applicable register of such holders maintained by Meta and will be deemed to have been received on the first day following the date of mailing which is a Business Day.

The provisions of this Plan of Arrangement, the Arrangement Agreement and the Letter of Transmittal and Election Form apply notwithstanding any accidental omission to give notice to any one or more Meta Shareholders, Meta Optionholders or Meta Warrantholders and notwithstanding any interruption of mail services in Canada, the United States or elsewhere following mailing. In the event of any interruption of mail service following mailing, RTO Acquiror intends to make reasonable efforts to disseminate any notice by other means, such as dissemination by press release.

Notwithstanding the provisions of the Arrangement Agreement, this Plan of Arrangement and the Letter of Transmittal and Election Form, certificates, if any, for RTO Acquiror Shares and Exchangeable Shares issuable, pursuant to the Arrangement need not be mailed if RTO Acquiror determines that delivery thereof by mail may be delayed. Persons entitled to cheques and certificates which are not mailed for the foregoing reason may take delivery thereof at the office of the Transfer Agent in respect of which the certificates being issued were deposited, upon application to the Transfer Agent, until such time as RTO Acquiror has determined that delivery by mail will no longer be delayed. Notwithstanding the provisions of the Arrangement Agreement, this Plan of Arrangement and the Letter of Transmittal and Election Form, the deposit of cheques and certificates with the Transfer Agent in such circumstances will constitute delivery to the persons entitled thereto and the RTO Acquiror Shares will be deemed to have been paid for immediately upon such deposit.

**APPENDIX I**
**TO THE PLAN OF ARRANGEMENT PROVISIONS**
**ATTACHING TO THE EXCHANGEABLE SHARES**

**SCHEDULE B**
**META ARRANGEMENT RESOLUTION**

**BE IT RESOLVED AS A SPECIAL RESOLUTION THAT:**

1) the arrangement (the "**Arrangement**") under Section 182 of the *Business Corporations Act* (Ontario) (the "**OBCA**") involving Torchlight Energy Resources, Inc. ("**Purchaser**") and Metamaterial Inc. ("**Meta**"), as more particularly described and set forth in the management proxy circular of Meta (the "**Circular**") dated ________, 2020 accompanying the notice of this meeting (as the Arrangement may be, or may have been, modified, amended or supplemented in accordance with the definitive arrangement agreement (as it may be amended, the "**Arrangement Agreement**") made as of December 14, 2020 between Purchaser and Meta) is hereby authorized, approved and adopted;

2) the plan of arrangement of Meta (as may be, or may have been, modified, amended or supplemented in accordance with its terms and the terms of the Arrangement Agreement as the "**Plan of Arrangement**") implementing the Arrangement, the full text of which is set out in Appendix "B" to the Circular, is hereby authorized, approved and adopted;

3) the (i) Arrangement Agreement and related transactions, (ii) actions of the directors of Meta in approving the Arrangement Agreement, and (iii) actions of the directors and officers of Meta in executing and delivering the Arrangement Agreement, and any amendments, modifications or supplements thereto, are hereby ratified and approved;

4) Meta be and is hereby authorized to apply for a final order from the Ontario Superior Court of Justice (Commercial List) (the "**Court**") to approve the Arrangement on the terms set forth in the Arrangement Agreement and the Plan of Arrangement (as they may be modified, amended or supplemented as described in the Circular);

5) notwithstanding that this resolution has been passed (and the Arrangement approved) by the shareholders of Meta or that the Arrangement has been approved by the Court, the directors of Meta are hereby authorized and empowered, without further notice to, or approval of, the shareholders of Meta to (i) modify, amend or supplement the Arrangement Agreement or the Plan of Arrangement to the extent permitted by the terms of the Arrangement Agreement or the Plan of Arrangement; and (ii) subject to the terms of the Arrangement Agreement, not to proceed with the Arrangement and related transactions;

6) any director or officer of Meta is hereby authorized and directed for and on behalf of Meta to execute, whether under corporate seal of Meta or otherwise, and to deliver for filing with the Director under the OBCA articles of arrangement and such other documents as are necessary or desirable to give effect to the Arrangement in accordance with the Arrangement Agreement, such determination to be conclusively evidenced by the execution and delivery of such articles of arrangement and any such other documents;

7) Meta be and is hereby authorized to apply for the delisting of its common shares from the Canadian Securities Exchange (the "**Delisting**") in connection with the transactions contemplated in the Arrangement Agreement; and

8) any one director or officer of Meta is hereby authorized and directed, for and on behalf and in the name of Meta, to execute or cause to be executed and to deliver or cause to be delivered, whether under corporate seal of Meta or otherwise, all such agreements, forms, waivers, notices, certificate, confirmations and other documents and instruments, and to perform or cause to be performed all such other acts and things, as in the opinion of such director or officer may be necessary, desirable or useful for the purpose of giving effect to these resolutions and the matters authorized thereby, the Arrangement Agreement, completion of the Plan of Arrangement, and the Delisting, including:

a. all actions required to be taken by or on behalf of Meta, and all necessary filings and obtaining the necessary approvals, consents and acceptances of appropriate regulatory authorities; and

b. the signing of the certificates, consents and other documents or declarations required under the Arrangement Agreement or otherwise to be entered into by Meta;

such determination to be conclusively evidenced by the execution and delivery of such document, agreement or instrument or the doing of any such act or thing.

**SCHEDULE C**
**REPRESENTATIONS AND WARRANTIES OF META**

Meta represents and warrants to and in favour of RTO Acquiror as follows, and acknowledges that RTO Acquiror is relying upon such representations and warranties in connection with the completion of the transactions contemplated herein:

(a) Schedule C(a) of the Meta Disclosure Letter sets forth the name and jurisdiction of incorporation and the directors and officers of Meta and each of its subsidiaries (in this Schedule C, the "**Meta Subsidiaries**"). Each of Meta and the Meta Subsidiaries (i) has been duly incorporated and is validly existing and in good standing under the laws of its jurisdiction of incorporation and is up-to-date in respect of all material corporate filings; (ii) has all requisite corporate or other organization, as applicable power and authority to carry on its business as now conducted and to own or lease and operate its assets and properties; and (iii) in respect of Meta, has all requisite corporate power and authority to enter into and carry out its obligations under this Agreement.

(b) Meta does not beneficially own, or exercise control or direction over, directly or indirectly, any interest in any other Person other than the Meta Subsidiaries or any agreement, option or commitment to acquire any such investment. All of the issued and outstanding securities of the Meta Subsidiaries are owned by Meta.

(c) No steps or proceedings have been taken, instituted or, to the knowledge of Meta, are pending for the dissolution, liquidation or winding up of Meta or a Meta Subsidiary. Except as disclosed in Schedule C(c) of the Meta Disclosure Letter, neither Meta nor any Meta Subsidiary: (i) is insolvent or bankrupt under or pursuant to any corporate, insolvency, winding-up, restructuring, reorganization, administration or other Laws applicable to it; (ii) has commenced, approved, authorized or taken any action in furtherance of proceedings in respect of it under any applicable bankruptcy, insolvency, restructuring, reorganization, administration, winding up, liquidation, dissolution, or similar Law; (iii) has proposed a compromise or arrangement with its creditors generally or is or has been subject to any actions taken, orders received or proceedings commenced by creditors or other Persons for or in respect of the bankruptcy, receivership, insolvency, restructuring, reorganization, administration, winding-up, liquidation or dissolution of it, or any of its property or assets; (iv) had any encumbrancer take possession of any of its property, or (v) had any execution or distress become enforceable or become levied upon any of its property.

(d) Each of Meta and the Meta Subsidiaries is, in all material respects, conducting its business in compliance with all applicable Laws (including all material applicable federal, provincial, state, municipal and local laws, regulations and other lawful requirements of any Government Entity) of each jurisdiction in which its business is carried on and is licensed, registered or qualified in all jurisdictions in which it owns, leases or operates its property or carries on business to enable its business to be carried on as now conducted and its property and assets to be owned or leased and operated and all such licenses, registrations and qualifications are valid, subsisting and in good standing and it has not received a notice of non-compliance, nor knows of, nor has reasonable grounds to know of, any facts that could give rise to a notice of non-compliance with any such Laws, licenses, registrations or qualifications which would reasonably be expected to result in a Meta Material Adverse Effect.

(e) Meta has the requisite corporate power and authority to enter into, deliver and perform its obligations under this Agreement. The execution and delivery of this Agreement and performance by Meta of its obligations under this Agreement and the consummation of the Arrangement and other transactions contemplated hereby have been duly authorized by all necessary corporate action of Meta and no other corporate proceedings on the part of Meta are necessary to authorize the execution, delivery and performance of this Agreement or the consummation of the Arrangement and the other transactions contemplated hereby other than the approval by the Meta Board of the Meta Circular and the approval by the Meta Shareholders in the manner required by the Interim Order, applicable Law and approval of the Arrangement by the Court.

(f) This Agreement has been duly and validly executed and delivered by Meta and, assuming due authorization, execution and delivery by RTO Acquiror, Canco and Callco, constitutes a legal, valid and binding obligation of Meta, enforceable against Meta in accordance with its terms, subject however, to limitations with respect to enforcement imposed by Law in connection with bankruptcy, insolvency, reorganization or other Laws affecting creditors' rights generally and to the extent that equitable remedies such as specific performance and injunctions are only available in the discretion of the court from which they are sought.

(g) Other than the Interim Order and any approvals required by the Interim Order, the Final Order, filings with the Director under the OBCA and such filings and other actions required under applicable Securities Laws and the Key Regulatory Approvals set out in Schedule C(g) of the Meta Disclosure Letter, no authorization, approval, order, license, permit or consent of any Governmental Entity, and no notice, registration, declaration or filing by Meta or any of the Meta Subsidiaries with any such Governmental Entity is required in connection with the execution and delivery of, and performance by Meta of its obligations under, this Agreement or the consummation of the Arrangement and the other transactions contemplated in this Agreement.

(h) Other than as set out in Schedule C(h) of the Meta Disclosure Letter, there is no requirement under any Meta Material Contract to which Meta or any Meta Subsidiary is a party or by which Meta or any Meta Subsidiary is bound or has any rights to make a filing with, give any notice to, or to obtain the consent or approval of, any party to such Meta Material Contract relating to the transactions contemplated by this Agreement.

(i) The execution and delivery of this Agreement by Meta, the performance by Meta of its obligations hereunder and the consummation of the transactions contemplated hereby do not and will not (whether after notice or lapse of time or both) (i) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under (whether after notice or lapse of time or both) or give rise to any right of termination or acceleration of any obligations or indebtedness, and neither Meta nor a Meta Subsidiary is currently in material breach or default of, (A) any Law applicable to Meta or a Meta Subsidiary; (B) the constating documents, by-laws or resolutions of Meta or any Meta Subsidiary, as applicable; (C) any Contract or Debt Instrument to which Meta or any Meta Subsidiary is a party or by which it is bound, except as disclosed in Schedule C(i) of the Meta Disclosure Letter, or (D) any judgment, decree or order binding Meta or any Meta Subsidiary, as applicable, or the assets or properties thereof; (ii) allow any Person to exercise any rights, require any consent or other action by any Person or permit the termination, cancellation, acceleration or other change of any right or other obligation or the loss of any benefit to which Meta or any Meta Subsidiary is entitled (including by triggering any rights of first refusal or first offer, change in control provision or other restriction or limitation) under any Material Contract; or (iii) result in the creation or imposition of any Encumbrance up on any of Meta's assets or the assets of the Meta Subsidiaries.

(j) Schedule C(j) of the Meta Disclosure Letter sets forth the authorized, issued and outstanding share capital of Meta and each of the Meta Subsidiaries. All of the issued and outstanding shares of capital stock of, or other equity or voting interests in, each of Meta and the Meta Subsidiaries has been duly authorized and validly issued in compliance with applicable Laws and, is fully paid and non-assessable, were not issued in violation of any pre-emptive rights, purchase options, call options, rights of first refusal, first offer, co-sale or participation or subscription rights or other similar rights. Except as set out in Schedule C(j) of the Meta Disclosure Letter, all of the issued and outstanding shares of capital stock of, or other equity or voting interests in each Meta Subsidiary is owned, directly or indirectly, both as a matter of record and beneficially by Meta and is free and clear of all Encumbrances (except for Permitted Encumbrances), except for restrictions imposed by applicable Laws. Schedule C(l) of the Meta Disclosure Letter sets forth a list of all other securities of Meta.

(k) No order, ruling or determination having the effect of suspending the sale or ceasing the trading in any securities of Meta has been issued by any regulatory authority and is continuing in effect and no proceedings for that purpose have been instituted or, to the knowledge of Meta, are pending, contemplated or threatened by any regulatory authority.

(l) Except for the securities set forth in Schedule C(l) of the Meta Disclosure Letter, no Person now has any agreement or option or right or privilege (whether at law, pre-emptive or contractual) capable of becoming an agreement for the purchase, subscription, redemption, repurchase or issuance of, or conversion into, any shares, securities, warrants or convertible obligations of any nature of Meta and a sufficient number of Meta Shares are reserved for issuance pursuant to outstanding options, warrants, share incentive plans, convertible, exercisable and exchangeable securities and other rights to acquire Meta Shares. Schedule C(l) of the Meta Disclosure Letter sets forth all issued and outstanding securities of Meta convertible into Meta Shares, their grant and expiration date, exercise price and number of Meta Shares into which they are exercisable, as applicable.

(m) The Meta Annual Financial Statements and the Meta Interim Financial Statements (in this Schedule C, collectively, the "**Meta Financial Statements**"), (i) have been prepared in accordance with IFRS applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and (ii) fairly present, in all material respects, the consolidated financial position (including the assets and liabilities, whether absolute, contingent or otherwise as required by IFRS) of Meta and the Meta Subsidiaries as at the respective dates thereof and the consolidated results of their operations and cash flows for the periods indicated and contain and reflect adequate provisions for all reasonably anticipated liabilities, expenses and losses of Meta and the Meta Subsidiaries in accordance with IFRS and there has been no change in accounting policies or practices of Meta or any of the Meta Subsidiaries since January 1, 2020, that would be required to be disclosed in the Meta Financial Statements in accordance with IFRS, except as described in the notes thereto. There has been no material adverse change in the consolidated financial position of Meta and the Meta Subsidiaries since the date of the latest balance sheet included in the Meta Financial Statements. There are no material off-balance sheet transactions, arrangements, obligations (including contingent obligations) or other relationships of Meta or the Meta Subsidiaries with unconsolidated entities or other Persons. Since March 5, 2020, there have been no formal investigations regarding financial reporting or accounting policies and practices discussed with, reviewed by or initiated at the direction of the chief executive officer or chief financial officer of Meta, the Meta Board or any committee thereof. Since March 5, 2020, neither Meta nor its independent auditors have identified (i) any significant deficiency or material weakness in the system of internal accounting controls utilized by Meta, (ii) any fraud, whether or not material, that involves Meta's management or other employees who have a role in the preparation of financial statements or the internal accounting controls utilized by Meta, or (iii) any claim or allegation regarding any of the foregoing. Except as disclosed in the Meta Financial Statements, neither Meta nor any of the Meta Subsidiaries has any liabilities, indebtedness, obligation, expense, claim, deficiency, guaranty, or endorsement, whether accrued, absolute, contingent, matured, or unmatured of the kind required to be disclosed on a balance sheet or in the related notes to the consolidated financial statements prepared in accordance with IFRS which are, individually or in the aggregate, material to the business, results of operations or financial condition of Meta and the Meta Subsidiaries taken as a whole, except liabilities (i) identified in the balance sheet of Meta as of September 30, 2020 or the notes thereto, (ii) incurred in connection with the transactions contemplated by this Agreement, (iii) described on Schedule C(m) of the Meta Disclosure Letter, (iv) executory obligations under any Contract or (v) incurred since the date of the balance sheet of Meta as of September 30, 2020 in the ordinary course of business consistent with past practices. Meta does not intend to correct or restate, nor is there any basis for any correction or restatement of, any aspect of the Meta Financial Statements.

(n) Since September 30, 2020 through the date of this Agreement and other than with respect to the negotiation, execution and performance of this Agreement, each of Meta and the Meta Subsidiaries has conducted its business only in the ordinary course of business consistent with past practice, and there has not been: (a) any event that has had a Meta Material Adverse Effect, or (b) any material change by Meta or any Meta Subsidiary in its accounting methods, principles or practices, except as required by concurrent changes in IFRS or as disclosed in the notes to the Meta Financial Statements.

(o) Neither Meta nor any of the Meta Subsidiaries has any material liabilities or obligations of any nature, whether or not accrued, contingent or otherwise, except for: (i) liabilities and obligations that are adequately presented or reserved on the Meta Financial Statements or disclosed in the notes thereto; or (ii) liabilities and obligations incurred in the ordinary course of business consistent with past practice that are not and would not, individually or in the aggregate with all other liabilities and obligations of Meta and the Meta Subsidiaries (other than those disclosed on the Meta Financial Statements), be material to Meta and the Meta Subsidiaries (taken as a whole). Without limiting the foregoing, the Meta Financial Statements reflects reasonable reserves in accordance with IFRS for contingent liabilities of Meta and the Meta Subsidiaries.

(p) Each of Meta and the Meta Subsidiaries maintains internal control over financial reporting. Such internal control over financial reporting is effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with IFRS and includes policies and procedures that: (A) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with IFRS, and that receipts and expenditures of Meta and the Meta Subsidiaries are being made only with appropriate authorizations of management and directors of Meta and the Meta Subsidiaries, as applicable; and (B) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the assets of Meta or the Meta Subsidiaries that could have a material effect on its financial statements. As of the date of this Agreement, there neither is, nor has been, any fraud with respect to Meta or the Meta Subsidiaries, whether or not material, relating to the financial reporting or internal control over financial reporting of Meta or the Meta Subsidiaries, as applicable. As of the date of this Agreement, to the knowledge of Meta, there is no fraud that involves management or any other employees who have a significant role in the internal control over financial reporting of Meta or the Meta Subsidiaries.

(q) There are no actions, proceedings or, to Meta's knowledge, investigations (whether or not purportedly by or on behalf of Meta) commenced or, to the knowledge of Meta, threatened or pending against or relating to Meta or any Meta Subsidiary or the business thereof or affecting any of their assets and properties or against any current officer or director relating to such individual's role with Meta or any Meta Subsidiary at law or in equity (whether in any court, arbitration or similar tribunal) or before or by any Governmental Entity, that would reasonably be expected to result in a Meta Material Adverse Effect or prevent or materially delay the consummation of the Arrangement.

(r) Except as disclosed in Schedule C(r) of the Meta Disclosure Letter, Meta is not party to any Contract or arrangement, nor to the knowledge of Meta, is there any shareholders agreement or other Contract, which in any manner affects the voting control of any of the securities of Meta.

(s) All Taxes due and payable by Meta, have been paid. All Tax Returns required to be filed by Meta have been filed with all appropriate Governmental Entities and all such Tax Returns did not contain a misrepresentation as at the respective dates thereof. Except as disclosed in Schedule C(s) of the Meta Disclosure Letter, to the knowledge of Meta, no examination of any Tax Return of Meta is currently in progress and there are no issues or disputes outstanding with any Governmental Entity respecting any Taxes that have been paid, or may be payable, by Meta. Meta has timely and properly collected all material sales, use, value-added and similar Taxes required to be collected, and has remitted such amounts on a timely basis to the appropriate Governmental Entity. Meta has not been, is not, and immediately prior to the Closing will not be, treated as an "investment company" within the meaning of Section 368(a)(2)(F) of the U.S. Tax Code. Meta has not taken any action, nor to the knowledge of Meta are there any facts or circumstances not set forth in this Agreement or the Plan of Arrangement, that could reasonably be expected to prevent the Arrangement from qualifying as a "reorganization" within the meaning of Section 368(a) of the U.S. Tax Code.

(t) Neither Meta nor, to Meta's knowledge, any other Person, is in default in any material respect in the observance or performance of any term, covenant or obligation to be performed by Meta or a Meta Subsidiary or such other Person under any Material Contract, and no event has occurred which with notice or lapse of time or both would constitute such a default by Meta or any Meta Subsidiary or, to Meta's knowledge, any other party, except where such default or event would not reasonably be expected to result in a Meta Material Adverse Effect.

(u) Since September 30, 2020:

(i) Except as disclosed in Schedule C(u)(i) of the Meta Disclosure Letter, there has not been any material change in the assets, liabilities, obligations (absolute, accrued, contingent or otherwise), business, condition (financial or otherwise) or results of operations of Meta or any Meta Subsidiary;

(ii) Except as disclosed in Schedule C(u)(i) of the Meta Disclosure Letter, there has not been any material change in the share capital or long-term debt of Meta;

(iii) There has not been any entering into, or an amendment of, any Meta Material Contract (as defined below) other than (A) in the ordinary course of business consistent with past practice, or (B) renewals of any such contract;

(iv) There has not been any satisfaction or settlement of any material claims or material liabilities, other than the settlement of such claims or such liabilities in the ordinary course of business consistent with past practice;

(v) Except for ordinary course adjustments to salary, bonus, or other remuneration payable to any officers or senior or executive officers, there has not been any increase in the salary, bonus, severance, termination pay, change of control entitlements or other remuneration payable to any senior or executive officers of Meta or any Meta Subsidiary; and

(vi) Meta and the Meta Subsidiaries have carried on their business in the ordinary course consistent with past practice.

(v) There has been no interruption to or discontinuity in any supplier or distributor arrangement or relationship of Meta and the Meta Subsidiaries with each of their respective principal suppliers and distributors and the relationships of Meta and the Meta Subsidiaries with each of their respective principal suppliers and distributors are satisfactory, and there are no unresolved disputes with any such supplier or distributor. No supplier or distributor of Meta or any Meta Subsidiary has notified Meta or the Meta Subsidiary that such supplier or distributor will not continue dealing with Meta or the Meta Subsidiary on substantially the same terms as presently conducted, and to the knowledge of Meta, there is no reason to believe that, any such supplier or distributor will not continue dealing with Meta or the Meta Subsidiary on substantially the same terms as presently conducted, in each case subject to changes in pricing and volume in the ordinary course.

(w) The relationships of Meta and the Meta Subsidiaries with each of their respective customers are satisfactory, and there are no unresolved disputes with any such customer.

(x) Each of Meta and the Meta Subsidiaries possesses permits, licenses, approvals, consents and other authorizations issued by a federal, provincial, state, local or foreign regulatory agencies or bodies (in this Schedule C, collectively, "**Governmental Licenses**") required by Law to conduct the business now operated by them, except where the failure to hold such Governmental Licenses would not, individually or in the aggregate, result in a Meta Material Adverse Effect. Each Governmental License is valid and in full force and effect, and is renewable by its terms or in the ordinary course without the need for Meta to comply with any special rules of procedures, agree to any materially different terms or conditions or pay any amounts other than routine filing fees. To the knowledge of Meta, each of Meta and the Meta Subsidiaries is in compliance in all material respects with the terms and conditions of all such Governmental Licenses. No consent, licence, order, authorization, approval, permit, registration or declaration of, or filing with, any Governmental Entity or other Person (including without limitation any consent, approval, order or filing pursuant to any applicable bulk sales laws or similar laws) is required in connection with: (i) the closing of the Arrangement; (ii) the execution and delivery by Meta of this Agreement or any document delivered by Meta at the closing of the Arrangement to which it is a party; (iii) the observance and performance by Meta of its obligations under this Agreement or any document delivered by Meta at the closing of the Arrangement to which it is a party; or (iv) avoiding the loss of any Governmental Licenses relating to Meta or the Meta Subsidiaries, any of their properties and assets, or the business now operated by them.

(y) To the knowledge of Meta, no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Governmental License.

(z) There are no actions, proceedings or, to Meta's knowledge, investigations commenced or, to the knowledge of Meta, pending in respect of or regarding any such Governmental License. None of Meta and the Meta Subsidiaries has received any written notice of revocation or non-renewal of any Governmental License, or of any intention of any Person to revoke or refuse to renew any of such Governmental License.

(aa) Other than the Meta Financial Advisor, there is no Person acting or purporting to act at the request of Meta who is entitled to any brokerage, agency or other fiscal advisory or similar fee in connection with the transactions contemplated by this Agreement and the Plan of Arrangement.

(bb) Except as disclosed in Schedule C(bb) of the Meta Disclosure Letter or in the Meta Financial Statements, neither Meta nor any Meta Subsidiary has any loan or other indebtedness outstanding which has been made to any of its shareholders or stockholders, officers, directors or employees, past or present, or any Person not dealing at arm's length with it, other than for the reimbursement of ordinary course business expenses.

(cc) Except for (i) employment, consulting or employment compensation agreements entered into in the ordinary course of business, (ii) customary director and officer indemnification arrangements on market terms, or (iii) financing agreements or shareholder agreements with the shareholders of Meta entered into in connection with financings or other transactions to which Meta shareholders are generally parties and that will terminate at or prior to the Effective Time as a result of the Arrangement, there are no current contracts or other transactions (including relating to indebtedness by Meta or the Meta Subsidiaries) between Meta or any Meta Subsidiaries on the one hand, and (a) any officer or director of Meta or the Meta Subsidiaries, (b) any holder of record or beneficial owner of five percent (5%) or more of the voting securities of Meta, or (c) any affiliate or associate of any officer, director or beneficial owner, on the other hand except as disclosed in Schedule C(cc) of the Meta Disclosure Letter or in the Meta Financial Statements.

(dd) To the knowledge of Meta, none of Meta's directors or officers is now, or in the last ten (10) years has been, subject to an order or ruling of any securities regulatory authority or securities exchange prohibiting such individual from acting as a director or officer of a public company or of a company listed on a particular securities exchange.

(ee) The assets and properties of Meta and the Meta Subsidiaries and their business and operations are insured against loss or damage with responsible insurers on a basis consistent with insurance obtained by reasonably prudent participants in comparable businesses, and such coverage is in full force and effect, and Meta and the Meta Subsidiaries have not failed to promptly give any notice or present any material claim thereunder.

(ff) Neither Meta nor the Meta Subsidiaries own any real property or hold an ownership interest in any real property, or have owned or held such ownership interest in the past five years, save and except as set out in Schedule C(ff) of the Meta Disclosure Letter. With respect to each of the material leased premises of Meta and the Meta Subsidiaries, Meta and the Meta Subsidiaries occupies the applicable leased premises and has the right to occupy and use the leased premises, subject to the terms of the respective leases, and each of the leases pursuant to which Meta and the Meta Subsidiaries occupies such leased premises is valid, legally binding and enforceable against Meta or a Meta Subsidiary, as applicable, and to the knowledge of Meta, the other parties in accordance with its terms is in good standing and in full force and effect, and none of Meta or any of the Meta Subsidiaries is in breach of, or default under, such lease, sublease, license or occupancy agreement, and no event has occurred which, with notice, lapse of time or both, would constitute such a breach or default by Meta or any of the Meta Subsidiaries or permit termination, modification or acceleration by any third party thereunder. No third party has repudiated or has the right to terminate or repudiate any such lease (except for the normal exercise of remedies in connection with a default thereunder or any termination rights set forth in the lease) or any provision thereof. None of the aforementioned leases has been assigned by Meta or any of the Meta Subsidiaries in favour of any Person or sublet or sublicensed. There exists no claim of any kind or right of set-off against Meta or any Meta Subsidiary, as the case may be, as tenant by the landlord or against the landlord by Meta or any Meta Subsidiary, as the case may be, as tenant as of the date hereof. Meta and the Meta Subsidiaries own, lease or licence all personal or movable property as is necessary to conduct their business as presently conducted, and Meta and the Meta Subsidiaries have good and valid title to, or a valid and enforceable interest (whether a leasehold interest or otherwise) in, all of such personal or movable property.

(gg) Meta and the Meta Subsidiaries as tenants are in actual possession of all properties leased by them. Except as disclosed in Schedule C(gg) of the Meta Disclosure Letter, Meta and the Meta Subsidiaries are not in arrears of rent required to be paid pursuant to any applicable lease.

(hh) The minute books and records of Meta and the Meta Subsidiaries made available to RTO Acquiror and its counsel in connection with their due diligence investigation in respect of the Arrangement contain full, true and correct copies of all constating documents, including all amendments thereto, and contain copies of all proceedings of securityholders and directors (and committees thereof) and are complete in all material respects.

(ii) Schedule C(ii) of the Meta Disclosure Letter sets out separately all Intellectual Property owned by Meta or the Meta Subsidiaries that has been registered or which applications for registration have been filed and all other material Intellectual Property that is owned by Meta or the Meta Subsidiaries (in this Schedule C, the "**Meta Owned Intellectual Property**") and the Intellectual Property that is duly licensed by Meta as part of its business as presently conducted (in this Schedule C, the "**Meta Licensed Intellectual Property**", and together with the Meta Owned Intellectual Property, the "**Meta Intellectual Property**"). Meta or a Meta Subsidiary is the sole and exclusive owner of the Meta Owned Intellectual Property and all other Intellectual Property that it owns or purports to own with good, valid and marketable title thereto, free and clear of all Encumbrances (other than Permitted Encumbrances). Meta or a Meta Subsidiary has valid and enforceable licenses to use all of the Meta Licensed Intellectual Property used by it in connection with, and as required for, its business as presently conducted. Meta has no knowledge to the effect that it will be unable to obtain or maintain any rights or licenses to use all Intellectual Property necessary for the conduct of its business. The Meta Owned Intellectual Property and the Meta Licensed Intellectual Property constitute all of the Intellectual Property required by Meta and the Meta Subsidiaries to conduct their respective businesses as currently conducted. To the knowledge of Meta, no third parties have rights to any Intellectual Property, except for the ownership rights of the owners of the Meta Licensed Intellectual Property which is licensed to Meta or a Meta Subsidiary. To the knowledge of Meta, there is no infringement, misappropriation or misuse by third parties of any Meta Owned Intellectual Property. There is no pending or, to the knowledge of Meta, threatened action, suit, proceeding or claim by third parties challenging the rights in or to any Meta Owned Intellectual Property, and Meta is not aware of any facts which form a reasonable basis for any such claim. The Meta Owned Intellectual Property that is the subject of an application or registration is valid, in full force and effect. There is no pending or, to the knowledge of Meta, threatened action, suit, proceeding or claim by others challenging the validity or enforceability of any Meta Owned Intellectual Property, and Meta is not aware of any allegations or finding of unenforceability or invalidity of the Meta Owned Intellectual Property or any facts which form a reasonable basis for any such claim. All applications, registrations, filings, renewals and payments necessary to preserve the rights of Meta or any Meta Subsidiary in and to Meta Owned Intellectual Property have been duly filed, made, prosecuted, maintained, paid, are in good standing and are recorded in the name of Meta or a Meta Subsidiary. There is no pending or, to the knowledge of Meta, threatened action, suit, proceeding or claim by third parties that Meta or a Meta Subsidiary infringes, misappropriates or otherwise violates any patent, trademark, copyright, trade secret or other proprietary rights of others. To the knowledge of Meta, the business of Meta and the Meta Subsidiaries does not infringe, misappropriate or otherwise violate any patent, trademark, copyright, trade secret or other proprietary rights of third parties and, without limiting the foregoing, to the knowledge of Meta, there is no patent or patent application by third parties that contains claims that interfere with the issued or pending claims of any Meta Owned Intellectual Property.

(jj) Except in respect of the Intellectual Property set forth in Schedule C(jj) of the Meta Disclosure Letter, no licenses or other rights have been granted to any third party in, to and in respect of the Meta Owned Intellectual Property.

(kk) Except as set forth in Schedule C(kk) of the Meta Disclosure Letter, neither Meta nor any Meta Subsidiary is obligated to pay any royalties, fees or other compensation to any third party in respect of its ownership, use, practice, exploitation or commercialization of any Intellectual Property.

(ll) Except as disclosed in Schedule C(ll) of the Meta Disclosure Letter, no permits, licenses, approvals, consents or other authorizations issued by any federal, provincial, state, local or foreign regulatory agency or body are required to import or sell the products of Meta or any Meta Subsidiary.

(mm) Except in respect of the individuals listed in Schedule C(mm) of the Meta Disclosure Letter, all current and former employees of, and current and former consultants (excluding consultants who have exclusively provided financial services) to, Meta and the Meta Subsidiaries have entered into proprietary rights or similar agreements with Meta or the applicable Meta Subsidiary, whereby any Intellectual Property created by them in the course of the performance of their employment or engagement has been fully and irrevocably assigned to Meta or the applicable Meta Subsidiary without additional consideration, and, to the knowledge of Meta, no employee of, or consultant to, Meta or the applicable Meta Subsidiary is in violation of such agreements.

(nn) All Persons having access to or knowledge of the Intellectual Property or any information of a confidential nature, in each case that is necessary or required or otherwise used for or in connection with the conduct or operation or proposed conduct or operation of Meta's business, have entered into non-disclosure agreements with Meta or the applicable Meta Subsidiary preventing the disclosure of such Intellectual Property or information, and there has been no breach of any such agreement. To the knowledge of Meta, the employment or engagement by Meta or the applicable Meta Subsidiary of such Persons does not violate any non-disclosure or non-competition agreement between any such Person and a third party. Each of Meta and the Meta Subsidiaries have taken all reasonably necessary and appropriate steps (including but not limited to appropriately marking and labelling Intellectual Property) to protect the secrecy, confidentiality and proprietary nature of all Intellectual Property.

(oo) Each of Meta and the Meta Subsidiaries have taken all reasonably necessary and appropriate steps (including but not limited to appropriately marking and labelling Intellectual Property) to protect the secrecy, confidentiality and proprietary nature of all Meta Owned Intellectual Property.

(pp) The conduct of Meta and the Meta Subsidiaries in carrying on the Meta Business and the operation of the Meta Business by Meta and the Meta Subsidiaries have been and is in compliance with all Environmental Laws, in all material respects, and there are no existing events, conditions, or circumstances that would reasonably be expected to materially and adversely affect the ability of Meta or the Meta Subsidiaries to comply with Environmental Laws.

(qq) Each of Meta and the Meta Subsidiaries has obtained all licenses, permits, approvals, consents, certificates, registrations and other authorizations under all applicable Environmental Laws (in this Schedule C, the "**Environmental Permits**") necessary as at the date hereof for the operation of the business carried by Meta and the Meta Subsidiaries, and each Environmental Permit is valid, subsisting and in good standing in all material respects and none of Meta nor any of the Meta Subsidiaries is in default or breach of any Environmental Permit in any respect and no proceeding is outstanding or, to the knowledge of Meta, has been threatened or is pending to revoke or limit any Environmental Permit.

(rr) To the knowledge of Meta, each of Meta and the Meta Subsidiaries has not used, except in compliance in all respects with all Environmental Laws and Environmental Permits, any property or facility which it owns, controls manages, operates or leases or previously owned, controlled, operated, managed or leased, to generate, manufacture, process, distribute, use, treat, store, dispose of, transport or handle any Hazardous Substance and, to the knowledge of Meta, there have been no releases of Hazardous Substances at any property or facility which it owns, controls, manages, operates or leases or previously owned, controlled, operated, managed or leased..

(ss) Each of Meta and the Meta Subsidiaries has not received any notice of, or been prosecuted for, an offence alleging, non-compliance in any material respect with any Environmental Laws, and none of Meta nor the Meta Subsidiaries has settled any allegation of non-compliance short of prosecution. There are no orders or directions issued against each of Meta and the Meta Subsidiaries under Environmental Laws including those requiring any material work, repairs, construction or capital expenditures to be made with respect to any of the assets of Meta or the Meta Subsidiaries, nor has Meta or any Meta Subsidiary received notice of any of the same.

(tt) There are no past unresolved or, to the knowledge of Meta, any threatened or pending claims, complaints, notices or requests for information received by Meta or any Meta Subsidiary with respect to any alleged violation of any Environmental Laws, and to the knowledge of Meta, no conditions exist at, on or under any property now or previously owned, operated, optioned or leased by Meta or a Meta Subsidiary which, with the passage of time, or the giving of notice or both, would give rise to liability under Environmental Laws that, individually or in the aggregate, would reasonably be expected to result in a Meta Material Adverse Effect.

(uu) None of Meta nor any of the Meta Subsidiary has received any notice wherein it is alleged or stated that it is potentially responsible for a federal, provincial, state, municipal or local clean-up site or corrective action under Environmental Laws that would reasonably be expected to result in a Meta Material Adverse Effect.

(vv) None of Meta or the Meta Subsidiaries have agreed by contract or other agreement to indemnify or be responsible for any liabilities or obligations under Environmental Laws.

(ww) To the knowledge of Meta, Meta and the Meta Subsidiaries are and have been in compliance in all material respects with all applicable Laws pertaining to employment and employment practices, including all Laws relating to labour relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labour, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence and unemployment insurance. All individuals characterized and treated by Meta or any Meta Subsidiary as independent contractors or consultants are properly treated as independent contractors under all applicable Laws. There are no actions against Meta or any Meta Subsidiary pending or, to the knowledge of Meta, threatened to be brought or filed, by or with any Governmental Entity or arbitrator in connection with the employment of any current or former applicant, employee, consultant or independent contractor of Meta or any Meta Subsidiary, including, without limitation, any claim relating to unfair labour practices, employment discrimination, harassment, retaliation, equal pay, wage and hours or any other employment related matter arising under applicable Laws.

(xx) Neither Meta nor any Meta Subsidiary is subject to any claim for wrongful dismissal, constructive dismissal or any other tort claim, actual or threatened, or any litigation actual or threatened, relating to employment or termination of employment of employees or independent contractors.

(yy) Each plan for retirement, bonus, stock purchase, profit sharing, stock option, deferred compensation, severance or termination pay, insurance, medical, hospital, dental, vision care, drug, sick leave, disability, salary continuation, legal benefits, unemployment benefits, vacation, incentive or otherwise contributed to or required to be contributed to, by Meta or a Meta Subsidiary for the benefit of any current or former director, officer, employee or consultant of Meta or a Meta Subsidiary (in this Schedule C, the "**Meta Employee Plans**") has been maintained in compliance with its terms and with the requirements prescribed by any and all Laws that are applicable to such Meta Employee Plans, in each case in all material respects and has been publicly disclosed to the extent required by Securities Laws.

(zz) All material accruals for unpaid vacation pay, premiums for unemployment insurance, health premiums, federal or state pension plan premiums, accrued wages, salaries and commissions and employee benefit plan payments have been reflected in the books and records of Meta and the Meta Subsidiaries.

(aaa) There is not currently any labour disruption, dispute, slowdown, stoppage, complaint or grievance or, to the knowledge of Meta, threatened or pending which is adversely affecting or would reasonably be expected to adversely affect, in a material manner, the carrying on of the business of Meta and the Meta Subsidiaries, and, to the knowledge of Meta, there is no proposal to unionize its employees and no collective bargaining agreements are in place or currently being negotiated by Meta or any Meta Subsidiary.

(bbb) Neither the execution and delivery of this Agreement, shareholder or other approval of this Agreement nor the consummation of the transactions contemplated by this Agreement could, either alone or in combination with another event, (i) entitle any employee, director, officer or independent contractor of the Meta Group to severance pay, termination pay, change of control payment or benefits, or any material increase in severance pay, (ii) accelerate the time of payment or vesting, or materially increase the amount of compensation due to any such employee, director, officer or independent contractor, (iii) directly or indirectly cause the Meta Group to transfer or set aside any assets to fund any material benefits under any Employee Plan, (iv) otherwise give rise to any material liability under any Employee Plan, or (v) limit or restrict the right to merge, materially amend, terminate or transfer the assets of any Employee Plan on or following the consummation of the transactions contemplated by this Agreement.

(ccc) Each of Meta and each Meta Subsidiary has been and is now conducting its business in compliance in all material respects with all applicable Laws of each jurisdiction in which it carries on its business and has not received a notice of material non-compliance, and, to the knowledge of Meta, there are no facts that would give rise to a notice of material non-compliance with any such Laws.

(ddd) Other than this Agreement, neither Meta nor any Meta Subsidiary is currently party to any agreement in respect of: (i) the purchase of any material property or assets or any interest therein or the sale, transfer or other disposition of any material property or assets or any interest therein currently owned, directly or indirectly, by Meta or a Meta Subsidiary whether by asset sale, transfer of shares or otherwise; or (ii) the change of control of Meta or a Meta Subsidiary (whether by sale or transfer of shares or otherwise).

(eee) None of Meta nor any Meta Subsidiary is a party to any Material Contract, other than as set forth on Schedule C(eee) of the Meta Disclosure Letter (in this Schedule C, collectively, the "**Meta Material Contracts**").

(fff) All Meta Material Contracts are in good standing in all material respects and in full force and effect.

(ggg) Meta is not in material default or breach of any Meta Material Contract and, to the knowledge of Meta, there exists no condition, event or act which, with the giving of notice or lapse of time or both, would constitute a material default or breach under any Meta Material Contract and/or which would give rise to a right of termination on the part of any other party to a Meta Material Contract.

(hhh) Meta is a "reporting issuer" (as that term is defined under applicable Securities Laws) or equivalent thereof and not on the list of reporting issuers in default under applicable Securities Laws in British Columbia, Ontario, Alberta and Quebec, and is not in default of any material requirements of any Securities Laws or the rules and regulations of the CSE. Meta has not taken any action to cease being a reporting issuer in any province nor has Meta received notification from any Securities Authority seeking to revoke the reporting issuer status of Meta. No delisting, suspension of trading in or cease trading order with respect to any of its securities and, to the knowledge of Meta, no inquiry or investigation of any Securities Authority, is pending, in effect or ongoing or threatened. The Meta Shares are listed on the CSE and trading of the Meta Shares is not currently halted or suspended. Meta does not have any securities listed for trading on any securities exchange other than the CSE. Meta is not subject to any cease trade or other order of the CSE or any Securities Authority, and, to the knowledge of Meta, no investigation or other proceedings involving Meta that may operate to prevent or restrict trading of any securities of Meta are currently in progress or pending before the CSE or any Securities Authority. Meta has timely filed or furnished all Meta Disclosure Documents required to be filed or furnished by Meta under applicable Securities Laws. Each of the Meta Disclosure Documents complied in all material respects with applicable Securities Laws and did not, as of the date filed (or, if amended or superseded by a subsequent filing prior to the date of this Agreement, on the date of such filing), contain any misrepresentation (as defined under applicable Securities Laws). Meta has not filed any confidential material change report (which at the date of this Agreement remains confidential) or any other confidential filings (including redacted filings) filed to or furnished with, as applicable, any Securities Authority. There are no outstanding or unresolved comments in comment letters from any Securities Authority with respect to any of the Meta Disclosure Documents and, to the knowledge of Meta, neither Meta nor any of the Meta Disclosure Documents is the subject of an ongoing audit, review, comment or investigation by any Securities Authority or the CSE.

(iii) The operations of Meta and the Meta Subsidiaries are and have been conducted, at all times, in material compliance with all applicable Anti-Money Laundering Laws, and no action by or before any Governmental Entity against Meta or any Meta Subsidiary with respect to the Anti-Money Laundering Laws is pending. None of Meta nor any Meta Subsidiary has, directly or indirectly: (i) made or authorized any contribution, payment or gift of funds or property to any official, employee or agent of any governmental agency, authority or instrumentality of any jurisdiction in violation of applicable Laws; or (ii) made any contribution to any candidate for public office, in either case where either the payment or the purpose of such contribution, payment or gift was, is or would be prohibited under the *Corruption of Foreign Public Officials Act* (Canada), the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (United States) or the rules and regulations promulgated thereunder or under any other Laws of any relevant jurisdiction covering a similar subject matter applicable to Meta, the Meta Subsidiaries and their operations. None of Meta, the Meta Subsidiaries, or, to the knowledge of Meta, any director, officer, agent, employee, affiliate or Person acting on behalf of Meta or any Meta Subsidiary has been or is currently subject to any United States sanctions administered by the Office of Foreign Assets Control of the United States Treasury Department.

(jjj) None of Meta, any Meta Subsidiary or, to the knowledge of Meta, any of their officers, directors or employees acting on behalf of Meta has violated the United States' Foreign Corrupt Practices Act (and the regulations promulgated thereunder), the *Corruption of Foreign Public Officials Act* (Canada) (and the regulations promulgated thereunder) or any other applicable Law covering a similar subject matter applicable to Meta, the Meta Subsidiaries and their operations, and to the knowledge of Meta, no such action has been taken by any of its agents, representatives or other Persons acting on behalf of Meta.

(kkk) Except for the representations and warranties expressly made by Meta in this Schedule C or in any certificate delivered pursuant to this Agreement, neither Meta nor any other Person makes or has made any representation or warranty of any kind whatsoever, express or implied, at law or in equity, with respect to Meta or any of the Meta Subsidiaries or their respective business, operations, assets, liabilities, condition (financial or otherwise), notwithstanding the delivery or disclosure to RTO Acquiror or any of its affiliates or Representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing. Without limiting the generality of the foregoing, neither Meta nor any other Person makes or has made any express or implied representation or warranty to RTO Acquiror or any of its Representatives with respect to (a) any financial projection, forecast, estimate, or budget relating to Meta, any of its subsidiaries or their respective businesses or, (b) except for the representations and warranties made by Meta in this Schedule C, any oral or written information presented to RTO Acquiror or any of its Representatives in the course of their due diligence investigation of Meta and the Meta Subsidiaries, the negotiation of this Agreement or the course of the Arrangement.

(lll) Except as disclosed in Schedule C(lll) of the Meta Disclosure Letter, none of Meta or any Meta Subsidiary is a party to or bound or affected by any commitment, agreement or document containing any covenant which expressly limits the freedom of Meta or the Meta Subsidiary to compete or operate in any line of business, transfer or move any of its assets or operations or which materially or adversely affects the business practices, operations or condition of Meta or the Meta Subsidiary.

(mmm) Except as disclosed in Schedule C(mmm) of the Meta Disclosure Letter, neither Meta nor any of the Meta Subsidiaries is party to, bound by or subject to any indenture, mortgage, lease, agreement, license, permit, authorization, certification, instrument, statute, regulation, order, judgment, decree or law that would be violated or breached by, or under which default would occur or which could be terminated, cancelled or accelerated, in whole or in part, or that would require consent or notice, as a result of the execution, delivery and performance of this Agreement or the consummation of any of the transactions provided for in this Agreement and the Plan of Arrangement (except as would not, individually or in the aggregate, have or reasonably be expected to have, individually or in the aggregate, a Meta Material Adverse Effect or as set out in the Key Regulatory Approvals).

**SCHEDULE D**
**REPRESENTATIONS AND WARRANTIES OF RTO ACQUIROR**

RTO Acquiror represents and warrants to and in favour of Meta as follows, and acknowledges that Meta is relying upon such representations and warranties in connection with the completion of the transactions contemplated herein:

(a) Schedule D(a) of the RTO Acquiror Disclosure Letter sets forth the name and jurisdiction of incorporation and the directors and officers of RTO Acquiror and each of its subsidiaries (in this Schedule D, the "**RTO Acquiror Subsidiaries**"). Each of RTO Acquiror and the RTO Acquiror Subsidiaries (i) has been duly incorporated and is validly existing and in good standing under the laws of its jurisdiction of incorporation and is up-to-date in respect of all material corporate filings; (ii) has all requisite corporate or other organization as applicable, power and authority to carry on its business as now conducted and to own or lease and operate its assets and properties; and (iii) in respect of RTO Acquiror, Canco and Callco, has all requisite corporate power and authority to enter into and carry out its obligations under this Agreement.

(b) RTO Acquiror does not beneficially own, or exercise control or direction over, directly or indirectly, any interest in any other Person other than the RTO Acquiror Subsidiaries or any agreement, option or commitment to acquire any such investment. All of the issued and outstanding securities of the RTO Acquiror Subsidiaries are owned by RTO Acquiror.

(c) No steps or proceedings have been taken, instituted or, to the knowledge of RTO Acquiror, are pending for the dissolution, liquidation or winding up of RTO Acquiror or an RTO Acquiror Subsidiary. Except as disclosed in Schedule D(c) of the RTO Acquiror Disclosure Letter, neither RTO Acquiror nor any RTO Acquiror Subsidiary: (i) is insolvent or bankrupt under or pursuant to any corporate, insolvency, winding-up, restructuring, reorganization, administration or other Laws applicable to it; (ii) has commenced, approved, authorized or taken any action in furtherance of proceedings in respect of it under any applicable bankruptcy, insolvency, restructuring, reorganization, administration, winding up, liquidation, dissolution, or similar Law; (iii) has proposed a compromise or arrangement with its creditors generally or is or has been subject to any actions taken, orders received or proceedings commenced by creditors or other Persons for or in respect of the bankruptcy, receivership, insolvency, restructuring, reorganization, administration, winding-up, liquidation or dissolution of it, or any of its property or assets; (iv) had any encumbrancer take possession of any of its property, or (v) had any execution or distress become enforceable or become levied upon any of its property. RTO Acquiror is not unable to pay its liabilities as they become due and the realizable value of the assets of RTO Acquiror are not less than the aggregate of its liabilities and stated capital of all classes.

(d) Each of RTO Acquiror and the RTO Acquiror Subsidiaries is, in all material respects, conducting its business in compliance with all applicable Laws (including all material applicable federal, provincial, state, municipal and local laws, regulations and other lawful requirements of any Governmental Entity) of each jurisdiction in which its business is carried on and is duly licensed, registered or qualified in all jurisdictions in which it owns, leases or operates its property or carries on business to enable its business to be carried on as now conducted and its property and assets to be owned or leased and operated and all such licenses, registrations and qualifications are valid, subsisting and in good standing and it has not received a notice of non-compliance, nor knows of, nor has reasonable grounds to know of, any facts that could give rise to a notice of non-compliance with any such laws, regulations or permits which would reasonably be expected to result in an RTO Acquiror Material Adverse Effect.

(e) RTO Acquiror has the requisite corporate power and authority to enter into, deliver and perform its obligations under this Agreement. The execution and delivery of this Agreement and performance by RTO Acquiror of its obligations under this Agreement and the consummation of the Arrangement and other transactions contemplated hereby have been duly authorized by all necessary corporate action of RTO Acquiror and no other corporate proceedings on the part of RTO Acquiror are necessary to authorize the execution, delivery and performance of this Agreement or the consummation of the Arrangement and the other transactions contemplated hereby other than the approval by the RTO Acquiror Board of the RTO Acquiror Proxy Statement and the approval of the RTO Acquiror Shareholder Approval Matters by the RTO Acquiror Shareholders in the manner required by applicable Law.

(f) This Agreement has been duly and validly executed and delivered by each of RTO Acquiror, Canco and Callco and, assuming due authorization, execution and delivery by Meta, constitutes a legal, valid and binding obligation of RTO Acquiror, Canco and Callco, enforceable against RTO Acquiror, Canco and Callco in accordance with its terms, subject however, to limitations with respect to enforcement imposed by Law in connection with bankruptcy, insolvency, reorganization or other Laws affecting creditors' rights generally and to the extent that equitable remedies such as specific performance and injunctions are only available in the discretion of the court from which they are sought.

(g) Other than the actions required under applicable Securities Laws and the Key Regulatory Approvals set out in Schedule D(g) of the RTO Acquiror Disclosure Letter, no authorization, approval, order, license, permit or consent of any Governmental Entity, and no notice, registration, declaration or filing by RTO Acquiror or any of the RTO Acquiror Subsidiaries with any such Governmental Entity is required in connection with the execution and delivery of, and performance by RTO Acquiror or the RTO Acquiror Subsidiaries (including Canco and Callco) of their obligations under, this Agreement or the consummation of the Arrangement and the other transactions contemplated in this Agreement.

(h) Other than as set out in Schedule D(h) of the RTO Acquiror Disclosure Letter, there is no requirement under any RTO Acquiror Material Contract (as defined below) to which RTO Acquiror or any RTO Acquiror Subsidiary is a party or by which RTO Acquiror or any RTO Acquiror Subsidiary is bound or has any rights to make a filing with, give any notice to, or to obtain the consent or approval of, any party to such RTO Acquiror Material Contract relating to the transactions contemplated by this Agreement.

(i) The execution and delivery of this Agreement by RTO Acquiror, the performance by RTO Acquiror of its obligations hereunder and the consummation of the transactions contemplated hereby do not and will not (whether after notice or lapse of time or both) (i) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under (whether after notice or lapse of time or both) or give rise to any right of termination or acceleration of any obligations or indebtedness, and neither RTO Acquiror nor an RTO Acquiror Subsidiary is currently in material breach or default of, (A) any Law applicable to RTO Acquiror or an RTO Acquiror Subsidiary; (B) the constating documents, by-laws or resolutions of RTO Acquiror or any RTO Acquiror Subsidiary, as applicable; (C) any Contract or Debt Instrument to which RTO Acquiror or any RTO Acquiror Subsidiary is a party or by which it is bound, except as disclosed in Schedule C(i) of the RTO Acquiror Disclosure Letter, or (D) any judgment, decree or order binding RTO Acquiror or any RTO Acquiror Subsidiary, as applicable, or the assets or properties thereof; (ii) allow any Person to exercise any rights, require any consent or other action by any Person or permit the termination, cancellation, acceleration or other change of any right or other obligation or the loss of any benefit to which RTO Acquiror or any RTO Acquiror Subsidiary is entitled (including by triggering any rights of first refusal or first offer, change in control provision or other restriction or limitation) under any Material Contract; or (iii) result in the creation or imposition of any Encumbrance up on any of RTO Acquiror's assets or the assets of the RTO Acquiror Subsidiaries.

(j) Schedule D(j) of the RTO Acquiror Disclosure Letter sets forth the authorized, issued and outstanding share capital of RTO Acquiror and each of the RTO Acquiror Subsidiaries. All of the issued and outstanding shares of capital stock of, or other equity or voting interests in, each of RTO Acquiror and the RTO Acquiror Subsidiaries has been duly authorized and validly issued in compliance with applicable Laws and, is fully paid and non-assessable, were not issued in violation of any pre-emptive rights, purchase options, call options, rights of first refusal, first offer, co-sale or participation or subscription rights or other similar rights. All of the issued and outstanding shares of capital stock of, or other equity or voting interests in each RTO Acquiror Subsidiary is owned, directly or indirectly, both as a matter of record and beneficially by RTO Acquiror and is free and clear of all Encumbrances (except for Permitted Encumbrances), except for restrictions imposed by applicable Laws. Schedule D(m) of the RTO Acquiror Disclosure Letter sets forth a list of all other securities of RTO Acquiror.

(k) RTO Acquiror is not aware of any legislation, or proposed legislation published by a legislative body, which it anticipates will result in an RTO Acquiror Material Adverse Effect.

(l) No order, ruling or determination having the effect of suspending the sale or ceasing the trading in any securities of RTO Acquiror has been issued by any regulatory authority and is continuing in effect and no proceedings for that purpose have been instituted or, to the knowledge of RTO Acquiror, are pending, contemplated or threatened by any regulatory authority.

(m) Except for the securities set forth in Schedule D(m) of the RTO Acquiror Disclosure Letter, no Person now has any agreement or option or right or privilege (whether at law, pre-emptive or contractual) capable of becoming an agreement for the purchase, subscription, redemption, repurchase or issuance of, or conversion into, any shares, securities, warrants or convertible obligations of any nature of RTO Acquiror and a sufficient number of RTO Acquiror Shares are reserved for issuance pursuant to outstanding options, warrants, share incentive plans, convertible, exercisable and exchangeable securities and other rights to acquire RTO Acquiror Shares. Schedule D(m) of the RTO Acquiror Disclosure Letter sets forth all issued and outstanding securities of RTO Acquiror convertible into RTO Acquiror Shares, their grant and expiration date, exercise price and number of RTO Acquiror Shares into which they are exercisable, as applicable.

(n) The audited consolidated financial statements (including any related notes thereto) representing the financial condition of RTO Acquiror as of December 31, 2018 and December 31, 2019 and the unaudited financial statements (including the notes thereto) representing the financial condition of RTO Acquiror as of September 30, 2020 (collectively, the "**RTO Acquiror Financial Statements**"), including any available quarterly financial statements (including any related notes thereto), (i) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and (ii) fairly present, in all material respects, the consolidated financial position of RTO Acquiror and its Subsidiaries as at the respective dates thereof and the consolidated results of its operations and cash flows for the periods indicated, except that the unaudited interim financial statements were or are subject to normal and recurring year-end adjustments. RTO Acquiror has not effected any securitization transactions or "off-balance sheet arrangements" (as defined in Item 303(c) of SEC Regulation S-K). Since March 16, 2020, there have been no formal investigations regarding financial reporting or accounting policies and practices discussed with, reviewed by or initiated at the direction of the chief executive officer, chief financial officer or general counsel of RTO Acquiror, the RTO Acquiror Board or any committee thereof. Since March 16, 2020, neither RTO Acquiror nor its independent auditors have identified (i) any significant deficiency or material weakness in the system of internal accounting controls utilized by RTO Acquiror, (ii) any fraud, whether or not material, that involves RTO Acquiror's management or other employees who have a role in the preparation of financial statements or the internal accounting controls utilized by RTO Acquiror, or (iii) any claim or allegation regarding any of the foregoing. Except as disclosed in the RTO Acquiror Financial Statements, neither RTO Acquiror nor any of the RTO Acquiror Subsidiaries has any liabilities, indebtedness, obligation, expense, claim, deficiency, guaranty, or endorsement, whether accrued, absolute, contingent, matured, or unmatured of the kind required to be disclosed on a balance sheet or in the related notes to the consolidated financial statements prepared in accordance with GAAP which are, individually or in the aggregate, material to the business, results of operations or financial condition of RTO Acquiror and the RTO Acquiror Subsidiaries taken as a whole, except liabilities (i) identified in the balance sheet of RTO Acquiror as of September 30, 2020 or the notes thereto, (ii) incurred in connection with the transactions contemplated by this Agreement, (iii) described on Section D(n) of the RTO Acquiror Disclosure Letter, (iv) executory obligations under any Contract or (v) incurred since the date of the balance sheet of RTO Acquiror as of September 30, 2020 in the ordinary course of business consistent with past practices. RTO Acquiror does not intend to correct or restate, nor is there any basis for any correction or restatement of, any aspect of the RTO Acquiror Financial Statements.

(o) Since September 30, 2020 through the date of this Agreement and other than with respect to the negotiation, execution and performance of this Agreement, each of the RTO Acquiror and RTO Acquiror Subsidiaries has conducted its business only in the ordinary course of business consistent with past practice, and there has not been: (a) any event that has had an RTO Acquiror Material Adverse Effect, or (b) any material change by RTO Acquiror or any RTO Acquiror Subsidiaries in its accounting methods, principles or practices, except as required by concurrent changes in GAAP or as disclosed in the notes to the RTO Acquiror Financial Statements.

(p) Neither RTO Acquiror nor any of the RTO Acquiror Subsidiaries has any material liabilities or obligations of any nature, whether or not accrued, contingent or otherwise, except for: (i) liabilities and obligations that are adequately presented or reserved on the RTO Acquiror Financial Statements or disclosed in the notes thereto; or (ii) liabilities and obligations incurred in the ordinary course of business consistent with past practice that are not and would not, individually or in the aggregate with all other liabilities and obligations of RTO Acquiror and the RTO Acquiror Subsidiaries (other than those disclosed on the RTO Acquiror Financial Statements), be material to RTO Acquiror and the RTO Acquiror Subsidiaries (taken as a whole). Without limiting the foregoing, the RTO Acquiror Financial Statements reflects reasonable reserves in accordance with U.S. GAAP for contingent liabilities of RTO Acquiror and the RTO Acquiror Subsidiaries.

(q) Each of RTO Acquiror and the RTO Acquiror Subsidiaries maintains internal control over financial reporting. Such internal control over financial reporting is effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP and includes policies and procedures that: (A) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP, and that receipts and expenditures of RTO Acquiror and the RTO Acquiror Subsidiaries are being made only with appropriate authorizations of management and directors of RTO Acquiror and the RTO Acquiror Subsidiaries, as applicable; and (B) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the assets of RTO Acquiror or the RTO Acquiror Subsidiaries that could have a material effect on its financial statements. As of the date of this Agreement, there neither is, nor has been, any fraud with respect to RTO Acquiror or the RTO Acquiror Subsidiaries, whether or not material, relating to the financial reporting or internal control over financial reporting of RTO Acquiror or the RTO Acquiror Subsidiaries, as applicable. As of the date of this Agreement, to the knowledge of RTO Acquiror, there is no fraud that involves management or any other employees who have a significant role in the internal control over financial reporting of RTO Acquiror or the RTO Acquiror Subsidiaries.

(r) The RTO Acquiror Certificate of Designation is in a form which complies with Nevada Law and, when filed, will constitute the valid RTO Acquiror Certificate of Designation under Nevada Law. The dividend of RTO Acquiror Preferred Stock to be declared prior to the Effective Time will be exempt from registration under all applicable Securities Laws.

(s) There are no actions, proceedings or, to RTO Acquiror's knowledge, investigations (whether or not purportedly by or on behalf of RTO Acquiror) commenced or, to the knowledge of RTO Acquiror, threatened or pending against or relating to RTO Acquiror or an RTO Acquiror Subsidiary or the business thereof or affecting any of their assets and properties or against any current officer or director relating to such individual's role with RTO Acquiror or any RTO Acquiror Subsidiary at law or in equity (whether in any court, arbitration or similar tribunal) or before or by any Governmental Entity, that would reasonably be expected to result in an RTO Acquiror Material Adverse Effect or prevent or materially delay the consummation of the Arrangement.

(t) Except as disclosed in Schedule D(t) of the RTO Acquiror Disclosure Letter, none of RTO Acquiror or any RTO Acquiror Subsidiary is a party to or bound or affected by any commitment, agreement or document containing any covenant which expressly limits the freedom of RTO Acquiror or the RTO Acquiror Subsidiary to compete or operate in any line of business, transfer or move any of its assets or operations or which materially or adversely affects the business practices, operations or condition of RTO Acquiror or the RTO Acquiror Subsidiary.

(u) Except as disclosed in Schedule D(u) of the RTO Acquiror Disclosure Letter, Neither RTO Acquiror nor any of the RTO Acquiror Subsidiaries is party to, bound by or subject to any indenture, mortgage, lease, agreement, license, permit, authorization, certification, instrument, statute, regulation, order, judgment, decree or law that would be violated or breached by, or under which default would occur or which could be terminated, cancelled or accelerated, in whole or in part, or that would require consent or notice, as a result of the execution, delivery and performance of this Agreement or the consummation of any of the transactions provided for in this Agreement and the Plan of Arrangement (except as would not, individually or in the aggregate, have or reasonably be expected to have, individually or in the aggregate, an RTO Acquiror Material Adverse Effect or as set out in the Key Regulatory Approvals).

(v) Except as disclosed in Schedule D(v) of the RTO Acquiror Disclosure Letter, RTO Acquiror is not party to any Contract or arrangement, nor to the knowledge of RTO Acquiror, is there any shareholders agreement or other Contract, which in any manner affects the voting control of any of the securities of RTO Acquiror.

(w) All Taxes due and payable by RTO Acquiror have been paid. All Tax Returns required to be filed by RTO Acquiror have been filed with all appropriate Governmental Entities and all such Tax Returns did not contain a misrepresentation as at the respective dates. Except as disclosed in Schedule D(w) of the RTO Acquiror Disclosure Letter, to the knowledge of RTO Acquiror, no examination of any Tax Return of RTO Acquiror is currently in progress and there are no issues or disputes outstanding with any Governmental Entity respecting any Taxes that have been paid, or may be payable, by RTO Acquiror. RTO Acquiror has timely and properly collected all material sales, use, value-added and similar Taxes required to be collected, and has remitted such amounts on a timely basis to the appropriate Governmental Entity. RTO Acquiror has not been, is not, and immediately prior to the Closing will not be, treated as an "investment company" within the meaning of Section 368(a)(2)(F) of the U.S. Tax Code. RTO Acquiror has not taken any action, nor to the knowledge of RTO Acquiror are there any facts or circumstances not set forth in this Agreement or the Plan of Arrangement, that could reasonably be expected to prevent the Arrangement from qualifying as a "reorganization" within the meaning of Section 368(a) of the U.S. Tax Code.

(x) Neither RTO Acquiror nor, to RTO Acquiror's knowledge, any other Person, is in default in any material respect in the observance or performance of any term, covenant or obligation to be performed by RTO Acquiror or an RTO Acquiror Subsidiary or such other Person under any Material Contract, and no event has occurred which with notice or lapse of time or both would constitute such a default by RTO Acquiror or an RTO Acquiror Subsidiary or, to RTO Acquiror's knowledge, any other party, except where such default or event would not reasonably be expected to result in an RTO Acquiror Material Adverse Effect.

(y) Since September 30, 2020:

(i) Except as disclosed in Schedule D(y)(i) of the RTO Acquiror Disclosure Letter, there has not been any material change in the assets, liabilities, obligations (absolute, accrued, contingent or otherwise), business, condition (financial or otherwise) or results of operations of RTO Acquiror or an RTO Acquiror Subsidiary;

(ii) Except as disclosed in Schedule D(y)(ii) of the RTO Acquiror Disclosure Letter, there has not been any material change in the share capital or long-term debt of RTO Acquiror;

(iii) There has not been any entering into, or an amendment of, any RTO Acquiror Material Contract (as defined below) other than (A) in the ordinary course of business consistent with past practice, or (B) renewals of any such contract;

(iv) There has not been any satisfaction or settlement of any material claims or material liabilities, other than the settlement of such claims or such liabilities incurred in the ordinary course of business consistent with past practice;

(v) Except for ordinary course adjustments to salary, bonus, or other remuneration payable to any officers or senior or executive officers, there has not been any increase in the salary, bonus, severance, termination pay, change of control entitlements or other remuneration payable to any senior or executive officers of RTO Acquiror or any RTO Acquiror Subsidiary; and

(vi) RTO Acquiror and the RTO Acquiror Subsidiaries have carried on their business in the ordinary course consistent with past practice.

(z) There has been no interruption to or discontinuity in any supplier or distributor arrangement or relationship of RTO Acquiror and the RTO Acquiror Subsidiaries with each of their respective principal suppliers and distributors and the relationships of RTO Acquiror and the RTO Acquiror Subsidiaries with each of their respective principal suppliers and distributors are satisfactory, and there are no unresolved disputes with any such supplier or distributor. No supplier or distributor of RTO Acquiror or an RTO Acquiror Subsidiary has notified RTO Acquiror or the RTO Acquiror Subsidiary that such supplier or distributor will not continue dealing with RTO Acquiror or the RTO Acquiror Subsidiary on substantially the same terms as presently conducted, and to the knowledge of RTO Acquiror, there is no reason to believe that, any such supplier or distributor will not continue dealing with RTO Acquiror or the RTO Acquiror Subsidiary on substantially the same terms as presently conducted, in each case subject to changes in pricing and volume in the ordinary course.

(aa) The relationships of RTO Acquiror and the RTO Acquiror Subsidiaries with each of their respective customers are satisfactory, and there are no unresolved disputes with any such customer.

(bb) Each of RTO Acquiror and the RTO Acquiror Subsidiaries possesses permits, licenses, approvals, consents and other authorizations issued by a federal, provincial, state, local or foreign regulatory agencies or bodies (in this Schedule D, collectively, "**Governmental Licenses**") required by Law to conduct the business now operated by them, except where the failure to hold such Governmental Licenses would not, individually or in the aggregate, result in an RTO Acquiror Material Adverse Effect. Each Governmental License is valid and in full force and effect, and is renewable by its terms or in the ordinary course without the need for RTO Acquiror to comply with any special rules of procedures, agree to any materially different terms or conditions or pay any amounts other than routine filing fees. To the knowledge of RTO Acquiror, each of RTO Acquiror and the RTO Acquiror Subsidiaries is in compliance in all material respects with the terms and conditions of all such Governmental Licenses. No consent, licence, order, authorization, approval, permit, registration or declaration of, or filing with, any Governmental Entity or other Person (including without limitation any consent, approval, order or filing pursuant to any applicable bulk sales laws) is required in connection with: (i) the closing of the Arrangement; (ii) the execution and delivery by RTO Acquiror of this Agreement or any document delivered by RTO Acquiror at the closing of the Arrangement to which it is a party; (iii) the observance and performance by RTO Acquiror of its obligations under this Agreement or any document delivered by RTO Acquiror at the closing of the Arrangement to which it is a party; or (iv) avoiding the loss of any Governmental Licenses relating to RTO Acquiror or RTO Acquiror Subsidiaries, any of their properties and assets, or the business now operated by them.

(cc) To the knowledge of RTO Acquiror, no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Governmental License.

(dd) There are no actions, proceedings or, to RTO Acquiror's knowledge, investigations commenced or, to the knowledge of RTO Acquiror, pending in respect of or regarding any such Governmental License. None of RTO Acquiror and the RTO Acquiror Subsidiaries has received any written notice of revocation or non-renewal of any Governmental License, or of any intention of any Person to revoke or refuse to renew any of such Governmental License.

(ee) None of the directors, officers or employees of RTO Acquiror, any known holder of more than five percent (5%) of any class of shares of RTO Acquiror, or any known associate or affiliate of any of the foregoing Persons, has had any material interest, direct or indirect, in any material transaction or any proposed material transaction with RTO Acquiror or an RTO Acquiror Subsidiary which, as the case may be, materially affected, is material to or will materially affect RTO Acquiror.

(ff) Other than the RTO Acquiror Financial Advisor, there is no Person acting or purporting to act at the request of RTO Acquiror who is entitled to any brokerage, agency or other fiscal advisory or similar fee in connection with the transactions contemplated by this Agreement and the Plan of Arrangement.

(gg) Except as disclosed in Schedule D(gg) of the RTO Acquiror Disclosure Letter or in the RTO Acquiror Financial Statements, neither RTO Acquiror nor any RTO Acquiror Subsidiary has any loan or other indebtedness outstanding which has been made to any of its shareholders, officers, directors or employees, past or present, or any Person not dealing at arm's length with it, other than for the reimbursement of ordinary course business expenses.

(hh) Except for (i) employment, consulting or employment compensation agreements entered into in the ordinary course of business, (ii) customary director and officer indemnification arrangements on market terms, or (iii) financing agreements or shareholder agreements with the RTO Acquiror Shareholders entered into in connection with financings or other transactions to which RTO Acquiror Shareholders are generally parties and that will terminate at or prior to the Effective Time as a result of the Arrangement, there are no current contracts or other transactions (including relating to indebtedness by RTO Acquiror or the RTO Acquiror Subsidiaries) between RTO Acquiror or any RTO Acquiror Subsidiaries on the one hand, and (a) any officer or director of RTO Acquiror or the RTO Acquiror Subsidiaries, (b) any holder of record or beneficial owner of five percent (5%) or more of the voting securities of RTO Acquiror, or (c) any affiliate or associate of any officer, director or beneficial owner, on the other hand except as disclosed in Schedule D(hh) of the RTO Acquiror Disclosure Letter.

(ii) To the knowledge of RTO Acquiror, none of RTO Acquiror's directors or officers is now, or in the last ten (10) years has been, subject to an order or ruling of any securities regulatory authority or securities exchange prohibiting such individual from acting as a director or officer of a public company or of a company listed on a particular securities exchange.

(jj) The assets and properties of RTO Acquiror and the RTO Acquiror Subsidiaries and their business and operations are insured against loss or damage with responsible insurers on a basis consistent with insurance obtained by reasonably prudent participants in comparable businesses, and such coverage is in full force and effect, and RTO Acquiror and the RTO Acquiror Subsidiaries have not failed to promptly give any notice or present any material claim thereunder. Schedule D(jj) of the RTO Acquiror Disclosure Letter sets out a true and complete summary of the insurance policies of RTO Acquiror and the RTO Acquiror Subsidiaries.

(kk) Neither RTO Acquiror nor the RTO Acquiror Subsidiaries own any real property or hold an ownership interest in any real property, or have owned or held such ownership interest in the past five years, save and except as set out in Schedule D(kk) of the RTO Acquiror Disclosure Letter. With respect to each of the material leased premises of RTO Acquiror and the RTO Acquiror Subsidiaries, RTO Acquiror and the RTO Acquiror Subsidiaries occupies the applicable leased premises and has the right to occupy and use the leased premises, subject to the terms of the respective leases, and each of the leases pursuant to which RTO Acquiror and the RTO Acquiror Subsidiaries occupies such leased premises is valid, legally binding and enforceable against RTO Acquiror or an RTO Acquiror Subsidiary, as applicable, and to the knowledge of RTO Acquiror, the other parties in accordance with its terms is in good standing and in full force and effect, and none of RTO Acquiror or any of the RTO Acquiror Subsidiaries is in breach of, or default under, such lease, sublease, license or occupancy agreement, and no event has occurred which, with notice, lapse of time or both, would constitute such a breach or default by RTO Acquiror or any of the RTO Acquiror Subsidiaries or permit termination, modification or acceleration by any third party thereunder. No third party has repudiated or has the right to terminate or repudiate any such lease (except for the normal exercise of remedies in connection with a default thereunder or any termination rights set forth in the lease) or any provision thereof. None of the aforementioned leases has been assigned by RTO Acquiror or any of the RTO Acquiror Subsidiaries in favour of any Person or sublet or sublicensed. There exists no claim of any kind or right of set-off against RTO Acquiror or any RTO Acquiror Subsidiary, as the case may be, as tenant by the landlord or against the landlord by RTO Acquiror or any RTO Acquiror Subsidiary, as the case may be, as tenant as of the date hereof. RTO Acquiror and the RTO Acquiror Subsidiaries own, lease or licence all personal or movable property as is necessary to conduct their business as presently conducted, and RTO Acquiror and the RTO Acquiror Subsidiaries have good and valid title to, or a valid and enforceable interest (whether a leasehold interest or otherwise) in, all of such personal or movable property.

(ll) RTO Acquiror and the RTO Acquiror Subsidiaries as tenants are in actual possession of all properties leased by them. Except as disclosed in Schedule D(ll) of the RTO Acquiror Disclosure Letter, RTO Acquiror and the RTO Acquiror Subsidiaries are not in arrears of rent required to be paid pursuant to any applicable lease.

(mm) RTO Acquiror is not a shell company (as defined in Rule 405 under the Securities Act) and has not been a shell company for at least twelve (12) calendar months previously.

(nn) The minute books and records of RTO Acquiror and the RTO Acquiror Subsidiaries made available to Meta and its counsel in connection with their due diligence investigation in respect of the Arrangement contain full, true and correct copies of all constating documents, including all amendments thereto, and contain copies of all proceedings of securityholders and directors (and committees thereof) and are complete in all material respects.

(oo) Schedule D(oo) of the RTO Acquiror Disclosure Letter sets out separately all Intellectual Property owned by RTO Acquiror or an RTO Acquiror Subsidiary that has been registered or which applications for registration have been filed and all other material Intellectual Property that is owned by RTO Acquiror or an RTO Acquiror Subsidiary (in this Schedule D, the "**RTO Acquiror Owned Intellectual Property**") and the Intellectual Property that is duly licensed by RTO Acquiror as part of its business as presently conducted (in this Schedule D, the "**RTO Acquiror Licensed Intellectual Property**", and together with the RTO Acquiror Owned Intellectual Property, the "**RTO Acquiror Intellectual Property**"). RTO Acquiror or an RTO Acquiror Subsidiary is the sole and exclusive owner of the RTO Acquiror Owned Intellectual Property and all other Intellectual Property that it owns or purports to own with good, valid and marketable title thereto, free and clear of all Encumbrances. Schedule D(oo) of the RTO Acquiror Disclosure Letter lists all license agreements to which RTO Acquiror or an RTO Acquiror Subsidiary is a party or by which it is bound (whether as licensor, licensee or otherwise) with respect to the Intellectual Property, excluding any licenses for unmodified, commercially-available, off-the-shelf software, for which RTO Acquiror or an RTO Acquiror Subsidiary pays a license fee of more than $1,000 in the aggregate annually. RTO Acquiror or an RTO Acquiror Subsidiary has valid and enforceable licenses to use all of the RTO Acquiror Licensed Intellectual Property used by it in connection with, and as required for, its business as presently conducted. RTO Acquiror has no knowledge to the effect that it will be unable to obtain or maintain any rights or licenses to use all Intellectual Property necessary for the conduct of its business. The RTO Acquiror Owned Intellectual Property and the RTO Acquiror Licensed Intellectual Property constitute all of the Intellectual Property required by RTO Acquiror or an RTO Acquiror Subsidiary to conduct its business as currently conducted. To the knowledge of RTO Acquiror, no third parties have rights to any Intellectual Property, except for the ownership rights of the owners of the RTO Acquiror Licensed Intellectual Property which is licensed to RTO Acquiror or an RTO Acquiror Subsidiary. To the knowledge of RTO Acquiror, there is no infringement, misappropriation or misuse by third parties of any RTO Acquiror Owned Intellectual Property. There is no pending or, to the knowledge of RTO Acquiror, threatened action, suit, proceeding or claim by third parties challenging the rights in or to any RTO Acquiror Owned Intellectual Property, and RTO Acquiror is not aware of any facts which form a reasonable basis for any such claim. The RTO Acquiror Owned Intellectual Property that is the subject of an application or registration is valid, in full force and effect. There is no pending or, to the knowledge of RTO Acquiror, threatened action, suit, proceeding or claim by others challenging the validity or enforceability of any RTO Acquiror Owned Intellectual Property, and RTO Acquiror is not aware of any allegations or finding of unenforceability or invalidity of the RTO Acquiror Owned Intellectual Property or any facts which form a reasonable basis for any such claim. All applications, registrations, filings, renewals and payments necessary to preserve the rights of RTO Acquiror or any RTO Acquiror Subsidiary in and to RTO Acquiror Owned Intellectual Property have been duly filed, made, prosecuted, maintained, paid, are in good standing and are recorded in the name of RTO Acquiror or an RTO Acquiror Subsidiary. There is no pending or, to the knowledge of RTO Acquiror, threatened action, suit, proceeding or claim by third parties that RTO Acquiror or an RTO Acquiror Subsidiary infringes, misappropriates or otherwise violates any patent, trademark, copyright, trade secret or other proprietary rights of others. To the knowledge of RTO Acquiror, the business of RTO Acquiror and the RTO Acquiror Subsidiaries does not infringe, misappropriate or otherwise violate any patent, trademark, copyright, trade secret or other proprietary rights of third parties and, without limiting the foregoing, to the knowledge of RTO Acquiror, there is no patent or patent application by third parties that contains claims that interfere with the issued or pending claims of any RTO Acquiror Intellectual Property.

(pp) Except in respect of the Intellectual Property set forth in Schedule D(pp) of the RTO Acquiror Disclosure Letter, no licenses or other rights have been granted to any third party in, to and in respect of the RTO Acquiror Owned Intellectual Property.

(qq) Other than in respect of those contracts disclosed in Schedule D(qq) of the RTO Acquiror Disclosure Letter, neither RTO Acquiror nor any RTO Acquiror Subsidiary is a party to or bound by any Contract or other obligation that limits or impairs its ability to use, sell, transfer, assign or convey, or that otherwise affects any RTO Acquiror Intellectual Property.

(rr) Except as set forth in Schedule D(rr) the RTO Acquiror Disclosure Letter, neither RTO Acquiror nor any RTO Acquiror Subsidiary is obligated to pay any royalties, fees or other compensation to any third party in respect of its ownership, use, practice, exploitation or commercialization of any RTO Acquiror Intellectual Property.

(ss) Except as disclosed in Schedule D(ss) of the RTO Acquiror Disclosure Letter, neither RTO Acquiror nor any RTO Acquiror Subsidiary has received any funding from a Governmental Entity that impacts or has the potential to impact RTO Acquiror or an RTO Acquiror Subsidiary's ownership, use, practice, exploitation or commercialization of the RTO Acquiror Owned Intellectual Property. Except as disclosed in Schedule D(ss) of the RTO Acquiror Disclosure Letter, to the knowledge of RTO Acquiror, no employee, contractor, consultant or other service provider of RTO Acquiror or an RTO Acquiror Subsidiary, who was involved in, or who contributed to, the creation or development of the RTO Acquiror Owned Intellectual Property, has performed services for any government, university, college or other educational institution or research centre or government funded institution during a period of time during which such Person worked for RTO Acquiror or an RTO Acquiror Subsidiary.

(tt) Except as disclosed in Schedule D(tt) of the RTO Acquiror Disclosure Letter, no permits, licenses, approvals, consents or other authorizations issued by any federal, provincial, state, local or foreign regulatory agency or body are required to import or sell the products of RTO Acquiror or any RTO Acquiror Subsidiary.

(uu) Except in respect of the individuals listed in Schedule D(uu) of the RTO Acquiror Disclosure Letter, all current and former employees of, and current and former consultants (excluding consultants who have exclusively provided financial services) to, RTO Acquiror and the RTO Acquiror Subsidiaries have entered into proprietary rights or similar agreements with RTO Acquiror or the applicable RTO Acquiror Subsidiary, whereby any Intellectual Property created by them in the course of the performance of their employment or engagement has been fully and irrevocably assigned to RTO Acquiror or the applicable RTO Acquiror Subsidiary without additional consideration, and, to the knowledge of RTO Acquiror, no employee of, or consultant to, RTO Acquiror or the applicable RTO Acquiror Subsidiary is in violation of such agreements. Except in respect of the individuals listed in Schedule D(uu)(ii), all current and former employees of, and current and former consultants (excluding consultants who have exclusively provided financial services) to, RTO Acquiror and the RTO Acquiror Subsidiaries have entered into proprietary rights or similar agreements with RTO Acquiror or the applicable RTO Acquiror Subsidiary, whereby all rights in any Intellectual Property created by them in the course of the performance of their employment or engagement have been waived in favour of RTO Acquiror or the applicable RTO Acquiror Subsidiary and its successors and assigns, and, to the knowledge of RTO Acquiror, no employee of, or consultant to, RTO Acquiror or the applicable RTO Acquiror Subsidiary is in violation of such agreements.

(vv) All Persons having access to or knowledge of the Intellectual Property or any information of a confidential nature, in each case that is necessary or required or otherwise used for or in connection with the conduct or operation or proposed conduct or operation of RTO Acquiror's business have entered into non-disclosure agreements with RTO Acquiror or the applicable RTO Acquiror Subsidiary preventing the disclosure of such Intellectual Property or information, and there has been no breach of any such agreement. To the knowledge of RTO Acquiror, the employment or engagement by RTO Acquiror or the applicable RTO Acquiror Subsidiary of such Persons does not violate any non-disclosure or non-competition agreement between any such Person and a third party. Each of RTO Acquiror and the RTO Acquiror Subsidiaries have taken all reasonably necessary and appropriate steps (including but not limited to appropriately marking and labelling Intellectual Property) to protect the secrecy, confidentiality and proprietary nature of all Intellectual Property.

(ww) The conduct of RTO Acquiror and the RTO Acquiror Subsidiaries in carrying on the RTO Acquiror Business and the operation of the RTO Acquiror Business by RTO Acquiror and the RTO Acquiror Subsidiaries have been and is in compliance with all Environmental Laws, in all material respects, and there are no existing events, conditions, or circumstances that would reasonably be expected to materially and adversely affect the ability of RTO Acquiror or the RTO Acquiror Subsidiaries to comply with Environmental Laws.

(xx) Each of RTO Acquiror and the RTO Acquiror Subsidiaries has obtained all licenses, permits, approvals, consents, certificates, registrations and other authorizations under all applicable Environmental Laws (in this Schedule D, the "**Environmental Permits**") necessary as at the date hereof for the operation of the business carried by RTO Acquiror and the RTO Acquiror Subsidiaries, and each Environmental Permit is valid, subsisting and in good standing in all material respects and none of RTO Acquiror nor any of the RTO Acquiror Subsidiaries is in default or breach of any Environmental Permit in any respect and no proceeding is outstanding or, to the knowledge of RTO Acquiror, has been threatened or is pending to revoke or limit any Environmental Permit.

(yy) To the knowledge of RTO Acquiror, each of RTO Acquiror and the RTO Acquiror Subsidiaries has not used, except in compliance in all respects with all Environmental Laws and Environmental Permits, any property or facility which it owns, controls manages, operates or leases or previously owned, controlled, operated, managed or leased, to generate, manufacture, process, distribute, use, treat, store, dispose of, transport or handle any Hazardous Substance and, to the knowledge of RTO Acquiror, there have been no releases of Hazardous Substances at any property or facility which it owns, controls, manages, operates or leases or previously owned, controlled, operated, managed or leased.

(zz) Each of RTO Acquiror and the RTO Acquiror Subsidiaries has not received any notice of, or been prosecuted for, an offence alleging, non-compliance in any material respect with any Environmental Laws, and none of RTO Acquiror nor any of the RTO Acquiror Subsidiaries has settled any allegation of non-compliance short of prosecution. There are no orders or directions issued against each of RTO Acquiror and the RTO Acquiror Subsidiaries under Environmental Laws including those requiring any material work, repairs, construction or capital expenditures to be made with respect to any of the assets of RTO Acquiror or an RTO Acquiror Subsidiary, nor has RTO Acquiror or an RTO Acquiror Subsidiary received notice of any of the same.

(aaa) There are no past unresolved or, to the knowledge of RTO Acquiror, any threatened or pending claims, complaints, notices or requests for information received by RTO Acquiror or an RTO Acquiror Subsidiary with respect to any alleged violation of any Environmental Laws; and, to the knowledge of RTO Acquiror, no conditions exist at, on or under any property now or previously owned, operated, optioned or leased by RTO Acquiror or an RTO Acquiror Subsidiary which, with the passage of time, or the giving of notice or both, would give rise to liability under Environmental Laws that, individually or in the aggregate, would reasonably be expected to result in an RTO Acquiror Material Adverse Effect..

(bbb) None of RTO Acquiror nor any RTO Acquiror Subsidiary has received any notice wherein it is alleged or stated that it is potentially responsible for a federal, provincial, state, municipal or local clean-up site or corrective action under Environmental Laws that would reasonably be expected to result in an RTO Acquiror Material Adverse Effect.

(ccc) Except as disclosed in Schedule D(ccc) of the RTO Acquiror Disclosure Letter, there are no environmental audits, evaluations, assessments, studies or tests relating to RTO Acquiror or an RTO Acquiror Subsidiary.

(ddd) None of RTO Acquiror or the RTO Acquiror Subsidiaries have agreed by contract or other agreement to indemnify or be responsible for any liabilities or obligations under Environmental Laws.

(eee) To the knowledge of RTO Acquiror, RTO Acquiror and the RTO Acquiror Subsidiaries are and have been in compliance in all material respects with all applicable Laws pertaining to employment and employment practices, including all Laws relating to labour relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labour, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence and unemployment insurance. All individuals characterized and treated by RTO Acquiror or any RTO Acquiror Subsidiary as independent contractors or consultants are properly treated as independent contractors under all applicable Laws. There are no actions against RTO Acquiror or any RTO Acquiror Subsidiary pending or, to the knowledge of RTO Acquiror, threatened to be brought or filed, by or with any Governmental Entity or arbitrator in connection with the employment of any current or former applicant, employee, consultant or independent contractor of RTO Acquiror or any RTO Acquiror Subsidiary, including, without limitation, any claim relating to unfair labour practices, employment discrimination, harassment, retaliation, equal pay, wage and hours or any other employment related matter arising under applicable Laws.

(fff) Schedule D(fff) of the RTO Acquiror Disclosure Letter sets out a complete and accurate list of all current employees and consultants engaged or employed by RTO Acquiror and the RTO Acquiror Subsidiaries and includes names and titles of all such employees and consultants, together with their position/role and location of their employment or provision of services. All of the employees and consultants listed in Schedule D(fff) of the RTO Acquiror Disclosure Letter are engaged pursuant to a written contract of employment or provision of services and all such contracts have been disclosed to the legal counsel of Meta in the virtual data room maintained by RTO Acquiror for the purposes of facilitating the Parties' due diligence investigations.

(ggg) Neither RTO Acquiror nor any RTO Acquiror Subsidiary is subject to any claim for wrongful dismissal, constructive dismissal or any other tort claim, actual or threatened, or any litigation actual or threatened, relating to employment or termination of employment of employees or independent contractors.

(hhh) Each plan for retirement, bonus, stock purchase, profit sharing, stock option, deferred compensation, severance or termination pay, insurance, medical, hospital, dental, vision care, drug, sick leave, disability, salary continuation, legal benefits, unemployment benefits, vacation, incentive or otherwise contributed to or required to be contributed to, by RTO Acquiror or an RTO Acquiror Subsidiary for the benefit of any current or former director, officer, employee or consultant of RTO Acquiror or an RTO Acquiror Subsidiary (in this Schedule D, the "**RTO Acquiror Employee Plans**") has been maintained in compliance with its terms and with the requirements prescribed by any and all Laws that are applicable to such RTO Acquiror Employee Plans, in each case in all material respects and has been publicly disclosed to the extent required by Securities Laws.

(iii) All material accruals for unpaid vacation pay, premiums for unemployment insurance, health premiums, federal or state pension plan premiums, accrued wages, salaries and commissions and employee benefit plan payments have been reflected in the books and records of RTO Acquiror and the RTO Acquiror Subsidiaries.

(jjj) There is not currently any labour disruption, dispute, slowdown, stoppage, complaint or grievance or, to the knowledge of RTO Acquiror, threatened or pending which is adversely affecting or would reasonably be expected to adversely affect, in a material manner, the carrying on of the business of RTO Acquiror and the RTO Acquiror Subsidiaries, and to the knowledge of RTO Acquiror, there is no proposal to unionize its employees and no collective bargaining agreements are in place or currently being negotiated by RTO Acquiror or an RTO Acquiror Subsidiary.

(kkk) Except as set forth on Schedule D(kkk) of the RTO Acquiror Disclosure Letter, neither the execution and delivery of this Agreement, shareholder or other approval of this Agreement nor the consummation of the transactions contemplated by this Agreement could, either alone or in combination with another event, (i) entitle any employee, director, officer or independent contractor of the RTO Acquiror Group to severance pay, termination pay, change of control payment or benefits, or any material increase in severance pay, (ii) accelerate the time of payment or vesting, or materially increase the amount of compensation due to any such employee, director, officer or independent contractor, (iii) directly or indirectly cause the RTO Acquiror Group to transfer or set aside any assets to fund any material benefits under any Employee Plan, (iv) otherwise give rise to any material liability under any Employee Plan, or (v) limit or restrict the right to merge, materially amend, terminate or transfer the assets of any Employee Plan on or following the consummation of the transactions contemplated by this Agreement.

(lll) Each of RTO Acquiror and each RTO Acquiror Subsidiary has been and is now conducting its business in compliance in all material respects with all applicable Laws of each jurisdiction in which it carries on its business and has not received a notice of material non-compliance, and, to the knowledge of RTO Acquiror, there are no facts that would give rise to a notice of material non-compliance with any such Laws.

(mmm) Other than this Agreement, neither RTO Acquiror nor any RTO Acquiror Subsidiary is currently party to any agreement in respect of: (i) the purchase of any material property or assets or any interest therein or the sale, transfer or other disposition of any material property or assets or any interest therein currently owned, directly or indirectly, by RTO Acquiror or an RTO Acquiror Subsidiary whether by asset sale, transfer of shares or otherwise; or (ii) the change of control of RTO Acquiror or an RTO Acquiror Subsidiary (whether by sale or transfer of shares or otherwise).

(nnn) None of RTO Acquiror nor any RTO Acquiror Subsidiary is a party to any Material Contract, other than as set forth on Schedule D(nnn) of the RTO Acquiror Disclosure Letter (collectively, the "RTO Acquiror Material Contracts").

(ooo) All RTO Acquiror Material Contracts are in good standing in all material respects and in full force and effect.

(ppp) RTO Acquiror is not in material default or breach of any RTO Acquiror Material Contract and, to the knowledge of RTO Acquiror, there exists no condition, event or act which, with the giving of notice or lapse of time or both, would constitute a material default or breach under any RTO Acquiror Material Contract and/or which would give rise to a right of termination on the part of any other party to an RTO Acquiror Material Contract.

(qqq) The RTO Acquiror is a "reporting issuer" or equivalent thereof under applicable Securities Laws in the United States, and is not in default of any material requirements of any Securities Laws or the rules and regulations of the SEC or NASDAQ. RTO Acquiror has not taken any action to cease to be a reporting issuer nor has RTO Acquiror received notification from any Securities Authority seeking to revoke the reporting issuer status of RTO Acquiror. No delisting, suspension of trading in or cease trading order with respect to any of its securities and, to the knowledge of the RTO Acquiror, no inquiry or investigation of any Securities Authority, is pending, in effect or ongoing or threatened. The RTO Acquiror Shares are listed on NASDAQ and trading of the RTO Acquiror Shares is not currently halted or suspended. The RTO Acquiror does not have any securities listed for trading on any securities exchange other than NASDAQ. RTO Acquiror is not subject to any cease trade or other order of NASDAQ or any Securities Authority, and, to the knowledge of the RTO Acquiror, no investigation or other proceedings involving the RTO Acquiror that may operate to prevent or restrict trading of any securities of the RTO Acquiror are currently in progress or pending before NASDAQ or any Securities Authority. RTO Acquiror has timely filed or furnished all RTO Acquiror Disclosure Documents required to be filed or furnished by RTO Acquiror under applicable Securities Laws. Each of the RTO Acquiror Disclosure Documents complied in all material respects with applicable Securities Laws and did not, as of the date filed (or, if amended or superseded by a subsequent filing prior to the date of this Agreement, on the date of such filing), contain any misrepresentation (as defined under applicable Securities Laws). RTO Acquiror has not filed any confidential filings (including redacted filings) filed to or furnished with, as applicable, any Securities Authority. There are no outstanding or unresolved comments in comment letters from any Securities Authority with respect to any of the RTO Acquiror Disclosure Documents and, to the knowledge of RTO Acquiror, neither RTO Acquiror nor any of the RTO Acquiror Disclosure Documents is the subject of an ongoing audit, review, comment or investigation by any Securities Authority or the SEC.

(rrr) The operations of RTO Acquiror and the RTO Acquiror Subsidiaries are and have been conducted, at all times, in material compliance with all applicable Anti-Money Laundering Laws, and no action by or before any Governmental Entity against RTO Acquiror or an RTO Acquiror Subsidiary with respect to the Anti-Money Laundering Laws is pending. None of RTO Acquiror nor any RTO Acquiror Subsidiary has, directly or indirectly: (i) made or authorized any contribution, payment or gift of funds or property to any official, employee or agent of any governmental agency, authority or instrumentality of any jurisdiction in violation of applicable Laws; or (ii) made any contribution to any candidate for public office, in either case where either the payment or the purpose of such contribution, payment or gift was, is or would be prohibited under the Corruption of Foreign Public Officials Act (Canada), the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (United States) or the rules and regulations promulgated thereunder or under any other Laws of any relevant jurisdiction covering a similar subject matter applicable to RTO Acquiror, the RTO Acquiror Subsidiaries and their operations. None of RTO Acquiror, an RTO Acquiror Subsidiary, or, to the knowledge of RTO Acquiror, any director, officer, agent, employee, affiliate or Person acting on behalf of RTO Acquiror or any RTO Acquiror Subsidiary has been or is currently subject to any United States sanctions administered by the Office of Foreign Assets Control of the United States Treasury Department.

(sss) None of RTO Acquiror, an RTO Acquiror Subsidiary, or, to the knowledge of RTO Acquiror, any of their officers, directors or employees acting on behalf of RTO Acquiror has violated the United States' Foreign Corrupt Practices Act (and the regulations promulgated thereunder), the Corruption of Foreign Public Officials Act (Canada) (and the regulations promulgated thereunder) or any other applicable Law covering a similar subject matter applicable to the RTO Acquiror, the RTO Acquiror Subsidiaries and their operations, and to the knowledge of RTO Acquiror, no such action has been taken by any of its agents, representatives or other Persons acting on behalf of RTO Acquiror.

(ttt) Subject to Permitted Encumbrances: (i) RTO Acquiror does not have reason to believe that RTO Acquiror does not have good and marketable title to or the irrevocable right to produce and sell its petroleum, natural gas and related hydrocarbons and represents and warrants that such interests are free and clear of all Encumbrances created by, through or under RTO Acquiror, and that RTO Acquiror has not received written notice of any default or purported default under, nor has there been any act or omission by RTO Acquiror that could reasonably constitute a breach of or a default under, the leases, licenses, permits, concessions, concession agreements, contracts, subleases, reservations or other agreements in which RTO Acquiror derives its interests in its oil and gas properties that have not been remedied in all material respects or if unremedied would reasonably be expected to result in an RTO Acquiror Material Adverse Effect; and (ii) there are no defects, failures or impairments in the title of RTO Acquiror to its assets, whether or not an action, suit, proceeding or inquiry is pending or threatened in writing or whether or not discovered by any third party, which in the aggregate, could materially adversely affect: (A) the quantity and pre-tax net present values of such assets as reflected in RTO Acquiror's most recent reserve report; (B) the current production volumes of RTO Acquiror; or (C) the current cash flow of RTO Acquiror.

(uuu) Except as disclosed in Schedule D(uuu) of the RTO Acquiror Disclosure Letter, none of the oil and gas assets of RTO Acquiror are subject to an agreement that provides for an area of mutual interest or an area of exclusion.

(vvv) Except as set out in Schedule D(vvv) of the RTO Acquiror Disclosure Letter, none of the oil and gas assets or properties of RTO Acquiror or any of the RTO Acquiror Subsidiaries are subject to reduction by reference to payout of or production penalty on any well or otherwise, or to change to an interest of any other size or nature by virtue of or through any right or interest granted by, through or under RTO Acquiror which could in the aggregate would reasonably be expected to result in an RTO Acquiror Material Adverse Effect.

(www) Except as set out in Schedule D(www) of the RTO Acquiror Disclosure Letter, all royalties, and all ad valorem, property, production, severance and similar Taxes, assessment, deposits and rentals payable on or before the date hereof and based on, or measured by, RTO Acquiror's or any RTO Acquiror Subsidiary's ownership of its oil and gas assets or properties, the production of petroleum substances from its oil and gas assets or properties or the receipt of proceeds therefrom under the leases and other title and operating documents pertaining to RTO Acquiror's or any RTO Acquiror Subsidiary's oil and gas assets or properties payable on or before the date hereof, have been properly paid in full and in a timely manner.

(xxx) Except as set out in Schedule D(xxx) of the RTO Acquiror Disclosure Letter, (i) none of the wells in which RTO Acquiror holds an interest have been produced in excess of applicable production allowables imposed by any Applicable Laws or any Governmental Entity, and RTO Acquiror has no knowledge of any impending change in production allowables imposed by any Applicable Laws or any Governmental Entity that may be applicable to any of the wells in which it holds an interest, other than changes of general application in the jurisdiction in which such wells are situate; and (ii) RTO Acquiror has not received notice of any production penalty or similar production restriction of any nature imposed or to be imposed by any Governmental Entity, including gas oil ratio, off target and overproduction penalties imposed by any Governmental Entity that may be applicable, and, to its knowledge, none of the wells in which it holds an interest is subject to any such penalty or restriction.

(yyy) None of the wells in which RTO Acquiror holds an interest are subject to any material production penalty or restriction arising from the overproduction of petroleum substances from its oil and gas assets or properties (other than those imposed in the ordinary course of the oil and gas industry by a Governmental Entity).

(zzz) All wells in which RTO Acquiror holds an interest: (i) for which RTO Acquiror was or is operator, were or have been drilled and, if and as applicable, completed, operated and abandoned (and if abandoned, plugged and abandoned and the wellsite therefor properly reclaimed or restored) in accordance with good and prudent oil and gas industry practices in the United States and all applicable Laws; and (ii) for which RTO Acquiror was not or is not operator, to the knowledge of RTO Acquiror, were or have been drilled and, if and as applicable, completed, operated and abandoned (and if abandoned, plugged and abandoned and the wellsite therefor properly reclaimed or restored) in accordance with good and prudent oil and gas industry practices in the jurisdiction in which such wells are situate and all applicable Laws.

(aaaa) RTO Acquiror's tangible depreciable property used or intended for use in connection with its oil and gas assets: (i) for which RTO Acquiror was or is operator, was or has been constructed, operated and maintained in accordance with good and prudent oil and gas industry practices in the jurisdiction in which such property is situate and all applicable Laws during all periods in which RTO Acquiror was operator thereof and is in good condition and repair, ordinary wear and tear excepted, and is useable in the ordinary course of business; and (ii) for which RTO Acquiror was not or is not operator, to the knowledge of RTO Acquiror, was or has been constructed, operated and maintained in accordance with good and prudent oil and gas industry practices in the jurisdiction in which such property is situate and all applicable Laws during all periods in which RTO Acquiror was not operator thereof and is in good condition and repair, ordinary wear and tear excepted, and is useable in the ordinary course of business.

(bbbb) RTO Acquiror has provided to Meta a complete and accurate description of all wells, facilities and lands of RTO Acquiror as at the date of this Agreement.

(cccc) Except for the representations and warranties expressly made by RTO Acquiror in this Schedule D or in any certificate delivered pursuant to this Agreement, neither RTO Acquiror nor any other Person makes or has made any representation or warranty of any kind whatsoever, express or implied, at law or in equity, with respect to RTO Acquiror or any of the RTO Acquiror Subsidiaries or their respective business, operations, assets, liabilities, condition (financial or otherwise), notwithstanding the delivery or disclosure to Meta or any of its affiliates or Representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing. Without limiting the generality of the foregoing, neither RTO Acquiror nor any other Person makes or has made any express or implied representation or warranty to Meta or any of its Representatives with respect to (a) any financial projection, forecast, estimate, or budget relating to RTO Acquiror, any of its subsidiaries or their respective businesses or, (b) except for the representations and warranties made by RTO Acquiror in this Schedule D, any oral or written information presented to Meta or any of its Representatives in the course of their due diligence investigation of RTO Acquiror and the RTO Acquiror Subsidiaries, the negotiation of this Agreement or the course of the Arrangement.

(dddd) RTO Acquiror has complied, or has caused the operators under any agreement RTO Acquiror is subject to, to comply with all ongoing reporting or continuous drilling obligations under all agreements and has complied or has caused the operators under any agreement RTO Acquiror is subject to, to comply with any governmental agency reporting obligations. Each agreement RTO Acquiror is a party to is in force and effect and is valid, binding and enforceable against the parties to such agreement, and, to the Knowledge of RTO Acquiror, each other party thereto in accordance with its term. All monetary obligations due and payable by RTO Acquiror or any operator under the agreements have been paid in full and no party to any of the agreements is in material breach or default of its obligations under the agreements.

**SCHEDULE E**
**SENIOR OFFICERS OF META**

All senior officers and directors of Meta.

**SCHEDULE F**
**SENIOR OFFICERS OF RTO ACQUIROR**

All senior officers and directors of RTO Acquiror.

**SCHEDULE G**
**KEY REGULATORY APPROVALS**

**Canada**

- exemption orders from the Securities Authorities from the prospectus requirements with respect to the first trade in Exchangeable Shares

**United States**

- filings required under the U.S. Securities Act and U.S. Exchange Act, and other actions required by the SEC pursuant thereto

**SCHEDULE H**
**SUPPORT AGREEMENT**

**AGREEMENT** made as of the __ day of ________, 2021, between Torchlight Energy Resources, Inc., a corporation existing under the laws of the State of Nevada (hereinafter referred to as "**RTO Acquiror**"), 2798831 Ontario Inc., a company existing under the laws of Ontario (hereinafter referred to as "**Callco**") and 2798832 Ontario Inc., a corporation existing under the laws of Ontario (hereinafter referred to as "**Canco**").

**RECITALS:**

A. in connection with an arrangement agreement (the "**Arrangement Agreement**") made as of December 14, 2020 between RTO Acquiror, Canco, Callco, and Metamaterial Inc. ("**META**"), the Exchangeable Shares are to be issued to certain holders of securities of META pursuant to the Plan of Arrangement contemplated by the Arrangement Agreement; and

B. pursuant to the Arrangement Agreement, RTO Acquiror, Canco and Callco are required to enter into this agreement.

In consideration of the foregoing and the mutual agreements contained herein (the receipt and sufficiency of which are acknowledged), the parties agree as follows:

## ARTICLE 1
## DEFINITIONS AND INTERPRETATION

### 1.1 Defined Terms

Each initially capitalized term used and not otherwise defined herein shall have the meaning ascribed thereto in the rights, privileges, restrictions and conditions (collectively, the "**Share Provisions**") attaching to the Exchangeable Shares as set out in the articles of Canco. In this agreement, "**including**" means "including without limitation" and "**includes**" means "includes without limitation".

### 1.2 Interpretation Not Affected by Headings

The division of this agreement into Articles, Sections and other portions and the insertion of headings are for convenience of reference only and do not affect the construction or interpretation of this agreement. Unless otherwise specified, references to an "Article" or "Section" refer to the specified Article or Section of this agreement.

### 1.3 Number, Gender

Words importing the singular number only shall include the plural and vice versa. Words importing any gender shall include all genders.

**1.4 Date for any Action**

If any date on which any action is required to be taken under this agreement is not a business day, such action shall be required to be taken on the next succeeding business day. For the purposes of this agreement, a "business day" means any day other than a Saturday, Sunday or any other day on which commercial banking institutions in Toronto, Ontario or Houston, Texas are authorized or required by applicable law to be closed.

**ARTICLE 2**
**COVENANTS OF RTO ACQUIROR AND CANCO**

**2.1 Covenants Regarding Exchangeable Shares**

So long as any Exchangeable Shares not owned by RTO Acquiror or its affiliates are outstanding, RTO Acquiror shall:

(a) not declare or pay any dividend or make any other distribution on the RTO Acquiror Shares, except for the dividend of RTO Acquiror Preferred Stock contemplated in Section 2.15 of the Arrangement Agreement or any Asset Sale Dividend (as such term is defined in the terms of the preferred stock of RTO Acquiror), unless (i) Canco shall (A) on the same day declare or pay, as the case may be, an equivalent dividend or other distribution (as provided for in the Share Provisions) on the Exchangeable Shares (an "**Equivalent Dividend**"), and (B) have sufficient money or other assets or authorized but unissued securities available to enable the due declaration and the due and punctual payment, in accordance with applicable law, of any such Equivalent Dividend, or (ii) Canco shall, in the case of a dividend that is a stock dividend on the RTO Acquiror Shares (A) subdivide the Exchangeable Shares in lieu of a stock dividend thereon (as provided for in the Share Provisions) in a corresponding, contemporaneous and economically equivalent manner to that in respect of the RTO Acquiror Shares (an "**Equivalent Stock Subdivision**"), and (B) have sufficient authorized but unissued securities available to enable the Equivalent Stock Subdivision;

(b) advise Canco sufficiently in advance of the declaration by RTO Acquiror of any dividend or other distribution on the RTO Acquiror Shares and take all such other actions as are necessary or desirable, in co-operation with Canco, to ensure that

(i) the respective declaration date, record date and payment date for an Equivalent Dividend on the Exchangeable Shares shall be the same as the declaration date, record date and payment date for the corresponding dividend or other distribution on the RTO Acquiror Shares, or

(ii) the record date and effective date for an Equivalent Stock Subdivision shall be the same as the record date and payment date for the corresponding stock dividend on the RTO Acquiror Shares;

(c) ensure that the record date for any dividend or other distribution declared on the RTO Acquiror Shares is not less than 7 days after the declaration date of such dividend or other distribution;

(d) take all such actions and do all such things as are necessary to enable and permit Canco, in accordance with applicable law, to pay and otherwise perform its obligations with respect to the satisfaction of the Liquidation Amount, the Retraction Price or the Redemption Price in respect of each issued and outstanding Exchangeable Share (other than Exchangeable Shares owned by RTO Acquiror or its affiliates) upon the liquidation, dissolution or winding-up of Canco or any other distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs, the delivery of a Retraction Request by a holder of Exchangeable Shares or a redemption of Exchangeable Shares by Canco, as the case may be, including all such actions and all such things as are necessary or desirable to enable and permit Canco to cause to be delivered RTO Acquiror Shares to the holders of Exchangeable Shares in accordance with the provisions of Sections 5, 6 or 7, as the case may be, of the Share Provisions;

(e) take all such actions and do all such things as are necessary or desirable to enable and permit RTO Acquiror and Callco, in accordance with applicable law, to perform its obligations arising upon the exercise by it of the Liquidation Call Right, the Retraction Call Right, the Change of Law Call Right (as defined in the Plan of Arrangement) or the Redemption Call Right, including all such actions and all such things as are necessary or desirable to enable and permit RTO Acquiror and Callco to cause to be delivered RTO Acquiror Shares to the holders of Exchangeable Shares in accordance with the provisions of the Liquidation Call Right, the Retraction Call Right, the Change of Law Call Right or the Redemption Call Right, as the case may be; and

(f) except in connection with any event, circumstance or action which causes or could cause the occurrence of a Redemption Date, not exercise its vote as a shareholder to initiate the voluntary liquidation, dissolution or winding up of Canco or any other distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs, nor take any action or omit to take any action that is designed to result in the liquidation, dissolution or winding up of Canco or any other distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs.

**2.2 Segregation of Funds**

RTO Acquiror shall cause Canco to deposit a sufficient amount of funds in a separate account of Canco and segregate a sufficient amount of such other assets and property as is necessary to enable Canco to pay dividends when due and to pay or otherwise satisfy its respective obligations under Sections 5, 6 and 7 of the Share Provisions, as applicable.

**2.3 Reservation of RTO Acquiror Shares**

RTO Acquiror hereby represents, warrants and covenants in favour of Canco and Callco that RTO Acquiror has reserved for issuance and shall, at all times while any Exchangeable Shares (other than Exchangeable Shares held by RTO Acquiror or its affiliates) are outstanding, keep available, free from pre-emptive and other rights, out of its authorized and unissued capital stock such number of RTO Acquiror Shares (or other shares or securities into which RTO Acquiror Shares may be reclassified or changed as contemplated by Section 2.7): (a) as is equal to the sum of (i) the number of Exchangeable Shares issued and outstanding from time to time and (ii) the number of Exchangeable Shares issuable upon the exercise of all rights to acquire Exchangeable Shares outstanding from time to time; and (b) as are now and may hereafter be required to enable and permit RTO Acquiror to meet its obligations under the Voting and Exchange Trust Agreement and under any other security or commitment pursuant to which RTO Acquiror may now or hereafter be required to issue RTO Acquiror Shares, to enable and permit Callco or RTO Acquiror, as the case may be, to meet its obligations under each of the Liquidation Call Right, the Retraction Call Right, the Change of Law Call Right and the Redemption Call Right and to enable and permit Canco to meet its obligations hereunder and under the Share Provisions.

**2.4 Notification of Certain Events**

In order to assist RTO Acquiror to comply with its obligations hereunder and to permit Callco or RTO Acquiror to exercise, as the case may be, the Liquidation Call Right, the Retraction Call Right, the Change of Law Call Right and the Redemption Call Right, Canco shall notify RTO Acquiror and Callco of each of the following events at the time set forth below:

(a) in the event of any determination by the Board of Directors of Canco to institute voluntary liquidation, dissolution or winding-up proceedings with respect to Canco or to effect any other distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs, at least 60 days prior to the proposed effective date of such liquidation, dissolution, winding-up or other distribution;

(b) promptly, upon the earlier of receipt by Canco of notice of and Canco otherwise becoming aware of any threatened or instituted claim, suit, petition or other proceedings with respect to the involuntary liquidation, dissolution or winding-up of Canco or to effect any other distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs;

(c) immediately, upon receipt by Canco of a Retraction Request;

(d) on the same date on which notice of redemption is given to holders of Exchangeable Shares, upon the determination of a Redemption Date in accordance with the Share Provisions;

(e) as soon as practicable upon the issuance by Canco of any Exchangeable Shares or rights to acquire Exchangeable Shares (other than the issuance of Exchangeable Shares and rights to acquire Exchangeable Shares pursuant to the Arrangement); and

(f) promptly, upon receiving notice of a Change of Law (as defined in the Plan of Arrangement).

**2.5 Delivery of RTO Acquiror Shares to Canco and Callco**

In furtherance of its obligations under Section 2.1(d) and Section 2.1(e), upon notice from Canco or Callco of any event that requires Canco or Callco to cause to be delivered RTO Acquiror Shares to any holder of Exchangeable Shares, RTO Acquiror shall forthwith allot, issue and deliver or cause to be delivered to the relevant holder of Exchangeable Shares as directed by Canco or Callco the requisite number of RTO Acquiror Shares to be allotted to, received by, and issued to or to the order of, the former holder of the surrendered Exchangeable Shares (but, for the avoidance of doubt, not to Canco or Callco). All such RTO Acquiror Shares shall be duly authorized and validly issued as fully paid and non-assessable. In consideration of the issuance and delivery of each such RTO Acquiror Share, Canco or Callco, as the case may be, shall ascribe a cash amount or pay a purchase price equal to the fair market value of such RTO Acquiror Shares.

**2.6 Qualification of RTO Acquiror Shares**

If any RTO Acquiror Shares (or other shares or securities into which RTO Acquiror Shares may be reclassified or changed as contemplated by Section 2.7) to be issued and delivered hereunder require registration or qualification with or approval of or the filing of any document, including any prospectus or similar document or the taking of any proceeding with or the obtaining of any order, ruling or consent from any governmental or regulatory authority under any United States or Canadian federal, state, provincial or territorial securities including any stock exchange on which securities of RTO Acquiror are listed or other law or regulation or pursuant to the rules and regulations of any securities or other regulatory authority in the United States or Canada or the fulfillment of any other United States or Canadian legal requirement before such shares (or such other shares or securities) may be issued by RTO Acquiror and delivered by RTO Acquiror at the direction of Callco or Canco, if applicable, to the holder of surrendered Exchangeable Shares or in order that such shares (or such other shares or securities) may be freely traded (other than any restrictions of general application on transfer by reason of a holder being a "control person" for purposes of Canadian federal, provincial or territorial securities Law or the equivalent thereof under any United States Laws), RTO Acquiror shall use its commercially reasonable efforts (which, for greater certainty, shall not require RTO Acquiror to consent to a term or condition of an approval or consent which RTO Acquiror reasonably determines could have a materially adverse effect on RTO Acquiror or its subsidiaries) to cause such RTO Acquiror Shares (or such other shares or securities) to be and remain duly registered, qualified or approved under United States and/or Canadian Law. RTO Acquiror shall use its commercially reasonable efforts (which, for greater certainty, shall not require RTO Acquiror to consent to a term or condition of an approval or consent which RTO Acquiror reasonably determines could have a materially adverse effect on RTO Acquiror or its subsidiaries) to cause all RTO Acquiror Shares (or such other shares or securities) to be delivered hereunder to be listed, quoted or posted for trading on all stock exchanges and quotation systems on which outstanding RTO Acquiror Shares (or such other shares or securities) have been listed by RTO Acquiror and remain listed and are quoted or posted for trading at such time.

**2.7 Economic Equivalence**

So long as any Exchangeable Shares not owned by RTO Acquiror or its affiliates are outstanding:

(a) RTO Acquiror shall not without prior approval of Canco and the prior approval of the holders of the Exchangeable Shares given in accordance with Section 12 of the Share Provisions:

(i) issue or distribute RTO Acquiror Shares (or securities exchangeable for or convertible into or carrying rights to acquire RTO Acquiror Shares) to the holders of all or substantially all of the then outstanding RTO Acquiror Shares by way of stock dividend or other distribution, other than an issue of RTO Acquiror Shares (or securities exchangeable for or convertible into or carrying rights to acquire RTO Acquiror Shares) to holders of RTO Acquiror Shares (i) who exercise an option to receive dividends in RTO Acquiror Shares (or securities exchangeable for or convertible into or carrying rights to acquire RTO Acquiror Shares) in lieu of receiving cash dividends, or (ii) pursuant to any dividend reinvestment plan or similar arrangement; or

(ii) issue or distribute rights, options or warrants to the holders of all or substantially all of the then outstanding RTO Acquiror Shares entitling them to subscribe for or to purchase RTO Acquiror Shares (or securities exchangeable for or convertible into or carrying rights to acquire RTO Acquiror Shares); or

(iii) other than the dividend of RTO Acquiror Preferred Stock contemplated in Section 2.15 of the Arrangement Agreement or any Asset Sale Dividend (as such term is defined in the terms of the preferred stock of RTO Acquiror), issue or distribute to the holders of all or substantially all of the then outstanding RTO Acquiror Shares (A) shares or securities (including evidence of indebtedness) of RTO Acquiror of any class (other than RTO Acquiror Shares or securities convertible into or exchangeable for or carrying rights to acquire RTO Acquiror Shares), or (B) rights, options, warrants or other assets other than those referred to in Section 2.7(a)(ii);

unless in each case the economic equivalent on a per share basis of such rights, options, securities, shares, evidences of indebtedness or other assets is issued or distributed simultaneously to holders of the Exchangeable Shares and at least 7 days prior written notice thereof is given to the holders of Exchangeable Shares; provided that, for greater certainty, the above restrictions shall not apply to any securities issued or distributed by RTO Acquiror in order to give effect to and to consummate, in furtherance of or otherwise in connection with the transactions contemplated by, and in accordance with, the Arrangement Agreement and the Plan of Arrangement.

(b) RTO Acquiror shall not without the prior approval of Canco and the prior approval of the holders of the Exchangeable Shares given in accordance with Section 12 of the Share Provisions:

(i) subdivide, re-divide or change the then outstanding RTO Acquiror Shares into a greater number of RTO Acquiror Shares; or

(ii) reduce, combine, consolidate or change the then outstanding RTO Acquiror Shares into a lesser number of RTO Acquiror Shares; or

(iii) reclassify or otherwise change RTO Acquiror Shares or effect an amalgamation, merger, arrangement, reorganization or other transaction affecting RTO Acquiror Shares;

unless the same or an economically equivalent change shall simultaneously be made to, or in the rights of the holders of, the Exchangeable Shares and at least seven days prior written notice is given to the holders of Exchangeable Shares, provided that, for greater certainty, the above restrictions shall not apply to any securities issued or distributed by RTO Acquiror in order to give effect to and to consummate, in furtherance of or otherwise in connection with the transactions contemplated by, and in accordance with, the Arrangement Agreement and the Plan of Arrangement.

(c) RTO Acquiror shall ensure that the record date for any event referred to in Section 2.7(a) or Section 2.7(b), or, if no record date is applicable for such event, the effective date for any such event, is not less than five business days after the date on which such event is declared or announced by RTO Acquiror (with contemporaneous notification thereof by RTO Acquiror to Canco).

(d) The Board of Directors of Canco shall determine, acting in good faith and in its sole discretion, "economic equivalence" for the purposes of any event referred to in Section 2.7(a) or Section 2.7(b) and each such determination shall be conclusive and binding on RTO Acquiror. In making each such determination, the following factors may, without excluding other factors determined by the Board of Directors of Canco to be relevant, be considered by the Board of Directors of Canco:

(i) in the case of any stock dividend or other distribution payable in RTO Acquiror Shares, the number of such shares issued in proportion to the number of RTO Acquiror Shares previously outstanding;

(ii) in the case of the issuance or distribution of any rights, options or warrants to subscribe for or purchase RTO Acquiror Shares (or securities exchangeable for or convertible into or carrying rights to acquire RTO Acquiror Shares), the relationship between the exercise price of each such right, option or warrant and the Current Market Price of an RTO Acquiror Share;

(iii) in the case of the issuance or distribution of any other form of property (including any shares or securities of RTO Acquiror of any class other than RTO Acquiror Shares, any rights, options or warrants other than those referred to in Section 2.7(d)(ii), any evidences of indebtedness of RTO Acquiror or any assets of RTO Acquiror), the relationship between the fair market value (as determined by the Board of Directors of Canco in the manner above contemplated) of such property to be issued or distributed with respect to each outstanding RTO Acquiror Share and the Current Market Price of an RTO Acquiror Share;

(iv) in the case of any subdivision, redivision or change of the then outstanding RTO Acquiror Shares into a greater number of RTO Acquiror Shares or the reduction, combination, consolidation or change of the then outstanding RTO Acquiror Shares into a lesser number of RTO Acquiror Shares or any amalgamation, merger, arrangement, reorganization or other transaction affecting RTO Acquiror Shares, the effect thereof upon the then outstanding RTO Acquiror Shares; and

(v) in all such cases, the general taxation consequences of the relevant event to holders of Exchangeable Shares to the extent that such consequences may differ from the taxation consequences to holders of RTO Acquiror Shares as a result of differences between taxation laws of Canada and the United States (except for any differing consequences arising as a result of differing withholding taxes and marginal taxation rates and without regard to the individual circumstances of holders of Exchangeable Shares).

(e) Canco agrees that, to the extent required, upon due notice from RTO Acquiror, Canco shall use its best efforts to take or cause to be taken such steps as may be necessary for the purposes of ensuring that appropriate dividends are paid or other distributions are made by Canco, or subdivisions, redivisions or changes are made to the Exchangeable Shares, in order to implement the required economic equivalence with respect to the RTO Acquiror Shares and Exchangeable Shares as provided for in this Section 2.7.

**2.8 Tender Offers**

In the event that a tender offer, share exchange offer, issuer bid, take-over bid or similar transaction with respect to RTO Acquiror Shares (an "**Offer**") is proposed by RTO Acquiror or is proposed to RTO Acquiror or its shareholders and is recommended by the Board of Directors of RTO Acquiror, or is otherwise effected or to be effected with the consent or approval of the Board of Directors of RTO Acquiror, and the Exchangeable Shares are not redeemed by Canco or purchased by RTO Acquiror or Callco pursuant to the Redemption Call Right, RTO Acquiror shall expeditiously and in good faith take all such actions and do all such things as are necessary or desirable to enable and permit holders of Exchangeable Shares (other than RTO Acquiror and its affiliates) to participate in such Offer to the same extent and on an economically equivalent basis as the holders of RTO Acquiror Shares, without discrimination. Without limiting the generality of the foregoing, RTO Acquiror shall expeditiously and in good faith take all such actions and do all such things as are necessary or desirable to ensure that holders of Exchangeable Shares may participate in each such Offer without being required to retract Exchangeable Shares as against Canco (or, if so required, to ensure that any such retraction, shall be effective only upon, and shall be conditional upon, the closing of such Offer and only to the extent necessary to tender or deposit to the Offer). Nothing herein shall affect the rights of Canco to redeem (or RTO Acquiror or Callco to purchase pursuant to the Redemption Call Right) Exchangeable Shares, as applicable, in the event of an RTO Acquiror Control Transaction.

**2.9 Ownership of Outstanding Shares**

Without the prior approval of Canco and the prior approval of the holders of the Exchangeable Shares given in accordance with Section 12 of the Share Provisions, RTO Acquiror covenants and agrees in favour of Canco that, as long as any outstanding Exchangeable Shares are owned by any person other than RTO Acquiror or any of its affiliates, RTO Acquiror shall be and remain the direct or indirect beneficial owner of all issued and outstanding voting shares in the capital of Canco and Callco. Notwithstanding the foregoing, but subject to Article 3, RTO Acquiror shall not be in violation of this Section 2.9 if any person or group of persons acting jointly or in concert acquire all or substantially all of the assets of RTO Acquiror or the RTO Acquiror Shares pursuant to any merger of RTO Acquiror as a result of which RTO Acquiror is not the surviving corporation.

**2.10 RTO Acquiror and Affiliates Not to Vote Exchangeable Shares**

RTO Acquiror covenants and agrees that it shall appoint and cause to be appointed proxyholders with respect to all Exchangeable Shares held by it and its affiliates for the sole purpose of attending each meeting of holders of Exchangeable Shares in order to be counted as part of the quorum for each such meeting. RTO Acquiror further covenants and agrees that it shall not, and shall cause its affiliates not to, exercise any voting rights which may be exercisable by holders of Exchangeable Shares from time to time pursuant to the Share Provisions or pursuant to the provisions of the OBCA (or any successor or other corporate statute by which Canco may in the future be governed) with respect to any Exchangeable Shares held by it or by its affiliates in respect of any matter considered at any meeting of holders of Exchangeable Shares.

---

**2.11 Ordinary Market Purchases**

For certainty, nothing contained in this agreement, including the obligations of RTO Acquiror contained in Section 2.8, shall limit the ability of RTO Acquiror (or any of its subsidiaries including, without limitation, Callco or Canco) to make ordinary market purchases of RTO Acquiror Shares in accordance with applicable laws and regulatory or stock exchange requirements.

**2.12 Stock Exchange Listing**

RTO Acquiror covenants and agrees in favour of Canco that, as long as any outstanding Exchangeable Shares are owned by any person other than RTO Acquiror or any of its affiliates, RTO Acquiror shall use reasonable efforts to maintain a listing for such RTO Acquiror Shares on the NASDAQ Capital Market.

**ARTICLE 3**
**RTO ACQUIROR SUCCESSORS**

**3.1 Certain Requirements in Respect of Combination, etc.**

So long as any Exchangeable Shares not owned by RTO Acquiror or its affiliates are outstanding, RTO Acquiror shall not consummate any transaction (whether by way of reconstruction, reorganization, consolidation, arrangement, amalgamation, merger, transfer, sale, lease or otherwise) whereby all or substantially all of its undertaking, property and assets would become the property of any other person or, in the case of a merger, of the continuing corporation resulting therefrom, provided that it may do so if:

(a) such other person or continuing corporation (the "**RTO Acquiror Successor**") by operation of law, becomes, without more, bound by the terms and provisions of this agreement or, if not so bound, executes, prior to or contemporaneously with the consummation of such transaction, an agreement supplemental hereto and such other instruments (if any) as are necessary or advisable to evidence the assumption by the RTO Acquiror Successor of liability for all moneys payable and property deliverable hereunder and the covenant of such RTO Acquiror Successor to pay and deliver or cause to be delivered the same and its agreement to observe and perform all the covenants and obligations of RTO Acquiror under this agreement; and

(b) such transaction shall be upon such terms and conditions as to preserve and not to impair in any material respect any of the rights, duties, powers and authorities of the other parties hereunder or the holders of the Exchangeable Shares.

Notwithstanding the foregoing provisions of this Section 3.1, RTO Acquiror shall be permitted to consummate an Asset Sale Transaction (as such term is defined in the terms of the preferred stock of the RTO Acquiror).

**3.2 Vesting of Powers in Successor**

Whenever the conditions of Section 3.1 have been duly observed and performed, the parties, if required by Section 3.1, shall execute and deliver the supplemental agreement provided for in Section 3.1(a) and thereupon the RTO Acquiror Successor and such other person that may then be the issuer of the RTO Acquiror Shares shall possess and from time to time may exercise each and every right and power of RTO Acquiror under this agreement in the name of RTO Acquiror or otherwise and any act or proceeding by any provision of this agreement required to be done or performed by the Board of Directors of RTO Acquiror or any officers of RTO Acquiror may be done and performed with like force and effect by the directors or officers of such RTO Acquiror Successor.

**3.3 Wholly-Owned Subsidiaries**

Nothing herein shall be construed as preventing (i) the amalgamation or merger of any wholly-owned direct or indirect subsidiary of RTO Acquiror with or into RTO Acquiror, (ii) the winding-up, liquidation or dissolution of any wholly-owned direct or indirect subsidiary of RTO Acquiror, or (iii) any other distribution of the assets of any wholly-owned direct or indirect subsidiary of RTO Acquiror among the shareholders of such subsidiary for the purpose of winding up its affairs, and any such transactions are expressly permitted by this Article 3.

**3.4 Successorship Transaction**

Notwithstanding the foregoing provisions of Article 3, in the event of an RTO Acquiror Control Transaction:

(a) in which RTO Acquiror merges or amalgamates with, or in which all or substantially all of the then outstanding RTO Acquiror Shares are acquired by, one or more other corporations to which RTO Acquiror is, immediately before such merger, amalgamation or acquisition, “related” within the meaning of the Tax Act (otherwise than by virtue of a right referred to in paragraph 251(5)(b) thereof);

(b) which does not result in an acceleration of the Redemption Date in accordance with paragraph (b) of that definition; and

(c) in which all or substantially all of the then outstanding RTO Acquiror Shares are converted into or exchanged for shares or rights to receive such shares (the “**Other Shares**”) of another corporation (the “**Other Corporation**”) that, immediately after such RTO Acquiror Control Transaction, owns or controls, directly or indirectly, RTO Acquiror;

then all references herein to "RTO Acquiror" shall thereafter be and be deemed to be references to "Other Corporation" and all references herein to "RTO Acquiror Shares" shall thereafter be and be deemed to be references to "Other Shares" (with appropriate adjustments if any, as are required to result in a holder of Exchangeable Shares on the exchange, redemption or retraction of such shares pursuant to the Exchangeable Share Provisions or Article 5 of the Plan of Arrangement or exchange of such shares pursuant to the Voting and Exchange Trust Agreement immediately subsequent to the RTO Acquiror Control Transaction being entitled to receive that number of Other Shares equal to the number of Other Shares such holder of Exchangeable Shares would have received if the exchange, redemption or retraction of such shares pursuant to the Exchangeable Share Provisions or Article 5 of the Plan of Arrangement, or exchange of such shares pursuant to the Voting and Exchange Trust Agreement had occurred immediately prior to the RTO Acquiror Control Transaction and the RTO Acquiror Control Transaction was completed) without any need to amend the terms and conditions of the Exchangeable Shares and without any further action required.

## ARTICLE 4
## GENERAL

### 4.1 Term

This agreement shall come into force and be effective as of the date hereof and shall terminate and be of no further force and effect at such time as no Exchangeable Shares (or securities or rights convertible into or exchangeable for or carrying rights to acquire Exchangeable Shares) are held by any person other than RTO Acquiror and any of its affiliates.

### 4.2 Changes in Capital of RTO Acquiror and Canco

At all times after the occurrence of any event contemplated pursuant to Section 2.7 and Section 2.8 or otherwise, as a result of which either RTO Acquiror Shares or the Exchangeable Shares or both are in any way changed, this agreement shall forthwith be amended and modified as necessary in order that it shall apply with full force and effect, *mutatis mutandis,* to all new securities into which RTO Acquiror Shares or the Exchangeable Shares or both are so changed and the parties hereto shall execute and deliver an agreement in writing giving effect to and evidencing such necessary amendments and modifications.

### 4.3 Severability

If any term or other provision of this agreement is invalid, illegal or incapable of being enforced by any rule or law, or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

**4.4 Amendments, Modifications**

(a) Subject to Section 4.2, Section 4.3 and Section 4.5 this agreement may not be amended or modified except by an agreement in writing executed by Canco, Callco and RTO Acquiror and approved by the holders of the Exchangeable Shares in accordance with Section 12 of the Share Provisions.

(b) No amendment or modification or waiver of any of the provisions of this agreement otherwise permitted hereunder shall be effective unless made in writing and signed by all of the parties hereto.

**4.5 Ministerial Amendments**

Notwithstanding the provisions of Section 4.4, the parties to this agreement may in writing at any time and from time to time, without the approval of the holders of the Exchangeable Shares, amend or modify this agreement for the purposes of:

(a) adding to the covenants of any or all parties provided that each of Canco, Callco and RTO Acquiror shall be of the good faith opinion that such additions will not be materially prejudicial to the rights or interests of the holders of the Exchangeable Shares;

(b) making such amendments or modifications not inconsistent with this agreement as may be necessary or desirable with respect to matters or questions which, in the good faith opinion of each of Canco, Callco and RTO Acquiror, it may be expedient to make, provided that each shall be of the good faith opinion that such amendments or modifications will not be materially prejudicial to the rights or interests of the holders of the Exchangeable Shares;

(c) making such changes or corrections which, on the advice of counsel to Canco, Callco and RTO Acquiror, are required for the purpose of curing or correcting any ambiguity or defect or inconsistent provision or clerical omission or mistake or manifest error, provided that the each of Canco, Callco and RTO Acquiror shall be of the good faith opinion that such changes or corrections will not be materially prejudicial to the rights or interests of the holders of the Exchangeable Shares; or

(d) making changes to provide added protection or benefit to or for the benefit of holders of Exchangeable Shares provided that each of Canco, Callco and RTO Acquiror shall be of the good faith opinion that such changes will not be materially prejudicial to the rights or interests of the holders of Exchangeable Shares.

**4.6 Meeting to Consider Amendments**

Canco, at the request of RTO Acquiror, shall call a meeting or meetings of the holders of the Exchangeable Shares for the purpose of considering any proposed amendment or modification requiring approval pursuant to Section 4.4. Any such meeting or meetings shall be called and held in accordance with the bylaws of Canco, the Share Provisions and all applicable laws.

**4.7 Enurement**

This agreement shall be binding upon and enure to the benefit of the parties hereto and their respective successors and assigns.

**4.8 Notices to Parties**

Any notice and other communications required or permitted to be given pursuant to this agreement shall be sufficiently given if delivered in person or if sent by facsimile transmission (provided such transmission is recorded as being transmitted successfully) to the parties at the following addresses:

(a) In the case of RTO Acquiror, Canco or Callco to the following address:

<@>

Attention: <@>
E-mail: <@>

with a copy to (which shall not constitute notice):

Fasken Martineau DuMoulin LLP
Attn: Mr. John Sabetti
333 Bay Street, Suite 2400

Toronto, ON
M5H 2T6
Tel: 416 366 8381

and

Wilson Sonsini Goodrich & Rosati PC
12235 El Camino Real
San Diego, CA 92130-3002

Attention: Martin Waters and Ethan Lutske
Email: mwaters@wsgr.com; elutske@wsgr.com

or at such other address as the party to which such notice or other communication is to be given has last notified the party given the same in the manner provided in this section, and if not given the same shall be deemed to have been received on the date of such delivery or sending.

**4.9 Counterparts**

This agreement may be executed in counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument.

**4.10 Jurisdiction**

This agreement shall be construed and enforced in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein. Each party hereto irrevocably submits to the non-exclusive jurisdiction of the courts of the Province of Ontario with respect to any matter arising hereunder or related hereto.

**IN WITNESS WHEREOF,** the parties hereto have caused this agreement to be duly executed as of the date first above written.

**TORCHLIGHT ENERGY RESOURCES, INC.**

Per: ______________________________
Name
______________________________
Title

**2798831 ONTARIO INC.**

Per: ______________________________
Name
______________________________
Title

**2798832 ONTARIO INC.**

Per: ______________________________
Name
______________________________
Title

**SCHEDULE I**
**VOTING AND EXCHANGE TRUST AGREEMENT**

**AGREEMENT** made as of the __ day of _______, 2021, between Torchlight Energy Resources, Inc., a corporation existing under the laws of the State of Nevada (hereinafter referred to as "**RTO Acquiror**"), 2798832 Ontario Inc., a corporation existing under the laws of the Province of Ontario (hereinafter referred to as "**Canco**"), and _____________, a trust company incorporated under the laws of Canada (hereinafter referred to as the "**Trustee**").

**RECITALS:**

A. In connection with an arrangement agreement (the "**Arrangement Agreement**") made as of December 14, 2020 between RTO Acquiror, Canco, 2798831 Ontario Inc., a corporation existing under the laws of the Province of Ontario ("**Callco**") and Metamaterial Inc., a corporation existing under the laws of the Province of Ontario ("**META**"), the Exchangeable Shares are to be issued to certain holders of securities of META pursuant to the Plan of Arrangement contemplated in the Arrangement Agreement;

B. Pursuant to the Arrangement Agreement, RTO Acquiror and Canco are required to enter into this agreement.

In consideration of the foregoing and the mutual agreements contained herein (the receipt and sufficiency of which are acknowledged), the parties agree as follows:

## ARTICLE 1
## DEFINITIONS AND INTERPRETATION

### 1.1 Definitions

In this agreement, each initially capitalized term used and not otherwise defined herein shall have the meaning ascribed thereto in the rights, privileges, restrictions and conditions (collectively, the "**Share Provisions**") attaching to the Exchangeable Shares as set out in the articles of Canco and the following terms shall have the following meanings:

"**Agency**" means any domestic or foreign court, tribunal, federal, state, provincial or local government or governmental agency, department or authority or other regulatory authority (including the Exchange and NASDAQ) or administrative agency or commission (including the Securities Authorities and the SEC) or any elected or appointed public official.

"**Authorized Investments**" means short term interest-bearing or discount debt obligations issued or guaranteed by the Government of Canada or any province thereof or a Canadian chartered bank (which may include an affiliate or related party of the Trustee), maturing not more than one year from the date of investment, or an interest-bearing segregated account with a Canadian Schedule I chartered bank.

"**Automatic Exchange Right**" means the benefit of the obligation of RTO Acquiror to effect the automatic exchange of Exchangeable Shares for RTO Acquiror Shares pursuant to Section 5.12.

"**Beneficiaries**" means the registered holders from time to time of Exchangeable Shares, other than RTO Acquiror and its affiliates.

"**Beneficiary Votes**" has the meaning ascribed thereto in Section 4.2(1).

"**Board of Directors**" means the Board of Directors of Canco.

"**Exchange**" means the Canadian Securities Exchange, the Toronto Stock Exchange or such other recognized securities exchange upon which the Exchangeable Shares may be listed for trading from time to time.

"**Exchange Right**" has the meaning ascribed thereto in Section 5.1(1).

"**Exchangeable Share Consideration**" has the meaning ascribed thereto in Section 5.4.

"**Exchangeable Shares**" means the exchangeable shares in the capital of Canco.

"**including**" means "including without limitation" and "**includes**" means "includes without limitation".

"**Indemnified Parties**" has the meaning ascribed thereto in Section 8.1(1).

"**Insolvency Event**" means (i) the institution by Canco of any proceeding to be adjudicated a bankrupt or insolvent or to be wound up, or the consent of Canco to the institution of bankruptcy, insolvency or winding-up proceedings against it, or (ii) the filing of a petition, answer or consent seeking dissolution or winding-up under any bankruptcy, insolvency or analogous laws, including the *Companies Creditors' Arrangement Act* (Canada) and the *Bankruptcy and Insolvency Act* (Canada), and the failure by Canco to contest in good faith any such proceedings commenced in respect of Canco within 30 days of becoming aware thereof, or the consent by Canco to the filing of any such petition or to the appointment of a receiver, or (iii) the making by Canco of a general assignment for the benefit of creditors, or the admission in writing by Canco of its inability to pay its debts generally as they become due, or (iv) Canco not being permitted, pursuant to solvency requirements of applicable law, to redeem any Retracted Shares pursuant to Section 6(6) of the Share Provisions.

"**Liquidation Event**" has the meaning ascribed thereto in Section 5.12(2).

"**Liquidation Event Effective Date**" has the meaning ascribed thereto in Section **Error! Reference source not found.**.

"**List**" has the meaning ascribed thereto in Section 4.6.

"**NASDAQ**" means the NASDAQ Capital Market.

"**Officer's Certificate**" means, with respect to RTO Acquiror or Canco, as the case may be, a certificate signed by any officer or director of RTO Acquiror or Canco, as the case may be.

"**Other Corporation**" has the meaning ascribed thereto in Section 10.4(c).

"**Other Shares**" has the meaning ascribed thereto in Section 10.4(c).

"**Privacy Laws**" has the meaning ascribed thereto in Section 6.18.

"**RTO Acquiror Consent**" has the meaning ascribed therein in Section 4.2(1).

"**RTO Acquiror Meeting**" has the meaning ascribed thereto in Section 4.2(1).

"**RTO Acquiror Shares**" means the common stock, par value US$0.01 per share in the capital of RTO Acquiror.

"**RTO Acquiror Special Voting Share**" means the special voting share in the capital of RTO Acquiror which entitles the holder of record to a number of votes at meetings of holders of RTO Acquiror Shares equal to the number of Exchangeable Shares outstanding from time to time (excluding Exchangeable Shares held by RTO Acquiror and affiliates of RTO Acquiror), which share is to be issued to and voted by, the Trustee as described herein.

"**RTO Acquiror Successor**" has the meaning ascribed thereto in Section 10.1(a).

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Support Agreement**" means that certain support agreement of even date between Canco, Callco and RTO Acquiror substantially in the form of Schedule I to the Arrangement Agreement, as it may be amended and/or restated in accordance with the terms of the Support Agreement.

"**Trust**" means the trust created by this agreement.

"**Trust Estate**" means the RTO Acquiror Special Voting Share, any other securities, the Automatic Exchange Right, the Exchange Right and any money or other property which may be held by the Trustee from time to time pursuant to this agreement.

"**Trustee**" means such person appointed by Meta and RTO Acquiror (each acting reasonably) and, subject to the provisions of Article 9, includes any successor trustee.

"**Voting Rights**" means the voting rights attached to the RTO Acquiror Special Voting Share.

**1.2 Interpretation Not Affected by Headings, etc.**

The division of this agreement into Articles, sections and other portions and the insertion of headings are for convenience of reference only and do not affect the construction or interpretation of this agreement. Unless otherwise specified, references to an "Article" or "section" refer to the specified Article or section of this agreement.

**1.3 Number, Gender, etc.**

Words importing the singular number only shall include the plural and vice versa. Words importing any gender shall include all genders.

**1.4 Date for any Action**

If any date on which any action is required to be taken under this agreement is not a business day, such action shall be required to be taken on the next succeeding business day.

**ARTICLE 2**
**PURPOSE OF AGREEMENT**

**2.1 Establishment of Trust**

The purpose of this agreement is to create the Trust for the benefit of the Beneficiaries as herein provided. RTO Acquiror, as the settlor of the Trust, hereby appoints the Trustee as trustee of the Trust. The delivery by RTO Acquiror of $1.00 for the purpose of settling the Trust is hereby acknowledged by the Trustee. The Trustee shall hold the RTO Acquiror Special Voting Share in order to enable the Trustee to exercise the Voting Rights and shall hold the Automatic Exchange Right and the Exchange Right in order to enable the Trustee to exercise such rights, in each case as trustee for and on behalf of the Beneficiaries as provided in this agreement.

**ARTICLE 3**
**RTO ACQUIROR SPECIAL VOTING SHARE**

**3.1 Issue and Ownership of the RTO Acquiror Special Voting Share**

Immediately following execution of this agreement, RTO Acquiror shall issue to the Trustee the RTO Acquiror Special Voting Share (and shall deliver the certificate representing such share to the Trustee) to be hereafter held of record by the Trustee as trustee for and on behalf of, and for the use and benefit of, the Beneficiaries and in accordance with the provisions of this agreement. RTO Acquiror hereby acknowledges receipt from the Trustee as trustee for and on behalf of the Beneficiaries of $1.00 and other good and valuable consideration (and the adequacy thereof) for the issuance of the RTO Acquiror Special Voting Share by RTO Acquiror to the Trustee. During the term of the Trust and subject to the terms and conditions of this agreement, the Trustee shall possess and be vested with full legal ownership of the RTO Acquiror Special Voting Share and shall be entitled to exercise all of the rights and powers of an owner with respect to the RTO Acquiror Special Voting Share provided that the Trustee shall:

(a) hold the RTO Acquiror Special Voting Share and the legal title thereto as trustee solely for the use and benefit of the Beneficiaries in accordance with the provisions of this agreement; and

(b) except as specifically authorized by this agreement, have no power or authority to sell, transfer, vote or otherwise deal in or with the RTO Acquiror Special Voting Share and the RTO Acquiror Special Voting Share shall not be used, sold, transferred, voted, dealt with or disposed of by the Trustee for any purpose (including for exercising dissent or appraisal rights relating to the RTO Acquiror Special Voting Shares) other than the purposes for which this Trust is created pursuant to this agreement and in accordance with this agreement.

**3.2 Legended Share Certificates**

Canco shall cause each certificate or ownership statement under a direct registration system representing Exchangeable Shares to bear an appropriate legend notifying each Beneficiary of their right to instruct the Trustee in respect of the exercise of their portion of the Voting Rights in respect of the Exchangeable Shares held by each such Beneficiary.

**3.3 Safe Keeping of Certificate**

The certificate representing the RTO Acquiror Special Voting Share shall at all times be held in safe keeping by the Trustee or its duly authorized agent.

## ARTICLE 4
## EXERCISE OF VOTING RIGHTS

**4.1 Voting Rights**

The Trustee, as the holder of record of the RTO Acquiror Special Voting Share, shall be entitled to exercise all of the Voting Rights, including the right to consent to or vote in person or by proxy attaching to the RTO Acquiror Special Voting Share on any matters, questions, proposals or propositions whatsoever that may properly come before the shareholders of RTO Acquiror at an RTO Acquiror Meeting. The Voting Rights shall be and remain vested in and exercised by the Trustee on behalf of the Beneficiaries subject to the terms of this agreement. Subject to Section 6.15:

(a) the Trustee shall exercise the Voting Rights only on the basis of instructions received pursuant to this Article 4 from Beneficiaries on the record date established by RTO Acquiror or by applicable law for such RTO Acquiror Meeting or RTO Acquiror Consent who are entitled to instruct the Trustee as to the voting thereof;

(b) to the extent that no instructions are received from a Beneficiary with respect to the Voting Rights to which such Beneficiary is entitled, the Trustee shall not exercise or permit the exercise of such Voting Rights; and

(c) without prejudice to paragraph (b) above, under no circumstances shall the Trustee exercise or permit the exercise of a number of Voting Rights which is greater than the number of Exchangeable Shares outstanding and not owned by RTO Acquiror and its affiliates at the relevant time.

**4.2 Number of Votes**

(1) With respect to all meetings of shareholders of RTO Acquiror at which holders of RTO Acquiror Shares are entitled to vote (each, an "**RTO Acquiror Meeting**") and with respect to all written consents sought from holders of the RTO Acquiror Shares (each, an "**RTO Acquiror Consent**"), each Beneficiary shall be entitled to instruct the Trustee to cast and exercise that number of votes equal to a pro rata number of Voting Rights determined by reference to the total number of outstanding Exchangeable Shares not owned by RTO Acquiror and its affiliates on the record date established by RTO Acquiror or by applicable law for such RTO Acquiror Meeting or RTO Acquiror Consent, for each Exchangeable Share owned of record by a Beneficiary on the record date established by RTO Acquiror or by applicable law for such RTO Acquiror Meeting or RTO Acquiror Consent, as the case may be (collectively, the "**Beneficiary Votes**"), in respect of each matter, question, proposal or proposition to be voted on at such RTO Acquiror Meeting or consented to in connection with such RTO Acquiror Consent.

(2) The aggregate Voting Rights on a poll at an RTO Acquiror Meeting shall consist of a number of votes equal to one vote per outstanding Exchangeable Share from time to time not owned by RTO Acquiror and its affiliates on the record date established by RTO Acquiror or by applicable law for such RTO Acquiror Meeting or RTO Acquiror Consent, and for which the Trustee has received voting instructions from the Beneficiaries in accordance with this Agreement. Pursuant to the terms of the Special Voting Share, the Trustee or its proxy is entitled on a vote on a show of hands to one vote in addition to any votes which may be cast by a Beneficiary (or its nominee) on a show of hands as proxy for the Trustee. Any Beneficiary who chooses to attend an RTO Acquiror Meeting in person, and who is entitled to vote in accordance with Section 4.8(2), shall be entitled to one vote on a show of hands.

**4.3 Mailings to Shareholders**

(1) With respect to each RTO Acquiror Meeting or RTO Acquiror Consent, the Trustee shall use its reasonable efforts to promptly mail or cause to be mailed (or otherwise communicate in the same manner as RTO Acquiror utilizes in communications to holders of RTO Acquiror Shares subject to applicable regulatory requirements and provided that such manner of communications is reasonably available to the Trustee) to each of the Beneficiaries named in the List to the extent practicable on the same day as the mailing or notice (or other communication) with respect thereto is commenced by RTO Acquiror to its shareholders:

(a) a copy of such notice, together with any related materials, including any circular or information statement or listing particulars, to be provided to shareholders of RTO Acquiror;

(b) a statement that such Beneficiary is entitled to instruct the Trustee as to the exercise of the Beneficiary Votes with respect to such RTO Acquiror Meeting or RTO Acquiror Consent or, pursuant to Section 4.7, to attend such RTO Acquiror Meeting and to exercise personally the Beneficiary Votes thereat;

(c) a statement as to the manner in which such instructions may be given to the Trustee, including an express indication that instructions may be given to the Trustee to give:

(i) a proxy to such Beneficiary or his, her or its designee to exercise personally the Beneficiary Votes; or

(ii) a proxy to a designated agent or other representative of RTO Acquiror to exercise such Beneficiary Votes;

(d) a statement that if no such instructions are received from the Beneficiary, the Beneficiary Votes to which such Beneficiary is entitled will not be exercised;

(e) a form of direction whereby the Beneficiary may so direct and instruct the Trustee as contemplated herein; and

(f) a statement of the time and date by which such instructions must be received by the Trustee in order to be binding upon it, which in the case of an RTO Acquiror Meeting shall not be earlier than the close of business on the fourth business day prior to such meeting, and of the method for revoking or amending such instructions.

(2) The materials referred to in this Section 4.3 shall be provided to the Trustee by RTO Acquiror, and the materials referred to in Section 4.3(1)(c), Section 4.3(1)(e) and Section 4.3(1)(f) shall (if reasonably practicable to do so) be subject to reasonable comment by the Trustee in a timely manner. Subject to the foregoing, RTO Acquiror shall ensure that the materials to be provided to the Trustee are provided in sufficient time to permit the Trustee to comment as aforesaid and to send all materials to each Beneficiary at the same time as such materials are first sent to holders of RTO Acquiror Shares. RTO Acquiror agrees not to communicate with holders of RTO Acquiror Shares with respect to the materials referred to in this Section 4.3 otherwise than by mail unless such method of communication is also reasonably available to the Trustee for communication with the Beneficiaries. Notwithstanding the foregoing, RTO Acquiror may at its option exercise the duties of the Trustee to deliver copies of all materials to all Beneficiaries as required by this Section 4.3 so long as in each case RTO Acquiror delivers a certificate to the Trustee stating that RTO Acquiror has undertaken to perform the obligations set forth in this Section 4.3.

(3) For the purpose of determining the number of Beneficiary Votes to which a Beneficiary is entitled in respect of any RTO Acquiror Meeting or RTO Consent, the number of Exchangeable Shares owned of record by the Beneficiary shall be determined at the close of business on the record date established by RTO Acquiror or by applicable law for purposes of determining shareholders entitled to vote at such RTO Acquiror Meeting or in respect of such RTO Acquiror Consent. RTO Acquiror shall notify the Trustee of any decision of the board of directors of RTO Acquiror with respect to the calling of any RTO Acquiror Meeting and shall provide all necessary information and materials to the Trustee in each case promptly and in any event in sufficient time to enable the Trustee to perform its obligations contemplated by this Section 4.3.

**4.4 Copies of Shareholder Information**

RTO Acquiror shall deliver to the Trustee copies of all proxy materials (including notices of RTO Acquiror Meetings but excluding proxies to vote RTO Acquiror Shares), information statements, reports (including all interim and annual financial statements) and other written communications that, in each case, are to be distributed by RTO Acquiror from time to time to holders of RTO Acquiror Shares in sufficient quantities and in sufficient time so as to enable the Trustee to send or cause to send those materials to each Beneficiary at the same time as such materials are first sent to holders of RTO Acquiror Shares. The Trustee shall mail or otherwise send to each Beneficiary, at the expense of RTO Acquiror, copies of all such materials (and all materials specifically directed to the Beneficiaries or to the Trustee for the benefit of the Beneficiaries by RTO Acquiror) received by the Trustee from RTO Acquiror contemporaneously with the sending of such materials to holders of RTO Acquiror Shares. The Trustee shall also make available for inspection during regular business hours by any Beneficiary at the Trustee's principal office in <@> all proxy materials, information statements, reports and other written communications that are (a) received by the Trustee as the registered holder of the Special Voting Share, and (b) made available by the RTO Acquiror generally to the holders of its shares or specifically directed to the Beneficiaries or to the Trustee for the benefit of the Beneficiaries by the RTO Acquiror.

Notwithstanding the foregoing, RTO Acquiror at its option may exercise the duties of the Trustee to deliver copies of all such materials to each Beneficiary as required by this Section 4.4 so long as in each case RTO Acquiror delivers a certificate to the Trustee stating that RTO Acquiror has undertaken to perform the obligations set forth in this Section 4.4.

**4.5 Other Materials**

As soon as reasonably practicable after receipt by RTO Acquiror or shareholders of RTO Acquiror (if such receipt is known by RTO Acquiror) of any material sent or given by or on behalf of a third party to holders of RTO Acquiror Shares generally, including dissident proxy and information circulars (and related information and material) and tender offer, take-over bid and securities exchange take-over bid circulars (and related information and material), provided such material has not been sent to the Beneficiaries by or on behalf of such third party, RTO Acquiror shall use its reasonable efforts to obtain and deliver to the Trustee copies thereof in sufficient quantities so as to enable the Trustee to forward such material (unless the same has been provided directly to Beneficiaries by such third party) to each Beneficiary as soon as possible thereafter. As soon as reasonably practicable after receipt thereof, the Trustee shall mail or otherwise send to each Beneficiary, at the expense of RTO Acquiror, copies of all such materials received by the Trustee from RTO Acquiror. The Trustee shall also make available for inspection during regular business hours by any Beneficiary at the Trustee's principal office in <@> copies of all such materials. Notwithstanding the foregoing, RTO Acquiror at its option may exercise the duties of the Trustee to deliver copies of all such materials to each Beneficiary as required by this Section 4.5 so long as in each case RTO Acquiror delivers a certificate to the Trustee stating that RTO Acquiror has undertaken to perform the obligations set forth in this Section 4.5.

**4.6 List of Persons Entitled to Vote**

Canco shall, (a) prior to each annual, general, special, extraordinary or other RTO Acquiror Meeting or the seeking of any RTO Acquiror Consent and (b) forthwith upon each request made at any time by the Trustee in writing, prepare or cause to be prepared a list (a "**List**") of the names and addresses of the Beneficiaries arranged in alphabetical order and showing the number of Exchangeable Shares held of record by each such Beneficiary, in each case at the close of business on the date specified by the Trustee in such request or, in the case of a List prepared in connection with an RTO Acquiror Meeting, or RTO Acquiror Consent at the close of business on the record date established by RTO Acquiror or pursuant to applicable law for determining the holders of RTO Acquiror Shares entitled to receive notice of and/or to vote at such RTO Acquiror Meeting or to give consent. Each such List shall be delivered to the Trustee promptly after receipt by Canco of such request or the record date for such meeting or seeking of consent, as applicable, and in any event within sufficient time as to permit the Trustee to perform its obligations under this agreement. RTO Acquiror agrees to give Canco notice (with a copy to the Trustee) of the calling of any RTO Acquiror Meeting, together with the record date therefor, sufficiently prior to the date of the calling of such meeting so as to enable Canco to perform its obligations under this Section 4.6.

**4.7 Entitlement to Direct Votes**

Subject to Section 4.8 and Section 4.11, any Beneficiary named in a List prepared in connection with any RTO Acquiror Meeting or RTO Acquiror Consent shall be entitled (a) to instruct the Trustee in the manner described in Section 4.2 with respect to the exercise of the Beneficiary Votes to which such Beneficiary is entitled, (b) to attend such meeting and personally exercise thereat, as the proxy of the Trustee, the Beneficiary Votes to which such Beneficiary is entitled, or (c) appoint a third party as the proxy of the Trustee to attend such meeting and exercise thereat the Beneficiary Votes to which such Beneficiary is entitled except, in each case, to the extent that such Beneficiary has transferred the ownership of any Exchangeable Shares in respect of which such Beneficiary is entitled to Beneficiary Votes after the close of business on the record date for such meeting or seeking of consent.

**4.8 Voting by Trustee and Attendance of Trustee Representative at Meeting**

(1) In connection with each RTO Acquiror Meeting or RTO Acquiror Consent, the Trustee shall exercise, either in person or by proxy, in accordance with the instructions received from a Beneficiary pursuant to Section 4.3, the Beneficiary Votes as to which such Beneficiary is entitled to direct the vote (or any lesser number thereof as may be set forth in the instructions) other than any Beneficiary Votes that are the subject of Section 4.8(2); provided, however, that such written instructions are received by the Trustee from the Beneficiary prior to the time and date fixed by the Trustee for receipt of such instruction in the notice given by the Trustee to the Beneficiary pursuant to Section 4.3.

(2) To the extent so instructed in accordance with the terms of this Agreement, the Trustee shall cause a representative who is empowered by it to sign and deliver, on behalf of the Trustee, proxies for Voting Rights enabling a Beneficiary to attend each RTO Acquiror Meeting. Upon submission by a Beneficiary (or its designee) named in the List prepared in connection with the relevant meeting of identification satisfactory to the Trustee's representative, and at the Beneficiary's request, such representative shall sign and deliver to such Beneficiary (or its designee) a proxy to exercise personally the Beneficiary Votes as to which such Beneficiary is otherwise entitled hereunder to direct the vote, if such Beneficiary either (i) has not previously given the Trustee instructions pursuant to Section 4.3 in respect of such meeting or (ii) submits to such representative written revocation of any such previous instructions. At such meeting, the Beneficiary (or its designee) exercising such Beneficiary Votes in accordance with such proxy shall have the same rights in respect of such Beneficiary Votes as the Trustee to speak at the meeting in favour of any matter, question, proposal or proposition, to vote by way of ballot at the meeting in respect of any matter, question, proposal or proposition, and to vote at such meeting by way of a show of hands in respect of any matter, question or proposition.

**4.9 Distribution of Written Materials**

Any written materials distributed by the Trustee pursuant to this Agreement shall be sent by mail (or otherwise communicated in the same manner as RTO Acquiror utilizes in communications to holders of RTO Acquiror Shares subject to applicable regulatory requirements and provided such manner of communications is reasonably available to the Trustee) to each Beneficiary at its address as shown on the books of Canco. RTO Acquiror agrees not to communicate with holders of RTO Acquiror Shares with respect to such written materials otherwise than by mail unless such method of communication is also reasonably available to the Trustee for communication with the Beneficiaries. Canco shall provide or cause to be provided to the Trustee for purposes of communication, on a timely basis and without charge or other expense:

(a) a current List; and

(b) upon the request of the Trustee, mailing labels to enable the Trustee to carry out its duties under this agreement.

Canco's obligations under this Section 4.9 shall be deemed satisfied to the extent RTO Acquiror exercises its option to perform the duties of the Trustee to deliver copies of materials to each Beneficiary and Canco provides the required information and materials to RTO Acquiror.

**4.10 Termination of Voting Rights**

All of the rights of a Beneficiary with respect to the Beneficiary Votes exercisable in respect of the Exchangeable Shares held by such Beneficiary, including the right to instruct the Trustee as to the voting of or to vote personally such Beneficiary Votes, shall be deemed to be surrendered by the Beneficiary to RTO Acquiror or Callco, as the case may be, and such Beneficiary Votes and the Voting Rights represented thereby shall cease immediately upon (i) the delivery by such holder to the Trustee of the certificates representing such Exchangeable Shares in connection with the occurrence of the automatic exchange of Exchangeable Shares for RTO Acquiror Shares, as specified in Article 5 (unless RTO Acquiror shall not have delivered the requisite RTO Acquiror Shares issuable in exchange therefor to the Trustee pending delivery to the Beneficiaries), or (ii) the retraction or redemption of Exchangeable Shares pursuant to Section 6 or 7 of the Share Provisions, or (iii) the effective date of the liquidation, dissolution or winding-up of Canco pursuant to Section 5 of the Share Provisions, or (iv) the purchase of Exchangeable Shares from the holder thereof by RTO Acquiror or Callco pursuant to the exercise by RTO Acquiror or Callco of the Retraction Call Right, the Redemption Call Right or the Liquidation Call Right, or upon the purchase of Exchangeable Shares form the holders thereof by RTO Acquiror or Callco pursuant to the exercise by RTO Acquiror or Callco of the Change of Law Call Right (as defined in the Plan of Arrangement) (unless, in any case, RTO Acquiror or Callco, as the case may be, shall not have delivered the requisite consideration in exchange therefor).

**4.11 Disclosure of Interest in Exchangeable Shares**

The Trustee and/or Canco shall be entitled to require any Beneficiary or any person who the Trustee and/or Canco know or have reasonable cause to believe to hold any interest whatsoever in an Exchangeable Share to confirm that fact or to give such details as to whom has an interest in such Exchangeable Share as would be required (if the Exchangeable Shares were a class of "voting or equity securities" of Canco) under Section 5.2 of National Instrument 62-104 *Take Over Bids and Issuer Bids*, as amended from time to time, or as would be required under the articles of RTO Acquiror or any laws or regulations, or pursuant to the rules or regulations of any Agency, if the Exchangeable Shares were RTO Acquiror Shares. If a Beneficiary does not provide the information required to be provided by such Beneficiary pursuant to this Section 4.11, the board of directors of RTO Acquiror may take any action permitted under the articles of RTO Acquiror or any laws or regulations, or pursuant to the rules or regulations of any Agency, with respect to the Voting Rights relating to the Exchangeable Shares held by such Beneficiary.

## ARTICLE 5
## EXCHANGE AND AUTOMATIC EXCHANGE

### 5.1 Grant of Exchange Right and Automatic Exchange Right

(1) RTO Acquiror hereby grants to Trustee as trustee for and on behalf of, and for the use and benefit of, the Beneficiaries the right (the "**Exchange Right**"), upon the occurrence and during the continuance of an Insolvency Event, to require RTO Acquiror to purchase from each or any Beneficiary all or any part of the Exchangeable Shares held by such Beneficiary and the Automatic Exchange Right, all in accordance with the provisions of this agreement. RTO Acquiror hereby acknowledges receipt from the Trustee as trustee for and on behalf of the Beneficiaries of good and valuable consideration (and the adequacy thereof) for the grant of the Exchange Right and the Automatic Exchange Right by RTO Acquiror to the Trustee.

(2) During the term of the Trust and subject to the terms and conditions of this agreement, the Trustee shall possess and be vested with full legal ownership of the Automatic Exchange Right and the Exchange Right and shall be entitled to exercise all of the rights and powers of an owner with respect to the Automatic Exchange Right and the Exchange Right, provided that the Trustee shall:

(a) hold the Automatic Exchange Right and the Exchange Right and the legal title thereto as trustee solely for the use and benefit of the Beneficiaries in accordance with the provisions of this agreement; and

(b) except as specifically authorized by this agreement, have no power or authority to exercise or otherwise deal in or with the Automatic Exchange Right or the Exchange Right, and the Trustee shall not exercise any such rights for any purpose other than the purposes for which the Trust is created pursuant to this agreement.

(3) The obligations of RTO Acquiror to issue RTO Acquiror Shares pursuant to the Automatic Exchange Right or the Exchange Right are subject to all applicable laws and regulatory or stock exchange requirements.

### 5.2 Legended Share Certificates

Canco shall cause each certificate representing Exchangeable Shares to bear an appropriate legend notifying the Beneficiaries of:

(a) their right to instruct the Trustee with respect to the exercise of the Exchange Right in respect of the Exchangeable Shares held by a Beneficiary; and

(b) the Automatic Exchange Right.

### 5.3 General Exercise of Exchange Right

The Exchange Right shall be and remain vested in and exercisable by Trustee. Subject to Section 6.15, the Trustee shall exercise the Exchange Right only on the basis of instructions received pursuant to this Article 5 from Beneficiaries entitled to instruct the Trustee as to the exercise thereof. To the extent that no instructions are received from a Beneficiary with respect to the Exchange Right, the Trustee shall not exercise or permit the exercise of the Exchange Right.

**5.4 Purchase Price**

The purchase price payable by RTO Acquiror for each Exchangeable Share to be purchased by RTO Acquiror under the Exchange Right shall be an amount per share equal to (i) the Current Market Price of an RTO Acquiror Share on the day before the exchange, which shall be satisfied in full by RTO Acquiror issuing to the Beneficiary one RTO Acquiror Share, plus (ii) an additional amount equal to the full amount of all declared and unpaid dividends on each such Exchangeable Share held by such holder on any dividend record date which occurred prior to the date of the exchange (collectively the "**Exchangeable Share Consideration**"). In connection with each exercise of the Exchange Right, RTO Acquiror shall provide to the Trustee an Officer's Certificate setting forth the calculation of the purchase price for each Exchangeable Share.

**5.5 Exercise Instructions**

Subject to the terms and conditions set forth herein, a Beneficiary shall be entitled upon the occurrence and during the continuance of an Insolvency Event, to instruct the Trustee to exercise the Exchange Right with respect to all or any part of the Exchangeable Shares registered in the name of such Beneficiary on the books of Canco. To cause the exercise of the Exchange Right by the Trustee, the Beneficiary shall deliver to the Trustee, in person or by certified or registered mail, at its principal office in <@> or at such other place as the Trustee may from time to time designate by written notice to the Beneficiaries, the certificates representing the Exchangeable Shares which such Beneficiary desires RTO Acquiror to purchase, duly endorsed in blank for transfer, and accompanied by such other documents and instruments as the Trustee, RTO Acquiror and Canco may reasonably require together with (a) a duly completed form of notice of exercise of the Exchange Right, contained on the reverse of or attached to the Exchangeable Share certificates, stating (i) that the Beneficiary thereby instructs the Trustee to exercise the Exchange Right so as to require RTO Acquiror to purchase from the Beneficiary the number of Exchangeable Shares specified therein, (ii) that such Beneficiary has good title to and owns all such Exchangeable Shares to be acquired by RTO Acquiror free and clear of all liens, claims, security interests and encumbrances, (iii) the names in which the certificates representing RTO Acquiror Shares issuable in connection with the exercise of the Exchange Right are to be issued, and (iv) the names and addresses of the persons to whom such new certificates should be delivered, and (b) payment (or evidence satisfactory to the Trustee, RTO Acquiror and Canco of payment) of the taxes payable, if any, as contemplated by Section 5.7 of this agreement. If only a part of the Exchangeable Shares represented by any certificate or certificates delivered to the Trustee are to be purchased by RTO Acquiror under the Exchange Right, a new certificate for the balance of such Exchangeable Shares shall be issued to the holder at the expense of Canco.

**5.6 Delivery of RTO Acquiror Shares; Effect of Exercise**

Promptly after the receipt by the Trustee of the certificates representing the Exchangeable Shares which the Beneficiary desires RTO Acquiror to purchase under the Exchange Right, together with such documents and instruments of transfer and a duly completed form of notice of exercise of the Exchange Right (and payment of taxes payable, if any, as contemplated by Section 5.7 or evidence thereof), duly endorsed for transfer to RTO Acquiror, the Trustee shall notify RTO Acquiror and Canco of its receipt of the same, which notice to RTO Acquiror and Canco shall constitute exercise of the Exchange Right by the Trustee on behalf of the Beneficiary in respect of such Exchangeable Shares, and RTO Acquiror shall promptly thereafter deliver or cause to be delivered to the Trustee, for delivery to the Beneficiary in respect of such Exchangeable Shares (or to such other persons, if any, properly designated by such Beneficiary) the Exchangeable Share Consideration deliverable in connection with the exercise of the Exchange Right; provided, however, that no such delivery shall be made unless and until the Beneficiary requesting the same shall have paid (or provided evidence satisfactory to the Trustee, Canco and RTO Acquiror of the payment of) the taxes payable, if any, as contemplated by Section 5.7 of this agreement. Immediately upon the giving of notice by the Trustee to RTO Acquiror and Canco of the exercise of the Exchange Right, as provided in this Section 5.6, and with no further action required by the parties, the closing of the transaction of purchase and sale contemplated by the Exchange Right shall be deemed to have occurred, and the Beneficiary of such Exchangeable Shares shall be deemed to have transferred to RTO Acquiror all of such Beneficiary's right, title and interest in and to such Exchangeable Shares and in the related interest in the Trust Estate and shall cease to be a holder of such Exchangeable Shares and shall not be entitled to exercise any of the rights of a holder in respect thereof, other than the right to receive his proportionate part of the total Exchangeable Share Consideration therefor, unless such Exchangeable Share Consideration is not delivered by RTO Acquiror to the Trustee for delivery to such Beneficiary (or to such other person, if any, properly designated by such Beneficiary) within three business days of the date of the giving of such notice by the Trustee, in which case the rights of the Beneficiary shall remain unaffected until such Exchangeable Share Consideration is delivered by RTO Acquiror. Upon delivery of such Exchangeable Share Consideration to the Trustee, the Trustee shall promptly deliver such Exchangeable Share Consideration to such Beneficiary (or to such other person, if any, properly designated by such Beneficiary). Concurrently with such Beneficiary ceasing to be a holder of Exchangeable Shares, the Beneficiary shall be considered and deemed for all purposes to be the holder of the RTO Acquiror Shares delivered to it pursuant to the Exchange Right.

**5.7 Stamp, Transfer or Other Taxes**

Upon any sale or transfer of Exchangeable Shares to RTO Acquiror pursuant to the Exchange Right or the Automatic Exchange Right, the share certificate or certificates representing RTO Acquiror Shares to be delivered in connection with the payment of the purchase price therefor shall be issued in the name of the Beneficiary in respect of the Exchangeable Shares so sold or transferred or in such names as such Beneficiary may otherwise direct in writing without charge to the holder of the Exchangeable Shares so sold or transferred; provided, however, that such Beneficiary (a) shall pay (and none of RTO Acquiror, Canco or the Trustee shall be required to pay) any documentary, stamp, transfer of other taxes or duties that may be payable in respect of any transfer involved in the issuance or delivery of such shares to a person other than such Beneficiary or (b) shall have evidenced to the satisfaction of RTO Acquiror that such taxes or duties, if any, have been paid.

**5.8 Notice of Insolvency Event**

As soon as practicable following the occurrence of an Insolvency Event or any event that with the giving of notice or the passage of time or both would be an Insolvency Event, Canco and RTO Acquiror shall give written notice thereof to the Trustee. As soon as practicable following the receipt of notice from Canco and RTO Acquiror of the occurrence of an Insolvency Event, or upon the Trustee becoming aware of an Insolvency Event, the Trustee shall mail to each Beneficiary, at the expense of RTO Acquiror (such funds to be received in advance), a notice of such Insolvency Event in the form provided by RTO Acquiror, which notice shall contain a brief statement of the rights of the Beneficiaries with respect to the Exchange Right.

**5.9 Failure to Retract**

Upon the occurrence of an event referred to in paragraph (iv) of the definition of Insolvency Event, Canco hereby agrees with the Trustee and in favour of the Beneficiary promptly to forward or cause to be forwarded to the Trustee all relevant materials delivered by the Beneficiary to Canco or to the transfer agent of the Exchangeable Shares (including a copy of the retraction request delivered pursuant to Section 6(1) of the Share Provisions) in connection with such proposed redemption of the Retracted Shares.

**5.10 Listing of RTO Acquiror Shares**

RTO Acquiror covenants that if any RTO Acquiror Shares to be issued and delivered pursuant to the Automatic Exchange Right or the Exchange Right require registration or qualification with or approval of or the filing of any document, including any prospectus or similar document, or the taking of any proceeding with or the obtaining of any order, ruling or consent from any Agency under any United States or Canadian federal, provincial or territorial law or regulation or pursuant to the rules and regulations of any Agency including any stock exchange upon which a security of the RTO Acquiror is listed or the fulfillment of any other United States or Canadian legal requirement before such shares may be issued and delivered by RTO Acquiror to the initial holder thereof or in order that such shares may be freely traded (other than any restrictions of general application on transfer by reason of a holder being a "control person" or the equivalent of RTO Acquiror for purposes of Canadian securities Law or any United States equivalent), RTO Acquiror shall use its commercially reasonable efforts (which, for greater certainty, shall not require RTO Acquiror to consent to a term or condition of an approval or consent which RTO Acquiror reasonably determines could have a materially adverse effect on RTO Acquiror or its subsidiaries) to cause such RTO Acquiror Shares (or such other shares or securities) to be and remain duly registered, qualified or approved. RTO Acquiror shall use its commercially reasonable efforts (which, for greater certainty, shall not require RTO Acquiror to consent to a term or condition of an approval or consent which RTO Acquiror reasonably determines could have a materially adverse effect on RTO Acquiror or its subsidiaries) to cause all RTO Acquiror Shares (or such other shares or securities) to be delivered pursuant to the Automatic Exchange Right or the Exchange Right to be listed, quoted or posted for trading on all stock exchanges and quotation systems on which outstanding RTO Acquiror Shares have been listed by RTO Acquiror and remain listed and are quoted or posted for trading at such time.

**5.11 RTO Acquiror Shares**

RTO Acquiror hereby represents, warrants and covenants that the RTO Acquiror Shares issuable as described herein will be duly authorized and validly issued as fully paid and non assessable.

**5.12 Automatic Exchange on Liquidation of RTO Acquiror**

(1) RTO Acquiror shall give the Trustee written notice of each of the following events at the time set forth below:

(a) in the event of any determination by the board of directors of RTO Acquiror to institute voluntary liquidation, dissolution or winding-up proceedings with respect to RTO Acquiror or to effect any other distribution of assets of RTO Acquiror among its shareholders for the purpose of winding up its affairs, at least 60 days prior to the proposed effective date of such liquidation, dissolution, winding-up or other distribution; and

(b) as soon as practicable following the earlier of (A) receipt by RTO Acquiror of notice of, and (B) RTO Acquiror otherwise becoming aware of any instituted claim, suit, petition or other proceedings with respect to the involuntary liquidation, dissolution or winding-up of RTO Acquiror or to effect any other distribution of assets of RTO Acquiror among its shareholders for the purpose of winding up its affairs, in each case where RTO Acquiror has failed to contest in good faith any such proceeding commenced in respect of RTO Acquiror within 30 days of becoming aware thereof.

(2) As soon as practicable following receipt by the Trustee from RTO Acquiror of notice of any event (a "**Liquidation Event**") contemplated by Section 5.12(1)(a) or Section 5.12(1)(b), the Trustee shall give notice thereof to the Beneficiaries. Such notice shall be provided to the Trustee by RTO Acquiror and shall include a brief description of the automatic exchange of Exchangeable Shares for RTO Acquiror Shares provided for in Section **Error! Reference source not found.**.

---

(3) In order that the Beneficiaries will be able to participate on a pro rata basis with the holders of RTO Acquiror Shares in the distribution of assets of RTO Acquiror in connection with a Liquidation Event, immediately prior to the effective date (the "**Liquidation Event Effective Date**") of a Liquidation Event, each of the then outstanding Exchangeable Shares (other than Exchangeable Shares held by RTO Acquiror and its affiliates) shall be automatically exchanged for one RTO Acquiror Share. To effect such automatic exchange, RTO Acquiror shall purchase each Exchangeable Share outstanding immediately prior to the Liquidation Event Effective Date and held by Beneficiaries, and each Beneficiary shall sell the Exchangeable Shares held by it at such time, free and clear of any lien, claim or encumbrance, for a purchase price per share equal to (i) the Current Market Price of an RTO Acquiror Share on the day prior to the Liquidation Event Effective Date, which shall be satisfied in full by RTO Acquiror issuing to the Beneficiary one RTO Acquiror Share for each Exchangeable Share, plus (ii) an additional amount equal to the full amount of all declared and unpaid dividends on each such Exchangeable Share held by such holder on any dividend record date which occurred prior to the date of the exchange. RTO Acquiror shall provide the Trustee with an Officer's Certificate in connection with each automatic exchange setting forth the calculation of the purchase price for each Exchangeable Share. Upon payment by RTO Acquiror of such purchase price, the relevant Beneficiary shall cease to have any right to be paid by Canco any amount in respect of declared and unpaid dividends on each Exchangeable Share.

(4) The closing of the transaction of purchase and sale contemplated by the automatic exchange of Exchangeable Shares for RTO Acquiror Shares shall be deemed to have occurred immediately prior to the Liquidation Event Effective Date, and each Beneficiary shall be deemed to have transferred to RTO Acquiror all of the Beneficiary's right, title and interest in and to such Beneficiary's Exchangeable Shares free and clear of any lien, claim or encumbrance and the related interest in the Trust Estate and each such Beneficiary shall cease to be a holder of such Exchangeable Shares and RTO Acquiror shall issue to the Beneficiary the RTO Acquiror Shares issuable upon the automatic exchange of Exchangeable Shares for RTO Acquiror Shares and on the applicable payment date shall deliver to the Trustee for delivery to the Beneficiary a cheque for the balance, if any, of the purchase price for such Exchangeable Shares, without interest, in each case less any amounts withheld pursuant to Section 5.13. Concurrently with such Beneficiary ceasing to be a holder of Exchangeable Shares, the Beneficiary shall become the holder of the RTO Acquiror Shares issued pursuant to the automatic exchange of such Beneficiary's Exchangeable Shares for RTO Acquiror Shares and the certificates held by the Beneficiary previously representing the Exchangeable Shares exchanged by the Beneficiary with RTO Acquiror pursuant to such automatic exchange shall thereafter be deemed to represent RTO Acquiror Shares issued to the Beneficiary by RTO Acquiror pursuant to such automatic exchange. Upon the request of a Beneficiary and the surrender by the Beneficiary of Exchangeable Share certificates deemed to represent RTO Acquiror Shares, duly endorsed in blank and accompanied by such instruments of transfer as RTO Acquiror may reasonably require, RTO Acquiror shall deliver or cause to be delivered to the Beneficiary certificates representing the RTO Acquiror Shares of which the Beneficiary is the holder.

---

**5.13 Withholding Rights**

Notwithstanding any other provision of this agreement, RTO Acquiror, Canco and the Trustee shall be entitled to deduct and withhold from any dividend, distribution, consideration, purchase price or other amounts otherwise payable under this agreement to any holder of Exchangeable Shares or RTO Acquiror Shares such amounts as RTO Acquiror, Canco or the Trustee is required to deduct and withhold with respect to such payment under the *Income Tax Act* (Canada) or United States tax Laws or any provision of federal, provincial, state, local or foreign tax Law, in each case as amended or succeeded. The Trustee may act and rely on the advice of counsel with respect to such matters. To the extent that amounts are so deducted and withheld, such withheld amounts shall be treated for all purposes as having been paid to the holder of the shares in respect of which such deduction and withholding was made, provided that such withheld amounts are actually remitted to the appropriate taxing Agency. To the extent that the amount so required to be deducted or withheld from any payment to a holder exceeds the cash portion of the consideration otherwise payable to the holder, RTO Acquiror, Canco and the Trustee are hereby authorized to sell or otherwise dispose of such portion of the consideration as is necessary to provide sufficient funds to RTO Acquiror, Canco or the Trustee, as the case may be, to enable it to comply with such deduction or withholding requirement and RTO Acquiror, Canco or the Trustee shall notify the holder thereof and remit to such holder any unapplied balance of the net proceeds of such sale.

**5.14 No Fractional Shares**

A holder of an Exchangeable Share shall not be entitled to any fraction of an RTO Acquiror Share upon the exercise of the Exchange Right or Automatic Exchange Right hereunder and no certificates or other evidence of ownership representing any such fractional interest shall be issued but rather the number of RTO Acquiror Shares issuable shall be rounded down to the nearest whole number without payment in respect of such fractional share.

## ARTICLE 6
## CONCERNING THE TRUSTEE

**6.1 Powers and Duties of the Trustee**

(1) The rights, powers, duties and authorities of the Trustee under this agreement, in its capacity as Trustee of the Trust, shall include:

(a) receipt and deposit of the RTO Acquiror Special Voting Share from RTO Acquiror as trustee for and on behalf of the Beneficiaries in accordance with the provisions of this agreement;

(b) granting proxies and distributing materials to Beneficiaries as provided in this agreement;

(c) voting the Beneficiary Votes in accordance with the provisions of this agreement;

(d) receiving the grant of the Automatic Exchange Right and the Exchange Right from RTO Acquiror as trustee for and on behalf of the Beneficiaries in accordance with the provisions of this agreement;

(e) enforcing the benefit of the Automatic Exchange Right and the Exchange Right, in each case in accordance with the provisions of this agreement, and in connection therewith receiving from Beneficiaries Exchangeable Shares and other requisite documents and distributing to such Beneficiaries RTO Acquiror Shares and cheques, if any, to which such Beneficiaries are entitled pursuant to the Automatic Exchange Right or the Exchange Right, as the case may be;

(f) holding title to the Trust Estate;

(g) investing any moneys forming, from time to time, a part of the Trust Estate as provided in this agreement;

(h) taking action at the direction of a Beneficiary or Beneficiaries to enforce the obligations of RTO Acquiror and Canco under this agreement; and

(i) taking such other actions and doing such other things as are specifically provided in this agreement to be carried out by the Trustee whether alone, jointly or in the alternative.

(2) In the exercise of such rights, powers, duties and authorities the Trustee shall have (and is granted) such incidental and additional rights, powers, duties and authority not in conflict with any of the provisions of this agreement as the Trustee, acting in good faith and in the reasonable exercise of its discretion, may deem necessary, appropriate or desirable to effect the purpose of the Trust. Any exercise of such discretionary rights, powers, duties and authorities by the Trustee shall be final, conclusive and binding upon all persons.

(3) The Trustee in exercising its rights, powers, duties and authorities hereunder shall act honestly and in good faith and with a view to the best interests of the Beneficiaries and shall exercise the care, diligence and skill that a reasonably prudent trustee would exercise in comparable circumstances.

(4) The Trustee shall not be bound to give notice or do or take any act, action or proceeding by virtue of the powers conferred on it hereby unless and until it shall be specifically required to do so under the terms hereof; nor shall the Trustee be required to take any notice of, or to do, or to take any act, action or proceeding as a result of any default or breach of any provision hereunder, unless and until notified in writing of such default or breach, which notices shall distinctly specify the default or breach desired to be brought to the attention of the Trustee, and in the absence of such notice the Trustee may for all purposes of this agreement conclusively assume that no default or breach has been made in the observance or performance of any of the representations, warranties, covenants, agreements or conditions contained herein.

**6.2 No Conflict of Interest**

The Trustee represents to RTO Acquiror and Canco that at the date of execution and delivery of this agreement there exists no material conflict of interest in the role of the Trustee as a fiduciary hereunder and the role of the Trustee in any other capacity. The Trustee shall, within 30 days after it becomes aware that such material conflict of interest exists, either eliminate such material conflict of interest or resign in the manner and with the effect specified in Article 9. If, notwithstanding the foregoing provisions of this Section 6.2, the Trustee has such a material conflict of interest, the validity and enforceability of this agreement shall not be affected in any manner whatsoever by reason only of the existence of such material conflict of interest. If the Trustee contravenes the foregoing provisions of this Section 6.2, any interested party may apply to the Superior Court of Justice (Ontario) for an order that the Trustee be replaced as Trustee hereunder.

**6.3 Dealings with Transfer Agents, Registrars, etc.**

(1) Each of RTO Acquiror and Canco irrevocably authorizes the Trustee, from time to time, to:

(a) consult, communicate and otherwise deal with the respective registrars and transfer agents, and with any such subsequent registrar or transfer agent, of the Exchangeable Shares and RTO Acquiror Shares; and

(b) requisition, from time to time, (i) from any such registrar or transfer agent any information readily available from the records maintained by it which the Trustee may reasonably require for the discharge of its duties and responsibilities under this agreement and (ii) from the transfer agent of RTO Acquiror Shares, and any subsequent transfer agent of such shares, the share certificates issuable upon the exercise from time to time of the Automatic Exchange Right and pursuant to the Exchange Right.

(2) RTO Acquiror and Canco shall authorize their respective registrars and transfer agents to comply with all such requests. RTO Acquiror covenants that it shall supply its transfer agent with duly executed share certificates for the purpose of completing the exercise from time to time of the Automatic Exchange Right and the Exchange Right, in each case pursuant to Article 5.

**6.4 Books and Records**

The Trustee shall keep available for inspection by RTO Acquiror and Canco at the Trustee's principal office in <@> correct and complete books and records of account relating to the Trust created by this agreement, including all relevant data relating to mailings and instructions to and from Beneficiaries and all transactions pursuant to the Automatic Exchange Right and the Exchange Right. On or before December 31, 2021, and on or before December 31 in every year thereafter, so long as the RTO Acquiror Special Voting Share is registered in the name of the Trustee, the Trustee shall transmit to RTO Acquiror and Canco a brief report, dated as of the preceding December 31st, with respect to:

(a) the property and funds comprising the Trust Estate as of that date;

(b) the number of exercises of the Automatic Exchange Right, if any, and the aggregate number of Exchangeable Shares received by the Trustee on behalf of Beneficiaries in consideration of the issuance by RTO Acquiror of RTO Acquiror Shares in connection with the Automatic Exchange Right, during the calendar year ended on such December 31st; and

(c) any action taken by the Trustee in the performance of its duties under this agreement which it had not previously reported.

**6.5 Income Tax Returns and Reports**

The Trustee shall, to the extent necessary, prepare and file, or cause to be prepared and filed, on behalf of the Trust appropriate Canadian income tax returns and any other returns or reports as may be required by applicable law or pursuant to the rules and regulations of any other Agency, including any securities exchange or other trading system through which the Exchangeable Shares are traded. In connection therewith, the Trustee may obtain the advice and assistance of such experts or advisors as the Trustee considers necessary or advisable (who may be experts or advisors to RTO Acquiror or Canco). If requested by the Trustee, RTO Acquiror or Canco shall retain qualified experts or advisors for the purpose of providing such tax advice or assistance.

**6.6 Indemnification Prior to Certain Actions by Trustee**

(1) The Trustee shall exercise any or all of the rights, duties, powers or authorities vested in it by this agreement at the request, order or direction of any Beneficiary upon such Beneficiary furnishing to the Trustee reasonable funding, security or indemnity against the costs, expenses and liabilities which may be incurred by the Trustee therein or thereby, provided that no Beneficiary shall be obligated to furnish to the Trustee any such funding, security or indemnity in connection with the exercise by the Trustee of any of its rights, duties, powers and authorities with respect to the RTO Acquiror Special Voting Share pursuant to Article 4, subject to Section 6.15, and with respect to the Automatic Exchange Right and the Exchange Right pursuant to Article 5.

(2) None of the provisions contained in this agreement shall require the Trustee to expend or risk its own funds or otherwise incur financial expenses in the exercise of any of its rights, powers, duties, or authorities unless funded, given security and indemnified as aforesaid.

**6.7 Action of Beneficiaries**

No Beneficiary shall have the right to institute any action, suit or proceeding or to exercise any other remedy authorized by this agreement for the purpose of enforcing any of its rights or for the execution of any trust or power hereunder unless the Beneficiary has requested the Trustee to take or institute such action, suit or proceeding and furnished the Trustee with the funding, security or indemnity referred to in Section 6.6 and the Trustee shall have failed to act within a reasonable time thereafter. In such case, but not otherwise, the Beneficiary shall be entitled to take proceedings in any court of competent jurisdiction such as the Trustee might have taken; it being understood and intended that no one or more Beneficiaries shall have any right in any manner whatsoever to affect, disturb or prejudice the rights hereby created by any such action, or to enforce any right hereunder or the Voting Rights, the Automatic Exchange Right or the Exchange Right except subject to the conditions and in the manner herein provided, and that all powers and trusts hereunder shall be exercised and all proceedings at law shall be instituted, had and maintained by the Trustee, except only as herein provided, and in any event for the equal benefit of all Beneficiaries.

**6.8 Reliance Upon Declarations**

The Trustee shall not be considered to be in contravention of any of its rights, powers, duties and authorities hereunder if, when required, it acts and relies in good faith upon statutory declarations, certificates, opinions or reports furnished pursuant to the provisions hereof or required by the Trustee to be furnished to it in the exercise of its rights, powers, duties and authorities hereunder if such statutory declarations, certificates, opinions or reports comply with the provisions of Section 6.9, if applicable, and with any other applicable provisions of this agreement.

**6.9 Evidence and Authority to Trustee**

(1) RTO Acquiror and/or Canco shall furnish to the Trustee evidence of compliance with the conditions provided for in this agreement relating to any action or step required or permitted to be taken by RTO Acquiror and/or Canco or the Trustee under this agreement or as a result of any obligation imposed under this agreement, including in respect of the Voting Rights or the Automatic Exchange Right or the Exchange Right and the taking of any other action to be taken by the Trustee at the request of or on the application of RTO Acquiror and/or Canco promptly if and when:

(a) such evidence is required by any other section of this agreement to be furnished to the Trustee in accordance with the terms of this Section 6.9; or

(b) the Trustee, in the exercise of its rights, powers, duties and authorities under this agreement, gives RTO Acquiror and/or Canco written notice requiring it to furnish such evidence in relation to any particular action or obligation specified in such notice.

(2) Such evidence shall consist of an Officer's Certificate of RTO Acquiror and/or Canco or a statutory declaration or a certificate made by persons entitled to sign an Officer's Certificate stating that any such condition has been complied with in accordance with the terms of this agreement.

(3) Whenever such evidence relates to a matter other than the Voting Rights or the Automatic Exchange Right or the Exchange Right or the taking of any other action to be taken by the Trustee at the request or on the application of RTO Acquiror and/or Canco, and except as otherwise specifically provided herein, such evidence may consist of a report or opinion of any solicitor, attorney, auditor, accountant, appraiser, valuer or other expert or any other person whose qualifications give authority to a statement made by him, provided that if such report or opinion is furnished by a director, officer or employee of RTO Acquiror and/or Canco it shall be in the form of an Officer's Certificate or a statutory declaration.

(4) Each statutory declaration, Officer's Certificate, opinion or report furnished to the Trustee as evidence of compliance with a condition provided for in this agreement shall include a statement by the person giving the evidence:

(a) declaring that he has read and understands the provisions of this agreement relating to the condition in question;

(b) describing the nature and scope of the examination or investigation upon which he based the statutory declaration, certificate, statement or opinion; and

(c) declaring that he has made such examination or investigation as he believes is necessary to enable him to make the statements or give the opinions contained or expressed therein.

**6.10 Experts, Advisers and Agents**

The Trustee may:

(a) in relation to these presents act and rely on the opinion or advice of or information obtained from any solicitor, attorney, auditor, accountant, appraiser, valuer or other expert, whether retained by the Trustee or by RTO Acquiror and/ or Canco or otherwise, and may retain or employ such assistants as may be necessary to the proper discharge of its powers and duties and determination of its rights hereunder and may pay proper and reasonable compensation for all such legal and other advice or assistance as aforesaid;

(b) employ such agents and other assistants as it may reasonably require for the proper determination and discharge of its powers and duties hereunder; and

(c) pay reasonable remuneration for all services performed for it (and shall be entitled to receive reasonable remuneration for all services performed by it) in the discharge of the trusts hereof and compensation for all reasonable disbursements, costs and expenses made or incurred by it in the discharge of its duties hereunder and in the management of the Trust.

**6.11 Investment of Moneys Held by Trustee**

Unless otherwise provided in this agreement, any moneys held by or on behalf of the Trustee which under the terms of this agreement may or ought to be invested or which may be on deposit with the Trustee or which may be in the hands of the Trustee shall, upon the receipt by the Trustee of the written direction of Canco, be invested or reinvested in the name or under the control of the Trustee in Authorized Investments, or as otherwise agreed upon in writing by the Trustee and Canco. Any direction of Canco to the Trustee as to investment or reinvestment of funds shall be in writing. If no such direction is received, the Trustee shall not have any obligation to invest the monies and pending receipt of such a direction all interest or other income and such moneys may be deposited in the name of the Trustee in any chartered bank in Canada or, with the consent of Canco, in the deposit department of the Trustee or any other specified loan or trust company authorized to accept deposits under the laws of Canada or any province thereof at the rate of interest then current on similar deposits. The Trustee shall not be held liable for any losses incurred in the investment of any funds as herein provided that the trustee has not acted in bad faith or with fraud, gross negligence or wilful misconduct in investing any such funds.

**6.12 Trustee Not Required to Give Security**

The Trustee shall not be required to give any bond or security in respect of the execution of the trusts, rights, duties, powers and authorities of this agreement or otherwise in respect of the premises.

**6.13 Trustee Not Bound to Act on Request**

Except as in this agreement otherwise specifically provided, the Trustee shall not be bound to act in accordance with any direction or request of RTO Acquiror and/or Canco or of the directors thereof until a duly authenticated copy of the instrument or resolution containing such direction or request shall have been delivered to the Trustee, and the Trustee shall be empowered to act upon any such copy purporting to be authenticated and believed by the Trustee to be genuine.

**6.14 Authority to Carry on Business**

The Trustee represents to RTO Acquiror and Canco that at the date of execution and delivery by it of this agreement it is authorized to carry on the business of a trust company in each of the provinces of Canada but if, notwithstanding the provisions of this Section 6.14, it ceases to be so authorized to carry on business, the validity and enforceability of this agreement and the Voting Rights, the Automatic Exchange Right and the Exchange Right shall not be affected in any manner whatsoever by reason only of such event but the Trustee shall, within 90 days after ceasing to be authorized to carry on the business of a trust company in any province of Canada, either become so authorized or resign in the manner and with the effect specified in Article 9.

**6.15 Conflicting Claims**

(1) If conflicting claims or demands are made or asserted with respect to any interest of any Beneficiary in any Exchangeable Shares, including any disagreement between the heirs, representatives, successors or assigns succeeding to all or any part of the interest of any Beneficiary in any Exchangeable Shares, resulting in conflicting claims or demands being made in connection with such interest, then the Trustee shall be entitled, in its sole discretion, to refuse to recognize or to comply with any such claims or demands. In so refusing, the Trustee may elect not to exercise any Voting Rights, Automatic Exchange Right or Exchange Right subject to such conflicting claims or demands and, in so doing, the Trustee shall not be or become liable to any person on account of such election or its failure or refusal to comply with any such conflicting claims or demands. The Trustee shall be entitled to continue to refrain from acting and to refuse to act until:

(a) the rights of all adverse claimants with respect to the Voting Rights, Automatic Exchange Right or Exchange Right subject to such conflicting claims or demands have been adjudicated by a final judgement of a court of competent jurisdiction; or

(b) all differences with respect to the Voting Rights, Automatic Exchange Right or Exchange Right subject to such conflicting claims or demands have been conclusively settled by a valid written agreement binding on all such adverse claimants, and the Trustee shall have been furnished with an executed copy of such agreement certified to be in full force and effect.

(2) If the Trustee elects to recognize any claim or comply with any demand made by any such adverse claimant, it may in its discretion require such claimant to furnish such surety bond or other security satisfactory to the Trustee as it shall deem appropriate to fully indemnify it as between all conflicting claims or demands.

**6.16 Acceptance of Trust**

The Trustee hereby accepts the Trust created and provided for, by and in this agreement and agrees to perform the same upon the terms and conditions herein set forth and to hold all rights, privileges and benefits conferred hereby and by law in trust for the various persons who shall from time to time be Beneficiaries, subject to all the terms and conditions herein set forth.

**6.17 Third Party Interests**

Each party to this agreement hereby represents to the Trustee that any account to be opened by, or interest to be held by the Trustee in connection with this agreement, for or to the credit of such party, either (i) is not intended to be used by or on behalf of any third party; or (ii) is intended to be used by or on behalf of a third party, in which case such party hereto agrees to complete and execute forthwith a declaration in the Trustee's prescribed form as to the particulars of such third party.

**6.18 Privacy**

The parties acknowledge that Canadian federal and/or provincial legislation that addresses the protection of individuals' personal information (collectively, "**Privacy Laws**") applies to obligations and activities under this agreement. Despite any other provision of this agreement, no party shall take or direct any action that would contravene, or cause the others to contravene, applicable Privacy Laws. The parties shall, prior to transferring or causing to be transferred personal information to the Trustee, obtain and retain required consents of the relevant individuals to the collection, use and disclosure of their personal information, or shall have determined that such consents either have previously been given upon which the parties can rely or are not required under the Privacy Laws. Specifically, the Trustee agrees: (a) to have a designated chief privacy officer; (b) to maintain policies and procedures to protect personal information and to receive and respond to any privacy complaint or inquiry; (c) to use personal information solely for the purposes of providing its services under or ancillary to this agreement and not to use it for any purpose except with the consent of or direction from the other parties or the individual involved; (d) not to sell or otherwise improperly disclose personal information to any third party; and (e) to employ administrative, physical and technological safeguards to reasonably secure and protect personal information against loss, theft, or unauthorized access, use or modification.

**ARTICLE 7**
**COMPENSATION**

**7.1 Fees and Expenses of the Trustee**

Canco agrees to pay the Trustee reasonable compensation for all of the services rendered by it under this agreement and shall reimburse the Trustee for all reasonable and documented expenses (including, but not limited to, taxes other than taxes based on the net income or capital of the Trustee, fees paid to legal counsel and other experts and advisors and travel expenses) and disbursements, including the reasonable cost and expense of any suit or litigation of any character and any proceedings before any governmental Agency, reasonably incurred by the Trustee in connection with its duties under this agreement; provided that Canco shall have no obligation to reimburse the Trustee for any expenses or disbursements paid, incurred or suffered by the Trustee in any suit or litigation or any such proceedings in which the Trustee is determined to have acted in bad faith or with fraud, gross negligence or wilful misconduct or to have materially breached any provision hereof.

**ARTICLE 8**
**INDEMNIFICATION AND LIMITATION OF LIABILITY**

**8.1 Indemnification of the Trustee**

(1) RTO Acquiror and Canco jointly and severally agree to indemnify and hold harmless the Trustee and each of its directors, officers, employees and agents appointed and acting in accordance with this agreement (collectively, the "**Indemnified Parties**") against all claims, losses (other than loss of profits), damages, reasonable costs, penalties, fines and reasonable expenses (including reasonable expenses of the Trustee's legal counsel) which, without fraud, gross negligence, wilful misconduct or bad faith on the part of such Indemnified Party or a material breach of any provision hereof, may be paid, incurred or suffered by the Indemnified Party by reason or as a result of the Trustee's acceptance or administration of the Trust, its compliance with its duties set forth in this agreement, or any written or oral instruction delivered to the Trustee by RTO Acquiror or Canco pursuant hereto.

(2) In no case shall RTO Acquiror or Canco be liable under this indemnity for any claim against any of the Indemnified Parties unless RTO Acquiror and Canco shall be notified by the Trustee of the written assertion of a claim or of any action commenced against the Indemnified Parties, promptly after any of the Indemnified Parties shall have received any such written assertion of a claim or shall have been served with a summons or other first legal process giving information as to the nature and basis of the claim. Subject to (ii) below, RTO Acquiror and Canco shall be entitled to participate at their own expense in the defence and, if RTO Acquiror and Canco so elect at any time after receipt of such notice, either of them may assume the defence of any suit brought to enforce any such claim. The Trustee shall have the right to employ separate counsel in any such suit and participate in the defence thereof, but the fees and expenses of such counsel shall be at the expense of the Trustee unless: (i) the employment of such counsel has been authorized by RTO Acquiror or Canco; or (ii) the named parties to any such suit include both the Trustee and RTO Acquiror or Canco and the Trustee shall have been advised by counsel acceptable to RTO Acquiror or Canco that there may be one or more legal defences available to the Trustee that are different from or in addition to those available to RTO Acquiror or Canco and that, in the judgement of such counsel, would present a conflict of interest were a joint representation to be undertaken (in which case RTO Acquiror and Canco shall not have the right to assume the defence of such suit on behalf of the Trustee but shall be liable to pay the reasonable fees and expenses of counsel for the Trustee). This indemnity shall survive the termination of the Trust and the resignation or removal of the Trustee.

**8.2 Limitation of Liability**

The Trustee shall not be held liable for any loss which may occur by reason of depreciation of the value of any part of the Trust Estate or any loss incurred on any investment of funds pursuant to this agreement, except to the extent that such loss is attributable to the fraud, gross negligence, wilful misconduct or bad faith on the part of the Trustee or to have resulted from a material breach by the Trustee of any provision hereof.

## ARTICLE 9
## CHANGE OF TRUSTEE

**9.1 Resignation**

The Trustee, or any trustee hereafter appointed, may at any time resign by giving written notice of such resignation to RTO Acquiror and Canco specifying the date on which it desires to resign, provided that such notice shall not be given less than thirty (30) days before such desired resignation date unless RTO Acquiror and Canco otherwise agree and provided further that such resignation shall not take effect until the date of the appointment of a successor trustee and the acceptance of such appointment by the successor trustee. Upon receiving such notice of resignation, RTO Acquiror and Canco shall promptly appoint a successor trustee, which shall be a corporation organized and existing under the laws of Canada and authorized to carry on the business of a trust company in all provinces of Canada, by written instrument in duplicate, one copy of which shall be delivered to the resigning trustee and one copy to the successor trustee. Failing the appointment and acceptance of a successor trustee, a successor trustee may be appointed by order of a court of competent jurisdiction upon application of one or more of the parties to this agreement. If the retiring trustee is the party initiating an application for the appointment of a successor trustee by order of a court of competent jurisdiction, RTO Acquiror and Canco shall be jointly and severally liable to reimburse the retiring trustee for its legal costs and expenses in connection with same.

**9.2 Removal**

The Trustee, or any trustee hereafter appointed, may (provided a successor trustee is appointed) be removed at any time on not less than 30 days' prior notice by written instrument executed by RTO Acquiror and Canco, in duplicate, one copy of which shall be delivered to the trustee so removed and one copy to the successor trustee.

**9.3 Successor Trustee**

Any successor trustee appointed as provided under this agreement shall execute, acknowledge and deliver to RTO Acquiror and Canco and to its predecessor trustee an instrument accepting such appointment. Thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor under this agreement, with the like effect as if originally named as trustee in this agreement. However, on the written request of RTO Acquiror and Canco or of the successor trustee, the trustee ceasing to act shall, upon payment of any amounts then due to it pursuant to the provisions of this agreement, execute and deliver an instrument transferring to such successor trustee all the rights and powers of the trustee so ceasing to act. Upon the request of any such successor trustee, RTO Acquiror, Canco and such predecessor trustee shall execute any and all instruments in writing for more fully and certainly vesting in and confirming to such successor trustee all such rights and powers.

**9.4 Notice of Successor Trustee**

Upon acceptance of appointment by a successor trustee as provided herein, RTO Acquiror and Canco shall cause to be mailed notice of the succession of such trustee hereunder to each Beneficiary specified in a List. If RTO Acquiror or Canco shall fail to cause such notice to be mailed within 10 days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be mailed at the expense of RTO Acquiror and Canco.

## ARTICLE 10
## RTO ACQUIROR SUCCESSORS

**10.1 Certain Requirements in Respect of Combination, etc.**

So long as any Exchangeable Shares not owned by RTO Acquiror or its affiliates are outstanding, RTO Acquiror shall not consummate any transaction (whether by way of reconstruction, reorganization, consolidation, arrangement, amalgamation, merger, transfer, sale, lease or otherwise) whereby all or substantially all of its undertaking, property and assets would become the property of any other person or, in the case of a merger, of the continuing corporation resulting therefrom, provided that it may do so if:

(a) such other person or continuing corporation (the "**RTO Acquiror Successor**"), by operation of law, becomes, without more, bound by the terms and provisions of this agreement or, if not so bound, executes, prior to or contemporaneously with the consummation of such transaction, a trust agreement supplemental hereto and such other instruments (if any) as are necessary or advisable to evidence the assumption by the RTO Acquiror Successor of liability for all moneys payable and property deliverable hereunder and the covenant of such RTO Acquiror Successor to pay and deliver or cause to be delivered the same and its agreement to observe and perform all the covenants and obligations of RTO Acquiror under this agreement: and

(b) such transaction shall be upon such terms and conditions as substantially to preserve and not to impair in any material respect any of the rights, duties, powers and authorities of the Trustee or of the Beneficiaries hereunder.

Notwithstanding the foregoing provisions of Section 10.1, RTO Acquiror shall be permitted to consummate an Asset Sale Transaction (as such term is defined in the terms of the preferred stock of the RTO Acquiror).

**10.2 Vesting of Powers in Successor**

Whenever the conditions of Section 10.1 have been duly observed and performed, the Trustee, RTO Acquiror Successor and Canco shall, if required by Section 10.1, execute and deliver the supplemental trust agreement provided for in Article 11 and thereupon RTO Acquiror Successor and such other person that may then be the issuer of the RTO Acquiror Shares shall possess and from time to time may exercise each and every right and power of RTO Acquiror under this agreement in the name of RTO Acquiror or otherwise and any act or proceeding by any provision of this agreement required to be done or performed by the board of directors of RTO Acquiror or any officers of RTO Acquiror may be done and performed with like force and effect by the directors or officers of such RTO Acquiror Successor.

**10.3 Wholly-Owned Subsidiaries**

Nothing herein shall be construed as preventing (i) the amalgamation or merger of any wholly-owned direct or indirect subsidiary of RTO Acquiror (other than Canco or Callco) with or into RTO Acquiror, (ii) the winding-up, liquidation or dissolution of any wholly-owned direct or indirect subsidiary of RTO Acquiror (other than Canco or Callco), or (iii) any other distribution of the assets of any wholly-owned direct or indirect subsidiary of RTO Acquiror (other than Canco or Callco) among the shareholders of such subsidiary for the purpose of winding up its affairs, and any such transactions are expressly permitted by this Article 10.

**10.4 Successor Transactions**

Notwithstanding the foregoing provisions of this Article 10, in the event of an RTO Acquiror Control Transaction:

(a) in which RTO Acquiror merges or amalgamates with, or in which all or substantially all of the then outstanding RTO Acquiror Shares are acquired by, one or more other corporations to which RTO Acquiror is, immediately before such merger, amalgamation or acquisition, "related" within the meaning of the ITA (otherwise than by virtue of a right referred to in paragraph 251(5)(b) thereof);

(b) which does not result in an acceleration of the Redemption Date in accordance with paragraph (b) of that definition in the Share Provisions; and

(c) in which all or substantially all of the then outstanding RTO Acquiror Shares are converted into or exchanged for shares or rights to receive such shares (the "**Other Shares**") of another corporation (the "**Other Corporation**") that, immediately after such RTO Acquiror Control Transaction, owns or controls, directly or indirectly, RTO Acquiror,

then, (i) all references herein to "RTO Acquiror" shall thereafter be and be deemed to be references to "Other Corporation" and all references herein to "RTO Acquiror Shares" shall thereafter be and be deemed to be references to "Other Shares" (with appropriate adjustments, if any, as are required to result in a holder of Exchangeable Shares on the exchange, redemption or retraction of such shares pursuant to the Share Provisions or Article 5 of the Plan of Arrangement or exchange of such shares pursuant to this agreement immediately subsequent to the RTO Acquiror Control Transaction being entitled to receive that number of Other Shares equal to the number of Other Shares such holder of Exchangeable Shares would have received if the exchange, redemption or retraction of such shares pursuant to he Share Provisions or Article 5 of the Plan of Arrangement, or exchange of such shares pursuant to this agreement had occurred immediately prior to the RTO Acquiror Control Transaction and the RTO Acquiror Control Transaction was completed) without any need to amend the terms and conditions of this agreement and without any further action required; and (ii) RTO Acquiror shall cause the Other Corporation to deposit one or more voting securities of such Other Corporation to allow Beneficiaries to exercise voting rights in respect of the Other Corporation substantially similar to those provided for in this agreement.

## ARTICLE 11
## AMENDMENTS AND SUPPLEMENTAL TRUST AGREEMENTS

**11.1 Amendments, Modifications, etc.**

Subject to Sections 11.2, 11.4 and 13.1, this agreement may not be amended or modified except by an agreement in writing executed by RTO Acquiror, Canco and the Trustee and approved by the Beneficiaries in accordance with Section 11(2) of the Share Provisions.

**11.2 Ministerial Amendments**

Notwithstanding the provisions of Section 11.1, the parties to this agreement may in writing, at any time and from time to time, without the approval of the Beneficiaries, amend or modify this agreement for the purposes of:

(a) adding to the covenants of any or all parties hereto for the protection of the Beneficiaries hereunder provided that each of Canco and RTO Acquiror shall be of the good faith opinion and the Trustee, acting on the advice of counsel, shall be of the opinion that such additions will not be materially prejudicial to the rights or interests of the Beneficiaries;

(b) making such amendments or modifications not inconsistent with this agreement as may be necessary or desirable with respect to matters or questions which, in the good faith opinion of each of RTO Acquiror and Canco and in the opinion of the Trustee, having in mind the best interests of the Beneficiaries, it may be expedient to make, provided that RTO Acquiror, Canco and the Trustee, acting on the advice of counsel, shall be of the opinion that such amendments and modifications will not be materially prejudicial to the interests of the Beneficiaries;

(c) making such changes or corrections which, on the advice of counsel to RTO Acquiror, Canco and the Trustee, are required for the purpose of curing or correcting any ambiguity or defect or inconsistent provision or clerical omission or mistake or manifest error; or

(d) making changes to provide added protection or benefit to or for the benefit of Beneficiaries hereunder provided that each of Canco and RTO Acquiror shall be of the good faith opinion and the Trustee, acting on the advice of counsel, shall be of the opinion that such changes will not be materially prejudicial to the rights or interests of the Beneficiaries.

**11.3 Meeting to Consider Amendments**

Canco, at the request of RTO Acquiror, shall call a meeting or meetings of the Beneficiaries for the purpose of considering any proposed amendment or modification requiring approval pursuant hereto. Any such meeting or meetings shall be called and held in accordance with the by-laws of Canco, the Share Provisions and all applicable laws.

**11.4 Changes in Capital of RTO Acquiror and Canco**

At all times after the occurrence of any event contemplated pursuant to Section 2.7 or 2.8 of the Support Agreement or otherwise, as a result of which either RTO Acquiror Shares or the Exchangeable Shares or both are in any way changed, this agreement shall forthwith be amended and modified as necessary in order that it shall apply with full force and effect, *mutatis mutandis*, to all new securities into which RTO Acquiror Shares or the Exchangeable Shares or both are so changed and the parties hereto shall execute and deliver a supplemental trust agreement giving effect to and evidencing such necessary amendments and modifications.

**11.5 Execution of Supplemental Trust Agreements**

From time to time Canco (when authorized by a resolution of its Board of Directors), RTO Acquiror (when authorized by a resolution of its board of directors) and the Trustee may, subject to the provisions of these presents, and they shall, when so directed by these presents, execute and deliver by their proper officers, trust agreements or other instruments supplemental hereto, which thereafter shall form part hereof, for any one or more of the following purposes:

(a) evidencing the succession of RTO Acquiror Successors and the covenants of and obligations assumed by each such RTO Acquiror Successor in accordance with the provisions of Article 9 and the successors of the Trustee or any successor trustee in accordance with the provisions of Article 9;

(b) making any additions to, deletions from or alterations of the provisions of this agreement or the Voting Rights, the Automatic Exchange Right or the Exchange Right which, in the opinion of the Trustee, will not be materially prejudicial to the interests of the Beneficiaries or are, in the opinion of counsel to the Trustee, necessary or advisable in order to incorporate, reflect or comply with any legislation the provisions of which apply to RTO Acquiror, Canco, the Trustee or this agreement; and

(c) for any other purposes not inconsistent with the provisions of this agreement, including to make or evidence any amendment or modification to this agreement as contemplated hereby; provided that, in the opinion of the Trustee, the rights of the Beneficiaries will not be materially prejudiced thereby.

## ARTICLE 12
## TERMINATION

**12.1 Term**

The Trust created by this agreement shall continue until the earliest to occur of the following events:

(a) no outstanding Exchangeable Shares are held by a Beneficiary; and

(b) each of RTO Acquiror and Canco elects in writing to terminate the Trust and such termination is approved by the Beneficiaries in accordance with Section 12 of the Share Provisions.

**12.2 Survival of Agreement**

This agreement shall survive any termination of the Trust and shall continue until there are no Exchangeable Shares outstanding held by a Beneficiary; provided, however, that the provisions of Article 7 and Article 8 shall survive any such termination of this agreement.

## ARTICLE 13
## GENERAL

**13.1 Severability**

If any term or other provision of this agreement is invalid, illegal or incapable of being enforced by any rule or law, or public policy, all other conditions and provisions of this agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

**13.2 Enurement**

This agreement shall be binding upon and enure to the benefit of the parties hereto and their respective successors and assigns and, subject to the terms hereof, to the benefit of the Beneficiaries.

**13.3 Notices to Parties**

Any notice and other communications required or permitted to be given pursuant to this agreement shall be sufficiently given if delivered in person or if sent by facsimile transmission (provided such transmission is recorded as being transmitted successfully) to the parties at the following addresses:

(i) In the case of RTO Acquiror or Canco to the following address:

_________________________

Attention: ___________________
E-mail: ___________________

with a copy to (which shall not constitute notice):

Fasken Martineau DuMoulin LLP
Attn: Mr. John Sabetti
Bay Adelaide Centre
333 Bay Street, Suite 2400
P.O. Box 20
Toronto, ON M5H 2T6
Tel: 416 366 8381

and

Wilson Sonsini Goodrich & Rosati PC
12235 El Camino Real
San Diego, CA 92130-3002

Attention: Martin Waters and Ethan Lutske
Email: mwaters@wsgr.com; elutske@wsgr.com

(ii) In the case of Trustee to:

__________________________

or at such other address as the party to which such notice or other communication is to be given has last notified the party given the same in the manner provided in this section, and if not given the same shall be deemed to have been received on the date of such delivery or sending.

**13.4 Notice to Beneficiaries**

Any and all notices to be given and any documents to be sent to any Beneficiaries may be given or sent to the address of such Beneficiary shown on the register of holders of Exchangeable Shares in any manner permitted by the by-laws of Canco from time to time in force in respect of notices to shareholders and shall be deemed to be received (if given or sent in such manner) at the time specified in such by-laws, the provisions of which by-laws shall apply *mutatis mutandis* to notices or documents as aforesaid sent to such Beneficiaries.

**13.5 Counterparts**

This agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

**13.6 Jurisdiction**

This agreement shall be construed and enforced in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

**13.7 Attornment**

Each of the Trustee, RTO Acquiror, and Canco agrees that any action or proceeding arising out of or relating to this agreement may be instituted in the courts of Ontario, waives any objection which it may have now or hereafter to the venue of any such action or proceeding, irrevocably submits to the non-exclusive jurisdiction of the said courts in any such action or proceeding, agrees to be bound by any judgement of the said courts and not to seek, and hereby waives, any review of the merits of any such judgement by the courts of any other jurisdiction, and RTO Acquiror hereby appoints Canco at its registered office in the Province of Ontario as attorney for service of process.

**IN WITNESS WHEREOF** the parties hereto have caused this agreement to be duly executed as of the date first above written.

**2798832 ONTARIO INC.**

By: ______________________________
Name:
Title:

**[TRUSTEE]**

By: ______________________________
Name:
Title:

**TORCHLIGHT ENERGY RESOURCES, INC.**

By: ______________________________
Name:
Title:

**SCHEDULE J**
**TORCHLIGHT ENERGY RESOURCES, INC.**

**CERTIFICATE OF DESIGNATION OF PREFERENCES,**
**RIGHTS AND LIMITATIONS**
**OF**
**SERIES A NON-VOTING PREFERRED STOCK**

PURSUANT TO SECTION 78.1955 OF THE
NEVADA REVISED STATUTES

Pursuant to Section 78.1955 of the Nevada Revised Statutes, the undersigned does hereby certify, on behalf of Torchlight Energy Resources, Inc., a Nevada corporation, that the following resolution was duly adopted by the board of directors of the Torchlight Energy Resources, Inc. ("Company"), pursuant to Article 3 of the Articles of Incorporation of the Company, as amended.

**WHEREAS**, the Amended and Restated Articles of Incorporation of the Company (the "Articles of Incorporation") authorizes the issuance of up to [ ][1] shares of preferred stock, par value $0.001 per share, of the Company ("Preferred Stock") in one or more series, which Preferred Stock shall have such distinctive designation or title, voting powers or no voting powers, and such preferences, rights, qualifications, limitations or restrictions, as shall be stated in such resolution or resolutions providing for the issuance of such class or series of Preferred Stock as may be adopted from time to time by the board of directors of the Company (the "Board") prior to the issuance of any shares thereof;

**WHEREAS**, it is the desire of the Board to establish and fix the number of shares to be included in a new series of Preferred Stock and the designation, rights, preferences, and limitations of the shares of such new series.

**NOW, THEREFORE, BE IT RESOLVED**, that the Board does hereby provide for the issue of a series of Preferred Stock and does hereby in this Certificate of Designation (this "Certificate of Designation") establish and fix and herein state and express the designation, rights, preferences, powers, restrictions, and limitations of such series of Preferred Stock as follows:

**TERMS OF PREFERRED STOCK**

Section 1. Definitions. For the purposes hereof, the following terms shall have the following meanings:

"Acquisition" means the acquisition by the Company of all of the outstanding shares of Metamaterial Inc., a corporation existing under the laws of the Province of Ontario, by way of a statutory plan of arrangement pursuant to the Business Corporations Act (*Ontario*), pursuant to the Arrangement Agreement dated as of December 14, 2020, by and among the Company, Metamaterial Inc., 2798832 Ontario Inc., a corporation existing under the laws of the Province of Ontario and 2798331 Ontario Inc., a corporation existing under the laws of the Province of Ontario (the "Arrangement Agreement").

1 To be calculated based on reverse split and inserted in Amended and Restated Articles of Incorporation.

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 405 of the Securities Act of 1933, as amended.

"Articles of Incorporation" has the meaning set forth in the Recitals.

"Asset Sale Dividend" means a Net Proceeds Dividend or a Holdback Dividend, as applicable.

"Asset Sale Expiration Date" means the earlier of (i) December 31, 2021 or (ii) the date which is six (6) months from the closing of the Acquisition.

"Asset Sale Transaction" means one or more transactions consummated at any time prior to the Asset Sale Expiration Date pursuant to which the Company or any of its Affiliates sells, farms out or otherwise transfers to a third party some or all of the Carved-Out Assets. For the avoidance of doubt, more than one Asset Sale Transaction may occur for purposes of this Certificate of Designation.

"Board" has the meaning set forth in the Recitals.

"Business Day" means any day other than a Saturday, Sunday, a day which is a federal legal holiday in the United States, or a day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home," "shelter-in-place," "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the electronic funds transfer systems (including for wire transfers) of commercial banks in the City of New York are generally open for use by customers on such day.

"Carved-Out Assets" means any assets that are used or held for use in the Company's oil and gas exploration business as described in the Company Disclosure Documents.

"Certificate of Designation" has the meaning set forth in the Recitals.

"Claimable Company Business Costs" has the meaning set forth in Section 8.

"Common Stock" means the common stock, par value $0.001 per share, of the Company.

"Company Disclosure Documents" means all information, disclosure, forms, reports, schedules, statements, certifications and other documents, including without limitation all press releases, forms, reports, schedules, financial statements and notes and schedules to such financial statements, management's discussion and analysis of financial condition and results of operations, certifications, annual information forms, management information circulars, material change reports, business acquisition reports and other documents publicly disclosed or filed by the Company with the Securities and Exchange Commission and Nasdaq since January 1, 2020 and through the closing of the Acquisition.

"Fundamental Transaction" means at any time while the Series A Preferred Stock is outstanding, (i) the Company, directly or indirectly, in one or more related transactions effects any merger or consolidation of the Company with or into another Person, (ii) the Company, directly or indirectly, effects any sale, lease, license, assignment, transfer, conveyance or other disposition of all or substantially all of its assets in one or a series of related transactions, (iii) any direct or indirect purchase offer, tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to sell, tender or exchange their shares for other securities, cash or property and has been accepted by the holders of fifty percent (50%) or more of the outstanding Common Stock, (iv) the Company, directly or indirectly, in one or more related transactions effects any reclassification, reorganization or recapitalization of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for cash or property, or (v) the Company, directly or indirectly, in one or more related transactions consummates a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person whereby such other Person acquires more than fifty percent (50%) of the outstanding shares of Common Stock (not including any shares of Common Stock held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock or share purchase agreement or other business combination); provided, that in each of the foregoing transactions or series of transactions, each shall only be deemed a Fundamental Transaction if such other Person acquires more than fifty percent (50%) of voting securities of the Company's or its successors' (or the ultimate parent entity following a reorganization) voting securities, or all or substantially all of the Company's assets.

"Holder" means a holder of shares of Series A Preferred Stock.

"Holdback Amount" means, with respect to any Asset Sale Transaction, an amount equal to ten percent (10%) of the Net Proceeds from such Asset Sale Transaction.

"Indemnifiable Amounts" has the meaning set forth in Section 8.

"Holdback Dividend" has the meaning set forth in Section 3(a).

"Liquidation" has the meaning set forth in Section 5.

"Net Proceeds" means an aggregate amount (without duplication) equal to the sum of: (i) all consideration actually received by the Company or its Affiliates as consideration from a third party in exchange for taking title to the Carved-Out Assets and consummation of an Asset Sale Transaction, plus (ii) the amount of cash remaining from financing activities undertaken by the Company prior to the closing of the Acquisition as permitted pursuant to Section 5.3(b)(i) of the Arrangement Agreement (which, for the avoidance of doubt, does not include such amounts raised pursuant to Section 2.16 and Section 6.3(j) of the Arrangement Agreement), after the payment of transaction costs and expenses incurred by the Company or its Affiliates in connection with the Acquisition, and other accrued liabilities of the Company as contemplated by Section 6.3(k) of the Arrangement Agreement, less (iii) all out-of-pocket costs and expenses incurred by the Company or its Affiliates to third parties for the negotiation, entry into and consummation of the Acquisition (solely to the extent unpaid as of the closing of the Acquisition) and such Asset Sale Transaction, including any amounts paid for indemnification, costs of investigation, costs of defense and settlement, expert fees, broker fees, finder's fees, advisory fees, accountant or legal counsel fees and disbursements incurred by the Company in connection with the Acquisition (solely to the extent unpaid as of the closing of the Acquisition) and such Asset Sale Transaction, less (iv) costs incurred by the Company solely with respect to the Carved-Out Assets after the effective time of the Acquisition, less (v) any applicable sales, income and other taxes incurred by the Company or its Affiliates in respect of the performance of the Company's obligations under or otherwise in connection with an Asset Sale Transaction, payment of the Asset Sale Dividends or the Carved-Out Assets, less (vi) any liabilities of the Company actually incurred in connection with any Asset Sale Transaction or the Carved-Out Assets, less (vii) any payments to holders of debt securities of the Company that are outstanding immediately prior to the Acquisition and are not converted into equity prior to or in connection with the Acquisition, less (viii) any change of control, severance, compensation or other payments to any employee, officer or other service provider triggered in connection with the Acquisition (solely to the extent unpaid as of the closing of the Acquisition), less (ix) any amount paid or due and payable with respect to the the senior secured debt of RTO Acquiror held by The David A. Straz, Jr. Foundation and by The David A. Straz, Jr. Irrevocable Trust DTD 11/11/1986, in the event such debt is not converted or repaid in full prior to the closing of the Acquisition (collectively, (iii) through (ix) above shall be referred to herein as "Company Business Costs"). For the avoidance of doubt, amounts placed in escrow, earnout or contingent or other post-closing payments, including milestone or royalty payments, in connection with an Asset Sale Transaction will not be considered Net Proceeds unless (and only to the extent that) such amounts are actually received by the Company.

"Net Proceeds Dividend" has the meaning set forth in Section 3(a).

"Per Share Holdback Amount" means, with respect to an Asset Sale Transaction, the amount obtained by dividing (i) the Holdback Amount with respect to such Asset Sale Transaction by (ii) the total number of shares of Series A Preferred Stock outstanding as of the record date fixed in connection with the applicable Net Proceeds Dividend.

"Per Share Holdback Dividend Amount" means, with respect to a Holdback Dividend, (i)(A) the Holdback Amount from the applicable Asset Sale Transaction less (B) all Indemnifiable Amounts deducted from such Holdback Amount, divided by (ii) the total number of shares of Series A Preferred Stock outstanding as of the record date fixed in connection with the applicable Holdback Dividend.

"Per Share Net Proceeds" means, with respect to an Asset Sale Transaction, the amount obtained by dividing (i) the Net Proceeds from such Asset Sale Transaction by (ii) the total number of shares of Series A Preferred Stock outstanding as of the record date fixed in connection with the applicable Net Proceeds Dividend.

"Per Share Net Proceeds Dividend Amount" means, with respect to a Net Proceeds Dividend, the Per Share Net Proceeds less the Per Share Holdback Amount.

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"Remaining Assets" means (i) any Carved-Out Assets that have not been sold or are not otherwise subject to an Asset Sale Transaction as of the Asset Sale Expiration Date and (ii) any cash referred to in clause (ii) of the definition of "Net Proceeds" that is remaining as of the Asset Sale Expiration Date, less any amounts necessary to pay the reasonable out-of-pocket costs and expenses incurred by the Company in connection with the Spin-Off Dividend.

"Preferred Stock" has the meaning set forth in the Recitals.

"Series A Preferred Stock" has the meaning set forth in Section 2.

"Spin-Off Dividend" has the meaning set forth in Section 3(a).

"Successor Entity" means the Person, which may be the Company, formed by, resulting from or surviving any Fundamental Transaction or the Person with which such Fundamental Transaction shall have been made.

Section 2. Designation, Amount and Par Value. There shall be a series of Preferred Stock that shall be designated as "Series A Non-Voting Preferred Stock" (the "Series A Preferred Stock") and the number of shares constituting such series shall be _______________. Each share of Series A Preferred Stock shall have a par value of $0.001 per share. The shares of Series A Preferred Stock shall only be issued and maintained in the form of securities held in book-entry form.

Section 3. Dividends.

a) Asset Sale Dividends. Conditioned upon, and subject to (i) the consummation of the Acquisition, (ii) the consummation of one or more Asset Sale Transactions prior to the Asset Sale Expiration Date, and (iii) a determination by the Board that a distribution is not prohibited pursuant to applicable provisions of the Nevada Revised Statutes (including Section 78.288 thereof), Holders shall be entitled to receive from time to time and without interest, and the Company shall pay, in respect of each share of Series A Preferred Stock, the following dividends: (A) an amount equal to the Per Share Net Proceeds Dividend Amount, payable as set forth in Section 3(b)(i) ("Net Proceeds Dividends"), (B) an amount equal to the Per Share Holdback Dividend Amount, payable as set forth in Section 3(b)(ii) ("Holdback Dividends") and (C) pro rata equity in a spin-off entity to which the Company will transfer any Remaining Assets (and associated Company Business Costs) ("Spin-Off Dividend").

b) Payment of Asset Sale Dividends.

(i) Net Proceeds Dividends shall be paid no later than the thirtieth (30th) day following the receipt of Net Proceeds by the Company from an Asset Sale Transaction. For clarity, multiple Asset Sale Dividends may be paid in respect of one Asset Sale Transaction in the event that the Company receives Net Proceeds from an Asset Sale Transaction in multiple installments (as a result of post-closing payments, release of escrowed funds or otherwise).

(ii) Holdback Dividends shall be paid within ten (10) days of the final determination of the Per Share Holdback Dividend Amount with respect to the applicable Asset Sale Transaction.

(iii) In the event there are any Remaining Assets at the Asset Sale Expiration Date, then the Spin-Off Dividend shall be paid as soon as reasonably practicable following the Asset Sale Expiration Date, subject to applicable law and securities registration exemption.

c) Withholding and Holdback. The Company will be entitled to deduct and withhold, or cause to be deducted or withheld, from any Asset Sale Dividend payable to a Holder, such amounts as the Company is required to deduct and withhold with respect to the making of such payment under the United States Internal Revenue Code, as amended, or any provision of state or local tax law. To the extent that amounts are so deducted or withheld, such withheld amounts shall be paid over to or deposited with the relevant governmental entity and will be treated for all purposes of this Certificate of Designation as having been paid to the Holder in respect of which such deduction and withholding was made. Further, the Company will be entitled to deduct and hold back, or cause to be deducted or held back, from any Net Proceeds Dividend payable to a Holder, the Per Share Holdback Amount with respect to the applicable Asset Sale Transaction.

d) No Payment if No Asset Sale Transactions are Effected. Holders shall not be entitled to any Assets Sale Dividends if no Asset Sale Transactions are effected prior to the Asset Sale Expiration Date; provided, however, that the Spin-Off Dividend will be paid, subject to applicable law and securities registration exemption.

e) Cancellation of Series A Preferred Stock. Immediately upon the later of (i) the payment of all Asset Sale Dividends in respect of all Asset Sale Transactions consummated prior the Asset Sale Expiration Date or (ii) the payment of all Spin-Off Dividends (subject to applicable law and securities registration exemption), the Asset Sale Expiration Date, each share of Series A Preferred Stock shall, automatically and without any action on the part of the holder thereof, cease to be outstanding and shall be cancelled and returned to the status of authorized but unissued shares of Preferred Stock and shall no longer be designated as Series A Preferred Stock, and any holder thereof shall thereafter cease to have any rights with respect to such shares.

Section 4. Voting Rights. Except as otherwise provided herein or as otherwise required by Chapter 78 of the Nevada Revised Statutes, the Series A Preferred Stock shall have no voting rights. However, as long as any shares of Series A Preferred Stock are outstanding, the Company shall not, without the affirmative vote of the Holders of a majority of the then outstanding shares of the Series A Preferred Stock, (a) alter or change adversely the powers, preferences or rights given to the Series A Preferred Stock or alter or amend this Certificate of Designation, (b) amend its articles of incorporation or other organizational documents in any manner that adversely affects any rights of the Holders in a way that is material and disproportionate to other stockholders of the Company, (c) increase the number of authorized shares of Series A Preferred Stock, or (d) enter into any agreement with respect to any of the foregoing. Any vote required or permitted under this Section 4 may be taken at a meeting of the Holders or through the execution of an action by written consent in lieu of such meeting, provided that the consent is executed by Holders representing a majority of the outstanding shares of Series A Preferred Stock.

Section 5. Liquidation and Fundamental Transactions. In the event of a liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary (a "Liquidation"), or a Fundamental Transaction, in each case occurring prior to the cancellation of the Series A Preferred Stock pursuant to Section 3(e), after the payment or adequate provision for the payment of the Company's liabilities and obligations, the Holders shall be entitled to receive out of the remaining assets of the Company an amount equal to any accrued and unpaid Asset Sale Dividends then owed under this Certificate of Designation, for each share of Series A Preferred Stock, before any distribution or payment shall be made to the holders of any Common Stock, and if the assets of the Company shall be insufficient to pay in full such amounts, then the entire assets to be distributed to the Holders shall be ratably distributed among the Holders in accordance with the respective amounts that would be payable on such shares if all amounts payable thereon were paid in full. For the avoidance of doubt, none of the Acquisition or any Asset Sale Transaction shall be deemed a Liquidation. The Holders shall not be entitled to any rights in respect of a Liquidation or Fundamental Transaction except as set forth in this Section 5.

Section 6. Redemption. The shares of Series A Preferred Stock shall not be redeemable; provided, however, that the foregoing shall not limit the ability of the Company to offer to purchase, purchase or otherwise deal in such shares for consideration in the Company's sole discretion, nor shall the foregoing limit a Holder's ability to transfer any of its shares of Series A Preferred Stock to the Company for any or no consideration.

Section 7. Series A Preferred Stock Register. The Company shall maintain at its principal executive offices a register for the Series A Preferred Stock, in which the Company shall record (i) the name, address, electronic mail address and facsimile number of each holder in whose name the shares of Series A Preferred Stock have been issued and (ii) the name, address, electronic mail address and facsimile number of each transferee of any shares of Series A Preferred Stock. The Company may treat the Person in whose name any share of Series A Preferred Stock is registered on the register as the owner and holder thereof for all purposes. The Company shall keep the register open and available at all times during business hours for inspection by any holder of Series A Preferred Stock or his, her or its legal representatives.

Section 8. Indemnification. With respect to each Asset Sale Transaction, the Holdback Amount shall be available to indemnify, defend and hold harmless the Company and its Affiliates, including but not limited to its officers, directors, employees and representatives, from (i) any Company Business Costs actually incurred and not otherwise previously deducted in the calculation of Net Proceeds with respect to such Asset Sale Transaction ("Claimable Company Business Costs") and (ii) any losses actually incurred by the Company or any of its Affiliates in respect of claims for indemnification made by any Person pursuant to the definitive agreement for such Asset Sale Transaction, solely to the extent that the Company or any of its Affiliates is required to pay such losses out-of-pocket after the exhaustion by the Person claiming indemnification of any holdback or escrowed funds, rights of set-off, or other sources of recovery which are specifically provided for in the applicable definitive agreements with respect to the relevant Asset Sale Transaction, in respect of such claim for indemnification (such out-of-pocket losses, together with Claimable Company Business Costs, "Indemnifiable Amounts").

Section 9. Notice to Holders. Any notice or other communication required or permitted by the provisions of this Certificate of Designation to be given to a holder of shares of Series A Preferred Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Company, or given by electronic communication in compliance with the provisions of Chapter 78 of the Nevada Revised Statutes, and shall be deemed sent upon such mailing or electronic transmission.

Section 10. No Other Rights or Privileges. Except as specifically set forth herein, the Holders shall have no other rights, privileges or preferences with respect to the Series A Preferred Stock.

**RESOLVED, FURTHER**, that the Chairman, the president or any vice-president, and the secretary or any assistant secretary, of the Company be and they hereby are authorized and directed to prepare and file this Certificate of Designation of Preferences, Rights and Limitations in accordance with the foregoing resolution and the provisions of the Nevada Revised Statutes.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the undersigned has executed this Certificate this ___ day of __________, ______.

Name:
Title:

**SCHEDULE K**
**LOCK-UP AGREEMENT**

Torchlight Energy Resources, Inc. and Metamaterial Inc.

Lock-Up Agreement

_______________, 2020

This Lock-Up Agreement (this "Agreement") is executed in connection with the Arrangement Agreement (the "Arrangement Agreement") by and among Torchlight Energy Resources, Inc. ("RTO Acquiror"), 2798832 Ontario Inc. ("Canco"), 2798331 Ontario Inc. ("Callco"), and Metamaterial Inc. (or any successor entity thereto, "META"), dated as of [____________], 2020 (each, a "Party" and collectively, the "Parties"). Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Arrangement Agreement. For purposes of this Agreement, "Shares" means all issued and outstanding shares of common stock in the capital of either of RTO Acquiror or META that the undersigned directly or indirectly owns beneficially or of record as of immediately prior to the Effective Time.

In connection with, and as an inducement to, the parties entering into the Arrangement Agreement and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the undersigned, by executing this Agreement, agrees that, without the prior written consent of META prior to the Effective Time or RTO Acquiror following the Effective Time, with respect to the Shares, during the period commencing at the Effective Time and continuing until the date that is one hundred and eighty (180) days after the Closing Date, the undersigned will not: (a) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, make any short sale or otherwise transfer or dispose of or lend, directly or indirectly, any Shares or any securities convertible into, exercisable or exchangeable for or that represent the right to receive Shares (including without limitation, Shares which may be deemed to be, directly or indirectly, beneficially owned or held of record by the undersigned in accordance with the rules and regulations of the Securities and Exchange Commission) whether now owned or hereafter acquired; (b) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the Shares, whether any such transaction described in clause (a) or (b) above is to be settled by delivery of Shares or such other securities, in cash or otherwise; (c) make any demand for or exercise any right with respect to, the registration of any Shares; or (d) publicly disclose the intention to do any of the foregoing (each of the foregoing restrictions, the "Lock-Up Restrictions"). The period during which the Lock-Up Restrictions apply to any particular portion of the Shares shall be deemed the "Lock-Up Period" with respect thereto.

The undersigned agrees that the Lock-Up Restrictions preclude the undersigned from engaging in any hedging or other transaction with respect to any then-subject Shares which is designed to or which reasonably could be expected to lead to or result in a sale or disposition of such Shares even if such Shares would be disposed of by someone other than the undersigned. Such prohibited hedging or other transactions would include without limitation any short sale or any purchase, sale or grant of any right (including without limitation any put or call option) with respect to such Shares or with respect to any security that includes, relates to, or derives any significant part of its value from such Shares.

Notwithstanding the foregoing, the undersigned may transfer any of the Shares (i) as a *bona fide* gift or gifts or charitable contribution(s), (ii) to any trust for the direct or indirect benefit of the undersigned or the immediate family of the undersigned, (iii) if the undersigned is a corporation, partnership, limited liability company, trust or other business entity (1) to another corporation, partnership, limited liability company, trust or other business entity that is a direct or indirect affiliate (as defined in Rule 405 promulgated under the Securities Act of 1933, as amended) of the undersigned or (2) as distributions of Shares to limited partners, limited liability company members or stockholders of the undersigned or holders of similar equity interests in the undersigned, (iv) if the undersigned is a trust, to the beneficiary of such trust, (v) by testate succession or intestate succession, (vi) to any immediate family member, any investment fund, family partnership, family limited liability company or other entity controlled or managed by the undersigned, (vii) to a nominee or custodian of a person or entity to whom a disposition or transfer would be permissible under clauses (i) through (vi), (viii) pursuant to a bona fide third party tender offer, merger, consolidation or other similar transaction (or series of related transactions) made to all holders of the common stock of RTO Acquiror pursuant to which a person or "group" (as defined in or under Section 13(d) of the Exchange Act) would beneficially own fifty percent (50%) or more of the total outstanding voting securities of RTO Acquiror, *provided* that in the event that such tender offer, merger, consolidation or other such transaction is not completed, the Shares shall remain subject to the restrictions contained in this Agreement, or (ix) pursuant to an order of a court or regulatory agency; *provided,* in the case of clauses (i)-(vii), that (A) such transfer shall not involve a disposition for value and (B) the transferee agrees in writing with RTO Acquiror to be bound by the terms of this Agreement; and *provided further*, in the case of clauses (i)-(vii), no filing by any party under Section 16(a) of the Exchange Act shall be required or shall be made voluntarily in connection with such transfer. For purposes of this Agreement, "immediate family" shall mean any relationship by blood, marriage, domestic partnership or adoption, not more remote than first cousin.

In addition, for the avoidance of doubt, the foregoing restrictions shall not apply to (i) the exercise of stock options granted pursuant to either of RTO Acquiror or META's equity incentive plans, including the "net" exercise of such options in accordance with their terms and the surrender of shares of common stock of RTO Acquiror or META in lieu of payment in cash of the exercise price and any tax withholding obligations due as a result of such exercise, or for any of the shares of common stock of RTO Acquiror or META issued upon such exercise, (ii) conversion or exercise of warrants into shares of common stock of RTO Acquiror or META or into any other security convertible into or exercisable for common stock of RTO Acquiror or META that are outstanding as of the Effective Time, or for any shares of common stock of RTO Acquiror or META issued upon such exercise or conversion; or (iii) the establishment of any contract, instruction or plan (a *"*Plan*"*) that satisfies all of the requirements of Rule 10b5-1(c)(1)(i)(B) under the Exchange Act; *provided* that no sales of the Shares shall be made pursuant to such a Plan prior to the expiration of the applicable Lock-Up Period, and such a Plan may only be established if no public announcement of the establishment or existence thereof and no filing with the Securities and Exchange Commission or other regulatory authority in respect thereof or transactions thereunder or contemplated thereby, by the undersigned, RTO Acquiror, META or any other person, shall be required, and no such announcement or filing is made voluntarily, by the undersigned, RTO Acquiror, META or any other person, prior to the expiration of the applicable Lock-Up Period. In furtherance of the foregoing, RTO Acquiror and the transfer agent of the RTO Acquiror (the "Transfer Agent") and registrar are hereby authorized to decline to make any transfer of the Shares if such transfer would constitute a violation or breach of this Agreement.

The undersigned agrees and consents to the entry of stop transfer instructions with the Transfer Agent against the transfer of the Shares subject to this Agreement except in compliance with the foregoing restrictions.

The undersigned hereby consents to receipt of this Agreement in electronic form and understands and agrees that this Agreement may be signed electronically. In the event that any signature is delivered by facsimile transmission, electronic mail, or otherwise by electronic transmission evidencing an intent to sign this Agreement, such facsimile transmission, electronic mail or other electronic transmission shall create a valid and binding obligation of the undersigned with the same force and effect as if such signature were an original.

The undersigned hereby represents and warrants that the undersigned has full power and authority to enter into this Agreement and that upon request, the undersigned will execute any additional documents reasonably necessary to ensure the validity or enforcement of this Agreement. All authority herein conferred or agreed to be conferred and any obligations of the undersigned shall be binding upon the successors, assigns, heirs or personal representatives of the undersigned.

The undersigned understands that the undersigned shall be released from all obligations under this Agreement if the Arrangement Agreement is terminated pursuant to its terms.

The undersigned understands that RTO Acquiror, Canco, Callco, and META are entering into the Arrangement Agreement in reliance upon this Agreement.

[*Remainder of Page Intentionally Left Blank*]

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

Very truly yours,

________________________________________
Printed Name of Holder

By: ______________________________________
Signature

________________________________________
Printed Name of Person Signing
(and indicate capacity of person signing if signing as custodian, trustee, or on behalf of an entity)

[*Signature Page to Lock-Up Agreement*]

# EXHIBIT G

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K/A

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2023**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission File Number: **333-266143**

# NEXT BRIDGE HYDROCARBONS, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Nevada** | **87-2538731** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**500 W. Texas Ave., Suite 890**
**Midland TX 79701**
(Address of principal executive offices) (Zip Code)

**(432) 553-9745**
(Registrant's telephone number, including area code)

**6300 Ridgelea Place, Suite 950**
**Fort Worth TX 76116**
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| N/A | N/A | N/A |

Securities registered pursuant to Section 12(g) of the Act: None

Our common stock is not publicly traded and is not eligible for electronic transfer through the Depository Trust Company book-entry system or any other established clearing corporation.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ | Non-accelerated filer | ☒ | Smaller reporting company | ☒ | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management assessment of the effectiveness of its internal controls over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to (§240.10D-1(b)). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The Registrant was not a public company as of the last business day of its most recently completed second fiscal quarter and, therefore, cannot calculate the aggregate market value of its voting and non-voting common equity held by non-affiliates as of such date.

| Class | Outstanding at September 15, 2025 |
|---|---|
| Common stock, par value $0.0001 per share | 264,387,563 |

**DOCUMENTS INCORPORATED BY REFERENCE**

None

## EXPLANATORY NOTE

**Items Amended in this Filing**

Next Bridge Hydrocarbons, Inc. (the "Company," "we," "our," or "us") is filing this Amendment No. 1 on Form 10-K/A (this "Form 10-K/A") to amend, correct errors, and restate certain items presented in the Company's Annual Report on Form 10-K for the year ended December 31, 2023, which was initially filed with the U.S. Securities and Exchange Commission ("SEC") on July 17, 2024 (the "2023 Original Filing"). This Form 10-K/A contains our audited restated annual financial statements as of and for the year ended December 31, 2023, which have been restated to correct certain errors in the 2023 Original Filing as described in further detail below.

A Change in Reporting Entity became effective at December 14, 2022, resulting from the spinoff lacking economic substance and requiring the inclusion of pre-spinoff historical financial reporting periods in all subsequent filings.

Comparative numbers for the year ended December 31, 2022 presented in this 10-K-A have been restated and disclosures detailing the impact of those restatements on subsequent filing periods – March 31, 2023, June 30, 2023, September 30, 2023 – as well as the year ended December 31, 2023, are included.

This Form 10-K/A also includes amendments to and restates and revises the following items of the 2023 Original Filing:

- **Part I – Item 1. Business**
- **Part I – Item 2. Properties**
- **Part II – Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**
- **Part II – Item 8. Financial Statements and Supplementary Data**
- **Part II – Item 9A. Controls and Procedures**
- **Part III – Item 14. Principal Accountant Fees and Services**
- **Part IV – Item 15 Exhibits, Financial Statement Schedules**

In accordance with applicable SEC rules, this Form 10-K/A includes new certifications specified in Rule 13a-14 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), from our Chief Executive Officer and Chief Financial Officer dated as of the date of this filing. This Form 10-K/A also contains a new report of M&K CPAS, PLLC ("M&K"), the Company's independent registered public accounting firm, on the consolidated financial statements for the years ended December 31, 2023 and 2022, and a new consent of M&K.

Other than as described below, this Form 10-K/A does not reflect adjustments for events occurring after the filing of the 2023 Original Filing except to the extent that they are otherwise required to be included and discussed herein. See below for a detailed discussion of the effect of the restatement on the consolidated financial statements included in this Form 10-K/A.

Pursuant to Rule 12b-15 under the Exchange Act, this Form 10-K/A contains only the items and exhibits to the 2023 Original Filing that are being amended and restated, and unaffected items and exhibits are not included herein. Except as noted herein, the information included in the 2023 Original Filing remains unchanged. This Form 10-K/A continues to describe the conditions as of the date of the 2023 Original Filing, and except as contained herein, we have not updated or modified the disclosures contained in the 2023 Original Filing to reflect any events that have occurred after the 2023 Original Filing. Accordingly, forward-looking statements included in this Form 10-K/A may represent management's views as of the 2023 Original Filing and should not be assumed to be accurate as of any date thereafter. This Form 10-K/A should be read in conjunction with the Company's filings made with the SEC subsequent to the filing of the 2023 Original Filing, including any amendment to those filings.

**Background of the Restatement**

In the 2023 10-K Original Filing, 100% of the carrying value of the Company's oil and natural gas assets (previously recorded as of December 31, 2022 and incurred in 2023), were impaired for the year ended December 31, 2023. In the Annual Report on Form 10-K for the year ended December 31, 2022 and the 2023 Original Filing, the Company applied business combination accounting and an adjustment to fair value had been applied to oil and natural gas assets that were received in the Spinoff transaction on December 14, 2022.

As a result of an internal review, the Company identified errors related to the impairment adjustment and the revaluation of assets from the Spinoff to fair value. The review was prompted by the Company's receipt of comments issued by the staff of the SEC related to their review of the annual report for December 31, 2023. After review of the staff's comments, discussion with the staff, and investigation and further analysis, the Company determined that errors had been made in the application of generally accepted accounting principles with respect to these matters.

Based on that subsequent analysis with respect to the Company's oil and natural gas properties, and a modification to account for the distribution by Meta Materials, Inc. of shares of our common stock to its preferred stockholders that was completed on December 14, 2022 (the "Spin-Off"), this Form 10-K/A includes:

- Reversal of the 100% impairment recorded as of and for the years ended December 31, 2023 and 2022; and

- Recission of the business combination including adjustments to reverse the business combination fair value adjustment for the Orogrande Project (as defined below) originally recorded in connection with the Spin-Off. This adjustment returned the basis of oil and natural gas properties to their cumulative historical basis. just prior to the Spin-Off. Reference Note 2 for details of the corrections contained in the financial statements.

  The restatement is included as part of a change in reporting entity, resulting from the Spin-Off lacking economic substance, and requiring the inclusion of pre spinoff historical financial reporting periods in all subsequent filings.

Reference Notes 2 and 3 to the consolidated financial statements for detail disclosures regarding the restatements.

**Table of Contents**

**PART I**


| | | |
|---|---|---|
| Item 1. | Business | 4 |
| Item 2. | Properties | 4 |


**PART II**


| | | |
|---|---|---|
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 16 |
| Item 8. | Financial Statements and Supplementary Data | 26 |
| Item 9A | Controls and Procedures | 28 |


**PART III**


| | | |
|---|---|---|
| Item 14. | Principal Accounting Fees and Services | 30 |


**PART IV**


| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 31 |
| | Signatures | 32 |

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

The information contained in this 10-K/A includes "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These forward-looking statements are identified by their use of terms such as "can," "could," "continuing," "may," "will," "expect," "anticipate," "aim," "estimate," "intend," "ongoing," "plan," "predict," "potential," "project," "should," "seeks," "believe," "likely to" and similar words, phrases or expressions. All statements, other than statements of historical facts, included in this report, are forward-looking statements, including statements mentioned under "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," regarding:

- amount and timing of future production of oil and natural gas;
- amount, nature and timing of capital expenditures;
- the number of anticipated wells to be drilled after the date hereof;
- the availability of exploration and development opportunities;
- our financial or operating results;
- our cash flow and anticipated liquidity;
- operating costs including lease operating expenses, administrative costs and other expenses;
- finding and development costs;
- our business strategy; and
- other plans and objectives for future operations.

Our actual results and condition could differ materially from those implied or expressed in the forward-looking statements for any reason. They can be affected by a number of factors, including, among others:

- the risks described in "Risk Factors" and elsewhere in this report;
- the volatility of prices and supply of, and demand for, oil and natural gas;
- the timing and success of our drilling activities;
- the numerous uncertainties inherent in estimating quantities of oil and natural gas reserves and actual future production rates and associated costs;
- our ability to successfully identify, execute or effectively integrate future acquisitions;
- the usual hazards associated with the oil and natural gas industry, including fires, well blowouts, pipe failure, spills, explosions and other unforeseen hazards;
- our ability to effectively market our oil and natural gas;
- the availability of rigs, equipment, supplies and personnel;
- our ability to discover or acquire additional reserves;
- our ability to satisfy future capital requirements;
- changes in regulatory requirements;
- general economic conditions, status of the financial markets and competitive conditions; and
- our ability to retain key members of our senior management and key employees.

Moreover, we operate in a rapidly evolving environment. New risk factors and uncertainties emerge from time to time, and it is not possible for our management to predict all the risk factors and uncertainties, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. We qualify all of our forward-looking statements by these cautionary statements.

You should not rely upon forward-looking statements as predictions of future events. The forward-looking statements made in this report relate only to events or information available to us as of the date of this report. Except as required by law, we undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

## DEFINITIONS

The following are abbreviations and definitions of terms commonly used in the oil and gas industry and in this report. Natural gas equivalents and crude oil equivalents are determined using the ratio of six Mcf to one barrel. Unless the context otherwise requires, all references to "us," "our," "we," "NBH," the "Company" or "Next Bridge" mean Next Bridge Hydrocarbons, Inc. and where applicable, its consolidated subsidiaries including Torchlight Hazel, LLC, a Texas limited liability company ("Torchlight Hazel"), Hudspeth Oil Corporation, a Texas corporation ("Hudspeth"), Hudspeth Operating, LLC, a Texas limited liability company ("Hudspeth Operating"), and Torchlight Energy, Inc., a Nevada corporation ("TEI") and Wolfbone Investments LLC, a Texas limited liability company ("Wolfbone").

"**Bbl**" means a barrel of U.S. 42 gallons of oil.

"**BOE**" means one barrel of oil equivalent.

"**Completion**" means the installation of permanent equipment for the production of oil or gas.

"**Condensate**" means natural gas in liquid form produced in connection with natural gas wells.

"**Exploratory well**" means a well drilled to find a new field or to find a new productive reservoir in a field previously found to be productive of oil or natural gas in another reservoir or to extend a known reservoir.

"**Gross**" when used with respect to acres or wells, production or reserves refers to the total acres or wells in which we or another specified person has a working interest.

"**MBbls**" means one thousand barrels of oil.

"**Mcf**" means one thousand cubic feet of natural gas.

"**Net**" when used with respect to acres or wells, refers to gross acres of wells multiplied, in each case, by the percentage working interest owned by us.

"**NGL**" refers to natural gas liquids, which is composed exclusively of carbon and hydrogen.

"**Oil**" means crude oil or condensate.

"**Operator**" means the individual or company responsible for the exploration, development, and production of an oil or gas well or lease.

"**Proved developed non-producing**" means reserves (i) expected to be recovered from zones capable of producing but which are shut-in because no market outlet exists at the present time or whose date of connection to a pipeline is uncertain or (ii) currently behind the pipe in existing wells, which are considered proved by virtue of successful testing or production of offsetting wells.

"**Proved developed producing**" means reserves expected to be recovered from currently producing zones under continuation of present operating methods. This category includes recently completed shut-in gas wells scheduled for connection to a pipeline in the near future.

"**Proved developed reserves**" means reserves that can be expected to be recovered through existing wells with existing equipment or operating methods.

"**Proved reserves**" means the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided by contractual arrangements.

"**Proved undeveloped reserves**" means reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Reserves on undrilled acreage are limited to those drilling locations offsetting productive wells that are reasonably certain of production when drilled or where it can be demonstrated with certainty that there is continuity of production from the existing productive formation.

"**Recompletion**" means the completion for production of an existing well bore in another formation from which the well has been previously completed.

"**Royalty**" means an interest in an oil and gas lease that gives the owner of the interest the right to receive a portion of the production from the leased acreage (or of the proceeds of the sale thereof), but generally does not require the owner to pay any portion of the costs of drilling or operating the wells on the leased acreage. Royalties may be either landowner's royalties, which are reserved by the owner of the leased acreage at the time the lease is granted, or overriding royalties, which are usually reserved by an owner of the leasehold in connection with a transfer to a subsequent owner.

"**SEC**" means the United States Securities and Exchange Commission.

"**Working interest**" means an interest in an oil and gas lease that gives the owner of the interest the right to drill for and produce oil and gas on the leased acreage and requires the owner to pay a share of the costs of drilling and production operations. The share of production to which a working interest owner is entitled will always be smaller than the share of costs that the working interest owner is required to bear, with the balance of the production accruing to the owners of royalties. For example, the owner of a 100% working interest in a lease burdened only by a landowner's royalty of 12.5% would be required to pay 100% of the costs of a well but would be entitled to retain 87.5% of the production.

## Part I

### Items 1 and 2. Business and Properties

*The following description of the business of Next Bridge Hydrocarbons, Inc. should be read in conjunction with the information included elsewhere in this report on Form 10-K/A for the years ended December 31, 2023 and 2022.*

### Overview

We were incorporated in Nevada on August 31, 2021, as OilCo Holdings, Inc. and changed our name to Next Bridge Hydrocarbons, Inc. pursuant to our Amended and Restated Articles of Incorporation filed on June 30, 2022. We spun-off from Meta Materials, Inc. ("Meta") on December 14, 2022 pursuant to which we became an independent company. Prior to the Spin-Off, we were a wholly-owned subsidiary of Meta.

We are an energy company engaged in the acquisition, exploration, exploitation and development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and natural gas project we hold in the Orogrande Basin in West Texas in Hudspeth County, Texas (the "Orogrande Project"). In addition, we have minor interests in the Eastern edge of the Midland Basin in Sterling, Tom Green and Irion Counties, Texas (the "Hazel Project"), and two minor well interests located in Oklahoma (the "Oklahoma Properties").

We operate our business through five wholly owned subsidiaries: TEI, Hudspeth, Torchlight Hazel, Wolfbone Investments LLC, and Hudspeth Operating.

As of December 31, 2023, we had interests in three oil and natural gas projects: the Orogrande Project, the Hazel Project, and the Oklahoma Properties in partnership with Kodiak Oil & Gas Exploration Inc. in Central Oklahoma.

In August 2020, our subsidiaries entered into the Option Agreement (defined below) with MHP (defined below), under which, in exchange for satisfying certain drilling obligations, MHP had the option to purchase the entire Hazel Project, which MHP determined not to exercise; however, MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the well attributable to our interest until such time as it has recovered its reasonable costs and expenses for drilling, completing and operating the well. Operations continue under the Option Agreement until such time as the revenue from the project equates to the dollars spent by, and shall be reimbursed to, MHP. At such time, any acreage held by production and all wells will revert back to our subsidiary, Torchlight Hazel. See "Current Projects" below for additional discussion regarding our oil and natural gas properties.

### Market Opportunity

The market for any oil and natural gas that we may produce depends on factors beyond our control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, demand for oil and natural gas, the marketing of competitive fuels, and the effects of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial, and individual consumers.

Our oil production is expected to be sold at prices tied to the spot oil markets. Our natural gas production is expected to be sold under short-term contracts and priced based on first of the month index prices or on daily spot market prices. We will rely on our operating partners to market and sell our production.

### Our Competitive Strengths

*Experienced People.* As of December 31, 2023, we had five full-time employees, but presently we have two employees. We engage consultants for various roles as needed including high quality exploration and technical partners. Our internal operations team serves as the foundation of our values-driven culture and commitment to developing a skilled, agile, diverse and engaged workforce. Advancing a safe, ethical, inclusive and diverse culture creates an environment that attracts and retains the high-performing workforce needed to successfully execute our strategy. We plan to continue to build on the expertise and experiences of our management and operations teams and seek guidance from outside advisors as well as our Board.

*Project Focus.* We are focusing primarily on exploration projects backed by a high degree of scientific information. We may pursue high risk exploration prospects which may appear less favored than low risk exploration. We will, however, consider these high risk-high reward exploration prospects in connection with exploitation opportunities in a project that would reduce the overall project economic risk. We will consider such high risk-high reward prospects on their individual merits.

*Limit Capital Risks.* Limited capital exposure is planned initially to add value to a project and determine its economic viability. Management has experience in successfully managing risks of projects, finance, and value.

**Business Strategy**

Our mission is to safely increase production and cash flow from our oil and natural gas properties which we believe are rich in opportunities through a disciplined allocation of capital and operational management for the benefit of our shareholders. Our business strategy is designed to accomplish this mission by focusing on two key objectives: (1) maximize the value of our producing assets; and (2) progress our discovered resources into proved reserves, production, and cash flow through efficient appraisal, development and exploitation. We believe there are three principal business processes that we must follow to enable our operations to be profitable. Each major business process offers the opportunity for a distinct partner or alliance as we grow. These processes are:

- Investment Evaluation and Review;
- Operations and Field Activities; and
- Administrative and Finance Management.

*Investment Evaluation and Review.* We believe this process is the key ingredient to our success. Recognition of quality investment opportunities is the fuel that drives our engine. Broadly, this process includes the following activities: prospect acquisition, regional and local geological and geophysical evaluations, data processing, economic analysis, lease acquisition and negotiations, permitting, and field supervision. We expect these evaluation processes to be managed by our management team. Expert or specific technical support will be outsourced as needed.

*Operations and Field Activities.* This process begins following management approval of an investment. Well site supervision, construction, drilling, logging, product marketing, and transportation are examples of some activities. We will prefer to be the operator where possible.

*Administrative and Finance Management.* This process coordinates our initial structuring and capitalization, general operations and accounting, reporting, audit, banking and cash management, regulatory agencies reporting and interaction, timely and accurate payment of royalties, taxes, leases rentals, vendor accounts and performance management that includes budgeting and maintenance of financial controls, and interface with legal counsel and tax and other financial and business advisors.

**Current Projects**

As of December 31, 2023, we had interests in three oil and natural gas projects: the Orogrande Project, the Hazel Project, and the Oklahoma Properties. Additionally, we acquired lease interests in certain Louisiana projects in March 2024.

Orogrande Project, West Texas

On August 7, 2014, our predecessor entered into a Purchase Agreement with Hudspeth, McCabe Petroleum Corporation (“MPC”), and Gregory McCabe (“Mr. McCabe”), the sole owner of Wolfbone Investments, LLC (“Wolfbone”). Mr. McCabe was the sole owner of both Hudspeth and MPC. Under the terms and conditions of the Purchase Agreement, our predecessor acquired 100% of the capital stock of Hudspeth which held certain oil and natural gas assets, including a 100% working interest in approximately 172,000 predominately contiguous acres in the Orogrande Basin in West Texas; provided, that the Company now has an interest in approximately 134,000 based on the expiration of certain leases since acquired. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe. Mr. McCabe owns a controlling interest in Magdalena, an entity that holds a 4.5% overriding royalty interest in the Orogrande acreage, which he obtained prior to, and was not a part of the August 2014 transaction.

Effective March 27, 2017, the Orogrande acreage became subject to a Development Unit Agreement 2837 with University Lands ("DDU Agreement"), which allows for all 192 existing leases covering approximately 134,000 gross acres leased from University Lands to be combined into one drilling and development unit for development purposes. The term of the DDU Agreement expired on December 31, 2024. The DDU Agreement also grants the right to extend the DDU Agreement through December 31, 2029, if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid. As of December 31, 2023, the Company expected to exercise its option to extend the term under the DDU Agreement prior to its expiration. Reference Note 13 Subsequent Events.

Drilling obligations under the DDU Agreement included five wells per year in the years 2021, 2022 and 2023. The drilling obligations are minimum yearly requirements and may be exceeded if acceleration is desired.

On November 7, 2022, we extended the term applicable to our 2022 fiscal year drilling obligations in the Orogrande Project in order to stay in compliance with the continuous drilling clause under the DDU Agreement. As of December 31, 2023, we were in compliance with our drilling obligations under the DDU Agreement.

As of December 31, 2023, leases covering approximately 134,000 acres remained in effect.

While drilling wells under our 2022 drilling obligation, our operations team deployed a new mist drilling solution that increased hole stability, which we believe will result in meaningful cost savings for additional wells drilled in the Orogrande Project. Multiple test wells were drilled in the Orogrande Project in order to stay in compliance with the DDU Agreement. While these previously drilled wells may have potential to produce hydrocarbons to sell commercially in the future, we have no immediate plans to deploy the additional capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including reservoir locations, target depths and designated acreage, in the Orogrande Project. Notwithstanding the foregoing, development of the wells continued through December 31, 2023, to further capture and document the scientific base in support of demonstrating the production potential of the property.

We have drilled a total of 18 test wells in the Orogrande Project properties to test for potential shallow pay zones and deeper pay zones that may be present on structural plays. Two horizontal wells were successfully completed for hydrocarbons through the 2020 drilling program. However, as of December 31, 2023, both wells remain shut-in waiting for hook up to a gas pipeline. The various wells drilled on the Orogrande Basin through 2022 confirmed that there are at least five potential distinct reservoirs under our acreage. While these wells may have potential to produce hydrocarbons to sell commercially in the future, due to capital constraints we have no immediate plans to deploy the capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including well locations, target depths and designated acreage, in the Orogrande Project. The remaining wells can be used for future development for various applications such as re-entering the wellbores for horizontal unconventional development, fresh water supply, or salt water disposal and/or plugged and abandoned.

On July 25, 2018, we and Hudspeth entered into a Settlement & Purchase Agreement (the “Settlement Agreement”) with University Founders (and Founders Oil & Gas Operating, LLC, former operator) (“Founders”), Wolfbone and MPC (entities controlled by a related party), which agreement provided for Founders assigning all of its working interest in the oil and natural gas leases of the Orogrande Project to Hudspeth and Wolfbone equally. Future well capital spending obligations remained the same 50% contribution from Hudspeth and 50% from Wolfbone until such time as the $40.5 million to be spent on the project. Cumulative capital spending did not exceed $40.5 million until after the closing of the merger between Meta and Torchlight Energy Resources, Inc. in June 2021.

Effective as of October 6, 2023, the Company and certain investor participants (each a “Participant” and collectively the “Participants”) entered into twenty-five separate Participation Agreements (the “Participation Agreements”) to conduct drilling of wells in the Company’s approximately 17,000 acre Johnson Prospect in Hudspeth County, Texas, which is a portion of the Company’s Orogrande Prospect.

Pursuant to the Participation Agreement, the Participants collectively funded the cost of drilling, of approximately $9,000,000, which was used to (i) acquire the rights to drill on the Johnson Prospect and (ii) finance the drilling of five (5) vertical wells in the Johnson Prospect in connection with the Company’s 2023 drilling program requirements under its University Lands Drilling and Development Unit Agreement. Each Participant will have the right to participate in the drilling of additional wells on the Johnson Prospect in the future, including an additional five (5) vertical wells in locations determined by Hudspeth Operating, LLC, the Company’s wholly owned subsidiary (“Hudspeth”), in its sole discretion, in 2024. The Participation Agreement provides for an initial allocation of the working interests and net revenue interests among each Participant and the Company and then a re-allocation upon payout or payment to such Participant of drilling and completion costs for each well drilled. Following payout, the Company will own 25% of working interest as described below and 18.75% net revenue interest in each well. Hudspeth will be the operator of the Johnson Prospect pursuant to a joint operating agreement (the “Operating Agreement”) entered into in connection with the Participation Agreement. The Participation Agreement and the Operating Agreement required, among other things, that Hudspeth and the Company drill and complete at least five (5) vertical wells by December 31, 2023, unless the term of the Participation Agreement is extended. The wells were completed by December 31, 2023.

The Company reserved a twenty-five percent (25%) back-in interest, which shall automatically revert to the Company following the date that each Participant first recovers 100% of the costs attributable to the drilling and development of the wells in which such Participant has participated.

Further, within a specified period following drilling of the initial five (5) wells, pursuant to the Participation Agreement each Participant had the option to elect to transfer and assign all its interests to the Company in exchange for the issuance of shares of common stock of the Company at a conversion factor of $1.20 per share. The option was exercised by the Participants on December 31, 2024.

One of the Participants is McCabe Petroleum Corporation, an entity controlled by Mr. McCabe, the Chairman of the Company’s Board of Directors, the largest shareholder of the Company and a lender of the Company. As such, entry into the Participation Agreement and the related transactions pursuant thereto constitute related party transactions, which have been duly approved by the Company’s Board of Directors and Audit Committee.

*Acquisition of Working Interest*

On December 21, 2022, the Company entered into that certain Agreement and Plan of Merger (the "Merger Agreement") with Hudspeth, Wolfbone, MPC and Mr. McCabe, pursuant to which in a series of transactions the oil and natural gas leases, the lands covered by such leases, pooling and communitization agreements, rights-of-way, the surface estate of the lands and all wells located in Orogrande Project will be transferred, conveyed and assigned to Hudspeth (or its designated assignee) in consideration of (1) treating the Orogrande Obligations (as defined in the Merger Agreement) as having been irrevocably satisfied and discharged in full with respect to MPC and (2) an issuance of 56,297,638 shares of Company common stock to Mr. McCabe (such series of transactions collectively, the "Merger").

The Merger became effective on April 25, 2023. As a result of the Merger, the Company acquired Wolfbone's 22.6249% remaining rights to working interest in the Orogrande Project in consideration of the issuance by the Company of the 56,297,638 shares of the Company's common stock to Mr. McCabe.

The Merger was completed in accordance with the Texas Business Organizations Code, whereby (a) the Company formed NBH MergeCo, LLC with the State of Texas ("MergeCo") in order to cause Hudspeth to assign all of its rights under the Merger Agreement to MergeCo and MergeCo assumed Hudspeth's obligations under the Merger Agreement, (b) MergeCo, Wolfbone and MPC merged with each of Wolfbone and MPC as surviving entities, and (c) Wolfbone became a direct and wholly-owned subsidiary of the Company. The closing of the transactions contemplated by the Merger Agreement occurred on May 11, 2023.

On May 11, 2023, the Company and its wholly owned subsidiary, Hudspeth, entered into a contribution and exchange agreement with each of the prior working interest owners in the Orogrande Project named in the table below (each an "Orogrande Owner" and collectively, the "Orogrande Owners"), pursuant to which, the Company issued to the Orogrande Owners the number of shares of the Company's common stock set forth opposite such Orogrande Owner's name below in exchange for and in order to acquire such Orogrande Owner's rights to working interest in the Orogrande Project.

| | **Shares of Common Stock** | **Working Interest Contribution** |
|---|---|---|
| Dingus Investments, Inc. | 7,050,382 | 2.8334% |
| Pandora Energy, LP | 6,220,779 | 2.5000% |
| Kennedy Minerals, Ltd | 6,220,779 | 2.5000% |
| The de Compiegne Property Company No. 20, Ltd | 6,220,779 | 2.5000% |
| Loma Hombre Energy, LLC | 622,078 | 0.2500% |
| Sero Capital, LLC | 725,840 | 0.2917% |
| **TOTAL** | **27,060,637** | **10.8751%** |

The Orogrande Project ownership as of December 31, 2023, is detailed as follows:

| | Revenue Interest | Working Interest |
|---|---|---|
| University Lands – Mineral Owner | 20.000% | |
| ORRI – Magdalena Royalties, LLC, an entity controlled by Gregory McCabe, Chairman of the Board | 4.500% | |
| ORRI – Unrelated Parties | 0.500% | |
| Hudspeth Oil Corporation, a subsidiary of Next Bridge Hydrocarbons, Inc. | 56.250% | 75.000% |
| Wolfbone Investments, LLC, a subsidiary of Next Bridge Hydrocarbons, Inc. | 18.750% | 25.000% |
| | 100.000% | 100.000% |

Hazel Project in the Midland Basin in West Texas

Effective April 4, 2016, TEI acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. A back-in after payout of a 25% working interest was retained by MPC and another unrelated working interest owner.

In October 2016, the holders of all of Torchlight Energy Resources, Inc.'s then-outstanding shares of Series C Preferred Stock (which were issued in July 2016) elected to convert into a total 33.33% working interest in our Hazel Project, reducing our ownership from 66.66% to a 33.33% working interest.

*Acquisition of Additional Interests in Hazel Project*

On January 30, 2017, we entered into and closed an Agreement and Plan of Reorganization and a Plan of Merger with an entity which was wholly owned by Mr. McCabe, which resulted in the acquisition of approximately 40.66% working interest in the 12,000 gross acres, 9,600

net acres, in the Hazel Project.

Also, on January 30, 2017, the Company entered into and closed a Purchase and Sale Agreement with Wolfbone. Under the agreement, we acquired certain of Wolfbone's Hazel Project assets, including its interest in the Flying B Ranch #1 well and the 40 acre unit surrounding the well.

Upon the closing of the transactions, our working interest in the Hazel Project increased by 40.66% to a total ownership of 74%.

Effective June 1, 2017, we acquired an additional 6% working interest from unrelated working interest owners increasing our working interest in the Hazel Project to 80%, and an overall net revenue interest of 75%.

The Company has drilled seven test wells on the Hazel Project to capture and document the scientific base in support of demonstrating the production potential of the property. No wells were drilled on the Hazel Project during the year ended December 31, 2023.

*Option Agreement with Masterson Hazel Partners, LP*

On August 13, 2020, our subsidiaries TEI and Torchlight Hazel (collectively, "Torchlight Subs") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and MPC. Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on our Hazel Project, sufficient to satisfy Torchlight Subs's continuous development obligations on the southern half of the prospect no later than September 30, 2020. MHP has satisfied this drilling obligation. MHP paid to Torchlight Subs $1,000 as an option fee at the time of execution of the Option Agreement. MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the Well attributable to Torchlight Subs's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the Well.

In exchange for MHP satisfying the above drilling obligations, Torchlight Subs granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight Subs's continuous development obligations on the northern half of the prospect. Because MHP exercised this drilling option and satisfied the continuous development obligations on the northern half of the prospect, under the terms of the Option Agreement (as amended in September 2020) MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. Such purchase would be under the terms of a form of Purchase and Sale Agreement included as an exhibit to the Option Agreement, at an aggregate purchase price of $12,690,704 for approximately 9,762 net mineral acres, and not less than 74% net revenue interest (approximately $1,300 per net mineral acre). MHP declined to exercise the option in 2021.

Full impairment of the historical cost incurred in prior periods for the Hazel Project has been previously recognized.

<u>Oklahoma Properties in the Hunton Play of Central Oklahoma</u>

Presently, we are producing from one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

Full impairment of the historical cost incurred in prior periods for the Oklahoma Properties has been previously recognized.

<u>Louisiana Projects</u>

In March 2024, we entered into and closed a Contribution Agreement with Wildcat Partners SPV, LLC, a Delaware limited liability company ("Wildcat"), under which Wildcat transferred to us 100% of the issued and outstanding membership interests in each of (a) Wildcat Cowboy, LLC, a Texas limited liability company ("Cowboy"), (b) Wildcat Packer, LLC, a Texas limited liability company ("Packer"), (c) Wildcat Panther, LLC, a Texas limited liability company ("Panther") and (d) Wildcat Valentine, LLC, a Texas limited liability company ("Valentine"). As consideration, we issued 2,500,000 shares of our common stock, under the terms and conditions of the Contribution Agreement.

MPC previously owned and sold to Wildcat the underlying oil and gas prospects owned by Cowboy, Packer, Panther and Valentine. MPC always retained a 25% back-in after payout and various overriding royalty interests in the prospects owned by Cowboy, Packer, Panther and Valentine, but MPC agreed to waive its 25% back-in after payout but retain its overriding royalty interests in all such prospects in an effort to facilitate the transactions described below, including the sale of the leases owned by Valentine, including a leasehold estates in approximately 3,878.90 gross acres and 3,626.25 net acres of land situated in Lafourche Parish, Louisiana (the "Valentine Leases"), and the leases owned by Panther, including leasehold estates in approximately 618 gross acres and 618 net acres of land situated in Acadia Parish, Louisiana (the "Panther Leases"), the leases owned by Packer, including leasehold estates in approximately 4,349 gross acres and 4,349 net acres of land situated in Acadia and Lafourche Parish, Louisiana (the "Packer Leases"), the leases owned by Cowboy, including leasehold estates in approximately 835 gross acres and 835 net acres of land situated in Acadia Parish, Louisiana (the "Cowboy Leases").

Concurrent with the closing of the above transactions with Wildcat, we entered into and closed a Participation Agreement with Magnetar Exploration L.P. ("Magnetar") under which we sold to Magnetar a 100% working interest, entitled to not less than a 75% net revenue interest, in and to the Valentine Leases, along with a 100% right, title and interest in all contracts affecting the Valentine Leases, all under the terms and conditions of such Participation Agreement, including the following consideration: (a) Magnetar paid $964,448 from which we are required to pay bonuses of $240,000 to ORX Exploration and $60,000 to Zebrowski Consulting, resulting in net proceeds to us of $664,448; (b) Magnetar agrees to pay all delay rentals pertaining to the Valentine Leases which accrue during calendar year 2024 and during the months of January through August of 2025, provided, however, that if the initial test well is commenced at any time prior to the end of August, 2025, Magnetar's obligation to bear delay rental expenses thereafter will be deemed terminated, and the obligation for the payment of subsequent delay rentals shall be governed by the subject operating agreement; (c) in the event Magnetar has not commenced actual drilling operations on lands covered by the Valentine Leases on or prior August 31, 2025, then Magnetar shall have the option to continue paying rentals or extending the leases within the Area of Mutual Interest (the "AMI") until December 31, 2026; (d) we will have the option to participate for up to a 1/3 working interest in the initial test well to be undertaken by Magnetar on lands covered by the Valentine Leases, with this right to extend to subsequent wells to be undertaken by Magnetar, subject to the further provisions regarding operations; and (e) at least three working days prior to its spudding the initial test well, Magnetar will pay to us a spud fee of $600,000 of which $240,000 of the cost thereof will be shared with ORX Exploration and $120,000 will be shared with Zebrowski Consulting, leaving us with $240,000.

Also concurrent with the closing of the above transactions with Wildcat, we enter into and closed a Participation Agreement with Magnetar under which we sold to Magnetar a 100% working interest, entitled to not less than a 75% net revenue interest, in and to the Panther Leases covering approximately 618 gross acres of land situated within the AMI provided therein, along with a 100% right, title and interest in all contracts affecting the Panther Leases, for the following consideration: (a) Magnetar paid $428,918.05 to us and $70,081.95 to MPC for delay rentals paid by it; (b) Magnetar agrees to reimburse McCabe for its payment of delay rentals to sustain certain of the Panther Leases coming due in March and April 2024 in the amount of $70,081.98; (c) Magnetar agrees to pay all delay rentals pertaining to the Panther Leases which accrue during calendar year 2024, shown to be $23,888.90; (d) in the event Magnetar is unable to commence actual drilling operations on lands covered by the Subject Panther Leases on or prior February 1, 2025, then Magnetar shall have the option to extend or take new leases on any of the Panther Leases that would expire during the following 12 calendar months; (e) we will have the option to participate up to a 1/3 working interest in the initial test well to be undertaken by Magnetar on lands covered by the Panther Leases, with this right to extend to subsequent wells to be undertaken by Magnetar, subject to the further provisions regarding operations; (f) prior to its spudding the initial test well, Magnetar will pay to us a spud fee equal to $100,000 of which $20,000 will be shared with Zebrowski Consulting.

Reference Note 13 regarding the valuation of common stock issued and its impact on the recording of the subsequent sale of a portion of the assets acquired.

**Oil and Natural Gas Reserves**

Other than the Producing Hazel Wells (defined below), the only producing properties owned by us were the Oklahoma Properties, which were marginally producing and were uneconomic for reserve calculation purposes. At the end of 2023, reserves did not include any value for proved undeveloped properties.

We currently have two producing wells located on the Hazel Project, the Flying B Ranch #3H well and the Flying B Ranch #4H well (the "Producing Hazel Wells"). Production is from the Wolfcamp formation. At December 31, 2023, there were no proved reserves or proved developed nonproducing reserves related to these properties after giving effect to the obligation to reimburse drilling costs incurred by MHP.

The initial gross monthly production rate for the Flying B Ranch #4H was estimated to be 4,200 Bbl, although we will receive no future revenue from these wells until their estimated depletion because all of such revenue, after deducting expenses to produce the oil, is to be received by MHP directly and credited toward the recoupment of drilling costs incurred by MHP.

As of December 31, 2023, our proved developed nonproducing reserves related to the Producing Hazel Wells totaled -0- BOE, after giving effect to the obligation to reimburse drilling costs incurred by MHP. As of December 31, 2023, the outstanding cost reimbursement balance owed to MHP was $3,364,823.

**Production, Price and Cost Summary**

Oklahoma Properties

During the year ended December 31, 2022, we produced and sold 183 Bbls net to our interest (168 for the predecessor period plus 15 for the successor period) at an average sale price of $98.75 per Bbl. We produced and sold 3,031 Mcf of natural gas net to our interest (2,789 for the predecessor period plus 242 for the successor period) at an average sales price of $7.51 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $42.68 per BOE. Our depreciation, depletion, and amortization expense was $-0- per BOE.

During the year ended December 31, 2023, we produced and sold 244 barrels of oil net to our interest at an average sale price of $76.50 per Bbl. We produced and sold 3,558 Mcf of gas net to our interest at an average sales price of $2.07 per Mcf. Our average production cost including lease operating expenses and direct production taxes was $18.90 per BOE. Our depreciation, depletion, and amortization expense was $-0- per BOE.

Hazel Project

During the year ended December 31, 2022, 22,511 barrels of oil net to our interest (21,647 for the predecessor period plus 864 for the successor period) were sold at an average sale price of approximately $55.98 per Bbl, although we received none of this revenue because all of it, after deducting expenses to produce the oil, was either received by MHP directly during the time that the Option Agreement was in effect or credited towards the recoupment of drilling costs incurred by MHP. We produced and sold -0- Mcf of natural gas net to our interest.

| | December 31, 2022 Reserves | | | December 31, 2022 Future Net Revenue (M$) | |
|---|---|---|---|---|---|
| **Category** | **Oil (Bbls)** | **Gas (Mcf)** | **Total (BOE)** | **Total** | **Present Value Discounted at 10%** |
| Net Proved Producing | 0 | 0 | 0 | $ - | $ - |
| Net Proved Nonproducing | 0 | 0 | 0 | $ - | $ - |
| Total Net Proved | 0 | 0 | 0 | $ - | $ - |
| Standardized Measure of Future Net Cash Flows Related to Proved Oil and Gas Properties | | | | | $ - |
| Probable Undeveloped | | | | $ - | $ - |

During the year ended December 31, 2023, 10,860 barrels of oil net to our interest were sold at an average sale price of approximately $70.99 per Bbl, although we received none of this revenue because all of it, after deducting expenses to produce the oil, was either received by MHP directly during the time that the Option Agreement was in effect or credited towards the recoupment of drilling costs incurred by MHP. We produced and sold -0- Mcf of natural gas net to our interest.

| | December 31, 2023 Reserves | | | December 31, 2023 Future Net Revenue (M$) | |
|---|---|---|---|---|---|
| **Category** | **Oil (Bbls)** | **Gas (Mcf)** | **Total (BOE)** | **Total** | **Present Value Discounted at 10%** |
| Net Proved Producing | 0 | 0 | 0 | $ - | $ - |
| Net Proved Nonproducing | 0 | 0 | 0 | $ - | $ - |
| Total Net Proved | 0 | 0 | 0 | $ - | $ - |
| Standardized Measure of Future Net Cash Flows Related to Proved Oil and Gas Properties | | | | | $ - |
| Probable Undeveloped | 0 | 0 | 0 | $ - | $ - |

The net producing reserves from 2022 and 2023 were -0- BOE related to the Producing Hazel Wells due to the obligation to pass revenue through to MHP under the terms of the Option Agreement effective during both periods. Since we have no reserve value as of December 31, 2022 and December 31, 2023, Standardized Measure is not presented.

Due to the inherent uncertainties and the limited nature of reservoir data, both proved and probable reserves are subject to change as additional information becomes available. The estimates of reserves, future cash flows, and present value are based on various assumptions, including those prescribed by the SEC, and are inherently imprecise.

Table of Contents

Investments to support our oil and natural gas properties during the years ended December 31, 2023 and 2022 were $8.6 million and $6.9 million.

| | Fiscal year Ended December 31 - Restated | |
|---|---|---|
| | 2023 | 2022 |
| Property acquisition costs | $ 723,669 | $ - |
| Development costs | 8,653,640 | 6,790,628 |
| Exploratory costs | $ - | $ - |
| Totals | $ 9,377,309 | $ 6,790,628 |

Original Property acquisition costs for the year ended December 31, 2023, stated above were $16,015,592 representing the value of 83,358,275 shares of common stock and cancellation of an account receivable given in exchange for 33.5% working interest in the Company's Orogrande Project. Original 2023 Property acquisition costs have been restated to $723,669.

Property development costs presented above exclude interest capitalized into the full cost pool. For the years ended December 31, 2023 and 2022, we capitalized $2,498,184 and $1,363,538 of interest on unevaluated properties, respectively.

The development costs 2023 and 2022 include work solely in the Orogrande Project. We made progress during 2023 and 2022 to develop proved producing reserves in the Orogrande Project in the Permian Basin in West Texas, which has not yet resulted in hydrocarbon production. We incurred costs of $11.1 million in 2023 and $8.2 million in 2022 related to certain drilling activity carried out to remain in compliance with all aspects of our lease obligations and to satisfy the continuous drilling clause under the agreement with University Lands, whereby we are obligated to satisfy certain minimum yearly requirements that may be exceeded if desired. Additionally, the Company and certain investor participants entered into twenty-five separate Participation Agreements to conduct drilling of wells in the Company's approximately 17,000 acre Johnson Prospect in Hudspeth County, Texas, which is a portion of the Company's Orogrande Prospect to satisfy the 2023 drilling requirement.

No development costs were incurred in 2023 or 2022 for the Oklahoma Properties.

During the fiscal years ended December 31, 2023 and 2022, development and exploratory net wells were drilled as set forth in the table below.

**Drilling Activity Summary**

| | **December 31,** | |
|---|---|---|
| | **2023** | **2022** |
| Hazel Project (Texas) | | |
| Dry | 0 | 0 |
| Productive | 0 | 0 |
| Orogrande Project (Texas) | | |
| Dry | 0 | 0 |
| Productive | 5 | 5 |

Effective as of October 6, 2023, the Company and certain investor participants entered into twenty-five separate Participation Agreements to conduct drilling of wells in approximately 17,000 acre Johnson Prospect in Hudspeth County, Texas, which is a portion of the Company's Orogrande Prospect.

Pursuant to the Participation Agreement, the Participants collectively funded the cost of drilling which was used to (i) acquire the rights to drill on the Johnson Prospect and (ii) finance the drilling of five (5) vertical wells in the Johnson Prospect in connection with the Company's 2023 drilling program requirements under its University Lands Drilling and Development Unit Agreement.

The Participation Agreement provides for an initial allocation of the working interests and net revenue interests among each Participant and the Company and then a re-allocation upon payout or payment to such Participant of drilling and completion costs for each well drilled. Following payout, the Company will own 25% of working interest and 18.75% net revenue interest in each well.

| | **December 31, 2023** | | **December 31, 2022** | |
|---|---|---|---|---|
| | **Gross** | **Net** | **Gross** | **Net** |
| ***Productive Wells*** | | | | |
| Oil | 7.00 | 2.67 | 5.00 | 2.67 |
| Gas | 7.00 | 2.66 | 4.00 | 2.66 |

| *Test Wells* | | | | |
|---|---|---|---|---|
| Salt Water Disposal | 3.00 | 2.13 | 3.00 | 2.13 |
| Fresh Water Supply | 3.00 | 2.00 | 3.00 | 2.00 |
| Plug & Abandon | 5.00 | 3.87 | 5.00 | 3.87 |

Well status as of December 31, 2023 includes the five wells drilled under the Participation Agreements and which satisfied the 2023 drilling requirement. Since the Participants hold the working interest in those wells until payout, the Net Interest is unchanged from 2022.

With the principal goal of gathering scientific data from a strategy of drilling test wells, all wells were drilled with the intent of being completed and productive for hydrocarbons. Two horizontal wells were successfully completed for hydrocarbons through the 2020 drilling program, however as of December 31, 2023 both wells remain shut-in waiting for hook-up to a gas pipeline. The various wells drilled on the Orogrande Basin through 2023 confirmed that there are at least five potential distinct reservoirs under our acreage. While these wells may have potential to produce hydrocarbons to sell commercially in the future, due to capital constraints we have no immediate plans to deploy the capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including well locations, target depths and designated acreage, in the Orogrande Project. The remaining wells can be used for future development for various applications such re-entering the wellbores for horizontal unconventional development, fresh water supply, or salt water disposal and/or plugged and abandoned.

**Producing Well Summary**

**Acreage.**

The Orogrande Project consists of unevaluated and undeveloped properties in progress of development for future production.

| | Total Acres | | Developed Acres | | Undeveloped Acres | |
|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net |
| **Texas—** | | | | | | |
| Orogrande Project | 134,000 | 134,000 | - | - | 134,000 | 134,000 |
| Hazel Project | 645 | 516 | 645 | 516 | - | - |
| **Oklahoma—** | | | | | | |
| Viking | 640 | 192 | 640 | 192 | - | - |
| Total | 135,285 | 134,708 | 1,285 | 708 | 134,000 | 134,000 |

**Marketing and Customers**

The market for any oil and natural gas that we may produce depends on factors beyond our control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, demand for oil and natural gas, the marketing of competitive fuels, and the effects of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial, and individual consumers.

Our oil production is expected to be sold at prices tied to the spot oil markets. Our natural gas production is expected to be sold under short-term contracts and priced based on first of the month index prices or on daily spot market prices. We will rely on our operating partners to market and sell our production.

**Competition**

The oil and gas industry is highly competitive. Competitors include major oil companies, other independent energy companies and individual producers and operators, many of which have financial resources, personnel and facilities substantially greater than we do. We face intense competition for the acquisition of oil and natural gas properties and leases for oil and gas exploration. Not only do our competitors explore for and produce oil and natural gas, but also many carry on midstream and refining operations and market petroleum and other products on a regional, national, or worldwide basis. The operations of other companies may be able to pay more for exploratory prospects and productive oil and natural gas properties. They may also have more resources to define, evaluate, bid for, and purchase a greater number of properties and prospects than our financial or human resources permit. Our larger or integrated competitors may have the resources to be better able to absorb the burden of current and future federal, state, and local laws and regulations more easily than we can, which would adversely affect our competitive position. Our ability to locate reserves and acquire interests in properties in the future will be dependent upon our ability and resources to evaluate and select suitable properties and consummate transactions in this highly competitive environment. In addition, we may be at a disadvantage in producing oil and natural gas properties and bidding for exploratory prospects because we have fewer financial and human resources than other companies in our industry. Should a larger and better financed company decide to directly compete with us, and be successful in its efforts, our business could be adversely affected.

**Regulation**

Our oil and natural gas development operations are subject to stringent and complex federal, state, tribal, regional and local environmental, health and safety laws and regulations governing, among other factors, worker safety and health, the discharge and disposal of substances into the environment, and the protection of the environment and natural resources. Numerous governmental entities, including the U.S. Environmental Protection Agency ("EPA") and analogous state and local agencies, (and, under certain laws, private individuals) have the power to enforce compliance with these laws and regulations and any permits issued under them. These laws and regulations may, among other things: (i) require permits to conduct exploration, drilling, water withdrawal, wastewater disposal and other production related activities; (ii) govern the types, quantities and concentrations of substances, including emissions of CO2, methane and certain other greenhouse gases ("GHG"), that may be disposed or released into the environment or injected into formations in connection with drilling or production activities, and the manner of any such disposal, release, or injection; (iii) limit or prohibit construction or drilling activities or require formal mitigation measures in sensitive areas such as wetlands, wilderness areas or areas inhabited by endangered or threatened species; (iv) require investigatory and remedial actions to mitigate pollution conditions arising from the Company's operations or attributable to former operations; (v) impose safety and health restrictions designed to protect employees and others from exposure to hazardous or dangerous substances; and (vi) impose obligations to reclaim and abandon well sites and pits.

Certain existing environmental and occupational safety and health laws and regulations to which our business operations are subject including, the Clean Air Act, as amended (the "CAA"), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the Federal Resource Conservation and Recovery Act ("RCRA"), Federal Water Pollution Control Act of 1972 as amended by the Oil Pollution Act of 1990, EPA rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of a leak detection and repair ("LDAR") program under the CAA's New Source Performance Standards ("NSPS") in 40 C.F.R. Part 60, Subpart OOOOa ("Quad Oa"), the Federal Occupational Safety and Health Act ("OSHA") and other state equivalent laws and regulations. In December 2023, the EPA finalized NSPS Subpart OOOOb, which seeks to reduce methane and volatile organic compound emissions from the oil and natural gas source category and NSPS Subpart OOOOc, which create, for the first-time, emission guidelines for existing oil and natural gas sources that would be included in individual states' implementation plans. These standards expand upon previously issued NSPS Subparts OOOO and OOOOa published by the EPA in 2012 and 2016, respectively. For further discussion of the risks to our results of operations arising out of our environmental regulatory compliance, see "Risks Relating to Our Business", including the following risk factors "*—Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict*," "*—Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays*," and "*—Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce.*"

**Environmental Matters**

Our operations and properties are and will be subject to extensive and changing federal, state, and local laws and regulations relating to environmental protection, including the generation, storage, handling, emission, transportation, and discharge of materials into the environment, and relating to safety and health. In the future, environmental legislation and regulation may trend toward stricter standards. These laws and regulations may, for example:

- require the acquisition of a permit or other authorization before construction or drilling commences and for certain other activities;
- limit or prohibit construction, drilling, and other activities on certain lands lying within wilderness and other protected areas;
- impose substantial liabilities for pollution resulting from operations; or
- restrict certain areas from fracking and other stimulation techniques.

The permits required for our operations may be subject to revocation, modification, and renewal by issuing authorities. Governmental authorities have the power to enforce their regulations, and violations are subject to fines or injunctions, or both. In the opinion of management, we are and will be in substantial compliance with current applicable environmental laws and regulations and have no material commitments for capital expenditures to comply with existing environmental requirements. Nevertheless, changes in existing environmental laws and regulations or in interpretations thereof could have a significant impact on our company, as well as the oil and natural gas industry in general.

CERCLA and comparable state statutes impose strict, joint, and several liability on owners and operators of sites and on persons who disposed of or arranged for the disposal of "hazardous substances" found at such sites. It is not uncommon for the neighboring landowners and other third parties to file claims for personal injury and property damage allegedly caused by hazardous substances released into the environment. The RCRA and comparable state statutes govern the disposal of "solid waste" and "hazardous waste" and authorize the imposition of substantial fines and penalties for noncompliance. Although CERCLA currently excludes petroleum from its definition of "hazardous substance," state laws affecting our operations may impose clean-up liability relating to petroleum and petroleum related products. In addition, although RCRA classifies certain oil field wastes as "non-hazardous," such exploration and production wastes could be reclassified as hazardous wastes thereby making such wastes subject to more stringent handling and disposal requirements.

The Endangered Species Act ("ESA") seeks to ensure that activities do not jeopardize endangered or threatened animal, fish, and plant species, nor destroy or modify the critical habitat of such species. Under the ESA, exploration and production operations, as well as actions by federal agencies, may not significantly impair or jeopardize protected species or habitat. The ESA provides for criminal and civil penalties for violations. Other statutes that provide protection to animal and plant species and that may apply to our operations include, but are not necessarily limited to, the Fish and Wildlife Coordination Act, the Fishery Conservation and Management Act, the Migratory Bird Treaty Act and the National Historic Preservation Act. Although we believe that our operations are and will be in substantial compliance with such statutes, any change in these statutes or any reclassification of a species as endangered could subject us to significant expenses to modify our operations or could force us to discontinue certain operations altogether.

Hydraulic fracturing is regulated by state and federal environmental and oil and gas regulatory authorities, including specifically the requirement to disclose certain information related to hydraulic fracturing operations. Operators must follow applicable legal requirements for groundwater protection and are subject to supervision by state and federal regulators (including the U.S. Department of the Interior Bureau of Land Management ("BLM") on federal acreage). Furthermore, well construction practices require the installation of multiple layers of protective steel casing surrounded by cement that are specifically designed and installed to protect freshwater aquifers by preventing the migration of fracturing fluids into aquifers. Regulatory proposals in some states and local communities have been initiated to require or make more stringent the permitting and compliance requirements for hydraulic fracturing operations. Federal and state agencies have continued to assess the impacts of hydraulic fracturing, which could spur further action toward federal and/or state legislation and regulation of hydraulic fracturing activities. In addition, in light of concerns about seismic activity being triggered by the injection of produced waters into underground wells and hydraulic fracturing, certain regulators are also considering additional requirements related to seismic safety for hydraulic fracturing activities. Further restrictions on hydraulic fracturing could make it prohibitive to conduct our operations, and also reduce the amount of oil and natural gas that we or our operators are ultimately able to produce from our properties.

**Climate Change**

Significant studies and research have been devoted to climate change and global warming, and climate change has developed into a major political issue in the United States and globally. Certain research suggests that GHG emissions contribute to climate change and pose a threat to the environment. Recent scientific research and political debate has focused in part on carbon dioxide and methane incidental to oil and natural gas exploration and production. Many states and the federal government have enacted legislation directed at controlling GHG emissions, and future legislation and regulation could impose additional restrictions or requirements in connection with our drilling and production activities and favor use of alternative energy sources, which could affect operating costs and demand for oil products. As such, our business could be materially adversely affected by domestic and international legislation targeted at controlling climate change.

**Human Capital**

The health and safety of our employees and those that work with us is a priority. Employees and contractors are expected to take all necessary and reasonable actions to ensure safe operations by following safe work practices, complying with relevant policies and regulations, and completing all applicable training. To support our dedication to health, safety and the environment, we have a health and safety policy and that applies to all employees and contractors. In addition to adoption of our employment policies, the Company fosters a strong safety culture through training.

**Corporate Information**

Our principal executive office is located at 500 W. Texas Ave., Suite 890, Midland, TX 79701. We currently share this office space with companies owned by our CEO, Gregory McCabe, and believe that the condition and size of those offices are adequate for our current needs. Our website is nextbridgehydrocarbons.com. Information contained on or accessible through our website, when available, shall not be incorporated by reference herein.

**Available Information**

We file annual, quarterly and current reports, proxy statements and other documents with the SEC under the Securities Exchange Act of 1934. The SEC maintains a website that contains reports, proxy and information statements, and other information that is electronically filed with the SEC. The public can obtain any documents that we file with the SEC at www.sec.gov. We also make available free of charge on our website, our Annual Report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and, if applicable, amendments to those reports filed or furnished pursuant to Section 13(a) of the Exchange Act as soon as reasonably practicable after we file such material with, or furnish it to, the SEC.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operation**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our audited and unaudited financial statements and related notes that are included elsewhere in this report. Some of the information contained in this discussion and analysis constitutes forward-looking statements that involve risks and uncertainties. Actual results could differ materially from those discussed in these forward-looking statements. Factors that could cause or contribute to these differences include, but are not limited to, those discussed below and elsewhere in this report, particularly under the section titled "Cautionary Statement Concerning Forward-Looking Statements."*

**Overview**

Our consolidated financial statements have been prepared on a stand-alone basis. Our consolidated financial statements reflect our financial position, results of operations and cash flows in conformity with GAAP.

A Change in Reporting Entity became effective at December 14, 2022, resulting from the spinoff lacking economic substance and requiring the inclusion of pre-spinoff historical financial reporting periods in all subsequent filings.

Where applicable certain items have been restated as notated throughout the consolidated financials statements and disclosures following.

The historical costs and expenses reflected in our 2022 restated consolidated comparative financial statements include an allocation for certain corporate shared service functions historically provided by Meta including executive oversight, accounting, treasury, tax, legal, human resources, occupancy, procurement, information technology and other shared services. These expenses have been allocated to us on the basis of direct usage when identifiable, with the remainder allocated on a pro rata basis based on sales, headcount, tangible assets or other measures considered to be a reasonable reflection of the historical utilization levels of these services.

Our management believes the assumptions underlying our restated consolidated financial statements, including the assumptions regarding the allocation of general corporate expenses from Meta are reasonable. Nevertheless, our financial statements may not include all of the actual expenses that would have been incurred had we operated as a stand-alone company during the periods presented and may not reflect what our actual results of operations, financial position and cash flows would have been if we had operated as a stand-alone company during the periods presented. Actual costs that would have been incurred if we had operated as a stand-alone company would depend on multiple factors, including organizational structure and strategic decisions made in various areas, including information technology and infrastructure. We now perform these functions using our own resources and purchased services.

On December 21, 2022, we entered into that certain Agreement and Plan of Merger (the "Merger Agreement") with Hudspeth, Wolfbone, MPC and Mr. McCabe, pursuant to which in a series of transactions the oil and natural gas leases, the lands covered by such leases, pooling and communitization agreements, rights-of-way, the surface estate of the lands and all wells located in the Orogrande Project will be transferred, conveyed and assigned to Hudspeth (or its designated assignee) in consideration of (1) treating the Orogrande Obligations (as defined in the Merger Agreement) as having been irrevocably satisfied and discharged in full with respect to MPC and (2) an issuance of 56,297,638 shares of our common stock to Mr. McCabe (such series of transactions collectively, the "Merger"). The Merger was completed in May 2023 in accordance with the Texas Business Organizations Code, whereby (a) the Company will form NBH MergeCo, LLC with the State of Texas ("MergeCo") in order to cause Hudspeth to assign all of its rights under the Merger Agreement to MergeCo and MergeCo will assume Hudspeth's obligations under the Merger Agreement, (b) Hudspeth (or MergeCo, as its assignee), Wolfbone and MPC shall merge with each of Wolfbone and MPC as surviving entities, and (c) Wolfbone became a direct and wholly-owned subsidiary of the Company. The closing of the transactions contemplated by the Merger Agreement were subject to the satisfaction of certain customary closing conditions, including filing and acceptance of the certificate of merger by the Secretary of State of the State of Texas.

In connection with the Merger, on December 22, 2022, the Company entered into the 2022 Note (defined below). The Company is entitled to request advances under the 2022 Note in a minimum principal amount of $100,000 each. Mr. McCabe is the largest shareholder of our common stock. As such, the Merger and 2022 Note constitute related party transactions which have been duly approved by our Board and Audit Committee. As of December 31, 2023, the Company had drawn $20 million on the 2022 Note. The maturity date of the loan had been amended to September 30, 2024.

*Recent Developments*

We met our 2022 drilling obligations under the DDU Agreement to drill five new wells in the Orogrande Project in advance of the March 31, 2023, deadline under University Lands lease requirement. The data collected from these five wells, in addition to the five wells drilled in 2021, confirmed that there are at least five potential distinct reservoirs under our acreage. Also, our operations team deployed a new mist drilling solution which increased hole stability, which we believe will result in meaningful cost savings for additional wells drilled in the Orogrande Project. While these wells may have potential to produce hydrocarbons to sell commercially in the future, we have no immediate plans to deploy the additional capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including reservoir locations, target depths and designated acreage, in the Orogrande Project.

Effective as of October 6, 2023, the Company and certain investor participants (each a "Participant" and collectively the "Participants") entered into twenty-five separate Participation Agreements (the "Participation Agreements") to conduct drilling of wells in the Company's approximately 17,000 acre Johnson Prospect in Hudspeth County, Texas, which is a portion of the Company's Orogrande Prospect.

Pursuant to the Participation Agreement, the Participants collectively funded the cost of drilling, of approximately $9,000,000, which was used to (i) acquire the rights to drill on the Johnson Prospect and (ii) finance the drilling of five (5) vertical wells in the Johnson Prospect in connection with the Company's 2023 drilling program requirements under its University Lands Drilling and Development Unit Agreement. Each Participant will have the right to participate in the drilling of additional wells on the Johnson Prospect in the future, including an additional five (5) vertical wells in locations determined by Hudspeth Operating, LLC, the Company's wholly owned subsidiary ("Hudspeth"), in its sole discretion, in 2024. The Participation Agreement provides for an initial allocation of the working interests and net revenue interests among each Participant and the Company and then a re-allocation upon payout or payment to such Participant of drilling and completion costs for each well drilled. Following payout, the Company will own 25% of working interest as described below and 18.75% net revenue interest in each well. Hudspeth will be the operator of the Johnson Prospect pursuant to a joint operating agreement (the "Operating Agreement") entered into in connection with the Participation Agreement. The Participation Agreement and the Operating Agreement required, among other things, that Hudspeth and the Company drill and complete at least five (5) vertical wells by December 31, 2023, unless the term of the Participation Agreement is extended.

The wells were completed by December 31, 2023 satisfying the 2023 drilling obligation under the DDU Agreement.

*Income Taxes*

Judgment is required in determining the provision for income taxes and related accruals, deferred tax assets and liabilities. In the ordinary course of business, tax issues may arise where the ultimate outcome is uncertain. Additionally, our tax returns are subject to audit by various tax authorities. Consequently, changes in our estimates for contingent tax liabilities may materially impact our results of operations or financial position.

**Results of Operations**

***Historical Results for the Years Ended December 31, 2023 and 2022* – Restated**

***Historical Results for the Years Ended December 31, 2023 - Restated***

For the year ended December 31, 2023, we had a restated net loss of $10,389,372 compared to a restated net loss of $8,950,166 for the year ended December 31, 2022. At December 31, 2023, we had restated current assets of $2,085,810 and total assets of $55,863,568. As of December 31, 2023, we had restated current liabilities of $49,180,169. Restated stockholders' equity was $6,434,748 at December 31, 2023.

***Historical Results for the Years Ended December 31, 2022 - Restated***

For the year ended December 31, 2022, we had a restated net loss of $8,950,166. The net loss was primarily due to restated general and administrative expenses for the year ended December 31, 2022.

At December 31, 2022, we had restated current assets of $959,117 and restated total assets of $42,658,863. As of December 31, 2022, we had restated current liabilities of $31,092,824. Restated stockholders' equity was $11,319,173 at December 31, 2022.

*Revenue and Gross Profit*

| | Year Ended December 31 | | |
|---|---|---|---|
| | 2023 | 2022 | Change |
| Product Sales BOE | 837 | 692 | 145 |
| Total Revenue | $ 26,031 | $ 40,834 | $ (14,803) |
| Cost of revenue | (60,933) | (169,551) | (108,618) |
| Gross Profit (Loss) | $ (34,902) | $ (128,717) | $ 93,815 |
| Gross profit percentage | -134.08% | -315.22% | -633.76% |

*Production Revenues and Cost of Revenue*

For the year ended December 31, 2023, we had production revenue of $26,031 compared to $40,834 in 2022 . The change in revenue was primarily due to the increase in oil and natural gas production from 692 BOE for the 2022 period to 837 BOE for the 2023 period from the Oklahoma Properties, a decrease in the average price of oil from $98.75 in 2022 to $76.50 in 2023 and a decrease in the average price of natural gas from $7.51 in 2022 to $2.07 in 2023. Our cost of revenue, consisting of lease operating expenses and production taxes, was $169,551 for the year ended December 31, 2022 compared with $60,933 for the year ended December 31, 2023. For each of the years ended December 31, 2022 and 2023, production and revenue are detailed as follows:

| Property | Quarter | Oil Production {BBLS} | Gas Production {MCF} | Oil Revenue | Gas Revenue | Total Revenue |
|---|---|---|---|---|---|---|
| Oklahoma | Q1 - 2022 | 0 | 0 | $ - | $ - | $ - |
| Hazel (TX) | Q1 - 2022 | 0 | 0 | - | - | - |
| **Total Q1-2022** | | 0 | 0 | $ - | $ - | $ - |
| Oklahoma | Q2 - 2022 | 97 | 1,267 | $ 9,688 | $ 7,716 | $ 17,404 |
| Hazel (TX) | Q2 - 2022 | 0 | 0 | - | - | $ - |
| **Total Q2-2022** | | 97 | 1,267 | $ 9,688 | $ 7,716 | $ 17,404 |
| **Oklahoma** | Q3 - 2022 | 43 | 887 | $ 4,635 | $ 8,329 | $ 12,964 |
| **Hazel (TX)** | Q3 - 2022 | 0 | 0 | - | - | - |
| **Total Q3-2022** | | 43 | 887 | $ 4,635 | $ 8,329 | $ 12,964 |
| **Oklahoma** | Q4 - 2022 | 43 | 877 | 3,749 | 6,717 | 10,466 |
| **Hazel (TX)** | Q4 - 2022 | 0 | 0 | - | - | - |
| **Total Q4-2022** | | 43 | 877 | $ 3,749 | $ 6,717 | $ 10,466 |
| **Total 2022** | | 183 | 3,031 | 18,072 | 22,762 | 40,834 |
| **Average Commodity Price** | | | | $ 98.75 | $ 7.51 | |
| Oklahoma | Q1 - 2023 | 107 | 748 | $ 8,141 | $ 2,783 | $ 10,924 |
| Hazel (TX) | Q1 - 2023 | 0 | 0 | - | - | - |
| **Total Q1-2023** | | 107 | 748 | $ 8,141 | $ 2,783 | $ 10,924 |
| Oklahoma | Q2 - 2023 | 43 | 867 | 3,195 | 1,646 | 4,841 |
| Hazel (TX) | Q2 - 2023 | 0 | 0 | - | - | - |
| **Total Q2-2023** | | 43 | 867 | $ 3,195 | $ 1,646 | $ 4,841 |
| Oklahoma | Q3 - 2023 | 79 | 1183 | 6,184 | 1,547 | 7,731 |
| Hazel (TX) | Q3 - 2023 | 0 | 0 | - | - | - |
| **Total Q3-2023** | | 79 | 1183 | $ 6,184 | $ 1,547 | $ 7,731 |
| Oklahoma | Q4 - 2023 | 15 | 760 | 1,146 | 1,389 | 2,535 |
| Hazel (TX) | Q4 - 2023 | 0 | 0 | - | - | - |
| **Total Q4-2023** | | 15 | 760 | 1,146 | 1,389 | 2,535 |
| **Total 2023** | | 244 | 3558 | $ 18,666 | $ 7,365 | $ 26,031 |
| **Average Commodity Price** | | | | $ 76.50 | $ 2.07 | |

*Expenses for the Years Ended December 31, 2023 and 2022 - Restated*

We recorded depreciation, depletion and amortization expense of $-0- for the year ended December 31, 2023 compared to $-0- for the year ended December 31, 2022.

*Operating Expenses*

| | Year Ended December 31, | |
|---|---|---|
| | **2023** | **2022** |
| Operating Expenses | | |
| General & Administrative | $ 12,095,611 | $ 8,821,945 |
| Total operating expenses | $ 12,095,611 | $ 8,821,945 |

*General and Administrative Expenses*

Our general and administrative expense for the year ended December 31, 2023 was $12,095,611 compared to $8,821,945 for the year ended December 31, 2022. Our general and administrative expenses consisted of consulting and compensation expense, substantially all of which were non-cash or deferred, accounting and administrative costs, professional consulting fees, and other general corporate expenses. The change in general and administrative expenses in 2023, compared to 2022, is primarily due to employee compensation and an increase in consulting fees, filing fees, legal fees, director and officer liability insurance, and investor relations expenses.

**Cash Flows, Liquidity and Capital Resources.**

*Cash Flows* - Restated

*The following table summarizes sources and uses of cash and cash equivalents:*

| | Restated Year Ended December 31, 2023 | Restated Year Ended December 31, 2022 |
|---|---|---|
| **Cash Flows From (Used in) Operating Activities** | | |
| Net loss | $ (10,389,372) | $ (8,950,166) |
| Adjustments to reconcile net loss to net cash from operations: | | |
| Accretion expense | 1,785 | 1,092 |
| Prospect fee offset to note payable | (368,334) | (26,612) |
| Expense related to stock based compensation | 4,781,278 | - |
| Change in: | | |
| Accounts receivable | (208,882) | 74,310 |
| Accounts receivable, related party | - | (14,153) |
| Prepayments - development costs | 18,660 | (150,000) |
| Prepaid expenses | (14,440) | (59,633) |
| Other assets | (25,000) | (55,179) |
| Accounts payable and accrued expenses | (1,353,787) | 4,734,248 |
| **Net cash from (used in) operating activities** | (7,558,092) | (4,446,093) |
| **Cash Flows from (used in) Investing Activities** | | |
| Investment in oil and natural gas properties | (8,653,640) | (6,790,628) |
| **Net cash from (used in) investing activities** | (8,653,640) | (6,790,628) |
| **Cash Flows From (Used in) Financing Activities** | | |
| Proceeds from notes payable, related party | 18,000,000 | 9,500,000 |
| Payments on promissory notes | (1,000,000) | - |
| Prepayments, working interest owners | 311,281 | - |
| Contributions from parent, net | - | 316,600 |
| **Net cash from (used in) financing activities** | 17,311,281 | 9,816,600 |
| **Net increase (decrease) in cash** | 1,099,549 | (1,420,121) |
| **Cash - beginning of period** | 569,298 | 1,989,419 |
| **Cash - end of period** | $ 1,668,847 | $ 569,298 |
| **Supplemental disclosure of cash flow information:** | | |
| Cash paid for interest | $ 199,345 | $ - |
| **Supplemental disclosure of non-cash investing and financing activities:** | | |
| Common stock issued in working interest acquisition | $ 723,669 | $ - |
| Account receivable cancelled in WI acquisition | $ 177,519 | $ - |
| Capitalized Interest | $ 2,498,184 | $ 1,363,538 |

At December 31, 2023, we had cash and cash equivalents of $1,668,847 compared to $569,298 as of December 31, 2022.

*Cash Flows From Operating Activities - Restated*

Cash used in operating activities for the year ended December 31, 2023, was $7,558,092 compared to $4,446,093 for the restated year ended December 31, 2022.

Cash used in operating activities for the year ended December 31, 2023 can be attributed principally to net loss from operations of $10,389,372 adjusted for $4,781,279 in expense related to stock based compensation and changes in other liabilities, and accounts payable and accrued expenses.

*Cash Flows from Investing Activities - Restated*

Cash used in investing activities for the year ended December 31, 2023 was $8,653,640 compared to $6,790,628 for the restated year ended December 31, 2022. Cash used in investing activities consisted primarily of investments in oil and natural gas properties.

*Cash Flows from Financing Activities - Restated*

Cash provided by financing activities for the year ended December 31, 2023 was $17,311,281 compared to $9,816,600 for the year ended December 31, 2022. Cash flows provided by financing activities consisted primarily of loans from a related party.

We expect to continue to have cash flows provided by financing activities as we seek new rounds of financing and continue to develop our oil and natural gas investments. We do not expect to pay cash dividends on our common stock in the foreseeable future.

Reference the Restated Consolidated Statements of Cash Flows included in the financial statements for additional detail of the components that comprise the net use of cash in operations. We expect to continue to use cash flows in operating activities until such time as we achieve sufficient commercial oil and natural gas production to cover our operating costs.

*Capital Expenditures - Restated*

Our capital expenditures are summarized in the following table:

| | Year Ended 2023 | Year Ended 2022 |
|---|---|---|
| Acquisitions: | | |
| Proved property | $ - | $ - |
| Unproved property working interest | 901,188 | - |
| Exploration and development: | | |
| Development drilling and completion costs | 8,653,640 | 6,790,628 |
| Capitalized interest | 2,498,184 | 1,363,538 |
| Total exploration and development | 12,053,012 | 8,154,166 |
| Other property | - | - |
| Total capital expenditures | $ 12,053,012 | 8,154,166 |
| Change in accrued capital expenditures and other | 1,353,787 | (4,734,248) |
| Common stock issued for development costs | (723,669) | - |
| Account receivable cancelled in working interest acquisition | (177,519) | - |
| Prepaid drilling costs | - | 150,000 |
| Capitalized interest | (2,498,184) | (1,363,538) |
| Total cash capital expenditures | $ 10,007,427 | $ 2,206,380 |

*Liquidity and Capital Resources*

Liquidity risk is the risk that we will not meet our financial obligations as they become due after use of currently available cash. We have a planning and budgeting process to monitor operating cash requirements, including amounts projected for capital expenditures, which are adjusted as input variables change. These variables include, but are not limited to, our ability to generate revenue from operations, general and administrative requirements and the availability of equity or debt capital. As these variables change, we may be required to issue equity or obtain debt financing.

*The 2021 Note*

Prior to the date on which our shares of common stock were distributed to the holders of Series A Preferred Stock of Meta (the "Spin-Off"), on October 1, 2021, we issued a secured, revolving promissory note in an original principal amount of up to $15 million in favor of Meta (as amended to date, the "2021 Note"). The 2021 Note was issued to provide capital to engage certain consultants and satisfy the minimum drilling requirements under the DDU Agreement, which was necessary to preserve our interests in the oil and gas properties. Though Meta had no intentions to operate the oil and natural gas assets as an independent business, Meta would need to maintain the oil and natural gas interests until a sale of such assets or the Spin-Off could be consummated as it was obligated to do under its charter documents. The 2021 Note bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date.

The 2021 Note is secured by a security interest in (a) pursuant to a Stock Pledge Agreement dated as of September 30, 2021 between Gregory McCabe (the "Pledgor" or "Mr. McCabe") and Meta (the "Stock Pledge Agreement"), 1,515,000 shares of Meta's common stock that are owned directly and beneficially by the Pledgor, and (b) pursuant to a Deed of Trust, Mortgage, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production dated as of September 30, 2021 made by Wolfbone (an affiliate of the Pledgor) for the benefit of Meta (the "Security Agreement"), a 25% working interest beneficially owned by the Pledgor in the Orogrande Project as defined in the Security Agreement. Following the Merger, we expect Wolfbone to become an indirect subsidiary of the Company and the Security Agreement to remain in place.

The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2021 Note.

Upon the occurrence and during the continuance of an event of default under the 2021 Note, Meta as the lender may declare all outstanding principal and accrued and unpaid interest under the 2021 Note immediately due and payable, may terminate any remaining commitment to make advances under the 2021 Note, and may exercise the other rights and remedies provided for under the 2021 Note and related security documents. The events of default under the 2021 Note include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants, an event of default under the Stock Pledge Agreement or the Security Agreement, bankruptcy and insolvency events with respect us or our subsidiaries, cross defaults with certain of our other material indebtedness, and material judgments against us.

On June 28, 2022 and in August 2022, we borrowed $1.9 million and $2.7 million as an advance from Meta to be treated as an unsecured term loan, in addition to $441,000 previously advanced, under a Loan Agreement with Meta as the lender (the "Loan Agreement"), the proceeds of which are available for our working capital and general corporate purposes. As of the date of this report, we had an aggregate principal amount outstanding of $5.0 million, which is the maximum amount available under the Loan Agreement. The loans were due and payable on March 31, 2023 (the "Maturity Date"), unless extended as described in the following sentence. Under the Loan Agreement, if we raise $30 million or more in capital through debt or equity or a combination thereof by the Maturity Date, the Maturity Date will be extended to October 3, 2023 and the 2021 Note plus the loans under the Loan Agreement would be amortized in six equal monthly installments. Loans under the Loan Agreement bear interest at a fixed rate of 8% per annum if no event of default exists, and at a fixed rate of 12% per annum if an event of default exists.

We have the right to prepay the loans under the Loan Agreement in whole or in part at any time without penalty. Amounts repaid or prepaid may not be reborrowed. We will be required to prepay the loans upon an asset disposition (other than permitted asset sales), certain equity issuances (other than permitted equity), debt issuances (other than permitted debt), and certain extraordinary receipts. We are required to prepay the loans from our annual excess cash flow, if any.

The Loan Agreement includes customary representations and covenants that, subject to certain exceptions and qualifications, restrict our ability to do certain things, such as: incur additional indebtedness; incur liens; engage in mergers, acquisitions, and asset sales; make loans and investments; declare dividends or redeem or repurchase equity interests; transact with affiliates on a non-arm's length basis; and enter into certain restrictive agreements. In addition, the Loan Agreement contains customary affirmative covenants, including covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our existence and material properties, customary visitation rights, reporting requirements, compliance with applicable laws and regulations, and formation or acquisition of new subsidiaries.

Upon the occurrence and during the continuance of an event of default, Meta as the lender has the right to declare all outstanding principal and accrued and unpaid interest under the Loan Agreement immediately due and payable and exercise certain other rights and remedies. The events of default under the Loan Agreement include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants or representations and warranties, a change in control or a material adverse change defined in the Loan Agreement, material judgments and attachments, cross defaults with certain other material indebtedness, and bankruptcy and insolvency events with respect to the Company and our subsidiaries.

See the discussion under the caption "Recent Developments" and Note 7 of the notes to our financial statements as of and for the year ended December 31, 2023 included in this report for information about the amendments to the 2021 Note and the Loan Agreement entered into subsequent to the end of fiscal year 2023.

*The 2022 Note*

On December 22, 2022, we issued an unsecured promissory note in the principal amount of up to $20 million in favor of Mr. McCabe (the "2022 Note"). The 2022 Note bears interest at 5% per annum, computed on the basis of a 365-day year, and matures on June 30, 2024 (the "2022 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2022 Note Maturity Date, the 2022 Note Maturity Date will be extended to October 3, 2023. The outstanding principal of the 2022 Note, together with all accrued interest thereon, becomes due on June 21, 2023. The revolving commitment under the 2022 Note expires on 2022 Note Maturity Date. As of December 31, 2022, we had $2 million principal amount outstanding and $18 million of available borrowings under the 2022 Note.

The 2022 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2022 Note.

Upon the occurrence and during the continuance of an event of default under the 2022 Note, Mr. McCabe as the lender may declare all outstanding principal and accrued and unpaid interest under the 2022 Note immediately due and payable, may terminate any remaining commitment to make advances under the 2022 Note, and may exercise the other rights and remedies provided for under the 2022 Note. The events of default under the 2022 Note include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants, bankruptcy and insolvency events with respect us or our subsidiaries, cross defaults with certain of our other material indebtedness, and material judgments against us.

Following the Spin-Off, our management considered ways to mitigate certain risks of having its indebtedness held by a third party lender following the Spin-Off and retain some flexibility in respect of negotiating the terms of the 2021 Note and Loan Agreement. Our management team believed that having all of the corporate debt transferred to Mr. McCabe was in the best interest of the Company and its stockholders. In light of Mr. McCabe acting as a guarantor of the obligations of the 2021 Note, consolidating the debt with Mr. McCabe would also mitigate any risks that the lender would seek recourse against Mr. McCabe in the event we were unable to satisfy our obligations thereunder. On August 7, 2023, Mr. McCabe and Meta entered into a Loan Sale Agreement whereby Mr. McCabe purchased from Meta (i) the 2021 Note and (ii) all outstanding loans made to us by Meta pursuant to the Loan Agreement (the "Loan Purchase"). As a result of the Loan Purchase, Mr. McCabe replaced Meta as the lender and a secured party under the 2021 Note and the Loan Agreement. As consideration for the Loan Purchase, Mr. McCabe agreed to pay to Meta $6,000,000 in cash and agreed to purchase shares of common stock of Meta in the amount of $6,000,000 over a period of time at a price per share equal to a 120% premium to the Meta's common stock price as of closing on the last trading day of each quarter. Additionally, as part of the Loan Purchase, Meta assigned to Mr. McCabe the lien on 25% of the Orogrande Prospect. After Mr. McCabe purchased $500,000 worth of shares of Meta's common stock (in two equal tranches), Mr. McCabe and Meta came to an agreement to settle the Loan Purchase by allowing Mr. McCabe to make one additional $700,000 cash payment to Meta and surrender the shares of common stock he previously acquired, while retaining the rights as lender under the 2021 Note and the Loan Agreement. Our obligations and responsibilities under the 2021 Note, the Loan Agreement and the 2022 Note remain unchanged. Following certain amendments entered into in order to extend the 2022 Note, the maturity date was extended to June 30, 2025.

*Contractual Obligations*

Our most significant contractual obligations relate to the Loan Agreement, the 2021 Note, 2022 Note and drilling and development commitments and other lease operating expenses under certain leases for the Orogrande Project.

Our debt obligations include the $15 million principal balance outstanding under the 2021 Note, which incurs interest at 8% per annum and matures on March 31, 2024. On September 2, 2022, we entered into a Loan Agreement that governs the term loans advanced to us from Meta on April 14, 2022, May 4, 2022, May 12, 2022, May 26, 2022, June 1, 2022, June 13, 2022, June 28, 2022, August 11, 2022 and August 29, 2022, for an aggregate principal balance outstanding of $5 million, which is the maximum amount of Meta's commitment under the Loan Agreement. The term loans incur interest at a per annum rate equal to 8% and mature on September 30, 2024.

On December 21, 2022, we issued the 2022 Note that governs the term loans advanced to us from Mr. McCabe on December 22, 2022, for an aggregate principal balance up to $20 million. Draws on the loan through December 31, 2023 total $20,000,000. The term loan incurs interest at a per annum rate equal to 5% and matures on June 21, 2023. Under each of the 2021 Note, the Loan Agreement and the 2022 Note, if we raise additional capital through debt or equity, or any combination thereof, of at least $30 million before the respective maturity dates, we will be entitled to extend maturity to October 3, 2023 and repay the outstanding balances in six equal monthly installments beginning in April 2023 up to such extended maturity date. Amendment to the Note terms has extended the maturity date to September 30, 2024.

For the year ended December 31, 2022, we incurred an aggregate interest on the 2022 Note, the 2021 Note and under the Loan Agreement of $1,571,336. Interest incurred during the year ended December 31, 2023, was $2,498,184. See the discussion under the caption "Liquidity and Capital Resources."

In addition to our debt commitments, the Orogrande Project leases representing approximately 134,000 gross acres in the Orogrande Basin in West Texas were subject to expiration in 2024 in the event we failed to drill five wells during the 2024 calendar year in compliance with our drilling obligations under the DDU Agreement. For a discussion of the risks relating to our drilling obligations, see "Risk Factors—Risks Relating to Our Business", including the risk factor "*—Our acreage must be drilled before lease expiration in order to hold the acreage by production. In the highly competitive market for acreage, failure to drill sufficient wells in order to hold acreage will result in a substantial lease renewal cost, or if renewal is not feasible, loss of our lease and prospective drilling opportunities*". See also Note 7 of the notes to our financial statements as of and for the year ended December 31, 2023.

Management believes that currently available resources may not provide sufficient funds to enable us to meet our financing and drilling obligations for future years. We anticipate that we will continue to incur operating losses and generate negative cash flows from operations for the foreseeable future. As a result, we will need additional capital resources to fund our operations both in the short term and in the long term, prior to achieving break even or positive operating cash flow. While we do not have any committed sources of capital, we expect to continue to opportunistically seek access to additional funds through public or private equity offerings or debt financings, through partnering or other strategic arrangements, including credit application arrangements with our third party servicers, or a combination of the foregoing. Despite our efforts, we may face obstacles in continuing to attract new financing due to industry conditions and our history and current record of net losses. We can provide no assurance that we will be able to obtain the financing required to meet our stated objectives or even to continue as a going concern.

**Critical Accounting Estimates**

*Oil and natural gas properties*—The Company uses the full cost method of accounting for exploration and development activities as defined by the SEC. Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities. Gain or loss on the sale or other disposition of oil and natural gas properties is not recognized, unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least annually and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions.

Gains and losses on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and natural gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

*Depreciation, depletion, and amortization*—The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

*Ceiling test*—Future production volumes from oil and gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and gas properties. If the net capitalized cost of proved oil and gas properties, net of related deferred income taxes, plus the cost of unproved oil and gas properties, exceeds the present value of estimated future net cash flows discounted at 10%, net of related tax affects, plus the cost of unproved oil and gas properties, the excess is charged to expense and reflected as additional accumulated DD&A. The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

*Asset retirement obligations*—The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

*Recent Accounting Pronouncements*

Our audited consolidated financial statements and the accompanying notes thereto found elsewhere in this report contain a description of recent accounting pronouncements.

**Item 8. Consolidated Financial Statements and Supplementary Data**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**


| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm PCAOB #2738 | F-1 |
| **Consolidated Financial Statements of Next Bridge Hydrocarbons, Inc.** | |
| Consolidated Balance Sheets as of December 31, 2023, and 2022 (Restated) | F-2 |
| Consolidated Statements of Operations for the years ended December 31, 2023, and 2022 (Restated) | F-3 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2023, and 2022 (Restated) | F-4 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2023, and 2022 (Restated) | F-5 |
| Notes to Consolidated Financial Statements for the years ended December 31, 2023, and 2022 (Restated) | F-6 |

The consolidated financial statements of Next Bridge Hydrocarbons, Inc. appearing in this report have been audited by M&K CPAS, PLLC an independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such reports given on the authority of such firm as experts in accounting and auditing.

We are responsible for the fairness and reliability of the financial statements and other financial data included in this report. In the preparation of the financial statements, it is necessary for us to make informed estimates and judgments based on currently available information on the effects of certain events and transactions. Estimates of the oil and natural gas reserves of the Company and related future net cash flows and the present values were based upon reserve reports prepared by PeTech Enterprises, Inc. have been included in this report. All of the Company's properties are unevaluated properties with the exception of the Hazel Project. The reserve report for 2023 included in this filing is necessary to compare proved reserves for the Hazel Project to the remaining balance of reimbursements due to MHP (the Optionee) is entitled to receive, as its sole recourse for the recoupment of drilling costs, All revenue from Hazel production is payable to MHP until such time as MHP has recovered its reasonable costs and expenses for drilling, completing, and operating the well. As of December 31, 2023, and 2022 the balance due to MHP exceeded the value of the proved reserves resulting in reportable reserves of $-0-.

We have included these estimates in reliance on the authority of such firm as an expert in such matters.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders

Next Bridge Hydrocarbons, Inc.

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Next Bridge Hydrocarbons, Inc. (the Company) as of December 31, 2023 and 2022, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the years in the two-year period ended December 31, 2023, and the related notes (collectively referred to as the " consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2023 and 2022, and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2023 in conformity with accounting principles generally accepted in the United States of America.

**Going Concern**

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. As discussed in Note 4 to the consolidated financial statements, the company has an accumulated deficit, negative cash flows from operations, and has a working capital deficiency as of December 31, 2023, which raises substantial doubt about its ability to continue as a going concern. Management's plans regarding these matters are also described in Note 4. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB .

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and the significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe our audits provide a reasonable basis for our opinion.

**Restatement of the 2023 and 2022 Consolidated Financial Statements**

As discussed in Note 2 to the consolidated financial statements, the accompanying 2023 and 2022 consolidated financial statements have been restated to correct for errors.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing separate opinions on the critical audit matter or on the accounts or disclosures to which it relates.

*Oil and Natural Gas Properties*

As discussed in Note 2, 5 and 6 to the consolidated financial statements, the Company accounts for its oil and gas properties using the full-cost method of accounting. Management capitalizes certain oil and gas acquisition and drilling costs in unproved and unevaluated properties.

To determine whether there is impairment related to the unproved and unevaluated properties, the Company evaluates considerations of lease renewals and extensions, considerations of exploratory drilling, and the ability of access of capital to develop and extend current leases.

Auditing management's evaluation of unproved and unevaluated properties can be a significant judgement given the fact that the Company uses management's estimates and development intentions on future development plans, which are difficult to substantiate.

To evaluate the appropriateness of management's development plans, we evaluated the key factors and assumptions used to determine the development plans for unproved and unevaluated oil and gas. The procedures included, among other (i) evaluating the intentions and ability to attain lease renewals and extensions, (ii) evaluating the ability to access capital to develop and extend current leases, (iii) evaluating exploratory drilling, and (iv) management's ongoing economic commitment related to the unproved and unevaluated properties.

s/ M&K CPAS, PLLC

We have served as the Company's auditor since 2024

The Woodlands, TX

July 17, 2024 (September 15, 2025 as to the effects of the restatement discussed in Note 2)

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED BALANCE SHEETS**

| | Restated December 31 2023 | Restated December 31, 2022 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash | $ 1,668,847 | $ 569,298 |
| Accounts receivable, related party | - | 177,519 |
| Accounts receivable - working interest owners | 207,470 | - |
| Production receivable | 1,412 | - |
| Prepayments - development costs | 131,340 | 150,000 |
| Prepaid expenses | 76,741 | 62,300 |
| Total current assets | 2,085,810 | 959,117 |
| Oil and natural gas properties | 53,672,579 | 41,619,567 |
| Other assets | 105,179 | 80,179 |
| TOTAL ASSETS | $ 55,863,568 | $ 42,658,863 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 3,777,685 | $ 4,947,764 |
| Prepayments, working interest owners | 311,281 | - |
| Note payable - META | - | 22,573,724 |
| Note payable - related party | 41,221,028 | 2,000,000 |
| Accrued interest payable, unrelated parties | - | 1,571,336 |
| Accrued interest payable, related parties | 3,870,175 | - |
| Total current liabilities | 49,180,169 | 31,092,824 |
| Asset retirement obligations | 248,651 | 246,866 |
| Total liabilities | 49,428,820 | 31,339,690 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, par value $0.0001, 50,000,000 shares authorized; -0- issued and outstanding December 31, 2023 and December 31, 2022 | - | - |
| Common stock, par value $0.0001; 500,000,000 shares authorized; 248,830,516 issued and outstanding at December 31, 2023; 165,472,241 issued and outstanding at December 31, 2022 | 24,883 | 16,547 |
| Additional paid-in capital | 106,343,260 | 100,846,649 |
| Accumulated deficit | (99,933,395) | (89,544,023) |
| Total stockholders' equity | 6,434,748 | 11,319,173 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 55,863,568 | $ 42,658,863 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Restated Year Ended December 31, 2023 | Restated Year Ended December 31, 2022 |
|---|---|---|
| Oil and natural gas sales | $ 26,031 | $ 40,834 |
| Operating expenses: | | |
| Lease operating expenses | 59,059 | 166,567 |
| Production taxes | 1,874 | 2,984 |
| General and administrative | 12,095,611 | 8,821,945 |
| Total operating expenses | 12,156,544 | 8,991,496 |
| Other income (expense) | | |
| Prospect fee income | 1,700,000 | - |
| Administration income | 41,140 | - |
| Interest income | 1 | 496 |
| Total other income | 1,741,141 | 496 |
| Loss before income taxes | (10,389,372) | (8,950,166) |
| Provision for income taxes | - | - |
| **Net loss** | $ (10,389,372) | $ (8,950,166) |
| **Loss per common share:** | | |
| **Basic and Diluted** | $ (0.06) | $ (0.05) |
| **Weighted average number of common shares outstanding:** | | |
| **Basic and Diluted** | 180,316,865 | 165,472,241 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY – RESTATED**

| | Common stock shares | Common stock amount | Additional paid-in capital | Accumulated deficit | Total |
|---|---|---|---|---|---|
| **Balance, December 31, 2021** | 165,472,241 | $ 16,547 | $100,530,049 | $(80,593,857) | $ 19,952,739 |
| Contributions from parent | - | - | 316,600 | - | 316,600 |
| Net loss | - | - | - | (8,950,166) | (8,950,166) |
| **Balance, December 31, 2022** | 165,472,241 | $ 16,547 | $100,846,649 | $(89,544,023) | $ 11,319,173 |
| Common stock issued for working interest | 83,358,275 | 8,336 | 715,333 | - | 723,669 |
| Stock based compensation | - | - | 4,781,278 | - | 4,781,278 |
| Net loss | - | - | - | (10,389,372) | (10,389,372) |
| **Balance, December 31, 2023** | 248,830,516 | $ 24,883 | $106,343,260 | $(99,933,395) | $ 6,434,748 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

Table of Contents

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Restated Year Ended December 31, 2023 | Restated Year Ended December 31, 2022 |
|---|---|---|
| **Cash Flows From (Used in) Operating Activities** | | |
| Net loss | $ (10,389,372) | $ (8,950,166) |
| Adjustments to reconcile net loss to net cash from operations: | | |
| Accretion expense | 1,785 | 1,092 |
| Prospect fee offset to note payable | (368,334) | (26,612) |
| Expense related to stock based compensation | 4,781,278 | - |
| Change in: | | |
| Accounts receivable | (208,882) | 74,310 |
| Accounts receivable, related party | - | (14,153) |
| Prepayments - development costs | 18,660 | (150,000) |
| Prepaid expenses | (14,440) | (59,633) |
| Other assets | (25,000) | (55,179) |
| Accounts payable and accrued expenses | (1,353,787) | 4,734,248 |
| **Net cash from (used in) operating activities** | (7,558,092) | (4,446,093) |
| **Cash Flows from (used in) Investing Activities** | | |
| Investment in oil and natural gas properties | (8,653,640) | (6,790,628) |
| **Net cash from (used in) investing activities** | (8,653,640) | (6,790,628) |
| **Cash Flows From (Used in) Financing Activities** | | |
| Proceeds from notes payable, related party | 18,000,000 | 9,500,000 |
| Payments on promissory notes | (1,000,000) | - |
| Prepayments, working interest owners | 311,281 | - |
| Contributions from parent, net | - | 316,600 |
| **Net cash from (used in) financing activities** | 17,311,281 | 9,816,600 |
| **Net increase (decrease) in cash** | 1,099,549 | (1,420,121) |
| **Cash - beginning of period** | 569,298 | 1,989,419 |
| **Cash - end of period** | $ 1,668,847 | $ 569,298 |
| **Supplemental disclosure of cash flow information:** | | |
| Cash paid for interest | $ 199,345 | $ - |
| **Supplemental disclosure of non-cash investing and financing activities:** | | |
| Common stock issued in working interest acquisition | $ 723,669 | $ - |
| Account receivable cancelled in WI acquisition | $ 177,519 | $ - |
| Initial recognition of ARO liability | $ - | $ 223,837 |
| Capitalized Interest | $ 2,498,184 | $ 1,363,538 |

*The accompanying notes are an integral part of these Consolidated Financial Statements.*

**NEXT BRIDGE HYDROCARBONS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2023**

## 1. NATURE OF BUSINESS

Prior to its incorporation, the oil and natural gas assets of Next Bridge Hydrocarbons, Inc. (the "Company") were owned, controlled, developed and operated by Torchlight Energy Resources, Inc. ("Torchlight Energy"), including the ownership of Torchlight Hazel, LLC, a Texas limited liability company ("Torchlight Hazel"), Hudspeth Oil Corporation, a Texas corporation ("Hudspeth"), Hudspeth Operating, LLC, a Texas limited liability company ("Hudspeth Operating"), and Torchlight Energy, Inc., a Nevada corporation ("TEI") as its subsidiaries. In 2020, Torchlight and Meta Materials, Inc. ("Meta") entered into a definitive agreement pursuant to which Torchlight and Meta would consummate a business combination (the "Prior Business Combination") resulting in the cessation of Torchlight's separate corporate existence with Meta as the surviving corporation and all of the common shareholders of Torchlight becoming the holders of the Series A Preferred Stock of Meta separate and apart from the common shareholders of Meta. Further, other than Robert Lance Cook who continued on the board of directors, the other members of the board of directors and executive officers of Torchlight resigned as of the closing of that transaction. In connection with the business combination, the Meta corporate charter was revised to designate shares of the Series A Preferred Stock issuable to the Torchlight common shareholders. The rights and preferences of such preferred stock included, among other things, the right to proceeds received in connection with an outright sale or spin-off of all of the oil and natural gas assets previously owned and operated by Torchlight. In order to facilitate any such sale or spin-off, the Company was incorporated in Nevada on August 31, 2021 as OilCo Holdings, Inc. as a wholly owned subsidiary of Meta. The Company changed its name to Next Bridge Hydrocarbons, Inc. pursuant to its Amended and Restated Articles of Incorporation filed on June 30, 2022. While the Company was a wholly owned subsidiary of Meta, and prior to the Spin-Off (as defined below), the board of directors of the Company consisted of two executives from Meta and one independent director, Robert Lance Cook, and the management team was comprised of executives of Meta. Certain holders of the shares of the Series A Preferred Stock of Meta caused such shares to trade on the over-the-counter market (OTC) under the symbol MMTLP.

Effective December 14, 2022 (the "Spin-Off Date"), the Company was spun off from Meta, resulting in the Company becoming an independent company (the "Spin-Off") with a new board of directors and slate of executive officers. In the Spin-Off, the Company's shares of common stock were distributed, on a pro rata basis, to the then-current holders of the Meta preferred stock, which did not constitute the same holders as the common stockholders of Torchlight prior to its business combination with Meta.

## 2. RESTATEMENT OF PREVIOUSLY ISSUED CONSOLIDATED FINANCIAL STATEMENTS

The Company has restated the financial statements for the years ended December 31, 2022 and 2023 due to identified errors related to impairment adjustments to the Company's oil and natural gas properties and to apply guidance in Accounting Standards Codification Topic ("ASC") 845-10-30-3 and 8 related to the Company's Spin-Off transaction which occurred on December 14, 2022.

Regarding the impairment adjustment, the Company improperly recorded a 100% impairment on the Company's oil and natural gas properties as of December 31, 2022 and any additions to oil and natural gas properties in all subsequent periods as the Company continued to incur capitalized costs related to the continued development of the Orogrande Project. The Company has determined this impairment is not in accordance with GAAP and the full cost method of accounting for oil and natural gas properties. The elimination of all value ascribed to the oil and natural gas properties by impairment of the oil and natural gas properties at December 31, 2022 and 2023 were incorrectly based on a presumption of impairment in the absence of having established oil and natural gas reserves and without having yet secured an extension to the lease, and did not properly consider the Company's stated intentions and rights to extend the lease coupled with the Company's ongoing efforts to evaluate the Orogrande properties in the application of the full cost method of accounting, particularly with regard to unevaluated property costs. At the time of the filing of the Company's Annual Report on Form 10-K for the year ended December 31, 2023 filed with the SEC on July 17, 2024, an impairment adjustment of $80,743,013 effective as of December 31, 2022, was reflected in the comparative 2022 financial presentation. That impairment adjustment has been reversed in this restatement. The Company also had subsequent impairment adjustments in the amount of $27,167,415 for the year ended December 31, 2023, that have been reversed.

Following the Spin-Off the Company did not properly apply the guidance in ASC 845-10-30-3 and 8. The Company has determined the Spin-Off transaction is the recission of a prior business combination and therefore at the time of the Spin-Off the historical carrying value of the Company's assets and liabilities should have been carried forward with no adjustment to fair value that was previously recorded at the time of the Prior Business Combination or as of the Spin-Off Date. Accounting for the Spin-Off of the oil and gas properties on December 14, 2022 was incorrectly based on a presumption of fair value that did not properly consider the continuity of the economic interests that had been conveyed via the preferred shares issued by Torchlight Energy Resources, Inc. to its common shareholders just prior to its reverse merger with Meta Materials Inc., and who became shareholders of the Company because of the Spin-Off from Meta Materials Inc., and, at which time shares of common stock of the Company was distributed to the then record holders of the preferred stock of Meta Materials, Inc. thus enacting the recission of a prior business combination. This affected oil and natural gas properties and additional paid in capital. Additionally, the Company should not have applied the predecessor and successor guidance related to the Spin-Off and the statements of operations, stockholder's equity and cashflows have been restated in order to show the historical amounts related to the Company for a full 12 month period ended December 31, 2022. The net impact of returning to the historical accounting basis presentation was a reduction in oil and natural gas properties of $39,031,194, with an offsetting reduction to additional paid in capital as of the Spin-Off Date.

The adjustments made as of and for the years ended December 31, 2023 and 2022 to address the error corrections needed for these two matters to more clearly align and reflect financial statements that comply with generally accepted accounting principles are detailed below and are further applied to comparative amounts in reports for subsequent periods.

**Explanation of Adjustments Related to 2022 Consolidated Financial Statements**

The Company's initial Annual Report on Form 10-K for the year ended December 31, 2022 filed on March 31, 2023 (the "2022 Original Filing"), stated the cost basis of oil and natural gas properties at $79,695,928.

After that filing the Company was notified that the auditing firm used for 2022 had been sanctioned by the SEC and was therefore required to engage new auditors for 2023 and 2022. The reaudit of 2022 ultimately resulted in a decision by management to impair 100% of the cost of oil and natural gas properties.

Reference on the schedule below the first adjustment to impair $79,695,928 and record $1,056,125 in additional accounts payable as of December 31, 2022, that should have been accrued for. The combination of these two amounts is adjusted in accumulated deficit on the consolidated balance sheet as well. A portion of the adjustment to accounts payable totaling $1,047,085 should have been capitalized to oil and gas properties and was additional impairment expense in the 2022 Original Filing leading to a total adjustment to impairment expense of $80,743,013. The additional adjustment of $9,040 in accounts payable related to general and administrative expenses incurred for the year ended December 31, 2022. These amounts affected the Company's cashflow from operating activities.

As described above, the elimination of all value ascribed to the oil and natural gas properties by impairment of the oil and gas properties at December 31, 2022 was incorrectly based on a presumption of impairment in the absence of having established oil and natural gas reserves and without having yet secured an extension to the lease, and did not properly consider our stated intentions and rights to extend the lease coupled with our ongoing efforts to evaluate the Orogrande properties in the application of the full cost method of accounting, particularly with regard to unevaluated property costs.

After the Company filed the 2022 Original Filing, an adjustment was made to restore the 100% impairment as of December 31, 2022, that was included in the Company's 2022 Original Filing. The adjustment in the amount of $80,743,013 is applied to reduce previously restated 2022 impairment expense for the year ended December 31, 2022 with the adjustment also effecting accumulated deficit in the same amount. This amount affected the Company's cash flow from operating activities. The Company also identified an additional $92,253 in lease operating expenses that should have been incurred in 2022 with an offset to oil and natural gas properties. The amount also affected cashflows used in investing activities as a decrease in the amount of cash used in investment in oil and natural gas properties.

As described above, the consolidated financial statements as of December 31, 2022, are further adjusted to account for modification to accounting for the Spin-Off as the recission of a Prior Business Combination. The Company previously did not apply the guidance in ASC 845-10-30-3 and 8. The Company has determined the Spin-Off is the recission of a Prior Business Combination and therefore at the time of the Spin-Off the historical carrying value of the Company's assets and liabilities should have been carried forward with no adjustment to fair value that was previously recorded at the time of the Prior Business Combination or as of the Spin-Off Date.

The net impact of returning to the historical cost basis was a reduction in oil and natural gas properties of $39,031,194, with the offset to reduce additional paid in capital since the fair value adjustment made previously on December 14, 2022 had increased additional paid in capital.

The conversion to change the reporting entity to include the impact of historical transactions required further adjustment to increase additional paid in capital by $88,532,203 with an offsetting increase of the same amount to accumulated deficit.

The financial statements are also restated to remove the previous presentation of predecessor and successor presentation on the consolidated statements of operations and cashflows for the year ended December 31, 2022. The Company should not have applied the predecessor and successor guidance related to the Spin-Off and the statements of operations, stockholder's equity and cashflows have been restated in order to show the historical amounts related to the Company for a full 12-month period ended December 31, 2022

The impact of the above matters constitutes the adjustments to the following Consolidated Balance Sheets, Consolidated Statements of Operations, and Consolidated Statements of Cash Flows.

**RESTATEMENT OF PREVIOUSLY ISSUED 2022 CONSOLIDATED FINANCIAL STATEMENTS**

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED BALANCE SHEETS**

| | Original 2022 Form 10K | Adjustment | December 31, 2022 As Restated for Comparative in 2023 Form 10-K Filed 7/17/24 | Adjustment | As Restated Comparative for 2023 Form 10-K-A Filed August 2025 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash | $ 569,298 | $ - | $ 569,298 | $ - | $ 569,298 |
| Accounts receivable | $ - | $ - | $ - | $ - | $ - |
| Accounts receivable, related party | $ 177,519 | $ - | $ 177,519 | $ - | $ 177,519 |
| Prepayments - development costs | $ 150,000 | $ - | $ 150,000 | $ - | $ 150,000 |
| Prepaid expenses | $ 62,300 | $ - | $ 62,300 | $ - | $ 62,300 |
| Total current assets | $ 959,117 | $ - | $ 959,117 | $ - | $ 959,117 |
| Oil and natural gas properties | $ 79,695,928 | $(79,695,928) | $ - | $ 80,743,013<br>$(39,123,446) | $ 41,619,567 |
| Other assets | $ 80,179 | $ - | $ 80,179 | $ - | $ 80,179 |
| TOTAL ASSETS | $ 80,735,224 | $(79,695,928) | $ 1,039,296 | $ 41,619,567 | $ 42,658,863 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 3,891,649 | $ 1,056,125 | $ 4,947,774 | $ (10) | $ 4,947,764 |
| Note Payable - META | $ 22,573,724 | $ - | $ 22,573,724 | $ - | $ 22,573,724 |
| Note Payable - Related Party | $ 2,000,000 | $ - | $ 2,000,000 | $ - | $ 2,000,000 |
| Accrued interest payable | $ 1,571,336 | $ - | $ 1,571,336 | $ - | $ 1,571,336 |
| Total current liabilities | $ 30,036,709 | $ 1,056,125 | $ 31,092,834 | $ (10) | $ 31,092,824 |
| | $ - | | | | |
| Asset retirement obligations | $ 246,866 | $ - | $ 246,866 | $ - | $ 246,866 |
| | $ - | | | | |
| Total liabilities | $ 30,283,575 | $ 1,056,125 | $ 31,339,700 | $ (10) | $ 31,339,690 |
| Stockholders' equity (deficit): | | | | | |
| Preferred stock, par value $0.0001, 50,000,000 shares authorized; -0- issued and outstanding December 31, 2022 | $ - | $ - | $ - | $ - | $ - |
| Common stock, par value $0.0001; 500,000,000 shares authorized; 165,472,241 issued and outstanding at December 31, 2022 | $ 16,547 | $ - | $ 16,547 | $ - | $ 16,547 |
| Additional paid-in capital | $ 51,345,640 | $ - | $ 51,345,640 | $ 49,501,009 | $ 100,846,649 |
| Accumulated deficit | $ (910,538) | $(80,752,053) | $ (81,662,591) | $ (7,881,432) | $ (89,544,023) |
| Total stockholders' equity (deficit) | $ 50,451,649 | $(80,752,053) | $ (30,300,404) | $ 41,619,577 | $ 11,319,173 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) | $ 80,735,224 | $(79,695,928) | $ 1,039,296 | $ 41,619,567 | $ 42,658,863 |

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Original 2022 Form 10K Successor Period December 15, 2022 December 31, 2022 | Original 2022 Form 10K Predecessor Period January 1, 2022 December 14, 2022 | Restatement Adjustment (Successor) | Comparative for Original 2023 10K Successor Period December 15, 2022 December 31, 2022 | Comparative for Original 2023 10K Predecessor Period January 1, 2022 December 14, 2022 | Restatement Adjustment (Successor) | As Restated Comparative for 2023 Form 10-K-A Filed August 2025 |
|---|---|---|---|---|---|---|---|
| Oil and gas sales | $ 2,561 | $ 38,273 | $ - | $ 2,561 | $ 38,273 | $ - | $ 40,834 |
| Operating expenses: | | | | | | | |
| Lease operating expenses | $ 5,826 | $ 68,488 | $ - | $ 5,826 | $ 68,488 | $ 92,253 | $ 166,567 |
| Production taxes | $ 229 | $ 2,755 | $ - | $ 229 | $ 2,755 | $ - | $ 2,984 |
| General and administrative | $ 907,045 | $ 7,905,860 | $ 9,040 | $ 916,085 | $ 7,905,860 | $ - | $ 8,821,945 |
| Impairment expense | $ - | $ - | $ 80,743,013 | $ 80,743,013 | $ - | $(80,743,013) | $ - |
| Total operating expenses | $ 913,100 | $ 7,977,103 | $ 80,752,053 | $ 81,665,153 | $ 7,977,103 | $(80,650,760) | $ 8,991,496 |
| Other income | | | | | | | |
| Interest income | $ 1 | $ 495 | $ - | $ 1 | $ 495 | $ - | $ 496 |
| Total other income | $ 1 | $ 495 | $ - | $ 1 | $ 495 | $ - | $ 496 |
| Loss before income taxes | $ (910,538) | $ (7,938,335) | $(80,752,053) | $ (81,662,591) | $ (7,938,335) | $ 80,650,760 | $ (8,950,166) |
| Provision for income taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Net loss | $ (910,538) | $ (7,938,335) | $(80,752,053) | $ (81,662,591) | $ (7,938,335) | $ 80,650,760 | $ (8,950,166) |
| Loss per common share: Basic and Diluted | $ (0.01) | $ (0.05) | | $ (0.49) | $ (0.05) | | $ (0.05) |
| Weighted average number of common shares outstanding: Basic and Diluted | 165,472,241 | 165,472,241 | | 165,472,241 | 165,472,241 | | 165,472,241 |

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Original 2022 10K Successor December 15, 2022 December 31, 2022 | Original 2022 10K Predecessor January 1, 2022 December 14, 2022 | Adjustment (Successor) | Comparative for Original 2023 10K Successor December 15, 2022 December 31, 2022 | Comparative for Original 2023 10K Predecessor January 1, 2022 December 14, 2022 | Adjustment (Successor) | As Restated for Comparative in 2023 Form 10-K-A Filed August 2025 |
|---|---|---|---|---|---|---|---|
| **Cash Flows From (Used in) Operating Activities** | | | | | | | |
| Net loss | $ (910,538) | $ (7,938,335) | $ (80,752,053) | $ (81,662,591) | $ (7,938,335) | $ 80,650,760 | $ (8,950,166) |
| Adjustments to reconcile net loss to net cash from operations: | | | | | | | |
| Accretion expense | $ 1,092 | | | $ 1,092 | $ - | $ - | $ 1,092 |
| Bad debt expense | $ - | $ (26,612) | | $ - | $ (26,612) | $ - | $ (26,612) |
| Impairment expense | $ - | $ - | $ 80,743,013 | $ 80,743,013 | $ - | $(80,743,013) | $ - |
| Change in: | | | | | | | |
| Accounts receivable | $ - | $ 74,310 | | $ - | $ 74,310 | $ - | $ 74,310 |
| Accounts receivable, related party | $ - | $ (14,153) | | $ - | $ (14,153) | $ - | $ (14,153) |
| Prepayments - development costs | $ - | $ (150,000) | | $ - | $ (150,000) | $ - | $ (150,000) |
| Other assets | $ 39,185 | $ (94,364) | | $ 39,185 | $ (94,364) | $ - | $ (55,179) |
| Prepaid expenses | $ (58,225) | $ (1,408) | | $ (58,225) | $ (1,408) | $ - | $ (59,633) |
| Accounts payable and accrued expenses | $ 1,154,917 | $ 2,524,381 | | $ 2,209,867 | $ 2,524,381 | $ - | $ 4,734,248 |
| Accrued interest payable | $ (1,091) | $ - | | $ - | $ - | $ - | $ - |
| **Net cash from (Used in) operating activities** | $ 225,340 | $ (5,626,181) | | $ 1,272,341 | $ (5,626,181) | $ (92,253) | $ (4,446,093) |
| **Cash Flows From (Used in) Investing Activities** | $ (1,976,029) | $ (3,859,851) | | $ (3,023,030) | $ (3,859,851) | $ 92,253 | $ (6,790,628) |
| **Net cash from (Used in) investing activities** | $ (1,976,029) | $ (3,859,851) | | $ (3,023,030) | $ (3,859,851) | $ 92,253 | $ (6,790,628) |
| **Cash Flows From Financing Activities** | $ 2,000,000 | $ 7,500,000 | | $ 2,000,000 | $ 7,500,000 | $ - | $ 9,500,000 |
| | $ - | $ 316,600 | | $ - | $ 316,600 | $ - | $ 316,600 |
| **Net cash from financing activities** | $ 2,000,000 | $ 7,816,600 | | $ 2,000,000 | $ 7,816,600 | $ - | $ 9,816,600 |
| **Net increase (decrease) in cash** | $ 249,311 | $ (1,669,432) | | $ 249,311 | $ (1,669,432) | $ - | $ (1,420,121) |
| **Cash - beginning of year** | $ 319,987 | $ 1,989,419 | | $ 319,987 | $ 1,989,419 | $ - | $ 1,989,419 |
| **Cash - end of year** | $ 569,298 | $ 319,987 | - | $ 569,298 | $ 319,987 | $ - | $ 569,298 |
| **Supplemental disclosure of cash flow information:** | | | | | | | |
| Cash paid for interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Cash paid for state franchise tax | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Supplemental disclosure of non-cash investing and financing activities:** | | | | | | | |
| Issuance of common stock | $ - | $ 16,547 | $ - | $ - | $ 16,547 | $ - | $ 16,547 |
| Account payable reduced by expense offset | $ 15,638 | $ - | $ - | $ 15,638 | $ - | $ - | $ 15,638 |
| Initial recognition of ARO liability | $ - | $ - | $ - | $ - | $ - | $ 223,837 | $ 223,837 |
| Capitalized Interest included in interest payable | $ 74,210 | $ 1,289,328 | $ - | $ 74,210 | $ 1,289,328 | | $ 1,363,538 |

**RESTATEMENT OF PREVIOUSLY ISSUED 2023 FINANCIAL STATEMENTS**

The Company's initial Annual Report on Form 10-K for the year ended December 31, 2023 filed on July 17, 2024 (the "2023 Original Filing"), is also restated to account for the changes noted above related to the financial statements as of and for the year ended December 31, 2022. The carry forward impact of the 2022 restatement was an increase to oil and natural gas properties of $41,619,567, an increase to additional paid in capital of $49,501,009 and an increase in accumulated deficit of $7,881,442.

Following the previous impairment of 100% of the value of oil and natural gas properties as of December 31, 2022, further impairments of development costs incurred in subsequent quarterly periods in 2023 were recorded in those periods to be consistent with the reversal of the 100% impairment at the end of 2022. As previously stated, the Company has determined this to be incorrect and reverse the impairment incurred during the year ended December 31, 2023 in the amount of $27,167,415. This amount is also adjusted to accumulated deficit as of December 31, 2023 and operating cashflows for the year ended December 31, 2023.

The Company has also restated each quarterly financial statement related to previously filed 2023 quarterly financial statements. See Note 3 for discussion and the restated consolidated financial statements for each quarter.

Table of Contents

The Company also has made additional restatement adjustments to modify accounting for the acquisition of additional working interest in the Orogrande Project in April 2023. The consideration for the acquisition was common stock of the Company. Adjustments to the value per share of the stock issued were made to acknowledge the impact on the per share value of the stock, taking into account the corrections to the value of the Company assets as described above. The initial value of the stock issued in the acquisition was $15,838,073 and has been adjusted to $723,669. The decrease to oil and natural gas properties was $15,114,404 with an offset to decrease additional paid in capital. The amount also restated non-cash investing activities for a decrease of $15,114,404.

The impact of the above matters constitutes the adjustments to the following Consolidated Balance Sheets, Consolidated Statements of Operations, and Consolidated Statements of Cash Flows.

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2023 As Filed in 2023 Form 10-K Filed 7/17/24 | Restatement | Restated December 31, 2023 in 2023 Form 10-K-A Filed August 2025 |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash | $ 1,668,847 | - | 1,668,847 |
| Accounts receivable | 207,470 | - | 207,470 |
| Production receivable | 1,412 | - | 1,412 |
| Accounts receivable, related party | - | - | - |
| Prepayments - development costs | 131,340 | - | 131,340 |
| Prepaid expenses | 76,741 | - | 76,741 |
| Total current assets | 2,085,810 | - | 2,085,810 |
| Oil and natural gas properties | - | 53,672,579 | 53,672,579 |
| Other assets | 105,179 | - | 105,179 |
| TOTAL ASSETS | $ 2,190,989 | 53,672,579 | $ 55,863,568 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 3,777,693 | (8) | 3,777,685 |
| Preayments, working interest owners | 311,281 | - | 311,281 |
| Note Payable - Related Party | 41,221,028 | - | 41,221,028 |
| Accrued interest payable | 3,870,175 | - | 3,870,175 |
| Total current liabilities | 49,180,177 | (8) | 49,180,169 |
| Asset retirement obligations | 248,651 | - | 248,651 |
| Total liabilities | 49,428,828 | (8) | 49,428,820 |
| Commitments and contingencies | | | |
| Stockholders' equity (deficit): | | | |
| Preferred stock, par value $0.0001, 50,000,000 shares authorized; -0- issued and outstanding December 31, 2023 | - | - | - |
| Common stock, par value $0.0001; 500,000,000 shares authorized; 248,830,516 issued and outstanding at December 31, 2023; | 24,883 | - | 24,883 |
| Additional paid-in capital | 71,956,656 | 34,386,604 | 106,343,260 |
| Accumulated deficit | (119,219,378) | 19,285,983 | (99,933,395) |
| Total stockholders' equity (deficit) | (47,237,839) | 53,672,587 | 6,434,748 |

| | | | | |
|---|---|---|---|---|
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) | $ | 2,190,989 | 53,672,579 | 55,863,568 |

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | December 31, 2023 As Filed in 2023 Form 10-K Filed 7/17/24 | Restatement | Restated December 31, 2023 in 2023 Form 10-K-A Filed August 2025 |
|---|---|---|---|
| Oil and gas sales | $ 26,031 | $ - | $ 26,031 |
| Operating expenses: | | | |
| Lease operating expenses | 59,059 | 0 | 59,059 |
| Production taxes | 1,874 | 0 | 1,874 |
| General and administrative | 12,095,611 | - | 12,095,611 |
| Impairment expense | 27,167,415 | (27,167,415) | - |
| Total operating expenses | 39,323,959 | (27,167,415) | 12,156,544 |
| Other income (expense) | | | |
| Prospect fee income | 1,700,000 | | 1,700,000 |
| Administration income | 41,140 | | 41,140 |
| Interest income | 1 | | 1 |
| Total expense, net | 1,741,141 | - | 1,741,141 |
| Loss before income taxes | (37,556,787) | 27,167,415 | (10,389,372) |
| Provision for income taxes | - | - | - |
| **Net loss** | $ (37,556,787) | $ 27,167,415 | $ (10,389,372) |
| **Loss per common share:** | | | |
| **Basic and Diluted** | $ (0.21) | | $ (0.06) |
| **Weighted average number of common shares outstanding:** | | | |
| **Basic and Diluted** | 180,316,865 | | 180,316,865 |

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | December 31, 2023 As Filed in 2023 Form 10-K Filed 7/17/24 | Adjustment | Restated December 31, 2023 in 2023 Form 10-K-A Filed August 2025 |
|---|---|---|---|
| **Cash Flows From (Used in) Operating** | | | |
| Net loss | $ (37,556,787) | $ 27,167,415 | $ (10,389,372) |
| Adjustments to reconcile net loss to net cash from operations: | | | |
| Accretion expense | 1,785 | - | 1,785 |
| Impairment expense | 27,167,415 | (27,167,415) | - |
| Expense related to stock based compensation | 4,781,279 | - | 4,781,279 |
| Prospect fee offset to note payable | (368,334) | - | (368,334) |
| Change in: | | | |
| Accounts receivable | (208,882) | - | (208,882) |
| Prepayments - development costs | 18,660 | - | 18,660 |
| Other assets | (25,000) | - | (25,000) |
| Prepaid expenses | (14,441) | - | (14,441) |
| Accounts payable and accrued expenses | (1,353,787) | - | (1,353,787) |
| **Net cash from (Used in) operating activities** | (7,558,092) | - | (7,558,092) |
| | | | |
| **Cash Flows From (Used in) Investing Activities** | | | |
| Investment in oil and gas properties | (8,653,640) | - | (8,653,640) |
| **Net cash from (Used in) investing activities** | (8,653,640) | - | (8,653,640) |
| | | | |
| **Cash Flows From Financing Activities** | | | |
| Proceeds from notes payable | 18,000,000 | - | 18,000,000 |
| Payments on promissory notes | (1,000,000) | - | (1,000,000) |
| Prepayments, working interest owners | 311,281 | - | 311,281 |
| **Net cash from financing activities** | 17,311,281 | - | 17,311,281 |
| | | | |
| **Net increase (decrease) in cash** | 1,099,549 | - | 1,099,549 |
| | | | |
| **Cash - beginning of year** | 569,298 | - | 569,298 |
| **Cash - end of year** | $ 1,668,847 | $ - | $ 1,668,847 |
| | | | |
| **Supplemental disclosure of cash flow** | | | |
| Cash paid for interest | $ 199,345 | $ - | $ 199,345 |
| | | | |
| **Supplemental disclosure of non-cash investing and financing activities:** | | | |
| Common stock issued in working interest acquisition | $ 15,838,073 | $(15,114,404) | $ 723,669 |
| Account receivable cancelled in WI acquisition | $ 177,519 | $ - | $ 177,519 |
| Capitalized Interest included in interest payable | $ 2,498,184 | $ - | $ 2,498,184 |

### 3. RESTATEMENTS OF PREVIOUSLY ISSUED UNAUDITED INTERIM CONSOLIDATED FINANCIAL STATEMENTS

The Company's Form 10-Qs as originally filed for each quarter ended in 2023, are also restated to account for the changes in Note 2 related to the financial statements as of and for the three months ended March 31, 2023, as of and for the three and six months ended June 30, 2023, and as of and for the three and nine months ended September 30, 2023. The carry forward impact of the 2022 restatement was an increase to oil and natural gas properties of $41,619,567, an increase to additional paid-in capital of $49,501,009 and an increase in accumulated deficit of $7,881,442 as of January 1, 2023. These amounts impact each of the quarter ended financial statements in the same as a carryforward.

### RESTATEMENT OF PREVIOUSLY ISSUED INTERIM MARCH 31, 2023 FINANCIAL STATEMENTS

Restatements as of and for the three months ended March 31, 2023 consist of the carry forward impact of the error corrections described in Note 2 related to the reversal of fair value adjustment to account for the Spin-Off as a recission of a Prior Business Combination. This correction resulted in a decrease to oil and natural gas properties of $39,031,194 and an offset to additional paid in capital. Additionally to properly account for the Spin-Off and the impact of historical transactions the corrections increased additional paid in capital by $88,532,203 with an offsetting increase of the same amount to accumulated deficit. The Company also made a correction for the reclassification of lease operating expense in the amount of $92,252 that was offset to oil and natural gas properties. The Company also identified and adjusted stock compensation expense in the amount of $100,005. This amount also affected cashflow from operations.

The impact of the above matters constitutes the adjustments to the following Consolidated Balance Sheets, Consolidated Statements of Operations, and Consolidated Statements of Cash Flows.

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED BALANCE SHEETS**
**MARCH 31, 2023**
**UNAUDITED**

| | As Originally Reported | Restatement | As Restated |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash | $ 5,301,647 | $ 0 | $ 5,301,647 |
| Accounts receivable, related party | $ 177,519 | $ 0 | $ 177,519 |
| Prepaid expenses | $ 51,184 | $ 0 | $ 51,184 |
| Total current assets | $ 5,530,350 | $ 0 | $ 5,530,350 |
| Oil and gas properties, net of impairment | $ 88,626,670 | $(39,123,446) | $ 49,503,224 |
| Other assets | $ 80,179 | $ 0 | $ 80,179 |
| TOTAL ASSETS | $ 94,237,199 | $(39,123,446) | $ 55,113,753 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY(DEFICIT)** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 5,375,669 | $ 0 | $ 5,375,669 |
| Note Payable - META | $ 21,589,362 | $ 0 | $ 21,589,362 |
| Note Payable - Related Party | $ 16,875,000 | $ 0 | $ 16,875,000 |
| Accrued interest payable | $ 1,935,084 | $ 0 | $ 1,935,084 |
| Total current liabilities | $ 45,775,115 | $ 0 | $ 45,775,115 |
| Asset retirement obligations | $ 252,731 | $ 0 | $ 252,731 |
| Total liabilities | $ 46,027,846 | $ 0 | $ 46,027,846 |
| Commitments and contingencies | | | |
| Stockholders' equity(deficit): | | | |
| Preferred stock, par value $0.001, 500,000,000 shares authorized; -0- issued and outstanding March 31, 2023 | $ 0 | $ 0 | $ 0 |
| Common stock, par value $0.001; 500,000,000 shares authorized; 165,472,241 issued and outstanding at March 31, 2023; | $ 16,547 | $ 0 | $ 16,547 |
| Additional paid-in capital | $ 51,490,795 | $ 49,601,014 | $101,091,809 |
| Accumulated deficit | $ (3,297,989) | $(88,724,460) | $ (92,022,449) |
| Total stockholders' equity(deficit) | $ 48,209,353 | $(39,123,446) | $ 9,085,907 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY(DEFICIT) | $ 94,237,199 | $(39,123,446) | $ 55,113,753 |

Table of Contents

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**Three Months ended March 31, 2023**
**UNAUDITED**

| | As Originally Reported | As Restatements | Restated |
|---|---|---|---|
| Oil and gas sales | $ 10,924 | $ 0 | $ 10,924 |
| Operating expenses: | | | |
| Lease operating expenses | $ 15,816 | $ 0 | $ 15,816 |
| Production taxes | $ 786 | $ 0 | $ 786 |
| General and administrative | $ 2,381,774 | $ 90,975 | $ 2,472,749 |
| Impairment expense | $ 0 | $ 0 | $ 0 |
| Total operating expenses | $ 2,398,376 | $ 90,975 | $ 2,489,351 |
| Other income | | | |
| Interest income | $ 1 | $ 0 | $ 1 |
| Total other income | $ 1 | $ 0 | $ 1 |
| Loss before income taxes | ($ 2,387,451) | ($ 90,975) | ($ 2,478,426) |
| Provision for income taxes | $ 0 | $ 0 | $ 0 |
| **Net loss** | ($ 2,387,451) | ($ 90,975) | ($ 2,478,426) |
| **Loss per common share:** | | | |
| **Basic and Diluted** | ($ 0.01) | - | ($ 0.01) |
| **Weighted average number of common shares outstanding:** | | | |
| **Basic and Diluted** | 165,472,241 | - | 165,472,241 |

Table of Contents

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**THREE MONTHS ENDED MARCH 31, 2023**
**UNAUDITED**

| | As Originally Reported | Restatements | As Restated |
|---|---|---|---|
| **Cash Flows Used in Operating Activities** | | | |
| Net loss | ($ 2,387,451) | ($ 90,975) | ($ 2,478,426) |
| Adjustments to reconcile net loss to net cash from operations: | | | |
| Accretion expense | $ 5,865 | $ 0 | $ 5,865 |
| Stock compensation expense | $ 145,155 | $ 100,005 | $ 245,160 |
| Impairment expense | $ 0 | $ 0 | $ 0 |
| Change in: | | | |
| Prepayments - development costs | $ 150,000 | $ 0 | $ 150,000 |
| Prepaid expenses | $ 11,117 | $ 0 | $ 11,117 |
| Accounts payable and accrued expenses | $ 1,499,658 | ($ 9,030) | $ 1,490,628 |
| **Net cash used in operating activities** | ($ 575,656) | $ 0 | ($ 575,656) |
| **Cash Flows Used in Investing Activities** | | | |
| Investment in oil and gas properties | ($ 8,437,883) | $ 0 | ($ 8,437,883) |
| **Net cash used in investing activities** | ($ 8,437,883) | $ 0 | ($ 8,437,883) |
| **Cash Flows From Financing Activities** | | | |
| Proceeds from notes payable, related party | $ 14,875,000 | $ 0 | $ 14,875,000 |
| Payments on promissory notes | ($ 1,129,112) | $ 0 | ($ 1,129,112) |
| **Net cash from financing activities** | $ 13,745,888 | $ 0 | $ 13,745,888 |
| **Net increase in cash** | $ 4,732,349 | | $ 4,732,349 |
| **Cash - beginning of year** | $ 569,298 | $ 0 | $ 569,298 |
| **Cash - end of year** | $ 5,301,647 | $ 0 | $ 5,301,647 |
| **Supplemental disclosure of cash flow information:** | | | |
| Cash paid for interest | $ 129,112 | $ 0 | $ 129,112 |
| Cash paid for income tax | $ 0 | $ 0 | $ 0 |
| **Supplemental disclosure of non-cash investing and financing activities:** | | | |
| Capitalized Interest included in interest payable | $ 492,860 | $ 0 | $ 492,860 |

**RESTATEMENT OF PREVIOUSLY ISSUED INTERIM JUNE 30, 2023 FINANCIAL STATEMENTS**

The Company's initial Form 10-Q for the quarter ended June 30, 2023 filed on August 14, 2023 (the "Q2 2023 Original Filing").

After that filing the Company was notified that the auditing firm used for 2022 had been sanctioned by the SEC and was therefore required to engage new auditors for 2023 and 2022. The reaudit of 2022 ultimately resulted in a decision by management to impair 100% of the cost of oil and natural gas properties.

Restatements of the Q2 2023 Original Filing as of and for the three and six months ended June 30, 2023 consist of the carry forward impact of the adjustments described in Note 2. Additionally, impairment to oil and natural gas properties for the three and six months ended June 30, 2023 of $17,127,020 and $25,008,677 was incurred in the initial restatement to the Q2 2023 Original Filing. These amounts are also adjusted to accumulated deficit as of June 30, 2023 and cashflows from operating activities. The Company identified an error related to the valuation of stock based compensation and restated the Q2 2023 Original Filing for the three and six months ended June 30, 2023 of $596,868 and $687,833. These amounts affected general and administrative expenses, additional paid in capital and cashflows from operating activities.

As described in Note 2, the elimination of all value ascribed to the oil and natural gas properties by impairment of the oil and gas properties at December 31, 2022 was incorrectly based on a presumption of impairment in the absence of having established oil and natural gas reserves and without having yet secured an extension to the lease, and did not properly consider the Company's stated intentions and rights to extend the lease coupled with the Company's ongoing efforts to evaluate the Orogrande properties in the application of the full cost method of accounting, particularly with regard to unevaluated property costs.

After the Company filed the Form S-1/A filed August 28, 2024, additional restatements were made to restate oil and natural gas properties and additional historical balances as described in Note 2.

Following the previous impairment of 100% of the value of oil and natural gas properties as of December 31, 2022, further impairments of development costs incurred in subsequent quarterly periods in 2023 were recorded in those periods to be consistent with the reversal of the 100% impairment at the end of 2022. As previously stated the Company has determined this to be incorrect and reverse the impairment incurred during 2023. The amount of impairment that has been reversed for the three and six months ended June 30, 2023 is $17,127,020 and $25,008,677. These amounts are also adjusted to accumulated deficit as of June 30, 2023 and operating cashflows.

Additional adjustments have been made to modify accounting for the acquisition of additional working interest in the Orogrande Project in April 2023. The consideration for the acquisition was common stock of the Company. Adjustments to the value per share of the stock issued were made to acknowledge the impact on the per share value of the stock, taking into account the corrections to the value of the Company assets as described in Note 2 above. The initial value of the stock issued in the acquisition was $15,838,073 and has been adjusted to $723,669.

The impact of the above matters constitutes the adjustments to the following Consolidated Balance Sheets, Consolidated Statements of Operations, and Consolidated Statements of Cash Flows.

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED BALANCE SHEETS - JUNE 30, 2023**
**UNAUDITED**

| | As Originally Filed | Restatement | As Last Reported on Form S-1/A Filed August 28, 2024 | Restatement | As Restated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash | $ 737,404 | $ 0 | $ 737,404 | $ 0 | $ 737,404 |
| Prepayments - development costs | $ 4,034 | $ 0 | $ 4,034 | $ 0 | $ 4,034 |
| Prepaid expenses | $ 32,614 | $ 0 | $ 32,614 | $ 0 | $ 32,614 |
| Total current assets | $ 774,052 | $ 0 | $ 774,052 | $ 0 | $ 774,052 |
| Oil and natural gas properties, net | $118,255,432 | $ (118,255,432) | $ 0 | $51,513,840 | $ 51,513,840 |
| Other assets | $ 80,179 | $ 0 | $ 80,179 | $ 0 | $ 80,179 |
| TOTAL ASSETS | $119,109,663 | $ (118,255,432) | $ 854,231 | $51,513,840 | $ 52,368,071 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 1,271,140 | $ 0 | $ 1,271,140 | $ 0 | $ 1,271,140 |
| Note Payable - META | $ 21,589,362 | $ 0 | $ 21,589,362 | $ 0 | $ 21,589,362 |
| Note Payable - Related Party | $ 19,000,000 | $ 0 | $ 19,000,000 | $ 0 | $ 19,000,000 |
| Accrued interest payable | $ 2,511,173 | $ 0 | $ 2,511,173 | $ 0 | $ 2,511,173 |
| Total current liabilities | $ 44,371,675 | $ 0 | $ 44,371,675 | $ 0 | $ 44,371,675 |
| Asset retirement obligations | $ 258,802 | $ 0 | $ 258,802 | $ 0 | $ 258,802 |
| Total liabilities | $ 44,630,477 | $ 0 | $ 44,630,477 | $ 0 | $ 44,630,477 |
| Commitments and contingencies | | | | | |
| Stockholders' equity (deficit): | | | | | |
| Preferred stock, par value $0.001, 500,000,000 shares authorized; -0- issued and outstanding June 30, 2023 | $ 0 | | $ 0 | $ 0 | $ 0 |
| Common stock, par value $0.001; 500,000,000 shares authorized; 248,830,516 issued and outstanding at June 30, 2023; | $ 99,905 | ($ 75,022) | $ 24,883 | $ 0 | $ 24,883 |
| Additional paid-in capital | $ 80,133,023 | ($ 11,731,847) | $ 68,401,176 | $34,386,605 | $102,787,781 |
| Accumulated deficit | $ (5,753,742) | $ (106,448,563) | $ (112,202,305) | $17,127,235 | $ (95,075,070) |
| Total stockholders' equity | $ 74,479,186 | $ (118,255,432) | $ (43,776,246) | $51,513,840 | $ 7,737,594 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) | $119,109,663 | $ (118,255,432) | $ 854,231 | $51,513,840 | $ 52,368,071 |

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**Six and Three Months Ended June 30, 2023**
**UNAUDITED**

| | Six Months Ended June 30, 2023 | | | | | Three Months Ended June 30, 2023 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | As Originally Filed | Restatement | As Last Reported on Form S-1/A Filed August 28, 2024 | Restatement | As Restated | As Originally Filed | Restatement | As Reported on Form S-1/A Filed August 28, 2024 | Restatement | As Restated |
| Oil and natural gas sales | $ 15,765 | $ 0 | $ 15,765 | $ 0 | $ 15,765 | $ 4,841 | $ 0 | $ 4,841 | $ 0 | $ 4,841 |
| Operating expenses: | | | | | | | | | | |
| Lease operating expenses | $ 26,510 | $ 0 | $ 26,510 | $ 0 | $ 26,510 | $ 10,694 | $ 0 | $ 10,694 | $ 0 | $ 10,694 |
| Production taxes | $ 1,135 | $ 0 | $ 1,135 | $ 0 | $ 1,135 | $ 349 | $ 0 | $ 349 | $ 0 | $ 349 |
| General and administrative | $ 4,831,325 | $ 687,833 | $ 5,519,158 | $ 0 | $ 5,519,158 | $ 2,449,551 | $ 596,868 | $ 3,046,419 | $ 0 | $ 3,046,419 |
| Impairment expense | $ 0 | $ 25,008,677 | $ 25,008,677 | ($25,008,677) | $ 0 | $ 0 | $ 17,125,020 | $ 17,125,020 | ($17,125,020) | $ 0 |
| Total operating expenses | $ 4,858,970 | $ 25,696,510 | $ 30,555,480 | ($25,008,677) | $ 5,546,803 | $ 2,460,594 | $ 17,721,888 | $ 20,182,482 | ($17,125,020) | $ 3,057,462 |
| Other income | | | | | | | | | | |
| Interest income | $ 1 | $ 0 | $ 1 | $ 0 | $ 1 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Total other income | $ 1 | $ 0 | $ 1 | $ 0 | $ 1 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Loss before income taxes | ($ 4,843,204) | ($25,696,510) | ($ 30,539,714) | $ 25,008,677 | ($ 5,531,037) | ($ 2,455,753) | ($17,721,888) | ($ 20,177,641) | $ 17,125,020 | ($ 3,052,621) |
| Provision for income taxes | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| **Net loss** | ($ 4,843,204) | ($25,696,510) | ($ 30,539,714) | $ 25,008,677 | ($ 5,531,037) | ($ 2,455,753) | ($17,721,888) | ($ 20,177,641) | $ 17,125,020 | ($ 3,052,621) |
| Loss per common share: | | | | | | | | | | |
| Basic and Diluted | ($ 0.02) | - | ($ 0.16) | - | ($ 0.03) | ($ 0.01) | - | ($ 0.09) | - | ($ 0.01) |
| Weighted average number of common shares outstanding: | | | | | | | | | | |
| Basic and Diluted | 195,407,533 | - | 195,407,533 | - | 195,407,533 | 225,013,866 | - | 225,013,866 | - | 225,013,866 |

Table of Contents

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**Six Months Ended June 30, 2023**
**UNAUDITED**

| | As Originally Filed | Restatement | As Last Reported on Form S-1/A Filed August 28, 2024 | Restatement | As Restated |
|---|---|---|---|---|---|
| **Cash Flows from (used in) Operating Activities** | | | | | |
| Net loss | ($ 4,843,204) | ($25,696,510) | ($ 30,539,714) | $ 25,008,677 | ($ 5,531,037) |
| Adjustments to reconcile net loss to net cash from operations: | | | | | $ 0 |
| Accretion expense | $ 11,936 | $ 0 | $ 11,936 | $ 0 | $ 11,936 |
| Expense related to stock options issued | $ 528,927 | $ 696,873 | $ 1,225,800 | $ 0 | $ 1,225,800 |
| Impairment expense | $ 0 | $ 25,008,677 | $ 25,008,677 | ($25,008,677) | $ 0 |
| Change in: | | | | | |
| Accounts receivable | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Accounts receivable, related party | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Prepayments - development costs | $ 150,000 | $ 0 | $ 150,000 | $ 0 | $ 150,000 |
| Prepaid expenses | $ 25,652 | $ 0 | $ 25,652 | $ 0 | $ 25,652 |
| Accounts payable and accrued expenses | ($ 2,604,872) | ($ 1,056,126) | ($ 3,660,998) | $ 0 | ($ 3,660,998) |
| **Net cash used in operating activities** | ($ 6,731,561) | ($ 1,047,086) | ($ 7,778,647) | $ 0 | ($ 7,778,647) |
| **Cash Flows From (used in) Investing Activities** | | | | | |
| Investment in oil and natural gas properties | ($ 8,900,988) | $ 1,047,086 | ($ 7,853,902) | $ 0 | ($ 7,853,902) |
| **Net cash from (used in) investing activities** | ($ 8,900,988) | $ 1,047,086 | ($ 7,853,902) | $ 0 | ($ 7,853,902) |
| **Cash Flows From Financing Activities** | | | | | |
| Proceeds from notes payable, related party | $ 17,000,000 | $ 0 | $ 17,000,000 | $ 0 | $ 17,000,000 |
| Payments on promissory notes | ($ 1,000,000) | $ 0 | ($ 1,000,000) | $ 0 | ($ 1,000,000) |
| Payments on accrued interest | ($ 199,345) | $ 0 | ($ 199,345) | $ 0 | ($ 199,345) |
| **Net cash from financing activities** | $ 15,800,655 | $ 0 | $ 15,800,655 | $ 0 | $ 15,800,655 |
| **Net increase (decrease) in cash** | $ 168,106 | $ 0 | $ 168,106 | $ 0 | $ 168,106 |
| **Cash - beginning of period** | $ 569,298 | $ 0 | $ 569,298 | $ 0 | $ 569,298 |
| **Cash - end of period** | $ 737,404 | $ 0 | $ 737,404 | $ 0 | $ 737,404 |
| **Supplemental disclosure of cash flow information:** | | | | | |
| Cash paid for interest | $ 199,345 | $ 0 | $ 199,345 | $ 0 | $ 199,345 |
| **Supplemental disclosure of non-cash investing and financing activities:** | | | | | |
| Common stock issued for working interest | $ 28,341,814 | ($12,503,742) | $ 15,838,072 | ($15,114,403) | $ 723,669 |
| Account receivable-related party discharged in WI acqisition | $ 177,519 | $ 0 | $ 177,519 | $ 0 | $ 177,519 |
| Capitalized Interest | $ 1,139,183 | $ 0 | $ 1,139,183 | $ 0 | $ 1,139,183 |

**RESTATEMENT OF PREVIOUSLY ISSUED INTERIM SEPTEMBER 30, 2023 FINANCIAL STATEMENTS**

The Company's initial Form 10-Q for the quarter ended September 30, 2023 filed on November 14, 2023 (the "Q3 2023 Original Filing").

After that filing the Company was notified that the auditing firm used for 2022 had been sanctioned by the SEC and the Company was therefore required to engage new auditors for 2023. In the course of the new auditors' examination for the year ended December 31, 2023, it was required that opening entries carried forward from 2022 be examined. When it was discovered that all appropriate auditing procedures had not been applied in the previous 2022 audit, management extended the 2023 engagement to include reaudit of 2022 which ultimately resulted in a decision by management to impair 100% of the cost of oil and natural gas properties.

Restatements of the of the Q3 2023 Original Filing as of and for the three and nine months ended September 30, 2023 consist of the carry forward impact of the adjustments described in Note 2. Additionally, impairment to oil and natural gas properties for the three and nine months ended September 30, 2023 of $1,282,738 and $26,291,415 was incurred in the initial restatement to the Q3 2023 Original Filing. These amounts are also adjusted to accumulated deficit as of September 30, 2023 and cashflows from operating activities. The Company identified an error related to the valuation of stock based compensation and restated the Q3 2023 Original Filing for the three and nine months ended September 30, 2023 of $1,046,332 and $1,734,165. These amounts affected general and administrative expenses, additional paid in capital and cashflows from operating activities.

As described in Note 2, the elimination of all value ascribed to the oil and natural gas properties by impairment of the oil and natural gas properties at December 31, 2022 was incorrectly based on a presumption of impairment in the absence of having established oil and natural gas reserves and without having yet secured an extension to the lease, and did not properly consider the Company's stated intentions and rights to extend the lease coupled with our ongoing efforts to evaluate the Orogrande properties in the application of the full cost method of accounting, particularly with regard to unevaluated property costs.

After the Company filed the Form 10-Q for September 30, 2024 on November 14, 2023, additional restatements were made to restate oil and natural gas properties and additional historical balances as described in Note 2.

Following the previous impairment of 100% of the value of oil and natural gas properties as of December 31, 2022, further impairments of development costs incurred in subsequent quarterly periods in 2023 were recorded in those periods to be consistent with the reversal of the 100% impairment at the end of 2022. As previously stated the Company has determined this to be incorrect and reverse the impairment incurred during 2023. The amount of impairment that has been reversed for the three and nine months ended September 30, 2023 is $1,282,738 and $26,291,415. These amounts are also adjusted to accumulated deficit as of September 30, 2023 and operating cashflows for those quarters.

The Company also has made additional restatement adjustments to modify accounting for the acquisition of additional working interest in the Orogrande Project in April 2023. The consideration for the acquisition was common stock of the Company. Adjustments to the value per share of the stock issued were made to acknowledge the impact on the per share value of the stock, taking into account the corrections to the value of the Company assets as described above. The initial value of the stock issued in the acquisition was $15,838,073 and has been adjusted to $723,669. The decrease to oil and natural gas properties was $15,114,404 with an offset to decrease additional paid in capital. The amount also restated non-cash investing activities for a decrease of $15,114,404.

The impact of the above matters constitutes the adjustments to the following Consolidated Balance Sheets, Consolidated Statements of Operations, and Consolidated Statements of Cash Flows.

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED BALANCE SHEETS - SEPTEMBER 30, 2023**
**UNAUDITED**

| | As Originally Filed | Restatement | As Last Reported for Comparative 9/30/2023 in 10Q for 9/30/2024 Filed November 13, 2024 | Restatement | As Restated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash | $ 4,884,997 | $ 0 | $ 4,884,997 | $ 0 | $ 4,884,997 |
| Prepayments - development costs | $ 110,750 | $ 0 | $ 110,750 | $ 0 | $ 110,750 |
| Prepaid expenses | $ 70,908 | $ 0 | $ 70,908 | $ 0 | $ 70,908 |
| Total current assets | $ 5,066,655 | $ 0 | $ 5,066,655 | $ 0 | $ 5,066,655 |
| Oil and natural gas properties, net | $119,538,170 | ($ 119,538,170) | $ 0 | $52,796,578 | $ 52,796,578 |
| Other assets | $ 105,179 | $ 0 | $ 105,179 | $ 0 | $ 105,179 |
| TOTAL ASSETS | $124,710,004 | ($ 119,538,170) | $ 5,171,834 | $52,796,578 | $ 57,968,412 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 1,285,641 | $ 0 | $ 1,285,641 | $ 0 | $ 1,285,641 |
| Prepayments, working interest owners | $ 5,611,892 | $ 0 | $ 5,611,892 | $ 0 | $ 5,611,892 |
| Note Payable - Related Party | $ 41,589,362 | $ 0 | $ 41,589,362 | $ 0 | $ 41,589,362 |
| Accrued interest payable | $ 3,191,007 | $ 0 | $ 3,191,007 | $ 0 | $ 3,191,007 |
| Total current liabilities | $ 51,677,902 | $ 0 | $ 51,677,902 | $ 0 | $ 51,677,902 |
| Asset retirement obligations | $ 264,826 | $ 0 | $ 264,826 | $ 0 | $ 264,826 |
| Total liabilities | $ 51,942,728 | $ 0 | $ 51,942,728 | $ 0 | $ 51,942,728 |
| Commitments and contingencies | | | | | |
| Stockholders' equity (deficit): | | | | | |
| Preferred stock, par value $0.001, 500,000,000 shares authorized; -0- issued and outstanding September 30, 2023 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Common stock, par value $0.001; 500,000,000 shares authorized; 248,830,516 issued and outstanding at September 30, 2023; | $ 24,883 | $ 0 | $ 24,883 | $ 0 | $ 24,883 |
| Additional paid-in capital | $ 80,971,349 | ($ 23,282,357) | $ 57,688,992 | 46,899,385 | $104,588,377 |
| Accumulated deficit | $ (8,228,956) | $ (96,255,813) | $ (104,484,769) | 5,897,193 | $ (98,587,576) |
| Total stockholders' equity | $ 72,767,276 | $ (119,538,170) | $ (46,770,894) | $52,796,578 | $ 6,025,684 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) | $124,710,004 | $ (119,538,170) | $ 5,171,834 | $52,796,578 | $ 57,968,412 |

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**Nine and Three Months Ended September 30, 2023**
**UNAUDITED**

| | Nine Months Ended September 30, 2023 | | | | | Three Months Ended September 30, 2023 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | As Originally Filed | Restatement | As Last Reported for Comparative 9/30/2023 in 10Q for 9/30/2024 | Restatement | As Restated | As Originally Filed | Restatement | As Last Reported for Comparative 9/30/2023 in 10Q for 9/30/2024 | Restatement | As Restated |
| Oil and natural gas sales | $ 23,496 | $ 0 | $ 23,496 | $ 0 | $ 23,496 | $ 7,731 | $ 0 | $ 7,731 | $ 0 | $ 7,731 |
| Operating expenses: | | | | | | | | | | |
| Lease operating expenses | $ 36,812 | $ 0 | $ 36,812 | $ 0 | $ 36,812 | $ 10,302 | $ 0 | $ 10,302 | $ 0 | $ 10,302 |
| Production taxes | $ 1,692 | $ 0 | $ 1,692 | $ 0 | $ 1,692 | $ 557 | $ 0 | $ 557 | $ 0 | $ 557 |
| General and administrative | $ 7,303,411 | $ 1,725,125 | $ 9,028,536 | | $ 9,028,536 | $ 2,472,086 | $ 1,037,292 | $ 3,509,378 | $ 0 | $ 3,509,378 |
| Impairment expense | $ 0 | $ 26,291,415 | $ 26,291,415 | ($26,291,415) | $ 0 | $ 0 | $ 1,282,738 | $ 1,282,738 | ($1,282,738) | $ 0 |
| Total operating expenses | $ 7,341,915 | $ 28,016,540 | $ 35,358,455 | ($26,291,415) | $ 9,067,040 | $ 2,482,945 | $ 2,320,030 | $ 4,802,975 | ($1,282,738) | $ 3,520,237 |
| Other income | | | | | | | | | | |
| Interest expense | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Interest income | $ 1 | $ 0 | $ 1 | $ 0 | $ 1 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Total other income | $ 1 | $ 0 | $ 1 | $ 0 | 1 | - | - | - | - | - |
| Loss before income taxes | ($ 7,318,418) | ($28,016,540) | ($ 35,334,958) | $ 26,291,415 | ($ 9,043,543) | ($ 2,475,214) | ($2,320,030) | ($ 4,795,244) | $ 1,282,738 | ($ 3,512,506) |
| Provision for income taxes | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| **Net loss** | ($ 7,318,418) | ($28,016,540) | ($ 35,334,958) | $ 26,291,415 | ($ 9,043,543) | ($ 2,475,214) | ($2,320,030) | ($ 4,795,244) | $ 1,282,738 | ($ 3,512,506) |
| **Loss per common share:** | | | | | | | | | | |
| **Basic and Diluted** | ($ 0.04) | - | ($ 0.17) | - | ($ 0.04) | ($ 0.01) | - | ($ 0.02) | - | ($ 0.01) |
| **Weighted average number of common shares outstanding:** | | | | | | | | | | |
| **Basic and Diluted** | 185,319,449 | - | 213,410,883 | - | 213,410,883 | 248,830,516 | - | 248,860,516 | - | 248,860,516 |

Table of Contents

**NEXT BRIDGE HYDROCARBONS INC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**Nine Months Ended September 30, 2023**
**UNAUDITED**

| | As Originally Filed | Restatement | As last Reported for Comparative 9/30/2023 in 10Q for 9/30/2024 Filed November 13, 2024 | Restatement | As Restated |
|---|---|---|---|---|---|
| **Cash Flows From (used in) Operating Activities** | | | | | |
| Net loss | ($ 7,318,418) | ($28,016,540) | ($ 35,334,958) | $ 26,291,415 | ($ 9,043,543) |
| Adjustments to reconcile net loss to net cash from operations: | | | | | |
| Accretion expense | $ 17,961 | $ 0 | $ 17,961 | $ 0 | $ 17,961 |
| Expense related to stock options issued | $ 1,292,231 | $ 1,734,165 | $ 3,026,396 | $ 0 | $ 3,026,396 |
| Impairment expense | $ 0 | $ 26,291,415 | $ 26,291,415 | ($26,291,415) | $ 0 |
| Change in: | | | | | |
| Accounts receivable | ($ 4,271) | $ 0 | ($ 4,271) | $ 0 | ($ 4,271) |
| Accounts receivable, related party | - | $ 0 | $ 0 | $ 0 | $ 0 |
| Prepayments - development costs | $ 43,520 | $ 0 | $ 43,520 | $ 0 | $ 43,520 |
| Prepaid expenses | ($ 8,608) | $ 0 | ($ 8,608) | $ 0 | ($ 8,608) |
| Other assets | ($ 25,000) | $ 0 | ($ 25,000) | $ 0 | ($ 25,000) |
| Accounts payable and accrued expenses | ($ 2,590,371) | ($ 1,056,126) | ($ 3,646,497) | $ 0 | ($ 3,646,497) |
| **Net cash from (used in) operating activities** | ($ 8,592,956) | ($ 1,047,086) | ($ 9,640,042) | $ 0 | ($ 9,640,042) |
| **Cash Flows From Investing Activities** | | | | | |
| Investment in oil and natural gas properties | ($ 9,503,892) | $ 1,047,086 | ($ 8,456,806) | $ 0 | ($ 8,456,806) |
| **Net cash from (used in) investing activities** | ($ 9,503,892) | $ 1,047,086 | ($ 8,456,806) | $ 0 | ($ 8,456,806) |
| **Cash Flows From Financing Activities** | | | | | |
| Proceeds from notes payable, related party | $ 18,000,000 | $ 0 | $ 18,000,000 | $ 0 | $ 18,000,000 |
| Payments on promissory notes | ($ 1,000,000) | $ 0 | ($ 1,000,000) | $ 0 | ($ 1,000,000) |
| Payments on accrued interest | ($ 199,345) | $ 0 | ($ 199,345) | $ 0 | ($ 199,345) |
| Prepayments, working interest owners | $ 5,611,892 | $ 0 | $ 5,611,892 | $ 0 | $ 5,611,892 |
| **Net cash from financing activities** | $ 22,412,547 | $ 0 | $ 22,412,547 | $ 0 | $ 22,412,547 |
| **Net increase (decrease) in cash** | $ 4,315,699 | $ 0 | $ 4,315,699 | $ 0 | $ 4,315,699 |
| **Cash - beginning of period** | $ 569,298 | $ 0 | $ 569,298 | $ 0 | $ 569,298 |
| **Cash - end of period** | $ 4,884,997 | $ 0 | $ 4,884,997 | $ 0 | $ 4,884,997 |
| **Supplemental disclosure of cash flow information:** | | | | | |
| Cash paid for interest | $ 199,345 | $ 0 | $ 199,345 | $ 0 | $ 199,345 |
| **Supplemental disclosure of non-cash investing and financing activities:** | | | | | |
| Common stock issued for working interest | $ 28,341,814 | ($12,503,742) | $ 15,838,072 | ($15,114,403) | $ 723,669 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Account receivable-related party discharged in WI acqisition | $ | 177,519 | $ | 0 | $ | 177,519 | $ | 0 | $ | 177,519 |
| Capitalized Interest | $ | 1,819,016 | $ | 0 | $ | 1,819,016 | $ | 0 | $ | 1,819,016 |

**SUMMARY OF RESTATEMENTS IMPACT BY PERIOD**

The following schedules summarize the impacts of the aggregate 2022 restatements detailed in Note 2 above and the aggregate 2023 restatements detailed in Note 3 above.

Additionally, the impacts on the interim first, second, and third quarters of 2023 are presented.

**NEXT BRIDGE HYDROCARBONS INC**
**SUMMARY OF RESTATEMENTS**
**DECEMBER 31, 2022 THROUGH JUNE 30, 2023**

| | December 31, 2022 | | | March 31, 2023 | | June 30, 2023 | | | Three Months Ended June 30, 2023 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Originally Reported 03/31/23 | Previously Restated 07/17/24 | Currently Restated | Originally Reported 05/15/23 | Currently Restated | Originally Reported 08/14/23 | Previously Restated 08/28/24 | Currently Restated | Originally Reported 08/14/23 | Previously Restated 08/28/24 | Currently Restated |
| BALANCE SHEETS | | | | | | | | | | | |
| Oil and natural gas properties | $79,695,928 | $ 0 | $ 41,619,567 | $88,626,670 | $ 49,503,224 | $118,255,432 | $ 0 | $ 51,513,840 | | | |
| Total Assets | $80,735,224 | $ 1,039,296 | $ 42,658,863 | $94,237,199 | $ 55,113,753 | $119,109,663 | $ 854,231 | $ 52,368,071 | | | |
| Additional paid-in capital | $51,345,640 | $ 51,345,640 | $100,846,649 | $51,490,795 | $101,091,809 | $ 80,133,023 | $ 68,401,176 | $102,787,781 | | | |
| Accumulated deficit | $ (910,538) | $(81,662,591) | $ (89,544,023) | $ (3,297,989) | $ (92,022,449) | $ (5,753,742) | $(112,202,305) | $ (95,075,070) | | | |
| Total stockholders' equity | $50,451,649 | $(30,300,404) | $ 11,319,173 | $48,209,353 | $ 9,085,907 | $ 74,479,186 | $ (43,776,246) | $ 7,737,594 | | | |
| Total Liabilities and Stockholders' equity | $80,735,224 | $ 1,039,296 | $ 42,658,863 | $94,237,199 | $ 55,113,753 | $119,109,663 | $ 854,231 | $ 52,368,071 | | | |
| STATEMENTS of OPERATIONS | | | | | | | | | | | |
| Impairment expense | $ 0 | $80,743,013 | $ 0 | $ 0 | $ 0 | $ 0 | $25,008,677 | $ 0 | $ 0 | $17,125,020 | $ 0 |
| Lease operating expenses | $ 74,314 | $ 74,314 | $ 166,567 | $ 15,816 | $ 15,816 | $ 26,510 | $ 26,510 | $ 26,510 | $ 10,694 | $ 10,694 | $ 10,694 |
| Total operating expenses | $8,890,203 | $89,642,256 | $8,991,496 | $2,398,376 | $2,489,351 | $4,858,970 | $30,555,480 | $5,546,803 | $2,460,594 | $20,182,482 | $3,057,462 |
| Net loss | $8,848,873 | $81,662,591 | $8,950,166 | $2,387,451 | $2,478,426 | $4,843,204 | $30,539,714 | $5,531,037 | $2,455,753 | $20,177,641 | $3,052,621 |
| STATEMENTS of CASH FLOWS | | | | | | | | | | | |
| Net loss | $ 8,848,873 | $ 81,662,591 | $8,950,166 | $2,387,451 | $2,478,426 | $4,843,204 | $ 30,539,714 | $5,531,037 | | | |
| Impairment expense | $ 0 | $(80,743,013) | $ 0 | $ 0 | $ 0 | $ 0 | $(25,008,677) | $ 0 | | | |

**NEXT BRIDGE HYDROCARBONS INC**
**SUMMARY OF RESTATEMENTS**
**SEPTEMBER 30, 2023 THROUGH YEAR ENDED DECEMBER 31, 2023**

| | September 30, 2023 | | | Three Months Ended September 30, 2023 | | | December 31, 2023 | |
|---|---|---|---|---|---|---|---|---|
| | Originally Reported 11/14/23 | Previously Restated 11/13/24 | Currently Restated | Originally Reported 08/14/23 | Previously Restated 08/28/24 | Currently Restated | Originally Reported 07/17/24 | Currently Restated |
| BALANCE SHEETS | | | | | | | | |
| Oil and natural gas properties | $119,538,170 | $ 0 | $ 52,796,578 | | | | $ 0 | $ 53,672,579 |
| Total Assets | $124,710,004 | $ 5,171,834 | $ 57,968,412 | | | | $ 2,190,989 | $ 55,863,568 |
| Additional paid-in capital | $ 80,971,349 | $ 57,688,992 | $104,588,377 | | | | $ 71,956,656 | $106,343,260 |
| Accumulated deficit | $ (8,228,956) | $(104,484,769) | $ (98,587,576) | | | | $(119,219,378) | $ (99,933,395) |
| Total stockholders' equity | $ 72,767,276 | $ (46,770,894) | $ 6,025,684 | | | | $ 47,237,839 | $ 6,434,748 |
| Total Liabilities and Stockholders' equity | $124,710,004 | $ 5,171,834 | $ 57,968,412 | | | | $ 2,190,989 | $ 55,863,568 |
| STATEMENTS of OPERATIONS | | | | | | | | |
| Impairment expense | $ 0 | $26,291,415 | $ 0 | $ 0 | $1,282,738 | $ 0 | $27,167,415 | $ 0 |
| Lease operating expenses | $ 36,812 | $ 36,812 | $ 36,812 | $ 10,302 | $ 10,302 | $ 10,302 | $ 59,059 | $ 59,059 |
| Total operating expenses | $7,341,915 | $35,358,455 | $9,067,040 | $2,482,945 | $4,802,975 | $3,520,237 | $39,323,959 | $12,156,544 |
| Net loss | $7,318,418 | $35,334,958 | $9,043,543 | $2,475,214 | $4,795,244 | $3,512,506 | $37,556,787 | $10,389,372 |
| STATEMENTS of CASH FLOWS | | | | | | | | |
| Net loss | $7,318,418 | $ 35,334,958 | $9,043,543 | | | | $37,556,787 | $10,389,372 |
| Impairment expense | $ 0 | $(26,291,415) | $ 0 | | | | $27,167,415 | $ 0 |

## 4. GOING CONCERN

At December 31, 2023, the Company had not yet achieved profitable operations. The Company had a restated net loss of $10,389,372 for the year ended December 31, 2023. The Company expects to incur further losses in the development of its business. The Company had a working capital deficit as of December 31, 2023, of $47,094,359. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

The Company's ability to continue as a going concern is dependent on its ability to generate future profitable operations or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due. Management's plan to address the Company's ability to continue as a going concern includes: (1) obtaining debt or equity funding from private placement, institutional, or public sources; (2) obtaining loans from financial institutions, where possible, or (3) participating in joint venture transactions with third parties. Although management believes that it will be able to obtain the necessary funding to allow the Company to remain a going concern through the methods discussed above, there can be no assurances that such methods will prove successful.

These consolidated financial statements have been prepared assuming that the Company will continue as a going concern and therefore, the financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amount and classifications of liabilities that may result from the outcome of this uncertainty.

**5. SIGNIFICANT ACCOUNTING POLICIES**

The Company maintains its accounts on the accrual method of accounting in accordance with accounting principles generally accepted in the United States of America. Accounting principles followed and the methods of applying those principles, which materially affect the determination of financial position, results of operations and cash flows are summarized below:

***Use of estimates***—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make estimates and certain assumptions that affect the amounts reported in these consolidated financial statements and accompanying notes. Actual results could differ from these estimates.

***Basis of presentation***—The financial statements are presented on a consolidated basis and include the accounts of Next Bridge Hydrocarbons, Inc. and its wholly owned subsidiaries, TEI, Hudspeth, Torchlight Hazel, Wolfbone, and Hudspeth Operating. All significant intercompany balances and transactions have been eliminated. As noted above, the Company was involved in the Spin-Off on December 14, 2022.

In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary to fairly present the financial position as of, and the results of operations for all periods presented. In preparing the accompanying financial statements, management has made certain estimates and assumptions that affect reported amounts in the consolidated financial statements and disclosures of contingencies. Actual results may differ from those estimates.

***Risks and uncertainties***—The Company's operations are subject to significant risks and uncertainties, including financial, operational, technological, and other risks associated with operating an emerging business, including the potential risk of business failure.

***Concentration of risks***—At times the Company's cash balances are in excess of amounts guaranteed by the Federal Deposit Insurance Corporation. The Company's cash is placed with a highly rated financial institution, and the Company regularly monitors the creditworthiness of the financial institutions with which it does business.

***Fair value of financial instruments***—Financial instruments consist of cash, receivables, payables and promissory notes, if any. The estimated fair values of cash, receivables, and payables approximate the carrying amount due to the relatively short maturity of these instruments. The carrying amounts of any promissory notes approximate their fair value giving affect for the term of the note and the effective interest rates.

For assets and liabilities that require re-measurement to fair value the Company categorizes them in a three-level fair value hierarchy as follows:

- Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities.
- Level 2 inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration.
- Level 3 inputs are unobservable inputs based on management's own assumptions used to measure assets and liabilities at fair value.

A financial asset or liability's classification within the hierarchy is determined based on the lowest level input that is significant to the fair value measurement.

***Cash and cash equivalents*** – Cash and cash equivalents include certain investments in highly liquid instruments with original maturities of three months or less.

***Accounts receivable*** – Accounts receivable consist of amounts due from Joint Interest Billing to the working interest owners who are participants in the Johnson Project. Those owners acquired working interest and participated in funding five wells drilled in 2023 on the Orogrande Project. Balances due represent their pro rata share of charges for development and operating costs allocable to those five wells after applying any prepayments from those owners.

Management reviews receivables periodically and reduces the carrying amount by an allowance for credit losses that reflects management's best estimate of the amount expected to be collected in the future. As of December 31, 2023 and 2022, no allowance for expected credit losses was considered necessary.

***Oil and natural gas properties*** – The Company uses the full cost method of accounting for exploration and development activities as defined by the SEC. Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as properties and equipment. This includes any internal costs that are directly related to property acquisition, exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities.

Oil and natural gas properties include costs that are excluded from costs being depleted or amortized. Oil and natural gas property costs excluded represent investments in unevaluated properties and include non-producing leasehold, geological, and geophysical costs associated with leasehold or drilling interests and exploration drilling costs. The Company allocates a portion of its acquisition costs to unevaluated properties based on relative value. Costs are transferred to the full cost pool as the properties are evaluated over the life of the reservoir. Unevaluated properties are reviewed for impairment at least quarterly and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan, and political, economic, and market conditions. The Company recorded no impairment expense for the year ended December 31, 2023, and for the year ended December 31, 2022.

Gains and losses, if any, on the sale of oil and natural gas properties are not generally reflected in income unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves. Sales of less than 100% of the Company's interest in the oil and natural gas property are treated as a reduction of the capital cost of the field, with no gain or loss recognized, as long as doing so does not significantly affect the unit-of-production depletion rate. Costs of retired equipment, net of salvage value, are usually charged to accumulated depreciation.

***Capitalized interest*** – The Company capitalizes interest on unevaluated properties during the periods in which they are excluded from costs being depleted or amortized. During the year ended December 31, 2023, the Company capitalized $2,498,184 of interest on unevaluated properties. Capitalized interest for the year ended December 31, 2022, was $1,363,538.

***Depreciation, depletion, and amortization*** – The depreciable base for oil and natural gas properties includes the sum of all capitalized costs net of accumulated depreciation, depletion, and amortization ("DD&A"), estimated future development costs and asset retirement costs not included in oil and natural gas properties, less costs excluded from amortization. The depreciable base of oil and natural gas properties is amortized on a unit-of-production method.

***Ceiling test*** – Future production volumes from oil and natural gas properties are a significant factor in determining the full cost ceiling limitation of capitalized costs. Under the full cost method of accounting, the Company is required to periodically perform a "ceiling test" that determines a limit on the book value of oil and natural gas properties. If the net capitalized cost of proved oil and natural gas properties, net of related deferred income taxes, plus the cost of unproved oil and natural gas properties, exceeds the present value of estimated future net cash flows discounted at 10 percent, net of related realizable tax affects, plus the cost of unproved oil and natural gas properties, the excess is charged to expense and reflected as additional accumulated DD&A.

The ceiling test calculation uses a commodity price assumption which is based on the unweighted arithmetic average of the price on the first day of each month for each month within the prior 12-month period and excludes future cash outflows related to estimated abandonment costs.

The determination of oil and natural gas reserves is a subjective process, and the accuracy of any reserve estimate depends on the quality of available data and the application of engineering and geological interpretation and judgment. Estimates of economically recoverable reserves and future net cash flows depend on a number of variable factors and assumptions that are difficult to predict and may vary considerably from actual results. In particular, reserve estimates for wells with limited or no production history are less reliable than those based on actual production. Subsequent re-evaluation of reserves and cost estimates related to future development of proved oil and natural gas reserves could result in significant revisions to proved reserves. Other issues, such as changes in regulatory requirements, technological advances, and other factors which are difficult to predict could also affect estimates of proved reserves in the future.

***Asset retirement obligations*** – The fair value of a liability for an asset's retirement obligation ("ARO") is recognized in the period in which it is incurred if a reasonable estimate of fair value can be made, with the corresponding charge capitalized as part of the carrying amount of the related long-lived asset. The liability is accreted to its then-present value each subsequent period, and the capitalized cost is depleted over the useful life of the related asset. Abandonment costs incurred are recorded as a reduction of the ARO liability.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and natural gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement.

***Share-based compensation*** – Compensation cost for equity awards is based on the fair value of the equity instrument on the date of grant and is recognized over the period during which an employee is required to provide service in exchange for the award.

The Company accounts for stock option awards using the calculated value method. The Company values warrant and option awards using the Black-Scholes option pricing model.

The Company accounts for any forfeitures of options when they occur. Previously recognized compensation cost for an award is reversed in the period that the award is forfeited.

The Company also issues equity awards to non-employees. The fair value of these option awards is estimated when the award recipient completes the contracted professional services. The Company recognizes the expense for the estimated total value of the awards during the period from their issuance until performance completion.

***Income taxes*** – Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is established to reduce deferred tax assets if it is more likely than not that the related tax benefits will not be realized. Reference Note 8 to the Financial Statements.

Authoritative guidance for uncertainty in income taxes requires that the Company recognize the financial statement benefit of a tax position only after determining that the relevant tax authority would more likely than not sustain the position following an examination. Management has reviewed the Company's tax positions and determined there were no uncertain tax positions requiring recognition in the consolidated financial statements. Company tax returns remain subject to federal and state tax examinations. Generally, the applicable statutes of limitation are three to four years from their respective filings.

Estimated interest and penalties related to potential underpayment on any unrecognized tax benefits are classified as a component of tax expense in the statements of operation. The Company has not recorded any interest or penalties associated with unrecognized tax benefits for the year ended December 31, 2023, or for the year ended December 31, 2022.

***Revenue recognition*** – The Company's revenue is typically generated from contracts to sell natural gas, crude oil or NGLs produced from interests in oil and natural gas properties owned by the Company. Contracts for the sale of natural gas and crude oil are evidenced by (1) base contracts for the sale and purchase of natural gas or crude oil, which document the general terms and conditions for the sale, and (2) transaction confirmations, which document the terms of each specific sale. The transaction confirmations specify a delivery point which represents the point at which control of the product is transferred to the customer. The Company elects to treat contracts to sell oil and natural gas production as normal sales, which are then accounted for as contracts with customers. The Company has determined that these contracts represent multiple performance obligations, which are satisfied when control of the commodity transfers to the customer, typically through the delivery of the specified commodity to a designated delivery point.

Revenue is measured based on consideration specified in the contract with the customer, and excludes any amounts collected on behalf of third parties. The Company recognizes revenue in the amount that reflects the consideration it expects to be entitled to in exchange for transferring control of those goods to the customer. Amounts allocated in the Company's price contracts are based on the standalone selling price of those products in the context of long-term contracts. Payment is generally received one or two months after the sale has occurred.

Gain or loss on derivative instruments is outside the scope of ASC 606, *Revenue Recognition*, and is not considered revenue from contracts with customers subject to ASC 606. The Company may in the future use financial or physical contracts accounted for as derivatives as economic hedges to manage price risk associated with normal sales, or in limited cases may use them for contracts the Company intends to physically settle but do not meet all of the criteria to be treated as normal sales.

*Producer Gas Imbalances.* The Company applies the sales method of accounting for natural gas revenue. Under this method, revenues are recognized based on the actual volume of natural gas sold to purchasers.

***Basic and diluted earnings (loss) per share*** – Basic earnings (loss) per common share is computed by dividing net income (loss) available to common shareholders by the weighted average number of common shares outstanding during the period. Diluted earnings (loss) per common share is computed in the same way as basic earnings (loss) per common share except that the denominator is increased to include the number of additional common shares that would be outstanding if all potential common shares had been issued and if the additional common shares were dilutive. The Company had no dilutive shares for the year ended December 31, 2023, or for the year ended December 31, 2022. Reference Note 9 to the Financial Statements regarding outstanding Stock Options.

***Environmental laws and regulations*** – The Company is subject to extensive federal, state, and local environmental laws and regulations. Environmental expenditures are expensed or capitalized depending on their future economic benefit. The Company believes that it is in compliance with existing laws and regulations. The Company accrued no liability as of December 31, 2023 and December 31, 2022.

***Recent accounting pronouncements adopted*** – In June 2016, the FASB issued ASC 326, Financial Instruments- Credit Losses ("ASC 326"), which replaces the current "incurred loss" methodology for recognizing credit losses with an "expected loss" methodology. This new methodology requires that a financial asset measured at amortized cost be presented at the net amount expected to be collected. This standard is intended to provide more timely decision-useful information about the expected credit losses on financial instruments. For smaller reporting companies, this guidance is effective for fiscal years beginning after December 15, 2022, and early adoption is permitted. The Company adopted this as of January 1, 2023. The adoption of ASC 326 did not have a material impact to our financial statements or results of operations.

## 6. RESTATED OIL AND NATURAL GAS PROPERTIES

The following table presents the capitalized costs for oil and natural gas properties of the Company:

| | Restated December 31, 2023 | Restated December 31, 2022 |
|---|---|---|
| Evaluated costs subject to amortization | $ - | $ - |
| Unevaluated costs | 53,672,579 | 41,619,567 |
| Total capitalized costs | 53,672,579 | 41,619,567 |
| Less accumulated depreciation, depletion and amortization | - | - |
| Total oil and gas properties | $ 53,672,579 | $ 41,619,567 |

Unevaluated costs as of December 31, 2023, and December 31, 2022, include cumulative costs of developing the Orogrande Project.

The Company periodically adjusts for the separation of evaluated versus unevaluated costs within its full cost pool to recognize the value impairment related to the expiration of, or changes in market value, of unevaluated leases. The impact of reclassifications as they become necessary is to increase the basis for calculation of future period's depletion, depreciation and amortization which effectively recognizes the impairment on the consolidated statement of operations over future periods. Reclassified costs also become evaluated costs for purposes of ceiling tests, and which may cause recognition of increased impairment expense in future periods. There were no remaining cumulative unevaluated costs which had been reclassified within the Company's full cost pool totals as of December 31, 2023, or December 31, 2022, since the Company had no proved reserve value associated with our properties.

Due to the volatility of commodity prices, should oil and natural gas prices decline in the future, it is possible that a write-down could occur. Proved reserves are estimated quantities of crude oil, natural gas, and NGLs, which geological and engineering data demonstrate with reasonable certainty to be recoverable from known reservoirs under existing economic and operating conditions. The independent engineering estimates include only those amounts considered to be proved reserves and do not include additional amounts which may result from new discoveries in the future, or from application of secondary and tertiary recovery processes where facilities are not in place or for which transportation or marketing contracts are not in place. Estimated reserves to be developed through secondary or tertiary recovery processes are classified as unevaluated properties.

**Current Projects**

The Company is an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. The Company is primarily focused on the acquisition of early-stage projects, the development and delineation of these projects, and then the monetization of those assets once these activities are completed.

The Company's primary focus is the development of interests in oil and natural gas projects it holds in the Permian Basin in West Texas. The Company also holds minor interests in certain other oil and natural gas projects in Central Oklahoma that it is in the process of divesting.

As of December 31, 2023, the Company had interests in three oil and natural gas projects: the Orogrande Project in Hudspeth County, Texas (16 wells), the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, (7 wells) and two wells in Central Oklahoma.

Orogrande Project, West Texas

On August 7, 2014, Torchlight entered into a Purchase Agreement with Hudspeth, McCabe Petroleum Corporation ("MPC"), and Gregory McCabe ("Mr. McCabe"). Mr. McCabe was the sole owner of both Hudspeth and MPC. Under the terms and conditions of the Purchase Agreement, Torchlight purchased 100% of the capital stock of Hudspeth which held certain oil and natural gas assets, including a 100% working interest in approximately 172,000 predominately contiguous acres in the Orogrande Basin in West Texas. Mr. McCabe has, at his option, a 10% working interest back-in after payout and a reversionary interest if drilling obligations are not met, all under the terms and conditions of a participation and development agreement among Hudspeth, MPC and Mr. McCabe. Such back-in interest was contributed to the Company pursuant to that certain Contribution Agreement (as defined below). Mr. McCabe also owns a controlling interest in Magdalena, an entity that holds a 4.5% overriding royalty interest in the Orogrande acreage, —which he obtained prior to, and was not a part of the August 2014 transaction.

Effective March 27, 2017, the Orogrande acreage became subject to a Development Unit Agreement 2837 with University Lands ("DDU Agreement"), which allows for all 192 existing leases covering approximately 134,000 gross acres leased from University Lands to be combined into one drilling and development unit for development purposes. The term of the DDU Agreement expires on December 31, 2024, and the time to drill on the drilling and development unit continues through December 31, 2024. The DDU Agreement grants the right to extend the DDU Agreement through December 31, 2029 if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid. The Company expects to exercise its option to extend the term under the DDU Agreement prior to its expiration.

Drilling obligations under the DDU Agreement include five wells per year in the years 2021, 2022 and 2023 and five wells in 2024. The drilling obligations were minimum yearly requirements and may be exceeded if acceleration is desired.

On October 8, 2024, the Company received notice from University Lands that they would not be allowing the extension of the Orogrande DDU Agreement at its scheduled renewal date of December 31, 2024.

*Drilling Requirement 2023*

Effective as of October 6, 2023, the Company and certain investor participants (each a "Participant" and collectively the "Participants") entered into twenty-five separate Participation Agreements (the "Participation Agreements"), "The Johnson Project", to conduct drilling of wells in approximately 17,000 acres in Hudspeth County, Texas, which is a portion of the Company's Orogrande Prospect. The aggregate total of Prospect Fees paid by the participants was $1,700,000.

As of December 31, 2023, the 2023 drilling requirements had been met and leases covering approximately 134,000 acres remain in effect.

While drilling wells under our 2023 and 2022 drilling obligation, our operations team deployed a new mist drilling solution that increased hole stability, which we believe will result in meaningful cost savings for additional wells drilled in the Orogrande Project. Multiple test wells were drilled in the Orogrande Project in order to stay in compliance with the DDU Agreement. While these previously drilled wells may have potential to produce hydrocarbons to sell commercially in the future, we have no immediate plans to deploy the additional capital necessary to sell production from these wells to third parties. Instead, we plan to use the results from these wells to determine our drilling plans for future wells, including reservoir locations, target depths and designated acreage, in the Orogrande Project. Notwithstanding the foregoing, development of the wells continued through December 31, 2023, to further capture and document the scientific base in support of demonstrating the production potential of the property.

*Acquisition of Working Interest*

On December 21, 2022, the Company entered into that certain Agreement and Plan of Merger (the "Merger Agreement") with Hudspeth, Wolfbone, MPC and Mr. McCabe, pursuant to which in a series of transactions the oil and natural gas leases, the lands covered by such leases, pooling and communitization agreements, rights-of-way, the surface estate of the lands and all wells located in Orogrande Project will be transferred, conveyed and assigned to Hudspeth (or its designated assignee) in consideration of (1) treating the Orogrande Obligations (as defined in the Merger Agreement) as having been irrevocably satisfied and discharged in full with respect to MPC and (2) an issuance of 56,297,638 shares of Company common stock to Mr. McCabe (such series of transactions collectively, the "Merger").

The Merger became effective on April 25, 2023. As a result of the Merger, the Company acquired Wolfbone's 22.6249% remaining rights to working interest in the Orogrande Project in consideration of the issuance by the Company of the 56,297,638 shares of the Company's common stock to Mr. McCabe.

The Merger was completed in accordance with the Texas Business Organizations Code, whereby (a) the Company formed NBH MergeCo, LLC with the State of Texas ("MergeCo") in order to cause Hudspeth to assign all of its rights under the Merger Agreement to MergeCo and MergeCo assumed Hudspeth's obligations under the Merger Agreement, (b) MergeCo, Wolfbone and MPC merged with each of Wolfbone and MPC as surviving entities, and (c) Wolfbone became a direct and wholly-owned subsidiary of the Company. The closing of the transactions contemplated by the Merger Agreement occurred on May 11, 2023.

On May 11, 2023, the Company and its wholly owned subsidiary, Hudspeth, entered into a contribution and exchange agreement with each of the prior working interest owners in the Orogrande Project named in the table below (each an "Orogrande Owner" and collectively, the "Orogrande Owners"), pursuant to which, the Company issued to the Orogrande Owners the number of shares of the Company's common stock set forth opposite such Orogrande Owner's name below in exchange for and in order to acquire such Orogrande Owner's rights to working interest in the Orogrande Project.

| | **Shares of Common Stock** | **Working Interest Contribution** |
|---|---|---|
| Dingus Investments, Inc. | 7,050,382 | 2.8334% |
| Pandora Energy, LP | 6,220,779 | 2.5000% |
| Kennedy Minerals, Ltd | 6,220,779 | 2.5000% |
| The de Compiegne Property Company No. 20, Ltd | 6,220,779 | 2.5000% |
| Loma Hombre Energy, LLC | 622,078 | 0.2500% |
| Sero Capital, LLC | 725,840 | 0.2917% |
| **TOTAL** | **27,060,637** | **10.8751%** |

The Orogrande Project ownership as of December 31, 2023, is detailed as follows:

| | Revenue Interest | Working Interest |
|---|---|---|
| University Lands – Mineral Owner | 20.000% | |
| ORRI – Magdalena Royalties, LLC, an entity controlled by Gregory McCabe, Chairman of the Board | 4.500% | |
| ORRI – Unrelated Party | 0.500% | |
| Hudspeth Oil Corporation, a subsidiary of Next Bridge Hydrocarbons, Inc. | 56.250% | 75.000% |
| Wolfbone Investments, LLC, a subsidiary of Next Bridge Hydrocarbons, Inc. | 18.750% | 25.000% |
| | 100.000% | 100.000% |

Hazel Project in the Midland Basin in West Texas

Effective April 4, 2016, TEI acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin. A back-in after payout of a 25% working interest was retained by MPC and another unrelated working interest owner.

In October 2016, the holders of all of Torchlight's then-outstanding shares of Series C Preferred Stock (which were issued in July 2016) elected to convert into a total 33.33% working interest in our Hazel Project, reducing TEI's ownership from 66.66% to a 33.33% working interest.

*Acquisition of Additional Interests in Hazel Project*

On January 30, 2017, Torchlight entered into and closed an Agreement and Plan of Reorganization and a Plan of Merger with an entity which was wholly owned by Mr. McCabe, which resulted in the acquisition of approximately 40.66% working interest in the 12,000 gross acres, 9,600 net acres, in the Hazel Project.

Also on January 30, 2017, Torchlight entered into and closed a Purchase and Sale Agreement with Wolfbone. Under the agreement, Torchlight acquired certain of Wolfbone's Hazel Project assets, including its interest in the Flying B Ranch #1 well and the 40-acre unit surrounding the well.

Upon the closing of the transactions, the Torchlight working interest in the Hazel Project increased by 40.66% to a total ownership of 74%.

Effective June 1, 2017, Torchlight acquired an additional 6% working interest from unrelated working interest owners increasing its working interest in the Hazel project to 80%, and an overall net revenue interest of 75%.

Seven test wells have been drilled on the Hazel Project to capture and document the scientific base in support of demonstrating the production potential of the property.

*Option Agreement with Masterson Hazel Partners, LP*

On August 13, 2020, the Company's subsidiaries TEI and Torchlight Hazel (collectively, "Torchlight Subs") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and MPC. Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on the Hazel Project, sufficient to satisfy Torchlight Subs's continuous development obligations on the southern half of the prospect no later than September 30, 2020. MHP has satisfied this drilling obligation. MHP paid Torchlight Subs $1,000 as an option fee at the time of execution of the Option Agreement. MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the Well attributable to the Torchlight Subsidiary's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the well.

In exchange for MHP satisfying the above drilling obligations, Torchlight Subs granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight Subsidiary's continuous development obligations on the northern half of the prospect. MHP declined to exercise its option to purchase the entire Hazel Project in 2021.

Hunton Play, Central Oklahoma

As of December 31, 2023, the Company was producing from one well in the Viking Area of Mutual Interest and one well in Prairie Grove.

**The McCabe Contribution Agreement**

On July 25, 2023, the Company entered into a Contribution Agreement among the Company, Mr. McCabe, and MPC, an entity exclusively owned and operated by Mr. McCabe (the "McCabe Contribution Agreement"), pursuant to which Mr. McCabe will contribute up to a ten percent (10%) back-in working interest option for the Orogrande Project exercisable following the point in time at which the proceeds of all production from all operations conducted on the Orogrande Project (exclusive of royalty, overriding royalty and taxes chargeable to the working interest) equals the actual cost incurred by NBH and its predecessors in drilling, testing, equipping and the cost of operating the wells located on the Orogrande Prospect, inclusive of overhead charges (the "Back-In Interest"), an option originally granted to Mr. McCabe pursuant to that certain Participation Agreement, dated September 23, 2014 (the "Participation Agreement"), by and among Mr. McCabe, Hudspeth, and MPC, and MPC will contribute up to one hundred percent (100%) of the interest currently held by MPC in the drilling project located on over 1,150 acres in Vermillion Parish, Louisiana (the "Bronco Prospect"). Pursuant to the McCabe Contribution Agreement, and subject to the satisfaction of certain conditions provided therein, including the effectiveness of the Company's Registration Statement on Form S-1 (File No. 333-273442) filed with the SEC on July 26, 2023 (as amended, the "Registration Statement"), Mr. McCabe will contribute an amount of the Back-In Interest and MPC will contribute an amount of the Bronco Prospect in proportion to the percentage of shares of common stock of NBH that are directly registered in the name of the beneficial owner with the Company's transfer agent on or prior to the

Case 4:24-cv-00767-P Document 81-2 Filed 08/24/26 Page 937 of 1072 PageID 3071
record date (as defined in the Registration Statement) and remain directly registered with the Company's transfer agent for the holding period (as defined in the Registration Statement).

**7. RELATED PARTY BALANCES**

As of December 31, 2023, and December 31, 2022, the Company had a balance of $-0- and $177,519, respectively, for an account receivable due from MPC, an entity controlled by the largest shareholder and the chairman of the Company's Board of Directors, for amounts advanced related to the Orogrande development cost sharing arrangement agreed to in connection with the acquisition of the Orogrande working interests in 2014. In connection with the closing of the Merger, the account receivable due from MPC was deemed fully satisfied and discharged.

*The 2021 Note and Loan Agreement*

On October 1, 2021, the Company entered into a note payable with Meta, its former parent, to borrow up to $15 million which bears interest at 8% per annum, computed on the basis of a 360-day year (the "2021 Note"). The 2021 Note was initially to mature on March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if the Company raised $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date would be extended to September 30, 2023, and the outstanding principal of the 2021 Note would amortize in six equal, monthly installments. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts the Company's ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of its assets, unless the Company is the surviving entity, or the successor entity assumes all of obligations under the 2021 Note. The 2021 Note is collateralized by certain shares of common stock in Meta held by one of Meta's stockholders, Mr. McCabe, and by a lien on a 25% interest in the Orogrande Project owned by Wolfbone, a subsidiary of the Company.

On September 2, 2022, the Company entered into a loan agreement with Meta, as lender (the "Loan Agreement") that would govern prior loan amounts advanced to the Company from Meta. As of August 11, 2022, and August 29, 2022, the Company borrowed an additional $1.2 million and $1.46 million, respectively, representing the remaining amount available for borrowing under the Loan Agreement and resulting in a total of $5 million principal amount outstanding related to the Loan Agreement, the proceeds of which were used for working capital and general corporate purposes. The term loans under the Loan Agreement bear interest at a per annum rate equal to 8% and were to mature on March 31, 2023 (the "Maturity Date"); provided, however, if the Company raised $30 million or more in capital through debt or equity, or a combination thereof by the Maturity Date, the Maturity Date would be extended to October 3, 2023 and the term loan would be amortized in six equal monthly installments. The Loan Agreement includes customary representations and covenants that, subject to exceptions and qualifications, restrict our ability to do certain things, such as: engage in mergers, acquisitions, and asset sales; transact with affiliates; undergo a change in control; incur additional indebtedness; incur liens; make loans and investments; declare dividends or redeem or repurchase equity interests; and enter into certain restrictive agreements. In addition, the Loan Agreement contains customary events of default, mandatory prepayment events and affirmative covenants, including, without limitation, covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our material properties, reporting requirements, compliance with applicable laws and regulations, and formation or acquisition of new subsidiaries.

On March 31, 2023, the Company entered into an amendment to the 2021 Note and an amendment to Loan Agreement in order to extend each of the 2021 Note Maturity Date and the Maturity Date respectively from March 31, 2023, to October 3, 2023. Such amendments also removed the provisions allowing for extensions of the 2021 Note Maturity Date and the Maturity Date in the event the Company raised $30 million or more in capital through debt or equity or a combination thereof by March 31, 2023.

Under the terms of the Arrangement Agreement that governed the merger transaction between Torchlight and Meta in June 2021, the oil and natural gas assets were to be sold or spun out from Meta and the costs of any sale or spin-off incurred by Meta were to be borne the then-existing shareholders of Torchlight. The amount of the reimbursement payable to Meta in connection with the Spin-Off is $2.59 million which was added to the principal amount of the Loan Agreement for a principal balance outstanding of $7.59 million as of March 31, 2023. Concurrently with the amendment to the Loan Agreement, the Company made a prepayment of $1 million to reduce the principal balance to $6.59 million.

On August 7, 2023, Mr. McCabe and Meta entered into a Loan Sale Agreement whereby Mr. McCabe purchased from Meta (i) the 2021 Note and (ii) all outstanding loans made to the Company by Meta pursuant to the Loan Agreement (the "Loan Purchase"). As a result of the Loan Purchase, Mr. McCabe replaced Meta as the lender and secured party under the 2021 Note and the Loan Agreement. Additionally, as part of the Loan Purchase, Meta assigned to Mr. McCabe its lien on 25% of the Orogrande Prospect. The Company's obligations and responsibilities under the 2021 Note and the Loan Agreement remain unchanged.

The combined balance on the 2021 Note and the Loan Agreement as of December 31, 2023 was $21.22 million. As of December 31, 2023, the combined total accrued and unpaid interest under the 2021 Note and the Loan Agreement was $3.06 million.

On October 1, 2023, the Company entered into an amendment to the 2021 Note and an amendment to Loan Agreement in order to extend each of the 2021 Note Maturity Date and the Maturity Date respectively from October 3, 2023 to March 31, 2024. Additional amendments have extended the maturity date to June 30, 2025.

On December 22, 2022, the Company issued an unsecured promissory note in the principal amount of up to $20 million in favor of Mr. McCabe (the “2022 Note”), which bears interest at 5% per annum, computed on the basis of a 365-day year.

On June 16, 2023, the Company entered into an amendment to the 2022 Note in order to extend the maturity date of the 2022 Note (the “2022 Note Maturity Date”) from June 21, 2023 to October 3, 2023. Such amendment also removed the provisions allowing for extensions of the 2022 Note Maturity Date in the event the Company raised $30 million or more in capital through debt or equity or a combination thereof by March 31, 2023. The revolving commitment under the 2022 Note expires on the 2022 Note Maturity Date. As of December 31, 2023, the Company had $20 million in principal amount outstanding under the 2022 Note. As of December 31, 2023, the Company had $815,202 in accrued but unpaid interest on the 2022 Note.

On December 31, 2023, the Company entered into an amendment to the 2022 Note in order to extend the 2022 Note Maturity Date from October 3, 2023 to March 31, 2024. Additional amendments have extended the maturity date to June 30, 2025.

## 8. COMMITMENTS AND CONTINGENCIES

### Legal Matters

On April 30, 2020, the Company’s wholly owned subsidiary, Hudspeth, filed suit against Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies (“Cordax”). The suit, *Hudspeth and Wolfbone Investments, LLC v. Datalog LWT, Inc. d/b/a Cordax Evaluation Technologies*, was filed in the 189th Judicial District Court of Harris County, Texas. The suit seeks the recovery of approximately $1.4 million in costs incurred as a result of a tool failure during drilling activities on the University Founders A25 #2 well that is located in the Orogrande Field. Wolfbone, a subsidiary of the Company, is a co-plaintiff in that action. After the suit was filed, Cordax filed a mineral lien in the amount of $104,500 against the Orogrande Field and has sued the operator and counterclaimed against Hudspeth for breach of contract, seeking the same amount as the lien. Meta, as the Company’s parent at the time, determined to add the manufacturer of one of the tool components that it contends was one of the causes of the tool failure. It was later disclosed that Cordax is the subsidiary of a Canadian parent company, who has also been added to the case. Cordax’s current Chairman of the Board filed a special appearance after being served with a citation, alleging that he was a Canadian citizen with no meaningful ties to Texas. After discovery was conducted on this issue, a nonsuit without prejudice for this defendant was filed, dismissing him from the case. The remaining parties attended mediation on June 15, 2022, that was unsuccessful in resolving the case. Cordax filed a motion for summary judgment, attempting to dismiss Hudspeth and Wolfbone’s claims. The Court denied Cordax’s motion. Discovery is substantially complete. The Company is required to indemnify Meta in connection with this matter pursuant to the terms of the Distribution Agreement with Meta entered into in connection with the consummation of the Spin-Off. Prior to trial, in 2024, the parties settled the case. As soon as Cordax fulfills its payment obligations to Hudspeth (the amount of which is confidential), the Harris County case will be dismissed with prejudice. Cordax’s releases of Hudspeth and Wolfbone were effective when the Settlement Agreement was signed, May 16, 2024.

On March 18, 2021, Cordax filed a lawsuit in Hudspeth County, Texas seeking to foreclose its mineral lien against the Orogrande Field in the amount of $104,500. and recover related attorney’s fees. The foreclosure action, *Datalog LWT Inc. d/b/a Cordax Evaluation Technologies v. Torchlight Energy Resources, Inc.*, was filed in the 205th Judicial District Court of Hudspeth County, Texas. The Company is contesting the lien in good faith and filed a Plea in Abatement on May 10, 2021, seeking a stay in the Hudspeth County lien foreclosure case pending final disposition of the related case currently pending in Harris County, Texas. The Company is required to indemnify Meta in connection with this matter pursuant to the terms of the Distribution Agreement with Meta. As part of the settlement in the Harris County case, Cordax released the mineral lien, and the case has been dismissed with prejudice.

On March 15, 2024, a securities class action captioned *Targgart v. Next Bridge Hydrocarbons, Inc., et al.*, No. 24-cv-1927, was filed in the U.S. District Court for the Eastern District of New York. The action is brought on behalf of a putative class of persons or entities that acquired the Company’s shares in connection with the Company’s spin-off from Meta Materials, Inc., in December 2022. The complaint names as defendants the Company and certain of its current and former officers and directors. The complaint asserts claims under Sections 11 and 15 of the Securities Act, alleging that the Form S-1 that the Company filed with the SEC on July 14, 2022, which became effective on November 18, 2022, contained untrue statements or omissions. The complaint seeks, among other things, unspecified statutory and compensatory damages. On August 12, 2024, the case was transferred to the Northern District of Texas. On September 9, 2024, plaintiffs filed an amended complaint that added a Section 12(a)(2) claim against the Company. Defendants moved to dismiss the complaint, and on July 3, 2025, the Court granted that motion. Targgart has filed a notice of appeal.

### Environmental Matters

The Company is subject to contingencies as a result of environmental laws and regulations. Present and future environmental laws and regulations applicable to the Company's operations could require substantial capital expenditures or could adversely affect its operations in other ways that cannot be predicted at this time. As of December 31, 2023, and December 31, 2022, no amounts had been recorded because no specific liability has been identified that is reasonably probable of requiring the Company to fund any future material amounts.

**9. STOCKHOLDERS' EQUITY**

The Company has 500,000,000 authorized shares of common stock, par value of $0.0001 per share and 50,000,000 authorized shares of preferred stock, par value of $0.0001 per share. As of December 31, 2022, the Company had 165,472,241 outstanding shares of common stock outstanding that had been issued in the Spin-Off transaction on December 14, 2022, and no shares of preferred stock outstanding.

On April 25, 2023, the Company issued 83,358,275 shares of common stock for the acquisition of additional working interest in the Orogrande Project.

As of December 31, 2023, the Company had 248,830,516 outstanding shares of common stock and no shares of preferred stock outstanding.

**Stock Based Compensation**

In 2022, the Company's board of directors adopted, and the stockholders approved, the 2022 Equity Incentive Plan (the "2022 Plan"). The 2022 Plan permits the Company to grant stock options, restricted stock, restricted stock units, performance shares awards and any one or more of the foregoing, for up to a maximum of 58,273,612 shares following an automatic increase to the number of shares reserved under the 2022 Plan on January 1, 2023.

During the year ended December 31, 2023, the Company granted 35,856,521 stock options in the first and second quarters of 2023 as authorized under the 2022 Plan.

Upon the resignations by certain of the Company's employees in the second quarter, 2023, 6,618,889 of the options granted to those employees in March, 2023. were forfeited, canceled, and returned to the option pool available under the 2022 Plan.

As of December 31, 2023, 29,237,632 options are outstanding.

Vesting was subject to continued service with the Company for up to one year with provisions for earlier vesting subject to the attainment of events outlined in the Plan.

All options outstanding were fully vested as of December 31, 2023.

Options granted were valued using the Black-Scholes Option Pricing Model resulting in a total value of $4,781,279. Option expense for the year ended December 31, 2023, net of forfeitures, was $4,781,279.

Inputs to the Black-Scholes Model are as follows:

| | |
|---|---|
| Risk-free interest rate | 4.00% |
| Expected volatility of common stock | 125.39% |
| Dividend yield | 0.00% |
| Discount due to lack of marketability | 0% |
| Expected life of option/warrant | Ten Years |

A summary of stock options outstanding as of December 31, 2023, all of which expire in 2033, including the relevant exercise price is presented below:

| Exercise Price | Expiration 2033 | Total |
|---|---|---|
| $ 1.2056 | 29,237,632 | 29,237,632 |
| | 29,237,632 | 29,237,632 |

**10. INCOME TAXES**

The Company recorded no income tax provision at December 31, 2023 and December 31, 2022 because of anticipated losses for the 2024 fiscal year and actual losses incurred in 2023.

The Company estimates its annual effective income tax rate in recording its provision for income taxes in the various jurisdictions in which it operates. Statutory tax rate changes and other significant or unusual items are recognized as discrete items in the quarter in which they occur. The Company recorded no income tax expense for the year ended December 31, 2023 because the Company incurred a tax loss in the current year. Similarly, no income tax expense was recognized for the year ended December 31, 2022.

The Company had a gross deferred tax asset related to federal net operating loss carryforwards of $69,594,386 and $55,153,554 at December 31, 2023 and December 31, 2022, respectively. The federal net operating loss carryforward will begin to expire in 2034. Realization of the deferred tax asset is dependent, in part, on generating sufficient taxable income prior to expiration of the loss carryforwards. The Company has placed a 100% valuation allowance against the net deferred tax asset because future realization of these assets is not assured.

**11. NOTES PAYABLE, RELATED PARTIES**

On October 1, 2021, we issued a secured, revolving promissory note in an original principal amount of up to $15 million, which was subsequently increased to $20 million, in favor of Meta (as amended to date, the “2021 Note”). The 2021 Note was fully drawn with a principal balance outstanding of $20 million, bears interest at 8% per annum, computed on the basis of a 360-day year. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum.

On August 7, 2023, following the Loan Purchase, Mr. McCabe replaced Meta as the lender and secured party under the 2021 Note but the Company’s obligations under the 2021 Note remain unchanged.

On December 31, 2023, the Company and Mr. McCabe as successor in interest to Meta entered into an amendment to the 2021 Note and an amendment to the Loan Agreement extending the 2021 Note Maturity Date and the Maturity Date, respectively to March 31, 2024.

Additionally, we have an aggregate principal balance of $6,589,362 outstanding under the Loan Agreement with Mr. McCabe as successor-in-interest to Meta, which bears interest at a fixed rate of 8% per annum if no event of default exists, and at a fixed rate of 12% per annum if an event of default exists.

On December 31, 2023, the Company and Mr. McCabe entered an amendment to the 2022 Note extending the 2022 Note Maturity Date to March 31, 2024.

The combined balance on the 2021 Note ($15 million) and the Loan Agreement ($6.2 million) as of December 31, 2023, was $21.22 million. As of December 31, 2023, the combined total accrued and unpaid interest under the 2021 Note and the Loan Agreement was $24.28 million.

In connection with the Merger, on December 22, 2022, the Company entered into an additional Note in the principal amount of up to $20 million in favor of Mr. McCabe. Mr. McCabe is the largest shareholder of the Company's common stock and the chairman of the board of directors of the Company. As of December 31, 2023, the Company had a balance of $20 million and accrued and unpaid interest of $815,202 due under the 2022 Note.

**12. ASSET RETIREMENT OBLIGATIONS**

The following is a reconciliation of the asset retirement obligations liability through December 31, 2023:

| | |
|---|---|
| Asset retirement obligations – January 1, 2022 | $ 21,937 |
| Accretion expense | 1,092 |
| Estimated liabilities recorded | 223,837 |
| Asset retirement obligations – December 31, 2022 | $ 246,866 |
| Accretion expense | 1,785 |
| Estimated liabilities recorded | - |
| Asset retirement obligations – December 31, 2023 | $ 248,651 |

**13. SUBSEQUENT EVENTS**

On January 23, 2024, Mr. McCabe loaned $1,000,000 to us, which was evidenced under a 0% Senior Unsecured Promissory Note effective as of that date (the "McCabe Note"), which provided, among other things, that the loan will be due on February 28, 2025, with the Company having the option to extend the loan by one additional year. The loan will bear interest at the rate of 0% per annum and will be payable in one balloon payment of principal and interest on the maturity date. If we elect to extend the loan for one year, the loan will continue to bear interest at the rate of 0% per annum and will be payable in one balloon payment of principal and interest on the extended maturity date.

On February 29, 2024, CAPCO Holding, Inc., a Texas corporation ("Capco"), loaned us $2,000,000 under a 12% Secured Promissory Note (the "Capco Note"), which provides, among other things, that the loan will be due in one year, with us having the option to extend the loan by one additional year. The loan will bear interest at the rate of 12% per annum and will be payable in one balloon payment of principal and interest on the maturity date. If we elect to extend the loan for one year, we must pay all accrued interest for that first year, and thereafter, the loan will bear interest at a rate that is mutually agreeable to us and Capco, which rate will not exceed 18% per annum, and will be payable in one balloon payment of principal and interest on the extended maturity date. As part of the transaction, Gregory McCabe, our Chairman and Chief Executive Officer, entered into a Stock Pledge and Security Agreement with Capco under which he pledged 250,000 of his shares of common stock of the Company to secure our obligations under the Capco Note. Further, Mr. McCabe entered into a Subordination Agreement (the "Subordination Agreement") with Capco and us under which Mr. McCabe agreed to subordinate all of the Company's indebtedness and obligations owed to Mr. McCabe to the Capco Note, under the terms and conditions of the Subordination Agreement.

Also on February 29, 2024, we entered into a Consulting Agreement with an individual, under which the Consultant has agreed to provide analysis and advisory services to us for consideration of $10,000 per month and the issuance to him of 500,000 shares of common stock, under the terms and conditions of the Consulting Agreement.

In March 2024, we entered into and closed a Contribution Agreement with Wildcat Partners SPV, LLC, a Delaware limited liability company ("Wildcat"), under which Wildcat transferred to us 100% of the issued and outstanding membership interests in each of (a) Wildcat Cowboy, LLC, a Texas limited liability company ("Cowboy"), (b) Wildcat Packer, LLC, a Texas limited liability company ("Packer"), (c) Wildcat Panther, LLC, a Texas limited liability company ("Panther") and (d) Wildcat Valentine, LLC, a Texas limited liability company ("Valentine"). As consideration, we issued 2,500,000 shares of our common stock, under the terms and conditions of the Contribution Agreement.

The accounting treatment of the stock issuance reported in our original filing of our Quarterly Report on Form 10-Q for the quarter ended March 31, 2024, for the Wildcat acquisition, was based on an independent valuation of our common stock, which valuation was used in recording the subsequent sale of a portion of the assets acquired that initially resulted in a gain on sale of those assets of $618,502. After subsequently reconsidering the valuation method alternatives for the basis of the stock issued, the cash received from the subsequent sales was used to substitute for the independent valuation in recording of the sale of the assets. A restatement of the transaction will be recorded in the Company's 10K for the year ended December 31, 2024 (not yet filed at the date of this report) having the effect of reducing the gain on sale to $-0-.

On April 2, 2024, we entered into a Consulting Agreement with an individual, under which the Consultant has agreed to provide analysis and advisory services to us for consideration of 100,000 shares of common stock.

With respect to *Targgart v. Next Bridge Hydrocarbons Inc*., on August 12, 2024 the case was transferred to the Northern District of Texas. On September 9, 2024, plaintiffs filed an amended complaint that added a Section 12(a)(2) claim against the Company. Defendants moved to dismiss the complaint, and on July 3, 2025, the Court granted that motion. Targgart has filed a notice of appeal.

On October 8, 2024, the Company received notice from University Lands that they would not be allowing the extension of the Orogrande DDU agreement at its scheduled renewal date of December 31, 2024.

**Item 9. Changes In and Disagreements with Accountants on Accounting and Financial Disclosure**

Not applicable.

**Item 9A. Controls and Procedures**

***Evaluation of Disclosure Controls and Procedures***

The Company maintains disclosure controls and procedures (as that term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) that are designed to ensure that information required to be disclosed in the Company's reports under the Exchange Act is recorded, processed, and summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this annual report on Form 10-K was made under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer. For the restated years 2023 and 2022 disclosures included in this filing, acknowledgement was given to the impact of the restatement matters, in turn, resulted in the need to restate 2023 and 2022. The extensive amount of additional work and time required resulted in non-timely filing. Reference Explanatory Note and disclosures in Note 2 to the financial statements. Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures (a) were not effective to ensure that information required to be disclosed by us in reports filed or submitted under the Exchange Act is timely recorded, processed, summarized and reported and (b) include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

***Management's Report on Internal Control over Financial Reporting***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with accounting principles generally accepted in the United States of America, and that receipts and expenditures are being made only in accordance with authorizations of management and our directors; and (iii) provide reasonable assurance regarding prevention or timely detection of the unauthorized acquisition, use or disposition of assets that could have a material effect on the financial statements. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2023, using the framework specified in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment, management has concluded that our internal control over financial reporting was not effective as of December 31, 2023. The ineffectiveness of the Company's internal control over financial reporting was due to two material weaknesses in its internal control over financial reporting identified by management: (i) an insufficient degree of segregation of duties among the small number of accounting and financial reporting personnel, and (ii) a lack of a formalized and complete set of policy and procedure documentation evidencing its system of internal controls over financial reporting. These factors led to certain adjustments which have been reflected in our audited financial statements. Certain of these weaknesses may not be uncommon in a company of the company's size due to personnel and financial limitations.

It should be noted that any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system will be met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there is only the reasonable assurance that our controls will succeed in achieving their goals under all potential future conditions.

***Changes in Internal Control over Financial Reporting***

There were no changes in our internal control over financial reporting during the quarter ended December 31, 2023 that materially affected or are reasonably likely to materially affect our internal control over financial reporting.

**Item 9B. Other Information**

None.

## PART III

**Item 14. Principal Accountant Fees and Services - Restated**

The fees billed to us for the years ended December 31, 2023 and 2022 by our independent registered public accounting firm, M&K CPAS, PLLC, are set forth below:

| | Year Ended December 31[5] | |
|---|---|---|
| | 2023 | 2022 |
| Audit Fees[1] | $ 70,250 | $ 89,300 |
| Audit Related Fees[2] | | |
| Tax Fees[3] | - | - |
| All Other Fees[4] | 24,500 | - |
| Total Fees | $ 94,750 | $ 89,300 |

(1) Audit fees represents the aggregate fees billed to us by M&K CPAS, PLLC, of Woodlands, Texas for professional services rendered for the audit of our financial statements for the year ended December 31, 2022 and 2023, as restated.

(2) Audit-related fees represent fees billed for services rendered with respect to the fiscal years for assurance and related services that are reasonably related to the performance of the audit or review of our financial statements, as restated, and are not reported under "Audit Fees".

(3) Tax fees consist of fees billed for professional services relating to tax compliance, tax planning and tax advice.

(4) All other 2023 fees consist of fees billed for consents and a comfort letter related to our registration statement on Form S-1 filed with the SEC on August 28, 2024.

(5) The information presented in this table excludes the audit fees and audit-related fees billed for services rendered by our previous accounting firm prior to the restatement of financial statements for the years ended December 31, 2022 and 2023, which are presented below:

| | Year Ended December 31 | |
|---|---|---|
| | 2023 | 2022 |
| Audit Fees[a] | $ 82,500 | $ 165,000 |
| Audit Related Fees[b] | 247,500 | - |
| Tax Fees[c] | - | - |
| All Other Fees[d] | 165,000 | - |
| Total Fees | $ 495,000 | $ 165,000 |

(a) Audit fees represent the aggregate fees billed to us by BF Borgers, CPA for professional services rendered for the audit of our financial statements for the year ended December 31, 2022 and 2023, prior to the restatement.

(b) Audit-related fees represent fees billed for services rendered during the fiscal years for assurance and related services that are reasonably related to the performance of the audit or review of our financial statements, prior to the restatement, and are not reported under "Audit Fees".

(c) Tax fees consist of fees billed for professional services relating to tax compliance, tax planning and tax advice.

(d) All other 2023 fees consist of fees billed for auditor consents delivered with respect to registration statements on Form S-1 (File Nos., 333-269366, 333-266143, and 333-273442) filed with the SEC.

***Pre-Approval of Audit and Non-Audit Services***

The Audit Committee's policy is to pre-approve all audit and permissible non-audit services provided by the independent registered public accounting firm. These services may include audit services, audit related services, tax services and other services. Pre-approval is detailed as to the particular service or category of service and is subject to a specific engagement authorization. The Audit Committee requires the

independent registered public accounting firm and management to report on the actual fees charged for each category of service at Audit Committee meetings throughout the year.

During the year, circumstances may arise when it becomes necessary to engage the independent registered public accounting firm for additional services not contemplated in the original pre-approval. In those instances, the Audit Committee requires specific pre-approval authority from the chairman of the Audit Committee, who must report on such approvals at the next scheduled Audit Committee meeting. All 2023 audit and non-audit services provided by the independent registered public accounting firm were pre-approved by the Audit Committee.

## PART IV

### Item 15. Exhibits and Financial Statement Schedules

(1) Financial Statements—See the Index to Consolidated Financial Statements, together with the report thereon of M&K CPAS PLLC dated [●], 2025 under Part II, Item 8 "Consolidated Financial Statements and Supplementary Data".

(2) All financial statement schedules are omitted because they are not applicable, or are immaterial or the required information is presented in the consolidated financial statements or the related notes.

(3) Exhibits. The following exhibits to this Form 10-K/A are intended to supplement the exhibits listed and/or filed with the 2023 Original Filing.

| Exhibit Number | Exhibit Description |
|---|---|
| 31.1 | Chief Executive Officer certification under Section 302 of the Sarbanes-Oxley Act of 2002.* |
| 31.2 | Chief Financial Officer certification under Section 302 of the Sarbanes-Oxley Act of 2002.* |
| 32.1 | Chief Executive Officer certification under Section 906 of the Sarbanes-Oxley Act of 2002.* |
| 32.2 | Chief Financial Officer certification under Section 906 of the Sarbanes-Oxley Act of 2002.* |
| 101.INS* | Inline XBRL Instance Document |
| 101.SCH* | Inline XBRL Schema Document |
| 101.CAL* | Inline XBRL Calculation Linkbase Document |
| 101.LAB* | Inline XBRL Labels Linkbase Document |
| 101.PRE* | Inline XBRL Presentation Linkbase Document |
| 101.DEF* | Inline XBRL Definition Linkbase Document |
| 104* | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

* To be filed herewith.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**NEXT BRIDGE HYDROCARBONS, INC.**

Date: September 15, 2025

By: /s/ Gregory McCabe
Gregory McCabe
Chairman and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Gregory McCabe<br>Gregory McCabe | Chairman and Chief Executive Officer | September 15, 2025 |
| /s/ Roger Wurtele<br>Roger Wurtele | Chief Financial Officer | September 15, 2025 |
| /s/ Robert L. Cook<br>Robert L. Cook | Director | September 15, 2025 |
| /s/ Edward Pocock III<br>Edward Pocock III | Director | September 15, 2025 |

# EXHIBIT H

EXECUTION

Adam M. Apton, Esq.
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171

*Attorneys for Lead Plaintiffs*
*and Lead Counsel for the Class*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE META MATERIALS INC. SECURITIES LITIGATION | Case No. 1:21-cv-07203-CBA-JRC<br>**STIPULATION OF SETTLEMENT**<br>**CLASS ACTION** |

This Stipulation of Settlement, dated January 19, 2024 (the "Stipulation"), is submitted pursuant to Rule 23 of the Federal Rules of Civil Procedure. Subject to the approval of the Court, this Stipulation is made and entered into by and among: (i) Lead Plaintiffs Kaoutar Kajjame, Philip Granite, and Ricardo Joseph, individually and on behalf of the Settlement Class (defined below) (collectively, "Plaintiffs"); and (ii) Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc. ("Meta Materials"), George Palikaras, Greg McCabe, John Brda, and Kenneth Rice (collectively, "Defendants," and together with Plaintiffs, the "Parties"), by and through their respective counsel in the above-captioned consolidated class action. The Stipulation is intended to fully, finally, and forever compromise, resolve, discharge, settle, and dismiss with prejudice the Released Claims,

subject to the approval of the Court and the terms and conditions set forth in this Stipulation. All capitalized terms used in the Stipulation are defined terms.

## I. THE LITIGATION

The Litigation (defined below) is pending before the Honorable Carol Bagley Amon in the United States District Court for the Eastern District of New York (the "Court"). The initial complaint in this action was filed on January 3, 2022, styled *Maltagliati v. Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc., et. al.,* No. 1:21-cv-07203-CBA-JRC (E.D.N.Y.). ECF No. 1. A second complaint was filed on January 26, 2022, styled *McMillan v. Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc., et al.,* No. 1:22-cv-00463-CBA-JRC (E.D.N.Y.).

On July 15, 2022, the Court appointed Kaoutar Kajjame, Philip Granite, and Ricardo Joseph as Lead Plaintiffs and consolidated the above-referenced actions under the caption *In re Meta Materials Inc. Securities Litigation*, No. 1:21-cv-07203-CBA-JRC (E.D.N.Y.) (the "Federal Action"). ECF No. 43.

On July 20, 2022, the Parties submitted a stipulation setting a schedule for the filing of an amended complaint and Defendants' response thereto. ECF No. 45.

On August 29, 2022, Plaintiffs timely filed the operative complaint under the modified schedule naming the Company, George Palikaras, Greg McCabe, John Brda, and Kenneth Rice as defendants, and alleging violations of Sections 10(b), 14(a), 20(a) of the Exchange Act, and Rules 10b-5 and 14a-9 promulgated thereunder, and Sections 11 and 15 of the Securities Act. The operative complaint is titled the "Amended Complaint for Violations of the Federal Securities Laws" (the Amended Complaint"). ECF No. 46.

On October 13, 2022, Defendants moved to dismiss Plaintiffs' Amended Complaint. The Parties completed briefing on the motion on January 12, 2023. ECF Nos. 47, 50-54.

On February 27, 2023, the Court held oral argument on Defendants' motion to dismiss.

On September 21, 2023, a shareholder class action complaint was filed in Nevada state court naming the Company, George Palikaras, Greg McCabe, John Brda, Kenneth Rice, Alexandre Zyngier, Robert Lance Cook, and Michael Graves as defendants (together with the Defendants, the "Settling Defendants"), and alleging claims for breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty, styled *Denton, et al. v. Palikaras, et al.*, No. A-23-878134-C (Clark Cty., NV) (the "State Action"). The State Action has not been served on the defendants.

On September 29, 2023, the Court granted Defendants' motion and dismissed Plaintiffs' Amended Complaint with prejudice in a Memorandum & Order. ECF No. 59. On October 3, 2023, the Clerk filed a judgment in accordance with the Court's Memorandum & Order. ECF No. 60.

On October 27, 2023, Plaintiffs filed a motion to vacate the Court's Memorandum & Order dated September 29, 2023 and Judgment dated October 3, 2023 and for leave to amend the Amended Complaint. ECF No. 62. The Parties completed briefing on Plaintiffs' motion on November 27, 2023. ECF Nos. 63-66.

On December 14, 2023, while Plaintiffs' motion to vacate and for leave to amend was pending, Plaintiffs in this Federal Action and the plaintiffs in the State Action (together, the "Settling Plaintiffs") and the Settling Defendants (collectively, the "Settling Parties") participated in a full-day private mediation session with mediator Jed Melnick, Esq.

On December 20, 2023, the Settling Parties executed a confidential term sheet agreeing to a settlement subject to approval by the Court. Subsequent to signing the term sheet, Plaintiffs notified the Court of the Parties' agreement to settle the Litigation and requested that the action be stayed. ECF No. 68. Pursuant to Court order, the Litigation is currently stayed pending approval of the Settlement (defined below).

## II. DEFENDANTS' DENIALS OF WRONGDOING AND LIABILITY

The Settling Defendants have denied, and continue to deny, each and all of the claims and allegations of wrongdoing made by the Settling Plaintiffs in the Litigation and further maintain that they have meritorious defenses. The Settling Defendants expressly have denied, and continue to deny, all charges of wrongdoing or liability against them arising out of the conduct, statements, acts or omissions alleged, or that could have been alleged in the Litigation. The Settling Defendants also have denied, and continue to deny, any and all allegations of fault, liability, wrongdoing, or damages whatsoever.

As set forth below, neither the Settlement nor any of the terms of this Stipulation shall in any event be construed or deemed to be evidence of or constitute an admission, concession, or finding of any fault, liability, wrongdoing, or damage whatsoever or any infirmity in the defenses that the Settling Defendants have, or could have, asserted in the Litigation. The Settling Defendants are entering into this Stipulation solely to eliminate the uncertainty, burden, and expense of further protracted litigation. The Settling Defendants have determined that it is desirable and beneficial to them that the Litigation be settled in the manner and upon the terms and conditions set forth in this Stipulation.

## III. PLAINTIFFS' CLAIMS AND THE BENEFITS OF SETTLEMENT

The Settling Plaintiffs believe that the claims asserted in the Litigation have merit and that evidence could be obtained through discovery to support their claims. The Settling Plaintiffs and their counsel, however, recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the Litigation through trial and any appeals. The Settling Plaintiffs and their counsel also have taken into account the uncertain outcome and risk of any litigation, especially in complex actions such as this Litigation, as well as the difficulties and delays inherent in such litigation. The Settling Plaintiffs and their counsel also are mindful of the inherent problems of proof under and possible defenses to the claims asserted in the Litigation. The Settling

Plaintiffs and their counsel believe that the Settlement set forth in this Stipulation confers substantial benefits upon the Settlement Class. Based on their evaluation, the Settling Plaintiffs and their counsel have determined that the Settlement set forth in this Stipulation is in the best interests of the Settlement Class.

## IV. TERMS OF THE STIPULATION AND AGREEMENT OF SETTLEMENT

This Stipulation (together with the exhibits hereto) reflects the final and binding agreement between the Settling Parties.

Based upon their investigation, prosecution, and mediation of the case, the Settling Plaintiffs and Lead Counsel have concluded that the terms and conditions of this Stipulation are fair, reasonable, and adequate to the Settlement Class and in the best interests of all Settlement Class Members. Based on the Settling Plaintiffs' direct oversight of the prosecution of this Litigation and with the advice of their counsel, Plaintiffs have agreed to settle and release the claims raised in the Action pursuant to the terms and provisions of this Stipulation, after considering, among other things: (a) the financial benefit that the Settlement Class will receive under the proposed Settlement; and (b) the significant risks and costs of continued litigation and trial.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among the Settling Plaintiffs (for themselves and the Settlement Class Members) and the Settling Defendants, by and through their respective counsel or attorneys of record, that, subject to the approval of the Court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the Litigation and the Released Claims shall be finally and fully compromised, settled, and released, and the Litigation shall be dismissed with prejudice, and without costs, as to all Settling Parties, upon and subject to the terms and conditions of this Stipulation, as follows:

**1. Definitions**

As used in this Stipulation the following terms have the meanings specified below. In the event of any inconsistency between any definitions set forth below and any definition set forth in any other document related to the settlement set forth in this Stipulation, the definitions set forth below shall control.

1.1 "Authorized Claimant" means any Settlement Class Member whose claim for recovery has been allowed pursuant to the terms of this Stipulation.

1.2 "Claims Administrator" means the firm retained by the Settling Plaintiffs and Lead Counsel, subject to approval of the Court, to provide all notices approved by the Court to potential Settlement Class Members and to administer the Settlement Fund.

1.3 "Class Period" means the period from September 21, 2020 and June 24, 2022, both dates inclusive.

1.4 "Defendants" means Meta Materials, George Palikaras, Greg McCabe, John Brda, and Kenneth Rice.

1.5 "Effective Date" means the first date by which all of the events and conditions specified in ¶7.1 of the Stipulation have been met and occurred or have been waived.

1.6 "Escrow Agent" means Esquire Bank.

1.7 "Final" means, with respect to any order of the Court, including, without limitation, the Final Order and Judgment, that such order represents a final and binding determination of all issues within its scope and has not been reversed, vacated, or modified in any way and is no longer subject to appellate review, either because of disposition on appeal and conclusion of the appellate process or because of passage, without action, of time for seeking appellate review. Without limitation, an order becomes Final when either: (a) no appeal has been filed and the time has passed for any notice of appeal to be timely filed; or (b) an appeal has been filed and either (i) the court

of appeals has affirmed the judgment or dismissed that appeal and the time for any reconsideration or further appellate review has passed; or (ii) a higher court has granted further appellate review and that court has affirmed the underlying judgment or affirmed the court of appeals' decision affirming the judgment or dismissing the appeal. For purposes of this paragraph, an "appeal" shall include appeals as of right, discretionary appeals, interlocutory appeals, proceedings involving any petition for a writ of certiorari, or other writ that may be filed in connection with approval or disapproval of this settlement. Any appeal or other proceeding pertaining to any order concerning the issue of attorneys' fees and expenses, the Plan of Allocation of the Settlement Fund, as hereinafter defined, or the procedures for determining Authorized Claimants' recognized claims shall not in any way delay or preclude the Final Order and Judgment from becoming Final.

1.8 "Final Order" means the Order Approving the Settlement and Order of Dismissal with Prejudice, substantially in the form attached hereto as Exhibit B.

1.9 "Immediate Family" means any immediate family members as that term is defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii).

1.10 "Judgment" means the Order and Final Judgment to be rendered by the Court, substantially in the form attached hereto as Exhibit B.

1.11 "Lead Counsel" means the law firm of Levi & Korsinsky, LLP.

1.12 "Litigation" means the actions captioned *In re Meta Materials Inc. Securities Litigation*, No. 1:21-cv-07203-CBA-JRC (E.D.N.Y.) (the "Federal Action"), and *Denton, et al. v. Palikaras, et al.*, No. A-23-878134-C (Clark Cty., NV) (the "State Action").

1.13 "Net Settlement Fund" means the portion of the Settlement Fund that shall be distributed to Authorized Claimants as allowed by the Stipulation, the Plan of Allocation, or the Court, which shall consist of the Settlement Fund less: (i) any Court-awarded attorneys' fees and

expenses; (ii) Notice and Administration Expenses; (iii) Taxes and Tax Expenses; and (iv) other Court-approved deductions.

1.14 "Officer" means any officer as that term is defined in the Securities Exchange Act of 1934 Rule 16a-1(f).

1.15 "Person" means an individual, corporation, limited liability corporation, professional corporation, partnership, limited partnership, limited liability partnership, limited liability company, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business, legal or other entity and their spouses, heirs, predecessors, successors, representatives, or assignees.

1.16 "Plaintiffs" means Kaoutar Kajjame, Philip Granite, and Ricardo Joseph, individually and on behalf of the Settlement Class.

1.17 "Plaintiffs' Counsel" means any attorney or firm who has appeared in the Litigation on behalf of Plaintiffs, including The Rosen Law Firm, P.A and Pomerantz LLP.

1.18 "Plan of Allocation" means a plan or formula of allocation of the Settlement Fund whereby the Net Settlement Fund shall be distributed to Authorized Claimants. Any Plan of Allocation is not part of this Stipulation and neither Settling Defendants nor their Related Parties shall have any responsibility or liability with respect thereto.

1.19 "Proof of Claim and Release" means the Proof of Claim and Release form for submitting a claim, which, subject to approval of the Court, shall be substantially in the form attached hereto as Exhibit A-2, that a Settlement Class Member must complete and submit should that Settlement Class Member seek to share in a distribution of the Net Settlement Fund.

1.20 "Related Parties" means each Settling Defendant and each Settling Defendants' respective past, present or future parents, subsidiaries, joint ventures and joint venturers, divisions and affiliates, and their respective present and former employees, consultants, contractors, members, partnerships and partners, managers, principals, officers, directors, controlling shareholders, attorneys, advisors, financial advisors, investment banks, underwriters, accountants, auditors, and insurers and reinsurers; any entity in which a Settling Defendant has a controlling interest; and the predecessors, successors, estates, immediate family members, spouses, heirs, executors, trusts, trustees, administrators, agents, legal or personal representatives, assigns, and assignees of each of them, in their capacity as such.

1.21 "Released Claims" means Released Defendants' Claims and Released Plaintiffs' Claims (defined below).

1.22 "Released Defendants' Claims" means any and all claims and causes of action of every nature and description, whether known or Unknown Claims, asserted or unasserted, whether arising under federal, state, common or foreign law arising from the institution, prosecution, or settlement of the claims against Defendants, except claims to enforce the Settlement.

1.23 "Released Plaintiffs' Claims" means any and all claims, demands, rights, liabilities, and causes of action of every nature and description, whether known or Unknown Claims, asserted or unasserted, mature or not mature, contingent or absolute, liquidated or unliquidated, accrued or unaccrued, whether arising under federal, state, statutory, regulatory, common or foreign law concerning, based on, arising out of, or in connection with (i) the purchase, sale, or ownership of Torchlight and/or Meta Materials securities between September 21, 2020 and June 24, 2022, both dates inclusive; and (ii) all claims alleged or that could have been alleged in the Federal and State Actions, including but not limited to any acts or omissions relating to disclosures, public filings,

registration statements, press releases, presentations, or other statements made by the Settling Defendants. The release shall not include any derivative claims asserted by shareholders on behalf of Meta Materials in the related shareholder derivative action, captioned *Hines v. Palikaras, et al.*, Case No. 1:22-cv-00248-CBA-JRC (E.D.N.Y.).

1.24 "Released Persons" means each and all of the Settling Defendants and their Related Parties.

1.25 "Settlement" means the resolution of the Litigation in accordance with the terms and provisions of this Stipulation.

1.26 "Settlement Amount" means Three Million Dollars ($3,000,000.00) in cash to be paid by or on behalf of the Settling Defendants by wire transfer to the Escrow Agent pursuant to ¶ 2.1 of this Stipulation.

1.27 "Settlement Class" or "Class" means: (a) All Persons that purchased Meta Materials and/or Torchlight Energy Resources, Inc. ("Torchlight") publicly traded securities during the Class Period, and were damaged thereby; (b) All holders of Torchlight stock as of the May 5, 2021 record date, eligible to vote on the proposed merger with Metamaterial, Inc. at Torchlight's June 11, 2021 special meeting of shareholders, and were damaged thereby; and (c) All holders of Torchlight stock as of June 28, 2021, the date the proposed merger with Metamaterial, Inc. was consummated, and were damaged thereby. Excluded from the Settlement Class are: (i) the Settling Defendants and their Related Parties; (ii) the officers, directors, and affiliates of Meta Materials, at all relevant times; (iii) Meta Materials' employee retirement or benefit plan(s) and their participants or beneficiaries to the extent they purchased or acquired Meta Materials securities through any such plan(s); (iv) any entity in which the Settling Defendants have or had controlling interest; (v)

Immediate Family members of any excluded person; and (vi) the legal representatives, heirs, successors, or assigns of any excluded person or entity.

1.28 "Settlement Class Member" or "Member of the Class" means a Person who falls within the definition of the Settlement Class as set forth in ¶ 1.27 above.

1.29 "Settlement Fund" means the Settlement Amount plus all interest and accretions thereto.

1.30 "Settlement Hearing" means the hearing set by the Court under Rule 23(e)(2) of the Federal Rules of Civil Procedure to consider final approval of the Settlement.

1.31 "Settling Defendants" means, collectively the Company, George Palikaras, Greg McCabe, John Brda, Kenneth Rice, Alexandre Zyngier, Robert Lance Cook, and Michael Graves.

1.32 "Settling Plaintiffs" means Plaintiffs and Allen Denton and Menachem Gurevitch, plaintiffs in the State Action.

1.33 "Settling Parties" means, collectively, the Settling Defendants and the Settling Plaintiffs, on behalf of themselves and the Settlement Class.

1.34 "Unknown Claims" means any and all Released Claims which Settling Plaintiffs, Plaintiffs' Counsel, any Settlement Class Members, Settling Defendants, or Settling Defendants' counsel do not know or suspect to exist in his, her, its, or their favor at the time of the release which, if known by him, her, it, or them might have affected his, her, its, or their settlement with and release of the Settling Parties, or might have affected his, her, its, or their decision(s) with respect to the Settlement. Unknown Claims include those Released Claims in which some or all of the facts comprising the claim may be suspected, or that may be undisclosed or hidden. With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, Settling Plaintiffs and the Settlement Class Members shall be deemed to have, and

by operation of the Judgment shall have, expressly waived and relinquished the provisions, rights, and benefits conferred by or under California Civil Code § 1542, or any other law of the United States or any state or territory of the United States, or principle of common law that is similar, comparable, or equivalent to § 1542, which provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Settling Plaintiffs acknowledge that they may hereafter discover facts in addition to or different from those which they or their counsel now knows or believes to be true with respect to the subject matter of the Released Claims, but the Settling Plaintiffs shall expressly settle and release, and each Settlement Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. The Settling Parties acknowledge, and the Settlement Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and is a key element of the Settlement of which this release is a part.

**2. The Settlement**

**a. The Settlement Fund**

2.1 As consideration for the full settlement of the Released Plaintiffs' Claims against the Settling Defendants and in consideration of the releases in ¶¶ 1.22 and 1.23 above, all of which the Settling Parties agree are good and valuable consideration, Meta Materials will deposit or cause to be deposited the Settlement Amount into an interest-bearing escrow account ("Escrow Account") controlled by the Escrow Agent on or before fourteen (14) calendar days after the later of: (i) the entry of the Preliminary Approval Order, as defined in ¶3.1 herein; and (ii) the receipt by Meta Materials of all information necessary to effectuate a transfer of funds, including the bank name and ABA routing number, account name and number, and a signed W-9 reflecting the taxpayer identification number for the Settlement Fund, which Plaintiffs will provide to Meta Materials within five (5) calendar days of the entry of the Preliminary Approval Order.

2.2 If the entire Settlement Amount is not timely deposited into the Escrow Account, Lead Counsel may terminate the Settlement but only if: (i) Lead Counsel has notified Defendants' counsel in writing of Lead Counsel's intention to terminate the Settlement, and (ii) the entire Settlement Amount is not transferred to the Escrow Account within five (5) business days after Lead Counsel has provided such written notice.

2.3 Other than the obligation of Meta Materials to pay or cause to be paid the Settlement Amount into the Settlement Fund set forth in ¶ 2.1 herein, the Settling Defendants shall have no obligation to make any other payment into the Settlement Fund pursuant to this Stipulation, and shall have no responsibility, obligation, or liability with respect to the Escrow Account or the monies maintained in the Escrow Account or the administration of the Settlement, including, without limitation, any responsibility or liability related to any fees, taxes, investment decisions, maintenance, supervision or distribution of any portion of the Settlement Amount.

**b. The Escrow Agent**

2.4 The Settlement Fund shall be used as provided in ¶ 5.6 below.

2.5 The Escrow Agent shall invest the Settlement Amount deposited pursuant to ¶ 2.1 hereof in short term United States Agency or Treasury Securities or other instruments backed by the Full Faith and Credit of the United States Government or an Agency thereof, or fully insured by the United States Government or an Agency thereof and shall reinvest the proceeds of these instruments as they mature in similar instruments at their then-current market rates. All risks related to the investment of the Settlement Fund shall be borne by the Settlement Fund, and the Released Persons shall have no responsibility for, interest in, or liability whatsoever with respect to investment decisions or the actions of the Escrow Agent, or any transactions executed by the Escrow Agent.

2.6 The Escrow Agent shall not disburse the Settlement Fund except as provided in this Stipulation, by an order of the Court, or with the prior written agreement of Defendants' counsel.

2.7 Subject to further order(s) and/or directions as may be made by the Court, or as provided in this Stipulation, the Escrow Agent is authorized to execute such transactions as are consistent with the terms of this Stipulation. The Released Persons shall have no responsibility for, interest in, or liability whatsoever with respect to the actions of the Escrow Agent, or any transaction executed by the Escrow Agent.

2.8 All funds held by the Escrow Agent shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to this Stipulation and/or further order(s) of the Court.

2.9 Notwithstanding the fact that the Effective Date of the Settlement has not yet occurred, Lead Counsel may use up to Two Hundred Seventy Five Thousand Dollars ($275,000.00) from the Settlement Fund, without further approval and/or order of the Court, for

reasonable costs and expenses actually incurred in connection with providing notice of the Settlement to the Class, locating Settlement Class Members, soliciting claims, assisting with the submission of claims, processing Proof of Claim and Release forms, administering the Settlement, and paying escrow fees and costs, if any ("Notice and Administration Expenses"). After the Effective Date, all such Notice and Administration Expenses shall be paid from the Settlement Fund subject to prior approval of the Court. The Released Persons shall have no responsibility for or liability whatsoever with respect to the Notice and Administration Expenses, nor shall they have any responsibility or liability whatsoever for any claims with respect thereto.

**c. Taxes**

2.10 (a) The Settling Parties and the Escrow Agent agree to treat the Settlement Fund as being at all times a "qualified settlement fund" within the meaning of Treas. Reg. §1.468B-1. The Settling Parties and the Escrow Agent further agree that the Settlement Fund shall be established pursuant to the Court's subject matter jurisdiction within the meaning of Treas. Reg. §1.468B-1(c)(1). In addition, the Escrow Agent shall timely make such elections as necessary or advisable to carry out the provisions of this ¶ 2.10, including the "relation-back election" (as defined in Treas. Reg. § 1.468B-1) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be the responsibility of the Escrow Agent to timely and properly prepare and deliver the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

(b) For the purpose of § 1.468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" (as defined in Treas. Reg. § 1.468B-2(k)(3)) shall be the Escrow Agent. The Escrow Agent shall timely and properly file all informational and other federal, state, or local tax returns necessary or advisable with

respect to the earnings on the Settlement Fund (including, without limitation, the returns described in Treas. Reg. § 1.468B-2(k)). Such returns (as well as the elections described in ¶ 2.10(a) hereof) shall be consistent with this ¶ 2.10 and in all events shall reflect that all Taxes (including any estimated Taxes, interest, or penalties) on the income earned by the Settlement Fund shall be paid out of the Settlement Fund as provided in ¶ 2.10(c) hereof.

(c) All (i) Taxes (including any estimated Taxes, interest, or penalties) arising with respect to the income earned by the Settlement Fund, including any Taxes or tax detriments that may be imposed upon the Released Persons or their counsel with respect to any income earned by the Settlement Fund for any period, after the deposit of the Settlement Amount, during which the Settlement Fund does not qualify as a "qualified settlement fund" for federal or state income tax purposes ("Taxes"), and (ii) expenses and costs incurred in connection with the operation and implementation of this ¶ 2.10 (including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) the returns described in this ¶ 2.10) ("Tax Expenses"), shall be paid out of the Settlement Fund; in all events the Released Persons and their counsel shall have no liability or responsibility whatsoever for the Taxes or the Tax Expenses. The Escrow Agent, through the Settlement Fund, shall indemnify and hold each of the Released Persons and their counsel harmless for Taxes and Tax Expenses (including, without limitation, Taxes payable by reason of any such indemnification). Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of the Settlement Fund and shall be timely paid by the Escrow Agent out of the Settlement Fund without prior order from the Court and the Escrow Agent shall be authorized (notwithstanding anything herein to the contrary) to withhold from distribution to Authorized Claimants any funds necessary to pay such amounts, including the establishment of adequate

reserves for any Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treas. Reg. § 1.468B-2(l)(2)); neither the Released Persons nor their counsel are responsible nor shall they have any liability for any Taxes or Tax Expenses. The Settling Parties hereto agree to cooperate with the Escrow Agent, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this ¶ 2.10.

**d. Termination of Settlement**

2.11 In the event that this Stipulation is not approved or the Settlement is not approved, or is terminated, canceled, or the Effective Date otherwise fails to occur for any reason, including, without limitation, in the event the Judgment is reversed or vacated or materially altered following any appeal taken therefrom, or is successfully collaterally attacked, the Settlement Fund (including accrued interest) less Notice and Administration Expenses up to Two Hundred and Fifty Thousand Dollars ($250,000.00) and Taxes or Tax Expenses paid, incurred, or due and owing pursuant to ¶¶ 2.9 and 2.10 hereof in connection with the Settlement provided for herein, shall be refunded to Meta Materials or its insurer who paid the Settlement within ten (10) calendar days, or such other time as agreed to by Meta Materials or its insurers in accordance with ¶ 7.4 herein.

**3. Preliminary Approval Order and Settlement Hearing**

3.1 Within ten (10) calendar days after execution of this Stipulation, Lead Counsel shall submit this Stipulation together with its Exhibits to the Court and shall apply for entry of an order (the "Preliminary Approval Order"), substantially in the form of Exhibit A attached hereto, requesting, *inter alia*, the preliminary approval of the Settlement set forth in this Stipulation and approval for publication of a settlement notice (the "Notice") and summary notice ("Summary Notice"), substantially in the forms of Exhibits A-1 and A-3 attached hereto, and the mailing of a postcard notice (the "Postcard Notice"), substantially in the form of Exhibit A-4 attached hereto. The Notice shall include the general terms of the Settlement set forth in this Stipulation, the

proposed Plan of Allocation, the general terms of the Fee and Expense Application, as defined in ¶ 6.1 hereof, and the date of the Settlement Hearing as defined below.

3.2 Meta Materials shall provide to Lead Counsel or the Claims Administrator certain transfer records reflecting ownership or acquisition of Meta Materials securities within ten (10) business days of the date of entry of the Preliminary Approval Order. It shall be solely Lead Counsel's responsibility to disseminate the Notice, Postcard Notice, and Summary Notice to the Settlement Class in accordance with this Stipulation and as ordered by the Court. Settlement Class Members shall have no recourse as to the Released Persons with respect to any claims they may have that arise from any failure of the notice process.

3.3 Lead Counsel shall request that, after notice is given and not earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State officials are provided with notice pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1715 *et seq.* ("CAFA") as set forth in ¶ 3.4 below, the Court hold a hearing (the "Settlement Hearing") and approve the Settlement of the Litigation as set forth herein.

3.4 At the Settlement Hearing, the Settling Parties shall jointly request entry of the Final Order and Judgment, in the form attached hereto as Exhibit B:

(a) finally approving the Settlement as fair, reasonable and adequate, within the meaning of Rule 23 of the Federal Rules of Civil Procedure, and directing consummation pursuant to its terms;

(b) directing that the Litigation be dismissed without costs and expenses, except as set forth in this Stipulation, and with prejudice, and releasing the Released Claims;

(c) permanently barring and enjoining the institution and prosecution, by the Settling Plaintiffs and/or the Settlement Class Members, of any other action against the Released Persons in any court asserting the Released Claims;

(d) reserving jurisdiction over the Litigation, including all future proceedings concerning the administration, consummation, and enforcement of this Stipulation;

(e) finding that the Litigation was prosecuted and defended on a good faith basis in accordance with the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Rule 11 of the Federal Rules of Civil Procedure;

(f) finding, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that there is no just reason for delaying and directing entry of a final judgment; and

(g) containing such other and further provisions consistent with the terms of this Stipulation to which the Settling Parties expressly consent in writing.

3.5 At or after the Settlement Hearing, Lead Counsel also will request that the Court approve the proposed Plan of Allocation and the Fee and Expense Application (defined below).

3.6 Defendants shall no later than ten (10) calendar days following the filing of this Stipulation with the Court serve upon the appropriate State official of each State in which a Settlement Class Member resides and the Attorney General of the United States a notice of the proposed Settlement in compliance with the requirements of CAFA. Defendants are solely responsible for the costs of the CAFA notice and administering the CAFA notice.

**4. Releases**

4.1 Upon the Effective Date, as defined in ¶ 1.5 hereof, the Settling Plaintiffs and each of the other Settlement Class Members, whether or not such Settlement Class Member executes and delivers the Proof of Claim and Release form, and whether or not such Settlement Class Member shares or seeks to share in the Settlement Fund, for themselves and for any Person

claiming now or in the future through or on behalf of them, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever waived, released, relinquished, discharged and dismissed the Settling Defendants and their Related Parties from each and every one of the Released Plaintiffs' Claims.

4.2 Any Proof of Claim and Release that is executed by Settlement Class Members shall be substantially in the form contained in Exhibit A-2 attached hereto.

4.3 Upon the Effective Date, the Settling Plaintiffs, all Settlement Class Members and anyone claiming now or in the future through or on behalf of any of them, will be forever barred and enjoined from commencing, instituting, prosecuting, or continuing to prosecute any action or other proceeding in any court of law or equity, arbitration tribunal, or administrative forum, asserting the Released Plaintiffs' Claims against any of the Released Persons.

4.4 Upon the Effective Date, each of the Settling Defendants shall be deemed to have, and by operation of the Final Order and Judgment shall have, fully, finally, and forever released, relinquished, and discharged Settling Plaintiffs, each of the Settlement Class Members, and Lead Counsel from the Released Defendants' Claims. This release shall not apply to any person or entity who or which submits a request for exclusion from the Settlement Class that is accepted by the Court.

**5. Administration and Calculation of Claims, Final Awards, and Supervision and Distribution of the Settlement Fund**

5.1 As part of the Preliminary Approval Order, Plaintiffs shall seek appointment of a Claims Administrator.

5.2 The Claims Administrator, subject to such supervision and direction of Lead Counsel and the Court as may be necessary or as circumstances may require, shall administer and calculate the claims submitted by Settlement Class Members and shall oversee distribution of the

Net Settlement Fund to Authorized Claimants pursuant to the Plan of Allocation. Other than Meta Materials' obligation to provide certain records as provided in ¶ 3.2 above, none of the Settling Defendants, nor their Related Parties, shall have any responsibility, authority or liability whatsoever for the selection of the Claims Administrator, the Plan of Allocation, the administration of the Settlement, the claims process, or disbursement of the Net Settlement Fund, and shall have no liability whatsoever to any Person or entity, including, but not limited to, the Settling Plaintiffs, any other Settlement Class Members, or Lead Counsel in connection with the foregoing. The Settling Defendants shall cooperate in the administration of the Settlement to the extent reasonably necessary to effectuate its terms.

5.3 In accordance with the terms of the Preliminary Approval Order to be entered by the Court, Lead Counsel shall cause the Claims Administrator to mail the Postcard Notice to those members of the Settlement Class as may be identified through reasonable effort. Lead Counsel shall also cause the Claims Administrator to: (a) post downloadable copies of the Notice and Proof of Claim and Release Form online at a website maintained for the purpose of providing information to the Settlement Class; and (b) have the Summary Notice and Postcard Notice published and mailed, respectively, in accordance with the terms of the Preliminary Approval Order to be entered by the Court.

5.4 The Settling Defendants will take no position with respect to the Plan of Allocation. The Plan of Allocation proposed in the Notice is not a necessary term of the Settlement or of this Stipulation and it is not a condition of the Settlement or of this Stipulation that any particular plan of allocation be approved by the Court. The Settling Plaintiffs and Lead Counsel may not cancel or terminate the Settlement (or this Stipulation) based on this Court's or any appellate court's ruling with respect to the Plan of Allocation or any other plan of allocation in this Litigation. The

Settling Defendants shall not object in any way to the Plan of Allocation or any other plan of allocation in this Litigation. Neither the Settling Defendants, nor any of the Settling Defendants' Related Parties, shall have any liability, obligation, or responsibility whatsoever for the application of the Court-approved plan of allocation.

5.5 Any Settlement Class Member who does not timely submit a valid Proof of Claim and Release Form will not be entitled to receive any distribution from the Net Settlement Fund, but will otherwise be bound by all of the terms of this Stipulation and Settlement, including the terms of the Judgment to be entered in the Litigation and the releases provided for herein, and will be permanently barred and enjoined from bringing any action, claim, or other proceeding of any kind against the Settling Defendants or Settling Defendants' Related Parties with respect to the Released Plaintiffs' Claims in the event that the Effective Date occurs with respect to the Settlement.

5.6 The Settlement Fund shall be applied as follows:

(a) to pay all the costs and expenses reasonably and actually incurred in connection with providing Notice, Postcard Notice, and Summary Notice, locating Settlement Class Members, soliciting Class claims, assisting with the filing of claims, administering and distributing the Net Settlement Fund to Authorized Claimants, processing Proof of Claim and Release forms, and paying escrow fees and costs, if any;

(b) to pay the Taxes and Tax Expenses;

(c) to pay attorneys' fees and expenses of Plaintiffs' Counsel and reimbursement of Plaintiffs' expenses (the "Fee and Expense Award"), if and to the extent allowed by the Court; and

(d) to distribute the balance of the Net Settlement Fund to Authorized Claimants as allowed by this Stipulation, the Plan of Allocation, or the Court.

5.7 After the Effective Date, and in accordance with the terms of this Stipulation, the Plan of Allocation, or such further approval and further order(s) of the Court as may be necessary or as circumstances may require, the Net Settlement Fund shall be distributed to Authorized Claimants, subject to and in accordance with the following provisions of this Stipulation.

5.8 Within one hundred-twenty (120) days after the mailing of the Postcard Notice or such other time as may be set by the Court, each Person claiming to be an Authorized Claimant shall be required to submit to the Claims Administrator a completed Proof of Claim and Release form, substantially in the form of Exhibit A-2 attached hereto, signed under penalty of perjury and supported by such documents as are specified in the Proof of Claim and Release form.

5.9 Except as otherwise ordered by the Court, all Settlement Class Members who fail to timely submit a valid Proof of Claim and Release form within such period shall be forever barred from receiving any payments pursuant to this Stipulation and the Settlement set forth herein, but will in all other respects be subject to and bound by the provisions of this Stipulation, the releases contained herein, and the Judgment, and will be barred from bringing any action against the Released Persons concerning the Released Claims. Notwithstanding the foregoing, Lead Counsel shall have the discretion to accept late-submitted claims for processing by the Claims Administrator so long as the distribution of the Settlement Fund to Authorized Claimants is not materially delayed thereby. No Person shall have any claim against Plaintiffs, their counsel, the Released Persons, the Claims Administrator or any Settlement Class Member by reason of the exercise or non-exercise of such discretion.

5.10 Each Proof of Claim and Release shall be submitted to and reviewed by the Claims Administrator, under the supervision of Lead Counsel, who shall determine, in accordance with this Stipulation and the approved Plan of Allocation, the extent, if any, to which each claim shall be allowed, subject to review by the Court pursuant to ¶ 5.12 below.

5.11 Proof of Claim and Release forms that do not meet the submission requirements may be rejected. Prior to rejecting a Proof of Claim and Release in whole or in part, the Claims Administrator shall communicate with the claimant in writing to give the claimant the chance to remedy any curable deficiencies in the Proof of Claim and Release submitted. The Claims Administrator, under the supervision of Lead Counsel, shall notify, in a timely fashion and in writing, all claimants whose claims the Claims Administrator proposes to reject in whole or in part for curable deficiencies, setting forth the reasons therefor, and shall indicate in such notice that the claimant whose claim is to be rejected has the right to a review by the Court if the claimant so desires and complies with the requirements of ¶ 5.12 below.

5.12 If any claimant whose timely claim has been rejected in whole or in part for curable deficiency desires to contest such rejection, the claimant must, within twenty (20) calendar days after the date of mailing of the notice required in ¶ 5.3 above, or a lesser period of time if the claim was untimely, serve upon the Claims Administrator a notice and statement of reasons indicating the claimant's grounds for contesting the rejection along with any supporting documentation, and requesting a review thereof by the Court. If a dispute concerning a claim cannot be otherwise resolved, Lead Counsel shall thereafter present the claimant's request for review to the Court.

5.13 Each claimant who declines to be excluded from the Settlement Class shall be deemed to have submitted to the jurisdiction of the Court with respect to the claimant's claim, including, but not limited to, all releases provided for herein and in the Judgment, and the claim

will be subject to investigation and discovery under the Federal Rules of Civil Procedure, provided that such investigation and discovery shall be limited to the claimant's status as a Settlement Class Member and the validity and amount of the claimant's claim. In connection with processing the Proofs of Claim and Release, no discovery shall be allowed on the merits of the Litigation or the Settlement.

5.14 The Net Settlement Fund shall be distributed to the Authorized Claimants substantially in accordance with the Plan of Allocation set forth in the Notice and approved by the Court. Any such Plan of Allocation is not part of this Stipulation. No funds from the Net Settlement Fund shall be distributed to Authorized Claimants until the Effective Date. If there is any balance remaining in the Net Settlement Fund after a reasonable period of time after the date of the initial distribution of the Net Settlement Fund, Lead Counsel shall, if feasible and economical, reallocate (which reallocation may occur on multiple occasions) such balance among Authorized Claimants in an equitable and economical fashion. Any *de minimis* balance that still remains in the Net Settlement Fund after such reallocation(s) and payments, which is not feasible or economical to reallocate, shall be donated to any appropriate non-sectarian, non-profit charitable organization(s) serving the public interest selected by Lead Counsel and approved by the Court.

5.15 The Settling Defendants and their Related Parties shall have no responsibility for or liability whatsoever with respect to the investment or distribution of the Settlement Fund or Net Settlement Fund, the Plan of Allocation, the determination, administration, or calculation of claims, the payment or withholding of Taxes or Tax Expenses, or any losses incurred in connection therewith. No Person shall have any claim of any kind against the Settling Defendants, their Related Parties, or counsel for the Settling Defendants with respect to the matters set forth in ¶¶

5.1-5.18 hereof; and the Settlement Class Members, Settling Plaintiffs, and Lead Counsel hereby fully, finally and forever release the Settling Defendants and their Related Parties from any and all liability and claims arising from or with respect to the administration, investment, or distribution of the Settlement Fund.

5.16 No Person shall have any claim against the Settling Defendants or their Related Parties, Settling Defendants' counsel, Settling Plaintiffs, Plaintiffs' Counsel or the Claims Administrator, or any other Person designated by Lead Counsel based on determinations or distributions made substantially in accordance with this Stipulation and the Settlement contained herein, the Plan of Allocation, or further order(s) of the Court.

5.17 It is understood and agreed by the Settling Parties that any proposed Plan of Allocation of the Net Settlement Fund, including, but not limited to, any adjustments to an Authorized Claimant's claim set forth therein, is not a part of this Stipulation and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement set forth in this Stipulation, and any order or proceeding relating to the Plan of Allocation shall not operate to terminate or cancel this Stipulation or affect the finality of the Court's Judgment approving this Stipulation and the Settlement set forth herein, or any other orders entered pursuant to the Stipulation. The time to appeal from approval of the settlement shall commence upon the Court's entry of the Judgment regardless of whether a Plan of Allocation has been approved.

5.18 All Persons who fall within the definition of Settlement Class Members (who do not exclude themselves) shall be subject to and bound by the provisions of this Stipulation, the releases contained herein, the Judgment with respect to all Released Claims, regardless of whether such Persons seek or obtain by any means, including, without limitation, by submitting a Proof of

Claim and Release or any similar document, any distribution from the Settlement Fund or Net Settlement Fund.

**6. Lead Counsel's Attorneys' Fees and Expenses**

6.1 Lead Counsel may submit an application or applications (the "Fee and Expense Application") from the Settlement Fund for: (a) an award of attorneys' fees; plus (b) expenses incurred in connection with prosecuting the Litigation; plus (c) any interest on such attorneys' fees and expenses at the same rate and for the same periods as earned by the Settlement Fund (until paid) as may be awarded by the Court. Lead Counsel reserves the right to make additional applications for fees and expenses incurred.

6.2 Any fees and expenses, as awarded by the Court, shall be paid to Lead Counsel from the Settlement Fund, as ordered, immediately after the Court executes the Judgment and an order awarding such fees and expenses, notwithstanding the existence of any timely filed objections thereto or to the Settlement, or potential for appeal therefrom, or collateral attack on the Settlement or any part thereof. Lead Counsel may thereafter allocate the attorneys' fees among Plaintiffs' Counsel in a manner in which they in good faith believe reflects the contributions of such counsel to the initiation, prosecution, and resolution of the Litigation.

6.3 In the event that the Effective Date does not occur, or the Judgment or the order making the Fee and Expense Award is reversed or modified, or this Stipulation is canceled or terminated for any other reason, and such reversal, modification, cancellation or termination becomes Final and not subject to review, and in the event that the Fee and Expense Award has been paid to any extent, then Lead Counsel, including their partners and/or shareholders, and such other Plaintiffs' Counsel, including their law firms, partners, and/or shareholders, and Plaintiffs who have received any portion of the Fee and Expense Award shall, within five (5) business days from receiving notice from the Settling Defendants' counsel or from a court of appropriate

jurisdiction, refund to the Settlement Fund all such fees and expenses previously paid to them from the Settlement Fund plus interest thereon at the same rate as earned on the Settlement Fund in an amount consistent with such reversal, modification, cancellation or termination. Any refunds required pursuant to ¶ 6.3 shall be the several obligation of Lead Counsel, including their partners and/or shareholders, and former partners and/or shareholders who received a distribution of any portion of the Fee and Expense Award, Plaintiffs' Counsel, including their law firms, partners, and/or shareholders, and Settling Plaintiffs that received fees or expenses to make appropriate refunds or repayments to the Settlement Fund.

6.4 The procedure for and the allowance or disallowance by the Court of any applications by any Plaintiffs' Counsel for attorneys' fees and expenses to be paid out of the Settlement Fund is not part of the Settlement set forth in this Stipulation, and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement set forth in this Stipulation, and any order or proceeding relating to the Fee and Expense Application, or any appeal from any order relating thereto or reversal or modification thereof, shall not operate to terminate or cancel this Stipulation, or affect or delay the finality of the Judgment approving this Stipulation and the Settlement of the Litigation set forth therein.

6.5 Any fees and/or expenses awarded by the Court shall be paid solely from the Settlement Fund. The Settling Defendants and their Related Parties shall have no responsibility for, and no liability whatsoever with respect to, any payment of attorneys' fees and/or expenses (including Taxes) to Plaintiffs' Counsel, or any other counsel or Person who receives payment from the Net Settlement Fund.

6.6 The Settling Defendants and their Related Parties shall have no responsibility for, and no liability whatsoever with respect to, the allocation among Plaintiffs' Counsel and/or any other Person who may assert some claim thereto, of any Fee and Expense Award that the Court may make in the Litigation, and the Settling Defendants and their related parties take no position with regard to such matters.

6.7 The Released Persons shall have no responsibility for, and no liability whatsoever with respect to, any attorneys' fees, costs, or expenses (including Taxes) incurred by or on behalf of any Settlement Class Member, whether or not paid from the Escrow Account.

**7. Conditions of Settlement, Effect of Disapproval, Cancellation, or Termination**

7.1 The Effective Date of the Settlement shall be the date when all of the following shall have occurred and is conditioned on the occurrence of all of the following events:

(a) the Court has entered the Preliminary Approval Order, as required by ¶ 3.1 hereof;

(b) the Settlement Amount has been deposited into the Escrow Account;

(c) Meta Materials has not exercised its option to terminate the Stipulation pursuant to ¶ 7.3 hereof;

(d) The Court has approved the Settlement described herein, following notice to the Settlement Class and a hearing, as prescribed by Rule 23 of the Federal Rules of Civil Procedure;

(e) The Court has entered the Final Order and Judgment, substantially in the form of Exhibit B attached hereto;

(f) The Final Order and Judgment has become Final, as defined in ¶ 1.7 hereof; and

(g) Notwithstanding the foregoing, in the event that Meta Materials files for bankruptcy protection or an insolvency proceeding is otherwise commenced against Meta Materials prior to the Final Order, the Settlement will be contingent on the Bankruptcy Court's approval of a Bankruptcy Rule 9019 Motion approving the Settlement and the Bankruptcy Court's approval of a Motion To Modify the Automatic Stay to authorize the payment of the Settlement Amount and defense expenses by one or more insurance companies providing insurance coverage to Defendants.

7.2 Upon the Effective Date, except as described in ¶¶ 7.4 and 7.5 below, any and all remaining interest or right of the Settling Defendants in or to the Settlement Fund, if any, shall be absolutely and forever extinguished. If all of the conditions specified in ¶ 7.1 hereof are not met, then the Settlement shall be canceled and terminated subject to ¶¶ 7.4 and 7.5 hereof unless Lead Counsel and counsel for the Settling Defendants mutually agree in writing to proceed with the Settlement.

7.3 Meta Materials shall have the right to terminate the Settlement and render it null and void in the event that Settlement Class Members who purchased or otherwise acquired more than a certain percentage of Meta Materials securities subject to this Settlement exclude themselves from the Settlement Class, as set forth in a separate agreement (the "Supplemental Agreement") executed between the Settling Plaintiffs and the Settling Defendants, by and through their counsel. The Supplemental Agreement, which is being executed concurrently herewith, shall not be filed with the Court and its terms shall not be disclosed in any other manner (other than the statements herein, to the extent necessary, or as otherwise provided in the Supplemental Agreement), unless and until the Court otherwise directs or a dispute arises between the Settling Parties concerning its interpretation or application. If submission of the Supplemental Agreement is required for

resolution of a dispute or is otherwise ordered by the Court, the Settling Parties will seek to have the Supplemental Agreement submitted to the Court *in camera* or filed under seal.

7.4 In the event the Effective Date does not occur or this Stipulation shall terminate, or be canceled, or otherwise fail to become effective for any reason, including, without limitation, in the event that the Settlement as described herein is not approved by the Court or the Final Order or Judgment is reversed or vacated following any appeal taken therefrom, then:

(a) within ten (10) business days after written notification of such event is sent by counsel for the Defendants or Lead Counsel to the Escrow Agent, the Settlement Fund (including accrued interest) and all payments disbursed, less reasonable expenses which have been properly disbursed pursuant to Section 2 hereof or are determined to be properly chargeable to the Settlement Fund, up to the amount provided in ¶ 2.9, shall be refunded, reimbursed, and repaid by the Escrow Agent to Meta Materials or Meta Materials' paying insurers pursuant to written instructions by Defendants' counsel. If such amounts are not timely paid by the Escrow Agent, then interest shall accrue at the rate of 5% per annum, until such amounts are paid;

(b) the Escrow Agent or its designee shall apply for any tax refund owed on the Settlement Fund and pay the proceeds, after deduction of any fees or expenses reasonably incurred in connection with such application(s) for refund, pursuant to written instructions from Defendants' counsel;

(c) the Settling Parties shall be restored to their respective positions in the Litigation as of December 20, 2023;

(d) the terms and provisions of the Stipulation, with the exception of ¶¶ 2.5-2.8, 2.10, 6.7, and 8.3-8.19 hereof, shall have no further force and effect with respect to the Settling Parties, and neither the existence nor the terms of this Stipulation (nor any negotiations preceding

this Stipulation nor any acts performed pursuant to, or in furtherance of, this Stipulation) shall be used in this Litigation or in any other proceeding for any purpose (other than to enforce the terms remaining in effect); and

(e) any judgment or order entered by the Court in accordance with the terms of the Stipulation shall be treated as vacated, *nunc pro tunc*. No order of the Court or modification or reversal on appeal of any order of the Court concerning the Plan of Allocation or the amount of any attorneys' fees, costs, expenses, and interest awarded by the Court to any of Plaintiffs' counsel shall constitute grounds for cancellation or termination of the Stipulation.

7.5 If the Court does not enter the Final Order and Judgment in the form of Exhibit B hereto, or if the Court enters the Final Order and Judgment and appellate review is sought and, on such review, the Final Order or Judgment is vacated, modified, or reversed, then this Stipulation and the Settlement incorporated herein shall be cancelled and terminated, unless all Settling Parties who are adversely affected thereby, in their sole discretion within thirty days from the date of the mailing of such ruling to such parties, provide written notice to all other parties hereto of their intent to proceed with the Settlement under the terms of the Final Order and Judgment as modified by the Court or on appeal. Such notice may be provided on behalf of Settling Plaintiffs and the Settlement Class Members by Lead Counsel. No Settling Party shall have any obligation whatsoever to proceed under any terms other than in the form provided and agreed to herein; provided, however, that no order of the Court concerning any fee and expense application, or any modification or reversal on appeal of such order, shall constitute grounds for cancellation or termination of this Stipulation by any Settling Party.

**8. Miscellaneous Provisions**

8.1 The Settling Parties: (a) acknowledge that it is their intent to consummate this agreement; and (b) agree to cooperate to the extent reasonably necessary to effectuate and

implement all terms and conditions of this Stipulation and to exercise their best efforts to accomplish the foregoing terms and conditions of this Stipulation.

8.2 The Settling Parties intend this Settlement to be a final and complete resolution of all disputes between them with respect to the Litigation. The Settlement compromises all claims that were or are contested and shall not be deemed an admission by any Settling Party as to the merits of any claim or defense. The Judgment will contain a finding that, during the course of the Litigation, the Settling Parties and their respective counsel at all times complied with the requirements of Federal Rule of Civil Procedure 11. The Settling Parties agree that the Settlement Amount and the other terms of the Settlement were negotiated in good faith by the Settling Parties, and reflect a settlement that was reached voluntarily after consultation with competent legal counsel. The Settling Parties reserve their right to rebut, in a manner that such party determines to be appropriate, any contention made in any public forum regarding the Litigation, including that the Litigation was brought or defended in bad faith or without a reasonable basis.

8.3 Neither the Stipulation nor the Settlement contained herein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claim, any allegation made in the Litigation, or of any wrongdoing or liability of the Released Persons; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Released Persons in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; or (c) is or may be deemed or used as an admission or evidence that any claims asserted by Lead Plaintiffs were not valid or that the amount recoverable was not greater than the Settlement Amount, in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. Neither this

Stipulation nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of this Stipulation or the Settlement shall be admissible in any proceeding for any purpose except that Settling Defendants and/or their respective Related Parties may file this Stipulation and/or the Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

8.4 All agreements made and orders entered during the course of the Litigation relating to the confidentiality of information shall survive this Stipulation.

8.5 All of the Exhibits to this Stipulation are material and integral parts hereof and are fully incorporated herein by this reference.

8.6 This Stipulation may be amended or modified only by a written instrument signed by or on behalf of all Settling Parties or their respective successors-in-interest.

8.7 This Stipulation and the Exhibits attached hereto and the Supplemental Agreement constitute the entire agreement among the Settling Parties hereto as to the subject matter hereof and supersede any prior or contemporaneous written or oral agreements or understandings between the Settling Parties. No representations, warranties, or inducements have been made to any party concerning this Stipulation or its Exhibits other than the representations, warranties, and covenants contained and memorialized in such documents. It is understood by the Settling Parties that, except for the matters expressly represented herein, the facts or law with respect to which this Stipulation is entered into may turn out to be other than or different from the facts now known to each party or believed by such party to be true; each party therefore expressly assumes the risk of the facts or

law turning out to be different, and agrees that this Stipulation shall be in all respects effective and not subject to termination by reason of any such different facts or law.

8.8 Except as otherwise provided herein, each party shall bear his, her, or its own fees and costs.

8.9 Lead Counsel, on behalf of the Settlement Class, represents that it is expressly authorized by the Settling Plaintiffs to take all appropriate action required or permitted to be taken by the Settlement Class pursuant to this Stipulation to effectuate its terms and also is expressly authorized to enter into any modifications or amendments to this Stipulation on behalf of the Settlement Class which they deem appropriate.

8.10 Each counsel or other Person executing this Stipulation or any of its Exhibits on behalf of any party hereto hereby warrants that such Person has the full authority to do so.

8.11 This Stipulation may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument. A complete set of executed counterparts shall be filed with the Court. Signatures sent by facsimile or in .pdf form via e-mail shall be deemed originals.

8.12 All notices, requests, demands, claims, and other communications hereunder shall be in writing and shall be deemed duly given (i) when delivered personally to the recipient, (ii) one (1) business day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (iii) seven (7) business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

***If to Settling Plaintiffs or to Lead Counsel:***

LEVI & KORSINSKY, LLP
Attn: Adam M. Apton
33 Whitehall Street, 17th Floor

New York, New York 10004
Telephone: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

***If to Settling Defendants' or Defendants' Counsel:***

WILSON SONSINI GOODRICH & ROSATI, P.C.
Attn: Gregory L. Watts
701 Fifth Avenue Ste 5100
Seattle, WA 98104
Telephone: (206) 883-2617
Fax : (206) 883-2699
Email: gwatts@wsgr.com

BROWN RUDNICK LLP
Attn: Rachel O. Wolkinson
601 Thirteenth Street NW Suite 600
Washington, DC 20005
Telephone: (202) 536-1755
Email: rwolkinson@brownrudnick.com

8.13 This Stipulation shall be binding upon, and inure to the benefit of, the successors and assigns of the Settling Parties, including any corporation or other entity into or with which any party merges, consolidates, or reorganizes.

8.14 The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of this Stipulation, and all Settling Parties submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement embodied in this Stipulation and matters related to the Settlement.

8.15 The waiver by one party of any breach of this Stipulation by any other party shall not be deemed a waiver by any other party or a waiver of any other prior or subsequent breach of this Stipulation.

8.16 Pending approval of the Court of this Stipulation and its Exhibits, all proceedings in this Litigation shall be stayed and all Members of the Settlement Class shall be barred and enjoined from prosecuting any of the Released Claims against any of the Released Persons.

8.17 This Stipulation and the Exhibits hereto shall be considered to have been negotiated, executed, and delivered, and to be wholly performed, in the State of New York, and the rights and obligations of the parties to the Stipulation shall be construed and enforced in accordance with, and governed by, the internal, substantive laws of New York without giving effect to its choice-of-law principles.

8.18 The headings herein are used for the purpose of convenience only and are not meant to have legal effect.

8.19 This Stipulation shall not be construed more strictly against one party than another merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of the Settling Parties, it being recognized that it is the result of arm's-length negotiations between the Settling Parties and the Settling Parties have contributed substantially and materially to the preparation of this Stipulation.

IN WITNESS WHEREOF, the Parties hereto have caused the Stipulation to be executed, by their duly authorized attorneys, dated January 19, 2024.

[Signatures on following pages]

**LEVI & KORSINSKY, LLP**

Adam M. Apton
33 Whitehall Street, 17th Floor
New York, New York 10004
Telephone: (212) 363-7500
Fax: (212) 363-7171
aapton@zlk.com

*Attorneys for Lead Plaintiffs and Lead Counsel for the Settlement Class*

**POMERANTZ LLP**

Gustavo Bruckner
600 Third Avenue
New York, New York 10016
Telephone: (646) 581-9941
Fax: (917) 463-1044
gfbruckner@pomlaw.com

*Attorneys for Plaintiffs Allen Denton and Menachem Gurevitch*

**WILSON SONSINI GOODRICH & ROSATI, P.C.**

Gregory L. Watts
701 Fifth Avenue Ste 5100
Seattle, WA 98104
Telephone: (206) 883-2617
Fax : (206) 883-2699
Email: gwatts@wsgr.com

*Counsel for Defendants Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc., George*

[redacted]

*Palikaras, Kenneth Rice, Greg McCabe, and John Brda*

**BROWN RUDNICK LLP**

/s/ [signature]

Rachel O. Wolkinson
601 Thirteenth Street NW Suite 600
Washington, DC 20005
Telephone: (202) 536-1755
Email: rwolkinson@brownrudnick.com

*Counsel for Defendant Alexandre Zyngier*

**EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE META MATERIALS INC. SECURITIES LITIGATION | Case No. 1:21-cv-07203-CBA-JRC<br><br>**[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF SETTLEMENT** |

**WHEREAS**, a consolidated class action is pending before the Court entitled *In re Metamaterials Inc. Securities Litigation*, No. 1:21-cv-07203-CBA-JRC (E.D.N.Y.);

**WHEREAS**, (a) Lead Plaintiffs Kaoutar Kajjame, Philip Granite, and Ricardo Josephs, individually and on behalf of the Settlement Class (defined below) (collectively, "Plaintiffs"), and (b) Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc. ("Meta Materials"), George Palikaras, Greg McCabe, John Brda, and Kenneth Rice (collectively, "Defendants"; and together with the Plaintiffs, the "Parties") have determined to settle all claims asserted against Defendants in this Litigation with prejudice on the terms and conditions set forth in the Stipulation of Settlement dated January 19, 2024 (the "Stipulation") subject to the approval of this Court (the "Settlement");

**WHEREAS**, (a) Allen Denton and Menachem Gurevitch, plaintiffs in a related shareholder class action lawsuit alleging claims for breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty, styled *Denton, et al. v. Palikaras, et al.*, No. A-23-878134-C (Clark Cty., NV) (the "State Action") filed in Nevada state court, and (b) Defendants and additional defendants Alexandre Zyngier, Robert Lance Cook, and Michael Graves in the State Action also

have determined to settle all claims asserted in the State Action, as contemplated and comprised by the definition of the Settlement Class in this Action; and

**WHEREAS**, the Court having reviewed and considered Plaintiffs' unopposed Motion for Preliminary Approval of Class Action Settlement (the "Motion"); as well as all papers submitted in support thereof; the proposed Settlement as set forth in the Stipulation, which, together with the exhibits annexed thereto, sets forth the terms and conditions of a proposed settlement of the above-captioned Litigation, dismissing the Defendants with prejudice upon the terms and conditions set forth therein; a copy of which has been submitted with the Motion and the terms of which are incorporated herewith; and all other prior proceedings in this Litigation; and good cause for this Order having been shown:

**NOW, THEREFORE, IT IS HEREBY ORDERED**:

1. The provisions of the Stipulation, including definitions of the terms used therein, are hereby incorporated by reference as though fully set forth herein. All capitalized terms used herein have the meanings set forth and defined in the Stipulation.

2. This Court has jurisdiction over the subject matter of this Litigation and over all parties to this Litigation, including Settlement Class Members.

3. The Court preliminarily approves the Settlement and the proposed Plan of Allocation described in the Notice as fair, reasonable and adequate as to all Settlement Class Members, pending a final settlement and fairness hearing (the "Settlement Hearing"). The Court preliminarily finds that the proposed Settlement should be approved as: (i) the result of serious, extensive arm's-length and non-collusive negotiations; (ii) falling within a range of reasonableness warranting final approval; (iii) having no obvious deficiencies; (iv) not improperly granting preferential treatment to any of the Plaintiffs or segments of the Settlement Class; and (v)

warranting notice of the proposed Settlement at the Settlement Hearing described below.

4. Pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and for purposes of this Settlement only, the Court hereby certifies a Settlement Class, defined as: (a) All Persons that purchased Meta Materials and/or Torchlight Energy Resources, Inc. ("Torchlight") publicly traded securities during the Class Period, and were damaged thereby; (b) All holders of Torchlight stock as of the May 5, 2021 record date, eligible to vote on the proposed merger with Metamaterial, Inc. at Torchlight's June 11, 2021 special meeting of shareholders, and were damaged thereby; and (c) All holders of Torchlight stock as of June 28, 2021, the date the proposed merger with Metamaterial, Inc. was consummated, and were damaged thereby. Excluded from the Settlement Class are: (i) Defendants and their Related Parties; (ii) the officers, directors, and affiliates of Meta Materials, at all relevant times; (iii) Meta Materials' employee retirement or benefit plan(s) and their participants or beneficiaries to the extent they purchased or acquired Meta Materials securities through any such plan(s); (iv) any entity in which Defendants have or had controlling interest; (v) Immediate Family members of any excluded person; and (vi) the legal representatives, heirs, successors, or assigns of any excluded person or entity. Also excluded from the Settlement Class are those Persons who validly and timely request exclusion.

5. With respect to the Settlement Class, this Court finds solely for purposes of effectuating this settlement that: (a) the Settlement Class Members are so numerous that joinder of all Settlement Class Members in the Litigation is impracticable; (b) there are questions of law and fact common to the Settlement Class which predominate over any individual questions; (c) the claims of the Plaintiffs are typical of the claims of the Settlement Class; (d) Plaintiffs have fairly and adequately represented and protected the interests of all of the Settlement Class Members; and (e) a class action is superior to other available methods for the fair and efficient adjudication of

the controversy, considering: (i) the interests of the members of the Settlement Class in individually controlling the prosecution of the separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by members of the Settlement Class; (iii) the desirability or undesirability of continuing the litigation of these claims in this particular forum; and (iv) the difficulties likely to be encountered in the management of the class action.

6. The Court hereby finds and concludes that pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for the purposes of the Settlement only, Plaintiffs are adequate class representatives and certifies them as Class Representatives for the Settlement Class. The Court also appoints Lead Counsel as Class Counsel for the Settlement Class, pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

7. The Court approves the appointment of Strategic Claims Services as the Claims Administrator to supervise and administer the notice procedure and the processing of claims.

8. The Court orders the stay of any pending litigation and enjoins the initiation of any new litigation by any Settlement Class Member in any court, arbitration, or other tribunal that includes any Released Claims against the Released Parties.

9. The Court hereby approves, as to form and content, the proposed Notice and Postcard Notice, substantially in the forms annexed hereto as Exhibits A-1 and A-4, and directs that as soon as practicable after entry of this Order, but no later than fourteen (14) days after entry of this Order granting preliminary approval, that the Settlement Administrator publish the Notice on a website to be maintained by the Claims Administrator and provide the Postcard Notice to each known Settlement Class Member via first class U.S. mail, postage pre-paid. Meta Materials shall cooperate in the identification of Settlement Class Members by producing reasonably available information from its shareholder transfer records or transfer agent. The Claims

Administrator shall file with the Court proof of mailing of the Notice seven (7) days prior to the Settlement Hearing.

10. Banks, brokerage firms, institutions, and other persons who are nominees who purchased or otherwise acquired Meta Materials securities for the beneficial interest of other persons during the Settlement Class Period are directed to, within ten (10) days after receipt of the Notice: either (a) send the Postcard Notice to all beneficial owners of Meta Materials securities purchased or otherwise acquired during the Class Period; or (b) send a list of the name, addresses and email addresses of such beneficial owners to the Claims Administrator; or (c) request a link to the location of the Long Notice and Proof of Claim and email the link to Settlement Class Members. Upon full compliance with these directions, such nominees may seek reimbursement of their reasonable expenses actually incurred up to a maximum of $0.03 per name, address and email address provided to the Claims Administrator; or up to $0.03 per Postcard Notice mailed, plus postage at the rate used by the Claims Administrator; or up to $.03 per email sent. The Claims Administrator or nominees shall provide notice to each Settlement Class Member no later than sixty (60) days prior to the Settlement Hearing.

11. The cost of providing the Notice to the Settlement Class as specified in this Order shall be paid as set forth in the Stipulation.

12. The Court hereby approves, as to form and content, the proposed form Summary Notice, substantially in the form annexed hereto as Exhibit A-3, and directs that within twenty-one (21) days after entry of this Order granting preliminary approval the Claims Administrator shall cause such Summary Notice to be published on a national business newswire. The Claims Administrator shall file with the Court proof of publication of the Summary Notice seven (7) days prior to the Settlement Hearing.

13. The Court approves the proposed Proof of Claim substantially in the form of Exhibit A-2 hereto.

14. The Court orders that the Notices, Proof of Claim form, Stipulation of Settlement and all papers submitted in support thereof be posted to a website to be maintained by the Claims Administrator.

15. This Court preliminarily finds that the distribution of the Notice and the publication of the Publication Notice, and the notice methodology, contemplated by the Stipulation and this Order:

(a) Constitute the best practicable notice to Settlement Class Members under the circumstances of this Action;

(b) Are reasonably calculated, under the circumstances, to apprise Settlement Class Members of: (i) the proposed Settlement of this Action; (ii) their right to exclude themselves from the Settlement Class; (iii) their right to object to any aspect of the proposed Settlement; (iv) their right to appear at the Settlement Hearing, either on their own or through counsel hired at their own expense, if they did not exclude themselves from the Settlement Class; and (v) the binding effect of the proceedings, rulings, orders, and judgments in this Action, whether favorable or unfavorable, on all persons not excluded from the Settlement Class;

(c) Are reasonable and constitute due, adequate, and sufficient notice to all persons entitled to be provided with notice; and

(d) Fully satisfy all applicable requirements of the Federal Rules of Civil Procedure (including Rules 23(c) and (d)), the United States Constitution (including the Due Process Clause), the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(7), the

Private Securities Litigation Reform Act of 1995, the Rules of Court, and any other applicable law.

16. Settlement Class Members who wish to participate in the Settlement shall complete and submit the Proof of Claim and Release form in accordance with the instructions contained in the Notice. Unless the Court orders otherwise, all Proof of Claim and Release forms must be submitted no later than one hundred twenty (120) days after entry of this Order.

17. Any Settlement Class Member who does not submit a Proof of Claim and Release within the time provided shall be barred from sharing in the distribution of the proceeds of the Net Settlement Fund, unless otherwise ordered by the Court, but shall nevertheless be bound by any final judgment entered by the Court. Notwithstanding the foregoing, Lead Counsel shall have the discretion to accept late-submitted claims for processing by the Claims Administrator so long as distribution of the Net Settlement Fund is not materially delayed thereby.

18. Any person falling within the definition of the Settlement Class may seek to be excluded from the Settlement Class by submitting to the Settlement Administrator a request for exclusion ("Request for Exclusion"), which complies with the requirements set forth in the Notice and is postmarked no later than twenty-eight (28) days prior to the Settlement Hearing. Any Request for Exclusion that does not supply the information required by this Paragraph 16 shall be rejected, and any such Settlement Class Member shall be bound by the Stipulation and any judgment entered in connection therewith.

19. All persons who submit valid and timely Requests for Exclusion shall have no rights under the Stipulation, shall not share in the distribution of the Net Settlement Fund, and shall not be bound by the Settlement Stipulation or the Judgment. However, a Settlement Class Member may submit a written revocation of a Request for Exclusion up until seven (7) days prior to the

date of the Settlement Hearing and still be eligible to receive payments pursuant to the Stipulation provided the Settlement Class Member also submits a valid Proof of Claim prior to the Settlement Hearing (the "Bar Date").

20. Unless otherwise ordered by the Court, the Court stays all proceedings in the Action other than proceedings necessary to carry out or enforce the terms and conditions of the Stipulation. Pending final determination of whether the Settlement should be approved, the Court bars and enjoins Plaintiffs, and all other members of the Settlement Class, from commencing or prosecuting any and all of the Released Plaintiffs' Claims against each and all of the Defendants' Related Parties.

21. The Settlement Hearing shall take place before the undersigned, United States District Judge Carol Bagley Amon, in Courtroom 10D S at the United States District Court for the New York Eastern District, 225 Cadman Plaza East, Brooklyn, NY 11201, on _____________, at ____:__.m., to determine:

(a) Whether the Settlement, on the terms and conditions provided for in the Stipulation, should be finally approved by the Court as fair, reasonable, and adequate;

(b) Whether the Litigation should be dismissed on the merits and with prejudice as to the Defendants;

(c) Whether the Court should permanently enjoin the assertion of any claims that arise from or relate to the subject matter of the Litigation;

(d) Whether the application for attorneys' fees and expenses to be submitted by Lead Counsel should be approved;

(e) Whether the Plan of Allocation is fair and reasonable to the members of the Settlement Class; and

(f) Such other matters as the Court may deem necessary or appropriate.

22. The Court may finally approve the Stipulation at or after the Settlement Hearing with any modifications agreed to by the parties and without further notice to the Settlement Class Members.

23. Lead Counsel and/or Defendants' Counsel shall submit papers in support of the Settlement, Plan of Allocation and Award of Attorney Fees and Expenses no later than thirty-five (35) days prior to the Settlement Hearing.

24. Any Settlement Class Member and any other interested person may appear at the Settlement Hearing in person or by counsel and be heard, to the extent allowed by the Court, either in support of or in opposition to the matters to be considered at the hearing; provided, however, that no person shall be heard, and no papers, briefs, or other submissions shall be considered by the Court in connection to such matters, unless no later than twenty-eight (28) days before the Settlement Hearing, such person files with the Court a statement of objection setting forth: (i) whether the person is a Settlement Class Member; (ii) to which part of the Stipulation the Settlement Class Member objects; (iii) the specific reason(s), if any, for such objection including any legal support the Settlement Class Member wishes to bring to the Court's attention. Such Settlement Class Member shall also provide documentation sufficient to establish the Meta Materials securities purchased, acquired and sold from September 21, 2020 to June 24, 2022, both dates inclusive (including the number of shares, dates, and prices). Failure to provide such information and documentation shall be grounds to void the objection.

25. All papers in response to objections or otherwise in support of the Settlement and related matters shall be filed fourteen (14) days prior to the Settlement Hearing.

26. Defendants shall have no responsibility for the Plan of Allocation or any Fee and

Expense Application, and such matters will be considered separately from the fairness, reasonableness, and adequacy of the Stipulation.

27. At or after the Settlement Hearing, the Court shall determine whether the Plan of Allocation and any Fee and Expense Application proposed by Lead Counsel should be approved.

28. All reasonable expenses incurred in identifying and notifying Settlement Class Members as well as administering the Settlement Fund shall be paid as set forth in the Stipulation. The Court may adjourn the Settlement Hearing, including the consideration of the motion for attorneys' fees and expenses, without further notice of any kind other than an announcement of such adjournment in open court at the Settlement Hearing or any adjournment thereof. The contents of the Settlement Fund held by Esquire Bank (which the Court approves as the Escrow Agent), shall be deemed and considered to be *in custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as they shall be distributed pursuant to the Stipulation and/or further order(s) of the Court.

29. If the Settlement is approved, all Settlement Class Members will be bound by the terms of the Settlement as set forth in the Stipulation, and by any judgment or determination of the Court affecting the Settlement Class, regardless of whether or not a Settlement Class Member submits a Proof of Claim. Any member of the Settlement Class who fails to opt out of the Settlement Class or who fails to object in the manner prescribed therein shall be deemed to have waived, and shall be foreclosed forever from raising objections or asserting any claims arising out of, related to, or based in whole or in part on any of the facts or matters alleged, or which could have been alleged, or which otherwise were at issue in the Action.

30. Upon payment of the Settlement consideration to the Escrow Account by Defendants, the Settlement Fund shall be deemed to be in the custody of the Court and shall remain

subject to the jurisdiction of the Court until such time as the Settlement Fund is distributed or returned to Defendants pursuant to the Stipulation and/or further order of this Court. There shall be no distribution of any part of the Net Settlement Fund to the Settlement Class until the Plan of Allocation is finally approved.

31. Except for the obligation to cooperate in the production of reasonably available information with respect to the identification of Class Members from Meta Materials' shareholder transfer records, in no event shall Defendants have any responsibility for the administration of the Settlement, and Defendants shall not have any obligation or liability to Plaintiffs in connection with such administration.

32. No Person shall have any claim against the Released Parties, the Claims Administrator, the Escrow Agent or any other agent designated by Lead Counsel based on distribution determinations or claim rejections made substantially in accordance with this Stipulation and the Settlement, the Plan of Allocation, or further orders of the Court, except in the case of fraud or willful misconduct. No person shall have any claim under any circumstances against the Released Parties, based on any distributions, determinations, claim rejections or the design, terms, or implementation of the Plan of Allocation.

33. Defendants have denied, and continue to deny, any and all allegations and claims asserted in the Litigation, and Defendants have represented that they entered into the Settlement solely to eliminate the burden, expense, and uncertainties of further litigation.

34. Neither the Stipulation, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be construed as an admission or concession by Defendants of the truth of any of the allegations in the Litigation, or of any liability, fault, or wrongdoing of any kind.

35. The Released Parties, and each of their counsel may file the Stipulation and/or the Order and Final Judgment in any action that may be brought against them in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction of any other theory of claim preclusion or issues preclusion or similar defense or counterclaim.

36. In the event that the Settlement does not become effective in accordance with the terms of the Stipulation, this Order shall be rendered null and void to the extent provided by and in accordance with the Stipulation and shall be vacated, and in such event, all orders entered and releases delivered in connection therewith shall be null and void to the extent provided by and in accordance with the Settlement, and without prejudice to the rights of the parties to the Stipulation before it was executed.

37. The Court reserves the right to alter the time or the date of the Settlement Hearing without further notice to the Settlement Class Members, provided that the time or the date of the Settlement Hearing shall not be set at a time or date earlier than the time and date set forth above, and retains jurisdiction to consider all further applications arising out of or connected with the settlement.

**SO ORDERED** in the Eastern District of New York on _____________, 2024.

_________________________________
THE HON. CAROL BAGLEY AMON
UNITED STATES DISTRICT JUDGE

**EXHIBIT A-1**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE META MATERIALS INC. SECURITIES LITIGATION | Case No. 1:21-cv-07203-CBA-JRC<br><br>**NOTICE OF PENDENCY AND PROPOSED SETTLEMENT OF CLASS ACTION** |

**TO: ALL PERSONS OR ENTITIES WHO PURCHASED META MATERIALS INC. F/K/A TORCHLIGHT ENERGY RESOURCES, INC. SECURITIES FROM SEPTEMBER 21, 2020 TO JUNE 24, 2022, INCLUSIVE, OR HELD TORCHLIGHT ENERGY RESOURCES, INC. STOCK AT THE TIME OF ITS MERGER WITH METAMATERIAL, INC. ON JUNE 28, 2021.**

PLEASE READ THIS NOTICE CAREFULLY AND IN ITS ENTIRETY. YOUR RIGHTS MAY BE AFFECTED BY PROCEEDINGS IN THIS ACTION. PLEASE NOTE THAT IF YOU ARE A CLASS MEMBER, YOU MAY BE ENTITLED TO SHARE IN THE PROCEEDS OF THE SETTLEMENT DESCRIBED IN THIS NOTICE. TO CLAIM YOUR SHARE OF THE PROCEEDS OF THE SETTLEMENTS, YOU MUST SUBMIT A VALID PROOF OF CLAIM AND RELEASE FORM ("PROOF OF CLAIM") **POSTMARKED OR SUBMITTED ONLINE ON OR BEFORE** __________.

A federal court authorized this Notice. This is not a solicitation from a lawyer.

**Shares and Time Period:** (I) Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc. ("Meta Materials") (MMAT) common stock (CUSIP: 59134N104) and other Meta Materials securities purchased between September 21, 2020 and June 24, 2022, inclusive (the "Class Period"); (II) Torchlight Energy Resources, Inc. ("Torchlight") stock held as of May 5, 2021, the record date for shares eligible to vote on the merger with Metamaterial, Inc.; and (III) Torchlight stock held as of June 28, 2021, the date the merger with Metamaterial, Inc. closed.

**Settlement Fund:** $3,000,000.00 in cash. Your recovery will depend on the amount of shares purchased and the timing of your purchases and any sales. Depending on the number of eligible shares that participate in the settlement and when those shares were purchased and sold, Plaintiffs estimate the average cash recovery per share of common stock will be approximately $0.015 per share (assuming claims representing shares are filed) before deduction of court-approved fees and expenses.

**Reasons for Settlement:** Lead Plaintiffs' principal reason for entering into the settlement is the substantial certain cash benefit for the Settlement Class and the avoidance of the costs and risks associated with continued litigation, including the danger of no recovery for Members of the Class. Defendants are entering into the settlement solely to eliminate the uncertainty, burden and expense of further protracted litigation.

**If the Class Action Had Not Settled:** Continuing with the case could have resulted in dismissal or loss at trial. The two sides do not agree on the amount of money that could have been won if Plaintiffs prevailed at trial. The parties also disagree about: (1) the method for determining whether the price of Meta Materials common stock was artificially inflated during the relevant period; (2) the amount of any such inflation; (3) the extent that various statements and/or omissions alleged by Plaintiffs were materially false or misleading; (4) the extent that various statements and/or omissions alleged by Plaintiffs influenced the trading price of Meta Materials securities during the Class Period; and (5) whether the statements and/or omissions alleged were material, false, misleading, or otherwise actionable under the securities laws.

**Attorneys' Fees and Expenses:** Plaintiffs are represented by Lead Counsel. Lead Counsel has not received any payment for their work investigating the facts, conducting this litigation or negotiating the settlement on behalf of Plaintiffs and the Settlement Class. Court-appointed Lead Counsel will ask the Court for an award of attorneys' fees equal to or less than $1,000,000 which amounts to one-third of the Settlement Fund and reimbursement of out-of-pocket litigation expenses not to exceed $60,000 to be paid from the Settlement Fund. If the above amounts are requested and approved by the Court, the average cost per share of common stock will be $0.00525.

**Deadlines:**

Submit Claim: ______________
Request Exclusion: ______________
File Objection: ______________

**Court Hearing on Fairness of Settlement:** __________

**More Information:** www.MetaMaterialsSecuritiesSettlement.com or

**Claims Administrator:**
Meta Materials Securities Litigation
c/o Strategic Claims Services
600 N. Jackson Street, Suite 205
Media, PA 19063
Toll-free: (866) 274-4004
Fax: (610) 565-7985
info@stategicclaims.net

**Lead Counsel:**
Adam M. Apton, Esq.
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor
New York, New York 10004
aapton@zlk.com

**YOUR LEGAL RIGHTS AND OPTIONS IN THIS CLASS ACTION SETTLEMENT:**

| | |
|---|---|
| **SUBMIT A CLAIM FORM** | The only way to get a payment |
| **EXCLUDE YOURSELF** | Get no payment. This is the only option that allows you to participate in another lawsuit against the Defendants relating to the legal claims in this case. |

| | |
|---|---|
| **OBJECT** | You may write to the Court if you do not like this Settlement. |
| **GO TO A HEARING** | You may ask to speak in Court about the fairness of the settlement. |
| **DO NOTHING** | Get no payment |

These rights and options – ***and the deadlines to exercise them*** – are explained in this Notice.

The Court in charge of this case must decide whether to approve the settlement. Payments will be made if the Court approves the settlement and, if there are any appeals, after appeals are resolved. Please be patient.

**BASIC INFORMATION**

**1. Why Did I Get This Notice Package?**

You or someone in your family may have purchased Meta Materials securities between September 21, 2020 and June 24, 2022, both dates inclusive, or otherwise held Torchlight stock on either May 5, 2021 or June 28, 2021, the record date and closing date for the merger with Metamaterial, Inc., respectively.

The Court ordered that this Notice be sent to you because you have a right to know about a proposed settlement of a class action lawsuit, and about all of your options, before the Court decides whether to approve the settlement. If the Court approves it and after any objections or appeals are resolved, the Claims Administrator appointed by the Court will make the payments that the settlement allows.

This package explains the lawsuit, the settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them.

The Court in charge of the case is the United States District Court for the Eastern District of New York, and the case is known as *In re Meta Materials Inc. Securities Litigation*, Case No. 1:21-cv-07203-CBA-JRC. The person who sued is called the Plaintiff or Plaintiffs, and the company and individuals sued are called Defendants. Defendants have agreed to settle the claims made in this case.

**2. What is this Lawsuit About?**

Plaintiffs filed this lawsuit alleging that Defendants acted with scienter when making false and/or materially misleading statements concerning: (1) Torchlight's merger with Metamaterial, Inc.; (2) the benefits and/or risks associated with the merger; and (3) the development status of Meta Materials' products, including their readiness for commercialization. Plaintiffs allege that false and materially misleading statements induced shareholders to purchase Meta Materials securities at artificially inflated prices and/or vote in favor of Torchlight's merger with Metamaterial, Inc. Plaintiffs further allege that when the truth concerning the development status of Meta Materials' products was revealed, the value of Meta Materials' common stock declined and, as a result, Plaintiffs and other members of the Settlement Class suffered substantial damages. Plaintiffs' allegations in this Litigation are substantially similar to the claims alleged in *Denton, et al. v. Palikaras, et al.*, No. A-23-878134-C (Clark Cty., NV), which will be resolved by way of this settlement, if approved by the Court. Defendants have denied, and continue to deny, each and all of the claims and allegations of wrongdoing made by Plaintiffs in this lawsuit and the *Denton* lawsuit.

**3. Why Is This a Class Action?**

In a class action, one or more people or entities called class representatives sue on behalf of people who have similar claims. Here, all these people are called a Class or Class Members.

One court resolves the issues for all the Class Members, except for those who exclude themselves from the Class. Judge Carol Bagley Amon is in charge of this class action.

**4. Why Is There a Settlement?**

The Court did not decide in favor of Plaintiffs or Defendants. Instead, both sides agreed to a settlement. That way, they avoid the costs of litigation and eligible Settlement Class Members who make valid claims will get compensation. Plaintiffs and their attorneys believe the settlement is best for all Settlement Class Members.

**WHO IS IN THE SETTLEMENT**

To see if you will get money from this settlement, you first have to determine if you are a Settlement Class Member.

**5. How Do I Know if I Am a Part of the Settlement?**

The Settlement Class includes: (a) All Persons that purchased Meta Materials and/or Torchlight publicly traded securities during the Class Period, and were damaged thereby; (b) All holders of Torchlight stock as of the May 5, 2021 record date, eligible to vote on the proposed merger with Metamaterial, Inc. at Torchlight's June 11, 2021 special meeting of shareholders, and were damaged thereby; and (c) All holders of Torchlight stock as of June 28, 2021, the date the proposed merger with Metamaterial, Inc. was consummated, and were damaged thereby.

**6. What Are the Exceptions to Being Included?**

You are not a Settlement Class Member if you are:

- One of the Defendants or their Related Parties;
- An officer, director, or affiliate of Meta Materials;
- A Meta Materials' employee retirement or benefit plan or a participant or beneficiary to the extent you purchased or acquired Meta Materials securities through any such plan(s);

- Any entity in which Defendants have or had controlling interest;
- An Immediate Family member of any excluded person; or
- The legal representative, heir, successor, or assign of any excluded person or entity.

**7. I'm Still Not Sure If I Am Included in the Class Action**

If you are still not sure whether you are included, you can ask for free help. You can contact the Claims Administrator toll-free at (866) 274-4004, or you can fill out and return the Proof of Claim form enclosed with this Notice package, to see if you qualify.

**THE SETTLEMENT BENEFITS – WHAT YOU GET**

**8. What Does the Settlement Provide?**

Defendants have agreed to pay a total of $3,000,000.00 in cash. The Settlement Fund will be divided among all eligible Settlement Class Members who send in valid claim forms, after payment of Court-approved attorneys' fees and expenses and the costs of claims administration, including the costs of printing and mailing this Notice and the cost of publishing notice (the "Net Settlement Fund").

**9. How Much Will My Payment Be?**

Your share of the Net Settlement Fund will depend on several things, including, how many Settlement Class Members submit timely and valid Proof of Claim forms, the total recognized losses represented by the valid Proof of Claim forms that Settlement Class Members send in, the total number of shares of Torchlight and/or Meta Materials common stock or securities you purchased, how much you paid, when you purchased, and if you sold your shares and for how much. By following the instructions in the following Plan of Allocation, you can calculate what is called your Recognized Loss (defined below).

The Plan of Allocation for this Settlement is as follows:

1. The objective of the Plan of Allocation is to equitably distribute the Net Settlement Fund among Authorized Claimants based on their respective alleged economic losses as a result of the alleged misstatements and omissions, as opposed to losses caused by market- or industry-wide factors, or company-specific factors unrelated to the alleged fraud. The Claims Administrator shall determine each Authorized Claimant's share of the Net Settlement Fund based upon the recognized loss formula ("Recognized Loss") described below.

2. A Recognized Loss will be calculated for each share of Torchlight and/or Meta Materials common stock and each call option purchased or otherwise acquired during the Class Period. The calculation of Recognized Loss will depend upon several factors, including when the Meta Materials common stock or call option was purchased or otherwise acquired during the Class Period, and in what amounts, and whether such stock or option was sold (or otherwise disposed of), and if sold, when it was sold, and for what amounts. The Recognized Loss is not intended to estimate the amount a Settlement Class Member might have been able to recover after a trial, nor to estimate the amount that will be paid to Authorized Claimants pursuant to the Settlement. The Recognized Loss is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants. The Claims Administrator will use its best efforts to administer and distribute the Net Settlement Fund to the extent that it is equitably and economically feasible.

3. The Plan of Allocation was created with the assistance of a consulting damages expert and reflects the assumption that the price of Meta Materials common stock was artificially inflated throughout the Class Period. The computation of the estimated alleged artificial inflation in the price of Meta Materials common stock during the Class Period is based on certain misrepresentations alleged by Plaintiffs and the price change in the stock in reaction to the public announcements that allegedly corrected the misrepresentations alleged by Plaintiffs.

4. The U.S. federal securities laws allow investors to recover losses caused by disclosures which corrected the defendants' previous misleading statements or omissions. Thus, in order to have recoverable damages, the corrective disclosure of the allegedly misrepresented information must be the cause of the decline in the price or value of Meta Materials common stock. In this Litigation, Plaintiffs allege that Defendants made false statements and/or omitted material facts during the Class Period, which had the purported effect of artificially inflating the price of Meta Materials common stock. Plaintiffs further allege that corrective disclosures removed artificial inflation from the price of Meta Materials common stock on December 14, 2021 (the "Corrective Disclosure Date"). Thus, in order for a Settlement Class Member to have a Recognized Loss under the Plan of Allocation, Meta Materials common stock and call options must have been purchased or acquired during the Class Period and held during the Corrective Disclosure Date.

5. The operative complaint in the Litigation alleges additional Corrective Disclosure Dates. However, the Court dismissed Plaintiffs' operative complaint and, in turn, the additional Corrective Disclosure Dates alleged therein. The Plan of Allocation is premised on the Corrective Disclosure Date that most accurately coincides with the theory of liability alleged in the operative complaint that provided Settlement Class Members with the greatest probability of success if the Litigation were to have continued.

6. In the calculations below, all purchase and sale prices shall exclude any fees, taxes and commissions. If a Recognized Loss amount is calculated to be a negative number, that

Recognized Loss shall be set to zero. Any transactions in Meta Materials common stock or call options executed outside of regular trading hours for the U.S. financial markets shall be deemed to have occurred during the next regular trading session for the U.S. financial markets.

7. A Recognized Loss will be calculated as set forth below for each purchase of Meta Materials common stock and call option during the Class Period, that is listed in the Proof of Claim and Release form and for which adequate documentation is provided.

**Recognized Loss Calculation – Common Stock**

8. For each share of Torchlight and/or Meta Materials common stock purchased, the Recognized Loss per share shall be calculated as follows:

- For each Torchlight and/or Meta Materials share purchased between September 21, 2020 and December 14, 2021, and:
  - Sold before the opening of trading on December 14, 2021, the Recognized Loss is $0; or
  - Held at the opening of trading on December 14, 2021, the Recognized Loss is your purchase price *minus* $2.91[1] per share.

- For each Meta Materials share purchased on or after December 14, 2021, the Recognized Loss is $0.00.

- For each Torchlight share purchased prior to September 21, 2020 and held as of May 5, 2021 or June 28, 2021, and:
  - Sold before the opening of trading on December 14, 2021, the Recognized Loss is $0; or
  - Continuously held through the opening of trading on December 14, 2021, the Recognized Loss is your purchase price *minus* $2.91 per share.

**Recognized Loss Calculation – Call Options**

9. For each Meta Materials' call option purchased, the Recognized Loss per option shall be calculated as follows:

- For each Meta Materials call option not held at the opening of trading on December 14, 2021, the Recognized Loss is $0.00.

- For each Meta Materials call option purchased between September 21, 2020 and December 14, 2021, and held at the opening of trading on December 14, 2021, the Recognized Loss is the purchase price *minus* the intrinsic value of the Meta Materials call option on the date of exercise, where the intrinsic value shall be *the greater of*: (i) $0.00 or (ii) $2.91 per share *minus* the strike price of the option.

---

[1] $2.91 is the closing price of Meta Materials common stock on December 14, 2021 (*i.e.*, the Corrective Disclosure Date).

10. No Recognized Loss shall be calculated based upon the purchase or acquisition of any Meta Materials call option that had been previously sold or written.

11. **Maximum Recovery for Call Options:** Settlement proceeds available for Meta Materials call options purchased or otherwise acquired during the Class Period shall be limited to a total amount equal to 9.0% of the Net Settlement Fund.[2]

**INSTRUCTIONS APPLICABLE TO ALL CLAIMANTS**

12. The payment you receive will reflect your proportionate share of the Net Settlement Fund. Such payment will depend on the number of eligible securities that participate in the Settlement, and when those securities were purchased and sold. The number of claimants who send in claims varies widely from case to case.

13. A purchase or sale of Meta Materials common stock or call option shall be deemed to have occurred on the "contract" or "trade" date as opposed to the "settlement" or "payment" date.

14. Acquisition by Gift, Inheritance, or Operation of Law: If a Settlement Class Member acquired Meta Materials common stock or call options during the Class Period by way of gift, inheritance or operation of law, such a claim will be computed by using the date and price of the original purchase and not the date and price of transfer.

15. Notwithstanding any of the above, receipt of Meta Materials common stock or call options during the Class Period in exchange for securities of any other corporation or entity shall not be deemed a purchase or sale of Meta Materials common stock or call options.

16. The first-in-first-out ("FIFO") basis will be applied to purchases and sales. Sales will be matched in chronological order, by trade date, first against like Meta Materials securities held as of the close of trading on September 20, 2020 (*i.e.*, the last trading day before the Class Period begins) and then against the purchases of like Meta Materials securities during the Class Period.

17. The date of covering a "short sale" is deemed to be the date of purchase of shares. The date of a "short sale" is deemed to be the date of sale of shares. In accordance with the Plan of Allocation, however, the Recognized Loss on "short sales" is zero. In the event that a claimant has an opening short position in Meta Materials common stock, the earliest Class Period purchases shall be matched against such opening short position and not be entitled to a recovery until that short position is fully covered.

18. If a Settlement Class Member has "written" Meta Materials call options, thereby having a short position in the call options, the date of covering such a written position is deemed

[2] Meta Materials call option trading accounted for approximately 9.0% of total losses for Meta Materials common stock and call options during the Class Period. Consequently, claims for Meta Materials call option transactions are limited to 9.0% of the Settlement pursuant to the Plan of Allocation.

to be the date of purchase or acquisition of the call option. The date on which the call option was written is deemed to be the date of sale of the call option. In accordance with the Plan of Allocation, however, the Recognized Loss on "written" Meta Materials call options is zero. In the event that a Claimant has an opening written position in Meta Materials call options, the earliest purchases or acquisitions of like-call options during the Class Period shall be matched against such opening written position, and shall not be entitled to a recovery, until that written position is fully covered.

19. With respect to Meta Materials common stock purchased through the exercise of a call or put option,[3] the purchase date of Meta Materials common stock shall be the exercise date of the option and the purchase price shall be the closing price of Meta Materials common stock on the exercise date. Any Recognized Loss arising from purchases of Meta Materials common stock acquired during the Class Period through the exercise of an option on Meta Materials common stock shall be computed as provided for other purchases of Meta Materials common stock in the Plan of Allocation. The submission of Claims for such purchases of Meta Materials common stock acquired during the Class Period through the exercise of an option on Meta Materials common stock shall otherwise be subject to the same requirements described in this Notice and the Plan of Allocation for submitting a Claim for other purchases of Meta Materials common stock.

20. Payment according to the Plan of Allocation will be deemed conclusive against all Authorized Claimants. A Claimant's "Recognized Claim" under the Plan of Allocation shall be the sum of his, her or its Recognized Loss amounts. The Claims Administrator shall allocate to each Authorized Claimant a *pro rata* share of the Net Settlement Fund based on his, her, or its Recognized Claim as compared to the total Recognized Claims of all Authorized Claimants. No distribution will be made to Authorized Claimants who would otherwise receive a distribution of less than $15.00.

21. Settlement Class Members who do not submit an acceptable Proof of Claim and Release form will not share in the Settlement proceeds. The Stipulation and the Judgment dismissing this Litigation will nevertheless bind Settlement Class Members who do not submit a request for exclusion or submit an acceptable Proof of Claim and Release.

22. Please contact the Claims Administrator or Lead Counsel if you disagree with any determinations made by the Claims Administrator regarding your Recognized Loss. If you are unsatisfied with the determinations, you may ask the Court, which retains jurisdiction over all Settlement Class Members and the claims-administration process, to decide the issue by submitting a written request.

23. Defendants, their respective counsel, and all other Released Persons will have no responsibility or liability whatsoever for the investment of the Settlement Fund, the distribution of the Net Settlement Fund, the Plan of Allocation, or the payment of any claim. Plaintiff and Lead

[3] Including (1) purchases of Meta Materials common stock as the result of the exercise of a call option, and (2) purchases of Meta Materials common stock by the seller of a put option as a result of the buyer of such put option exercising that put option.

Counsel likewise will have no liability for their reasonable efforts to execute, administer, and distribute the Settlement.

24. Distributions will be made to Authorized Claimants after all claims have been processed and after the Court has finally approved the Settlement. If any funds remain in the Net Settlement Fund by reason of uncashed distribution checks or otherwise, then, after the Claims Administrator has made reasonable and diligent efforts to have Settlement Class Members who are entitled to participate in the distribution of the Net Settlement Fund cash their distributions, any balance remaining in the Net Settlement Fund after at least six (6) months after the initial distribution of such funds will be used in the following fashion: (i) first, to pay any amounts mistakenly omitted from the initial disbursement; (ii) second, to pay any additional settlement administration fees, costs, and expenses, including those of Lead Counsel as may be approved by the Court; and (c) finally, to make a second distribution to claimants who cashed their checks from the initial distribution and who would receive at least $15.00, after payment of the estimated costs, expenses, or fees to be incurred in administering the Net Settlement Fund and in making this second distribution, if such second distribution is economically feasible.

## HOW YOU GET A PAYMENT – SUBMITTING A CLAIM FORM

### 10. How Will I Get a Payment?

To qualify for payment, you must be an eligible Settlement Class Member and you must send in a claim form. A claim form is enclosed with this Notice. Read the instructions carefully, fill out the form, include all the documents the form asks for, sign it, and mail it postmarked no later than __________ to the Claims Administrator at the address listed above or submit the electronic version by 11:59 p.m. EST on __________ at www.MetaMaterialsSecuritiesSettlement.com.

### 11. When Will I Get My Payment?

The Court will hold a hearing on __________, to decide whether to approve the settlement. If Judge Carol Bagley Amon approves the class action settlement, there may be appeals. It is always uncertain whether these appeals can be resolved, and resolving them can take time, perhaps several years. Everyone who sends in a claim form will be informed of the determination with respect to their claim. Please be patient.

### 12. What Am I Giving Up to Get a Payment or Stay in the Class?

Unless you exclude yourself, you are staying in the Settlement Class, and that means that you cannot sue, continue to sue, or be part of any other lawsuit against the Defendants about the same legal issues in this case, including but not limited to the action styled *Denton, et al. v. Palikaras, et al.*, No. A-23-878134-C (Clark Cty., NV). It also means that all of the Court's Order will apply to you and legally bind you and you will release your claims in this case against the Defendants. The terms of the release are included in the claim form that is enclosed.

**EXCLUDING YOURSELF FROM THE SETTLEMENT**

If you do not want a payment from this settlement, but you want to keep the right to sue or continue to sue any of the Defendants on your own about the same legal issues in this case, then you must take steps to get out of the Settlement Class. This is called excluding yourself or is sometimes referred to as opting out of the Settlement Class.

**13. How Do I Get Out of the Settlement Class?**

To exclude yourself form the Settlement Class, you must send a letter by mail stating that you want to be excluded from the Settlement in *In re Meta Materials Inc. Securities Litigation*, No. 1:21-cv-07203-CBA-JRC (E.D.N.Y.). You must include your name, address, telephone number, signature, and your transactions in Torchlight and/or Meta Materials securities from September 21, 2020 to June 24, 2022, both dates inclusive. You must include the dates, quantities, and prices associated with your transactions. You must mail your exclusion request postmarked no later than __________ to:

Meta Materials Securities Litigation
c/o Strategic Claims Services
600 N. Jackson Street, Suite 205
Media, PA 19063

If you ask to be excluded, you are not eligible to get any settlement payment, and you cannot object to the settlement. You will not be legally bound by anything that happens in this lawsuit.

**14. If I Do Not Exclude Myself, Can I Sue the Defendants for the Same Thing Later?**

No. Unless you exclude yourself, you give up any right to sue the Defendants for the claims resolved by the class action settlement. If you have a pending lawsuit against any of the Defendants, speak to your lawyer in that case immediately. Remember the exclusion deadline is __________.

**15. If I Exclude Myself, Can I Get Money from This Settlement?**

No. If you exclude yourself, do not send in a claim form. But, you may sue, continue to sue, or be part of a different lawsuit against any of the Defendants. You should consult with a lawyer concerning your rights prior to excluding yourself from the Settlement.

**THE LAWYERS REPRESENTING YOU**

**16. Do I Have a Lawyer in This Case?**

The Court appointed the law firm of Levi & Korsinsky, LLP to represent you and other Settlement Class Members. These lawyers are called Lead Counsel. You will not be charged for the services of these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

**17. How Will the Lawyers Be Paid?**

Plaintiffs' Counsel will ask the Court for attorneys' fees of up to one-third of the Settlement Fund ($1,000,000) and for reimbursement of their out-of-pocket litigation expenses up to $60,000 that were advanced in connection with the Litigation, plus interest. Such sums as may be approved

by the Court will be paid from the Settlement Fund. Settlement Class Members are not personally liable for any such fees or expenses.

The attorneys' fees and expenses requested will be the only payment to Lead Counsel for their efforts in achieving this settlement and for the risk in undertaking this representation on a wholly contingent basis. To date, Lead Counsel has not been paid for their services for conducting this litigation on behalf of the Lead Plaintiff and Settlement Class nor for their substantial out-of-pocket expenses. The fees requested will compensate Lead Counsel for their work in achieving the Settlement Fund and is well within the range of fees awarded to class counsel under similar circumstances in other cases of this type. The Court may award less than this amount.

Lead Counsel will also request an award in an amount not to exceed a total of $10,000 for the Plaintiffs and potentially other plaintiff representatives as reimbursement for their time and expenses serving as the representative plaintiffs during this Litigation. All amounts, including expenses incurred by the Claims Administrator for disseminating notice of this settlement, will be requested before distribution of the Net Settlement Fund to Settlement Class Members. Again, such sums as may be approved by the Court will be paid from the Settlement Fund.

## OBJECTING TO THE SETTLEMENT

You can tell the Court that you do not agree with the settlement or some part of it.

### 18. How Do I Tell the Court that I Do Not Like the Settlement?

If you are a Settlement Class Member, you can object to the settlement if you do not like any part of it. You can give reasons why you think the Court should not approve it. The Court will consider your views. To object, you must send a letter to the Court saying that you object to the settlement in *In re Meta Materials Inc. Securities Litigation*, No. 1:21-cv-07203-CBA-JRC (E.D.N.Y.). Be sure to include your name, address, telephone number, the reasons you object to

the Settlement, and your transactions in Torchlight and/or Meta Materials securities from September 21, 2020 to June 24, 2022, both dates inclusive. You must include the dates, quantities, and prices associated with your transactions. Any objection to the settlement must be filed with the Court no later than __________.

**19. What's the Difference Between Objecting and Excluding?**

Objecting is simply telling the Court that you do not like something about the settlement. You can object ***only if*** you stay in the Settlement Class. Excluding yourself is telling the Court that you do not want to be part of the Settlement Class. If you exclude yourself, you have no basis to object because the case no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the settlement. You may attend and you may ask to speak, but you do not have to.

**20. When and Where Will the Court Decide Whether to Approve the Settlement?**

The Court will hold a fairness hearing at ____ __.m., on ______, in Courtroom 10D S at the United States District Court for the New York Eastern District, 225 Cadman Plaza East Brooklyn, New York 11201. At this hearing the Court will consider whether the settlement of the Litigation is fair, reasonable, and adequate. If there are objections, the Court will consider them. Judge Carol Bagley Amon will listen to people who have asked to speak at the hearing. The Court will also consider how much to pay to Lead Counsel and whether an award to the Plaintiffs is appropriate. The Court may decide these issues at the hearing or take them under consideration. We do not know how long these decisions will take.

**21. Do I Have to Come to the Hearing?**

No. Lead Counsel will answer questions Judge Carol Bagley Amon may have. But, you are welcome to come at your own expense. If you send an objection, you do not have to come to Court to talk about it. As long as you mailed your written objection on time, the Court will consider it. You may also pay your own lawyer to attend, but it is not necessary.

**22. May I Speak at the Hearing?**

You may ask the Court for permission to speak at the Settlement Hearing. To do so, you must send a letter saying that it is your intention to appear in *In re Meta Materials Inc. Securities Litigation*, No. 1:21-cv-07203-CBA-JRC (E.D.N.Y.). Be sure to include your name, address, telephone number, and your transactions in Torchlight and/or Meta Materials securities from September 21, 2020 to June 24, 2022, both dates inclusive. You must include the dates, quantities, and prices associated with your transactions. You cannot speak at the hearing if you exclude yourself from the Settlement Class.

**IF YOU DO NOTHING**

**23. What Happens if I Do Nothing At All?**

If you do nothing, you will get no money from this Settlement. But, unless you exclude yourself, you will not be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against the Defendants about the same legal issues in this case.

**GETTING MORE INFORMATION**

**24. Are There More Details About the Settlement?**

This Notice summarizes the proposed settlement. More details are in the Stipulation of Settlement dated __________. You can get a copy of the Stipulation or more information about the Settlement by visiting www.MetaMaterialsSecuritiesSettlement.com.

You can also contact the Claims Administrator:

Meta Materials Securities Litigation
c/o Strategic Claims Services
600 N. Jackson Street, Suite 205
Media, PA 19063
toll-free: (866) 274-4004
fax: (610) 565-7985
email: info@strategicclaims.net

Or Lead Counsel

Levi & Korsinsky, LLP
Attn: Adam M. Apton
33 Whitehall Street, 17th Floor
New York, New York 10004
Telephone: (212) 363-7500
Email: aapton@zlk.com

You can also obtain a copy from the Clerk's Office during regular business hours:

Clerk of Court
United States District Court for the New York Eastern District
225 Cadman Plaza East
Brooklyn, NY 11201

**DO NOT TELEPHONE THE COURT OR DEFENDANTS' COUNSEL REGARDING THIS NOTICE**

**SPECIAL NOTICE TO NOMINEES**

If you hold shares of any Torchlight and/or Meta Materials security: (i) purchased from September 21, 2020 to June 24, 2022, both dates inclusive, or (ii) held as of May 5, 2021 or June 28, 2021 (regardless of when they were purchased), then, within ten (10) days after you received this Notice, you must either: (1) send a copy of the Postcard Notice by first class mail to all such beneficial owners; or (2) provide a list of names, addresses and email addresses of such Persons to the Claims Administrator; or (3) send a link to the location of the Long Notice and Proof of Claim and email the link to Settlement Class Members:

Meta Materials Securities Litigation
c/o Strategic Claims Services
600 N. Jackson Street, Suite 205
Media, PA 19063

If you choose to mail the Postcard Notice yourself, you may obtain from the Claims Administrator (without cost to you) as many additional copies of these documents as you will need to complete the mailing.

Regardless of whether you choose to complete the mailing or emailing yourself or elect to have the mailing performed for you, you may seek reimbursement of their reasonable expenses actually incurred up to a maximum of $0.03 per name, address and email address provided to the Claims Administrator; or up to $0.03 per Postcard Notice mailed, plus postage at the rate used by the Claims Administrator; or up to $.03 per email sent.

**DATED: ______________, 2024**

**BY ORDER OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**EXHIBIT A-2**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE META MATERIALS INC. SECURITIES LITIGATION | Case No. 1:21-cv-07203-CBA-JRC<br>**PROOF OF CLAIM AND RELEASE** |

## I. GENERAL INSTRUCTIONS

1. To recover as a member of the Settlement Class based on your claims in the action entitled *In re Meta Materials Inc. Securities Litigation*, Case No. 1:21-cv-07203-CBA-JRC (the "Litigation"), you must complete and, on pages _____ hereof, sign this Proof of Claim and Release. If you fail to file a properly addressed (as set forth in paragraph 3 below) Proof of Claim and Release, your claim may be rejected and you may be precluded from any recovery from the Settlement Fund created in connection with the proposed settlement of the Litigation.[1]

2. Submission of this Proof of Claim and Release, however, does not assure that you will share in the proceeds of settlement in the Litigation.

3. YOU MUST SUBMIT AN ELECTRONIC VERSION OR MAIL YOUR COMPLETED AND SIGNED PROOF OF CLAIM AND RELEASE ON OR BEFORE ________________, ADDRESSED AS FOLLOWS:

Meta Materials Securities Litigation
c/o Strategic Claims Services

[1] Unless otherwise stated, all terms used in this Proof of Claim and Release shall have the same meanings as set forth in the Stipulation of Settlement filed with the Court.

600 N. Jackson Street, Suite 205
Media, PA 19063

4. If you are a Class Member, you are bound by the terms of any judgment entered in the Action, WHETHER OR NOT YOU SUBMIT A PROOF OF CLAIM AND RELEASE FORM unless you timely and validly request exclusion from the Settlement Class pursuant to the Notice.

## II. CLAIMANT IDENTIFICATION

1. If you purchased or acquired Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc. ("Meta Materials") securities and held the certificate(s) in your name, you are the beneficial purchaser or acquirer as well as the record purchaser or acquirer. If, however, the certificate(s) were registered in the name of a third party, such as a nominee or brokerage firm, you are the beneficial purchaser and the third party is a record purchaser.

2. Use Part I of this form entitled "Claimant Identification" to identify each purchaser of record ("nominee"), if different from the beneficial purchaser of Meta Materials securities which form the basis of this claim. THIS CLAIM MUST BE FILED BY THE ACTUAL BENEFICIAL PURCHASER OR PURCHASERS, OR THE LEGAL REPRESENTATIVE OF SUCH PURCHASER OR PURCHASERS OF THE HUMANIGEN SECURITIES UPON WHICH THIS CLAIM IS BASED.

3. All joint purchasers must sign this claim. Executors, administrators, guardians, conservators and trustees must complete and sign this claim on behalf of Persons represented by them; their authority must accompany this claim and their titles or capacities must be stated. The Social Security (or taxpayer identification) number and telephone number of the beneficial owner may be used in verifying the claim. Failure to provide the foregoing information could delay verification of your claim or result in rejection of the claim.

## III. CLAIM FORM

1. Use Part II of this form entitled "Schedule of Transactions in Meta Materials Securities" to supply all required details of your transaction(s). If you need more space or additional schedules, attach separate sheets giving all of the required information in substantially the same form. Sign and print or type your name on each additional sheet.

2. On the schedules, provide all of the requested information with respect to ***all*** of your purchases or acquisitions and ***all*** of your sales of Torchlight and/or Meta Materials securities which took place at any time between September 21, 2020 and December 14, 2021, inclusive, whether such transactions resulted in a profit or a loss. If you purchased Torchlight stock prior to September 21, 2020 and held those shares through December 14, 2021, provide the same information as requested above. Failure to report all such transactions may result in the rejection of your claim.

3. List each transaction in the Class Period separately and in chronological order by trade date, beginning with the earliest. You must accurately provide the month, day, and year of each transaction you list. For call option transactions, you must also provide type of contract (*e.g.*, call or put), number of contracts, maturity date, strike price, and transaction type (*e.g.*, buy to open, buy to close, sell to open, sell to close).

4. Broker confirmations or other documentation of your transactions in Torchlight and/or Meta Materials securities should be attached to your claim. Failure to provide this documentation could delay verification of your claim or result in rejection of your claim. For shares of Torchlight held as of September 20, 2020, you need to provide the cost basis of these shares.

5. The above requests are designed to provide the minimum amount of information necessary to process the simplest claims.

6. NOTICE REGARDING INSTITUTIONAL FILERS: Representatives with

authority to file on behalf of (a) accounts of multiple Settlement Class Members and/or (b) institutional accounts with large numbers of transactions ("Representative Filers") must submit information regarding their transactions in an electronic spreadsheet format. If you are a Representative Filer, you must contact the Claims Administrator at efile@strategicclaims.net or visit their website at www.strategicclaims.net/institutional-filers/ to obtain the required file layout. Claims which are not submitted in electronic spreadsheet format and in accordance with the Claims Administrator's instructions may be subject to rejection. All Representative Filers MUST also submit a manually signed Proof of Claim and Release, as well as proof of authority to file (see Item 3 of the Claimant Identification), along with the electronic spreadsheet format. No claims submitted in electronic spreadsheet format will be considered to have been properly submitted unless the Claims Administrator issues to the Claimant a written acknowledgment of receipt and acceptance of electronically submitted data.

7. NOTICE REGARDING ONLINE FILING: Claimants who are not Representative Filers may submit their claims online using the electronic version of the Proof of Claim and Release hosted at www.MetaMaterialsSecuritiesSettlement.com. If you are not acting as a Representative Filer, you do not need to contact the Claims Administrator prior to filing; you will receive an automated e-mail confirming receipt once your Proof of Claim and Release has been submitted. If you are unsure if you should submit your claim as a Representative Filer, please contact the Claims Administrator at info@strategicclaims.net or (866) 274-4004. If you are not a Representative Filer, but your claim contains a large number of transactions, the Claims Administrator may request that you also submit an electronic spreadsheet showing your transactions to accompany your Proof of Claim and Release.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

*In re Meta Materials Inc. Securities Litigation*

Case No. 1:21-cv-07203-CBA-JRC

PROOF OF CLAIM AND RELEASE

Must be Postmarked No Later Than

_____________, 202__

Please Type or Print

PART I: CLAIMANT IDENTIFICATION

| | | |
|---|---|---|
| Beneficial Owner Name | | |
| Record Owner Name | | |
| Address | | |
| | | |
| City | State | Zip Code |
| Foreign Province | Foreign Country | |
| Telephone Number (Work) | Telephone Number (Home) | |
| Email | | |
| Social Security Number (for individuals): | OR | Taxpayer Identification Number (for estates, trusts, corporations, etc.): |

Claimant Account Type (check appropriate box):

☐ Individual (includes joint owner accounts) ☐ Pension Plan ☐ Trust
☐ Corporation ☐ Estate
☐ IRA/401K ☐ Other ______ (please specify)

PART II: SCHEDULE OF TRANSACTIONS IN COMMON STOCK

A. Number of shares of Meta Materials and/or Torchlight common stock held at the close of trading on September 20, 2020: ________. . The Cost Basis of these shares is: ____________.

B. Purchases of common stock prior to the close of trading on December 14, 2021:

| | **Trade Date Mo. Day Year** | **Number of Shares Purchased** | **Price per Share** | **Total Purchase Price** |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |

C. Sales of common stock prior to the close of trading on December 14, 2021, inclusive:

| | **Trade Date Mo. Day Year** | **Number of Shares Sold** | **Price per Share** | **Total Sale Price** |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |

D. Number of shares of Meta Materials common stock held at the close of trading on December 14, 2021: _____________

If you require additional space, attach extra schedules in the same format as above. Please attach extra schedules for option transactions that contain the information requested above in Section III. Sign and print your name on each additional page.

PART III: SCHEDULE OF TRANSACTIONS IN CALL OPTIONS

A. Separately list all positions in Meta Materials and/or Torchlight Call Option contracts in which you had an open interest as of the close of trading on September 20, 2020:

| **Strike Price** | **Expiration Date** | **Number of Call Option Contracts** |
|---|---|---|
| | | |
| | | |
| | | |

B. Separately list each and every purchase/acquisition (including free receipts) of Call Option contracts from after the opening of trading on September 21, 2020,

through and including the opening of trading on December 14, 2021:

| **Transaction Type (Buy to Open/Buy to Close)** | **Purchase Date** | **Strike Price** | **Expiration Date** | **Number of Call Option Contracts** | **Purchase/ Acquisition Price Per Call Option Contract** | **Total Purchase/ Acquisition Price** | **Exercised /Assigned /Expired** | **Exercise /Assign/Expired Date** |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

C. Separately list each and every sale/disposition (including free deliveries) of Call Options from after the opening of trading on September 21, 2020, through and including the opening of trading on December 14, 2021:

| **Transaction Type (Sell to Open/Sell to Close)** | **Sale Date** | **Strike Price** | **Expiration Date** | **Number of Call Option Contracts** | **Sale Price Per Call Option Contract** | **Total Sale Price** | **Exercised/Assigned/Expired** | **Exercise/Assign/Expired Date** |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

D. Separately list all positions in Call Option contracts in which you had an open interest as of the opening of trading on December 14, 2021:

| **Strike Price** | **Expiration Date** | **Number of Call Option Contracts** |
|---|---|---|
| | | |
| | | |
| | | |

If you require additional space, attach extra schedules in the same format as above. Please attach extra schedules for option transactions that contain the information requested above in Section III. Sign and print your name on each additional page.

YOU MUST READ AND SIGN THE RELEASE ON PAGE ____. FAILURE TO SIGN

THE RELEASE MAY RESULT IN A DELAY IN PROCESSING OR THE REJECTION OF YOUR CLAIM.

## IV. SUBMISSION TO JURISDICTION OF COURT AND ACKNOWLEDGMENTS

I (We) submit this Proof of Claim and Release under the terms of the Stipulation of Settlement, dated as of January ___, 2024 ("Stipulation") described in the Notice. I (We) also submit to the jurisdiction of the United States District Court for the Eastern District of New York, with respect to my (our claim) as a Settlement Class Member (as defined in the Notice) and for purposes of enforcing the release set forth herein. I (We) further acknowledge that I am (we are) bound by and subject to the terms of any judgment that may be entered in the Litigation. I (We) agree to furnish additional information to Lead Counsel to support this claim if required to do so. I (We) have not submitted any other claim covering the same purchases or sales of Meta Materials securities during the Class Period and know of no other Person having done so on my (our) behalf.

## V. RELEASE

1. I (We) hereby acknowledge full and complete satisfaction of, and do hereby fully, finally and forever settle, release, relinquish and discharge all of the Released Plaintiffs' Claims.

2. "Released Plaintiffs' Claims" means any and all claims, demands, rights, liabilities, and causes of action of every nature and description, whether known or Unknown Claims, asserted or unasserted, mature or not mature, contingent or absolute, liquidated or unliquidated, accrued or unaccrued, whether arising under federal, state, statutory, regulatory, common or foreign law concerning, based on, arising out of, or in connection with (i) the purchase, sale, or ownership of Torchlight and/or Meta Materials securities between September 21, 2020 and June 24, 2022, both dates inclusive; and (ii) all claims alleged or that could have been alleged in the Federal and State Actions, including but not limited to any acts or omissions relating to disclosures, public filings,

registration statements, press releases, presentations, or other statements made by the Settling Defendants. The release shall not include any derivative claims asserted by shareholders on behalf of Meta Materials in the related shareholder derivative action, captioned *Hines v. Palikaras, et al.*, Case No. 1:22-cv-00248-CBA-JRC (E.D.N.Y.).

3. "Unknown Claims" means any and all Released Claims which Settling Plaintiffs, Plaintiffs' Counsel, any Settlement Class Members, Settling Defendants, or Settling Defendants' counsel do not know or suspect to exist in his, her, its, or their favor at the time of the release which, if known by him, her, it, or them might have affected his, her, its, or their settlement with and release of the Settling Parties, or might have affected his, her, its, or their decision(s) with respect to the Settlement. Unknown Claims include those Released Claims in which some or all of the facts comprising the claim may be suspected, or that may be undisclosed or hidden. With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, Settling Plaintiffs and the Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, expressly waived and relinquished the provisions, rights, and benefits conferred by or under California Civil Code § 1542, or any other law of the United States or any state or territory of the United States, or principle of common law that is similar, comparable, or equivalent to § 1542, which provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Settling Plaintiffs acknowledge that they may hereafter discover facts in addition to or different from those which they or their counsel now knows or believes to be true with respect to the subject matter of the Released Claims, but the Settling Plaintiffs shall expressly settle and release, and

each Settlement Class Member upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. The Settling Parties acknowledge, and the Settlement Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and is a key element of the Settlement of which this release is a part.

4. This release shall be of no force or effect unless and until the Court approves the Settlement set forth in the Stipulation and it becomes effective on the Effective Date.

5. I (We) hereby warrant and represent that I (we) have not assigned or transferred or purported to assign or transfer, voluntarily or involuntarily, any matter released pursuant to this release or any other part or portion thereof.

6. I (We) hereby warrant and represent that I (we) have included information about all of my (our) transactions in Meta Materials and/or Torchlight securities that occurred prior to or during the Class Period, as necessary, and the number and type of Meta Materials securities held by me (us) on September 21, 2020 and December 14, 2021.

7. I (We) certify that I am (we are) not subject to backup withholding under the provisions of Section 3406(a)(1)(C) of the Internal Revenue Code.

*Note: If you have been notified by the Internal Revenue Service that you are subject to backup withholding, please strike out the language that you are not subject to backup withholding*

*in the certification above.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing information supplied by the undersigned is true and correct.

Executed this __________ day of _____________________, 202__ in ____________________________.
(Month/Year) (City/State/Country)

______________________________
(Sign your name here)

______________________________
(Type or print your name here)

______________________________
(Capacity of person(s) signing e.g., Beneficial Purchaser, Executor or Administrator)

______________________________
(Sign your name here)

______________________________
(Type or print your name here)

______________________________
(Capacity of person(s) signing e.g., Beneficial Purchaser, Executor or Administrator)

**ACCURATE CLAIMS PROCESSING TAKES A SIGNIFICANT AMOUNT OF TIME. THANK YOU FOR YOUR PATIENCE.**

Reminder Checklist:
1. Please sign the above release and declaration.
2. If this Claim is being made on behalf of Joint Claimants, then both must sign.
3. Remember to attach copies of supporting documentation if available.
4. Do not send originals of certificates.
5. Keep a copy of your claim form and all supporting documentation for your records.
6. If you desire an acknowledgement of receipt of your claim form, please send it Certified Mail, Return Receipt Requested.
7. If you move, please send your new address to the address below.
8. Do not use red pen or highlighter on the Proof of Claim and Release form or supporting documentation.

**THIS PROOF OF CLAIM FORM MUST SENT NO LATER THAN ________.**

**By electronic version at www.MetaMaterialsSecuritiesSettlement.com**.

**By Mail:**
**Meta Materials Securities Litigation**
**c/o Strategic Claims Services**
**600 N. Jackson Street, Suite 205**
**Media, PA 19063**

**EXHIBIT A-3**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE META MATERIALS INC. SECURITIES LITIGATION | Case No. 1:21-cv-07203-CBA-JRC<br>**SUMMARY NOTICE** |

**TO: ALL PERSONS OR ENTITIES WHO PURCHASED META MATERIALS INC. F/K/A/ TORCHLIGHT ENERGY RESOURCES, INC. SECURITIES FROM SEPTEMBER 21, 2020 TO JUNE 24, 2022, INCLUSIVE, OR HELD TORCHLIGHT ENERGY RESOURCES, INC. STOCK AT THE TIME OF ITS MERGER WITH METAMATERIAL, INC. ON JUNE 28, 2021.**

**YOU ARE HEREBY NOTIFIED,** pursuant to Rule 23 of the Federal Rules of Civil Procedure that a hearing will be held on _____________, 202__, at ___:00 __.m., before the Honorable Carol Bagley Amon, United States District Judge, in Courtroom 10D S at the United States District Court for the New York Eastern District Courthouse, 225 Cadman Plaza East, Brooklyn, New York 11201, for the purpose of determining, among other things,: (1) whether the proposed Settlement of the claims in the Litigation for the sum of $3,000,000.00 in cash should be approved by the Court as fair, reasonable and adequate to the Members of the Settlement Class; (2) whether, thereafter, the Litigation should be dismissed with prejudice as set forth in the Stipulation of Settlement dated January 19, 2024 ("Stipulation"); (3) whether the Plan of Allocation is fair, reasonable and adequate and therefore should be approved; and (4) whether the application of Lead Counsel for the payment of attorneys' fees and reimbursement of expenses incurred in connection with the Litigation and awards to the Plaintiffs should be approved.

If you purchased Meta Materials securities between September 21, 2020 and June 24, 2022, both dates inclusive, or held Torchlight Energy Resources, Inc. stock at the time of Torchlight's merger with Metamaterial, Inc. on June 28, 2021, your rights may be affected by the settlement of this Litigation. If you have not received the detailed Notice of Pendency and Proposed Settlement of Class Action (the "Notice") and a copy of the Proof of Claim and Release Form, you may obtain them free of charge by contacting the Claims Administrator, by mail at: *In re Meta Materials Inc. Securities Litigation*, c/o Strategic Claims Services, 600 N. Jackson Street, Suite 205, Media, PA 19063.

If you are a member of the Settlement Class and wish to share in the distribution of the Settlement Fund, you must submit a Proof of Claim no later than ________, establishing that you are entitled to recovery. As further described in the Notice, you will be bound by any Judgment entered in the Litigation, regardless of whether you submit a Proof of Claim, unless you exclude yourself from the Settlement Class, in accordance with the procedures set forth in the Notice, no later than _________. Any objections to the Settlement, Plan of Allocation or attorneys' fees and expenses must be filed and served, in accordance with the procedures set forth in the Notice, no later than _________.

Inquiries, other than requests for the Notice, may be made to Lead Counsel for the Settlement Class: Adam M. Apton, Esq., Levi & Korsinsky, LLP, 33 Whitehall Street, 17th Floor, New York, New York 10004, aapton@zlk.com.

**INQUIRIES SHOULD NOT BE DIRECTED TO THE COURT, THE CLERK'S OFFICE, THE DEFENDANTS, OR DEFENDANTS' COUNSEL.**

If you have any questions about the Settlement, you may contact Lead Counsel at the address listed above.

**DATED: ______________, 2024**

**BY ORDER OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**EXHIBIT A-4**

In re Meta Materials Inc. Securities Litigation
c/o _____________
[Insert]

[Postage Prepaid]

***COURT-ORDERED LEGAL NOTICE***

**Important Notice about a Securities Class Action Settlement.**

**You may be entitled to a CASH payment. This Notice may affect your legal rights. Please read it carefully.**

*In re Meta Materials Inc. Securities Litigation*
Case No. 1:21-cv-07203

Name
Address
City, State
Zip

***THIS CARD PROVIDES ONLY LIMITED INFORMATION ABOUT THE SETTLEMENT. PLEASE VISIT WWW.METAMATERIALSSECURITIESSETTLEMENT.COM FOR MORE INFORMATION.***

There has been a proposed Settlement of claims against Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc. ("Meta Materials"), George Palikaras, Greg McCabe, John Brda, and Kenneth Rice (collectively, the "Defendants"). The Settlement would resolve a lawsuit in which Plaintiffs allege Defendants disseminated materially false and misleading information to the investing public about Meta Materials between September 21, 2020 and June 24, 2022, inclusive (the "Class Period") in violation of the federal securities laws and related claims alleging breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty asserted against Defendants, Alexandre Zyngier, Robert Lance Cook, and Michael Graves in a separate lawsuit styled *Denton, et al. v. Palikaras, et al.*, No. A-23-878134-C (Clark Cty., NV). Defendants, including the additional defendants in the *Denton* lawsuit, deny any wrongdoing. You received this Postcard Notice because you or someone in your family may have (i) purchased or otherwise acquired Meta Materials securities during the Class Period, (ii) held Torchlight stock as of May 5, 2021 and was eligible to vote on the proposed merger between Torchlight and Metamaterial, Inc. at Torchlight's June 11, 2021 special meeting of shareholders, or (iii) held Torchlight stock as of June 28, 2021, the date the proposed merger with Metamaterial, Inc. was consummated.

Defendants have agreed to pay a Settlement Amount of $3,000,000. The Settlement provides that the Settlement Fund, after deduction of any Court-approved attorneys' fees and expenses, notice and administration costs, and taxes, is to be divided among all Settlement Class Members who submit a valid Proof of Claim, in exchange for the settlement of this case and the Released Claims by Settlement Class Members. **For all details of the Settlement, read the Stipulation and full Notice, available at www.MetaMaterialsSecuritiesSettlement.com.**

Your share of the Settlement proceeds will depend on the number of valid Claims submitted, and the number, size and timing of your transactions in Meta Materials securities. If every eligible Settlement Class Member submits a valid Proof of Claim Form, the average recovery will be $0.015 per eligible share before expenses and other Court-ordered deductions. Your award will be determined *pro rata* based on the number of claims submitted. This is further explained in the detailed Notice found on the Settlement website.

**To qualify for payment, you must submit a Proof of Claim Form**. The Proof of Claim Form can be found on the website www.MetaMaterialsSecuritiesSettlement.com or will be mailed or emailed to you upon request to the *In re Meta Materials Inc. Securities Litigation*, c/o Strategic Claims Services, 600 N. Jackson Street, Suite 205, Media, PA 19063, (866) 274-4004. **Proof of Claim Forms must be submitted online or postmarked by __________**. If you do not want to be legally bound by the Settlement, you must exclude yourself by _______, or you will not be able to sue the Defendants about the legal claims in this case. If you exclude yourself, you cannot get money from this Settlement. If you want to object to the Settlement, you may file an objection by __________. The detailed Notice explains how to submit a Proof of Claim Form, exclude yourself or object.

The Court will hold a hearing in this case on ______________ to consider whether to approve the Settlement and a request by the lawyers representing the Settlement Class for up to one-third of the Settlement Fund in attorneys' fees, plus actual expenses up to $60,000 for litigating the case and negotiating the Settlement, and awards to Plaintiffs and other plaintiff representatives be approved up to $10,000. You may attend the hearing and ask to be heard by the Court, but you do not have to. For more information, call toll-free (866) 274-4004 or visit the website www. www.MetaMaterialsSecuritiesSettlement.com and read the detailed Notice.

**EXHIBIT B**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

IN RE META MATERIALS INC. SECURITIES LITIGATION

Case No. 1:21-cv-07203-CBA-JRC

**[PROPOSED] FINAL JUDGMENT AND ORDER OF DISMISSAL WITH PREJUDICE**

**WHEREAS**, a consolidated class action is pending before the Court entitled *In re Meta Materials Inc. Securities Litigation*, No. 1:21-cv-07203-CBA-JRC (E.D.N.Y.);

**WHEREAS**, (a) Lead Plaintiffs Kaoutar Kajjame, Philip Granite, and Ricardo Joseph, individually and on behalf of the Settlement Class ("Plaintiffs"), and (b) defendants Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc. ("Meta Materials"), George Palikaras, Greg McCabe, John Brda, and Kenneth Rice (collectively, "Defendants"; and together with the Plaintiffs, the "Parties") have determined to settle all claims asserted against Defendants in this Litigation with prejudice on the terms and conditions set forth in the Stipulation of Settlement dated ______________, 2024 (the "Stipulation") subject to the approval of this Court (the "Settlement");

**WHEREAS**, (a) Allen Denton and Menachem Gurevitch, plaintiffs in a related shareholder class action lawsuit alleging claims for breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty, styled *Denton, et al. v. Palikaras, et al.*, No. A-23-878134-C (Clark Cty., NV) (the "State Action") filed in Nevada state court, and (b) Defendants and additional defendants Alexandre Zyngier, Robert Lance Cook, and Michael Graves in the State Action also

have determined to settle all claims asserted in the State Action, as contemplated and comprised by the definition of the Settlement Class in this Action;

**WHEREAS,** this matter came before the Court for hearing pursuant to an Order of this Court, dated ___________, on the application of the Plaintiffs and the Defendants for approval of the Settlement set forth in the Stipulation;

(A) Pursuant to the Preliminary Approval Order entered on ___________ this Court scheduled a Settlement Hearing for ___________, at ____.m., to determine, *inter alia*, whether the proposed Settlement, Plan of Allocation, and requests for Lead Counsel's fees and expenses and requests for Compensatory Awards to Plaintiffs are fair, reasonable, and adequate, and should be approved by the Court (the "Settlement Hearing");

(B) The Court has received affidavit(s) and/or declaration(s) attesting to compliance with the terms of the Preliminary Approval Order, including the mailing of the Notice and publication of the Summary Notice;

(C) The Court has received ___________ objection(s) and/or request(s) for exclusion to the proposed Settlement and Plan of Allocation; and

(D) Due to adequate notice having been given to the Settlement Class as required by the Preliminary Approval Order, and the Court having held a Settlement Hearing on ___________, and the Court having considered all papers filed and proceedings in this Litigation and otherwise being fully informed of the matters herein, and for the reasons stated on the record on ___________ and set forth in more detail in the Court's written opinion, and good cause appearing,

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED**:

1. The provisions of the Stipulation, including definitions of the terms used therein, the Notice, the Summary Notice, and the Postcard Notice, are hereby incorporated by reference as

though fully set forth herein. All capitalized terms used herein have the meanings set forth and defined in the Stipulation.

2. This Court has jurisdiction over the subject matter of this Litigation and over all parties to this Litigation, including all Settlement Class Members.

3. Plaintiffs and all Settlement Class Members (except those who requested exclusion, if any) are bound by this Order and Final Judgment (the "Judgment").

4. The Court finds that the Plaintiffs and Lead Counsel have fairly and adequately represented the Settlement Class both in terms of litigating the Action and for purposes of entering into and implementing the Settlement and have satisfied the requirements of Federal Rules of Civil Procedure 23(a)(4) and 23(g), respectively.

5. This Court finds that the distribution of the Notice and the publication of the Summary Notice, and the notice methodology, all of which were implemented in accordance with the terms of the Stipulation and the Court's Preliminary Approval Order:

(a) Constituted the best practicable notice to Settlement Class Members under the circumstances of this Litigation;

(b) Were reasonably calculated, under the circumstances, to apprise Settlement Class Members of: (i) the proposed Settlement of this Litigation; (ii) their right to exclude themselves from the Settlement Class; (iii) their right to object to any aspect of the proposed Settlement; (iv) their right to appear at the Settlement Hearing, either on their own or through counsel hired at their own expense, if they did not exclude themselves from the Settlement Class; and (v) the binding effect of the proceedings, rulings, orders, and judgments in this Litigation, whether favorable or unfavorable, on all persons not excluded from the Settlement Class;

(c) Were reasonable, fair, and constituted due, adequate, and sufficient notice to all persons entitled to be provided with notice; and

(d) Fully satisfied all applicable requirements of the Federal Rules of Civil Procedure (including Rules 23(c) and (d)), the United States Constitution (including the Due Process Clause), the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(7), the Private Securities Litigation Reform Act of 1995, the Rules of Court, and any other applicable law.

6. The terms and provisions of the Stipulation were negotiated by the parties at arm's length and were entered into by the parties in good faith.

7. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court finds that the Settlement set forth in the Stipulation is fair, reasonable, and adequate as to all members of the Settlement Class, and in the best interests of the Settlement Class taking into account, *inter alia*, the benefits to the Settlement Class; the complexity, expense, and possible duration of further litigation; the risks of establishing liability and damages; and the costs of continued litigation.

8. The Settlement set forth in the Stipulation is hereby finally approved as fair, reasonable and adequate in all respects, in accordance with the terms and provisions therein, and the Plaintiffs and the Settlement Class Members, and all and each of them, are hereby bound by the terms of the Settlement as set forth in the Stipulation.

9. The Plan of Allocation, as described in the Notice, is hereby approved as fair, reasonable and adequate. Any order, proceeding, appeal, modification or change relating to the Plan of Allocation or the Fee and Expense Award shall in no way disturb or affect the finality of this Judgment, and shall be considered separate from this Judgment.

10. Upon the Effective Date, Plaintiffs and the Settlement Class Members, on behalf of themselves, and their heirs, executors, trustees, administrators, predecessors, successors, and assigns, shall be deemed to have, and by operation of the Judgment entered in the Litigation shall have, fully, finally, and forever released, relinquished and discharged any and all Released Plaintiffs' Claims against each and every one of the Released Persons, and shall forever be barred and enjoined, without the necessity of any of the Released Persons posting a bond, from commencing, instituting, prosecuting, or maintaining any of the Released Plaintiffs' Claims.

11. Upon the Effective Date, Defendants, on behalf of themselves, and their heirs, executors, trustees, administrators, predecessors, successors, and assigns, for good and valuable consideration the receipt and adequacy of which is hereby acknowledged, shall fully, finally, and forever release, relinquish, and discharge any and all Released Defendants' Claims against each and every one of Plaintiffs, and shall forever be barred and enjoined, without the necessity of any of the Plaintiffs, posting a bond, from commencing, instituting, prosecuting, or maintaining any of the Released Defendants' Claims against any of the Plaintiffs.

12. Plaintiffs and all Settlement Class Members are hereby forever barred and enjoined from prosecuting the Released Plaintiffs' Claims against the Released Persons.

13. In accordance with 15 U.S.C. § 78u-4(f)(7), claims for contribution arising out of any Released Plaintiffs' Claim, including, but not limited to, any claims that arise out of the Litigation (i) by any Person against a Released Person, and (ii) by any Released Person against any Person other than as set out in 15 U.S.C. § 78u-4(f)(7)(A)(ii) are hereby permanently barred, extinguished, discharged, satisfied, and unenforceable.

14. Any plan of allocation submitted by Lead Counsel or any other order entered regarding the attorneys' fee and expense application shall in no way disturb or affect this Judgment and shall be considered separate from this Judgment.

15. Neither the Stipulation nor the Settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claims, or of any wrongdoing or liability of the Defendants; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Defendants in any civil, criminal, or administrative proceeding in any court, administrative agency or other tribunal. Defendants may file the Stipulation and/or this Judgment in any other action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or similar defense or counterclaim.

16. Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over (a) implementation of this Settlement and any award or distribution of the Settlement Fund, including interest earned thereon; (b) disposition of the Settlement Fund; (c) hearing and determining applications for attorneys' fees and expenses in the Class Action; and (d) all parties hereto for the purpose of construing, enforcing, and administering the Stipulation.

17. Without further approval from the Court, Plaintiffs and Defendants are hereby authorized to agree to and adopt such amendments or modifications of the Stipulation or any exhibits attached thereto to effectuate the Settlement that: (a) are not materially inconsistent with this Judgment; and (b) do not materially limit the rights of Settlement Class Members in connection

with the Settlement. Without further order of the Court, Plaintiffs and Defendants may agree to reasonable extensions of time to carry out any provisions of the Settlement.

18. The Court finds that during the course of the Litigation, Plaintiffs and Defendants, and their respective counsel at all times complied with the requirements of Federal Rule of Civil Procedure 11.

19. In the event that the Settlement does not become effective in accordance with the terms of the Stipulation or the Effective Date does not occur, or in the event that the Settlement Fund, or any portion thereof, is returned to the Defendants, then this Judgment shall be rendered null and void to the extent provided by and in accordance with the Stipulation and shall be vacated and, in such event, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Stipulation.

20. This Litigation is dismissed with prejudice. The parties are to bear their own costs, except as otherwise provided in the Stipulation or this Judgment.

21. The provisions of this Judgment constitute a full and complete adjudication of the matters considered and adjudged herein, and the Court determines that there is no just reason for delay in the entry of this Judgment. The Clerk is hereby directed to immediately enter this Judgment.

**SO ORDERED** in the Eastern District of New York on _____________, 202___.

_________________________________
THE HON. CAROL BAGLEY AMON
UNITED STATES DISTRICT JUDGE

# EXHIBIT I

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE META MATERIALS INC. SECURITIES LITIGATION | Case No. 21-cv-07203-JRC<br><br>**FINAL JUDGMENT AND ORDER OF DISMISSAL WITH PREJUDICE** |

**WHEREAS**, a consolidated class action is pending before the Court entitled *In re Meta Materials Inc. Securities Litigation*, No. 21-cv-07203- JRC (E.D.N.Y.);

**WHEREAS**, (a) Lead Plaintiffs Kaoutar Kajjame, Philip Granite, and Ricardo Joseph, individually and on behalf of the Settlement Class ("Plaintiffs"), and (b) defendants Meta Materials Inc. f/k/a Torchlight Energy Resources, Inc. ("Meta Materials"), George Palikaras, Greg McCabe, John Brda, and Kenneth Rice (collectively, "Defendants"; and together with the Plaintiffs, the "Parties") have determined to settle all claims asserted against Defendants in this Litigation with prejudice on the terms and conditions set forth in the Stipulation of Settlement dated January 19, 2024 (the "Stipulation") (Dkt. 69) subject to the approval of this Court (the "Settlement");

**WHEREAS**, (a) Allen Denton and Menachem Gurevitch, plaintiffs in a related shareholder class action lawsuit alleging claims for breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty, styled *Denton, et al. v. Palikaras, et al.*, No. A-23-878134-C (Clark Cty., NV) (the "State Action") filed in Nevada state court, and (b) Defendants and additional defendants Alexandre Zyngier, Robert Lance Cook, and Michael Graves in the State Action also have determined to settle all claims asserted in the State Action, as contemplated and comprised by the definition of the Settlement Class in this Action;

**WHEREAS,** this matter came before the Court for hearing pursuant to an Order of this

Court, dated February 6, 2024, on the application of the Plaintiffs and the Defendants for approval of the Settlement set forth in the Stipulation;

(A) Pursuant to the Preliminary Approval Order entered on February 6, 2024, this Court scheduled a Settlement Hearing for May 21, 2024, at 10:00 a.m., to determine, *inter alia*, whether the proposed Settlement, Plan of Allocation, and requests for Lead Counsel's fees and expenses and requests for Compensatory Awards to Plaintiffs are fair, reasonable, and adequate, and should be approved by the Court (the "Settlement Hearing");

(B) The Court has received affidavit(s) and/or declaration(s) attesting to compliance with the terms of the Preliminary Approval Order, including the mailing of the Notice and publication of the Summary Notice;

(C) The Court has received zero objections and 223 valid requests for exclusion to the proposed Settlement and Plan of Allocation (listed in Addendum A hereto); and

(D) Due to adequate notice having been given to the Settlement Class as required by the Preliminary Approval Order, and the Court having held a Settlement Hearing on May 21, 2024, and the Court having considered all papers filed and proceedings in this Litigation and otherwise being fully informed of the matters herein, and for the reasons stated on the record on May 21, 2024, and as set forth herein, and good cause appearing,

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED**:

1. The provisions of the Stipulation, including definitions of the terms used therein, the Notice, the Summary Notice, and the Postcard Notice, are hereby incorporated by reference as though fully set forth herein. All capitalized terms used herein have the meanings set forth and defined in the Stipulation.

2. This Court has jurisdiction over the subject matter of this Litigation and over all parties to this Litigation, including all Settlement Class Members.

3. Plaintiffs and all Settlement Class Members (except those who validly requested exclusion, *see* Addendum A) are bound by this Order and Final Judgment (the "Judgment").

4. Pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and for purposes of this Settlement only, the Court hereby certifies a Settlement Class, defined as: (a) All Persons that purchased Meta Materials and/or Torchlight Energy Resources, Inc. ("Torchlight") publicly-traded securities during the Class Period, and were damaged thereby; (b) All holders of Torchlight stock as of the May 5, 2021 record date, eligible to vote on the proposed merger with Metamaterial, Inc. at Torchlight's June 11, 2021 special meeting of shareholders, and were damaged thereby; and (c) All holders of Torchlight stock as of June 28, 2021, the date the proposed merger with Metamaterial, Inc. was consummated, and were damaged thereby. Excluded from the Settlement Class are: (i) Defendants and their Related Parties; (ii) the officers, directors, and affiliates of Meta Materials, at all relevant times; (iii) Meta Materials' employee retirement or benefit plan(s) and their participants or beneficiaries to the extent they purchased or acquired Meta Materials securities through any such plan(s); (iv) any entity in which Defendants have or had controlling interest; (v) Immediate Family members of any excluded person; and (vi) the legal representatives, heirs, successors, or assigns of any excluded person or entity. Also excluded from the Settlement Class are those Persons who validly and timely requested exclusion.

5. With respect to the Settlement Class, this Court finds for purposes of effectuating this settlement that: (a) the Settlement Class Members are so numerous that joinder of all Settlement Class Members in the Litigation is impracticable; (b) there are questions of law and fact common to the Settlement Class which predominate over any individual questions; (c) the claims of the Plaintiffs are typical of the claims of the Settlement Class; (d) Plaintiffs have fairly

and adequately represented and protected the interests of all of the Settlement Class Members; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the controversy, considering: (i) the interests of the members of the Settlement Class in individually controlling the prosecution of the separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by members of the Settlement Class; (iii) the desirability or undesirability of continuing the litigation of these claims in this particular forum; and (iv) the difficulties likely to be encountered in the management of the class action.

6. The Court finds that the Plaintiffs and Lead Counsel have fairly and adequately represented the Settlement Class both in terms of litigating the Action and for purposes of entering into and implementing the Settlement and have satisfied the requirements of Federal Rules of Civil Procedure 23(a)(4) and 23(g), respectively.

7. This Court finds that the distribution of the Notice and the publication of the Summary Notice, and the notice methodology, all of which were implemented in accordance with the terms of the Stipulation and the Court's Preliminary Approval Order:

(a) Constituted the best practicable notice to Settlement Class Members under the circumstances of this Litigation;

(b) Were reasonably calculated, under the circumstances, to apprise Settlement Class Members of: (i) the proposed Settlement of this Litigation; (ii) their right to exclude themselves from the Settlement Class; (iii) their right to object to any aspect of the proposed Settlement; (iv) their right to appear at the Settlement Hearing, either on their own or through counsel hired at their own expense, if they did not exclude themselves from the Settlement Class; and (v) the binding effect of the

proceedings, rulings, orders, and judgments in this Litigation, whether favorable or unfavorable, on all persons not excluded from the Settlement Class;

(c) Were reasonable, fair, and constituted due, adequate, and sufficient notice to all persons entitled to be provided with notice; and

(d) Fully satisfied all applicable requirements of the Federal Rules of Civil Procedure (including Rules 23(c) and (d)), the United States Constitution (including the Due Process Clause), the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(7), the Private Securities Litigation Reform Act of 1995, the Rules of Court, and any other applicable law.

8. The terms and provisions of the Stipulation were negotiated by the parties at arm's length and were entered into by the parties in good faith.

9. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court finds that the Settlement set forth in the Stipulation is fair, reasonable, and adequate as to all members of the Settlement Class, and in the best interests of the Settlement Class taking into account, *inter alia*, the benefits to the Settlement Class; the complexity, expense, and possible duration of further litigation; the risks of establishing liability and damages; and the costs of continued litigation.

10. The Settlement set forth in the Stipulation is hereby finally approved as fair, reasonable and adequate in all respects, in accordance with the terms and provisions therein, and the Plaintiffs and the Settlement Class Members, and all and each of them, are hereby bound by the terms of the Settlement as set forth in the Stipulation.

11. The Plan of Allocation, as described in the Notice, is hereby approved as fair, reasonable and adequate. Any order, proceeding, appeal, modification or change relating to the

Plan of Allocation or the Fee and Expense Award shall in no way disturb or affect the finality of this Judgment, and shall be considered separate from this Judgment.

12. Upon the Effective Date, Plaintiffs and the Settlement Class Members, on behalf of themselves, and their heirs, executors, trustees, administrators, predecessors, successors, and assigns, shall be deemed to have, and by operation of the Judgment entered in the Litigation shall have, fully, finally, and forever released, relinquished and discharged any and all Released Plaintiffs' Claims against each and every one of the Released Persons, and shall forever be barred and enjoined, without the necessity of any of the Released Persons posting a bond, from commencing, instituting, prosecuting, or maintaining any of the Released Plaintiffs' Claims.

13. Upon the Effective Date, Defendants, on behalf of themselves, and their heirs, executors, trustees, administrators, predecessors, successors, and assigns, for good and valuable consideration the receipt and adequacy of which is hereby acknowledged, shall fully, finally, and forever release, relinquish, and discharge any and all Released Defendants' Claims against each and every one of Plaintiffs, and shall forever be barred and enjoined, without the necessity of any of the Plaintiffs, posting a bond, from commencing, instituting, prosecuting, or maintaining any of the Released Defendants' Claims against any of the Plaintiffs.

14. Plaintiffs and all Settlement Class Members are hereby forever barred and enjoined from prosecuting the Released Plaintiffs' Claims against the Released Persons.

15. In accordance with 15 U.S.C. § 78u-4(f)(7), claims for contribution arising out of any Released Plaintiffs' Claim, including, but not limited to, any claims that arise out of the Litigation (i) by any Person against a Released Person, and (ii) by any Released Person against any Person other than as set out in 15 U.S.C. § 78u-4(f)(7)(A)(ii) are hereby permanently barred, extinguished, discharged, satisfied, and unenforceable.

16. Any plan of allocation submitted by Lead Counsel or any other order entered regarding the attorneys' fee and expense application shall in no way disturb or affect this Judgment and shall be considered separate from this Judgment.

17. Neither the Stipulation nor the Settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claims, or of any wrongdoing or liability of the Defendants; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Defendants in any civil, criminal, or administrative proceeding in any court, administrative agency or other tribunal. Defendants may file the Stipulation and/or this Judgment in any other action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or similar defense or counterclaim.

18. Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over (a) implementation of this Settlement and any award or distribution of the Settlement Fund, including interest earned thereon; (b) disposition of the Settlement Fund; (c) hearing and determining applications for attorneys' fees and expenses in the Class Action; and (d) all parties hereto for the purpose of construing, enforcing, and administering the Stipulation.

19. Without further approval from the Court, Plaintiffs and Defendants are hereby authorized to agree to and adopt such amendments or modifications of the Stipulation or any exhibits attached thereto to effectuate the Settlement that: (a) are not materially inconsistent with

this Judgment; and (b) do not materially limit the rights of Settlement Class Members in connection with the Settlement. Without further order of the Court, Plaintiffs and Defendants may agree to reasonable extensions of time to carry out any provisions of the Settlement.

20. The Court finds that during the course of the Litigation, Plaintiffs and Defendants, and their respective counsel at all times complied with the requirements of Federal Rule of Civil Procedure 11.

21. In the event that the Settlement does not become effective in accordance with the terms of the Stipulation or the Effective Date does not occur, or in the event that the Settlement Fund, or any portion thereof, is returned to the Defendants, then this Judgment shall be rendered null and void to the extent provided by and in accordance with the Stipulation and shall be vacated and, in such event, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Stipulation.

22. This Litigation is dismissed with prejudice. The parties are to bear their own costs, except as otherwise provided in the Stipulation or this Judgment.

23. The provisions of this Judgment constitute a full and complete adjudication of the matters considered and adjudged herein, and the Court determines that there is no just reason for delay in the entry of this Judgment. The Clerk is hereby directed to immediately enter this Judgment.

**SO ORDERED**

Dated: Brooklyn, New York
May 22, 2024

s/ James R. Cho
James R. Cho
United States Magistrate Judge

## ADDENDUM A

| | |
|---|---|
| 1 | Bernard Macy |
| 2 | Kuljeet Thind |
| 3 | Peter Lyngstad |
| 4 | Bobby Bryant |
| 5 | Vuong Tran |
| 6 | Kevin Suter |
| 7 | Steven J. Tucker |
| 8 | Oliver Lamar Poole Jr |
| 9 | Kyle Knutson |
| 10 | Jessica Weller |
| 11 | Harold W. Morris |
| 12 | Scott Oeltjen |
| 13 | Raghu Mandava |
| 14 | Lisa Kaufman |
| 15 | Nora A. Galindo |
| 16 | Gary and Carol Barrios |
| 17 | Lloyd Grissom |
| 18 | Bradley Rains |
| 19 | Kahraman C. Karadeniz |
| 20 | Cecilia Belasse |
| 21 | Laura Freed |
| 22 | Nick Oeltjen |
| 23 | Tyler Ayotte |
| 24 | Austin Ayotte |
| 25 | Stephanie Ayotte |
| 26 | Christopher Perdue |
| 27 | Janet Hall |
| 28 | Keegan Bottoms |
| 29 | Wanda and Michael Norgard |
| 30 | Chris Hesby |
| 31 | Michelle Bruent |
| 32 | Gerald G Garcia |
| 33 | William J Hans |
| 34 | Donald VanTongeren |
| 35 | Abdulbaset Shagrun |
| 36 | Cianni Kwon |
| 37 | Chris Schenkel |
| 38 | Dorothy DeMay |
| 39 | Dane Jenkins |

| | |
|---|---|
| 40 | Yiming Mike Liu |
| 41 | Jeffre Feeder |
| 42 | Kevin Root |
| 43 | Leon Notrica |
| 44 | Pawel Chrobak |
| 45 | Timothy Jordan Ohar |
| 46 | Faustino Gabriel Fernandez Mendoza |
| 47 | David Amaya |
| 48 | Fortune Tiger |
| 49 | Theodore Nguyen |
| 50 | John Burge |
| 51 | Kevin Wang |
| 52 | KTJJ Foundation |
| 53 | Rodolfo Luiz Coelho |
| 54 | Tina Wang |
| 55 | Dr. Joseph Ferguson |
| 56 | Aaron Horne |
| 57 | Wayne Galjour |
| 58 | James A. Gribble III |
| 59 | Dena Ann Gregory |
| 60 | David & Sheree Sesok |
| 61 | Jason and Lori Forth |
| 62 | Madilinn Ainsworth |
| 63 | Michael B. Ainsworth |
| 64 | Deborah Jean Allen |
| 65 | Rance Edward Allen |
| 66 | Russell Seekatz |
| 67 | Susan Galjour |
| 68 | Michael J. Wagner |
| 69 | Michael Loftis |
| 70 | Jonathan Alyn Lobas |
| 71 | Diane Loftis |
| 72 | Bryan DeJoode and Katie Welshhons |
| 73 | Angela R Henkens |
| 74 | Jordan Stone |
| 75 | Norma Barnett |
| 76 | Alberto Santoyo |
| 77 | Matt Mlyniec |
| 78 | Stacie Blatz |
| 79 | David Jr. & Samantha Sesok |

| | |
|---|---|
| 80 | Ray Cousino |
| 81 | Marina Ivanova |
| 82 | Laura L. Roberts |
| 83 | Chad Brinegar |
| 84 | Tso-Chien Chou |
| 85 | Wen Fen Lo |
| 86 | Kimberly Kepling |
| 87 | Dustin James Clark |
| 88 | Robert Carpenter JR |
| 89 | Lynne George |
| 90 | John Light |
| 91 | Richard Tinsman |
| 92 | Juan E. Pabon |
| 93 | Steven Simone |
| 94 | Robert Kalina |
| 95 | Donna M. Richburg |
| 96 | Will Lush |
| 97 | John C. Pervel Jr. |
| 98 | Nicole C. Hughes |
| 99 | Andrew Cuccia |
| 100 | Wei Chun Tseng |
| 101 | Christopher Taro Ayabe |
| 102 | Lisa & Dave Buder |
| 103 | Thomas & Laurie Lucas |
| 104 | Skye Bailey |
| 105 | Timothy and Shannon Donoghue |
| 106 | Jason Rolo |
| 107 | Richard S Vencill Jr |
| 108 | Shereen Rogers |
| 109 | Aaron Selders |
| 110 | Todd Poth |
| 111 | Gary Hooper |
| 112 | Carolyn Hooper |
| 113 | Owen Perkins |
| 114 | Alexander Waldruff |
| 115 | Jaime M. Serensits |
| 116 | Joshua Calara |
| 117 | Garret Cote |
| 118 | Michael Ganos |
| 119 | Kathryn Iwahiro |

| | |
|---|---|
| 120 | Matthew Wassmer |
| 121 | Jonathan Leb |
| 122 | Matt Funke |
| 123 | Timothy A. Murray |
| 124 | Jacob Lee Clark |
| 125 | Charles Hill |
| 126 | Cary Wallace |
| 127 | Joe Haddon |
| 128 | Micayla Entrekin |
| 129 | Christopher Entrekin |
| 130 | Laura Entrekin |
| 131 | Ronald J. Schuette |
| 132 | Angela St Clair Lloyd |
| 133 | Corey L. Neal |
| 134 | Melanie R. Medford |
| 135 | Jose L. Garcia |
| 136 | Jose G. Garcia-Rios |
| 137 | James Joshua Oswald |
| 138 | Melanie Hairston |
| 139 | Denny Gonzalez |
| 140 | Zhi Yong Zhong |
| 141 | Douglas Nickerson |
| 142 | Johnna Alvarez |
| 143 | Scott Hooper |
| 144 | Jody McDaniel (Gilletti) |
| 145 | David Fosburgh |
| 146 | Justin Kix |
| 147 | Zuriel A. Cervantes |
| 148 | Anthony Losiniecki |
| 149 | Francis (Frank) H. James |
| 150 | Matthew Callahan |
| 151 | Veerapaneni Srinivasa |
| 152 | Thomas Cody Wheelis |
| 153 | Christopher Ward |
| 154 | Henry Cedeno |
| 155 | Diana Lynn Ultican |
| 156 | Karrie Nesbitt |
| 157 | Patrick Jay Thorson |
| 158 | James Danelski |
| 159 | Emanuella Iwahiro |

| | |
|---|---|
| 160 | Matthew Iwahiro |
| 161 | Roy and Tara Moore |
| 162 | Sunny Gill |
| 163 | Simmy Kaur |
| 164 | Richard W. Currens |
| 165 | Adam Brimmer |
| 166 | Kaitlyn Maloof |
| 167 | Deanne L. Benorden |
| 168 | Marcos Egberto Monteiro |
| 169 | Kurtis Bellamey |
| 170 | Paul M. Damitz |
| 171 | Royland D. Jarrett |
| 172 | Charissa Ann Jarrett |
| 173 | Douglas Collins |
| 174 | Scott Geschwill |
| 175 | Jason Amell |
| 176 | Kris Kersmarki |
| 177 | Shelly Anderson |
| 178 | Niki De Sario |
| 179 | Rosie Parmar |
| 180 | Kerran Seth and Rosie Parmar |
| 181 | Kostas Georgakoulias |
| 182 | Christopher Guzzi |
| 183 | Barbara K. Mabry |
| 184 | Allyson Floyd |
| 185 | Michael Layne |
| 186 | Ricky Osborne |
| 187 | Stuart Fitzgerald |
| 188 | Casey C. Reed |
| 189 | Erik Lien |
| 190 | Ryan Balzanto |
| 191 | Deborah L. Semkowski |
| 192 | Henok Kidane |
| 193 | Steve Ryan Wabeke |
| 194 | James Maffett |
| 195 | Eric Brind |
| 196 | Christopher Thomas Richardson |
| 197 | Stephen Kupchun |
| 198 | Anh Tuan Nguyen |
| 199 | Peter Britton |

| | |
|---|---|
| 200 | Mitchell Iwahiro |
| 201 | Truitt A. Coffman |
| 202 | Jason D. Frost |
| 203 | Ryan J. Kelly |
| 204 | Andrea Alerman Webber |
| 205 | Dana and Nicholas Dybdal-Hargreaves |
| 206 | Cynthia West |
| 207 | Helen Iwahiro |
| 208 | Lisa Marcey |
| 209 | Jason and Teri Smalley |
| 210 | Lisa Lackey |
| 211 | Etienne Tjon-Joe-Pin |
| 212 | Jonathan Gilbert |
| 213 | Larry A. Benorden |
| 214 | Michelle Allen |
| 215 | Jeremy England |
| 216 | Trevor Black |
| 217 | Copper Z Hansen |
| 218 | Anh Khang Phuong |
| 219 | Autumn L. Jones |
| 220 | Michael Fosburgh |
| 221 | Vanessa Eleanor Leigh |
| 222 | Ginette Bowen |
| 223 | Michael Gary Casey |

# EXHIBIT J

**Exhibit 3.2**

**BARBARA K. CEGAVSKE**
**Secretary of State**
**202 North Carson Street**
**Carson City, Nevada 89701-4201**
**(775) 684-5708**
**Website: www.nvsos.gov**

# Certificate, Amendment or Withdrawal of Designation

**NRS 78.1955, 78.1955(6)**

☒ **Certificate of Designation**
☐ **Certificate of Amendment to Designation - Before Issuance of Class or Series**
☐ **Certificate of Amendment to Designation - After Issuance of Class or Series**
☐ **Certificate of Withdrawal of Certificate of Designation**

**TYPE OR PRINT - USE DARK INK ONLY - DO NOT HIGHLIGHT**

| | |
|---|---|
| **1. Entity information:** | Name of entity: Torchlight Energy Resources, Inc.<br>Entity or Nevada Business Identification Number (NVID): E0768622007-2 |
| **2. Effective date and time:** | For Certificate of Designation or Amendment to Designation Only (Optional): Date: Time:<br>(must not be later than 90 days after the certificate is filed) |
| **3. Class or series of stock:** (Certificate of Designation only) | The class or series of stock being designated within this filing:<br>Series A Non-Voting Preferred Stock |
| **4. Information for amendment of class or series of stock:** | The original class or series of stock being amended within this filing: |
| **5. Amendment of class or series of stock:** | ☐ Certificate of Amendment to Designation- Before Issuance of Class or Series<br>As of the date of this certificate no shares of the class or series of stock have been issued. |
| | ☐ Certificate of Amendment to Designation- After Issuance of Class or Series<br>The amendment has been approved by the vote of stockholders holding shares in the corporation entitling them to exercise a majority of the voting power, or such greater proportion of the voting power as may be required by the articles of incorporation or the certificate of designation. |
| **6. Resolution:** Certificate of Designation and Amendment to Designation only) | By resolution of the board of directors pursuant to a provision in the articles of incorporation this certificate establishes OR amends the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of stock.*<br>Designation establishes Series A Non-Voting Preferred Stock. |
| **7. Withdrawal:** | Designation being Withdrawn: Date of Designation:<br>No shares of the class or series of stock being withdrawn are outstanding.<br>The resolution of the board of directors authorizing the withdrawal of the certificate of designation establishing the class or series of stock: * |

| | |
|---|---|
| **8. Signature:** (Required) | X John A. Broda<br>Signature of Officer Date: 6/14/2021 |

* Attach additional page(s) if necessary
This form must be accompanied by appropriate fees.


Revised: 1/1/2019

**TORCHLIGHT ENERGY RESOURCES, INC.**
**CERTIFICATE OF DESIGNATION OF PREFERENCES, RIGHTS AND LIMITATIONS**
**OF**
**SERIES A NON-VOTING PREFERRED STOCK**

PURSUANT TO SECTION 78.1955 OF THE
NEVADA REVISED STATUTES

Pursuant to Section 78.1955 of the Nevada Revised Statutes, the undersigned does hereby certify, on behalf of Torchlight Energy Resources, Inc., a Nevada corporation, that the following resolution was duly adopted by the board of directors of the Torchlight Energy Resources, Inc. ("Company"), pursuant to Article 3 of the Articles of Incorporation of the Company, as amended.

**WHEREAS**, the Amended and Restated Articles of Incorporation of the Company (the "Articles of Incorporation") authorizes the issuance of up to 200,000,000 shares of preferred stock, par value $0.001 per share, of the Company ("Preferred Stock") in one or more series, which Preferred Stock shall have such distinctive designation or title, voting powers or no voting powers, and such designations, preferences, limitations, restrictions and relative rights, as shall be stated in such resolution or resolutions providing for the issuance of such class or series of Preferred Stock as may be adopted from time to time by the board of directors of the Company (the "Board") prior to the issuance of any shares thereof;

**WHEREAS**, it is the desire of the Board to establish and fix the number of shares to be included in a new series of Preferred Stock and the powers, designations, preferences, limitations, restrictions and relative rights of the shares of such new series.

**NOW, THEREFORE, BE IT RESOLVED**, that the Board does hereby provide for the issue of a series of Preferred Stock and does hereby in this Certificate of Designation (this "Certificate of Designation") establish and fix and herein state and express the powers, designations, preferences, limitations, restrictions and relative rights of such series of Preferred Stock as follows:

**TERMS OF PREFERRED STOCK**

Section 1. Definitions. For the purposes hereof, the following terms shall have the following meanings:

"Acquisition" means the acquisition by the Company of all of the outstanding shares of Metamaterial Inc., a corporation existing under the laws of the Province of Ontario, by way of a statutory plan of arrangement pursuant to the Business Corporations Act (*Ontario*), pursuant to the Arrangement Agreement dated as of December 14, 2020, by and among the Company, Metamaterial Inc., 2798832 Ontario Inc., a corporation existing under the laws of the Province of Ontario and 2798831 Ontario Inc., a corporation existing under the laws of the Province of Ontario (the "Arrangement Agreement").

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 405 of the Securities Act of 1933, as amended.

"Articles of Incorporation" has the meaning set forth in the Recitals.

"Asset Sale Dividend" means a Net Proceeds Dividend, a Holdback Dividend or a Spin-Off Dividend, as applicable.

"Asset Sale Expiration Date" means the earlier of (i) December 31, 2021 or (ii) the date which is six (6) months from the closing of the Acquisition, or such later date as may be agreed between the Company and the Preferred Representative (pursuant to and as defined in the Side Letter).

"Asset Sale Transaction" means one or more transactions consummated at any time prior to the Asset Sale Expiration Date pursuant to which the Company or any of its Affiliates sells, farms out or otherwise transfers to a third party some or all of the Carved-Out Assets. For the avoidance of doubt, more than one Asset Sale Transaction may occur for purposes of this Certificate of Designation.

"Board" has the meaning set forth in the Recitals.

"Business Day" means any day other than a Saturday, Sunday, a day which is a federal legal holiday in the United States, or a day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close; provided, however, for clarification, commercial banks shall not be deemed to be authorized or required by law to remain closed due to "stay at home," "shelter-in-place," "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the electronic funds transfer systems (including for wire transfers) of commercial banks in the City of New York are generally open for use by customers on such day.

"Carved-Out Assets" means any assets that are used or held for use in the Company's oil and gas exploration business as described in the Company Disclosure Documents.

"Certificate of Designation" has the meaning set forth in the Recitals.

"Claimable Company Business Costs" has the meaning set forth in Section 8.

"Common Stock" means the common stock, par value $0.001 per share, of the Company.

"Company Disclosure Documents" means all information, disclosure, forms, reports, schedules, statements, certifications and other documents, including without limitation all press releases, forms, reports, schedules, financial statements and notes and schedules to such financial statements, management's discussion and analysis of financial condition and results of operations, certifications, annual information forms, management information circulars, material change reports, business acquisition reports and other documents publicly disclosed or filed by the Company with the Securities and Exchange Commission and Nasdaq since January 1, 2020 and through the closing of the Acquisition.

"Fundamental Transaction" means at any time while the Series A Preferred Stock is outstanding, (i) the Company, directly or indirectly, in one or more related transactions effects any merger or consolidation of the Company with or into another Person, (ii) the Company, directly or indirectly, effects any sale, lease, license, assignment, transfer, conveyance or other disposition of all or substantially all of its assets in one or a series of related transactions, (iii) any direct or indirect purchase offer, tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to sell, tender or exchange their shares for other securities, cash or property and has been accepted by the holders of fifty percent (50%) or more of the outstanding Common Stock, (iv) the Company, directly or indirectly, in one or more related transactions effects any reclassification, reorganization or recapitalization of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for cash or property, or (v) the Company, directly or indirectly, in one or more related transactions consummates a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person whereby such other Person acquires more than fifty percent (50%) of the outstanding shares of Common Stock (not including any shares of Common Stock held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock or share purchase agreement or other business combination); provided, that in each of the foregoing transactions or series of transactions, each shall only be deemed a Fundamental Transaction if such other Person acquires more than fifty percent (50%) of voting securities of the Company's or its successors' (or the ultimate parent entity following a reorganization) voting securities, or all or substantially all of the Company's assets.

"Holder" means a holder of shares of Series A Preferred Stock.

"Holdback Amount" means, with respect to any Asset Sale Transaction, an amount equal to ten percent (10%) of the Net Proceeds from such Asset Sale Transaction.

"Indemnifiable Amounts" has the meaning set forth in Section 8.

"Holdback Dividend" has the meaning set forth in Section 3(a).

"Liquidation" has the meaning set forth in Section 5.

"Net Proceeds" means an aggregate amount (without duplication) equal to the sum of: (i) all consideration actually received by the Company or its Affiliates as consideration from a third party in exchange for taking title to the Carved-Out Assets and consummation of an Asset Sale Transaction, plus (ii) the amount of cash remaining from financing activities undertaken by the Company prior to the closing of the Acquisition as permitted pursuant to Section 5.3(b)(i) of the Arrangement Agreement (which, for the avoidance of doubt, does not include such amounts raised pursuant to Section 2.16 and Section 6.3(j) of the Arrangement Agreement), after the payment of transaction costs and expenses incurred by the Company or its Affiliates in connection with the Acquisition, and other accrued liabilities of the Company as contemplated by Section 6.3(k) of the Arrangement Agreement, less (iii) all out-of-pocket costs and expenses incurred by the Company or its Affiliates to third parties for the negotiation, entry into and consummation of the Acquisition (solely to the extent unpaid as of the closing of the Acquisition) and such Asset Sale Transaction, including any amounts paid for indemnification, costs of investigation, costs of defense and settlement, expert fees, broker fees, finder's fees, advisory fees, accountant or legal counsel fees and disbursements incurred by the Company in connection with the Acquisition (solely to the extent unpaid as of the closing of the Acquisition) and such Asset Sale Transaction, less (iv) any applicable sales, income and other taxes incurred by the Company or its Affiliates in respect of the performance of the Company's obligations under or otherwise in connection with an Asset Sale Transaction, payment of the Asset Sale Dividends or the Carved-Out Assets, less (v) any liabilities of the Company actually incurred in connection with any Asset Sale Transaction, Asset Sale Dividend or the Carved-Out Assets, less (vi) any payments to holders of debt securities of the Company that are outstanding immediately prior to the Acquisition and are not converted into equity prior to or in connection with the Acquisition, less (vii) any change of control, severance, compensation or other payments to any employee, officer or other service provider triggered in connection with the Acquisition (solely to the extent unpaid as of the closing of the Acquisition), less (viii) any amount paid or due and payable with respect to the senior secured debt of RTO Acquiror held by The David A. Straz Jr. Foundation and by The David A. Straz, Jr. Irrevocable Trust DTD 11/11/1986, in the event such debt is not converted or repaid in full prior to the closing of the Acquisition (collectively, (iii) through (viii) above shall be referred to herein as "Company Business Costs"). For the avoidance of doubt, amounts placed in escrow, earnout or contingent or other post-closing payments, including milestone or royalty payments, in connection with an Asset Sale Transaction will not be considered Net Proceeds unless (and only to the extent that) such amounts are actually received by the Company.

"Net Proceeds Dividend" has the meaning set forth in Section 3(a).

"Per Share Holdback Amount" means, with respect to an Asset Sale Transaction, the amount obtained by dividing (i) the Holdback Amount with respect to such Asset Sale Transaction by (ii) the total number of shares of Series A Preferred Stock outstanding as of the record date fixed in connection with the applicable Net Proceeds Dividend.

"Per Share Holdback Dividend Amount" means, with respect to a Holdback Dividend, (i)(A) the Holdback Amount from the applicable Asset Sale Transaction less (B) all Indemnifiable Amounts deducted from such Holdback Amount, divided by (ii) the total number of shares of Series A Preferred Stock outstanding as of the record date fixed in connection with the applicable Holdback Dividend.

"Per Share Net Proceeds" means, with respect to an Asset Sale Transaction, the amount obtained by dividing (i) the Net Proceeds from such Asset Sale Transaction by (ii) the total number of shares of Series A Preferred Stock outstanding as of the record date fixed in connection with the applicable Net Proceeds Dividend.

"Per Share Net Proceeds Dividend Amount" means, with respect to a Net Proceeds Dividend, the Per Share Net Proceeds less the Per Share Holdback Amount.

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"Remaining Assets" means (i) any Carved-Out Assets that have not been sold, farmed out or otherwise transferred by the Company or its Subsidiaries to a third party or are not otherwise subject to an Asset Sale Transaction as of the Asset Sale Expiration Date and (ii) any cash referred to in clause (ii) of the definition of "Net Proceeds" that is remaining as of the Asset Sale Expiration Date, less any amounts necessary to pay the reasonable out-of-pocket costs and expenses incurred by the Company in connection with the Spin-Off Dividend.

"Preferred Stock" has the meaning set forth in the Recitals.

"Preferred Stock End Date" has the meaning set forth in Section 3(e).

"Series A Preferred Stock" has the meaning set forth in Section 2.

"Side Letter" means that certain letter agreement, dated as of the date hereof, between the Company and Preferred Representative (as defined therein), which relates to the subject matter hereof.

"Spin-Off Dividend" has the meaning set forth in Section 3(a).

Section 2. Designation, Amount and Par Value. There shall be a series of Preferred Stock that shall be designated as "Series A Non-Voting Preferred Stock" (the "Series A Preferred Stock") and the number of shares constituting such series shall be 175,000,000. Each share of Series A Preferred Stock shall have a par value of $0.001 per share. The shares of Series A Preferred Stock shall only be issued and maintained in the form of securities held in book-entry form.

Section 3. Dividends.

a) Asset Sale Dividends. Conditioned upon, and subject to (i) the consummation of the Acquisition, (ii) with respect to clauses (A) and (B) below, the consummation of one or more Asset Sale Transactions prior to the Asset Sale Expiration Date, and (iii) a determination by the Board that a distribution is not prohibited pursuant to applicable provisions of the Nevada Revised Statutes (including Section 78.288 thereof) or other applicable law (including any law requiring the affirmative vote of all or any portion of the shareholders of the Company to effectuate any such dividend, in which event such dividend shall be conditioned upon obtaining such vote), Holders shall be entitled to receive from time to time and without interest, and the Company shall pay, in respect of each share of Series A Preferred Stock, the following dividends: (A) an amount equal to the Per Share Net Proceeds Dividend Amount, payable as set forth in Section 3(b)(i) ("Net Proceeds Dividends"), (B) an amount equal to the Per Share Holdback Dividend Amount, payable as set forth in Section 3(b)(ii) ("Holdback Dividends") and (C) if applicable and subject to Section 3(c), pro rata equity in a spin-off entity to which the Company will transfer any Remaining Assets (and associated Company Business Costs) ("Spin-Off Dividend"), in each case in accordance with Section 3(b) and the terms of the Side Letter.

b) Payment of Asset Sale Dividends.

(i) Net Proceeds Dividends shall be paid no later than the thirtieth (30th) day following the receipt and final determination (in accordance with the Side Letter) of Net Proceeds by the Company from an Asset Sale Transaction. For clarity, multiple Asset Sale Dividends may be paid in respect of one Asset Sale Transaction in the event that the Company receives Net Proceeds from an Asset Sale Transaction in multiple installments (as a result of post-closing payments, release of escrowed funds or otherwise). Notwithstanding the foregoing, except as set forth in Section 5, the Company shall not be required to pay a Net Proceeds Dividend until the earlier of (A) such time as the aggregate amount of Asset Sale Dividends then accrued is greater than $2,000,000 or (B) such time as the Company has no Remaining Assets.

(ii) Holdback Dividends shall be paid within ten (10) days of the final determination of the Per Share Holdback Dividend Amount with respect to the applicable Asset Sale Transaction. Notwithstanding the foregoing, except as set forth in Section 5, the Company shall not be required to pay a Holdback Dividend until the earlier of (A) such time as the aggregate amount of Asset Sale Dividends then accrued is greater than $2,000,000 or (B) such time as the Company has no Remaining Assets.

(iii) In the event there are any Remaining Assets at the earlier of the Asset Sale Expiration Date or immediately prior to the Preferred Stock End Date, then the Spin-Off Dividend shall be paid as soon as reasonably practicable following the Asset Sale Expiration Date, or immediately prior to the Preferred Stock End Date, as applicable, in each case subject to applicable law, securities registration exemption and the terms of the Side Letter.

c) Withholding and Holdback. The Company will be entitled to deduct and withhold, or cause to be deducted or withheld, from any Asset Sale Dividend payable to a Holder, such amounts as the Company is required to deduct and withhold with respect to the making of such payment under the United States Internal Revenue Code, as amended, or any provision of non-U.S., state or local tax law. To the extent that amounts are so deducted or withheld, such withheld amounts shall be paid over to or deposited with the relevant governmental entity and will be treated for all purposes of this Certificate of Designation as having been paid to the Holder in respect of which such deduction and withholding was made. To the extent any Asset Sale Dividend is paid or otherwise distributed in property other than cash, including in connection with a Spin-Off Dividend, the Company may retain or be provided and sell an amount or proportion of such property (or, in the event of a Spin-Off Dividend, an amount of Remaining Assets) sufficient to permit the Company (i) to make any such required deduction and withholding in cash, and (ii) pay any applicable sales, income and other taxes incurred by the Company or its Affiliates in connection with such Asset Sale Dividend (including, for the avoidance of doubt, in connection with any sale contemplated by clause (i) or this clause (ii)). Further, the Company will be entitled to deduct and hold back, or cause to be deducted or held back, from any Net Proceeds Dividend payable to a Holder, the Per Share Holdback Amount with respect to the applicable Asset Sale Transaction.

d) No Payment if No Asset Sale Transactions Are Effected. Holders shall not be entitled to any Assets Sale Dividends if no Asset Sale Transactions are effected prior to the Asset Sale Expiration Date; provided, however, that the Spin-Off Dividend will be paid, subject to applicable law, securities registration exemption and the terms of the Side Letter.

e) Cancellation of Series A Preferred Stock. Immediately upon the later of (i) the payment of all Asset Sale Dividends in respect of all Asset Sale Transactions consummated prior the Asset Sale Expiration Date or (ii) the payment of all Spin-Off Dividends (subject to applicable law, securities registration exemption and the terms of the Side Letter), or immediately prior to or concurrent with the consummation of a Liquidation or a Fundamental Transaction (but subject to compliance with Section 5 hereof prior to the consummation of or concurrent with such Liquidation or Fundamental Transaction) (any such time, the "Preferred Stock End Date"), each share of Series A Preferred Stock shall, automatically and without any action on the part of the holder thereof, cease to be outstanding and shall be cancelled and returned to the status of authorized but unissued shares of Preferred Stock and shall no longer be designated as Series A Preferred Stock, and any holder thereof shall thereafter cease to have any rights with respect to such shares.

Section 4. Voting Rights. Except as otherwise provided herein or as otherwise required by Chapter 78 of the Nevada Revised Statutes, the Series A Preferred Stock shall have no voting rights. However, as long as any shares of Series A Preferred Stock are outstanding, the Company shall not, without the affirmative vote of the Holders of a majority of the then outstanding shares of the Series A Preferred Stock, (a) alter or change adversely the powers, preferences or rights given to the Series A Preferred Stock under this Certificate of Designation, (b) amend its articles of incorporation or other organizational documents, including this Certificate of Designation or the Side Letter, in any manner that adversely affects any rights of the Holders in a way that is material and disproportionate to other shareholders of the Company, (c) increase the number of authorized shares of Series A Preferred Stock (other than as a result of a pro rata stock split or similar corporate action), or (d) enter into any agreement with respect to any of the foregoing, the effectiveness of which is not conditioned on obtaining such vote. Any vote required or permitted under this Section 4 may be taken at a meeting of the Holders or through the execution of an action by written consent in lieu of such meeting, provided that the consent is executed by Holders representing a majority of the outstanding shares of Series A Preferred Stock. For the avoidance of doubt, the Company shall be permitted to amend, cancel or rescind this Certificate of Designation (including by filing a Certificate of Withdrawal of Certificate of Designation with the Nevada Secretary of State pursuant to Section 78.1955(6) of the Nevada Revised Statutes) at such time as no shares of Series A Preferred Stock are outstanding (including following the cancellation thereof as described in Section 3(e) hereof).

Section 5. Liquidation and Fundamental Transactions. In the event of a liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary (a "Liquidation"), or a Fundamental Transaction, in each case occurring prior to the cancellation of the Series A Preferred Stock pursuant to clause (i) or (ii) of Section 3(e), after, in the case of a Liquidation, the payment or adequate provision for the payment of the Company's liabilities and obligations, the Holders shall be entitled to receive an amount equal to any accrued and unpaid Net Proceeds Dividends and Holdback Dividends then owed under this Certificate of Designation, and a Spin-Off Dividend of any Remaining Assets immediately prior to the consummation of the Liquidation or Fundamental Transaction, for each share of Series A Preferred Stock, before any distribution or payment shall be made to the holders of any Common Stock. If, in the case of a Liquidation, the assets of the Company shall be insufficient to pay in full such amounts, then the entire assets to be distributed to the Holders shall be ratably distributed among the Holders in accordance with the respective amounts that would be payable on such shares if all amounts payable thereon were paid in full. In the event that (a) the Spin-Off Dividend referred to in the preceding sentence cannot be paid as a result of applicable law, lack of securities registration exemption or the terms of the Side Letter, or (b) it is otherwise reasonably determined by the Company, after consultation with the Preferred Representative, that the payment of such Spin-Off Dividend would materially impede or jeopardize the timely completion of a Fundamental Transaction, then the Company shall distribute to the Holders, prior to the consummation of the applicable Liquidation or Fundamental Transaction and in lieu of such Spin-Off Dividend, an amount of cash, equity or a combination thereof, in the same form and proportion as the consideration to be received by the holders of Common Stock in such Fundamental Transaction (or, in the case of a Liquidation, other property), having an equivalent value to the Remaining Assets (as mutually agreed by the Company and the Preferred Representative), in which event all such requirements of this Section 5 shall be deemed satisfied with respect thereto. For the avoidance of doubt, none of the Acquisition or any Asset Sale Transaction shall be deemed a Liquidation. The Holders shall not be entitled to any rights in respect of a Liquidation or Fundamental Transaction except as set forth in this Section 5.

Section 6. Redemption. The shares of Series A Preferred Stock shall not be redeemable; provided, however, that the foregoing shall not limit the ability of the Company to offer to purchase, purchase or otherwise deal in such shares for consideration in the Company's sole discretion, nor shall the foregoing limit a Holder's ability to transfer any of its shares of Series A Preferred Stock to the Company for any or no consideration.

Section 7. Series A Preferred Stock Register. The Company shall maintain at its principal executive offices a register for the Series A Preferred Stock, in which the Company shall record (a) the name, address, electronic mail address and facsimile number of each holder in whose name the shares of Series A Preferred Stock have been issued and (b) the name, address, electronic mail address and facsimile number of each transferee of any shares of Series A Preferred Stock. The Company may treat the Person in whose name any share of Series A Preferred Stock is registered on the register as the owner and holder thereof for all purposes. The Company shall keep the register open and available at all times during business hours for inspection by any holder of Series A Preferred Stock or his, her or its legal representatives.

Section 8. Indemnification. With respect to each Asset Sale Transaction, the Holdback Amount shall be available to indemnify, defend and hold harmless the Company and its Affiliates, including but not limited to its officers, directors, employees and representatives, from (a) any Company Business Costs actually incurred and not otherwise previously deducted in the calculation of Net Proceeds with respect to such Asset Sale Transaction ("Claimable Company Business Costs") and (b) any losses actually incurred by the Company or any of its Affiliates in respect of claims for indemnification made by any Person pursuant to the definitive agreement for such Asset Sale Transaction, solely to the extent that the Company or any of its Affiliates is required to pay such losses out-of-pocket after the exhaustion by the Person claiming indemnification of any holdback or escrowed funds, rights of set-off, or other sources of recovery which are specifically provided for in the applicable definitive agreements with respect to the relevant Asset Sale Transaction, in respect of such claim for indemnification (such out-of-pocket losses, together with Claimable Company Business Costs, "Indemnifiable Amounts"). Any such indemnification shall be sought and recovered in accordance with the terms of the Side Letter.

Section 9. Stock Split. If the Company effects a stock split or stock combination of the Common Stock, then the Preferred Stock may be proportionally split or combined, at the sole discretion of the Company without any further action by any Holder or the Holders together.

Section 10. Side Letter. Substantially contemporaneously with the filing of this Certificate of Designation, the Company has entered into the Side Letter setting forth certain terms with respect to the matters described herein. As permitted by Section 78.195(4) of the Nevada Revised Statutes, to the extent actions are taken or determinations made in accordance with the terms of the Side Letter, such actions or determinations shall be deemed in compliance with, and satisfy the requirements of, this Certificate of Designation with respect to any related or applicable obligation of the Company or right of any Holder under this Certificate of Designation.

Section 11. Notice to Holders. Any notice or other communication required or permitted by the provisions of this Certificate of Designation to be given to a holder of shares of Series A Preferred Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Company, or given by electronic communication in compliance with the provisions of Chapter 78 of the Nevada Revised Statutes, and shall be deemed sent upon such mailing or electronic transmission.

Section 12. No Other Rights or Privileges. Except as specifically set forth herein, the Holders shall have no other rights, privileges or preferences with respect to the Series A Preferred Stock.

**RESOLVED, FURTHER**, that the Chairman, the president or any vice-president, and the secretary or any assistant secretary, of the Company be and they hereby are authorized and directed to prepare and file this Certificate of Designation of Preferences, Rights and Limitations in accordance with the foregoing resolution and the provisions of the Nevada Revised Statutes.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the undersigned has executed this Certificate this 14th day of June, 2021.

Name: John A. Brda
Title: President and Chief Executive Officer

*[Signature Page to Certificate of Designation of Series A Preferred Stock of Torchlight Energy Resources, Inc.*

*090403*

**BARBARA K. CEGAVSKE**
**Secretary of State**
**202 North Carson Street**
**Carson City, Nevada 89701-4201**
**(775) 684-5708**
**Website: www.nvsos.gov**

# Certificate of Correction

(PURSUANT TO NRS CHAPTERS 78, 78A, 80, 81, 82, 84, 86, 87, 87A, 88, 88A, 89 AND 92A)

**USE BLACK INK ONLY - DO NOT HIGHLIGHT**

**ABOVE SPACE IS FOR OFFICE USE ONLY**

**Certificate of Correction**

**(Pursuant to NRS Chapters 78, 78A, 80, 81, 82, 84, 86, 87, 87A, 88, 88A, 89 and 92A)**

1. The name of the **entity** for which correction is being made:

Torchlight Energy Resources, Inc.

2. Description of the original document for which correction is being made:

Certificate of Designation of Preferences, Rights and Limitations of Series A Non-Voting Preferred Stock

3. Filing date of the original document for which correction is being made: 06/14/2021

4. Description of the inaccuracy or defect:

Section 2 of the Certificate of Designation provided for an incorrect number of authorized shares constituting the Series A Non-Voting Preferred Stock. 175,000,000 authorized shares was incorrect.

5. Correction of the inaccuracy or defect:

Section 2. Designation, Amount and Par Value. There shall be a series of Preferred Stock that shall be designated as “Series A Non-Voting Preferred Stock” (the “Series A Preferred Stock”) and the number of shares constituting such series shall be 199,500,000. Each share of Series A Preferred Stock shall have a par value of $0.001 per share. The shares of Series A Preferred Stock shall only be issued and maintained in the form of securities held in book-entry form.

6. Signature:

x [signature]

| **Authorized Signature** | **Title *** | **Date** |
|---|---|---|
| | President and CEO | 06/15/2021 |

* If entity is a corporation, it must be signed by an officer if stock has been issued, OR an incorporator or director if stock has not been issued; a limited-liability company, by a manager or managing members; a limited partnership or limited-liability limited partnership, by a general partner; a limited-liability partnership, by a managing partner; a business trust, by a trustee.

**IMPORTANT:** Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

*This form must be accompanied by appropriate fees.*

**PRINT**

Nevada Secretary of State Correction
Revised: 1-5-15