IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| TODD TARGGART, individually and on behalf of all others similarly situated, | § | |
| Plaintiff, | § | Case No. 4:24-cv-00767-P |
| v. | § | |
| NEXT BRIDGE HYDROCARBONS, INC., ROBERT L. COOK, CLIFTON DUBOSE, JR., JOSEPH DEWOODY, LUCAS T. HAWKINS, DELVINA OELKERS, MIA PITTS, KRISTIN WHITLEY, GREGORY MCCABE, and JOHN BRDA, | § | |
| Defendants. | § | |

# PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FILED BY DEFENDANT JOHN BRDA

# TABLE OF CONTENTS

INTRODUCTION ..... 1

STATEMENT OF FACTS ..... 2

A. John Brda. ..... 2

B. The Special Dividend. ..... 3

C. MMTLP Begins Trading Over-the-Counter. ..... 3

D. The Spin-Off. ..... 5

E. The SEC's Enforcement Action. ..... 6

LEGAL STANDARD ..... 8

ARGUMENT ..... 9

A. Rule 8(a) Applies to Plaintiffs' "Statutory Seller" Allegations against Brda. ..... 9

B. Brda Solicited Retail Shareholder Investment Pursuant to a Defective Prospectus and Misleading Registration Statement. ..... 10

C. Brda Is a "Statutory Seller" under Section 12(a)(2). ..... 13

D. Brda's Statute of Limitations Defense Is Meritless. ..... 16

E. Plaintiffs Properly Rely on Factual Allegations from the SEC's Enforcement Action Complaint. ..... 21

CONCLUSION ..... 23

**TABLE OF AUTHORITIES**

**Cases**

*Amorosa v. GE*,
No. 21-CV-3137 (JMF), 2022 U.S. Dist. LEXIS 149234 (S.D.N.Y. Aug. 19, 2022) .............. 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................ 9

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012) .............................................................................. 22

*Brooks v. United Dev. Funding III, L.P.*,
No. 4:20-cv-00150-O, 2020 U.S. Dist. LEXIS 197662 (N.D. Tex. Apr. 15, 2020) ................. 23

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
No. H-14-3428, 2016 U.S. Dist. LEXIS 5702 (S.D. Tex. Jan. 19, 2016) .................................. 9

*Combs v. Safemoon LLC*,
No. 2:22-cv-00642-DBB-JCB, 2024 U.S. Dist. LEXIS 58417 (D. Utah Mar. 29, 2024)......... 15

*Craftmatic Securities Litigation v. Kraftsow*,
890 F.2d 628 (3d Cir. 1989) ............................................................................................ 15

*DeBenedictis v. Merrill Lynch & Co., Inc.*,
492 F.3d 209 (3d Cir. 2007) ............................................................................................ 16

*In re Enron Corp. Sec.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ................................................................................ 9

*FDIC As Receiver for Guar. Bank v. RBS Sec. Inc.*,
No. A-14-CA-126-SS, 2018 U.S. Dist. LEXIS 251005 (W.D. Tex. May 9, 2018).................. 18

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017) .............................................................................................. 18

*Firefighters Pension & Relief Fund v. Bulmahn*,
53 F. Supp. 3d 882 (E.D. La. 2014) ................................................................................. 18

*In re Fleming Cos. Sec. & Derivative Litig.*,
No. 5-03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488 (E.D. Tex. June 10, 2004) ............. 9

*In re Franklin Bank Corp. Sec. Litig.*,
782 F. Supp. 2d 364 (S.D. Tex. 2011) .............................................................................. 19

*In re Genius Brands Int'l, Inc.*,
97 F.4th 1171 (9th Cir. 2024)............................................................................................ 14

*Gustafson v. Alloyd Co. Inc.*,
513 U.S. 561 (1995) .......... 10

*Haping v. 17 Educ.*,
No. 1:22-cv-09843 (LAK) (SDA), 2023 U.S. Dist. LEXIS 129268 (S.D.N.Y. July 20, 2023) 18

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019) .......... 12

*Heck v. Triche*,
775 F.3d 265 (5th Cir. 2014) .......... 9

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) .......... 1

*Houghton v. LeShner*,
No. 22-cv-07781-WHO, 2023 U.S. Dist. LEXIS 188539 (N.D. Cal. Sep. 20, 2023) .......... 21

*Junker v. Crory*,
650 F.2d 1349 (5th Cir. 1981) .......... 9

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976) .......... 22

*Lone Star Ladies Inv. Club v. Scholtzsky's Inc.*,
238 F.3d 363 (5th Cir. 2001) .......... 1, 10, 17

*Margolies v. Deason*,
464 F.3d 547 (5th Cir. 2006) .......... 16

*Mass. Mut. Life Ins. Co. v. DB Structured Prods.*,
No. 11-30039-MGM, 2015 U.S. Dist. LEXIS 87244 (D. Mass. June 19, 2015) .......... 17

*Merck & Co., Inc. v. Reynolds*,
559 U.S. 633 (2010) .......... 17, 19

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) .......... 8, 9

*In re Mylan N.V. Sec. Litig.*,
379 F. Supp. 3d 198 (S.D.N.Y. 2019) .......... 22

*Pappas v. Qutoutiao Inc.*,
No. 23-1233, 2024 U.S. App. LEXIS 27250 (2d Cir. Oct. 28, 2024) .......... 9, 10

*Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*,
730 F.3d 263 (3d Cir. 2013) .......... 18

*Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc.*,
730 F.3d 263 (3d Cir. 2013) ........ 17

*Pino v. Cardone Capital, LLC*,
55 F.4th 1253 (9th Cir. 2022) ........ 13, 14, 15

*Pinter v. Dahl*,
486 U.S. 622 (1988) ........ 13, 14, 17, 21

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ........ 15

*Schneider v. Natera, Inc.*,
No. 1:22-CV-398-DAE, 2023 U.S. Dist. LEXIS 160171 (W.D. Tex. Sep. 11, 2023) ........ 8

*Sewell v. D'Alessandro & Woodyard, Inc.*,
725 F. Supp. 2d 1344 (M.D. Fla. 2010) ........ 19

*Sherman v. Abengoa S.A.*,
156 F.4th 152 (2d Cir. 2025) ........ 21

*Spitzberg v. Hous. Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ........ 17

*Sudo Props. v. Terrebonne Par. Consol. Gov't*,
503 F.3d 371 (5th Cir. 2007) ........ 16

*Targgart v. Next Bridge Hydrocarbons, Inc.*,
No. 25-10879, 2026 U.S. App. LEXIS 18813 (5th Cir. June 26, 2026) ........ passim

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) ........ 18

*Topalian v. Ehrman*,
954 F.2d 1125 (5th Cir. 1992) ........ 16

*United States v. Gluk*,
831 F.3d 608 (5th Cir. 2016) ........ 22

*United States v. Matthews*,
312 F.3d 652 (5th Cir. 2002) ........ 13

*Vanguard Specialized Funds v. VEREIT Inc.*,
No. CV-15-02157-PHX-ROS, 2016 U.S. Dist. LEXIS 137881 (D. Ariz. Oct. 3, 2016) ........ 10

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
No. CV 11 - 9495 PSG (JCGx), 2013 U.S. Dist. LEXIS 72683 (C.D. Cal. May 9, 2013) ........ 13

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) .......... 22

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) .......... 10

*In re Vivendi Universal, S.A.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003) .......... 11

*Wildes v. BitConnect Int'l PLC*,
25 F.4th 1341 (11th Cir. 2022) .......... 14, 15

*In re WorldCom, Inc. Sec. Litig.*,
294 F. Supp. 2d 392 (S.D.N.Y. 2003) .......... 11

*Zakinov v. Ripple Labs, Inc.*,
No. 18-cv-06753-PJH, 2020 U.S. Dist. LEXIS 32982 (N.D. Cal. Feb. 26, 2020) .......... 11

*Zhang Yang v. Nobilis Health Corp.*,
No. 22-20224, 2023 U.S. App. LEXIS 5926 (5th Cir. Mar. 13, 2023) .......... 22

**Statutes**

15 U.S.C. § 77l(a)(2) .......... 9

15 U.S.C. §77l .......... 9

15 U.S.C. §77l(a)(2) .......... 10

**Rules**

FED. R. CIV. P. 10 .......... 1

## INTRODUCTION

Defendant John Brda played an integral role in the registration, promotion, and spin-off of Next Bridge Hydrocarbon, Inc. ("NBH"). By his design, shareholders received preferred stock supposedly tied to the value of oil and gas assets belonging to NBH's predecessor parent company, Torchlight Energy Resources, Inc. ("Torchlight"). Brda then promoted these shares through various channels, including official corporate communications such as press releases and proxy statements as well as informal communications with memes and flashy Twitter posts. For good measure, Brda also retained and paid undisclosed stock promoters. Brda's efforts worked. He created a feverish market for the preferred shares and immense anticipation among retail investors for NBH's spin-off. In exchange for his efforts, Brda ultimately walked away with a $1.5 million cash bonus and as much as $3 million in proceeds from insider sales.

These facts give rise to liability under Section 12(a)(2) of the Securities Act of 1933. Section 12(a)(2) was intended to supplement the other anti-fraud provisions of the federal securities laws and guarantee recourse to investors harmed by false and/or materially misleading statements made in conjunction with initial offerings. Similar to Section 11 claims[1], the threshold for establishing liability under Section 12 is relatively low and once it is met, liability is virtually absolute. *See Lone Star Ladies Inv. Club v. Scholtzsky's Inc.*, 238 F.3d 363, 369 (5th Cir. 2001) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).

Brda raises a handful of arguments in hopes of making a quick exit from the case. None of these arguments has merit. Although Brda currently presents himself as a former executive far removed from the events in question, he was the driving force behind everything relevant to this

[1] Plaintiffs incorporate by reference their arguments in support of the Section 11 claims, as set forth in their response to the Next Bridge Hydrocarbons, Inc. defendants' motion to dismiss filed herewith. *See* FED. R. CIV. P. 10(c).

lawsuit. The Fifth Circuit on appeal agreed that his use of social media to promote NBH qualifies as "solicitation" for purposes of pleading liability under Section 12(a)(2). *See Targgart v. Next Bridge Hydrocarbons, Inc.*, No. 25-10879, 2026 U.S. App. LEXIS 18813, at *11 (5th Cir. June 26, 2026). Finally, Brda fails to carry his burden when arguing that Plaintiffs' claims are time barred. The SEC's recent enforcement action against Brda unveiled a slew of facts revealing his role and responsibility for NBH's promotion and spin-off. Those facts were not known prior to the filing of the SEC's complaint, which was within one year of naming Brda as a defendant in this action.

## STATEMENT OF FACTS

### A. John Brda.

Defendant Brda is integral to this case. He served as CEO of NBH's predecessor parent company, Torchlight, from 2014 through its merger with Metamaterial Technologies Inc. ("Metamaterial"). ¶25.[2] While at Torchlight, Brda was one of only four employees. ¶25.

Brda was directly involved in Torchlight's merger negotiations with Metamaterial. ¶¶27-28. Alongside Torchlight's founder and controller, Defendant Gregory McCabe, Brda held virtual meetings with Metamaterial's management and, as the SEC's enforcement action later revealed, was responsible for the special dividend, preferred shares, and spin-off underlying this lawsuit. *See* ¶¶28-29, 122-27, 140.

As much if not more so than any other individual defendant in this lawsuit, Brda publicly promoted NBH and the money investors could make if they bought in prior to the spin-off. *See* ¶34. Brda repeatedly used social media (mainly through Twitter) to promote NBH and solicit shareholders. *See*, *e.g.*, ¶¶34, 120-21, 128, 133.

[2] Citations to "¶__" refer to Plaintiffs' Amended Complaint (Dkt. No. 41).

**B. <u>The Special Dividend.</u>**

When Torchlight merged with Metamaterial, Brda and McCabe negotiated an agreement whereby Torchlight's oil and gas assets (referred to as the "O&G Assets") would effectively remain under the ownership and control of Torchlight's shareholders. The agreement provided that Meta Materials (as the surviving entity post-merger) would attempt to dispose of the O&G Assets and, if successful, Torchlight shareholders would be entitled to receive the proceeds from that disposition. ¶29. To facilitate this payment, Torchlight's shareholders received preferred stock upon the completion of the merger that would then entitle them to payment from the proceeds of the O&G Assets sale. ¶¶3, 31-32. Meta Materials ultimately did not sell the O&G Assets and instead proceeded with the spin-off. ¶¶4, 33.

**C. <u>MMTLP Begins Trading Over-the-Counter.</u>**

The preferred stock issued in conjunction with the merger began trading over the counter under the ticker symbol "MMTLP" shortly after it was issued. ¶34. It began trading in October 2021 and continued trading until the spin-off finally occurred in December 2022. ¶34. While the MMTLP shares were trading over-the-counter, NBH filed its registration statement for the spin-off. NBH filed its initial registration statement on July 14, 2022, followed by several amendments and a final prospectus (the "Registration Statement"). ¶4. The SEC declared the Registration Statement "effective" on November 18, 2022. ¶4.

Prior to and during MMTLP's time trading over-the-counter, Brda resoundingly promoted the O&G Assets and the preferred stock that would be issued in connection with the merger. For example:

- On March 3, 2020, Brda told investors during a presentation that the O&G Assets (specifically, the "Orogrande Basin" assets) comprised 3.7 billion barrels of oil. ¶50;

- On September 2, 2020, Brda told investors during another investor presentation that the O&G Assets have "3.7 billion barrels of recoverable reserves in addition to between 5 and 8 Tcf of gas." ¶51;
- On December 14, 2020, Brda issued press releases emphasizing that shareholders who purchased Torchlight stock before the merger would receive the O&G Assets preferred shares prior to closing. ¶129; and
- On February 4, March 23, April 21, and May 7, 2021, Brda disseminated proxy statements soliciting shareholder approval for the issuance of the preferred dividend and the spin-off (*i.e.*, NBH). ¶132.

Brda's promotional efforts grew stronger after the merger, and especially while the preferred stock was trading over-the-counter. For example:

- On June 9, 2022, one month before NBH filed its initial registration statement, Brda tweeted a meme featuring The Monkees singing "I'm a Believer" and told investors they should purchase MMTLP shares to own an interest in the O&G Assets. ¶144;
- On June 17, 2022, Brda again promoted NBH via Twitter by telling investors that shareholders who held "short" positions in MMTLP would be unable to cover once the spin-off occurred. ¶145;
- On October 9, 2022, approximately three months after NBH filed its initial registration statement, Brda told public investors during a "Space" call that he had not "sold a share" of his MMTLP stock because of he was so confident in the O&G Assets. ¶146;
- On December 6, 2022, just days before the spin-off, Brda congratulated retail investors for purchasing MMTLP and holding it through the spin-off. ¶147;
- On December 7, 2022, Brda again encouraged investors to continue holding MMTLP

into the spin-off because it would be "legendary". ¶148;

- On December 9, 2022, Brda reiterated the claim that the O&G Assets comprised 3.2 billion barrels of oil and urged MMTLP shareholders to maintain "Diamond Hands," which is a trading slang term used to describe investors who hold onto stocks even when the market is volatile.[3] ¶¶149-50; and
- On December 11, 2022, on the eve of the spin-off, Brda tweeted that "WE ALL hold together 3.2 Billion Barrels of Oil," referring to the O&G Assets that would be transferred to MMTLP shareholders vis-à-vis the spin-off. ¶151.

While Brda was publicly promoting MMTLP and the O&G Assets that would be spun-off to NBH, he was simultaneously selling shares into the over-the-counter markets. Brda sold approximately 388,000 shares of MMTLP shares before the spin-off. ¶37. Based on MMTLP's historical trading prices, Brda sold these shares for between $300,000 and $3,000,000. ¶37.

Defendant McCabe also sold shares. In total, McCabe liquidated approximately 6.7 million shares of MMTLP on the eve of the spin-off for proceeds of between $19.6 million and $78.9 million. ¶36.

**D. <u>The Spin-Off.</u>**

The spin-off occurred on December 14, 2022. Shareholders who held preferred stock under the MMTLP ticker tendered their shares in exchange for new shares in NBH that had been registered under the Registration Statement. ¶¶5, 35. In total, Meta Materials exchanged approximately 165 million shares of its preferred stock for new shares in NBH. ¶35.

[3] "Diamond hands is a slang term for an investor who refrains from selling an investment (such as stock shares) despite downturns or losses. . . . The term is often used positively to refer to an investor who doesn't panic when their investment decreases or fluctuates in value—one who is resolute and patient enough to hold until they realize big gains." *Dictionary.com*, https://www.dictionary.com/e/slang/diamond-hands (last visited Sept. 9, 2026).

**E. <u>The SEC's Enforcement Action.</u>**

On July 20, 2023, approximately seven months after the spin-off, Meta Materials filed a Form 8-k disclosing that the SEC had issued a "Wells Notice" to Meta Materials, Meta Materials' then-current CEO, George Palikaras, and Brda relating to "a previously disclosed SEC investigation." Dkt. No. 85-3, App. 303. Although the Form 8-k referred to a previous disclosure of the SEC investigation, that disclosure was hardly substantive. It consisted of one sentence in which Meta Materials disclosed it received a subpoena from the SEC in September 2021 requesting "certain documents and information related to, among other things, the merger involving Torchlight Energy Resources, Inc. and Metamaterial Inc." Declaration of Adam M. Apton ("Apton Decl."), Exhibit F (Pl. App. 035). Meta Materials never provided investors with additional details or information about the scope or purpose of the investigation.

On June 25, 2024, almost three years after first subpoenaing Meta Materials and a year after issuing its "Wells Notices," the SEC filed suit accusing Brda of committing securities fraud under Section 10(b) and Rule 10b-5. While Brda's public support for the O&G Assets, preferred shares, and the spin-off had been publicly known up to this point, the SEC's complaint placed Brda's actions in context. It revealed Brda's integral role in a "fraudulent scheme" aimed at creating a "short squeeze" that, importantly, required him to solicit retail shareholder investment to pull it off. The SEC's enforcement action has a different focus than the case at bar; specifically, it focuses on statements made by Brda about his supposed efforts to sell the O&G Assets (and not the value of the O&G Assets themselves). However, the factual information contained in the SEC's complaint establishes with certainty Brda's role as a "statutory seller" for purposes of Section 12(a)(2) liability. ¶120. Specifically, the SEC's complaint revealed that:

- In or around June 2020, Brda concocted a scheme to combat short-sellers of

Torchlight's stock, which as he described in internal correspondence would result in forcing "short" investors to "cover" their positions, *i.e.*, a "short squeeze." ¶121;

- Brda's plan entailed segregating Torchlight's O&G Assets, creating a new class of preferred stock tied to the O&G Assets, marketing and promoting the preferred stock using a "short squeeze" narrative, and ultimately enriching himself once the "short squeeze" was executed. ¶¶122-26;
- Brda then followed through with his plan by securing approval from Metamaterial's board of directors to "[p]lay up the [preferred share] dividend," according to a September 2020 presentation. ¶127;
- Brda recruited third-party consultants to help promote Torchlight's merger and the preferred shares that would be issued for the O&G Assets paying them between $3,000 and $5,000 per month. ¶128;
- Brda meanwhile developed the plans for the spin-off and launched NBH by *inter alia* obtaining Defendant McCabe's approval for the spin-off given his then-current role as Chairman and recruiting management to oversee NBH by paying them "consulting fees" in the amount of $20,000 per month. ¶¶129-30; and
- Simultaneously, Brda was continuing to promote Torchlight's O&G Assets and the preferred shares that would ultimately turn into NBH through the spin-off. This included arming stock promoters with information about his "short squeeze" plan they could spread to retail investors, holding meetings with institutional investors wherein he discussed his plans for the preferred stock and the "short squeeze" it would create, and personally posting promotional claims about Torchlight's O&G Assets on Twitter. ¶¶130-35.

The SEC's complaint also made clear that Brda profited from his plans for the spin-off and "short squeeze." As a result of Brda's promotional campaign, Torchlight's trading volume surged just prior to and after the record date for the preferred stock dividend. ¶¶126-37. Brda used this period of peak volume (indeed, trading reached over 80 million shares per day hitting prices upwards of $10 per share) to hold an at-the-market offering for Torchlight. ¶¶137-39. In total, the offering sold 16.2 million shares and raised $137.5 million. ¶139. On June 24, 2021, immediately following the offering and just one day before the merger closed with Metamaterial, Brda successfully obtained a $1.5 million bonus based on the success of the capital raise he had conducted. ¶¶141-43.

In August 2021, Brda then submitted his fully-formed plan for the spin-off of the O&G Assets to Meta Materials' board of directors, including specifics as to the management team (which had been receiving payment since January 2021). ¶140. The plan was adopted and completed the following year with the spin-off occurring in December 2022. In the interim, Brda promoted the preferred stock and NBH's spin-off repeatedly (while also selling hundreds of thousands of shares for millions of dollars in proceeds). *See*, *e.g.*, ¶¶37, 144-51.

## LEGAL STANDARD

"'Claims under sections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements' that impose liability for material misstatements and omissions in securities offering documents (for Section 11, the registration statement; for Section 12(a)(2), the prospectus)." *Schneider v. Natera, Inc.*, No. 1:22-CV-398-DAE, 2023 U.S. Dist. LEXIS 160171, at *28 (W.D. Tex. Sep. 11, 2023) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010)). To state a *prima facie* claim under Section 12(a)(2), a plaintiff must allege: (1) the defendant is a "statutory seller"; (2) the sale was effectuated "by means of a prospectus or oral

communication"; and (3) the prospectus or oral communication "include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359 (quoting 15 U.S.C. §77l(a)(2)).

"Section 12(a) does not require a plaintiff to prove scienter either and the pleadings need only satisfy the liberal pleading requirements of Rule 8 of the Federal Rules of Civil Procedure." *In re Fleming Cos. Sec. & Derivative Litig.*, No. 5-03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488, at *144-45 (E.D. Tex. June 10, 2004) (citing *In re Enron Corp. Sec.*, 235 F. Supp. 2d 549, 596 (S.D. Tex. 2002)). Consequently, "[t]he complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true." *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2016 U.S. Dist. LEXIS 5702, *10 (S.D. Tex. Jan. 19, 2016). So long as the complaint "contain[s] sufficient factual allegations, as opposed to legal conclusions," it will "state a claim for relief that is 'plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pappas v. Qutoutiao Inc.*, No. 23-1233, 2024 U.S. App. LEXIS 27250, *4 (2d Cir. Oct. 28, 2024) (applying notice pleading standard to Securities Act claims).

## ARGUMENT

### A. Rule 8(a) Applies to Plaintiffs' "Statutory Seller" Allegations against Brda.

Section 12 claims do not require intent or any particular mental state. *See* 15 U.S.C. §77l; *Heck v. Triche*, 775 F.3d 265, 280 (5th Cir. 2014) (Section 12 "requires only a showing that the defendant was negligent"); *Junker v. Crory*, 650 F.2d 1349, 1359 (5th Cir. 1981) (holding that to recover under Section 12, "plaintiff need not establish that the defendant acted with scienter or that he relied in any way on the defendant's misrepresentations or omissions."). Consequently, when pleading a Section 12 claim, plaintiffs only need to satisfy Rule 8's lenient "notice pleading"

standard. *See Pappas*, 2024 U.S. App. LEXIS 27250, at *5 ("A plaintiff may retain the application of the Rule 8 notice pleading standard by expressly pleading negligence, disclaiming fraud, eschewing language in its Section 11 or Section 12(a)(2) claims implying fraud or the elements thereof"); *Lone Star Ladies*, 238 F.3d at 368 ("The proper route is to disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated.").

Brda makes reference to Rule 9(b) but never explains how it applies to Plaintiffs' allegations other than noting Plaintiffs' reference to the SEC's enforcement action which, in turn, alleges a "fraudulent scheme." Dkt. No. 83 at 3-4. While the SEC might be alleging a "fraudulent scheme," Plaintiffs are asserting violations of Section 12 and Section 12 does not require Plaintiffs to plead that Brda acted with any specific mental intent. Without any alleged circumstances constituting fraud, Rule 9(b) does not have any relevance. This is especially true considering that Brda's motion is geared almost exclusively to disputing his role as a "statutory seller." "[S]ince the acts creating statutory seller liability can be committed negligently, . . . the rationale of *Vess* points to Rule 9(b) being inapplicable to Plaintiffs' statutory seller allegations." *Vanguard Specialized Funds v. VEREIT Inc.*, No. CV-15-02157-PHX-ROS, 2016 U.S. Dist. LEXIS 137881, at *49-50 (D. Ariz. Oct. 3, 2016) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) (quoting *Lone Star Ladies*, 238 F.3d at 368)).

### B. <u>**Brda Solicited Retail Shareholder Investment Pursuant to a Defective Prospectus and Misleading Registration Statement.**</u>

Section 12(a)(2) liability attaches whenever a defendant solicits shareholder purchases by means of a "prospectus or oral communication," which includes "documents related to public offerings" and "communications that relate to a prospectus." *See* 15 U.S.C. §77l(a)(2); *Gustafson v. Alloyd Co. Inc.*, 513 U.S. 561, 569 (1995). Consequently, Brda's "solicitation" conduct renders him liable under Section 12(a)(2), given the timing and content of his public statements. Brda

devised the spin-off and obtained approval for it from Meta Materials' board of directors in August 2021. *See* ¶¶126-27, 129-30, 140. His "solicitations" from that point forward consistently referenced NBH (or "Oilco") and its 3.7 billion barrels of oil (which relates directly to the O&G Assets misrepresentations in the Registration Statement). ¶¶144-51. Plaintiffs purchased their shares for the express purpose of receiving stock in NBH, which they ultimately did once the spin-off was completed. ¶¶5, 34-35. The shares received by Plaintiffs were indisputably pursuant and traceable to NBH's Registration Statement. ¶¶12-14. The Fifth Circuit agreed, as alleged, that these allegations "plausibly bring Brda's conduct within Section 12's scope because they at least intimate that investors should acquire interests in [NBH]." *Targgart*, 2026 U.S. App. LEXIS 18813, at *11.

Brda tries to avoid the Fifth Circuit's holding by arguing that his solicitations were not allegedly "false or misleading." Dkt. No. 83 at 5-7. Brda's argument misinterprets the case law. Courts have routinely held that promoters can be held liable under Section 12(a)(2) where, as here, they solicit shareholders to purchase stock vis-à-vis statements that "relate" to a misleading prospectus. *See*, *e.g.*, *Zakinov v. Ripple Labs, Inc.*, No. 18-cv-06753-PJH, 2020 U.S. Dist. LEXIS 32982, at *35-36 (N.D. Cal. Feb. 26, 2020) (finding that defendants qualify as "sellers" where plaintiff alleged that "defendants 'have earned over $1.1 billion through the sale of XRP'" and "that defendants published various tweets, interviews, and articles pushing the adoption of XRP"); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003) (finding adequate allegations that CEO was a statutory seller where he "regularly appeared before investors and financial news agencies to tour the financial vitality of [the company] and thereby encourage investors to purchase [the company's] securities"); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 423 (S.D.N.Y. 2003) (finding sufficient allegations that an underwriter was a statutory

seller where the underwriter "participat[ed] in 'road show' meetings").

Accepting Plaintiffs' allegations as true for the purposes of the pleading, Brda's argument fails because his "solicitations" were sufficiently related to NBH's misleading Registration Statement. *See Targgart*, 2026 U.S. App. LEXIS 18813, at *11-12 ("At the motion-to-dismiss stage, plausibility is all that is needed, so we reverse."); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 857 (S.D.N.Y. 2019) ("Defendants participated in the preparation of the Registration Statement and participated in marketing 'road shows' to investors. Accordingly, drawing all reasonable inferences in their favor, Plaintiffs have plausibly alleged that these Defendants solicited purchase of stocks through the SPO"). Moreover, as Brda admits, several of his "solicitations" post-dated the Registration Statement *after* it was filed with the SEC and disseminated to public investors, thereby underscoring Brda's intent to "solicit" investors. *See* Dkt. No. 83 at 7 ("As for the few post-July 14, 2022 statements . . . ."). These "post-July 14, 2022" also happen to be the most dangerous given their temporal proximity to the spin-off. *See* ¶146 (Oct. 9, 2022: Brda during "Space" call saying he had not "sold a share" of his MMTLP stock because of he was so confident in the O&G Assets); ¶147 (Dec. 6, 2022: Brda congratulating retail investors for purchasing MMTLP and holding it through the spin-off); ¶148 (Dec. 7, 2022: Brda encouraging investors to continue holding MMTLP into the spin-off because it would be "legendary"); ¶¶149-50 (Dec. 9, 2022: Brda reiterating claim that the O&G Assets comprised 3.2 billion barrels of oil and urging investors to maintain "Diamond Hands"); ¶151 (Dec. 11, 2022: Brda tweeting "WE ALL hold together 3.2 Billion Barrels of Oil").[4]

[4] The Fifth Circuit explicitly called out the last tweet dated December 11, 2022 referencing "3.2 Billion Barrels of Oil" when rejecting Brda's arguments and reversing his dismissal. *See Targgart*, 2026 U.S. App. LEXIS 18813, at *11.

**C. <u>Brda Is a "Statutory Seller" under Section 12(a)(2).</u>**

When reversing the dismissal of this action, the Fifth Circuit allowed Defendants to renew certain arguments on remand. *Targgart*, 2026 U.S. App. LEXIS 18813, at *12-13. That said, the Fifth Circuit in the course of its decision went ahead and rejected Brda's "statutory seller" argument. *See id*. at *11-12 ("These posts, along with other allegations in the complaint, plausibly bring Brda's conduct within Section 12's scope because they at least intimate that investors should acquire interests in Next Bridge. At the motion-to-dismiss stage, plausibility is all that is needed, so we reverse.") (omitting citations and footnotes). This now constitutes law of the case and is binding upon Brda going forward. *See United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) ("Under the law of the case doctrine, an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal."); *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, No. CV 11 - 9495 PSG (JCGx), 2013 U.S. Dist. LEXIS 72683, at *29-30 (C.D. Cal. May 9, 2013) (refusing to reconsider holdings on falsity, scienter, and loss causation under "law of the case" doctrine).

Even if Brda's role as a "statutory seller" could be "reexamined," the outcome would be the same. In *Pinter v. Dahl*, 486 U.S. 622, 643 (1988), the Supreme Court held that a person may be liable as a "seller" under the predecessor version of Section 12(a) if the person either: (1) passes title to the securities to the plaintiff; or (2) "engages in solicitation," *i.e.*, "solicits the purchase [of the securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pino v. Cardone Capital, LLC*, 55 F.4th 1253, 1257-58 (9th Cir. 2022). What it takes to "engage[] in solicitation" has changed over the years as technology has advanced. When first enacted, "people understood solicitation to include communications made through diffuse, publicly available means—at the time, newspaper and radio advertisements." *Wildes v.*

*BitConnect Int'l PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022). "Under the text, then, a solicitation need not be 'personal' to trigger liability. Broadly disseminated communications also can convey a solicitation—indeed, they are consistent with the longstanding interpretation of the term." *Id.*

This background on the statute and what constitutes "solicitation" is important in light of how Brda solicited shareholders for NBH. After devising his "short squeeze" plan and laying the groundwork for the spin-off, he predominantly used Twitter to promote NBH and the O&G Assets listed in its Registration Statement. *See* ¶¶133-35, 144-51. These online posts constitute "solicitations" for the purposes of Section 12(a)(2) liability. *See In re Genius Brands Int'l, Inc.*, 97 F.4th 1171, 1182 (9th Cir. 2024) ("PennyStocks solicited the purchase of Genius's securities. According to the complaint, Genius retained PennyStocks 'to publish and disseminate favorable information about Genius's shares.' Those articles solicited the purchase of Genius's securities because they urged or lured readers into purchasing Genius stock."); *Pino*, 55 F.4th at 1260 ("the advertisements at issue in this case—Instagram posts and YouTube videos—are the types of potentially injurious solicitations that are intended to command attention and persuade potential purchasers to invest in the Funds during the 'most critical' first stage of a selling transaction, when the buyer becomes involved. Pino fairly alleges that the nature of social media presents dangers that investors will be persuaded to purchase securities without full and fair information." (citing *Pinter*, 486 U.S. at 646-47)); *Wildes*, 25 F.4th at 1346 ("A new means of solicitation is not any less of a solicitation. So when the promoters urged people to buy BitConnect coins in online videos [posted on YouTube], they still solicited the purchases that followed. The plaintiffs therefore have stated a section 12 claim against Arcaro and the other promoters.").

These cases show that a direct communication between the defendant and the plaintiff is not necessary to establish liability under Section 12, contrary to what Brda claims. *See* Dkt. No.

83 at 8-9. Brda's legal support does not hold differently. While he cites *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003), the "the directness requirement urged by [Brda] stems from *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989). The *Craftmatic* court made this statement in the context of holding that 'an issuer [is not] liable solely on the basis of its involvement in preparing the prospectus' (*Craftmatic*, 890 F.2d at 636); it said nothing about diffuse communications published through various forms of media. And, of course, the case itself predates the invention of social media by many years." *Combs v. Safemoon LLC*, No. 2:22-cv-00642-DBB-JCB, 2024 U.S. Dist. LEXIS 58417, at *52-53 (D. Utah Mar. 29, 2024) (inserting citations from footnotes).

Brda's final argument on this point is that the $1.5 million bonus he received was insufficient to qualify as a "financial incentive" for solicitation under Section 12. Dkt. No. 83 at 10. Brda's argument is flawed for at least two reasons. First, he provides no support for the notion that the "financial incentive" must be received or realized after the solicitation and not before. Second, Brda's argument disregards Plaintiffs' allegations concerning the 388,000 shares of preferred stock he was able to liquidate just prior to the spin-off. ¶37. Brda's solicitations helped create a retail market for the preferred shares (through over-the-counter exchanges) that allowed him to monetize between $300,000 and $3,000,000 of his stock. ¶37. These allegations suffice to establish Brda's "financial incentive" at the pleading stage.

"[T]hrough [his] social media engagement, [Brda was a] significant participant[] in the selling transaction because [he] disseminated material information to would-be investors. To conclude that [his] social media communications fall outside the Act's protections would be at odds with Congress's remedial goals." *Pino*, 55 F.4th at 1260; *Wildes*, 25 F.4th at 1346 ("Technology has opened new avenues for both investment and solicitation. Sellers can now reach

a global audience through podcasts, social media posts, or, as here, online videos and web links. But under the district court's cramped reading of the Securities Act, a seller who would be liable for recommending a security in a personal letter could not be held accountable for making the exact same pitch in an internet video . . . . That makes little sense."). The Fifth Circuit agreed with this premise and, accordingly, Brda should be required to adhere to it. *See Targgart*, 2026 U.S. App. LEXIS 18813, at *11-12.

**D. Brda's Statute of Limitations Defense Is Meritless.**

The statutory period for a Section 12(a)(2) claim starts to run "when a purchaser of securities knew—or in the exercise of reasonable diligence, should have known—of the alleged wrongdoing." *Topalian v. Ehrman*, 954 F.2d 1125, 1133 (5th Cir. 1992). "This standard is generally referred to as 'inquiry notice,' and it applies 'when a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.'" *Sudo Props. v. Terrebonne Par. Consol. Gov't*, 503 F.3d 371, 376 (5th Cir. 2007) (quoting *DeBenedictis v. Merrill Lynch & Co., Inc.*, 492 F.3d 209, 216 (3d Cir. 2007)). "The 'fact-intensive inquiry' of what constitutes inquiry notice 'is typically appropriate for consideration by a jury.'" *Sudo Props.*, 503 F.3d at 376 (quoting *Margolies v. Deason*, 464 F.3d 547, 553 (5th Cir. 2006)).

Plaintiffs' claim against Brda is not barred by Section 12's one-year statute of limitations because Brda's role in the spin-off was not known or discoverable before the SEC filed its complaint on June 25, 2024. ¶152. Defendants purport to disagree with this statement on the basis that Brda's "purported solicitations" were made in public SEC filings and therefore discoverable to Plaintiffs. Dkt. No. 83 at 14. However, the facts that animated Plaintiffs' Section 12 claim were those pertaining to his responsibility for the spin-off plan in the first place, his secret promotional efforts through privately paid consultants, and the financial incentives he secured from

successfully pulling it all off. ¶¶121-43. As the case law holds, being a "statutory seller" requires more than just the "usual" role of "preparing a prospectus and conducting a road show." *Lone Star Ladies*, 238 F.3d at 370 (" . . . *Pinter* holds that a plaintiff invoking section 12 may show that an issuer's role was not the usual one; that it went farther and became a vendor's agent.").

Without these additional facts, Plaintiffs' Section 12 claim would not have been viable had they alleged it at the outset. Without notice of facts supporting the entirety of the claim, the statutory clock did not start ticking. *See Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010) (implementing "discovery" rule for securities claims); *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 693 (5th Cir. 2014) ("this argument [statute of limitations] could not be evaluated on a motion to dismiss" under *Merck* analysis); *Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc.*, 730 F.3d 263, 273 (3d Cir. 2013) ("We agree with Operating Engineers that the discovery standard announced by the Supreme Court in Merck applies not only the Exchange Act's statute of limitations, but also to the Securities Act's statute of limitations. Importantly, both statutes incorporate the word 'discovery,' which the *Merck* Court identified as a term of art representing the discovery rule."); *see also Mass. Mut. Life Ins. Co. v. DB Structured Prods.*, No. 11-30039-MGM, 2015 U.S. Dist. LEXIS 87244, at *25-29 (D. Mass. June 19, 2015) (collecting cases applying "discovery rule" under *Merck*).

Brda argues that the Supreme Court's holding in *Merck* is not binding because that case dealt with claims under the Exchange Act and not the Securities Act. Dkt. No. 83 at 12. That is a distinction without a difference and is not a valid basis to disregard the case. The argument is also incorrect. Courts within the Fifth Circuit have applied and/or cited *Merck* when deciding statute of limitations issues across all sorts of contexts, including cases asserting Securities Act claims. *See, e.g.*, *FDIC As Receiver for Guar. Bank v. RBS Sec. Inc.*, No. A-14-CA-126-SS, 2018 U.S.

Dist. LEXIS 251005, at *19 (W.D. Tex. May 9, 2018) ("The Supreme Court's Merck standard for 'discovery' applies to Section 13 of the Securities Act of 1933 [statute of limitations]."). Other appellate level courts agree on this point. *See*, *e.g.*, *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 n.37 (2d Cir. 2017) ("Following the parties' lead, we assume arguendo that Merck, which involved the statute of limitations for claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), applies with equal force to the statute of limitations in Section 13 of the Securities Act."); *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 273 (3d Cir. 2013) ("We agree with the Operating Engineers that the discovery standard announced by the Supreme Court in Merck applies not only to the Exchange Act's statute of limitations, but also to the Securities Act's statute of limitations."). *See also Haping v. 17 Educ.*, No. 1:22-cv-09843 (LAK) (SDA), 2023 U.S. Dist. LEXIS 129268, at *37 n.10 (S.D.N.Y. July 20, 2023) ("Although [*Merck*] addressed the statute of limitations under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), the weight of authority in this Circuit has applied Merck to alleged violations of Section 11 of the Securities Act."); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1052 n.7 (N.D. Cal. 2016) ("Though *Merck* was an Exchange Act case, its reasoning applies equally to the similar timeliness requirements for Securities Act claims.").

Brda's authority does not support deviating from the weight of this authority. While he cites *Firefighters Pension & Relief Fund v. Bulmahn*, 53 F. Supp. 3d 882, 900 n.40 (E.D. La. 2014), the decision only noted that some courts disagreed on whether *Merck* applied to Section 11 of the Securities Act before concluding that it "need not resolve this question" because the plaintiffs in *Bulmahn* were on notice of the defendants' "performance problems" well in advance of the statutory bar date due to repeated disclosures made during conference calls over the course

of nearly two years before filing suit. *Id*. at 903-06. Brda's other cited authority, *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 383 (S.D. Tex. 2011), noted *Merck*'s emphasis on whether the claims required evidence of scienter. The court in *Franklin* ultimately rejected the statute of limitations defense because the record did not yield clear evidence of notice. *See id*. at 409-10. Neither case is applicable here given the marked difference in facts. Indeed, Plaintiffs did not discover the facts necessary to establish Brda's role as a "statutory seller" until reading the SEC's complaint. Those facts included Brda's responsibility for and promotion of the issuance of the preferred stock and the spin-off. *See* ¶¶120-51. Those facts elevated Brda's role from just an ordinary commentator on the stock (albeit with a history as Torchlight's former CEO) to the driving force behind the investor interest that allowed him to successfully pocket a $1.5 million bonus, liquidate millions of dollars of stock, and execute NBH's spin-off.[5]

Brda also tries to show "inquiry notice" based on filings from an earlier, unrelated case. Dkt. No. 83 at 12-13. Although this earlier case, *Maltagliati v. Meta Materials Inc., et al.*, No. 1:21-cv-07203 (E.D.N.Y.), involved some of the same defendants, its focus was entirely removed from the O&G Assets and NBH's spin-off. The *Maltagliati* case instead focused on Metamaterials and its lack of any "commercial ready" products. The plaintiffs in that case did not assert any claims under Section 12 against anyone (let alone Brda); nor could they have because NBH's Registration Statement for the spin-off did not exist (at the time the action was commenced) and was not "effective" (at the time of the amended complaint). Thus, an important prerequisite for a Section 12 claim (a false and/or misleading registration statement) did not exist.

[5] Brda also cites *Sewell v. D'Alessandro & Woodyard, Inc.*, 725 F. Supp. 2d 1344 (M.D. Fla. 2010). Dkt. No. 83 at 11, 14. In *Sewell*, there was no dispute over the defendant's role as a statutory seller; thus the dispute was squarely over when the plaintiffs first learned that the statements at issue were false because they waited too long to file suit. *Sewell*, 725 F. Supp. 2d at 1346. Notably, the court in *Sewell* applied the "discovery" rule from *Merck*. *Id.*

Defendants also misplace reliance on earlier references to the SEC's investigation and subpoena. Dkt. No. 83 at 13-14. These references were insufficient to place Plaintiffs on "inquiry notice." Meta Materials (not NBH) disclosed its receipt of a "Wells Notice" for Brda but said only that the notice related to "a previously disclosed SEC investigation." Dkt. No. 85-3 (App. 303). The "previously disclosed SEC investigation" was described in March 2022 as Meta Materials' receipt of a subpoena from the SEC requesting "certain documents and information related to, among other things, the merger involving Torchlight Energy Resources, Inc. and Metamaterial Inc." Apton Decl., Exhibit F (Pl. App. 035). Being that the spin-off, NBH, and the majority of Brda's promotional claims had not even occurred at this point, Plaintiffs had no basis to believe Brda was a "statutory seller" in violation of Section 12 let alone "trigger a reasonable investor's inquiry notice," as Brda tries to argue. *See* Dkt. No. 83 at 19.

Brda's argument on "inquiry notice" also overlooks the acute differences between what a plaintiff's lawyer can accomplish through pre-suit investigation and what the SEC can uncover with subpoena power. Brda acts as if everything in the SEC's enforcement action complaint was knowable to Plaintiffs if they had just been paying better attention. *See* Dkt. No. 83 at 14. But that position is unsupported by any facts in the record. Instead, the SEC's enforcement action complaint excerpts internal communications that were not accessible to Plaintiffs, such as Brda's June 2020 emails outlining his plans for a "short squeeze" (¶¶121-26) or his efforts to orchestrate and promote the dividend that resulted in the issuance of the Meta Materials preferred stock (¶¶127-31). This information appeared for the first time in the public sphere vis-à-vis the SEC's enforcement action complaint following a years-long investigation undertaken by the SEC. Thus, while Brda correctly notes that Plaintiffs' claims are based on his "publicly available" tweets (Dkt. No. 83 at 14), that is only part of the story. The facts showing his motivation and financial interest

in promoting NBH securities did not emerge until the SEC filed its complaint in June 2024, thereby bringing Plaintiffs' Section 12 allegations against Brda within the applicable one-year statute of limitations. *See Pinter*, 486 U.S. at 647 ("The language and purpose of [Section 12] suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner"); *Houghton v. LeShner*, No. 22-cv-07781-WHO, 2023 U.S. Dist. LEXIS 188539, at *7 (N.D. Cal. Sep. 20, 2023) (comparing and contrasting cases where defendants qualified as statutory sellers based on facts beyond public promotion of the security). *See also Targgart*, 2026 U.S. App. LEXIS 18813, at *11 n.5 (5th Cir. June 26, 2026) ("Plaintiffs also allege that Brda acted for personal gain.").

### E. <u>Plaintiffs Properly Rely on Factual Allegations from the SEC's Enforcement Action Complaint.</u>

Brda misconstrues the rules concerning when a plaintiff can and cannot rely on allegations from enforcement proceedings. Dkt. No. 83 at 15. Unlike a consent order that is the product of a settlement, the allegations relied upon by Plaintiffs come from an enforcement action proceeding; specifically, a complaint filed by the SEC after a years-long investigation that began with a formal order of investigation dated August 3, 2021, followed by a document subpoena dated April 14, 2022, a deposition on August 18, 2022, and a Wells Notice dated July 20, 2023. *See* Apton Decl., Exhibit G (Pl. App. 039-040). The allegations relied upon by Plaintiffs do not include any legal determinations but instead only describe internal communications by/between Brda and other relevant parties. *See* Dkt. No. 83-1 (Brda's chart comparing SEC enforcement action complaint with Plaintiffs' allegations). Relying on enforcement action allegations in this manner is routinely done and accepted by courts throughout the country. *See Sherman v. Abengoa S.A.*, 156 F.4th 152, 166 (2d Cir. 2025) ("For the avoidance of all doubt, we hold that a complaint may rely on factual allegations or reports incorporated in complaints from other proceedings, subject, of course, to the

limitations of Federal Rule of Civil Procedure 11."); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012) (reversing in part based on new allegations sourced from SEC interview transcripts); *United States v. Gluk*, 831 F.3d 608, 613-14 (5th Cir. 2016) (facts determined through an official SEC investigation are admissible as evidence in litigation).

"The relevant inquiry focuses on the way a plaintiff seeks to use the third-party pleadings and how the pleadings came into existence." *Zhang Yang v. Nobilis Health Corp.*, No. 22-20224, 2023 U.S. App. LEXIS 5926, at *8 (5th Cir. Mar. 13, 2023). Importantly, the Fifth Circuit in *Yang* drew the distinction between the third-party complaint in that case and "official SEC documents" with the latter being appropriate under existing precedent. *Id.* at *9-10 (citing *Gluk*, *supra*). Where, as here, the allegations are factual in nature (not unadjudicated legal determinations or bargained-for consents) sourced from official investigations, it would no sense to preclude those allegations from a complaint when by comparison plaintiffs rely on factual allegations from less official sources all the time, *e.g.*, newspapers. *See*, *e.g.*, *In re Mylan N.V. Sec. Litig*., 379 F. Supp. 3d 198, 214-15 (S.D.N.Y. 2019) (treating allegations taken from the State Attorney General's complaint against the company as a "proper basis for the pleadings"); *In re Bear Stearns Mortg. Pass-Through Certificates Litig*., 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012). ("It makes little sense to say that information . . . which the [complaint] could unquestionably rely on if it were mentioned in a news clipping . . . is immaterial simply because it is conveyed in an unadjudicated complaint.").

Brda's authority on this point helps illustrate Plaintiffs' argument. In *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976), the Second Circuit explicitly limited its holding to the facts of that case because the consent judgment at issue was "the result of private bargaining" and did not reflect "an actual adjudication of any of the issues." *Id*. at 893-94. Unlike

a consent judgment, Plaintiffs relied on factual allegations contained in the SEC's enforcement action complaint that were not the product of "private bargaining" but instead an expansive investigation that involved *inter alia* subpoenas and deposition testimony. *See* Apton Decl., Exhibit G (Pl. App. 039-040).[6]

In *Brooks v. United Dev. Funding III, L.P.*, No. 4:20-cv-00150-O, 2020 U.S. Dist. LEXIS 197662, at *41-42 (N.D. Tex. Apr. 15, 2020), the court struck allegations from an SEC complaint because the plaintiffs "had not provided the Court with any certification that they independently investigated the allegations." That is not the case here where many of the allegations were, in fact, independently verified by Plaintiffs' counsel searching for and confirming the contents of Brda's public statements as well as other publicly available information. For example, Plaintiffs' counsel was able to confirm Brda's public statements and reactions discussed in Paragraphs 132-135 as well as confirm the trading activity described in Paragraphs 136-139. Other information, such as Brda's involvement in the merger between Metamaterial and Torchlight and compensation that he received discussed in Paragraphs 141-43, was also confirmed in public records such as Torchlight's proxy statement for the merger and annual reports file with the SEC. Thus, the case at bar is not like *Brooks* where the attorneys engaged in "wholesale incorporation" of allegations into their complaint without any independent investigation.

## CONCLUSION

Plaintiffs respectfully request that Brda's motion be denied in its entirety for the reasons set forth above.

[6] Brda's reliance on *Amorosa v. GE*, No. 21-CV-3137 (JMF), 2022 U.S. Dist. LEXIS 149234 (S.D.N.Y. Aug. 19, 2022), fails for the same reason. In that case, the plaintiff similarly attempted to rely on a consent agreement memorializing a settlement while conducting little, if any, additional independent investigation.

DATED: September 14, 2026

**MOSES, PALMER & HOWELL, L.L.P.**

/s/ Shayne D. Moses
Shayne D. Moses
State Bar No. 14578980
smoses@mph-law.com
David A. Palmer
State Bar No. 00794416
dpalmer@mph-law.com
Fort Worth Club Building
306 West 7th Street, Suite 504
Fort Worth, Texas 76102
Tel.: (817) 255-9101
Fax: (817) 255-9199
Email: smoses@mph-law.com

**LEVI & KORSINSKY, LLP**
Adam M. Apton (*admitted pro hac vice*)
33 Whitehall Street, 27th Floor
New York, NY 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Lead Plaintiffs and Lead Counsel for the Class*